<pre>
 1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
 2                  MIDDLE DISTRICT OF FLORIDA


 3                            - - -
 4              HONORABLE ANTHONY E. PORCELLI
           UNITED STATES MAGISTRATE JUDGE PRESIDING
 5                            - - -

 6   Cin-Q AUTOMOBILES, INC.,   )
                                )
 7          PLAINTIFF,          )
                                )
 8   VS.                        ) NO. 8:13-cv-1592-AEP
                                )
 9   BUCCANEERS LIMITED         )
     PARTNERSHIP,               )
10                              )
            DEFENDANT.          )
11   _____)
                                )
12   TECHNOLOGY TRAINING        )
     ASSOCIATES,                )
13                              )
            PLAINTIFF,          )
14                              ) NO. 8:16-cv-1622-AEP
     VS.                        )
15                              )
     BUCCANEERS LIMITED         )
16   PARTNERSHIP,               )
                                )
17          DEFENDANT.          )
     _____)
</pre>

18                            **EVIDENTIARY HEARING**

19                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                          **OCTOBER 20, 2016**
20                         TAMPA, FLORIDA

21

22

                 MELISSA A. PIERSON, CA CSR 12499,
23                    IL CSR 084.003138, RPR
                  FEDERAL OFFICIAL COURT REPORTER
24               801 N. FLORIDA AVENUE, 2ND FLOOR
                     TAMPA, FLORIDA 33602
25                  PH:  (813)301-5336
                    USDCtranscripts@gmail.com

1    **APPEARANCES OF COUNSEL:**

2    ON BEHALF OF PLAINTIFF TECHNOLOGY TRAINING ASSC:

3            BOCK LAW FIRM, LLC
             BY:  MR. DANIEL J. COHEN, ESQ.
4            BY:  MR. PHILLIP A. BOCK, ESQ.
             BY:  MR. DAVID M. OPPENHEIM, ESQ.
5            BY:  MR. TOD A. LEWIS, ESQ.
             134 N. LASALLE STREET
6            ST. 1000
             CHICAGO, IL 60602
7            (312) 658-5555
             office@bockhatchllc.com

8

9    ON BEHALF OF DEFENDANT BUCCANEERS LIMITED PARTNERSHIP:

10           LATHAM & WATKINS, LLP
             BY:  MR. MARK S. MESTER, ESQ.
11           BY:  MS. KATHLEEN P. LALLY, ESQ.
             330 N. WABASH AVENUE
12           ST. 2800
             CHICAGO, IL 60602
13           (312) 993-2639
             http://www.lw.com

14
             HOLLAND & KNIGHT, LLP
15           BY:  MR. JOSEPH H. VARNER, ESQ.
             100 N. TAMPA STREET
16           ST. 4100
             TAMPA, FL 33602
17           (813) 227-8500
             https://m.hklaw.com

18
             DAVID S. COHEN, ESQ.
19           TAMPA BAY BUCCANEERS
             1 BUCCANEER PLACE
20           TAMPA, FL 33607

21

22

23

24

25

1                        **I N D E X**

2

3    **Court's Exhibits**                                    **ADM**

4        Exhibit No. 1                                    24
         Exhibit No. 2                                    24
5        Exhibit No. 3                                    24
         Exhibit No. 4                                    29
6        Exhibit No. 5                                    29
         Exhibit No. 6                                    29

7

8

9

10   **WITNESS:**

11   **Phillip A. Bock**

12       Examination by The Court:                         9
         Examination by Mr. Cohen:                        42

13

14

15   **David M. Oppenheim**

16       Examination by The Court:                        47

17

18

19

20

21

22

23

24

25

```
 1                    TAMPA, FLORIDA; OCTOBER 20, 2016

 2                           - - -

 3              (COURT IN SESSION AT 10:13 A.M.)

 4                         *   *   *

 5              MADAM CLERK:  Technology Training Associates vs.

 6    Buccaneers Limited Partnership, 8:16-cv-122-AEP.

 7              THE COURT:  Counsel state your appearances for the

 8    record, please.

 9              MR. COHEN:  Daniel Cohen of the Bock Law Firm on

10    behalf of Technology Training Associates, et., al.

11              THE COURT:  Thank you, Mr. Cohen.

12              MR. BOCK:  Phil Bock for the same parties.

13              THE COURT:  Thank you, Mr. Bock.  Good morning.

14              MR. OPPENHEIM:  David Oppenheim for Bock Law Firm.

15              THE COURT:  Thank you, Mr. Oppenheim.

16              MR. MESTER:  Good morning, your Honor.  Mark Mester

17    for the Buccaneers.

18              THE COURT:  Thank you.  Good morning.

19              MS. LALLY:  Good morning, your Honor.  Kathleen

20    Lally for the Buccaneers.

21              THE COURT:  Good morning.

22              MR. VARNER:  Good morning.  Joe Varner for the

23    Buccaneers.

24              THE COURT:  Good morning.

25              MR. D.S. COHEN:  Good morning, your Honor.
```

1    David Cohen for the Buccaneers.

2            THE COURT:  All right.  Good morning.

3            I know we have requested interveners present in the

4    well in the back, and you don't need to announce on the

5    record, but I will just note that for the record.

6            This matter was scheduled sua sponte by the Court

7    wanting to conduct an inquiry regarding potential for any

8    conflict of interest regarding proposed counsel for the

9    settlement as proposed in this potential Class.

10           I'll note a couple additional things for the

11   record.  There has been a supplemental authority that was

12   provided in the record yesterday regarding the injunctive

13   relief sought before Judge Honeywell in which the Court

14   denied the injunctive relief.  I'll note that for the record

15   filed in this case at Document No. 47.  That was in case

16   No. 16-cv-1622 before Judge Honeywell.

17           Additionally, I'll note the brief that was filed at

18   Document No. 46.  I've reviewed the brief, as well as the

19   attachments to the brief, which included the transcript

20   before Judge Honeywell for the preliminary injunction.

21           Having said that, I have additional questions

22   beyond what was explored for the preliminary injunction, as

23   well as I see it is a different -- although the issues are

24   substantially similar, there are still different issues I

25   must resolve before we go forward.

1          So let me just start off then, Mr. Cohen, are you

2     going to make the presentation of the witnesses?

3          MR. COHEN:  Judge, to the extent the Court desires

4     that, yes.  And I only say that because going over my notes

5     the Court had indicated it would have questions.  So I didn't

6     know whether the Court would start the interrogation.

7          THE COURT:  Well, let's not call it interrogation.

8     How about just an examination.

9          MR. COHEN:  I didn't mean that.

10          THE COURT:  I hope no one feels that.

11          Well, let's -- let me just ask this, because if

12     there is something that you would like to put on the record

13     first, then fine.  I do have my own independent questions.

14     So I was going to give you the opportunity.  But, I have

15     reviewed the entirety of the transcript in the preliminary

16     injunction, so if it was simply matters that you wanted to

17     cover that were previously covered there, there is no need,

18     but if there is something beyond that you want to explore

19     with the witnesses, you may do so.

20          MR. COHEN:  Judge, I think we had told the Court

21     long ago we were interested in transparency, and so -- may I

22     approach the lectern?

23          THE COURT:  You may.

24          MR. COHEN:  I hope we have extra copies of this.

25     In going through everything, we don't find anything that is

1    troubling, disturbing or anything else about anything.

2         There is one email chain that is not necessarily

3    flattering, but we don't think it has any bearing on any

4    issues in this case or in settlements.  But in the goal of

5    full disclosure and candor we wanted to bring it to the

6    Court's attention.

7         It is an email chain on April 29th, of 2016.  And

8    so the Court may understand its context, Bock Law Firm works

9    as co-counsel with the Anderson & Wanca Law Firm in many

10   class actions.  In fact, we still do at this time.  And on

11   April 29th, an issue came up in a separate and distinct class

12   action called *Ross vs. Rogan* -- *Ross Good vs. Rogan Shoes*,

13   where the parties were trying to agree on a mediator.  And

14   one of the mediator's the parties seemed to agree on was

15   Wayne Anderson.  And then Mr. Wanca expressed that he was not

16   okay with Wayne Anderson.  At this point, April 29th,

17   Mr. Oppenheim already is employed at Bock Law Firm.  And when

18   Phil Bock became aware that there was a problem with Wayne

19   Anderson, he asked Mr. Oppenheim what the problem was because

20   we've used Wayne Anderson before.  And at that point

21   Mr. Oppenheim expressed to him that it was probably that

22   Mr. Wanca was dissatisfied with Mr. Anderson's performance in

23   the Cin-Q/Buccaneers mediations because Mr. Wanca had some

24   goal of a record setting settlement, and he didn't think

25   that Mr. Anderson was doing a good job.  And I'm summarizing

1    the exact words in the text, which will speak for themselves.

