# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TECHNOLOGY TRAINING )
ASSOCIATES, INC. and LARRY E. )
SCHWANKE, D. C. d/b/a/ BACK TO )
BASICS FAMILY CHIROPRACTIC, )
individually and as the representatives ) No. 8:16-cv-01622-MSS-AEP
of a class of similarly-situated persons, )
) Mag. Judge Anthony E. Porcelli
Plaintiffs, )
)
v. )
)
BUCCANEERS LIMITED )
PARTNERSHIP, )
)
Defendant. )

## DECLARATION OF DANIEL J. COHEN

COMES NOW the undersigned declarant, Daniel J. Cohen, and testifies to the following:

1.     I am an attorney at law, bar-certified to practice in the States of Missouri (1992), Illinois (1993) and Florida (2017). I am also generally admitted to practice in numerous federal district courts and federal circuit courts of appeal, including the Eleventh Circuit Court of Appeals.

2.     My specialized fields of practice include plaintiffs' personal injury litigation (with a subspecialty in litigation involving the Federal Employers Liability Act ("FELA"), 45 U. S. C. § 51 *et seq.*), and nationwide consumer class action litigation. I have been practicing law for approximately 26 years.

3.     My practice of law has included first-chair trial responsibility in (a) more than 30 personal-injury jury trials, and (b) numerous class actions brought pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, including six TCPA trials.

4.     I have been employed as an associate attorney at Bock Law Firm, LLC d/b/a Bock & Hatch, LLC and Bock, Hatch, Lewis & Oppenheim, LLC ("Bock Firm"), since approximately January 2010. Originally, my role and responsibility within the firm was part time, and was primarily focused on the trial, and immediately pretrial, needs of Bock Firm's class action cases.

However, my time commitment to Bock Firm steadily increased over the years and, by 2016, my role and responsibility was full-time and included broad responsibility for cases to which I was assigned. Beginning in late-2016, and continuing through to today, my responsibility has included a supervisory role within the Chicago office in which most of the firm's attorneys are employed. I am an at-will employee, and I answer to the owner of Bock Firm, Phillip A. Bock. I have no ownership stake in Bock Firm, I am a salaried employee, and I have no negotiated or agreed compensation package beyond my base salary.

5.      On April 29, 2016, Mr. Bock forwarded an email chain to me, containing communications that he had with Mr. Oppenheim earlier that day. The April 29, 2016 email chain concluded with Mr. Bock inquiring of me and two other Bock Firm attorneys (not including Mr. Oppenheim) about the possibility of Bock Firm bringing a class action against the Buccaneers. A copy of that e-mail was presented and read into the record at the October 20, 2016 hearing in this case.

6.      Mr. Bock and I spoke by telephone later in the day on April 29, 2016, and over that weekend (*i.e.*, April 29th was a Friday), and throughout the following week, about the possibility of bringing a class action against the Buccaneers. Our conversations were fluid and non-decisive throughout that entire period of time, until mid-day on May 6, 2016 (*i.e.*, the day on which the TTA action was filed). For example, at least part of our first conversation included the observation that we did not even know if we could prosecute such an action because we did not know if we had a potential class member available and willing to be a plaintiff. By the end of the weekend, we knew that we had at least two such potential plaintiffs, but Mr. Bock still needed to contact them to confirm their willingness to serve as class representatives in such an action. He did that early during the week of May 2, 2016. But even after we knew that we had available plaintiffs if we were going to proceed, a decision to proceed had not been made. It was not until Friday, May 6, 2016, that Mr. Bock "pulled the trigger" and made the final decision to proceed with the filing of the TTA action.

7.      One issue that was discussed before filing the TTA action was the choice of forum, particularly as it related to any arguable statute of limitations defense. We elected to file the action in Florida state court because Eleventh Circuit case law regarding statute of limitations tolling in class actions was not favorable, and although Florida's state courts did not appear to have addressed that issue, at least we knew that they were not bound by the Eleventh Circuit's position on the issue. In any event, we fully anticipated that if the Buccaneers were interested in discussing settlement, and if such settlement discussions ultimately led to a class settlement agreement, that settlement would be presented to the Middle District of Florida federal court, and preferably to

Judge Porcelli, who already was presiding over the Cin-Q action. Indeed, one of the likely scenarios that we had discussed was that we would dismiss the state court TTA action, and seek to intervene in the already-pending Cin-Q action, as such intervention would almost certainly ensure tolling as to the TTA class claims by virtue of the timely-filed Cin-Q class claims. Alternately, we considered a scenario under which we would ultimately file the TTA case in the Middle District of Florida as a separate new case, and then seek transfer and/or consolidation before Judge Porcelli.

