# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., )
et al., )
               Plaintiffs, )
   v. )
           )
BUCCANEERS LIMITED )     Case No. 8:13-cv-01592-AEP
PARTNERSHIP and JOHN DOES )
1-10, )         Magistrate Judge
         Defendants, )     Anthony E. Porcelli
_____ )
  )
TECHNOLOGY TRAINING )
ASSOCIATES, INC., et al., )
  )
         Intervenors. )

## SUBMISSION OF BTL REGARDING THE
## LIST OF NUMBERS INCLUDED WITH THE
## REPORTS OF ROBERT BIGGERSTAFF

Date:  February 18, 2022

Mark S. Mester
   (admitted *pro hac vice*)
Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
       robert.collins@lw.com

Joseph H. Varner, III
(Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

I.  INTRODUCTION AND FACTUAL BACKGROUND ................................1

    A.  This Litigation ....................................................................................2

    B.  Settlement Negotiations ......................................................................7

II.  THE BIGGERSTAFF LIST IS IN NO SENSE RELIABLE........................9

    A.  The Biggerstaff List Contains Numerous Anomalies That
        Undermine Its Reliability ..................................................................10

        1.  Wireless Numbers ..................................................................11

        2.  Mr. Biggerstaff Also Did Not Consider False Positives
            Consisting Of Zero Pages Sent And Zero Baud Rates .............12

        3.  The National Do Not Call Registry / Florida Do Not Call
            List..........................................................................................13

        4.  Mr. Biggerstaff Largely Ignored (And Obviously Cannot
            Explain) The Test Faxes That He Reported Were Sent To
            BTL But That Were Never Received .......................................14

        5.  Online Fax Services ................................................................15

    B.  Mr. Biggerstaff Either Did Not Request Or Did Not Have
        Access To The Basic Sorts Of Information That Would Be
        Available In A Typical TCPA Fax Case ............................................18

III.  THE RECENT CLAIMS OF INTERVENORS REGARDING FALSE
     POSITIVES AND BTL'S TEST FAXES ARE SIMPLY NOT
     SUPPORTED BY THE RECORD................................................................20

    A.  BTL Received As Few As Only One Of The 21 Faxes That Mr.
        Biggerstaff Claimed Were Successfully Sent To It ...........................20

    B.  Intervenors Distort The Testimony Of Mr. Canfield And Take
        His Testimony Completely Out Of Context.......................................23

IV.  CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Amchem Products v. Windsor,
521 U.S. 591 (1997) ...........................................................................................17

Balschmiter v. TD Auto Fin. LLC,
303 F.R.D. 508 (E.D. Wis. 2014) .........................................................................9

Causer v. Apria Healthcare Inc.,
2014 WL 12966005 (C.D. Cal. 2014) ...................................................................8

Cin-Q Auto., Inc. v. Buccaneers Ltd. P'Ship,
2014 WL 7224943 (M.D. Fla. 2014) ..................................................................18

Farmer v. DirectSat USA LLC,
2013 WL 1195651 (N.D. Ill. 2013) .....................................................................11

Hunt v. 21st Mortg. Corp.,
2014 WL 1664288 (N.D. Ala. 2014) ........................................................... 10, 18

Hunter v. Time Warner Cable Inc.,
2019 WL 3812063 (S.D.N.Y. 2019) ....................................................................12

In re HealthSouth Corp. Sec. Litig.,
257 F.R.D. 260 (N.D. Ala. 2009) ..........................................................................2

In re Rules & Regs. Implementing TCPA,
33 FCC Rcd. 11179 (2018) ..................................................................................17

In the Matter of Amerifactors Fin. Grp.,
2019 WL 6712128 (F.C.C. 2019) ........................................................................16

In the Matter of J. Ryerson & Son,
2020 WL 5362216 (F.C.C. 2020) ........................................................................16

Landsman & Funk, P.C. v. Skinder-Strauss Assocs.,
2015 WL 2383358 (D.N.J. 2015) ..........................................................................2

Lyngaas v. Curaden AG,
2019 WL 6210690 (E.D. Mich. 2019) ........................................................... 18, 19

McClain v. Metabolife Int'l, Inc.,
401 F.3d 1233 (11th Cir. 2005) ...........................................................................15

**Page(s)**

Physicians Healthsource, Inc. v. Masimo Corp.,
  2019 WL 8138043 (C.D. Cal. 2019) ....................................................................10

Presswood v. Am. HomePatient,
  2021 WL 3674596 (E.D. Mo. 2021) ....................................................................15

Sandusky Wellness Ctr. v. ASD Specialty Healthcare, Inc.,
  863 F.3d 460 (6th Cir. 2017)................................................................................5

Shamblin v. Obama for Am.,
  2015 WL 1909765 (M.D. Fla. 2015) ........................................................... 10, 17

Sherman v. Yahoo,
  2015 WL 5604400 (S.D. Cal. 2015) ....................................................................9

Smith v. Microsoft Corp.,
  297 F.R.D. 464 (S.D. Cal. 2014) .........................................................................5

Vandervort v. Balboa Capital Corp.,
  8 F. Supp. 3d 1200 (C.D. Cal. 2014) ...................................................................2

Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.,
  274 F.R.D. 229 (S.D. Ill. 2011)............................................................................7

**OTHER AUTHORITIES**

Expert Report of Robert Biggerstaff (Dkt. 71-7),
  Vigus v. S. Ill. Riverboat/Casino Cruises, Inc., No. 3:08-cv-00786 (S.D. Ill.) ......7

Florida Do Not Call FAQs, Fla. Dep't of Agric. and Consumer Servs.,
  https://www.fdacs.gov/Business-Services/Florida-Do-Not-Call .........................13

In re Rules & Regs. Implementing TCPA,
  84 Fed. Reg. 10266 (F.C.C. 2019).....................................................................17

National Do Not Call Registry FAQs, FTC,
  https://www.consumer.ftc.gov/articles/national-do-not-call-registry-faqs...........13

Preliminary Approval Order (Dkt. 1668),
  In re HealthSouth Corp. Sec. Litig., No. 2:03-cv-01500 (N.D. Ala.)....................2

In response to the Court's January 25, 2022 Order (Dkt. 334) regarding the reliability of the list of numbers identified in the expert reports of Robert Biggerstaff that were previously submitted by Plaintiffs Cin-Q Automobiles, Inc. and Medical & Chiropractic Clinic, Inc. ("Plaintiffs"), Defendant Buccaneers Team LLC ("BTL") states as follows:[1]

## I.    INTRODUCTION AND FACTUAL BACKGROUND

In a typical class action, the class representatives and their counsel would have compiled a class list well before any proposed settlement was presented to a court for approval.  That court would have likewise already had an opportunity to consider earlier in the litigation threshold questions such as the ascertainability of the proposed class.  The class list itself, however, would be based on documents and information obtained through discovery and would include the names and last-known addresses of class members.

