UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., *et al.*,

       Plaintiffs,

v.                                                                  Case No. 8:13-cv-1592-AEP

BUCCANEERS LIMITED
PARTNERSHIP,

       Defendant.
_____/

## **ORDER**

     Yet again, the Court confronts the issue of the propriety of the preliminary approval of the settlement of the class claims in this matter.   Currently before the Court is the Unopposed Motion for Preliminary Approval of Class Action Settlement and Notice to the Class submitted by Plaintiffs Cin-Q Automobiles, Inc. ("Cin-Q") and Medical & Chiropractic Clinic, Inc. ("M&C") (collectively, "*Cin-Q* Plaintiffs")[1] (Doc. 324).   *Cin-Q* Plaintiffs and Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL" or "Defendant") reached a proposed settlement regarding the class claims in this action and, by the instant motion, seek preliminary approval of the class action settlement and issuance of notice to the putative class.   For the following reasons, the motion is granted, the class settlement is preliminarily approved, and notice shall be provided in the manner and to the

_____

[1]   Though *Cin-Q* Plaintiffs are the named plaintiffs in this action, the Court will refer to them as *Cin-Q* Plaintiffs throughout this Order for consistency.

extent outlined herein.

## I.     Background

### A.     *Cin-Q Action*

In June 2013, Cin-Q initiated this action against BTL, alleging that BTL sent unsolicited advertisements via facsimile to Cin-Q in violation of the Telephone Consumer Protection Act ("TCPA"), as amended by the Junk Fax Prevention Act ("JFPA").  *See Cin-Q Automobiles, Inc. v. Buccaneers Ltd. P'ship, et al.*, Case No. 8:13-cv-1592-AEP (M.D. Fla. filed June 18, 2013) ("*Cin-Q Action*" or "this action") (Doc. 1).  The faxed advertisements pertained to Tampa Bay Buccaneers tickets and were allegedly sent by or on behalf of BTL in 2009 and 2010.  With the filing of the Complaint, Cin-Q submitted an initial motion for class certification.  *Cin-Q Action*, (Doc. 5).  A week later, Cin-Q submitted an Amended Complaint and an amended motion seeking class certification.  *Cin-Q Action*, (Doc. 7 & 8).

During the proceedings in the *Cin-Q Action*, the parties engaged in extensive discovery, motion practice, and mediation conferences, with no resolution, over the course of three years.   Initially, BTL moved to dismiss Cin-Q's First Amended Complaint, arguing that no basis existed for holding BTL liable for the allegedly unlawful actions of FaxQom, a third-party broadcast fax service, as the fax sent by FaxQom to Cin-Q exceeded the limited authority BTL bestowed upon FaxQom.  *Cin-Q Action*, (Doc. 17).   Mainly, BTL argued that it employed FaxQom as an independent contractor and, alternatively, even if FaxQom could be considered an agent of BTL, BTL specifically limited FaxQom's authority to act by instructing it

not to send unlawful facsimiles, meaning the fax sent to CinQ was the result of FaxQom acting beyond the scope of its authority. Upon consideration, the Court denied BTL's Motion to Dismiss, finding that Cin-Q alleged sufficient facts to state a *prima facie* case against BTL under a vicarious liability theory because Cin-Q demonstrated that BTL was a "sender" who authorized FaxQom to send the facsimile advertisements on its behalf and who received the benefits of those faxes and that material issues of fact remained that were inappropriate for resolution at that stage of the proceedings (Doc. 41).

Around the same time, Cin-Q moved to file a second amended complaint, M&C moved to intervene, Cin-Q and M&C moved to submit a second amended motion for class certification, and BTL subsequently moved to bifurcate the issues of vicarious liability and class certification. *Cin-Q Action*, (Doc. 37, 39, 63). Following hearings on those and other motions, the Court permitted the filing of the Second Amended Class Action Complaint, adding M&C as another named plaintiff and putative class representative and rendering the amended motion for class certification moot. *Cin-Q Action*, (Doc. 68). As to BTL's request to bifurcate, the Court granted it in part and denied it in part, indicating that discovery would not be bifurcated but that the Court would take up the issue of liability on summary judgment motions prior to consideration of the class certification issues. *Cin-Q Action*, (Doc. 68).

Following several discovery disputes, BTL submitted its Motion for Final Summary Judgment on the dispositive issue of BTL's alleged vicarious liability

under the TCPA and for alleged conversion of property. *Cin-Q Action*, (Doc. 129-37).  In sum, BTL argued that: (1) neither BTL nor the independent contractor it retained, FaxQom, sent a facsimile to either Cin-Q or M&C or to any member of the putative class; (2) if *Cin-Q* Plaintiffs received a single facsimile, it was sent by entities unknown to BTL; (3) BTL was the victim of fraud; (4) as a result of that fraud, BTL had no knowledge of, or control over, any of the individuals or entities that may have been involved in sending facsimiles; and (5) BTL did not convert Cin-Q or M&C's property. *Cin-Q Action*, (Doc. 129).  At the same time, *Cin-Q* Plaintiffs submitted their Motion for Summary Judgment, arguing that: (1) BTL was directly liable as the sender of unsolicited fax advertisements under the TCPA and FCC regulations; (2) there is no vicarious-liability requirement in a TCPA unsolicited-fax claim; (3) BTL was directly and vicariously liable under the common law of agency and torts; and (4) it was irrelevant whether FaxQom physically pressed the send button. *Cin-Q Action*, (Doc. 138).

Upon consideration of both motions for summary judgment, the responses in opposition thereto, and several supplements by the parties, the Court denied both summary judgment motions on December 17, 2014. *Cin-Q Action*, (Doc. 167).  In considering the TCPA claim, the Court concluded that the determination of "on whose behalf" the faxes were sent and of whether BTL constituted the "sender" for purposes of the TCPA remained questions for which material issues of fact existed in the record because the source, scope, and form of the offending directive was inconclusive.  With respect to the conversion claim, the Court determined that it

was ambiguous whether the complicated and shifting relationship between BTL and FaxQom lent itself to a finding that FaxQom's actions were attributable to BTL under Florida agency law and whether the conduct at issue exceeded the scope of FaxQom's authority.

Throughout 2015 and 2016, *Cin-Q* Plaintiffs and BTL continued to engage in extensive motion practice after the denial of the summary judgment motions, including *Cin-Q* Plaintiffs' motion for reconsideration, BTL's motions to consolidate cases, and BTL's motion to bifurcate and proceed directly to trial on the issue of liability. *Cin-Q Action*, (Doc. 168, 169, 170, 178). During that time, the Court denied the request to reconsider the Order denying the motions for summary judgment and determined that continuing the bifurcated procedure risked an unnecessary trial and multiple intervening appeals that posed an even greater threat to the speedy and inexpensive disposition of this action. *Cin-Q Action*, (Doc. 181). Additionally, the Court declined to certify questions for interlocutory review and, instead, indicated that the action would proceed directly to discovery in aid of *Cin-Q* Plaintiffs' anticipated motion for class certification under Rule 23. *Cin-Q Action*, (Doc. 181).

*Cin-Q* Plaintiffs and BTL continued to engage in discovery in preparation for the filing of the class certification motion and sought several extensions for the submission of the motion. Finally, on March 25, 2016, after surviving BTL's motions to dismiss and for summary judgment, *Cin-Q* Plaintiffs submitted another motion for class certification. *Cin-Q Action*, (Doc. 207). As set forth more fully in

the class certification motion, *Cin-Q* Plaintiffs detailed the actions that led to the purported transmission of the fax advertisements (Doc. 207, at 3-9). To summarize, BTL hired FaxQom to send fax advertisements for Tampa Bay Buccaneers football games in 2009 (Doc. 207, Ex. 1, Deposition of Matthew Kaiser (without exhibits) ("Kaiser Dep."), at 66-108). According to *Cin-Q* Plaintiffs' expert, Robert Biggerstaff ("Biggerstaff"), FaxQom used USADatalink and 127 High Street for the lists of fax numbers and as a fax broadcaster to physically transmit the faxes (Doc. 207, Ex. 4, Expert Report of Robert Biggerstaff (the "Biggerstaff Report")), ¶¶1 & 19). Beginning with the August 2009 faxes, FaxQom retained the services of Rocket Messaging Inc. ("RMI") as a fax messaging service (Biggerstaff Report, ¶1; Doc. 207, Ex. 7, Declaration of Ian Jenkins ("Jenkins Decl."), ¶¶2 & 5); Doc. 207, Ex. 8, Deposition of Ian Jenkins (without exhibits) ("Jenkins Dep."), at 31-47). Based on a review of the records provided from 127 High Street and RMI, Biggerstaff opined that he could determine the amount of unique fax numbers and successful error-free transmissions, despite some deficiencies with the records provided. Specifically, Biggerstaff estimated that BTL successfully sent 343,122 faxes to 131,011 unique fax numbers offering tickets to Tampa Bay Buccaneers football games from July 2009 through June 2010, with (1) 102,526 successful error-free transmissions received by 102,524 unique fax numbers from 127 High Street and (2) 240,596 successful error-free transmissions received by 120,232 unique fax numbers from RMI (Biggerstaff Report, ¶¶1, 16, 22). Based on the volume of fax advertisements sent, *Cin-Q* Plaintiffs sought class certification, defining the proposed classes as

6

follows:

Class A:
All persons or entities who were successfully sent facsimiles offering tickets to Tampa Bay Buccaneers games from July 14, 2009, through July 16, 2009, which contained the following statement at the bottom of the fax: "To immediately and permanently remove your fax number from our opt-in compiled database, please call 877-272-7614. Removaltech@FaxQom.com."

Class B:
All persons or entities who were successfully sent facsimiles offering tickets to Tampa Bay Buccaneers games from August 17, 2009, through August 20, 2009, which contained the following statement at the bottom of the fax: "To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205.  Removaltech@FaxQom.com."

Class C:
All persons or entities who were successfully sent facsimiles offering tickets to Tampa Bay Buccaneers games from May 24, 2010, through June 9, 2010, which contained the following statement at the bottom of the fax: "If your office has decide[d] to opt-out of further faxes please call 866-247-0920.  Thank you."

*See Cin-Q Action*, (Doc. 207).[2]

BTL planned to contest *Cin-Q* Plaintiffs' motion, including the findings set forth by Biggerstaff.  To that end, BTL received extensions to file its response to the Motion for Class Certification, during which the parties continued to leave settlement discussions open.  BTL then moved, on April 18, 2016, for a settlement

---

[2]  Notably, the Second Amended Complaint defined a single proposed class as follows:

All persons from July 1, 2009, to present who were sent facsimile advertisements offering group tickets or individual game tickets for the Tampa Bay Buccaneers games and which did not display the opt out language required by 47 C.F.R. 64.1200.

*See Cin-Q Action*, (Doc. 70, at 5).

conference before the Court or a designee as the parties had reached an impasse in their other settlement efforts, which *Cin-Q* Plaintiffs opposed. *Cin-Q Action*, (Docs. 215 & 219). Indeed, in April 2016, the mediator declared an impasse. *Cin-Q Action*, (Doc. 218). BTL thus never submitted a response to *Cin-Q* Plaintiffs' third motion seeking class certification. Rather, on May 12, 2016, BTL filed a Notice of Pendency of Related Action indicating that a related action was filed in the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida, captioned *Technology Training Associates, Inc. v. Buccaneers Limited Partnership, et al.*, Case No. 16-CA-004333 (Fla. Cir. Ct.) (filed May 6, 2016). *Cin-Q Action*, (Doc. 222). The filing of that action set off a firestorm of activity, culminating in nearly six more years of litigation.

### B.   *Technology Training I Action*

Namely, after the settlement discussions in the *Cin-Q Action* initially reached an impasse, and while the Motion for Class Certification remained pending in the *Cin-Q Action*, Technology Training Associates, Inc. and Larry E. Schwanke, D.C. d/b/a Back to Basics Family Chiropractic ("*TTA* Plaintiffs") contacted BTL regarding pursuit of the same class claims on behalf of the same purported class at issue in the *Cin-Q Action*. Subsequently, on May 6, 2016, *TTA* Plaintiffs initiated an action against BTL in the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida, alleging violations of the TCPA on behalf of the same class as the *Cin-Q Action* and regarding the same facsimile advertisements. *See Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, No. 16-CA-4333 (Fla. Cir. Ct.)

(filed May 6, 2016) ("*Technology Training I Action*") (Doc. 1); *Cin-Q Action*, (Doc. 223, Ex. A). *TTA* Plaintiffs similarly sought damages and injunctive relief under the TCPA both on behalf of themselves and a proposed class of similarly situated persons. Upon becoming aware of the pending *Technology Training I Action*, *Cin-Q* Plaintiffs sought to enjoin BTL from proceeding in the *Technology Training I Action* and moved for an order immediately certifying the class in the *Cin-Q Action* rather than in any other action. *Cin-Q Action*, (Docs. 223 & 224). *Cin-Q* Plaintiffs also asked the state court on May 13, 2016, to allow them to intervene in the *Technology Training I Action* or to strike the class allegations and disqualify *TTA* Plaintiffs' counsel (Doc. 223, Ex. D). The state court set the motion for a hearing to occur on May 19, 2016, but, prior to the state court's consideration of *Cin-Q* Plaintiffs' motion, *TTA* Plaintiffs voluntarily dismissed the *Technology Training I Action* on May 18, 2016.

Shortly thereafter, and given the existence of the claims by *TTA* Plaintiffs, the undersigned conducted a status conference in the *Cin-Q Action* on May 25, 2016 to address multiple motions filed by the parties in this action, including BTL's motion for settlement conference, *Cin-Q* Plaintiffs' motion to enjoin BTL from participating in a competing case, and BTL's motion for a determination that the mediation privilege had been waived. *Cin-Q Action*, (Docs. 215, 223, 231). After hearing oral argument regarding the motions and the status of the *Technology Training I Action*, the undersigned denied all three motions and directed *Cin-Q* Plaintiffs and BTL to conduct another mediation conference prior to BTL's June

20, 2016 deadline for filing a response to the Motion for Class Certification in this action. *Cin-Q Action*, (Doc. 233). During the hearing, the undersigned further directed that, if BTL entered into a settlement affecting class certification in the *Cin-Q Action*, BTL must notify *Cin-Q* Plaintiffs of the potential settlement in any separate action three days prior to the filing of any settlement or other filing relating to a settlement.

