# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., <u>et al.</u>, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| | ) |
| BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, | ) ) ) ) |
| Defendants. | ) ) ) |
| TECHNOLOGY TRAINING ASSOCIATES, INC., <u>et al.</u>, | ) ) ) |
| Intervenors. | ) ) ) |

Case No. 8:13-cv-01592-AEP

Magistrate Judge Anthony E. Porcelli

## <u>DECLARATION OF KEN SPONSLER</u>

I, Ken Sponsler, declare and state as follows:

## I.    INTRODUCTION

1.    My name is Ken Sponsler. I am the Senior Vice President at PossibleNOW Services, Inc. d/b/a CompliancePoint Litigation Support Services ("CPLSS"), located in Duluth, Georgia.

2.    This Declaration lists my current findings and conclusions in this matter. I reserve the right to provide additional information in this matter. I also

1

reserve the right to supplement this Declaration as new information becomes available.

## II.   ASSIGNMENT

3.    CPLSS and I were asked by counsel for Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL") in the above-captioned matter to conduct an analysis and opine on: (1) the reliability of commercial reverse lookup searches to accurately determine the names and current addresses for individuals and entities associated with the lines in 2009 and 2010 that allegedly received the faxes at issue in 2009 and/or 2010; and (2) the likelihood that notices faxed to the lines that allegedly received the faxes in 2009 and/or 2010 would be received by the individual or entity who was associated with the line in 2009 and/or 2010.

## III.   QUALIFICATIONS

4.    I have extensive experience regarding facsimile ("fax") transmission technology and its application with respect to the rules and requirements under the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), 47 USC § 227 (hereafter "TCPA"). I have previously served as a party-appointed expert witness in dozens of TCPA matters. I have also been appointed by federal courts to serve as a TCPA compliance monitor.

5.    My experience includes dozens of consulting and testifying witness engagements in matters relating to the inability to reliably identify historical

recipients of faxes, particularly in a case such as this where the faxes at issue were allegedly sent in 2009 and or 2010 (nearly 13 years ago).

6.     My qualifications were previously described in Paragraphs 15-25 of the February 18, 2022 Declaration of Ken Sponsler in Support of BTL's Submission Regarding the Reliability of the Biggerstaff Report Data ("February 18, 2022 Sponsler Declaration"), and I incorporate them into this Declaration.

7.     This Declaration assumes the Court is familiar with the facsimiles at issue in this case and incorporates the background information regarding the alleged fax marketing campaign described in Paragraphs 26-31 of the February 18, 2022 Sponsler Declaration.

8.     This Declaration also assumes the Court is familiar with the inherent limitations in utilizing fax notice to accurately or reliably provide notice to all or part of the settlement class, described in Paragraphs 24-38 of the May 31, 2022 Declaration of Ken Sponsler in Support of BTL's Motion for Extension of Time ("May 31, 2022 Sponsler Declaration").

## IV.   ANALYSIS AND OPINIONS

### A.     Opinion One: The Second Reverse Lookup, performed by LexisNexis, Suffers From The Same Limitations And Flaws As The First Reverse Lookup, performed by TransUnion.

9.     As previously described in Paragraph 12 of the May 31, 2022 Sponsler Declaration, Epiq Class Action & Claim Solutions, Inc. ("Epiq") previously

3

attempted to identify the names and current addresses of the settlement class members by conducting a "reverse lookup" search using Mr. Biggerstaff's list of numbers and TransUnion's reverse lookup database.

10.    I now understand that Epiq has attempted to identify the names and current addresses of the settlement class members by conducting a second reverse lookup, this time using LexisNexis's reverse lookup database.

11.    LexisNexis's database suffers from the same shortcomings as TransUnion's database.  Similar to TransUnion, LexisNexis is one of the most prolific and robust providers of reverse lookup services.  Such databases, however, cannot accurately or reliably determine who held a particular line at a given period in the past, particularly when the events in question occurred a decade or more earlier.  In other words, these databases cannot provide accurate historical information in the sort of circumstances presented in this case.  Furthermore, they cannot accurately identify where those individuals reside today.

12.    LexisNexis (like TransUnion) aggregates data itself, which can lead to repeated errors that compound over time.  As explained in Paragraph 22 of the May 31, 2022 Sponsler Declaration, reverse lookups are not a reliable method for identifying settlement class members and providing them notice of the settlement today.  Plaintiffs, Epiq and LexisNexis also present no verification or validation process to mitigate these inherent inaccuracies and limitations.

