UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., *et al.*,

    Plaintiffs,

v.                                                                              Case No. 8:13-cv-1592-AEP

BUCCANEERS LIMITED
PARTNERSHIP,

    Defendant.
                                      /

## ORDER

On August 31, 2022, this cause came before the Court for an evidentiary hearing regarding the Motion to Address for Purposes of the Notice Program the Limitation of Reverse Lookups Under the Circumstances of this Case filed by Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL" or "Defendant") (Doc. 381) and upon Plaintiffs Cin-Q Automobiles, Inc. and Medical & Chiropractic Clinic, Inc. (collectively, "Cin-Q" or "Plaintiffs") Motion to order fax notice and publication notice (Doc. 350).[1] The heart of the issue presented by the parties' competing motions was how to identify absentee Class

---

[1] At the hearing, the Court also addressed Defendant's Unopposed Motion to Seal Documents attached to Defendant's Motion for an Extension of Time (Doc. 348), Defendant's Motion for Extension of Time to File/Submit its memorandum regarding ascertainability and supplemental notice (Doc. 349), Defendant's Motion for Leave to file a response to Plaintiff's Request to Alter and Amend the Settlement Agreement by using for Purposes of Mailed Notice the Reverse Lookup Unilaterally Directed by Class Counsel (Doc. 354), and Defendant's Motion to Seal Documents and Testimony (Doc. 393).

Members to receive direct notice. For the following reasons and those stated at the hearing, direct notice shall be provided in the manner and to the extent outlined herein.

## I. Background

The Court has fully outlined the extensive history of this case in its previous Order granting preliminary approval of the class action settlement and notice to the class (Doc. 343). However, as it pertains to the issues addressed at the evidentiary hearing, it is important to note events transpiring after the Court preliminarily approved the class settlement.

On March 29, 2022, the Court granted Plaintiff's unopposed motion for preliminary approval of class settlement (Doc. 343). At that time, the Court approved the proposed Notice program as it appeared to satisfy the requirements of Federal Rule of Civil Procedures 23(c)(2)(B) (Doc. 343, at 73). The Notice program in the Settlement Agreement, which the Court incorporated into its Order, provides for Cin-Q and BTL to provide Notice to Class Members via U.S. mail to the addresses associated with the fax numbers at issue and by Settlement Website (Doc. 324-1, at 17-18). The Settlement Administrator, Epiq Class Action & Claim Solutions, Inc. ("Epiq" or "Settlement Administrator"), would obtain the mailing addresses through a reverse-lookup of the fax numbers (*see* Doc. 324-1, at 19). The Claim Form would be included with the mailed Notice and would also be accessible to download from the Settlement Website. Additionally, the Settlement Agreement leaves to the Court's discretion whether to provide notice by facsimile and/or

publication, following issuance of the notice via U.S. mail and by Settlement Website. The Court noted that if it determined at a later time that the combination of providing notice by posting it on the Settlement Website and by mailing it through the reverse-lookup process lacked efficacy in sufficiently notifying Class Members, the Court would order that notice be provided by other means, including by publication and/or by facsimile (Doc. 343, at 74).

According to the Settlement Agreement and the Court's Order, within ten days of the preliminary approval Order, Cin-Q and BTL were to provide Epiq with the records identifying the fax numbers to which the facsimile advertisements offering tickets to Tampa Bay Buccaneers games were allegedly sent, which Epiq would then use to locate addresses for Class Members. By May 31, 2022, the parties were directed to file simultaneous briefing as to whether the Court should order additional publication and/or fax notice based on the results of the reverse-lookup process.

What ensued was multiple filings by the parties and hearings to address concerns over the results of Epiq's reverse lookup, where they used TransUnion as a vendor. Ultimately, the Court ordered that a second reverse lookup be conducted by Epiq. Epiq conducted a second reverse lookup using LexisNexis as a vendor, which led to BTL filing a motion to address the reverse lookups for the purposes of the Notice Program (Doc. 381).

