## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CIN-Q AUTOMOBILES, INC. and MEDICAL CHIROPRACTIC CLINIC, INC., individually and on behalf of a class, | ) ) ) ) | |
| | ) | No. 8:13-cv-01592-AEP |
| Plaintiffs, | ) ) | |
| | ) | Hon. Anthony E. Porcelli |
| v. | ) ) | |
| BUCCANEERS LIMITED PARTNERSHIP, | ) ) ) | |
| Defendant | ) ) | |
| _____ | ) ) | |
| TECHNOLOGY TRAINING ASSOCIATES, INC., *et al.*, | ) ) ) | |
| Intervenors. | ) ) | |

# INTERVENORS' OBJECTIONS
# TO PROPOSED CLASS ACTION SETTLEMENT

Phillip A. Bock (FL Bar #93895)
Robert M. Hatch (pro hac vice)
Jonathan B. Piper (pro hac vice)
Bock Hatch & Oppenheim, LLC
203 N. La Salle Street, Suite 2100
Chicago, IL 60601

# TABLE OF CONTENTS

Page

I.   Introduction. ................................................................................................. 1

II.  Statement of Facts. ....................................................................................... 6

    A.   BTL's fax broadcast data. ...................................................................... 6

    B.   The notice and claims process. .............................................................. 7

        1.   The notice and its dissemination. .................................................. 7

        2.   The claim form and claims process. .............................................. 9

III. Argument. .................................................................................................... 13

    A.   The Proposed Settlement did not provide "the best notice that is practicable under the circumstances." ................................................... 14

    B.   The Proposed Settlement did not provide an effective "method for distributing relief to the class." ............................................................ 18

    C.   The Proposed Settlement does not "treat class members equitably relative to each other." ......................................................................... 22

IV.  Conclusion. .................................................................................................. 23

Intervenors Technology Training Associates, Inc., Larry F. Schwanke, D.C., Barewood Outlet, Inc., and Thomas Savino d/b/a WebRX Pharmacy Palace, d/b/a RxPalace.com (collectively "Intervenors"), object to the proposed class action settlement (the "Proposed Settlement") between plaintiffs Cin-Q Automobiles, Inc. and Medical and Chiropractic Clinic, Inc. ("Plaintiffs) and defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL") [Doc. 324-1].[1]

## I.    Introduction.

The Court should reject the Proposed Settlement because it minimizes BTL's payments to the class while maximizing Plaintiffs' attorney fees. It was based on an unnecessarily challenging claim form, distributed through a deficient notice program. It is a "claims made" settlement, so BTL will pay only the valid and approved claims but obtain a release from every class member. *Cin-Q,* Doc. 314-1, p. 15. It contains a "clear sailing" clause that prohibits BTL from objecting to paying $4,937,500 in attorney fees to Plaintiffs' counsel. Doc. 324, pp. 15-16.

Plaintiffs allege BTL successfully sent 343,122 unsolicited fax advertisements to a class of the subscribers to 131,011 unique fax numbers in the Tampa area in 2009 and 2010, in violation of the Telephone Consumer Protection act ("TCPA"), 47 U.S.C. § 227(a)(5). Claims have been made for less than 3,000 (2%) of those fax

---

[1]    Documents filed in the docket for this action, No. 8:13-cv-01592-AEP (M.D. Fla.), are referred to by their ECF number as follows "Doc. ___," and page references are to the pages in the docket entry, not those in the original document.

numbers, and most of these are likely to be rejected for a variety of reasons.[2] Preliminary data shows the valid claims will likely total hundreds of thousands of dollars, not the $14 million value that Plaintiffs and BTL have attributed to *potential* claims for purposes of calculating Plaintiffs' attorney fees. Doc. 324, pp. 2, 11.

The claims rate was low, because BTL wanted it low, and Plaintiffs acquiesced in exchange for BTL's agreement to pay a large attorney fee. Docs. 325, 332, 342, 412. Purportedly to avoid fraud, the claim form and notice program were designed to minimize claims, and consequently BTL's payments to the class, while permitting Plaintiff's counsel to request nearly $5 million in fees for ostensibly making $14 million available to be claimed. Exhibit 5 (Emails exchanged between BTL's Counsel and Intervenors Counsel between 9-26-22 and 9-27-22).

But the settlement did not offer relief to every class member. The claim form required class members to affirm "under penalty of perjury" in 2023 that they remember receiving one of the Buccaneers junk faxes in 2009 or 2010. Doc. 421, p. 4. Class members who do not remember or have evidence of having been sent one of the faxes could not claim any money, but would release their claims anyway.

