**EXHIBIT E**

| | |
|---|---|
| **From:** | Glenn Hara |
| **To:** | Robert.Collins@lw.com |
| **Cc:** | ross@loftusandeisenberg.com; m@mcalaw.net; mca2175@hotmail.com; mark.mester@lw.com; Gabe.Slater@lw.com |
| **Subject:** | RE: Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices |
| **Date:** | Thursday, June 1, 2023 7:36:00 PM |

Robbie and Mark,

We write in response to your email of May 30, 2023, regarding the status of the parties' meet-and-confer efforts on Epiq's defect notices/requests for additional information.

## I.     Points of Agreement.

You are correct that Plaintiffs agree Epiq should follow up with a defect notice or request for more information (which Epiq has previously called a "Notice of Incomplete Claim") in the following categories:

1. Claims containing non-matching fax numbers (*i.e.*, any claim containing a fax number not matching a number on the Biggerstaff list);
2. Multi-Claimed Fax Number (*i.e.*, any claim featuring a fax number also listed on another claim form);
3. Missing Signature;
4. Potential Government Entity; and
5. Claims submitted by entities not registered until after the class period (*i.e.*, July 2009 to June 2010).

We note that Plaintiffs have been in agreement on points 1-4 since our response to Epiq's first email raising "defect" issues on April 26, 2023, and in agreement on point 5 since our meet-and-confer with BTL on May 16, 2023.

## II.     Points of Disagreement

### A.  The claimed "five-fax" limit.

Although not mentioned in your May 30 email, we wanted to make sure it is clear that we intend to raise with Judge Porcelli the claimed "five-fax-per-claimant' limit that Epiq has stated it intends to implement, at BTL's urging. If you recall, Epiq at first agreed with Plaintiffs that there is no such limit and that claimants who file otherwise valid claims on more than one fax number will be paid according to the number of faxes received at that number on the Biggerstaff List. (email from O. Castillejos, Feb. 23, 2023). BTL then convinced Epiq to change its mind to interpret the Agreement as meaning no claimant may recover more than $615, regardless of how many fax numbers they claim on. (Castillejos email, Feb. 28, 2023). More

recently, the Intervenors asked Epiq about this issue, and Epiq reiterated the view that claimants are limited to five faxes. (Castillejos email Apr. 26, 2023).

We would note that this issue was briefed at the preliminary approval stage in Intervenors' Response to Motion for Preliminary Approval and in Plaintiffs' Reply in Support of Preliminary Approval. Intervenors argued the Cin-Q Settlement is "substantially the same" as the TTA Settlement. (Doc. 325 at 2). Plaintiffs responded that the Cin-Q Settlement is substantially better than the TTA Settlement because claimants would be paid "up to $615 *per fax number*" in the Cin-Q Settlement, compared to $565 per fax number in the TTA Settlement. (Doc. 329 at 4 (emphasis added)).

Intervenors argued it was unclear whether claimants with more than one fax number would be paid for each fax number under the Cin-Q Settlement. (Doc. 325 at 6–7). Plaintiffs responded that Intervenors were mistaken because the submission of each fax number is a "claim," and the claim form the parties negotiated allows claimants to make multiple "claims" in a single form, stating, "List all numbers at which you or your company received faxes between July 14, 2009, and June 9, 2010," and "Attach a separate sheet if necessary," and stating that "The Settlement Administrator will verify that the fax number(s) you provide appear(s) in the existing records related to the case before approving your claim." (Doc. 329 at 7). Plaintiffs argued that the notice "plainly tells claiming class members they will be paid for each fax number." (*Id.*) As far as we can see, BTL was silent on the issue until February 2023. It does not appear to us that BTL or anyone else raised the issue at the preliminary approval hearing.

### B. The points of disagreement in BTL's May 30, 2023 email.

We believe BTL has correctly identified these points of disagreement as issues the court should decide:

1. **Claimants Identified By Epiq Using The TransUnion And LexisNexis Reverse Lookups**

Plaintiffs agree with Epiq that "defecting records identified by LexisNexis or TransUnion" would be inappropriate. The fact that a claimant was identified in a reverse lookup in not indicia of fraud or anything else. We are at an impasse on this issue, and BTL should raise it with the Court if it insists this is a valid reason for a defect letter.

