**EXHIBIT F**

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | Criminal Docket |
| ) | |
| vs. ) | No. 8:13-cv-1592-AEP |
| ) | |
| BUCCANEERS LIMITED PARTNERSHIP, ) and JOHN DOES 1-10, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| TECHNOLOGY TRAINING ASSOCIATES, ) INC., et al., ) | |
| ) | |
| Intervenors. ) | |
| _____ ) | |

Transcript of Evidentiary Hearing

Heard in Courtroom 10A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Wednesday - August 31, 2022
10:13 a.m. - 3:15 p.m.

BEFORE THE HONORABLE ANTHONY E. PORCELLI

UNITED STATES MAGISTRATE JUDGE

REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF,
CIN-Q AUTOMOBILES, INC.:

      **Michael C. Addison**
      ADDISON LAW OFFICE, P.A.
      1304 Alicia Avenue
      Tampa, Florida 33604-6406

      **Ross Michael Good**
      **Glenn L. Hara** (appearing by Zoom)
      ANDERSON & WANCA
      3701 Algonquin Road, Suite 500
      Rolling Meadows, Illinois 60008


PRESENT ON BEHALF OF THE DEFENDANT,
BUCCANEERS LIMITED PARTNERSHIP:

      **Mark S. Mester**
      **Robert C. Collins, III**
      LATHAM & WATKINS LLP
      330 North Wabash Avenue, Suite 2800
      Chicago, Illinois 60611

      **Joseph H. Varner, III**
      HOLLAND & KNIGHT, LLP
      100 North Tampa Street, Suite 4100
      Tampa, Florida 33602


PRESENT ON BEHALF OF INTERVENOR,
TECHNOLOGY TRAINING ASSOCIATES:

      **Jonathan B. Piper**
      BOCK LAW FIRM, LLC
      134 North LaSalle Street, Suite 1000
      Chicago, Illinois 60602

## I N D E X

**WITNESSES CALLED BY THE PLAINTIFFS**:                    **PAGE**

**LOREE KOVACH**
Direct Examination By Mr. Collins                          30
Cross-Examination By Mr. Piper                             63
Cross-Examination By Mr. Good                             70
Redirect Examination By Mr. Collins                       108
Cross-Examination By Mr. Good                            116

Reporter's Certificate                                    175


**EXHIBITS**


**DEFENDANTS'**                                      **INTRODUCE**

Exhibits 1 and 2                                          118

PROCEEDINGS

1

2   (Open court.)

3        THE COURT:  Okay.  Let's go ahead and call the case,

4   please.

5        THE CLERK:  Okay.  It's Cin-Q Automobiles versus

6   Buccaneers Limited Partnership, Case 8:13-cv-1592-AEP.

7        THE COURT:  All right.  Good morning.  Let me have

8   counsel state your appearance for the record, please.

9        MR. ADDISON:  Michael Addison for Cin-Q Automobiles.

10        THE COURT:  Thank you, Mr. Addison.

11        MR. GOOD:  Ross Good for Medical & Chiropractic

12   Clinic in the class.  And I'm joined by Greg Williams on behalf

13   of Medical & Chiropractic Clinic.

14        THE COURT:  All right.  Good morning to you all.

15   Thank you.

16        MR. MESTER:  Good morning, Your Honor.  Mark Mester,

17   Robbie Collins for BTL.

18        THE COURT:  Thank you.  Good morning.

19        MR. VARNER:  Good morning, Your Honor.  Joe Varner

20   for BTL.

21        THE COURT:  Good morning.  Thank you.

22        MR. PIPER:  And Jonathan Piper for the intervenors,

23   Technology.

24        THE COURT:  All right.  Thank you, Mr. Piper.  Good

25   morning.

10:14:21AM  1        Mr. Hara, can you hear us okay?

10:14:23AM  2        MR. HARA:  Yes, Your Honor, I can hear you fine.

10:14:25AM  3        Can you hear me?

10:14:27AM  4        THE COURT:  State your appearance, please.

10:14:29AM  5        MR. HARA:  Good morning.  Glenn Hara on behalf of the

10:14:31AM  6   plaintiffs in the class.

10:14:32AM  7        THE COURT:  All right.  Thank you.  Good morning.

10:14:35AM  8        All right.  Let me just ask some logistical

10:14:38AM  9   questions.  How many witnesses are we anticipating presenting

10:14:40AM 10   by Zoom?

10:14:41AM 11        MR. MESTER:  Your Honor, I'm only aware of one;

10:14:45AM 12   Ms. Kovach.

10:14:45AM 13        THE COURT:  All right.  So what we're going to try to

10:14:48AM 14   do -- I think this will work -- as you request to present

10:14:54AM 15   exhibits to the witness, I'm going to try to call it up as the

10:14:59AM 16   administrator and do a split screen so that they can see it on

10:15:04AM 17   their screen; I'll do a share screen on the Zoom.  So we'll

10:15:09AM 18   work through it to make sure it works that way.  I anticipate

10:15:13AM 19   that shall work.

10:15:14AM 20        Okay.  Is that all right?

10:15:17AM 21        MR. MESTER:  Yes.

10:15:18AM 22        MR. GOOD:  There is one housekeeping matter I'd like

10:15:21AM 23   to address before I start with the witnesses, Your Honor.

10:15:23AM 24        THE COURT:  Yes.

10:15:24AM 25        MR. GOOD:  Your Honor, on March 25th, 2016, BTL filed

10:15:28AM 1  a motion with this Court regarding the use of their disclosed

10:15:31AM 2  expert, David Canfield.  They sought leave to replace David

10:15:36AM 3  Canfield.  This Court denied BTL's request to designate a

10:15:40AM 4  replacement expert for David Canfield in this matter at docket

10:15:44AM 5  217.

10:15:45AM 6        BTL has not sought leave to disclose an additional

10:15:48AM 7  expert, nor have they actually disclosed an additional expert.

10:15:51AM 8  For this reason, I move to strike Ken Sponsler as an expert and

10:15:57AM 9  move to strike his three declarations of February 18th, 2022,

10:16:01AM 10  May 31st, 2022, and August 5th, 2022, from the record.

10:16:08AM 11        Additionally, they never disclosed Ken Sponsler as an

10:16:13AM 12  expert in this matter, as is required under federal rule of

10:16:16AM 13  civil procedure 26(a)(2).  "The Court may exclude affidavits or

10:16:22AM 14  testimony from a witness when a party fails" --

10:16:25AM 15        THE COURT:  Was Ms. Merryman disclosed?

10:16:28AM 16        MR. GOOD:  Ms. Merryman's not an expert, Your Honor.

10:16:29AM 17        THE COURT:  Well, what was the purpose of her

10:16:30AM 18  affidavit?

10:16:31AM 19        MR. GOOD:  She provided a reverse-lookup search, the

10:16:35AM 20  same way InfoUSA did.  She's not an expert.

10:16:38AM 21        THE COURT:  What is the distinction here?

10:16:39AM 22        MR. GOOD:  Mr. Sponsler is testifying that there is

10:16:42AM 23  no reverse-lookup search that is sufficient to be used.

10:16:46AM 24        THE COURT:  Based on his opinion or based upon work

10:16:48AM 25  that he's done?

| | |
|---|---|
| 10:16:49AM | 1 |
| 10:16:52AM | 2 |
| 10:16:53AM | 3 |

MR. GOOD:  His opinion.  That's one of his opinions
in his declaration.

THE COURT:  All right.

MR. GOOD:  And to be clear, nobody is relying on
Ms. Merryman's declaration for the motion that's at issue
today.

THE COURT:  But she was relied upon for your motion.

MR. GOOD:  What motion is that?

THE COURT:  The motion for the second reverse lookup.

MR. GOOD:  She was proposed as part of it, but
Your Honor gave --

THE COURT:  Wait a minute.  Mr. Good, let's not dance
on the head of the pin here.  You submitted her affidavit to me
for my consideration for a second reverse lookup, did you not?

MR. GOOD:  I did.

THE COURT:  So that is what we call to be relied
upon, is it not?

MR. GOOD:  Yes.

THE COURT:  All right.

MR. GOOD:  Based on the work that she performed.

THE COURT:  All right.

MR. GOOD:  And to be clear, she provided, at a
purchase to plaintiffs, the reverse-lookup search results,
which were provided to defendants' counsel and the results of
which were provided to Your Honor.  She did not render any

10:17:43AM 1  opinions or expert testimony to be relied upon as to

10:17:49AM 2  reliability of any other reverse-lookup searches, which is what

10:17:54AM 3  Mr. Sponsler has done now three times since Your Honor denied

10:17:59AM 4  defendants' motion for leave to name a new expert.

10:18:03AM 5            THE COURT:  All right.  What else?

10:18:06AM 6            MR. GOOD:  Again, federal rule of civil procedure

10:18:10AM 7  26(a)(2).

10:18:13AM 8            And, finally, defendants have refused to produce

10:18:17AM 9  Mr. Sponsler for testimony, and therefore the plaintiffs are

10:18:20AM 10 deprived of the opportunity to cross-examine Mr. Sponsler,

10:18:23AM 11 whom, again, they rely upon in this motion before this

10:18:26AM 12 Honorable Court.

10:18:27AM 13           THE COURT:  All right.  Response.

10:18:29AM 14           MR. MESTER:  Your Honor, the first part of the

10:18:31AM 15 argument is the first I've heard.  My understanding was that

10:18:34AM 16 they were denied without prejudice.  We'd be happy to brief

10:18:34AM 17 that.

10:18:38AM 18           In terms of Mr. Sponsler, we told Mr. Good almost two

10:18:42AM 19 weeks ago, that in light of his decision to not call

10:18:47AM 20 Ms. Merryman to Your Honor's questions, to not call

10:18:51AM 21 Ms. Merryman or Data Axle, we saw no reason for us -- we didn't

10:18:54AM 22 need to call Mr. Sponsler.  We offered to do so, however

10:18:59AM 23 Mr. Good would likewise voluntarily produce Mr. Biggerstaff,

10:19:02AM 24 which he repeatedly refused to do.  So we have neither parties'

10:19:05AM 25 experts here today, and I don't think they're necessary.  It's

certainly not necessary for what we intend to do.  Obviously --
we did also, by the way, Your Honor, as we indicated in the
submission on Friday, we subpoenaed Mr. Biggerstaff, he never
issued objections to that subpoena.  So my understanding is
he's not available.  But he's not available.  Mr. Good did not
subpoena Mr. Sponsler.

THE COURT:  All right.  So I want to be clear, are
you going to be relying upon the affidavits as submitted in the
record?

MR. MESTER:  For purposes of the motion, yes,
Your Honor.  The motion that was filed, yes.

THE COURT:  Okay.  Let me defer on that for a moment,
because I want to address a few things.

All right.  I want to be clear for the record as to
what we're doing.  As I see it, the issue before the Court, in
looking at the agreement that's contemplated by the parties,
specifically, I'm looking at Section VII(D), which provides
that "Within ten (10) Days of the Preliminary Approval Date,
the Parties shall provide to the Settlement Administrator
records identifying the fax numbers to which the facsimile
advertisements offering tickets to the Tampa Bay Buccaneer
games were allegedly sent.  The Settlement Administrator will
then use these records to determine the mailing addresses for
as many members of the Settlement Class as possible.  The
Parties will work cooperatively with the Settlement

10:20:47AM 1   Administrator to mutually agree upon the most practicable and

10:20:50AM 2   reasonable methods under the circumstances by which the

10:20:52AM 3   addresses of the members of the Settlement Class can be derived

10:20:56AM 4   in an efficient and reasonable manner."

10:21:00AM 5        In connection with that, I find also relevant to

10:21:04AM 6   these proceedings Section VIII(E), which reads that "BTL shall

10:21:09AM 7   have the right to audit Claim Forms for validity and fraud.  In

10:21:14AM 8   the event BTL determines that a Claim Form is invalid or

10:21:18AM 9   fraudulent and should be rejected, it shall bring that to the

10:21:21AM 10  attention of Class Counsel, and the Parties shall meet and

10:21:24AM 11  confer and attempt, in good faith, to resolve any dispute

10:21:28AM 12  regarding the rejected claim.  Following their meet and confer,

10:21:32AM 13  the Parties will provide the Settlement Administrator with

10:21:34AM 14  their positions regarding the disputed claim.  The Settlement

10:21:38AM 15  Administrator, after considering the positions of the Parties,

10:21:41AM 16  and, if appropriate, seeking any additional information from

10:21:44AM 17  the Settlement Class Member, will make an initial

10:21:47AM 18  determination, subject to review by the Court."

10:21:50AM 19       I highlight these two areas, because right now we are

10:21:54AM 20  stuck in Section VII(D), where we have not been able --

10:21:59AM 21  certainly the parties have not been able to agree upon the most

10:22:02AM 22  practicable and reasonable methods under the circumstances to

10:22:05AM 23  get notice to as many class members as possible.  What was

10:22:10AM 24  originally contemplated, but not specified in the agreement,

10:22:13AM 25  was that the class administrator would undertake these efforts

10:22:17AM  1   to identify as many members as possible.

10:22:21AM  2          Epiq did so, first utilizing TransUnion, whether, as

10:22:28AM  3   alleged in the pleadings by BTL, class counsel went without

10:22:34AM  4   conferring immediately to the Court asking for aid in

10:22:37AM  5   identifying more members with the request of a second reverse

10:22:40AM  6   lookup can be debated.  But, nonetheless, I ordered the second

10:22:45AM  7   reverse lookup, not based upon Ms. Merryman -- in fact, I did

10:22:48AM  8   not consider her affidavit at all, or her information, but

10:22:53AM  9   rather just on the simple fact, as was highlighted by the first

10:22:57AM 10   reverse lookup, there were little, if any, businesses that were

10:23:00AM 11   identified.

10:23:01AM 12          Additionally, a small percentage of potential class

10:23:06AM 13   members that were identified, based on the numbers, which, to

10:23:10AM 14   be very blunt right now, are ambiguous to me in the record

10:23:14AM 15   given how they are worded in the pleadings, and so that is one

10:23:16AM 16   thing I want to be highlighted during this hearing is exactly

10:23:19AM 17   what are the numbers for each of the lookups.  But based upon

10:23:23AM 18   what I have come up with, there were 17,971 numbers identified

10:23:32AM 19   with a single identity, meaning a single name and address.  But

10:23:38AM 20   that is not entirely clear to me either, because when I say

10:23:40AM 21   name and address, I am not sure, on the TransUnion lookup, if

10:23:44AM 22   that means 17,971 were associated with both the name and

10:23:49AM 23   address, or just the name, or just an address.  But,

10:23:53AM 24   nonetheless, I found the second reverse lookup was warranted,

10:23:57AM 25   and class counsel, I felt, was warranted in requesting a second

10:24:02AM  1  reverse lookup.

10:24:04AM  2          My function is to ensure that the absent class

10:24:07AM  3  members are afforded due process, as the defense is afforded

10:24:12AM  4  due process.  As I contemplate the settlement agreement, that

10:24:16AM  5  is exactly what's at issue here, is, again, to determine "the

10:24:18AM  6  most practicable and reasonable methods under the circumstances

10:24:21AM  7  by which the addresses can be identified."

10:24:26AM  8          Now, what concerns me, and let me just be clear,

10:24:29AM  9  Mr. Mester, because I want you to address this.  What concerns

10:24:32AM 10  me now is what you are raising, which appears to be somewhat

10:24:35AM 11  contrary to the agreement.  By the spirit of the agreement,

10:24:39AM 12  there was an agreement to identify a class administrator, which

10:24:43AM 13  here was Epiq, and have that class administrator to undertake

10:24:47AM 14  efforts to identify.

10:24:50AM 15          Is it your position that this sentence that reads

10:24:53AM 16  that "The Parties will work cooperatively with the Settlement

10:24:56AM 17  Administrator to mutually agree upon the most practicable and

10:24:59AM 18  reasonable methods," that that entitles BTL to pull the curtain

10:25:04AM 19  back upon what methods are being utilized by Epiq in order to

10:25:09AM 20  do its job in its process?

10:25:12AM 21          MR. MESTER:  Certainly so, Your Honor.  I think

10:25:14AM 22  clearly it was contemplated as we worked cooperatively with

10:25:17AM 23  class counsel to come up with the best method to identify

10:25:20AM 24  through a reverse lookup as many as we could.  We recognize we

10:25:23AM 25  might not be able to identify "any," and when we made the joint

10:25:26AM 1   motion to appoint Epiq, we used that exact phrase, "if any."

10:25:29AM 2   We recognize we might not be able to identify "any."

10:25:32AM 3           But what was contemplated in my mind, what we

10:25:35AM 4   understood was, we would work with class counsel.  We did.

10:25:38AM 5   Epiq chose TransUnion, they ran a reverse lookup, and they came

10:25:42AM 6   up with the results that they came up with.  And as I think

10:25:45AM 7   Ms. Kovach made clear in the June hearing, that's what they

10:25:48AM 8   typically would have done.  They would have used TransUnion,

10:25:50AM 9   they would have done one reverse lookup, and that's what they

10:25:52AM 10  came up with, and they weren't at all surprised that so few

10:25:55AM 11  numbers were identified given the long passage of time between

10:25:59AM 12  the events in question on the one hand and the date when the

10:26:01AM 13  reverse lookup was run on the other.  So none of that surprised

10:26:05AM 14  us.

10:26:05AM 15          And then as Your Honor -- if you look at the next

10:26:08AM 16  paragraph in Section VII, what was supposed to happen, in our

10:26:12AM 17  view, was we would then move to the question of supplemental

10:26:15AM 18  notices in a way to augment the mailed notice that would go to

10:26:18AM 19  those people who were identified in the reverse lookup.  That's

10:26:21AM 20  when Mr. Good, then --

10:26:23AM 21          THE COURT:  But what do you contemplate identify to

10:26:25AM 22  me?

10:26:25AM 23          MR. MESTER:  Pardon me, Your Honor?

10:26:26AM 24          THE COURT:  What do you contemplate identify to me?

10:26:29AM 25  The most practical methods and efforts to identify, and so is

10:26:33AM 1   that simply the identification of an identity of an individual

10:26:37AM 2   associated with the number during the time period that is

10:26:40AM 3   relevant in the case?

10:26:41AM 4          MR. MESTER:  Certainly, Your Honor, and nothing more

10:26:43AM 5   than that, and that's a crucial issue.  We never contemplated

10:26:48AM 6   what has obviously happened in the interim.  We never

10:26:53AM 7   contemplated that we'd be identifying people that held these

10:26:55AM 8   numbers at some time other than when the faxes were sent, yet

10:26:57AM 9   that's what we've done.  And that's why you can see,

10:26:59AM 10  Your Honor, from both lookups, we have multiple hits on a

10:27:03AM 11  single number of 16 to 19 or more numbers.  There's no way 16

10:27:07AM 12  to 19 people held one of those numbers in a one-year period,

10:27:11AM 13  and that's what's happened, and that's the difficulty.

10:27:14AM 14         But clearly what was contemplated, and it plays right

10:27:18AM 15  off the definition of the settlement class, that these are

10:27:20AM 16  people who originally received faxes sent to them in 2009 and

10:27:24AM 17  2010 on behalf of BTL, nothing more and nothing less.  So those

10:27:27AM 18  are the people we have to identify, and that was the whole

10:27:30AM 19  purpose and that was what was contemplated by Section VII of

10:27:33AM 20  the settlement.

10:27:34AM 21         THE COURT:  All right.  What I'd like to know

10:27:36AM 22  throughout the hearing -- and I can tell you what I have, and

10:27:38AM 23  this is what I've got from your pleadings, which may be

10:27:41AM 24  different, because it seems to be a moving target at times, but

10:27:45AM 25  what will be helpful for me to understand is for both of the

10:27:50AM 1 the lookups, so, independently, the total number of numbers

10:27:55AM 2 that were IDed -- or let me rephrase, associated with any

10:28:00AM 3 identifiers, then the total number associated with multiple

10:28:06AM 4 individual identifiers, and then the total number associated

10:28:10AM 5 with one individual identifier, then that would also mean what

10:28:15AM 6 is the total number from that lookup where there's been no

10:28:20AM 7 identification.

10:28:22AM 8 In addition to that, if it's been done on the

10:28:26AM 9 cross-referencing of the lookups, does that mean where you have

10:28:32AM 10 a single identification in the TransUnion and a single

10:28:37AM 11 identification of Lexis, has that created multiple identities

10:28:43AM 12 for a number?  In other words, by those lookups, did they also

10:28:47AM 13 add to each other?

10:28:50AM 14 Then what is the level of identifiers when we talk

10:28:53AM 15 about multiple identifiers?  As I just stated before, does that

10:28:57AM 16 mean identification only by a name, or address only, or is this

10:29:02AM 17 all name and address.  Then what is the time period, if any,

10:29:07AM 18 associated with any of these identifications.

10:29:13AM 19 And then, lastly, what you highlighted in your

10:29:17AM 20 motion, which I was unclear about whether that has been

10:29:19AM 21 remedied or not, you seem to indicate that Lexis put what you

10:29:24AM 22 call an arbitrary cap on how many identities would be

10:29:29AM 23 associated with the number.  Has that been remedied?  And if it

10:29:33AM 24 is, then that's no longer an issue.  And if not, then what was

10:29:36AM 25 that cap, and, if any -- any further information you know about

| | | |
|---|---|---|
| 10:29:40AM | 1 | that? |
| 10:29:42AM | 2 | But what I have right now is you highlighted |
| 10:29:50AM | 3 | currently, in total, there is 40,022 phone numbers associated |
| 10:29:58AM | 4 | with multiple identifiers, multiple individuals, and 49,350 |
| 10:30:04AM | 5 | that there is no identifiers for. |
| 10:30:09AM | 6 | The TransUnion, and what I have alone, is that there |
| 10:30:17AM | 7 | was 40,940 that were identified.  You had put in your pleading, |
| 10:30:25AM | 8 | though, that there was 18,013 with just a single match of those |
| 10:30:29AM | 9 | identifications.  However, when I did the math, in combination |
| 10:30:34AM | 10 | with the totals you gave me that I just mentioned a moment ago, |
| 10:30:41AM | 11 | the 40,022 multipliers, I came with up 17,971.  My math can be |
| 10:30:49AM | 12 | wrong, which is why I'm simply asking -- I need some clarity on |
| 10:30:53AM | 13 | those numbers as to what we're talking about. |
| 10:30:55AM | 14 | The concern I have, though, is I want to stay focused |
| 10:31:00AM | 15 | on what was done and allow you to highlight your concerns |
| 10:31:07AM | 16 | about, as you indicate, the reliability of these |
| 10:31:10AM | 17 | identifications, and you can put that on the record.  But that |
| 10:31:17AM | 18 | to me should only be, then, with Ms. Kovach, and that is |
| 10:31:22AM | 19 | whatever Epiq did, or if you feel like you're being prevented |
| 10:31:25AM | 20 | from preventing any further information, because I know what |
| 10:31:28AM | 21 | your notice said regarding your efforts to subpoena other |
| 10:31:31AM | 22 | witnesses, but I think the focus should be on what was done and |
| 10:31:34AM | 23 | the results of the lookups so that you can comment upon that. |
| 10:31:38AM | 24 | Now, I get the sense your argument is none of this is |
| 10:31:43AM | 25 | reliable, and that's problematic, but I'll let you make your |

10:31:49AM  1  argument.  And I'll address it later, but I think the parties

10:31:54AM  2  contemplated this, at least by Section VIII(E), which allows

10:32:02AM  3  for a process or these things to be challenged.

10:32:07AM  4           So, as for example, a hypothetical, if mailed notice

10:32:11AM  5  is sent out to -- let's say, one number has three -- and I

10:32:15AM  6  recognize your argument about over-inclusive notice, but three

10:32:22AM  7  individuals associated with a number.  Mailed notice goes to

10:32:26AM  8  all three, recognizing all three, it's highly improbable all

10:32:31AM  9  three would be class members.  If one individual submits a

10:32:37AM 10  claim form for that number, that in and of itself doesn't

10:32:42AM 11  necessarily mean they're a class member.

10:32:44AM 12           If two individuals or three individuals submit a

10:32:47AM 13  claim for that number, clearly there is a high degree of

10:32:54AM 14  probability at least two are fraudulent, which then is

10:33:00AM 15  contemplated by Section VIII(E), which allows you to conduct an

10:33:07AM 16  audit, allows you to confer with class counsel to see if

10:33:11AM 17  anything can be resolved.  If not, then it's Epiq's

10:33:15AM 18  responsibility to determine what is the appropriate claim and a

10:33:19AM 19  valid claim, to include requiring -- and this is one of the

10:33:23AM 20  things that you proposed, but it's already within the

10:33:26AM 21  agreement -- requiring more proof from any claimant to

10:33:28AM 22  establish their claim.  And then even if you're not satisfied,

10:33:33AM 23  then that would be the Court's ultimate determination as to

10:33:36AM 24  whether any one or any and all are valid claims.

10:33:41AM 25           So that's the one aspect as it seems to me -- you

10:33:44AM  1  know, one of the things you've asked for already has already

10:33:47AM  2  been contemplated by the parties is in the agreement.  But the

10:33:50AM  3  point I'm getting at is, to take the position that in total

10:33:58AM  4  this type of reverse lookup is just unwarranted and not

10:34:01AM  5  reliable and therefore mailed notice cannot be issued, it

10:34:05AM  6  seem -- it's troubling to me, because I need to make sure we're

10:34:09AM  7  using all efforts to secure notice to absent class members.

10:34:14AM  8  And I know you've put it in your pleadings that you've even

10:34:17AM  9  offered just to stay with the TransUnion list for the single

10:34:22AM 10  identifiers, but the problem I have with that is that -- to be

10:34:28AM 11  plain about it, that doesn't deal with your issues.

10:34:31AM 12          I mean, you know, I recognize at each varying level,

10:34:36AM 13  there is a stronger reliability, where you have one identifier

10:34:40AM 14  with one number, there's a higher inference that there is a

10:34:45AM 15  connection and they are a class member.  When you have multiple

10:34:50AM 16  number -- individuals with one number, that lessens.  When you

10:34:53AM 17  just have an address -- multiple addresses associated with a

10:34:56AM 18  number, it lessens even more.  And then when you have no

10:34:59AM 19  identity, that's the weakest.  But, nonetheless, we have to

10:35:02AM 20  figure out what is the best way to get notice to class members,

10:35:07AM 21  and so that's what I'm contemplating.

10:35:10AM 22          So I wanted highlight that for you all as we go

10:35:13AM 23  through the hearing so you can address those issues in the

10:35:16AM 24  presentation of the evidence that you're going to submit, and

10:35:18AM 25  then we'll talk about it afterwards.

10:35:21AM 1      But Mr. Good's motion is well taken.  I'm not looking

10:35:25AM 2 to consider outside factors here.  I want to focus on what was

10:35:28AM 3 done itself, and alternatively what I would consider is if

10:35:33AM 4 anyone has suggestions, that if you think there are

10:35:36AM 5 deficiencies, then I'll take those.  But meaning -- I suppose

10:35:41AM 6 one of the suggestions you've already put on the record is just

10:35:43AM 7 to stick with TransUnion's single identifiers.  Fine, I'll

10:35:48AM 8 accept that argument.  But I don't -- I think the record itself

10:35:52AM 9 as to what was done by Epiq, you can present that for my

10:35:56AM 10 consideration as to the reliability.  I don't need any outside

10:35:59AM 11 opinions as to that.  So I want to stay focused on what was

10:36:03AM 12 done.

10:36:03AM 13      And so the motion was just thrust upon you, but I

10:36:08AM 14 will tell you -- I'll give you an opportunity to respond to it

10:36:11AM 15 further at the end of the hearing as far as striking the

10:36:14AM 16 opinion evidence, but it was not much I was going to rely upon

10:36:19AM 17 anyways.  But I'll hear you as to why you think I should rely

10:36:22AM 18 upon it when we get to argument down the road.

10:36:24AM 19      All right.  Who do you want to call first?

10:36:26AM 20      MR. MESTER:  Your Honor, may I just make a point?

10:36:27AM 21      THE COURT:  Yes.

10:36:28AM 22      MR. MESTER:  And I apologize, it was late-breaking

10:36:31AM 23 news, but we got it to the Court as soon as we got it.

10:36:34AM 24      As you reference it, we had a great deal of

10:36:37AM 25 difficulty getting anyone to appear.  As soon as we had the

10:36:40AM  1    hearing on August 12th, we immediately reached out to Epiq and

10:36:44AM  2    asked Epiq to contact TransUnion and LexisNexis so that they

10:36:48AM  3    can voluntarily comply.  Epiq didn't get back to us real

10:36:52AM  4    promptly, eventually got back to us and said, sorry, no one is

10:36:55AM  5    willing to do so.  So that naturally led us to ask Epiq for

10:36:59AM  6    contact information for both TransUnion and LexisNexis so we

10:37:02AM  7    can issue subpoenas.  We never got that information from

10:37:05AM  8    TransUnion.  We did get information from LexisNexis, and we

10:37:08AM  9    promptly served the subpoena.

10:37:09AM  10           We heard from LexisNexis' outside counsel for the

10:37:13AM  11   first time, and this is referenced in the submission we filed

10:37:19AM  12   last Friday.  We heard from LexisNexis' outside counsel for the

10:37:21AM  13   first time last Thursday, and we were immediately advised that

10:37:24AM  14   we had sent the service of subpoena to the wrong LexisNexis

10:37:29AM  15   individual.  It was a different corporation.  We just used what

10:37:32AM  16   Epiq gave us, they obviously gave us the wrong name.  I can't

10:37:36AM  17   explain that, it seems odd to me, but in any event, that's what

10:37:39AM  18   happened.

10:37:39AM  19           We then had a dialogue with LexisNexis' outside

10:37:42AM  20   counsel, and he said -- and we can give you all the

10:37:45AM  21   documentation of this.  He said, you know, "There's a

10:37:48AM  22   disclaimer, and the disclaimer should make this clear.  Why

10:37:51AM  23   don't you raise it with Epiq," so we did that.  Epiq said, "We

10:37:55AM  24   don't have any knowledge of that," and we asked for a copy of

10:37:58AM  25   their agreement with LexisNexis, and they refused to give it to

| | |
|---|---|
| 10:38:01AM | 1 |
| 10:38:03AM | 2 |
| 10:38:06AM | 3 |
| 10:38:09AM | 4 |
| 10:38:14AM | 5 |
| 10:38:17AM | 6 |
| 10:38:21AM | 7 |
| 10:38:23AM | 8 |
| 10:38:26AM | 9 |
| 10:38:31AM | 10 |
| 10:38:35AM | 11 |
| 10:38:36AM | 12 |
| 10:38:39AM | 13 |
| 10:38:40AM | 14 |
| 10:38:44AM | 15 |
| 10:38:48AM | 16 |
| 10:38:51AM | 17 |
| 10:38:55AM | 18 |
| 10:38:59AM | 19 |
| 10:39:03AM | 20 |
| 10:39:07AM | 21 |
| 10:39:10AM | 22 |
| 10:39:12AM | 23 |
| 10:39:16AM | 24 |
| 10:39:20AM | 25 |

us.  They said it was confidential.

         We then discussed with LexisNexis' outside counsel, in lieu of them appearing for the hearing, because their view was they hadn't been properly served, they offered to provide us with a declaration.  That declaration was submitted to Your Honor, the Court, last night.  We got it at 4:26, and we submitted it -- the notice of filing last night.

         That will be a focus of today's hearing, because I think once you see that, you'll recognize -- LexisNexis says right in the declaration that the database was never intended for this purpose.  They further say that to rely on any of the data requires independent verification, which obviously that didn't occur.

         So I think to advance the ball, if we could focus on that, and we will with Ms. Kovach, and we will in argument, I think that will help the Court at least see what the basis is for the LexisNexis side of it and the TransUnion side, and I'll stop talking.  My point on TransUnion was only simply this.  We agreed in the settlement agreement in broad strokes to have a reverse lookup.  My view was to have just one.  And so when we said we would accept the TransUnion results, it's not because I think they're reliable, simple because I think we already agreed to do that.  And we were trying to offer that up as a compromise, frankly, because I recognize there's discomfort with class counsel.

| | |
|---|---|
| 10:39:21AM | 1 |
| 10:39:23AM | 2 |
| 10:39:26AM | 3 |
| 10:39:28AM | 4 |
| 10:39:33AM | 5 |
| 10:39:33AM | 6 |
| 10:39:37AM | 7 |
| 10:39:38AM | 8 |
| 10:39:40AM | 9 |
| 10:39:42AM | 10 |
| 10:39:45AM | 11 |
| 10:39:53AM | 12 |
| 10:39:56AM | 13 |
| 10:39:59AM | 14 |
| 10:40:06AM | 15 |
| 10:40:09AM | 16 |
| 10:40:11AM | 17 |
| 10:40:14AM | 18 |
| 10:40:15AM | 19 |
| 10:40:15AM | 20 |
| 10:40:17AM | 21 |
| 10:40:18AM | 22 |
| 10:40:20AM | 23 |
| 10:40:22AM | 24 |
| 10:40:26AM | 25 |

THE COURT:  What do you mean you agreed to do that?  You agreed specifically that TransUnion be utilized?

MR. MESTER:  No.  What we agreed, Your Honor, was we would leave it to the settlement administrator to do what it always does, and we understood that they would pick one source, and they did pick TransUnion.  And I think Ms. Kovach was quite clear that's who they were using.

THE COURT:  And I understood that, Mr. Mester.  But that's why I disagree with you.  I don't think that's what the disagreement specifies.  The agreement says to identify as many class members as possible, and I found it to be deficient.  I just simply found it to be deficient.  If you're not identifying businesses, and it was such a low rate, whether it was 17,971 or 18,013, seemed to me Epiq should have done more.

MR. MESTER:  Your Honor, and I understand why you would have the impression that there were no businesses represented, that's because Mr. Good told you that.  It's not true.  A lot of businesses --

MR. GOOD:  (Stands.)

THE COURT:  All right.  Mr. Good, I don't need you to respond.

MR. MESTER:  A lot of businesses were identified, but they were identified by names of people, not by the name of the business.  That later became clear with the LexisNexis reverse lookup.

10:40:26AM 1      THE COURT:  All right.  Well, and, again, what was

10:40:27AM 2  larger is the small amount.  It's as simple as that.  You know,

10:40:31AM 3  and to be blunt, I think I said that on the record, that would

10:40:34AM 4  be not performing my fiduciary obligation to the absent class

10:40:37AM 5  members if I found that to be sufficient.

10:40:39AM 6      MR. MESTER:  Your Honor, I think that's the balance;

10:40:41AM 7  the balance is between, on the one hand, quantity and, on the

10:40:43AM 8  other hand, accuracy.  Ms. Kovach made very clear at the last

10:40:47AM 9  hearing the TransUnion database -- and I think it has a lot of

10:40:50AM 10  problems itself.  They're not here today, we haven't had a

10:40:52AM 11  chance to talk to them.  But the TransUnion database I think is

10:40:56AM 12  more accurate and the criteria are more rigorous than

10:40:58AM 13  LexisNexis.  LexisNexis makes that very clear in their

10:41:01AM 14  declaration, we're not even supposed to be using it for those

10:41:03AM 15  purposes.

10:41:03AM 16      THE COURT:  All right.  Well, that's what you want to

10:41:04AM 17  present; that's what I want to hear.

10:41:05AM 18      MR. MESTER:  Thank you, Your Honor.

10:41:06AM 19      MR. GOOD:  May I respond, Your Honor?

10:41:07AM 20      THE COURT:  You need to response to something?  Yes.

10:41:09AM 21      MR. GOOD:  Yes, Your Honor.

10:41:11AM 22      Your Honor focused on Section VII(D) of the

10:41:15AM 23  settlement agreement.  I'd like to direct your attention to the

10:41:17AM 24  last sentence of Section VII(D).  This sentence reads, "The

10:41:20AM 25  mailing addresses will be updated with the National Change of

Address Database maintained by the United States Postal Service before mailing."

It's my understanding this has not yet been done by Epiq.  Your Honor said it was interested in knowing the exact numbers of the results from both LexisNexis and from TransUnion.  I wanted the Court to be aware, it's my understanding, that that can't be provided at this time, because we haven't reached that step as provided explicitly in the settlement agreement.  I also --

THE COURT:  Mr. Good, I'm sorry, I don't understand that.  What do you mean by that?

MR. GOOD:  They haven't done the National Change of Address lookup yet.

