# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., )
<u>et al.</u>, )
     **Plaintiffs,** )
  **v.** )
              )
BUCCANEERS LIMITED )
PARTNERSHIP and JOHN DOES )
1-10, )
     **Defendants,** )
_____ )
              )
TECHNOLOGY TRAINING )
ASSOCIATES, INC., <u>et al.</u>, )
     **Intervenors.** )

**Case No. 8:13-cv-01592-AEP**

**Magistrate Judge
Anthony E. Porcelli**

## MOTION AND INCORPORATED MEMORANDUM OF LAW
## IN SUPPORT OF BTL'S MOTION TO COMPEL COMPLIANCE
## <u>WITH SECTION VIII OF THE SETTLEMENT AGREEMENT</u>

Date:  June 16, 2023

Mark S. Mester
 (admitted *pro hac vice*)
Robert C. Collins III
 (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
   robert.collins@lw.com

Joseph H. Varner, III
 (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   FACTUAL BACKGROUND ......................................................... 7

    A.    Notice ................................................................................. 7

    B.    The Claims Process ........................................................... 8

        1.    Duplicate Claims.................................................... 8

        2.    Facially Invalid Claims .......................................... 9

        3.    Questionable Claims ............................................ 11

        4.    Claims Processing ................................................ 11

    C.    Both TransUnion And LexisNexis Confirm Significant
        Limitations On The Use Of Their Respective Databases As
        Well As The Need For <u>Independent</u> <u>Verification</u> And
        <u>Validation</u> ........................................................................ 12

        1.    Epiq's Agreements With LexisNexis And TransUnion ........... 13

        2.    The Declarations From TransUnion And LexisNexis ............. 14

    D.    The Meet And Confer Process ........................................... 16

III.  ARGUMENT.............................................................................. 16

    A.    Given The Limitations Noted By <u>Both</u> TransUnion And
        LexisNexis And What Appears To Be Rampant Fraud In The
        Claims Process, Documentation Should Be Requested From All
        Claimants Who Are Recipients Of Mailed Notice............................ 17

    B.    The Attestation Requirement Has Likewise Proven To Be
        Ineffective And Is Otherwise Clearly Not Proxy For
        Independent Verification And Validation............................... 20

    C.    Supplying A Number On The Biggerstaff List Does Not Verify
        Membership In the Settlement Class Either................................. 22

i

**Page**

D.    The Other Four Categories Of Claimants ...........................................28

E.    Claimants Not Identified On Either Reverse Lookup .........................28

F.    Claims Submitted By Persons And Entities With Addresses
      Outside The State Of Florida ..............................................................29

G.    Claims Submitted By Claimants For Which The Reverse
      Lookups Identified More Than One Match .........................................29

H.    Claims From Fax Service Providers ...................................................31

I.    In The Alternative, BTL Should Be Allowed To Engage In
      Confirmatory Discovery......................................................................32

IV.   CONCLUSION................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

<u>Advanced Rehab v. Amedisys</u>,
2020 WL 4937790 (W.D. Tenn. 2020) ..................................................................31

<u>Arkin v. Pressman</u>,
38 F.4th 1001 (11th Cir. 2022) ...............................................................................6

<u>In re Brinker Data Incident</u>,
2021 WL 1405508 (M.D. Fla. 2021) .....................................................................19

<u>Brown v. Electrolux</u>,
817 F.3d 1225 (11th Cir. 2016) .............................................................................18

<u>Camden I Condo. Ass'n v. Dunkle</u>,
946 F.2d 768 (11th Cir. 1991) .................................................................................6

<u>Carrera v. Bayer</u>,
727 F.3d 300 (3d Cir. 2013) ..................................................................................28

<u>Cherry v. Dometic</u>,
986 F.3d 1296 (11th Cir. 2021) ......................................................................18, 19

<u>Daisy v. Mobile Mini</u>,
489 F. Supp. 3d 1287 (M.D. Fla. 2020) ..................................................................9

<u>In re Deepwater Horizon</u>,
643 Fed. Appx. 377 (5th Cir. 2016) .........................................................................8

<u>Gilchrest v. Bolger</u>,
733 F.2d 1551 (11th Cir. 1984) .............................................................................32

<u>Haines v. Fidelity Nat'l Title</u>,
2022 WL 1095961 (M.D. Fla. 2022) .....................................................................18

<u>Hunter v. Time Warner</u>,
2019 WL 3812063 (S.D.N.Y. 2019) ......................................................................28

<u>Juris v. Inamed</u>,
685 F.3d 1294 (11th Cir. 2012) ...............................................................................7

**Page(s)**

Mullane v. Central Hanover Bank,
　　339 U.S. 306 (1950)........................................................................7

Opperman v. Kong Techs.,
　　Order of Referral (Dkt. 922), No. 3:13-cv-00453 (N.D. Cal. Jan. 17, 2018).....22

Prado-Steiman v. Bush,
　　221 F.3d 1266 (11th Cir. 2000) ...........................................................32

Rensel v. Centra Tech,
　　2021 WL 4134984 (S.D. Fla. 2021) ......................................................19

Sharfman v. Infucare,
　　Motion for Entry of Authorization Order (Dkt. 19),
　　No. 6:21-cv-00525 (M.D. Fla. Aug. 18, 2021)...........................................20, 31

Sherman v. Yahoo,
　　2015 WL 5604400 (S.D. Cal. 2015)......................................................14

Shin v. Cobb Cty. Bd. of Educ.,
　　248 F.3d 1061 (11th Cir. 2001) ...........................................................32, 33

TRG Columbus Dev. v. Sifontes,
　　163 So.3d 548 (Fla. 3d DCA 2015) ......................................................23

In the Matter of Westfax,
　　30 F.C.C.R. 8620 (2015)...................................................................30

Williams v. Reckitt Benckiser,
　　2023 WL 2906311 (11th Cir. 2023) ......................................................6

Wilson v. Badcock,
　　329 F.R.D. 454 (M.D. Fla. 2018) .........................................................14, 16, 21

Xavier v. Philip Morris,
　　787 F. Supp. 2d 1075 (N.D. Cal. 2021) .................................................18

In re Yahoo!,
　　2020 WL 4212811 (N.D. Cal. 2020) .....................................................32

**STATUTES**

18 U.S.C. § 1621 .............................................................................21

iv

Page(s)

## RULES

FED. R. CIV. P. 23 ................................................................19, 32

## OTHER AUTHORITIES

Alex Ebert, <u>NFL Buccaneers' Fax Spat Incites 'Never-Ending'
  Legal Fees Feud</u>, Bloomberg Law (Mar. 23, 2023) ...........................................24

Defendant Buccaneers Team LLC ("BTL") respectfully moves to compel compliance with Section VIII of the Settlement Agreement and for other relief.[1]  In support of this motion, BTL states as follows:

## I.   <u>INTRODUCTION</u>

At the August 31, 2022 hearing and in light of the various concerns raised regarding the reverse lookup process utilized by the Settlement Administrator, the Court noted that Section VIII of the Settlement Agreement includes a number of measures designed to protect the due process rights of <u>both</u> BTL as well as members of the Settlement Class.  <u>See</u> Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 164:19-165:12 (approving the use of Mailed Notice only after "balancing the due process [rights] of the defendant that is contemplated by Section VIII(E) of the settlement agreement").  Those measures include the ability of the Settlement Administrator to seek information from claimants in order to fully evaluate claims as well as the ability of BTL, Class Counsel and members of the Settlement Class to raise with the Court issues relating to claims.  <u>See</u> <u>id.</u> at 165:4-12 (noting the Settlement Administrator's ability to "require more information to include proof of ownership" of a claimed fax number); Settlement Agt. (Dkt. 324-1) § VIII.E.

As we understood its comments at that hearing, the Court contemplated a broad distribution of Mailed Notice being sent to persons and entities identified as <u>potential</u> members of the Settlement Class through two reverse lookups performed using the databases of <u>both</u> TransUnion and LexisNexis.  <u>See</u> Aug. 31, 2022 Hr'g

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with the motion for preliminary approval of Plaintiffs Cin-Q Automobiles, Inc. ("Cin-Q") and Medical & Chiropractic Clinic, Inc. ("M&C," and, collectively with Cin-Q, "Plaintiffs").  <u>See</u> Settlement Agt. (Dkt. 324-1).  In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted, unless otherwise indicated.

