# EXHIBIT 6

| | |
|---|---|
| **From:** | Collins, Robert (CH) |
| **Sent:** | Tuesday, May 30, 2023 9:51 PM |
| **To:** | ghara@andersonwanca.com; ross@loftusandeisenberg.com; m@mcalaw.net |
| **Cc:** | Mester, Mark (CH); Slater, Gabe (CH) |
| **Subject:** | Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices |

Dear Glenn and Ross –

We write to memorialize the meet and confer efforts of the Parties thus far concerning requests for additional information and/or defect notices to be issued by Epiq and as contemplated by Section VIII of the Settlement Agreement.  See Settlement Agt. (Dkt. 324-1) § VIII.  Those efforts consisted of three telephone conferences on May 16, 2023, May 18, 2023 and May 23, 2023, together with several email exchanges.  If your recollection of what transpired differs in any way from what is set forth below, please let us know right away.

**A. The Purpose Of The Reverse Lookups Performed By Epiq**

From the outset, we first note that during the meet and confer process, you both repeatedly made clear that the reverse lookups were not intended to identify class members and that the names and addresses produced by the reverse lookups are thus not class members but, instead, simply a population of persons and entities to whom Mailed Notice should be (and was) sent.  BTL agrees and (as you know) has consistently taken the position that fax numbers are not class members.  See, e.g., BTL's Submission Regarding Ascertainability (Dkt. 365) at 7 (noting that there are "serious questions regarding the accuracy and reliability of that partial list of names and addresses compiled by the Settlement Administrator through its reverse lookup . . . regarding the accuracy and derivation of the list of telephone numbers previously compiled by Mr. Biggerstaff as well as the age of the underlying data on which Mr. Biggerstaff relied.").  This backdrop underscores, however, why we have uniformly insisted on the need for the Parties to undertake sufficient efforts to verify potentially invalid and/or fraudulent claims, which is exactly what is, of course, comprehended by Section VIII of the Settlement Agreement.  See Settlement Agt. (Dkt. 324-1) § VIII.E ("The Settlement Administrator, after considering the positions of the Parties and, if appropriate, seeking any additional information from the Settlement Class Member, will make an initial determination, subject to review by the Court.") (emphasis added).

**B. The Parties' Points Of Agreement**

First, we believe that the Parties are in agreement with regards to sending defect notices or requests for information (as appropriate) to the following categories of claimants:

1. Claims containing non-matching fax numbers (i.e., any claim containing a fax number not matching a number on the Biggerstaff list);

2. Multi-Claimed Fax Number (i.e., any claim featuring a fax number also listed on another claim form);

3. Missing Signature;

4. Potential Government Entity; and

5. Claims submitted by entities not registered until after the class period (i.e., July 2009 to June 2010).

The Parties are also in agreement that should any of the above claimants fail to respond to a request for additional information, then that claim should be denied based on the subject of the defect at issue.

**C. The Parties' Points Of Disagreement**

    **1. Claimants Identified By Epiq Using The TransUnion And LexisNexis Reverse Lookups**

We understand that you object to sending any requests for additional information to claimants who received notice as a result of a match on the LexisNexis and/or TransUnion reverse lookups. We take your position to be that—without any independent verification—these claims are otherwise valid for three reasons: (1) the claimant was identified by the reverse lookup; (2) the claimant provided a fax number that matched the Biggerstaff list; and (3) the claimant listed the fax number under the penalty of perjury. As we explained during the meet and confer, however, none of these justifications withstand scrutiny in our view.

<u>First</u>, as you both conceded, a claimant is not a class member simply because they were identified by one or both of the reverse lookups. Thus, the mere fact that the claimant received Mailed Notice cannot standing alone provide verification of their claim. To underscore this problem, the reverse lookups collectively identified <u>multiple</u> matches for 1,124 of the fax numbers listed in claims forms (or 37% of all claimed fax numbers matching the Biggerstaff list).

At minimum, BTL would hope that Plaintiffs would agree that at least this subset of claimants should receive requests for additional information (<u>i.e.</u>, claimants that claimed a fax number for which the reverse lookups identified a multiple match). Please let us know as soon as possible if Plaintiffs agree to send requests for additional information to this group of claimants.

<u>Second</u>, you noted that the fact that a claimant was able to provide a fax number matching a number on the Biggerstaff list provides evidence of reliability, because there would be no other means for the class member to know the matching fax number. As we explained, however, even if the claimant held the fax line at one point in time, it does <u>not</u> mean that the claimant held the fax line during the 11-month class period. This is especially true given the declarations we have obtained from TransUnion and LexisNexis, which both expressly note the reverse lookups cannot accurately determine whether any person or entity in fact held the fax line in 2009 or 2010. <u>See</u> Decl. of S. Parks (Dkt. 398-2) ¶ 6 (explaining that without "independent verification" the results of the reverse lookup should not be relied upon to determine the name and mailing address of the person or entity that held a phone line in 2009 and/or 2010); Decl. of L. Roach (Dkt. 442) ¶ 3 (declarant for TransUnion stating same). Instead, those databases simply identify persons and entities that may have held such number at <u>some</u> point in time, the point of the needed independent verification and validation being to document that such person <u>actually</u> held that number between July 2009 and June 2010 and is thus a member of the Settlement Class. <u>See id.</u>

We also remind you that due to your efforts, the Biggerstaff list was publicly filed (and readily available to anyone) for a period of over six years. <u>See</u> Pls.' Mot. to Certify Class (Dkt. 207) (publicly filing the Biggerstaff list on March 25, 2016). <u>But see</u> Order granting Motion to Seal (granting sealing of the Biggerstaff list on September 2, 2022). This again counsels in favor of at least sending requests for additional information to these claimants. And as Ross repeatedly mentioned during the meet and confer, Plaintiffs believe that counsel for Intervenors have accessed this list before in an attempt to identify class members. BTL thus fails to see why the public availability of this list for six years does not at least warrant utilizing requests for additional information as contemplated by the Settlement Agreement. <u>See</u> Settlement Agt. (Dkt. 324-1) § VIII.E.

