# EXHIBIT 7

| | |
|---|---|
| **From:** | Collins, Robert (CH) |
| **Sent:** | Thursday, June 15, 2023 7:58 PM |
| **To:** | Glenn Hara |
| **Cc:** | ross@loftusandeisenberg.com; m@mcalaw.net; mca2175@hotmail.com; Mester, Mark (CH); Slater, Gabe (CH) |
| **Subject:** | RE: Cin-Q v. BTL – Meet & Confer on Requests for Information / Defect Notices |

Glenn –

We write in response to your email dated June 1, 2023.  See June 1, 2023 Email from G. Hara.  In light of the passing of your father, we delayed sending our response out of respect for you and your father.  We asked Ross to extend our condolences and trust and hope he did so.  If there is, however, anything we can do in terms of scheduling or otherwise, please let us know.

A.    **New Questions Raised By BTL**

While we understand it is your position that the Parties have reached an impasse with respect to the points of disagreement referenced in your email, we are troubled that Plaintiffs have refused to even consider the additional questions raised by BTL, which were potential points of compromise designed to narrow the issues that need to be presented to Judge Porcelli.  See May 30, 2023 Email fr. G. Hara.  Among other things, BTL urged Plaintiffs to reconsider having Epiq request additional information from claimants in instances where the reverse lookups identified contrary matches for the claimed fax number.  See id.

Plaintiffs' only justification for this position is that there is "no reason to assume there is anything fraudulent regarding such claimants" and that "there is nothing indicative of fraud in this scenario."  See June 1, 2023 Email fr. G. Hara.  As we have previously noted, however, you continue to confuse conclusive evidence of fraud with an indicia of fraud.  See Apr. 19, 2023, Email fr. R. Good.  The fact that the reverse lookup process (which you have obviously endorsed) generated evidence that a particular claimant may in fact not be a member of the Settlement Class and that the person or entity that held the number on the Biggerstaff list for which a claim being made may be some other person or entity is certainly evidence of what may potentially be an invalid claim, if the results of the reverse lookup process are to be trusted at all and for anything.  And even putting aside fraud, the mere fact that the reverse lookup identified contrary matches for the same number raises obvious questions as to the validity of the claim, in particular, whether the claimant actually held the fax number from July 2009 to June 2010, which (as you know) is not discernible from the results of the reverse lookup without independent verification.  See Roach Decl. (Dkt. 442) ¶ 3; Parks Decl. (Dkt. 398-2) ¶¶ 5-6.

As evidenced by the fact that 83% of the claimed fax numbers do not match the Biggerstaff list (including fax numbers provided by your clients) and that 91% of all claims include at least one invalid number, the penalty of perjury requirement on the claim form has clearly failed to screen out the submission of invalid fax numbers.  And because claimants have provided invalid fax numbers in the vast majority of cases, we fail to see how claimants can be relied upon to attest to the fact that they actually held the line during a narrow 11-month window from 2009-2010.  See Settlement Agreement (Dkt. 324-1) at § IV(B).  And in instances where the reverse lookups themselves have suggested that multiple persons or entities could have held the line during the 11-month window, it is more than appropriate to seek basic information and independent verification from the claimants themselves.

We recognize that during the May 22, 2023 meet and confer you cautioned us that if BTL continues to exercise its audit rights under the Settlement Agreement, it may jeopardize final approval of the Settlement Agreement by driving down the claims rate to a point where final approval would not be warranted.  We are, of course, mindful of your comments and this possibility.  The purpose of the audit and defect process, however, is not to artificially inflate the claims rate to

ensure final approval but is, instead, to identify genuine class members and respect the due process rights of BTL. See e.g., Carrera v. Bayer, 727 F.3d 300, 310-311 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues."); Hunter v. Time Warner, 2019 WL 3812063, *13-14 (S.D.N.Y. 2019) (noting defendant's due process right to challenge self-attestation affidavits where reverse lookup could not adequately identify class members). We trust that you understand this, but given your refusal to even consider these compromise measures suggested by BTL to verify questionable claims, we are concerned that Plaintiffs are prioritizing final approval over a fair and legitimate claims process.

