# EXHIBIT 18

1          **UNITED STATES DISTRICT COURT**
           **MIDDLE DISTRICT OF FLORIDA**
2               **TAMPA DIVISION**

3
CIN-Q AUTOMOBILES, INC. and
4 MEDICAL & CHIROPRACTIC CLINIC,
INC., individually and
5 on behalf of a class,

6                    Plaintiff,

7     vs.                 CASE NO. 8:13-cv-1592 AEP
                          June 13, 2022
8                         Tampa, Florida
                          1:33 - 3:02 p.m.
9
BUCCANEERS LIMITED PARTNERSHIP,
10
                     Defendant.
11 _____/

12

13

14
           **TRANSCRIPT OF MOTION HEARING**
15            (Via Zoom Videoconference)
        BEFORE THE HONORABLE ANTHONY E. PORCELLI
16            UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24 Proceedings transcribed via courtroom digital audio
recording by transcriptionist using computer-aided
25 transcription.

```
 1   A P P E A R A N C E S:

 2   For the Plaintiff:       MICHAEL C. ADDISON, ESQ.
                              Addison Law Office, P.A.
 3                            1304 Alicia Avenue
                              Tampa, Florida 33604
 4                            813/223-2000

 5                            GLENN L. HARA, ESQ.
                              ROSS MICHAEL GOOD, ESQ.
 6                            Anderson & Wanca
                              3701 Algonquin Road, Suite 500
 7                            Rolling Meadows, Illinois 60008
                              847/368-1500
 8
     For the Defendant:       ROBERT C. COLLINS III, ESQ.
 9                            MARK S. MESTER, ESQ.
                              Latham & Watkins LLP
10                            330 N. Wabash Ave., Suite 2800
                              Chicago, Illinois 60611
11                            312/876-7700

12                            JOSEPH H. VARNER III, ESQ.
                              Holland & Knight, LLP - Tampa
13                            100 N Tampa Street, Suite 4100
                              Tampa, Florida 33602
14
     For the Intervenor:      PHILLIP A. BOCK, ESQ.
15                            Bock Law Firm, LLC
                              134 N. LaSalle Street, Suite 1000
16                            Chicago, Illinois 60602
                              312/658-5500
17
     Also Present:            Loree Kovach with Epiq
18

19   Court Reporter:          Howard W. Jones, RPR, CMR, FCRR
                              801 N. Florida Avenue, Suite 15A
20                            Tampa, Florida 33602
                              813/301-5024
21

22                 * * * * * * * * * *

23

24

25
```

**I N D E X**

                                                                    **PAGE**


CERTIFICATE OF COURT REPORTER                          68


\* \* \* \* \* \* \* \* \*


**E X H I B I T S**


*(NONE RECEIVED IN EVIDENCE)*


\* \* \* \* \* \* \* \* \* \*

1    **(COURT CALLED TO ORDER)**

2              **P R O C E E D I N G S**

3         MR. MESTER:  (recording begins) ... that was

4    jointly agreed to by the parties.  But when Mr. Good then

5    starts, you know, doing additional reverse lookups like, you

6    know, like, I can't keep track of them all at this point.

7    That's not what was contemplated.

8         So, the Buccaneers for purposes of the settlement

9    agreement agreed to the one reverse lookup.  That doesn't

10   mean we agreed to the results or agree that the class was

11   ascertainable, but we certainly did agree to that.

12        THE COURT:  And so if I was to even contemplate

13   that if there is doubt -- question about how sufficient or

14   how extensive, let me reword that, extensive Epiq's reverse

15   lookup was and contemplate additional reverse lookups, what

16   would be your condition?

17        MR. MESTER:  I think that would be a breach of the

18   settlement agreement.  As we indicated in the earlier

19   submission we made, I think that would probably trigger the

20   withdrawal provision of the settlement agreement.  That's a

21   question I would rather not have to face today, because I

22   don't think it's necessary.  I don't think it's called for.

23        But I also think it would be improvident because I

24   don't think there is any indication that any other reverse

25   lookup would be any better.  In fact, I think, indeed, Your

1    Honor, there is plenty of indication it would be worse.

2    We're simply confounding the problems and confusion that any

3    reverse lookup brings by doing additional ones.

4            THE COURT:  And that's where I'm confused though,

5    because then by that very argument I don't understand how a

6    publication notice could satisfy the points that you are

7    making.  That is even, in my view, more subject and rampant

8    to potential fraud; whereas, a reverse lookup there are

9    efforts that are being undertaken to specifically identify a

10   number that is known in the case with the individual for

11   appropriate notice.

12           MR. MESTER:  Sure, Your Honor.  Let me try to

13   explain.  This is again the subject of some discussions in

14   the mediation.  The publication notice is obviously the fall

15   back that was established by the Supreme Court in Malaney.

16   No one suggests it's perfect.  But it is different

17   publication than direct notice.  Direct notice means could

18   be a fax notice or a mail notice.  Direct notice means you

19   are sending a notice to someone and most people that get a

20   notice in the mail or if they get a fax on a fax machine

21   understood or assume that they probably are eligible to

22   submit a claim.

23           If you see a notice in the newspaper, it suggests

24   to you and they are typically worded differently, it's

25   suggesting that you may be eligible if you meet the

1    following criteria.

2          So, just at that initial level, there is going to

3    be a difference.  But for this case in particular, there is

4    an additional important point, and it's this.  And it's

5    especially a problem with fax notice.  One of the ways the

6    safeguards we built into the claim form was requiring the

7    class member to write down the fax number where they believe

8    they got the claim.

9          But if we send a fax to somebody on that number,

10   even though they didn't own that fax line in 2009 or 2010,

11   there is a high probability they are going to write down the

12   fax number on the machine they got the fax on.  The problem

13   is that doesn't prove that they actually are members of the

14   class.  In fact, it takes away one of the important

15   safeguards we believe we have otherwise.

16         So, that's -- that's the difference in this case.

17   For publication notice, you would have to be awfully lucky

18   to guess -- to guess a number on the Biggerstaff list and

19   write it down.  And if you don't put that correct number

20   down, then the settlement administrator is going to pick up

21   on that obviously in the claim process.

22         But for fax notice and for mailed notice, it's a

23   problem.  And the reason why it's a problem for mailed

24   notice, although, admittedly some (inaudible), the

25   over-inclusiveness of the reverse lookups we strongly

1   believe and suspect is a function of the fact that we are

2   picking up numbers, we are picking up names and addresses of

3   people who held those numbers, but not in 2009 and 2010.

4           So, if you get a -- if you get mailed notice and

5   you were a holder of that number in 2015, you may write down

6   that number but that still doesn't mean you are a member of

7   the settlement class.  And that's why we think a big part of

8   the difference --

9           THE COURT:  (inaudible) -- the individual to make

10  a claim have to assert that they had received the class in

11  those specific years in the relevant time period?

12          MR. MESTER:  They do, Your Honor, but that's

13  obviously subject ultimately if there's a -- if there is,

14  you know, perceived to be an onslaught of fraudulent claims.

15  That's subject to BTL's right to audit and ultimately

16  challenge.

17          Again, our goal and hope is not that we have to

18  challenge --

19          THE COURT:  Well, this is the bigger question.

20  And I know some of it is circular, but does that then focus

21  more on feasibility rather than ascertainability?

22          MR. MESTER:  It does, Your Honor, and I'm mindful

23  of the distinction we alluded to in our papers.  The

24  Eleventh Circuit in Cherry obviously distinguished those two

25  things.  I would be remiss if I suggested I fully understand

 1  how those two things don't ultimately merge, but I don't sit

 2  on the Eleventh Circuit, so ...

 3         THE COURT:  I don't think you are alone in that

 4  regard.

 5         MR. MESTER:  Thank you, Your Honor.  I mean, I

 6  think at some point if we have to have, you know, 2,000 mini

 7  trials on fraudulent claims that feels to me awfully close

 8  to a lack of both feasibility and ascertainability.

 9         THE COURT:  So, one of the issues that was raised

10  by plaintiff specifically, Mr. Good, is the concern

11  regarding whether Epiq was able to identify numbers within

12  the entities.  You wanted to be able to make a presentation

13  on that.

14         MR. GOOD:  Yes, Your Honor.

15         THE COURT:  Let me hear -- Mr. Good, I'm gonna

16  have Mr. Mester if he wants to present Epiq for that purpose

17  and then I'll have you be able to respond.

18         MR. MESTER:  We do, Your Honor.  And if I could

19  just sort of set the stage.  We have learned a fair amount

20  since we were last before Your Honor on Wednesday.

21         After the hearing, we received from Mr. Good the

22  estimate, the quote, that Your Honor just allowed to be

23  filed under seal.  Until that time, we weren't aware of the

24  fact that there had been a separate estimate and quote by

25  Epiq.  We weren't aware of that until Wednesday.

1          On Thursday, we asked for Mr. Good and

2     Mr. Addison's communications with Epiq with respect to that

3     quote and estimate mindful of the fact whatever assumptions

4     go to those estimates are going to play a big role in how

5     the estimates play out.  And we received those e-mails and

6     those were attached, Your Honor, to our Friday submission

7     and also to what we filed yesterday.

8          And I think what you can pretty clearly then put

9     together is a situation where Mr. Stein, who was the Epiq

10    representative, as I understand it -- I never met him or

11    spoke to him -- but Mr. Stein was working with Mr. Addison

12    and Mr. Good and he made certain assumptions and he then did

13    a sample run and came up with some numbers.

14          There is the e-mail in there that says that --

15    from Mr. Stein to Mr. Addison, the sent-back result was

16    interesting.  And interestingly enough in that e-mail Mr.

17    Stein suggested that they may want to rethink whether or not

18    to use reverse lookup because there is other ways to achieve

19    reach better.