2            In the dialogue between Mr. Bock and Mr. Oppenheim

3    after that, Mr. Bock expressed his views of Mr. Wanca's

4    settlement methods, and he, at some point, expressed the view

5    that Mr. Oppenheim would be doing the Class a service if he

6    found a client, and he went ahead, and he prosecuted and

7    settled the Buccaneers class action.  At all times,

8    Mr. Oppenheim remained very neutral in his responses.

9            And at the end of the email chain between Mr. Bock

10   and Mr. Oppenheim, Mr. Bock, later that afternoon,

11   communicated with myself and Tod Lewis, another attorney in

12   the firm, and he said, "Hmmm, Brian holding out for a record

13   settlement in an uncertified case, not that the latter part

14   is so relevant.  We could find a Plaintiff and approach the

15   Defendant about settling.  LOL.  Lots of laughs."

16           We're bringing this to the Court's attention

17   because out of everything that exists and everything that

18   transpired, there is nothing, and this is the only thing that

19   we would think that the lawyers at the Wanca firm would want

20   to know about and we would certainly think the Court would

21   want to know about.  So I have a copy here, if I may?

22           THE COURT:  You may approach, yes.

23           MR. COHEN:  Thank you.

24           THE COURT:  The whole string is on April 29th?

25           MR. COHEN:  I believe it is, Judge.

1      THE COURT:  All right.  Mr. Bock, if I could start

2  with you, then, and I just ask, and I apologize for the

3  inconvenience, but it will just make it simpler if you just

4  come to the witness stand so we can do it that way, and I'm

5  going to ask my courtroom deputy to place you under oath.

6      MR. BOCK:  Where is it?

7      MADAM CLERK:  Right there.  Watch your step.

8  Please face me and raise your right hand.

9      THE WITNESS:  I do.

10 (Witness sworn.)

11     MADAM CLERK:  Have a seat, please.  I'll ask you to

12 state your name for the record, and spell your last name,

13 please.

14     THE WITNESS:  Phillip A. Bock, B-O-C-K.

15     THE COURT:  All right.

16                    **PHILLIP A. BOCK**

17 Called as a witness herein, having been first duly sworn

18 was examined and testified as follows:

19                     **EXAMINATION**

20 BY THE COURT:

21 Q.   Mr. Bock, so that is actually very helpful because I did

22 have some questions regarding what I would call the

23 "triggering event" as to when your firm decided to pursue a

24 litigation.  As I understand your prior testimony, you

25 indicated it occurred sometime around April 18th, in a

1   conversation with Mr. Addison.  Do you recall that testimony?

2   **A.**   I do recall that testimony.

3   **Q.**   All right.  So, if you can, elaborate on that.  What was

4   the significance of that event to you?

5   **A.**   Well, if I could back up a little bit.  In 2009 and

6   2010, Mr. Wanca and I had talked about filing a TCPA case

7   against the Buccaneers for junk faxes and exchanged emails

8   with Mike Addison about that.  Mike Addison said he'd file

9   the case, or something, and we were going to join that.  And,

10  I didn't hear anything further of it, and we were super busy

11  with literally hundreds of class actions.  And around the end

12  of 2011, this opinion came out from the 7th Circuit in

13  *Ashford Gear*, and at the time we had maybe 100 of these cases

14  on file with this Business-to-Business Solutions, and my firm

15  took it upon ourselves to dedicate the next year digging out

16  of that hole all around the country, and you know, frankly we

17  won everywhere.  We were able to make Anderson & Wanca be

18  Class counsel with us in most cases.  We were never accused

19  of doing anything wrong.  They were.  We argued that they did

20  nothing wrong.  We convinced most Courts that they did

21  nothing wrong.  All the Courts agreed we could be Class

22  counsel.  Most agreed they could also be Class counsel.

23  While that was happening, Mr. Wanca was filing all kinds of

24  cases without me.  We'd been in a joint venture for TCPA

25  cases for years, since, like, 2003.

1          So, fast forward to maybe 2013, and I'm getting

2     alerts, you know, Google news alerts or whatever about class

3     actions and I see that they filed one against the Buccaneers,

4     apparently we're not in it.  Well, I don't have any

5     plaintiffs.  I don't have the transmission reports that they

6     had found in one of our -- I think, in one of our joint

7     cases, just like in *Ashford Gear*.  Mr. Good told me at the

8     Christmas party at the end of 2011, that they had obtained

9     another hard drive that was going to be even better than the

10    Caroline Abraham hard driving B to B.

11          And I was a little distracted cause Judge Posner

12    had just issued an opinion naming only my firm and saying we

13    were scumbags, and that was like the end of Thanksgiving

14    break or something like that.  Like I said, we didn't do

15    anything wrong.  We weren't even accused of doing anything

16    wrong except Judge Posner said, "Class counsel, primarily

17    attorneys from Bock & Hatch are bad people."

18          My point is I don't know where they got the

19    transmission records for this case, but reviewing the case

20    they basically had the transmission records and then they

21    went and started taking depositions manned by two or three

22    attorneys, and sort of built the case, and kind of made it

23    worse by proving that the Buccaneers had some pretty good

24    excuses about people, and aliases, and all this stuff,

25    tricking them, and convincing them that that's legal or

1   whatever.

2         So, the whole time I just didn't have a Plaintiff.

3   I didn't have the transmission records, and how can you file

4   a case when you don't even know who's in the class.

5         So, April 18th -- so, along the way -- and

6   Mr. Oppenheim never mentioned he worked for Wanca's Wanca's

7   office for a few years, and he knew that there was this

8   tension of, "they were filing cases behind my back and then

9   doing it while I knew it," but he was the lead guy settling

10   them and stuff.  So him and I would spend lots of time in

11   mediations on joint cases and we never mention the cases I'm

12   not in because he knew it would make me very hostile to hear

13   about how they're making money on cases that were primarily

14   my idea, my work.  My firm did all the class cert arguments,

15   briefing, appeals.  I've argued these cases in, like, six

16   different federal appellate courts, for example.

17         Sorry, I get a little angry about this situation.

18   **Q.**   Do you remember the question?

19   **A.**   Yeah.  I'm sorry, your Honor.  April 18th, I go to argue

20   the *Florida First vs. Term Provider* summary judgment in a

21   certified class where I'm co-counsel with Wanca and Mike

22   Addison.  And Mike Addison thinks that's a good time to tell

23   me about his Buccaneers case again.  And I say, "again," he

24   talked about it before in front of me anyway, but I didn't

25   have a Plaintiff.

1      So he says -- he says, "Well, I don't know how the

2  Buccaneers's settlement is going to go.  Wanca is holding out

3  for -- holding out for a bigger fund so we can get bigger

4  fees, and I don't know what's going to happen."  And I said,

5  "I'm not in that case, Mike."  And then, he said something

6  about -- and this is after Oppenheim had switched to my firm.

7  He said something about that, and I think he was trying to,

8  you know, get the juicy story or whatever, and all I said

9  was, "Look, Dave and I worked together for years.  We liked

10  each other.  We decided you might as well come over and work

11  with me."

12      At that time, Dave Oppenheim and I had not

13  discussed filing the Buccaneers case.  We never discussed me

14  filing the Buccaneers case or anything like that.  I sent

15  that email saying, "You know, you should do the right thing.

16  You should file that case and get that case settled and get

17  the Class their money before they lose."

18  **Q.**   I did want to follow up on that.  So, to be clear then,

19  up to April 18th, you had never considered filing a case

20  against the Buccaneers?

21  **A.**   I had considered it, but I didn't have a plaintiff.

22  **Q.**   All right.  Let me rephrase it.  Did you ever do any

23  action to pursue it?

24  **A.**   Not really.  I mean, I sent emails internally and asked

25  people to watch, you know, but, no.

**Q.**   If I understood your prior testimony, it was something
at this April 18th encounter that kindled some interest in
pursuing it?

**A.**   For sure.  Yeah, yeah.

**Q.**   What did you do after that?

**A.**   Well --

**Q.**   Let me be more specific.  Now, in light of the
April 29th email, did you do anything to pursue the
litigation from April 18th to April 29th?

**A.**   No.  No.

**Q.**   All right.  So then, using then, this benchmark email --
the benchmark dated on the email of April 29th, after that
date what occurred?

**A.**   So after that date, um -- let's see -- at some point
around then I became aware that they were not settling the
case.  So even though I should have been included in the case
I didn't -- I wasn't actively going to file it because
somebody else was doing it in front of your Honor.  But then
when -- I think I knew -- actually, I think I knew before
April 29 that the Buc's had filed a motion for a settlement
conference.  Because I get these alerts from Law360.  And I
know I got -- I'm sorry.  I'm trying to remember.  I got a
Law360 alert that they had filed a class cert motion, and at
some point I knew that the Buc's filed something asking for a
settlement conference.  And sometime after April 29th -- I

1    guess on April 29 is when I told the other guys in my office,

2    "Hey, maybe we should do one of these cases then."  And I was

3    still, sort of, not thinking about actively doing it, but it

4    was in my head, and I don't know, a couple hours later I was,

5    like, "Yeah, why don't we do it?"  So I just pulled up the

6    class cert motion.  There's a Biggerstaff report.  He's been

7    our expert in hundreds of cases.  He says, "Here's all the

8    people who got them."