8.      In the afternoon of May 6, 2016, Bock Firm filed the TTA action (*i.e.*, the initial state-court filing).

9.      On the same afternoon that we filed the TTA state court action, Jonathan Piper (another Bock Firm associate) and I placed a telephone call to Buccaneers' counsel, Mark Mester. He did not answer, and so I left a message identifying myself, providing my cell phone number, and asking him to call me at his earliest convenience. Mr. Mester called me back later that afternoon/evening, and I told him that I wanted to give him a heads-up that we had just filed a TCPA putative class action against the Buccaneers in Florida state court. I asked Mr. Mester if his client might be interested in exploring the possibility of early settlement discussions. He responded that he would need to confer with his client, but he thought that might be an option. Over the ensuing weekend, I spoke with Mr. Mester one or two more times, and by Monday, May 9, 2016, he had advised me that his client was interested.

10.      In at least one of those conversations, I made two things clear to Mr. Mester: first, that in order to negotiate, Bock Firm would need to review everything that had been produced, exchanged or developed in discovery in the Cin-Q action, so that we could fulfill our due diligence obligations; and second, that Bock Firm could not and would not participate in anything that could be construed as a "reverse auction," meaning: (a) that the Buccaneers would have to offer us more than they had ever offered A+W in the Cin-Q action (I frankly told Mr. Mester that we had no idea how the settlement negotiations in the Cin-Q action had panned out, but that if the Buccaneers offered us less than had been offered in the Cin-Q action, such a settlement would be rejected anyway, so the Buccaneers needed to be prepared to pay all that they were willing to pay, and it needed to be more than they ever offered, or expressed a willingness to offer, in the Cin-Q action); and (b) that we were unwilling to negotiate with the Buccaneers if they were still engaging in any settlement negotiations in the Cin-Q action. On the first point, Mr. Mester agreed to provide Bock Firm with all of the referenced documents so that we could undertake our due diligence review in preparation for negotiations (and he later did so). On the second point, Mr. Mester assured me that the Buccaneers were prepared to negotiate in good faith, that they understood that any

settlement reached, if any, must be "more" than any offer the Buccaneers had made in the Cin-Q action, and that the Buccaneers would not negotiate with plaintiffs' counsel in the Cin-Q action while they were negotiating with us.

11.     Almost immediately following Mr. Bock's aforesaid April 29, 2016, forwarded email to me, he and I discussed whether Mr. Oppenheim should be screened off of the case because of a potential conflict of interest. Based on our awareness of federal case law bearing on the issue, it was our general and mutual assessment that Mr. Oppenheim did not have any such conflict of interest. Nevertheless, out of an abundance of caution, and anticipating that Mr. Wanca would do all that he could to make life difficult for Mr. Oppenheim, we made the decision to wall Mr. Oppenheim off from the case. For this reason, there were no communications by anyone at Bock Firm with Mr. Oppenheim about the firm's consideration of the possibility of filing a Buccaneers class action prior to its filing on May 6, 2016. Then, on May 7, 2016, the day after the TTA state court action was filed, Mr. Bock issued a firm-wide email to everyone, except Mr. Oppenheim and the paralegal assigned to him, advising them of the filing, and of the fact that Mr. Oppenheim was and would continue to be walled off from the case.

12.     Before Mr. Mester sent us a link to download non-public materials from the Cin-Q action, Bock Firm attorneys reviewed publicly accessible materials available through PACER. On or about May 13, 2016, Mr. Mester's office made that download link available, and all such materials were downloaded. Mr. Bock and I subsequently instructed almost the entire firm (except for Mr. Oppenheim and his paralegal) to review and report back on the relevant content of these materials. In the period of time between the download of these Cin-Q action materials and the first mediation in the TTA action scheduled for May 19, 2016, Bock Firm attorneys and staff completed their review of the downloaded materials. Walking into the first mediation session, we had done our due diligence, and we were knowledgeable regarding all relevant case facts and evidence bearing on all issues, including the prospects for contested class certification and merits disposition.