In the settlement context, the class list would, of course, be used by the settlement administrator in the first instance to send mailed notice to class members. But the class list would also be used by the settlement administrator to determine if

---

[1] The reports of Mr. Biggerstaff were prepared in 2014 and 2015 and were filed with the Court on March 25, 2016 with Plaintiffs' motion for class certification as Exhibit 4 and Exhibit 6.  See March 20, 2014 Expert Report of R. Biggerstaff (Dkts. 207-5–207-7) ("Biggerstaff Rpt."); Oct. 30, 2015 Supplemental Expert Report of R. Biggerstaff (Dkt. 207-9) ("Supp. Biggerstaff Rpt."). In addition, Mr. Biggerstaff prepared a third report that Plaintiffs filed (with the exception of one exhibit) on April 7, 2016 as Exhibit B to their opposition to BTL's motion to designate a replacement expert for Mr. Canfield.  See Dec. 22, 2015 Second Expert Report of R. Biggerstaff (Dkt. 210-2) ("Second Biggerstaff Rpt.").

persons making a claim on the settlement fund are actually eligible to make such a claim based on the objective criteria contained in the class definition, thereby ferreting out fraudulent claims.

Typically, however, class membership is easily resolved through available documentation (e.g., "all persons who, between April 24, 1997 and March 18, 2003 . . . , purchased or otherwise acquired the stock or options of HealthSouth Corporation[.]").[2]   And while the potential for fraud is always a concern in the administration of any class settlement, an accurate class list typically goes a long way in ensuring fraud is kept to a minimum, without otherwise requiring inordinate amounts of time and effort being spent by the administrator, the parties or a court in addressing and resolving cases of suspected fraud.

### A.   This Litigation

This litigation is, of course, anything but typical.  Instead of a class list, all we have at this point is a list of numbers compiled nearly a decade ago by Mr. Biggerstaff   from   materials   of   dubious   heritage   obtained   from   sources   of

---

[2] See In re HealthSouth, 257 F.R.D. 260, 265 (N.D. Ala. 2009); see also, e.g., Prelim. App. Order (HealthSouth, No. 2:03-cv-01500, Dkt. 1668) at 3 (ordering notice based on transfer records and shareholder information).  The obvious analogue here would be a copy of the fax allegedly sent on BTL's behalf, but that option was summarily rejected by Plaintiffs and their counsel (as well as by Intervenors and their counsel in prior negotiations).  But see Vandervort v. Balboa Capital, 8 F. Supp. 3d 1200, 1204 (C.D. Cal. 2014) (approving requirement that persons who claim-in provide a copy of the fax or faxes allegedly sent to them in order to qualify for highest level of compensation); Landsman & Funk v. Skinder-Strauss, 2015 WL 2383358, *6 (D.N.J. 2015) (same).

questionable reliability and with no indication as to the names and addresses of any class members.  See Second Biggerstaff Rpt. (Dkt. 210-2) at ¶¶ 38-39, 51-54 (Biggerstaff describing how he would supposedly go about identifying class members in 2015); Settlement Agt. (Dkt. 324-1) at § VII.D (noting Settlement Administrator will use the Biggerstaff list to determine—to the extent feasible—the names of class members).[3]  And rather than providing a class list with his expert opinion so that the accuracy of the list and the ascertainability of the proposed class could each be assessed earlier in the litigation by the Court as well as by BTL and its expert, Mr. Biggerstaff instead played possum and simply opined in October of 2015 (over six years ago) that it supposedly would be feasible in 2015 to compile a class list for purposes of notice and other case-related activities.  See Supp. Biggerstaff Rpt. (Dkt. 207-9) at ¶¶ 5-16.

Indeed, Mr. Biggerstaff blithely spoke in his October 2015 report of the supposed ease with which a class list could purportedly be put together as of the date of his report, again some six years ago and some five years _after_ the faxes in question

---

[3] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval.  See Settlement Agt. (Dkt. 324-1).

were allegedly sent.[4]  See Supp. Biggerstaff Rpt. (Dkt. 207-9) at ¶¶ 1, 13.[5]  But Mr. Biggerstaff provided no explanation as to why he did not prepare a class list himself (as would be typical) or why he did not at least test his conclusions through a reverse lookup of a sample of the numbers on his list.  See id. at passim.

Nor did Plaintiffs or Mr. Biggerstaff account for the possible passage of time or for the likelihood that some or all of the sources of information that Mr. Biggerstaff indicated he would rely upon in 2015 in preparing a class list might cease to exist or otherwise be inaccessible in the ensuing years, a possibility that typically compels class counsel to construct a class list as early in the case as possible.  See,

---

[4] As will be addressed in a later submission regarding the feasibility of a reverse lookup under the circumstances presented in this case, the passage of time (over 11 years) since the faxes at issue were allegedly sent is in no sense a minor issue.  See Decl. of K. Sponsler ("Sponsler Decl."), Ex. A hereto, at ¶¶ 6, 13.  Even in Mr. Biggerstaff's estimation, over 5 percent of telephone numbers turn over and are reassigned each year, meaning the bulk of the numbers on Mr. Biggerstaff's list inevitably are no longer held by the person or entity that held those numbers in 2009 and 2010, to the extent that the small businesses that would have comprised the majority of intended recipients are even still in business (which the vast majority would not be).  See id. at ¶¶ 47-53; see also id. at 47 (noting that the annual turnover rate of telephone numbers is actually much higher after accounting for, among other things, business churn).  Moreover, telephone companies typically only retain subscriber information for seven to ten years, meaning the information as to who held the number on the Biggerstaff list is no longer available from the telephone companies that assigned the numbers to customers in the first place.  See id.

[5] In a later report, Mr. Biggerstaff was even more expansive in setting forth his opinion as to the ease with which a class list could supposedly be compiled in 2015:

> The methodologies for identifying the holders of telephone numbers I have described are both administratively feasible, efficient, and accurate.  The same methodologies have been used in other cases I have been involved in.

Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 85.  As with many of his opinions, however, Mr. Biggerstaff provided no detail at all in terms of what these "other cases" were, nor did he explain how those cases were in any sense comparable to the unique circumstances of this one.  See id. at passim; see also disc. infra at 18-20 (noting lack of fax broadcasting equipment, manuals, detailed fax logs, etc.).

e.g., Smith v. Microsoft, 297 F.R.D. 464, 473 (S.D. Cal. 2014) (noting that "while Plaintiff has the phone numbers of people who were sent [text messages] five years ago, he does not have those persons' current information, making identification of the class members a daunting task") (emphasis added); see also, e.g., Sandusky Wellness Ctr. v. ASD, 863 F.3d 460, 473 (6th Cir. 2017) (affirming denial of class certification over inability to identify class members and noting that "if [plaintiff] had brought suit earlier, fax logs would have existed, and their absence would not pose an independent barrier to class certification").

Instead, Mr. Biggerstaff left the preparation of an actual list to an unspecified date in the future.  See Supp. Biggerstaff Rpt. (Dkt. 207-9) at ¶ 6 (noting name and address information could be obtained "if desired"); see also BTL's Opp'n (Dkt. 148), TTA v. BLP, No. 8:16-cv-01622-AEP (M.D. Fla.), at 28-29, 29 n.32 (noting that even as of February 2019, Mr. Biggerstaff still had not identified actual class members and had instead merely created a list of numbers that allegedly received a fax).  Mr. Biggerstaff was nevertheless not at all keen on having the feasibility of compiling a class list or other of his opinions tested through cross-examination, repeatedly placing various impediments to his being deposed and at one point insisting he would only agree to a deposition at the office of his favored court reporter located less than ten miles from his remote island home in South Carolina.

See Lally Decl. (Dkt. 237-3) at ¶ 18; see also id. at Ex. I (ECF pp. 29-34).  And to this very day, Mr. Biggerstaff has succeeded in avoiding a deposition in this case.

Mr. Biggerstaff's reticence with regard to the prospect of being deposed, however, may well be explained by the infirmities in his list and the difficulties that would be faced putting together a list of persons who actually received facsimiles sent to fax numbers that would have been held over a decade ago.  See disc. infra at 18-20.  In reality, the list of numbers loosely constructed by Mr. Biggerstaff is derived from scattered documents collected from the potpourri of disreputable persons and entities that FaxQom (a/k/a Steve Simms, a/k/a Michael Clement) surreptitiously engaged with during its engagement with BTL.[6]  See Biggerstaff Rpt. (Dkt. 207-5) at ¶¶ 13-22 (outlining sources of list data).

None of the things that would be expected in a typical TCPA case, however, were ever located, such as the equipment used by the fax broadcasters or detailed fax logs, and as discussed below, the Biggerstaff list is anything but reliable, containing a number of anomalies that should have been apparent to Mr. Biggerstaff or anyone with the experience he claims to have.  See disc. infra at 10-20.  As such,

---

[6] Many of the documents Mr. Biggerstaff relied upon were not properly authenticated and even more would not be admissible.  See, e.g., March 9, 2015 S. Pelowich Dep. Tr. ("Pelowich Dep."), Ex. B hereto, at 99:11-102:12 (contractor for 127 High Street did not produce fax lists and exception reports, was not the records custodian and "can't say they're authentic documents"); id. at 114:24-116:9 (contractor for 127 High Street could not confirm authenticity of zip file of documents provided to her by Plaintiffs' counsel).

we are left at this point with only a list of numbers of highly questionable lineage from over a decade ago, and it virtually goes without saying that telephone numbers are not class members.  See, e.g., Vigus v. Riverboat Cruises, 274 F.R.D. 229, 235-36 (S.D. Ill. 2011) (class based on telephone numbers was not "sufficiently defined so as to be identifiable" and could not be determined based on objective criteria using expert's method for determining which numbers had been reassigned and no longer had consent to receive pre-recorded calls).[7]

## B.    Settlement Negotiations

As would be expected, the infirmities in the Biggerstaff list and the anticipated problems in compiling a proper class list animated the negotiation of not only the Claim Form under consideration by the Court but also the Settlement Agreement itself.  See Jan. 20, 2022 Hr'g Tr. (Dkt. 338-1) at 43:24-44:20.  Unlike a typical TCPA fax case, the fact a particular number is on the Biggerstaff list is in no sense a guarantee a fax was actually sent to that number in 2009 or 2010.  See disc. infra at 10-17; see also, e.g., Pelowich Dep., Ex. B, at 129:5-24 (contractor for 127 High

---

[7] Vigus was a TCPA class action brought jointly by the Wanca firm as well as Intervenors' counsel. See Vigus, 274 F.R.D. at 231.  Mr. Biggerstaff was their expert.  See Expert Rpt. of R. Biggerstaff (Vigus, No. 3:08-cv-00786, Dkt. 71-7).  The case involved calls made to telephone numbers that at one point in time were held by persons who had consented to receiving calls from Harrah's.  See Vigus, 274 F.R.D. at 231-32.  Over time, however, a portion of those numbers were reassigned to persons who had not consented to receiving calls from Harrah's, and the claim in Vigus was that calls made to those numbers after reassignment violated the TCPA.  Id. at 232-33.  But recognizing the difficulty in determining who held what number when and after questioning Mr. Biggerstaff's methodology, the court in Vigus denied class certification based on ascertainability and predominance concerns.  Id. at 235-38.

Street "can't confirm and nobody can confirm what actual faxes were sent out to whom, by whom, and whether they were received" due to 127 High Street's 90-day records retention policy).

To the contrary and as demonstrated below, it is beyond credible dispute that faxes were <u>not</u> sent to a significant number of the numbers on Mr. Biggerstaff's list. <u>See</u> disc. <u>infra</u> at 11-14.  Accordingly, asking persons who submit a Claim Form to attest to the fact they actually received a fax from BTL at some point (as the Claim Form submitted with Plaintiffs' motion for preliminary approval does) is simply minimal assurance that those persons are eligible to make a claim.  <u>See id.</u>; <u>see also</u>, <u>e.g.</u>, <u>Causer v. Apria Healthcare</u>, 2014 WL 12966005, *5 (C.D. Cal. 2014) (claim form approved requiring claimants to attest to the fact "he or she received an autodialed, prerecorded, or artificial voice call on or behalf [sic] of Apria to a cell phone number").