### C.   *Technology Training II Action*

Following dismissal of the *Technology Training I Action*, *TTA* Plaintiffs and BTL conducted two days of mediation, which resulted in an agreement on a class settlement (the "*TTA* Settlement") on June 16, 2016. Upon reaching the *TTA* Settlement with *TTA* Plaintiffs, BTL provided written notice to *Cin-Q* Plaintiffs of the *TTA* Settlement in accordance with the undersigned's directive at the May 25, 2016 hearing. Subsequently, *TTA* Plaintiffs initiated a new action on June 20, 2016. *See Tech. Training Assocs., Inc., et al. v. Buccaneers Ltd. P'ship*, Case No. 8:16-cv-1622-AEP (M.D. Fla.) ("*Technology Training II Action*") (Doc. 1). *TTA* Plaintiffs filed their Class Action Complaint on behalf of themselves and a class of similarly situated individuals, alleging claims for violations of the TCPA, conversion, and invasion of privacy. *Technology Training II Action*, (Doc. 1). Essentially, *TTA* Plaintiffs alleged that BTL violated the TCPA by sending unsolicited advertisements by facsimile in 2009 or 2010 offering tickets to Tampa Bay Buccaneers games, while failing to provide the proper opt-out notice required by the TCPA. In doing so, *TTA* Plaintiffs defined the similarly situated members of the

class as:

> All persons who, in 2009 or 2010, received one or more facsimile advertisements sent by or on behalf of [BTL] and offering tickets for Tampa Bay Buccaneers games.

*Technology Training II Action,* (Doc. 1, ¶17).   Specifically excluded from the settlement class were the following persons: (1) BTL and its respective parents, subsidiaries, divisions, affiliates, associated entities, business units, predecessors in interest, successors, successors in interest and representatives and each of their respective immediate family members; (2) Class Counsel; and (3) the judges who have presided over the litigation and any related cases.  *Technology Training II Action,* (Doc. 1, ¶18).  As for the relief requested, *TTA* Plaintiffs sought statutory damages, treble damages, injunctive relief, costs, and attorney's fees.

On the same day, *Cin-Q* Plaintiffs filed a Motion to Transfer Related Case under Local Rule 1.04(b), to Consolidate Cases, and Appoint Interim Class Counsel, seeking to (1) transfer the *Technology Training II Action* to the undersigned pursuant to Local Rule 1.04(b); (2) consolidate the *Cin-Q Action* with the *Technology Training II Action* following transfer; and (3) appoint the law firms of Addison & Howard, P.A. ("Addison & Howard"), and Anderson + Wanca as interim co-lead counsel for the class.  *Technology Training II Action,* (Doc. 8).  Additionally, on that day, *Cin-Q* Plaintiffs filed an identical Motion to Transfer Related Case under Local Rule 1.04(b), to Consolidate Cases, and Appoint Interim Class Counsel in the *Cin-Q Action* seeking the same relief, while BTL filed a Motion for a Stay or, in the Alternative, an Extension of Time in the *Cin-Q Action* seeking a stay of the *Cin-Q*

*Action* or, alternatively, an extension of time to respond to the Motion for Class Certification pending in the *Cin-Q Action*.   *Cin-Q Action*, (Docs. 236 & 237). Subsequently, on June 22, 2016, *TTA* Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Class Action Settlement and Notice to the Class. *Technology Training II Action,* (Doc. 18).  Pursuant to Rule 23(e), Plaintiffs requested, on behalf of themselves and a proposed settlement class of similarly situated persons (the "*TTA* Settlement Class"), that the Court enter an order (1) preliminarily approving the parties' proposed class action settlement agreement (the "*TTA* Settlement Agreement") that appointed *TTA* Plaintiffs as class representatives and their attorneys as class counsel; (2) approving the form of Class Notice attached to the *TTA* Settlement Agreement and its dissemination to the *TTA* Settlement Class by U.S. mail, website, and publication; and (3) setting dates for opt-outs, objections, and a fairness hearing.  *Technology Training II Action,* (Doc. 18).

Thereafter, on June 27, 2016, the undersigned conducted a status conference in the *Cin-Q Action* and the *Technology Training II Action*.   After hearing oral argument regarding the motions for class certification, to transfer, and to stay, pending in both actions, the undersigned granted BTL's request to stay the *Cin-Q Action*, stayed the *Cin-Q Action* pending further order of the Court, and permitted the parties in both the *Cin-Q Action* and the *Technology Training II Action* to file a supplemental memorandum regarding the appropriateness of conducting an inquiry into the allegations by *Cin-Q* Plaintiffs regarding the occurrence of a "reverse auction" in the *Technology Training II Action*.   In accordance with the Court's

directive, the parties briefed the issue of a "reverse auction" and the appropriateness of considering the issue prior to or after preliminary approval of class certification and the *TTA* Settlement.  *Technology Training II Action,* (Docs. 29-31).

On July 8, 2016, the deadline for the briefs, *Cin-Q* Plaintiffs additionally submitted their Motion to Intervene in the *Technology Training II Action*.  *Technology Training II Action,* (Doc. 28).  By the motion, *Cin-Q* Plaintiffs sought intervention as of right under Rule 24(a) and by permission under Rule 24(b).  Though *Cin-Q* Plaintiffs received permission from the Court to submit a brief as to the issue of a reverse auction, *Cin-Q* Plaintiffs wanted to intervene to move to strike the class allegations, arguing that the *TTA* Plaintiffs were barred by the statute of limitations and, if necessary, to oppose the motion for preliminary or final approval.  In support of intervention, *Cin-Q* Plaintiffs argued that their motion was timely, they possessed an interest related to the subject matter of the *Technology Training II Action*, the disposition of the *Technology Training II Action* might impede or impair their ability to protect their interests, and their interests were not adequately represented by the parties in the *Technology Training II Action*.  Both *TTA* Plaintiffs and BTL opposed *Cin-Q* Plaintiffs' request to intervene. *Technology Training II Action,* (Docs. 37 & 39).

After conducting further hearings on the matter, the Court issued its Order denying *Cin-Q* Plaintiffs' Motion to Transfer Related Case under Local Rule 1.04(b), to Consolidate Cases, and Appoint Interim Class Counsel; denying *Cin-Q* Plaintiffs' Motion to Intervene; and granting *TTA* Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Notice to the Class.  *Technology Training II Action,*

(Doc. 56).  In doing so, the Court considered, at length, the issue of *TTA* Plaintiffs' standing to bring the *Technology Training II Action* given *Cin-Q* Plaintiffs' argument that the statute of limitations barred *TTA* Plaintiffs' claims.  *Technology Training II Action,* (Doc. 56, at 13-21).  As discussed more fully therein, the Court concluded that *Cin-Q* Plaintiffs' arguments regarding the lack of standing by *TTA* Plaintiffs due to the running of the statute of limitations and the inapplicability of equitable tolling was misplaced because BTL explicitly and unequivocally waived the statute-of-limitations affirmative defense, with such waiver surviving in the event of termination of the *TTA* Settlement Agreement.  *Technology Training II Action,* (Doc. 56, at 14-15; *see* Doc. 18, Ex. 1, at XV.H.).

After concluding that *TTA* Plaintiffs established standing, the Court then determined that *TTA* Plaintiffs established the requirements for class certification under Rule 23(a).  *Technology Training II Action,* (Doc. 56, at 21-29).  Specifically, the Court determined that *TTA* Plaintiffs established numerosity, commonality, typicality, and adequacy of representation.  In discussing the adequacy-of-representation prong, the Court concluded that *TTA* Plaintiffs adequately represented the interests of the class and did not harbor any interests antagonistic to or in substantial conflict with those of the rest of the class.  *Technology Training II Action,* (Doc. 56, at 24-29).  With respect to the adequacy of *TTA* Plaintiffs' Counsel, Attorneys Phillip A. Bock ("Bock"), Jonathan B. Piper, and Daniel J. Cohen of the law firm Bock Law Firm, LLC d/b/a Bock, Hatch, Lewis & Oppenheim, LLC ("Bock Hatch"), the Court found counsel adequate to represent the interests of the

14

*TTA* Settlement Class. *Technology Training II Action,* (Doc. 56, at 25-29).  In making that finding, the Court addressed the issue that arose regarding whether a conflict existed with the representation of Bock Hatch based upon David M. Oppenheim ("Oppenheim") previously working for Anderson + Wanca on behalf of *Cin-Q* Plaintiffs in the *Cin-Q* Action and then switching firms to join Bock Hatch, the firm representing *TTA* Plaintiffs, while the *Cin-Q Action* remained pending.  *Technology Training II Action,* (Doc. 56, at 25-29).  After conducting an evidentiary hearing and allowing supplemental briefing on the issue, the Court concluded that no conflict existed and Oppenheim only owed a duty to the putative class, not to *Cin-Q* Plaintiffs – an issue thoroughly explored in *Medical & Chiropractic Clinic, Inc., v. Oppenheim, et al.*, Case No. 8:16-cv-1477-CEH-CPT (M.D. Fla. filed June 8, 2016) ("*M&C Action*"), as discussed more fully below.

Having satisfied the requirements of Rule 23(a), the analysis turned to whether *TTA* Plaintiffs could establish Rule 23(b)'s requirements of predominance of common issues and superiority of the class action to other means of litigation. *Technology Training II Action,* (Doc. 56, at 29-31).  Upon consideration, the Court concluded that the common issues outweighed and predominated over any individualized issues involved in the litigation and that proceeding as a class action provided the superior method to other methods available to fairly and efficiently adjudicate the controversy.  Having determined that preliminary certification of the *TTA* Settlement Class was warranted, the Court then turned to the issue of whether preliminary approval of the *TTA* Settlement Agreement was similarly warranted.

*Technology Training II Action,* (Doc. 56, at 31-37). Namely, the Court was tasked with determining whether the *TTA* Settlement constituted a fair, adequate, and reasonable resolution and did not result from collusion between the parties. *Technology Training II Action,* (Doc. 56, at 31-32). Upon review of the terms, the Court found that the *TTA* Settlement Agreement, which provided, among other things, a Settlement Fund up to $19.5 million and payments of up to $350 for the first facsimile and up to $565 total for up to five facsimiles to members of the *TTA* Settlement Class who submitted claims, appeared fair, adequate, and reasonable solely for purposes of preliminary approval. *Technology Training II Action,* (Doc. 56, at 33-34). Accordingly, the Court granted *TTA* Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Notice to the Class and set forth the terms of the preliminary certification of the *TTA* Settlement Class, including the time for disseminating notice to *TTA* Settlement Class members and the date and time for the fairness hearing. *Technology Training II Action,* (Doc. 56, at 37-39, 42-52).[3]

In addition to granting preliminary approval of the *TTA* Settlement Class, the Court denied *Cin-Q* Plaintiffs' Motion to Transfer Related Case under Local Rule 1.04(b), to Consolidate Cases, and Appoint Interim Class Counsel and denied *Cin-Q* Plaintiffs' Motion to Intervene. *Technology Training II Action,* (Doc. 56, at 39-42). As discussed, the Court did not need to transfer the action because the undersigned received the case through random assignment and then by consent to

---

[3] Notably, however, *TTA* Plaintiffs and BTL never issued notice to the Settlement Class, in contravention of the Court's Order, and the Court therefore never conducted a fairness hearing in the *Technology Training II Action* nor entered final approval.

the undersigned's jurisdiction by *TTA* Plaintiffs and BTL. *Technology Training II Action,* (Doc. 56, at 39). Further, given the preliminary approval of the *TTA* Settlement and appointment of *TTA* Plaintiffs' Counsel as class counsel, the considerations did not favor consolidation of the *Technology Training II Action* and the *Cin-Q Action* and obviated the need for appointment of Addison & Howard and Anderson + Wanca. *Technology Training II Action,* (Doc. 56, at 39-40).

Finally, in considering *Cin-Q* Plaintiffs' Motion to Intervene, the Court denied *Cin-Q* Plaintiffs' request both for intervention as of right, pursuant to Rule 24(a), and by permission, pursuant to Rule 24(b). *Technology Training II Action,* (Doc. 56, at 40-42). The Court concluded that *Cin-Q* Plaintiffs could assert their objections in the normal course of the proceedings, as anticipated by Rule 23, and that a potential incentive award to *Cin-Q* Plaintiffs and attorneys' fees for their counsel were not foreclosed, thereby negating their contention regarding the necessity for intervention as of right. Likewise, the Court concluded that permissive intervention was not appropriate since *Cin-Q* Plaintiffs could still assert their claims and defenses in this action at the appropriate time or could opt out of the class and continue to pursue their claims on an individual basis in the *Cin-Q Action*.

Given the rulings in the *Technology Training II Action*, the Court denied all pending motions in the *Cin-Q Action*, including *Cin-Q* Plaintiffs' Motion for Class Certification. *Cin-Q Action*, (Docs. 207, 236, 241, 250). The Court also stayed the *Cin-Q Action* pending further order of the Court.

**D.    *M&C Action***

Meanwhile, based on the initiation of the *Technology Training II Action*, M&C initiated an action against Oppenheim and Bock Hatch, in the Circuit Court of the 13th Judicial Circuit in and for Hillsborough County, Florida, on June 1, 2016, which Oppenheim and Bock Hatch then removed to federal court a week later. *See M&C Action*, (Docs. 1 & 2). M&C asserted claims for (1) breach of fiduciary duty against Oppenheim and Bock Hatch; and (2) aiding and abetting breach of fiduciary duty against Bock Hatch. *M&C Action*, (Doc. 2). Essentially, M&C claimed that it had an interest in being named as class representative and obtaining class certification for the proposed class after vigorously litigating the *Cin-Q Action* for the prior three years through fact discovery, class discovery, depositions, expert discovery, dispositive motions, and mediation conferences. *M&C Action*, (Doc. 2, ¶¶14-15). M&C further alleged that, during the course of the proceedings in the *Cin-Q Action* through the time of his resignation from Anderson + Wanca on April 8, 2016, Oppenheim represented M&C as its attorney in the *Cin-Q Action*, billing at least 80 hours on the matter; intimately involving himself in the preparation, strategy, and participation in the two mediation conferences conducted in the *Cin-Q Action*; completing multiple settlement negotiations in the *Cin-Q Action*; and operating as the primary point of contact for *Cin-Q* Plaintiffs with regard to the mediation conferences in the *Cin-Q Action.* *M&C Action*, (Doc. 2, ¶¶17-23). According to M&C, Oppenheim became familiar with and received access to the case strategy, discovery, analysis, and settlement strategy of *Cin-Q* Plaintiffs, the

purported class, and BTL, and was granted full authority to settle on behalf of *Cin-Q* Plaintiffs. *M&C Action*, (Doc. 2, ¶¶24-25). M&C alleged that Oppenheim prepared and submitted the mediation statements for both mediation conferences held in the *Cin-Q Action*, represented *Cin-Q* Plaintiffs at both mediation conferences, and held discussions with Michele Zakrewski, President of M&C, both before and after the mediation conferences. *M&C Action*, (Doc. 2, ¶¶26-28, 30-33, 35). Even though the parties to the *Cin-Q Action* did not reach a resolution during either of the first two mediation conferences, M&C alleged that Oppenheim remained involved in the matter through continued correspondence with the second mediator and other counsel for *Cin-Q* Plaintiffs and continued to receive access to purportedly privileged and confidential information regarding *Cin-Q* Plaintiffs and the putative class. *M&C Action*, (Doc. 2, ¶¶37-40). As a result of his involvement in the *Cin-Q Action*, M&C asserted that Oppenheim acted as M&C's attorney and thus owed it ethical and fiduciary duties. *M&C Action*, (Doc. 2, ¶¶41-47).