13.    The results Epiq obtained from LexisNexis, accordingly, suffer from similar limitations as the TransUnion reverse lookup.  Epiq's search through the LexisNexis database only returned any identifiable information for 69,885 of the 131,011 lines (or 53.3 percent) on Mr. Biggerstaff's list of lines.  For the remaining 61,126 lines (or 46.7 percent), LexisNexis' reverse lookup process returned no identifying information whatsoever.   See Summary of Identifying Information Distribution, LexisNexis Name Or Address Results, attached hereto as Exhibit A. This is consistent with my past experience with other reverse lookup searches, which often do not return identifying information for a substantial portion of the lines searched.  An example of such inaccuracies involved when reverse lookup data sources are used for historical number/person associations are included in Paragraph 15 of the May 31, 2022 Sponsler Declaration.

14.    The number of results is further reduced when filtered to only those results where the reverse lookup produced a name and an address, both of which are obviously required for mailed notice.  Epiq's search through the LexisNexis database only returned at least one name *and* address for 66,742 of the 131,011 lines (or 50.9 percent) on Mr. Biggerstaff's list of lines.  LexisNexis' reverse lookup found no results for 61,126 lines (or 46.7 percent), and only a name(s), but no address, for the remaining 3,143 lines (or 2.4 percent).  See Summary of Identifying

Information Distribution, LexisNexis Name and Address Results, attached hereto as Exhibit B.

15.  The second reverse look up, which was performed by LexisNexis, suffers from an additional flaw, similar to the TransUnion reverse lookup: multiple matches.  Among the results that returned at least one name, the LexisNexis reverse lookup found multiple results for 25,780 lines, or 19.7 percent of the total number of lines on Mr. Biggerstaff's list.  Of the number of lines for which the LexisNexis reverse lookup found any match, 36.9 percent of the lines returned multiple matches.  Filtering down to only those results for which the LexisNexis reverse lookup found a name and an address, 36 percent of the lines which returned a match had multiple matches.

16.  Finally, the LexisNexis reverse lookup failed to find any name and address for 64,269 lines.  Even combining the two results, there remains 49,360 numbers, or 37.7 percent of the numbers on the Biggerstaff list, for which there is no match.  Moreover, the July 28, 2022 declaration of Loree Kovach, (provided to me by counsel for BTL) incorrectly states the number of names and addresses that have been identified through the two reverse lookups.   While Ms. Kovach's declaration states that the two reverse lookups have identified at least one name and address associated with 83,699 phone numbers, in fact, the two reverse lookups only identified at least one name and address associated with 81,651 phone numbers.  See

6

July 28, 2022 Declaration of Loree Kovach, ¶ 22.  Ms. Kovach's declaration further

concluded that "17,140 unique numbers were identified in File 1 and 34,255 unique

numbers were identified in File 2 with a name and mailing address."  See id. ¶ 21.[1]

We were unable to determine the methodology used by Ms. Kovach to calculate

these numbers and are unable to independently verify those conclusions.

**B.**     **Opinion Two:  The Second Reverse Lookup, performed by LexisNexis, Compounds The Issues Of Confusion And Fraudulent Claims Given The Inherent Inability Of Reverse Lookups To Accurately Determine Who Held A Telephone Number At A Specific Point In The Past**

17.     While the use of a second reverse lookup may be supported by an

understandable desire to collect more data, in my experience, additional reverse

lookups substantially increase the risk of fraudulent claims by enlarging the amount

of numbers with multiple results and enlarging the number of matches per line.

Mailing notice to multiple sets of people for the same line increases the chances of

fraudulent claims and class member confusion, as recipients of class notice would

normally assume that they are entitled to a claim on settlement proceeds,

particularly given the high likelihood of memory loss and lack of a physical fax

---

[1] The results of the LexisNexis reverse lookup were split into two files.  File 1 contained all results for which the TransUnion reverse lookup identified at least one match, and File 2 contained all results for which the TransUnion reverse lookup did not identify a match.

after almost 13 years.  The more numbers with multiple results, and the more matches per line, the more risk of fraudulent claims.

18.    This risk is compounded by my understanding that Epiq's proposal is to mail notice to each set of identifying information for lines with multiple sets of identifying information, even though only one of those individuals can be a member of the settlement class.