## II.   Discussion

Following preliminary approval of a settlement, Rule 23 dictates that the

court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Where a class is certified under Rule 23(b)(3), albeit preliminarily for our purposes, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all class members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice must clearly and concisely include the following information in plain, easily understood language:

> (1) the nature of the action;
>
> (2) the definition of the class certified;
>
> (3) the class claims, issues, or defenses;
>
> (4) that a class member may enter an appearance through an attorney if the member so desires;
>
> (5) that the court will exclude from the class any member who requests exclusion;
>
> (6) the time and manner for requesting exclusion; and
>
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii). In the Settlement Agreement Cin-Q and BTL agreed that the parties would provide the Settlement Administrator records identifying the fax numbers which the facsimile advertisements offering tickets for Tampa Bay Buccaneer games were allegedly sent (Doc. 324-1, at 17). The Settlement Administrator would then use these records to determine the mailing addresses for *as many members of the Settlement Class as possible* (Doc. 324-1, at 17-18). The parties agreed to work cooperatively with the Settlement Administrator to

mutually agree upon the most practicable and reasonable methods under the circumstances by which the addresses of the members of the Settlement Class could be derived in an efficient and reasonable manner (Doc. 324-1, at 18). Then, the mailing addresses would be updated with the United States Postal Service's National Change of Address Database (Doc. 324-1, at 18). Additionally, the parties agreed that the Court would decide whether to order additional forms of notice through facsimile and/or publication notice if the identity and mailing address of absent Class Members could not be reasonably determined from the reverse-lookup process in a manner consistent with existing requirements for notice (Doc. 324-1, at 18-19).

According to Loree Kovach, Epiq's Vice President, Epiq conducted the initial reverse lookup using a product by TransUnion, which yielded results for 40,940 unique numbers out of the original 131,011 unique fax numbers being matched with at least one name and mailing address (Doc. 380-1, at 4-5). Out of those 40,940 matched numbers, approximately 22,799 unique fax numbers had matches to multiple names and addresses while the remaining approximately 18,141 unique fax numbers matched a single name and address (Doc. 349-11, at 2). Thus, approximately 90,071 unique fax numbers did not match to a name and address (*see* Doc. 380-1, at 4). Cin-Q raised multiple issues with the TransUnion results, including allegations that TransUnion did not have a robust database of business numbers and that one of the named Plaintiffs did not appear as a match in the TransUnion reverse lookup.

At the hearing, Ms. Kovach testified that TransUnion has a product that is the industry standard for running reverse lookups in this type of circumstances, where the reverse lookup relates to a specific time period and thus, viewed as more reliable in these circumstances. As a result of the Court's order to conduct a second reverse lookup, Epiq contracted LexisNexis to conduct a reverse lookup because it has both an individual and consumer database. According to Ms. Kovach, although LexisNexis does not have a similar product to TransUnion that can isolate a search for ownership or association of a phone line to an individual or business within the relevant time period, LexisNexis created a proxy solution. The proxy solution was that LexisNexis would run the search for potential owners or users associated with each number and then look back at their 2009 and 2010 databases and confirm that the identified users existed during the relevant time period (*see* Docs. 381-3, at 2; 398-3). As a result of the LexisNexis search, of the 131,011 original numbers, approximately 51,395 unique numbers were matched with at least one name and mailing address (Doc. 380-1, at 4-5). The record is unclear as to exactly how many single matches and multiple matches resulted from the LexisNexis search and the parties failed to specifically address this at the hearing.

According to Ms. Kovach, after comparing the TransUnion and LexisNexis results, a total of 83,698 unique original numbers were matched with at least one name and mailing address (Doc. 380-1, at 5). BTL now argues that sending direct mail notice to all of the reverse lookup matches is overinclusive.