---

[2]     *See* Exhibit 1 (Email exchange between Orlando Castillejos (Epiq) and Jonathan Piper (Intervenors' counsel) (April 21-26, 2023); Exhibit 2 (Email from Orlando Castillejos (Claims Administrator Epiq) to Jonathon Piper (Intervenors' counsel) with attached "Preliminary Status Report" (April 11, 2023)); Exhibit 3 (Email from Juana Diego (Epiq) to Jonathon Piper with attached detail report (April 10, 2023)); Exhibit 4 Declaration of D. Bachmannhuff.

Seeing or remembering a junk fax is not required to prevail under the TCPA where, as here, there is proof the fax was sent, in the form of a fax log or other reliable data. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015). Plaintiffs' expert Robert Biggerstaff compiled a list of all fax numbers that were sent the BTL fax ads in question and how many each was sent. Biggerstaff Report (Doc. 207-5), ¶ 23.[3] Plaintiffs and BTL agreed to use that Biggerstaff List to verify the precise number of faxes received, for purposes of payment calculations, so they know the only question was who subscribed to or used the fax numbers in question in 2009 and 2010. Their claim form imposed a *higher* burden on the claimants than they would have faced if this case were pursued to a class-wide resolution on the merits.

The Proposed Settlement also required claimants to remember the fax number at which BTL's fax ad was received. Doc. 421, p. 4. Because the Biggerstaff List is a finite list of eligible fax numbers, the Settlement Administrator could have easily, and without added expense, included the relevant fax number on the mailed claim forms to facilitate claim submission. *Id.*

There is no need to differentiate among class members based on their memory of faxes in 2009 and 2010, but once that became the qualifier or disqualifier for a

---

[3]    BTL has disparaged the quality and accuracy of Biggerstaff's data and analysis, but Intervenors have shown BTL is wrong on this point. Doc. 342.

settlement check, both groups needed separate representation. Plaintiffs agreed the class members who do not remember or have evidence of receiving a fax in 2009 or 2010 could get nothing from the Proposed Settlement but would release their claims. Those class members did not have adequate representation at the bargaining table.

On top of that, the notice program was insufficient. Fax numbers are the only data available to identify the class members, but the settlement notice was not sent by fax. Individual notice was sent only by mail and only to addresses obtained through TransUnion and LexisNexis's "reverse-lookup process" of culling names and addresses connected to only two-thirds of the fax numbers on the Biggerstaff List, with unknown reliability. Doc. 409, p. 6. At almost no additional cost, the notice should have been sent by fax, and for a small cost, provided in internet advertisements as well. Instead, it was advertised only twice in three legacy newspapers without any attempt to determine how many people the newspapers might reach. Doc. 324-1, p. 19; Doc. 409, p. 11; Doc. 411 (Transcript of Evidentiary Hearing, p. 68 (Aug. 31, 2022)).

None of the four Intervenors received the mailed notice and none saw the newspaper ads. Exhibit 6 (L. Schwanke Dec., ¶¶ 7, 10; T. Savino Dec., ¶¶ 9, 12; M. Higgins Dec., ¶¶ 8, 11; J. Grace Dec., ¶¶ 9, 12). If notice had been faxed, class members like Intervenors Schwanke and Savino—still using the same fax number

4

they were using in 2009 and 2010—would have received notice of the settlement. *Id.* (L. Schwanke Dec., ¶ 4; T. Savino Dec., ¶ 4).

The combination of poor notice, an unnecessarily onerous claims process, a reversionary settlement fund, and high attorney fees with a "clear sailing" clause are classic "red flag[s]" that a proposed class settlement is inadequate and should be rejected. 4 Newberg and Rubenstein on Class Actions § 13:53 (6th ed.); *see also Williams v. Reckitt Benckiser LLC*, __ F.4th __, No. 22-11232, 2023 WL 2906311, at *13 (11th Cir. Apr. 12, 2023) (noting that courts must scrutinize the fee arrangement for potential collusion or unfairness to the class where the settlement at issue gives plaintiffs' counsel a disproportionate distribution of the settlement, the parties agreed to a "clear sailing arrangement," and the agreement contained a "'kicker' or 'reverter' clause") (citing *Briseno v. Henderson*, 998 F.3d 1014, 1027 (9th Cir. 2021); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014)).

BTL has argued the notice and claims process were properly limited because no fax logs exist for the faxes sent through 127 High Street. Doc. 343, pp. 74-75. Even assuming, *arguendo*, there are issues about the 127 High Street data, those issues should not impair the quality of the notice and claims process for the claims based on the faxes broadcast by Rocket Message, which have no such issue but comprised the majority of the faxing at issue. Biggerstaff Report, ¶¶ 13-22; Fed. R.