2. **Claimants Not Identified By <u>Either</u> Reverse Lookup; Claimants Providing Addresses From Outside The State Of Florida; Claimants Providing Three Or More Fax Numbers**

As we've discussed, there is nothing indicative of fraud in these scenarios. We agree with Epiq that, if the claim form is (1) timely, (2) signed under penalty of perjury, and (3) provides a matching fax number, then the claim should be paid. (email of S. Amin-Giwner, May 15, 2023). If BTL has evidence any particular claim is actually fraudulent, it should bring that evidence to the Administrator.

### III.     BTL's "New Questions" Raised in 5-30-23 Email

1. Do Plaintiffs agree to send requests for additional information to claimants identified by the reverse lookups if the reverse lookups identified <u>multiple</u> matches for the claimed fax number?

No, Plaintiffs do not agree. As we've discussed, there is no reason to assume there is anything fraudulent regarding such claimants. If there are multiple <u>claims</u> on a particular fax number, the parties have already agreed that this falls under the "multi-claimed fax number" scenario and should receive request(s) for additional information.

2. Do Plaintiffs agree to send requests for additional information to claimants <u>not</u> identified in the TransUnion or LexisNexis reverse lookup if the claimant provided a fax number for which the reverse lookups identified contrary matches?

No, Plaintiffs do not agree. As we've discussed, there is nothing indicative of fraud in this scenario, and we agree with Epiq that, if the claim form is (1) timely, (2) signed under penalty of perjury, and (3) provides a matching fax number, then the claim should be paid. (email of S. Amin-Giwner, May 15, 2023). If BTL has evidence any particular claim is actually fraudulent, it should bring that evidence to the Administrator.  We note that under BTL's proposal—where defect notices are sent to claimants identified in a reverse lookup, as well as claimants not identified in a reverse lookup—*every person who filed a claim in this settlement would receive a defect notice.*

### IV.     Epiq's proposal re: OFS and prisoner claimants.

Finally, as to "whether Plaintiffs have any position as to the measures Epiq proposed to identify claims submitted by potential fax service providers and claims submitted by potential prisoners," in Ms. Amin-Giwner's email of May 24, 2023, Plaintiffs do not oppose the measures Epiq explained.

Regards,
Glenn L. Hara
Anderson + Wanca

3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
(847) 368-1500

**From:** Glenn Hara
**Sent:** Wednesday, May 31, 2023 9:15 PM
**To:** Robert.Collins@lw.com
**Cc:** ross@loftusandeisenberg.com; m@mcalaw.net; mca2175@hotmail.com; mark.mester@lw.com; Gabe.Slater@lw.com
**Subject:** Re: Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices

Robbie,

We will have a response to your email tomorrow. We would like to be on the call to the court to request an additional day to submit the proposed schedule.

Glenn

Sent from my iPhone

On May 31, 2023, at 4:46 PM, Robert.Collins@lw.com wrote:

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Glenn –

It would be helpful to have your response to our email below to better understand what we can and cannot resolve between ourselves and thus how to address Epiq's request. Judge Porcelli told us at the hearing last week that we could ask for a bit more time to propose a schedule if we needed by calling his chambers. We'd propose that we ask his chambers for permission to submit the proposed schedule Friday rather than tomorrow to provide us another day to finalize a proposal to the Court.

Best,
Robbie

**From:** Glenn Hara <ghara@andersonwanca.com>
**Sent:** Wednesday, May 31, 2023 12:58 PM
**To:** Collins, Robert (CH) <Robert.Collins@lw.com>; ross@loftusandeisenberg.com; m@mcalaw.net; Michael Addison <mca2175@hotmail.com>
**Cc:** Mester, Mark (CH) <mark.mester@lw.com>; Slater, Gabe (CH)

<Gabe.Slater@lw.com>
**Subject:** RE: Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices

Robbie,

We will respond to your email below regarding defect categories/requests for additional information separately. For now, however, we feel the most pressing issue is the schedule we are to propose to the Court tomorrow (June 1).

Ms. Amin-Giwner's email from 5:12 p.m. yesterday states that Epiq will commit to the proposed schedule only if Epiq has "a confirmed list of defect types and approved defect letter language by June 30." We do not believe that is realistic under the current proposal, which allows the parties to file motions on disputed claims issues on June 9. Assuming 14 days for response briefs on June 23 would leave Judge Porcelli with seven days to decide these issues. We obviously can't dictate to Judge Porcelli when he must decide something.