THE COURT:  Well, I'm not worried about the change. The numbers I wanted to know was what I just specified, what has been identified by the reverse lookups?  What's the distinction there?  Am I missing something?

MR. GOOD:  Well, the thing you're missing is the National Change of Address is used to standardize and organize the addresses.  Something that might not appear to be a match after going through NCOA might end up being a match.  So that might -- with numbers the size -- I'll go so far to suggest it will impact the final numbers when it goes through NCOA.

THE COURT:  Maybe I've assumed something as to what happens with the change of address.  What's the process that

| | | |
|---|---|---|
| 10:42:34AM | 1 | that occurs there? |
| 10:42:34AM | 2 | MR. GOOD:  The U.S. Postal Service keeps records of |
| 10:42:37AM | 3 | changes of address, addresses that close, that mail can't be |
| 10:42:41AM | 4 | delivered to, you know, businesses are acquired, businesses |
| 10:42:44AM | 5 | close, things of that nature. |
| 10:42:44AM | 6 | THE COURT:  No, I understand that.  So, for example, |
| 10:42:47AM | 7 | if I've moved, they would update my change of address, and my |
| 10:42:51AM | 8 | address would be in this database, correct? |
| 10:42:54AM | 9 | MR. GOOD:  That is correct.  If you moved and your |
| 10:42:56AM | 10 | business was acquired, that could theoretically be in there as |
| 10:42:59AM | 11 | well.  And if LexisNexis and TransUnion had differing matches, |
| 10:43:04AM | 12 | and the National Change of Address actually -- I don't want to |
| 10:43:07AM | 13 | use the word "corrected," but explained that or rectified it, |
| 10:43:11AM | 14 | that would be done in the National Change of Address lookup |
| 10:43:14AM | 15 | process. |
| 10:43:14AM | 16 | We'll get into this later, but in Epiq's quote to |
| 10:43:18AM | 17 | plaintiff, they explain how they do their standardization |
| 10:43:21AM | 18 | process before the mailing takes place.  Again, it's my |
| 10:43:24AM | 19 | understanding that hasn't been done yet. |
| 10:43:26AM | 20 | THE COURT:  All right.  Then that will be helpful to |
| 10:43:27AM | 21 | explain that.  Thank you. |
| 10:43:28AM | 22 | MR. GOOD:  Thank you. |
| 10:43:28AM | 23 | I also want to address Your Honor's hypothetical |
| 10:43:32AM | 24 | regarding one fax sent to three people.  If Your Honor were to |
| 10:43:35AM | 25 | refer to the exhibit with the class notice and the claim |

| | |
|---|---|
| 10:43:40AM 1 | form -- |
| 10:43:41AM 2 | THE COURT:  No, I'm more familiar with that.  That's |
| 10:43:43AM 3 | something -- |
| 10:43:43AM 4 | MR. GOOD:  I'm sure you are. |
| 10:43:44AM 5 | I wanted to again make very clear to this Court, I |
| 10:43:48AM 6 | assume you're already aware of this, the form in step one is |
| 10:43:50AM 7 | not prepopulated.  That means that if those -- |
| 10:43:52AM 8 | THE COURT:  Do they even know the number to populate, |
| 10:43:54AM 9 | and then they're swearing under oath, which has already been |
| 10:43:57AM 10 | raised, which is an extraordinary circumstance, which is |
| 10:43:59AM 11 | another reason for me that will increase the reliability.  I'll |
| 10:44:03AM 12 | recognize that -- |
| 10:44:03AM 13 | MR. GOOD:  Okay. |
| 10:44:04AM 14 | THE COURT:  -- and we'll discuss it more at the end |
| 10:44:05AM 15 | of the hearing. |
| 10:44:06AM 16 | MR. GOOD:  And to be clear, the fax number not only |
| 10:44:07AM 17 | has to be known, it has to match. |
| 10:44:09AM 18 | THE COURT:  Yes, it has to match the records.  I |
| 10:44:11AM 19 | understand. |
| 10:44:11AM 20 | MR. GOOD:  I just want to make sure we were clear on |
| 10:44:13AM 21 | that. |
| 10:44:13AM 22 | And, also, I reviewed the transcript prior to today's |
| 10:44:18AM 23 | hearing from the last time Loree Kovach spoke to this Honorable |
| 10:44:22AM 24 | Court, she said 300 out of 40,000 were the number of businesses |
| 10:44:26AM 25 | contained in the TransUnion records. |

| 10:44:27AM | 1 | I have nothing further. |

10:44:27AM   1          I have nothing further.

10:44:29AM   2          THE COURT:  All right.  Ms. Vito, I'm going on to

10:44:37AM   3   Zoom now.  Let's try this out.

10:44:43AM   4          THE CLERK:  Okay.

10:45:44AM   5          THE COURT:  Good morning, Ms. Kovach.

10:45:46AM   6          THE WITNESS:  Good morning.

10:45:47AM   7          THE COURT:  We're going to test something out here.

10:45:49AM   8   I want to make sure you're able to see, once I do something

10:45:54AM   9   here.  Be patient with me, please.

10:46:29AM  10          All right.  Ms. Kovach, I displayed a document, all

10:46:32AM  11   it reads is the case number.  Can you see that document on your

10:46:36AM  12   screen?

10:46:37AM  13          THE WITNESS:  Yes, I can.

10:46:38AM  14          THE COURT:  All right.  Mr. Hara?

10:46:41AM  15          MR. HARA:  Yes, Your Honor, I can see it.

10:46:46AM  16          THE COURT:  All right.  Is that showing up for

10:46:49AM  17   everybody else?

10:46:49AM  18          MR. MESTER:  Yes, Your Honor.

10:46:51AM  19          MR. GOOD:  Yes, Your Honor.

10:46:51AM  20          THE COURT:  All right.  All right.  I think we'll be

10:46:52AM  21   able to do it, then.  You'll just have to be patient with me as

10:46:54AM  22   I draw up your exhibits.

10:46:58AM  23          All right.  For the record, please call the first

10:47:00AM  24   witness.

10:47:01AM  25          MR. COLLINS:  Your Honor, the defendant will call

10:47:04AM  1   Ms. Kovach.  Loree Kovach.

10:47:06AM  2           THE COURT:  All right.  Thank you.

10:47:09AM  3           Ms. Vito.

10:47:09AM  4           THE CLERK:  Ms. Kovach, good morning.  This is Lynne

10:47:11AM  5   Vito, Judge Porcelli's courtroom deputy.  I'm going to ask you

10:47:12AM  6   to please raise your right hand.

10:47:16AM  7                           LOREE KOVACH,

10:47:16AM  8   called for examination by counsel for the defendants, after

10:47:16AM  9   having been first duly sworn or affirmed to testify the truth,

10:47:16AM 10   the whole truth, and nothing but the truth, testified as

10:47:24AM 11   follows:

10:47:24AM 12           THE CLERK:  Thank you.  You can put your hand down

10:47:26AM 13   now.

10:47:26AM 14           I'll ask you to state your name and spell your last

10:47:29AM 15   name, please.

10:47:31AM 16           THE WITNESS:  Sure.  My name is Loree Kovach.  That's

10:47:35AM 17   K-o-v, as in Victor, a-c-h.

10:47:39AM 18           THE CLERK:  Thank you.

10:47:39AM 19           THE COURT:  All right.  Before you proceed, I

10:47:41AM 20   neglected to raise this.  Document No. 393 is the motion to

10:47:44AM 21   seal certain exhibits.  I just wanted to make sure, is there

10:47:47AM 22   any objection to that by the plaintiffs' counsel?

10:47:50AM 23           MR. GOOD:  For Exhibits 1 through 6, there's no

10:47:51AM 24   objection.  For the other exhibits, we don't know who authored

10:47:55AM 25   them, we don't know what they are.

10:47:57AM 1      THE COURT:  All right.  Well, as those come up, then,

10:47:57AM 2  let's take those up.

10:47:58AM 3      So as to 1 through 6, the motion will be granted.

10:48:00AM 4      MR. GOOD:  Thank you, Your Honor.

10:48:02AM 5      THE COURT:  So before you seek to offer anything

10:48:04AM 6  else, please confer with counsel and then we'll go from there.

10:48:05AM 7      MR. COLLINS:  Understood, Your Honor.  Thank you.

10:48:06AM 8      THE COURT:  All right.  You may proceed.  Thank you.

10:48:08AM 9      One moment, I'm sorry.

10:48:10AM 10      Ms. Kovach, first of all, thank you for your time

10:48:12AM 11  this morning.  This is obviously a little unorthodox.  What I'm

10:48:17AM 12  going to ask is you just be patient with all of us.  The best

10:48:19AM 13  thing to do is wait for somebody to complete -- to finish their

10:48:23AM 14  question before you respond so we can avoid talking over one

10:48:27AM 15  another.  We have a court reporter here that is taking down

10:48:30AM 16  everything, so this could be even more difficult for the court

10:48:33AM 17  reporter.  So if we ask you to repeat something, please repeat

10:48:35AM 18  it.  And then if you're having any difficulty with your audio,

10:48:39AM 19  let us know.

10:48:41AM 20      THE WITNESS:  Okay.  Thanks, Your Honor.

10:48:41AM 21      THE COURT:  All right.  You may proceed.

10:48:45AM 22      THE WITNESS:  Yeah, understood.

10:48:45AM 23      THE COURT:  You may proceed.

10:48:45AM 24  ///

10:48:47AM 25  ///

## LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

DIRECT EXAMINATION

10:48:47AM   1

10:48:47AM   2  BY MR. COLLINS:

10:48:48AM   3  Q.   Good morning, Ms. Kovach.

10:48:49AM   4       Can you hear me okay?

10:48:50AM   5  A.   Yes, I can.

10:48:51AM   6       Good morning.

10:48:51AM   7  Q.   And just so you know, the camera is facing me this way,

10:48:55AM   8  but you're on the screen this way.  So if I'm not looking

10:48:58AM   9  exactly at you, it doesn't mean I'm not paying attention to

10:49:01AM  10  you.  Okay?

10:49:02AM  11  A.   Okay.  Thank you.

10:49:04AM  12  Q.   Now that we're on the record, could you please just state

10:49:07AM  13  your name for the court reporter?

10:49:11AM  14  A.   Sure.  Loree Kovach.

10:49:13AM  15  Q.   And where do you work, Ms. Kovach?

10:49:17AM  16  A.   I'm a vice president at Epiq.

10:49:19AM  17  Q.   When did you begin at Epiq?

10:49:23AM  18  A.   I began at Epiq in 2018 when they acquired the company I

10:49:27AM  19  worked at previously.

10:49:28AM  20  Q.   And how long have you been the vice president at Epiq?

10:49:32AM  21  A.   Since I began in 2018.

10:49:35AM  22  Q.   As vice president, what is your role, just generally, or

10:49:39AM  23  briefly?

10:49:41AM  24  A.   So I'm a vice president of client services, which means I

10:49:44AM  25  oversee teams handling our project administration, so the

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

10:49:48AM 1  project management teams that are working directly with clients

10:49:51AM 2  are under my oversight.

10:49:54AM 3  **Q.**   And what has your role been in this particular case?

10:49:59AM 4  **A.**   In this particular case, I've overseen some of the

10:50:03AM 5  questions and our responses that have been raised with respect

10:50:05AM 6  to the reverse-lookup searches that have been conducted.

10:50:11AM 7  **Q.**   You previously provided information to the Court at the

10:50:13AM 8  last hearing.  I understand you weren't under oath, but you

10:50:16AM 9  provided information to the Court, correct?

10:50:19AM 10  **A.**   Correct.

10:50:20AM 11        THE COURT:  One moment.

10:50:22AM 12        Mr. Hara, not that we don't mind looking at you, but

10:50:26AM 13  I think it may be helpful during at least the presentation of

10:50:29AM 14  the testimony if you'd just disable your camera, and then you

10:50:33AM 15  can turn it back on after we're done with the testimony.

10:50:36AM 16        MR. HARA:  Very well, Your Honor.

10:50:37AM 17        THE COURT:  Thank you.

10:50:38AM 18        All right.  You may continue.

10:50:40AM 19        MR. COLLINS:  Thank you, Your Honor.

10:50:40AM 20  **Q.**   (By Mr. Collins)  Ms. Kovach, just asking you about what

10:50:43AM 21  you -- the information you provided at the last hearing on

10:50:46AM 22  June 13th, 2022, understanding again that you weren't

10:50:51AM 23  technically under oath, was that information or testimony

10:50:54AM 24  honest and truthful?

10:50:56AM 25  **A.**   Yes, it was.

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

10:50:57AM   1   **Q.**   And do you still stand by what you told the Court at the

10:51:00AM   2   last hearing?

10:51:02AM   3   **A.**   I do.

10:51:03AM   4   **Q.**   Is there anything you want to change about what you told

10:51:05AM   5   the Court at that last hearing?

10:51:08AM   6   **A.**   There is not.

10:51:12AM   7   **Q.**   Ms. Kovach, I know we're here talking about a couple of

10:51:16AM   8   reverse lookups, so I want to just ask you a couple of

10:51:18AM   9   questions about reverse lookups generally.  What is a reverse

10:51:25AM  10   lookup?

10:51:25AM  11   **A.**   A reverse lookup is when we're provided with phone numbers

10:51:30AM  12   and maybe fax numbers, landlines, cell phones, et cetera, and

10:51:35AM  13   we provide those phone numbers to a vendor who then attempts to

10:51:38AM  14   provide back to us ownership information, so the names and

10:51:42AM  15   addresses of individuals who owned those numbers either

10:51:45AM  16   currently or historically, and those vendors use their

10:51:51AM  17   proprietary databases to provide that information.

10:51:55AM  18   **Q.**   And at the June 13th, 2022 hearing, you told the Court and

10:51:59AM  19   the parties that reverse-lookup searches are questionable at

10:52:03AM  20   best.  Do you still understand reverse-lookup searches to be

10:52:05AM  21   questionable at best?

10:52:08AM  22   **A.**   Yeah.  I don't recall "questionable at best" was my actual

10:52:11AM  23   phrasing, but they are by no means perfect, so they are -- the

10:52:18AM  24   results are not always entirely accurate.

10:52:26AM  25   **Q.**   And why do you say they're not always entirely accurate?

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

10:52:33AM 1  **A.**   So the searches are usually designed to identify likely

10:52:36AM 2  owners of a phone number.  The vendors will always represent

10:52:43AM 3  that -- the vendors themselves don't represent anything about

10:52:46AM 4  the accuracy of the results.  So the results themselves --

10:52:52AM 5  there's no publicly available database that could tell with

10:52:58AM 6  complete certainty who owned a phone number during a particular

10:53:02AM 7  timeframe, whether that be now or historically.  So that's what

10:53:06AM 8  we mean by that.  Right?  There's no publicly available source

10:53:08AM 9  that can say that with certainty, and so the vendors compile

10:53:13AM 10 information from publicly available sources, but it's not with

10:53:16AM 11 certainty.  Right?  It's somebody that signed up for a

10:53:19AM 12 particular service that the vendor has access to, they can see

10:53:22AM 13 that person signed up with a phone number, that phone number

10:53:24AM 14 then gets registered in their database, but that doesn't mean

10:53:28AM 15 that the person, you know, even owns that number.  They could

10:53:30AM 16 have used someone else's number to sign up with that database.

10:53:32AM 17 **Q.**   So here we've done searches with TransUnion and

10:53:36AM 18 LexisNexis.  So just to make that specific to this case,

10:53:41AM 19 TransUnion doesn't represent that its results are accurate for

10:53:45AM 20 purposes of historically identifying the owner of a telephone

10:53:49AM 21 line or a fax line?

10:53:52AM 22 **A.**   So TransUnion has a search that is designed to identify

10:53:56AM 23 likely owners of a telephone number during a specified

10:54:01AM 24 timeframe.  The term that they use frequently when describing

10:54:04AM 25 the search is "likely," so that's not saying with certainty

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

10:54:07AM  1   that they're identifying those owners, but their search is

10:54:10AM  2   designed to identify likely owners of a number during a

10:54:13AM  3   particular timeframe.

10:54:14AM  4   Q.   But they don't represent that they actually have

10:54:16AM  5   identified the holder or owner of a fax line in this case as of

10:54:22AM  6   2009 or 2010, correct?

10:54:25AM  7   A.   Right.  Again, they say it's the likely owner.  So I don't

10:54:28AM  8   know what degree of certainty they have with their data, but

10:54:33AM  9   again there is no publicly available database that would

10:54:35AM 10   identify that with certainty.

10:54:36AM 11   Q.   You don't know what degree of accuracy their data has?

10:54:40AM 12   A.   No.  I think that in any circumstance, the numbers

10:54:45AM 13   themselves that we're providing would impact the accuracy.

10:54:50AM 14   Q.   But you don't know -- TransUnion has provided results here

10:54:55AM 15   of hits of names and addresses for the lines at issue in this

10:54:59AM 16   case, and you don't know what degree of accuracy those results

10:55:02AM 17   have, correct?

10:55:04AM 18   A.   Correct.  I don't know that.

10:55:05AM 19   Q.   And you don't know what degree of accuracy the LexisNexis

10:55:11AM 20   results have here for purposes of identifying the owners or

10:55:14AM 21   holders of a line in 2009 and 2010, correct?

10:55:18AM 22   A.   Correct.  Correct.

10:55:26AM 23   Q.   So -- and just to go through a little bit of that

10:55:28AM 24   background or history in this case, Epiq was originally tasked

10:55:33AM 25   by the Court as the settlement administrator with performing a

## LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

10:55:40AM 1  reverse-lookup search pursuant to the terms of the settlement

10:55:43AM 2  agreement.  Is that an accurate statement?

10:55:44AM 3  **A.**   Correct.

10:55:46AM 4  **Q.**   And you originally chose to use Epiq to run the

10:55:51AM 5  reverse-lookup search, that first search?

10:55:54AM 6           MR. GOOD:  TransUnion.

10:55:55AM 7           MR. COLLINS:  I'm sorry.  Thank you, all.  Let me

10:55:56AM 8  state that again for clarity.

10:55:58AM 9  **Q.**   (By Mr. Collins)  Epiq originally chose TransUnion to run

10:56:01AM 10 that first reverse-lookup search, correct?

10:56:04AM 11 **A.**   That is correct, yes.

10:56:05AM 12 **Q.**   And in particular, it was the batch legal product?

10:56:10AM 13 **A.**   Correct.  That is the product that TransUnion has that is,

10:56:14AM 14 they claim is designed to identify likely owners of a number

10:56:16AM 15 during a particular timeframe, which is what we were tasked

10:56:19AM 16 with doing here.

10:56:22AM 17 **Q.**   And that batch legal product includes compiled data from

10:56:29AM 18 many different sources, right?

10:56:32AM 19 **A.**   That's our understanding, yes.  That's how TransUnion

10:56:35AM 20 describes the product.

10:56:36AM 21 **Q.**   And my understanding, from what Epiq has told us outside

10:56:39AM 22 the hearing, is that it's up to 10,000 sources or more, right?

10:56:45AM 23 **A.**   That sounds correct, yeah.

10:56:49AM 24 **Q.**   Why did you choose TransUnion to conduct that search?

10:56:54AM 25 **A.**   TransUnion is the only vendor that we're aware of that has

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

10:56:57AM   1   a product that is specifically designed to identify owners of a

10:57:02AM   2   number during a particular timeframe.  Other vendors will tell

10:57:05AM   3   you that their products are not designed to identify owners

10:57:08AM   4   during a particular timeframe, they're designed to identify

10:57:12AM   5   current owners, and so they have to -- if they are trying to

10:57:16AM   6   identify owners during a particular timeframe, they have to

10:57:22AM   7   develop a proxy solution to do that.

10:57:23AM   8   Q.   So is the TransUnion batch legal product the industry

10:57:26AM   9   standard for this?

10:57:28AM  10   A.   Yes.

10:57:30AM  11   Q.   And based on your experience, is it the most reliable for

10:57:34AM  12   this purpose?

10:57:36AM  13   A.   I would say yes, based on my experience.

10:57:41AM  14   Q.   Now, here, TransUnion provided results for approximately

10:57:48AM  15   40,000 of the lines; is that right?

10:57:52AM  16   A.   Yes, that sounds right.

10:57:55AM  17   Q.   And you testified in the June hearing that that's not an

10:57:58AM  18   unexpected percentage, that's a relatively typical percentage.

10:58:02AM  19   Is that the case?

10:58:05AM  20   A.   Yeah, that's correct.

10:58:07AM  21   Q.   Why is --

10:58:07AM  22   A.   I think their response rate is about -- about 35 percent,

10:58:11AM  23   and that's a fairly common rate.

10:58:13AM  24   Q.   And why do you say that's common or a common rate?

10:58:19AM  25   A.   So it's just typical of the rate that -- response rate we

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

10:58:23AM 1  usually see when using the batch legal process.  We found that

10:58:27AM 2  when we're using a search like that that is more targeted to a

10:58:31AM 3  specific timeframe, the response rate is in that range -- or

10:58:35AM 4  the results rate is in that range.

10:58:38AM 5  Q.   Does the TransUnion batch legal product always produce the

10:58:43AM 6  largest number of results compared to other vendors?

10:58:47AM 7  A.   No.  It actually produces the smallest typically.

10:58:51AM 8  Q.   And does that mean it's an inferior product?

10:58:55AM 9  A.   No, not at all.  I think that the -- you know, I don't

10:59:00AM 10 have access to the database that any of these vendors use, so

10:59:03AM 11 this is really speculation, but because they have designed a

10:59:07AM 12 product to target specific timelines when no one else does, our

10:59:12AM 13 assumption is the lower number of results is due to the

10:59:16AM 14 precision of the product.

10:59:20AM 15 Q.   All right.  I believe at the June hearing you said, "The

10:59:23AM 16 batch legal product may produce a lower number of total

10:59:24AM 17 results, but we don't think that more results are better.  And

10:59:28AM 18 we" --

10:59:29AM 19 A.   Correct.

10:59:29AM 20 Q.   "And we believe that the TransUnion batch legal product on

10:59:33AM 21 its own produces the most accurate set of potential class

10:59:36AM 22 members."

10:59:37AM 23 A.   That's correct.

10:59:39AM 24 Q.   All right.  Did the TransUnion --

10:59:41AM 25 A.   And, again, that's because -- sorry.  And, again, that's

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

10:59:44AM 1   just because they are targeting a specific timeframe when no

10:59:48AM 2   other product can.  So just to clarify, it's the most accurate

10:59:51AM 3   in this circumstance -- right? -- where we are trying to target

10:59:55AM 4   owners during a particular timeframe.

10:59:56AM 5   **Q.**   So we talked earlier about how that TransUnion product has

11:00:00AM 6   10,000 plus sources.  Does the TransUnion results include

11:00:05AM 7   individuals?

11:00:09AM 8   **A.**   They do.

11:00:09AM 9   **Q.**   Does the TransUnion results include businesses and

11:00:14AM 10  entities?

11:00:15AM 11  **A.**   Yes.

11:00:16AM 12  **Q.**   How do you know that?

11:00:19AM 13  **A.**   Well, we looked at the results, you can see that some of

11:00:23AM 14  them, you know, are individuals by name, you can see that some

11:00:26AM 15  of them are businesses.  We did spot-checking of ones that

11:00:29AM 16  appeared to be businesses in advance of the last hearing and

11:00:33AM 17  were able to find, you know, matching businesses via Google,

11:00:37AM 18  you know, that matched what we were provided in the TransUnion

11:00:40AM 19  results.

11:00:41AM 20  **Q.**   Now, Mr. Good, the class counsel at the last hearing and

11:00:45AM 21  before you joined the Zoom today, said that you previously

11:00:48AM 22  testified there were only 300 businesses in the TransUnion

11:00:51AM 23  results.  Is that your testimony?

11:00:55AM 24  **A.**   No, that's not true.  We just did an approximation of

11:01:00AM 25  businesses we could identify based on some data analysis, so

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:01:04AM 1   just by name.  I don't have any way of saying with certainty

11:01:08AM 2   how many businesses are in the TransUnion results.  Somebody

11:01:11AM 3   could have a business fax number registered under a name, like

11:01:15AM 4   an individual first and last name, I would still consider that

11:01:18AM 5   a business fax number, so that's an example of what reason I

11:01:22AM 6   wouldn't know.  I also didn't read every line of results to see

11:01:27AM 7   which results appeared facially to be businesses.  So the 300

11:01:32AM 8   number is an approximation just some from quick data analysis

11:01:36AM 9   of things that we could look at programatically to try to

11:01:40AM 10  identify businesses.

11:01:41AM 11  **Q.**   But it's possible there are more business results because

11:01:42AM 12  they appear to be registered under an individual name rather

11:01:45AM 13  than a business name?

11:01:47AM 14  **A.**   Absolutely.  Not only possible, but likely.

11:01:50AM 15  **Q.**   In your experience, is it more likely for a small business

11:01:53AM 16  rather than a large business to have a line registered in an

11:01:56AM 17  individual name?

11:01:59AM 18  **A.**   I don't think I have experience sufficient to say one way

11:02:02AM 19  or the other.

11:02:04AM 20  **Q.**   Now, the TransUnion results produced up to 16 hits for a

11:02:08AM 21  given line.  Is that right?

11:02:11AM 22  **A.**   Yes, that's correct.

11:02:13AM 23  **Q.**   And for more than half of the lines for which TransUnion

11:02:17AM 24  had results, there was more than one name and address

11:02:20AM 25  associated with the line; is that correct?

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:02:24AM 1    A.   That's correct.

11:02:30AM 2    Q.   For any line with more than one name and address result,

11:02:34AM 3    there's no way to know from the data itself which of those

11:02:39AM 4    people or entities is the actual class member in this case,

11:02:44AM 5    right?

11:02:46AM 6    A.   That's correct.  Even if multiple people owned the fax

11:02:51AM 7    number during the timeframe, the TransUnion data doesn't tell

11:02:54AM 8    us who actually received the fax at issue.

11:02:58AM 9    Q.   And in fact, for the lines even for which TransUnion

11:03:05AM 10   provides only one name and address result, you can't say from

11:03:08AM 11   the data itself that that person or entity is in fact the class

11:03:14AM 12   member, right?

11:03:15AM 13   A.   Correct.  Again, the TransUnion data doesn't tell us who

11:03:23AM 14   received a fax, it just tells us likely owners during the

11:03:23AM 15   timeframe.

11:03:24AM 16   Q.   And it's possible that even if the TransUnion results have

11:03:28AM 17   one or more matches that the actual class member is not among

11:03:33AM 18   those matches, it could be somebody that's not in the results

11:03:36AM 19   at all, right?

11:03:39AM 20   A.   That's correct.  Again, because there is no publicly

11:03:41AM 21   available source out of owners of particular phone numbers.

11:03:47AM 22   Q.   Now, I believe you said at the last hearing, but I want to

11:03:50AM 23   make sure we get this right that --

11:03:51AM 24          THE COURT:  Counsel, before you go on.

11:03:53AM 25          Ms. Kovach, when we're talking about -- I want to

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:03:54AM 1   make sure it's clear when we talk about timeframe.  So was

11:04:01AM 2   TransUnion's search focusing on solely on 2009 and 2010?

11:04:06AM 3         THE WITNESS:  Yes, Your Honor, it was.

11:04:08AM 4         THE COURT:  All right.  Thank you.

11:04:10AM 5         You may continue.

11:04:10AM 6         MR. COLLINS:  Thank you, Your Honor.

11:04:10AM 7   Q.   (By Mr. Collins)  Now, at the last hearing, I believe you

11:04:14AM 8   said something along the lines of -- but I want to make sure we

11:04:17AM 9   get it right -- that outside the events of this case, or

11:04:20AM 10  obviously any Court-ordered agreement, Epiq wouldn't ordinarily

11:04:24AM 11  choose to supplement the results of TransUnion's reverse lookup

11:04:29AM 12  with another search with a different vendor.  Is that right?

11:04:34AM 13  A.   That's correct.  That's not a unilateral decision we would

11:04:37AM 14  typically make.

11:04:38AM 15      So normally, opposite scenarios where we're retained as

11:04:42AM 16  notice expert, which we were not here, Epiq's role is really to

11:04:46AM 17  conduct the notice program as defined in the settlement

11:04:50AM 18  agreement.  So we would run a search, as we did here, talk to

11:04:56AM 19  the parties about the results, and typically just proceed with

11:04:59AM 20  that type of notice and any other types of notice specified in

11:05:02AM 21  the settlement agreement.

11:05:03AM 22      If the parties -- typically outside of this scenario, if

11:05:07AM 23  the parties had concerns about the search results, we could

11:05:11AM 24  discuss options with them.  But there's not a scenario where

11:05:15AM 25  Epiq would unilaterally make a determination to run a second

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:05:19AM   1    search, absent direction from the Court or in the party

11:05:24AM   2    settlement agreement or upon discussion and agreement from and

11:05:26AM   3    with the parties.

11:05:27AM   4    Q.   And here, obviously, we're in a situation where the Court

11:05:31AM   5    asked you to run a second reverse lookup.  What company did

11:05:36AM   6    Epiq choose to do that second search?

11:05:39AM   7    A.   So Epiq ended up using LexisNexis to conduct the second

11:05:43AM   8    search.

11:05:44AM   9    Q.   And who else did you consider?

11:05:47AM  10    A.   So we also talked to two other vendors besides LexisNexis.

11:05:51AM  11    We spoke to PacificEast, and we spoke to Data Axle/InfoUSA;

11:05:59AM  12    that is one company.  I think they go by Data Axle for purposes

11:06:02AM  13    of their search product.

11:06:03AM  14    Q.   And why did you end up selecting LexisNexis?

11:06:08AM  15    A.   So PacificEast told us that their data did not -- it would

11:06:12AM  16    be unlikely to have many business results.  And our

11:06:15AM  17    understanding was a part of the direct reason for the direction

11:06:17AM  18    to conduct an additional search was the Court's concern about

11:06:20AM  19    the volume of business results in the TransUnion file, so then

11:06:27AM  20    that left us with InfoUSA/Data Axle and Lexis.

11:06:31AM  21         And both of those vendors told us that they were unable to

11:06:36AM  22    identify owners of a number during a particular timeframe, so

11:06:40AM  23    here in the 2009 to 2010 timeframe, that that was not what

11:06:40AM  24    their datasets were designed to do.  And each of them instead

11:06:46AM  25    proposed a proxy solution.

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:06:49AM 1       The proxy solutions were basically identical between the

11:06:53AM 2  two.  Each of them indicated that they would identify current

11:06:56AM 3  owners of the numbers and then look to see whether those

11:06:59AM 4  businesses were observed in their datasets during the 2009 and

11:07:05AM 5  2010 timeframe.  So essentially what they could do is tell you

11:07:07AM 6  that a company or a person owned the number now and was visible

11:07:11AM 7  in their datasets during the timeframe at issue here.  They

11:07:14AM 8  could not say that that person owned the number during that

11:07:17AM 9  time.

11:07:21AM 10      So we -- so since both of them had the same proxy

11:07:25AM 11 solution, we were able to run some sample records for each

11:07:29AM 12 vendor.  The Lexis results -- there were more results from

11:07:33AM 13 Lexis than there were from InfoUSA, and all of the InfoUSA

11:07:37AM 14 results were present in the results from Lexis, and so for that

11:07:41AM 15 reason we felt that the Lexis results would be more inclusive,

11:07:45AM 16 and we used that vendor.  Lexis is also a very well known, you

11:07:49AM 17 know, vendor, used very frequently in the claims administration

11:07:53AM 18 industry for various types of searches.

11:07:56AM 19 **Q.**   So I just want to make sure I understood some of the

11:07:58AM 20 things you said in that answer.

11:08:00AM 21      So the Lexis product or products that were ultimately used

11:08:04AM 22 in this case were not designed to identify the owners or

11:08:11AM 23 holders of these phone lines as of 2009/2010; is that right?

11:08:18AM 24 **A.**   Correct.

11:08:18AM 25 **Q.**   And Lexis doesn't represent or hold itself out to Epiq as

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:08:22AM  1  saying it is designed or it can identify the holders or owners

11:08:27AM  2  or subscribers of those lines as of 2009/2010, correct?

11:08:33AM  3  **A.**   That's correct.

11:08:40AM  4  **Q.**   And --

11:08:40AM  5          MR. COLLINS:  Your Honor, if I may, if we could pull

11:08:43AM  6  up Exhibit --

11:08:43AM  7          THE COURT:  Before you do, Ms. Kovach, explain to me

11:08:45AM  8  in the proxy solution -- I want to make sure I understand that.

11:08:49AM  9  What you indicated is they would just identify current owners

11:08:53AM  10 of the number, and then look in their databases to see if they

11:08:58AM  11 were reflected historically?  Would you elaborate a little bit

11:09:02AM  12 more on that.

11:09:02AM  13         THE WITNESS:  Correct.

11:09:04AM  14         Yeah.  So our understanding with both vendors is that

11:09:07AM  15 they are constantly taking what are essentially snapshots of

11:09:11AM  16 various publicly available datasets, and they compile those

11:09:16AM  17 into one big database that they use, their proprietary

11:09:19AM  18 databases.  And so when they're taking those snapshots, they

11:09:22AM  19 are recording the date that the snapshot is there.  And so if

11:09:25AM  20 they took a snapshot in 2009 and they see that business A

11:09:28AM  21 existed in 2009, that would be a data point that exists in

11:09:32AM  22 their system.

11:09:33AM  23         And so they have -- both vendors have what are called

11:09:38AM  24 like last seen dates.  I think Lexis uses the term "last seen."

11:09:41AM  25 I don't know if -- and "first seen."  And I don't know if Data

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:09:45AM 1   Axle uses the same term, but essentially the same concept.

11:09:48AM 2   So -- and then each vendor tokenizes entities and people in

11:09:53AM 3   their system.  So if a business changes names, it would still

11:09:57AM 4   sort of be able to be tied back to the same record throughout

11:09:59AM 5   the life of the dataset.

11:10:02AM 6          And so each vendor can say that the business that

11:10:06AM 7   owns a number today, they can look back through their dataset

11:10:09AM 8   and see historically the earliest date or various dates on

11:10:13AM 9   which that business or person were observed as their -- as they

11:10:19AM 10  combed the various public datasets.  So they record observation

11:10:22AM 11  dates.  So basically they can just say this business exists

11:10:25AM 12  today, it owns this number today.  In 2009, this business also

11:10:29AM 13  existed.  They cannot say that the business also owned the

11:10:33AM 14  number in 2009.

11:10:35AM 15         THE COURT:  Understood.  Thank you.

11:10:37AM 16         All right.  You wanted an exhibit pulled up?

11:10:40AM 17         MR. COLLINS:  Yes, please, Your Honor.  Unless -- I'm

11:10:42AM 18  happy to ask a few questions --

11:10:44AM 19         THE COURT:  No, that's fine.  Thank you.

11:10:45AM 20  Q.   (By Mr. Collins)  Just to stay on the same theme,

11:10:47AM 21  Ms. Kovach, so we don't go out of order, just on that proxy

11:10:51AM 22  solution, so -- to make sure that I understand as well.  So

11:10:54AM 23  the -- with the proxy solution, Lexis can identify whether a

11:11:01AM 24  business or entity was at some points or currently associated

11:11:08AM 25  with a phone number, and then determine if that business or

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:11:14AM 1  entity existed separately in 2009/2010.  Is that basically how

11:11:21AM 2  it works?

11:11:22AM 3  **A.**  That's correct.

11:11:23AM 4  **Q.**  But it doesn't identify or purport to identify whether the

11:11:28AM 5  business or entity actually held the line in 2009/2010?

11:11:34AM 6  **A.**  That's correct.

11:11:40AM 7        MR. COLLINS:  Your Honor, if you could please pull up

11:11:43AM 8  Exhibit 63.

11:11:52AM 9        THE COURT:  Is that a spreadsheet?

11:11:55AM 10       MR. COLLINS:  No, Your Honor.  It was the declaration

11:11:58AM 11  we submitted last night.

11:11:59AM 12       THE COURT:  Oh, just last night's declaration.

11:12:02AM 13       MR. COLLINS:  That's right.

11:12:03AM 14       And I have some hard copies as well if that would

11:12:05AM 15  help.

11:12:05AM 16       MR. GOOD:  Your Honor, before you pull this, the

11:12:07AM 17  plaintiffs would like to interpose an objection.

11:12:09AM 18       THE COURT:  All right.