Tr. (Dkt. 410) at 162:20-163:18 (ordering Mailed Notice to be provided to matches on <u>both</u> the TransUnion and LexisNexis databases).   While recognizing this approach would be over-inclusive and would lead to Mailed Notice being sent to a number of persons and entities that are <u>not</u> members of the Settlement Class, the Court deliberately relied on Section VIII and the processes provided therein in concluding that the Settlement Agreement itself provided ample means for addressing the risks of over-inclusive notice, while ensuring that only valid claims are ultimately honored.  <u>See id.</u> at 138:17-139:1.  The Court further concluded that the broader question of ascertainability of the Settlement Class could and should be addressed at a later date, with what would transpire during the notice program and claims process further informing that issue.  <u>See id.</u> at 165:13-17 (acknowledging potential manageability problems associated with the notice program and claims process and "recognizing that [ascertainability and manageability] may still be an issue yet to be determined").

As directed by the Court, two reverse lookups were undertaken by Epiq using the databases of TransUnion and LexisNexis, Mailed Notice was sent to 114,301 persons and entities along with Publication Notice in three separate publications, and the deadline for the submission of claims has now passed.[2]  <u>See</u> Apr. 4, 2023 Email fr. J. Diego, Ex. 2 hereto (cataloging the total number of claim packages mailed by Epiq); Order (Dkt. 418) (setting claims deadline of February 6, 2023).  In its ruling last August, however, and based on the information available at that time, the Court's

---

[2] In addition to the 114,301 persons identified by the reverse lookups, Epiq subsequently mailed notice to an additional 24 persons who requested Mailed Notice through the Toll Free Number on the Settlement Website.  <u>See</u> Mar. 21, 2023 Email fr. J. Diego, Ex. 1 hereto.  Epiq also re-mailed 9,555 notice packages, bringing the total count of mailings sent to 123,880.  <u>See id.</u>

ruling also reflected a perceived variation in the reliability of the results obtained using TransUnion versus LexisNexis, with the Court ordering that notice be sent to both single and multiple matches on the TransUnion database but only to single matches on the LexisNexis database. See Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 163:19-22 ("[A]s to the degree of reliability, without doubt . . . LexisNexis reverse lookup is less reliable than the TransUnion reverse lookup . . .").

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Moreover, what has since transpired during the claims process has further highlighted the need for the safeguards provided in Section VIII of the Settlement Agreement, with the widespread submission of invalid and fraudulent claims occurring in the claims process and with at least one-third (and likely far more) of all claims being fraudulent or invalid. See disc. infra at 8-12; see also Intervenors' Objs. (Dkt. 434) at 11-13 (concluding that over 1,000 claims appeared "very doubtful" and that likely one-third of all claims will fail due to likely fraud).

This motion addresses the now-obvious need for independent verification, the proper implementation of Section VIII of the Settlement Agreement and what appears to be rampant fraud in the claims process.  While Class Counsel argued vociferously for the over-inclusive notice that the Court ended up ordering after the hearing last August, Class Counsel have now taken a much, much narrower view of the need for use of the Section VIII safeguards agreed to in the Settlement Agreement.  See June 1, 2023 Email fr. G. Hara, Ex. 3 hereto (contending Section VIII of the Settlement Agreement should be ignored so long as a claim is timely, signed under penalty of perjury and lists a fax number matching the Biggerstaff list).  This is the position of Class Counsel even though the need for those safeguards is all the more pressing at this juncture, given the information recently received from TransUnion as well as the fraud that has already been uncovered in the claims process itself.

As noted in an earlier submission, Epiq has largely abdicated its role in the process, recently taking the position it will in effect only send requests for information or deficiency notices to members of the Settlement Class if all Parties agree or if otherwise directed by the Court.  See May 15, 2023 Email fr. S. Amin-Giwner, Ex. 4 hereto.  This has led to a lengthy meet and confer process between the Parties, and that process recently concluded.  See Declaration of Gabriel Slater ("Slater Declaration" or "Slater Decl.") ¶¶ 18-22, Ex. 5 hereto; May 30, 2023 Email fr. R. Collins, Ex. 6 hereto; June 1, 2023 Email fr. G. Hara, Ex. 3; June 15, 2023 fr. R. Collins, Ex. 7 hereto.  Agreement has, in turn, been reached on five categories of

claimants who should receive requests for information or deficiency notices.[3]  See June 1, 2023 Email fr. G. Hara, Ex. 3.  This motion, however, addresses the remaining categories on which agreement could not be reached.  See id.; June 15, 2023 fr. R. Collins, Ex. 7.

More specifically, the categories of claims addressed in this motion on which agreement could not be reached are as follows:

1.  Claims submitted by claimants identified by TransUnion;
2.  Claims submitted by claimants identified by LexisNexis;
3.  Claims submitted by claimants not identified on either reverse lookup;
4.  Claims submitted by claimants providing an address outside the State of Florida; and
5.  Claims submitted by claimants for which the reverse lookup process identified multiple matches.

Category List, Ex. 8 at 2; see also May 30, 2023 Email fr. R. Collins, Ex. 6; June 15, 2023 Email fr. G. Hara, Ex. 3.

Of these five categories, the first two are the largest and in some sense the most important, as a decision to send requests for additional information to the first two categories would largely (but not completely) obviate the need to make a decision with respect to the other three categories.[4]  See disc. infra at 17-28.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[3] The categories for defect notices and/or requests for information where agreement was reached between the Parties are identified in Exhibit 8 hereto.

[4] Of the 3,016 Claim Forms submitted, 2,307 were submitted by persons and entities that received Mailed Notice (accounting for 76%), and the remaining 709 Claims Forms were submitted by persons and entities that did not receive Mailed Notice (accounting for 24%).  See Slater Decl. ¶ 16.

███████████████████████████▌ ████████████████████████████████

███████████████████████▌

As discussed in more detail below, Class Counsel have argued that two features of the Claim Form can somehow serve as proxy for the independent verification and validation that TransUnion and LexisNexis have indicated is necessary.  <u>See</u> June 1, 2023 Email fr. G. Hara, Ex. 3 (contending claims should be presumptively accepted without further verification so long as it is "signed under penalty of perjury" and "provides a matching fax number" to the Biggerstaff list).  That is plainly not the case, however, as the claims process itself makes abundantly clear.  <u>See</u> disc. <u>infra</u> at 8-12.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████▌ ████████████████████

---

[5] Epiq had originally agreed that requests for additional information should be sent to all recipients of Mailed Notice who matched <u>only</u> on the LexisNexis database, owing to the limitations on that database noted by the Court in August and by Shawn Parks in his declaration.  <u>See</u> Jan. 2023 Emails bt. O. Castillejos and R. Collins, Ex. 9 hereto.  Epiq, however, has since apparently recanted that position and indicated it will only do what the Parties jointly agree to, unless directed by the Court.  <u>See</u> May 15, 2023 Email fr. S. Amin-Giwner, Ex. 4.

[6] The incentives of Class Counsel to inflate the number of claims that are paid out of the Settlement Fund are nonetheless obvious.  <u>See</u>, <u>e.g.</u>, <u>Williams v. Reckitt Benckiser</u>, 2023 WL 2906311, *13 (11th Cir. 2023) (noting the incentive of plaintiff's counsel to maintain a sufficiently high claims rate so as to avoid receiving in attorneys' fees a disproportionate distribution of the settlement).  Under Eleventh Circuit precedents, the benefit conferred to class members is one of the primary factors the Court will consider in deciding the reasonableness and propriety of any fee paid to Class Counsel.  <u>See</u>, <u>e.g.</u>, <u>Camden I Condo. Ass'n v. Dunkle</u>, 946 F.2d 768, 774 (11th Cir. 1991) (noting that an attorney's fee award should not be approved if the fees are disproportionate to what the class receives).  This is scarcely a reason, however, to allow fraudulent or invalid claims, and for obvious reasons, fraudulent or invalid claims would not be properly credited to the benefit conferred to the settlement class for purposes of calculating attorneys' fees or other purposes.  <u>See</u>, <u>e.g.</u>, <u>Arkin v. Pressman</u>, 38 F.4th 1001, 1009 (11th Cir. 2022) (noting that a substantial benefit "creates, discovers, increases, or preserves the class's ultimate recovery" of a common fund).

█

## II.   FACTUAL BACKGROUND

The factual background for this motion is set forth below.  <u>See</u> disc. <u>infra</u> at 7-16.