<u>Finally</u>, we understand your position to be that a final layer of reliability is the attestation requirement included on the claim form, which requires claimants certify under the penalty of perjury that the following is true:

> Between July 14, 2009, and June 9, 2010, I or my company subscribed to the fax number(s) identified above or attached to this Proof of Claim and faxes were received at such number or numbers, <u>including faxes from the Tampa Bay Buccaneers</u>.

Settlement Agt. (Dkt. 324-1) Ex. A thereto (emphasis added). For some time, Plaintiffs have taken the position that attestation somehow eliminates the need for independent verification of claims. <u>See, e.g.,</u> Pls.' Response to BTL's

Motion to Address the Unreliability of Reverse Lookups (Dkt. 388) at 11 (rejecting BTL's request that claimants provide proof of ownership in 2009 or 2010 of a fax line on the Biggerstaff list, because "[t]he Claim Form negotiated by the parties already does that: it requires the claimant to swear under penalty of perjury" that they held the fax line in 2009 or 2010").

While BTL certainly hoped that the attestation request would screen out invalid and fraudulent claims, that simply has not been the case. In total, 86% of claimed fax numbers did not match the Biggerstaff list, and 2,715 claims (or 85% of all claims) provided at least one invalid fax number. Indeed, both of your clients provided invalid numbers that did not match the Biggerstaff list, as did all five of the Intervenors. We certainly hope that the provision of invalid fax numbers was an error on behalf of your clients, but in any case, given that the 86% of claimed fax numbers do not match the Biggerstaff list and 85% of all claims include an invalid number, Plaintiffs cannot seriously dispute that the certification under the penalty of perjury has been all but ignored by the vast majority of all claimants.

BTL thus fails to see how the attestation requirement can provide any basis for verification of a claim, and the abject failure of the attestation requirement to screen out invalid and fraudulent claims only reinforces why attestation is not a proxy for independent verification and validation.

   **2.  Claimants Not Identified By Either Reverse Lookup**

We next understand that Plaintiffs' object to sending requests for additional information to claimants that were not identified on any reverse lookup. Plaintiff's position (as we understand it) is that there is no reason to suspect such claims are invalid or fraudulent, in part because publication notice was provided as part of the notice program. See Settlement Agt. (Dkt. 324-1) § II.FF.

But Plaintiffs cannot credibly discount issues presented by claimants who were not identified by either reverse lookup, while at the same time relying on the reverse lookup process to establish adequate notice in this case. Claims submitted by persons or entities not identified in either reverse lookup creates an indicia of invalidity and/or fraud sufficient to warrant a request for additional information, in particular given the possibility that the TransUnion or LexisNexis reverse lookups may have identified different matches for those exact fax numbers.

To that end, would Plaintiffs at least agree to send requests for additional information to claimants not identified in the TransUnion or LexisNexis reverse lookups if the claimant provided a fax number for which the reverse lookups identified contrary matches?

   **3.  Claimants Providing Addresses From Outside The State Of Florida**

During the meet and confer, we also discussed claimants who provided addresses outside the State of Florida. Ross objected to this category, noting that most of these entities are likely businesses that could reasonably have held fax lines in multiple states. But this is simply incorrect, as 83% of the claimants that provided an address from outside the State of Florida were individuals, not businesses. And further, among the business entities, many of the business names provided on the claim forms do not suggest any association with the State of Florida. BTL is, of course, not suggesting a claim should be denied for this reason alone, but merely suggesting that Epiq seek additional information from these claimants such an informed decision can be made by Epiq on whether to accept or deny each claim. See Settlement Agt. (Dkt. 324-1) § VIII(E).

   **4.  Claimants Providing Three Or More Fax Numbers**

Finally, BTL has suggested seeking additional information from claimants that provided three or more fax numbers. These claims make up a relatively small portion of the total number of claims, accounting for just 10% of all claims. Collectively, however, these 348 claimants provided 15,349 fax numbers (or 76% of the total number of fax numbers provided). Because these claims make up such a substantial portion of the total list of fax numbers, we think it is especially important to assess these claims for potential fraud. See Settlement Agt. (Dkt. 324-1) § VIII.E (describing

3

Epiq's responsibility to review claims for "validity and fraud"). We understand Plaintiffs' position to be that there is nothing "fraudulent" about such claims without any further evidence – but because Epiq's role is to review claims for both "validity and fraud" BTL continues to believe it is essential to seek some form of verification from these claimants given their outsized impact on the total number of claimed fax numbers.

**D. Open Issues**

BTL remains open to further discussion on all of these issues. In particular, BTL would appreciate responses to two new questions raised in this email, specifically:

1. Do Plaintiffs agree to send requests for additional information to claimants identified by the reverse lookups if the reverse lookups identified multiple matches for the claimed fax number?

2. Do Plaintiffs agree to send requests for additional information to claimants not identified in the TransUnion or LexisNexis reverse lookup if the claimant provided a fax number for which the reverse lookups identified contrary matches?

BTL would appreciate responses from Plaintiffs on these two issues as soon as possible as well as confirmation on the points of agreement and disagreement as set out in this email.

Please also inform us whether Plaintiffs have any position as to the measures Epiq proposed to identify claims submitted by potential fax service providers and claims submitted by potential prisoners. See May 24, 2023 Email fr. S. Amin-Giwner.

Best regards,
Robbie

**Robert C. Collins III**

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800 | Chicago, IL 60611
D: +1.312.876.6566 | M: +1.219.789.3376