We are open to further discussion on these two outstanding issues. But if Plaintiffs have nothing further to discuss, we will have no choice but to consider the meet and confer process concerning outstanding claims closed.

**B.       The "Five-Fax" Issue**

Before engaging on the merits of the erroneous interpretation of the Settlement Agreement advanced by Plaintiffs, we first wish to make several preliminary notes concerning your June 1, 2023 email.

First, we utterly fail to understand your contention that "BTL was silent on [this] issue until February 2023." See June 1, 2023 Email fr. G. Hara. As you surely recall, BTL did not oppose preliminary approval of the Settlement Agreement and did not have an opportunity to brief any of the issues raised by Intervenors in their Opposition to Preliminary Approval. See Plaintiffs' Unopposed Motion for Preliminary Approval (Dkt. 324). Further, this issue was not discussed at the Preliminary Approval Hearing by Judge Porcelli or by any of the Parties. See generally Jan. 20, 2022 H'rg Tr. When Plaintiffs first advanced this position to Epiq by email on February 22, 2023 (see Feb. 22, 2023 Email fr. G. Hara), however, BTL promptly responded with two emails clearly stating BTL's position that (at most) any class member could only be paid for a maximum of five faxes under the Settlement Agreement. See Feb. 24, 2023 Email fr. R. Collins; Mar. 7, 2023 Email fr. R. Collins.

Second, your email mischaracterizes the course of events by wrongly suggesting that "Epiq at first agreed with Plaintiffs" regarding the five-fax limit. See June 1, 2023 Email fr. G. Hara. On the contrary, it was Epiq that initially explained to the Parties that any class member could receive payment for at most five facsimiles. See Feb. 22, 2023 Email fr. J. Diego (explaining that a class member "may be approved for up to 5 valid faxes per the Settlement Agreement"). It was then Plaintiffs who suggested a contrary interpretation. See Feb. 22, 2023 Email fr. G. Hara. After reviewing the positions of both parties, Epiq responded by noting its agreement with BTL's common-sense interpretation of the language in the Settlement Agreement and Plaintiffs' own submissions to the Court:

> Based on the language found in Plaintiffs Motion for Preliminary Approval, Order Granting Preliminary Approval Order, and Settlement Agreement, it does appear to us that Class Members who submit valid Claims are eligible for payments of $350 to $615. We did not find language that would have us calculate the award of each Class Member by the number of valid fax numbers claimed and the facsimiles each valid fax number represents. If there is additional information that has not been referenced which may help us better understand the Class Member awards, please let us know.

Feb. 28, 2023 Email fr. O. Castillejos (emphasis added). In April, Epiq again made its position clear that "a claimant is eligible to be paid for a maximum of 5 valid faxes ($615) regardless of the number of claims or additional valid fax numbers claimed." See Apr. 26, 2023 Email fr. O. Castillejos.

Turning to the merits of your argument, you appear to place great weight on Plaintiffs' exchange with Intervenors in briefing concerning Preliminary Approval. See June 1, 2203 Email fr. G. Hara. As discussed above, however, BTL did not participate in that briefing. But in any case, this briefing provides no support for your assertion that members of the Settlement Class can receive payment per fax, rather than per class member. In particular, Plaintiffs' Reply in Support of Preliminary Approval states as follows:

> The claim form asks claimants to "List all numbers at which you or your company received faxes between July 14, 2009, and June 9, 2010. Attach a separate sheet if necessary," and states that "The Settlement Administrator will verify that the fax number(s) you provide appear(s) in the existing records related to the case before approving your claim." (Doc. 324-1, 9432). It plainly tells claiming class members they will be paid for each fax number.

Reply in Support of Preliminary Approval (Dkt. 329) at 7.