20          As I understand it from Mr. Good, they didn't

21    follow up on that e-mail.  Mr. Good has represented to us

22    that they never received the results of that sample run that

23    was performed by Mr. Stein.  And, as I understand it,

24    Mr. Good can correct me, at this particular period of time,

25    which was August of 2021, Mr. Good was having his second

1    child.

2          So I think -- I think a lot of these

3    communications fell to Mr. Addison.  And we have always

4    gotten along with Mr. Addison, but I don't know that he has

5    the experience with class actions that Mr. Good or I do.  I

6    don't know how many third-party administrators he's dealt

7    with.  And I'm not saying anything to cast aspersions of

8    anyone.  It's just what happened.

9          But in any event, Mr. Stein also suggested a joint

10   call between class counsel, BTL's counsel and Epiq to kind

11   of hash out these assumptions.  Again, we weren't even aware

12   this was going on.  That joint call never happened.  I don't

13   know that Mr. Addison followed up on that suggestion.  And,

14   so, Mr. Good got the estimate he got that we saw for the

15   first time on Wednesday.

16         Fast forward to April, the full results of the --

17   of the reverse lookup that Epiq performed that were provided

18   to the parties and shortly thereafter, almost

19   instantaneously, Mr. Good hired Ms. Merryman to perform a

20   second reverse lookup.  And then there was a long series

21   of -- we have seen a lot of e-mails back and forth and

22   efforts.

23         We believe that what Mr. Good did in retaining

24   Ms. Merryman was contrary to the settlement agreement, but

25   that's not the point of what I'm saying here.  The point I'm

1    saying is, Your Honor, until we saw those e-mails on

2    Thursday and then spoke with them -- then communicated very

3    briefly with Epiq on Friday, we didn't understand what had

4    happened, but now we do and Ms. Kovach can certainly state

5    to this, but the reality is this:  There were two different

6    TransUnion databases that were used; one for the result that

7    was performed or the sample lookup was performed more Mr.

8    Good and other one was used for the full lookup that was

9    presented to the parties in April.

10          And I believe it is clear that the TransUnion

11   database used for the full lookup was the appropriate one

12   because it highlights the aspherical holders of number

13   versus the current holders.

14          So that was for us the kind of -- the key to the

15   Rosetta Stone, so to speak, that we didn't have until very

16   late Friday.  But I think it does explain much of what's

17   consumed the parties' time over the last six or seven weeks

18   and a lot of that is unfortunate because I think a lot of it

19   could have been avoided if Mr. Good had picked up the phone

20   and talked to Epiq when he got the April results and said,

21   hey, what's reason for this difference?

22          THE COURT:  All right.  Mr. Good?

23          MR. GOOD:  I'm not going to respond to any of the

24   aspersions cast by Mr. Mester.

25          I would like to direct the Court's attention to

1   page one of the Epiq -- attachment "A" of their quote.

2   Specifically -- and this is the reason we handed it to Your

3   Honor -- this is the 55 percent rate.  It's right in the

4   middle there reverse/phone search hit rate, 55 percent.

5   This was given to us before the representation by

6   Mr. Collins that the Epiq reverse lookup would include both

7   individuals and entities.

8           What Mr. Mester has referred to as my violations

9   of the settlement agreement include performing an additional

10  lookup by retaining classsettlement.com.  He prefers to call

11  them Ms. Merryman, however you would prefer to call that

12  editing.  They did the reverse lookup on the remaining

13  numbers that Epiq didn't search and low and behold they

14  found a lot of entities, including the plaintiffs, including

15  additional plaintiffs including intervenors.  And we wanted

16  to present that to the Court so the Court could see what was

17  happening here.

18          To the statement that I never contacted Epiq about

19  the discrepancy, that is just simply incorrect, I

20  immediately -- or almost immediately contacted Epiq about

21  the field names, first name/last name and the fact that

22  there were no business entities.  There is documentation for

23  this.

24          Also, regarding Epiq never giving the sample to

25  plaintiff's counsel.  In addition to me confirming this to

1    Mr. Mester, Jonathan Stein of Epiq also confirmed this to

2    Mr. Mester.  This should have put this to rest.  I don't

3    know why this is being brought up again.  We never saw the

4    sample that was the basis for Epiq saying they could get a

5    55 percent hit rate in their estimate.

6            We were led to believe that individuals and

7    entities would be subject to the reverse lookup.

8    Individuals were subject to the reverse lookup.  Entities

9    were not.  There has been no evidence put before Your Honor

10   to suggest that entities should not be part of the reverse

11   lookup.  We believe they should.

12           I understand that Mr. Mester has a problem with

13   class settlement.  He has given numerous reasons for his

14   problem.  He has given numerous questions to class

15   settlement's representative, Ms. Merryman.  For that reason,

16   I went to another company, which is much, much larger called

17   InfoUSA.  I obtained a quote from them.  I did not obtain

18   anything other than a quote.  I have not obtained a reverse

19   lookup from them merely to demonstrate that there are other

20   companies other than TransUnion and class settlement

21   offering this type of data.  I can go to other companies as

22   well and get similar quotes to the extent that InfoUSA for

23   some reason Mr. Mester finds unacceptable.

24           I would point out to the Court that InfoUSA is

25   owned by company called Data Axle.  They are a multi-billion

 1   dollar corporation.  They have thousands of employees.  They

 2   are a very, very large corporation.  I cannot possibly

 3   understand what the problem would be with using them.  They

 4   would be happy to explain their methodology, though I am

 5   sure there would be questions that they would not be able to

 6   answer because given the iterations of questions that

 7   Ms. Merryman was put through on behalf of class settlement.

 8          She went through six sets of questions, Your

 9   Honor.  There is no set of questions that would have been

10   acceptable to get a reverse lookup historically for

11   entities.  And that really is what we are here for.  And we

12   have tried to keep our submissions to the Court concise.  We

13   have not responded to personal attacks.  We have tried to

14   focus on what is in the best interest of the class.  We

15   believe bringing this to Your Honor's attention is in the

16   best interest of the class for mail notice and doing

17   everything we can to get fax notice and publication notice

18   out is in the best interest of the class because we want the

19   class to be given notice and to be given the ability to file

20   claims in this matter.

21          THE COURT:  All right.  Thank you.

22          Ms. Kovach, I have some questions if you don't

23   mind.  Again, thank you for your time.  I'm just gonna ask

24   if you could un-mute yourself and just state your name and

25   your role at Epiq, please.

1          MS. KOVACH:  Sure.  My name is Loree Kovach.  I'm

2    the vice-president of client services at Epiq.

3          THE COURT:  All right.  And, so, one of the issues

4    than been raised to my attention by the parties and as you

5    heard Mr. Good explain a moment ago, plaintiff's counsel's

6    concern is that Epiq did not, whatever methodology utilized

7    through TransUnion, was not able to identify any entities as

8    potential class members.

9          So, are you prepared to explain that or if you

10   have information regarding that?

11         MS. KOVACH:  Yeah, absolutely.  So, it's incorrect

12   to say that TransUnion's database doesn't return entities.

13   They actually do.  I'm looking at the results from the

14   search we performed.  I see companies like Fulton pools,

15   G-Construction, Florida Boat Lifts, Harvey, Inc., Island

16   Inc.  So, there are entities returned in the results from

17   TransUnion, so it's incorrect to say that we only search

18   people and not entities.  The TransUnion results do include

19   entities.

20         THE COURT:  And do you know percentagewise as a

21   comparison from individuals to entities what the results

22   were?

23         MS. KOVACH:  It is a small number.  About -- just

24   ballparking it again, you know, this is not taking into

25   account that someone may have a business fax number

1    registered under their name.  Looks like maybe 300 of the

2    results were businesses, so it's a small number.  But

3    probably larger when you take into account faxes for

4    businesses registered under names.

5              THE COURT:  And one of the concerns that has been

6    highlighted is that named plaintiff's themselves were not

7    identified in the reverse lookup.  Would that be of issue?

8              MS. KOVACH:  Yes.  So, that's not uncommon in

9    reverse lookups.  It is, you know -- it's -- reverse lookups

10   are certainly not a science.  They are kind of questionable

11   at best, but it's sort of the best option available often in

12   these cases.  We very frequently don't end up with named

13   plaintiffs contact information in reverse lookup searches or

14   one named plaintiff, but not all of them.

15             So, it's not something that's uncommon.  Something

16   we always keep an eye out for, but it's not unheard of to

17   not find named plaintiffs.

18             THE COURT:  And what would be the harm in

19   utilizing other companies databases to try to verify beyond

20   the 40,000 that were listed?

21             MS. KOVACH:  So, we are, of course, happy to use

22   any other service provider that the Court directs or that

23   the parties agree to.  The terms of the settlement agreement

24   here directed us to use the best search practicable to find

25   numbers for people within a very specific date range.

1  TransUnion is an industry standard for that type of search.

2  The product that we used here is called Batch Legal Reverse

3  Lookup.  It was designed by TransUnion for legal scenarios

4  where you have to do reverse lookups most commonly in the

5  class action settlement context and specifically designed to

6  identify owners during specific date ranges.

7       So, that's a very -- again, it's an industry

8  standard product designed specifically for this purpose by a

9  company that is considered one of the leaders in

10 identification services.  It's the product that we use in

11 any type of case where we are required to use -- do a

12 reverse lookup unless directed otherwise.  So that's why we

13 use this product in this instance.

14      We normally wouldn't supplement an initial search

15 with additional searches unless directed by the terms of the

16 settlement or by the parties or by the Court directly.  But,

17 again, happy to do so if directed.

18      THE COURT:  And if you were directed to

19 supplement, what would you undertake?

20      MS. KOVACH:  Well, without being told which

21 provider to specifically use, what we would likely do is

22 consult with TransUnion to see if they had a different

23 search.  There are other providers that we use typically.

24 Lexis-Nexis is one of them.  PacEast is another one.  So, we

25 would probably go to providers we are familiar with just

1   because we have a trusted relationship with them.  We are

2   comfortable with the results they provide.  That being said,

3   again, if there were other providers that we were directed

4   to use, we would be happy to.