9    **Q.**   Let me slow you down.  If you could just give

10   Mr. Biggerstaff's name for the record.

11   **A.**   I'm sorry.  Robert Biggerstaff.

12   **Q.**   All right.  So he was the expert used in the underlying

13   Cin-Q litigation?

14   **A.**   Yes.

15   **Q.**   And so you reviewed the report on ECF, Mr. Biggerstaff's

16   expert report?

17   **A.**   Yes.  I just pulled the -- yes.  I pulled the

18   Plaintiff's class cert motion.  That was attached.  I looked

19   at his list, and he has a list of all the fax numbers that

20   receive the faxes from the Buccaneers according to the

21   transmission records and then I looked, and we have

22   plaintiffs in Tampa.  I sent marketing letters and that sort

23   of thing to find clients, and find plaintiffs for class

24   actions for junk fax cases.  And so, I just took -- I just

25   put together a little list with Tod Lewis and Jim Smith of my

1   firm of, "Who do we know in that area?  What's their fax

2   number?"  And I looked and I was like, "Hey, here's some

3   people who have already, like, told us they want to do junk

4   fax class actions and they are on the list."

5   **Q.**   So let me take it step-by-step.  So you pulled the

6   report, and I think your testimony in redirect during the

7   preliminary injunction was that you, essentially, OCR'd the

8   report, is that correct?

9   **A.**   Um, yes.  Yeah.  Yeah.

10  **Q.**   And how long did that process take?

11  **A.**   Um, ten minutes.

12  **Q.**   Not a very long process, right?

13  **A.**   Right.

14  **Q.**   There is about 131,000 numbers -- in excess of 131,000

15  numbers on that report, correct?

16  **A.**   I think so.  I thought it was 101,000 and 330,000 faxes

17  or something like that.  Around 100,000.

18  **Q.**   Around 100,000?

19  **A.**   Yes.

20  **Q.**   What was the process you did then, to identify numbers

21  that you had information about on that report?

22  **A.**   Um, I just looked for, um, plaintiffs that we had in,

23  sort of, our staple of plaintiffs.

24  **Q.**   What do you mean by that?

25  **A.**   I looked for their fax numbers.

1    **Q.**   What do you mean by that?

2    **A.**   Technology Training Associates has fax numbers.  I know

3    what they are.  I searched for them in the Biggerstaff

4    transmission list.

5    **Q.**   But you have represented TTA in other cases?

6    **A.**   No.  Before that we hadn't filed any cases for them, but

7    I had talked to them.  They had responded to a marketing

8    letter that I sent before Oppenheim changed firms or

9    anything.  That was in marketing.  I think I sent some

10   marketing letters.

11   **Q.**   And what was the purpose of the marketing letter?

12   **A.**   The marketing letter was to find people who -- well,

13   everybody receives these junk faxes.  Find people who receive

14   them and want to do something about it, want to be a class

15   representative and pursue claims about them.

16   **Q.**   When you say, "these junk faxes," are we specifically

17   talking about faxes from the Buccaneers, or just in general

18   junk faxes?

19   **A.**   I'm sorry, your Honor.  In general.

20   **Q.**   All right.  So just a general marketing that if you've

21   received an unauthorized fax, if you want to do something

22   about it, contact the firm?

23   **A.**   Yes.

24   **Q.**   And so, if I understand your testimony, both TTA and

25   Dr. -- is it Schwanke?

**A.**    Yes.

**Q.**    -- Dr. Schwanke responded to that solicitation?

**A.**    Yes.

**Q.**    As part of that solicitation was it just like a form
they sent back with their information or you actually had
client contact with them?

**A.**    Well, I did have client contact with them.  So what
happens is I wrote a marketing letter, had it approved by the
Bar, sent that out, and then people -- and at the bottom it
says, "If you want somebody to contact you, put your name,
and phone number, and email address or something."  And these
are people who did that.

             MR. COHEN:  Your Honor?

             THE COURT:  Yes.

             MR. COHEN:  We have copies of the actual
E-marketing solicitation letters for Technology Training
Associates and Dr. Schwanke.  The copies that showed the date
they went out as a solicitation, and the dates they came
back, if the Court would like to see them?

             THE COURT:  Yes, if you can pass that up.  Bear
with me one moment, Mr. Bock.

(Court peruses document.)

BY THE COURT:

**Q.**    So I see on the form that's provided there is where they
can say they want to be contacted, and they do provide you a

1    number and the email address for contact purposes?

2    **A.**    Yes.

3    **Q.**    And so, if I understand your testimony then, at some

4    point someone in your firm contacted both TTA and

5    Dr. Schwanke?

6    **A.**    Yes.

7    **Q.**    And that would have been prior to April 29th?

8    **A.**    I don't remember.

9    **Q.**    Let me rephrase it this way.

10   **A.**    It would have been me, and I can't remember the date

11   that I first called them.  I try to call those people within

12   the first few days of them returning one of those letters.

13   **Q.**    I'll rephrase it this way.  If I understand you, you

14   would have had their fax numbers?

15   **A.**    Yes.

16   **Q.**    And you were checking it against the report -- the

17   expert report in the Cin-Q case, is that correct?

18   **A.**    Yes.

19   **Q.**    To be clear, again, you OCR'd the documents and then

20   just simply did a find within the document, is that correct?

21   **A.**    Yes.

22   **Q.**    How many numbers did you go through before you wound up

23   locating these two clients's numbers, fax numbers?

24   **A.**    Um, I think -- I think Schwanke -- one of them was,

25   like, the first one that I searched.  There was another

1   couple three people who -- you know, other people could have

2   been plaintiffs in the case that I spoke to, but -- I don't

3   remember searching for anybody and not finding it but maybe I

4   did.  I mean, it was like every fax number in Tampa or

5   something like that.

6   **Q.**   Do you recall if that all happened on the same date of

7   April 29th?

8   **A.**   I think it was the -- April 29th, I think, was a Friday?

9   **Q.**   Yes.

10  **A.**   I think I did this on Saturday morning.

11  **Q.**   All right.  So the following day?

12  **A.**   Exactly.

13  **Q.**   And who helped you with the process?  Was it Mr. Lewis

14  and Mr. Smith?

15  **A.**   Yes.

16  **Q.**   Was there anyone else involved with that process?

17  **A.**   No.  Dan Cohen was copied on -- I think him and I talked

18  and he had some emails, but he wasn't doing that stuff.

19  **Q.**   All right.  Tell me what you did next after you

20  identified TTA and Dr. Schwanke on the list?

21  **A.**   Then I contacted them to see if they were interested in

22  doing this.

23  **Q.**   And would that have been when, the following week?

24  **A.**   Yes, if it wasn't that Saturday or something.  I don't

25  remember the date.  But it would have been -- it would have

1   been Monday or Tuesday, something like that.  The next week

2   for sure.

3   **Q.**   All right.  What was the nature, without getting into

4   privileged information but, in essence, what was the nature

5   of the conversation?

6   **A.**   The essence was --

7   **Q.**   Let me rephrase it.

8   **A.**   Yeah.

9   **Q.**   Because I want to tread carefully on these questions.

10  **A.**   Okay.

11  **Q.**   How did you confirm independent of the list the expert

12  report that they received a fax from the Buccaneers?

13  **A.**   I didn't.

14  **Q.**   Have you ever done that at any point?

15  **A.**   Well, I have because Dr. Schwanke had kept a big giant

16  pile of junk faxes for the years preceding and he actually

17  has one of the ones he received.  We have the original fax

18  that he received from the -- you know, these broadcasters

19  back in -- it was either '09 or 2010.

20  **Q.**   How big is that box?

21  **A.**   Well, it went to Chicago, but, yeah.

22  **Q.**   How big is his collection of junk faxes?

23  **A.**   I think it was 7 or 800 pages or something like that.

24  **Q.**   All right.  So that's why I wanted to confirm.  You are

25  saying Dr. Schwanke had one of the original -- alleged

1   original faxes sent to him?

2   **A.**   Yeah, he does.

3   **Q.**   All right.  What about TTA?

4   **A.**   TTA did not.

5   **Q.**   The attachments to the complaint -- to the complaint

6   originally filed in this action, where did those attachments

7   come from?

8   **A.**   From that Biggerstaff report, I think.  I think so.  I

9   think he attaches a copy of all the exemplar faxes.  So I

10  just attach that as the exhibit to the complaint.

11  **Q.**   So I understand that essentially, you downloaded the

12  document from the Cin-Q matter and then just cut-and-paste

13  those attachments?