13.     Counsel in the TTA action had agreed to use retired judge Wayne Andersen as the mediator—because he had been the mediator in the second formal mediation session in the Cin-Q action, such that it was believed that he would already be familiar with the relevant issues and evidentiary disputes, and he had mediated other TCPA class actions involving Mr. Bock—and that mediation session had been scheduled for May 19, 2016. Unfortunately, the ADR organization with which Judge Andersen was affiliated ("JAMS") inadvertently and erroneously included Michael Addison on the JAMS confirmation email, thereby putting him on notice of the pending case and the scheduled mediation. This error by JAMS was not planned by Bock Firm or

4

Mr. Bock himself; to the contrary, it caused much consternation by and between counsel for the parties in the TTA action. Shortly thereafter, Judge Andersen changed his original decision and advised the parties to the TTA action that he would not be willing to mediate the case.

14. Counsel in the TTA action then agreed to mediate with Peter Grilli, a Tampa-based professional mediator known to Mr. Bock, and were able to secure that mediation for the same day that had been canceled with Judge Andersen (*i.e.*, May 19, 2016). Unfortunately, Mr. Grilli inadvertently disclosed to Mr. Addison the scheduling of that mediation when—while Mr. Addison apparently was in Mr. Grilli's office for an unrelated matter—Mr. Grilli asked Mr. Addison if he would be in attendance at the upcoming mediation of the Buccaneers class action. Mr. Grilli promptly sent an email to counsel for the parties in the TTA action apologizing for this disclosure. The parties decided to proceed with mediation with Mr. Grilli anyway.

15. In the meantime, Mr. Addison had filed a motion to intervene in the TTA state court action for the stated purpose of seeking a temporary restraining order and injunctive relief prohibiting the parties in the TTA action from, among other things, engaging in class settlement negotiations. Mr. Addison scheduled a hearing on those requests for May 18, 2016, *i.e.*, the day before the scheduled mediation with Mr. Grilli on May 19, 2016. Mr. Bock and I, together with at least two other Bock Firm attorneys, considered our options under the circumstances. First, we could proceed with the hearing in state court, running the risk that the court might enjoin class negotiations in the TTA action. Second, we could dismiss the state court TTA action and immediately re-file in the Middle District of Florida ahead of the scheduled mediation. Third, we could dismiss the state court TTA action and hold off further filing decisions until we knew whether there was an actual need to make such a decision.

16. We opted for the third option because it seemed to preserve our ability to bring a class settlement to the Middle District of Florida if we were able to reach such a settlement, without risking the uncertainty of how the Florida state court would rule on the pending intervention and injunction motions, and at the same time without wasting energy on a prematurely re-filed action that might be unnecessary if the mediation were unsuccessful. On May 17, 2016, we dismissed the TTA state court action without prejudice, thereby mooting the motions previously filed by Mr. Addison seeking intervention and injunctive relief.

17. On May 17, 2016, the Cin-Q plaintiffs filed a motion in the Cin-Q action seeking relief similar to that which Mr. Addison had sought by way of intervention in the state court TTA action. Cin-Q ECF No. 224. Specifically,

the Cin-Q plaintiffs asked Judge Porcelli to enjoin the Buccaneers from engaging in class settlement negotiations with Bock Firm or the TTA plaintiffs, or from reaching a class settlement with Bock Firm or the TTA plaintiffs. At the time of the May 19, 2016, first mediation session with Mr. Grilli, the Cin-Q plaintiffs' motion in that regard remained pending.

18.   Mr. Bock, Jonathan Piper, James Smith, and I attended the May 19, 2016, mediation session with Mr. Grilli. Mike Higgins, owner of TTA, was also in attendance. Although it was a team effort, I served as the lead negotiator for Bock Firm. The Buccaneers attended by and through their counsel of record (Mr. Mester, Ms. Lally, and Joseph H. Varner, III), and by the Buccaneers' general counsel, David Cohen, but decision makers with final settlement authority were unavailable because, as it was reported to us, they were en route to England for an unrelated business emergency. The mediation lasted all day. TTA initially demanded uncapped relief at $500 per fax, and the Buccaneers made at least one class-wide settlement offer, a $16 million fund with $300 relief per class member. Nevertheless, by the end of the day, the parties had not reached agreement. The parties thereafter agreed to a second formal mediation session with Mr. Grilli scheduled for June 1, 2016.