Unfortunately, however, these problems extend beyond the issue of whether specific faxes were sent, as they will inevitably complicate the identification of the persons and entities who held the telephone numbers in 2009 and 2010, which is obviously essential for determining the names and addresses of class members. Although the reverse lookup process to be undertaken by the Settlement Administrator should identify to the extent feasible those persons and entities, we anticipate that only a very small fraction of the class can actually be identified with

8

any degree of reliability.  See, e.g., Balschmiter v. TD Auto Fin., 303 F.R.D. 508, 524 (E.D. Wis. 2014) (noting "both parties' experts agree that there is no reverse-lookup provider that can reliably provide subscriber information at a specified date in the past"); Sherman v. Yahoo, 2015 WL 5604400, *6 (S.D. Cal. 2015) ("Plaintiff has not explained how [reverse lookup databases] would verify that the current owners of the numbers were the owners over two and a half years ago.").  That issue will, of course, be fully addressed to the Court after the reverse lookup process has been completed and would be a problem even if the Biggerstaff list were perfectly accurate.  See Proposed Settlement Schedule (Dkt. 337-2) at 1.  But the unreliability of the Biggerstaff list no doubt impacts the notice process in multiple ways and also raises ascertainability concerns.  See disc. supra at 4 n.4.

## II.   THE BIGGERSTAFF LIST IS IN NO SENSE RELIABLE

As discussed below, there are multiple and varied reasons why the Biggerstaff list is not accurate or reliable.  See disc. infra at 10-17.  The reasons noted below are, in turn, in addition to the separate problems noted by Plaintiffs' counsel in their recent submission.  See Pls.' Brief Regarding Reliability (Dkt. 339) at 8 (noting "Plaintiffs lack the fax logs with respect to faxes sent to 78 percent of the target fax numbers" and further noting that BTL's prior expert (David Canfield) "dispute[d] the reliability of Biggerstaff's methods and opine[d] that 'it is not reasonable to assume that all of the numbers that did not appear on the exception report email

represent successful transmissions'").[8]  Any one of these reasons, however, would be enough to cast doubt on the Biggerstaff list itself and the care with which it was compiled, but taken together, they leave no question that the list is in no sense reliable.  See disc. infra at 10-17.

### A.   The Biggerstaff List Contains Numerous Anomalies That Undermine Its Reliability

Mr. Biggerstaff opines without reservation or qualification that the list of numbers he compiled and, in general, the conclusions he reached were reliable and accurate to a "reasonable degree of scientific certain[t]y" and that "[t]he principles and methods" he used were themselves "reliable, repeatable, and generally accepted."  See Biggerstaff Rpt. (Dkt. 207-5) at ¶ 55; Supp. Biggerstaff Rpt. (Dkt. 207-9) at ¶ 16.  Numerous anomalies are present in his list that not only undermine Mr. Biggerstaff's credibility in this case, however, but that also make clear the list itself is in no sense reliable, let alone reliable to a "reasonable degree of scientific certain[t]y."  See disc. infra at 11-17.

---

[8] In their recent submission, Plaintiffs cite two cases where Mr. Biggerstaff has been approved as an expert.  See Pls.' Brief Regarding Reliability (Dkt. 339) at 3 n.1 (citing Shamblin v. Obama for Am., 2015 WL 1909765, *3 (M.D. Fla. 2015), and Hunt v. 21st Mortg., 2014 WL 1664288, *3-4 (N.D. Ala. 2014)).  To be sure, there are other courts that have taken a dimmer view of Mr. Biggerstaff's qualifications and methodologies.  See, e.g., Physicians Healthsource v. Masimo, 2019 WL 8138043, *7-11 (C.D. Cal. 2019) (granting motion to exclude Biggerstaff's testimony where plaintiffs "failed to meet their burden [] of proving that Biggerstaff's testimony is reliable both as to Biggerstaff's methods and as to whether the testimony has a reliable basis in the knowledge and experience of the discipline").  Neither case relied on by Plaintiffs, however, is remotely comparable to this one, and both cases only raise further questions regarding Mr. Biggerstaff and his opinions in this case, as addressed below.  See disc. infra at 10-20.

### 1.  Wireless Numbers

First, the Biggerstaff list contains at least 38 telephone numbers that were assigned as wireless numbers ab initio and that as a result almost certainly could not have received a fax.[9]  See Sponsler Decl., Ex. A, at ¶¶ 10, 12.[10]  The presence of these numbers on the Biggerstaff list should have been apparent to Mr. Biggerstaff, and if he had recognized the anomalies (assuming he did not), they should have caused him to question the overall accuracy of the list as well as the reliability of the sources he relied upon.[11]  See Sponsler Decl., Ex. A, at ¶ 10.

But if the methodology Mr. Biggerstaff used led him to conclude that faxes were sent to these wireless numbers (as it clearly did), then his methodology is

---

[9] The 38 wireless lines noted in the declaration of Ken Sponsler (being submitted herewith) were wireless lines from inception, and wireless devices are generally not capable of sending or receiving faxes and were even less capable of doing so in 2009 and 2010 (if at all).  See Sponsler Decl., Ex. A, at ¶¶ 10, 34.  Mr. Biggerstaff, however, opined that all of the telephone lines on his list were capable in 2009 and 2010 of receiving faxes and that all faxes on the list were sent on BTL's behalf.  See Biggerstaff Rpt. (Dkt. 207-5) at ¶¶ 23, 54.  That is plainly false.  See disc. infra at 11-12.

[10] Mr. Sponsler was retained by BTL when Mr. Canfield could no longer continue to serve as an expert in this case due to the health issues Mr. Canfield faced that were previously noted to the Court.  See BTL's Motion for Stay (Dkt. 237) at 8-10.

[11] Stated otherwise, if the presence of a specific number on the Biggerstaff list and in the records upon which he relied reliably and conclusively meant (as Mr. Biggerstaff opined) that a fax was successfully sent to that number, what explains the fact that over 30 faxes could not have possibly been sent to numbers on the Biggerstaff list that were initially and always assigned to wireless accounts?  See disc. infra at 11-12.  Undetected and unexplained anomalies are, of course, a strong indication under Daubert that a chosen methodology is suspect and unreliable, and that is certainly the case here.  See, e.g., Farmer v. DirectSat, 2013 WL 1195651, *5-10 & n.6 (N.D. Ill. 2013) (excluding expert and noting proposed report did not address, inter alia, "his failure to systematically or scientifically review the data for errors or anomalies that might render the application of his methodology inappropriate").