In April 2016, not long after the filing of the Motion for Class Certification Motion in the *Cin-Q Action*, Oppenheim resigned from Anderson + Wanca and joined Bock Hatch. *M&C Action*, (Doc. 2, ¶¶48-50). Shortly thereafter, in May 2016, Bock Hatch filed the *Technology Training I Action* and then, in June 2016, filed the *Technology Training II Action* asserting claims on behalf of the same putative class members identified in the *Cin-Q Action*, as discussed more fully above. *See M&C Action*, (Doc 2, ¶¶57-58). Based on the foregoing, M&C alleged a claim for breach of fiduciary duty against Oppenheim, which it asserted was imputed to Bock Hatch,

and a claim for aiding and abetting breach of fiduciary duty against Bock Hatch. *M&C Action*, (Doc. 2, ¶¶85-105). Namely, M&C alleged that Oppenheim owed M&C an undivided duty of loyalty to represent M&C's interests and a duty not to represent a client with interests materially adverse to M&C, with such duties continuing after his resignation from Anderson + Wanca, which were then imputed to Bock Hatch. *M&C Action*, (Doc. 2, ¶¶87-94). Further, M&C alleged that Bock Hatch aided and abetted the breach of fiduciary duty because Bock Hatch knew about Oppenheim's representation of M&C in the *Cin-Q Action*, and the attendant duties attached to such representation, and substantially assisted Oppenheim's breach of those duties. *M&C Action*, (Doc. 2, ¶¶99-102).

Following the filing of the Complaint and removal in the *M&C Action*, M&C filed its Amended Motion for Entry of Temporary Restraining Order and Preliminary Injunction seeking to enjoin Oppenheim and Bock Hatch from (1) representing any entity in a case alleging class-wide allegations substantially related to the *Cin-Q Action*; (2) representing *TTA* Plaintiffs in any actions substantially related to the *Cin-Q Action*; (3) engaging in settlement negotiations with BTL, or reaching a settlement, in any matter substantially related to the *Cin-Q Action*; and (4) using, disclosing, or relying upon confidential information Oppenheim gained while representing M&C, including information protected by the attorney-client privilege or mediation privilege. *M&C Action*, (Doc. 5). After conducting an evidentiary hearing in July 2016 regarding the request for a preliminary injunction, United States District Judge Charlene E. Honeywell ("Judge Honeywell") denied

M&C's motion for preliminary injunction in October 2016.  *M&C Action*, (Doc. 71). In doing so, Judge Honeywell determined that M&C could not establish a substantial likelihood of success on the merits of either its breach-of-fiduciary-duty claim or its aiding-and-abetting claim, could not establish a threat of irreparable harm, could not establish that any threatened injury to M&C outweighed the harm an injunction would cause Oppenheim or Bock Hatch, and could not establish that an injunction would serve the public interest.  *M&C Action*, (Doc. 71, at 5-15).  Judge Honeywell concluded that Oppenheim had a fiduciary duty to the entire class, including M&C, but it was questionable whether M&C could demonstrate the existence of a special fiduciary duty to M&C different from the fiduciary duty owed to all class members.  *M&C Action*, (Doc. 71, at 7).  Judge Honeywell further found, since neither Oppenheim nor Bock Hatch were pursuing relief for the class that was "materially adverse" to the interests of the other class members, including M&C, that M&C was unlikely to establish a breach of any duty owed by Oppenheim. *M&C Action*, (Doc. 71, at 9).  Then, Judge Honeywell determined that M&C failed to demonstrate irreparable harm because, among other things, any issue related to an alleged "reverse auction" could be remedied through the normal course of litigation, namely, the approval process of the *TTA* Settlement.  *M&C Action*, (Doc. 71, at 14).  Given those findings, Judge Honeywell determined that the balance of harm weighed against entry of an injunction, since M&C demonstrated no irreparable harm it would suffer, and that entry of an injunction would not serve the public interest as no materially adverse interest existed among the parties in the

*M&C Action*, the *Cin-Q Action*, and the *Technology Training II Action*.  *M&C Action*, (Doc. 71, at 15).

Notably, though, given the issues raised during the pursuit of the preliminary injunction in the *M&C Action*, the undersigned conducted an independent evidentiary hearing in the *Technology Training II Action* in October 2016 to also consider any potential conflict of interest related to Oppenheim's participation in the *Cin-Q Action* on behalf of *Cin-Q* Plaintiffs and the proposed class, given his subsequent departure from employment with Anderson + Wanca to employment with Bock Hatch, currently representing *TTA* Plaintiffs in the *Technology Training II Action*.  Both Oppenheim and Bock provided testimony during the hearing, while *Cin-Q* Plaintiffs were not permitted to participate in the evidentiary hearing in the *Technology Training II Action*.

Subsequently, in the *M&C Action*, M&C sought partial summary judgment on its claims solely as to the issue of liability, and Oppenheim and Bock Hatch sought summary judgment on M&C's claims in full.  *M&C Action*, (Docs. 142 & 144).  Upon consideration, Judge Honeywell denied M&C's Motion for Partial Summary Judgment and granted Oppenheim and Bock Hatch's Motion for Summary Judgment, finding that M&C could not establish the existence of a fiduciary duty owed to it individually, could not establish that Oppenheim or Bock Hatch breached any fiduciary duty owed to M&C to the extent that one existed, and could not establish any damages suffered as a result of the purported breach, and, further, given the lack of a breach of fiduciary duty on the part of Oppenheim,

M&C could not establish a claim for aiding and abetting such breach by Bock Hatch.  *M&C Action*, (Doc. 221).  With respect to the alleged fiduciary duty, Judge Honeywell remained unpersuaded that any fiduciary duty existed with respect to M&C individually or that the Florida Rules of Professional Conduct provided the standard of care in a breach of fiduciary duty case involving class action litigation. *M&C Action*, (Doc. 221, at 13-20).  Even assuming, *arguendo*, that a fiduciary duty existed to M&C individually under the Florida Rules of Professional Conduct, Judge Honeywell concluded that M&C could not establish that any actions taken by Oppenheim or Bock Hatch constituted a breach because M&C's interests were not materially adverse[4] to that of *TTA* Plaintiffs' interests for purposes of the Florida Rules and Oppenheim did not disclose any confidential or mediation-privileged information[5] related to M&C individually with Bock Hatch.  *M&C Action*, (Doc. 221, at 20-24).   Finally, Judge Honeywell determined that M&C suffered no damages as a result of the purported breach of the fiduciary duty because the decision to move to intervene in the *Technology Training II Action* invoked questions pertaining to the class, not to M&C individually, and because "conflicts between class members and/or class representatives in class action litigation is anticipated, and procedures, such as those employed by Cin-Q plaintiffs in their Motion to Intervene, are in place to address such conflicts."  *M&C Action*, (Doc. 221, at 24-25).

---

[4] *See* Florida Bar Rule 4-1.10(b), which states: "When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person …."
[5] *See* Florida Bar Rules 4-1.6, 4-1.9, and 4-8.4.

On August 31, 2018, M&C appealed Judge Honeywell's Order to the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit").  *See M&C Action*, (Doc. 225).   At the time, given the pending appeal relating to whether Oppenheim or Bock Hatch breached any fiduciary duties or aided and abetted such breach, the undersigned conducted a hearing in the *Technology Training II Action* to address whether the matters pending in that action should be stayed pending a resolution by the Eleventh Circuit of the appeal in the *M&C Action*.  *TTA* Plaintiffs, BTL, and *Cin-Q* Plaintiffs *all* indicated that the resolution of the appeal in the *M&C Action* would have no bearing on the outcome of the *Technology Training II Action*, so the *Technology Training II Action* proceeded during the pendency of the appeal in the *M&C Action*.

Subsequently, the Eleventh Circuit affirmed Judge Honeywell's Order.  *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983 (11th Cir. 2020).  Primarily, the Eleventh Circuit concluded that (1) neither Oppenheim nor Bock Hatch owed a fiduciary duty to M&C, one of the class representatives in the putative class action, distinct from the duty owed to the class; and (2) M&C failed to establish it suffered damage resulting from any alleged breach of fiduciary duty owed to it by Oppenheim or Bock Hatch, and, thus, neither were liable for a purported breach. *Id.* at 985-94.  Accordingly, the *M&C Action* formally concluded on December 31, 2020 with the issuance of the Eleventh Circuit's mandate confirming the affirmance of Judge Honeywell's Order.  *M&C Action*, (Doc. 242).

### E.   The Eleventh Circuit Appeal in *Technology Training II Action*

During the pendency of the *M&C Action*, *Cin-Q* Plaintiffs also submitted an appeal to the Eleventh Circuit (the "*TTA* Eleventh Circuit Appeal") regarding the denial of their request to intervene in the *Technology Training II Action*.  *Technology Training II Action,* (Docs. 28, 56, 58); *see Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692 (11th Cir. 2017).  On appeal, the Eleventh Circuit considered whether this Court erred in denying *Cin-Q* Plaintiffs' request to intervene as of right under Rule 24(a)(2) and declined to address whether the Court erred in denying *Cin-Q* Plaintiffs' request for permissive intervention under Rule 24(b)(2).  The sole issue presented by *Cin-Q* Plaintiffs to the Eleventh Circuit on appeal involved this Court's denial of intervention.  Indeed, in their appellate brief, *Cin-Q* Plaintiffs framed the issue as follows:

> In this appeal, No. 17-11710, *Cin-Q* Plaintiffs appeal solely from the denial of their motion to intervene, and do not attack the terms of the *TTA* settlement.   Although *Cin-Q* Plaintiffs maintain the *TTA* settlement is not fair, adequate, or reasonable, this appeal is limited to reviewing the district court's denial of intervention as of right under a de novo standard, and reviewing the denial of permissive intervention for abuse of discretion.
>
> ***
>
> But this is not an appeal from a final approval order, and this Court need not consider whether the *TTA* settlement is appropriate at this time.  The Court may *never* need to decide the propriety of the *TTA* settlement if it reverses the district court's denial of intervention in this appeal, allowing *Cin-Q* Plaintiffs to intervene to protect their interests as the true representatives of the class.

*Technology Training II Action*, (Doc. 141, Ex. 2) (emphasis in original).  In their reply

brief on appeal, *Cin-Q* Plaintiffs also indicated that adequacy of representation under Rule 23(a)(4) was not at issue, but rather, the only issue on appeal involved whether *Cin-Q* Plaintiffs' interests were adequately represented by the *TTA* Plaintiffs and BTL under Rule 24(a)(2), arguing:

> Here, *TTA* Plaintiffs and [BTL] are equivocating between "adequacy" of the existing parties for purposes of Rule 24(a)(2) intervention, with "adequacy" of representation for purposes of Rule 23(a)(4). The adequacy of *TTA* Plaintiffs for Rule 23 purposes has not yet been litigated, since there has been no discovery and almost nothing is known about them, aside from Mr. Bock's testimony that he contacted them to ask if they were interested in acting as plaintiffs after finding their fax numbers in the materials attached to *Cin-Q* Plaintiffs' motion for class certification. (A916-17, Hr'g Tr. at 15-16).

> The standard for intervention, on the other hand, is merely whether the existing parties "may be" inadequate, a showing that "should be treated as minimal." *Meek v. Metro. Dade Cty., Fla.*, 985 F.2d 1471, 1478 (11th Cir. 1993). *Cin-Q* Plaintiffs do not have the burden of demonstrating *TTA* Plaintiffs are inadequate class representatives at this stage in a Rule 23(a)(4) analysis, and *Cin-Q* Plaintiffs are not, as *TTA* Plaintiffs claim, "demand[ing] full resolution of Plaintiffs' adequacy" for purposes of class certification on their motion to intervene. (*TTA* Pls.' Br. at 26). What they are demanding is a decision on the Rule 24(a)(2) question of whether their interests "may be" inadequately represented by the existing parties for purposes of the minimal intervention standard, which is plainly the case.

*Technology Training II Action*, (Doc. 141, Ex. 2).

Given the issue presented, the Eleventh Circuit considered whether this Court erred in denying *Cin-Q* Plaintiffs' request to intervene in the *Technology Training II Action*. As the Eleventh Circuit indicated, parties seeking to intervene under Rule 24(a)(2) must demonstrate that (1) their request to intervene is timely; (2) they have an interest relating to the property or transaction which is the subject

of the action; (3) they are so situated that disposition of the action, as a practical matter, may impede or impair their ability to protect that interest; and (4) their interest is represented inadequately by the existing parties to the suit. *Tech. Training Assocs.*, 874 F.3d at 695-96 (citing *Stone v. First Union Corp.*, 371 F.3d 1305, 1308-09 (11th Cir. 2004)).  As to the first two prongs, the Eleventh Circuit concluded that *Cin-Q* Plaintiffs satisfied those prongs, since the request to intervene was timely and since, as class members, they would be bound by the terms of the *TTA* Settlement if approved and judgment was then entered.  *Tech. Training Assocs.*, 874 F.3d at 696 (citation omitted).

In considering the third prong, the Eleventh Circuit determined that *Cin-Q* Plaintiffs satisfied that prong by demonstrating a risk that they would be bound by an unsatisfactory class action settlement.  *Id.* at 696-97.  In making that determination, the Eleventh Circuit disagreed with this Court's finding that Rule 23's procedural protections provided a basis for concluding that the disposition of the *Technology Training II Action* would not impede or impair *Cin-Q* Plaintiffs' ability to protect their interests under Rule 24(a)(2)'s third prong.  *Id.* at 695-97.  As part of that determination, the Eleventh Circuit considered BTL's reliance upon the decision in *Grilli v. Metropolitan Life Insurance Co.*, 78 F.3d 1533 (11th Cir. 1996), and, in a footnote, the Eleventh Circuit indicated that the *Grilli* holding did not extend to cases like the *Technology Training II Action*, where the facts of the case demonstrated that "the existing parties do <u>not</u> adequately represent the movants' interest." *Tech. Training Assocs.*, 874 F.3d at 696 n.3 (emphasis in original).

With respect to the fourth prong, the Eleventh Circuit's analysis started with the presumption that the *TTA* Plaintiffs' representation was adequate in pursuing the same general objective – vindicating the rights of the class under the TCPA. *Id.* at 697. As the Eleventh Circuit noted, the presumption is weak and merely requires the proposed intervenors to present some evidence to the contrary. *Id.* Based on the record before it, the Eleventh Circuit concluded that *Cin-Q* Plaintiffs rebutted the weak presumption that *TTA* Plaintiffs adequately represented *Cin-Q* Plaintiffs' interests by presenting evidence that *TTA* Plaintiffs' Counsel engaged in a "Machiavellian" plan to undercut *Cin-Q* Plaintiffs' negotiating position. *Id.* In support of its conclusion, the Eleventh Circuit stated:

> Because the movants can rebut the presumption, we return[ ] to the general rule that adequate representation exists if no collusion is shown between the representative and an opposing party, if the representative does not have or represent an interest adverse to the proposed interven[o]r, and if the representative does not fail in fulfillment of his duty. Showing any one of these factors is not difficult. The requirement of the Rule is satisfied if the applicant shows that representation of his interest may be inadequate; and the burden of making that showing should be treated as minimal.