19.    For instance, of the 66,742 lines for which a name and address were returned in the LexisNexis reverse lookup, 42,728 were associated with a single name and address.  While this presents an increase over the number of lines for which a single match was returned in the TransUnion search (17,996 or 13.7 percent), the LexisNexis reverse lookup substantially increased the number of lines with multiple results.  The LexisNexis reverse lookup found multiple matches for 36 percent of the numbers for which it found a match with a name and address, for a total of 24,014 numbers with multiple matches on the Biggerstaff list.  Of that, 3,428 of the numbers for which there were multiple matches on the LexisNexis reverse lookup had a single match on the TransUnion reverse lookup, and an additional 13,650 had multiple matches on the LexisNexis reverse lookup and no matches on the TransUnion reverse lookup.  In sum, 17,078 of the numbers for which there were multiple matches on the LexisNexis reverse lookup had zero or only one match on the TransUnion reverse lookup.  Whereas 9,753 of the numbers

for which there was a multiple match on the TransUnion reverse lookup had a single match on the LexisNexis reverse lookup, and an additional 6,255 had multiple matches on the TransUnion reverse lookup and no matches on the LexisNexis reverse lookup.  See Summary of TransUnion and LexisNexis (Name And Address) Results, attached hereto as Exhibit C.

20.     Adding the two reverse lookups together, there are now multiple matches for at least 30.5 percent of the numbers on the Biggerstaff list or at least 40,022 numbers in total.  In addition, there are 5,914 numbers for which LexisNexis and TransUnion each returned a single result, which may not necessarily match each other.  For these 45,936 numbers, there is no way to determine which (if any) of the sets of identifying information actually corresponds to the recipient of a fax at issue during the 2009-10 period.

21.     The conflicts among the data and the resulting problems are underreported by the foregoing analysis.  This is because LexisNexis did not provide all relevant data in its database when reporting the results of its reverse lookup.  Instead, LexisNexis artificially capped the number of matches per line that it shared with Epiq at three (3).  Therefore, even if the true number of matches associated with a given number were more than three, LexisNexis only shared three matches.  Indeed, the TransUnion results found 6,090 numbers for which there were more than three matches, with as many matches as sixteen (16) for a given number.

As a result, the likelihood that the results reported by LexisNexis in fact accurately identified the settlement class member is even lower.

22.    If mailed notice were to be sent to all persons and entities for which Epiq found more than one match in either the TransUnion or LexisNexis reverse lookups, that would necessarily mean that at least 66,733 to 101,186 Mailed Notices would be sent to numbers associated with persons and/or entities that are <u>not</u> members of the Settlement Class.  Moreover, even if the two reverse lookups identified a single, consistent match, due to the inherent limitations in the reverse lookup process, it cannot be assured that the Mailed Notice will be sent to an actual class member.

23.    At a 5 percent claims rate, the Court would receive a minimum of 3,336 fraudulent claims.  If the claim-in rate were higher, then the number of fraudulent claims would increase.

24.    The problem caused by multiple matches is also compounded by the fact that even in instances where TransUnion and LexisNexis both located a single match, that match may not contain the <u>same</u> name or address.  To understand the extent of this problem in the two reverse lookups, my team conducted a manual review of a statistically significant sample of the results.

25.    This type of analysis is regularly used in my field. Historical data analysis from compiled data sources is fraught with reliability challenges,

especially in a case like this where significant damages are at stake. As I've described previously, data aggregators such as TransUnion and LexisNexis access hundreds of public records and apply algorithms in an attempt to resolve or even prioritize results based upon their own "secret sauce" or as one Court described it, a "black box[2]".  There are no means by which to validate the sources of these records, or the reliability of the results. Simply put, this type of analysis is not suited for the purpose it is being proposed here. However, my practice has learned over many years of experience that a manual review by trained examiners can reveal anomalies or confirm results that an automated, algorithm centric, computer software program simply cannot. This is painstaking work that would take weeks or even months of effort to accomplish for the entirety of the results, but a statistically significant sample can be useful for the trier of fact to consider.

26.   To undertake this analysis, we first identified the number of lines for which TransUnion and LexisNexis each returned at least one name or one address. This consisted of 27,126 unique phone numbers.