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) is

informative in the instant case. In *In re Nissan*, the Fifth Circuit held that notice to a class of original U.S. retail purchasers of Datsun vehicles by way of mail notice to all current registered Datsun owners was both overinclusive and underinclusive. 552 F.2d at 1099. The court reasoned that while sending direct notice to all registered Datsun owners would include class members who were original retail purchasers that kept their vehicles, it also included present owners and it was impossible to estimate how many absentee class members would receive direct notice. *Id.* Moreover, the court found that "[a] more fundamental defect" with the notice was that the class notice was underinclusive in that class members who no longer owned the vehicles they purchased would not receive direct notice. *Id.* The court reasoned that because the car dealerships had records of sales during the relevant time period, direct notice based on the information on those records was the best practicable under the circumstances. *Id.*

In striking the balance between protecting the rights of absent class members and making Rule 23 workable, courts have held that it is not necessary to send individual notices to an overinclusive group of people simply because that group contains some additional class members whose identifies are unknown. *See, e.g., In re "Agent Orange" Product Liab. Litig.,* 818 F.2d 145, 169 (2d Cir. 1987) (rejecting argument that individual mail notice should have been provided to all 2.4 million Vietnam Veterans, because there were "far fewer than that number exposed to Agent Orange" and thus notice would have been "considerably overbroad"); *In re Domestic Air Transportation Antitrust Litigation,* 141 F.R.D. 534, 539-46 (N.D. Ga.

1992) (sending notice to larger group "would most likely confuse the recipients and encourage [responses] by non-class members"); *Pierce v. Novastar Mortg., Inc.,* 2007 WL 505670, at *3 (W.D.Wash. Feb. 12, 2007) ("[I]ndividual notice . . . creates a greater expectation than notice by publication, and the plaintiffs should make every effort to provide such notice only to class members."); *but see Macarz v. Transworld Sys. Inc.*, 201 F.R.D. 54, 59-61 (D. Conn. 2001) (requiring notice to each person on list in defendant's possession where list was approximately 25 percent overinclusive but "approximately three-quarters of the notices sent to the names on the proposed list would result in notice to all class members").

As discussed at the hearing, in contemplating what Cin-Q and BTL agreed to and balancing the due process rights of the absentee Class Members and BTL, the Court finds that direct mail notice remains appropriate in this case. However, in considering the reliability and verifiability of the reverse lookups and the unique circumstances presented by this case where the facsimile advertisements were allegedly sent more than a decade ago, the Court must direct the best notice that is practicable under the circumstances to all Class Members. Therefore, the Court finds that it is appropriate to send direct mail notice to all individuals and entities identified as a single match to a unique fax number in the TransUnion reverse lookup, as this appears to be the most reliable set of results from the reverse lookup. Additionally, direct mail notice to all individuals and entities identified as one of multiple matches to a unique fax number in the TransUnion reverse lookup is also appropriate because the TransUnion reverse lookup is the industry standard for this

type of search and it is focused on identifying individuals and entities who were associated with the phone number during the relevant time period. While the Court recognizes that direct notice to multiple individuals associated with the same unique fax number during the relevant time period may be somewhat overinclusive, to not send notice to those multiple matches would deprive direct notice to Class Members. Moreover, the Court finds that direct mail notice to all individuals and entities identified as a single match to a unique phone number in the LexisNexis reverse lookup is also appropriate. Although the Court notes that the LexisNexis reverse lookup is generally less reliable than the TransUnion reverse lookup in the instant circumstances, given that one of the named Plaintiffs was not identified in the TransUnion reverse lookup, but according to Class Counsel, was the single match for a unique fax number in the LexisNexis reverse lookup, the Court finds that the single matches would include more Class Members and be more easily verifiable. Based upon the representations from the parties, although not clear from the record, the sum of all matches from TransUnion and single matches from LexisNexis result in potentially delivering direct notice to approximately 63 percent of the class. This, in addition to publication notice as contemplated in the Settlement Agreement, will reasonably notify Class Members.