Civ. P. 23(e)(2)(D) (class settlement proposal must "treat class members equitably relative to each other").

The Proposed Settlement resembles another TCPA settlement proposed by one of Plaintiffs' counsel, Andersen + Wanca, and recently described by the Eleventh Circuit as "never anything more than a legal fiction created to maximize Wanca's attorney fees." *Arkin v. Pressman, Inc.*, 38 F.4th 1001, 1012 (11th Cir. 2022). "When the class attorneys succeed in reaping 'a golden harvest of fees' in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged. … For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985).

The Court should reject the Proposed Settlement because it is not "fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(2); *Williams*, __ F.4th at __, 2023 WL 2906311, at *13; *Arkin*, 38 F.4th at 1012; *Briseno*, 998 F.3d at 1027; *Pearson*, 772 F.3d at 787.

## II. Statement of Facts.

### A. BTL's fax broadcast data.

Between July 14, 2009, and June 9, 2010, BTL successfully faxed 343,122 advertisements for group tickets to Buccaneers football games to 131,011 unique fax

numbers. Biggerstaff Report, ¶¶ 1, 23, Exs. 2, 3, 6, 7. BTL sent three different fax ads. *Id.* BTL hired 127 High Street to broadcast the first ad on July 14, 15, and 16, 2009, and the data for these were found on a hard drive obtained from 127 High Street. *Id.*, ¶¶ 9, 17-22, Ex. 6. Later, BTL hired Rocket Messaging to broadcast two different fax ads, the first between August 17, 2009, and August 20, 2009, and the second between May 24, 2010, and June 9, 2010. *Id.*, ¶¶ 13-16, Ex. 3. Rocket Messaging produced fax logs detailing its fax broadcasts for BTL. *Id.* Only about half of the unique fax numbers in the 127 High Street records and Rocket Messaging records were the same. *Id.*, ¶¶ 73-74.

### B. The notice and claims process.

#### 1. The notice and its dissemination.

The Rocket Messaging fax logs and the 127 High Street data contained fax numbers for all putative class members. Biggerstaff Report, ¶ 23, Ex. 7. The Settlement Administrator hired TransUnion to do a reverse-lookup to derive names and mailing addresses for those fax numbers. Doc. 409, p. 3. TransUnion's search yielded results for 40,940 fax numbers. *Id.*, p. 5. Of those, 22,799 yielded multiple names and addresses, and 18,141 yielded a single name and address. *Id.* Given the poor results, Plaintiffs requested and, over BTL's objection, the Court permitted the Settlement Administrator to do a second reverse-lookup using LexisNexis. *Id.*, pp.

5-6. This search produced names and addresses for 51,395 unique fax numbers. *Id.*, p. 6.

Removing duplicates and combining the results of both reverse lookups, the Settlement Administrator was left with 83,698 unique fax numbers matched to at least one name and mailing address. *Id.* The Court noted that 83,698 equals 63 percent of the 131,011 unique fax numbers in the class, but because the reverse-lookup process produced multiple names and addresses for many of the same unique fax numbers, the percentage overstates the portion of the class on the Settlement Administrator's final mailing list. *Id.*, p. 9.; Doc. 409, pp. 8-9; Doc. 410 (Transcript of Evidentiary Hearing, pp. 32-33 Aug. 31, 2022).

Plaintiff and Intervenors argued the Court should have also ordered notice to be sent by fax to all the unique fax numbers. Doc. 338-1 (Transcript of Motion Hearing, p. 27 Jan. 20, 2022); Doc. 409, p. 10. The Court declined this request asserting that doing so "would fail to provide BTL with adequate safeguards against claims by non-class members and the record does not support that notice by facsimile would be reliable in reaching Class Members." Doc. 409, p. 10. The Court did not explain why it expected fax notice would be more likely to encourage claims by non-class members than names and addresses derived from those same fax numbers, nor did the Court explain why those same fax numbers could be used to reliably verify claims but not to send notice by fax. *Id.*; *see also* Doc. 410 (Transcript of Evidentiary

8

Hearing, pp. 32-33 (Aug. 31, 2022). The four Intervenors were not sent notice and would not have known of the settlement had they not been told about it by their counsel. Exhibit 6 (J. Grace Dec., ¶¶ 9, 12; L. Schwanke Dec., ¶¶ 7, 10; M. Higgins Dec., ¶¶ 8, 11; T. Savino Dec., ¶¶ 9, 12). Nevertheless, all four have fax numbers on the class list, and they have valid claims. *Id.* (L. Schwanke Dec., ¶ 12; M. Higgins Dec., ¶ 13; T. Savino Dec., ¶ 14; J. Grace Dec., ¶ 14). Three Intervenors recall receiving at least one of BTL's fax ads, and one does not recall receiving them but knows it did only because its fax number was in the Rocket Messaging and 127 High Street data. *Id.* Two of the Intervenors still use the same fax number. *Id.* (L. Schwanke Dec., ¶ 4; T. Savino Dec., ¶ 4).