One possible way to expedite this would be for the parties to (1) forego response briefs and simply submit their briefs on all issues on June 9 for the court's decision; and (2) ask the court for a status to alert Judge Porcelli that Epiq has requested a decision by June 30, giving the judge 21 days (rather than seven) to decide the issues raised. Is that something BTL would be amenable to?

Regards,
Glenn L. Hara
Anderson + Wanca
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
(847) 368-1500

---

**From:** Robert.Collins@lw.com <Robert.Collins@lw.com>
**Sent:** Tuesday, May 30, 2023 9:51 PM
**To:** Glenn Hara <ghara@andersonwanca.com>; ross@loftusandeisenberg.com; m@mcalaw.net
**Cc:** mark.mester@lw.com; Gabe.Slater@lw.com
**Subject:** Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Dear Glenn and Ross –

We write to memorialize the meet and confer efforts of the Parties thus far concerning requests for additional information and/or defect notices to be issued by Epiq and as contemplated by Section VIII of the Settlement Agreement.  See Settlement Agt. (Dkt. 324-1) § VIII.  Those efforts consisted of three telephone conferences on May 16, 2023, May 18, 2023 and May 23, 2023, together with several email exchanges.  If your recollection of what transpired differs in any way from what is set forth below, please let us know right away.

**A. The Purpose Of The Reverse Lookups Performed By Epiq**

From the outset, we first note that during the meet and confer process, you both repeatedly made clear that the reverse lookups were <u>not</u> intended to identify class members and that the names and addresses produced by the reverse lookups are thus <u>not</u> class members but, instead, simply a population of persons and entities to whom Mailed Notice should be (and was) sent.  BTL agrees and (as you know) has consistently taken the position that fax numbers are <u>not</u> class members.  <u>See</u>, <u>e.g.</u>, BTL's Submission Regarding Ascertainability (Dkt. 365) at 7 (noting that there are "serious questions regarding the accuracy and reliability of that partial list of names and addresses compiled by the Settlement Administrator through its reverse lookup . . . regarding the accuracy and derivation of the list of telephone numbers previously compiled by Mr. Biggerstaff as well as the age of the underlying data on which Mr. Biggerstaff relied.").  This backdrop underscores, however, why we have uniformly insisted on the need for the Parties to undertake sufficient efforts to verify potentially invalid and/or fraudulent claims, which is exactly what is, of course, comprehended by Section VIII of the Settlement Agreement.  <u>See</u> Settlement Agt. (Dkt. 324-1) § VIII.E ("The Settlement Administrator, after considering the positions of the Parties and, if appropriate, <u>seeking any additional information from the Settlement Class Member</u>, will make an initial determination, subject to review by the Court.") (emphasis added).

**B. The Parties' Points Of Agreement**

<u>First</u>, we believe that the Parties are in agreement with regards to sending defect notices or requests for information (as appropriate) to the following categories of claimants:

1. Claims containing non-matching fax numbers (<u>i.e.</u>, any claim containing a fax number <u>not</u> matching a number on the Biggerstaff list);

2. Multi-Claimed Fax Number (<u>i.e.</u>, any claim featuring a fax number also listed on another claim form);

3. Missing Signature;

4. Potential Government Entity; and

5. Claims submitted by entities not registered until after the class period (i.e., July 2009 to June 2010).

The Parties are also in agreement that should any of the above claimants fail to respond to a request for additional information, then that claim should be denied based on the subject of the defect at issue.

**C. The Parties' Points Of Disagreement**

1. **Claimants Identified By Epiq Using The TransUnion And LexisNexis Reverse Lookups**

We understand that you object to sending any requests for additional information to claimants who received notice as a result of a match on the LexisNexis and/or TransUnion reverse lookups. We take your position to be that—without any independent verification—these claims are otherwise valid for three reasons: (1) the claimant was identified by the reverse lookup; (2) the claimant provided a fax number that matched the Biggerstaff list; and (3) the claimant listed the fax number under the penalty of perjury. As we explained during the meet and confer, however, none of these justifications withstand scrutiny in our view.