11:12:09AM 19       MR. GOOD:  This was filed last night.  They're not

11:12:12AM 20  producing this witness for cross-examination, at this point

11:12:17AM 21  representing that they would, and we have no ability to

11:12:19AM 22  cross-examine this witness, and this is an evidentiary hearing

11:12:22AM 23  for which this testimony is being used.

11:12:24AM 24       THE COURT:  All right.  What's your response?

11:12:26AM 25       MR. COLLINS:  The response, Your Honor, is what we

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:12:29AM  1   did -- we sought the voluntary -- as Mr. Mester said, we sought

11:12:33AM  2   the voluntary compliance of LexisNexis through Ms. Kovach and

11:12:37AM  3   Epiq.  For whatever reason, they -- we did not receive the

11:12:41AM  4   information in order to be able to either contact them

11:12:43AM  5   voluntarily or subpoena them.

11:12:44AM  6            We issued the subpoena as soon as we could.  As

11:12:47AM  7   Mr. Mester said, we were provided the incorrect name of the

11:12:51AM  8   Lexis entity by -- that Epiq used by Epiq, and so we subpoenaed

11:12:55AM  9   the wrong party.  Nonetheless, Lexis' counsel contacted us and

11:13:00AM 10   was willing to provide this declaration.  We only received the

11:13:03AM 11   declaration as of 4:26 p.m. yesterday, provided it as soon as

11:13:09AM 12   we could.  Of course Mr. Good had every opportunity as well to

11:13:14AM 13   subpoena or seek Lexis to comply or show up at the hearing.

11:13:18AM 14   And at the end of the day, it speaks to facts, not any opinions

11:13:23AM 15   that are clearly relevant to issues before the Court.

11:13:26AM 16            THE COURT:  So what I'm to understand, though, is

11:13:27AM 17   you're seeking to examine Ms. Kovach on the declaration facts

11:13:33AM 18   identified in the declaration?

11:13:34AM 19            MR. COLLINS:  Ms. Kovach is familiar with the

11:13:36AM 20   declaration.  We provided it to her yesterday.  And I'm seeking

11:13:38AM 21   to examine her to the extent she agrees or it's her independent

11:13:42AM 22   knowledge.  I'm happy to ask the questions outside of that as

11:13:45AM 23   well, Your Honor.

11:13:46AM 24            THE COURT:  I think that's a more appropriate way to

11:13:48AM 25   proceed, is just ask her knowledge as to what the LexisNexis

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:13:53AM  1  does rather than submitting what is in the declaration for the

11:13:56AM  2  truth of the matter asserted if you're going to just seek the

11:14:00AM  3  testimony through Ms. Kovach as to her understanding of how the

11:14:03AM  4  process was done with LexisNexis.

11:14:05AM  5          Mr. Mester.

11:14:06AM  6          MR. MESTER:  I didn't mean to interrupt.  We will at

11:14:09AM  7  some point want to ask to introduce the declaration pursuant to

11:14:12AM  8  804 and 807, but we don't need to do it at this point.

11:14:17AM  9          THE COURT:  All right.  Let's proceed.

11:14:18AM  10         Mr. Good, anything else?  You're still standing.

11:14:21AM  11         MR. GOOD:  Your Honor, I just want to be clear here

11:14:23AM  12 on the timeline.  They sought this testimony, and in lieu of

11:14:27AM  13 the testimony they've now obtained a declaration which

11:14:31AM  14 precludes the plaintiffs from cross-examining the witness but

11:14:33AM  15 accomplishes their ends.

11:14:35AM  16         THE COURT:  I understand.

11:14:37AM  17         MR. GOOD:  Thank you, Your Honor.

11:14:38AM  18         THE COURT:  You may proceed.

11:14:40AM  19 Q.   (By Mr. Collins)  Ms. Kovach, just asking a few particular

11:14:42AM  20 questions about LexisNexis search product that you used.

11:14:45AM  21      So the LexisNexis search that Epiq obtained was using two

11:14:54AM  22 products of LexisNexis, correct?

11:14:58AM  23 A.   That's correct.  They created a custom search for us using

11:15:02AM  24 two of their products, one of which was designed to identify

11:15:05AM  25 businesses and the other to identify individuals.

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:15:08AM 1  **Q.**   And the LexisNexis products that were used are not

11:15:13AM 2  designed to identify the individuals or entities that are

11:15:18AM 3  associated with the numbers as of 2009/2010, right?

11:15:23AM 4  **A.**   That's correct.

11:15:24AM 5  **Q.**   And the LexisNexis products are not designed to identify

11:15:27AM 6  the individuals or entities or businesses that in fact received

11:15:32AM 7  a fax at issue on a particular line in 2009 and 2010, correct?

11:15:39AM 8  **A.**   That's correct.  I'm not aware of any vendor that can

11:15:42AM 9  identify who received a fax.

11:15:44AM 10 **Q.**   And the LexisNexis products do not actually identify the

11:15:47AM 11 class member who held or owned or subscribed to the line in

11:15:53AM 12 2009/2010, correct?

11:15:56AM 13 **A.**   They're not designed to identify that with certainty.  I

11:15:59AM 14 don't think it's fair to say that there are no people that

11:16:02AM 15 owned the fax number during 2009 and 2010 in the Lexis results.

11:16:09AM 16 **Q.**   Understood.

11:16:09AM 17       And as we talked about before, you don't know the

11:16:13AM 18 percentage or degree of accuracy of how many actual class

11:16:16AM 19 members are in those results, right?

11:16:18AM 20 **A.**   That's correct.

11:16:31AM 21 **Q.**   Is it your understanding -- or it is your understanding

11:16:34AM 22 that Lexis' data is not intended to be relied upon for the

11:16:40AM 23 accuracy or completeness of the data, right?

11:16:48AM 24 **A.**   My understanding is Lexis has language along those lines

11:16:54AM 25 in their terms and conditions.  I think it's up to the

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:16:58AM 1   recipient of the data of what they want to do with the data

11:17:01AM 2   provided.

11:17:01AM 3   **Q.**   But your understanding is that -- at least Lexis' position

11:17:05AM 4   is that the data cannot be relied upon for accuracy and

11:17:10AM 5   completeness, correct?

11:17:10AM 6   **A.**   That's correct.  Lexis does say that their data is not

11:17:14AM 7   without error.

11:17:15AM 8   **Q.**   And it's LexisNexis' position that the data provided in

11:17:20AM 9   this case should not be relied upon without independent

11:17:24AM 10  verification; is that right?

11:17:29AM 11  **A.**   So that's not a position that Lexis took directly with us

11:17:33AM 12  with respect to this data.  As I've said, there are terms and

11:17:37AM 13  conditions attached to their contracts, the terms and

11:17:44AM 14  conditions do have language in there about independent

11:17:47AM 15  verification, but it's not something that Lexis specifically

11:17:51AM 16  said with respect to this dataset to us.  Right?  It's a

11:17:54AM 17  contract term.

11:17:56AM 18  **Q.**   Well, you obtained this data from Lexis pursuant to your

11:18:01AM 19  contract with Lexis, correct?

11:18:03AM 20  **A.**   We did.

11:18:03AM 21  **Q.**   And we asked you for a copy of that contract, correct?

11:18:08AM 22  **A.**   Correct.  And our contract is confidential, so we were

11:18:10AM 23  unable to provide that to you.

11:18:12AM 24  **Q.**   So you -- Epiq declined to provide the contract to us,

11:18:16AM 25  right?

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:18:17AM 1   **A.**   That's correct.

11:18:19AM 2   **Q.**   And why is that contract confidential?

11:18:25AM 3   **A.**   Terms with our vendors would always be considered

11:18:28AM 4   confidential.

11:18:30AM 5   **Q.**   But the contract contains terms from LexisNexis under

11:18:36AM 6   which LexisNexis informs you that its data should not be relied

11:18:43AM 7   upon without independent verification, correct?

11:18:50AM 8   **A.**   That language is in their terms and conditions, yes,

11:18:53AM 9   that's correct.

11:18:55AM 10   **Q.**   And you --

11:18:55AM 11   **A.**   I just want to say that this is not a topic that comes up

11:19:00AM 12   when we're doing these searches typically.  But everybody who

11:19:03AM 13   is directing us to do searches typically understands that

11:19:06AM 14   they're not perfect.  I don't think anyone is ever assuming

11:19:11AM 15   that the results from any vendor are a hundred percent accurate

11:19:14AM 16   and should be relied on with a hundred percent certainty.

11:19:19AM 17   **Q.**   And I'm just getting, I think, a narrower point, which is,

11:19:23AM 18   Epiq commissioned and LexisNexis provided results in this case

11:19:31AM 19   pursuant to a contract under which LexisNexis has terms that

11:19:38AM 20   informed Epiq that those results should not be relied upon

11:19:42AM 21   without independent verification, correct?

11:19:44AM 22       MR. GOOD:  I'd like to object, Your Honor.  This line

11:19:48AM 23   of inquiry is about a confidential document which neither of us

11:19:52AM 24   have been able to see, and the witness has already --

11:19:54AM 25       THE COURT:  You don't need to object.  Let's move on.

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:19:57AM  1    The point has been made by the testimony that --

11:20:00AM  2         MR. COLLINS:  I'll move on.

11:20:01AM  3         THE COURT:  -- there's no certainty about any of this

11:20:03AM  4    information.  So the point's been made.

11:20:08AM  5    Q.   (By Mr. Collins)  And to date, the LexisNexis results that

11:20:12AM  6    have been provided in this case have not gone through some type

11:20:15AM  7    of independent verification, correct?

11:20:15AM  8         MR. GOOD:  Your Honor --

11:20:20AM  9         THE WITNESS:  That's correct.  I don't -- yeah,

11:20:22AM  10   that's correct.

11:20:23AM  11        THE COURT:  What's the objection?

11:20:25AM  12        MR. GOOD:  Form, vague.  I don't know what that's

11:20:28AM  13   referring to.

11:20:29AM  14        THE COURT:  All right.  Overruled.

11:20:32AM  15   Q.   (By Mr. Collins)  All right.  Ms. Kovach, LexisNexis first

11:20:51AM  16   provided results in this case in July of 2022; is that right?

11:20:56AM  17   A.   That's correct.

11:20:57AM  18   Q.   And did the LexisNexis results in July of 2022 provide all

11:21:03AM  19   of the matches or hits that Lexis had in its database?

11:21:08AM  20   A.   They did not.  So in consultation with Lexis, we capped

11:21:15AM  21   the number of results; that was based on advice from Lexis that

11:21:22AM  22   anything over the numbers that we capped at would not be likely

11:21:26AM  23   to lead to good results.  Lexis takes the position that their

11:21:31AM  24   last seen -- most recently last seen records are their better

11:21:35AM  25   records, and so we capped it at three from the business

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:21:41AM  1   database and one from the individual database.

11:21:45AM  2   **Q.**   I think, actually, didn't you keep it at two results from

11:21:48AM  3   the business database and one from the individual database?

11:21:53AM  4   **A.**   My apologies.  Yeah, that's correct.  So three in total.

11:21:55AM  5   **Q.**   I just wanted to make sure we had it clean on the record.

11:21:58AM  6        Did LexisNexis ever explain to Epiq the methodology or

11:22:16AM  7   basis for believing that up to three results were the best?

11:22:23AM  8   **A.**   So, again, they represented that their most recently seen

11:22:27AM  9   records are better, and so that was the purpose of the cap.

11:22:34AM 10   Right?  We were identifying the most recently seen records in

11:22:38AM 11   both databases, and their advice was any records past the cap

11:22:44AM 12   numbers the two and the one, would be less valuable than the

11:22:48AM 13   ones that we capped it at because they were not the most

11:22:52AM 14   recently seen records.  So this "most recently seen" concept is

11:22:57AM 15   sort of their basis for valuing their records.

11:23:02AM 16   **Q.**   Do you have an understanding of why "most recently seen"

11:23:07AM 17   is a better way to identify the hits in the context of trying

11:23:12AM 18   to identify class members as of 2009/2010?

11:23:18AM 19   **A.**   I do not.  We relied on our vendor's representation about

11:23:23AM 20   which of their records are most likely to be accurate, and so

11:23:25AM 21   we went with the "last seen" methodology that they recommended.

11:23:38AM 22   **Q.**   Did TransUnion impose any cap on its results?

11:23:43AM 23   **A.**   They did not.  But, again, Lexis did not impose a cap

11:23:47AM 24   unilaterally here.  They advised us, and we made the

11:23:51AM 25   determination based on their advice.  TransUnion's product

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:23:55AM 1  is -- again, it wasn't a custom search like we designed for

11:23:58AM 2  Lexis -- with Lexis.  TransUnion just gave us all results

11:24:02AM 3  available for the phone numbers we provided.

11:24:04AM 4  **Q.**   Understood.  And to go back to that, I guess the broader

11:24:08AM 5  point is, whether the results from Lexis are capped results or

11:24:11AM 6  whether the results from Lexis are the uncapped results, these

11:24:15AM 7  are all results as -- I think as you said before, from

11:24:18AM 8  databases that were not designed to identify historic

11:24:21AM 9  associations in any case, right?

11:24:24AM 10  **A.**   That's correct.

11:24:34AM 11  **Q.**   And the TransUnion results had over 6,000 lines that had

11:24:39AM 12  more than three results?  Is that your understanding?

11:24:46AM 13  **A.**   I don't have the dataset in front of me, but that sounds

11:24:50AM 14  accurate.

11:24:50AM 15  **Q.**   And the TransUnion results had up to 16 results per line?

11:24:56AM 16  **A.**   That's my understanding, yes.

11:25:02AM 17  **Q.**   And after -- well, in August, then, Epiq asked LexisNexis

11:25:09AM 18  to provide the uncapped results, or the results without the

11:25:14AM 19  limit of three, correct?

11:25:18AM 20  **A.**   That's correct.  At your request, we asked Lexis to

11:25:20AM 21  provide all results available from their databases via their

11:25:26AM 22  proxy solution.  So, again, this was them identifying current

11:25:30AM 23  owners and then limiting the results only to businesses that

11:25:34AM 24  were seen in their records between 2009 and 2010 -- I'm sorry,

11:25:38AM 25  businesses and individuals that were seen between 2009 and

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:25:42AM  1   2010.

11:25:44AM  2   Q.   And was it reasonable to ask for the uncapped results?

11:25:50AM  3   A.   Certainly.

11:25:50AM  4   Q.   And --

11:25:50AM  5   A.   I don't -- yeah.  But?

11:25:57AM  6   Q.   Neither the parties, nor the Court asked for the capped in

11:25:57AM  7   the first place, correct?

11:26:01AM  8   A.   That's correct.  But I think we were directed to use our

11:26:04AM  9   best judgment to select a vendor, and we took that to include

11:26:07AM  10  creating the right search.  We relied on our vendor's

11:26:11AM  11  recommendations what the right search would be and the search

11:26:17AM  12  designed to yield the best results.

11:26:19AM  13  Q.   So essentially you relied on LexisNexis' representation as

11:26:23AM  14  to what was best?

11:26:26AM  15  A.   We did.

11:26:28AM  16  Q.   And you don't have an understanding of the methodology or

11:26:33AM  17  the statistical data that LexisNexis relied upon to reach that

11:26:40AM  18  conclusion that up to three was best, right?

11:26:45AM  19  A.   I do not, no.

11:26:47AM  20  Q.   And the LexisNexis uncapped results, then they had up to

11:26:53AM  21  19 hits per line; is that right?

11:26:56AM  22  A.   I'm going to have to take your word for that one.  I

11:26:58AM  23  didn't really review the uncapped data results myself.

11:27:02AM  24  Q.   Is there any way to know from the data which of the names

11:27:08AM  25  or entities in the LexisNexis results is a class member?

## LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:27:15AM  1  **A.**    No.   Again, the class membership is defined by having

11:27:19AM  2  received a fax, and none of the datasets that we have been able

11:27:23AM  3  to obtain can identify who received a fax.

11:27:26AM  4  **Q.**    And is there any way to know from the LexisNexis data

11:27:29AM  5  which of the names or entities held or subscribed to the line

11:27:36AM  6  in 2009 and 2010?

11:27:39AM  7  **A.**    Not with certainty from the data alone.   Right?   As

11:27:43AM  8  indicated previously, the datasets are designed to identify

11:27:46AM  9  likely owners via a proxy solution.   So, again, I don't think

11:27:50AM 10  it's accurate to say that there are no owners of those numbers

11:27:54AM 11  in the Lexis dataset.   But can I say with certainty who are the

11:28:01AM 12  actual owners?   No.   That's not publicly available information,

11:28:03AM 13  so no vendor can provide that.

11:28:04AM 14  **Q.**    Nor can you say the Lexis results -- the likelihood that

11:28:08AM 15  the class members are in the results, correct?

11:28:11AM 16  **A.**    Correct.

11:28:13AM 17  **Q.**    Because I think you said that the LexisNexis database was

11:28:16AM 18  designed to find the likely owners.   But were you talking about

11:28:20AM 19  the TransUnion database as opposed to the Lexis database?

11:28:25AM 20  **A.**    Not that their database was designed to find likely

11:28:29AM 21  owners, that their proxy solution was designed to find likely

11:28:32AM 22  owners, in their terms.   So this is the best search they could

11:28:35AM 23  provide given the structure of their databases.

11:28:44AM 24  **Q.**    But that doesn't change anything you've said so far about

11:28:47AM 25  the purpose of Lexis' results, correct, and the Lexis

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:28:51AM  1  databases?

11:28:55AM  2  **A.**   So the purpose of the Lexis databases is not to identify

11:28:58AM  3  historical owners.  I don't know what specifically with respect

11:29:03AM  4  to the purpose of their results you're asking about.

11:29:07AM  5  **Q.**   And I asked the question earlier about the LexisNexis

11:29:09AM  6  results.  But has Epiq, to date, done anything to independently

11:29:14AM  7  verify any of the results in the TransUnion data?

11:29:21AM  8  **A.**   No.  I don't -- absent a notice program and a claims

11:29:23AM  9  process, I don't know what independent verification would look

11:29:27AM  10  like.  That's not an issue that typically is raised with

11:29:31AM  11  respect to using the results from any sort of reverse lookup.

11:29:36AM  12  **Q.**   I just want to cover one other topic on the LexisNexis

11:29:40AM  13  results.  So after Epiq provided the capped and uncapped

11:29:46AM  14  LexisNexis results to the parties, we raised the discrepancy

11:29:52AM  15  with you between those two results.  Do you recall that?

11:29:57AM  16  **A.**   Yes.

11:29:58AM  17  **Q.**   And, in particular, we noticed that at least 128 lines in

11:30:04AM  18  the uncapped results had fewer results than in the capped

11:30:09AM  19  results.  Is that your understanding?

11:30:13AM  20  **A.**   Yes.

11:30:14AM  21  **Q.**   Did -- and is it reasonable to expect that the uncapped

11:30:20AM  22  results would include all of the capped results plus any more

11:30:24AM  23  above three if they exist in the LexisNexis database?

11:30:29AM  24  **A.**   I think that's reasonable, but also the database is -- our

11:30:33AM  25  understanding is the database is constantly evolving, so

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:30:37AM  1  information is being updated or added to.  So in this instance,

11:30:44AM  2  Lexis did not have a specific answer with respect to the

11:30:51AM  3  hundred-plus records that you called out, but after internal

11:30:55AM  4  discussions, they informed us that the likely reason for the

11:30:58AM  5  difference was just due to the ongoing, constant updates and

11:31:03AM  6  changes to their dataset.

11:31:07AM  7  Q.   So LexisNexis took the position that at least that one

11:31:12AM  8  discrepancy was likely due to the fact that the capped results

11:31:15AM  9  were run in 2009 and the uncapped results were run in August

11:31:20AM 10  and that there were updates in the database in that month?

11:31:24AM 11  A.   I think you meant to say the capped results are run in

11:31:28AM 12  July of 2020, not 2009.

11:31:30AM 13  Q.   Yeah.  Let me try that again.

11:31:32AM 14  A.   And the uncapped results -- yeah.

11:31:32AM 15  Q.   So LexisNexis --

11:31:34AM 16  A.   Go ahead.

11:31:36AM 17  Q.   -- took the position that that discrepancy was due to the

11:31:38AM 18  capped results being run in July of 2022, and the uncapped

11:31:41AM 19  results being run in August 2022, and there would be updates in

11:31:47AM 20  the Lexis --

11:31:48AM 21  A.   Correct.

11:31:48AM 22  Q.   -- database in that month?

11:31:50AM 23  A.   Correct.  Their representation was that the change was

11:31:52AM 24  likely due to updates that occurred between when the first and

11:31:55AM 25  second searches were run.

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:31:57AM 1   **Q.**   So your understanding is that -- at least from Lexis, that

11:32:03AM 2   there were somehow updates in the past month that would change

11:32:07AM 3   the association for at least some number of lines as of

11:32:12AM 4   2009/2010.  Is that correct?

11:32:19AM 5   **A.**   Yes, that's correct.

11:32:35AM 6   **Q.**   So when we combine the TransUnion and LexisNexis results,

11:32:42AM 7   I believe we now have about 218,000 names and addresses -- or

11:32:46AM 8   names and/or addresses?  Is that your understanding?

11:32:50AM 9          THE COURT:  Say that one more time.

11:32:52AM 10  **Q.**   (By Mr. Collins)  When we combine the Lexis and TransUnion

11:32:55AM 11  results, we now have approximately 218,000 hits.

11:33:03AM 12         THE COURT:  Thank you.

11:33:05AM 13         THE WITNESS:  That sounds roughly right.  We haven't

11:33:08AM 14  conducted a full data analysis to combine the two result sets

11:33:13AM 15  and deduped them, et cetera, so I don't think I can say with

11:33:16AM 16  certainty, but that doesn't sound like an unreasonable

11:33:19AM 17  estimate.

11:33:19AM 18  **Q.**   (By Mr. Collins)  And once we have those aggregated

11:33:22AM 19  results, can you say accurately or reliably which name in the

11:33:27AM 20  hits is in fact associated with a particular line as of

11:33:33AM 21  2009/2010?

11:33:34AM 22         MR. GOOD:  Objection.  Asked and answered.

11:33:36AM 23         THE COURT:  Overruled.  You can answer that again.

11:33:41AM 24         THE WITNESS:  Well, so you say "associated."  Do you

11:33:43AM 25  mean owners, or do you mean -- I mean, the vendors are

**LOREE KOVACH - DIRECT EXAM BY MR. COLLINS**

11:33:45AM  1  representing that these people are associated with these

11:33:47AM  2  numbers, that's an undefined term, I think.

11:33:51AM  3  **Q.**   (By Mr. Collins)  Fair enough.

11:33:52AM  4       Can you accurately or reliably say which name in the

11:33:55AM  5  aggregated results is the class member in this case that held

11:33:59AM  6  the line in 2009 or 2010?

11:34:04AM  7  **A.**   No.  Again, none of the results purport to represent who

11:34:07AM  8  received a fax, which I think is a key component of class

11:34:10AM  9  membership.

11:34:15AM 10  **Q.**   Okay.  But putting aside whether they received a fax or

11:34:18AM 11  not, you can't reliably or accurately say which name or

11:34:26AM 12  address -- which name was the class member that held the line

11:34:31AM 13  in 2009 or 2010, right?

11:34:34AM 14  **A.**   That's correct.  Not with certainty.

11:34:41AM 15  **Q.**   And can you say with any accuracy or reliability how many

11:34:46AM 16  of the class members are not identified in the aggregated

11:34:50AM 17  TransUnion and LexisNexis results?

11:34:57AM 18  **A.**   I mean, aside from the numbers, there were -- no result

11:35:00AM 19  was returned at all, no.  We can't say how many are not class

11:35:04AM 20  members.

11:35:23AM 21       MR. COLLINS:  Your Honor, I think I may be close to

11:35:25AM 22  done.  If you can indulge me just one minute.

11:35:28AM 23       THE COURT:  Yes.

11:35:29AM 24     (Off-the-record discussion between Mr. Collins and

11:35:36AM 25      Mr. Mester.)

LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:36:09AM 1      MR. COLLINS:  Just two questions, Your Honor.

11:36:10AM 2      THE COURT:  Please.

11:36:10AM 3  Q.   (By Mr. Collins)  Ms. Kovach, the first question is, is a

11:36:17AM 4  more accurate way to try to find the owner or holder of a line

11:36:22AM 5  historically to subpoena or otherwise get information from

11:36:28AM 6  telephone companies like Verizon or AT&T?

11:36:35AM 7  A.   More accurate than a reverse lookup?

11:36:38AM 8  Q.   Correct.

11:36:39AM 9  A.   Yeah.  I mean, I think the actual owners of the business

11:36:43AM 10 records would have more accurate results than a vendor that's

11:36:46AM 11 just compiling publicly available data sources.

11:36:51AM 12 Q.   And you mentioned earlier that reverse-lookup vendors like

11:36:56AM 13 TransUnion and Lexis are proprietary databases that compile

11:37:02AM 14 data from various sources, correct?

11:37:04AM 15 A.   Correct.

11:37:05AM 16 Q.   Those vendors don't disclose -- let me start that over.

11:37:12AM 17 Those vendors, including LexisNexis and TransUnion, don't

11:37:15AM 18 disclose the actual sources and methods they use to create

11:37:19AM 19 their databases, correct?

11:37:21AM 20 A.   Not to my knowledge, no.

11:37:24AM 21      MR. COLLINS:  Nothing further, Your Honor.

11:37:25AM 22      THE COURT:  All right.  Thank you.

11:37:26AM 23      Before cross-examination, Ms. Kovach, I have some

11:37:30AM 24 questions.  You may not have this information, so if you don't,

11:37:33AM 25 just let me know.

## LOREE KOVACH - DIRECT EXAM BY MR. COLLINS

11:37:35AM  1          THE WITNESS:  Sure.

11:37:36AM  2          THE COURT:  Can you tell me how many total numbers

11:37:38AM  3   were associated with identifications just through the

11:37:41AM  4   TransUnion reverse lookup?

11:37:47AM  5          THE WITNESS:  How many total numbers had results

11:37:49AM  6   through the TransUnion lookup?  I believe we had about 29,000

11:37:56AM  7   or 30,000.  I don't have the exact number in front of me, but I

11:37:59AM  8   think it is on the record somewhere.

11:38:02AM  9          MR. GOOD:  Your Honor, if I might point to her

11:38:05AM 10   declaration.

11:38:06AM 11          THE COURT:  All right.  Why don't you -- if you want

11:38:07AM 12   to examine her with that, that would be helpful.  I don't have

11:38:10AM 13   a problem --

11:38:10AM 14          MR. GOOD:  Well, I can do that after --

11:38:13AM 15          THE COURT:  Well, then after you're done with your

11:38:13AM 16   cross, I'll ask you to do that.  So whoever is going to do the

11:38:17AM 17   cross for plaintiffs' counsel, and then I'll recognize the

11:38:19AM 18   intervenor after that.

11:38:21AM 19          MR. GOOD:  I actually spoke to intervenors' counsel.

11:38:23AM 20   If it's okay, intervenors' counsel is going to go first.

11:38:25AM 21          THE COURT:  All right.

11:38:27AM 22          MR. PIPER:  If that's what Your Honor --

11:38:29AM 23          THE COURT:  No.  That's fine.

11:38:30AM 24          MR. PIPER:  And I haven't discussed what I'm going to

11:38:32AM 25   do with plaintiffs' counsel.

**LOREE KOVACH - CROSS-EXAM BY MR. PIPER**

11:38:33AM   1          THE COURT:  All right.  No.  That's fine.  Go ahead,

11:38:36AM   2   Mr. Piper.

11:38:36AM   3          MR. PIPER:  Thank you.

11:38:38AM   4                      CROSS-EXAMINATION

11:38:38AM   5   BY MR. PIPER:

11:39:02AM   6   Q.   Good morning, Ms. Kovach.  My name's Jonathan Piper.  I

11:39:06AM   7   represent some putative class members that are not involved in

11:39:11AM   8   the settlement.  My firm, Bock Hatch, and your firm, Epiq, have

11:39:17AM   9   worked together in the past in other cases, but I don't know

11:39:19AM  10   you, so that's who I am.  And --

11:39:23AM  11   A.   Good morning, Mr. Piper.

11:39:26AM  12   Q.   -- there's a camera this way, and you're this way, so if

11:39:29AM  13   I'm looking off to the side, it's because I'm looking at you.

11:39:32AM  14          So in addition to doing what you're doing here, which is

11:39:36AM  15   trying to implement notice plans that somebody else has agreed

11:39:42AM  16   to, does Epiq also provide a service where it designs its own

11:39:48AM  17   notice plans and recommends them?

11:39:51AM  18   A.   We do.  So we weren't engaged to provide that service

11:39:55AM  19   here, but if parties do want to engage us for that, we have a

11:39:59AM  20   notice expert, his name is Cameron Azari.  He's been certified

11:40:04AM  21   as an expert under appropriate evidentiary standards by various

11:40:07AM  22   courts across the country.  And so he would typically work with

11:40:10AM  23   the parties to design a notice program that had appropriate

11:40:13AM  24   reach and frequency to satisfy due process standards.

11:40:17AM  25   Q.   Thank you.  And that was a great answer.

## LOREE KOVACH - CROSS-EXAM BY MR. PIPER

11:40:19AM 1   And we haven't discussed your testimony before, correct?

11:40:24AM 2  **A.**   That's correct, we have not.

11:40:26AM 3  **Q.**   And if, instead, the parties -- if Judge Porcelli told you

11:40:30AM 4  he wanted Epiq to propose a couple of notice plans that Epiq

11:40:35AM 5  thinks would be the best practicable notice that could be sent

11:40:39AM 6  to get to the most class members in this case, is that

11:40:42AM 7  something Epiq could do?

11:40:46AM 8  **A.**   It's something Epiq could do.  I personally wouldn't be

11:40:48AM 9  the person to do that.  So, again, we would use our notice

11:40:51AM 10  expert to do that since he's the one that's been qualified to

11:40:54AM 11  provide that type of opinion.  But, yes, that is a service that

11:40:58AM 12  Epiq can provide.

11:40:59AM 13  **Q.**   And that's not a service that Mr. Mester or the Buccaneers

11:41:05AM 14  have asked you to perform at this point, correct?

11:41:08AM 15  **A.**   That's correct.  No one has asked us to provide expert

11:41:11AM 16  notice services in this case.

11:41:12AM 17  **Q.**   Not the plaintiffs either, Mr. Good's clients.

11:41:16AM 18  **A.**   Correct.  The plaintiffs have not asked for that either.

11:41:18AM 19  **Q.**   Are you familiar with the term "reach" used in the context

11:41:24AM 20  of class action notice?

11:41:27AM 21  **A.**   I am.

11:41:28AM 22  **Q.**   And that's a marketing term; is that correct?

11:41:34AM 23  **A.**   It originated as a marketing term, yes.

11:41:37AM 24  **Q.**   And what does reach mean in the class action notice

11:41:40AM 25  context?

LOREE KOVACH - CROSS-EXAM BY MR. PIPER

11:41:42AM 1 **A.**    So I can generally answer that question, but, again, I

11:41:46AM 2 just want to clarify that I am not a notice expert, so I'm

11:41:49AM 3 technically not qualified to really speak to reach and

11:41:51AM 4 frequency in any degree of detail.  I just want to go on record

11:41:56AM 5 as saying that before I answer the question.

11:41:58AM 6 **Q.**    Sure.

11:41:59AM 7 **A.**    So reach basically refers to the percentage of the class

11:42:04AM 8 that a particular notice campaign is able to reach.  So the

11:42:10AM 9 percentage of the class that sees the notice via whatever

11:42:14AM 10 method the notice is effectuated, whether that be mail,

11:42:18AM 11 publication, or some other form.

11:42:20AM 12 **Q.**    And that -- and is reach one of the subjects that as a

11:42:25AM 13 notice expert Mr. Azari provides opinions about if he's

11:42:31AM 14 directed to do that?

11:42:33AM 15 **A.**    That's correct.

11:42:37AM 16 **Q.**    And neither the Buccaneers nor the plaintiffs have asked

11:42:41AM 17 you to provide a reach opinion at this hearing today, correct?

11:42:47AM 18 **A.**    That's correct.  And had they asked me, I would, again,

11:42:50AM 19 not be qualified to do so.

11:42:55AM 20 **Q.**    But if Judge Porcelli directed Epiq to provide an opinion

11:42:59AM 21 about reach, about this notice plan or any of the ones, or

11:43:04AM 22 about one that Epiq came up with, Mr. Azari could do that,

11:43:10AM 23 correct?

11:43:10AM 24 **A.**    That's correct.

11:43:23AM 25 **Q.**    Are you familiar with a 2010 document of the Federal

**LOREE KOVACH - CROSS-EXAM BY MR. PIPER**

11:43:32AM  1   Judicial Center called the Judges' Class Action Notice and

11:43:42AM  2   Claims Process Checklist and Plain Language Guide?

11:43:42AM  3   **A.**    So I'm generally familiar with the FJC guidelines.  If

11:43:46AM  4   you're going to ask me any questions with specificity, it's

11:43:49AM  5   been a while since I reviewed any of the documentation.

11:43:52AM  6   **Q.**    Well, I'm not, but I just want to know if that's something

11:43:55AM  7   that people in your industry, class action administration,

11:43:58AM  8   refer to for guidance?

11:44:02AM  9   **A.**    Yes, we do.

11:44:07AM  10  **Q.**    So here we have a notice plan that includes direct mail

11:44:11AM  11  and newspaper publication components and possibly faxes.  Is

11:44:18AM  12  that your understanding?

11:44:21AM  13  **A.**    Yeah, that's my understanding.  I think it depends on what

11:44:26AM  14  Judge Porcelli ultimately orders here.

11:44:33AM  15  **Q.**    Would it be fair to say that if we just go with the

11:44:36AM  16  TransUnion numbers, the maximum reach for that direct mailing

11:44:43AM  17  would be the percentage of the class for which TransUnion gave

11:44:48AM  18  you mailing addresses to send to.

11:44:56AM  19  **A.**    So I -- just to make sure I'm understanding your question,

11:44:59AM  20  you're telling me -- or you're asking if the reach would be the

11:45:03AM  21  percentage of the class for whom we have -- for whom we have

11:45:07AM  22  addresses from TransUnion.

11:45:11AM  23       So a couple things just to clarify that.  As we've

11:45:13AM  24  discussed earlier, we don't know with certainty how many people

11:45:17AM  25  in the TransUnion dataset are class members, so from a reach

LOREE KOVACH - CROSS-EXAM BY MR. PIPER

11:45:20AM  1   perspective, you know, it wouldn't just be a straight

11:45:25AM  2   percentage of people for whom we have addresses.

11:45:27AM  3       And then also -- again, clarifying that I'm not an

11:45:31AM  4   expert -- reach and mailed notice would also take into account

11:45:34AM  5   how many notices were ultimately deliverable.  So we assume

11:45:38AM  6   something that wasn't returned to us as undeliverable was

11:45:42AM  7   delivered.  I couldn't say with certainty now, having not

11:45:45AM  8   conducted any mailings, even how many mailings were not -- you

11:45:49AM  9   know, how many mailings would ultimately be delivered.  So I

11:45:51AM  10  think it's sort of speculative to try to define what reach

11:45:55AM  11  would be just based on the TransUnion set now.

11:45:58AM  12  Q.   So in other words, whatever percentage they got hits for,

11:46:04AM  13  you'd have to discount for undeliverable mail.  Is that one of

11:46:10AM  14  the things you're pointing out?

11:46:12AM  15  A.   It's one of the things.  You would discount for

11:46:15AM  16  undeliverable mail.  You'd discount for non-class members.

11:46:20AM  17  Right?  So we're not saying a hundred percent of the results

11:46:23AM  18  provided by TransUnion are certainly class members.

11:46:27AM  19  Q.   And that would reduce the percentage of reach below the

11:46:30AM  20  number of hits, correct?

11:46:35AM  21  A.   Again, I'm not an expert, so I can't specifically say --

11:46:41AM  22  speak to reach and exactly how that's calculated in the legal

11:46:45AM  23  context.  So, again, we would be speculating to talk about it

11:46:50AM  24  at this point.

11:46:51AM  25  Q.   Well, the only point I'm trying to make is if you discount

LOREE KOVACH - CROSS-EXAM BY MR. PIPER

11:46:53AM 1  for the inaccuracies in the TransUnion results, that's not

11:46:58AM 2  going to make the reach go up, it's going to make the reach go

11:47:02AM 3  down, right?