### A.   Notice

By any standard, the notice provided under the Settlement Agreement has been deliberately extensive.  <u>See</u>, <u>e.g.</u>, <u>Mullane v. Central Hanover Bank</u>, 339 U.S. 306, 314 (1950) (holding that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); <u>Juris v. Inamed</u>, 685 F.3d 1294, 1321 (11th Cir. 2012) ("Where certain class members' names and addresses cannot be determined with reasonable efforts, notice by publication is generally considered adequate.").  A total of 114,301 Mailed Notices were sent to persons and entities that "matched" on one or both reverse lookups undertaken by the Settlement Administrator utilizing databases maintained by TransUnion as well as LexisNexis.[7] <u>See</u> Apr. 4, 2023 Email fr. J. Diego, Ex. 2.  The Mailed Notice, however, included mailings sent to the <u>multiple</u> matches identified by TransUnion, and it also included all numbers for which both LexisNexis and TransUnion identified <u>different</u> matches for the <u>same</u> fax number.  <u>See</u> Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 162:10-163:18 (directing notice be mailed to (1) all matches identified in the TransUnion reverse lookup (including multiple matches) and (2) only the single matches identified in the LexisNexis reverse lookup).

---

[7] In addition, publication notice was provided, consisting of publication of advertisements in consecutive Sunday issues of the <u>Tampa Bay Times</u>, <u>Sarasota Herald Tribune</u> and <u>Gainesville Sun</u>, again as contemplated by the Settlement Agreement and the Court's prior orders.  <u>See</u> Settlement Agt. (Dkt. 324-1) § II.FF.

## B.   The Claims Process

The claims process commenced on November 7, 2023 and ended on February 6, 2023.  See Order (Dkt. 418).  All in all, 3,016 claims referencing 20,363 individual telephone numbers were submitted to the Settlement Administrator.  See Slater Decl. ¶¶ 5-6.[8]  By any standard, however, the claims process itself was beset by widespread fraud, and that fraud took a number of different forms.  See disc. infra at 8-12.  Moreover, the claims process makes clear that the pre-existing safeguards in the Claim Form (i.e., the attestation requirement and the requirement that a telephone number on the Biggerstaff list be provided by claimants) are clearly not capable of preventing fraud or invalid claims standing alone.[9]  See disc. infra at 20-28.

### 1.   Duplicate Claims

As the Court noted at the August 31, 2022 hearing, duplicate claims made with respect to a single number on the Biggerstaff list would be a clear indication of fraud.  See Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 162:25-163:3 (explaining that "if

---

[8] Epiq has separately stated by email that the total number of claims is 3,192.  See Apr. 4, 2023 Email fr. J. Diego.  However, there are only 3,016 claims listed on the claims spreadsheet provided by Epiq.  See id.  Epiq has explained that this discrepancy is due to the fact that certain claimants submitted supplemental information containing additional fax numbers.  While these were included in Epiq's count of 3,192 "claims" in truth there were only 3,016 claims submitted by unique claimants.

[9] In the objection they filed on April 28, 2023, Intervenors and their counsel make note of what appears to be rampant fraud in the claims process suggesting that one-third of all claims are "very doubtful."  See Intervenors' Objs. (Dkt. 434) at 10.  We strongly suspect the actual number of fraudulent or invalid claims is much higher, but one-third is itself by no means a trivial or non-material number.  See, e.g., disc. infra at 8-12 (addressing fraud in the claims process).  Indeed, fraud at that level is relatively rare in the context of class action settlements, and it is certainly cause for concern.  See, e.g., In re Deepwater Horizon, 643 Fed. Appx. 377, 380-81 (5th Cir. 2016) (affirming award of sanctions against claimants based on fraudulent claims).  Intervenors' proposed "solution" to such fraud, however, is to provide even more over-inclusive notice, including fax notice, which the Court previously rejected.  See Intervenors' Objs. (Dkt. 434) at 14-21.  BTL will, of course, respond in full to Intervenors' objection on the schedule set by the Court, but for present purposes, the assessment of fraud in the claims process by Intervenors is nonetheless noteworthy.  See Order (Dkt. 447) ¶ 1(b).

multiple individuals submit claims" for the same fax number, "that clearly then creates a scenario where it is highly likely one of the claims or more may be fraudulent, and that efforts can be undertaken for a deficiency notice").  While the Court acknowledged the risk of duplicate claims as a possibility, the full scope of the problem may not have been anticipated, as no less than 890 claims or 30% of the <u>total</u> number of claims received are in fact duplicates.  <u>See</u> Slater Decl. ¶ 12.

Indeed, the duplicate claim problem is fully apparent with respect to the fax numbers claimed by M&C and Cin-Q.  A total of 199 Claim Forms were submitted by claimants other than M&C listing the fax number claimed by M&C, and 16 Claim Forms were submitted by claimants other than Cin-Q listing the fax number claimed by Cin-Q.[10]  <u>See</u> Slater Decl. ¶ 13.

### 2.    Facially Invalid Claims

Of the 20,363 fax numbers listed on Claim Forms received by the Settlement Administrator, 16,853 of those numbers or 83% are invalid and do <u>not</u> match <u>any</u> number on the Biggerstaff list, again in spite of the requirement that Claim Forms

---

[10] It is, of course, possible that someone other than M&C and/or Cin-Q held between July of 2009 and June of 2010 the telephone numbers M&C and Cin-Q have been claiming are theirs from the beginning of this litigation, and indeed, both Cin-Q and M&C submitted under penalty of perjury Claim Forms in which they claimed to have received faxes from BTL on a telephone number that is <u>not</u> listed on the Biggerstaff list.  <u>See</u> Slater Decl. ¶¶ 8-9.  But if M&C and Cin-Q did not actually hold the numbers they have been claiming, then that would obviously raise an entirely new set of issues, including standing.  <u>See</u>, <u>e.g.</u>, <u>Daisy v. Mobile Mini</u>, 489 F. Supp. 3d 1287, 1290 (M.D. Fla. 2020).  Needless to say, this is an issue that should be addressed by Class Counsel, though to date, they have not done so.  Moreover, a process will need to be established for determining who actually held the numbers claimed by Cin-Q and M&C from July of 2009 to June of 2010, given the significant implications this has for standing and the fact that 215 <u>other</u> persons and entities are now stating under penalty of perjury that they held those numbers and received faxes purportedly sent on behalf of BTL during the relevant timeframe.  <u>See</u> Slater Decl. ¶ 13.  Finally, this issue also creates additional questions regarding the accuracy of the Biggerstaff list, which questions have yet to be fully resolved.  <u>See</u> BTL's Submission regarding Ascertainability (Dkt. 365).

be submitted under penalty of perjury.  See Slater Decl. ¶ 6.  Settlement Agt. (Dkt. 324-1) § VIII.B.  In many instances, all numbers supplied on a particular Claim Form are invalid, whereas in other instances, one number may be valid but others are plainly not.  See Slater Decl. ¶ 7 (2,738 claims (or 91% of all claims) contained at least one fax number that did not match the Biggerstaff list, meaning only 9% of claims submitted included only numbers on the Biggerstaff list).[11]  Put another way, despite the fact that each claimant attested under the penalty of perjury that they had received faxes sent on behalf of the Tampa Bay Buccaneers at each claimed fax number, 91% of claimants provided fax numbers that did not match the Biggerstaff list and are, therefore, presumptively invalid.  See Slater Decl. ¶ 7.

For example, Cin-Q submitted a Claim Form listing three numbers:  (1) 352-377-9774; (2) 352-258-9006; and (3) 135-237-5027.  See Slater Decl. ¶ 8.  The former number was on the Biggerstaff list, whereas the latter two numbers on its Claim Form clearly was not, as noted above.  See id.  Yet Cin-Q freely listed the latter numbers on and stated under penalty of perjury that:

> Between July 14, 2009, and June 9, 2010, I or my company subscribed to the fax number(s) identified above or attached to this Proof of Claim and faxes were received at such number or numbers, including faxes from the Tampa Bay Buccaneers.

Settlement Agt. (Dkt. 324-1) at Ex. A.[12]

---

[11] Again, the fact that only 9% of all Claim Forms are fully facially valid may suggest fraud at a level that would literally be unprecedented or it may suggest problems with the Biggerstaff list even broader than anyone ever imagined.