Fundamentally, your argument again confuses "class members" with "fax numbers." The Claim Form merely informs each <u>class</u> <u>member</u> that each <u>fax</u> <u>number</u> they provide will be verified and that they do not need to list the number of fax numbers that they are providing. Nowhere does the Claim Form, however, state that each class member will receive payment for each fax received or for each fax number that they provide, and nowhere does it suggest that each class member can receive in excess of $615. Nor could it. The language of the Settlement Agreement is very clear that the maximum payment each <u>class member</u> is eligible to receive is up to $615 <u>total</u>:

> Subject to the terms of this Agreement, <u>Settlement Class Members</u> who received or were successfully sent in 2009 or 2010 one or more unsolicited facsimile advertisements relating to tickets for Tampa Bay Buccaneers games sent by or on behalf of BTL and who submit a Valid Claim <u>shall be eligible to receive up to</u>: (i) $350 for the first such facsimile; (ii) $125 for the second such facsimile; (iii) $90 for the third such facsimile; (iv) $25 for the fourth such facsimile: and (v) $25 for the fifth such facsimile.

Settlement Agreement (Dkt. 324-1) at § IV(B) (emphasis added). It does <u>not</u> say that each Class Member will be paid for each fax number they provide, nor does it say that any Class Member could receive more than $615. <u>See id.</u>

Indeed, whatever exchange Plaintiffs and Intervenors may have had, the Court was absolutely clear in its Order granting Preliminary Approval of the Settlement that the most a <u>class</u> <u>member</u> (not fax number) could receive was $615, stating that "the Settlement Agreement provides, among other things, for . . . payments of $350 to $615 (<u>i.e.</u>, $350 for the first facsimile; $125 for the second facsimile; $90 for the third facsimile; $25 for the fourth facsimile; and $25 for the fifth facsimile) to Class Members who submit a valid Claim . . . ." <u>See</u> Preliminary Approval Order (Dkt. 343) at 37; <u>see also</u> <u>id.</u> at 66 ("In effecting this resolution, the Settlement Agreement provides, among other things, for . . . <u>payments of up to $350 for the first facsimile and up to $615 total for up to five facsimiles to Settlement Class Members who submit claims</u> . . . .") (emphasis added). And in subsequent submissions to the Court, Plaintiffs have again clearly stated that that "[e]ach <u>class</u> <u>member</u> who submits a valid claim will be paid a pro rata share of the Settlement Fund in the amount of at least $350 (for one fax) and <u>up to</u> $565 (for five faxes). This is an excellent result for the class." <u>See</u> Motion for Award of Attorney Fees & Expenses (Dkt. 347) at 13.

Your email next turns to the the Class Notice, which you claim "plainly tells claiming class members they will be paid for each fax number." <u>See</u> June 1, 2023 Email fr. G. Hara. But this too is simply erroneous. The Notice of Class Action Settlement reads as follows:

> If the Court approves the Settlement at the final approval hearing, <u>each</u> <u>valid</u> <u>claim</u> will be paid up to $350.00 for the first fax, $125.00 for the second fax, $90.00 for the third fax, $25.00 for the fourth fax, and $25.00 for the fifth fax. You do not need to state on the Claim Form how many faxes you received from BTL in 2009 and 2010. You will be paid according to the electronic records obtained in this case.

Settlement Agreement (Dkt. 324-1) at Ex. B. And while obviously not dispositive, press coverage of this Settlement Agreement interpreted it exactly the way it was written that the most any Settlement Class Member could receive is $615. <u>See</u> Haley Konnath, *Buccaneers Ink $19.8M Deal To End TCPA Suit Over Ad Faxes*, Law360, https://www.law360.com/articles/1478827/buccaneers-ink-19-8m-deal-to-end-tcpa-suit-over-ad-faxes (last accessed June 15, 2023) ("<u>Individuals with valid claims will come away with payments between $350 and $615</u>, depending on how many advertisements they received, according to the order.")

3

We are, of course, more than willing to discuss each of these issues with you, and since the five fax limit was not an issue we discussed at any length at all in our prior meet and confer conferences, we continue to believe it would be appropriate (as required by the Settlement Agreement) for this issue to be the subject of a full meet and confer conference before it is raised with the Court.  See Settlement Agreement (Dkt. 324-1) at § V.III (requiring the Parties to "meet and confer" before bringing disputed claims to the Court).

Best Regards,
Robbie