5           THE COURT:  All right.  Is either party -- let me

6   start with plaintiff's counsel have any questions.

7           Mr. Good?

8           MR. GOOD:  I do.  Your Honor, this is Ross Good.

9           First, I just would like to point out I looked up

10  Fulton Pools.  It's line 70,32.  The first name is listed as

11  Fulton, the last name is listed as Pools.  I did search it

12  on Google while Ms. Kovach was speaking and it does appear

13  to be an entity, though I will point out, again, that on the

14  search results it does not appear to be entity.  It appears

15  to be a person whose first name is Fulton and last name

16  appears to be Pools.

17          I guess my only question of Ms. Kovach is:  Have

18  you ever worked with InfoUSA?

19          MS. KOVACH:  I have not.

20          MR. GOOD:  And regarding TransUnion, are you aware

21  of any other searches that TransUnion does that are entity

22  specific?

23          MS. KOVACH:  That would only return entity

24  results?

25          MR. GOOD:  That would separate out entities from

```
 1    individuals?

 2            MS. KOVACH:  Not a designed product like the Batch

 3    Legal product.  TransUnion is capable of doing a variety of

 4    different targeted searches if we spend time with them in

 5    advance and they can do custom coding for us.

 6            So, as far as their off-the-shelf products, for

 7    lack of a better word, I don't know that there is one that

 8    would separate out entities from individuals.  There might

 9    be that I'm just not aware of.

10            MR. GOOD:  Okay.  And, Your Honor, I just want to

11    conclude by pointing out that of the 300 alleged entities

12    that have been pointed out to the Court, that's 300 out of

13    more than 30,000 matches, which is -- my math, I'm, you

14    know, out of my head it's less than --

15            THE COURT:  I think it's more than 40,000 matches.

16            MR. GOOD:  40,000, so it's way less than

17    1 percent.

18            THE COURT:  Anything else, Mr. Good?

19            MR. GOOD:  No.

20            THE COURT:  All right.  Mr. Mester?

21            MR. MESTER:  Mr. Collins I think was going to --

22            THE COURT:  All right.  Mr. Collins?

23            MR. COLLINS:  Thank you, Your Honor.  And,

24    Ms. Kovach, thank you as well.

25            So, I think if I heard you correctly, you said
```

1    that if you are ordered by the Court or directed by the

2    parties, you can conduct additional searches.  Putting an

3    order from the Court aside, would you normally conduct an

4    additional reverse lookup beyond the Batch Legal TransUnion

5    search you conducted?

6           MS. KOVACH:  No.  I mean, we do whatever is

7    described in the terms of the settlement agreement.  It

8    would be very rare to see a settlement agreement contemplate

9    multiple searches and we wouldn't unilaterally do more than

10   one on our own.

11          MR. COLLINS:  And why --

12          THE COURT:  Let me interrupt there.  What did you

13   feel the settlement agreement directed you to do?

14          MS. KOVACH:  To conduct a reverse lookup to

15   identify potential class members affiliated with the phone

16   numbers we were provided during that 2009 to 2010 date

17   range.

18          THE COURT:  And in your opinion is the 40,000 plus

19   numbers that have been identified based upon the reverse

20   lookup a low percentage, normal percentage of return you

21   would expect?

22          MS. KOVACH:  It's about a normal percentage.  You

23   know, it's hard to say consistently what is -- what is and

24   isn't an accurate percentage because we don't know where the

25   data sets that were provided come from.  Sometimes they come

1  from a defendant's contemporaneous records that have just

2  been preserved.  Sometimes it's compiled from a variety of

3  sources.

4           So, the source of the data is also -- you know, is

5  a factor when we are conducting reverse searches.  But the

6  results are always very low.  The Batch Legal product

7  results are low as a percentage of the whole, but we think

8  that's probably pretty consistent, you know, with the types

9  of databases are being combed, the ability to ascertain

10  ownership within a specific time frame instead of, you know,

11  overall.

12           THE COURT:  All right.  I'm sorry, Mr. Collins.

13  You may continue.

14           MR. COLLINS:  No, no problem at all, Your Honor.

15           So, just to circle back, I think you said that if

16  not ordered or directed by the Court or parties you would

17  not unilaterally -- I think that was the word you used --

18  you would not unilaterally conduct an additional search.

19           Why is that?

20           MS. KOVACH:  Well, I mean, in particular we just

21  don't ever do things that aren't contemplated by the terms

22  of the parties' settlement.  But also the results we got

23  from changing are consistent with what we have got in other

24  cases where we have had to use -- do reverse searches, there

25  wasn't anything in the results that caused us concern.  And

1    we have used this product over and over again in these types

2    of cases without it ever causing issue.

3            MR. COLLINS:  I think when you -- when the Court

4    was originally asking you some questions, you said that

5    reverse lookups are all questionable at best.

6            What did you mean by that?

7            MS. KOVACH:  Well, it's not as though there exists

8    a single source of truth for the owners of phone numbers at

9    any given point in time whether they be fax lines land lines

10   or cellphones.

11           And, so, instead, you know, anybody providing that

12   service is using a variety of proxy databases to try to

13   compile the best list they can.  We often get phone calls

14   from people when we send them notice that have no idea what

15   we are talking about, so that suggests we are sometimes

16   getting the wrong person when we do these reverse lookups

17   even when we are using products that are, you know, targeted

18   to a specific time frame.

19           So, you know, the results are just never -- I

20   don't -- given the -- given what we see in response to

21   notices, they are by no means perfect.

22           MR. COLLINS:  And -- so in light of that, why is

23   it that you -- Epiq would typically just use the Batch Legal

24   product?

25           MS. KOVACH:  Well, again, we really rely on what

1    we are directed to do by the parties.  If that's what the

2    terms of the settlement indicate we should be doing, that's

3    what we do.

4           If there was other types of notice or types of

5    efforts to identify class members included in the terms of

6    the settlement, we would follow those.

7           MR. COLLINS:  Is the TransUnion database just one

8    pool of data or is it compiled data from multiple sources?

9           MS. KOVACH:  It's compiled data from multiple

10   source.  TransUnion indicates it's over a hundred separate

11   sources of data I believe is their number.  It's -- you

12   know, it's proprietary, as far as how they combine them,

13   search them, you know, register dates related to phone

14   numbers, so I can't speak in detail about that.  But it is a

15   large, large, large data set.  It's not a single database.

16          MR. COLLINS:  And I think your project

17   administrator at one point told the parties that in some

18   other metric it was like 10,000 plus sources or data sets or

19   something like that?

20          MS. KOVACH:  That sounds right, 10,000.  I'm

21   sorry, I misspoke.

22          MR. COLLINS:  Okay.  You mentioned that the search

23   results that you obtained have businesses in the first name

24   and last name column.  I think you also indicated that there

25   would likely be many more businesses on there but under the

1    names of individuals?

2           MS. KOVACH:  Right.  I mean, people sometimes

3    register their business fax under their own name instead of

4    under the business name.  And so, you know, it's likely that

5    some of the results that appear as a first and last name

6    might actually be someone's name, you know, but is the fax

7    line for their business.  So, I don't think that we can say

8    none of these result -- and the mailing address might be a

9    business mailing address, right, so I don't think that we

10   can say definitively that just because there is what appears

11   to be a first and last name that we don't have the mailing

12   record for a business.

13          MR. COLLINS:  And class counsel has at some point

14   raised the question of tax ID.  Is a tax ID required for the

15   entry or the result to be a business?

16          MS. KOVACH:  No, not at all.  So, we wouldn't

17   typically get tax IDs in the results for this type of

18   search.  Whether it be individuals' SSNs or business tax

19   IDs.  TransUnion doesn't want to share with us any more

20   information than what we need to perform the work that we

21   have -- that we are using the searches for.  So we don't

22   need tax IDs or SSNs to mail notice to people that addresses

23   that have been provided.

24          My understanding is TransUnion's data sets that

25   they utilize do include tax IDs for both businesses and

1  individuals.  I know that because when we are at -- when we

2  are doing different types of searches with them.  So, for

3  instance, we have an address, name and tax ID and we want to

4  get a better or more current address for that entity or

5  person, we can provide tax IDs and get better results.

6        So, they do utilize them in their searches.  It's

7  just not a data point they would return to us.

8        MR. COLLINS:  Okay.  In your view, is the -- are

9  the Batch Legal results from TransUnion, which I understand

10  is a database designed to historically find the names and

11  numbers at the appropriate time period, are those results

12  completely accurate and reliable in terms of identifying

13  class members?

14        MS. KOVACH:  No, I don't think any reverse lookup

15  tool is completely accurate.  I don't know how to prove that

16  one way or the other, right?  You know, we don't get

17  responses from a large percentage of the notices mailed one

18  way or the other, so I don't think anyone could definitively

19  prove that any database was a hundred percent accurate, but

20  I don't think the TransUnion results are a hundred percent

21  accurate.

22        As I mentioned earlier, we do get inquiries from

23  people, you know, wondering why they got the notice.  There

24  is a chance those people are actually class members, but --

25  you know, often they seem completely confused and, you know,

```
 1   likely are not.
 2           MR. COLLINS:  I'm sorry.  Did you -- I want to
 3   make sure you finished your --
 4           MS. KOVACH:  Yeah, that was it.
 5           MR. COLLINS:  Okay.  And saw in the results that
 6   Epiq obtained from TransUnion that there are for I think
 7   more than half of the lines there is more than one name and
 8   address associated with the line.
 9           So, is there any way to know from the data which
10   one of those people is the class member or the potential
11   class member?
12           MS. KOVACH:  No.  I mean, certainly not as the
13   class is defined here.  The best that we can say is that
14   TransUnion has identified two likely owners of the number
15   during the time frame that you have been provided.  Since
16   the class is defined as somebody who received a fax, there
17   is not any way of knowing which one of those two, if either,
18   are the ones that actually received a fax.
19           MR. COLLINS:  In terms of trying to identify the
20   name and address of a person associated with these numbers
21   that the relevant dates in 2009 and 2010, is the legal --
22   the Batch Legal TransUnion product the most reliable or the
23   highest in terms of industry standard in comparison to other
24   databases or other search methodologies?
25           MS. KOVACH:  So, I can't compare it obviously to
```

1    every other available product.  We have used, I mentioned,

2    Lexis-Nexis and PacEast as companies that we have use

3    before.  We do tend to think the TransUnion results are

4    slightly better, but each data set returns different

5    results.  We haven't done an intensive study.  Out of

6    TransUnion's products, I do think the Batch Legal product is

7    the best.  They do have two different reverse lookup

8    products.  The Batch Legal product is specifically designed,

9    as I mentioned earlier, to identify likely owners within

10   date bounds that we provide.