14  **A.**   Yes.

15  **Q.**   All right.  Was any of the faxes -- and that's why I'm

16  asking because I don't recall -- as an attachment from

17  Dr. Schwanke, was that an attachment at all in any way?

18  **A.**   No.  We didn't attach that one.

19  **Q.**   All right.  The -- the matter -- just in general, and

20  you've already testified previously about this, but I just

21  want to lay this foundation first.  It's clear you do these

22  types of cases throughout the country, is that a fair

23  statement?

24  **A.**   Yes.

25  **Q.**   Hundreds of these types of TCPA cases?

1   **A.**   Yes.

2   **Q.**   And so, you handle them mainly in class action

3   (inaudible), is that correct?

4   **A.**   Only -- yeah, only in -- they are only class actions

5   until a Judge says they're not.

6   **Q.**   So when you meet with a potential class representative,

7   do you discuss the potential, not whether it's a certainty,

8   but the potential of an incentive award with the potential

9   class rep?

10  **A.**   Yes.  Yeah, we put something on our retainer agreement

11  that says, "You know, you're not going to get anything more

12  than everybody else, but the Court can decide to award.  It's

13  totally up to the Court, and we will ask the Court if it's

14  appropriate," or something like that.  It might even say it

15  in those marketing letters.  I don't remember.

16  **Q.**   But to be clear, you specifically advised that there is

17  no certainty or guarantee of an incentive award?

18  **A.**   Right.  Yes.

19  **Q.**   But you explain there is an opportunity for such an

20  award, is that accurate?

21  **A.**   Yeah.  Well --

22  **Q.**   The potential opportunity.

23  **A.**   Well, yeah, yeah.  I mean, otherwise --

24  **Q.**   Sorry, Melissa.

25  **A.**   Otherwise nobody does that.  Just like plaintiff's class

1    action lawyers don't want to do the cases if they can't make

2    fees, but there is no guarantee and everything else.

3              MR. COHEN:  Your Honor, if I may, we do have an

4    exemplar retainer that is used --

5              THE COURT:  All right.  If you can pass that up.

6    Thank you.

7    BY THE COURT:

8    **Q.**   What I'm going to do, just for the record, the

9    April 29th email, I'm going to admit that into the record as

10   Court Exhibit No. 1.  The solicitation letters as Court

11   Exhibit No. 2, and then the retainer agreement.  Is there any

12   concern about any of this being on the public record,

13   particularly the retainer agreement?

14   **A.**   Well, your Honor, real quick, the retainer agreement,

15   that's for a different case.  I didn't have the foresight to

16   bring the ones that were signed by these two plaintiffs.

17   **Q.**   What I'll do is I'll allow you to redact out just the

18   case information and the names, you can black that out.  So

19   we can handle that after the hearing, and then, just submit

20   that as Court Exhibit No. 3.  The purpose is just the general

21   language of the incentive award, is that accurate?

22   **A.**   Yes.  And also -- but also, that's one that we have with

23   Mr. Wanca's firm.

24   (Court's Exhibit Nos. 1, 2, and 3

25   admitted into evidence.)

BY THE COURT:

**Q.**   Okay.  I understand.  All right.  So after communicating
with TTA and Dr. Schwanke, when was it definitively decided
to go ahead and pursue a separate action against the
Buccaneers?

**A.**   I don't remember the date, but pretty soon because I
would have pulled the class motion and the bigger staff
report, I think, on Saturday morning, and then I reached out
to some of these people, including Schwanke and TTA, probably
at the beginning of the week, and then when they said they
were -- I think -- I think TTA said he was interested first.
So, I can't remember.  Um, yeah, I think they said they were
interested first.  So then, I think the first case we filed
was only them as the Plaintiff, but I can't remember.  But
right away.  Right away, and then, Tod Lewis -- I told Tod
Lewis, "All right.  Here's some people who want to be
plaintiffs.  Let's get the complaint drafted."  He drafted
the complaint.  I think we filed it on a Friday.

**Q.**   All right.  So let's start there with Mr. Lewis and that
really was the purpose of my question.  At some point you
decided we're going to draft the complaint?

**A.**   Yes.

**Q.**   Were there any communications with Mr. Oppenheim about
the intent to pursue the litigation?

**A.**   Absolutely not.

Q.   As I understood your prior testimony, essentially, you were walling off Mr. Oppenheim.  Is that a fair statement?

A.   Yes.

Q.   So then why not communicate to him, tell him that you were going to pursue this litigation and that he should stay away?

A.   Well, I did tell him that after I -- you know, I filed the case on, like, a Friday, and on Saturday I sent an email to everybody in the office except Oppenheim, and said, "Don't -- nobody mention any of this stuff," and then, I sent him a text message that said, "Oh, by the way, I filed a case against the Buccaneers.  You're walled off," and something like, "That if people treat you like you have the plague or something, don't take it personally."  But I don't -- I don't -- I didn't think about notifying him that I was planning to file one or something like that.

Q.   Did you get to be present for Mr. Oppenheim's testimony during the preliminary injunction?

A.   Yes.

Q.   Do you recall him testifying that he was completely unaware of the litigation until he received an electronic notice about the litigation?

A.   Yes.

Q.   So how do you reconcile that?  If you had informed him after filing it with a text message and email, why would he

1    have not known about it until getting an electronic filing

2    from the Court?

3    **A.**    No -- he got the electronic filing from the Court.  He

4    didn't say anything to me.  I think the case was filed on

5    Friday, and the -- we had set up the or -- I hadn't.

6    Somebody at my office had set up my ECF with the Fl -- Tampa,

7    to be to me, but also to "office" or something like that.  So

8    he just got it because everybody else got it.  So he actually

9    got a notification that the case was filed, probably whenever

10   the Clerk did it, and I didn't know that.  I think I saw that

11   I got it.  The next morning is when I sent him a text and I

12   sent everybody else an email.  I think the next morning he

13   says, "Yeah, I got that notice," or something like that.

14   **Q.**    I apologize.  One moment.  I apologize for my ignorance

15   on this.  I'm not familiar if the State system has electronic

16   filing.  So --

17   **A.**    Tampa does.

18   **Q.**    Tampa does.  All right.  So the complaint was filed on

19   May 6th.

20   **A.**    Okay.

21   **Q.**    So explain to me then, if -- we're talking in the

22   beginning of May, prior to May 6th, what was the delay to

23   inform Mr. Oppenheim about the pursuit of the litigation?

24   Why not tell him immediately?  Because as you recognize,

25   there was a potential, you wanted to avoid any, even

1    accusations of potential conflict, why not, not only tell

2    everyone else in the firm to wall him off, why not simply

3    tell Mr. Oppenheim?

4    **A.**   You mean before I filed the complaint?

5    **Q.**   Yes.

6    **A.**   When I was "drafting" it?

7    **Q.**   Yes.

8    **A.**   I don't know.  I didn't think about it.  We just didn't

9    copy -- we didn't include him in the conversations.  We did

10   keep it a tight, like, one paralegal and two or three

11   attorneys, one, two, three, four attorneys, plus me.  But not

12   him.  We had -- so we just, in fact, walled him off, screened

13   him off.  He wouldn't have had any opportunity to see or

14   know, I don't even know if he was in town.  It's possible he

15   was on vacation.  I can't remember.

16             MR. COHEN:  Judge, if I may, we have documents

17   contemporaneous with these events.

18             THE COURT:  All right.  Please.

19             MR. COHEN:  I'm handing the Court an email from

20   Mr. Bock to the office advising of the filing of the

21   Buccaneers case, and that Mr. Oppenheim is to be walled off.

22             We also have --

23             THE COURT:  One moment.  For the record, that's a

24   Saturday, May 7th, email.  I'll admit that as Court Exhibit

25   No. 4.

1          MR. COHEN:  Thank you, Judge.

2    (Court Exhibit No. 4

3    admitted into evidence.)

4          MR. COHEN:  We also have a screen shot of a text

5    message from Mr. Bock to Mr. Oppenheim on Saturday, May 7th,

6    at 10:38 a.m., saying, "I filed a case against Buccaneers and

7    asked everyone to leave you out of it.  So if everybody is

8    staring at you like you are infected, that's what it is.

9    Please keep confidential."

10         THE COURT:  All right.  That will be entered as

11   No. 5.  Thank you.

12   (Court's Exhibit No. 5

13   admitted into evidence.)

14         MR. COHEN:  And finally, Judge, relating to this

15   discussion of Mr. Oppenheim receiving electronic notice of

16   our filing, um, presumably because Mr. Oppenheim already knew

17   by the time Mr. Bock told him, Mr. Oppenheim sent to

18   Mr. Bock, if I'm interpreting this email correctly, the email

19   that Mr. Oppenheim had received electronically from the Court

20   system the afternoon before.