19.   In the interim between the first and second mediation sessions, there was little, if any, substantive communication between the parties to the TTA action, and no movement related to settlement. However, on May 25, 2016, Judge Porcelli heard argument and ruled on the Cin-Q plaintiffs' aforesaid motion seeking an injunction prohibiting the Buccaneers from negotiating with us. At the time, I was in a TCPA class action jury trial in the United States District Court of New Jersey in *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, Case No. 1:11-CV-02658-JBS-KMW (D. N. J.). But that afternoon, I received a call from Ms. Lally, counsel for the Buccaneers, advising that Judge Porcelli had denied the Cin-Q plaintiffs' request for injunctive relief, but that he had also ordered (1) that the parties to the Cin-Q action must schedule one more mediation session, and (2) that if a class settlement was reached in the (at the time unfiled) TTA action, notice must be given to the Cin-Q plaintiffs' counsel, and a pleading relating to any such settlement should not be filed until at least three days after such notice had been provided.

20.   Judge Porcelli's May 25th order was of great significance to us because the Cin-Q plaintiffs' counsel had been hurling vitriolic accusations at us since they learned of our original filing of the state court TTA action, and they had been seeking court-ordered injunctive relief against us—in both Florida state court and the Middle District of Florida—all on the notion that there was something *prima facie* improper and impermissible about our actions, but Judge Porcelli had denied them the relief that they requested. On

the one hand, we did not presuppose that Judge Porcelli's refusal to enjoin settlement negotiations automatically meant that he would later approve whatever class settlement we might reach in the TTA action, if any. But on the other hand, it seemed clear to us that Judge Porcelli had decided that we could permissibly proceed with class settlement negotiations in the TTA action, with or without an action presently on file, and that in so doing he had specifically anticipated the possibility that we might be successful in achieving a class settlement. To be sure, we never had thought that we were doing anything wrong, or impermissible, but having endured approximately two weeks of relentless accusations to the contrary, we were buoyed by Judge Porcelli's order, and recommitted ourselves to finding out if we could get the Buccaneers to agree to a settlement that would be fair, reasonable and adequate for the class.

21.    The parties reconvened for the second mediation session with Mr. Grilli on June 1, 2016. Although it was, again, a team effort, Mr. Bock and Mr. Piper took a leading role in the negotiations for our team. The Buccaneers attended with full settlement authority. The parties continued to negotiate the basic class relief available to claiming class members. A substantial amount of effort was spent addressing the notice program for the settlement. The Buccaneers did not want to send notice by fax, and wanted to mail the notice. We wanted to assure that first class mail notice would be sent to as many owners of the fax numbers at the time of the faxing as could be identified. We were able to negotiate a notice plan that would give us control over the determination of entities and addresses to which notice would be mailed. We also negotiated that notice and administration costs would not be paid from the settlement fund, so that if more than one vendor was needed to help locate class members, those costs would not dilute the amount available to class members. At the end of the day, it was our understanding that the parties had reached an agreement in principle to a settlement for the class.

22.    Among other things, this settlement in principle involved the Buccaneers creating a $19.5 million reversionary fund to pay class member claims, incentive awards to the two class representatives in the TTA action, attorney fees, and litigation costs. Costs of class notice and claims administration were payable by the Buccaneers above and beyond the fund, so that such costs would not dilute the fund available to pay class member claims. Under this claims-made settlement, claiming class members would receive $350 for the first Buccaneers' fax that they had received, $100 for the second, $75 for the third, and $20 each for the fourth and fifth, per unique fax number. Based on my experience prosecuting and participating in settlement decisions in TCPA class actions, as well as my knowledge of TCPA class action settlements in which we had not been involved, but that had received court approval—including settlements sponsored by Mr. Wanca's firm—it was, and

to this day remains, my opinion that the class relief made available in the TTA settlement is fair, adequate, and reasonable. My assessment in this regard also takes account of the fact that the settlement fund is sufficient, after deduction for incentive awards, possible attorney fees, and litigation costs, to pay full value on class member claims up to a claims rate of more than 20%, which is almost double the higher end of the claims rate spectrum usually seen in TCPA fax (and other) consumer class action settlements.