fundamentally flawed and his conclusions are (at a minimum) highly suspect.  See, e.g., Hunter v. Time Warner, 2019 WL 3812063, *12 (S.D.N.Y. 2019) (denying class certification in part, because the defendant "persuasively demonstrated that [the plaintiff's expert's] methodology is incapable of accurately and reliably identifying a class of individuals that have received wrong-number calls").  Moreover, the documents and data on which Mr. Biggerstaff based his list are themselves unreliable to the extent they reflect (as he claims they do) that confirmed faxes were sent to these wireless numbers.  See Sponsler Decl., Ex. A, at ¶¶ 10, 77.[12]

### 2. Mr. Biggerstaff Also Did Not Consider False Positives Consisting Of Zero Pages Sent And Zero Baud Rates

Second, Mr. Biggerstaff opined that faxes allegedly sent by Rocket Messaging were "successful error-free transmissions" based on the presence of a "STATUS '0'" in the logs[.]"  Biggerstaff Rpt. (Dkt. 207-5) at ¶ 16.  Mr. Biggerstaff's records indicate, however, that 250 faxes with a Status Code 0 have zero pages sent and no "baud rate" (a measure of the extent to which two fax machines are communicating).[13]  See Sponsler Decl., Ex. A, at ¶¶ 8, 33 & Ex. 5.  Based on the reports submitted to the Court, Mr. Biggerstaff did not take these instances of false

---

[12] What Mr. Biggerstaff perceived in the records he reviewed as "message confirmation" of successful transmissions is plainly not, and if the evidence of transmission Mr. Biggerstaff relied upon for these 38 numbers is not reliable, then the rest of the evidence for the other numbers is likely not as well.  See Sponsler Decl., Ex. A, at ¶ 10, 77.

[13] A record showing zero pages and no baud rate indicates an attempted transmission was not successful, as no pages were sent and there was no communication between the two machines. See Sponsler Decl., Ex. A, at ¶ 33.

positives into account or try to explain them, and they certainly negate his overall assumption that "Status Code '0'" indicates a successful, error-free transmission.[14] See id. at ¶¶ 8, 33.

### 3.   The National Do Not Call Registry / Florida Do Not Call List

Third, Mr. Biggerstaff failed to account for the fact that a significant number of the telephone numbers on his list were on either the National Do Not Call Registry or the Florida Do Not Call List during the relevant time period, a clear red flag.  See Sponsler Decl., Ex. A, at ¶¶ 11-12, 39.  As confirmed by Mr. Sponsler, it is extremely unlikely that an operative fax line would be on the National Do Not Call Registry or the Florida Do Not Call List.  See id.  The Federal Trade Commission ("FTC") has also made this clear, noting that the National Do Not Call Registry does not include fax lines:

> The [National Do Not Call] Registry is for personal phone numbers. Business phone numbers and fax lines are not covered.

National Do Not Call Registry FAQs, FTC, https://www.consumer.ftc.gov/articles/national-do-not-call-registry-faqs (lasted visited Feb. 18, 2022); Florida Do Not Call FAQs, Fla. Dep't of Agric. and Consumer Servs., https://www.fdacs.gov/Business-Services/Florida-Do-Not-Call (last visited Feb. 18, 2022).

---

[14] At least 45 phone lines on Mr. Biggerstaff's list with a Status Code 0 are exclusively associated with zero pages sent and no baud rate, meaning there is no record of any fax being sent to those numbers, which account for approximately 250 faxes that Mr. Biggerstaff claims were sent.  See Sponsler Decl., Ex. A, at ¶¶ 8, 33.

The fact, however, that 25,319 of the telephone numbers on the Biggerstaff list (over 19 percent of the total) are on the National Do Not Call Registry and 21,883 lines (over 16 percent of the total) were on the National Do Not Call Registry when faxes were allegedly sent on behalf of BTL in 2009 and 2010 strongly suggests that Mr. Biggerstaff's list is unreliable and that it contains numerous errors.  See Sponsler Decl., Ex A, at ¶ 39.  But for his part, Mr. Biggerstaff apparently did not even consider this issue and made no effort at all to reconcile his conclusions with this information or cross-check his results against those two registries, let alone actually verify his results.   See id.; Biggerstaff Rpt. (Dkt. 207-5) at passim; Second Biggerstaff Rpt. (Dkt. 210-2) at passim.

### 4.    Mr. Biggerstaff Largely Ignored (And Obviously Cannot Explain) The Test Faxes That He Reported Were Sent To BTL But That Were Never Received

Fourth, Mr. Biggerstaff made little or no effort to account for the five test numbers BTL supplied to FaxQom or the fact that as few as only one fax was received by BTL out of the 21 supposedly sent to those numbers, according to the records Mr. Biggerstaff relied on in compiling his list.  See March 25, 2014 M. Kaiser Dep. Tr., Ex. C hereto, at 162:24-163:19, 169:21-170:3 (BTL's representative testifying he only recalled receiving one fax); Aug. 17, 2009 Email fr. M. Kaiser, Ex. D hereto, at BLP000092 (questioning why fax to test number not sent); Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 77; see also disc. infra at 20-22.

Instead, Mr. Biggerstaff relied upon little more than ipse dixit, arguing that the test faxes must have been sent, because his list and the records he relied on said they were, in spite of countervailing evidence that they were never actually received by BTL.[15]  See Second Biggerstaff Rpt. (Dkt. 210-2) at ¶¶ 75-77.  Like the other anomalies, however, this one too remains unexplained by Mr. Biggerstaff, although the obvious explanation is apparent.[16]  See id. ¶ 77, Ex. 2 (relying only on unverifiable High Street fax lists and exception reports and Rocket Messaging summary fax logs to conclude faxes were successfully sent).

### 5.  Online Fax Services

Fifth, the Biggerstaff list makes no accounting for faxes sent to numbers associated with online, Internet or cloud-based fax services such as eFax, MetroFax, SRFax or RingCentral Fax ("Online Fax Services") as opposed to traditional

---

[15] This approach pervades many of the opinions rendered in this case by Mr. Biggerstaff.  See Second Biggerstaff Rpt. (Dkt. 210-2) at ¶¶ 75-77, 81, 84.  He cites himself and the evidence he chose to rely upon, while ignoring countervailing evidence or rejecting the countervailing evidence by simply re-citing the evidence that is called into question by the countervailing evidence.  See id.  Sending a fax and receiving a fax, however, are obviously two different things, and the mere fact a telephone number is present on a list from a fax broadcaster that is paid per fax scarcely means that the fax was actually sent, let alone actually received.  See, e.g., Presswood v. Am. HomePatient, 2021 WL 3674596, *3 (E.D. Mo. 2021) (denying class certification in part, because "there [we]re no fax logs to serve as common proof of successful sending, and the evidence demonstrates that nearly 60% of the class did not receive the fax at issue") (emphasis in original).  Moreover, ipse dixit is in many respects the antithesis of what leads to "scientific certain[t]y."  See McClain v. Metabolife, 401 F.3d 1233, 1244 (11th Cir. 2005) (reversing admission of expert testimony and noting nothing "requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert") (internal quotation and citation omitted).