> The movants have met the minimal burden of showing that plaintiffs' representation of their interests may be inadequate. As we have explained, a representative party's greater willingness to compromise can impede [it] from adequately representing the interests of a nonparty. That is the case here. The plaintiffs have a greater incentive to settle because their claims may be barred by the statute of limitations if they cannot secure a waiver from Buccaneers, while the movants have no statute of limitations issues. Although the parties fiercely contest whether the plaintiffs' claims are actually time barred, the risk that they could be gives the plaintiffs a greater incentive to settle as compared to the movants. Which is evidenced by the plaintiffs' getting a waiver of the statute of limitations as part of the settlement.

> More broadly, the record appears to show that the plaintiffs' counsel,

Bock Hatch, deliberately underbid the movants in an effort to collect attorney's fees while doing a fraction of the work that the movants' counsel did.  If, as it appears, Bock Hatch was indeed motivated by a desire to grab attorney's fees instead of a desire to secure the best settlement possible for the class, it violated its ethical duty to the class.  It is plain from the record that during the negotiations the interests of the named plaintiffs and of Bock Hatch were aligned with those of Buccaneers and adverse to the movants' interests.  Given that, the plaintiffs cannot be expected to adequately represent the movants' interests.  The movants satisfied Rule 24(a)(2)'s fourth prong.

*Id.* at 697-98 (internal citations and quotation marks omitted; emphasis and alterations in original).  Based on its conclusion, the Eleventh Circuit remanded the case back to this Court with instructions to grant *Cin-Q* Plaintiffs' motion to intervene as of right.  *Id.* at 698.  The Eleventh Circuit provided no other instructions for this Court upon remand.

> ### F.   Renewed Motion to Decertify Settlement Class, Vacate Preliminary Approval Order, and Strike Class Allegations in the *Technology Training II Action*

Following issuance of the Eleventh Circuit's Mandate on the *TTA* Eleventh Circuit Appeal, *Technology Training II Action* (Doc. 77), the Court conducted a status conference, at which the Court addressed the procedural process moving forward, given the Eleventh Circuit's decision.  During the status conference, *Cin-Q* Plaintiffs orally moved to certify the class in the *Cin-Q Action* and to appoint Anderson + Wanca and Addison & Howard as class counsel.  After consideration, the Court determined that vacating the portion of the prior Order denying the request to intervene was appropriate but would take under advisement whether the rest of the Order should be vacated, specifically the request to vacate the preliminary approval

of the *TTA* Settlement and class certification.  Additionally, the Court denied *Cin-Q* Plaintiffs' oral motions and directed the parties to provide a scheduling plan for conducting discovery, filing additional briefing, and conducting an evidentiary hearing and any subsequent status conferences.

Following several hearings and discovery disputes, *Cin-Q* Plaintiffs moved to dismiss the *Technology Training II Action* or, alternatively, to decertify the *TTA* Settlement Class, vacate preliminary approval of the *TTA* Settlement, and strike *TTA* Plaintiffs' class allegations.  *Technology Training II Action,* (Doc. 131).  In doing so, *Cin-Q* Plaintiffs set forth several arguments.  Initially, they argued that *China Agritech, Inc. v. Resh*, 138 S.Ct. 1800 (2019) ("*China Agritech*") required dismissal or decertifying of the *TTA* Settlement Class, vacating of the preliminary approval of the *TTA* Settlement, and striking of the class allegations in this action, as *China Agritech* did not permit the maintenance of a class action after the expiration of the statute of limitations, regardless of whether BTL waived a statute of limitations defense.  Alternatively, *Cin-Q* Plaintiffs argued that the Court should decertify the *TTA* Settlement Class, vacate preliminary approval, and strike the class allegations based upon the findings in the *TTA* Eleventh Circuit Appeal.  Mainly, *Cin-Q* Plaintiffs asserted that the findings in the *TTA* Eleventh Circuit Appeal dictated that *TTA* Plaintiffs were inadequate class representatives and that *TTA* Plaintiffs' Counsel was inadequate class counsel.

BTL and *TTA* Plaintiffs each responded in opposition.  *Technology Training II Action,* (Docs. 141 & 148).  BTL argued that *China Agritech* did not require the

dismissal of the *Technology Training II Action* or the striking of the class allegations. *Technology Training II Action,* (Doc. 148).  BTL further asserted that its waiver of the statute of limitations for all purposes, which survived termination of the *TTA* Settlement, demonstrated that no basis existed for striking the class allegations, especially since the waiver did not form an integral term of the *TTA* Settlement but rather a procedural mechanism for presentation of the *TTA* Settlement to the Court rather than intervention in the *Cin-Q Action*, which it contended remained a viable option.  In addition, BTL asserted that the *TTA* Eleventh Circuit Appeal did not provide a basis for the relief sought by *Cin-Q* Plaintiffs since the law-of-the-case doctrine applied only to issues within the scope of the appeal, the Eleventh Circuit did not consider the adequacy of *TTA* Plaintiffs and *TTA* Plaintiffs' Counsel under Rule 23, and the record before the Eleventh Circuit was limited in scope.  To that end, BTL also argued that the communications produced in the *Technology Training II Action* relating to the *TTA* Settlement demonstrated that *TTA* Plaintiffs were not disarmed during negotiations.   Finally, BTL asserted that *Cin-Q* Plaintiffs' arguments regarding vacating the preliminary approval of the *TTA* Settlement were premature and not grounded in fact.

*TTA* Plaintiffs set forth similar arguments.  *Technology Training II Action,* (Doc. 141).  Essentially, *TTA* Plaintiffs argued that *China Agritech* did not prevent *TTA* Plaintiffs from maintaining a concurrent class action and that the decision in the *TTA* Eleventh Circuit Appeal did not support or require decertification.  Additionally, *TTA* Plaintiffs contended that *Cin-Q* Plaintiffs' objections to the *TTA*

Settlement would fail, *TTA* Plaintiffs' Counsel adequately represented the interests of the absent class throughout its negotiations with BTL, and *Cin-Q* Plaintiffs' negotiations focused on attorneys' fees to the detriment of the class.

In reply, *Cin-Q* Plaintiffs argued that the attempts to distinguish *China Agritech* from the facts of the *Technology Training II Action* failed such that the *Technology Training II Action* could not be maintained as a class action. *Technology Training II Action,* (Doc. 154). *Cin-Q* Plaintiffs further asserted that the attempts to minimize the findings by the Eleventh Circuit failed, meaning *TTA* Plaintiffs and *TTA* Plaintiffs' Counsel could not be permitted to represent a class. Finally, *Cin-Q* Plaintiffs argued that the settlement negotiations in the *Cin-Q Action* were irrelevant and, to the extent the Court found the *Cin-Q Action* settlement negotiations relevant, the settlement negotiations established that *Cin-Q* Plaintiffs' Counsel acted appropriately and in the interests of the class, while the *Technology Training II Action* settlement negotiations demonstrated that *TTA* Plaintiffs maintained no leverage to settle, thus leading to poor settlement terms.

Upon consideration of the Motion to Decertify Settlement Class, Vacate Preliminary Approval Order, and Strike Class Allegations, the Court granted the motion. *Technology Training II Action,* (Doc. 169). Particularly, the Court vacated the Preliminary Approval Order, decertified the *TTA* Settlement Class, struck *TTA* Plaintiffs' class claims in the *Technology Training II Action*, and stayed the matter pending a status conference. As explained more fully therein, though the Court did not read *China Agritech* to prohibit a defendant from waiving its statute of limitations

defense or allowing a plaintiff to bring class claims on that basis, the Court ultimately concluded that, given the findings set forth in the *TTA* Eleventh Circuit Appeal, the waiver of the statute of limitations defense provided the downfall of the class claims in the *Technology Training II Action* because it rendered the *TTA* Plaintiffs' interests antagonistic to or in substantial conflict with the interests of the *Cin-Q* Plaintiffs and the rest of the class and instead aligned the interests of the *TTA* Plaintiffs and BTL, thus precluding maintenance of a class action and approval of a class settlement in the *Technology Training II Action.*

Given those findings, the Court conducted an in-person status conference on November 19, 2019 to address the status of the *Cin-Q Action*, the *Technology Training II Action*, and another related action.[6]  A few days prior to the status conference, the *TTA* Plaintiffs moved, joined by Barewood Outlet, Inc., Thomas Savino d/b/a WebRX Pharmacy Palace and RxPalace.com, and Meryman Environmental, Inc. (collectively, "Intervenors") to intervene in the *Cin-Q Action* and moved for a global settlement conference in both the *Cin-Q Action* and the *Technology Training II Action* involving the parties in the *Cin-Q Action*, the *Technology Training II Action*, and the *Stein Action.  See Cin-Q Action*, (Doc. 258); *Technology Training II Action*, (Doc. 171). While *Cin-Q* Plaintiffs opposed intervention in the *Cin-Q Action*, BTL supported intervention.  *Cin-Q Action*, (Docs. 266 & 267).  The Court addressed all the pending matters and issues during the November 19, 2019 status conference, including the

---

[6]  *See Stein, D.D.S., M.S.D, P.A., et al. v. Buccaneers Ltd. Ptnsh'p*, Case No. 8:13-cv-2136-AEP (M.D. Fla.) (the "*Stein Action*").

33

appropriateness of intervention in the *Cin-Q Action*, attendance at a settlement conference, and whether to stay or consolidate the *Stein Action* and the *Technology Training II Action*, and took the matters under advisement.  Shortly thereafter, BTL moved to compel the record from the *M&C Action* to establish the inadequacy of *Cin-Q* Plaintiffs as class representatives and Anderson + Wanca as class counsel in the *Cin-Q* Action, which *Cin-Q* Plaintiffs opposed and Intervenors did not oppose. *Cin-Q Action*, (Docs. 264, 270, & 271).[7]

Given all the pending issues, the Court conducted a hearing on the Motion to Intervene on January 15, 2020 and additionally addressed BTL's Motion to Compel Discovery and the Motion for a Global Settlement Conference during the hearing.  After consideration, the Court denied the request for a global settlement in the *Technology Training II Action*, terminated all remaining deadlines, and administratively closed that case, as the *TTA* Plaintiffs indicated that they would like to reserve the ability to appeal.  *Technology Training II Action*, (Doc. 174).  The Court consolidated the *Stein Action* with the *Cin-Q Action* and administratively closed the *Stein Action*.  *Stein Action*, (Doc. 59).  Following that, the consolidated *Cin-Q Action* remained the only pending action.  Accordingly, the Court permitted the intervention in the *Cin-Q Action*, especially given the findings regarding the availability and requirements for intervention set forth in the *TTA* Eleventh Circuit

---

[7]  At that time, the motion to intervene remained pending in the *Cin-Q Action*.  Given that *TTA* Plaintiffs were joined by the additional potential intervenors, they will be referred to as Intervenors from this point forward when discussing matters in the *Cin-Q Action* but referred to as *TTA* Plaintiffs when discussing matters in the *Technology Training II Action*.

Appeal.  The Court denied, without prejudice, BTL's Motion to Compel Discovery and directed the parties to meet and confer to identify the information BTL sought to compel and any issues related thereto, with a subsequent status conference scheduled to address any outstanding issues.  *Cin-Q Action*, (Doc. 280). Additionally, during the hearing, the parties discussed the issue of appointment of interim class counsel, specifically, the appointment of Michael C. Addison ("Addison"), in the *Cin-Q Action* to facilitate any potential settlement discussions and the progress of the case.  The Court then entered a briefing schedule related to the issues of adequacy and appointment of class counsel.  *Cin-Q Action*, (Doc. 282).

Further, the Court granted the request for a global settlement to the extent that the case was referred to United States Magistrate Judge Amanda Sansone ("Judge Sansone"), with her consent, for a settlement conference, with Addison appointed, without opposition, as Interim Lead Counsel for purposes of the settlement conference.  *Cin-Q Action*, (Doc. 284).  Judge Sansone then scheduled the settlement conference for April 7, 2020.  *Cin-Q Action*, (Doc. 285).  Due to the COVID-19 pandemic, both the briefing schedule and the settlement conference were postponed.  Thereafter, starting in September 2020, Judge Sansone facilitated settlement discussions between *Cin-Q* Plaintiffs and BTL that lasted through June 2021.  At that time, Judge Sansone indicated that *Cin-Q* Plaintiffs and BTL reached a settlement as to material terms on a class-wide basis.  Based on the parties' representation, the Court provided a deadline for submission of a motion for

preliminary approval of the settlement, which *Cin-Q* Plaintiffs timely submitted. *Cin-Q Action*, (Doc. 324).

> **G.** **_Cin- Q_ Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and Notice to the Class in the _Cin-Q Action_**

*Cin-Q* Plaintiffs now move, unopposed, for preliminary approval of a class action settlement and for notice to the proposed class (Doc. 324). More specifically, pursuant to Rule 23, *Cin-Q* Plaintiffs request that the Court enter an order (1) preliminarily approving the proposed class action Settlement Agreement and Release (the "Settlement Agreement"), certifying the Settlement Class, appointing *Cin-Q* Plaintiffs as Class Representatives, and appointing Addison and the law firm of Addison Law Office, P.A., and Ross M. Good ("Good"), Glenn L. Hara ("Hara"), and Brian J. Wanca ("Wanca") and the law firm of Anderson + Wanca as Class Counsel; (2) approving the form of Class Notice attached to the Settlement Agreement and its dissemination to the class by U.S. mail and website and to determine whether additional notice be sent by facsimile or publication; and (3) setting dates for opt-outs, objections, and a fairness hearing. *Cin-Q Action*, (Doc. 324). For purposes of settlement, the parties stipulate to certification of a Settlement Class defined as:

> All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games.

> Specifically excluded from the Settlement Class are the following Persons:

(i)     BTL and its respective parents, subsidiaries, divisions, affiliates, associated entities, business units, predecessors in interest, successors, successors in interest and representatives and each of their respective immediate family members;

(ii)     Class Counsel; and

(iii)     The judges who have presided over the Litigation and any related cases.

*Cin-Q Action*, (Doc. 324, at 7-8 & Ex. 1, at III.A.).   BTL continues to deny all material allegations and liability, but, to facilitate settlement, the Settlement Agreement provides, among other things, for a Settlement Fund up to $19,750,000 to pay valid Class Member claims, to pay incentive awards to *Cin-Q* Plaintiffs, to pay Class Counsel attorneys' fees and reasonable out-of-pocket litigation expenses, and to pay notice and administration costs; payments of $350 to $615 (*i.e.,* $350 for the first facsimile; $125 for the second facsimile; $90 for the third facsimile; $25 for the fourth facsimile; and $25 for the fifth facsimile) to Class Members who submit a valid Claim (to be reduced *pro rata* if the Settlement Fund, after payment of incentive awards, fees, expenses, and notice and administration costs, cannot sufficiently pay the validly submitted claims); BTL's agreement to entry of an injunction prohibiting it from sending any further unsolicited facsimile advertisements that do not otherwise comply with the TCPA; and potential awards of attorneys' fees, expenses, notice and administration costs, and incentive awards to *Cin-Q* Plaintiffs, all of which shall be paid from the Settlement Fund.   *Cin-Q Action*, (Doc. 324, Ex. 1).  Any amounts remaining in the Settlement Fund following disbursement of all awards, attorneys' fees, expenses, notice and administration

costs, and incentive awards shall revert in full to BTL within 14 days of payment of all claims.