27.   We then selected a sample size of 650 lines.  We utilized a random sample of 650 phone numbers because this number of records is sufficient to predict that the results of the analysis of this sample or any other similar random sample of

---

[2] See Wilson vs. Badcock, Court in the Middle District of Florida Case No. 8:17-cv-02739-T-02AAS

650 phone numbers from the general population of 27,126 phone numbers would fall within the same confidence interval (margin of error ±5 percentage points) 99 percent of the time. This indicates that the results of the sample can be generalized to the entire population of 27,126 phone numbers.

28.   After collecting this sample, we manually reviewed each result to determine whether TransUnion and LexisNexis yielded the same results.  Of the 650 phone numbers reviewed in our sample, 61.7 percent, or 401 total phone numbers, had at least one name and address that did not match between the TransUnion and LexisNexis results.  See Summary of Manual Review, attached hereto as Exhibit D.[3]

29.   Not only were the TransUnion and LexisNexis results riddled with inconsistencies, but nearly half of the results were inconsistent between the two reverse lookups.  Forty-eight (48) percent, or 312 of the total phone numbers, had no name and address combinations in common between the TransUnion and LexisNexis results.  That number may in fact be higher, since it excludes possible matches for which the name and/or address was not entirely consistent but could not be determined to be completely inconsistent.  For instance, the 48 percent figure

---

[3] The full results of the manual review, consisting of names and addresses returned for the 650 phone numbers included in the sample size, are not attached to this Declaration.  However, we are happy to provide the full results to the Court upon request.

does <u>not</u> include results where LexisNexis and Transunion located the same last name, but different first names.  <u>See</u> Exhibit D.

30.   This manual review suggests that many of the results that appear to include a single match, in fact, include multiple matches when accounting for the two reverse lookups.  For instance, 6,252 of the phone numbers returned a single name <u>or</u> address on both the TransUnion and LexisNexis reverse lookups.  (*See Summary of TransUnion and LexisNexis (Name Or Address) Results, attached hereto as Exhibit E)*.  In our manual review sample, there were 147 phone numbers for which there was a single result on both the TransUnion and LexisNexis reverse lookups.  Of those, 98 had no name <u>and</u> address combination in common between the TransUnion and LexisNexis results, and 79 (53.7%) had no name <u>or</u> address in common between the TransUnion and LexisNexis results.

31.   Moreover, the "proxy" LexisNexis apparently used to account for the fact that it could not identify who held the telephone numbers on the Biggerstaff list in 2009 and 2010 (as described in the July 28, 2022 declaration of Loree Kovach, provided to me by counsel for BTL) would not begin to solve the foregoing problems.  To the contrary, this proxy only confirms the underlying lack of reliability of reverse lookups under these circumstances.

32.   This "proxy" solution involved identifying businesses affiliated with the relevant phone number, and then determining whether those businesses existed

during the 2009 to 2010 timeframe.  As noted in Paragraphs 34-38 of the May 31, 2022 Sponsler Declaration, small businesses come into existence and go out of business frequently.  Indeed, of the 44,215 establishments opened in Florida for the 12 months prior to March 2010, only 13,414 (30.3 percent) survived to March 2021. When a small business is sold, however, it is not at all uncommon for that business to retain the name it had before it was sold to someone else.  Therefore, the fact (apparently relied upon by LexisNexis as a "proxy" for proof of ownership of a telephone line in 2009 or 2010) that a business by the same name existed in 2009 or 2010 would not begin to establish what you would need to know in order to ensure that a mailed notice sent to that business today or to the owners of that business at some point after 2009 and 2010 would be sent to the actual owner of the business in 2009 or 2010, as the ownership of the business most likely changed in the intervening years for a large percentage of the businesses identified by Lexis/Nexis.

33.  As explained in Paragraph 23 of the May 31, 2022 Sponsler Declaration, I generally do not rely on third-party reverse lookup databases like TransUnion and LexisNexis to accurately identify individuals at a specific point in the past.  As these results demonstrate, utilizing a second reverse lookup only magnifies the number of phone numbers with multiple results.  Our manual review, moreover, suggests that even for results for which both TransUnion and LexisNexis

yielded one result each, nearly half of these results, in fact, likely consist of <u>multiple matches</u>.