      There are multiple limitations in place for the claims process, including that the claimant must provide the fax number associated with the claim (which will not be included in the notice) and certify under penalty of perjury that the information they have provided in the Claim Form is true and correct (Doc. 324-1, at 47).

Additionally, Epiq will reject any claim that does not substantially comply with the instructions on the Claim Form or the terms of the Agreement or is postmarked later than the Claim Deadline. The decision of Epiq as to whether a claim is valid is final and binding upon the parties, subject to an appeal by a party or any absent Class Member, which the parties will endeavor to resolve without Court intervention (Doc. 343, at 39). Any disputes regarding such determination, including as to whether a claim is fraudulent or valid, is subject to review by the Court. The Court finds that these are sufficient safeguards against non-class member claims while reaching as many Class Members as reasonably possible.

Cin-Q's request for facsimile notice (Doc. 350) is not appropriate because the safeguards referenced above would fail to provide BTL with adequate safeguards against claims by non-class members and the record does not support that notice by facsimile would be reliable in reaching Class Members.

At the hearing, Intervenors argued that the Court should consider independent advice from a notice expert in order to determine the best possible notice with the furthest reach. The Court found the request to be a prudent one, but the Intervenors did not provide the Court with supporting authority for its proposition that the Court has the authority to amend the Notice Program outside the bounds of the Settlement Agreement and the Court's preliminary approval Order. As such, the Court directs the Intervenors to brief the issue by September 9, 2022.

Accordingly, it is hereby

ORDERED:

1. Defendant's Motion to Address for Purposes of the Notice Program the Limitation of Reverse Lookups Under the Circumstances of this Case (Doc. 381) is GRANTED IN PART AND DENIED IN PART as follows:

    a. The Settlement Administrator shall provide Notice to all of the matched results from the TransUnion reverse lookup and to the single matched results from the LexisNexis reverse lookup. The Settlement Administrator shall engage in its standard process of verification, including but not limited to deduplication and updating mailing addresses with the National Change of Address Database, and any other process contemplated in the Settlement Agreement.

2. Plaintiffs' Motion to order fax notice and publication notice (Doc. 350) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent that Publication Notice shall occur as contemplated in the Settlement Agreement and as ordered at the hearing, and otherwise denied.

3. Defendant's Unopposed Motion to Seal Documents attached to Defendant's Motion for an Extension of Time (Doc. 348), Defendant's Motion for Extension of Time to File/Submit its memorandum regarding ascertainability and supplemental notice (Doc. 349), and Defendant's Motion for Leave to file a response to Plaintiff's Request to Alter and Amend the Settlement Agreement by using for Purposes of Mailed Notice the Reverse Lookup Unilaterally Directed by Class Counsel (Doc. 354) are DENIED AS MOOT.

4. Defendant's Motion to Seal Documents and Testimony (Doc. 393) is GRANTED to the extent that BTL's Exhibit 3A was admitted into evidence at the hearing and given that the document includes the results of the reverse lookups including personal identifying information and the class fax numbers at issue in this case, it is appropriate to have those documents sealed. For the same reasons, BTL moved to seal Exhibit 4 (Parts 1-3) in Plaintiffs' Motion to Certify (*see* Docs. 207-5; 207-6; 207-7), which the Court granted. The Court *sua sponte* orders that Exhibit 1 in Plaintiffs' Response in Opposition to Defendant's Motion to Address the Notice Program (*see* Doc. 388-1) shall be sealed as it contains some fax numbers of the Class Members. Absent further order of the Court, these filings shall remain under seal until the case is closed.

5. The parties are directed to review the docket for any additional disclosures of the class fax numbers and if found, shall file a motion requesting those matters be sealed pursuant to Local Rule 1.11.

6. The Intervenor may file a legal memorandum regarding the issues raised at the hearing on or before September 9, 2022.

DONE AND ORDERED in Tampa, Florida, on this 2nd day of September, 2022.

ANTHONY E. PORCELLI
United States Magistrate Judge

cc: Counsel of Record

12