### 2.    The claim form and claims process.

Claim forms were not pre-populated with the fax numbers used for the reverse-lookup process to find the names and addresses to which the forms were sent. Doc. 421, p. 4. The form required the person making a claim to "[l]ist all numbers at which you or your company received faxes between July 14, 2009, and June 9, 2010." *Id.* It warned, "The Settlement Administrator will verify that the fax number(s) you provide appear(s) in the existing records related to the case before approving your claim. The parties have the right to audit this Claim Form, verify your statements, and dispute any claims." *Id.* It provided an area to identify one fax number and instructed the recipient to attach a list of any additional fax numbers. *Id.*

9

"Step 2" of the claim form was entitled, "Verify Ownership of the Fax Number(s) Listed Above and Receipt of a Fax or Faxes." *Id.* Above a line to sign and date the claim, the form stated, "Between July 14, 2009, and June 9, 2019, I or my company subscribed to the fax number(s) identified above or attached to this Proof of Claim and faxes were received at such numbers, including faxes from the Tampa Bay Buccaneers. I certify under penalty of perjury that the foregoing is true and correct." *Id.*

The online claim form had a "certification" section rather than a signature line. Exhibit 7. This section stated, "By checking this box, I declare under penalty of perjury that between July 14, 2009, and June 9, 2010, I or my company subscribed to the fax number identified above and that faxes were received at such number, including faxes from the Tampa Bay Buccaneers. I further certify that the foregoing is true and correct to the best of my knowledge." *Id.* Plaintiff and BTL have never explained why the online claim form added the sentence, "I further certify that the foregoing is true to the best of my knowledge," and omitted the reference in the paper claim form to "ownership" of the fax number. The differences in the mailed and online claim forms were not brought to the Court's attention, and the online claim form was not approved by the Court.

Claims were due by February 6, 2023. *Id.* The Settlement Administrator advised the parties that 3,192 total claims were made. Exhibit 3. Of those, 2,980

claims listed a fax number that matched a fax number from the Rocket Messaging fax logs or the 127 High Street data. *Id.* The approximately 3,000 claimants sought payment for a little over 9,000 faxes sent by BTL. Exhibit 2.

As of March 31, 2023, the Settlement Administrator had not validated any claims, but had rejected 71 as too late, submitted after the claims deadline. *Id.* The Settlement Administrator also produced a spreadsheet with the names, fax numbers, and the number of faxes received by each. Exhibit 3 (Cin-Q Auto v BTL 2023-04-03_v2.xls).

A single company, Astro Companies, LLC, made claims for 781 fax numbers. *Id.;* Exhibit 4. Astro Companies appears to be a telecommunications services provider. https://astrocompanies.com/about-us/. Another company MCAG, Inc. made claims for 13,181 fax numbers, of which 71 coincidentally matched the Rocket Messaging logs or the 127 High Street data. *Id.* MCAG is apparently in the business of finding and making claims in class settlements for clients. https://www.mcaginc.com/.[4] Two hundred claim forms listed Cin-Q's fax number

---

[4]    Courts have held that TCPA junk fax claims cannot be assigned to others because they are claims for invasion of privacy that are not assignable under common law principles. *US Fax L. Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) (TCPA junk fax claim is in the nature of a tort claim for invasion of privacy, so under relevant state law, it cannot be assigned.); *U.S. Fax L. Ctr., Inc. v. T2 Techs., Inc.*, 183 P.3d 642, 645 (Colo. App. 2007) (same); *U.S. Fax L. Ctr., Inc. v. Myron Corp.*, 159 P.3d 745, 746 (Colo. App. 2006) (same); *McKenna v. Oliver*, 159 P.3d 697, 700 (Colo. App. 2006) (same); *Martinez v. Green*, 212 Ariz. 320, 322, 131 P.3d 492, 494 (Ct. App. 2006) (same). *Contra Parchman v. SLM*

as their own, by claimants located outside of Florida. <u>Exhibit 3</u> (Cin-Q Auto v BTL 2023-04-03_v2.xls); <u>Exhibit 4</u>. Plaintiff Medical & Chiropractic's ("M&C") fax number was claimed by 16 claimants who are not M&C. *Id.* These 1,068 claims seem very doubtful, and they amount to a third of all fax numbers claimed.