First, as you both conceded, a claimant is not a class member simply because they were identified by one or both of the reverse lookups. Thus, the mere fact that the claimant received Mailed Notice cannot standing alone provide verification of their claim. To underscore this problem, the reverse lookups collectively identified multiple matches for 1,124 of the fax numbers listed in claims forms (or 37% of all claimed fax numbers matching the Biggerstaff list).

At minimum, BTL would hope that Plaintiffs would agree that at least this subset of claimants should receive requests for additional information (i.e., claimants that claimed a fax number for which the reverse lookups identified a multiple match). Please let us know as soon as possible if Plaintiffs agree to send requests for additional information to this group of claimants.

Second, you noted that the fact that a claimant was able to provide a fax number matching a number on the Biggerstaff list provides evidence of reliability, because there would be no other means for the class member to know the matching fax number. As we explained, however, even if the claimant held the fax line at one point in time, it does not mean that the claimant held the fax line during the 11-month class period. This is especially true given the declarations we have obtained from TransUnion and LexisNexis, which both expressly note the reverse lookups cannot accurately determine whether any person or entity in fact held the fax line in 2009 or 2010. See Decl. of S. Parks (Dkt. 398-2) ¶ 6 (explaining that without "independent verification" the results of the reverse lookup should not be relied upon to determine the name and mailing address of the person or entity that held a phone line in 2009 and/or 2010); Decl. of L. Roach (Dkt. 442) ¶ 3 (declarant for TransUnion stating same).

Instead, those databases simply identify persons and entities that may have held such number at <u>some</u> point in time, the point of the needed independent verification and validation being to document that such person <u>actually</u> held that number between July 2009 and June 2010 and is thus a member of the Settlement Class.  <u>See id.</u>

We also remind you that due to your efforts, the Biggerstaff list was publicly filed (and readily available to anyone) for a period of over six years.  <u>See</u> Pls.' Mot. to Certify Class (Dkt. 207) (publicly filing the Biggerstaff list on March 25, 2016).  <u>But see</u> Order granting Motion to Seal (granting sealing of the Biggerstaff list on September 2, 2022).  This again counsels in favor of at least sending requests for additional information to these claimants.  And as Ross repeatedly mentioned during the meet and confer, Plaintiffs believe that counsel for Intervenors have accessed this list before in an attempt to identify class members.  BTL thus fails to see why the public availability of this list for six years does not at least warrant utilizing requests for additional information as contemplated by the Settlement Agreement.  <u>See</u> Settlement Agt. (Dkt. 324-1) § VIII.E.

<u>Finally</u>, we understand your position to be that a final layer of reliability is the attestation requirement included on the claim form, which requires claimants certify under the penalty of perjury that the following is true:

> Between July 14, 2009, and June 9, 2010, I or my company subscribed to the fax number(s) identified above or attached to this Proof of Claim and faxes were received at such number or numbers, <u>including</u> <u>faxes</u> <u>from</u> <u>the</u> <u>Tampa</u> <u>Bay</u> <u>Buccaneers</u>.

Settlement Agt. (Dkt. 324-1) Ex. A thereto (emphasis added).  For some time, Plaintiffs have taken the position that attestation somehow eliminates the need for independent verification of claims.  <u>See</u>, <u>e.g.</u>, Pls.' Response to BTL's Motion to Address the Unreliability of Reverse Lookups (Dkt. 388) at 11 (rejecting BTL's request that claimants provide proof of ownership in 2009 or 2010 of a fax line on the Biggerstaff list, because "[t]he Claim Form negotiated by the parties already does that: it requires the claimant to swear under penalty of perjury" that they held the fax line in 2009 or 2010").

While BTL certainly hoped that the attestation request would screen out invalid and fraudulent claims, that simply has not been the case.  In total, 86% of claimed fax numbers did <u>not</u> match the Biggerstaff list, and 2,715 claims (or 85% of all claims) provided at least one <u>invalid</u> fax number.  Indeed, <u>both</u> of your clients provided invalid numbers that did not match the Biggerstaff list, as did <u>all</u> five of the Intervenors.  We certainly hope that the provision of invalid fax numbers was an error on behalf of your clients, but in any case, given that the 86% of claimed fax numbers do not match the Biggerstaff list and 85% of all claims include an invalid number, Plaintiffs cannot seriously dispute that the certification under the penalty of perjury has been all but ignored by the vast majority of all claimants.