11:47:03AM 4  **A.**    Correct.

11:47:10AM 5  **Q.**    Now, the notice plan in this case also calls for

11:47:13AM 6  publication two Sundays each in the Tampa Bay Times, Sarasota

11:47:21AM 7  Herald Tribune, and the Gainesville Sun.  You haven't estimated

11:47:25AM 8  reach for any of those -- for those six newspaper prints,

11:47:29AM 9  correct?

11:47:32AM 10 **A.**    No.  My understanding is that only occurs at

11:47:35AM 11 Judge Porcelli's direction.  So -- but, no, we have not

11:47:38AM 12 estimated reach for any of that.

11:47:38AM 13 **Q.**    Have you looked --

11:47:40AM 14 **A.**    That's not typically something we would do, absent us

11:47:43AM 15 providing a notice plan.

11:47:46AM 16 **Q.**    Have you done any research on those three newspapers in

11:47:50AM 17 terms of their Sunday circulation?

11:47:54AM 18 **A.**    No.

11:48:02AM 19 **Q.**    Now, in the notice plans, it designs -- Epiq also

11:48:09AM 20 sometimes includes Internet banner ads, the kind of pop-ups or

11:48:15AM 21 ads you might see if you do a Google search or go on Yahoo,

11:48:20AM 22 correct?

11:48:20AM 23 **A.**    Yeah, that's correct.  That's something we include in

11:48:23AM 24 notice plans on other cases.

11:48:28AM 25 **Q.**    And in fact, one of the main changes in the world since

LOREE KOVACH - CROSS-EXAM BY MR. PIPER

11:48:32AM   1   that 2010 Federal Judicial Center document is that Internet

11:48:40AM   2   advertising has become a much bigger deal in the advertising

11:48:44AM   3   world, correct?

11:48:47AM   4   A.   I mean, I don't know the percentage at which

11:48:53AM   5   advertising -- Internet advertising has increased since 2010,

11:48:56AM   6   but I think it's probably safe to say it's more prevalent.

11:49:00AM   7   Q.   And is it safe -- have you been working in class action

11:49:03AM   8   administration before you came to Epiq?

11:49:08AM   9   A.   Yes.  I've been working in class action administration for

11:49:11AM  10   about 18 years.

11:49:13AM  11   Q.   And Internet advertising has become a more prominent

11:49:17AM  12   feature in class action notice over those 18 years, correct?

11:49:22AM  13   A.   Yes, that's correct.

11:49:26AM  14   Q.   Are you aware that in 2018, the Federal Rules of Civil

11:49:32AM  15   Procedure 23 was amended to reflect these new technology and

11:49:37AM  16   allow notice by electronic means?

11:49:42AM  17   A.   Yes.  I think the specific update related to email notice

11:49:46AM  18   as a viable form of notice.

11:50:00AM  19   Q.   I emailed you a couple of exhibits, one was -- there were

11:50:04AM  20   two declarations.  Did you have a chance to look at those?

11:50:08AM  21   A.   I did.

11:50:09AM  22   Q.   Okay.  One was my declaration that attached some banner

11:50:14AM  23   ads from your website.  Do you recall that?

11:50:18AM  24   A.   I do.

11:50:19AM  25   Q.   And did you recognize those were banner ads that Epiq was

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

11:50:23AM   1   involved in; is that correct?

11:50:26AM   2   A.   Yes.  I mean, if they're from our website, they are cases

11:50:29AM   3   that we were involved in.  I don't know that I specifically saw

11:50:32AM   4   them being published at the time they were actually published

11:50:35AM   5   live, but, yes, the banner ads on our website are

11:50:38AM   6   representative of ads that we have used in prior cases.

11:50:47AM   7   Q.   Have you ever done any notice work that included notice by

11:50:51AM   8   fax?

11:50:55AM   9   A.   Yes.  Epiq has overseen cases that included notice by fax.

11:51:14AM  10           MR. PIPER:  Your Honor, I think that's all I have at

11:51:16AM  11   this point.

11:51:17AM  12           THE COURT:  All right.  Mr. Piper, thank you.

11:51:19AM  13           MR. PIPER:  I'll just reserve -- I don't know what

11:51:22AM  14   Mr. Good is --

11:51:23AM  15           THE COURT:  Yep.

11:51:27AM  16           All right.  Mr. Good.

11:51:28AM  17           MR. GOOD:  Thank you, Your Honor.

11:51:29AM  18                        CROSS-EXAMINATION

11:51:29AM  19   BY MR. GOOD:

11:51:38AM  20   Q.   Just a quick housekeeping matter before I start,

11:51:42AM  21   Ms. Kovach.

11:51:42AM  22        For either the TransUnion or LexisNexis lists, has the

11:51:48AM  23   NCOA lookup been performed yet?

11:51:52AM  24   A.   Not to my knowledge, no.

11:51:55AM  25   Q.   Thank you.

## LOREE KOVACH - CROSS-EXAM BY MR. GOOD

11:52:04AM 1    For today's evidentiary hearing, are you represented by

11:52:07AM 2 counsel?

11:52:09AM 3  **A.**   I am not.

11:52:10AM 4  **Q.**   How do you prepare for today's evidentiary hearing?

11:52:16AM 5  **A.**   I reviewed the declaration I previously provided to the

11:52:19AM 6 parties, so that would be the one that you filed.  I reviewed

11:52:23AM 7 the notice provisions in the settlement agreement.  I reviewed

11:52:30AM 8 the documents counsel for the intervenor sent over.  I did look

11:52:37AM 9 at the declaration Mr. Collins provided from Lexis late last

11:52:42AM 10 night.  I think that's about it.

11:52:46AM 11 **Q.**   And who did you discuss your evidentiary hearing testimony

11:52:51AM 12 with?

11:52:55AM 13 **A.**   So I discussed internally with members of the project team

11:53:01AM 14 that helped facilitate the searches that were conducted here,

11:53:07AM 15 and then I did have a conversation with Mr. Collins.  That was

11:53:14AM 16 about the motion that he -- or document response he filed in

11:53:17AM 17 response to you filing my declaration.

11:53:21AM 18 **Q.**   And when did that discussion take place?

11:53:26AM 19 **A.**   Yesterday.

11:53:27AM 20 **Q.**   And what did you discuss with Mr. Collins yesterday?

11:53:32AM 21 **A.**   Just that I disagreed with some of his characterization of

11:53:39AM 22 what he purported my testimony would be in that document.

11:53:43AM 23 Mostly it was that I felt like he sort of over-generalized

11:53:47AM 24 things as opposed to clarifying that most of what I said was

11:53:50AM 25 specific to this case and the instance, that, you know, was in

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

11:53:54AM 1    front of us here.

11:53:54AM 2    **Q.**   And can you be specific as to what you believe was

11:53:57AM 3    over-generalized?

11:54:00AM 4    **A.**   I mean, it seemed to me like the way he described our

11:54:05AM 5    conversation was suggesting that we -- Epiq, as a company,

11:54:10AM 6    didn't find Lexis' results reliable in any circumstance, and I

11:54:15AM 7    thought that was an overstatement.

11:54:18AM 8         You know, as I mentioned earlier here today, I don't think

11:54:22AM 9    it's fair to say that there are no accurate results of owners

11:54:26AM 10   of those fax numbers between 2009 and 2010 in the Lexis

11:54:31AM 11   results.  You know, we use Lexis as a vendor for services and

11:54:35AM 12   feel that the results we get are reliable in other

11:54:39AM 13   circumstances.

11:54:39AM 14        Again, here, Lexis is not the best -- in our opinion, not

11:54:43AM 15   the best database to use because they don't have a product

11:54:48AM 16   designed to target ownership during a specific timeframe.  But

11:54:49AM 17   Lexis has -- we use their search products for a variety of

11:54:53AM 18   other reasons and feel that they're reasonably accurate for the

11:54:57AM 19   purpose for which they were designed.

11:54:59AM 20   **Q.**   And I want to just make sure we're on the same page.  What

11:55:01AM 21   do you define as ownership as you've been saying it throughout

11:55:05AM 22   your testimony today?

11:55:09AM 23   **A.**   Ownership would be that the business or person was paying

11:55:12AM 24   for the fax number with one of the providers in the area at

11:55:18AM 25   issue here.  So I don't know who all has coverage in the area

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

11:55:24AM 1  where these class members lived, but it would be the people who

11:55:28AM 2  are paying those providers for use of the phone number.

11:55:31AM 3  **Q.**   I may refer to that, and I'll try to use your term

11:55:35AM 4  "owner."  Please forgive me and understand, if I use the term

11:55:38AM 5  "subscriber," I'm referring to the same definition that you

11:55:42AM 6  just did.

11:55:43AM 7  **A.**   Okay.

11:55:43AM 8  **Q.**   Okay.  Thank you.

11:55:46AM 9      Are you aware if Epiq provided to plaintiffs' counsel a

11:55:52AM 10 quote for services to be performed in this case?

11:55:58AM 11 **A.**   Yes.

11:55:59AM 12      MR. GOOD:  Your Honor, at this time, if you could

11:56:00AM 13 show the witness Plaintiffs' Exhibit No. 2.

11:56:30AM 14 **Q.**   (By Mr. Good)  And while the Court is pulling that up,

11:56:32AM 15 when you spoke to Mr. Collins yesterday, was anybody else

11:56:36AM 16 present on that phone call?

11:56:39AM 17 **A.**   No.

11:56:41AM 18 **Q.**   Thank you.

11:56:49AM 19      MR. GOOD:  If Your Honor could go to the next page.

11:56:51AM 20      I'll represent for the record this is

11:56:54AM 21 Plaintiffs' Exhibit No. 2.

11:56:56AM 22 **Q.**   (By Mr. Good)  Ms. Kovach, do you recognize this document?

11:57:00AM 23 **A.**   If he can scroll down a bit more.

11:57:02AM 24      MR. GOOD:  Your Honor, maybe if you scrolled to

11:57:05AM 25 page 5.  I'm sorry to the next page.

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

11:57:12AM  1          THE COURT:  The attachment?

11:57:18AM  2          THE WITNESS:  Page 7?  Are we looking at the actual

11:57:21AM  3  estimate itself?

11:57:22AM  4          MR. GOOD:  Yeah, that might help.

11:57:24AM  5          THE WITNESS:  Okay.

11:57:25AM  6  Q.    (By Mr. Good)  Do you recognize this?

11:57:29AM  7  A.    So without seeing the signature block, I believe this is

11:57:31AM  8  the estimate that Don Stein provided to plaintiffs' counsel.

11:57:37AM  9  Mr. Stein is no longer with Epiq, but at the time he was a

11:57:41AM 10  salesperson for Epiq.

11:57:43AM 11  Q.    And is this format commonly used by Epiq, if you know?

11:57:51AM 12  A.    The format of the cover letter, or the estimate itself, or

11:57:55AM 13  both?

11:57:55AM 14  Q.    Is the estimate on page 7?

11:57:58AM 15  A.    Yes.  This is a common format we use.

11:58:07AM 16  Q.    And one of the headers reads, "Private Requirements and

11:58:10AM 17  Estimated Volumes."  Do you see that?

11:58:12AM 18  A.    I do.

11:58:13AM 19  Q.    And it says, "The settlement class in this matter has

11:58:16AM 20  approximately 131,000 class members," correct?

11:58:20AM 21  A.    That's correct.

11:58:22AM 22  Q.    And then a few lines down, it says, "Reverse fax/phone

11:58:28AM 23  search hit rate."  Do you see that?

11:58:29AM 24  A.    I do.

11:58:30AM 25  Q.    What does that refer to, do you know?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

11:58:34AM 1   A.   So my understanding is, before preparing this estimate,

11:58:38AM 2   Mr. Stein was provided with a sample dataset.  He then

11:58:43AM 3   requested our internal teams to run that dataset through

11:58:49AM 4   TransUnion's search -- reverse search process.

11:58:53AM 5       In this instance, he did not specify a target date range

11:58:57AM 6   when using TransUnion's reverse process, and so TransUnion

11:59:03AM 7   would have used their product that identifies prime owners of

11:59:06AM 8   the numbers, and that's where that 55 percent came from.

11:59:10AM 9   Q.   And, again, I just want to be clear.  When you use the

11:59:14AM 10  term "owners," you're referring to owners as being those that

11:59:19AM 11  paid for the fax lines, correct?

11:59:24AM 12  A.   Well, again, I don't know that TransUnion is representing

11:59:27AM 13  that their dataset tells you who paid for the fax line.  Right?

11:59:32AM 14  All of their databases are identified -- are designed to

11:59:36AM 15  identify likely owners.  So -- but, yes, the TransUnion search

11:59:41AM 16  identified likely current owners.  This is the one that

11:59:45AM 17  Mr. Stein used for the sample dataset to get this 55 percent

11:59:52AM 18  result.

11:59:52AM 19  Q.   Directing your attention to the next page, page 8.  In the

11:59:55AM 20  middle of the page, there's a heading titled "Data

11:59:56AM 21  Standardization and Reverse Lookup."  Do you see that?

12:00:01PM 22  A.   I do.

12:00:02PM 23  Q.   And this is broken into three parts:  import and

12:00:04PM 24  standardized data, data analyst, and address research 50K to

12:00:12PM 25  250K.  Do you see that?

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:00:13PM  1   A.   I do.

12:00:14PM  2   Q.   Can you explain what this section means?

12:00:18PM  3   A.   So import and standardized data is a profile charge that

12:00:24PM  4   we include to receive a dataset from parties and then import

12:00:29PM  5   into our system of records so that we can track all aspects of

12:00:33PM  6   that dataset so we can track whether we get an address for the

12:00:37PM  7   phone number, whether we mailed or emailed something to

12:00:40PM  8   someone, you know, for that record, whether they've submitted a

12:00:44PM  9   claim form in response, that sort of thing.  So that's just our

12:00:47PM 10   standard charge to pick a dataset and create records in our own

12:00:52PM 11   file system.

12:00:52PM 12       The data analyst line is our estimated charge for a data

12:00:58PM 13   analyst to manipulate the data in any way that's necessary.  So

12:01:02PM 14   in this case, since we received phone numbers, the data analyst

12:01:07PM 15   would be doing some review of the data to make sure there

12:01:10PM 16   weren't duplicates, deduping, if so, loading the numbers into

12:01:13PM 17   our system, and then getting the results back from the search,

12:01:18PM 18   and then analyzing those search results and creating mailing

12:01:22PM 19   records based on that.

12:01:24PM 20       And then the last line for address research is the charge

12:01:28PM 21   for TransUnion per input.  So that's what TransUnion charges us

12:01:32PM 22   per number that we send them regardless of the number of

12:01:36PM 23   results that we get back.

12:01:37PM 24   Q.   And you'll have to forgive me, I'm skipping out of order.

12:01:41PM 25   You mentioned deduping.  Does deduping refer to the process of

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:01:47PM  1    deduplication?

12:01:48PM  2    **A.**   It does, yes.  So we would typically look for duplicates

12:01:52PM  3    in the phone numbers and the returned names and addresses, that

12:01:55PM  4    sort of thing, so that we are, you know, not sending two

12:01:58PM  5    notices to the same person.

12:01:59PM  6    **Q.**   And prior to doing the deduplication, would you do the

12:02:04PM  7    NCOA lookup as described three lines down?

12:02:09PM  8    **A.**   So you would usually do NCOA lookup after deduplication so

12:02:15PM  9    we're not running the same name and address combinations

12:02:17PM 10    through NCOA twice.  But we would conduct the NCOA address

12:02:20PM 11    lookup as a part of this import and standardization process.

12:02:27PM 12    **Q.**   So as you sit here today, is it your understanding that

12:02:29PM 13    neither the standardization process, the deduplication process,

12:02:32PM 14    nor the NCOA lookup has been performed yet?

12:02:38PM 15    **A.**   So I would imagine, when we got the original dataset, we

12:02:40PM 16    did a quick duplication check.  But it seems like you all have,

12:02:45PM 17    you know, been working with the dataset for a while, so I would

12:02:47PM 18    be surprised to hear that we found duplicates.

12:02:50PM 19         With respect to the TransUnion results, I don't know that

12:02:52PM 20    I can say with certainty what we have and haven't done as far

12:02:55PM 21    as getting those loaded into our system.  I know at one point

12:03:00PM 22    we were preparing to mail notice, and so we might have, you

12:03:03PM 23    know, gotten partially through this process I described.  But

12:03:07PM 24    it's certainly not complete, we wouldn't be ready to, for

12:03:10PM 25    instance, mail tomorrow.  There would still need to be some

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:03:13PM 1  additional work that needs to be done.

12:03:24PM 2      MR. GOOD:  Your Honor, if we could go to the next

12:03:27PM 3  page.

12:03:30PM 4  Q.  (By Mr. Good)  In the middle of this page is a header

12:03:33PM 5  entitled "Claims Processing and Claim and Support."  Do you see

12:03:36PM 6  that?

12:03:36PM 7  A.  I do.

12:03:37PM 8  Q.  And the fourth line under this heading says "Claims

12:03:43PM 9  Review."  Do you see that?

12:03:44PM 10  A.  Yes.

12:03:44PM 11  Q.  What is claims review; do you know?

12:03:48PM 12  A.  Yes.  So that's the time that we would spend reviewing any

12:03:51PM 13  claims that needed to be reviewed.  We do use optical character

12:03:59PM 14  recognition, or OCR technology.  All claims, once they are

12:04:03PM 15  received, if they're mailed to us, we also -- I don't --

12:04:08PM 16  forgive me, I don't know if we planned on doing a claim filing

12:04:11PM 17  website here.  It looks like we do.  I see that there up at the

12:04:15PM 18  top.

12:04:15PM 19      So claims submitted via the website often don't need

12:04:19PM 20  review if a person is able to provide the requisite proof that

12:04:24PM 21  he or she is a class member.  But this line here would be for

12:04:27PM 22  any claims that did need manual review by a person.  They

12:04:31PM 23  couldn't be programmatically adjudicated based on some logic

12:04:37PM 24  rules that we would imply -- satisfy.

12:04:37PM 25  Q.  The next line is quality assurance.  Do you see that?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:04:40PM  1  A.    I do.

12:04:41PM  2  Q.    What is quality assurance, if you know?

12:04:43PM  3  A.    So that refers to quality assurance of the claims review.

12:04:47PM  4  As a standard, we would usually take a percentage of claims

12:04:50PM  5  manually reviewed by a person and have somebody else look at

12:04:54PM  6  them to ensure they were correctly adjudicated by the initial

12:04:58PM  7  reviewer.

12:04:58PM  8  Q.    And I know you've stated earlier that you use optical

12:05:00PM  9  character recognition for claims received; is that correct?

12:05:06PM  10  A.    For claims received via mail, correct.

12:05:10PM  11  Q.    And if a mailed notice were ordered and the recipient of

12:05:23PM  12  that mailed notice were to mail it back to Epiq with

12:05:27PM  13  inconsistent information from what Epiq had retrieved from

12:05:31PM  14  TransUnion or LexisNexis, would this be flagged in the claims

12:05:36PM  15  review process?

12:05:40PM  16  A.    So you said if they mailed the notice back.  Do you mean

12:05:43PM  17  if they mailed a claim form back to us?

12:05:46PM  18  Q.    Yes.  If they mailed a filled out claim form back with

12:05:50PM  19  inconsistent data.

12:05:51PM  20  A.    Yes, that is something that we would review.

12:05:54PM  21  Q.    And --

12:05:54PM  22  A.    So you're saying if a name -- if, like, the name of the

12:05:57PM  23  person to whom we sent the notice was different from the name

12:06:00PM  24  on the claim form when it was returned, that's something we

12:06:05PM  25  would review.

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:06:07PM  1  **Q.**   And the same for the fax number provided by the recipients

12:06:11PM  2  of the mailed notice?

12:06:14PM  3  **A.**   Right.  So typically we wouldn't include the fax number in

12:06:17PM  4  the mailing that goes out the door.  And so one of the data

12:06:21PM  5  points that the class member would be required to provide to

12:06:25PM  6  prove his or her class membership would be the number at which

12:06:28PM  7  they received the fax described in the notice.  And so if the

12:06:33PM  8  claim form we received had a fax number that did not match what

12:06:38PM  9  was in our records, that would be something that would be

12:06:43PM  10  flagged during that review.

12:06:44PM  11  **Q.**   And not only would it have to match what's in your records

12:06:46PM  12  universally, it would have to match the specific record for the

12:06:48PM  13  piece of mail that was sent out, correct?

12:06:52PM  14  **A.**   That's correct.  We would typically do a universal search

12:06:57PM  15  and, you know -- but what we're looking for is a match to the

12:07:00PM  16  record we sent out.

12:07:02PM  17  **Q.**   And so just to short cut things, would that mean that for

12:07:06PM  18  each piece of mail sent out, it is coded in a way that you can

12:07:11PM  19  tell who it was sent to?

12:07:14PM  20  **A.**   That's correct.

12:07:15PM  21  **Q.**   Thank you.

12:07:28PM  22        MR. GOOD:  Your Honor, if you could show the witness

12:07:29PM  23  the last page of Plaintiffs' Exhibit No. 5.

12:07:50PM  24        THE COURT:  Is that not it?

12:07:52PM  25        MR. GOOD:  No, that's Plaintiffs' Exhibit No. 2.  I'm

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:07:54PM  1  talking about Plaintiffs' Exhibit No. 5.

12:07:56PM  2       THE COURT:  Oh, No. 5.  I'm sorry.

12:07:58PM  3       MR. GOOD:  That's no problem.

12:08:07PM  4       THE COURT:  What page?

12:08:09PM  5       MR. GOOD:  The last page, Your Honor.

12:08:14PM  6  **Q.**  (By Mr. Good)  Ms. Kovach, have you seen this document

12:08:16PM  7  before?

12:08:19PM  8  **A.**  Yes.  That looks to me to be the claim form in this case.

12:08:30PM  9  **Q.**  If an unethical individual or entity were to receive this

12:08:35PM  10  document unfilled out, what steps would they have to go through

12:08:39PM  11  in order to fraudulently file a claim?

12:08:45PM  12  **A.**  So when we format this claim form for mailing, we would

12:08:49PM  13  have a bar code on it that indicated who it was sent to

12:08:53PM  14  initially -- and going back to what -- to your question

12:08:57PM  15  previously.  So if an unethical individual received this claim

12:09:00PM  16  form, they would have to complete it in full, including

12:09:05PM  17  providing the fax number at which they received the fax that's

12:09:11PM  18  at issue, between the dates at issue here, and then sign the

12:09:16PM  19  claim form and then send it back to us via one of those methods

12:09:22PM  20  provided there, so fax, mail, or electronically via the

12:09:26PM  21  website.

12:09:26PM  22       And so the things we would check for, as you indicated,

12:09:31PM  23  were, does this person's name appear in the dataset we received

12:09:36PM  24  from TransUnion, and does the phone number appear in the

12:09:41PM  25  dataset we received from the parties, which I think you all

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:09:45PM  1  refer to as the Biggerstaff list.  So the two things we would
12:09:48PM  2  look for -- so the -- the person attempting to commit fraud
12:09:52PM  3  would either have to provide a fax number that was in the
12:09:57PM  4  Biggerstaff list and not associated with any name at all, or in
12:10:02PM  5  the Biggerstaff list and associated with one of the names with
12:10:07PM  6  TransUnion.
12:10:07PM  7      If the person -- the attempted fraudster here got the fax
12:10:13PM  8  number right but had a name that was wrong, those are usually
12:10:15PM  9  the types of things we raise with the parties to discuss
12:10:18PM  10  whether and what kind of follow-up you would want us to do.
12:10:21PM  11 Q.   And if this hypothetical fraudster were to put a fax
12:10:26PM  12 number that is not associated with the bar code, would that
12:10:30PM  13 similarly trigger a red flag for which you would notify the
12:10:34PM  14 parties?
12:10:37PM  15 A.   So you're saying this person receives the claim form and
12:10:42PM  16 provides a fax number that is not in the data at all or is
12:10:47PM  17 not the fax number associated with the record here?
12:10:52PM  18 Q.   Not associated with the record.
12:10:56PM  19 A.   But still in the dataset.
12:10:59PM  20 Q.   Correct.
12:11:01PM  21 A.   So it would.  So we would consider that a name mismatch.
12:11:08PM  22 We could consider that a mismatch -- a fax mismatch, but since
12:11:09PM  23 it is still a fax number in the dataset, we would follow-up
12:11:13PM  24 with you -- both you and defense counsel to get direction on
12:11:16PM  25 how to handle it.

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:11:18PM   1    **Q.**   Thank you for the clarification.

12:11:20PM   2         How often, in your 18 years of experience, do you see

12:11:23PM   3    fraud like that I just described?

12:11:31PM   4    **A.**   So fraud where somebody provides a fax number that's not

12:11:35PM   5    the one associated with the record but is a fax number in our

12:11:38PM   6    dataset, that's pretty rare.  We do see fraud in these cases,

12:11:47PM   7    it happens.  Right?  We've seen people try to file claims using

12:11:51PM   8    the named plaintiff's fax number because it's in the record.

12:11:57PM   9    **Q.**   Mm-hmm.

12:11:57PM   10   **A.**   We've certainly seen people, I think, just enter a fax

12:12:03PM   11   number that's maybe not the right one, but it is the person

12:12:05PM   12   that TransUnion gave us.  Yeah, so the type of fraud you

12:12:09PM   13   described, though, somebody receiving the mailed notice, so it

12:12:12PM   14   being an address that we got from a vendor, giving us a fax

12:12:16PM   15   number that is on your class list of fax numbers but not the

12:12:20PM   16   one that is associated to the record at issue, that would be

12:12:24PM   17   pretty rare, I would think.

12:12:29PM   18   **Q.**   I know this might be difficult to quantify, and I'm not

12:12:32PM   19   asking you to quantity it.  But in ranking terms, what is the

12:12:35PM   20   most common type of fraud that Epiq witnesses as a claims

12:12:40PM   21   administrator?

12:12:49PM   22   **A.**   I think that's really hard to describe.  I mean, it's very

12:12:53PM   23   case specific.  Right?  You have consumer cases that get on

12:12:59PM   24   some of the class action aggregation websites, where there's no

12:13:03PM   25   proof of purchase required, and people just go file claims and

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:13:06PM 1  they've never bought the product at issue.  I think that's

12:13:09PM 2  probably the most common.  We don't really have any good way to

12:13:12PM 3  prove that in those cases, but it's reasonable to say that's

12:13:17PM 4  something that occurs.

12:13:19PM 5      You know, the -- we have a lot of fraud -- measures to

12:13:26PM 6  prohibit fraud that we put in place, so we do things when cases

12:13:30PM 7  are closed class cases, and by that I mean, you know, we have

12:13:34PM 8  some sort of identifiable population where we're requiring the

12:13:37PM 9  person filing the claim to prove that they're in our dataset by

12:13:41PM 10 some methodology.  So, here, it would be by providing the right

12:13:45PM 11 phone number.

12:13:46PM 12     So, again, I think it's just hard to say what the most

12:13:49PM 13 common type of fraud is, because it's very case specific and

12:13:53PM 14 specific to the requirements of each case.

12:13:55PM 15 **Q.**   Understood.

12:13:55PM 16     And does Epiq employ industry standards in rooting out and

12:14:03PM 17 detecting and preventing fraud in the claims process?

12:14:08PM 18 **A.**   We do.

12:14:11PM 19 **Q.**   Have you ever seen an inmate of a correctional facility

12:14:15PM 20 try to file a fraudulent claim?

12:14:19PM 21 **A.**   Yes.

12:14:20PM 22 **Q.**   Has that happened frequently in your experience?

12:14:25PM 23 **A.**   We frequently receive claims from prisons.  It's often

12:14:30PM 24 hard to determine exactly whether they're fraudulent or not.

12:14:34PM 25 So, again, in consumer cases, that happens frequently, but

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:14:37PM 1    somebody could have bought the product at issue when they

12:14:41PM 2    weren't in prison.

12:14:42PM 3        Now, if we did the research and the person was in prison

12:14:46PM 4    during the entire time of the class period, I think that means

12:14:48PM 5    it's very unlikely they bought the product that's at issue in

12:14:52PM 6    that scenario.  But we do see fraudulent filings from prisoners

12:14:55PM 7    in all types of cases.

12:14:57PM 8    Q.   And is that something that Epiq knows to look out for?

12:15:02PM 9    A.   We do.  It's something we can look for prison addresses,

12:15:07PM 10   for the address that the claimant provided.  Again, whether or

12:15:12PM 11   not we spend the time and effort to do that really depends on

12:15:15PM 12   the specifics of the case and discussions with our client.

12:15:25PM 13   Q.   Leaving aside the exhibit for the moment, I know this has

12:15:29PM 14   been discussed already, the first reverse lookup Epiq performed

12:15:32PM 15   in this matter was with TransUnion; is that correct?

12:15:37PM 16   A.   Yes, the first reverse lookup was with TransUnion.

12:15:40PM 17   Q.   Is it your understanding that TransUnion selects and

12:15:44PM 18   aggregates information on individual consumers and is one of

12:15:47PM 19   the leading credit reporting agencies in the United States?

12:15:53PM 20   A.   That's correct.  But just to clarify, the data that we use

12:15:56PM 21   is not credit report data.  That's subject to different laws

12:16:01PM 22   and regulations around what types of searches can be done.

12:16:05PM 23   Q.   Do you know if it comes from credit report data?

12:16:12PM 24   A.   I do not with any certainty.  I just know that if you are

12:16:17PM 25   going to do searches of credit report data, you are subject to

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:16:21PM  1  the Fair Credit Reporting Act, you have to have certain

12:16:24PM  2  permissions or authorizations from the subject of the search.

12:16:27PM  3  So based on that, I would say that it's unlikely that the

12:16:34PM  4  TransUnion databases used here are unlikely to come directly

12:16:36PM  5  from credit report data.  But I can't really speak to how they

12:16:41PM  6  compile their databases and what datasets they use.

12:16:45PM  7  Q.   And at paragraph 19 of your declaration, you state that

12:16:50PM  8  TransUnion located 40,940 records; is that correct?

12:16:56PM  9  A.   I don't have the declaration in front of me, but if that's

12:17:00PM 10  what it says, then, yes, that's correct.

12:17:01PM 11       MR. GOOD:  And I'll just ask the Court to put up

12:17:06PM 12  Plaintiffs' Exhibit 1, page 4 of 5 -- or I'm sorry, 5 of 6 if

12:17:26PM 13  you're going off of the PDF; 4 of 5 if you're going off the

12:17:44PM 14  PACER header.

12:17:38PM 15  Q.   (By Mr. Good)  Are you able to read paragraph 19?

12:17:41PM 16  A.   Yes.

12:17:48PM 17       Yes.  So I see there that there are 40,940 records that

12:17:57PM 18  TransUnion has provided results for.

12:17:57PM 19  Q.   As you sit here today, do you believe TransUnion did their

12:18:00PM 20  best to provide accurate historical records for the 40,940

12:18:06PM 21  numbers you referenced?

12:18:08PM 22  A.   Yes.  Yes.

12:18:09PM 23  Q.   And is that based on your history of working with

12:18:12PM 24  TransUnion?

12:18:15PM 25  A.   Yes.  I do think they did their best as -- allowed by

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:18:22PM  1    their dataset to provide accurate historical owners.  I don't

12:18:28PM  2    know that doing their best is anything we can quantify, but I

12:18:33PM  3    do think that they have created a search designed to identify

12:18:36PM  4    within their dataset historical owners.  That is the whole

12:18:41PM  5    product that was used.

12:18:45PM  6    Q.    After the hearing, which you attended, with

12:18:49PM  7    Judge Porcelli, you instructed LexisNexis to perform two

12:18:53PM  8    separate searches; is that correct?

12:18:59PM  9    A.    Yes.  So your statement can be interpreted two different

12:19:04PM 10    ways.  There were two different databases that were combined

12:19:08PM 11    into the single set of search results we initially provided,

12:19:11PM 12    and then there was a second, so that's two, technically --

12:19:15PM 13    right? -- because there's two different databases being used in

12:19:18PM 14    one combined custom search.  And then after those results were

12:19:23PM 15    provided, defense counsel asked for the full result set from

12:19:27PM 16    that same search methodology, and so we had the same search ran

12:19:32PM 17    again by Lexis and provide the full result dataset to both

12:19:37PM 18    parties at defense counsel's request.

12:19:40PM 19    Q.    Yes, that does.

12:19:41PM 20          And just to clarify for the transcript, the results for

12:19:44PM 21    the subset that defendants requested is referenced as File 1,

12:19:49PM 22    and the results for the subset ordered by the Court are

12:19:52PM 23    referenced as File 2; is that correct?

12:19:56PM 24    A.    Yeah.  And actually I think I should probably clarify

12:20:00PM 25    further.

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:20:00PM 1      So you are correct, the first search was conducted with

12:20:03PM 2  two separate files, and then the -- we did a secondary search

12:20:07PM 3  at defendants' request to provide the complete dataset with

12:20:12PM 4  both initial files, so that ends up being quite a few searches.

12:20:18PM 5  Q.   Yes.

12:20:20PM 6      And I apologize, but for clarity, I'm actually going to

12:20:26PM 7  start with File 2.

12:20:26PM 8          MR. GOOD:  So, Your Honor, if we could go to page 6

12:20:30PM 9  of 6, the final page in this exhibit.

12:20:32PM 10 Q.   (By Mr. Good)  Ms. Kovach, if you could review that top

12:20:35PM 11 table.  This is the table regarding the counts for File 2,

12:20:39PM 12 correct?

12:20:43PM 13 A.   That is correct.

12:20:44PM 14 Q.   And so this was the search of the 90,071 numbers that the

12:20:51PM 15 TransUnion search located no records for, correct?

12:20:55PM 16 A.   That is correct.

12:20:58PM 17 Q.   And the LexisNexis results found no records in either

12:21:03PM 18 database for 47,312 of those records, correct?

12:21:15PM 19 A.   That is correct, yes.

12:21:18PM 20 Q.   And among the 90,071 records, 4,550 of them were located

12:21:26PM 21 in Lexis' consumer database, correct?

12:21:30PM 22 A.   That's correct.

12:21:32PM 23 Q.   And an additional 39,717 were located in Lexis' business

12:21:39PM 24 database; is that correct?

12:21:42PM 25 A.   That's also correct.  There also was overlap between the

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:21:45PM  1   two, so you wouldn't sum these two numbers together to get the
12:21:52PM  2   number of unique phone numbers that had a hit.  In some
12:21:56PM  3   instances, the phone number returned a result in both the
12:21:59PM  4   consumer database and the business database, just for clarity
12:22:03PM  5   sake.
12:22:03PM  6   Q.   I understand.
12:22:05PM  7        But the maximum the overlap could possibly be would be
12:22:06PM  8   4,550, correct?
12:22:10PM  9   A.   Correct.
12:22:12PM 10   Q.   So even assuming the overlap was 100 percent, there were
12:22:17PM 11   eight times as many matches approximately in the business
12:22:21PM 12   database than in the consumer database; is that correct?
12:22:25PM 13   A.   That is correct.
12:22:26PM 14   Q.   And the overlap rate was less than a hundred percent,
12:22:30PM 15   correct?
12:22:31PM 16   A.   Yes.
12:22:32PM 17   Q.   Going back to the prior page, at the bottom of the page,
12:22:37PM 18   are the results for File 1 in the table.  Do you see that?
12:22:43PM 19   A.   I do.
12:22:44PM 20   Q.   These are the results where TransUnion did have a match,
12:22:49PM 21   but it was run against LexisNexis' two databases at the request
12:22:55PM 22   of defendants' counsel, correct?
12:22:56PM 23   A.   That's correct.
12:22:59PM 24   Q.   And, here, of the 40,940 unique records, LexisNexis found
12:23:07PM 25   no matches for 13,814; is that correct?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:23:13PM  1   A.    Yes.

12:23:14PM  2   Q.    And they did find matches in the consumer database for

12:23:19PM  3   18,313, correct?

12:23:22PM  4   A.    That is correct.

12:23:24PM  5   Q.    And they found matches in the business database for 15,952

12:23:29PM  6   of those numbers, correct?

12:23:31PM  7   A.    Correct.

12:23:32PM  8   Q.    And, again, as with File 2, there was also overlap among

12:23:37PM  9   the consumer database and the business database, so the overlap

12:23:42PM 10   was less than 100 percent, correct?