[12] Similarly, four of the Intervenors submitted Claim Forms with one valid number but one or more invalid numbers.  See Slater Decl. ¶ 10.  Moreover, one Intervenor, Barewood Outlet, Inc., failed to provide any number matching the Biggerstaff list, claiming instead that it had received a fax purportedly sent on behalf of BTL at 727-791-9345 and 813-244-1177 (both numbers not on the Biggerstaff list).  See id.  M&C also submitted on its Claim Form one number not on the Biggerstaff list.  See id. ¶ 9.

### 3.    Questionable Claims

In addition to the foregoing, there are any number of other Claim Forms that are of questionable validity for various reasons, including the following:

1. 761 Claim Forms (accounting for 25% of all claims) did not include <u>any</u> fax number found on the Biggerstaff list;

2. 31 Claim Forms were submitted by corporations that according to records of the Florida Secretary of State, did <u>not</u> come into existence until <u>after</u> the class period during which faxes were purportedly sent on behalf of BTL (<u>i.e.</u>, July 2009 to June 2010);

3. 713 claims (accounting for approximately 24% of all claims) were made by persons and entities that are not residents of the State of Florida, even though the faxes that were purportedly sent on behalf of BTL from July 2009 to June 2010 were sent exclusively to telephone numbers in Florida. <u>See</u>, <u>e.g.</u>, Sponsler Decl. (Dkt. 341-2) ¶ 48 (explaining that the faxes at issue in this case were directed to businesses and individuals in the State of Florida);

4. 781 fax numbers were listed by Astro Companies, LLC ("Astro"), an entity <u>not</u> registered with the Florida Secretary of State until <u>after</u> the time period specified in the definition of the Settlement Class and an entity that is itself an electronic fax service provider, rather than an actual recipient of faxes, and thus not eligible to make a claim under the TCPA (<u>see</u> disc. <u>infra</u> at 32-33); and

5. 110 fax numbers were submitted by a law firm representing itself as "outside counsel" for Walmart.

Slater Decl. ¶ 11, 14, 17; Mar. 28, 2023 Email fr. O. Castillejos, Ex. 12 hereto.

### 4.    Claims Processing

Given the breadth of apparent fraud in the claims process and the underlying issues with respect to the ascertainability of the Settlement Class itself, the processing of claims has been much more complicated and contentious than it otherwise would have been.  <u>See</u>, <u>e.g.</u>, Apr. 11, 2023 Email fr. R. Collins, Ex. 13 hereto (noting that Epiq had failed to provide a preliminary report of all claims accepted and rejected by April 7, 2023, as otherwise required by this Court's schedule).  Initially, Epiq took a lead role as the Settlement Administrator and made

preliminary determinations of what claims to provisionally disallow as well as which claimants should receive requests for information or deficiency notices, as called for by Section VIII of the Settlement Agreement.  See Mar. 28, 2023 Email fr. O. Castillejos, Ex. 12 (providing an initial list of proposed defect categories for which claimants would be sent requests for additional information).  But as the evidence mounted of the significant limitations in the reverse lookup process and especially in light of the recent confirmation by TransUnion that its database could not be used to pinpoint owners of a number on the Biggerstaff list without "independent verification and validation," Epiq essentially abdicated its role and has recently taken the position that it will only send out requests for information and deficiency notices to claimants if <u>all</u> Parties agree or if otherwise directed by the Court.[13]  See May 15, 2023 Email fr. S. Amin-Giwner, Ex. 4.

### C.   Both TransUnion And LexisNexis Confirm Significant Limitations On The Use Of Their Respective Databases As Well As The Need For <u>Independent</u> <u>Verification</u> And <u>Validation</u>



As noted, ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████    ████████

████████████████████████████████████████  <u>see</u> <u>also</u> Settlement Agt. (Dkt. 324-1) § III.A(i).  ███████████████████████████████

---

[13] Class Counsel have endorsed Epiq having only a "ministerial" role, and while BTL questions whether that approach is fully consistent with the Settlement Agreement, we have agreed with Class Counsel to focus on the meet and confer process and then present to the Court the issues upon which agreement cannot be reached as the most expeditious way at this point of effectuating the Settlement Agreement.  See, e.g., May 30, 2023 Email fr. R. Collins, Ex. 6.

**1.    Epiq's Agreements With LexisNexis And TransUnion**

[REDACTED]

[REDACTED]

### 2.  The Declarations From TransUnion And LexisNexis[15]

The declaration of Leslie Roach, Senior Consultant for TransUnion, is attached, as is the declaration of Shawn Park of LexisNexis.  See Roach Decl. (Dkt. 442); Parks Decl. (Dkt. 398-2).  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[14] As noted in earlier submissions, the "black box" nature of the reverse lookup process and of the sources of information used by providers has led numerous courts to criticize the process and ultimately decline to rely upon the results obtained.  See, e.g., Wilson v. Badcock, 329 F.R.D. 454, 457 (M.D. Fla. 2018) (noting plaintiff's expert attempted to identify cell phone subscribers of alleged wrong number calls using "the unobservable, proprietary 'black box' techniques of LexisNexis").  [REDACTED]  To that end, we recently confirmed with Epiq that the only information it received from TransUnion and LexisNexis from the two reverse lookups performed was the summary spreadsheets shared with the Parties, which contained the fax number along with matching names and addresses identified during the reverse lookups.  See May 26, 2023 Email fr. R. Collins, Ex. 14 hereto; June 1, 2023 Email from S. Amin-Giwner, Ex. 15 hereto.  No further information, however, was provided to Epiq (let alone the Parties or the Court) regarding the sources used by TransUnion or LexisNexis or the specific results obtained.  See June 1, 2023 Email from S. Amin-Giwner, Ex. 15.

[15] LexisNexis provided its agreement with Epiq as well as a declaration just before the August 31, 2022 hearing, and TransUnion has since provided the declaration of Leslie Roach and its agreement with Epiq.  See Parks Decl. (Dkt. 398-2); Roach Decl. (Dkt. 442).



During the meet and confer process discussed herein, Class Counsel have offered no reason why the limitations placed by TransUnion and LexisNexis on the use of their databases should be ignored or why independent verification and validation is not necessary.  See June 1, 2023 Email fr. G. Hara, Ex. 3 (stating the Parties were at an "impasse," because "[t]he fact that a claimant was identified in a reverse lookup in not indicia of fraud or anything else").[17]  Instead, they have simply



[17] Of course, BTL is not suggesting that the fact a claimant was identified in a reverse lookup is "indicia of fraud."  See May 30, 2023 Email fr. R. Collins, Ex. 6.

claimed without more that the attestation requirement on the Claim Form and the need to include some number on the Biggerstaff list are somehow proxy for or the functional equivalent of independent verification and validation. See, e.g., Pls.' Resp. to BTL's Mot. to Address the Unreliability of Reverse Lookups (Dkt. 388) at 11 (rejecting BTL's request that claimants provide proof of ownership in 2009 or 2010 of a fax line on the Biggerstaff list, because "[t]he Claim Form negotiated by the parties already does that: it requires the claimant to swear under penalty of perjury" that they held the fax line in 2009 or 2010).

### D.   The Meet And Confer Process

As noted, counsel for the Parties held three separate meet and confer sessions by telephone, and agreement was reached on several categories of persons and entities who should receive either a defect notice or a request for information. See May 30, 2023 Email fr. R. Collins, Ex. 6. Agreement was not reached, however, on five categories, and those categories are addressed below. See disc. infra at 17-34.

### III.   ARGUMENT

To address the effects of over-inclusive notice and to give effect to Section VIII of the Settlement Agreement while protecting the due process rights of both BTL as well as actual members of the Settlement Class, requests for information

---

This is not a class settlement where claimants receive $10 or $20 or coupons. See, e.g., Wilson, 329 F.R.D. at 458 (noting the strong "incentive for individuals to improperly enter the class" in TCPA cases with large individual payments). A claim for $615 is a material amount of money by any standard, and it is quite clearly enough money that many persons are willing to commit perjury in order to receive that amount. See disc. supra at 9-10 (noting that 83% of the fax numbers provided on Claim Forms were invalid in that they did not match the Biggerstaff list). That was, however, the whole reason why Section VIII of the Settlement Agreement includes the measures it does, including the ability of the Settlement Administrator to request additional information from claimants. See Settlement Agt. (Dkt. 324-1) § VIII.E.

should be sent to the five categories of claimants identified above.  See disc. supra at 11.  Each category is discussed in detail below.  See disc. infra at 17-34.