11           The other reverse lookup product that TransUnion

12   offers is designed to identify the most likely owner of the

13   number and that's without date bounds.  So, the most likely

14   owner based on some sort of algorithm that TransUnion has

15   created.

16           It returns a one-to-one result.  So, for every

17   number you are only going to get one result and that's the

18   single most best owner that TransUnion can identify.  That

19   returns more results, but those do not appear ever to be

20   better results.  In fact, we think that it's usually current

21   owners instead of owners during the timeframe in question.

22   So, we get a lot more questions when we -- if -- if that

23   product is ever used, so we don't use that product for --

24   for these types of searches unless, you know, directed

25   otherwise by the parties.

1          MR. COLLINS:  Okay.  So, I think you sort of hit

2    on getting more results versus getting reliable and accurate

3    results and there's two competing interests there.

4          In terms of balancing reliability and accuracy

5    with quantity, what is your or Epiq's view on whether the

6    Batch Legal product does that itself or whether you need to

7    supplement that in terms of balancing accuracy and quantity?

8          MS. KOVACH:  Well, again, we don't typically

9    supplement the Batch Legal product.  We think it's by design

10   going to get us the most accurate results.  It is usually,

11   as I mentioned, a lower number of results, but given how

12   difficult it is to ascertain ownership in a particular point

13   in time, that's not unexpected.  We don't think more results

14   are better.  You know, again, a product that's designed to

15   identify the most likely owner 11 years after the time frame

16   you are curious about is probably not designed to identify

17   the people you are looking for.  It's not gonna find you

18   most of your class members.

19     So, yes, we wouldn't supplement the -- typically

20   supplement that product, the Batch Legal product.

21          MR. COLLINS:  I think a minute ago when you

22   mentioned LexisNexis and another one, you said that -- I

23   think you used the word they will provide conflicting or

24   different results.

25          If we were to take, let's say, a sample of 500

1    numbers and run it through different -- the same set of 500

2    numbers and run it through databases, would they likely all

3    return the exact same results for a line or would there be

4    conflicts?

5            MS. KOVACH:  No, I think you would probably get

6    different results.  You know, each of these providers has a

7    propriety methodology for combing publicly and semi-publicly

8    available data and, you know, compiling data sets they use

9    to perform all these search activities.  I doubt they are

10   identical methodologies or identical data sets, so I would

11   expect different results if you were to run the same sample

12   through multiple providers.

13           MR. COLLINS:  So, if --

14           THE COURT:  Let me interrupt there, Mr. Collins.

15           Wouldn't that be a reason then to run another

16   reverse lookup?  Because if you are going to get different

17   results, it would seem to me you would be narrowing your

18   list even more.

19           MS. KOVACH:  Well, I think if you got different

20   results you wouldn't have any way of knowing which one was

21   the right one.

22           THE COURT:  Well, if you don't know which is the

23   right one, then you would not identify the list.  At least

24   what is being provided just on one list is simply based upon

25   all available information, that it's reasonable to infer

1    that the number has been identified with the potential class

2    member, but if you have conflicting information, then that

3    would no longer be reasonable to make such an inference.

4            MS. KOVACH:  I don't disagree.  Again, we usually

5    just run the searches that are directed in the terms of

6    settlement.  If a settlement agreement ever directed us to

7    use multiple products to attempt to find the best result,

8    then we certainly would.

9            You know, typically people are looking to do this

10   as efficiently as possible and I think industry-wide it's

11   accepted that one search is sufficient, you know, as a

12   standard, so that's what we do.

13           If we ever had parties that wanted to consult with

14   us on, you know, using multiple products and identifying --

15   you know, analyzing the data results, removing duplicates or

16   counting duplicates with a higher degree of accuracy -- you

17   know, duplicate results from different providers, we can do

18   all those things.  It's just not what we typically see.

19           THE COURT:  Understood.  All right.  Mr. Collins?

20           Sorry I interrupted you again.

21           MR. COLLINS:  No, please don't apologize.  It's

22   helpful to hear it.

23           So, let's take an example.  Let's take one number,

24   doesn't matter what the number is.  And the TransUnion

25   results, let's say, provide one hit -- one name and address

1    for that number.  Does that mean that that's for sure the

2    class member who held the line as of those particular dates

3    when the faxes were allegedly sent in 2009 and 2010?

4            MS. KOVACH:  I don't think I can say it would for

5    sure mean that's the person that held the fax number during

6    that time frame.  I think using the Batch Legal product it

7    is more likely to be -- it's likely to be the person that

8    held it during that time frame, but I can't say that it

9    would always a hundred percent of the time be the holder

10   during that time frame.

11           MR. COLLINS:  Even if there is just one hit?

12           MS. KOVACH:  Even with just one hit, yeah.

13           MR. COLLINS:  So, then, if the TransUnion

14   results -- I think we covered this earlier.  If the

15   TransUnion results have multiple hits, which more than half

16   do, I think up to 16 hits for a line here, I think you said

17   Epiq wouldn't have a way to know which is the class member.

18           Let's say the results -- the same line was run

19   through three different databases and now we have 12 hits,

20   you know, four from TransUnion -- four from each to make it

21   simple.  Does that -- is there any way then to know which is

22   the class member and which one isn't?

23           MS. KOVACH:  No, certainly not.

24           MR. COLLINS:  And I think you have heard or seen

25   that class counsel has gotten some results from a Dorothy

1   Sue Merryman at a company called class settlements.

2            MS. KOVACH:  Uh-huh.

3            MR. COLLINS:  Have you heard of -- before this

4   case, have you heard of class settlement or Dorothy Sue

5   Merryman before or worked with them?

6            MS. KOVACH:  No, not -- prior to this case, I have

7   not heard of the company or of Ms. Merryman.

8            MR. COLLINS:  And so, would you know whether her

9   results or their results have any indicia of reliability or

10  accuracy or to what degree they are accurate or reliable?

11           MS. KOVACH:  No, I couldn't speak to her results

12  at all.  I mean, it sounds as though it's a proprietary

13  methodology.  You know, again, there is no way to take the

14  results and test their accuracy either.

15           MR. COLLINS:  I don't know if I have any other

16  questions, Mark, unless --

17           MR. MESTER:  I don't either, Your Honor.

18           MR. COLLINS:  Okay.  Thank you, Your Honor.

19           THE COURT:  Mr. Bock, do you want to pose any

20  questions?

21           MR. BOCK:  Not at this time, Your Honor.

22           THE COURT:  All right.  Mr. Good, any follow-up on

23  that?

24           MR. GOOD:  Yes, Your Honor.

25           Prior to this hearing, did you have the

1  opportunity to review Epiq's estimate that was provided to

2  plaintiff's counsel?

3           MS. KOVACH:  I have.

4           MR. GOOD:  And you saw that 55 percent estimate?

5           MS. KOVACH:  I did.

6           MR. GOOD:  How far below the 55 percent estimate

7  would it have to be in order for Epiq to do a secondary

8  search?

9           MS. KOVACH:  There's no particular point where we

10  would do a secondary search.  And I can actually speak to

11  the reason for the 55 percent estimate.

12          MR. GOOD:  Sure.

13          MS. KOVACH:  I mentioned earlier that TransUnion

14  has two different products.  They have the Batch Legal

15  product, which, again, is designed to identify owners during

16  a specific time frame.  And then they also have a more

17  general reverse lookup product that is just a one-to-one

18  match.

19          When Mr. Stein ran a sample through TransUnion for

20  his estimate for you, he used that latter product, the

21  reverse lookup product, which again is designed to identify

22  the best owner, which is most often current owners.  And,

23  so, that's where the 55 percent came from his results using

24  that product.

25          When we went -- when we were appointed as

1    settlement administrator and went to run the search and had

2    more information, there was a specific time frame that was

3    at issue here and the Batch Legal product is better when you

4    have that level of specificity.  So, that's why the results

5    were different is because different products were used with

6    different purposes designed for each of the two products.

7            MR. GOOD:  So, is it your understanding that at

8    the time that the quote was given Mr. Stein did not have the

9    term sheet with the date range in it?

10           MS. KOVACH:  I don't know what he had or didn't

11   have.  The reverse lookup product is quicker and so if you

12   were under the wire to get an estimate out to you he

13   probably thought let's not let good be the enemy of great

14   and get it done.  I can't really speak to why he chose to

15   use the product he did versus using the Batch Legal for the

16   sample, but I can tell you that I can see that he used the

17   reverse lookup product and not Batch Legal.

18           MR. GOOD:  I know that phrase while I think it's

19   don't let perfect be the enemy the good and it's one that I

20   live by myself.

21           I wanted to direct your attention to one of the

22   plaintiffs in this case whose name is -- or the company name

23   is.  Excuse me, it's Jonathan Hall, which is a sole

24   proprietor, which is involved in this case.  Epiq was able

25   to match six names to that for his sole proprietorship and I

1  believe it's five individual -- one of the names is a direct

2  duplicate.

3          So, would that mean that those six individuals

4  were associated with that one telephone number?

5          MS. KOVACH:  Again, I can't speak specifically to

6  TransUnion's results.  It means that their system has shown

7  those six people as affiliated with that number during the

8  time frame that we gave them.