21         THE COURT:  All right.  That will be No. 6.  Thank

22   you.

23         MR. COHEN:  Thank you, Judge.

24   (Court Exhibit No. 6

25   admitted into evidence.)

1          THE WITNESS:  And your Honor --

2    BY THE COURT:

3    **Q.**   Yes.

4    **A.**   If I could add to my answer.  Your question was, "Why

5    didn't I screen him off earlier?"  It was because I never

6    thought that he actually had a conflict.  I had been through

7    this before.  This -- I've been doing class actions a long

8    time, and I have encountered the same issue where people file

9    case -- a new case, they file a competing case, somebody

10   who's -- I had a case certified nationwide class in Madison

11   County, Illinois, affirmed by the Appellate Court.  The

12   Supreme Court didn't take it.  The US Supreme Court doesn't

13   take it.  One of the three people appointed class counsel

14   files a new case out in New Jersey and they settled the case

15   out there, and everything -- there was no conflict.  There

16   was no -- there was no problem, because the class action

17   lawyers represent the Class, not some person who received a

18   junk fax, or paid an early termination fee on a cell phone or

19   whatever.  It's all about the whole Class.

20          So I didn't really think about it from a

21   conflict/ethics point.  It was, "Keep Dave out of it because

22   his former employer is going to have a cow about this."  You

23   know what I mean?  I don't want to sound flip, your Honor,

24   but it wasn't -- I don't believe Dave Oppenheim knows

25   anything that is secret, or useful or anything else.  There

1    was a whole big giant pile of faxes sent.  Somebody has the

2    records.  Mr. Biggerstaff attached 'em, and that's it.  The

3    question is how much liability could the Buccaneers have for

4    all of those faxes, but beyond that there's not really any

5    secrets.  This isn't a case -- it's not that kind of case,

6    you know.

7    **Q.**   Well, let me ask you then, going forward then, when the

8    complaint is filed, did you contact the Buccaneers prior to

9    filing of the complaint or after the filing of the complaint?

10   **A.**   After.  And it wasn't me.  When you say, "you," I

11   understand that to be the, "firm."

12   **Q.**   Sure.  All right.  So that was going to be my next

13   question.  Who was involved with that process?

14   **A.**   That was Dan Cohen and Jonathan Piper.

15   **Q.**   Do you know when the first contact was with the

16   Buccaneers?

17   **A.**   I -- well, I know because they told me that it was the

18   day -- it was after we filed the complaint.

19   **Q.**   So May 7th.  I don't want to confuse things.  The

20   Friday -- to help you with the dates, April 29th was the

21   email, Exhibit No. 1, is a Friday, the following Friday is

22   May 6th.

23   **A.**   Okay.

24   **Q.**   May 7th would have been a Saturday.

25   **A.**   Okay.  So, I think they either called Mr. Mester at the

1   end of the day on Friday, or sometime over the weekend or

2   first thing Monday morning, but I'm not sure.

3   **Q.**   All right.  And were you informed, based upon that

4   communication -- well, let me rephrase it.  When were you

5   informed that the Buccaneers were willing to engage in

6   settlement discussions?

7   **A.**   When Mr. Cohen told me after he had spoken to

8   Mr. Mester, but I don't know if it was the first time or

9   maybe he spoke to him a couple of times.  I don't remember,

10  but that was the first time I had heard of it, so when

11  Mr. Cohen.

12  **Q.**   Do you recall how soon after, when you had this

13  conversation, learning that they would engage in settlement

14  discussions, how soon that was from the complaint being filed

15  on May 6th?

16  **A.**   A few days, probably.  Within a week.

17  **Q.**   And as you recall, there was some issues going on about

18  whether the settlement was going to go forward, the

19  settlement discussions, that is.  I want to actually just

20  fast forward to the settlement discussions themselves.  Do

21  you recall when that took place?

22  **A.**   The first mediation session?

23  **Q.**   Yes.

24  **A.**   I believe it was on -- no.  May 19th?

25  **Q.**   All right.  So mid May, is that better for you then?

1    **A.**    Yeah.

2    **Q.**    Around May 19th.  Who attended on behalf of the Bock

3    Firm?

4    **A.**    Well, it was myself -- it was me, and Dan Cohen,

5    Jonathan Piper, another attorney named Jan Smith, and then,

6    Mike Higgins, who is the president of TTA.

7    **Q.**    What information were you armed with going into the

8    settlement discussions?

9    **A.**    The number of faxes that they sent, or that were

10   successfully sent.

11   **Q.**    And what sources of other -- let me rephrase that.  Was

12   your only source for that information the Biggerstaff report?

13   **A.**    Yes.  But -- yeah, no.  The people -- let me back up.

14   It was surprisingly a long time ago now.  We did -- we did --

15   we did, before the mediation, pull every single thing from

16   the ECF file in this case, and people read everything, all

17   the depositions, everything was -- you know, memos were

18   prepared, people were talking.  There's a lawyer named Robert

19   Hatch who's in Hawaii.  He was working on it.  Everybody --

20   like, everybody -- all-hands-on-deck, the whole office,

21   everybody except Oppenheim, maybe, I think, his paralegal.

22   We screened him off too.  But five or six attorneys and two

23   paralegals all working to get through all of this, figure out

24   all the legal arguments, what about this, what about that,

25   all of that.  So that when we went to the mediation we knew

1     as much as anybody else knew about the case from the stuff in

2     the public record.

3     **Q.**    Outside the public record was there any other

4     information gathered?

5     **A.**    No.

6     **Q.**    Was Mr. Oppenheim consulted in any way about the

7     mediation process?

8     **A.**    Not in any way.

9     **Q.**    Was he even informed about the mediation taking place?

10    **A.**    Not by anybody at our firm.  You know, what happened

11    was -- I think -- yeah, I think he was informed by maybe Mike

12    Addison or somebody.  Do you know what I mean?  We filed the

13    case -- my thought was we were going to go and have a

14    mediation, and if we could find out if the Buc's were

15    serious, find out if it's a good deal, get the most we could

16    get, get something that's reasonable and appropriate for the

17    Class, and if all of those things happened, then the plan was

18    to come here in front of your Honor and seek approval of that

19    settlement.  Why?  Because you had the case.  You knew

20    everything about it.  I had wanted to use Wayne Anderson to

21    mediate the case.  Why?  Because Wayne Anderson knew

22    everything about the settlement process.

23            But the other attorneys objected, and prevented

24    Wayne Anderson from being willing to do it.  But Dave

25    Oppenheim -- I -- so he knew about it, but I don't think -- I

1    don't think him and I even mentioned about it because right

2    away we knew -- you know, he's screened off.  That's it.

3    Don't talk about it.  I live in Miami Beach.  I don't live in

4    Chicago.  Tod Lewis is in Texas, and Dan Cohen lives in St.

5    Louis.  Robert Hatch lives in Hawaii.  So most of us aren't

6    even in the Chicago office, the people working on this, you

7    know, John Piper and Jim Smith are in Chicago but --

8    **Q.**   When you reviewed the public record, did you feel

9    confident enough that you had an understanding of the nature

10   of the class and the issues at hand in order to engage in

11   settlement?

12   **A.**   Yes.

13   **Q.**   Why is that?

14   **A.**   Because we knew everything, all the depositions, all the

15   transmissions.  They are not that complicated.  You know,

16   these cases are complicated because they are worth a lot of

17   money, and the Defendant pulls out all the stops.  But I've

18   had Judges say, "I don't know why this case is taking three

19   years.  There's a statute.  They violated.  It says how much

20   the damages are.  What's the hold up?"  And then the defense

21   lawyer starts talking about the Constitution, and all this --

22   there's all this -- you can't imagine the litigation that

23   happens in these things, and we read your Honor's opinion,

24   and we knew about that.  Mr. Cohen argued the *Cirrus* opinion,

25   *Cirrus* case.  So we were very familiar with everything -- the

1   whole -- everything that could be happening in the case we

2   knew about all that.  We just didn't have the transmission

3   records, and we didn't take the depositions, but when you

4   read all of those and you have ten-plus years experience

5   doing these cases, that's, you know --

6   **Q.**   The -- are you familiar with the expert report that was

7   filed for my consideration and the memorandum in this case?

8   **A.**   Um, yes.  You mean for today's hearing?

9   **Q.**   Yes.

10  **A.**   Yes.

11        MR. COHEN:  I'm sorry, Judge, just for

12  clarification, Mr. Bock may know, I don't know -- I'm not

13  certain I understand what you are referring to.

14        THE COURT:  I'm going to give you the specifics.

15  I've got to pull it up.

16        MR. COHEN:  Thank you.

17  BY THE COURT:

18  **Q.**   So it's attachment No. 1 of Document No. 46.  It's the

19  Declaration of -- I hope I get the name correct, Chinaris?

20  **A.**   Timothy Chinaris, yes.