23. As indicated, by the end of the second mediation session, it was our belief that we had reached a settlement in principle on all material terms relating to class relief, and it was only then that we agreed to entertain discussion of a possible attorney-fee award to be paid out of the settlement. Reaching agreement that the Buccaneers would not oppose a request for attorney fees up to 25% of the settlement fund was not a particularly significant sticking point. Counsel for the Buccaneers were knowledgeable and experienced, and presumably knew (a) that Eleventh Circuit precedent supported a percentage-of-the-fund method of calculating attorney fees in class action settlement, and (b) that a fee of 25% of the fund also was consistent with existing Eleventh Circuit precedent. For our part, we knew that we already had worked hard and diligently to achieve a good settlement for the class, and that we likely would invest far more time in the post-settlement phase of the litigation because the Cin-Q plaintiffs' (and their counsels') strenuous opposition to any settlement that we reached, regardless of the merits, was a foregone conclusion. We also recognized that just because the Buccaneers had agreed not to oppose an award of attorney fees up to 25% of the fund did not mean that Judge Porcelli would ultimately approve such an award, and we accepted the fact that any attorney-fee award that we might receive would be left to the discretion of the court.

24. We were so confident that we had a settlement in principle at the conclusion of the second mediation session, that we drafted a term sheet and asked the Buccaneers to sign it before leaving. We were surprised and disappointed that they were unwilling to do so at that time. However, one of the provisions that we had included in the term sheet was a provision confirming that the parties expected to present the proposed settlement to Judge Porcelli for approval, which we at that time construed to mean through intervention in the Cin-Q action, but we did not resolve with the Buccaneers the issue of the procedural vehicle for doing so at that time. Ultimately, as we were finalizing the settlement documentation and beginning to prepare for filing in court, we addressed the issue of whether to intervene in the Cin-Q action, or file a separate lawsuit. TTA's counsel preferred to intervene. Buccaneers' counsel advised that they would prefer if we filed a new action in the Middle District of Florida. We responded that in order to obtain the benefit of a tolled statute of limitations by virtue of the already-pending Cin-Q action,

we needed to intervene in that action. Buccaneers' counsel replied that in order to moot that concern, the Buccaneers would agree, as part of the settlement, to waive the statute of limitations. We accepted that proposal. The *only* concession that the Buccaneers asked for, or that we discussed or made, in return for the statute of limitations waiver was that we agreed to file a new lawsuit, rather than intervene.

25.     It has been suggested that because of this potential statute of limitations issue, we were at a disadvantage in our bargaining leverage, and we necessarily must have sacrificed some potential benefit or relief to the class as a *quid pro quo* for the Buccaneers' willingness to negotiate a settlement with us. To this suggestion I offer the following responsive observations:

a.     To my knowledge, the statute of limitations issue never came up with the Buccaneers at any time before or during the settlement negotiations in the TTA action, until the above-referenced moment—after the terms for class relief had been agree to—and then only in discussing and ultimately reaching agreement as to how the settlement would be presented to the Judge Porcelli;

b.     We were aware that under prevailing Eleventh Circuit precedent, the statute of limitations was tolled by the pendency of another putative class action, and would not be a viable defense if we intervened in the other case;

c.     Although I was lead negotiator for our team, Mr. Bock was and is the owner of the firm, and he never suggested anything to me in any manner suggesting that I back off, or yield, or moderate my settlement demands and positions because we were somehow disadvantaged and lacked bargaining leverage because of a statute of limitations concern; indeed, he never interfered with any of my demands or positions in any regard, and I understood that my job was to get the Buccaneers to pay as much as they were possibly willing to pay;

d.     I was well aware of Mr. Bock's April 18, 2016, conversation with Mr. Addison, in which Mr. Addison had complained that Mr. Wanca was holding up settlement to get a bigger fund to generate larger attorney fees (*i.e.*, Mr. Bock had reported that to me by email in mid-May 2016), so far from perceiving our side at a disadvantage, I believed that the Buccaneers had to negotiate in good faith with us, and pay us every dime they were willing to pay anyone, or they would be stuck with Mr. Wanca's unreasonable demands (whatever they may have been);

e.    I knew that Mr. Bock would not hesitate to walk away from the TTA action if he believed that the Buccaneers were not offering a settlement that, in his objective opinion, was fair, reasonable, and adequate to the class, and later events after the end of the second mediation confirmed my belief in that regard.