[16] The various entities with which FaxQom / Clement/Simms surreptitiously contracted obviously had a built-in incentive to inflate the number of faxes sent, as they were paid per fax.  See, e.g., Expert Report of D. Canfield ("Canfield Rpt.), Ex. E hereto, at ¶ 18 n.1.

15

telephone facsimile machines.  <u>See</u> Sponsler Decl., Ex. A, at ¶¶ 65-67.  As the FCC has made clear, the TCPA does <u>not</u> apply to fax transmissions received through Online Fax Services, because the transmission is converted into an electronic message (<u>e.g.</u>, an email with an attachment) that is not received on a telephone facsimile machine, as is otherwise required by the TCPA.  <u>See id.</u> at ¶¶ 56-57, 63-64; <u>In the Matter of Amerifactors</u>, 2019 WL 6712128, *3-4 (F.C.C. 2019); <u>In the Matter of J. Ryerson & Son</u>, 2020 WL 5362216, at *3-4 (F.C.C. 2020).[17]

There are numerous types of Online Fax Services, and certain Voice over Internet Protocol ("VoIP") services qualify as Online Fax Services as well.  <u>See</u> Sponsler Decl., Ex. A, at ¶¶ 60-61.  Online Fax Services, however, represent a substantial portion of the fax marketplace, especially among small businesses, given their convenience, low cost and security features.  <u>See id.</u> at ¶¶ 67-73.

A significant portion of the proposed class almost certainly used an Online Fax Service, but it is not feasible to reliably identify from the records available in

---

[17] During the notice and comment period on this issue, Mr. Biggerstaff submitted comments to the FCC, arguing all faxes sent to Online Fax Services should be covered by the TCPA.  <u>See</u> <u>In the Matter of J. Ryerson & Son</u>, 2020 WL 5362216, *2 ("Commenter Biggerstaff argues that all faxes are sent digitally, and can be received or sent using a computer, but the message in question should be considered a fax and not an email because '[w]hen someone uploads a list of 10-digit telephone numbers and a fax image to a fax broadcaster's website, they are undoubtedly sending faxes as a result of their actions even though they used a web browser to start the process.'").  That view, however, was conclusively <u>rejected</u> by the FCC, though it may explain to a degree why Mr. Biggerstaff was unconcerned with the presence of numbers associated with Online Fax Services on his list.  <u>See id.</u> at *4 ("We disagree with commenters who argue that the TCPA should apply because it should protect consumers from transmissions converted to email.").

this case the specific fax numbers on Biggerstaff's list that were associated with an Online Fax Service (as opposed to a telephone facsimile machine) as of 2009 and 2010.  See Sponsler Decl., Ex. A, at ¶¶ 6, 13-14.  Nor did Mr. Biggerstaff make any effort whatsoever to do so, instead gratuitously assuming that every number on his list was not associated with an Online Fax Service and was instead a number to which faxes were sent over telephone lines, which are covered by the TCPA.  See Second Biggerstaff Rpt. (Dkt. 210-2) at passim (failing to analyze at all the impact of Online Fax Services).  It would, however, require detailed individualized inquiries with respect to each proposed class member to make such a determination.  See Sponsler Decl., Ex. A, at ¶ 14.  But like the other issues addressed in this submission, this issue went wholly unexplained and apparently undetected by Mr. Biggerstaff.[18] See Biggerstaff Rpt. (Dkt. 207-5) at passim.

---

[18] In the one case Plaintiffs cited to bolster the Mr. Biggerstaff's credibility (i.e., Shamblin), the court did accept Mr. Biggerstaff as an expert but then proceeded to deny class certification, concluding that the commonality requirement of Rule 23 was not satisfied, because contrary to Mr. Biggerstaff's opinion, individualized proof would be necessary for each class member to determine (a) whether a telephone number was assigned to a cellular number at the time the call was allegedly made and (b) whether the recipient of the call had consented.  See Shamblin, 2015 WL 1909765, at *7.  In reaching that conclusion, Judge Hernandez rejected Mr. Biggerstaff's opinion that "classwide proof is available on these specific issues."  Id. at *7 n.2 ("[T]he Court disagrees with any of their conclusions tending to suggest that classwide proof is available on these specific issues.").  Given the anomalies in the Biggerstaff list in this case and the recent decision of the FCC that the lack of consent would have to be demonstrated in this case for each member of the proposed class, however, Plaintiffs' citation to Shamblin is more than a little ironic.  See Order, In re Rules & Regs. Implementing TCPA, 33 FCC Rcd. 11179 (2018); Final Rule, In re Rules & Regs. Implementing TCPA, 84 Fed. Reg. 10266 (F.C.C. 2019); see also Amchem v. Windsor, 521 U.S. 591, 620-21 (1997) (the United States Supreme Court holding that a settlement class must satisfy the requirements of Rule 23).

### B.   Mr. Biggerstaff Either Did Not Request Or Did Not Have Access To The Basic Sorts Of Information That Would Be Available In A Typical TCPA Fax Case

In a typical TCPA case, we would have available for inspection and testing the equipment used by the fax broadcaster.  See, e.g., Lyngaas v. Curaden, 2019 WL 6210690, *15 (E.D. Mich. 2019) (noting in excluding testimony that expert "did not review any information establishing that . . . software and equipment was in good working order [on the days in question]; that the proper procedures were implemented in programming and operating the equipment on those dates; or that the software was regularly tested for programming errors").  We would likewise have the documentation and manuals available for the equipment that was used, which, among other things, would provide detailed information regarding how logs were compiled on the equipment and what the various codes mean in the logs generated.[19]  See, e.g., Canfield Rpt., Ex. E, at ¶¶ 22, 25.