*Cin-Q* Plaintiffs and BTL agree that Class Notice should be sent by first-class U.S. mail, postage pre-paid, to Class Members for whom mailing addresses can be determined and by a Settlement Website. The Settlement Website will provide information and relevant documents related to the settlement, including the Agreement, the Class Notice, the Claim Form, and *Cin-Q* Plaintiffs' motion seeking attorneys' fees. *Cin-Q* Plaintiffs and BTL agree that the Court should determine whether additional notice should be provided by facsimile and/or by newspaper publication, if necessary, with *Cin-Q* Plaintiffs favoring both additional forms of notice and BTL opposed to either form of additional notice. Regardless of the format, the Class Notice will include instructions regarding opting out, objecting to, or submitting a Claim Form to the Settlement Administrator by mail or electronically. The Claim Form must be signed under penalty of perjury and identify the fax number or numbers on which the Class Member received faxes, including faxes from the Tampa Bay Buccaneers, as well as the Class Member's contact information. *Cin-Q Action*, (Doc. 324, Ex. 1, Ex. A). The Claim Form must be returned to the Settlement Administrator on or before the Claim deadline to receive a share of the Settlement Fund and may be returned via fax, mail, or electronically on the Settlement Website.

With respect to claims administration, BTL will retain and pay from the Settlement Fund an independent, third-party Settlement Administrator, which the

parties shall agree upon, subject to Court approval, who will issue the Class Notice, maintain the Settlement Website, receive the Claim Forms, assist Class Members in completing and submitting forms, and issue settlement checks. To that end, BTL has retained Epiq Class Action & Claim Solutions, Inc. ("Epiq" or "Settlement Administrator") as Settlement Administrator and submitted the Joint Motion for Appointment of Third-Party Settlement Administrator (Doc. 337), which the Court is granting in conjunction with the preliminary settlement approval. Within 10 days of entry of this preliminary approval order, the parties will provide Epiq with the records identifying the fax numbers to which the facsimile advertisements offering tickets to Tampa Bay Buccaneers games were allegedly sent, which Epiq will use to locate addresses for Class Members. No later than 30 days after entry of this preliminary approval order, Epiq shall create the Settlement Website, named BTL-TCPA-Settlement.com or, if unavailable, a name mutually agreed upon by the parties. No later than 90 days after entry of the preliminary approval order, Epiq will mail the Class Notice to all members of the Settlement Class whose addresses were derived from the process described above. Epiq will reject any claim that does not substantially comply with the instructions on the Claim Form or the terms of the Agreement or is postmarked later than the Claim Deadline. The decision of Epiq as to whether a Claim is valid is final and binding upon the parties, subject to an appeal by a party or any absent Class Member, which the parties will endeavor to resolve without Court intervention. Any disputes regarding such determination, including as to whether a Claim is fraudulent or valid, is subject to review by the

Court.  Prior to the fairness hearing, Epiq shall submit documentation to the Court reflecting that it executed the Notice Program in accordance with the Settlement Agreement and the preliminary approval order and shall include information regarding the success rate of the Class Notice transmission, the number of accepted and rejected Claims, the number of opt-outs and objections, and any other information that will assist the Court in determining the efficacy of the Notice Program.

The Settlement Agreement further provides for a Release of Claims. Specifically, in consideration for the relief provided in the Settlement Agreement, the Class Members will release all claims brought or that could have been brought, as defined in the Settlement Agreement, against BTL and the other Released Parties in this action about the advertisements sent by fax during the Class Period but, notably, will not release claims regarding advertising faxes sent after 2010.  In addition, Class Counsel will submit motions for an attorneys' fee award and incentive awards prior to the fairness hearing.  Class Counsel intends to seek an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, or $4,937,500, plus reasonable out-of-pocket expenses incurred, not to exceed $250,000, to be paid from the Settlement Fund.  Class counsel also intends to seek incentive awards of $10,000 for Cin-Q and $10,000 for M&C for serving as Class Representatives.  The motion will be available on the Settlement Website for Class Members to review.

In response to *Cin-Q* Plaintiffs' motion seeking preliminary approval,

Intervenors argue that they should be appointed as Co-Class Representatives and their counsel should be appointed as Co-Class Counsel.  *Cin-Q Action*, (Doc. 325).  Intervenors argue that the Settlement Agreement represents substantially the same settlement Intervenors proposed more than five years ago in the *Technology Training II Action*, which *Cin-Q* Plaintiffs initially opposed as a "reverse auction."  According to Intervenors, Class Members will receive no materially significant increase in overall benefit under the terms of the Settlement Agreement when compared to the *TTA* Settlement Agreement.  Rather, Intervenors contend that, given the passage of time, the total number of potential Class Members reached and successfully submitting claims will be greatly reduced.   While Intervenors agree that the settlement should be preliminarily approved so that Class Members may receive notice and respond to the proposed settlement, Intervenors contend that several deficiencies remain and certain revisions and clarifications should be made, including as to the Class Notice and the Claim Form.

*Cin-Q* Plaintiffs submit a reply brief, asserting that no basis exists for appointing Intervenors as Co-Class Representatives nor their counsel as Co-Class Counsel.  *Cin-Q Action*, (Doc. 329).  First, *Cin-Q* Plaintiffs contend that the Court cannot unilaterally alter the settlement terms, including the terms regarding the appointment of Class Representatives and Class Counsel.  Further, *Cin-Q* Plaintiffs argue that this Court already concluded that Intervenors cannot adequately represent the interests of the class in the *Technology Training II Action* based upon the findings set forth in the *TTA* Eleventh Circuit Appeal, and, as such, neither

Intervenors nor their counsel can be, nor need to be, appointed to represent the class in this action.  *Cin-Q* Plaintiffs additionally contend that any comparisons between the settlement reached in the *Technology Training II Action* and the *Cin-Q Action* are irrelevant and inaccurate.

In turn, Intervenors submit a sur-reply brief.   *Cin-Q Action*, (Doc. 332). Intervenors reiterate their position that they and their counsel should be appointed as Co-Class Representatives and Co-Class Counsel, arguing that the settlement terms in this action are materially worse than those achieved in the *Technology Training II Action*.  According to Intervenors, despite offering some Class Members modestly more money, focusing only on that benefit ignores the costs of delay caused by *Cin-Q* Plaintiffs' opposition to the *Technology Training II Action* settlement, the settlement in this action requires an onerous proof of claim, and the settlement in this action involves a weaker plan for providing notice to Class Members.  They also note that three of the Intervenors did not participate in the *Technology Training II Action*, and the inclusion of Intervenors and their counsel in this action will ensure adequate representation of the class and will achieve the ends of due process.

Given the arguments set forth by Intervenors, the Court conducted a hearing, at which counsel for *Cin-Q* Plaintiffs, BTL, and Intervenors appeared and presented argument relating to the Class Notice, the Claim Form, and proposed deadlines. The main issue centered upon the requirement in the Claim Form for Class Members to verify, under penalty of perjury, that the individual or entity subscribed to a fax number during the period from July 14, 2009 through June 9, 2010, as

identified in the Claim Form, and that such individual or entity received a fax at such number, "including faxes from the Tampa Bay Buccaneers" (*see* Doc. 324-1). BTL indicated that such language was necessary to prevent widespread fraud due to questions of reliability with the fax numbers contained in the Biggerstaff Report, based on the actions of the rogue third-party fax broadcaster, FaxQom. According to BTL, the Biggerstaff Report contains the entire universe of potential fax numbers for purposes of identifying potential Class Members, but questions remain as to whether the fax transmissions occurred on behalf of BTL to each of the fax numbers identified in the Biggerstaff Report. Intervenors countered that such language was not necessary and would in fact deter Class Members from submitting claims, thereby resulting in a very low response rate.

After considering the issue, the Court directed the parties to submit additional briefing addressing the indicia of reliability or unreliability of the Biggerstaff Report to assist in determining whether the disputed language is in fact necessary to address reliability issues with the fax numbers (Doc. 334). Subsequently, *Cin-Q* Plaintiffs, BTL, and Intervenors each submitted their respective briefs (Docs. 339, 341, 342). Essentially, *Cin-Q* Plaintiffs and BTL argue that the disputed language is necessary and occurred as the result of a reasonable compromise, given the outstanding issues regarding the reliability of the Biggerstaff Report, which included several anomalies, including wireless numbers, false positives, numbers on the National or Florida Do Not Call Registry, and online fax services; involved a lack of access to the basic information typically relied upon in a TCPA case, such as fax logs; and offered

conclusions conflicting with the expert opinion offered by BTL (Doc. 339 & 341). Intervenors contend that the inclusion of such language treats class members inequitably, no battle of the experts exists, BTL's expert bases his opinion upon theoretical speculation as to "false positives," the Biggerstaff Report is reliable, and all the information in the Biggerstaff Report was known to BTL at the time of the *TTA* Settlement in 2016 (Doc. 342).

## II.    Legal Standard

Questions concerning class certification remain within the sound discretion of the district court. *Birmingham Steel Corp. v. Tenn. Valley Auth.*, 353 F.3d 1331, 1335 (11th Cir. 2003) (citations omitted).  Under Rule 23, a district court should determine by order whether to certify the action as a class action as soon as practicable after a person sues as a class representative.  Fed. R. Civ. P. 23(c)(1)(A). Before entry of final judgment, however, a district court can alter or amend an order granting or denying class certification.  Fed. R. Civ. P. 23(c)(1)(C).  Indeed, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.  For such an order, particularly during the period before any notice is sent to members of the class, is inherently tentative." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (internal quotation, citation, and footnote omitted).

## III.    Discussion

As indicated, pursuant to Rule 23(e), *Cin-Q* Plaintiffs request on behalf of a Settlement Class that the Court enter an order (1) preliminarily approving the

Settlement Agreement, certifying the Settlement Class, appointing *Cin-Q* Plaintiffs as Class Representatives, and appointing Addison and the law firm of Addison Law Office, P.A., and Good, Hara, and Wanca and the law firm of Anderson + Wanca as Class Counsel; (2) approving the form of Class Notice attached to the Settlement Agreement and its dissemination to the Settlement Class by U.S. mail and website and to later determine whether additional Notice be sent by facsimile or publication; and (3) setting dates for opt-outs, objections, and a fairness hearing. *Cin-Q Action*, (Doc. 324). District courts maintain broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992) (citation omitted). Since the class action provides an exception to the general rule that litigation be conducted by and on behalf of the individual named parties only, to justify certification of a class, a class representative must be a member of the class and possess the same interest and suffer the same injury as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (citations omitted). The advocate of the class thus carries the initial burden of proof to establish the propriety of class certification. *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) (citation omitted).

In determining whether class certification is appropriate, "Rule 23 establishes the legal roadmap courts must follow[.]" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). Rule 23(a) requires the moving party to demonstrate that:

> (1)    the class is so numerous that joinder of all members is impracticable;

45

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  "Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification."  *Valley Drug*, 350 F.3d at 1188 (citation omitted); *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("To satisfy Rule 23, the putative class must meet each of the four requirements specified in 23(a), as well as at least one of the three requirements set forth in 23(b).") (citation omitted).

Accordingly, if a court determines that the moving party established the numerosity, commonality, typicality, and adequacy-of-representation requirements of Rule 23(a), the court then determines whether the moving party established the requirements of one of three possible categories under Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citations omitted).  In this instance, *Cin-Q* Plaintiffs seek certification of the Settlement Class pursuant to Rule 23(b)(3).  Under Rule 23(b)(3), a class action may be maintained if the requirements of Rule 23(a) are satisfied and if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

46

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

In determining the propriety of a class action, the question is whether the moving party meets the requirements of Rule 23, not whether the moving party states a cause of action or will prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted). Though a district court need not reach the merits of a claim when considering the propriety of class certification, "this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984) (internal citation and omitted). Instead, a district court can consider the merits of the moving party's claim at the class certification stage to the degree necessary to determine whether the moving party satisfied the requirements of Rule 23. *Heffner v. Blue Cross and Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006) (citations omitted); *see Dukes*, 564 U.S. at 350-51 (stating that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, ... and that

certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. ... Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citations, internal quotations, alterations, and citations omitted).

### A.    Standing

Prior to the certification of a class, and before undertaking any formal typicality or commonality review, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *see Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (noting that, to certify a class action, the named plaintiffs must have standing, and the putative class must meet all the requirements of Rule 23(a) in addition to at least one of the requirements in Rule 23(b)).  *Cin-Q* Plaintiffs allege that they suffered harm because BTL's faxes caused the loss of paper and toner consumed in the printing of BTL's faxes, the faxes utilized *Cin-Q* Plaintiffs' fax machines such that *Cin-Q* Plaintiffs could not use the fax machines during that time, the faxes violated *Cin-Q* Plaintiffs' privacy interests in being left alone, and the faxes cost *Cin-Q* Plaintiffs' employees time receiving, reviewing, and routing BTL's unauthorized faxes that would have otherwise been spent on *Cin-Q* Plaintiffs' business activities.  *See Cin-Q Action*, (Doc. 70, ¶43).  Such allegations establish a cognizable, particularized, and personal injury

for purposes of Article III standing. *See, e.g., Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1250-53 (11th Cir. 2015); *see JWD Auto. Inc. v. DJM Advisory Grp. LLC*, 218 F. Supp. 3d 1335, 1339 (M.D. Fla. 2016) ("In other words, in this Circuit, the successful transmission of even a single unsolicited fax causes an injury sufficiently concrete and particularized to confer standing under Article III to assert a TCPA claim."); *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 687 (S.D. Fla. 2014) (concluding that a plaintiff established Article III standing in a case involving TCPA violations where the plaintiff alleged that the defendants' conduct in sending it an unsolicited fax violated its legally protected interest under the TCPA because the TCPA confers the right to be free from certain harassing and privacy-invading conduct).[8]  Indeed, neither BTL nor the Intervenors contest *Cin-Q* Plaintiffs' standing in this action.  Accordingly, *Cin-Q* Plaintiffs established Article III standing.

### B.    Rule 23(a)

The question now turns to whether *Cin-Q* Plaintiffs can establish the requirements for class certification.  As noted above, under Rule 23(a), one or more members of a class may sue as representative parties on behalf of all members only

---

[8]  As discussed more fully in the instant motion, several developments regarding TCPA claims involving faxes have occurred in the past few years both at the administrative and district-court levels while this action remained pending.  *Cin-Q Action*, (Doc. 324, at 5-7). The Court does not read the administrative rulings or case law to divest this Court of jurisdiction over the immediate claims.  Rather, the changing legal landscape provides another rationale in support of approving the settlement and avoiding litigating issues pertaining to the use of an "online fax service" or "fax broadcaster" and the degree of liability or culpability on behalf of BTL.

if the movant establishes the numerosity, commonality, typicality, and adequacy-of-representation requirements.  Fed. R. Civ. P. 23(a)(1)-(4).