## V.  CONCLUSIONS

34.    For all of the reasons outlined above, it continues to be my opinion that the reverse lookup process employed by Epiq does not accurately identify the names and current addresses of settlement class members who held the lines at issue back in 2009 and 2010.  Reverse lookup services such as those offered by TransUnion or LexisNexis are not designed to accurately identify the holder of a phone line at a specific point in the past, and the companies often specifically disclaim the ability of their reverse lookup services to be used for such purposes.  It is my opinion that it is significantly likely that the results returned by the LexisNexis reverse lookup consist of numerous names that did not actually hold the lines at issue when the faxes were allegedly received.  Furthermore, it is not possible to determine the error rate of the LexisNexis reverse lookup process without independent verification by calling the numbers, which raises a host of issues.

35.    Thus, it is not possible to know what fraction (if any) of reverse-lookup results that were returned actually and correctly identify settlement class members.

36.    It is also problematic to send mail notice to more than one person per line, as such mailing would contain a very high number of non-class members. This problem, already apparent after the first reverse lookup, is only compounded by the

second reverse lookup, which has increased the number of lines with multiple matches to at least 40,022 phone numbers.  Sending mail notice to every person identified by LexisNexis and TransUnion's reverse lookup would result in at least 66,733 and up to 101,186 of the notices being sent to non-class members, even assuming the results were accurate (and as discussed, there is no corroborating evidence to support this assumption).

37.   For these reasons, it continues to be my opinion that mail notice is unlikely to be an effective form of notice to settlement class members.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 5th, 2022, in Beverly Hills, Florida

**Ken Sponsler**

**Exhibit A – Summary of Identifying Information Distribution, LexisNexis Name Or Address Results**

| Count of LexisNexis Results | Phones With This Count |
|:---:|:---:|
| 1 | 44,105 |
| 2 | 19,785 |
| 3 | 5,995 |
| 0 | 61,126 |

**Exhibit B – Summary of Identifying Information Distribution, LexisNexis
Name And Address Results**

| Count of LexisNexis Results | Phones With This Count |
|:---:|:---:|
| 1 | 42,728 |
| 2 | 18,818 |
| 3 | 5,196 |
| 0 | 64,269 |

**Exhibit C – Summary of TransUnion and LexisNexis (Name And Address) Results**

| LexisNexis Results | TransUnion Results | Phones With This Count | Min Excess Results | Max Excess Results |
|---|---|---|---|---|
| 0 | 0 | 49,360 | - | - |
| 0 | 1 | 8,654 | - | - |
| 0 | 2 | 3,828 | 3,828 | 3,828 |
| 0 | 3 | 1,525 | 3,050 | 3,050 |
| 0 | 4 | 565 | 1,695 | 1,695 |
| 0 | 5 | 217 | 868 | 868 |
| 0 | 6 | 85 | 425 | 425 |
| 0 | 7 | 15 | 90 | 90 |
| 0 | 8 | 11 | 77 | 77 |
| 0 | 9 | 5 | 40 | 40 |
| 0 | 10 | 3 | 27 | 27 |
| 0 | 16 | 1 | 15 | 15 |
| 1 | 0 | 27,061 | - | - |
| 1 | 1 | 5,914 | - | 5,914 |
| 1 | 2 | 4,391 | 4,391 | 8,782 |
| 1 | 3 | 2,569 | 5,138 | 7,707 |
| 1 | 4 | 1,496 | 4,488 | 5,984 |
| 1 | 5 | 722 | 2,888 | 3,610 |
| 1 | 6 | 328 | 1,640 | 1,968 |
| 1 | 7 | 159 | 954 | 1,113 |
| 1 | 8 | 56 | 392 | 448 |
| 1 | 9 | 19 | 152 | 171 |
| 1 | 10 | 6 | 54 | 60 |
| 1 | 11 | 3 | 30 | 33 |
| 1 | 12 | 2 | 22 | 24 |
| 1 | 13 | 1 | 12 | 13 |
| 1 | 14 | 1 | 13 | 14 |
| 2 | 0 | 11,742 | 11,742 | 11,742 |
| 2 | 1 | 2,520 | 2,520 | 5,040 |
| 2 | 2 | 1,854 | 1,854 | 5,562 |
| 2 | 3 | 1,189 | 2,378 | 4,756 |
| 2 | 4 | 805 | 2,415 | 4,025 |
| 2 | 5 | 400 | 1,600 | 2,400 |
| 2 | 6 | 168 | 840 | 1,176 |