One third of the claims were made by persons who are not residents of Florida. *Id.* Some people with valid claims may have moved, but many of these out of state claims may be invalid. Walmart made claims for 110 fax numbers and Regions Bank made claims for 94. *Id.* Their claims seem valid as the numbers claimed match the Biggerstaff List and have Florida area codes. *Id.*

The Settlement Administrator has notified the parties that it intends to send notice of defects to all claims that fall into the following categories:

1. Non-Matching Fax Number - A fax number claimed that is not matched to the Biggerstaff list. This includes a claimant who provided both valid and invalid fax numbers. For these records, we'll send them a defect notice regarding the invalid fax numbers.
   a. If one or more fax numbers claimed do not match then a defect letter would be mailed.

2. Multi Claimed Fax - A fax number claimed by multiple claimants.
   a. If a valid fax number matched to the Biggerstaff list is claimed across multiple claims then a defect letter would be mailed.

3. Original Notice Not Sent - A claim filed by claimant not identified in the original notice list.

---

*Corp.*, 896 F.3d 728, 741 (6th Cir. 2018) (federal common law governs and allows TCPA junk fax claim to survive death of the plaintiff); *Precise v. Credit One Bank, N.A.*, No. 3:16-CV-541-MCR-GRJ, 2018 WL 11491440, at *2 (N.D. Fla. July 26, 2018) (same).

      a.  If a claimant who was not sent direct notice claims a fax number on the Biggerstaff list then a defect letter would be mailed.

4.  Org Registered After Class Period - A claim filed by a business with an organizational date after June 9, 2010.

      a.  If according to LN Secretary of State search records a business was organized after June 9, 2010, then a defect letter would be mailed.

5.  Missing Signature - A claim filed and not signed.

      a.  If claim filed is not signed then a defect letter would be mailed.

6.  Government Entity - A claim filed by an entity that may be a government or department of a government.

      a.  If the name of the claimant includes one or more of the following words: "Government", "Public", "County", "Federal", "City", "State", and it is not a business then a defect letter would be mailed.

Exhibit 1.

It is still early in the claim verification process, but clear that the total number of valid claims will not exceed those for 2,980 fax numbers, and far more than one-third of those are likely to fail. That leaves no more than 2,000, and probably far less, out of a class of more than 131,011 unique fax numbers that may be paid if the Proposed Settlement is finally approved. Given the data available to date, the Court should decline to finally approve the Proposed Settlement until after the claims process is final and complete to ensure the Court knows the true value of the Proposed Settlement before determining final approval.

## III.   Argument.

BTL intended the Proposed Settlement to pay 650 to 1,300 class members

while releasing the claims of more than 130,000, and BTL appears to have achieved its purpose. <u>Exhibit 5</u>. The Proposed Settlement was designed to enable BTL to pay Plaintiffs' counsel nearly $5 million while paying the class members substantially less than $1 million. BTL and the Plaintiffs achieved their desired ends by designing a claim form that would make successful claims needlessly difficult, to be disseminated through a notice plan that would fail to reach much of the class. The Court should find that the Proposed settlement is not "fair, reasonable and adequate" and decline to finally approve the settlement. Fed R. Civ. P. 23(e)(2).

### A.   The Proposed Settlement did not provide "the best notice that is practicable under the circumstances."

Rule 23(c)(2)(B) states, "[T]he court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be one or more of the following: United States mail, electronic means, or other appropriate means." The rule was amended in 2018 to permit notice by "electronic means" "or other appropriate means." The advisory committee notes for the 2018 amendment state:

> Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case. <u>But technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or</u>

> <u>alternative method for giving notice.</u> Although first class mail may
> often be the preferred primary method of giving notice, courts and
> counsel have begun to employ new technology to make notice more
> effective. Because there is no reason to expect that technological
> change will cease, when selecting a method or methods of giving notice
> courts should consider the capacity and limits of current technology,
> including class members' likely access to such technology.
> …
> Counsel should consider which method or methods of giving notice will
> be most effective; simply assuming that the "traditional" methods are
> best may disregard contemporary communication realities. <u>The
> ultimate goal of giving notice is to enable class members to make
> informed decisions about whether to opt out or, in instances where a
> proposed settlement is involved, to object or to make claims.</u>

*Id.* (emphasis added).