BTL thus fails to see how the attestation requirement can provide <u>any</u> basis for verification of a claim, and the abject failure of the attestation requirement to screen out invalid and fraudulent claims only reinforces why attestation is <u>not</u> a proxy for independent verification and validation.

2. **Claimants Not Identified By <u>Either</u> Reverse Lookup**

We next understand that Plaintiffs' object to sending requests for additional information to claimants that were <u>not</u> identified on any reverse lookup. Plaintiff's position (as we understand it) is that there is no reason to suspect such claims are invalid or fraudulent, in part because publication notice was provided as part of the notice program. <u>See</u> Settlement Agt. (Dkt. 324-1) § II.FF.

But Plaintiffs cannot credibly discount issues presented by claimants who were <u>not</u> identified by either reverse lookup, while at the same time relying on the reverse lookup process to establish adequate notice in this case. Claims submitted by persons or entities not identified in <u>either</u> reverse lookup creates an <u>indicia</u> of invalidity and/or fraud sufficient to warrant a request for additional information, in particular given the possibility that the TransUnion or LexisNexis reverse lookups may have identified different matches for those <u>exact</u> fax numbers.

To that end, would Plaintiffs at least agree to send requests for additional information to claimants not identified in the TransUnion or LexisNexis reverse lookups if the claimant provided a fax number for which the reverse lookups identified contrary matches?

3. **Claimants Providing Addresses From Outside The State Of Florida**

During the meet and confer, we also discussed claimants who provided addresses outside the State of Florida. Ross objected to this category, noting that most of these entities are likely businesses that could reasonably have held fax lines in multiple states. But this is simply incorrect, as 83% of the claimants that provided an address from outside the State of Florida were individuals, not businesses. And further, among the business entities, many of the business names provided on the claim forms do <u>not</u> suggest any association with the State of Florida. BTL is, of course, not suggesting a claim should be <u>denied</u> for this reason alone, but merely suggesting that Epiq seek additional information from these claimants such an informed decision can be made by Epiq on whether to accept or deny each claim. <u>See</u> Settlement Agt. (Dkt. 324-1) § VIII(E).

4. **Claimants Providing Three Or More Fax Numbers**

Finally, BTL has suggested seeking additional information from claimants that provided three or more fax numbers. These claims make up a relatively small portion of the total number of claims, accounting for just 10% of all claims. Collectively, however, these

348 claimants provided 15,349 fax numbers (or <u>76%</u> of the total number of fax numbers provided). Because these claims make up such a substantial portion of the total list of fax numbers, we think it is especially important to assess these claims for potential fraud. <u>See</u> Settlement Agt. (Dkt. 324-1) § VIII.E (describing Epiq's responsibility to review claims for "validity and fraud"). We understand Plaintiffs' position to be that there is nothing "fraudulent" about such claims without any further evidence – but because Epiq's role is to review claims for <u>both</u> "validity and fraud" BTL continues to believe it is essential to seek some form of verification from these claimants given their outsized impact on the total number of claimed fax numbers.

**D. Open Issues**

BTL remains open to further discussion on all of these issues. In particular, BTL would appreciate responses to two new questions raised in this email, specifically:

1. Do Plaintiffs agree to send requests for additional information to claimants identified by the reverse lookups if the reverse lookups identified <u>multiple</u> matches for the claimed fax number?

2. Do Plaintiffs agree to send requests for additional information to claimants <u>not</u> identified in the TransUnion or LexisNexis reverse lookup if the claimant provided a fax number for which the reverse lookups identified contrary matches?

BTL would appreciate responses from Plaintiffs on these two issues as soon as possible as well as confirmation on the points of agreement and disagreement as set out in this email.

Please also inform us whether Plaintiffs have any position as to the measures Epiq proposed to identify claims submitted by potential fax service providers and claims submitted by potential prisoners. <u>See</u> May 24, 2023 Email fr. S. Amin-Giwner.

Best regards,
Robbie

**Robert C. Collins III**

**LATHAM & WATKINS** LLP
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6566 | M: +1.219.789.3376

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies

including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at [www.lw.com](www.lw.com).