12:23:44PM 11   A.    That's also correct.

12:23:58PM 12   Q.    Here, if you were to assume 100 percent overlap, it would

12:24:01PM 13   indicate the consumer database had 20 percent more matches than

12:24:07PM 14   the business database; is that correct?

12:24:12PM 15   A.    That's correct.  Yeah.  I'm going to take your word for it

12:24:19PM 16   on your math.  That sounds about right.

12:24:22PM 17   Q.    And based on your review of these two tables, is it fair

12:24:25PM 18   to say that LexisNexis had more matches for businesses than

12:24:33PM 19   TransUnion?

12:24:40PM 20   A.    More matches for businesses, but the searches are designed

12:24:43PM 21   differently, so I don't think that it's an apples-to-apples

12:24:47PM 22   comparison.

12:24:48PM 23   Q.    Can you explain?

12:24:50PM 24   A.    Right.  So the Lexis searches we've discuss previously is

12:24:57PM 25   not -- Lexis' databases do not identify owners during a

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:25:02PM 1   specific timeframe.  And so Lexis created this proxy solution
12:25:05PM 2   where they are looking at the current owner of a business or --
12:25:11PM 3   the current owner of a phone number, or subscriber, to use your
12:25:15PM 4   terminology, and then looking backwards in their dataset to see
12:25:19PM 5   whether that subscriber was observed between 2009 and 2010.
12:25:24PM 6   And so using that methodology, there are more business results,
12:25:29PM 7   but that's not the same thing as what TransUnion did.
12:25:32PM 8        Again, TransUnion's search is designed to identify the
12:25:36PM 9   actual subscriber during the 2009 to 2010 timeframe, so they're
12:25:41PM 10  different searches, different databases, so it just -- it
12:25:45PM 11  doesn't seem quite accurate to me to say -- I mean, it's --
12:25:49PM 12  certainly, on its face, TransUnion identified more businesses,
12:25:52PM 13  but the searches weren't designed to do the same thing, so I
12:25:55PM 14  don't think it's a completely accurate comparison between the
12:25:58PM 15  two.
12:25:58PM 16  Q.   I think at the end of your last statement you meant to say
12:26:00PM 17  LexisNexis found more businesses; is that accurate?
12:26:04PM 18  A.   Yes, that's correct.  Sorry.
12:26:07PM 19        THE COURT:  Mr. Good, one moment.
12:26:08PM 20        Ms. Kovach, you're familiar with the Court's order
12:26:10PM 21  which embodies the settlement agreement which requires Epiq as
12:26:14PM 22  the settlement administrator to identify as many class members
12:26:17PM 23  as possible.  Is that correct?
12:26:21PM 24        THE WITNESS:  Yes, Your Honor.
12:26:22PM 25        THE COURT:  All right.  And so with that charge, are

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:26:26PM  1   you of the opinion that Epiq fulfilled its obligation by simply

12:26:30PM  2   running the TransUnion reverse lookup?

12:26:36PM  3          THE WITNESS:  I am, and that's because the TransUnion

12:26:39PM  4   product is the one designed to identify owners.  Again, that to

12:26:44PM  5   us is a more accurate way to identify likely class members than

12:26:49PM  6   to use these proxy solutions that the other vendors offer.

12:26:53PM  7          THE COURT:  All right.  So then to follow up on that,

12:26:58PM  8   would you say that there are other additional class members

12:27:03PM  9   that have been identified, or potentially identified by the

12:27:08PM 10   LexisNexis reverse lookup?

12:27:12PM 11          THE WITNESS:  I think it's likely that potential

12:27:14PM 12   class members -- and if we describe those as owners of -- or

12:27:18PM 13   subscribers to the fax numbers during the timeframe -- are

12:27:23PM 14   identified in the Lexis results.  Obviously neither search is

12:27:27PM 15   going to identify people who actually received the fax, but if

12:27:30PM 16   we're just talking about likely owners of the fax numbers

12:27:33PM 17   during the relevant timeframe, I think it's safe to say that

12:27:36PM 18   there are people who did own the fax number during the

12:27:39PM 19   timeframe in the Lexis results.

12:27:43PM 20          THE COURT:  So then explain to me then, as a result

12:27:46PM 21   of that, how is it you are still of the opinion that the

12:27:48PM 22   TransUnion would have accomplished the directive to identify as

12:27:51PM 23   many as possible class members?

12:27:59PM 24          THE WITNESS:  So typically these types of notice

12:28:01PM 25   programs are not as contentious as this one is.  The TransUnion

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:28:07PM 1  results, we feel, are more accurate because of the way the

12:28:10PM 2  search is designed.  The Lexis option would likely result in

12:28:15PM 3  over-noticing just because the search isn't designed

12:28:18PM 4  specifically to identify the people we're looking for.  So by

12:28:21PM 5  definition, it's probably going to be over-inclusive.  And so

12:28:25PM 6  it really comes down to what the parties' objectives are.

12:28:30PM 7        So in a typical case that was less adversarial with

12:28:34PM 8  respect to reverse lookups than this one, we would have

12:28:35PM 9  conversations with our clients about the search results, we

12:28:39PM 10 would explain why TransUnion was the most accurate.  And if the

12:28:44PM 11 parties themselves had concerns, we could offer them additional

12:28:48PM 12 options, including using different vendors to conduct the

12:28:51PM 13 searches.  And if we did that, we would caution the parties

12:28:55PM 14 that using the additional vendor would likely result in

12:28:57PM 15 noticing people who -- more people who were not class members

12:29:02PM 16 in addition to getting any additional class members.

12:29:05PM 17       So it's often a cost-benefit analysis.  How much

12:29:08PM 18 money do you want to spend on the notice process knowing that

12:29:10PM 19 administration costs are paid from the funds.  And so, you

12:29:13PM 20 know, the cost of print and postage for sending other notices

12:29:17PM 21 does deplete the funds available to pay these class members

12:29:21PM 22 when they settle claims.

12:29:21PM 23       So typically this is not something that Epiq sort of

12:29:24PM 24 makes a unilateral decision on, it's the conversation we would

12:29:27PM 25 have with the parties.  But our starting point would be that

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:29:29PM 1   TransUnion search, because it is the only one specifically

12:29:31PM 2   designed to do the thing we're trying to do.

12:29:34PM 3       THE COURT:  All right.  And so let me ask, now having

12:29:39PM 4   had the benefit of the second reverse lookup with LexisNexis,

12:29:43PM 5   focusing solely on fax numbers that have been identified with

12:29:50PM 6   one entity or individual by name, address, or name and address,

12:29:56PM 7   and I know you've already testified that you've not had the

12:30:01PM 8   opportunity to dedupe, is it fair to say that there have been

12:30:04PM 9   at least additional identifications for either one individual

12:30:11PM 10   or entity based upon the LexisNexis reverse lookup?

12:30:20PM 11       THE WITNESS:  We have received results for additional

12:30:22PM 12   people above and beyond what TransUnion has provided.  I don't

12:30:26PM 13   think I can say -- speak to how many of those are actually

12:30:31PM 14   owners of the numbers versus how many are just current owners

12:30:34PM 15   who happen to exist during the 2009 to 2010 timeframe.  Again,

12:30:39PM 16   I would say that it's very likely that some of the people in

12:30:42PM 17   the Lexis results did actually own the number during that

12:30:46PM 18   timeframe, so I think it's fair to say that additional owners

12:30:50PM 19   of the numbers have been identified by Lexis, but without that

12:30:53PM 20   it's very difficult to know the percentage.

12:30:55PM 21       THE COURT:  How much time are you anticipating,

12:30:58PM 22   Mr. Good?

12:30:58PM 23       MR. GOOD:  I don't have much left, Your Honor.

12:31:01PM 24       THE COURT:  All right.

12:31:02PM 25       MR. GOOD:  Approximately eight questions.  I will

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:31:10PM  1  move expeditiously.

12:31:12PM  2  Q.    (By Mr. Good)  Along the lines that the Court just pointed

12:31:14PM  3  out, I want to represent to you that I'm here today with my

12:31:17PM  4  client, Dr. Greg Williams.  Dr. Williams owns Medical &

12:31:21PM  5  Chiropractic, Inc., and I'll represent to you that throughout

12:31:24PM  6  2009 and 2010, Medical & Chiropractic, Inc., was the subscriber

12:31:28PM  7  for fax number (813) 237-3792.  In order for my client to have

12:31:34PM  8  a claim approved by Epiq, he would need to fill out a proof of

12:31:38PM  9  claim form; is that correct?

12:31:41PM 10  A.    That's correct.

12:31:43PM 11  Q.    I will further represent to you that TransUnion found no

12:31:46PM 12  match for Medical & Chiropractic, Inc.'s fax number.  Is this

12:31:50PM 13  because Medical & Chiropractic, Inc., is an entity rather than

12:31:52PM 14  a person?

12:31:56PM 15  A.    I don't think I'm qualified to speak to why TransUnion's

12:31:59PM 16  dataset did not find a match for your client.

12:32:02PM 17  Q.    I'll further represent to you that LexisNexis did find a

12:32:05PM 18  match for my client, Medical & Chiropractic, Inc., and the

12:32:10PM 19  unique identifier's 327718.  If Epiq sends class notice to both

12:32:16PM 20  the TransUnion and LexisNexis list after combining them,

12:32:20PM 21  deduping, and running through the NCOA process as described in

12:32:23PM 22  the settlement agreement, will Medical & Chiropractic Clinic

12:32:28PM 23  then obtain a claim form via mail that they are able to fill

12:32:33PM 24  out and submit?

12:32:36PM 25  A.    If we used both datasets, yes.  But just to clarify for

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:32:43PM  1    named plaintiffs, we always do a review of the dataset to make

12:32:45PM  2    sure we have all the named plaintiffs and reach out to the

12:32:48PM  3    parties for mailing information if we don't.  So I think -- I

12:32:52PM  4    know our current practice, if we'd only used the TransUnion

12:32:54PM  5    dataset, your client would likely also have received a claim

12:32:57PM  6    form.

12:32:58PM  7    Q.    And earlier in your testimony, you identified that

12:33:02PM  8    TransUnion advertises that it has 10,000 sources that it uses

12:33:06PM  9    to gather its database.  Do you recall that?

12:33:12PM  10   A.    I do.

12:33:12PM  11   Q.    During this adversarial process that you have been thrust

12:33:16PM  12   into, were you asked to obtain the list of 10,000 sources from

12:33:20PM  13   TransUnion?

12:33:24PM  14   A.    I do believe we were asked if TransUnion would provide a

12:33:27PM  15   list of their sources, and their answer was no.

12:33:35PM  16   Q.    As you sit here today, and I won't ask if -- or, and I

12:33:39PM  17   would only ask you to say that it is confidential if the answer

12:33:42PM  18   is yes, but do you know any of their sources?

12:33:48PM  19   A.    No, not without speculating.  I can speculate, but, no, I

12:33:53PM  20   don't know any of their sources.

12:33:54PM  21   Q.    And I'm not going to ask you to speculate.

12:33:56PM  22         Do you know any of the sources used by LexisNexis?

12:33:59PM  23   A.    No.  Same answer, it would be speculation.

12:34:02PM  24   Q.    Is it possible, given that TransUnion uses over 10,000

12:34:06PM  25   sources, that at least one of those sources is used by both

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:34:09PM  1  LexisNexis and TransUnion?

12:34:13PM  2  **A.**   I think that's possible.

12:34:16PM  3  **Q.**   Prior to this case, have you ever had any reason to

12:34:18PM  4  believe that the reverse lookups of TransUnion are unreliable?

12:34:27PM  5  **A.**   No.  I don't think we think they're perfect, but we

12:34:31PM  6  certainly don't think they're unreliable.  I've stated

12:34:34PM  7  previously, TransUnion's reverse lookup is for this type of

12:34:39PM  8  reverse lookup, so where we're targeting owners during a

12:34:41PM  9  specific timeframe, we think the TransUnion product is the most

12:34:44PM  10  reliable product available.

12:34:47PM  11  **Q.**   Prior to this case, have you ever had any reason to

12:34:49PM  12  believe that the reverse lookups of LexisNexis are unreliable?

12:34:56PM  13  **A.**   Well, again, unreliable is a sort of -- can be defined a

12:35:00PM  14  lot of different ways.  We, as I've stated, wouldn't recommend

12:35:03PM  15  as a first search the LexisNexis product if we were looking to

12:35:07PM  16  identify owners during a specific timeframe, because they say

12:35:10PM  17  that their databases are not designed to do that.  LexisNexis

12:35:17PM  18  search results, when used for the purpose they they're

12:35:20PM  19  designed, are, in our opinion, reliable.

12:35:23PM  20  **Q.**   And given what you know about Epiq's methods of detecting

12:35:28PM  21  and preventing fraudulent claims from being approved, do you

12:35:32PM  22  believe that the inclusion of LexisNexis and TransUnion's

12:35:38PM  23  results, again, after going through the standardization,

12:35:41PM  24  deduplication, and NCOA reverse-lookup process and mailing to

12:35:47PM  25  both those lists, would increase the likelihood of fraud?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:35:53PM  1   **A.**    So I think it depends on how you define fraud.  If you're

12:35:57PM  2   defining that as people willfully trying to submit a claim to

12:36:03PM  3   which they aren't entitled, I think that's -- that's hard to

12:36:11PM  4   quantify.  Do I think that if we mailed to both lists we may

12:36:15PM  5   get from claims from people who are be able to provide their

12:36:20PM  6   phone number because they currently owned it but didn't

12:36:22PM  7   actually the receive the fax at issue or didn't actually own

12:36:24PM  8   the number during the relevant timeframes, I think you do

12:36:25PM  9   increase the likelihood of that if you use both datasets.

12:36:31PM 10   **Q.**    And so for the second example you gave, that would be

12:36:36PM 11   received by a person who obtained the fax number after 2010,

12:36:42PM 12   correct?

12:36:44PM 13   **A.**    Correct.

12:36:45PM 14   **Q.**    Then they're signing the statement under penalty of

12:36:49PM 15   perjury, even though what they're signing under penalty of

12:36:52PM 16   perjury is not accurate?

12:36:53PM 17   **A.**    Right.  I don't think we have the claim form back up

12:36:58PM 18   again, but, like, typically the penalty-of-perjury language

12:37:01PM 19   says "to the best of my knowledge," and I think some people can

12:37:04PM 20   interpret that as well.  It seems likely, I don't remember for

12:37:08PM 21   sure, maybe I got it, maybe I didn't, and I'm comfortable

12:37:12PM 22   signing this.  Right?  I think that was something so old is an

12:37:14PM 23   expected result here.  And since we know that we would be

12:37:17PM 24   sending notices to likely owners, just not the likely owner

12:37:21PM 25   during the timeframe at issue, we do have an increased chance

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:37:24PM 1  that people that have the fax number, but sometime after 2010,

12:37:28PM 2  or potentially even before 2009, have filed claims and put down

12:37:34PM 3  the right fax number or one that matches to your Biggerstaff

12:37:37PM 4  list but didn't actually receive the fax because they didn't

12:37:41PM 5  own the phone number during the timeframe.

12:37:44PM 6  **Q.**   It wouldn't have to match to the class list, it would have

12:37:46PM 7  to match to the fax number associated with the bar code you put

12:37:49PM 8  on the claim form, correct?

12:37:53PM 9  **A.**   Correct.  So as I -- I might not have been clear earlier,

12:37:57PM 10 but we typically do two types of matches.  So we're going to

12:38:01PM 11 match the name and fax number combination, so the match to the

12:38:06PM 12 bear code, and then we would also do a search to see if that

12:38:11PM 13 fax number appears anywhere in the list, unless the parties

12:38:16PM 14 directed us not to do that extra search.

12:38:18PM 15      Also, if our clients say if you give us a fax number that

12:38:19PM 16 is on your list or a number that is on your list, we want to

12:38:23PM 17 know about that, how many of those there are, and we can, you

12:38:26PM 18 know, figure out what to do if the names don't match up.

12:38:30PM 19 **Q.**   And so in a situation where a subsequent owner of a phone

12:38:37PM 20 number that was previously a fax number in 2009 and 2010

12:38:42PM 21 received a claim form in 2022 or, frankly, 2023, they would

12:38:50PM 22 fill out the claim form, and you're saying it could match,

12:38:57PM 23 because they are now the owner of that fax number and therefore

12:39:02PM 24 they could file the claim under penalty of perjury inaccurately

12:39:09PM 25 and therefore that would be the fraud that you're describing?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:39:15PM  1  **A.**   Right.  And so -- and that's what I mean by, you know, is

12:39:18PM  2  it truly fraud if they don't -- aren't necessarily, like,

12:39:21PM  3  intending to defraud the settlement fund -- right? -- they just

12:39:23PM  4  aren't sure whether they -- they can't remember how long

12:39:27PM  5  they've owned the number, they aren't sure whether they

12:39:29PM  6  received the fax or not, they sign the claim form and send it

12:39:31PM  7  in.

12:39:32PM  8  **Q.**   And I'm going to describe that as unintentional.

12:39:35PM  9      Can you describe a situation where there would be

12:39:38PM  10  intentional fraud based on including both the LexisNexis and

12:39:44PM  11  TransUnion lists?

12:39:48PM  12  **A.**   Well, I mean, I think in any scenario if somebody receives

12:39:51PM  13  the claim form, knows for a fact they didn't -- puts down a fax

12:39:58PM  14  number that they know for a fact they didn't own in 2009 and

12:40:00PM  15  2010, and -- but they just put down their current fax number,

12:40:06PM  16  like -- right, knowing that they didn't have that fax number

12:40:08PM  17  during the right timeframe, and that to me starts getting into

12:40:12PM  18  the grounds of intentional fraud.

12:40:14PM  19  **Q.**   So hypothetically if somebody acquired a number in 2021,

12:40:18PM  20  and they said I had it in 2009 and 2010, you're saying --

12:40:18PM  21  **A.**   Yeah.

12:40:22PM  22  **Q.**   -- that that is intentional fraud?

12:40:25PM  23  **A.**   Correct.

12:40:26PM  24  **Q.**   And that person would have to know the right fax number to

12:40:30PM  25  put down that has to match what's matching the bar code on the

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:40:34PM  1  proof of claim form?

12:40:38PM  2  **A.**   Correct.

12:40:39PM  3  **Q.**   Have you ever seen that before?

12:40:44PM  4  **A.**   I don't know that we would know if we had seen that

12:40:48PM  5  before.  So if we get results from any reverse lookup, we don't

12:40:53PM  6  know with certainty that that person was the owner during the

12:40:58PM  7  timeframe at issue.  More likely, based on how TransUnion's

12:41:02PM  8  product is designed but still not a hundred percent accurate,

12:41:05PM  9  so at any point someone could put down their current fax number

12:41:10PM  10  that they just obtained, you know, a month ago or a year ago,

12:41:14PM  11  and send in the claim form, and there is no way we would know

12:41:18PM  12  that -- right? -- because we don't have a way, aside from the

12:41:21PM  13  searches we've run, to identify owners during that specific

12:41:25PM  14  time name.

12:41:26PM  15  **Q.**   But if multiple claim forms were submitted, you would know

12:41:30PM  16  that there were competing claims, correct?

12:41:33PM  17  **A.**   Multiple claim forms for one phone number?

12:41:37PM  18  **Q.**   Yes.

12:41:39PM  19  **A.**   Yes, we would know there were competing claims.  That does

12:41:42PM  20  happen.  Usually we raise that with the parties.  There are

12:41:44PM  21  multiple ways to handle it.  We can just pay all three or four

12:41:49PM  22  or five or two, however many there are.  Sometimes that's the

12:41:53PM  23  path of least resistance if class is an issue.

12:41:56PM  24       The other option would be, you could send a letter to all

12:41:58PM  25  of the claimants claiming for one single phone number and ask

## LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:42:01PM  1  them for proof of ownership during the relevant timeframe.  In

12:42:05PM  2  a case like this, where the ownership period is 12, 13 years

12:42:10PM  3  ago, the likely result of doing that would be that all the

12:42:13PM  4  claims would be denied, because I doubt anyone would have any

12:42:16PM  5  proof, in which case we would deny the claim for failure to

12:42:19PM  6  respond to the deficiency notice.

12:42:21PM  7  Q.   So a deficiency notice, in a situation where multiple

12:42:27PM  8  claims were made on the same fax number, would be one way to

12:42:30PM  9  handle a situation if it arose of an intentionally fraudulent

12:42:36PM  10  actor?

12:42:38PM  11  A.   Correct.

12:42:39PM  12  Q.   And have you ever had an intentionally fraudulent actor in

12:42:44PM  13  a case with multiple claims filed for the same number?

12:42:51PM  14  A.   We have had multiple claims filed for the same number.  I

12:42:55PM  15  don't know that I can say with certainty whether we've had an

12:42:58PM  16  intentionally fraudulent actor amongst that group.  I can't

12:43:03PM  17  really speak to the state of mind of the people that file the

12:43:05PM  18  claims.

12:43:06PM  19  Q.   And it was handled with deficiency notices; is that

12:43:10PM  20  correct?

12:43:10PM  21  A.   I can't say for certainty -- with certainty.  That's an

12:43:15PM  22  option, but, again, often on TCP cases, the budget is tight and

12:43:20PM  23  clients are looking to minimize administration costs because

12:43:24PM  24  those do deplete the funds available to pay claimants.  And so

12:43:27PM  25  sometimes with the cost-benefit analysis, if it's a claim where

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

12:43:30PM 1  people are only getting you know, 10 or $15, it may make more

12:43:34PM 2  sense to just pay those claims rather than have the

12:43:38PM 3  administrator spend twice that to mail out letters, process

12:43:41PM 4  responses, answer phone calls related to them and that sort of

12:43:44PM 5  thing.  So without doing pretty significant research, I don't

12:43:47PM 6  know that I can say that those scenarios -- how specifically

12:43:51PM 7  those scenarios were handled and every time they come up.

12:43:54PM 8          MR. GOOD:  I have no further questions.

12:43:55PM 9          THE COURT:  All right.  Mr. Piper, are you going to

12:43:59PM 10 have anything else?

12:44:00PM 11         MR. PIPER:  Not on cross-examination of this witness.

12:44:02PM 12         THE COURT:  All right.  Mr. Collins, anything else?

12:44:07PM 13         MR. COLLINS:  I do, Your Honor.

12:44:08PM 14         THE COURT:  All right.  How much would you

12:44:08PM 15 anticipate?

12:44:09PM 16         MR. COLLINS:  Ten to 15 minutes.  I'll do my best.

12:44:13PM 17         THE COURT:  Let's try to go forward and see if we can

12:44:13PM 18 accomplish this, then.

12:44:13PM 19         MR. MESTER:  Judge --

12:44:17PM 20         THE COURT:  Mr. Mester, do you want a break?

12:44:17PM 21         MR. MESTER:  Yes.

12:44:20PM 22         THE COURT:  Ms. Kovach, let's take a 15-minute break,

12:44:22PM 23 at least, rather than break for lunch since you're only

12:44:25PM 24 anticipating about 15 more minutes, that way -- I don't want a

12:44:28PM 25 lengthy break so you can get on your day -- the remainder of

LOREE KOVACH - CROSS-EXAM BY MR. GOOD

12:44:31PM  1  the day without keeping you.

12:44:33PM  2          So we're going to take a 15-minute break and give

12:44:36PM  3  everybody a little bit of a pause, and we'll come back.  It's

12:44:39PM  4  quarter till.  Why don't we come back in at 1 o'clock.

12:44:42PM  5          All right.  We'll be in recess.

12:44:44PM  6      (Proceedings in recess from 12:44 p.m. until 1:00 p.m.)

01:00:44PM  7          THE COURT:  All right.  Everybody set?

01:00:46PM  8          MR. MESTER:  Yes, sir.

01:00:47PM  9          THE COURT:  All right.  We're going back on the

01:00:50PM 10  record.

01:00:50PM 11          Mr. Collins, before you begin, I do have a question

01:00:53PM 12  for Ms. Kovach.

01:00:54PM 13          Ms. Kovach, let me ask you, you testified a moment

01:00:58PM 14  ago in response to some of Mr. Good's questions that -- well,

01:01:07PM 15  let me rephrase that.

01:01:09PM 16          Do you know if Mr. Good's client was identified only

01:01:17PM 17  on the reverse lookup for LexisNexis?

01:01:25PM 18          THE WITNESS:  You mean not identified in the

01:01:29PM 19  TransUnion dataset?

01:01:31PM 20          THE COURT:  Yes.

01:01:33PM 21          THE WITNESS:  My understanding is that's correct.  I

01:01:34PM 22  have not personally looked in both datasets for Mr. Good's

01:01:39PM 23  client's fax number.

01:01:40PM 24          THE COURT:  All right.  As far as the identification

01:01:41PM 25  in the LexisNexis reverse lookup, were there any other

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

01:01:47PM  1  individuals or entities associated with the number that is

01:01:51PM  2  associated with Mr. Good's client?

01:01:55PM  3          THE WITNESS:  Unfortunately, Your Honor, I don't know

01:01:57PM  4  that off the top of my head.  I would be happy to take a look,

01:02:01PM  5  and then, you know, we can get that information to you if you

01:02:03PM  6  need it.

01:02:04PM  7          THE COURT:  All right.

01:02:04PM  8          MR. GOOD:  Your Honor, one of the exhibits that has

01:02:07PM  9  already been agreed to by the parties, we could put it on the

01:02:10PM 10  screen and I could give you the line number and you could look

01:02:13PM 11  at it now if you wanted.

01:02:15PM 12          THE COURT:  All right.  Which exhibit is it?

01:02:18PM 13          MR. GOOD:  It's BTL Exhibit 3.  And it's row 44243.

01:02:40PM 14          THE COURT:  What page is it on?

01:02:42PM 15          MR. GOOD:  It's a native spreadsheet, Your Honor.

01:03:03PM 16          MR. PIPER:  What row is it?

01:03:06PM 17          MR. GOOD:  44243.

01:03:08PM 18          THE COURT:  It's impossible to see, and I'll show you

01:03:11PM 19  why.

01:03:11PM 20          MR. GOOD:  Can I help you?

01:03:13PM 21          THE COURT:  I'll share the screen so you can tell --

01:03:16PM 22  so I can show you what I'm looking at.

01:03:20PM 23          MR. GOOD:  That's a PDF.

01:03:22PM 24          THE COURT:  Is this also in Excel?

01:03:25PM 25          MR. GOOD:  Yes, it's also in Excel.

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

01:03:27PM 1         THE COURT:  All right.  One moment.

01:03:29PM 2         MR. GOOD:  Thank you.

01:03:33PM 3         And, Your Honor, if you wanted, I believe I could ask

01:03:38PM 4 Mr. Hara to put it on his screen if you're unable to.

01:03:41PM 5         THE COURT:  All right.  Is this 3A, again?

01:03:44PM 6         MR. GOOD:  Yes, it's 3A, and it's the spreadsheet,

01:03:47PM 7 and it's row 44243.

01:04:43PM 8         THE COURT:  Bear with me.  I apologize.

01:06:02PM 9         MR. GOOD:  Row 44243, and if Your Honor would like, I

01:06:05PM 10 could help you undo the freeze pane so you could see the

01:06:17PM 11 column.  If you wanted me to approach, Your Honor.

01:06:35PM 12         I think you're going the wrong way.

01:06:37PM 13         THE COURT:  I'm going the wrong way?

01:06:39PM 14         MR. GOOD:  Yeah.  You're at row 6844, you need to go

01:06:45PM 15 36,000 rows down.  There you go, you're close now.

01:06:48PM 16         THE COURT:  All right.  I got it.  41 --

01:06:53PM 17         MR. GOOD:  41,000.

01:06:55PM 18         THE COURT:  What was it again?  44 --

01:06:58PM 19         MR. GOOD:  -- 243.  There, you got it.

01:07:10PM 20         THE COURT:  All right.

01:07:17PM 21         MR. GOOD:  If you widen out column C, that would

01:07:21PM 22 allow you to see the full name.  There it is.  That's it.

01:07:29PM 23         THE COURT:  Yes.  Thank you.

01:07:30PM 24         All right.  So is this exhibit representing that this

01:07:33PM 25 was the only entity identified with that number listed?

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

01:07:40PM 1      THE WITNESS:  It does look like that to me.  I

01:07:42PM 2 believe the way the spreadsheet was set up, there would be

01:07:45PM 3 additional entities listed in columns to the right.  If you

01:07:51PM 4 just want to scroll over, so we can double check.  Yeah, that

01:07:55PM 5 looks like that is the only one.

01:07:58PM 6      THE COURT:  So looking at Exhibit 3A, row 44243,

01:08:05PM 7 which now I'm looking at what you represented the column to the

01:08:08PM 8 right, if there were multiple entities, they would be

01:08:11PM 9 identified in these columns?

01:08:14PM 10      THE WITNESS:  Yes, Your Honor, that's correct.  So

01:08:15PM 11 you can see the example right below the row you've highlighted,

01:08:20PM 12 which are multiple results there.

01:08:22PM 13      THE COURT:  All right.  And I'm going to scroll

01:08:23PM 14 through all the way back.  And do you see any other entities

01:08:27PM 15 other than Tampa Chiropractic?

01:08:31PM 16      THE WITNESS:  I do not.

01:08:32PM 17      THE COURT:  All right.  Excuse me, to be clear, that

01:08:36PM 18 was a website; Medical & Chiropractic Clinic.

01:08:40PM 19      THE WITNESS:  Correct, Your Honor.  I don't see

01:08:42PM 20 anything else besides that entity.

01:08:44PM 21      THE COURT:  All right.  Thank you.

01:08:45PM 22      All right.  Anybody want to follow-up on those

01:08:47PM 23 questions before I recognize Mr. Collins?  Mr. Good?

01:08:53PM 24      MR. GOOD:  No, Your Honor.

01:08:57PM 25      THE COURT:  Mr. Piper.

## LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS

01:08:58PM 1      MR. PIPER:  No.

01:08:59PM 2      THE COURT:  All right.  Mr. Collins.  Thank you.

01:09:00PM 3      MR. COLLINS:  Thank you, Your Honor.

01:09:02PM 4                  REDIRECT EXAMINATION

01:09:02PM 5  BY MR. COLLINS:

01:09:08PM 6  **Q.**    Hi, Ms. Kovach.  Can you hear me okay?

01:09:11PM 7  **A.**    I can.

01:09:12PM 8  **Q.**    I'll try to be as brief as possible, although lawyers have

01:09:15PM 9  a hard time with that sometimes.

01:09:17PM 10      Let me start here.  With the data that you currently

01:09:21PM 11  have -- that Epiq currently has, do you have any way of knowing

01:09:26PM 12  whether a claimant is a class member?

01:09:34PM 13  **A.**    So you're saying, when we receive a claim form back from

01:09:37PM 14  somebody, do we have any way of knowing with certainty?  I

01:09:41PM 15  guess it depends on the level of certainty you want to put in

01:09:46PM 16  to somebody signing a claim form under oath.  So we have no way

01:09:49PM 17  of knowing, aside from the claimant's assertion under oath and

01:09:52PM 18  the fact that they're able to provide a phone number.

01:09:56PM 19  **Q.**    And you said that -- I believe in discussion with the

01:10:01PM 20  Court, as well as Mr. Good, you covered this topic of

01:10:06PM 21  LexisNexis, and I believe you said something along the lines

01:10:09PM 22  of, that LexisNexis results likely do have similar class

01:10:14PM 23  members in them beyond what TransUnion has.  Do you recall that

01:10:20PM 24  discussion?

01:10:23PM 25  **A.**    Yes, that's correct.  And, again, just using the term

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:10:27PM  1   class member loosely, I think we've established that neither
01:10:29PM  2   database can identify people who received faxes.  The point I
01:10:32PM  3   was trying to make was, it is likely that the Lexis results do
01:10:37PM  4   have owners of the fax numbers at issue between 2009/2010 in
01:10:41PM  5   the results, it's just the percentage that we wouldn't be able
01:10:47PM  6   to state.

01:10:48PM  7   **Q.**   And can you say with any level of certainty or reliability
01:10:51PM  8   that the Lexis results have more class members than TransUnion
01:10:56PM  9   doesn't, I guess, besides the named plaintiff we just looked
01:11:00PM  10  at?

01:11:03PM  11  **A.**   Aside from the named plaintiff record -- and I don't know
01:11:06PM  12  if there are other named plaintiff records that we could look
01:11:09PM  13  at -- that would be the only way we would be able to at this
01:11:12PM  14  point say with any certainty whether the Lexis data had other
01:11:18PM  15  class members than TransUnion didn't.  We would have to know
01:11:21PM  16  someone is a class member now.

01:11:24PM  17  **Q.**   And so with that understanding of the likelihood that it
01:11:29PM  18  has more -- that Lexis has more class members, can you give a
01:11:36PM  19  percentage of how many class members it's more likely to have?
01:11:40PM  20  In other words, can you say that five percent of the hits are
01:11:43PM  21  class members and 95 percent are not, or that 50 percent are
01:11:48PM  22  class members and 50 percent are not?  Can you put any
01:11:52PM  23  percentages on it?

01:11:53PM  24  **A.**   No.  I think we've already established I would have no way
01:11:56PM  25  of knowing that based on the information available today.

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:12:00PM  1  **Q.**   Both the TransUnion and Lexis results are providing names

01:12:06PM  2  and addresses that were likely associated with the numbers at

01:12:12PM  3  some point in time, right?

01:12:15PM  4  **A.**   Correct.

01:12:17PM  5  **Q.**   So if there's three hits for a line, it's likely that

01:12:25PM  6  those names were associated with the number at some point in

01:12:28PM  7  time, we just can't say with accuracy when?

01:12:36PM  8  **A.**   Correct.

01:12:36PM  9         THE COURT:  That's as to TransUnion?  Is that the

01:12:41PM  10  question?

01:12:41PM  11         MR. COLLINS:  As to both of them, Your Honor.

01:12:42PM  12         THE COURT:  Well, as to TransUnion, I thought your

01:12:45PM  13  testimony was that you could say it was for the time period of

01:12:49PM  14  2009/2010?

01:12:52PM  15         THE WITNESS:  TransUnion is representing that its

01:12:55PM  16  search is designed to identify owners between 2009 and 2010.

01:13:00PM  17  But Mr. Collins' question was in either dataset is it likely

01:13:07PM  18  that the -- the names we were given are people who the number

01:13:11PM  19  was associated with at some point in time, and I think that's a

01:13:13PM  20  true statement.

01:13:15PM  21         THE COURT:  All right.  Thank you.

01:13:16PM  22  **Q.**   (By Mr. Collins)  And it's possible that the TransUnion

01:13:27PM  23  results have a result where the person, in fact, was associated

01:13:32PM  24  with the number in 2008 or 2012 as opposed to 2009 and 2010,

01:13:42PM  25  right?

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:13:42PM  1  **A.**  I mean, I suppose that's possible.  I don't think we have

01:13:44PM  2  any way of knowing.  We don't have access to TransUnion's data,

01:13:47PM  3  we don't know how they determine association, et cetera.

01:13:54PM  4  **Q.**  And if TransUnion gives three results, even in the context

01:13:59PM  5  of trying to identify people associated with the lines in

01:14:04PM  6  2009/2010, there's no way to know which of those three is the

01:14:07PM  7  class member, if any of those three, correct?

01:14:12PM  8  **A.**  That's correct.  Again, none of the datasets identify who

01:14:15PM  9  received a fax.

01:14:18PM 10  **Q.**  So if a claimant acquired a number in 2012 and put their

01:14:27PM 11  fax number on the claim form, is there any way, with the

01:14:33PM 12  information you have, to know that that is an inaccurate or

01:14:37PM 13  fraudulent claim?

01:14:43PM 14  **A.**  For the scenario you're describing, we mail notice to

01:14:46PM 15  someone who it turns out obtained the number in 2012, they put

01:14:50PM 16  that number on the claim form and send it back in.  You're

01:14:56PM 17  correct, at this point we would -- at that point we would have

01:14:58PM 18  no way of knowing that that claim was invalid.

01:15:10PM 19  **Q.**  And if the name that a claimant puts on a claim form is

01:15:15PM 20  different than the name that notice is sent to, do you have any

01:15:24PM 21  way of knowing that that person is not the class member?

01:15:33PM 22  **A.**  Which person?  The person who puts the name on the claim

01:15:37PM 23  form, or the name in the dataset?

01:15:41PM 24  **Q.**  Well, let's do both.  If -- let's start with the name on

01:15:46PM 25  the claim form.