**A.  Given The Limitations Noted By Both TransUnion And LexisNexis And What Appears To Be Rampant Fraud In The Claims Process, Documentation Should Be Requested From All Claimants Who Are Recipients Of Mailed Notice**

As discussed above ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

As addressed in prior submissions, the Settlement Class is defined in terms of persons and entities that held telephone numbers on the Biggerstaff list between July of 2009 and June of 2010 and that received a facsimile purportedly sent on behalf of BTL during that short, 11-month time period nearly 13 years ago.  See Settlement Agt. (Dkt. 324-1) § II.A.  If, for example, a person or entity procured a number on the Biggerstaff list in 2006 but relinquished that number before July of 2009, then that person or entity would obviously not be a member of the Settlement Class and would not be eligible to make a claim upon the Settlement Fund.  See id.  Likewise,

if a person or entity acquired a number on the Biggerstaff list at any time between June of 2010 and the present, then that person or entity would also <u>not</u> be a member of the Settlement Class and would <u>not</u> be eligible to make a claim. <u>See id.</u>

It very much remains an open question whether the Settlement Class itself is in fact ascertainable or "capable of determination" at all. <u>See</u>, <u>e.g.</u>, BTL's Submission regarding Ascertainability (Dkt. 365). There is now no question, however, that the Settlement Class is not ascertainable or capable of determination <u>without</u> obtaining independent verification and validation of class membership from claimants and others.[18] But by failing to propose a process by which members of the Settlement Class can be accurately identified and by adamantly opposing the one method by which at least a small portion of the Settlement Class <u>might</u> be ascertainable (<u>i.e.</u>, determining which of the 3,016 persons and entities that submitted a claim are, in fact, class members), Class Counsel have again abdicated their responsibility, and the Settlement Class could (and likely should) be decertified

---

[18] As the Eleventh Circuit made clear in <u>Cherry</u> and as this Court reiterated in <u>Haines</u>, a class "can be capable of determination without being capable of <u>convenient</u> determination." <u>See</u> <u>Cherry v. Dometic</u>, 986 F.3d 1296, 1303 (11th Cir. 2021) (emphasis in original); <u>Haines v. Fidelity Nat'l Title</u>, 2022 WL 1095961, *8 (M.D. Fla. 2022). A corollary of this rule, however, is that a class that is <u>not</u> capable of determination at all, whether by convenient means or not, is clearly <u>not</u> ascertainable. <u>See</u> <u>Haines</u>, 2022 WL 1095961, *8 (explaining a class is only ascertainable if its membership can be determined from objective evidence, such that "the evaluation of the class criteria does not involve subjective analysis"); <u>see</u> <u>also</u> <u>Xavier v. Philip Morris</u>, 787 F. Supp. 2d 1075, 1090 (N.D. Cal. 2021) (class not ascertainable where the only evidence supporting membership was claimants' attestation based on memory of historical cigarette use). Plaintiffs and their counsel, of course, bear the burden at all times of establishing ascertainability. <u>See id.</u> *7 (noting that a plaintiff can establish administrative feasibility by proposing a process by which identification of the members of the class will be "manageable and successful"). Class Counsel have clearly <u>not</u> satisfied that burden to date, and by now opposing a suggested means by which at least the identities of many claimants perhaps could be ascertained, Class Counsel are only further ignoring their burden and confirming the ultimate lack of ascertainability of the Settlement Class. <u>See</u>, <u>e.g.</u>, <u>Brown v. Electrolux</u>, 817 F.3d 1225, 1233 (11th Cir. 2016) ("The party <u>seeking</u> class certification has the burden of proof.") (emphasis in original).

for that reason alone.  See Cherry, 986 F.3d at 1302 ("Ascertainability is an implied prerequisite of Rule 23."); see also In re Brinker Data Incident, 2021 WL 1405508, *5 (M.D. Fla. 2021) (class was only ascertainable under Cherry, because records useful for identification purposes were collected such that plaintiffs "do[] not rely on self-identification" to identify class members); Rensel v. Centra Tech, 2021 WL 4134984, *6 (S.D. Fla. 2021) (plaintiffs only "adduced sufficient evidence to meet the Cherry standard for ascertainability," because of a spreadsheet listing class members' personal information).

But for the precise determination necessary to actually confirm membership in the Settlement Class (i.e., that a person or entity held a number on the Biggerstaff list between July 2009 and June 2010 and received a fax during that period purportedly sent on behalf of BTL),



Nor have Class Counsel ever suggested any other method since the Settlement Agreement was first executed.[19]

---

[19] As noted in earlier submissions, it would have perhaps been feasible earlier in the litigation to obtain independent verification from telephone service providers for the numbers on the Biggerstaff list.  See, e.g., BTL's Submission regarding Ascertainability (Dkt. 365) at 6 (noting that Mr. Biggerstaff's prediction that a reverse lookup could be used to reliably ascertain the

## B.   The Attestation Requirement Has Likewise Proven To Be Ineffective And Is Otherwise Clearly Not Proxy For Independent Verification And Validation

Class Counsel have placed primary reliance on the attestation requirement in the Claim Form in arguing that independent verification is supposedly not needed. See June 1, 2023 Email fr. G. Hara, Ex. 3; Pls.' Resp. to BTL's Mot. to Address the Unreliability of Reverse Lookups (Dkt. 388) at 11 (rejecting suggestion that claimants provide proof of ownership in 2009 or 2010 of a fax line on the Biggerstaff list, because "[t]he Claim Form negotiated by the parties already does that: it requires the claimant to swear under penalty of perjury" that they held the fax line in 2009 or 2010).  As the claims process has made clear, however, the attestation requirement is clearly not effective in preventing fraud, with many patently fraudulent or invalid claims being submitted in spite of the attestation requirement itself, including Claim Forms from Plaintiffs as well as Intervenors.[20]  See Slater Decl. ¶¶ 8-10 (noting that three of the numbers on the Claim Forms submitted by Plaintiffs appear to be invalid

---

identity of class members in this case was largely based on conjecture, since he apparently failed to actually make any effort to perform a reverse lookup, even on a subset of the telephone numbers on the list he compiled).  For whatever reason, however, Class Counsel decided to not seek or obtain that information directly from the providers when it was still available, choosing instead to rely on Mr. Biggerstaff's prediction that a reverse lookup could be used as an alternative means of reliably ascertaining the identity of class members.  See Biggerstaff Rpt. (Dkt. 207-5). ████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

But decisions in other cases recently filed by the Wanca firm suggest that that firm now sees the need to subpoena telephone providers much earlier in the case, not only to determine the name and address of each person and entity holding a particular telephone number during a specific period of time, but also to ferret out (as required by guidance from the FCC) numbers held by online fax providers.  See Mot. for Entry of Auth. Order (Dkt. 19), Sharfman v. Infucare, No. 6:21-cv-00525 (M.D. Fla. Aug. 18, 2021); see also disc. infra at 32-34.

[20] As noted, the Claim Forms submitted by Intervenors are replete with errors (as are the ones from Plaintiffs).  One Intervenor, Barewood Outlet, Inc., failed to provide a single fax number matching the Biggerstaff list.  See Slater Decl. ¶ 10.  Following the May 22, 2023 hearing, BTL tried to address this issue with Intervenors' counsel but has yet to receive a substantive response.  See May 26, 2023 Email fr. R. Collins to J. Piper, Ex. 16.

and that six of the telephone numbers provided on the Claims Forms submitted by Intervenors appear to be invalid).

In fact, it is an unfortunate reality that the attestation requirement calling for Claim Forms to be submitted under penalty of perjury quite clearly had little or no deterrent effect in preventing fraudulent claims. See Wilson, 329 F.R.D. at 458 (noting TCPA damages are "an incentive for individuals to improperly enter the class" and that allowing potential claimants to self-attest to class membership in such a situation is "a danger that impacts due process protections for [defendants]"). No less than 83% of the claimed fax numbers do not match the Biggerstaff list and are thus presumptively invalid. See Slater Decl. ¶ 6. And in total, 91% of all claimants submitted at least one invalid fax number. See id.