9          MR. GOOD:  And, again, that would be -- nevermind.

10 I think I understood your answer.

11         You were asked earlier about the possibility of

12 running a sample of 500 through two different sources and

13 you said you would likely get some conflicting results; is

14 that correct?

15         MS. KOVACH:  Correct.

16         MR. GOOD:  If you were to run a sample of 500

17 results --  500 -- a sample of 500 for which there was no

18 result in TransUnion through either PacEast or LexisNexis or

19 InfoUSA, is it possible they would find more than zero

20 results?

21         MS. KOVACH:  Of course.  Yeah, that's possible.

22         MR. GOOD:  And are you familiar with the acronym

23 NPI?

24         MS. KOVACH:  I was not until I saw Ms. Merryman

25 reference it.

1          MR. GOOD:  Okay.  And as you sit here today, do

2   you know what the NPI registry is?

3          MS. KOVACH:  My understanding it's a registry of

4   healthcare related providers, but I'm not particularly

5   familiar with it.

6          MR. GOOD:  And do you know if it's tracked over

7   time so you can see when, for example, a fax number is added

8   or removed from the registry going back before 2009?

9          MS. KOVACH:  I don't.  I saw that they had an API,

10  but I didn't look into what the data points were that are

11  passed through with that.

12         MR. GOOD:  And do you know whether NPI is one of

13  the 10,000 plus sources utilized by TransUnion?

14         MS. KOVACH:  I do not.  We asked and they weren't

15  able to tell us, which is par for the course.  They don't --

16  are not very forthcoming about where all their data sets

17  come from because they consider that proprietary.

18         MR. GOOD:  So, if instructed to by this Court, you

19  could search only the numbers which TransUnion was unable to

20  locate through either PacEast, LexisNexis, InfoUSA or class

21  settlement, correct?

22         MS. KOVACH:  Correct.  If the Court directs us, we

23  are happy to use any other database that's named.

24         MR. GOOD:  And just using LexisNexis, for example,

25  if you had to run the additional 90,000 numbers at the

1    Court's direction through LexisNexis, approximately how long

2    would it take?

3            MS. KOVACH:  A few days probably.  I'm not

4    positive.  I'd want to, you know, talk to them.  I can't

5    remember what their off-the-shelf product is for this.  And,

6    you know, it would also depend on the date.  If we are gonna

7    do it date limited or not, you know, that sort of thing,

8    so -- but usually their searches take a few days.  They are

9    not an extended period of turnaround.

10           MR. GOOD:  And same question as to PacEast, if you

11   know?

12           MS. KOVACH:  Yeah, same there.  It's usually days

13   not weeks.  But I don't know what they would -- if they

14   would require any sort of customization for this type of

15   search.

16           MR. GOOD:  And Mr. Addison, Mr. Hara, do you have

17   any questions?

18           MR. ADDISON:  I do.

19           With respect to what Epiq does, you said that you

20   are guided by the settlement agreement between the parties,

21   correct?

22           MS. KOVACH:  Correct.

23           MR. ADDISON:  Let me quote you part of the

24   settlement agreement dealing with notice to the class.  It

25   says, the parties will work cooperatively with settlement

1   administrator to mutually agree upon the most practicable

2   and reasonable methods under the circumstances by which the

3   addresses of the members of the settlement class can be

4   derived in an efficient and reasonable manner.  The mailing

5   addresses will be updated with the national change of

6   address database maintained by the United States Postal

7   Service before mailing.

8            Do you recall that being the operative language in

9   the settlement agreement concerning identification of people

10  who would receive notice?

11           MS. KOVACH:  I do.

12           MR. ADDISON:  Didn't say anything about using

13  TransUnion as the sole source of the information, did it?

14           MS. KOVACH:  It didn't, but my understanding is

15  that we indicated TransUnion would be the provider we would

16  use in the proposals we sent to both plaintiff counsel and

17  to defense counsel.  I unfortunately don't -- was not privy

18  to the conversations had with the project manager and the

19  parties before the search was conducted.

20           You know, if the allegation is that we didn't

21  consult appropriately before running a search with you,

22  that's news to me and I'm not, you know, prepared to speak

23  to that -- to that issue.

24           MR. ADDISON:  Okay.  I'm looking right at the

25  proposal that was sent to me by Mr. Stein in August of 2021

1    and he doesn't disclose anywhere in that proposal that Epiq

2    is going to go outside of its own capabilities to identify

3    the class members, but it does say that there will be a --

4    actually, it goes into some detail about how you would

5    administer the settlement, but it doesn't say much about how

6    you'll identify who the class members are.  And TransUnion

7    is not mentioned anywhere in that proposal as far as I can

8    tell.

9         But your guided by the settlement agreement, which

10   says you will consult with the parties and find the best and

11   most efficient and practicable way to identify the class

12   members; correct?

13        MS. KOVACH:  Correct.  And for us that is

14   TransUnion.  That's -- as I mentioned, it's an industry

15   standard.  It's one of the products used most frequently in

16   our industry.  It's accepted as a research tool in our

17   government contracts, in contracts with major Fortune 500

18   companies.  It's a standard industry tool that's used.

19        MR. ADDISON:  I understand.  I just wanted to make

20   sure the Court is aware that what the proposal said and then

21   what the settlement agreement said and basically its

22   decision to unilaterally use TransUnion and no other reverse

23   lookup capability.

24        I have nothing further, Your Honor.

25        THE COURT:  All right.  Anyone else?

1          MR. MESTER:  No, Your Honor.

2          THE COURT:  All right.  Ms. Kovach, thank you for

3    your time.  And I don't believe -- I certainly didn't infer

4    it that way -- no one is critical of -- that you were not in

5    communication with the parties.  This is more of a dispute

6    between the parties.  More so an issue for my consideration

7    and you were very helpful in providing the information you

8    did to give me better understanding.

9          Mr. Mester, the way I see it, to be very blunt,

10   and I think the case law speaks to this matter as well, the

11   reality of it is there is no precision in identifying any

12   prior number.  It gets more complicated as more time passes.

13   But regardless if it was last month or 10 years ago, there

14   is no methodology that can be utilized to determine

15   definitively any one specific individual identified with the

16   number.  Particularly on how cellphones and other devices

17   are transmitted as well as the same with fax lines.

18          A subscribe on a line doesn't necessarily mean

19   that is the class member.  There is definitely possibilities

20   that someone who is listed as a subscriber for facsimile

21   line is not the appropriate class member.

22          What is contemplated by the settlement agreement

23   and more so as I have always viewed a reverse lookup is to

24   consult all available best resources to try to narrow down

25   specifically individuals that may be potential class members

1    to provide appropriate notice of the class.

2            The parties obviously contemplated and I'm certain

3    your client contemplated this matter, which by the specific

4    request, to insure some type of declaration to simply just

5    avoid a free for all, if notice goes to individuals who are

6    not class members, to have an additional requirement for

7    them to affirm that.

8            Even beyond that, it seems to me there is the

9    protection that you could identify what you believe to be

10   fraudulent claims.  And it seems to me, for example, if I

11   did not even utilize the reverse lookup and just we went

12   alone on notice publication, which the Supreme Court has

13   viewed to be sufficient, there would always still be

14   protections there.  And I would suspect that if there is a

15   challenge of any one potential individual asserting to be a

16   class member, some of these databases would be consulted for

17   that very purpose of the challenge as well as other

18   resources.

19           So, as I viewed the reverse lookup is at least

20   providing some measure on the front end before notice goes

21   out to narrow down potentially class members understanding

22   still, one, any potential class member is going to have to

23   attest that they believe they are a class member.  And then,

24   two, the Buccaneers are still in a position to challenge

25   that.

42

1          My concern is now given what has been presented --

2     and this is no way criticism to Epiq; rather, Epiq has done

3     what it felt was appropriate given its vast experience.  And

4     let me note that -- it's a vast experience in these types of

5     matters -- in relying on the particular database from

6     TransUnion which I fully accept as credible that it is an

7     industry standard.

8          But I have real significant concern given what's

9     been presented that we are only talking a very small

10    percentage of entities that have been identified and that is

11    300 out of the 40,000 plus.

12         What I am contemplating and this is what I want to

13    hear from the parties is requiring an additional reverse

14    lookup with another database.  And I recognize that there is

15    reasons not to do that, but I'm comfortable and confident

16    that there is better reason to do so rather than just going

17    forward on the 40,000 and then doing the other supplemental

18    notices.

19         And I will note I have real reservation -- I'm not

20    fully decided, but I have a real reservations about

21    facsimile notice.  And, so, I think any supplemental notice,

22    which I'm certain at a minimum publication notice is going

23    to be required going forward, but I'm still reserving on the

24    facsimile notice to determine whether we can get a better

25    percentage rate on a reverse lookup if we do that again.

1          So, I want to talk that through on what that will

2     do to us, if, one, how quickly could that be done.  And it

3     seems to me we are gonna have to adjust deadlines if I do

4     that.  And then to hear what concerns you may have and how

5     we walk through exactly how the additional reverse lookup

6     would be done.

7          So, Mr. Mester, I'm gonna give you a moment to

8     think about it and Mr. Good.  Mr. Addison, I'll start with

9     you.  And I want to highlight.  What Mr. Addison stated is

10    what I noted in the agreement.  There is no specific

11    requirement and there was no agreement that any one database

12    be contemplated.

13         In fact, the reality of it is if Epiq chose to do

14    so it could have consulted every database that's available

15    for this purpose to try to narrow down and specifically

16    identify individual class members.  There would have been no

17    prohibition by the agreement.  I think the agreement

18    actually is much broader to determine what, in consultation

19    with the parties, is the most appropriate way given these

20    databases that are out there and the criticism associated

21    with the various databases.