21        MR. COHEN:  Thank you, Judge.

22  BY THE COURT:

23  **Q.**   So, and this seems in line, as well, with Judge

24  Honeywell's recent order.  My question to you, though, is,

25  was there ever any concern about information that may have

1    been revealed by Mr. Oppenheim that was known to him based

2    upon the other case that could have been utilize in the

3    pursuit of this action?

4    **A.**    Can you --

5    **Q.**    Well, let me read the rule to you, and then I'll ask it

6    again.  What I'm reading for you is 4-1.9(b), which reads, "A

7    lawyer who has formally represented a client in a matter must

8    not afterwards use information relating to the representation

9    to the disadvantage of the former client.  Except as these

10   rules would permit or require with respect to a client or

11   when the information has become generally known."

12          So my question is were you ever concerned about

13   Mr. Oppenheim revealing something that may be known to him

14   based upon his prior representation in the Cin-Q matter?

15   **A.**    No.

16   **Q.**    The medical malpractice.

17   **A.**    Not in the context of that rule.  You know, I was

18   concerned in the context of, "You're off the case.  Let's not

19   talk about it.  You're out."  But, when you say is there some

20   information that could be used against the client everything

21   else the client is the Class.  I thought that for years since

22   I was taught that in other cases.  When I was arguing, "Well,

23   there's a conflict, and what about this, and we're on the

24   same team?"  And the Judges, and the case law, and the law

25   professor in California I tried to hire as an expert, they

1    all showed me that, no, that's not the case.  The case is

2    that the client is the case.  So I don't know --

3    **Q.**   The Class is the client.

4    **A.**   I'm sorry.  The Class is the client.  I'm sorry.

5    **Q.**   So what happens if the Class is not certified?  Who's

6    the client?

7    **A.**   The client is still the Class in the class action.  It's

8    filed as the class action.  It's filed as "so and so

9    Plaintiff, in their representative capacity on behalf of

10   everybody else."

11   **Q.**   Is it not filed individually and on behalf of the Class?

12   **A.**   That's how it's styled.  I'm not sure why.  But,

13   probably because the person has to identify themselves as a

14   member of the Class.  That's why it says individually, but

15   it's not, "individually or."

16   **Q.**   You may not have experienced this in your class actions,

17   but isn't it true not all Classes are certified?

18   **A.**   It is true, yes.

19   **Q.**   And what happens when a Class is not certified?

20   **A.**   Phil Bock takes an appeal.

21   **Q.**   It's an individual case, is it not?

22   **A.**   It's not.  It's still viewed as a Class action until

23   that's resolved, until the Class stuff is resolved.

24   **Q.**   So I'll ask it again.  If the Class is not certified,

25   even on appeal, what is it?

**A.**   Then it's an individual action.

**Q.**   And the lawyers then just abandon the client at that point?

**A.**   Could they withdraw?  Probably, yes.  I mean, you know, the client hires us on a contingency basis and they are not paying any of the expenses.  The client knows, the client, the named Plaintiff, the representative Plaintiff, I don't think they really think of Phil Bock as their lawyer, you know.  Mike Higgins from TTA he knows this is Class action for the Buccaneers.  He knows we're working for the whole Class.  He doesn't think it's all about Mike Higgins or anything.  He hadn't told -- he hasn't told me anything secret about his business, or some personal injury or whatever.  He's not going to call me up.  I'm not his lawyer. I'm the guy who does junk fax cases.  When I call people I say, "You know, Phil Bock, the junk fax lawyer," and then we laugh and that's what it is.

         So when it becomes an individual case, we try to get the case settled, and try to, you know -- say it's affirmed by the Class cert, denial affirmed by the US Supreme Court, then we say, "All right.  We might as well take the 500 bucks or whatever."

**Q.**   So based on that understanding would it be fair to say then, information that Mr. Oppenheim would have known from the prior mediations, based on your understanding, then that

1    would not have been confidential or privileged information?

2    **A.**    Yes, I agree with that.  Yeah, I think that.  I think

3    Dave Oppenheim should have filed -- he could have filed his

4    own case.  I think he should have been involved in the

5    mediation.  I think Wayne Anderson should have been involved

6    in the mediation.  I don't think it's Medical and

7    Chiropractic's case.  I don't think it's Technology Training

8    Associates case, and if Technology Training Associates says,

9    "We want to do this, or we want to do that," and it was

10   against the Class's interest, I would say, "Well, that's

11   interesting," and I would get a different Plaintiff and I

12   would say, "You know what, you're not in the case any more."

13   And I've done -- we've had that happen in cases with Mr.

14   Wanca where there is some problem with the named Plaintiff

15   being a problem and they are not the named Plaintiff anymore.

16   **Q.**    So would you agree then, information that Mr. Oppenheim

17   had about the prior mediation was valuable?  Would it have

18   been very helpful in the mediation in this case?

19   **A.**    No, not really.

20   **Q.**    Why not?

21   **A.**    Because, you know, what would be -- he never said what

22   they offered, or what the Buc's were willing to pay, or

23   anything like that.  But even if he did, it wouldn't have had

24   anything to do with what we were going to do.

25   **Q.**    Why not?  Wait a minute.  Who would not want to know the

1    prior information?  Why wouldn't that be valuable

2    information?

3    **A.**    Yeah, I don't know -- me.  I don't know why that would

4    be valuable information.  I'm not settling the case based on

5    what they were negotiating or what they were hoping for

6    because I know how Mr. Wanca negotiates settlement.  That's

7    not how I try to negotiate my settlements.

8    **Q.**    But it was Mr. Oppenheim doing the negotiations, was it

9    not?

10   **A.**    That what they said.  I have no idea.  Yes, I would

11   think it would be Dave Oppenheim.  He's their primary

12   negotiator.

13   **Q.**    So if I understand your testimony then, it wasn't -- you

14   didn't confer with Mr. Oppenheim about the mediation

15   information, not based upon any perception of a conflict, but

16   because it just didn't matter to you, is that accurate?

17   **A.**    Exactly.  No offense to Mr. Oppenheim, but we know how

18   to negotiate with the Defense team and figure out exactly how

19   much money we can get, and it took a couple different

20   mediation sessions.  It took some emails from Mr. Cohen

21   about, "That's it.  Forget it.  Good luck with the other

22   guys.  We're out.  Do this, or do that by high noon."  That

23   kind of thing.  It wasn't like, "Well, how much would they

24   have taken?  Well, we'll do it."  That was not -- that wasn't

25   it.  So I wouldn't have cared, you know.

1   **Q.**   All right.  Mr. Bock, that's all the questions I have.

2   Thank you.

3             THE COURT:  Mr. Cohen, did you want to put anything

4   else on the record?

5             MR. COHEN:  Very briefly if I may, Judge.

6             THE COURT:  You may.

7             MR. COHEN:  I'm not positive what everyone's

8   interpretation or construction of Mr. Bock's reference to,

9   "That we reviewed things within the public record going into

10  the first mediation," and if I may ask Mr. Bock questions to

11  clarify?

12            THE COURT:  Sure, please.

13                        **CROSS-EXAMINATION**

14  **BY MR. COHEN:**

15  **Q.**   Are you aware that at your instruction I communicated

16  with counsel for the Buccaneers after it was decided that

17  there was interest in pursuing settlement negotiations that

18  we, as the punitive Class counsel, needed to undertake full

19  due diligence.  Are you aware of that?

20  **A.**   Yes.  Now I remember that, yes.

21  **Q.**   Are you aware and do you recall that in response to that

22  Buccaneers counsel agreed to make available to us pretty much

23  anything and everything we wanted that was available to all

24  counsel in the Cin-Q case?

25  **A.**   I do remember that.  I wasn't party to those

1    conversations so I had forgotten.  I'm sorry.

2    **Q.**   Do you recall though, that we then did actually receive,

3    through a download, depositions, pleadings, anything and

4    everything that may not have otherwise been available in full

5    on the Court website itself?

6    **A.**   Yes.

7    **Q.**   And when you talked about five or six attorneys, two

8    paralegals spending day after day, every day reviewing,

9    organizing, discussing, did it include all of those materials

10    that we received from Buccaneers counsel --

11    **A.**   Yes.

12    **Q.**   -- so that we could do our due diligence?

13    **A.**   Yes.

14    **Q.**   You indicated something about you know how Mr. Wanca

15    negotiates, and then you also acknowledge that Mr. Oppenheim

16    would have been the lead negotiator when he was with Cin-Q or

17    -- with the Wanca firm in the Cin-Q mediation.  Have you

18    attended mediations over the years many times with

19    Mr. Oppenheim?

20    **A.**   Yes.

21    **Q.**   These were joint cases where Bock Law Firm and Wanca Law

22    Firm were co-class counsel and each sent someone to the

23    mediations?

24    **A.**   Yes.

25    **Q.**   Do you know how Mr. Oppenheim approaches mediation?  How

1    he approaches the negotiation in a mediation?