26.    In an email sent by me to Buccaneers counsel days after the second mediation session ended, I reiterated our view that we had reached a settlement in principle, and asked for written confirmation. At that point, I left what I anticipated would be the "minutia" to Mr. Piper in our Chicago office. But Mr. Piper reported back that Buccaneers' counsel had raised and injected new issues/terms into the settlement discussion, some of which we viewed as unacceptable. I distinctly recall a conference call that Mr. Piper had scheduled with Buccaneers' counsel in which I elected to briefly participate to express myself about what I perceived to be the Buccaneers' unreasonable, new demands. I told Mr. Mester and Ms. Lally that the calendar was creeping closer to the Buccaneers' court-ordered mediation with the Cin-Q plaintiffs, and I told them that we were not going to be part of a reverse auction, so if we did not have a final, signed deal very soon, we were going to drop the case and walk away. It has been suggested that we "colluded" with the Buccaneers in this settlement. I respectfully submit that anyone listening to my comments to Mr. Mester in that call, and his response to me, would know without any doubt that there was no "collusion" at play between the parties.

27.    Despite the clarity of my communication to Mr. Mester in that call, which was followed up by a confirming email from me, Mr. Piper continued to report back in the beginning of the week of June 13, 2016, that the settlement discussions were not moving toward any foreseeable resolution of the remaining disputed issues, yet the court-ordered mediation in the Cin-Q action was less than a week away. In the meantime, Mr. Piper advised me that the Buccaneers were backtracking on elements of the settlement documentation, particularly the claim form. In the evening of June 14, 2016, I spoke with Mr. Bock by phone. I told him that I thought we had done everything we could to bring home a good settlement for the class, but our efforts had been unsuccessful. I told him that we could not continue to negotiate with the Buccaneers at the same time that they were negotiating in the Cin-Q action because it would create the appearance of a reverse auction. I strongly suggested to him that he authorize me to have Mr. Piper send an email to Mr. Mester advising that we had reached an impasse, and that we were going to withdraw from any involvement in a Buccaneers-related class action. Mr. Bock understood and respected my input, and he authorized me to ask Mr. Piper to send that communication to Mr. Mester immediately. I asked Mr. Piper to do so, he did so the next morning. But the night of June 14, 2016,

came to an end with the firm belief on our side that our efforts had failed, and that the TTA action was concluded in all respects.

28.     Much to our surprise, however, Mr. Mester responded to Mr. Piper's email, and urged us not to walk away from the negotiations, expressing optimism that the parties could resolve all remaining disputes within a very brief period of time. Although skeptical, I told Mr. Piper to see if Buccaneers' counsel was serious. They were. A final agreement was reached within approximately two days thereafter.

29.     Pursuant to the Court's order, Bock Firm has produced written settlement communications with Buccaneers' counsel or with mediator Peter Grilli. True and correct copies of certain documents and e-mails produced by Bock Firm are attached hereto as Exhibit C. In addition, copies of documents and e-mails produced by Anderson + Wanca and Buccaneers counsel are attached hereto as Exhibits A and B, respectively.

30.     In addition to the communications produced in this litigation, there are also internal Bock Firm e-mails reflecting internal discussions about the statute of limitations issues even prior to filing the initial TTA action in state court. Because those internal communications are attorney work product and their production would arguably raise issues as to a broader waiver, we are not producing them now. However, if the Court wishes to review those e-mails *in camera,* we would be happy to provide them.

31.     In support of its settlement efforts, Bock Firm had a data analysis performed to determine how many class members received one, two, three, four and five faxes, respectively. Based on that analysis, it was possible to estimate how much would be paid under the settlement based on projected claims rates. Exhibit D summarizes those estimates and shows that the $19.5 million settlement fund, after deducting requested attorney fees, expenses and incentives, would be sufficient to pay claims at a claims rate of over 23 percent.

32.     If the Court has any additional questions for me pertaining to anything set forth herein, I am available to respond at the Court's convenience.

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed On: February 1, 2019          /s/  *Daniel J. Cohen*
                                       Daniel J. Cohen