---

[19] The reliance of Plaintiffs on the Hunt decision in their recent submission is also telling vis-à-vis the availability of equipment for inspection.  See Pls.' Brief Regarding Reliability (Dkt. 339) at 3 n.1.  In Hunt, the court plainly had reservations about Mr. Biggerstaff but ultimately allowed him to testify on a very narrow and idiosyncratic topic (namely, what practices the defendant in Hunt was likely to have employed using the equipment it had since destroyed), precisely because Mr. Biggerstaff was unable to inspect the telephone system used by the defendant, as the defendant in Hunt discarded that system shortly after being sued.  See Hunt, 2014 WL 1664288, *4-5.  In this case, Mr. Biggerstaff likewise had no opportunity to inspect anything but expressed no reservations at all about the lack of access to the fax broadcasting systems used by the various fax broadcasters.  See Biggerstaff Rpt. (Dkt. 207-5) at ¶¶ 13-23.  The critical difference here, however, is that BTL had nothing to do with the unavailability of those systems for inspection in this case.  See Pelowich Dep., Ex. B, at 129:2-4 (noting BTL "never directed that anything be destroyed").  Until this suit was filed, BTL was not even aware of the existence of USA Datalink, 127 High Street or Rocket Messaging or of their roles in sending any faxes purportedly on behalf of BTL.  See Cin-Q v. BLP, 2014 WL 7224943, *8 (M.D. Fla. 2014) ("[T]he record reveals that [BTL] had no access to the

18

In a typical TCPA fax case, we would also have detailed fax detail records, which typically include, <u>inter alia</u>, the following information:  (1) the date of each fax; (2) the duration of each fax; (3) start and end time of each fax; and (4) pages sent.  <u>See</u> Sponsler Decl., Ex. A, at ¶ 31 & Ex. 4.  All of this information is important, however, because it allows for crucial cross-checks on the data compiled.  <u>See</u> <u>Lyngaas</u>, 2019 WL 6210690, *10 (noting "courts are encouraged 'to assure accuracy by requiring the proponent to lay a proper foundation by showing that the machine and its functions are reliable, that it was correctly adjusted or calibrated, and that basic data put into the machine are accurate'") (citation omitted).  For example, the duration of each fax is important, because even if a fax is logged as a successful receipt, that may be erroneous information unless the transmission time of the fax was at least 30 seconds per page.[20]  <u>See</u> Sponsler Decl., Ex. A, at ¶ 31.

We, of course, have <u>none</u> of the foregoing here.  <u>See</u> Sponsler Decl., Ex. A, at ¶ 31.  Instead, we have incomplete lists in various formats from different broadcasters for some faxes over different periods of time.  <u>See</u> Biggerstaff Rpt. (Dkt. 207-5) at ¶¶ 13-23.  Indeed, the contrast between a typical fax detail record and what Mr. Biggerstaff relied upon here is stark.  <u>Compare</u> Sponsler Decl., Ex. A, at ¶ 31 & Ex. 4 (representative fax detail record), <u>with</u> <u>id.</u> at ¶ 31 & Ex. 5 (Rocket

---

fax lists at issue" and "was unaware of FaxQom's outsourcing to third parties USA Datalink, 127 Highstreet, and Rocket Messaging[.]").

[20] A one-page fax typically takes 30 to 60 seconds.  <u>See</u> Sponsler Decl., Ex. A, at ¶ 31.

Messaging record lacking indicia of transmission such as fax duration); see also Canfield Rpt., Ex. E, at ¶¶ 15-16, 18-21.  Without fax detail records, however, with typical fields allowing for cross-checks on claims of successful transmission as well as positive confirmation of receipt, the information Mr. Biggerstaff purported to rely upon leaves a great deal to be desired, to say the least.  See Sponsler Decl., Ex. A, at ¶¶ 31-34.

### III.   THE RECENT CLAIMS OF INTERVENORS REGARDING FALSE POSITIVES AND BTL'S TEST FAXES ARE SIMPLY NOT SUPPORTED BY THE RECORD

In their recent submission, Intervenors tried to cast doubt on the issue of false positives as it relates to the test faxes BTL asked FaxQom to include with each fax broadcast.  See Intervenors' Resp. (Dkt. 338) at 2-3.  The actual record, however, which admittedly Intervenors and their counsel had no role in amassing, makes very clear that not only are there many false positives on the Biggerstaff list, but also that there is no question that the vast majority of the test faxes BTL asked be sent were not actually received (or likely even sent), though Mr. Biggerstaff included all of them on his list and opined that there was supporting confirmation of successful receipt for each.  See Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 77, Ex. 2.

### A.   BTL Received As Few As Only One Of The 21 Faxes That Mr. Biggerstaff Claimed Were Successfully Sent To It

The claims of Intervenors notwithstanding, the current record fully supports the statements that were made at the January 20, 2022 hearing regarding the issue of

false positives, and the additional evidence provided with this submission only bolsters that conclusion. <u>See</u> disc. <u>supra</u> at 10-17. It is undisputed, however, that BTL supplied five of its own fax numbers and requested that those numbers be included by FaxQom in <u>each</u> of the several fax broadcasts requested by BTL. <u>See</u> Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 77, Ex. 2; Canfield Rpt., Ex. E, at ¶ 41; Kaiser Dep., Ex. C, at 48:2-7. Given there were "three (3) alleged fax jobs with 127 High Street and twenty-two (22) alleged fax jobs with Rocket Messaging," BTL should have received up to 125 faxes. <u>See</u> Canfield Rpt., Ex. E, at ¶ 42. There is no explanation in the record or from Mr. Biggerstaff as to why as many as 125 faxes were not sent to and received by BTL, but Mr. Biggerstaff opined that 21 faxes were successfully sent to BTL, based on his review of the records of 127 High Street and Rocket Messaging. <u>See</u> Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 77, Ex. 2.[21]

BTL's corporate representative testified, however, that BTL only received one of the 21 faxes that Mr. Biggerstaff opined were successfully sent to BTL. <u>See</u> Kaiser Dep., Ex. C hereto, at 162:24-163:11. Mr. Kaiser stated that "the only one I

---

[21] Mr. Canfield (BTL's prior expert) agreed that the Biggerstaff list reflects 21 faxes having been successfully sent to the test numbers supplied by BTL, but Mr. Canfield <u>strongly</u> disagreed with Mr. Biggerstaff in terms of how many test faxes were actually received by BTL and also disagreed with Mr. Biggerstaff's assessment of how many faxes were received by each respective line. <u>Compare</u> Canfield Rpt., Ex. E, at ¶¶ 42-43, <u>with</u> Second Biggerstaff Rpt. (Dkt. 210-2) at Ex. 2. Furthermore, Mr. Biggerstaff's calculation of the number of faxes successfully sent to the BTL test numbers was revised without explanation from the Biggerstaff Report to the Second Biggerstaff Report. <u>Compare</u> Biggerstaff Rpt. (Dkt. 207-5-207-7) at Ex. 7 pp. 1, 198, 200, 246, 282 (sum of values for test fax numbers equals 17), <u>with</u> Second Biggerstaff Rpt. (Dkt. 210-2) at Ex. 2 (claiming 21 successful, error-free transmissions to BTL).

can say with certainty that went out is the one that I received." See id. at 163:18-19; see also id. at 169:25-170:3.