### i.      Numerosity

Initially, *Cin-Q* Plaintiffs must demonstrate that the class is so numerous that joinder of all members would prove impracticable.  Fed. R. Civ. P. 23(a)(1).  To establish numerosity, the moving party typically must demonstrate either some evidence or a reasonable estimate of the number of purported class members.  *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation and quotation omitted); *cf. Vega*, 564 F.3d at 1267 (noting that, while mere allegations of numerosity are insufficient, a plaintiff need not show the precise number of members in the class to establish numerosity).  Though no fixed numerosity rule exists, courts generally determine that less than 21 members of a proposed class is inadequate to establish numerosity and more than 40 members of a proposed class is adequate to establish numerosity, with numbers between varying based upon other factors.  *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (concluding that a district court did not abuse its discretion in finding that the numerosity requirement had been met where a plaintiff identified at least 31 individual class members).  In determining numerosity, a district court may consider such factors as the size of the class, the ease of identifying the class members and determining the addresses of class members, the facility of effecting service upon class members if joined, and the geographic dispersion of class members.  *Kilgo*, 789 F.2d at 878.

Here, *Cin-Q* Plaintiffs contend that the numerosity requirement is satisfied, as the case involves more than 343,000 faxes sent to more than 131,000 unique fax numbers sent by BTL from July 2009 through June 2010. *Cin-Q Action*, (Doc. 324, at 12; *see also* Doc. 207, at 19-20 & Ex. 4). Given the inordinately large number of faxes and unique fax numbers, *Cin-Q* Plaintiffs easily establish numerosity.

### ii.    Commonality

*Cin-Q* Plaintiffs must next establish commonality, or that there exists questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Commonality pertains to the group characteristics of the class as a whole, whereas typicality pertains to the individual characteristics of the named plaintiff in relation to the class. *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citation omitted). To meet the commonality requirement, the moving party must demonstrate that the class action involves issues susceptible to class-wide proof. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citation omitted). Essentially, the moving party must show that the determination of the truth or falsity of a common contention will resolve an issue that is central to the validity of each of the claims in one stroke. *Dukes*, 564 U.S. at 350. Commonality therefore requires "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams*, 568 F.3d at 1355 (citation and quotation omitted). Notably, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557 (citations omitted). In this instance, common questions of fact and law exist regarding several

issues, including whether the faxes constitute advertisements, whether the faxes were sent by or on behalf of BTL, and whether the faxes complied with the regulations regarding opt-out notice. Accordingly, *Cin-Q* Plaintiffs establish commonality.

### iii.   Typicality

The next requirement *Cin-Q* Plaintiffs must demonstrate is that of typicality. Though the issues of commonality and typicality require separate inquiries, the proof required for each tends to merge. *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996) (citation and quotation omitted). As the Eleventh Circuit explained, typicality involves the following:

> A class may be certified only if the claims or defenses of the representative parties are typical of the claims or defenses of the class. The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories.

*Williams*, 568 F.3d at 1356-57 (internal citations, internal quotations, and internal marks omitted); *see Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) ("A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that

of other members of the class").  *Cin-Q* Plaintiffs satisfy the typicality requirement because *Cin-Q* Plaintiffs, like each Class Member, were sent the same or a similar fax from BTL, and each Class Member's claim is based upon the same legal theory and same set of facts as *Cin-Q* Plaintiffs' claim during the same period.  Given that the claims of the Settlement Class and *Cin-Q* Plaintiffs' claims are based on the same pattern or practice and the same legal theory, *Cin-Q* Plaintiffs established typicality.

### iv.    Adequacy of Representation

Finally, *Cin-Q* Plaintiffs must satisfy the adequacy-of-representation requirement, which requires the representative party in a class action to fairly and adequately protect the interests of those he or she purports to represent.  Fed. R. Civ. P. 23(a)(4); *Valley Drug*, 350 F.3d at 1189.  The moving party must demonstrate both (1) that the movant's interests and that of his or her counsel are not antagonistic to or in substantial conflict with those of the rest of the class, and (2) that the movant and his or her counsel are generally able to adequately prosecute the action and conduct the proposed litigation.  *See Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008); *see Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).  Furthermore, in appointing class counsel, a district court must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

The adequacy-of-representation requirement presents the main obstacle for purposes of preliminary approval of the settlement.  Despite Intervenors' arguments to the contrary, however, *Cin-Q* Plaintiffs demonstrate that they adequately represent the interests of the Settlement Class.  *Cin-Q* Plaintiffs initiated the instant action on behalf of themselves and the putative class, engaged in years of litigation and several months of settlement discussions with BTL, entered into the Settlement Agreement to resolve all the claims on a class-wide basis, and otherwise demonstrated that proceeding as a class action is appropriate.  *Cin-Q* Plaintiffs and their counsel have already expended substantial resources representing the putative class in this and all related matters.  The Court cannot ascertain any interests on behalf of *Cin-Q* Plaintiffs that are antagonistic to or in substantial conflict with those of the rest of the putative class.  Further, by reaching a class-wide settlement of the claims in this action, *Cin-Q* Plaintiffs demonstrated that they are generally adequate to prosecute the action, conduct the proposed litigation, and implement the Settlement Agreement.  Accordingly, *Cin-Q* Plaintiffs satisfy the adequacy-of-representation requirement to be appointed as Class Representatives.

With respect to Class Counsel, *Cin-Q* Plaintiffs seek to appoint Addison and the law firm of Addison Law Office, P.A., and Good, Hara, and Wanca and the law firm of Anderson + Wanca.  *Cin-Q* Plaintiffs establish that these attorneys can adequately represent and protect the interests of the Settlement Class and conduct the proposed litigation given that they have litigated this and other matters over the course of several years, already negotiated the settlement on behalf of the putative

class, and have extensive experience handling class action lawsuits, including class action lawsuits involving the TCPA.  As such, *Cin-Q* Plaintiffs demonstrate that, considering those factors, Addison, Good, Hara, and Wanca satisfy the adequacy-of-representation requirement for appointment as Class Counsel.

Notwithstanding, Intervenors contend that they should also be appointed as Co-Class Representatives and that their counsel should also be appointed as Co-Class Counsel (Doc. 325).  As discussed above, in setting forth their argument in the *TTA* Eleventh Circuit Appeal, *Cin-Q* Plaintiffs framed the issue presented as solely whether *Cin-Q* Plaintiffs' interests were adequately represented by *TTA* Plaintiffs and BTL for purposes of intervention under Rule 24, while *Cin-Q* Plaintiffs explicitly indicated that they did not seek to determine the adequacy of representation under Rule 23(a)(4).  *Technology Training II Action,* (Doc. 141, Ex. 2). On appeal, the Eleventh Circuit squarely addressed the issue of adequacy under Rule 24(a)(2) and found it lacking, making clear that *TTA* Plaintiffs and BTL inadequately represented *Cin-Q* Plaintiffs' interests for purposes of intervention as of right under Rule 24(a)(2).  *Tech. Training Assocs.*, 874 F.3d at 696-98.  Though the Eleventh Circuit addressed only the issue of adequacy for purposes of Rule 24(a)(2), the findings the Eleventh Circuit set forth in rendering its decision provided this Court with guidance in considering adequacy under Rule 23(a) when considering the request for decertification in the *Technology Training II Action*.

Guided by the findings from the *TTA* Eleventh Circuit Appeal, and after considering the parties' positions in the *Technology Training II Action*, the Court

found that the interests of *TTA* Plaintiffs were in substantial conflict with those of *Cin-Q* Plaintiffs and, thus, the rest of the putative class because, unlike *TTA* Plaintiffs, *Cin-Q* Plaintiffs and the other putative class members in the *Cin-Q Action* "have no statute of limitations issue." *See Tech. Training Assocs.*, 874 F.3d at 697. Indeed, the Eleventh Circuit explicitly addressed the issue in its decision, stating: "Although the parties fiercely contest whether the plaintiffs' claims are actually time barred, the <u>risk</u> that they could be gives the plaintiffs a greater incentive to settle as compared to the movants." *Id.* (emphasis in original). In decertifying the class and vacating the *TTA* Settlement in the *Technology Training II Action*, the Court found the Eleventh Circuit's observation instructive since *TTA* Plaintiffs in fact admitted that they were aware of the statute of limitations issue from the outset of the settlement negotiations with BTL, and, even though BTL and *TTA* Plaintiffs did not address the issue of the waiver of the statute of limitations until late in their settlement negotiations, that fact did not change the analysis. Namely, the timing of the actual waiver by BTL did not bear on the issue because the issue was present from the outset. Primarily, but for the timely initiation of the *Cin-Q Action*, BTL would have no reason to waive the statute of limitations defense to settle potential class claims with plaintiffs whose claims expired, and, likewise, but for obtaining a statute of limitations waiver, *TTA* Plaintiffs would not maintain the ability to bring class claims outside of the *Cin-Q Action*.

Given the unavailability of the separate class action option without a waiver of the statute of limitations, the interests of *TTA* Plaintiffs and BTL were aligned.

*See Id.* at 697-98.   Even on the limited record on appeal, the Eleventh Circuit indicated that it was "plain from the record that during the negotiations the interests of the named plaintiffs and of Bock Hatch were aligned with those of Buccaneers and adverse to the movants' interests." *Id.* at 698.  As the record in this action and in the *Technology Training II Action* indicate, *TTA* Plaintiffs and BTL endeavored to settle the class claims immediately following the original breakdown of the settlement negotiations in the *Cin-Q Action* and the impending deadline for BTL to respond to *Cin-Q* Plaintiffs' Motion for Class Certification.  *See, e.g., Cin-Q Action*, (Docs. 207, 215-43).

BTL expressed frustration with the settlement process with *Cin-Q* Plaintiffs and thus sought the Court's assistance in conducting a settlement conference given concerns BTL held with the position taken by *Cin-Q* Plaintiffs in the prior settlement negotiations.  *See Cin-Q Action*, (Doc. 215).  At the same time, as the Eleventh Circuit noted, e-mails indicated that *TTA* Plaintiffs' Counsel engaged in a "Machiavellian" plan to undercut *Cin-Q* Plaintiffs' negotiating position.  *Tech. Training Assocs.*, 874 F.3d at 697.  Indeed, *TTA* Plaintiffs' Counsel did not approach BTL about the filing of a new case regarding the same class claims until *after* the parties reached an impasse in the *Cin-Q Action*, a fact that *TTA* Plaintiffs' Counsel was aware of at the time they approached BTL.  Against that backdrop, both *TTA* Plaintiffs and BTL possessed aligning incentives to settle outside the purview of the *Cin-Q Action* or, at the very least, *Cin-Q* Plaintiffs.  As this Court previously determined, therefore, the interests of *TTA* Plaintiffs remained antagonistic to and in substantial conflict with

*Cin-Q* Plaintiffs and the rest of the putative class in the *Cin-Q Action*, meaning *TTA* Plaintiffs could not and cannot adequately represent the class under Rule 23(a)(4). The addition of three new parties as Intervenors along with the original *TTA* Plaintiffs does not change the analysis. Neither *TTA* Plaintiffs individually or Intervenors collectively nor their counsel demonstrated that they can adequately represent the interests of the class or, further, that the addition of more class representatives and more attorneys as class counsel will further the interests of the Settlement Class or assist in implementing the Settlement Agreement.

What the Court finds interesting at this juncture is Intervenors' argument that *Cin-Q* Plaintiffs effectively piggybacked on their settlement and thus Intervenors and their counsel deserve appointment as Co-Class Representatives and Co-Class Counsel. Given the actions taken by *TTA* Plaintiffs and their counsel in reaching a potential settlement in the *Technology Training II Action*, as already addressed by the Eleventh Circuit, the Court fails to understand how Intervenors take umbrage at *Cin-Q* Plaintiffs' efforts in securing a settlement on behalf of the Settlement Class in this action. Indeed, since *TTA* Plaintiffs and their counsel involved themselves in the underlying dispute, innumerable accusations of misdeeds and a fair amount of mudslinging has occurred between Intervenors' counsel and *Cin-Q* Plaintiffs' counsel, Addison excluded, taking whatever position served their interests at the time. For example, *TTA* Plaintiffs forcefully opposed intervention in the *Technology Training II Action*, while *Cin-Q* Plaintiffs vigorously sought intervention, even appealing the issue to the Eleventh Circuit, and then succeeding on appeal. Yet,

*TTA* Plaintiffs, along with three new parties, then sought intervention in the *Cin-Q Action*. When confronted with the question of intervention in the *Cin-Q Action*, *Cin-Q* Plaintiffs vehemently opposed such intervention despite the Eleventh Circuit's explicit findings in the *TTA* Eleventh Circuit Appeal regarding the propriety of intervention in this context. The records in all the related matters document the abundant issues and rifts between Intervenors' counsel and *Cin-Q* Plaintiffs' counsel. In fact, during the hearings and in briefing all the issues, discord between *Cin-Q* Plaintiffs' counsel and *TTA* Plaintiff's/Intervenor's counsel felt palpable. Whether such discord stems from years of opposition in class action lawsuits or from the potential recovery in this action, the course of conduct taken did nothing to further the interests of or serve the Settlement Class. The involvement of *TTA* Plaintiffs and their counsel thus appears to have hindered the resolution process more than assisted it, spawned several related matters, and created unnecessary roadblocks along the way. *Cin-Q* Plaintiffs and their counsel, and Addison specifically, expended several years attempting to reach a favorable result on behalf of a putative class and have done so, despite a variety of obstacles and issues along the way.

In sum, therefore, *Cin-Q* Plaintiffs demonstrated that both they and Addison, Good, Hara, and Wanca will adequately represent the interests of the Settlement Class. Neither Intervenors nor their counsel need be added as Co-Class Representatives or Co-Class Counsel to effectuate the settlement because there is simply no need for additional representatives or counsel and, more importantly, as the Court already made plain in the *Technology Training II Action*, they cannot

adequately represent the class under Rule 23(a)(4).   Accordingly, *Cin-Q* Plaintiffs established each of the Rule 23(a) factors.

### C.   Rule 23(b)

Having met the requirements under Rule 23(a), *Cin-Q* Plaintiffs assert that the putative class also meets the requirements under Rule 23(b)(3).  More precisely, *Cin-Q* Plaintiffs contend that the putative class satisfies the requirements regarding predominance of common issues and superiority of the class action to other means of litigation.  Fed. R. Civ. P. 23(b)(3).

### i.   Predominance

To satisfy the predominance requirement, the moving party must demonstrate that the issues in the class action subject to generalized proof, and therefore applicable to the class as a whole, predominate over the issues subject only to individualized proof.  *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citations omitted).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Windsor*, 521 U.S. at 623.  The predominance inquiry thus focuses upon the legal or factual questions that qualify each class member's case as a genuine controversy and, therefore, is a far more demanding requirement than the commonality requirement under Rule 23(a).  *Jackson*, 130 F.3d at 1005.  Indeed, predominance requires more than just the presence of common issues.   The common issues must outweigh and predominate over any individualized issues involved in the litigation.  *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 518 (S.D.