19

| LexisNexis Results | TransUnion Results | Phones With This Count | Min Excess Results | Max Excess Results |
|---|---|---|---|---|
| 2 | 7 | 85 | 510 | 680 |
| 2 | 8 | 32 | 224 | 288 |
| 2 | 9 | 12 | 96 | 120 |
| 2 | 10 | 3 | 27 | 33 |
| 2 | 11 | 4 | 40 | 48 |
| 2 | 12 | 4 | 44 | 52 |
| 3 | 0 | 1,908 | 3,816 | 3,816 |
| 3 | 1 | 908 | 1,816 | 2,724 |
| 3 | 2 | 894 | 1,788 | 3,576 |
| 3 | 3 | 604 | 1,208 | 3,020 |
| 3 | 4 | 421 | 1,263 | 2,526 |
| 3 | 5 | 237 | 948 | 1,659 |
| 3 | 6 | 124 | 620 | 992 |
| 3 | 7 | 55 | 330 | 495 |
| 3 | 8 | 19 | 133 | 190 |
| 3 | 9 | 12 | 96 | 132 |
| 3 | 10 | 8 | 72 | 96 |
| 3 | 11 | 4 | 40 | 52 |
| 3 | 12 | 1 | 11 | 14 |
| 3 | 14 | 1 | 13 | 16 |
| **TOTAL** | | | **66,733** | **101,186** |

20

**Exhibit D – Summary of Manual Review**

| Score | At least one name and address combination from TransUnion matched a name and address combination from LexisNexis | At least one name (but not necessarily the address) from TransUnion matched a name from LexisNexis | At least one address (but not necessarily the name) from TransUnion matched an address from LexisNexis | At least one name and address from TransUnion or LexisNexis did not match to a name/address from the other reverse lookup |
|---|---|---|---|---|
| No | 312 | 222 | 290 | 249 |
| Possible Yes | 61 | 109 | 16 | NA |
| Yes | 277 | 319 | 344 | 401 |
| Total | 650 | 650 | 650 | 650 |

21

**Exhibit E – Summary of TransUnion and LexisNexis (Name Or Address) Results**

| LexisNexis Results | TransUnion Results | Phones With This Count | Min Excess Results | Max Excess Results |
|---|---|---|---|---|
| 0 | 0 | 47,312 | - | - |
| 0 | 1 | 8,086 | - | - |
| 0 | 2 | 3,534 | 3,534 | 3,534 |
| 0 | 3 | 1,400 | 2,800 | 2,800 |
| 0 | 4 | 502 | 1,506 | 1,506 |
| 0 | 5 | 196 | 784 | 784 |
| 0 | 6 | 67 | 335 | 335 |
| 0 | 7 | 13 | 78 | 78 |
| 0 | 8 | 8 | 56 | 56 |
| 0 | 9 | 4 | 32 | 32 |
| 0 | 10 | 3 | 27 | 27 |
| 0 | 16 | 1 | 15 | 15 |
| 1 | 0 | 27,771 | - | - |
| 1 | 1 | 6,252 | - | 6,252 |
| 1 | 2 | 4,571 | 4,571 | 9,142 |
| 1 | 3 | 2,650 | 5,300 | 7,950 |
| 1 | 4 | 1,538 | 4,614 | 6,152 |
| 1 | 5 | 731 | 2,924 | 3,655 |
| 1 | 6 | 341 | 1,705 | 2,046 |
| 1 | 7 | 160 | 960 | 1,120 |
| 1 | 8 | 59 | 413 | 472 |
| 1 | 9 | 20 | 160 | 180 |
| 1 | 10 | 6 | 54 | 60 |
| 1 | 11 | 2 | 20 | 22 |
| 1 | 12 | 2 | 22 | 24 |
| 1 | 13 | 1 | 12 | 13 |
| 1 | 14 | 1 | 13 | 14 |
| 2 | 0 | 12,510 | 12,510 | 12,510 |
| 2 | 1 | 2,621 | 2,621 | 5,242 |
| 2 | 2 | 1,914 | 1,914 | 5,742 |
| 2 | 3 | 1,207 | 2,414 | 4,828 |
| 2 | 4 | 814 | 2,442 | 4,070 |
| 2 | 5 | 408 | 1,632 | 2,448 |
| 2 | 6 | 170 | 850 | 1,190 |