Here, the class consists of persons who were sent BTL fax ads. Biggerstaff Report, ¶¶ 13-23. Their fax numbers were found in the records of the two fax broadcasters hired by BTL, Rocket Messaging and 127 High Street. *Id.* Rocket Messaging produced actual fax logs, and 127 High Street produced a computer hard drive from which Plaintiff's expert Robert Biggerstaff identified BTL's target lists and the faxes that failed, thereby identifying those to whom 127 High Street successfully sent BTL's fax ads. *Id.*

Under these circumstances, notice by fax is the "best notice that is practicable under the circumstances." By definition, all of the class members not only had fax machines, but they used them to receive the BTL faxes that are the basis for their claims in this settlement. Moreover, the direct evidence available to identify the class members is limited to their fax numbers.

15

Nevertheless, BTL strenuously objected to notice by fax. Doc. 365, pp. 21-28. BTL argued that fax numbers may have changed, so notice might have gone to some who are not class members. *Id.* But BTL agreed to more costly, mailed notice where there was no direct evidence of the class member's names or addresses. Doc. 324-1, pp. 17-18. The Settlement Administrator used two reverse-lookup services to extrapolate the names and addresses of the class members from the fax numbers. Tr. 8-31-22, pp. 32-36, 43-45. The result was a list of 83,698 names and addresses that may or may not be some of the 131,011 class members. Doc. 409, p. 6.

Intervenors do not suggest that notice should not have been sent by mail, but that also sending the notice by fax would have been "the best method practicable under the circumstances," and something routinely done in TCPA junk fax class actions. *Physicians Healthsource, Inc. v. A-S Medications Sols.*, *LLC*, 950 F.3d 959, 970 971 (7th Cir. 2020); *Fam. Med. Pharmacy, LLC v. Holdings*, No. CV 15-0563-WS-C, 2016 WL 7320885, at *7 (S.D. Ala. Dec. 14, 2016); *A & L Indus., Inc. v. P. Cipollini, Inc.*, No. CIV.A. 12-07598 SRC, 2014 WL 906180, at *1 (D.N.J. Mar. 7, 2014); *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, No. CIV.A. 11-2658 JBS, 2014 WL 413533, at *2-*3 (D.N.J. Feb. 3, 2014); *see also Yates v. Checkers Drive-In Restaurants, Inc.*, No. 17 C 9219, 2020 WL 6447196, at *6 (N.D. Ill. Nov. 3, 2020) (text message notice for TCPA text message violations).

16

As the advisory committee notes to the 2018 amendment explain, "The ultimate goal of giving notice is to enable class members to make informed decisions about whether to … object or to make claims." That goal was not achieved by sending individual notice only by mail to the reverse-lookup names and addresses as the dismal claims rate in this case shows.

Citing a handful of older district court cases, BTL argued that notice by fax in a TCPA case is inappropriate. Doc. 365, pp. 17-19. Rule 23 was amended in 2018 to permit electronic notice. More recently, the Seventh Circuit approved fax notice for TCPA junk fax claims. *Physicians Healthsource*. 950 F.3d at 970-971. Similarly, in *City Select Auto Sales*, the court thoroughly analyzed the issue and held that fax notice was the "best method that [wa]s practicable" as required by Rule 23(c)(2)(B) where, as here, the only identifying information available was the class members' fax numbers. 2014 WL 413533, at *2-*3. Many courts have followed *City Select* and approved notice by fax. *Lyngaas*, 2019 WL 2865992, at *1; *Fam. Med. Pharmacy*, 2016 WL 7320885, at *7; *A & L Indus.*, 2014 WL 906180, at *1.

The supplemental publication notice was not the best practicable under the circumstances of this case. It was published only as an ad on two Sundays in legacy newspapers for Sarasota, Tampa, and Gainesville. Doc. 324-1, p. 19; Doc. 409, p. 11; Tr. 8-31-22, p. 68. BTL and Plaintiffs made no effort to determine what the "reach" of these papers were even though the Settlement Administrator could have

17

determined their reach and could have also recommended an optimal publication notice plan. Doc. 411 (Transcript of Evidentiary Hearing, p. 68 (Aug. 31, 2022)). The goal of the notice plan in this case was not to "enable class members … to make claims," it was to keep claims low as desired by BTL. Doc. 365; Exhibit 5. The notice plan did not comply with Rule 23(c)(2)(B), so the Proposed Settlement is inadequate and should not be finally approved.