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:15:51PM 1    A.    So you're saying we mailed notice to someone, a particular

01:15:57PM 2    person at a particular address, the claim form is returned to

01:16:01PM 3    us with a different name on it.  We have no way of knowing --

01:16:06PM 4    and everything else matches, they provided the phone number

01:16:10PM 5    that matches to the record, it's just a different name.  No, we

01:16:13PM 6    would not have any way of knowing whether or not that person

01:16:17PM 7    was a class member without asking for further information,

01:16:25PM 8    right.

01:16:33PM 9    Q.    So given that -- given that there's no way to know who the

01:16:40PM 10   class member is and whether or not a claimant who fills out a

01:16:47PM 11   form is or is not a class member, if the Buccaneers were to

01:16:54PM 12   challenge a claim form, what would Epiq do to determine whether

01:17:02PM 13   the claim is a valid claim or not?

01:17:09PM 14   A.    I think it would depend on the basis for your challenge.

01:17:14PM 15   If -- generally, if you were claiming that that person who

01:17:18PM 16   submitted the claim didn't own the fax number during the

01:17:21PM 17   timeframe at issue, I think the only option available to us,

01:17:25PM 18   that I'm aware of, would be what we discussed earlier with

01:17:28PM 19   Mr. Good, which would be to send what we would call a

01:17:31PM 20   deficiency notice to the claimant and ask them to provide proof

01:17:34PM 21   that they either owned the number during the timeframe or that

01:17:38PM 22   they owned the number and received a fax at issue.  So it

01:17:44PM 23   really would depend on how much proof the Buccaneers would

01:17:47PM 24   require to resolve the challenge.

01:17:50PM 25   Q.    Well, what type of proof could you request?

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:17:54PM  1   A.   We could request phone records, and I think that's pretty

01:17:59PM  2   much the only type of proof that would work here.  Maybe

01:18:04PM  3   somebody received a fax and saved it for 13 years; that seems

01:18:08PM  4   very unlikely.  I think the most likely type of proof that

01:18:11PM  5   would work here would be some sort of copy of a phone record

01:18:14PM  6   that either simply showed ownership of the fax number during

01:18:17PM  7   the timeframe we're talking about, or, you know, if it shows

01:18:21PM  8   incoming fax phone numbers, that would be sort of the most

01:18:25PM  9   perfect proof, but, again, very unlikely that someone would

01:18:28PM 10   have that, or even be able to request it from their phone

01:18:33PM 11   company this far out.

01:18:34PM 12   Q.   So other than a phone record from 2009/2010 that shows a

01:18:39PM 13   subscriber held the line or a copy of the fax received itself,

01:18:44PM 14   is there any other way to determine that a claimant is in fact

01:18:50PM 15   a class member?

01:18:57PM 16   A.   So claimants are creative in providing proof, so I'm not

01:19:01PM 17   going to say that that's the only type of proof that would

01:19:03PM 18   work.  Somebody might come up with something else that I

01:19:06PM 19   haven't thought of.  There's also obviously always the option

01:19:08PM 20   of subpoenaing the phone provider.  I don't -- that's not

01:19:13PM 21   anything Epiq would ever do to validate claim forms absent

01:19:17PM 22   express direction to do so in the settlement agreement or

01:19:20PM 23   directly from the Court.  But, you know, if you're asking me to

01:19:24PM 24   provide a definitive list of all the ways someone could prove

01:19:29PM 25   that they were a class member, I think that would have to be

**LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS**

01:19:31PM   1    included as well.

01:19:35PM   2    **Q.**   You received some questions earlier about types of

01:19:37PM   3    fraudulent claims and how often fraudulent claims occur.  Is it

01:19:43PM   4    fair to say that the more notice that goes out, the greater

01:19:47PM   5    likelihood of fraudulent claims?

01:19:53PM   6    **A.**   I don't know that that's necessarily fair as a

01:19:55PM   7    generalization.  It depends on the type of information required

01:20:01PM   8    to file a valid proof of claim.  So, you know, if we're talking

01:20:08PM   9    about a finite list of phone numbers and you have to provide

01:20:11PM   10   one of those phone numbers, I don't know that it's fair to

01:20:16PM   11   generally just say the more notice that goes out, the higher

01:20:19PM   12   the likelihood of fraud, because the person attempting fraud

01:20:23PM   13   would still need to know one of those relevant phone numbers.

01:20:27PM   14   **Q.**   Fair enough.  So I'll ask specific to the context of this

01:20:30PM   15   case.

01:20:30PM   16        In the context of this case, if notice were to go not to

01:20:34PM   17   just, for example, some subset of the TransUnion database but

01:20:40PM   18   also to some or all subset of the LexisNexis database, and in

01:20:42PM   19   the context of the case where the current data doesn't allow

01:20:47PM   20   you to know who the class member is, and we don't have names,

01:20:51PM   21   is expanding the notice to LexisNexis likely to lead to greater

01:20:57PM   22   or more fraudulent claims in your experience?

01:21:02PM   23   **A.**   So in the specific scenario you're describing, as we

01:21:06PM   24   discussed, we don't really have any way of knowing if someone

01:21:09PM   25   puts down a phone number, whether they owned it during the

LOREE KOVACH - REDIRECT EXAM BY MR. COLLINS

01:21:11PM 1   right timeframe to file the claim under oath, so it would be

01:21:14PM 2   hard to say.  I don't think I have any, like -- there's no way

01:21:20PM 3   I could quantify that, there's no research I could do into

01:21:24PM 4   historical cases to determine that.

01:21:26PM 5        I think I can tell you that my gut reaction is there would

01:21:31PM 6   probably be an increase in claims that I think we called

01:21:36PM 7   unintentional fraud -- right? -- someone who gets a claim form,

01:21:41PM 8   doesn't read very closely, puts down their current fax number,

01:21:45PM 9   signs the claim form and sends it back in, when, in fact, they

01:21:49PM 10  didn't actually own the fax number and receive a fax during the

01:21:53PM 11  timeframe we're talking about here.  I think just by virtue of

01:21:55PM 12  sending out more notices in the mail, you would probably have

01:21:59PM 13  an increase in that scenario.  But, again, there's no way for

01:22:02PM 14  us to tell, so that's really just speculation on my part.  We

01:22:04PM 15  can't quantify that when we do actually get claims in these

01:22:09PM 16  cases.

01:22:09PM 17  Q.   Fair enough.

01:22:10PM 18       And maybe I'll try to question it a different way, or from

01:22:10PM 19  the other side of it, which is to say, when Epiq receives a

01:22:19PM 20  claim form in this case, from the claim form and from the data

01:22:24PM 21  you currently have, Epiq has no way of knowing whether it's a

01:22:28PM 22  valid claim or an intentional or unintentional fraudulent

01:22:33PM 23  claim, right?

01:22:35PM 24  A.   That's correct.  I mean, assuming the person provides the

01:22:39PM 25  requisite information, right.

**LOREE KOVACH - CROSS-EXAM BY MR. GOOD**

01:22:43PM  1   Q.   And in your experience, are fraudulent claims more likely

01:22:49PM  2   when a pay-out or the potential pay-out is larger to a class

01:22:54PM  3   member?

01:23:01PM  4   A.   No, I don't think that's necessarily a fair statement.  I

01:23:03PM  5   think the likelihood of fraud depends on a lot of factors,

01:23:08PM  6   including the proof required to be able to submit a claim.

01:23:15PM  7   Q.   Okay.  Everything else equal, is there fraudulent claim

01:23:23PM  8   more likely when the potential pay-out is $20 versus over $600?

01:23:37PM  9   A.   I don't know that I can answer that question.  I just --

01:23:40PM 10   I --

01:23:41PM 11   Q.   Fair enough.

01:23:43PM 12           MR. COLLINS:  I have no further questions,

01:23:44PM 13   Your Honor.

01:23:44PM 14           THE COURT:  All right.  Thank you.

01:23:45PM 15           MR. COLLINS:  Thank you, Ms. Kovach.

01:23:46PM 16           THE COURT:  Yes.  Mr. Good.

01:23:48PM 17           MR. GOOD:  I have a brief follow-up, Your Honor.

01:23:50PM 18           THE COURT:  All right.

01:23:51PM 19                     CROSS-EXAMINATION

01:23:51PM 20   BY MR. GOOD:

01:23:58PM 21   Q.   During the last line of questioning, you were asked about

01:24:01PM 22   a fax number that you were subsequently assigned after 2010.

01:24:06PM 23   Do you recall that?

01:24:09PM 24   A.   Yes.

01:24:09PM 25   Q.   What is the probability that a fax number recycled by a

01:24:14PM 1  phone carrier would then be reassigned and repurposed to also

01:24:18PM 2  be a fax number, if you know?

01:24:21PM 3  **A.**   I have no idea.

01:24:25PM 4  **Q.**   Would it be less than a hundred percent?

01:24:28PM 5         THE COURT:  Asked and answered.  Move on.

01:24:36PM 6         MR. GOOD:  I've no further questions.

01:24:37PM 7         THE COURT:  All right.  Mr. Piper, anything else?

01:24:40PM 8         MR. PIPER:  Not with this witness.

01:24:41PM 9         THE COURT:  All right.  Can Ms. Kovach be released?

01:24:44PM 10         MR. COLLINS:  Yes, Your Honor.

01:24:45PM 11         THE COURT:  Ms. Kovach, thank you again for your

01:24:47PM 12  time.  Your information was very helpful to me, so thank you.

01:24:51PM 13         THE WITNESS:  All right.  Thank you, Your Honor.

01:24:55PM 14  Bye.

01:24:55PM 15         THE COURT:  Mr. Hara, you can put your video back on

01:24:58PM 16  if you'd like to join us.

01:25:03PM 17         All right.  Next witness, please.

01:25:07PM 18         MR. MESTER:  Your Honor, that's all we have.  We've

01:25:10PM 19  subpoenaed others, but we didn't get any compliance.

01:25:12PM 20         THE COURT:  Any witnesses?

01:25:13PM 21         MR. GOOD:  I'd like to renew the motion to strike the

01:25:15PM 22  declarations of LexisNexis and all of the declarations of

01:25:19PM 23  Kenneth Sponsler for the reasons previously stated.

01:25:21PM 24         THE COURT:  All right.  Let's get through witnesses

01:25:22PM 25  first.  Any witnesses?

| | | |
|---|---|---|
| 01:25:25PM | 1 | MR. GOOD:  (No oral response.) |
| 01:25:25PM | 2 | THE COURT:  Are you going to call any witnesses? |
| 01:25:26PM | 3 | MR. GOOD:  I mean, I called Ken Sponsler.  They said |
| 01:25:29PM | 4 | they're not producing him, so I have nobody else. |
| 01:25:34PM | 5 | THE COURT:  All right. |
| 01:25:34PM | 6 | MR. PIPER:  I have our two declarations.  There's no |
| 01:25:37PM | 7 | objections to those, as I understand it.  If you want to treat |
| 01:25:39PM | 8 | that as testimony, we can put that in, or I can do that -- |
| 01:25:44PM | 9 | THE COURT:  All right.  Let's start there. |
| 01:25:47PM | 10 | Mr. Collins, any objections to the declarations? |
| 01:25:51PM | 11 | Mr. Mester? |
| 01:25:52PM | 12 | MR. MESTER:  Mr. Piper's? |
| 01:25:54PM | 13 | THE COURT:  Yes. |
| 01:25:54PM | 14 | MR. MESTER:  No, Your Honor. |
| 01:25:55PM | 15 | THE COURT:  Any objections to the declarations? |
| 01:25:56PM | 16 | MR. GOOD:  No, Your Honor. |
| 01:25:57PM | 17 | THE COURT:  All right.  So for the record, we're |
| 01:26:11PM | 18 | going to introduce -- and I have, Mr. Piper, there are two |
| 01:26:16PM | 19 | declarations, Intervenors' 1 and Intervenors' 2.  Is that what |
| 01:26:22PM | 20 | you're requesting? |
| 01:26:23PM | 21 | MR. PIPER:  Correct, Your Honor. |
| 01:26:24PM | 22 | THE COURT:  All right.  They'll be introduced without |
| 01:26:27PM | 23 | objection. |
| 11:06:23AM | 24 | (Intervenors' Exhibits 1 and 2 introduced.) |
| 01:26:29PM | 25 | THE COURT:  All right.  Mr. Good, you want to renew |

01:26:31PM  1    your motions now?

01:26:31PM  2                    MR. GOOD:  Yes, Your Honor.

01:26:32PM  3                    THE COURT:  You may do so.

01:26:44PM  4                    MR. GOOD:  As previously stated at the beginning of

01:26:46PM  5    this hearing, Kenneth Sponsler has filed three declarations in

01:26:52PM  6    2022.  In March of 2016, BTL filed a motion regarding the use

01:26:58PM  7    of their disclosed expert, David Canfield.  They sought to

01:27:02PM  8    replace David Canfield.  This motion was denied by this Court

01:27:07PM  9    at docket 217.

01:27:09PM  10                   BTL has not sought to renew that motion, they have

01:27:13PM  11   not sought leave of Court to name a new expert, and they have

01:27:16PM  12   done so unilaterally without even properly disclosing him as an

01:27:21PM  13   expert.  They have produced three opinion expert declarations,

01:27:27PM  14   for lack of a better term, because they're not really styled as

01:27:30PM  15   reports.  They were produced improperly.  They were -- he has

01:27:36PM  16   not been subject to cross-examination, despite a statement by

01:27:39PM  17   Mr. Mester to this Honorable Court at a prior hearing that they

01:27:43PM  18   would produce him for cross-examination, and they have failed

01:27:46PM  19   to do so.

01:27:46PM  20                   They knew that plaintiffs intended to call him as it

01:27:50PM  21   was discussed numerous times, and instead they decided to pivot

01:27:54PM  22   and claim that they needed to bring up Mr. Biggerstaff, who has

01:27:59PM  23   not worked on this case in over six years, has never seen the

01:28:02PM  24   settlement agreement in this case, was not involved in the

01:28:05PM  25   settlement process, was not consulted in any way, and, again,

01:28:09PM 1   has done no work on this case in over six years.

01:28:11PM 2          This is clearly a ploy.  Mr. Sponsler's declarations,

01:28:15PM 3   all three of them, should be stricken, and Mr. Sponsler should

01:28:18PM 4   not be allowed to be retained in this matter.  They should have

01:28:22PM 5   to use the original expert, who was properly disclosed and who

01:28:26PM 6   was the subject of a prior motion, his name is David Canfield,

01:28:29PM 7   and he did produce an expert report in November of --

01:28:40PM 8   November 16th, 2015.

01:28:41PM 9          THE COURT:  All right.  And as to the declaration for

01:28:45PM 10  LexisNexis?

01:28:45PM 11         MR. GOOD:  As to LexisNexis, we obtained it

01:28:49PM 12  yesterday.  We anticipated getting witness testimony.  We

01:28:52PM 13  believe that this is an evidentiary hearing, we have the right

01:28:54PM 14  to cross-examine the witness providing sworn testimony

01:28:58PM 15  regarding the testimony provided.  We are being deprived of

01:29:01PM 16  that opportunity, because Mr. Mester got it yesterday

01:29:06PM 17  afternoon, but they're unwilling to produce the witness.  They

01:29:09PM 18  took a lot of time in drafting that declaration and no time

01:29:12PM 19  producing a witness.

01:29:13PM 20         It would appear to me that there is somehow an

01:29:18PM 21  agreement, whereby producing the declaration, it was done in

01:29:20PM 22  lieu of testimony.  This is improper for an evidentiary

01:29:22PM 23  hearing, whereas the declarants have to be willing to answer

01:29:25PM 24  questions and be subject to cross-examination for the

01:29:28PM 25  statements being put forth in support of the position.  We are

01:29:33PM 1   being deprived of cross-examination of this witness.

01:29:36PM 2          As you saw from Loree Kovach's testimony today, she

01:29:39PM 3   can't say what sources were used by LexisNexis, she can't say a

01:29:43PM 4   lot of things about the sources, because they aren't disclosing

01:29:46PM 5   them.  And while that's their prerogative, and while she stands

01:29:51PM 6   by the search of LexisNexis, we believe we're entitled to

01:29:54PM 7   cross-examine a witness from LexisNexis who's putting forth

01:29:57PM 8   these statements under penalty of perjury, because, again, this

01:30:04PM 9   is an evidentiary hearing.

01:30:04PM 10         And I'd like to remind the Court, this evidentiary

01:30:04PM 11  was not requested by plaintiffs' counsel or intervenors'

01:30:07PM 12  counsel, it was requested by defendants' counsel, who is now

01:30:11PM 13  obtaining these declarations, putting them forth as testimony

01:30:14PM 14  and not allowing us to cross-examine these witnesses.  So it's

01:30:17PM 15  three declarations for Mr. Sponsler and one declaration from

01:30:21PM 16  LexisNexis.

01:30:21PM 17         THE COURT:  All right.  Thank you.

01:30:23PM 18         All right.  Mr. Mester, Mr. Collins.

01:30:25PM 19         MR. MESTER:  Your Honor, let me go to the second

01:30:27PM 20  issue first.

01:30:27PM 21         THE COURT:  Let me just say how I construe the

01:30:30PM 22  objections:  the first, as to LexisNexis, is a hearsay

01:30:33PM 23  objection; as to Mr. Sponsler, both are relevancy and hearsay

01:30:38PM 24  objections.

01:30:38PM 25         MR. MESTER:  On the second one, clearly contemplated

01:30:40PM 1 by rule -- Federal Rule of Evidence 804, the declarant is

01:30:42PM 2 unavailable or was advised by his counsel that they are not

01:30:47PM 3 willing to produce him because we didn't serve the subpoena on

01:30:48PM 4 the correct entity.  That wasn't our fault --

01:30:50PM 5         THE COURT:  I wouldn't say that means unavailable

01:30:52PM 6 under the rule, but I -- believe me, I appreciate -- you made

01:30:55PM 7 it clear the efforts you've undertaken to try to get the

01:30:59PM 8 witnesses here.  I don't know if that necessarily means

01:31:02PM 9 unavailable.

01:31:02PM 10        MR. MESTER:  I think, Your Honor, I believe there's a

01:31:05PM 11 subset that says as if they were not willing to comply.

01:31:09PM 12        THE COURT:  That's, I guess, my question is, it

01:31:12PM 13 didn't seem that they were not willing to comply, they're

01:31:14PM 14 suggesting that the wrong entity was served.  Is that correct?

01:31:16PM 15        MR. MESTER:  They said all they would do is give us a

01:31:18PM 16 declaration, they wouldn't produce a live witness.

01:31:21PM 17        THE COURT:  All right.

01:31:21PM 18        MR. MESTER:  We can certainly -- Your Honor, we can

01:31:22PM 19 certainly reconvene at some point, and I'm sure --

01:31:23PM 20        THE COURT:  No.  Understood.  Okay.

01:31:24PM 21        MR. MESTER:  We're not at all adverse to doing that.

01:31:27PM 22 We'd like to have all the other witnesses before Your Honor as

01:31:29PM 23 well.

01:31:29PM 24        THE COURT:  Yes.

01:31:30PM 25        MR. MESTER:  This was not for want of effort.  But

01:31:32PM   1   under the circumstances, we did everything we could to get this

01:31:34PM   2   witness in front of Your Honor, and the declaration was the

01:31:37PM   3   best we could do.  And I think it clearly satisfies both Rule

01:31:40PM   4   804 and 807, so I think it is admissible, and we prefer

01:31:44PM   5   admission of it.

01:31:44PM   6         With respect to Mr. Biggerstaff and Mr. Sponsler,

01:31:47PM   7   this was not -- this issue was not raised with us, the 20- -- I

01:31:52PM   8   believe Mr. Good said the 2016 ruling.  My recollection, and I

01:31:55PM   9   admit it's very vague, because that was in the context of a

01:31:58PM  10   contested motion for class certification, was Your Honor denied

01:32:02PM  11   the motion without prejudice.  If we need to renew it, we'd be

01:32:06PM  12   happy to do so.  But has Your Honor promptly recalls,

01:32:08PM  13   Mr. Canfield had severe health issues and is no longer serving

01:32:11PM  14   as an expert and, as I understand, hasn't done so for almost a

01:32:14PM  15   decade.  So it's not an option to go back to Mr. Canfield and

01:32:18PM  16   ask him to do what Mr. Sponsler's done.  That's the first

01:32:21PM  17   point.

01:32:21PM  18         The second point is, we provided Mr. Sponsler's

01:32:24PM  19   declarations to assist the Court in the context of an approval

01:32:28PM  20   process for a class settlement.  I think it's a gratuitous

01:32:32PM  21   assumption by Mr. Good to think that we should have been able

01:32:38PM  22   to foretell back in 2013, or whenever it was appropriate to

01:32:42PM  23   identify the experts, and that was before I was even in the

01:32:44PM  24   case, who we might need at this point in an entirely different

01:32:49PM  25   context.

01:32:49PM   1          But I would say this, we subpoenaed Mr. Biggerstaff,

01:32:53PM   2   and we certainly wanted to and believe we should be allowed to

01:32:57PM   3   question Mr. Biggerstaff.  Mr. Good is correct, Mr. Sponsler

01:32:59PM   4   has never been questioned in this case, but neither has

01:33:02PM   5   Mr. Biggerstaff.  Mr. Biggerstaff has testified -- or opined on

01:33:06PM   6   two critical issues that are before the Court today.  The first

01:33:08PM   7   is the viability, the accuracy, and the reliability of a

01:33:13PM   8   reverse lookup.  I would respectfully submit, he was wrong.

01:33:15PM   9   It's not reliable and it's not accurate at this point.  So

01:33:18PM  10   clearly germane to what's before the Court.

01:33:20PM  11          And the second issue --

01:33:21PM  12          THE COURT:  But, Mr. Mester, what is known now to BTL

01:33:25PM  13   that would not have been known during the settlement

01:33:28PM  14   discussions for that very purpose?

01:33:29PM  15          MR. MESTER:  He had not run a reverse lookup at that

01:33:32PM  16   point.  We were relying on what he had told us.  No one had run

01:33:35PM  17   a reverse lookup.

01:33:36PM  18          MR. GOOD:  (Stands.)

01:33:36PM  19          THE COURT:  Mr. Good, let him finish his argument.

01:33:38PM  20   I'll give you a chance to be heard.  You don't have to stand up

01:33:40PM  21   every time you dislike something somebody is saying.  Just be

01:33:43PM  22   patient.  Have I ever deprived you of the opportunity to be

01:33:47PM  23   heard?

01:33:47PM  24          MR. GOOD:  Yes.

01:33:48PM  25          THE COURT:  All right.  Thank you for saying that.

01:33:50PM   1   Go ahead.

01:33:52PM   2   MR. MESTER:  I'm sorry, Your Honor.  I lost my train

01:33:54PM   3   of thought.

01:33:54PM   4   THE COURT:  You know, Mr. Good, I got to tell you,

01:33:58PM   5   for you to say that is insulting to the Court, because I have

01:34:01PM   6   never deprived you of that opportunity.  I give you every

01:34:04PM   7   opportunity and try to give you as much patience.

01:34:07PM   8   You're the only one in this courtroom that goes

01:34:10PM   9   around interrupting everyone else.  No one has ever stood up

01:34:14PM  10   during their arguments.  You're the one that doesn't show

01:34:17PM  11   respect and professionalism to everybody in this room, and I'm

01:34:21PM  12   not going to tolerate it.  So if I want to hear from you again,

01:34:25PM  13   I may turn to Mr. Addison, not you.  So you decide how you want

01:34:30PM  14   to proceed forward.  You understand me?

01:34:32PM  15   MR. GOOD:  Yes, Your Honor.

01:34:33PM  16   THE COURT:  All right.  Mr. Mester.

01:34:34PM  17   MR. MESTER:  With respect to what we don't know and

01:34:37PM  18   what we didn't know, you're correct, Your Honor, we were -- we

01:34:39PM  19   wondered, but we didn't know.  My point is that he opined that

01:34:44PM  20   it was accurate, it was feasible; he was incorrect.  But

01:34:48PM  21   there's a second point that in some ways is more direct.

01:34:51PM  22   Mr. Biggerstaff is also the source, obviously, of the

01:34:54PM  23   list, the list that was used for the reverse lookup.  And so

01:34:57PM  24   our point was, if the experts are going to be called,

01:35:01PM  25   Mr. Sponsler and Mr. Biggerstaff, we should hear from both of

01:35:04PM 1  them, and we would want to examine Mr. Biggerstaff not only on

01:35:07PM 2  the feasibility of a reverse lookup, but also in terms of the

01:35:12PM 3  accuracy of the list.

01:35:13PM 4       So to the extent that Mr. Good is moving to exclude

01:35:16PM 5  or strike Mr. Sponsler's declarations and opinions, we would do

01:35:20PM 6  likewise with Mr. Biggerstaff at this point, because we served

01:35:23PM 7  a lawful subpoena, no one showed up, no one served objections,

01:35:26PM 8  and here we are, and I don't believe Mr. Biggerstaff is

01:35:29PM 9  available.

01:35:29PM 10      THE COURT:  But what purpose is it being submitted

01:35:31PM 11 for as to the relevancy?  Are you suggesting just simply stated

01:35:34PM 12 reverse lookups should not even be contemplated by the Court?

01:35:37PM 13      MR. MESTER:  Your Honor, I wouldn't go that far.  We

01:35:39PM 14 fully admit, we fully acknowledge that we, the parties,

01:35:43PM 15 contemplated there would be a single reverse lookup performed

01:35:46PM 16 at the discretion of the settlement administrator choosing the

01:35:50PM 17 source that they would choose.  I think Ms. Kovach made very

01:35:52PM 18 clear that if left to her own devices, she would have chosen

01:35:54PM 19 TransUnion, as she did, and Epiq would have done that reverse

01:35:58PM 20 lookup.  So we understand.

01:35:59PM 21      We've always had reservations about reverse lookups,

01:36:01PM 22 and we certainly don't think reverse lookups solve the ultimate

01:36:03PM 23 ascertainability question, which is down the road.  But we

01:36:07PM 24 know -- we're not trying to get out of the settlement

01:36:10PM 25 agreement, we're not trying to avoid our obligations.  We think

01:36:13PM 1    what Mr. Good did by insisting on the second lookup was

01:36:16PM 2    contrary to the settlement agreement.  We don't think it was

01:36:19PM 3    reasonable, we don't think it's what's industry standard, we

01:36:21PM 4    don't think it's any of those things.  So we're willing to

01:36:24PM 5    settle, we can live with what we agreed to for purposes of

01:36:27PM 6    those --

01:36:27PM 7         THE COURT:  But the one thing that is easily provable

01:36:30PM 8    on this record, there's no doubt, as Ms. Kovach has testified

01:36:33PM 9    and has been magnified by all parties, there is no hundred

01:36:39PM 10   percent certainty on reverse lookups.  The one thing that is

01:36:42PM 11   certain is that TransUnion's lookup did not identify one member

01:36:46PM 12   of the class that we're aware of.

01:36:48PM 13        MR. MESTER:  Right.

01:36:49PM 14        THE COURT:  So what's your response to that?

01:36:51PM 15        MR. MESTER:  TransUnion puts a premium on accuracy

01:36:55PM 16   over quantity, and I think that's perfectly appropriate.  And

01:36:58PM 17   if I may, Your Honor --

01:36:59PM 18        THE COURT:  Yes.

01:37:00PM 19        MR. MESTER:  -- I'd like expand on that.  You quite

01:37:01PM 20   correctly pointed out Section VIII of the settlement agreement

01:37:05PM 21   and the process after the fact to be utilized.  But as you

01:37:08PM 22   heard from Ms. Kovach, if and when we get to that point, if we

01:37:10PM 23   have an excess of claims, and there's many fraudulent claims,

01:37:14PM 24   the process of having to go through all of those is going to be

01:37:17PM 25   incredibly time-consuming and incredibly difficult.  And part

01:37:20PM 1    of what we're concerned about is that will impose an enormous

01:37:23PM 2    burden on Your Honor and on the parties, but particularly on my

01:37:28PM 3    client, to pay to have those issues adjudicated.  So if we can

01:37:31PM 4    avoid that problem now, I'd rather do it now than have to deal

01:37:35PM 5    with it at the end.

01:37:37PM 6            THE COURT:  All right.  Anything else?

01:37:38PM 7            MR. MESTER:  That's it, Your Honor.

01:37:39PM 8            THE COURT:  All right.  Mr. Good.

01:37:42PM 9            MR. GOOD:  Before I start, I'd like to apologize to

01:37:50PM 10   the Court.  Your Honor --

01:37:51PM 11           THE COURT:  Apology is not necessary.  And I should

01:37:52PM 12   apologize as well, but go forward.

01:37:53PM 13           MR. GOOD:  I would like to apologize, because I'd

01:37:56PM 14   like to explain as well.  I've held a chip on my shoulder since

01:37:59PM 15   October of 2016.  There was a hearing in which I didn't feel

01:38:05PM 16   that I was given the opportunity to speak.  And Your Honor has

01:38:09PM 17   asked me that question before, and I didn't really answer it,

01:38:12PM 18   and today I blurted it out, and I apologize.  But there was one

01:38:16PM 19   hearing in which I was not given an opportunity to speak.

01:38:19PM 20   Your Honor was taken up on appeal from that hearing.  And I do

01:38:22PM 21   apologize for my conduct today.

01:38:27PM 22           That being said, I'd like to read from David

01:38:30PM 23   Canfield's expert report, again, done at the behest of BTL.

01:38:36PM 24   This is from paragraph 8, and, again, this is dated

01:38:40PM 25   November 16th, 2015.

01:38:41PM   1          "Moreover, even if these deficiencies were ignored,

01:38:45PM   2   positive identification of the members of the proposed class is

01:38:48PM   3   highly unlikely due to high turnover rates of phone numbers and

01:38:53PM   4   problems re-creating past lists of third-party database

01:38:57PM   5   providers, as well as the potential lack of historical data

01:39:01PM   6   from telephone carriers that would cover the entire period in

01:39:04PM   7   question."

01:39:04PM   8          BTL has held the consistent position that reverse

01:39:10PM   9   lookups were unreliable since at least November 16th of 2015.

01:39:15PM  10   In no way have they ever deviated from this position in this

01:39:18PM  11   litigation.  The claim otherwise is simply false.  They need a

01:39:23PM  12   new expert, because if they use Canfield, they're going to have

01:39:26PM  13   to use this prior report, and it's going to be shown to this

01:39:29PM  14   Court that they've held this position since before there was

01:39:32PM  15   even mediation before Magistrate Judge Sansone in this action

01:39:37PM  16   that was ordered by this Honorable Court.

01:39:39PM  17          And all I would like to point out for the Court is

01:39:40PM  18   their position has never changed.  It has never wavered.  It's

01:39:44PM  19   always been the same.  Yes, they came to a settlement

01:39:46PM  20   agreement, but that's what happens in settlement agreements.

01:39:48PM  21          THE COURT:  Isn't Mr. Canfield's report in the record

01:39:51PM  22   itself?

01:39:52PM  23          MR. GOOD:  I don't know if it was filed in the

01:39:53PM  24   record.  I know he was disclosed in the record, and there's a

01:39:56PM  25   filing under seal dealing with his medical issues, but I don't

01:39:59PM   1   think his report was actually filed.

01:40:01PM   2           Biggerstaff's was, because there was a motion for

01:40:03PM   3   class certification filed.  And then there was a detour for a

01:40:07PM   4   few years in a different matter.  But they never responded to

01:40:10PM   5   the motion for class certification, so they would have no

01:40:12PM   6   reason to file Mr. Canfield's report in the record.

01:40:15PM   7           I'm reading it to you, I don't have file-stamped

01:40:18PM   8   copy.  I did look for it prior to this hearing.  But I wanted

01:40:19PM   9   Your Honor to be aware of it.  I have additional copies, and I

01:40:22PM  10   can submit it to the Court if Your Honor would like it to be --

01:40:24PM  11           THE COURT:  So the purpose of it, you're arguing, is

01:40:27PM  12   your concern is that the position is that they only know that

01:40:31PM  13   now based upon the new report by Mr. Sponsler?

01:40:35PM  14           MR. GOOD:  My concern is what Mr. Mester just told

01:40:39PM  15   you about this being their new position is not new.  It's been

01:40:42PM  16   their position for seven years.  They have not deviated from

01:40:45PM  17   this position at all, and Mr. Sponsler's positions taken in his

01:40:50PM  18   third declaration, while they expand upon it, they still come

01:40:55PM  19   from the same kernel, which is in Mr. Canfield's report at

01:41:00PM  20   paragraph 8, which is -- it's been BTL's position for seven

01:41:04PM  21   years that reverse lookup are unreliable.  They went to a

01:41:07PM  22   mediation, they agreed to utilize reverse lookups, and we're

01:41:10PM  23   seeking to effectuate the settlement agreement in which they've

01:41:14PM  24   signed.

01:41:14PM  25           THE COURT:  All right.  Mr. Mester, anything else?

| | |
|---|---|
| 01:41:17PM | 1 |
| 01:41:17PM | 2 |
| 01:41:19PM | 3 |
| 01:41:24PM | 4 |
| 01:41:28PM | 5 |
| 01:41:30PM | 6 |
| 01:41:34PM | 7 |
| 01:41:37PM | 8 |
| 01:41:40PM | 9 |
| 01:41:46PM | 10 |
| 01:41:50PM | 11 |
| 01:41:55PM | 12 |
| 01:41:58PM | 13 |
| 01:42:00PM | 14 |
| 01:42:01PM | 15 |
| 01:42:02PM | 16 |
| 01:42:02PM | 17 |
| 01:42:04PM | 18 |
| 01:42:07PM | 19 |
| 01:42:10PM | 20 |
| 01:42:15PM | 21 |
| 01:42:17PM | 22 |
| 01:42:22PM | 23 |
| 01:42:24PM | 24 |
| 01:42:26PM | 25 |

MR. MESTER:  (Shakes head.)

THE COURT:  As to the motions, I'm going to deny the motions and allow the -- first of all, as to the expert opinion, settlement has already been contemplated, new information has been provided for my consideration, it does not change much at all, but nonetheless I think it's completeness of the record, so Mr. Sponsler's affidavits will remain.

As to the LexisNexis declaration, I'll allow it and admit it under 804 and 807 as well.  I want to make clear, efforts were undertaken to secure testimony, and I misread the letter, and that is correct, there was a rejection of making a witness available to testify, and instead the alternative was offered for the declaration, so I'll accept that.

MR. MESTER:  And I'm sorry --

THE COURT:  Anything else?

MR. MESTER:  I don't mean to interrupt.

Oh, I was just going to respond to Mr. Good.

We didn't mean to suggest we haven't always been skeptical about reverse lookups.  And Mr. Good is right, it was the subject of extensive negotiation in the settlement negotiations, but that only goes to my prior point, we reluctantly agreed to one, we didn't agree to two or more.  So that, I think, it informs the context.

THE COURT:  All right.  Thank you.

All right.  What's before the Court is document No.

01:42:30PM  1   381.  Also before the Court, which we've not discussed, is the

01:42:38PM  2   class counsel's request at document No. 350 which is for the

01:42:42PM  3   fax notification.  So I want to give you all the opportunity to

01:42:46PM  4   be heard, if there are any other arguments you want to make on

01:42:47PM  5   those matters.

01:42:47PM  6          I will tell you, it's my intent to take a recess, and

01:42:50PM  7   I'm going to articulate my findings today so we can move

01:42:53PM  8   forward and then discuss some other housekeeping matters.

01:42:56PM  9          So why don't we, Mr. Mester, take up any other

01:42:59PM 10   arguments you want to make as to your motion.

01:43:01PM 11          Mr. Piper, do you want to raise something

01:43:03PM 12   additionally?

01:43:03PM 13          MR. PIPER:  Before I do, I have a very small bit of

01:43:06PM 14   evidence, which, again, I don't think there's any objection to.

01:43:10PM 15          THE COURT:  All right.

01:43:11PM 16          MR. PIPER:  Ms. Kovach noted that the Judge's class

01:43:30PM 17   action notice checklist is something they rely on, I think you

01:43:35PM 18   can take judicial notice.  I'm not introducing the checklist

01:43:39PM 19   into evidence, but if other people would like to read along,

01:43:44PM 20   I'd like to read a few excerpts under Rule 803.  If you'd like

01:43:48PM 21   a copy --

01:43:49PM 22          THE COURT:  I have a copy.