Moreover, the attestation requirement would understandably do little or nothing to ensure that claimants who matched one or both of the reverse lookups are actually members of the Settlement Class. A person or entity that held a number on the Biggerstaff list at any time between 2000 and the present almost certainly would not remember whether they actually held that number in the short, 11-month period between July of 2009 and June of 2010. But see Settlement Agt. (Dkt. 324-1) at Ex. A (Claim Form requiring claimants to certify under penalty of perjury that they received faxes from the Tampa Bay Buccaneers between July 14, 2009 and June 9, 2010). While a person in that situation who submitted a Claim Form may not be guilty of perjury due to a lack of intentionality, there is no doubt their attestation on the Claim Form says little or nothing about whether they are in fact a member of the Settlement Class. See 18 U.S.C. § 1621 (defining perjury to mean "any declaration, certificate, verification, or statement under penalty of perjury" which the person

21

"does not <u>believe</u> to be true").[21]  In short, the attestation requirement does not begin to eliminate the need for requesting documentation from claimants.[22]  <u>See</u> disc. <u>supra</u> at 20-23.

### C.   Supplying A Number On The Biggerstaff List Does Not Verify Membership In the Settlement Class Either

In prior submissions, Class Counsel have also suggested that the requirement in the Claim Form that claimants provide the telephone number on which they allegedly received a fax purportedly sent on behalf of BTL somehow "proves" class membership and supposedly eliminates the need for independent verification and validation.  <u>See</u>, <u>e.g.</u>, Pls.' Resp. to BTL's Mot. to Address the Unreliability of Reverse Lookups (Dkt. 388) at 11.  And Class Counsel have stood by this argument, even as evidence has mounted through the claims process that providing a number on the Biggerstaff list alone obviously does <u>not</u> verify membership in the Settlement Class.  <u>See</u> June 1, 2023 Email fr. G. Hara, Ex. 3 (arguing that each claim should be accepted without further verification or validation, so long as it is "signed under penalty of perjury" and "provides a matching fax number" to the Biggerstaff list).  This suggestion by Class Counsel is, however, erroneous for at least four separate reasons.  <u>See</u> disc. <u>infra</u> at 23-28.

---

[21] In other words, it almost certainly would not be perjury for someone who, for example, held a number on the Biggerstaff list until 2008 to submit a Claim Form on the mistaken belief that they held that same number until 2009, but that person obviously nevertheless would <u>not</u> be a member of the Settlement Class and thus would <u>not</u> be eligible to receive anything from the Settlement Fund.  <u>See</u> Settlement Agt. (Dkt. 324-1) § III.A(i).

[22] BTL expressly reserves the right to raise with the Court once the claims process is fully completed the issue of appropriate sanctions and referrals for the extensive fraud that appears to have occurred during the claims process.  <u>See</u>, <u>e.g.</u>, Order of Referral (Dkt. 922), <u>Opperman v. Kong Techs.</u>, No. 3:13-cv-00453 (N.D. Cal. Jan. 17, 2018) (referring fraudulent claims to the U.S. Attorney).

First, the Parties agreed on Section VIII of the Settlement Agreement fully mindful of the requirements of the Claim Form and the need for claimants to provide their telephone numbers.  See Settlement Agt. (Dkt. 324-1) § VIII.E.  If anyone had believed that supplying a telephone number on the Biggerstaff list standing alone was sufficient to demonstrate class membership, then the documentation and fraud prevention procedures spelled out in Section VIII would be superfluous and redundant.  See id.  As a matter of basic contract interpretation, however, provisions of a contract should not be read so as to render other provisions superfluous, and it is otherwise clear that the provisions of the Claim Form are simply not sufficient unto themselves.  See, e.g., TRG Columbus Dev. v. Sifontes, 163 So.3d 548, 552 (Fla. 3d DCA 2015) (under Florida law, which governs the Settlement Agreement, "a court may not interpret a contract so as to render a portion of its language meaningless or useless").

Second, the claims process itself makes it equally clear that just because a claimant is able to come up with a number on the Biggerstaff list and include that number on a Claim Form does not mean that person or entity is a member of the Settlement Class.  See disc. supra at 8-12.  No less than 890 of the claims submitted to the Settlement Administrator included a fax number that was also claimed on a different claim form (i.e., duplicate claims), in spite of the vanishingly small possibility that two or more persons or entities held the same number during the 11-month class period.[23]  See Slater Decl. ¶ 11.  Indeed, of the 2,980 fax numbers

---

[23] In at least one instance (Cin-Q's number), 200 claims were made for a single number.  See Slater Decl. ¶ 13.  Those claims, however, represent 7% of the total number of claims received and are a very clear indication of fraud.  See Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 165:4-12 ("[I]f multiple

matching the Biggerstaff list and included on Claim Forms, 1,124 were <u>multiple</u> matches on the reverse lookups, meaning the reverse lookups identified more than one potential holder of the line from 2009-2010 for 38% of all matching fax numbers for which claims were submitted.  <u>See</u> June 15, 2023 Declaration of Ken Sponsler ("Sponsler Declaration or "Sponsler Decl.") ¶ 16, Ex. 17 hereto.

Moreover, Class Counsel elected to make the Biggerstaff list publicly available for a period of upwards of six years, a decision Class Counsel now admits "was a mistake."[24]  <u>See</u> Pls.' Mot. to Certify Class (Dkt. 207) (publicly filing the Biggerstaff list on March 25, 2016).  <u>But see</u> Order (granting sealing of the Biggerstaff list on September 2, 2022); <u>see also</u> Alex Ebert, <u>NFL Buccaneers' Fax Spat Incites 'Never-Ending' Legal Fees Feud</u>, Bloomberg Law (Mar. 23, 2023), Ex. 18.  Among other effects, making the Biggerstaff list public has no doubt fueled a good deal of the fraud that has occurred in the claims process.  In any event, however, it is abundantly clear that the fact the Biggerstaff list was publicly available made it possible for anyone to find a number on the list and then provide that number on a Claim Form.  <u>See</u> Pls.' Mot. to Certify Class (Dkt. 207).  And the fact numbers claimed by Cin-Q and M&C were identified by claimants in 215 Claim Forms that

_____

individuals submit claims, that clearly then creates a scenario where it is highly likely one of the claims or more may be fraudulent . . . .").

[24] As Mr. Addison candidly acknowledged in a recent news article on this litigation, the decision by Class Counsel to make the Biggerstaff list public was a mistake.  <u>See</u>, <u>e.g.</u>, Alex Ebert, <u>NFL Buccaneers' Fax Spat Incites 'Never-Ending' Legal Fees Feud</u>, Bloomberg Law (Mar. 23, 2023), Ex. 18 hereto ("'We published a list of the fax numbers that messages were sent to,' [Mr. Addison] said.  'We should have kept that under seal.'").

were <u>not</u> submitted by either Cin-Q or M&C raises obvious questions regarding the public accessibility of fax numbers.[25]  <u>See</u> Slater Decl. ¶ 13.

    <u>Third</u>, it is beyond cynical for Class Counsel to argue (as they did) for over-inclusive notice and for multiple reverse lookups (something that is rarely–if ever–done in class settlements) but to then insist that the explicit directions specified by the two companies that supplied <u>all</u> of the information for the two reverse lookups undertaken by Epiq should just be ignored.  <u>See</u>, <u>e.g.</u>, June 13, 2022 Hr'g Tr., Ex. 19 hereto, at 50:22-52:1 (Mr. Good commenting that "[a] second search is what is called for in this situation").  <u>But see</u> June 1, 2023 Email fr. G. Hara, Ex. 3 (failing to even acknowledge the declarations provided by TransUnion and LexisNexis and instead contending that no additional verification was needed); <u>see</u> <u>also</u> Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 28:8-18 (Ms. Kovach explaining that Epiq does not "typically" conduct multiple reverse lookups given that the first reverse lookup "by design [is] going to get us the most accurate results" and because Epiq "[does not] think more results are better.").

    It was entirely foreseeable that the Parties would find themselves where they now do and that many of the recipients of Mailed Notice who are <u>not</u> members of the Settlement Class would nonetheless submit claims.  <u>See</u> BTL's Mot. to Address Limitations of Reverse Lookups (Dkt. 381) at 10 (predicting the "perils of over-inclusive notice and the clear potential for fraud").  In response, Class Counsel

---

[25] In the case of Cin-Q and M&C, it is easy to spot the fraud, but in instances where no other claimant supplied the same fax number as the fraudulent claimant, t███████████████████████████
████████████████████████████████████████████████████████████████████
███████████

argued to the Court that "BTL's fear of 'fraudulent claims' is built on a fictional scenario that is simply not going to happen."[26]  Pls.' Resp. to BTL's Mot. to Address Limitations of Reverse Lookups (Dkt. 388) at 9.  Having urged the Court to take this course and having persistently discounted the risk of fraud, however, Class Counsel should now be estopped from arguing against the very steps that could help in rectifying the situation they helped create.  See June 13, 2022 Hr'g Tr., Ex. 19, at 50:22-52:1 (urging the Court to order a second reverse lookup); Pls.' Resp. to BTL's Mot. to Address Limitations of Reverse Lookups (Dkt. 388) at 9 (discounting BTL's fraud concerns as "fictional").