22         So, having said that, I'm at least at a minimum

23    confident I want an additional reverse lookup done.  It

24    seems to me -- and I do so because I have not looked at the

25    results and I do so without any consideration of

1   Ms. Merryman's, because I also accept and what was

2   articulated by Mr. Addison at the prior hearing, that there

3   is potential for errors in that process.  I'm not looking to

4   invite those errors.  I want something that is also

5   considered to be somewhat of an industry standard.  And we

6   may not get any additional results out of the additional

7   reverse lookup and I'll have to consider that going forward.

8          But at this stage, I do have concerns given what

9   has been highlighted by the small amount of entities that

10  have been identified out of the 40,000.

11         So, Mr. Good, what would be your suggestions for

12  going forward then?

13         MR. GOOD:  Your Honor, we would be comfortable

14  with Epiq making those decisions.  LexisNexis, PacEast.

15  Also, I would like to point out what NPI is, the Health and

16  Human Services Department of the federal government operates

17  the Centers for Medicare and Medicaid Services which

18  operates this NPI registry.

19         Basically, every doctor, medical practice, anybody

20  doing anything that is HIPPA related has to have an NPI

21  number and all of this is publicly available in a tracked

22  database that has to be updated.  And it's an amazing

23  resource.  The reason I pointed it out repeatedly is a lot

24  of the plaintiffs that have been in front of Your Honor,

25  including Medical and Chiropractic Clinic, Inc. are on that

1    database and you can see when they added their fax number

2    and when they took it off; therefore, you can see when they

3    owned it.

4         The API is there, as Epiq's representative has

5    said today.  I think that should be included.  But, again, I

6    would leave that to Epiq to decide.  I don't think that the

7    parties should really be in a position to direct Epiq to

8    that.  I think Epiq does have the ability to name other

9    sources and go to them --

10        THE COURT:  Mr. Good, if I could interrupt you for

11   a moment.  But that's my concern though.  Obviously, one,

12   the settlement agreement contemplates the parties having

13   some input in recommendations for Epiq's consideration.

14        But ultimately, two, Epiq has already done what it

15   felt was appropriate and so to leave them blind going

16   forward we may be right back where we are at right now where

17   you have criticism of what was done.

18        MR. GOOD:  Well, Your Honor, in that case,

19   plaintiff's counsel has already exceeded the cap for how

20   much we can recover and we paid class settlement to do the

21   list.  We have it ready to go today.  We would submit that

22   to Epiq to add to their list.  There are no duplicates from

23   their list because we only gave Class Settlement the 90,000

24   that remained.  We didn't give them the 40,000 that they

25   matched.

46

```
 1              In addition to that, we proposed InfoUSA because I
 2   know Mr. Mester has some concerns with Class Settlement.
 3   While I don't agree with them and I don't want to get into
 4   them here because I'm trying to avoid conflict, InfoUSA is
 5   one that we would suggest.  We submit that they are an
 6   industry standard.  They were a publicly traded company
 7   before they were taken private for billions of dollars.
 8   There are others out there, but, I mean, those are the two
 9   that leap out at us.
10              We already know, you know, approximately what the
11   results will be, so we could -- we would submit those to
12   Your Honor.  And if I -- at the end, not necessarily now, I
13   would like to briefly be heard on the fax notice component
14   as well, because I think there was a statement made that I
15   would like to clarify for Your Honor.
16              THE COURT:  All right.  Mr. Addison, do you want
17   to add anything.
18              MR. ADDISON:  No, Your Honor.
19              THE COURT:  Mr. Hara?
20              MR. HARA:  No, Your Honor.
21              THE COURT:  Mr. Mester?
22              MR. MESTER:  Thank you, Your Honor.  I think in
23   terms of the mail notice, I think if we break it down to the
24   elements it would be somewhat easier.
25              In terms of Rule 23 and what's required by due
```

1    process, I don't think there is any question that what we

2    have already done, which was retaining a leading third-party

3    administrator and probably the leading third-party

4    administrator in the country to undertake a reverse lookup

5    and to use their professional judgment to do what they

6    typically would do and to choose the databases they chose,

7    again, using their expertise, we have done all that's

8    required.  We have made a more than reasonable effort I

9    believe to identify and ascertain the names and addresses of

10   the persons and entities that held these numbers on the

11   Biggerstaff list in 2009 and 2010.

12          I go further, Your Honor.  This was two

13   submissions ago, so I apologize, but I don't think there is

14   any credible suggestion that a reverse lookup is even

15   required to satisfy Rule 23 or due process.  And the reason

16   I say that is because of the (inaudible) case we cited, Your

17   Honor, that cast more than a shadow of doubt on the accuracy

18   of reverse lookup.

19          So, it's puzzling notion -- and I don't mean this

20   in any way, Your Honor, to be disrespectful, but we have got

21   this imperfect product that generates highly imperfect

22   results, so we're going to keep back to the well, so to

23   speak, to get more and more tainted water.  I'm not sure

24   that's really gonna satisfy or solve any problems.

25          But in terms of Rule 23, I don't think there is

1    any question what we have done to date satisfies Rule 23,

2    which would mean then that the logical approach would be to

3    do what we have done, to send out notice to who has been

4    identified or ready and then to go to publication notice.

5              That's what Malaney calls for.  Your Honor, I

6    think that's what Jeris (ph), the Eleventh Circuit's recent

7    decision calls for.  To do more I think is to add more

8    confusion, more cost and more expense and I don't know at

9    all that it's warranted.

10             Getting then to the second level, which is what

11   was agreed to in the settlement agreement, what was

12   contemplated was the parties would jointly agree on a

13   reputable experienced settlement administrator to use its

14   judgment to decide what should be done and we did that.  We

15   jointly retained Epiq.  Epiq made decisions that I think

16   were sound and we don't have any questions about that.  They

17   did what they always do.  They ran one reverse lookup

18   through the leading purveyor of this information.

19             And as Ms. Kovach aptly put it, they never do a

20   second lookup.  They never do a second source unless

21   directed by someone to do so.  But to direct them to do so

22   is to in some sense to obviate their professional judgment.

23   And I don't know that that is really appropriate or really

24   consistent, honestly, with the settlement agreement.

25   Because we got the expert's opinion, they did what they

1    would do, they did what they typically would do and they got

2    the results that they got.

3           You know, it seems to me in some ways we are

4    trying to kind of manipulate the experiment, so to speak,

5    after the fact.  I don't know that it would be appropriate.

6           But, lastly, Your Honor, I would say only this.  I

7    don't think it would be appropriate to do a second reverse

8    lookup, but if we were to do one, I think it would be

9    important to let Epiq choose a source that they would be

10   comfortable with in this increasingly idiosyncratic and

11   unique circumstance.  I don't think we should instead foist

12   upon them InfoUSA or Ms. Merryman to say here are the

13   results, now, you know, I don't know what they would do with

14   them.

15          But moreover, Your Honor, if we are going to go

16   down that path, and I don't think we should, but if we were,

17   I think it would be critical that we come up with ways to

18   make sure that we achieve as much reliability and accuracy

19   as we can.  Those would include making sure that they run a

20   search on the entire set of numbers.  And to the extent

21   there are conflicts, I believe Your Honor alluded to

22   earlier, that would be prima facie evidence in each instance

23   that there is a lack of ascertainability with respect to

24   that particular number and mailed notice should not go out

25   to those persons.

1          Moreover, because all of these -- and in some

2     sense this is the fundamental problem and I think Ms. Kovach

3     hit on this, as did Mr. (inaudible) in his declarations, all

4     these databases are proprietary.  No one really knows what

5     goes into them.  There is not even the slightest shred at

6     the end of day of actual reliability or indicia of

7     reliability.

8          And, so, there ought to be a way to audit or test

9     the results.  And one way that comes to mind -- I don't know

10    that it's perfect -- is to ask each of these databases

11    TransUnion, whoever else Epiq would choose, we'd come up

12    with a random sample, each side, 500 numbers each, tell us

13    what the evidence is in your database of each of those

14    numbers actually being held by the person or entity that you

15    identified in 2009 or 2010.

16          I think if you ask them that, I have a strong

17    suspicion that the results would be very illuminating and I

18    don't think they would be illuminating in a way that would

19    add numbers.  I think they would subject a great deal of

20    numbers.

21          THE COURT:  All right.  Mr. Good?

22          MR. GOOD:  To Mr. Mester's point, I think they

23    would be illuminating in the sense that TransUnion would not

24    respond if Mr. Mester's standard that he just tried to

25    impose was imposed on TransUnion, he would literally be

1    removing, I believe, the only plaintiff that currently is

2    found in the records because, again, six members of the

3    plaintiff's family are there because it's a sole

4    proprietorship.

5            That is not contemplated for in the settlement

6    agreement.  Finding additional matches because an entity

7    search is done would not lead to additional fraud, it would

8    lead to entities getting notice which is what should happen.

9            The NPI registry, again, is a full open database

10   and administered by HHS, but that's far from complete

11   because it's only medical.  We proposed InfoUSA.  We

12   proposes Class Settlement, which Mr. Mester, for some

13   reason, keeps calling Ms. Merryman.  I won't get into my own

14   suspicions as to why.

15           But that one is done.  It's verifiable in the

16   sense that we have a claim form that was agreed to during

17   the mediation.  It has it's statement at the bottom and the

18   claims can be challenged before Your Honor if they believe

19   there is fraud in the claim process, the same as for

20   individuals or entities that review what's in the

21   publication notice.

22           So, there are already checks in place.  A second

23   search is what is called for in this situation where 300 out

24   of the 40,000 plus are allegedly entities.  And, again, they

25   appear in the first name/last name format, so that is

1   something troubling.

2           THE COURT:  You wanted to make a comment about the

3   facsimile notice?

4           MR. GOOD:  Yes.  The only comment I wanted to

5   make, Your Honor, was regarding facsimiles and facsimile

6   notice.  A fax number, while it is true that it may get

7   recycled, by which I mean a business may go out of business

8   or stop using fax number.  When that process takes place, it

9   goes into the general pool and then it can get reused.