2    **A.**    Yes.

3    **Q.**    And who taught him that?

4    **A.**    Well, to some extent I did, I guess.  I think he says

5    that I came up with the, you know, the term sheet we use, and

6    sort of the demand letter and stuff and he sort of perfected

7    the process.

8    **Q.**    Does that process operate the same whether Mr. Oppenheim

9    is doing it when he's at the Wanca Law Firm or you're doing

10    it when you're at the Bock Law Firm?

11    **A.**    Um, you mean generally how do we negotiate a class-wide

12    settlement?  It's basically the same, yeah.

13    **Q.**    So in order for there to be some significant difference

14    between what goes on in a Wanca negotiation without you

15    there, and what goes on in a Bock Law Firm negotiation

16    without Wanca there, if the basic approach and methods are

17    the same, would it all come down to the size of the class

18    fund being the fundamental difference in whether settlement

19    gets done or not?

20    **A.**    Um, yes, generally.  I mean, it's about getting the

21    Defendant the pay as much as, you know, $1 less than they

22    would have walked out and never talked to us again.

23    **Q.**    And in terms of getting adequate compensation for a

24    Class, do you take account of anticipated or projected claim

25    rates based on experience in the field?

**A.**   Yes.  Yep.

**Q.**   So that you need an amount of money in the fund that will allow for a certain amount of attorneys fees, any other costs coming out, if there are going to be incentive awards to the class representatives, and then, hopefully more than adequate funds to cover anticipated claim rates?

**A.**   That's right.

**Q.**   If you already have a number from the Defendant in mediation of a class action that would be sufficient to do all that, it would cover your attorney's fees, it would cover any other costs, it would cover incentive awards, and it would be more than sufficient to cover any reasonably plausible claims rate, and the attorney nevertheless insists on a larger fund for the Class, who is the only person that benefits from that larger fund?

**A.**   The attorney.

**Q.**   Because he increased the fund, he takes the same percentage, but it's larger because the fund was larger?

**A.**   Exactly.  Yeah, if the Court awards the fees based on percentage of the fund, the bigger the fund, the bigger the fees.  And this settlement is -- I think everybody -- I think it's a 21-percent claims rate.  If there is 21 percent or less claimed from the fund, everybody gets paid 100 percent of their claim, and -- if it's higher than the share pro-rata.

1   **Q.**   In your experience have you ever seen a claim rate come

2   near that?

3   **A.**   I think one time we did.  There was a case called

4   *Eclipse vs. US Compliance* a long time ago, and we did two or

5   three different claims processes, and I don't remember what

6   it was, but -- but generally the claims rate is going to be

7   four or five percent, probably, in a junk fax case, and

8   sometimes it's higher, sometimes it's lower.  I'm not sure

9   why exactly but --

10          MR. COHEN:  Judge, I don't think I had anything

11   further.  Thank you.

12          THE COURT:  All right.  Thank you.  Thank you,

13   Mr. Bock.  You may step down.

14          (Witness excused.)

15          THE COURT:  Mr. Oppenheim, if you would come

16   forward.

17          MR. OPPENHEIM:  Sure.

18          MADAM CLERK:  Raise your right hand.

19   (Witness sworn.)

20          THE WITNESS:  I do.

21          MADAM CLERK:  Thank you.  Have a seat.  I'll ask

22   you to please state your name for the record, spell your last

23   name, please.

24          THE WITNESS:  David Max Oppenheim,

25   O-P-P-E-N-H-E-I-M.

1          MADAM CLERK:  Thank you.

2                    **DAVID M. OPPENHEIM**

3    Called as a witness herein, having been first duly sworn

4    was examined and testified as follows:

5                         **EXAMINATION**

6    **BY THE COURT:**

7    **Q.**   Mr. Oppenheim, let me just -- the inquiry is going to be

8    short, so let me just be clear in the questions.  Prior to

9    changing firms were there ever any discussions with anyone at

10   the Bock Firm about your involvement in the Buccaneers

11   litigation?

12   **A.**   Um, there may have been.  Um, I know that when Brian

13   Wanca first started cutting Phil Bock out of cases and filing

14   cases on his own, that it was all a big secret, and everybody

15   was told not to let on about anything, and then over time

16   that relaxed, and so, things were no longer big secrets.  The

17   only time I can remember clearly, though, is a mediation that

18   I did in Tampa with Mike Addison and Phil Bock in the room

19   with me when Addison started talking about the Buc's case in

20   front of Phil.

21   **Q.**   The decision to change firms was the Buccaneers case in

22   any way involved in your decision to change firms?

23   **A.**   No.

24   **Q.**   When you changed firms, as I understand your prior

25   testimony, you submitted your resignation April 7, 2016, is

1    that correct?

2    **A.**   Yes, that was a Thursday.

3    **Q.**   And then, the following Monday you began work at the

4    Bock Firm, is that correct?

5    **A.**   I did.

6    **Q.**   Was there ever any contemplation by you individually,

7    prior to any other discussions with anyone else at the Bock

8    Firm, about pursuing independent a Buccaneers litigation?

9    **A.**   No.

10   **Q.**   Why not?

11   **A.**   Um, I never had done any case individually.  I worked

12   for Brian Wanca for seven years, and I worked closely with

13   Phil Bock in his firm over that time.  We still have a huge

14   joint caseload, and got a better offer to go work for Phil

15   instead of Brian, but either way I was going to be a part of

16   the team.

17   **Q.**   So then, if you clarify, when is it that you first

18   learned about the Bock Firm pursuing a litigation against the

19   Buccaneers?

20   **A.**   Well, obviously I was in this April 29th email that was

21   cast in the hypothetical, and the hypothetical of me going

22   out and doing it, which I sort of brushed off, but apart from

23   that I got this electronic receipt late in the day on Friday,

24   May 6th.

25   **Q.**   Why would you brush it off?

**A.**   You know, there was a lot of bad blood between Brian

Wanca and Phil Bock.   I just took it as Phil venting.

**Q.**   Why not participate in the litigation now?

**A.**   That was Phil's call, I think, in part to protect me.   I

know that as part of the retaliation, Brian Wanca filed an

Illinois ethics complaint against me, and it was easy to say

to them, as it is to your Honor, that I have nothing to do

with the case.   I haven't done anything with the case.   So to

the extent somebody is wrong, and I shouldn't be doing things

with the case, then I'm not.

**Q.**   So to be clear, at any point did you inform anyone at

the Bock Firm about any information you gathered during the

mediation process in the underlying litigation when you were

at the Wanca Firm?

**A.**   Apart from the notation that you'll see in that

April 29th email chain that Brian wanted to set the record

for TCPA settlements, which I think is $75 million, which I

think was something Phil knew anyway is a professional goal

of Brian's, no.

**Q.**   All right.   Thank you.   You may step down.

**A.**   Thank you, your Honor.

          (Witness excused.)

          THE COURT:   Mr. Cohen, do you want to make any

argument?

          MR. COHEN:   Judge, I would note two things.   One,

1    we do have Professor Generous here.  We had submitted his

2    report.  The Court may not feel it's appropriate at all.  The

3    Court may feel his report is sufficient.  The Court may wish

4    to hear from him.  That's why we brought him here.  I leave

5    that up to the Court whether you would like to hear from

6    Professor Generous.

7              THE COURT:  Well, let me ask you this:  Everyone is

8    focused on an issue as to whether the representation is

9    materially adverse.  One of the concerns I've always had is,

10   what information may have been divulged that would have been

11   to the disadvantage of the former client?  I don't know what

12   "disadvantage" means because it's not clear.

13             As I see it there's an argument to be made, even as

14   to that late bit of testimony, informing the new firm that

15   there's a stall in the settlement discussions based upon

16   whatever, and in this accusation that a demand is too high.

17   Certainly then, it's obvious, creating an opportunity that

18   Mr. Bock recognized, which obviously spurred him then to

19   potentially pursue his own independent litigation.

20             If that is information that was only known based

21   upon those who participated in the mediation, that there was

22   essentially a stalemate, given the demands, can that be then

23   perceived as a disadvantage to the former client?  That is,

24   the disadvantage being the opportunity for an incentive

25   award.  All former clients -- all clients are told, as

1    Mr. Bock stated, there is opportunities for an incentive

2    awards but no guarantee.  But the mere opportunity to obtain

3    an incentive award is nonetheless an opportunity that would

4    be foreclosed to the prior Class representatives if the Court

5    certifies the Class in this case.

6              MR. COHEN:  May I address that?

7              THE COURT:  You may address it either by calling

8    your witness or by argument, but that is something I think

9    needs to be addressed.