In light of the claims made by Intervenors' recent motion and so that the record is perfectly clear on this issue, we contacted Mr. Kaiser in the preparation of this submission, and he provided a declaration which is included as Exhibit F.  In that declaration, Mr. Kaiser again confirms that he recalls receiving the one fax about which he testified in his 2014 deposition but has no recollection of BTL receiving even five of those faxes.  See Declaration of M. Kaiser, Ex. F hereto, at ¶ 5.  Mr. Kaiser further attests that if approximately 20 other faxes had actually been received by BTL, he would have certainly been aware of that.  See id.  The record thus establishes that BTL did not receive approximately 20 of the faxes that Mr. Biggerstaff claims were successfully sent to BTL, contrary to Intervenors' current claim and Mr. Biggerstaff's opinions.  See Intervenors' Resp. (Dkt. 338) at 2.[22]

---

[22] Further undermining Mr. Biggerstaff's conclusion that the 127 High Street fax lists and exception reports show successful, error-free transmissions, Mr. Sponsler has identified at least one instance in which a BTL test fax number is present on an exception report for a specific day's fax job but is not present on the target fax list for that day.  See Sponsler Decl., Ex. A, at ¶ 36.  As with the numerous other anomalies discussed in this submission, however, there is no indication Mr. Biggerstaff discovered, explained or took this anomaly into account, even though it plainly undermines the notion that the 127 High Street fax lists and exception reports are accurate (i.e., a fax number should not be on an exception report if an attempt was not made to send a fax to that number in the first instance).  See id.

### B.   Intervenors Distort The Testimony Of Mr. Canfield And Take His Testimony Completely Out Of Context

In their recent submission, Intervenors claim that BTL's previously-designated expert (Mr. Canfield) testified that there was "no evidence of any actual 'false positive' in Biggerstaff's list of fax numbers . . . ."  Intervenors' Resp. (Dkt. 338) at 2.  Intervenors, however, quote Mr. Canfield entirely out of context and without regard to the procedural history of the case.  See id. at 2-3.[23]

The absence of trace logs and other supporting materials (e.g., documentation for the fax broadcasting systems) necessarily means that there is no proof that any fax was successfully sent, and as Mr. Canfield testified, the records available contained "large discrepancies" between 127 High Street and Rocket Messaging in terms of what they "report[ed] as a success rate."  See Canfield Dep., Ex. G, at 162:7-163:3.  Mr. Canfield testified that "we know that things are occurring that are anomalies that are not normal with the system," but without "a trace log, something that would show the definitive communication between sending machine, receiving machine," it is not possible to resolve those anomalies or determine that any faxes

---

[23] At the time of Mr. Canfield's deposition, Mr. Biggerstaff had not agreed to sit for deposition, and he has not agreed to do so as of the date of this submission.  See disc. supra at 5-6.  Mr. Canfield made clear, however, that a fundamental problem with Mr. Biggerstaff's analysis was "the absence of a trace log," which "renders moot the ability to make th[e] determination" that any fax was successfully sent in the first instance.  See Dec. 10, 2015 D. Canfield Dep. Tr. ("Canfield Dep."), Ex. G hereto, at 161:21-23; see also id. at 161:23-162:17.

were successfully sent. Id. at 163:1-23.[24] And as the additional evidence submitted herewith establishes, many of the faxes simply could not have been successfully sent, because the numbers on Mr. Biggerstaff's list could not have received the fax transmissions that Mr. Biggerstaff otherwise claims were received.[25] See disc. supra at 11-15.

## IV.  CONCLUSION

The Biggerstaff list is in no sense accurate or reliable, and apart from the broader implications of the problems with the Biggerstaff list that have now come to light, the requirement in the Claim Form that claimants attest to the fact they received at some point in time a fax purportedly sent on behalf of BTL is a perfectly

---

[24] The extracted testimony of Mr. Canfield that Intervenors addressed in their recent submission involved whether there was evidence of a false positive in the few records to which Mr. Biggerstaff did have access, an issue akin to whether it is possible to prove a negative. See Intervenors' Resp. (Dkt. 338) at 2-3. In responding to a series of questions that were vague and confusing by any standard, Mr. Canfield testified that there was neither confirmation nor refutation of false positives in the materials Mr. Biggerstaff relied upon, because those materials were incomplete, trace logs were not available and there were numerous anomalies in what was available. See Canfield Dep., Ex. G, at 161:8-162:21 (noting the lack of trace logs "renders moot the ability" to make a definitive determination as to false positives, but that there are nevertheless "large discrepancies").

[25] Intervenors also complained in their submission that they were not consulted in connection with the joint motion of Plaintiffs and BTL. See Intervenors' Resp. (Dkt. 338) at 1-2. BTL, however, had no intention of excluding any party and, for that reason, conferred with Mr. Addison, who has been appointed by the Court as Interim Lead Counsel for the proposed settlement class, including Intervenors. See Order (Dkt. 284) at ¶ 1(c). In any case, the Court has granted Intervenors the right to submit a brief on the reliability of the Biggerstaff records by February 25, 2022, and Intervenors did not object to any of the other relief sought in the joint motion. See Order (Dkt. 340); Intervenors' Resp. (Dkt. 338) at 2, 3 ("Intervenors take no position on the other issues raised in the joint motion.").

reasonable and appropriate requirement under the circumstances presented in this case.

BTL, in turn, would be more than willing to make Mr. Sponsler available for an evidentiary hearing before the Court on the matters addressed in his declaration and/or to make him available for deposition.  And BTL would likewise welcome the opportunity as part of confirmatory discovery to examine Mr. Biggerstaff at long last, should the Court be inclined to credit his opinions in this case.

Date:  February 18, 2022

Respectfully submitted,

/s/ Mark S. Mester
Mark S. Mester, One of the Attorneys
for Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
          robert.collins@lw.com

Joseph H. Varner, III
(Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2022, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system.

Date:  February 18, 2022

/s/ Mark S. Mester
Mark S. Mester, One of the Attorneys for
Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com