Fla. 2013).

*Cin-Q* Plaintiffs contend that BTL engaged in a widespread, mass fax advertising campaign. The facts required to demonstrated liability relate to BTL's common course of conduct in sending the same or similar faxes to more than 131,000 fax numbers. Additionally, the legal questions of whether the faxes are advertisements, whether BTL qualifies as the sender, whether the faxes contain the appropriate opt-out notice, and whether BTL's violations were willful predominate over any issues subject only to individualized proof. Accordingly, *Cin-Q* Plaintiffs established predominance.

### ii.    Superiority

*Cin-Q* Plaintiffs must also establish that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The superiority analysis focuses upon the relative advantages of proceeding as a class action suit over any other forms of litigation that might be realistically available to a moving party. *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1183-84 (11th Cir. 2010). In determining the superiority of the class action, the court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Here, given the large number of purported class members, the similarity of the claims of all class members, and the relatively small potential recovery in individual suits, proceeding as a class action lawsuit is superior to any other forms of litigation. Indeed, such considerations demonstrate the superiority of proceeding as a class action and thus weigh in favor of proceeding as a class action. Furthermore, nothing indicates that any class members maintain an interest in individually controlling the prosecution or defense of separate actions. In fact, in the other actions filed by potential class members, the named plaintiffs sought to proceed as a class action rather than proceed only on their individual claims. *See Technology Training II Action*; *Stein Action.* Moreover, handling this matter as a class action would prove less difficult than handling hundreds of thousands of individual lawsuits. Lastly, this action has been pending for years in this forum, so concentrating any remaining issues in this action provides the most effective and efficient means for achieving final resolution. Based on these considerations, therefore, *Cin-Q* Plaintiffs established that proceeding as a class action is superior to other methods available to fairly and efficiently adjudicate this controversy.

### D.    Rule 23(e)

Given that *Cin-Q* Plaintiffs and BTL entered into the Settlement Agreement to settle all claims on behalf of the Settlement Class, they seek the Court's preliminary approval of the Class, appointment of *Cin-Q* Plaintiffs as Class Representatives, appointment of Class Counsel, issuance of the Notice to the Class, and the scheduling of a fairness hearing. Under Rule 23(e), the claims, issues, or

defenses of a certified class may be settled with the court's approval, with the following applicable procedures:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> (5) Any class member may object to the proposal if it requires court approval under subdivision (e), with such objection indicating whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also states with specificity the grounds for the objection.

*See* Fed. R. Civ. P. 23(e)(1)-(5).  Having established that preliminary certification of the Settlement Class is warranted, *Cin-Q* Plaintiffs also established that preliminary approval of the Settlement Agreement is similarly warranted.  To approve a class action settlement, a district court must determine that the settlement is fair, adequate, and reasonable and is not the result of collusion between the parties. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (quotation and citation omitted); *see Fresco v. Auto Data Direct, Inc.*, No. 03-61063-CIV, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007) ("At the preliminary-approval step, the Court is required to make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms.") (internal quotation and citation omitted).  In

making such determination, a district court should consider the following factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). These factors are neither determinative nor exhaustive, and a district court may consider such other relevant factors as: (1) an unjustifiably burdensome claims procedure; (2) unduly preferential treatment of the class representative; (3) the terms of settlement in similar cases; (4) an unreasonably high award of attorney's fees to prevailing class counsel; and (5) impermissibly broad releases of liability. *Palmer v. Dynamic Recovery Sol., LLC*, Case No. 6:15-cv-59-Orl-40KRS, 2016 WL 2348704, at *2 (M.D. Fla. May 4, 2016).

Preliminary approval of a class settlement simply allows notice to issue to the class and for the class members to either object or opt out of the settlement. *Pierre-Val v. Buccaneers Ltd. P'ship.*, No. 8:14-CV-01182-CEH-EAJ, 2015 WL 3776918, at *1 (M.D. Fla. June 17, 2015). Accordingly, if a proposed settlement is within the range of possible approval, or if probable cause exists to notify the class of the proposed settlement, such settlement should be preliminarily approved. *Fresco*, 2007 WL 2330895, at *4. Notably, "[a]lthough class action settlements should be reviewed with deference to the strong judicial policy favoring settlement, the court must not approve a settlement merely because the parties agree to its terms."

*Palmer*, 2016 WL 2348704, at *3 (citations omitted).  With respect to precertification settlement, it is especially important since "the parties' speedy and seamless resolution of their dispute should prompt the court to consider whether the proposed settlement represents a bona fide end to the adversarial process or the collusive exploitation of the class action mechanism to the detriment of absent class members." *Id.* (citations omitted).

*Cin-Q* Plaintiffs assert claims for violations of the TCPA and for conversion relating to the purported unsolicited facsimile advertisements sent by or on behalf of BTL.  *Cin-Q Action*, (Doc. 70).   Under the TCPA, it is unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" except within certain enumerated circumstances, including that the unsolicited advertisement contains a proper notice.  47 U.S.C. § 227(b)(1)(C).   The TCPA provides that a person or entity may bring a private action to enjoin a TCPA violation; to recover actual monetary loss from such a violation, or to receive $500 in damages for each violation, whichever is greater; or both such actions.  47 U.S.C. § 227(b)(3)(A)-(C).  If a court concludes that the defendant acted willfully or knowingly, the court, in its discretion, may award treble damages.  *See* 47 U.S.C. § 227(b)(3); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016).   Although BTL denies every allegation of wrongdoing, liability, and damages, and further denies that litigation would be appropriate for class treatment, *Cin-Q* Plaintiffs and BTL entered into the Settlement Agreement to resolve all claims to avoid the expense, inconvenience, and inherent risk involved

with litigation as well as to prevent the continued disruption of BTL's business operations. *Cin-Q Action*, (Doc. 324, at 7).

In effecting this resolution, the Settlement Agreement provides, among other things, for a Settlement Fund up to $19,750,000; payments of up to $350 for the first facsimile and up to $615 total for up to five facsimiles to Settlement Class Members who submit claims, to be reduced on a *pro rata* basis if, after payment of fees, expenses, and incentive awards, the Settlement Fund proves insufficient to fully pay the valid claims submitted; BTL's agreement not to send any further unsolicited facsimile advertisements in violation of the TCPA; payment of notice and administration costs; potential incentive awards to *Cin-Q* Plaintiffs; and a potential award of attorneys' fees and expenses to Class Counsel, not to exceed 25% of the Settlement Fund. *Cin-Q Action*, (Doc. 324, Ex. 1). Solely for purposes of preliminary approval, such terms appear fair, adequate, and reasonable. Namely, the settlement is either on par with or exceeds prior TCPA settlements, both in the total amount in the Settlement Fund and in the amount awarded to each Class Member. *See, e.g., Family Med. Pharmacy, LLC v. Impax Lab., Inc.*, CIVIL ACTION 17-0053-WS-MU, 2017 WL 4366740 (S.D. Ala. Sept. 29, 2017) (preliminarily approving a TCPA settlement in case involving junk fax transmissions that included $4,815,700 in a settlement fund, to be distributed on a *pro rata* basis to class members making claims, with such distributions not to exceed $500 per compensable fax transmission; $75,000 toward costs of notice and claims administration; attorneys' fees and litigation expenses of up to one-third of the settlement fund; and incentive

awards); *Michel v. WM Healthcare Sol., Inc.*, No. 1:10-cv-638, 2014 WL 497031 (S.D. Ohio Feb. 7, 2014) (granting final approval for a TCPA fax class settlement involving approximately 400,000 class members that included $4,375,000 in a settlement fund with class members receiving a *pro rata* payment up to $1,500 after payment of fees, expenses, costs of notice, and incentive fees, which the court reduced to payment of 15% of the settlement fund in attorney's fees rather than one-third of the settlement fund and $3,000 each as incentive awards rather than the $10,000 requested).

With respect to the possible request for attorneys' fees and expenses, such request falls within the parameters of reasonable awards in the class action context. Attorney's fees awarded from a common fund should "'be based upon a reasonable percentage of the fund established for the benefit of the class.'" *Faught*, 668 F.3d at 1242 (quoting *Camden I Condo Assoc., Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)). In this context, courts generally consider fee requests reasonable where the requests fall between 20% to 25% of the settlement. *Faught*, 668 F.3d at 1242 (citation omitted); *see Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 435 (11th Cir. 2012) (finding reasonable a district court's fee award that constituted 25% of a common fund and noting that it is well-settled in the Eleventh Circuit that 25% is generally recognized as a reasonable fee award in common fund cases);[9] *Smith v. KFORCE Inc.*, Case No. 8:19-cv-02068-CEH-CPT, 2020 WL 7250603, at *2 (M.D.

---

[9]   Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

Fla. Dec. 9, 2020) (finding that one-third of a common fund, for which the class counsel would seek approval, was within the reasonable range for attorney's fees and costs upon consideration of preliminary approval of a class action settlement); *James v. JPMorgan Chase Bank, N.A.*, Case No. 8:15-cv-2424-T-23JSS, 2017 WL 2472499, at *2 (M.D. Fla. June 5, 2017) (finding a request for an attorneys' fees award equal to 30% of the settlement fund to be reasonable in granting final approval of a class action settlement in a case involving TCPA claims).  As noted, *Cin-Q* Plaintiffs intend to seek an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, or $4,937,500, plus reasonable out-of-pocket expenses incurred, not to exceed $250,000, to be paid from the Settlement Fund. *Cin-Q Action*, (Doc. 324, at 11 & Ex. 1, at II.A. & VI.).  The requested amount for potential reimbursement of attorneys' fees and expenses is thus fair, adequate, and reasonable for purposes of preliminary approval.

The Settlement Agreement also addresses potential incentive awards. Specifically, the Settlement Agreement indicates that *Cin-Q* Plaintiffs and BTL will request incentive awards in the amount of $10,000 for Cin-Q and in the amount of $10,000 for M&C. *Cin-Q Action*, (Doc. 324, Ex. 1, at VI.B.).  Recently, the Eleventh Circuit determined that "incentive awards" for class representatives equate to part salary and part bounty, which is prohibited by prior Supreme Court precedent. *Johnson v. NPAS Sol., LLC*, 975 F.3d 1244, 1255-61 (11th Cir. 2020).  While the Court appreciates that this action began pending well before the Eleventh Circuit's recent ruling, the Court must operate within the confines of the law as it stands

today.  Accordingly, while the parties may present their arguments as to why they believe the Court should still provide incentive awards to *Cin-Q* Plaintiffs, their efforts will likely prove an exercise in futility.

With respect to the other factors, *Cin-Q* Plaintiffs and BTL agree that they each seek to avoid the complexity, expense, and duration of litigation anticipated in this action.  As evidenced by the lengthy and detailed procedural history in this and the other related matters, detailed more fully above, the parties can reasonably anticipate similar procedural hurdles, a lengthy duration, and great expense to both parties if forced to litigate the issues present in this action.  The Class Members also benefit from the potential receipt of a monetary payment without the expense and risks associated with litigation, including the risk of a smaller or no award. Furthermore, uncertainty remains on both sides as to whether the claims upon which *Cin-Q* Plaintiffs seek to proceed are likely to succeed at trial, especially given notable changes in the legal landscape since the inception of this action.  *Cin-Q* Plaintiffs and BTL possess colorable arguments in support of and opposition to the claims set forth herein, which makes settlement an attractive option.  With respect to the stage at which the Settlement Agreement was reached, the parties engaged in several years of litigation in this and the other related matters, addressed similar issues at the administrative level while proceeding with litigation at the trial and appellate levels, and engaged in lengthy settlement discussions.  The parties did not blindly enter negotiations armed with little to no information nor settled the case prematurely.  Rather, each side entered the negotiations with a full understanding

69

of the issues and potential pitfalls related to litigation of the claims and engaged in arm's-length negotiations before a United States Magistrate Judge for several months.  The resolution reached by *Cin-Q* Plaintiffs and BTL after years of litigation and months of settlement negotiations therefore weighs in favor of preliminary approval.  Moreover, the Settlement Agreement does not delineate an unjustifiably burdensome claims procedure, unduly preferential treatment of the Class Representatives, or impermissibly broad releases of liability.  Based on those factors, preliminary approval appears fair, reasonable, and adequate at this stage.

Regarding the factor pertaining to the opposition to the settlement, no such opposition appears to exist.  In fact, Intervenors agree that a class settlement should go forward, but Intervenors contend that they should be involved as Co-Class Representatives and that their counsel should be appointed as Co-Class Counsel while also suggesting minor adjustments to the Class Notice and Claim Form. Intervenors argue that the settlement in this action is not materially better than the proposed settlement reached between *TTA* Plaintiffs and BTL in the *Technology Training II Action*, so Intervenors and their counsel should be allowed to participate. Intervenors fail to recognize, however, that the settlement reached in the *Technology Training II Action* is a nullity at this point with no bearing on these proceedings.  If anything, given the Eleventh Circuit's clear expression of disdain for how *TTA* Plaintiffs and their counsel obtained the settlement in *Technology Training II Action* and otherwise conducted themselves therein, reference to the prior settlement and their efforts to achieve that settlement does nothing to further Intervenors' or their

70

counsel's position in this action.

The settlement in this action shall preliminarily proceed without the need for Intervenors and their counsel to be named as Co-Class Representatives or Co-Class Counsel.  Indeed, Intervenors agreed that Addison should be appointed as Interim Class Counsel, and he obtained a settlement after months of negotiation facilitated by Judge Sansone. Though the Court appreciates Intervenors' arguments and position, it does not find them persuasive.  As a result, Intervenors and their counsel may continue to participate in this action by, for example, asserting any further objections at the fairness hearing and moving for an award of attorneys' fees at the same time as *Cin-Q* Plaintiffs.

After consideration, therefore, the undersigned concludes that the Settlement Agreement represents a bona fide end to the adversarial process rather than the collusive exploitation of the class action mechanism to the detriment of absent class members.  The settlement amount falls within the range of possible approval and, based on the foregoing, is preliminarily approved.  In doing so, the Court

(1) preliminarily approves the following Settlement Class:

> All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games.

> Specifically excluded from the Settlement Class are the following Persons:

> (i)     BTL and its respective parents, subsidiaries, divisions, affiliates, associated entities, business units, predecessors in interest, successors, successors in interest and representatives and each of their respective immediate family members;

          (ii)     Class Counsel; and

          (iii)    The judges who have presided over the Litigation and any related cases.

(2) preliminarily appoints Cin-Q and M & C as Class Representatives; and

(3) preliminarily appoints Addison and the law firm of Addison Law Office, P.A., and Good, Hara, and Wanca and the law firm of Anderson + Wanca as Class Counsel.