22

| LexisNexis Results | TransUnion Results | Phones With This Count | Min Excess Results | Max Excess Results |
|---|---|---|---|---|
| 2 | 7 | 86 | 516 | 688 |
| 2 | 8 | 31 | 217 | 279 |
| 2 | 9 | 12 | 96 | 120 |
| 2 | 10 | 3 | 27 | 33 |
| 2 | 11 | 5 | 50 | 60 |
| 2 | 12 | 4 | 44 | 52 |
| 3 | 0 | 2,478 | 4,956 | 4,956 |
| 3 | 1 | 1,037 | 2,074 | 3,111 |
| 3 | 2 | 948 | 1,896 | 3,792 |
| 3 | 3 | 630 | 1,260 | 3,150 |
| 3 | 4 | 433 | 1,299 | 2,598 |
| 3 | 5 | 241 | 964 | 1,687 |
| 3 | 6 | 127 | 635 | 1,016 |
| 3 | 7 | 55 | 330 | 495 |
| 3 | 8 | 20 | 140 | 200 |
| 3 | 9 | 12 | 96 | 132 |
| 3 | 10 | 8 | 72 | 96 |
| 3 | 11 | 4 | 40 | 52 |
| 3 | 12 | 1 | 11 | 14 |
| 3 | 14 | 1 | 13 | 16 |
| **TOTAL** | | | **69,054** | **104,846** |



**Exhibit F**

<u>Curriculum</u> <u>Vitae</u>

Kenneth R. Sponsler, CECP, CIPP/US
CompliancePoint Litigation Support Services
Office 770-255-1100
Mobile 770-363-7149
www.compliancepoint.com
ksponsler@compliancepoint.com

**Current Employment:**

Senior Vice President of CompliancePoint Litigation Support Services ("CPLSS"), a wholly owned subsidiary of PossibleNOW, Services Inc. ("PossibleNOW"), located in Duluth, Georgia.

**Education:**

120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; Troy University; City College of Chicago; Park University.

**Registrations, Licenses, Certifications:**
- Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE)
- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP)
- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO)

**Specialized Training:**
- U.S. Army Command Sergeant Major Course; First in Class
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate

**Professional Experience:**

More than 22 years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for consumer contact operations that include communication channels such as SMSs/text messages, emails, facsimiles, U.S. and international telephone calls for telemarketing, debt collection, and surveys, for example. Ken Sponsler has been designated as an *expert* in U.S. federal district court and provided *expert opinions* in numerous TCPA and TSR-related matters. CPLSS specializes in seller and customer-facing compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment data analysis, with a focus on operational assessments, risk identification, gap analysis, and implementation of compliance policies, procedures and strategies. The consulting practice includes seller/service

provider relations, contracting, record keeping, training, monitoring, and enforcement. Ken is a PACE member, a former member of the PACE Executive Committee and the PACE National Board of Directors. Ken served as the PACE Vice Chairman of the Board in 2018. Additionally, Ken has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400-man elite combat team.

**Publications and Webinars (including CompliancePoint products)**:
- *2016 Compliance Review - 2017 Forecast, Regulatory Updates, Feb 2017*
- *Text Message Compliance Webinar – September 2016*
- *2014 Compliance Review - 2015 Forecast, Regulatory Updates, Feb 2015*
- *2013 Compliance Review - 2014 Forecast, Regulatory Updates, Feb 2014*
- *Strategies For Compliance With New TCPA Requirements, March 2012*
- *Employment Placement Verification, February 2012*
- *2011 Compliance Legislation Review & 2012 Forecast, January 2012*
- *What Impacts Will The TCPA Changes Have On Your Business? Feb 2012*
- *Monthly Compliance Article for customer distribution (2007 – 2014)*

**Awards/Honors**:
- PACE 2019 Searcy Award for Advocacy as recognition for Ken's efforts in Advocating for the Association and the Industry at large
- PACE 2016 Pioneer Award for the Difference Ken's Dedication and Support has made with PACE and the Industry
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Contact Center Industry
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the U.S. Army, incl. the Legion of Merit

**Memberships:**
- Professional Association for Customer Engagement (PACE), formerly American Teleservices Association (ATA)
  - Teleservices Committee Member
- International Association of Privacy Professionals
  - Consumer Marketing Working Group
- Association of National Advertisers (ANA) formerly Direct Marketing Association (DMA)

**Presentations and Colloquies**:
Frequent speaker at industry events, including PACE Annual Convention; DMA Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users' Conference; the National Do Not Call Regulator Conference (attended by representatives of the DOJ, FTC, FCC, and state DNC regulators) and Quarterly Compliance Webinar Presentations.