**B.    The Proposed Settlement did not provide an effective "method for distributing relief to the class."**

Rule 23(e)(2)(C)(ii) requires that a "court may approve [a class settlement] only after … finding that it is fair, reasonable, and adequate after considering whether … the relief provided to the class is adequate, taking into account … the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." This language was added to Rule 23 in 2018. The advisory committee notes explain it was to ensure that courts included an "evaluation of any proposed claims process" in their measure of the adequacy of the relief to the class. The notes also explain that the court should "direct[] that the parties report back to the court about actual claims experience," and "the relief actually delivered to the class can be a significant factor in determining the appropriate fee award."

The Eleventh Circuit recently explained the necessity of carefully considering "the impact of Congress' 2018 amendments to Rule 23(e)(2)(C) on its analysis of

the fairness of a class-action settlement, including 'the effectiveness' of the settlement's 'method of distributing relief to the class,' … and whether the proposed attorneys' fees are disproportionately large compared to the amount of relief reasonably expected to be provided to the class." *Williams*, __ F.4th at __, 2023 WL 2906311, at *13. This is particularly true where, as here, the claim form has an unnecessary memory requirement, unclaimed funds revert to the defendant, there is a "clear sailing" agreement for the class counsel's fee award, and the award vastly exceeds the actual claims paid to the class. *Id.* (citing *Briseno*, 998 F.3d at 1026-1027; *Pearson*, 772 F.3d at 787).

Here, the claim form required class members to swear under penalty of perjury that they remembered receiving or knew they were successfully sent a BTL junk fax more than twelve years ago and the fax number they received them on. Doc. 421, p. 4. At no additional cost, the claim form could have included the fax number to which BTL sent its junk faxes and the number of faxes, while allowing class members to simply affirm these were correct without more.

It is not reasonable to require class members to specifically recall junk faxes sent more than twelve years ago. In fact, TCPA fax claims do not require proof that the recipient saw the fax. *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 634 (6th Cir. 2015)*; Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1250 -1252 (11th Cir. 2015); *see also Physicians Healthsource, Inc.*

*v. A-S Medication Sols., LLC*, 950 F.3d 959, 969 (7th Cir. 2020) (fax log alone can prove class members' TCPA junk fax claims); *Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (same)*; Ira Holtzman, C.P.A., & Assocs. Ltd. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("To the extent Turza contends that each recipient must prove that he printed the fax (wasting paper) or otherwise suffered monetary loss, he is wrong on the law."). It is enough to have a fax log that shows the fax was successfully sent. *Id.* Here, contrary to the holding in *Palm Beach*, each class member is being required specifically to recall seeing the fax, even though there was sufficient existing evidence available to Plaintiff and BTL to satisfy the *Palm Beach* standard to support their right to TCPA relief. The Proposed Settlement's claims process is inadequate because it demands a higher burden of proof than the class members would face to prove their claims if this case were to proceed to a classwide resolution on the merits.

*Palm Beach* and its progeny also show that Plaintiffs failed to adequately represent those class members who do not recall receiving BTL's fax ads because the Proposed Settlement releases their claims for no available relief. *A-S Medication*, *Palm Beach*, *Imhoff*, *Holtzman*, and *American Copper* show that adequately represented class members are entitled to relief in a TCPA class action regardless of whether they ever saw the ads at issue, but the Proposed Settlement requires them to swear under penalty of perjury that they received the ads without telling them that

20

Plaintiffs have records showing they were sent the ads. Intervenor Barewood, for example, only knows BTL sent fax ads to it because Barewood's counsel had access to the Rocket Messaging and 127 High Street data and informed Barewood that its fax number was in that data. Exhibit 4 (J. Grace Dec., ¶ 14). Many of the persons associated with the 131,011 fax numbers in the class might not, however, recall receiving the BTL fax ads and could not, therefore, fill out the claim form to make a valid claim. Plaintiffs had an obligation to represent these class members just as adequately as those who recall receiving BTL's fax ads. To represent class members like Barewood adequately, Plaintiffs should have insisted on a claim form pre-populated with the class member's fax number that simply asked the class member to affirm that it was using the number in 2009 and 2010. That is all that is needed to prove their TCPA claims under *A-S Medication*, *Palm Beach*, *Imhoff*, *Holtzman*, and *American Copper*, and releasing their claims while requiring more proof in the form of their specific recollection was inadequate and unfair.

The claim form discouraged claims, and as BTL desired, the claims actually paid are likely to include less than 1% of the claims the Proposed Settlement will release. They will also amount to less than 20% of the amount BTL pays to settle with more than five times more money going to Plaintiff's counsel. The claims process was not fair, reasonable, and adequate after considering the requirements of Rule 23(e)(2)(C)(ii), and should not be finally approved.