01:43:51PM 23          MR. PIPER:  Okay.  I'll just read a few points.  But

01:43:57PM 24   from page 1 --

01:43:58PM 25          THE COURT:  What year of the checklist are you

01:44:01PM 1  referring to?

01:44:03PM 2              MR. PIPER:  Pardon me?

01:44:03PM 3              THE COURT:  What year of the checklist are you

01:44:03PM 4  referring to?

01:44:03PM 5              MR. PIPER:  The 2010.

01:44:04PM 6              THE COURT:  All right.  Thank you.

01:44:06PM 7              MR. PIPER:  So from the first page, the first point,

01:44:09PM 8  "Will notice effectively reach the class?

01:44:11PM 9              "The percentage of the class that will be exposed to

01:44:14PM 10  a notice based on a proposed notice plan can always be

01:44:18PM 11  calculated by experts.  A high percentage (for example, between

01:44:23PM 12  70 to 95 percent) can often reasonably be reached by a notice

01:44:28PM 13  campaign."

01:44:29PM 14              From page 2, "Do you have unbiased evidence

01:44:34PM 15  supporting the plan's adequacy?

01:44:37PM 16              "Be careful if the notice plan was developed by a

01:44:39PM 17  vendor who submitted a low bid and might have incentives to cut

01:44:44PM 18  corners or cover up any gaps in the notice program.  In order

01:44:46PM 19  to find the 'best practicable' notice as Rule 23 requires, your

01:44:52PM 20  own expert" -- that is, the Court's own expert -- "report may

01:44:55PM 21  be advisable."

01:44:56PM 22              From page 3, about half way down, "Has the percentage

01:45:03PM 23  of the class to be reached by mail been calculated?

01:45:05PM 24              "The parties should be able to indicate how great a

01:45:09PM 25  percentage of the overall class will be reached by the

01:45:12PM  1   individual notice, so that the extent of any additional -- any

01:45:18PM  2   necessary additional notice can be determined."

01:45:22PM  3           And I think last down the page, "Will publication

01:45:24PM  4   efforts combined with mailings reach a high percentage of the

01:45:27PM  5   class?

01:45:27PM  6           "The lynchpin in an objective determination of the

01:45:31PM  7   adequacy of a proposed notice effort is whether all the notice

01:45:37PM  8   efforts together will reach a high percentage of the class.  It

01:45:39PM  9   is reasonable to reach between 70 to 95 percent.  A study of

01:45:46PM  10  recent published decisions shows that the median reach

01:45:47PM  11  calculation on approved notice plans was 87 percent."

01:45:51PM  12          Thank you, Judge.

01:45:57PM  13          THE COURT:  All right.  Mr. Mester, Mr. Collins.

01:46:00PM  14          MR. MESTER:  Yes, Your Honor.

01:46:02PM  15          THE COURT:  Any other arguments you want to make as

01:46:04PM  16  to your motion 381?

01:46:05PM  17          MR. MESTER:  I'd only make two points, Your Honor,

01:46:08PM  18  and I quoted from it before.  I think it came out, but in the

01:46:11PM  19  joint motion, which is document 337, that was submitted to

01:46:14PM  20  Your Honor of the appointment of Epiq, the parties jointly

01:46:17PM  21  represented that "Epiq would then have until thirty (30) days

01:46:20PM  22  following Preliminary Approval to conduct a reverse-lookup

01:46:23PM  23  process to determine what (if any) names and addresses as of

01:46:28PM  24  today can be associated with the telephone numbers on the

01:46:31PM  25  Biggerstaff Report."

01:46:31PM 1          That's important, because I think it does address the
01:46:34PM 2    state of mind as to the -- of the parties at the time we were
01:46:39PM 3    proposing Epiq and the recognition that the reverse-lookup
01:46:42PM 4    process might not be efficacious at all.
01:46:45PM 5          The second point, Your Honor, that I would make, and
01:46:50PM 6    it's throughout the Biggerstaff Report, but something I think
01:46:53PM 7    has been lost a bit in the shuffle, Mr. Biggerstaff identified
01:46:58PM 8    three different ways to identify class members.  We've talked a
01:47:04PM 9    lot -- really, two, but we've talked a lot about the one,
01:47:07PM 10   reverse lookups.  What we haven't talked about was the primary
01:47:10PM 11   method that he identified, and I think it's important to focus
01:47:13PM 12   on that, because it's that primary method and the fact that
01:47:15PM 13   it's no longer, as I believe, viable, why we're now left with
01:47:19PM 14   reverse lookups, but that is to subpoena the telephone
01:47:22PM 15   companies that issued these numbers and to then get from them
01:47:27PM 16   the names of the people who are paying for those lines.
01:47:32PM 17         To our knowledge, Mr. Biggerstaff went into
01:47:34PM 18   considerable detail how that was feasible and suggested that
01:47:38PM 19   competent counsel would always do that, would be able to do
01:47:40PM 20   that, but to our knowledge, it never happened.  And that's odd,
01:47:43PM 21   because in every other class case I've ever been in,
01:47:46PM 22   establishing a class list, not a list of numbers, but a class
01:47:49PM 23   list of names and addresses is something that's done before.
01:47:53PM 24         That burden, the burden of proving ascertainability,
01:47:56PM 25   has always been on plaintiffs, remains on plaintiffs, and I

01:48:00PM 1    don't think that ever occurred.  So we're left with this very,

01:48:03PM 2    very inferior alternative of reverse lookups, and it's not

01:48:05PM 3    through anyone's action or inaction other than plaintiffs and

01:48:05PM 4    their counsel to establish their burden.  Perhaps they can

01:48:12PM 5    enlighten us, but to my knowledge, it was never done.  And if

01:48:14PM 6    it had been done, I don't think we'd be here having this

01:48:18PM 7    argument.

01:48:19PM 8            The last point, Your Honor, I'd simply make is, I

01:48:24PM 9    think we heard today, at considerable length, neither of these

01:48:30PM 10   reverse lookups are all that reliable.  There's no way to tell

01:48:35PM 11   after the fact who is and who is not in the class.  That has

01:48:38PM 12   broader implications than just for today, but I think the last

01:48:42PM 13   thing we want to do is add to the complexity, and add to the

01:48:46PM 14   confusion, and add to the number of people that are getting

01:48:49PM 15   notices who aren't actually members of the class, because it's

01:48:51PM 16   something we'll all have to deal with down the road, and we'd

01:48:55PM 17   like to avoid it if we can, Your Honor.

01:48:56PM 18           THE COURT:  So you, in your pleading, don't

01:49:03PM 19   articulate consistently a standard.  There's some talk about

01:49:06PM 20   definitive proof and then some talk about reliability.

01:49:10PM 21           MR. MESTER:  (Nods head.)

01:49:11PM 22           THE COURT:  So let me suggest to you how I see it,

01:49:16PM 23   and then you tell me where you think I'm wrong.

01:49:18PM 24           As far as reliability on this record, you have given

01:49:24PM 25   TransUnion what is now of record, that focused solely on

01:49:28PM 1   2009/2010, the single -- or shorthand -- I'm going to reference

01:49:35PM 2   it this way -- the single identifiers, meaning one entity or

01:49:40PM 3   individual with one number.  When I say multiple identifiers,

01:49:44PM 4   that means multiple entities or individuals with one number.

01:49:49PM 5   So the single identifiers under TransUnion is the most

01:49:54PM 6   reliable, because it focuses on 2009/2010.  Then the multiple

01:49:59PM 7   identifiers under TransUnion would be the second most reliable,

01:50:04PM 8   again, because it focuses on those dates.

01:50:06PM 9         Then the LexisNexis review, the single identifiers

01:50:16PM 10  would be the third most reliable.  The multiple identifiers in

01:50:25PM 11  the TransUnion would be the least reliable, next to no one

01:50:30PM 12  being identified, that is the fax notices, which would be the

01:50:37PM 13  least reliable.  Do you disagree with that hierarchy?

01:50:39PM 14        MR. MESTER:  Your Honor, I agree with the hierarchy,

01:50:41PM 15  I just would want to make one note.

01:50:43PM 16        THE COURT:  All right.

01:50:43PM 17        MR. MESTER:  All of this -- when we're speaking of

01:50:46PM 18  reliability, we're speaking of it in terms of the notice

01:50:50PM 19  program, not ascertainability.  Yes, we think for purposes of

01:50:52PM 20  the notice program, I think the hierarchy Your Honor laid out

01:50:55PM 21  is exactly correct.

01:50:56PM 22        THE COURT:  Okay.  So let's talk ascertainability.

01:51:01PM 23  You agree, as reliability, the single TransUnion -- the single

01:51:07PM 24  identifier for TransUnion is the most reliable.  But is that

01:51:10PM 25  any more or less ascertainable than any of the other numbers?

01:51:15PM   1          MR. MESTER:  Excellent question, Your Honor.  I think

01:51:17PM   2   the answer is none of them are ascertainable because none of

01:51:21PM   3   them are reliable.  They truly are black boxes, and it's an

01:51:25PM   4   important caveat.  Ms. Kovach touched upon it.  She doesn't

01:51:28PM   5   know, we don't know, no one knows what the sources are or what

01:51:31PM   6   the methods are.  To establish this ascertainability,

01:51:35PM   7   plaintiffs' counsel has to come forward with credible,

01:51:37PM   8   reliable, admissible evidence.  None of this is that.  So --

01:51:40PM   9          THE COURT:  But isn't that why -- despite the

01:51:43PM  10   intervenors' objection, I can only assume on this settled

01:51:50PM  11   agreement why the parties contemplated it would be appropriate

01:51:53PM  12   to require the identifying information to include the number to

01:51:57PM  13   be included under the penalty of perjury by any potential

01:52:02PM  14   claimant.  So when a claimant makes that, that in and of itself

01:52:04PM  15   is putting forth evidence of a claim under the penalty of

01:52:07PM  16   perjury.

01:52:07PM  17          And then in addition to that, as I highlighted under

01:52:11PM  18   Section VIII(E), you have the opportunity at that point, once a

01:52:14PM  19   claimant comes forward with that type of proof, to challenge

01:52:19PM  20   that.  And it could be to the point that the administrator

01:52:23PM  21   requires further proof, or even if you're dissatisfied, then,

01:52:26PM  22   now, I recognize, as you just highlighted a moment ago, that

01:52:30PM  23   could be manageability issues down the road, but we won't know

01:52:35PM  24   that.  I'm just asking as to ascertainability, since you raised

01:52:37PM  25   that, that isn't that part of what was negotiated for

01:52:40PM 1   ascertainability?

01:52:42PM 2          MR. MESTER:  With all due respect, Your Honor, no.

01:52:44PM 3   The whole purpose of Section VII and Section VIII was to

01:52:49PM 4   address the notice program, not to address the requirements of

01:52:51PM 5   Rule 23, including ascertainability.  So all those processes,

01:52:54PM 6   Your Honor, correctly described are vis-a-vis the notice

01:52:57PM 7   program.  We think it's sufficient.  We recognized to go

01:53:00PM 8   forward with the settlement.  We don't know yet, we have

01:53:04PM 9   increasing indications, but we don't know whether or not

01:53:07PM 10  plaintiffs' counsel are going to come forward --

01:53:08PM 11         THE COURT:  And that may be where I'm disagreeing

01:53:11PM 12  with you and you need to enlighten me on, because

01:53:16PM 13  ascertainability is an objective criteria, as I see it, to

01:53:20PM 14  ascertain members of the class once you have the objective

01:53:23PM 15  criteria if there's sufficient evidence to be brought forward

01:53:27PM 16  that an individual meets that criteria.

01:53:31PM 17         So the claims form specifically addresses that for an

01:53:36PM 18  individual who is reasonably and under the rule for notice --

01:53:41PM 19  so I know I'm melding all of this, but for notice purposes, it

01:53:44PM 20  is practical means that -- the most practical means to identify

01:53:48PM 21  as many members as possible, reasonably.  So there's no

01:53:53PM 22  precision here, it's the best we can to identify members of the

01:53:57PM 23  class.  And then part of that is then when the notice -- the

01:54:04PM 24  claim is filed, there is evidence brought forward for purposes

01:54:08PM 25  identifying that they are a member of the class.

01:54:10PM 1        MR. MESTER:  And, Your Honor, it's that last part.  I

01:54:15PM 2   think it's assuming that it can be done.  I don't think it can

01:54:17PM 3   be done.  I think with the vast majority of class members that

01:54:21PM 4   submit claims, we won't be able to get documentation, and I

01:54:24PM 5   don't know what we -- I don't think the class is ascertainable,

01:54:28PM 6   because I don't think the documents or the evidence exists any

01:54:31PM 7   longer.

01:54:31PM 8        So the fact that someone submits a claim form,

01:54:34PM 9   particularly if it's a claim form that was submitted over --

01:54:37PM 10  through over-inclusive notice, someone, for instance -- for

01:54:38PM 11  example, Mr. Collins brought out in his redirect, someone who

01:54:41PM 12  held the number in 2012, that person writes that number in,

01:54:47PM 13  submits it to Epiq, Epiq doesn't know what to do.  They ask for

01:54:51PM 14  the documentation, no one has the documentation, then the

01:54:54PM 15  question becomes, what do we do?

01:54:56PM 16       THE COURT:  Mr. Mester, that's where I've gone back

01:54:59PM 17  and forth with you.  Then I don't understand what you're asking

01:55:01PM 18  me.  By that argument, that is to suggest, then, to decertify

01:55:06PM 19  the class, set aside the settlement, because you're suggesting

01:55:09PM 20  that the class is not ascertainable.  And it goes to my

01:55:12PM 21  question a moment ago, where if you agree with the proposition

01:55:15PM 22  that the single identifiers for TransUnion is the most

01:55:19PM 23  reliable, but what is the distinction from their claims form

01:55:22PM 24  from anyone else's?

01:55:24PM 25       MR. MESTER:  It's just a different standard,

01:55:26PM  1    Your Honor.  The standard for the notice program is different

01:55:28PM  2    than the Rule 23 ascertainability standard.  We're not there

01:55:33PM  3    yet in terms of the ascertainability standard.  We haven't made

01:55:37PM  4    a motion to decertify, plaintiffs haven't filed a motion for

01:55:38PM  5    final certification of the settlement class.  We will get

01:55:41PM  6    there, but we're not there yet.  They were talking about what

01:55:44PM  7    the notice program should entail, what the parameters of the

01:55:47PM  8    notice should be, and I respectfully submit, Your Honor, I

01:55:50PM  9    think it is a very different standard and I think it is a very

01:55:53PM 10    different process.

01:55:53PM 11        But what Your Honor can allow and what Your Honor can

01:55:55PM 12    rely upon for purposes of the notice program, it's less

01:55:59PM 13    rigorous, and it's -- that doesn't mean it should be anything,

01:56:02PM 14    of course, and I'm not suggesting you do that, Your Honor.  But

01:56:04PM 15    it's less rigorous than the standard for ascertainability and

01:56:08PM 16    other Rule 23 requirements, which, again, will be addressed at

01:56:10PM 17    or before final approval.

01:56:14PM 18        MR. HARA:  Your Honor, may I be heard on this issue

01:56:16PM 19    briefly?  It's Glenn Hara.

01:56:18PM 20        THE COURT:  Hold on.  Let me finish first.

01:56:22PM 21        As to, then, what you're suggesting, are you then

01:56:25PM 22    indicating that if I don't -- well, first, what are you

01:56:30PM 23    requesting?  What do you want me to do as far as the notice

01:56:32PM 24    program?

01:56:33PM 25        MR. MESTER:  We think, Your Honor, the appropriate

01:56:37PM 1    order from the Court would be to direct mailed notice to the

01:56:41PM 2    persons that were identified as a match on the TransUnion

01:56:46PM 3    search, a single match, we think that would be appropriate.  We

01:56:49PM 4    think that should be coupled with publication notice, and we

01:56:52PM 5    think if you do those two things, you've more than satisfied

01:56:55PM 6    the Rule 23 and due process requirements, which they overlay on

01:56:59PM 7    the settlement agreement.

01:57:01PM 8          The Court is obligated to file the settlement

01:57:05PM 9    agreement if it believes what -- that results in this notice

01:57:06PM 10   and satisfies Rule 23 and due process, and I'm confident that's

01:57:10PM 11   what we did, then we would be satisfied.

01:57:12PM 12         THE COURT:  Well, I'm glad you believe that, but what

01:57:14PM 13   do you have that would give me the comfort that that would

01:57:16PM 14   satisfy it?

01:57:17PM 15         MR. MESTER:  Well, four decades of case law, starting

01:57:21PM 16   with *Mullane*.  I mean, we've done more effort here to determine

01:57:28PM 17   whose in this class than almost any case I've ever been in, and

01:57:32PM 18   we still don't know.  But there is a limit, and that's why we

01:57:35PM 19   have in the settlement agreement terms like reasonable and

01:57:39PM 20   efficient and things like that.  We've done all this effort,

01:57:42PM 21   we've made all these efforts, we still don't know as much as

01:57:46PM 22   we'd like to, but we also recognize, and we agree that there's

01:57:48PM 23   been a decent mailed notice.

01:57:49PM 24         And so I think the appropriate thing to do would be

01:57:51PM 25   to use the source, the TransUnion -- excuse me, that Epiq chose

| | | |
|---|---|---|
| 01:57:54PM | 1 | that it believes is the most reliable.  That doesn't mean that |
| 01:57:59PM | 2 | we think it really is, but we understand that -- we've agreed |
| 01:58:01PM | 3 | and to send mailed notice to those individuals and rely on |
| 01:58:04PM | 4 | publication for the rest.  And I think if we did that, we would |
| 01:58:07PM | 5 | satisfy -- more than satisfy the requirement. |
| 01:58:09PM | 6 | THE COURT:  All right.  Anything else? |
| 01:58:09PM | 7 | MR. MESTER:  That's it, Your Honor. |
| 01:58:11PM | 8 | THE COURT:  All right.  Mr. Hara, you wanted to make |
| 01:58:13PM | 9 | a point? |
| 01:58:14PM | 10 | MR. HARA:  Yes.  Thank you, Your Honor. |
| 01:58:16PM | 11 | We could brief this issue in our response to docket |
| 01:58:20PM | 12 | 381.  And to some extent this is a matter of terminology, but a |
| 01:58:24PM | 13 | class is ascertainable in the Eleventh Circuit if it is defined |
| 01:58:28PM | 14 | by objective criteria.  That word "ascertainability" concerns |
| 01:58:33PM | 15 | the class definition.  And the Eleventh Circuit went through |
| 01:58:37PM | 16 | this in detail in the *Cherry* case, *Cherry versus Dometic* -- |
| 01:58:41PM | 17 | THE COURT:  It's already briefed in your papers. |
| 01:58:41PM | 18 | MR. HARA:  -- which Your Honor discussed -- |
| 01:58:42PM | 19 | THE COURT:  One moment, Mr. Hara. |
| 01:58:42PM | 20 | MR. HARA:  -- in *Haines versus Fidelity* -- |
| 01:58:44PM | 21 | THE COURT:  Mr. Hara, one moment.  If you're going to |
| 01:58:45PM | 22 | argue that, that's already briefed in your papers.  I'm fully |
| 01:58:49PM | 23 | aware of that. |
| 01:58:51PM | 24 | MR. HARA:  Okay.  Great.  So the class is |
| 01:58:52PM | 25 | ascertainable. |

01:58:53PM 1      Now, as to what are the requirements for submitting a

01:58:58PM 2  valid claim, what do you have to do in order to get -- to share

01:59:02PM 3  in the settlement fund, to be paid from the fund, that is a

01:59:05PM 4  question that is governed by the settlement agreement and by

01:59:08PM 5  the claim form that we negotiated with Judge Sansone for over a

01:59:13PM 6  year.  We have a deal on that.  And the deal is that if

01:59:15PM 7  somebody submits a valid claim form, they know the fax number,

01:59:19PM 8  the name matches the bar code that's associated with it, and

01:59:23PM 9  they sign under penalty of perjury, then that claim is going to

01:59:26PM 10  be paid.

01:59:26PM 11      That is not a Rule 23 requirement; it has nothing to

01:59:30PM 12  do with ascertainability.  It's just what is the deal that the

01:59:34PM 13  Buccaneers have agreed to here, and the deal that they agreed

01:59:37PM 14  to is this is the claim form we're going to use.  So they don't

01:59:40PM 15  get to renegotiate that now and ask for new proof requirements

01:59:43PM 16  and say they're going to move to decertify the class later if

01:59:47PM 17  too many claims are paid -- to many claims are made.  That --

01:59:49PM 18  that's -- we have a deal.

01:59:52PM 19      So the Rule 23 requirements, they've stipulated that

01:59:56PM 20  they're met.  They have asked the Court to certify a settlement

01:59:59PM 21  class, and that's what the Court did.  So the only question now

02:00:03PM 22  is, how are we going to effectuate the terms of the settlement

02:00:09PM 23  agreement and give the best notice practicable under Rule

02:00:10PM 24  23(c).

02:00:10PM 25      So I just wanted to clarify those issues and the

| | |
|---|---|
| 02:00:13PM | 1 |
| 02:00:17PM | 2 |
| 02:00:18PM | 3 |
| 02:00:22PM | 4 |
| 02:00:24PM | 5 |
| 02:00:26PM | 6 |
| 02:00:27PM | 7 |
| 02:00:30PM | 8 |
| 02:00:34PM | 9 |
| 02:00:39PM | 10 |
| 02:00:47PM | 11 |
| 02:00:52PM | 12 |
| 02:00:59PM | 13 |
| 02:01:03PM | 14 |
| 02:01:06PM | 15 |
| 02:01:09PM | 16 |
| 02:01:18PM | 17 |
| 02:01:22PM | 18 |
| 02:01:26PM | 19 |
| 02:01:29PM | 20 |
| 02:01:32PM | 21 |
| 02:01:38PM | 22 |
| 02:01:41PM | 23 |
| 02:01:44PM | 24 |
| 02:01:48PM | 25 |

1  ascertainability standard in the Eleventh Circuit, Your Honor.

2       THE COURT:  All right.  Thank you.

3       Mr. Piper, do you want to make any comments?

4       MR. PIPER:  Thank you, Your Honor.  Yes, Your Honor.

5  Can you hear me okay?

6       THE COURT:  Yes.

7       MR. PIPER:  Okay.  Your Honor, the quandary the Court

8  is in is that the parties to the settlement have not met their

9  burden of showing the best practicable notice, which was the

10  requirement under Rule 23.  In fact, it is highly unlikely that

11  any element separately or in combination was proposed is the

12  best practicable.  That's not a subjective question of "I know

13  it when I see it."  It's actually -- it may not be an exact

14  science, but it's subjective to objective opinion testimony.

15       In fact, what the quotes I read you from the 2010

16  checklist suggest is it's ultimately your job to figure out

17  what's the best practicable notice, including hiring an expert

18  to tell you what they think, separate and apart from what the

19  parties may be proposing.

20       I mean, Epiq's certainly ready and willing and able

21  to take on the work, but maybe they're too much water under the

22  bridge at this point.  Maybe you want to hire somebody separate

23  to -- who is a notice expert.  But they can tell you

24  objectively, look, here's how we do it.  This will get you to

25  the most class members.  We understand all the problems, but in

| | |
|---|---|
| 02:01:51PM | 1 |
| 02:01:54PM | 2 |
| 02:02:00PM | 3 |
| 02:02:04PM | 4 |
| 02:02:05PM | 5 |
| 02:02:08PM | 6 |
| 02:02:09PM | 7 |
| 02:02:12PM | 8 |
| 02:02:13PM | 9 |
| 02:02:16PM | 10 |
| 02:02:19PM | 11 |
| 02:02:23PM | 12 |
| 02:02:25PM | 13 |
| 02:02:27PM | 14 |
| 02:02:31PM | 15 |
| 02:02:35PM | 16 |
| 02:02:42PM | 17 |
| 02:02:47PM | 18 |
| 02:02:51PM | 19 |
| 02:02:54PM | 20 |
| 02:02:56PM | 21 |
| 02:03:01PM | 22 |
| 02:03:04PM | 23 |
| 02:03:07PM | 24 |
| 02:03:08PM | 25 |

1  this case this is the way you can get the notice to the most

2  class members and reach those percentages that are suggested in

3  the 2010 checklist, which -- for example, if we went with

4  Mr. Mester --

5          THE COURT:  Mr. Piper, let me interrupt if I can.

6          MR. PIPER:  Sure.

7          THE COURT:  Wasn't this something that would have

8  been argued prior to me taking, I think -- preliminarily

9  approving the agreement by the intervenor?  I mean, this seems

10  to me that if you thought that the settlement itself did not

11  properly contemplate a reach that would be appropriate,

12  shouldn't that have been argued at that time?

13          MR. PIPER:  Well, we did argue that the notice was

14  insufficient, so, for example, banner ads would be appropriate.

15  It's their burden to prove that it is the best practicable, and

16  we certainly reserve all those arguments for final approval.

17  But as the witness said, this is an unusually contentious

18  notice issue, even -- it's not just our objections, the parties

19  themselves are highly disputing what the notice should be.  And

20  the way to resolve that, one, they could prove to you -- they

21  could come in with notice experts to show why their proposals

22  were, but they chose not to do that.  I think they chose not to

23  do that, because they know they couldn't get the reach numbers

24  with what they've agreed to.

25          So what I would suggest is that, at this point, the

02:03:16PM 1    prudent thing to do, and if I could be so bold, would be to

02:03:22PM 2    appoint your own expert to come up with a notice plan that

02:03:26PM 3    would work with this case under all the circumstances, it could

02:03:30PM 4    be Epiq, it could be someone of your choice, the parties could

02:03:34PM 5    submit one or two names each to chose from.

02:03:37PM 6            And then you'd have Mr. Azari, or his equal at

02:03:42PM 7    another firm, come in and tell you, you know, the best way to

02:03:44PM 8    do this, we design notice plans, this isn't just something

02:03:49PM 9    lawyers are negotiating, here's what would actually, in my

02:03:53PM 10   opinion, be the best notice plan you can do.  And I certainly

02:03:56PM 11   expect it would be a very different plan than what you're

02:04:00PM 12   looking at now, because it wouldn't be what's the least worst

02:04:05PM 13   plan or what's the least bad plan, which is essentially what

02:04:10PM 14   we're arguing here today, but what's the best plan based on

02:04:13PM 15   what an expert appointed by the Court tells you.  Otherwise --

02:04:18PM 16   I mean, I'm a little astonished to hear Mr. Mester saying

02:04:23PM 17   that -- let's send out the notice and see what the claims are,

02:04:26PM 18   and then he'll decide if he wants to back out of the settlement

02:04:31PM 19   or argue whether something's ascertainable.

02:04:33PM 20           But that's another option.  I mean, you could just

02:04:35PM 21   vacate the thing now, and we could go back to the drawing

02:04:38PM 22   board.  We'd be happy to participate to resolve these issues

02:04:43PM 23   and come back with a new proposal.  But those to me are the

02:04:47PM 24   options.

02:04:48PM 25           THE COURT:  But isn't that what you're suggesting?  I

02:04:50PM 1  would assume Mr. Mester will argue, that if I considered your

02:04:55PM 2  recommendation, that would be contrary to the agreement and

02:04:57PM 3  they should be allowed to withdraw from the agreement.

02:05:00PM 4          MR. PIPER:  No, Your Honor.  Notice is not -- you're

02:05:02PM 5  not stuck with what they agreed to.  That's your own

02:05:07PM 6  independent fiduciary obligation is to make sure that the

02:05:11PM 7  class' due process rights are satisfied.  You know, if

02:05:18PM 8  Mr. Mester at that point wants to try to back out, I suppose he

02:05:22PM 9  could.  But I think the authority would be that notice falls

02:05:26PM 10 within your domain -- in fact, that's what the settlement

02:05:28PM 11 agreement says, is that the notice administrator, once

02:05:31PM 12 appointed, is your agent under your direction and supervision.

02:05:36PM 13 So the settlement agreement has some unusual language that

02:05:40PM 14 actually enhances your ability to control the notice program.

02:05:43PM 15         THE COURT:  All right.  Anything else?

02:05:45PM 16         MR. PIPER:  I think I've made my point.  Thank you.

02:05:48PM 17         THE COURT:  I'll give you a moment to respond to that

02:05:50PM 18 too.  Let me see what Mr. Good has to say.

02:05:53PM 19         MR. GOOD:  Thank you, Your Honor.

02:05:56PM 20         In response to Mr. Piper, with all due respect, the

02:06:01PM 21 parties did agree to notice programs, it did give Your Honor

02:06:05PM 22 certain discretion, Your Honor has already ruled the

02:06:07PM 23 publication notice will be a component of the notice program

02:06:10PM 24 for this class-wide settlement agreement.  Your Honor has not

02:06:14PM 25 yet rendered final decision on whether fax notice will be a

02:06:18PM 1   component of the notice program.

02:06:19PM 2          Mr. Piper is suggesting throwing out the settlement

02:06:23PM 3   agreement for which Your Honor has already given preliminary

02:06:26PM 4   approval.  Plaintiffs oppose doing such a thing at this

02:06:31PM 5   extremely late stage.  And, again, after preliminary approval,

02:06:36PM 6   it's unclear how that would address the issues that Mr. Mester

02:06:41PM 7   has brought up here.

02:06:43PM 8          In response to what Mr. Mester brought up about the

02:06:48PM 9   lack of subpoenas issued to telephone carriers prior to 2016,

02:06:53PM 10  again, I go back to David Canfield's expert report at paragraph

02:06:57PM 11  59, which states, "Positive identification of recipients is

02:07:01PM 12  highly unlikely due to the lack of an MCF in actual backlogs,

02:07:07PM 13  high turnover rates, and issues re-creating lists in the past

02:07:11PM 14  by third-party database providers, and potential lack of

02:07:16PM 15  historical data from telephone carriers that covers the entire

02:07:17PM 16  period in question."

02:07:19PM 17         Mr. Sponsler repeated this in his declaration at

02:07:24PM 18  paragraph 40, dated February 18th, 2022.  They have held the

02:07:29PM 19  position that subpoenas to telephone carriers were

02:07:33PM 20  insufficient, again, since November 16th, 2015, carrying

02:07:37PM 21  through to February 18th, 2022.  Putting that aside, we went to

02:07:41PM 22  a mediation and we agreed on a notice program that did not

02:07:44PM 23  include subpoenas to phone carriers.

02:07:46PM 24         They made this agreement.  It's a signed agreement,

02:07:49PM 25  it's already gotten preliminary approval from the Court, they

02:07:53PM  1  can't just walk away from it, and they can't claim they just
02:07:56PM  2  now came to this position that they have clearly held since
02:07:59PM  3  November of 2015.
02:08:01PM  4          That's all I have.
02:08:02PM  5          THE COURT:  Did you want to address specifically
02:08:03PM  6  Mr. Piper's request that the Court consider appointing an
02:08:06PM  7  independent expert to come up with a notice plan?
02:08:09PM  8          MR. GOOD:  I believe it would terminate the
02:08:12PM  9  settlement agreement, and I believe it's unnecessary given that
02:08:15PM 10  we have a robust settlement agreement.
02:08:18PM 11          I do believe that this dovetails very well into an
02:08:21PM 12  issue Your Honor has yet to decide, which is the fax notice
02:08:23PM 13  component which is contemplated in the settlement agreement and
02:08:27PM 14  Your Honor should include that as a component to maximize the
02:08:30PM 15  reach.  By including mail, fax, and publication, you maximize
02:08:38PM 16  the reach while at the same time addressing the hypothetical
02:08:41PM 17  concerns that Mr. Mester has brought out regarding fraudulent
02:08:46PM 18  claims being filed.
02:08:47PM 19          As Ms. Kovach testified to earlier, in some consumer
02:08:52PM 20  product class action cases, you don't actually have a class
02:08:55PM 21  list.  Somebody just has to attest that they bought, for
02:08:56PM 22  example, Duracell batteries in order to claim in and get their
02:09:00PM 23  claim approved.  That isn't the case here.
02:09:03PM 24          You know, one of the attachments to the declaration
02:09:07PM 25  cited by intervenors, who I would point out are future

02:09:11PM 1  objectors in this case, is the BP Deepwater Horizon oil spill.

02:09:16PM 2  In that case, people had to submit documentation which would be

02:09:20PM 3  reviewed prior to approval.

02:09:22PM 4        Doing banner ads in a fax ad class action doesn't

02:09:29PM 5  make any sense.  I mean, the people targeted would be

02:09:34PM 6  completely random and scattershot.  There are no forms on the

02:09:38PM 7  Internet for fax number owners from 2009 to 2010 in the Middle

02:09:46PM 8  District of Florida.  These fax numbers were targeted to

02:09:49PM 9  certain area codes.  And while, yes, I agree that you could

02:09:53PM 10 geofence banner ads and other types of advertisements based on

02:09:55PM 11 those area codes, you can't target the actual class numbers,

02:10:01PM 12 whereas with the BP oil spill, you can target coastline areas

02:10:03PM 13 and there would be a claims process that would involve

02:10:05PM 14 submitting documentation in furtherance of your claim.

02:10:09PM 15        But, again, as Ms. Kovach pointed out, this case is

02:10:12PM 16 not like a consumer product case where all you have to do is

02:10:16PM 17 attest, and it's not like a BP oil spill case where you have to

02:10:20PM 18 submit documentations and your documentations are going to be

02:10:22PM 19 unique from other people, and you're going to get paid based on

02:10:25PM 20 the documentation submitted.  This is about having a fax number

02:10:29PM 21 that is on the class list.

02:10:31PM 22        And, again, I'd like to point out to this Court, it

02:10:33PM 23 keeps being referred to as the Biggerstaff list.  It isn't.

02:10:35PM 24 It's the class list.  As Mr. Hara pointed out this class has

02:10:39PM 25 been certified by objective criteria.  So being a member of

02:10:42PM 1   this class doesn't mean just saying, "I'm a member of the
02:10:45PM 2   class," and raising your hand.  You have to have a fax number
02:10:48PM 3   and it has to be on the class list.  Doing banner ads would not
02:10:56PM 4   seem to further that goal, though, you could paper over it by
02:11:00PM 5   saying, in theory, it was seen by people who have fax numbers.
02:11:03PM 6   But that isn't the goal here.  We want to provide the best
02:11:07PM 7   notice practicable, and that is what is required by the Federal
02:11:08PM 8   Rules of Civil Procedure.
02:11:09PM 9               THE COURT:  All right.  Thank you.
02:11:12PM 10              All right.  Mr. Mester.
02:11:13PM 11              MR. MESTER:  Thank you, Your Honor.
02:11:15PM 12              I've got three to respond to here.  I'll start with
02:11:18PM 13  Mr. Hara.  It's simply not the case, Your Honor, that we can
02:11:20PM 14  stipulate to the Rule 23 requirements; that's the holding in
02:11:23PM 15  *Amchem*.  The whole point of *Amchem* was the parties came before
02:11:26PM 16  ultimately the Supreme Court and then stipulated the
02:11:28PM 17  certification of a settlement class, and the Court said, no,
02:11:31PM 18  that's not enough.  Your Honor has to do the rigorous analysis,
02:11:35PM 19  and it doesn't matter what we signed, what was agreed to, and
02:11:37PM 20  we certainly never stipulated to ascertainability.
02:11:40PM 21              With respect to Mr. Piper's suggestion, I think what
02:11:43PM 22  would have to happen -- and one of your questions, I think, was
02:11:47PM 23  directed at this -- I won't get into the question whether they
02:11:52PM 24  were timely or not, but I don't think it's appropriate or would
02:11:53PM 25  be appropriate for Your Honor to rewrite the settlement

02:11:56PM  1   agreement and then tell the parties they have to abide by it.

02:11:59PM  2       What I think Your Honor could do is reverse your

02:12:02PM  3   preliminary approval ruling and tell us to go back to the

02:12:05PM  4   drawing board or the negotiating table and see if we can work

02:12:09PM  5   something out.  I don't think that's necessary, but I did want

02:12:12PM  6   to at least give you our views as to what the proper procedure

02:12:15PM  7   would be if that ended up being what you decided you wanted to

02:12:19PM  8   do.

02:12:20PM  9       I don't think you can just change the entire notice

02:12:22PM 10   program, in other words, rewrite the settlement agreement, but

02:12:28PM 11   you certainly can.  And I tried to answer this question, I

02:12:28PM 12   think you asked it of me at the last hearing, you certainly can

02:12:31PM 13   decide, either at preliminary approval or anytime along the

02:12:34PM 14   process, that what we came up with doesn't satisfy Rule 23 or

02:12:38PM 15   due process, and then if you do you set aside preliminary

02:12:42PM 16   approval.