Fourth and perhaps most importantly, providing a number on a Claim Form from the Biggerstaff list does little or nothing to pinpoint the crucial issue of whether the person or entity held the number in question during the 11-month period on which the definition of the Settlement Class is based.  See Settlement Agt. (Dkt. 324-1) § III.A; ███████████████████████████████████████

████████████████████████████████████████

 It is very clear that many of the matches on the two reverse lookups performed by Epiq are persons or entities that held a telephone number on the Biggerstaff list at some point

---

[26] The "fictional scenario" that Class Counsel promised "is simply not going to happen" has obviously happened and then some.  See disc. supra at 7-12.  One would hope that in such circumstances, Class Counsel would work cooperatively with BTL to address the problem, using the existing procedures called for by the Settlement Agreement and Section VIII.  See Settlement Agt. (Dkt. 324-1) § VIII.E.  Plainly concerned about justifying their requested fee, however, and trying to paper over the increasingly apparent ascertainability problems, Class Counsel have taken the opposite approach, stubbornly pretending as if there is no problem at all.  See Slater Decl. ¶ 20 (noting Class Counsel's comment that BTL should refrain from challenging too many claims so as to not drive the claims rate down too low).

in time outside the class period.  See Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 60:10-14 (Ms. Kovach agreeing that the reverse lookups cannot accurately determine whether any person or entity in fact "held the [fax] line in 2009 or 2010"); ▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.[27]  The likelihood, however, that any of those persons or entities held that number during the 11-month class period is low, especially since nearly 13 years have now passed since faxes were purportedly sent on behalf of BTL

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ see also Sponsler Decl. (Dkt. 354-7) ¶ 23 (noting the annual turnover rate for private residences is at least 5.6% per year and even greater for businesses, as 38% of annual moves each year involve businesses).

All of this was, of course, previewed at the August 31, 2022 hearing.  See Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 46:3-5 (Loree Kovach, Epiq's representative, agreeing that reverse lookups cannot "identify or purport to identify whether the business or entity actually held the line in 2009/2010"). ▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

Put simply, being able to write down on a claim form a telephone number you may have held at some point over a 20-year or longer period of time does not amount to independent verification or validation, and it certainly is not sufficient to protect the

---

[27] As noted, even Epiq agreed at one point that requests for information should be sent to persons and entities that matched only on the LexisNexis database.  See Jan. 2023 Emails bt. O. Castillejos and R. Collins, Ex. 9. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

due process rights of BTL and the <u>actual</u> members of the Settlement Class.  <u>See</u>, <u>e.g.</u>, <u>Carrera v. Bayer</u>, 727 F.3d 300, 307, 310-311 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues."); <u>Hunter v. Time Warner</u>, 2019 WL 3812063, *13-14 (S.D.N.Y. 2019) (noting a defendant's due process right to challenge self-attestation affidavits where reverse lookup could not adequately identify class members).[28]

### D.   The Other Four Categories Of Claimants

The other four categories of claimants upon which agreement could not be reached by the Parties are largely self-explanatory and are briefly addressed below. <u>See</u> disc. <u>infra</u> at 28-34  The need for requests for information to these categories of claimants principally arose though implementation of the notice program as well as the claims process.  <u>See</u> disc. <u>supra</u> at 7-12.

### E.   Claimants Not Identified On Either Reverse Lookup

A total of 709 claimants were not identified on <u>either</u> reverse lookup.  <u>See</u> Slater Decl. ¶ 16.  As such, there is no independent evidence at all that those persons and entities are members of the Settlement Class and, instead, only an attestation on the Claim Form and the inclusion of a number on the Biggerstaff list, which (as noted) was freely available to <u>anyone</u> for a period of over six years.  <u>See</u> disc. <u>supra</u>

---

[28] At no point during the meet and confer process have Class Counsel ever been able to explain what exactly is so problematic about sending a simple request for information to a potential member of the Settlement Class.  <u>See</u> Slater Decl. ¶ 21.  Nor is it at all apparent what legitimate reasons Class Counsel would have for not wanting to make sure that only actual members of the Settlement Class receive proceeds from the Settlement Fund, the other obvious reasons notwithstanding.  <u>See</u> disc. <u>supra</u> at n. 6 (noting the impact on fees awarded to Class Counsel).

at 24.  Claimants in this category should, therefore, be sent requests for additional information.[29]  See Settlement Agt. (Dkt. 324-1) § VIII.

### F.   Claims Submitted By Persons And Entities With Addresses Outside The State Of Florida

No less than 713 claims (accounting for 24% of all claims) were received from claimants listing addresses outside the State of Florida.  See Slater Decl. ¶¶ 14-15.  All faxes purportedly sent on BTL's behalf in 2009 and 2010 were, however, sent exclusively to telephone numbers in Florida.[30]  See Sponsler Decl. (Dkt. 341-2) at ¶ 48.  It is, of course, possible that a recipient of a fax in 2009 or 2010 has since moved from the State of Florida.  But the listing of an address outside of Florida certainly should be sufficient for the Settlement Administrator to send a request for additional information in order to verify it is in fact a legitimate claim and that the person or entity is in fact a member of the Settlement Class.

### G.   Claims Submitted By Claimants For Which The Reverse Lookups Identified More Than One Match

Of the 2,980 claimed fax numbers matching the Biggerstaff list, 1,124 were multiple matches on the reverse lookups, meaning the reverse lookups identified more than one potential holder of the line from 2009-2010 for 38% of all numbers

---

[29] Class Counsel's position on this category highlights another inconsistency.  See disc. supra at 17-20.  When addressing other categories of claimants, Class Counsel have used a match on the TransUnion or LexisNexis databases as "evidence" of membership in the Settlement Class, but when addressing claimants that matched on neither, suddenly the lack of that "evidence" is not important.

[30] In discussing this category of claimants, Class Counsel suggested that the vast majority of claimants with addresses outside of Florida would be businesses that had branch offices in Florida or held fax lines in multiple states.  See Slater Decl. ¶ 15.  In reality, however 595 of these claimants (or 83% of the claimants in this category) are individuals and not businesses, and many of the entities that are businesses have names that suggest no connection whatsoever with Florida.  See, e.g., "Boston Children's Health Physicians" (providing an address in Ohio); "Lansing Pipe & Flange" (providing an address in New Jersey); "Giant Warehouse" (providing an address in Maryland).

supplied on Claim Forms that match a number on the Biggerstaff list.  See Sponsler Decl. ¶¶ 15-16.  The reverse lookups identified three or more matches for 770 of the claimed fax numbers, accounting for a total of 23.8% of the total number of claimed fax numbers matching the Biggerstaff list. See id. ¶ 16. The reverse lookups further identified four or more matches for 486 of the claimed fax numbers, accounting for 16.3% of the total claimed fax numbers matching the Biggerstaff list.  See id. Among the multiple matches Class Counsel have taken the position that the reverse lookup process can and should be relied upon for purposes of Mailed Notice, but Class Counsel are now willing to ignore the results of the reverse lookups and what are obviously conflicting results, which themselves are strongly suggestive of potentially invalid claims.[31]  This is, however, in direct conflict with the position previously taken by Class Counsel.  See Pls.' Resp. to BTL's Mot. to Address Limitations of Reverse Lookups (Dkt. 388) at 9.