10          So, for example, if you have Comcast as your phone

11  number provider for that fax number and then you go out of

12  business or you get rid of that fax number, it gets

13  reassigned.  The probability that it gets reassigned to be a

14  fax number again is infinitesimally low.

15          So, if you did approve fax notice, if your concern

16  is a fax going to somebody who has a fax machine now that is

17  in the class list, but did not have a fax machine in 2009 or

18  2010, the probability would be infinitesimally low.  If that

19  were to occur, you would still have the statement on the

20  claim form that they would have to sign stating that they

21  owned the fax number from 2009 to 2010.

22          Fax notice is a form of direct notice.  It is a

23  good form of direct notice because it directly notifies the

24  person in the class based on the best way that we have to

25  identify them as a class member.

1          I understand that there is some irony here.  I

2    understand a lot of judges like to make the same joke about

3    the irony and fax notice being used in a TCPA action.  But,

4    in this case, with something as old as this, we think it is

5    important to have a fax notice component because it is

6    direct notice, which is always better than publication

7    notice.

8          THE COURT:  All right.  Mr. Mester, you want to

9    respond to that?

10         MR. MESTER:  Thank you, Your Honor.  In terms of

11   fax notice, I think it's more than irony.  The goal of

12   Congress in TCPA was to limit unsolicited faxes, so it's

13   beyond ironic to suggest that the solution to that problem,

14   which the statute was designed to address is to send more

15   unsolicited notices.  And I think that's -- that comment

16   that Judge Kocoras made in the G.M. Sign case.

17         But separately and a part from that, I think I

18   finally now understand the point that Mr. Good was making

19   last week with regard to his grandmother's fax machine.  I

20   didn't understand candidly when he was making it, because I

21   kept reflect on the fact that none of my grandmothers had

22   fax machines.  That's not the problem we are worried about.

23   We are not worried about grandmothers fax machines.  What we

24   are worried about are the solo practitioner, the small

25   businesses that get sold in an asset sale and they go from

1    one set of owners to another set of owners.  And,

2    admittedly, it depends on the nature of the transaction

3    whether or not somebody would be a class member or not, but

4    you can easily imagine Your Honor a circumstance where there

5    is a delicatessen that's Joe's Delicatessen in 2009 or 2010

6    and it has a fax machine.  My understanding is that,

7    ironically enough, delicatessens are apparently one of the

8    remaining users of fax machines because they get orders --

9    lunch orders on the fax machine.

10         But Joe sells his delicatessen to Sally in 2011

11   and now Sally owns a delicatessen.  Well, Sally obviously

12   isn't a class member but she probably keeps the fax machine

13   and probably keeps the number and she keeps paying the

14   bills.  When we send the fax notice to Sally in 2011 --

15   today, she gets the fax number assuming she still owns the

16   delicatessen and chances are she doesn't --

17         THE COURT:  Mr. Mester, let me interrupt you.  I

18   do understand your point.  As I stated, I'm very skeptical,

19   so I'm not in a position now that I'm gonna consider

20   facsimile notice.

21         But what I am going to do despite your argument to

22   the contrary is I am concerned and it is my obligation to

23   insure that all efforts are reasonable in an effort to

24   identify potential class members and I have significant

25   concern given the low numbers.  Again, this is not in any

1  way a critique of Epiq's efforts.  But it has been

2  highlighted given those low number of entities that I think

3  it is worth the additional effort to undergo one more

4  reverse lookup.

5           And I will leave, Ms. Kovach, in Epiq's

6  professional judgment as to what database should be

7  consulted for that purpose to see if there are other

8  entities that can be identified.

9           My question for you is the timing.  And I know you

10 stated that's difficult to state but, could you at least

11 give me an estimate of what you think how long that would

12 take?

13          MS. KOVACH:  Is it just gonna be one search?  I

14 know Mr. Good --

15          THE COURT:  One.

16          MS. KOVACH:  Okay.  I would say we probably need

17 an extra week to do the search.  If we are only gonna search

18 the numbers that we weren't able to locate addresses for

19 through TransUnion and we are not gonna have to do any

20 analysis or comparison, if we could add a week for the

21 search, I think that should probably work.

22          I don't -- I apologize, I don't have the current

23 timeline in front of me nor do I know exactly where we are

24 in the process, but I think --

25          THE COURT:  I'm sorry to interrupt you.  You

1    wanted to say something?

2            MS. KOVACH:  Yeah.  I was just gonna say, so I'm

3    hesitant to say an additional week from now is going to work

4    because I don't know if we are already behind or not given

5    all of this.  But if you look at the time frame we were

6    initially given from when we received the data through when

7    we needed to mail notice, if we could add on a week for that

8    to do an additional search and make sure we still have that

9    time frame generally, that would work.

10           THE COURT:  Well, fortunately, the history of this

11   case is known to everyone and given that I did bake some

12   time in that we could adjust the deadlines to meet our

13   ultimate deadline here.

14           So what I will do -- a couple things.  One, I'm

15   not gonna order Epiq in any way which database to use;

16   however, I think it is somewhat informative that at least

17   both parties have highlighted InfoUSA, so I would take you

18   to just consider that.

19           Two, I am not looking for a comparison of lists.

20   This is just to identify the numbers or search and reverse

21   lookup the numbers that have not been previously identified.

22           The process going forward then is what I would ask

23   is once that has been done that it is shared with the

24   parties and the parties can meet and confer about any other

25   additional concerns and then I would like to set a

1    subsequent hearing then based upon those results.  I'll

2    allow the parties to make any other additional arguments

3    they want to make.

4            But at this stage I am confident that we are

5    taking all reasonable efforts to identify all potential

6    class members.  I have my reservations about facsimile

7    notices and I'll express those more at the other hearing,

8    but I'll allow plaintiff's counsel to make any further

9    additional arguments in that regard.

10           To be abundantly clear, if it has not been

11   already, I am going to order a publication notice.  And, so,

12   what we are just going to look at now is then the results of

13   the second reverse lookup and then I will have to adjust the

14   deadlines based upon that reverse lookup and determine if

15   there are any other issues that need to be raised or ruled

16   upon based upon that as raised by plaintiff's counsel or

17   otherwise.

18           All right.  Mr. Good, what I'll do in a moment is

19   give the date for a hearing, but before I do that, any other

20   concerns in proceeding in that fashion or any other issues?

21           MR. GOOD:  None for plaintiffs, Your Honor.

22           THE COURT:  Mr. Addison?

23           MR. ADDISON:  None for plaintiff, Your Honor.

24           THE COURT:  Mr. Hara.

25           MR. HARA:  No, Your Honor.

```
 1              THE COURT:  Mr. Collins?  Mr. Mester?
 2              MR. MESTER:  Yes, Your Honor, just two quick
 3     points.  On the first point, just looking forward, I --
 4     so -- this is not the scenario any of us hoped for, but just
 5     so I can make a comment on the record that if we go down
 6     this path and it results in a higher level of fraudulent
 7     claims than anyone hoped for or expects, I trust that
 8     Mr. Good and his colleagues are not gonna object to
 9     reasonable efforts by the Buccaneers to address those
10     concerns on the back end.
11              As I have said before, I'd prefer to address them
12     on the front end and I know our client would, but I don't
13     want to get, you know, to September or October and --
14              THE COURT:  There is no need to have Mr. Collins
15     excuse me, Mr. Good make a comment about that.  That's the
16     Buccaneers right.  I mean, if they are concerns you have
17     about fraudulent -- and that's been contemplated and if it's
18     not, it should be.  That's part of the process here and we
19     will take that up.  That, unfortunately, will have to be on
20     the back end.
21              And I know -- Mr. Mester, you may not necessarily
22     agree with my findings, but I do feel that this is actually
23     maybe a way to save some time in that regard, because if we
24     are able to identify additional potential class members
25     based upon another reverse lookup and you have a concern
```

1   about those individuals, then there is gonna be at least a

2   frame work where you will be able to challenge that based

3   upon either what was done with the reverse lookup or any

4   declarations by any of those individuals or any other

5   information that you gather.

6          MR. MESTER:  Yes, Your Honor, that actually gets

7   to my second point.  And I certainly understand -- with due

8   respect and I'm not belaboring the point, but I'm not sure I

9   understand why if we are gonna do a second reverse lookup we

10  shouldn't do the entire list, because I think that would

11  be -- that would be a step in the interests of reliability.

12         And, again, no disrespect to Ms. Kovach or Epiq at

13  all, but I'm skeptical of all reverse lookups.  If we have

14  an opportunity to demonstrate that the TransUnion one made a

15  lot of errors, and I'm pretty sure it did, then I think we

16  should take that as we are doing the rest.

17         So, my request would be that we expand it.  And

18  the second part of that request to be that we -- the

19  Buccaneers reserve the right, once we have those results, to

20  propose to Your Honor some type of mechanism, mindful of the

21  fact that these are all proprietary databases, to try to

22  test what we get because I --

23         THE COURT:  I don't have a concern about that.  I

24  appreciate your point.  But then are you gonna -- are you

25  requesting that Epiq then undertake the process of comparing

1    those results?

2            MR. MESTER:  I don't know that Epiq needs to.  I

3    think that we can probably do that.

4            THE COURT:  All right.  All right.  Anything else?

5            MR. MESTER:  No, Your Honor.

6            THE COURT:  Ms. Kovach, any concerns in running

7    the full list?  It seems to me that would be appropriate

8    given one of the things that I highlighted if there is

9    conflict on the reverse lookups themselves and that

10   certainly should be some information available to the

11   parties?

12           MS. KOVACH:  No, Your Honor, no concerns.

13   Typically, I mean, 90,000 versus 130,000 wouldn't cause an

14   appreciable increase in the time or anything like that.

15           THE COURT:  All right.  Thank you.

16           MR. GOOD:  Your Honor, may I briefly be heard?  I

17   don't actually object.  I just want to make a statement so

18   it's on the record.