10             MR. COHEN:  I appreciate that, Judge.  While I

11   believe that Professor Generous's declaration and his

12   opinions in this case are relevant to the, I guess, more

13   technical topic that Judge Honeywell's Order addresses, I

14   don't believe he has --

15             THE COURT:  There is no comment about B.

16   Everything focuses on 4-1.9(a).

17             MR. COHEN:  So, I would note a few things.  One is,

18   and I believe this is the natural flow, it's an unavoidable

19   following from the case law that comes from the Ninth

20   Circuit, the Seventh Circuit, the Fifth Circuit, that's

21   *Radcliff, Eubanks & Lacey Oil* cases, which dovetail right

22   into what Judge Honeywell concluded, and so the natural

23   following from Judge Honeywell's Order, I believe, is that

24   Dave Oppenheim had, with no involvement at the Bock Law Firm,

25   said to Brian Wanca, "I've had enough of being somebody

1   else's guy.  I'm going to be my own guy," he went out and

2   opened his own firm through perfectly legitimate

3   solicitations he found a person who was a member of the Buc's

4   Class under Radcliff, Eubanks, Lacey Oil under Judge

5   Honeywell's ruling, nothing would have precluded

6   Mr. Oppenheim from proceeding with his own case.

7            THE COURT:  I've looked at all these cases and I

8   recognize that, but it's still nonetheless troubling.  For

9   example, if there is no representation to Medical

10  Chiropractics or Cin-Q, why not just sign them up?  If there

11  is no responsibility to them individually and they are only

12  simply class representatives, why go find someone else?  Why

13  can't you simply approach them to pursue the litigation to be

14  class counsel?

15           MR. COHEN:  Well, I'm not certain, in your

16  question, which scenario you're engaging.  That Mr.

17  Oppenheim, in his own firm, would do that or that Bock Law

18  Firm could or should have done that?

19           THE COURT:  As I understand the argument that in

20  any Class matter the individual is not the client has always

21  been the representation.  My point is, if the individual is

22  not the client, then why go seek other clients to be the

23  Class representatives?  If you are looking to represent the

24  Class, why could you not approach the original -- those who

25  have been proposed to be the Class representatives to

1    represent them?

2              MR. COHEN:  I'm not positive that we couldn't, but

3    I wouldn't advise that for the same reason we screened

4    Mr. Oppenheim off.  Because if anybody took a dimmer view of

5    it, then we would want to take the high road, and I think

6    that's the road we took from start to finish here and I

7    appreciate that question.

8              Your Honor made a second point that we did address

9    in the last section of our prehearing brief that we filed,

10   but I wanted to make sure we reiterated it.  The case law

11   supports the proposition, and *Newburgh* very strongly supports

12   the proposition that a Class representative in one punitive

13   class, or certified class, who ends up not being the case

14   that gets the class action settled, it's -- the case is

15   settled in a different class action, the representative in

16   the defunked case that didn't get settled can come into the

17   settling case and petition for an incentive award in the

18   exact same fashion for the benefit that they conferred upon

19   the case.  And not only would Medical & Chiropractic and

20   Cin-Q have the right to do so in the TTA case if this Court

21   were to ultimately approve it, but we have gone on record

22   specifically saying we would not oppose or object to that.

23             THE COURT:  Let me interrupt you there.  Can prior

24   counsel seek to obtain fees out of the Class settlement for

25   their representation?

1          MR. COHEN:  I believe that prior counsel have the

2     right to petition for that, and that if the Court believes

3     that it's warranted under the circumstances, that they have

4     contributed benefit to the Class, and that they have

5     maintained a level of integrity and loyalty to the best

6     interest of the Class and not their own self-interest, then

7     this Court would have the ability and jurisdiction to

8     apportion fees as it saw reasonable and equitable.  But I

9     would hasten to mention that if we ever got to that point and

10    the Plaintiff's counsel in the Cin-Q were doing that, I would

11    think it would be incumbent upon this Court to ascertain what

12    went on in those mediations, why that case didn't get settled

13    after so long.  And if the Court still felt that Cin-Q's

14    counsel contributed so much to the case, then the Court could

15    still do whatever it felt was equitable.  I just think that

16    Medical & Chiropractic and Cin-Q are absolutely entitled to

17    come in and petition for an incentive award here and we won't

18    oppose it at all.  So they are not hurt.  And if Cin-Q's

19    counsel thinks they can withstand the light of truth on what

20    happened, let them come in and do it.

21          THE COURT:  All right.  Thank you.

22          MR. COHEN:  Thank you.

23          THE COURT:  Do you want to be heard?

24          MR. MESTER:  Judge, briefly, if I may.

25          THE COURT:  All right.

1          MR. MESTER:  Just three points.  I'll be very

2     brief.  I just wanted to remind the Court, and I know you

3     don't need reminding, but in terms of what was known or what

4     wasn't known, on April the 18th, we had filed that notice for

5     a settlement conference.  I indicated in that paper that we

6     believed we were at an impasse on mediation.  That obviously

7     substantially predates whatever disclosure discussions

8     occurred in the Bock Firm.  I don't know other than what I

9     just saw this morning.  I wanted to make that point because

10    that wasn't on the public record, and we then had that

11    hearing where we talked about it very briefly.  And obviously

12    shortly thereafter, the formal notice of impasse was filed

13    with Judge Anderson, the mediator.

14          THE COURT:  I'll note even beyond that whether that

15    was even -- there is nothing on the record to establish that

16    was known to anyone at the Bock Firm, but what was stated,

17    which I think is also refuted but nonetheless, there is a

18    representation on that same date there was information

19    provided from Mr. Addison regarding the difficulty in

20    settling the case.  I understand.

21          MR. MESTER:  That I knew nothing about.  I do know

22    we filed that on the 18th.  I just wanted to point that out

23    to your Honor.

24          The second point I wanted to make is certainly our

25    understanding is and has been all along that the named

1    Plaintiffs in the Cin-Q case would be fully entitled to seek

2    an incentive award from your Honor at your Honor's

3    discretion, and likewise, as Mr. Cohen indicated, that there

4    would be an opportunity for the counsel in the Cin-Q case to

5    do likewise subject to, I agree with Mr. Cohen, an inquiry

6    into what transpired previously in mediation.

7           And lastly, just from our perspective, the answer

8    to why I wouldn't contact Cin-Q or "MC," would be, I suspect,

9    in part, the same reason Mr. Cohen's firm wouldn't.  I think

10   under at least Illinois rules that would be considered a

11   violation of Rule 4.2 because they are represented parties.

12   So I wouldn't obviously contact them, and I suspect the

13   lawyers in the Bock Firm feels likewise.

14          THE COURT:  I agree with that and that's the point

15   of my question, they are representing parties, which then

16   indicates there's a representation to an individual client,

17   not a Class.

18          MR. MESTER:  But represented parties in their

19   capacity as named Plaintiffs in the Class.

20          THE COURT:  Name classes individually and on behalf

21   of the Class.  I'm not sure it's really a difference with the

22   distinction, but I understand the argument.

23          MR. MESTER:  Thank you, your Honor.

24          THE COURT:  All right.  I know this is a very

25   unusual proceeding, and so I appreciate everyone's patience

1    with it.  The information has been very helpful.  My intent

2    is to get something out as quick as possible one way or the

3    other to go forward.  Mr. Cohen, I believe you already

4    answered this question, but I do want to be clear about this.

5    If the Court does go forward in this matter here and

6    preliminary does an approval, it is, again, your position

7    that the Court is only -- based on a preliminary approval,

8    can adjust both the consideration of the fees award, and how

9    that's awarded, but then also, as to incentive awards as to

10   whoever else may petition for an incentive award in

11   determining whether they should receive an incentive award?

12           MR. COHEN:  Your Honor, if I understand your

13   meaning, I believe it's not just in this case, I believe it's

14   in all class actions that the Court retains the jurisdiction

15   to approve a settlement in terms of its benefit for the

16   Class, but determine for one reason or another that the

17   attorney fee petition by the counsel that got the case

18   settled needs to be left as is, needs to be reduced.

19           And as part of that same jurisdiction, I believe

20   the Court has the full authority to consider a fee petition

21   by Counsel in competing class actions for the benefit they

22   brought.

23           THE COURT:  All right.  Anything else?

24           MR. COHEN:  No, your Honor.

25           THE COURT:  Mr. Cohen, anything else?

1            MR. BOCK:  No, your Honor.

2            THE COURT:  All right.  We'll be in recess.  Thank

3    you.

4    (Court adjourned at 11:26 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3    COUNTY OF HILLSBOROUGH     )

 4                              )  SS.

 5    STATE OF FLORIDA           )

 6

 7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

 8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

 9    COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10    THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11    AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12    WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13    COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14    THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15    NOTES.

16

17

18    DATE:  10-21-2016

19

20    S:/MELISSA A. PIERSON

21    MELISSA A. PIERSON, CA/CSR 12499

22    IL/CSR 084.003138, RPR

23    FEDERAL OFFICIAL COURT REPORTER

24

25
```