### i.     Notice and Fairness Hearing

Following preliminary approval of a settlement, Rule 23 dictates that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Where a class is certified under Rule 23(b)(3), albeit preliminarily for our purposes, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all class members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice must clearly and concisely include the following information in plain, easily understood language:

(1) the nature of the action;

(2) the definition of the class certified;

(3) the class claims, issues, or defenses;

(4) that a class member may enter an appearance through an attorney if the member so desires;

(5) that the court will exclude from the class any member who requests exclusion;

(6) the time and manner for requesting exclusion; and

(7) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).   Upon review, the Notice provided by *Cin-Q* Plaintiffs, attached as Exhibit B to the Settlement Agreement, satisfies the requirements of Rule 23(c)(2)(B) and is incorporated herein.   *Cin-Q Action*, (Doc. 324, Ex. 1, Ex. B).

Intervenors do not argue that the Notice is inadequate but rather take issue with the proposed means of providing Notice to Class Members and with the Claim Form as currently drafted (Doc. 325).[10]   Mainly, Intervenors argue that the proposed means of providing notice outlined in the Settlement Agreement is deficient, as they originally negotiated publication notice by print in a Tampa newspaper and additionally through internet banner ads, which would provide a greater reach than print-only publication.   Despite Intervenors' arguments to the contrary, the manner in which *Cin-Q* Plaintiffs and BTL intend to provide notice is fair, adequate, and reasonable.   *Cin-Q* Plaintiffs and BTL agree to provide notice to Class Members by sending the Notice via U.S. mail to the addresses associated with the fax numbers at issue, which Epiq will obtain through a reverse-lookup process, and by Settlement

---

[10]   Intervenors also argue that the payment for providing notice and for settlement administration costs should not come out of the Settlement Fund but rather should be paid separately by BTL, as they proposed in the *TTA* Settlement.   The Court finds nothing inherently problematic with the costs of settlement administration coming out of the Settlement Fund.   *See, e.g., George v. Academy Mortgage Corp. (UT)*, 369 F. Supp. 3d 1356, 1366 & 1383 (N.D. Ga. 2019) (noting that the total settlement amount included the settlement administrator's administration costs and awarding payment of the settlement administration costs from the settlement fund in granting final approval of a class action settlement).

Website.  The Claim Form will be included with the mailed Notice and will also be accessible to download from the Settlement Website.  As to potential other forms of notice, the parties leave to the Court's discretion whether to provide notice by facsimile and/or publication, following issuance of the Notice via U.S. mail and by Settlement Website.  Further, as discussed more fully during the hearing, the Court will consider the propriety of notice by publication and by facsimile after Epiq conducts the reverse-lookup process and provides the Notice on the Settlement Website.  If the Court determines that the combination of providing notice by posting it on the Settlement Website and by mailing the Notice through the reverse-lookup process lacked efficacy in sufficiently notifying Class Members, the Court will order that notice be provided by other means, including by publication and/or by facsimile.  Accordingly, Intervenors' concerns regarding the adequacy of the means for providing notice to Class Members is premature and unavailing at this juncture.

More significantly, Intervenors argue that the phrase "including faxes from the Tampa Bay Buccaneers" should be removed from the Claim Form.  As discussed above, *Cin-Q* Plaintiffs and BTL included the language, after engaging in extensive, arm's-length negotiations overseen and facilitated by Judge Sansone, to account for and prevent the submission of potentially fraudulent claims.  The need for this language arose from outstanding questions regarding the reliability of the Biggerstaff Report.  Primarily, questions remain as to the reliability of the Biggerstaff Report based upon *Cin-Q* Plaintiffs' inability to obtain fax transmission

logs for the faxes transmitted in July 2009 by 127 High Street and Biggerstaff's opinion that he could deduce whether successful transmissions occurred by comparing the universe of all fax numbers in the broadcast to the exception reports showing unsuccessful transmissions (Biggerstaff Report, ¶19), which BTL's expert, David Canfield ("Canfield"), opined involved a flawed analysis "[b]ecause we do not have any indication as to what might cause a number to be included on the exception report," and, thus, "it is not reasonable to assume that all of the numbers that did not appear on the exception report emails represent successful transmissions." (Doc. 341, Ex. E, Expert Report of David E. Canfield ("Canfield Report"), ¶19).   As BTL frames it, "[t]his litigation is, of course, anything but typical.  Instead of a class list, all we have at this point is a list of numbers compiled nearly a decade ago by Mr. Biggerstaff from materials of dubious heritage obtained from sources of questionable reliability and with no indication as to the names and addresses of any class members" (Doc. 341, at 2-3).

As Canfield explains, without BTL's knowledge, FaxQom relied upon third parties to both provide the fax numbers and to send the faxes that BTL asked FaxQom to send, to the extent that such faxes were even sent (Canfield Report, ¶¶10-12).   According to Canfield, for at least some of the faxes sent in 2009, FaxQom worked with USADatalink to coordinate the sending of faxes, but USA Datalink did not compile fax numbers or send any transmissions (Canfield Report, ¶13).   Rather, USADatalink contracted out to another company, DMI Marketing, to provide the database of fax numbers and yet another company, 127 High Street,

to actually send the faxes (Canfield Report, ¶13).  With respect to the faxes sent in 2010 and possibly some of the faxes in 2009, FaxQom engaged another company, RMI, which claimed to only be a fax broadcaster and thus did not collect or compile databases or fax numbers (Canfield Report, ¶14).

Canfield indicated that 127 High Street could not confirm whether it sent any faxes relating to the Tampa Bay Buccaneers because it did not retain any records from the period and no longer existed as an entity (Canfield Report, ¶13). Consequently, 127 High Street provided no fax logs (Canfield Report, ¶18).  Instead, Biggerstaff relied upon lists found in emails of the principal of FaxQom purportedly confirming the submission of projects and the list of target phone numbers along with "exception report" emails purportedly indicating individual failed fax transmissions for that project (Canfield Report, ¶18).  Though RMI provided some very basic log information, the logs did not provide definitive "MCF" notations required to confirm receipt by the receiving fax machine (Canfield Report, ¶¶20-21). Beyond that, Canfield notes several other deficiencies that call into question the methodology used, the results obtained, and the opinions rendered by Biggerstaff (Canfield Report, ¶¶8-61).

Against that backdrop, the addition of the disputed language represented a fair compromise to resolve the outstanding issues.  Namely, given the unique factual and procedural history, the disputed substantive issues, the extensive negotiations facilitated by a United States Magistrate Judge, and the contested expert findings present in this action, including the issues regarding the reliability of the Biggerstaff

Report, the inclusion of such language serves both Class Members, by potentially preventing fraudulent claims from depleting the Settlement Fund, and the ends of due process.   Moreover, despite the Intervenors' arguments to the contrary, the inclusion of such language does not present an onerous hurdle for Class Members seeking to submit a claim nor treats any Class Members inequitably.   Accordingly, the Claim Form is appropriate and thus approved.

In sum, therefore, the Claim Form, the Notice, and the proposed means of providing notice to Class Members are all fair, reasonable, and adequate for purposes of preliminary approval of the Settlement Agreement.   Following issuance of the Notice and the period for opting out and objecting, the Court will subsequently conduct a fairness hearing.   Such hearing will take place on November 9, 2022, at 10:00 a.m., in Courtroom 10A of the Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida.   *Cin-Q* Plaintiffs shall move for final approval of the settlement no later than 21 days prior to the fairness hearing.

## IV.   Conclusion

For the foregoing reasons, it is hereby

ORDERED:

1.      The Unopposed Motion for Preliminary Approval of Class Action Settlement and Notice to the Class (Doc. 324) is GRANTED.   Unless otherwise indicated herein, the parties shall adhere to the terms of the Settlement Agreement.

2.      The following Settlement Class is preliminarily approved for purposes

of settlement:

> All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games.
>
> Specifically excluded from the Settlement Class are the following Persons:
>
>    (i)     BTL and its respective parents, subsidiaries, divisions, affiliates, associated entities, business units, predecessors in interest, successors, successors in interest and representatives and each of their respective immediate family members;
>
>    (ii)    Class Counsel; and
>
>    (iii)   The judges who have presided over the Litigation and any related cases.

3.    Cin-Q and M&C are preliminarily appointed as Class Representatives.

4.    Addison and the law firm of Addison Law Office, P.A., and Good, Hara, and Wanca and the law firm of Anderson + Wanca are preliminarily appointed as Class Counsel.

5.    The proposed settlement is fair, reasonable, and adequate to warrant notice to the Settlement Class.  The proposed Notice is approved and will (i) describe the essential terms of the settlement; (ii) disclose any special benefits of incentives to the class representatives; (iii) provide information regarding the proposed attorneys' fee award; (iv) indicate the time and place of the fairness hearing for consideration of final approval of the settlement; (v) include information regarding the method and time for objection and opting out of the settlement; (vi) explain the procedures for allocating and distributing the Settlement Fund; and (vii)

prominently display the address of Class Counsel and the procedure for making inquiries.

6.      The Joint Motion for Appointment of Third-Party Settlement Administrator (Doc. 337) is GRANTED. Epiq Class Action & Claim Solutions, Inc. is appointed as Settlement Administrator to perform the functions delineated in the Settlement Agreement, including disseminating the Class Notice in accordance with the Settlement Class Notice Program described in the Settlement Agreement and with the directives in this Order.  The notice provisions contained in the Settlement Agreement and this Order (i) provide the best practicable notice and are reasonably calculated to apprise the Settlement Class of the pendency of the litigation and of their right to object to or to exclude themselves from the proposed settlement; (ii) are reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and (iii) meet the requirements of applicable law.

a.      No later than April 8, 2022, the parties will provide Epiq with the records identifying the fax numbers to which the facsimile advertisements offering tickets to Tampa Bay Buccaneers games were allegedly sent, which Epiq will use to locate addresses for Class Members.

b.      No later than April 28, 2022, Epiq shall create the Settlement Website, named BTL-TCPA-Settlement.com or, if unavailable, a name mutually agreed upon by the parties.

c.      No later than May 31, 2022, *Cin-Q* Plaintiffs and BTL shall

submit simultaneous briefing as to whether the Court should order additional publication and/or fax notice based on the results of the reverse-lookup process.

      d.      No later than June 27, 2022, Epiq will mail the Class Notice to all members of the Settlement Class whose addresses were derived from the process described above.  Epiq shall establish a post office box in the name of the Settlement Administrator to be used for receiving requests for exclusion and any other communications.  Only Epiq, Class Counsel, BTL Counsel, the Court, the Clerk of Court, and any of their designated agents shall maintain access to the post office box, unless otherwise agreed upon by the parties. Epiq will reject any claim that does not substantially comply with the instructions on the Claim Form or the terms of the Agreement or is postmarked later than the Claim Deadline.

7.      A fairness hearing to determine final approval of the settlement is scheduled to occur on November 9, 2022, at 10:00 a.m., in Courtroom 10A of the Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida.

8.      The Claim Form is approved.  The deadlines for submitting Claims, opting out, or objecting are as follows:

      i.      Deadline for submitting a Claim is September 26, 2022;

      ii.      Deadline for submitting an opt-out is September 26, 2022; and

      iii.      Deadline for submitting an objection is September 26, 2022.

9.      Any Settlement Class Member who seeks to exclude himself or herself from the Settlement Class shall submit an appropriate, timely request for exclusion,

postmarked no later than September 26, 2022 to Epiq at the address on the Class Notice.

10.     Any Settlement Class Member who does not submit a timely, written request for exclusion from the Settlement Class will be bound by all proceedings, orders, and judgments in the litigation, even if such Settlement Class Member previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Release.

11.     Any attorney hired by a Settlement Class Member for the purposes of objecting to the proposed settlement, attorneys' fee award, or incentive award and who intends to make an appearance at the fairness hearing shall provide to Epiq (who shall forward it to Class Counsel and BTL Counsel) and file with the Clerk of Court a notice of intention to appear no later than October 3, 2022.  Any Settlement Class Member who files and serves a written objection and who intends to make an appearance at the fairness hearing may so state in their objection.

12.     Epiq shall provide the opt-out list to Class Counsel and BTL Counsel no later than October 6, 2022 after the opt-out and objection deadline and then file with the Court the opt-out list with an affidavit attesting to the completeness and accuracy thereof no later than October 11, 2022.

13.     Any Settlement Class Member who does not become an opt-out and who seeks to object to the fairness, reasonableness, or adequacy of the settlement or the Settlement Agreement shall file with the Court and serve on Class Counsel and BTL Counsel on or before October 10, 2022 a statement of the objection signed by

the Settlement Class Member containing the following information:

i.       The objector's name, address, telephone number, and, if represented by counsel, the name of his or her counsel;

ii.      A declaration stating that he or she is a Settlement Class Member and received or was successfully sent one or more unsolicited facsimile advertisements relating to tickets for Tampa Bay Buccaneers games;

iii.     A statement of all objections to the settlement; and

iv.      A statement of whether the objector intends to appear at the fairness hearing, either with or without counsel, and, if with counsel, the name of counsel who will attend.

14.      Any response to an objection shall be filed with the Court no later than October 24, 2022.

15.      Any Settlement Class Member who does not file a timely written objection to the settlement or who fails to otherwise comply with applicable requirements shall be foreclosed from seeking any adjudication or review of the settlement by appeal or otherwise.

16.      On or before October 31, 2022, Epiq shall submit proof of compliance with the Settlement Class Notice Program and this Order.

17.      No later than April 28, 2022, Class Counsel may submit any motions for an attorneys' fee award and incentive awards.  Class Counsel's motion shall be made available on the Settlement Website no later than May 2, 2022.  Any other party seeking to pursue an incentive award or any other attorney seeking to pursue

an award of fees must submit such motions to the Court no later than October 24, 2022.

18.     Until such time as a Settlement Class Member has timely excluded himself or herself from the Settlement Class, Settlement Class Members are preliminarily enjoined from (i) filing, commencing, prosecuting, intervening in, or participating as plaintiff, claimant, or class member in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on, relating to, or arising out of the claims and causes of action or the facts and circumstances giving rise to the litigation and/or the released claims; (ii) filing, commencing, participating in, or prosecuting a lawsuit or administrative, regulatory, arbitration, or other proceeding as a class action on behalf of any member of the Settlement Class who has not timely excluded himself or herself (including by seeking to amend a pending complaint to include class allegations or seeking class certification in a pending action), based on, relating to, or arising out of the claims and causes of action or the facts and circumstances giving rise to the litigation and/or the released claims; and (iii) attempting to effect opt-outs of a class of individuals in any lawsuit or administrative, regulatory, arbitration, or other proceeding based on, relating to, or arising out of the claims and causes of action or the facts and circumstances giving rise to the litigation and/or released claims.  Any person who knowingly violates such injunction shall pay the attorneys' fees and costs incurred by BTL, any other released person, and Class Counsel resulting from the violation.  Nothing prohibits members of the Settlement Class from participating

in any action or investigation initiated by a state or federal agency.

19.    This action is STAYED pending final approval of the settlement, except that such stay shall not prevent the filing of any motions, affidavits, or other filings necessary to obtain and preserve final judicial approval of the settlement.

DONE AND ORDERED in Tampa, Florida, on this 29th day of March, 2022.

ANTHONY E. PORCELLI
United States Magistrate Judge

cc:    Counsel of Record