21

**C.      The Proposed Settlement does not "treat class members equitably relative to each other."**

Rule 23(e)(2)(D) requires that a proposed class settlement "treats class members equitably relative to each other." This was also added in 2018, and the advisory committee notes explain, "Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."

Here, BTL and Plaintiff used alleged uncertainties in the 127 High Street data, which covered only one-third of the fax ads sent, to justify an inadequate notice and claims process for all claims of all class members. Biggerstaff Report, ¶¶13-22, Exs. 3, 6; Doc. 339, pp. 1-5; Doc. 342, pp. 5-7; Doc. 343, pp. 74-75. By impairing the notice and claims process based solely on the issues with the 127 High Street data, the Proposed Settlement treats the class members with claims supported by the Rocket Messaging fax logs inequitably. Plaintiffs' expert Biggerstaff's analysis of the Rocket Messaging fax logs is precisely the type of evidence that *Palm Beach* and its progeny have held conclusively prove a TCPA claim. 781 F.3d at 1245, 1249 n.3 & 7; *A-S Medication*, 950 F.3d at 969; *Imhoff*, 792 F.3d at 634; *American Copper*, 757 F.3d at 545; *Holtzman*, 728 F.3d at 627; Doc. 339, p.p. 7-8. For example, even

if individual notice by mail only and the onerous claim form were justified for claims arising from the 127 High Street data, it cannot be justified for the stronger claims evidenced by the Rocket Messaging fax logs. *Id.*

Assuming for the sake of argument that the 127 High Street data supported BTL's notice and claims arguments, the class should have been divided into two separate subclasses with separate notice and claims processing to "reflect the differences among their claims." Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment. Intervenors disagree with BTL regarding the quality of the 127 High Street data and believe all class members were treated inadequately by the Proposed Settlement, but even accepting BTL's arguments as true, there was no basis to use the inadequate notice and claims process for claims based on the Rocket Messaging fax logs, and for this reason as well the Proposed Settlement should not be finally approved.

## IV.    Conclusion.

To approve a class settlement, Rule 23(e)(2) requires that the Court find that "the class representatives and counsel have adequately presented the class." As explained above, the inadequacy of the notice and claims process and the scant number of claims that are likely to be paid shows inadequate representation. The fact that class members without a memory of the fax are offered nothing in exchange for their claims shows those class members have no representation. The Proposed

23

Settlement raises all the "red flags" that courts have identified as indicative of an inadequate class action settlement. It is a "claims made" settlement where BTL will never have to pay the $14 million supposedly made available to the class. Rather, the amount actually paid by BTL to the class is likely to be below $1 million. It also provides a "clear sailing" agreement that prohibits BTL from challenging Plaintiffs' counsels' request for nearly $5 million in attorney fees to be paid by BTL, and even if the Court were to reduce the fee award, the money would not go to the class, but be kept by BTL. Finally, the notice and claims process were designed to reduce valid claims by poor dissemination of individual notice by mail to only about half the class, scant publication notice, and an unduly burdensome claims process. In this BTL and Plaintiffs have succeeded, and Plaintiff's counsel will likely get at least 85% of what BTL pays to release the claims of all class members.

In addition, a plaintiff can prevail on a TCPA junk fax claim without showing the plaintiff ever saw the fax or recalled seeing it where a fax log shows it was successfully sent to the plaintiff's fax number. The Proposed Settlement claims process, however, requires that all valid claims must include swearing on penalty of perjury that the class member both saw and recalls seeing BTL's fax ads. The class is not defined to include only persons who saw and recall seeing BTL's fax ads. Rather, it covers every fax number in the Rocket Messaging fax logs and 127 High Street data. Thus, class members who did not see or do not recall seeing the BTL fax

ads in 2009 and 2010 will have their claims released just because they cannot specifically recall those ads. Plaintiffs negotiated a class settlement that releases the claims of probably the vast majority of class member for no relief at all. That is not adequate representation, and the Court should, therefore, not finally approve the Proposed Settlement.

Respectfully submitted,

TECHNOLOGY TRAINING ASSOCIATES, INC., LARRY E. SCHWANKE, D.C., BAREWOOD OUTLET, INC., AND THOMAS SAVINO D/B/A WEBRX PHARMACY PALACE, D/B/A RXPALACE.COM

By: /s/ Phillip A. Bock

Phillip A. Bock (FL Bar #93895)
Robert M. Hatch (pro hac vice)
Jonathan B. Piper (pro hac vice)
Bock Hatch & Oppenheim, LLC
203 N. La Salle Street, Suite 2100
Chicago, IL 60601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

By: <u>/s/ Phillip A. Bock</u>

26