02:12:42PM 17       THE COURT:  Well, let's forecast -- which I'm sure we

02:12:45PM 18   all wish is sooner than later, but let's forecast a fairness

02:12:50PM 19   hearing.  And there's an objection about whether due process

02:12:55PM 20   has been met as far as the reach.  And based upon your

02:12:59PM 21   proposal, what is your anticipated argument?

02:13:01PM 22       MR. MESTER:  I'm not trying to be coy, Your Honor, I

02:13:06PM 23   don't know, because I don't, in part, know what the results are

02:13:09PM 24   going to be of that whole process, and that -- I probably was

02:13:16PM 25   not as articulate as I could have been before.  That's part of

02:13:16PM   1    the reason for going through the notice program.

02:13:18PM   2             THE COURT:  But what we do know is there's

02:13:20PM   3    approximately 18,000 who you're suggesting to get direct mailed

02:13:24PM   4    notice, and then the remainder of notice be done by

02:13:28PM   5    publication.

02:13:29PM   6             MR. MESTER:  Yes, Your Honor.

02:13:29PM   7             THE COURT:  Based upon that, what would your argument

02:13:30PM   8    be that due process has been satisfied?

02:13:32PM   9             MR. MESTER:  At that point, my argument would be that

02:13:35PM  10    we've more than satisfied *Mullane* and all the relevant case

02:13:37PM  11    law.  But the Federal Judicial Guidelines -- and I testified

02:13:43PM  12    before the council -- were not designed to overrule *Mullane.*

02:13:47PM  13    *Mullane* is still the law, and the law is that you make

02:13:50PM  14    reasonable efforts to identify class members, and if you can

02:13:53PM  15    reasonably identify people, you send mailed notice.  And if you

02:13:55PM  16    can't, then publication is sufficient.  That's what the parties

02:13:59PM  17    agreed to.  We think that's more than sufficient.

02:14:01PM  18             Can you do other things?  Yes.  Would it be

02:14:03PM  19    inappropriate to do other things in this case?  One of the few

02:14:08PM  20    times I agree with Mr. Good, I think, for instance, banner ads

02:14:08PM  21    would be a very big mistake, because it would open up the

02:14:15PM  22    floodgates to even more fraudulent claims.  So we carefully

02:14:16PM  23    negotiated this notice program mindful of the specifics of this

02:14:21PM  24    case, but also mindful of the case law, and that's what we

02:14:23PM  25    intended to do.  I think we did it, but obviously that's not

02:14:28PM  1  ultimately my decision.

02:14:29PM  2          THE COURT:  All right.

02:14:31PM  3          MR. MESTER:  And that's -- I'm sorry, just one --

02:14:31PM  4          THE COURT:  Go ahead.  I'm sorry.

02:14:32PM  5          MR. MESTER:  The fax notice, we've briefed that

02:14:34PM  6  extensively; that would be the biggest mistake of all.  The

02:14:39PM  7  potential for fraudulent claims is extraordinary, because

02:14:41PM  8  you're sending a fax to a fax number, you simply write the

02:14:45PM  9  number down and then you send it back.  There's no contemporary

02:14:49PM 10  evidence with regard to efficacy.

02:14:52PM 11          Mr. Good mentioned breach.  The only evidence in the

02:14:56PM 12  record from the plaintiffs with respect to the efficacy of fax

02:14:57PM 13  notices, reports from Mr. Biggerstaff back in 2015, which

02:15:02PM 14  Mr. Good told us today, don't carry much water because they're

02:15:06PM 15  so old.  Well, they are very old.  The idea that there's many

02:15:07PM 16  faxes out there still in existence, reach wouldn't move at all

02:15:11PM 17  by fax notice, but there's a lot of reasons to not do it, and

02:15:15PM 18  we've identified all of those in our papers, Your Honor.

02:15:18PM 19          THE COURT:  All right.  Thank you.

02:15:19PM 20          Anybody have anything else?

02:15:20PM 21          MR. GOOD:  Yes, Your Honor.

02:15:22PM 22          THE COURT:  Mr. Good.

02:15:25PM 23          MR. GOOD:  As I discussed with Loree Kovach during

02:15:32PM 24  her depo -- her depo -- excuse me, her witness testimony today,

02:15:36PM 25  if a fax number is recycled, it does not automatically become a

| | |
|---|---|
| 02:15:40PM | 1 |
| 02:15:44PM | 2 |
| 02:15:47PM | 3 |
| 02:15:52PM | 4 |
| 02:15:55PM | 5 |
| 02:16:00PM | 6 |
| 02:16:04PM | 7 |
| 02:16:08PM | 8 |

1  fax number again.  The probability of such an event occurring,

2  because as Mr. Mester points out, fax numbers are less common

3  now than they were in 2009, is extremely low.  I've seen

4  estimates of it being below one percent.  So if somebody's

5  received a fax in 2009 and 2010, and they're sent a fax notice

6  now, the probability is they are the same person or entity that

7  they were in 2009 or 2010, because if the number was recycled,

8  it likely was not recycled to be a fax not -- or a fax machine.

9       The point that I'm trying to make is more than likely

10  the fax would not go through if that were the case, and if it

11  did go through, it would go to the right person.  And on top of

12  that, we have the penalty-of-perjury statement that was

13  approval negotiated before Judge Sansone at extreme amount of

14  time and arm's length before her to allow Your Honor to decide

15  whether fax notice should be used.

16       There is no harm in doing fax notice.  It only

17  increases reach and the opportunity for absent class members to

18  have the ability to file claims in this case.  That is good,

19  especially in light of the fact that the future objector has

20  already telegraphed to this Honorable Court that they intend to

21  object on the grounds of reach.

22       Thank you.

23       THE COURT:  All right.  Anything else?

24       Mr. Piper.

25       MR. PIPER:  With your indulgence.

```
02:17:08PM   1            We all have our opinions about notice.  Fax notice is
02:17:11PM   2   terrible, it's good, whatever.  But our opinions aren't worth
02:17:16PM   3   very much, because we're not experts in that sense.
02:17:20PM   4   Mr. Azari's firm has done fax notice.  Does he come in and say,
02:17:24PM   5   "Ah, it's terrible," or does he come in and say, "Actually, for
02:17:25PM   6   this kind of case, it's probably the best notice."  I don't
02:17:28PM   7   know what he'd say, frankly.  I think you might be
02:17:31PM   8   interested -- it might even change your opinion about fax
02:17:36PM   9   notice if Mr. Azari said that's what you should be doing.  I
02:17:36PM  10   don't know.
02:17:40PM  11            What does he think about banner ads?  I think maybe
02:17:45PM  12   Ross -- I'm sorry, Mr. Good is right, that that's not the way
02:17:45PM  13   to go, but wouldn't it be interesting to hear what a neutral
02:17:49PM  14   expert who actually does this for a living thinks about it.
02:17:53PM  15            You know, ad spins, that's what companies pay for
02:17:57PM  16   advertising.  I think there's a science worked out about that
02:18:00PM  17   so they're not wasting their money.  Maybe instead -- maybe we
02:18:07PM  18   could avoid wasting money and time by getting an informed
02:18:09PM  19   opinion and that's the way to go forward.
02:18:11PM  20            THE COURT:  All right.  Thank you.
02:18:11PM  21            Mr. Mester, you look like you're wanting to say
02:18:13PM  22   something else.
02:18:13PM  23            MR. MESTER:  Simply, Your Honor, Mr. Good keeps
02:18:15PM  24   talking about recycled fax numbers.  That's not what we're
02:18:20PM  25   worried about.  What we're worried about is over-inclusive
```

02:18:21PM  1   notice that goes out to people who held one of these numbers at

02:18:23PM  2   some point in time other than when the faxes were sent.  That's

02:18:26PM  3   where the potential for fraud is, and that's a risk that gets

02:18:30PM  4   greater and greater the more over-inclusive.

02:18:33PM  5            THE COURT:  All right.  Let me take a recess.  I'll

02:18:37PM  6   be back out at 2:30.  We'll take a break till then.  Thank you.

02:18:41PM  7        (Proceedings in recess from 2:18 p.m. until 2:45 p.m.)

02:45:44PM  8            THE COURT:  Mr. Hara, are you with us?

02:46:07PM  9        (No oral response.)

02:46:10PM  10           THE COURT:  Did we lose him?

02:46:13PM  11           MR. GOOD:  I'll send him a message.

02:46:25PM  12           Mr. Hara is suggesting we not wait for him.

02:46:51PM  13           THE COURT:  Is everybody else ready?

02:46:53PM  14           All right.  I want to thank you all for your

02:46:55PM  15   presentations.  I know everyone has spent a substantial amount

02:47:01PM  16   of energy and time in getting prepared for today to raise the

02:47:06PM  17   issues that have been brought before the Court.  So let me

02:47:08PM  18   frame the issues as I see them.

02:47:11PM  19           By doc. No. 381, BTL is asking the Court to consider,

02:47:16PM  20   under Section VII(D), what would be the appropriate methodology

02:47:21PM  21   that should be utilized by the claims administrator, that is,

02:47:25PM  22   Epiq, in order to identify as many class members as possible.

02:47:34PM  23   BTL has put, again, on the record, their objection as to what

02:47:39PM  24   the Court has already previously ruled and found appropriate,

02:47:42PM  25   that is, the additional reverse lookup, which directed -- by

02:47:47PM 1    direction of the Court, Epiq completed with the utilization of

02:47:51PM 2    LexisNexis.

02:47:51PM 3            So I'll reiterate again my findings for that purpose.

02:47:56PM 4    Under VII(D), it specifies, "The parties are to meet and confer

02:48:04PM 5    and work together to agree as to the most reasonable and

02:48:08PM 6    practical efforts that should be made, in consultation with

02:48:12PM 7    Epiq to identify as many class members as possible."  The

02:48:17PM 8    parties were unable to come to that agreement, and as a result

02:48:20PM 9    is asking the Court to rule based upon the disagreement.

02:48:24PM 10           So I find that issue to be within the bounds of the

02:48:28PM 11   settlement agreement, to include the very requests by class

02:48:35PM 12   counsel to order the additional reverse lookup.  I know that

02:48:45PM 13   BTL has taken the position that only one reverse lookup was

02:48:49PM 14   contemplated by the settlement agreement, but that is not in

02:48:52PM 15   the terms of the settlement agreement.  Again, what is

02:48:54PM 16   specified is that the claims administrator is to use all

02:48:58PM 17   reasonable efforts to identify as many class members as

02:49:02PM 18   possible.

02:49:03PM 19           Since that has been done, BTL has now filed its

02:49:09PM 20   motion at 381, suggesting to the Court a number of issues, but

02:49:14PM 21   ultimately as presented, at least at the hearing today, that

02:49:17PM 22   the Court only issue actual mailed notice to the single

02:49:22PM 23   identifiers on the TransUnion result for the reverse lookup.

02:49:29PM 24           So, again, I find that request to be appropriate

02:49:33PM 25   under the bounds of the settlement agreement, because it is

02:49:37PM   1   contemplated by the settlement agreement as to parties were to
02:49:40PM   2   attempt to meet and agree to propose to Epiq the most
02:49:47PM   3   reasonable efforts to be made to identify all class members.
02:49:52PM   4   And that request is made in consideration of due process to the
02:49:56PM   5   Buccaneers -- or to BTL.
02:49:59PM   6          Intervenors have now brought to the Court for the
02:50:03PM   7   first time and raised for the first time, not in a pleading or
02:50:06PM   8   any other fashion, either prior to today's hearing, that the
02:50:12PM   9   Court consider appointing an independent neutral to advise the
02:50:19PM  10   Court as to an appropriate notice that would consider due
02:50:29PM  11   process on both -- for purposes of reach to absentee class
02:50:34PM  12   members.
02:50:35PM  13          First of all, Mr. Piper, I thought about your very
02:50:41PM  14   request, without you making the request, and it is, as you
02:50:47PM  15   said, a prudent one.  But I don't know of any authority, and
02:50:53PM  16   none has been brought to my attention, that suggests I have the
02:50:57PM  17   authority, even if I was to consider a neutral, and then beyond
02:51:01PM  18   consideration of a neutral's suggestions, if I wanted to
02:51:05PM  19   implement those suggestions, that I would have the authority to
02:51:09PM  20   do so under a contemplated settlement agreement.  Rather, I
02:51:11PM  21   think what would be the result of that, the Court would have to
02:51:16PM  22   set aside the settlement agreement and allow the parties to
02:51:19PM  23   decide whether they wanted to accept the neutral's
02:51:21PM  24   recommendations or go forward with the litigation.
02:51:26PM  25          And I'm always very hesitant to do so, since the

02:51:31PM  1    request was made just at this hearing, but you provided me with
02:51:36PM  2    I note no authority to suggest that I have the ability to do
02:51:39PM  3    so.  So I am not going to do that today, even though I
02:51:44PM  4    recognize on the record it's probably the most prudent thing.
02:51:48PM  5    Rather, I'll leave it, because the parties -- and as I've asked
02:51:52PM  6    directly, which gives me some pause, so Mr. Good has recognized
02:51:57PM  7    in his argument, based upon what has been represented by the
02:52:00PM  8    intervenor, in anticipation that there's going to be an
02:52:02PM  9    objection as to reach.  So ultimately it is whether the parties
02:52:07PM 10    are satisfied and comfortable, that when it comes time, whether
02:52:11PM 11    it will be defensible reach as far as the notification.
02:52:18PM 12           But here's what I find, and given this record, what
02:52:21PM 13    is the appropriate for direct notification.  As I've already
02:52:26PM 14    stated before, I said the hierarchy, I am balancing what I find
02:52:31PM 15    to be reliable, and then later verifiable, and I'm balancing
02:52:37PM 16    due process to the absentee class members and due process to
02:52:43PM 17    BTL.  In fact, I think the *In re Nissan* relied upon by BTL,
02:52:53PM 18    which cites extensively *Mullane* -- for the record, it's
02:52:58PM 19    552 F.2d 1088, which is an old Fifth Circuit case from 1977, is
02:53:06PM 20    informative in two respects, the first as to
02:53:09PM 21    over-inclusiveness.
02:53:10PM 22           As to over-inclusiveness, I've not seen, nor has any
02:53:15PM 23    case law been provided to me, that expressly prohibits an
02:53:20PM 24    over-inclusive notice.  Rather, there are cases such as *In re*
02:53:26PM 25    *Nissan Motor Corp.* where it clearly indicates that

02:53:30PM 1    over-inclusiveness needs to be very cautiously looked at, but,

02:53:37PM 2    more importantly, under-inclusiveness is the real significant

02:53:44PM 3    issue.  That is, again, what is required by the rule itself is

02:53:47PM 4    to make all practicable efforts under the circumstances, and

02:53:51PM 5    these I think the parties recognize, are unique circumstances.

02:53:55PM 6             You're talking about a class from 2009 to 2010,

02:54:01PM 7    significant time has lapsed, numbers are transient in nature,

02:54:07PM 8    and by numbers, I mean the numbers at issue, and even records

02:54:11PM 9    may not even exist, so there are obstacles as a result of that.

02:54:20PM 10            And so looking at what is the best practical notice

02:54:24PM 11   under these circumstances to ensure that there is not any

02:54:29PM 12   under-inclusion, to exhaust all best efforts that class members

02:54:35PM 13   are getting notice, I find that, one, it's appropriate to send

02:54:41PM 14   direct notice to TransUnion, what I've been classifying as

02:54:46PM 15   single identifiers.  So those are the TransUnion results that

02:54:51PM 16   have identified one entity or individual with one of the

02:54:54PM 17   numbers at issue.  I find that that is the most reliable of the

02:55:00PM 18   reverse lookups, because, again, TransUnion focused on 2009 and

02:55:06PM 19   2010.

02:55:06PM 20            Two, I also find that direct notice should go to

02:55:10PM 21   those multiple identifiers from the TransUnion lookup.  Those

02:55:15PM 22   are, again, the focus of 2009 and 2010, where individuals or

02:55:25PM 23   entities have been identified by TransUnion of having been

02:55:29PM 24   associated with the relevant numbers during 2009 and 2010.

02:55:35PM 25            That, I recognize, is over-inclusive, because I

02:55:41PM  1    recognize it is highly improbable, although potential, highly

02:55:47PM  2    improbable that multiple individuals or entities associated

02:55:53PM  3    with one number will be class members.  However, I also find it

02:55:59PM  4    highly probable that at least one of those entities or

02:56:06PM  5    individuals, given that the focus was 2009 and 2010 with those

02:56:10PM  6    numbers, is a member of the class.  So to not send notice to

02:56:18PM  7    those multiple entities would be then to deprive actual notice

02:56:22PM  8    to one of the class members.  So for that reason, I find it

02:56:26PM  9    appropriate under these circumstances that it is the most

02:56:29PM  10   practical efforts to be made to identify those additional class

02:56:34PM  11   members.

02:56:35PM  12          Three, I also find it appropriate to send direct

02:56:40PM  13   mailed notice -- and let me note for the record, that

02:56:48PM  14   TransUnion, both single identifiers and multiple identifiers,

02:56:52PM  15   has been calculated at 40,022.  All right.  So, three, I also

02:57:00PM  16   find it appropriate to send direct mailed notices to the single

02:57:04PM  17   identifiers, again, that is a single entity or individual

02:57:09PM  18   who've been identified by the LexisNexis reverse lookup.

02:57:14PM  19          I note, again, as to the degree of reliability,

02:57:19PM  20   without doubt, it is less reliable, that is, the LexisNexis

02:57:24PM  21   reverse lookup is less reliable than the TransUnion reverse

02:57:28PM  22   lookup, because it did not focus on the 2009 and 2010 period.

02:57:34PM  23   However, the proxy solution, as suggested and was conducted,

02:57:38PM  24   was to identify an individual or entity that possessed the

02:57:45PM  25   number at some point in time and then to do a lookup for the

02:57:51PM 1    entities as to whether that entity existed during 2009/2010.

02:57:56PM 2         Again, that is not definitive proof that that makes

02:57:59PM 3    that entity or individual a class member, but in my view it

02:58:04PM 4    increases the high probability, given that only one individual

02:58:08PM 5    or entity was associated based upon LexisNexis' reverse lookup,

02:58:13PM 6    that they are a class member.  Therefore, I find it appropriate

02:58:17PM 7    to include that in the direct mailed notice.  And the best

02:58:21PM 8    example, in fact, the only -- the best evidence I find on this

02:58:24PM 9    record is Medical Chiropractic, who is not revealed in the

02:58:29PM 10   TransUnion reverse lookup, but was the sole entity identified

02:58:35PM 11   by the LexisNexis reverse lookup and the subsequent reverse

02:58:40PM 12   lookup.

02:58:41PM 13        By my count, that then means approximately 18,000

02:58:51PM 14   additional direct notices will go out.  So based upon my

02:58:55PM 15   approximation, that is 58,000 plus direct notices, which by my

02:59:06PM 16   estimate is around -- I think it's around between 38 and

02:59:14PM 17   39 percent of direct notices.  Don't hold me to that math,

02:59:17PM 18   because I'm just approximating it, but it's pretty close.

02:59:23PM 19        Again, I find it appropriate to make this

02:59:26PM 20   determination under the bounds of the settlement agreement.

02:59:33PM 21   Under VII(D), this is specifically contemplated by the parties.

02:59:38PM 22   I also find -- and I know the argument to the contrary, and

02:59:42PM 23   there's been an argument about ascertainability, and it's been

02:59:47PM 24   fully briefed as to what is the disagreement as to the parties

02:59:52PM 25   as to ascertainability under the Eleventh Circuit opinion in

| | |
|---|---|
| 02:59:57PM | 1 |
| 03:00:01PM | 2 |
| 03:00:05PM | 3 |
| 03:00:10PM | 4 |
| 03:00:14PM | 5 |
| 03:00:20PM | 6 |
| 03:00:26PM | 7 |
| 03:00:30PM | 8 |
| 03:00:35PM | 9 |
| 03:00:39PM | 10 |
| 03:00:46PM | 11 |
| 03:00:47PM | 12 |
| 03:00:48PM | 13 |
| 03:00:54PM | 14 |
| 03:00:59PM | 15 |
| 03:01:04PM | 16 |
| 03:01:08PM | 17 |
| 03:01:10PM | 18 |
| 03:01:16PM | 19 |
| 03:01:21PM | 20 |
| 03:01:25PM | 21 |
| 03:01:34PM | 22 |
| 03:01:39PM | 23 |
| 03:01:40PM | 24 |
| 03:01:43PM | 25 |

1 *Cherry,* but, more importantly, I find that in balancing the due

2 process of the defendant that is contemplated by Section

3 VIII(E) of the settlement agreement.

4       Specifically, that provides for a process where, for

5 example, in the TransUnion multiple identifier, if multiple

6 individuals submit claims, that clearly then creates a scenario

7 where it is highly likely one of the claims or more may be

8 fraudulent, and that efforts can be undertaken for a deficiency

9 notice, either by Epiq to require more information to include

10 proof of ownership, and if that's still not satisfied to BTL,

11 then to raise it for the Court as to whether the claim is a

12 valid claim or not.

13       The argument has been whether that would create an

14 unmanageable solution under Rule 23, but no one has provided me

15 with satisfactory evidence as to suggest it will be.  So I am

16 going forward and recognizing that that may still be an issue

17 yet to be determine.

18       As to fax notices, I'm denying document No. 350,

19 which I construe as the motion request as contemplated by the

20 settlement agreement to implement fax notices.  I find that to

21 be the least reliable, and, again, find *In re Nissan Motor*

22 *Corp.* to be informative as to the over-inclusiveness of such a

23 fax notice.

24       I recognize the Seventh Circuit has utilized fax

25 notices before, but, again, given the unique circumstances of

03:01:47PM  1    this case over a period of time, there is no case that is

03:01:51PM  2    similar, where it is all but certainty the fax notices are

03:01:56PM  3    going to be going to individuals that are not members of the

03:02:01PM  4    class.  And by the very fact that they are going to those fax

03:02:06PM  5    numbers increases substantially the likelihood of potential

03:02:09PM  6    fraud, additionally, which is a disservice to the absentee

03:02:13PM  7    class members and the class as a whole by increasing the

03:02:16PM  8    potential fraud upon the class that also is, I think, an

03:02:22PM  9    affront upon the due process rights of BTL.  So I am not going

03:02:27PM 10    to go forward with the fax notification.

03:02:29PM 11          I've already previously noted on the record, but I

03:02:33PM 12    want to make clear again, as contemplated by the settlement

03:02:36PM 13    agreement, I am ordering that publication notice go forward.

03:02:41PM 14          Mr. Good, I don't know if it was specified or not,

03:02:44PM 15    but I'd like an answer to this.  By publication notice with

03:02:49PM 16    those publications, does that include the websites used by

03:02:52PM 17    those publications as well?

03:02:53PM 18          MR. GOOD:  It's my understanding that it does,

03:02:55PM 19    Your Honor, on the date specified.

03:02:57PM 20          THE COURT:  All right.  Mr. Mester -- yes -- do you

03:03:02PM 21    disagree with that?

03:03:02PM 22          MR. MESTER:  That's not my understanding.

03:03:04PM 23          THE COURT:  All right.  Here we go.  Okay.  So that's

03:03:06PM 24    why I asked the question.  So why do you say that?

03:03:09PM 25          MR. MESTER:  Your Honor, we talked about newspaper;

03:03:10PM  1   we didn't talk about websites.

03:03:13PM  2          THE COURT:  All right.  Mr. Addison, there's no need.

03:03:15PM  3   I'll accept that as a disagreement as well.  I'm going to be

03:03:18PM  4   ordered that it be published on all outlets for those entities

03:03:23PM  5   that are outlined in the settlement agreement.  So if they have

03:03:27PM  6   a web presence, that it published on the web as well.

03:03:31PM  7          All right.  I think I've addressed what has been at

03:03:35PM  8   issue here today.  But I want to emphasize again, because

03:03:40PM  9   Mr. Piper has raised it, and in my view, and clearly in

03:03:44PM  10  Mr. Good's view as well, he is forecasting for all of us what

03:03:49PM  11  may be of issue if we get to ultimately a hearing, which is,

03:03:54PM  12  does that satisfy due process?  I think it's the parties'

03:03:59PM  13  obligation -- and let me also emphasize this.  Mr. Piper, if

03:04:01PM  14  you've got case law you think I'm wrong about that, that I have

03:04:05PM  15  the right to rewrite what has been contemplated by the parties

03:04:08PM  16  and still accept their settlement agreement, I'd be interested

03:04:13PM  17  to see that case law.

03:04:14PM  18         MR. PIPER:  I'm absolutely sure you have the right to

03:04:16PM  19  get an expert's neutral opinion to inform the Court.  I believe

03:04:21PM  20  you can also reshape the notice.

03:04:24PM  21         THE COURT:  Well, that's two different things.  I

03:04:26PM  22  agree with you, I can hear anything you want me to hear, but to

03:04:28PM  23  reshape the notice otherwise contemplated by the parties,

03:04:32PM  24  that's what I want to know, do I have the authority to do that?

03:04:35PM  25         MR. PIPER:  If I can have until next week --

|          |    |                                                                       |
|----------|----|-----------------------------------------------------------------------|
| 03:04:39PM | 1  | THE COURT:  Well, I'm going to give you that and then |
| 03:04:41PM | 2  | some, because what I'm going to talk about next is logistically |
| 03:04:45PM | 3  | going forward, because the next step is we have to redo the |
| 03:04:48PM | 4  | deadlines.  And so I want the parties to meet and confer to |
| 03:04:52PM | 5  | contemplate that, now that we are going to have at least a |
| 03:04:55PM | 6  | notice, then with the opportunity also that, if you find |
| 03:04:58PM | 7  | there's case law to suggest otherwise, so you can have time to |
| 03:05:02PM | 8  | submit that. |
| 03:05:03PM | 9  | The other thing I want to note is there are motions |
| 03:05:07PM | 10 | that technically have been ruled upon, but I want to term them |
| 03:05:10PM | 11 | for the record. |
| 03:05:11PM | 12 | So document 348, 349, and 354, all these motions -- |
| 03:05:18PM | 13 | although they did address, and I have reviewed them again for |
| 03:05:20PM | 14 | purposes of today's proceeding and taken them under advisement, |
| 03:05:23PM | 15 | they primarily were focusing on these second reverse lookups, |
| 03:05:26PM | 16 | so I'm denying those at moot. |
| 03:05:29PM | 17 | There was Exhibits 1 through 6 BTL had entered into |
| 03:05:33PM | 18 | the record under seal, but we only utilized the one that I |
| 03:05:38PM | 19 | questioned about.  So my question about that is, is it |
| 03:05:42PM | 20 | necessary to have those exhibits admitted and maintain them |
| 03:05:45PM | 21 | under a seal, or is it sufficient just to utilize the one, or |
| 03:05:48PM | 22 | even any of them since the testimony came in through |
| 03:05:53PM | 23 | Ms. Kovach?  What I'm asking is there -- no, no, you're fine. |
| 03:05:57PM | 24 | All I'm asking is, is there anything in those that you want of |
| 03:05:59PM | 25 | record to preserve for purposes of any appellate record? |

03:06:02PM 1     MR. MESTER:  Your Honor, I'd like to give you an

03:06:04PM 2 answer, but I'd have to look at them.

03:06:08PM 3     THE COURT:  Okay.  Look at them.  I'll hold off

03:06:09PM 4 admitting them into the record until you tell me otherwise.

03:06:13PM 5 But it's noted that those were stipulated to if that's what you

03:06:14PM 6 want to admit.

03:06:14PM 7     Mr. Piper.

03:06:15PM 8     MR. PIPER:  At a minimum, maybe Mr. Good could do the

03:06:18PM 9 one line for the spreadsheet.  That's certainly salient to what

03:06:24PM 10 you were --

03:06:27PM 11     THE COURT:  Yes.

03:06:28PM 12     Any objection?

03:06:30PM 13     MR. GOOD:  I have no objection to it.  I'm fine doing

03:06:32PM 14 it.  Just as a matter of making that one line --

03:06:35PM 15     THE COURT:  Let rephrase it, Mr. Good, to even avoid

03:06:37PM 16 that.  I'll admit that entire record.  I mean, it's been

03:06:40PM 17 introduced, so we'll just -- I can keep that under seal.

03:06:43PM 18     My question is as to the other ones that were just

03:06:45PM 19 never discussed or even presented.  All right.

03:06:58PM 20     THE CLERK:  Which exhibit?

03:06:59PM 21     THE COURT:  That was BTL Exhibit 3A, which in the

03:07:04PM 22 native format, there is -- it's not readable, the PDF that was

03:07:10PM 23 provided, but the native format is the only one which is an

03:07:13PM 24 Excel spreadsheet.

03:07:15PM 25     Okay.  Having stated all that, let me start with

03:07:18PM 1    class counsel, any other objections you want to make as to my

03:07:22PM 2    findings that you want to put on the record, or is there

03:07:25PM 3    anything that you think I'm missing?

03:07:27PM 4                MR. ADDISON:  No, Your Honor.

03:07:28PM 5                THE COURT:  Mr. Mester.

03:07:28PM 6                MR. MESTER:  Your Honor, just the continuing

03:07:30PM 7    observation as to ascertainability.

03:07:32PM 8                But there is one housekeeping issue in light of your

03:07:34PM 9    rulings.  We discovered -- we think we discovered, we could be

03:07:37PM 10   wrong, yesterday that when class counsel filed their contested

03:07:43PM 11   motion for class certification, they labeled the Biggerstaff --

03:07:46PM 12   what we call the Biggerstaff list, they call it the class list,

03:07:49PM 13   as confidential, but I believe it was not filed under seal.

03:07:54PM 14   That obviously creates an issue going forward, because that

03:07:58PM 15   would be something that would be available to someone who is

03:08:02PM 16   intent on committing some form of fraud.

03:08:04PM 17               THE COURT:  All right.  So I'm going to construe that

03:08:06PM 18   as a motion to -- if it is filed in the public record, to

03:08:10PM 19   direct that the clerk file that under seal.

03:08:12PM 20               MR. MESTER:  Yes, Your Honor.

03:08:13PM 21               THE COURT:  Any objection to that?

03:08:17PM 22               MR. GOOD:  Defense counsel has been aware of this

03:08:20PM 23   since October 2015.  There is no objection to this.

03:08:23PM 24               THE COURT:  Well, I don't think that -- just

03:08:24PM 25   highlighting now, based upon my ruling, I think is the point of

03:08:28PM  1    it, but yes.  All right.

03:08:28PM  2            MR. MESTER:  Thank you, Your Honor.

03:08:31PM  3            THE COURT:  So give me one moment, so I can be

03:08:33PM  4    specific about that in the record.

03:09:37PM  5            MR. HARA:  Your Honor, I have the document if you'd

03:09:39PM  6    like me to give you the location.

03:09:42PM  7            THE COURT:  I'm looking at document No. 341.  Is that

03:09:47PM  8    what you're referring to?

03:09:49PM  9            MR. HARA:  No.  This would be document 207-5, filed

03:09:54PM 10    March 25th, 2016.

03:09:56PM 11            THE COURT:  All right.  Mr. Hara, let me see if I'm

03:10:00PM 12    missing something else, then.

03:10:17PM 13            All right.  Give that to me one more time.

03:10:20PM 14            MR. HARA:  All right.  It is document 207-5, and the

03:10:27PM 15    part that should be redacted is Exhibit 7, which starts at page

03:10:32PM 16    ID 5510, is a very long -- but the list of the fax numbers

03:10:40PM 17    starts at page 5510.

03:10:52PM 18            THE COURT:  I apologize.  207?

03:10:55PM 19            MR. GOOD:  Yeah, 207, Your Honor, and it's the page

03:10:58PM 20    ID Mr. Hara identified to start with, and it ends at 5864.

03:11:35PM 21            THE COURT:  All right.  So it's Exhibit 4, 207.  For

03:11:40PM 22    the record, that is attachments 5, 6, and 7.  There are three

03:11:45PM 23    parts to that record.

03:11:48PM 24            MR. HARA:  Right.

03:11:49PM 25            THE COURT:  All right.  So I will direct that the

03:11:51PM   1    clerk seal Exhibit -- or attachments 5, 6, 7, which is

03:11:59PM   2    Exhibit 4, parts 1, 2, 3, that that be filed under seal for

03:12:06PM   3    document No. 207.  If there is any other things that you've

03:12:11PM   4    missed on the record, then just file it as a motion and I will

03:12:14PM   5    consider that as well to redact if there's other identified

03:12:17PM   6    information regarding the numbers.  I think that's an

03:12:18PM   7    appropriate request.

03:12:19PM   8            MR. MESTER:  Thank you, Your Honor.

03:12:20PM   9            THE COURT:  All right.  Let's talk about -- is there

03:12:23PM  10    anything else?

03:12:24PM  11            MR. MESTER:  No.

03:12:25PM  12            THE COURT:  All right.  Mr. Piper, did you want to

03:12:27PM  13    note any objections or anything based upon my ruling?

03:12:32PM  14            MR. PIPER:  Well --

03:12:32PM  15            THE COURT:  Other than your arguments.

03:12:34PM  16            MR. PIPER:  Yeah, I don't have anything to add.

03:12:36PM  17            THE COURT:  All right.  Let's talk about, then, going

03:12:40PM  18    forward, given that Mr. Piper may contemplate filing something.

03:12:43PM  19    If I give him till the end of next week, I'll decide upon

03:12:59PM  20    receiving that whether I need further information and whether I

03:13:03PM  21    need you all to respond to it.  So to be very blunt, if I

03:13:07PM  22    decide I still don't have the authority, I'm not going to seek

03:13:10PM  23    a response, but if I want you to respond to, I'll invite

03:13:13PM  24    responses.  Then at that point, it'll be my intent to direct

03:13:16PM  25    that you all meet and confer then to propose new scheduling

03:13:21PM 1   deadlines to go forward, back to the agreement, progressing

03:13:27PM 2   forward with purposes of notices.  So I will ask that you start

03:13:29PM 3   that process in advance to be prepared once -- if an issue is

03:13:35PM 4   raised, about whether I should rewrite the notice requirements

03:13:38PM 5   and that is resolved, then it be prepared to provide me dates

03:13:43PM 6   going forward so we can get back on schedule.

03:13:46PM 7          And so what I intend to do, though, is then direct

03:13:48PM 8   that -- if I do have to rule on something without -- either

03:13:51PM 9   with or without the benefit of your responsive pleading, if I

03:13:56PM 10  decide not to accept any further information, I will likely

03:14:03PM 11  direct that you provide me within ten days that schedule.  So

03:14:08PM 12  my point is, it would be helpful if you could start that

03:14:11PM 13  process sooner than later.

03:14:13PM 14         All right.  Am I missing anything on behalf of class

03:14:16PM 15  counsel that we've not addressed that you think still needs to

03:14:20PM 16  be addressed?

03:14:20PM 17             MR. ADDISON:  No, Your Honor.

03:14:21PM 18             THE COURT:  Mr. Mester.

03:14:22PM 19             MR. MESTER:  No, Your Honor.

03:14:23PM 20             THE COURT:  All right.  Mr. Piper, anything?

03:14:25PM 21             MR. PIPER:  No, that's fine.

03:14:27PM 22             THE COURT:  All right.  Thank you all for your time.

03:14:31PM 23  And, again, I know this has been a belabored process for you,

03:14:38PM 24  particularly for a number of reasons, but particularly for

03:14:45PM 25  today, I want to note a couple things.  One, I apologize to

03:14:50PM   1   everybody, my response was unwarranted and inappropriate, so I

03:14:54PM   2   apologize for that.  And so, frustrated at myself for that, but

03:15:01PM   3   I suspect you probably all in this case have felt similar

03:15:05PM   4   frustration.  Just accept that apology, and I promise to do

03:15:11PM   5   better on that.

03:15:12PM   6                  All right.  We'll be adjourned.  Thank you.

03:15:43PM   7                  (Whereupon, the Court adjourned at 3:15 p.m.)

03:15:43PM   8                              --oo0oo--

             9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25

REPORTER'S CERTIFICATE

I, REBECCA M. SABO, a Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 7th day of September, 2022.


/s/ Rebecca M. Sabo

Rebecca M. Sabo, RMR, CRR
United States Court Reporter