---

[31] Notably, Class Counsel also confirmed during the meet and confer process that they were no longer taking the position that the reverse lookup process or the results obtained therefrom were intended to identify or capable of identifying members of the Settlement Class.  See Slater Decl. ¶ 19.  Instead, the reverse lookup process in the view of Class Counsel was only intended to identify who should receive Mailed Notice. See id. We note this issue now, because Class Counsel previously indicated that confirmatory discovery by BTL would not be necessary on the reverse lookup process and the ascertainability issue, since Class Counsel only intended to rely upon what is already in the record, as no other evidence suggesting that the Settlement Class is ascertainable has ever been provided or identified by Class Counsel.  See Sept. 29, 2022 Email fr. R. Good, Ex. 20 hereto.  At that time, BTL raised the need to take further discovery from TransUnion and/or LexisNexis, but now that Class Counsel have confirmed they will not rely on the reverse lookups performed by those two entities to address ascertainability or determine who is and is not in the class, that will no longer be necessary, and BTL is accordingly noting in this submission and to the Court that it is relying on the representation of Class Counsel in electing to not further pursue confirmatory discovery on the reverse lookups for purposes of the ascertainability issue itself.  See BTL's Amended Proposed Timeline (Dkt. 419) (providing for confirmatory discovery in its proposed schedule).

### H.   Claims From Fax Service Providers

As noted in an earlier submission, fax service providers do <u>not</u> have standing under the TCPA.  <u>See</u>, <u>e.g.</u>, <u>In the Matter of Westfax</u>, 30 F.C.C.R. 8620, 8624 (2015) (clarifying that "it is the consumer to whom the content of a fax or efax is directed that is the 'recipient' under the TCPA" and that electronic fax providers like Astro "are neither the intended recipient nor the ultimate recipient of the document sent as a fax any more than would be the telephone company providing a telephone line to a consumer's traditional fax machine").  Instead, only the subscriber to a fax number supplied by a provider would have standing.  <u>See id.</u>; <u>see also</u>, <u>e.g.</u>, <u>Advanced Rehab v. Amedisys</u>, 2020 WL 4937790, *8 (W.D. Tenn. 2020) (modifying class definition in TCPA case to exclude fax service providers or recipients who received faxes through fax service providers).  Therefore, any claimant that is or may be a fax service provider should be sent a request for information to confirm that it actually has standing to make a claim on the Settlement Fund.[32]  <u>See id.</u>

Class Counsel have recently agreed to permit Epiq to undertake a manual review of claims submitted by business entities to identify potential fax service providers.  <u>See</u> June 1, 2023 Email fr. G. Hara, Ex. 3.  But should those efforts prove insufficient (given that 781 fax numbers have already been confirmed as being submitted by fax service providers), BTL reserves all rights to seek additional

---

[32] Nor is this an academic concern.  To date, claims for 781 separate numbers have been received by Epiq from what clearly appear to be fax service providers.  <u>See</u>, <u>e.g.</u>, Slater Decl. ¶ 17 (describing Claim From submitted by Astro).  It is anticipated, however, that other such claims were received but have not yet been identified and cannot be identified without additional information.

validation and verification to identify any potential fax service providers.  See Slater Decl. ¶ 17.[33]  At this point, however, the Court need not reach this issue.

## I.   In The Alternative, BTL Should Be Allowed To Engage In Confirmatory Discovery

The simplest and most expeditious way to obtain the independent verification that TransUnion and LexisNexis would require for determining membership in the Settlement Class would be to have Epiq request in the first instance documentation from the claimants specified above, as contemplated by the Settlement Agreement.[34] See Settlement Agt. (Dkt. 324-1) § VIII.  If the Court concludes, however, that it is not inclined to require the Settlement Administrator to seek additional information from the foregoing categories of claimants, then BTL should be allowed at this juncture to seek confirmatory discovery from at least a representative sample of those claimants, so that the Court will have some idea whether the problem is as widespread as TransUnion and LexisNexis believe it would be without independent verification.  See, e.g., Gilchrest v. Bolger, 733 F.2d 1551, 1555 (11th Cir. 1984) (A court may therefore only certify a class action "if the court is satisfied, after a

---

[33] As noted, the Wanca firm apparently has recently addressed in other TCPA class actions the need to weed out fax service providers, since they lack standing under the TCPA.  See Mot. for Entry of Auth. Order (Dkt. 19), Sharfman v. Infucare, No. 6:21-cv-00525 (M.D. Fla. Aug. 18, 2021).  Nonetheless, Mr. Hara argued in the meet and confer in this litigation that no steps should be taken to identify such claimants unless there was "affirmative" evidence that any claimant was a fax service provider, a position that seems directly at odds with what the Wanca firm has done and is doing in other cases.  See Slater Decl. ¶ 21.

[34] To be sure, there are many forms of documentation that would suffice to demonstrate membership in the Settlement Class.  Those would include any receipts or documentation of ownership of the line in question from July 2009 to June 2010 or documents that reflect the number as well as the necessary date range.  See, e.g., Feb. 8, 2023 Email fr. O. Castillejos, Ex. 21 hereto (suggesting possible sources of information to be provided by claimants).  Moreover, the Parties and the Court can address (as necessary) how to handle instances (if any) of claimants responding to requests for information by indicating they have no documentation.  See Settlement Agt. (Dkt. 324-1) § VIII.E.

rigorous analysis, that the prerequisites of Federal Rule of Civil Procedure 23 have been met."); In re Yahoo!, 2020 WL 4212811, *37 (N.D. Cal. 2020) (same); see also, e.g., Shin v. Cobb Cty. Bd. of Educ., 248 F.3d 1061, 1064 (11th Cir. 2001) (holding that a "district court retains the ability, and perhaps even a duty, to alter or amend a certification decision" if circumstances change, given that "the scope and contour of a class may change radically as discovery progresses and more information is gathered about the nature of the putative class members' claims") (quoting Prado-Steiman v. Bush, 221 F.3d 1266, 1273 (11th Cir. 2000)).

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████    Therefore, independent verification by the Settlement Administrator through requests for information to claimants or confirmatory discovery by BTL would be the most efficient way to establish that claimants are members of the Settlement Class.  See Settlement Agt. (Dkt. 324-1) § VIII.E; see also, e.g., Shin, 248 F.3d at 1064 ("District courts retains the ability, and perhaps even a duty, to alter or amend a certification decision" if circumstances change, given that "the scope and contour of a class may change

radically as discovery progresses and more information is gathered about the nature of the putative class members' claims").

## IV.  <u>CONCLUSION</u>

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ The claims process has, in turn, made it equally clear that the attestation requirement on the Claim Form and the need to provide a number on the Biggerstaff list provide little or no protection against fraudulent and invalid claims.  Accordingly, there should be no legitimate dispute that the Settlement Administrator should be directed to request additional information from the claimants identified above, and there should likewise be no dispute that the time to make such requests for information is now, so as to avoid further delay at the point in time when the Settlement Administrator must make <u>final</u> determinations on the validity of claims and when the Court must then adjudicate all disputed claims with respect to which the Parties cannot reach agreement.

In deciding to require what it acknowledged would be over-inclusive notice, the Court was understandably concerned that all reasonable measures be taken to provide notice to as many members of the Settlement Class as possible.  But in so doing, the Court also noted and deliberately relied upon the provisions of Section VIII of the Settlement Agreement as a means of addressing issues that arose <u>after</u> notice had been issued and the claims process was completed, while protecting the due process rights of BTL and the Settlement Class.  Having argued for over-

inclusive notice in the first place and stubbornly insisting that the Settlement Class is ascertainable in spite of all evidence to the contrary, Class Counsel are nevertheless now objecting to the most obvious and effective means available to ensure that claimants are <u>actually</u> members of the Settlement Class.   Those objections are, however, without merit for the reasons noted herein, and the Court should direct the Settlement Administrator to issue as soon as possible requests for information to the categories of claimants discussed in this motion.

Date:  June 16, 2023

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys
for Defendant Buccaneers Team LLC

Mark S. Mester
    (admitted *pro hac vice*)
Robert C. Collins III
    (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
            robert.collins@lw.com

Joseph H. Varner, III
    (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## <u>LOCAL RULE 3.01(G) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), the undersigned hereby certifies that we conferred with Plaintiffs' counsel with respect to the instant motion and have been informed that Plaintiffs oppose the relief requested herein.

Date:  June 16, 2023

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for
Defendant Buccaneers Team LLC

Mark S. Mester
    (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on June 16, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  June 16, 2023

                                 */s/ Mark S. Mester*
                                   Mark S. Mester
                                     (admitted *pro hac vice*)
                                   LATHAM & WATKINS LLP
                                   330 North Wabash Avenue, Suite 2800
                                   Chicago, Illinois 60611
                                   Telephone:  (312) 876-7700
                                   Facsimile:  (312) 993-9767
                                   E-mail:  mark.mester@lw.com