19           THE COURT:  Sure.

20           MR. GOOD:  The first set of results has a first

21   name and last name.  I anticipate the next set is going to

22   have other field names.  This is going to lead to a lot of

23   conflicting results.  I mean, if your name is Jonathan S.

24   Hall.  And it had a first name and last name it's gonna say

25   Jonathan Hall.  And your business name may be Jonathan Hall,

```
1   DCPC.  You are gonna have a lot of conflicts.
2            Now, they may look trivial to the naked eye, but
3   to a computer program that is comparing cells in a
4   spreadsheet, there is gonna be a lot of conflicts.  I mean,
5   they may -- again, I don't think they are going to be
6   substantive, but there is going to be a lot of conflicts
7   that are raised by doing this.
8            THE COURT:  It's noted, but I think it still
9   nonetheless would be appropriate to make that comparison.
10           MR. GOOD:  Understood.
11           THE COURT:  All right.  Mr. Varner, did you want
12  to add anything?
13           MR. VARNER:  No, Your Honor.  Thank you.
14           THE COURT:  Mr. Bock, anything?
15           MR. BOCK:  Yes, Your Honor.  InfoUSA has -- says
16  it has history databases.  And when we consulted with them
17  in the context of our proposed settlement with the Bucs,
18  they were able to add 39,000 addresses to the 56,000.  And
19  defendant had agreed to use those and we had dispute after
20  that?
21           Well, according to Mr. Cohen's letter that's in
22  the record in this case, 332-4, he says that Mr. Mester had
23  agreed that they would use those 36,000 from InfoUSA and we
24  were still arguing there should be more for the remaining
25  39,000 fax numbers that weren't gonna get any kind of notice
```

1     other than public indication.  But they didn't.  If he

2     disagreed with InfoUSA, Dan misrepresented it.  I don't

3     presently recall.  I would have to check my notes to see

4     what I have about it, but I just noticed that document is in

5     the record and it talks about what we were trying to do.

6     And our settlement agreement had required sending it to --

7     sending notice to as many as possible, so it changed in this

8     agreement to be what you have read and what the parties have

9     talked about today, but that's all I wanted to add.

10              THE COURT:  All right.  Thank you.

11              All right.  Then contemplating the date to have

12    another hearing to get everything back on track, if after

13    the reverse lookup -- second reverse lookup is conducted, is

14    it feasible from the parties' perspective if we scheduled

15    the hearing for June 30th?  I know that is a narrow gap of

16    time, but then I'm trying to avoid the 4th of July holiday

17    for everybody.

18              MR. MESTER:  Fine with me.

19              MR. GOOD:  What time on June 30th?  I have another

20    hearing on the west coast via zoom.  What time were you

21    contemplating, Your Honor?

22              THE COURT:  Well, time I can accommodate for you.

23    Let me just first ask as to that date.

24              Starting with Ms. Kovach, do you think that is

25    feasible for the lookup to be done and to share it with the

1   parties?

2         MS. KOVACH:  I think so.  We haven't worked with

3   InfoUSA previously, but I think Mr. Good had a contact there

4   where he got a quote, so as long as we can reach out to that

5   person and turn things around quickly we should be able to

6   send the list right away.

7         THE COURT:  All right.

8         MS. KOVACH:  I would say, Your Honor, if you need

9   Epiq at the hearing, I'm going to be at a conference in

10  Amsterdam on June 30th, so it might be hard for me to be

11  there at that time.

12        THE COURT:  Well, I don't think we are gonna need

13  Epiq at the hearing.  This is the last point.  Anything that

14  Epiq has done is gonna be belabored, so if there are other

15  issues to raise it's not gonna be something for Epiq's

16  concern, so thank you.

17        What time is your hearing Mr. Good on the 30th?

18        MR. GOOD:  It's at 11:30 eastern time, Your Honor,

19  and it will probably go approximately an hour to an hour and

20  a half.  So, the afternoon --

21        THE COURT:  So, if we do it at 2:00 o'clock?

22        MR. GOOD:  Yeah, 2:00 p.m. eastern time would be

23  great.

24        THE COURT:  How is that for everyone else?

25        MR. ADDISON:  Good for Addison.

```
 1              MR. HARA:  Fine for Glenn Hara.

 2              MR. MESTER:  Works for me, Your Honor.

 3              MR. COLLINS:  It works for me, Your Honor.

 4              THE COURT:  I think Mr. Mester froze.  Are you

 5    still with us?

 6              MR. ADDISON:  He's frozen.

 7              THE COURT:  Otherwise, he's demonstrating his

 8    aggravation with me and seeking a pause.

 9              MR. ADDISON:  With all due respect.

10              MR. COLLINS:  Your Honor, while we wait for

11    hopefully --

12              THE COURT:  Yes, Mr. Collins?

13              MR. COLLINS:  -- Mr. Mester to chime back in, I

14    can also shoot him an e-mail.  I just wanted to ask for a

15    point of clarification for Ms. Kovach.

16              Are you instructing her to use InfoUSA or to use

17    their judgment, because I know she --

18              THE COURT:  Use their judgment.  All I indicated

19    is as referenced here, you have intervenors, plaintiff's

20    counsel and Mr. Mester also identifying InfoUSA is at least

21    recognized as an industry standard.  But I will leave it to

22    Epiq's professional judgment as to how to conduct the

23    second -- given my concern regarding the business entities,

24    the second reverse lookup.

25              MR. COLLINS:  Thank you.  I wanted to -- I'm not
```

```
 1    sure that's what Mr. Mester intended to convey in terms of

 2    the Buccaneers' position, so I just wanted to make sure --

 3               THE COURT:  All right.

 4               MR. GOOD:  And one clarification regarding your

 5    preliminary approval order, Your Honor.  If I'm not

 6    mistaken, Ms. Kovach or Mr. Collins might correct me if I'm

 7    incorrect, but I believe the mail notice date you

 8    contemplated was June 27th?

 9               THE COURT:  Yes.

10               MR. GOOD:  So, can Your Honor's order reflect that

11    that date will be entered --

12               THE COURT:  Yes, that date is stayed pending

13    resolution of the 30th hearing.

14               MR. GOOD:  Thank you, Your Honor.

15               THE COURT:  That's the whole intent of it, so

16    there is no notice that needs to go out and I'll memorialize

17    that later today.

18               MR. GOOD:  Thank you, Your Honor.

19               MR. COLLINS:  Your Honor, I -- unless he dials

20    back in in a second, maybe we should just assume it works

21    for Mr. Mester?

22               THE COURT:  Okay.  I hate to conclude without him.

23               MR. COLLINS:  I just sent him an e-mail if asking

24    2:00 eastern on the 30th would work.  We can also confirm

25    that with your --
```

1        THE COURT:  Well, why don't we -- I will hold

2   often.  Tentatively, we are going to schedule it for the

3   30th at 2:00.  If another time works, then we will do it as

4   well, but I would like to do it on the 30th.  So, Mr.

5   Collins, once you have been able to get in touch with Mr.

6   Mester, if you will just contact my chambers to let us know

7   if that date is sufficient or not and that time.  That would

8   be -- well, perfect, good timing.

9             (Mr. Mester returns to the zoom call.)

10        THE COURT:  Mr. Mester, what I was asking -- you

11   are on mute -- is 2:00 o'clock on June 30th.  Does that work

12   for your calendar?

13        MR. MESTER:  Your Honor, I apologize.  There is a

14   tornado warning here and the power just went out.  It's back

15   on though, so we are okay for now.

16        Your Honor, I'm gonna be in New York at a

17   partners' meeting.  I can certainly make it, I just won't be

18   in my usual environment, which probably isn't that relevant.

19        THE COURT:  Is another time better later in the

20   day?

21        MR. MESTER:  No, Your Honor, I'll make myself

22   available at any time on the 30th that works for everyone

23   else including Your Honor.  And I don't know if Mr. Collins

24   has had an opportunity to address this, but I just wanted to

25   address one question or issue.  It is not the case that we

1    ever agreed to InfoUSA in the TTA settlement.  And I

2    strongly believe -- because I don't know that Epiq has any

3    relationship with or any reason to trust the results of

4    InfoUSA, which is essentially a competing administrator.  I

5    think it should be up to Epiq to decide who they use for an

6    additional source.

7              THE COURT:  Well, Mr. Collins did raise that and

8    I, again, emphasized I will leave it to the professional

9    judgment of Epiq.

10             MR. MESTER:  I apologize, Your Honor.

11             THE COURT:  All right.  Anybody else have anything

12   else for today?

13             MR. GOOD:  Yes, Your Honor.  I just want to

14   clarify.  InfoUSA has not been settlement administrator of

15   anything, never have they sought to be.  They are strictly a

16   data service provider and their parent company, Data Axle,

17   is the same thing.  They are not a class admin.  Thank you.

18             THE COURT:  Okay.  Thank you all for your time.

19             MR. ADDISON:  Thank you, Judge.

20             THE COURT:  We will see you on the 30th.

21             We will be adjourned.

22             (Proceedings concluded.)

23

24

25

```
1   UNITED STATES DISTRICT COURT )
                                 )
2   MIDDLE DISTRICT OF FLORIDA   )

3
                   REPORTER TRANSCRIPT CERTIFICATE
4
         I, Howard W. Jones, Official Court Reporter for the
5   United States District Court, Middle District of Florida,
    certify, pursuant to Section 753, Title 28, United States
6   Code, that the foregoing is a true and correct transcription
    of the stenographic notes taken by the undersigned in the
7   above-entitled matter (Pages 1 through 67 inclusive) and
    that the transcript page format is in conformance with the
8   regulations of the Judicial Conference of the United States
    of America.

9

10                              /s      Howard W. Jones
                                _____
11                              Howard W. Jones, RDR, RMR, FCRR
                                Official Court Reporter
12                              United States District Court
                                Middle District of Florida
13                              Tampa Division
                                Date:  6-19-2022
14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION