# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., <u>et al.</u>, | ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, | ) ) ) |
| Defendants, | ) ) |
| TECHNOLOGY TRAINING ASSOCIATES, INC., <u>et al.</u>, | ) ) ) |
| Intervenors. | ) |

Case No. 8:13-cv-01592-AEP

**Magistrate Judge Anthony E. Porcelli**

## BTL'S RESPONSE TO PLAINTIFFS' JUNE 16, 2023 MOTION REGARDING THE CLAIMS PROCESS

Date:  June 30, 2023

Mark S. Mester
   (admitted *pro hac vice*)
Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
            robert.collins@lw.com

Joseph H. Varner, III
   (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...............................................................................1

II.   FACTUAL BACKGROUND...............................................................2

    A.    The Settlement Agreement And Its Terms Were Painstakingly Negotiated Over An Extended Period Of Time ................................2

        1.    No One Knew How Large The Class Was Or Who Was In It ..........................................................................................3

        2.    Intervening Changes In Applicable Law .................................4

III.   ARGUMENT.......................................................................................6

    A.    The Settlement Agreement Very <u>Plainly</u> Limits Settlement Class Members To Five Faxes And A Maximum Recovery Of $615 .......................................................................................................6

        1.    Plaintiffs And Their Counsel Have Themselves <u>Directly</u> Confirmed That The Maximum Recovery For Any Class Member Is $615 ........................................................................8

        2.    The Court Was Equally Clear In Granting Preliminary Approval Of The Settlement Agreement ....................................9

        3.    The Conflation Of Settlement Class Members And Fax Numbers By Class Counsel Is Especially Apparent In How They Propose To Abrogate The Five-Fax Cap ................10

        4.    Caps On Claims Are A Frequent Feature Of Settlements Sponsored By The Wanca Firm As Well As TCPA Settlements In General ..............................................................11

    B.    The Continuing Efforts Of Class Counsel To Restrict BTL's Audit Rights Should Be Rejected ......................................................12

        1.    The Submission Of A Facially Valid Claim Form Clearly Does <u>Not</u> Extinguish BTL's Audit Rights................................13

**Page**

2.  Plaintiffs And Class Counsel Again Try To Take The
    Court's Comments Out Of Context ............................................14

3.  Class Counsel Likewise Want To Simply Ignore The
    Directives Of TransUnion And LexisNexis In Terms Of
    The <u>Proper</u> Use Of Their Databases ..........................................16

4.  Class Counsel Continue To Refuse To Take Any
    Responsibility For Problems That Are Largely Of Their
    Own Making .............................................................................18

5.  If Requests For Information Are Not Going To Be Sent
    To Claimants, Then BTL Should Be Allowed To Take
    Discovery .................................................................................19

IV.  CONCLUSION......................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

<u>Alpha Tech Pet v. LaGasse</u>,
   2017 WL 5069946 (N.D. Ill. 2017) ........................................................4

<u>Carlough v. Amchem</u>,
   158 F.R.D. 314 (E.D. Pa. 1993)............................................................17

<u>Daisy v. Mobile Mini</u>,
   489 F. Supp. 3d 1287 (M.D. Fla. 2020)..................................................3

<u>DeHoyos v. Allstate</u>,
   240 F.R.D. 269 (W.D. Tex. 2007) .........................................................17

<u>Gorss Motels v. Safemark Sys.</u>,
   931 F.3d 1094 (11th Cir. 2019)..............................................................5

<u>Gulf Oil v. Bernard</u>,
   452 U.S. 89 (1981) ...............................................................................14

<u>In re Domestic Air Transp.</u>,
   141 F.R.D. 534 (N.D. Ga. 1991)...........................................................17

<u>In re Nissan</u>,
   552 F.2d 1088 (5th Cir. 1977)...............................................................17

<u>In the Matter of Rules & Regs. Implementing the TCPA</u>,
   DA 18-1159 (F.C.C. Nov. 14, 2018) .......................................................5

<u>Licari Fam. Chiro. v. eClinical Works</u>,
   2018 WL 1449581 (M.D. Fla. 2018) .......................................................5

<u>McArthur v. A.A. Green</u>,
   637 So.2d 311 (Fla. 3d DCA 1994) .......................................................14

<u>Nelson v. HealthRight</u>,
   2019 WL 13187865 (M.D. Fla. 2019) ...................................................11

<u>Opperman v. Kong Tech.</u>,
   Order (Dkt. 918), No. 3:13-cv-00453 (N.D. Cal. 2017)........................14

<u>Pickett v. IBP</u>,
   209 F.3d 1276 (11th Cir. 2000)..............................................................10

**Page(s)**

Richardson v. Progressive,
   2022 WL 154426 (M.D. Fla. 2022) ......................................................11

Sandusky Wellness v. ASD,
   863 F.3d 460 (6th Cir. 2017).................................................................4

Schneider v. Chipotle,
   2019 WL 1512265 (N.D. Cal. 2019) ..................................................17

Skelton v. GM,
   1987 WL 6281 (N.D. Ill. 1987) ..........................................................17

Smith v. Microsoft,
   297 F.R.D. 464 (S.D. Cal. 2014) ......................................................4, 7

Snyder v. Fla. Prepaid,
   269 So.3d 586 (Fla. 1st DCA 2019) ....................................................7

Yaakov v. FCC,
   852 F.3d 1078 (D.C. Cir. 2017) ..........................................................5

## STATUTES

47 U.S.C. § 227 ........................................................................................6

## OTHER AUTHORITIES

Americana Art China v. Foxfire Printing,
   Settlement Agt. (Dkt. 208-1), No. 3:08-cv-06992 (N.D. Ill. 2012).....................11

Daisy v. Pollo Ops.,
   Settlement Agt. (Dkt. 105-1), No. 2:14-cv-00564 (M.D. Fla. 2015)...................11

Elwert v. Alliance Healthcare,
   Settlement Agt. (Dkt. 48-1), No. 5:15-cv-02223 (N.D. Ohio 2018) ...................12

Hailey Konnath, Buccaneers Ink $19.8M Deal To End TCPA Suit,
   Law360 (Mar. 29, 2022), available at https://www.law360.com/articles/
   1478827/buccaneers-ink-19-8m-deal-to-end-tcpa-suit-over-ad-faxes .................12

## RULES

Fed. R. Civ. P. 23 ............................................................................ 10, 11

## REGULATIONS

47 C.F.R. § 64.1200 ...............................................................................4

BTL responds as follows to the motion filed on June 16, 2023 by Plaintiffs regarding the ongoing claims process.[1]  See Mot. (Dkt. 451).

## I.    INTRODUCTION

From the outset of this litigation, Class Counsel have conflated telephone numbers with class members, suggesting they are somehow one in the same.  In their motion for class certification, for example, Plaintiffs argued the proposed class was supposedly ascertainable simply because Mr. Biggerstaff identified 131,011 fax numbers to which faxes had allegedly been sent on behalf of BTL between July of 2009 and June of 2010.  Plaintiffs and Class Counsel, however, otherwise made no effort to actually identify any of the persons and entities to whom such faxes were purportedly sent.  Indeed, Plaintiffs could not even estimate the size of the proposed class in their class motion (as movants for class certification are required to do), instead arguing the numerosity requirement was supposedly satisfied because Mr. Biggerstaff claimed to have identified "131,011 fax numbers in the Tampa area from July 2009 to June 2010."  Mot. for Class Cert. (Dkt. 207) at 19-20.  But given their unilateral focus on telephone numbers as opposed to the actual identity of class members, the list of numbers compiled by Mr. Biggerstaff became for Class Counsel something akin to a holy grail, representing the only tenuous link (if any) between Plaintiffs and the members of the proposed class they otherwise sought to represent.

To our knowledge, no effort was ever made by Plaintiffs, Class Counsel or Mr. Biggerstaff to try and figure out who actually held any of the numbers on the Biggerstaff list until after the Settlement Agreement was executed and the

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval.  See Settlement Agt. (Dkt. 324-1).  In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

Settlement Administrator then had two reverse lookups performed as part of the Settlement Class Notice Program.  Problems with the Biggerstaff list, however, along with anticipated difficulties in identifying class members <u>all</u> played a key role in the negotiation of the Settlement Agreement, and it was for these and other reasons BTL insisted there be a cap in the Settlement Agreement on how many faxes any class member could claim.  It was also because of these issues BTL insisted on robust audit procedures and other mechanisms in the Settlement Agreement in order to ensure persons and entities making claims were <u>actually</u> members of the Settlement Class.

The continuing efforts of Class Counsel notwithstanding, fax numbers are plainly <u>not</u> class members, and a class is not ascertainable simply because someone cobbles together a list of telephone numbers to which faxes were supposedly sent, even if telephone numbers are otherwise deemed to be "objective criteria."  As discussed more fully below, however, the actual text of the Settlement Agreement makes it <u>very</u> clear that a five-fax cap was agreed to and that the most any Settlement Class Member can recover is $615.  It is equally clear the current efforts of Class Counsel to rewrite the Settlement Agreement by eliminating the cap and gutting the audit provisions in Section VIII are misplaced and should be summarily rejected.

## II.    FACTUAL BACKGROUND

The factual background is set forth below.  <u>See</u> disc. <u>infra</u> at 2-6.

### A.  The Settlement Agreement And Its Terms Were Painstakingly Negotiated Over An Extended Period Of Time

On January 17, 2020, the Court ordered the Parties to mediation overseen by Magistrate Judge Amanda A. Sansone.  <u>See</u> Order (Dkt. 284).  What followed was a <u>lengthy</u> negotiation lasting over eight months, all painstakingly overseen by Judge

Sansone, to whom the Parties owe a continuing debt of gratitude.  Virtually every term in the Settlement Agreement, however, was the subject of <u>extensive</u> negotiation, <u>including</u> a cap on the number of faxes any Settlement Class Member could claim as well as the audit procedures and review process for claims in Section VIII.  <u>See</u> Settlement Agt. (Dkt. 324-1) §§ IV.B, VIII.E.

### 1.    No One Knew How Large The Class Was Or Who Was In It

These issues were important to BTL for two reasons.  <u>First</u>, no one at the time of those negotiations had <u>any</u> idea how large the Settlement Class actually would be (let alone who was in it), because all the Parties had was a list of numbers compiled by Mr. Biggerstaff and everyone recognized the Biggerstaff list itself had and still has many flaws.[2]  <u>See</u> Pls.' Mem. re Biggerstaff Rpt. (Dkt. 339) at 1-2 (admitting this case is "complicated" by the lack of fax-transmission logs); BTL's Mem. re Biggerstaff Rpt. (Dkt. 341) at 19 (Biggerstaff list consists of "incomplete lists in various formats from different broadcasters for some faxes over different periods of time").  As a result, the ascertainability of the Settlement Class was an important issue as was the ability of the Parties to <u>identify</u> eligible claimants and <u>exclude</u> fraudulent claims in the event of settlement.  <u>See</u>, <u>e.g.</u>, BTL's Ascert. Subm. (Dkt. 365) at 1.  While Plaintiffs bear the burden of demonstrating the Settlement Class is

---

[2] It was entirely possible that to the extent the Settlement Class was ascertainable at all by the time the Settlement Agreement was being negotiated, every number on the Biggerstaff list was held by a <u>different</u> person or entity during the period July 14, 2009 through June 9, 2010.  <u>See</u> Second Biggerstaff Rpt. (Dkt. 210-2) at ¶ 38 (acknowledging Mr. Biggerstaff had not identified the "names and addresses" of the persons and/or entities that held the fax numbers on his list).  It was also possible, however, that all (or most) of the numbers were held by (a) a handful of fax broadcasters and other aggregators of telephone numbers (typically not eligible to make a claim under the TCPA) and/or (b) persons and entities who received faxes through online fax services and/or (c) many of the numbers were held by no one from July 14, 2009 and June 9, 2010.  <u>See</u> Sponsler Decl. (Dkt. 341-2) ¶ 40 (a "significant percentage" of fax numbers were likely serviced by online fax service providers); <u>see also</u>, <u>e.g.</u>, <u>Daisy v. Mobile Mini</u>, 489 F. Supp. 3d 1287, 1297 (M.D. Fla. 2020) (recipients of faxes through online services lack Article III standing to recover damages).

ascertainable (a burden they now appear unable to discharge), the Parties recognized the infirmities in the Biggerstaff list and the passage of time would make the claims process more complicated than most, though admittedly no one could have foreseen the <u>full</u> magnitude of the problems that later arose or just how extensive the fraud would now appear to be.  <u>See</u> BTL's Mot. (Dkt. 458).[3]

## 2.   Intervening Changes In Applicable Law

<u>Second</u>, an intervening change in governing law in November of 2018 made the question of consent (and whether any given fax was unsolicited) again an important issue in this litigation.  Prior to 2018, consent was <u>not</u> an issue, because governing law required senders of faxes to provide a <u>compliant</u> opt-out notice on the face of the fax and the faxes purportedly sent on behalf of BTL were not compliant.[4] <u>See</u> 47 C.F.R. § 64.1200(a)(4)(iv).  In March of 2017, however, the D.C. Circuit held that the FCC's "solicited fax rule" exceeded the FCC's jurisdiction and invalidated the rule, meaning senders could utilize consent as a defense even though

---

[3] Because Class Counsel chose to focus on fax numbers instead of identifying class members, the ascertainability of the proposed class in this case was always on shaky ground, precisely because fax numbers are not class members.  <u>See</u>, <u>e.g.</u>, <u>Smith v. Microsoft</u>, 297 F.R.D. 464, 473 (S.D. Cal. 2014) (noting that "while Plaintiff has the phone numbers of people who were sent [text messages] five years ago, he does not have those persons' current information, making identification of the class members a daunting task").  But having failed to secure from telephone providers the <u>only</u> direct evidence of ownership of the lines in question, Class Counsel created the situation in which we now find ourselves, where it is questionable whether the Settlement Class is presently ascertainable at all and where it is clear the identity of members of the Settlement Class cannot currently be ascertained by means that are even close to being manageable.  <u>See</u>, <u>e.g.</u>, <u>Sandusky Wellness v. ASD</u>, 863 F.3d 460, 473 (6th Cir. 2017) ("[I]f [plaintiff] had brought suit earlier, fax logs would have existed, and their absence would not pose an independent barrier to class certification.").

[4] Under prior law, if a fax did not contain a compliant opt-out notice, then defendants were precluded from raising consent as an affirmative defense, and there was no need to consider whether the issue of consent would create the sort of individualized determinations that would preclude class certification.  <u>See</u>, <u>e.g.</u>, <u>Alpha Tech Pet v. LaGasse</u>, 2017 WL 5069946, *9 (N.D. Ill. 2017) (denying class certification in Wanca case following <u>Yaakov</u> due to need to determine whether <u>each</u> class member consented to receiving the faxes in question).

faxes lacked an opt-out notice.[5]  See Yaakov v. FCC, 852 F.3d 1078, 1083 (D.C. Cir. 2017).   Moreover, BTL had been repeatedly promised by FaxQom that all numbers used for any fax broadcast would be fully TCPA-compliant and would only consist of recipients that consented to receiving a fax.  See Order & Mem. (Dkt. 167) at 2-4.  Therefore, there was good reason to believe BTL would have a defense to many (if not most) of the claims of absent class members, and the issue of consent could be resolved only through individualized determinations that would make class treatment of Plaintiffs' claims unmanageable.   See, e.g., Licari Fam. Chiro. v. eClinical Works, 2018 WL 1449581, *4 (M.D. Fla. 2018) (putative TCPA class failed for lack of predominance following Yaakov).   As the compromise that eventually led to the Settlement Agreement, however, the Parties agreed to the five-fax cap and a limit of $615 per Class Member out of recognition of the fact that if anyone received more than five faxes but never lodged a complaint with BTL, then that was a good indication that person or entity had consented to receiving faxes.[6]

---

[5] In the wake of the D.C. Circuit's decision, the FCC issued an order on November 14, 2018, making clear the new directive on consent and opt-out notices was to have retroactive effect in this and other cases.  See FCC Order DA 18-1159; Gorss Motels v. Safemark Sys., 931 F.3d 1094, 1105 (11th Cir. 2019) ("The Commission did not merely determine that the solicited-fax rule was bad policy and should be repealed; instead, it accepted the holding of Yaakov, that the solicited-fax rule was invalid and, as a result, was never legally in force at all.").

[6] As the Court is aware, a number of recipients of faxes did complain to BTL, and steps were taken to ensure that no more faxes were sent to those numbers.  See Order & Mem. (Dkt. 167) at 2-3. But recipients that did not complain were obviously much more likely to have consented, and although discovery was not taken on this issue due to the state of the law at the time merits discovery in this matter was ongoing, the compromise of five faxes was a logical and deliberate way of addressing in the Settlement Agreement this and other issues.  See 47 U.S.C. § 227(a)(5) (defining "unsolicited" to mean a fax "without that person's prior express invitation or permission, in writing or otherwise").

See 47 U.S.C. § 227(a)(5).  And this compromise is <u>fully</u> reflected in the Settlement Agreement, as discussed below.[7]  <u>See</u> disc. <u>infra</u> at 6-12.

### III.  ARGUMENT

We address below the five-fax cap, followed by Section VIII of the Settlement Agreement and the audit process agreed to by the Parties.  <u>See</u> disc. <u>infra</u> at 6-20.

**A.   The Settlement Agreement Very <u>Plainly</u> Limits Settlement Class Members To Five Faxes And A Maximum Recovery Of $615**

Through selective editing and excerpting of the Settlement Agreement, Class Counsel try to piece together an argument that fax numbers really are equivalent to Settlement Class Members, with the consequence that the limits imposed in Section IV.B of the Settlement Agreement would apply to the former and not the latter and fax numbers could themselves somehow make claims.  <u>See</u> Mot. (Dkt. 451) at 1-2.  Plaintiffs thus suggest that the term "Valid Claim" supposedly modifies the limits on claims that Section IV.B otherwise imposes on Settlement Class Members, such that <u>each</u> fax number can make a "Valid Claim" for receipt of up to five faxes, because the claim itself "attaches to each fax number":

> The Settlement Agreement states that class members "who submit a Valid Claim shall be eligible to receive" the relevant amounts, meaning payments are per each "Valid Claim." (Doc. 324-1, Settlement Agreement, Section IV.B). A "Valid Claim" attaches to each fax number, and the claim form the parties negotiated merely invites claimants to submit multiple claims on one form. (Id.)

Mot. (Dkt. 451) at 1-2; <u>see also id.</u> at 5 (making same argument).

The lack of merit in these arguments, however, and the reason why Class Counsel must resort to editing and excerpting all become obvious when Section IV.B of the Settlement Agreement is considered as a <u>whole</u>:

---

[7] Not only does the Settlement Agreement make clear that there is a five-fax cap on claims by any Settlement Class Member, but it also further addresses the issue of consent by specifying in the claims process that <u>only</u> recipients of "<u>unsolicited</u> facsimile advertisements" are eligible to make a claim.  <u>See</u> Settlement Agt. (Dkt. 324-1) § IV.B.

> <u>Settlement Class Members</u> who received or were successfully sent in 2009 or 2010 one or more <u>unsolicited</u> facsimile advertisements relating to tickets for Tampa Bay Buccaneers games sent by or on behalf of BTL and who submit a <u>Valid Claim</u> <u>shall</u> <u>be</u> <u>eligible</u> <u>to</u> <u>receive</u> <u>up to</u>:
>
> > (i)    $350 for the first such facsimile;
> > (ii)   $125 for the second such facsimile;
> > (iii)  $90 for the third such facsimile;
> > (iv)  $25 for the fourth such facsimile; and
> > (v)   $25 for the <u>fifth</u> such facsimile.[8]

Settlement Agt. (Dkt. 324-1) § IV.B; <u>Snyder v. Fla. Prepaid</u>, 269 So.3d 586, 595 (Fla. 1st DCA 2019) (Florida law construes contracts in a way that gives a reasonable meaning to all provisions of the contract).[9]  As the text of Section IV.B makes clear, Class Members submit a Valid Claim, and the submission of a Valid Claim is one of two conditions Class Members must meet to "be eligible to receive <u>up to</u>" $615 for a "fifth such facsimile," the other being the Settlement Class Member "received" or "was successfully sent in 2009 or 2010" one or more "<u>unsolicited</u>" faxes sent on behalf of BTL.[10]  <u>See</u> Settlement Agt. (Dkt. 324-1) § IV.B.  But a "Valid Claim" is submitted by a Settlement Class Member, and a "Valid Claim" is itself <u>not</u> part of the Settlement Class nor eligible to submit a claim, just like a telephone number is <u>not</u> a Settlement Class Member.  <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 297 F.R.D. at 473 (denying class

---

[8] These amounts obviously add up to $615, which is the <u>maximum</u> amount any Settlement Class Member can recover under the Settlement Agreement, a point <u>confirmed</u> by Class Counsel in representations made to this Court.  <u>See</u> Settlement Agt. (Dkt. 324-1) § IV.B.

[9] An accurate excerpting of Section IV.B would read as follows:  "<u>Settlement Class Members</u> who received or were successfully sent in 2009 or 2010 one or more <u>unsolicited</u>" faxes "<u>and</u> who submit a Valid Claim" shall "be eligible to receive <u>up to</u>" $615 if they received five faxes.  <u>See</u> Settlement Agt. (Dkt. 324-1) § IV.B.

[10] The term "Valid Claim" is defined in the Settlement Agreement as follows:

> [A] timely and fully completed Claim Form submitted by a Settlement Class Member as more fully described in Section VIII.

Settlement Agt. (Dkt. 324-1) § II.SS.  As discussed below, the suggestion by Class Counsel that a Valid Claim "attaches to each fax number" finds no support in the Settlement Agreement.  Instead, a Valid Claim clearly "attaches" to the Settlement Class Member, and Claim Forms are "submitted by a Settlement Class Member," not by fax numbers.  <u>See</u> <u>id.</u>

certification absent reliable means of "identifying and providing notice to the class members as individuals, not merely numbers on a list").[11]

### 1. Plaintiffs And Their Counsel Have Themselves <u>Directly</u> Confirmed That The Maximum Recovery For Any Class Member Is $615

In addition to the terms of the Settlement Agreement, Plaintiffs' current argument is also directly at odds with what they <u>expressly</u> represented to the Court in seeking approval of the Settlement. <u>See</u>, <u>e.g.</u>, Mot. for Prelim. App. (Dkt. 324) at 17-18. Notably, <u>none</u> of these statements by Class Counsel are even <u>mentioned</u> in Plaintiffs' motion (let alone explained), but like the Settlement Agreement itself, they are equally dispositive. <u>See</u> Mot. (Dkt. 451).

In their motion for preliminary approval, Class Counsel made clear that $615 was the <u>maximum</u> amount <u>any</u> Settlement Class Member could receive:

> <u>Each</u> <u>class</u> <u>member</u> who does not opt-out of the Settlement Class and who submits a timely and valid claim form will be mailed a check in an amount <u>up</u> <u>to</u> $615.

Mot. for Prelim. App. (Dkt. 324) at 17.[12] Lest there be any doubt, however, Plaintiffs reiterated the point later in the motion, again noting Class Members could receive "up to $615" if they submitted a valid and timely Claim Form:

---

[11] Plaintiffs try to suggest that the ability of Settlement Class Members to list more than one number on a Claim Form somehow means the five-fax cap and limit of $615 should be read out of the Settlement Agreement. <u>See</u> Mot. (Dkt. 451) at 9. But it is entirely possible to recover for faxes sent to <u>multiple</u> numbers and still stay within the five-fax limit. If a single Settlement Class Member, for example, received two faxes on one number and three on another, then that person or entity would be entitled to receive compensation for five faxes. <u>See</u> Settlement Agt. (Dkt. 324-1) § IV.B.

[12] In their motion, Plaintiffs try to take issue with the fact BTL did not respond to a stray exchange in Plaintiffs' <u>reply</u> to Intervenors' opposition to Plaintiffs' preliminary approval motion. <u>See</u> Mot. (Dkt. 451) at 4-5. As Plaintiffs note, however, BTL did not oppose Plaintiffs' request for preliminary approval and provisional certification of the Settlement Class for purposes of implementation of the Settlement Class Notice Program (subject, of course, to final approval and Plaintiffs satisfying the requirements of Rule 23 for final certification of the Settlement Class), and therefore, BTL did not file a response to the motion nor did BTL believe it had standing to seek leave to file what would have been a surreply. <u>See</u> Mot. for Prelim. App. (Dkt. 324). Moreover, the issue did not even come up at the preliminary approval hearing (as Plaintiffs now concede). <u>See</u> <u>generally</u> Jan. 20, 2022 Hr'g Tr. But if BTL responded to every statement in the ongoing

8

> Here, each class member who does not opt-out of this proposed settlement and who submits a timely and valid Claim Form will receive a cash payment in an amount up to $615, and Defendant has agreed to pay from the Settlement Fund the attorneys' fees and certain expenses of Class Counsel for conferring that benefit upon each class member.

Id. at 18.[13]

### 2. The Court Was Equally Clear In Granting Preliminary Approval Of The Settlement Agreement

Although also not mentioned in Plaintiffs' motion, the Court was equally clear in its order granting preliminary approval of the Settlement Agreement that the maximum payment to a Settlement Class Member was up to $615, relying on the representations made by Class Counsel in their preliminary approval motion:

> [T]he Settlement Agreement provides, among other things, for . . . payments of $350 to $615 (i.e., $350 for the first facsimile; $125 for the second facsimile; $90 for the third facsimile; $25 for the fourth facsimile; and $25 for the fifth facsimile) to Class Members who submit a valid Claim . . . .

Order (Dkt. 343) at 37.  Later in the Court's opinion, the Court reiterated the range of possible recovery for each member of the Settlement Class:

> In effecting this resolution, the Settlement Agreement provides, among other things, for . . . payments of up to $350 for the first facsimile and up to $615 total for up to five facsimiles to Settlement Class Members who submit claims . . . .

Id. at 66.  But no effort whatsoever was made by Class Counsel to correct the record or to clarify their earlier statements to the Court.[14]

---

battles between the Wanca firm and Bock & Hatch or the ongoing efforts of the Wanca firm to somehow justify their requested fee, the docket in this case would be even more crowded than it already is.

[13] And in subsequent submissions, Plaintiffs again stated that "[e]ach class member who submits a valid claim will be paid a *pro rata* share of the Settlement Fund in the amount of at least $350 (for one fax) and up to $565 [sic] (for five faxes).  This is an excellent result for the class."  Mot. for Fees (Dkt. 347) at 13.

[14] Plaintiffs' claim that the cap was set at five faxes because five was supposedly the most faxes received by any number is also incorrect.  See Mot. (Dkt. 451) at 5.  In reality, five was not the most faxes received by any number.  See Biggerstaff Rpt. (Dkt. 207-7) at 12.

### 3.   The Conflation Of Settlement Class Members And Fax Numbers By Class Counsel Is Especially Apparent In How They Propose To Abrogate The Five-Fax Cap

Nowhere is the conflation of Settlement Class Members with fax numbers more apparent than in how Class Counsel now propose the five-fax limit should be implemented.   See Mot. (Dkt. 451) at 6-7.   As discussed above, the Settlement Agreement clearly limits any Settlement Class Member to five faxes and a maximum recovery of $615, using a sliding scale of payments up to $615.   See disc. supra at 6-9.   Class Counsel, however, are not only proposing in their motion that the five-fax limit be eliminated, but they are also proposing that the ascending scale for faxes one through five be reset for each fax number, again treating a fax number as if it were a Settlement Class Member.[15]   See Mot. (Dkt. 451) at 6-7.   But the Settlement Agreement itself clearly says otherwise.   See disc. supra at 6-9.   As discussed above, the Settlement Agreement plainly states that "Settlement Class Members" who received a fax "in 2009 or 2010" and who "submit a Valid Claim" shall "be eligible to receive up to" the amounts specified above for "the first such facsimile" through "the fifth such facsimile."   See Settlement Agt. (Dkt. 324-1) § IV.B.   There is no

---

[15] In other words, Plaintiffs are claiming that if a Settlement Class Member had five fax numbers on the Biggerstaff list and one fax was received at each number, the first fax received at each of the five numbers would entitle that claimant to receive $350 for each machine for a total of $1,750. See Mot. (Dkt. 451) at 6-7.   Even though the Class Member had only received a total of five faxes, Class Counsel's proposal would entitle the Class Member to nearly three times the maximum payment of $615 per Settlement Class Member that was agreed to and that Class Counsel touted as an "excellent result for the class."   See id.   This would also mean that similarly-situated Settlement Class Members would be treated differently, since Settlement Class Members receiving the same number of faxes would receive different amounts of money depending on how many machines they had (i.e., $615 for five faxes received on one machine versus $1,750 for five faxes received on five machines), creating obvious adequacy issues under Rule 23(a)(4).   See, e.g., Pickett v. IBP, 209 F.3d 1276, 1280 (11th Cir. 2000) (denying class certification for lack of adequacy, because "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class").

distinction for persons or entities with multiple fax machines and certainly no indication that any Settlement Class Member can recover more than $615.[16]  See id.

**4.    Caps On Claims Are A Frequent Feature Of Settlements Sponsored By The Wanca Firm As Well As TCPA Settlements In General**

Finally, while Class Counsel now try to suggest that there is something novel or improper about a cap on claims in a TCPA settlement, the reality is that caps are a common feature of settlements sponsored by the Wanca firm and of TCPA settlements in general.  See, e.g., Settlement Agt. (Dkt. 105-1), Daisy v. Pollo Ops., No. 2:14-cv-00564 (M.D. Fla. 2015) (TCPA settlement sponsored by Wanca firm, limiting claims to payment of $500 per claimant, regardless of number of faxes received).  Moreover, in TCPA settlements sponsored by the Wanca firm that do not contain caps, the Wanca firm has insisted on express language not found in the Settlement Agreement.[17]  The Wanca firm, therefore, certainly knows how to draft a "per fax" settlement when that is what they intend to do, and there is nothing at all

---

[16] As noted, the reality is Class Counsel had little or no idea at the time they executed the Settlement Agreement how many (if any) Settlement Class Members had multiple numbers on the Biggerstaff list, because Class Counsel never made any effort to find any of that out before the reverse lookups the Settlement Administrator had performed.  See Second Biggerstaff Rpt. (Dkt. 210-2) at passim.  Class Counsel, of course, had a duty to the members of the Settlement Class to know that information before agreeing to the Settlement Agreement on their behalf.  See, e.g., Nelson v. HealthRight, 2019 WL 13187865, *4 (M.D. Fla. 2019) (courts must consider "competency" of class counsel in certifying class).  If Class Counsel breached that duty, however, the appropriate remedies are a malpractice claim by absent class members and replacement of Class Counsel for failure to satisfy Rule 23(a)(4).  See, e.g., Richardson v. Progressive, 2022 WL 154426, *14 (M.D. Fla. 2022) (noting class counsel's "fiduciary duties to the class as a whole").  But the appropriate remedy is certainly not to ignore the terms of the Settlement Agreement or deprive BTL of the benefit of the bargain it reached in good faith with Plaintiffs and Class Counsel.  See Settlement Agt. (Dkt. 324-1) § IV.B.

[17] For example, there were no caps in Americana Art China, but to make that clear, this is what the settlement agreement in that case provided:

> Each member of the Class who submits a timely and valid Claim Form will be mailed a check . . . for each advertisement they received during the [class period] at each fax number for which they verify ownership on the claim form.

Settlement Agt. (Dkt. 208-1) at 6-7, Am. Art China v. Foxfire, No. 3:08-cv-06992 (N.D. Ill. 2012).

novel about the cap in the Settlement Agreement.[18] <u>See also</u> Settlement Agt. (Dkt. 48-1) at 1, <u>Elwert v. Alliance Healthcare</u>, No. 5:15-cv-02223 (N.D. Ohio 2018) (Wanca settlement limiting payment to $500 per claimant).

### B.   The Continuing Efforts Of Class Counsel To Restrict BTL's Audit Rights Should Be Rejected

As set forth more fully in BTL's June 16, 2023 motion, Class Counsel have persistently attempted to ignore and otherwise restrict the audit rights of BTL under Section VIII of the Settlement Agreement in spite of themselves largely creating the ascertainability issues in the first place and then urging the Court to authorize over-inclusive notice. <u>See</u> BTL's Mot. (Dkt. 458) at 25. As such, Plaintiffs' June 16, 2023 motion is only the latest installment of those efforts. <u>See also</u> June 13, 2022 Hr'g Tr. at 50:22-52:1 (Mr. Good urging the Court to order second reverse lookup).

Instead of meaningfully addressing with BTL in good faith (as required by Section VIII) the overwhelming evidence of fraud in the claims process as well as the serious limitations in the reverse lookups recently disclosed by TransUnion and earlier by LexisNexis, Class Counsel have instead stubbornly insisted that if someone simply submits a Claim Form signed under penalty of perjury and includes at least one number on the Biggerstaff list, then all of the protections in Section VIII

---

[18] Plaintiffs request in the alternative that the Court provide supplemental notice to a subset of claimants and then a second opportunity to opt out. <u>See</u> Mot. (Dkt. 451) at 9-10. The deadline for opting out, however, has long since passed, and the limit on opt-outs (which gives BTL the ability to withdraw from the Settlement Agreement if the limit is exceeded) was negotiated with the understanding that the Settlement Agreement meant what it said, namely that Settlement Class Members could make claims for no more than five faxes, meaning the opt-out limit would need to be renegotiated if the terms of the Settlement Agreement were changed. And last but not least, there is no ambiguity in the Settlement Agreement and no indication whatsoever that <u>anyone</u> was confused by the repeated statements by Class Counsel (and the Court) that the most any Settlement Class Member could recover is $615. <u>See</u>, <u>e.g.</u>, H. Konnath, <u>Buccaneers Ink $19.8M Deal To End TCPA Suit</u>, Law360 (Mar. 29, 2022) (reporting on Settlement Agreement that "[i]ndividuals with valid claims will come away with payments between $350 and $615, depending on how many advertisements they received, according to the order."); <u>see also</u> disc. <u>supra</u> at 12.

and audit rights of BTL are somehow nullified, such that BTL no longer has any right to challenge the information supplied on the Claim Form itself.  See Mot. (Dkt. 451) at 11-13.  This crabbed reading of Section VIII, however, finds no support in the Settlement Agreement or in common sense.[19]  See BTL's Mot. (Dkt. 458) at 7-8.

### 1. The Submission Of A Facially Valid Claim Form Clearly Does <u>Not</u> Extinguish BTL's Audit Rights

Class Counsel argue the submission of a Claim Form that appears valid on its face (i.e., it contains the required attestation and a number on the Biggerstaff list) somehow extinguishes BTL's audit rights under Section VIII of the Settlement Agreement and likewise obviates the need for any additional information.  See Mot. (Dkt. 451) at 11-12.  If that were the case, however, then there would have been no point in providing audit rights in the first place, since on the telling of Class Counsel, all Claim Forms could be validated on their face and all verification of the information submitted on a Claim Form would be confined to the four corners of the Claim Form itself.  See id. (suggesting a Claim Form is presumptively valid so long as it contains a matching fax number and is sworn to under the penalty of perjury). BTL insisted on audit rights precisely because of concerns over the ascertainability of the Settlement Class.   See, e.g., BTL's Mot. re Notice (Dkt. 381) (noting fraudulent claims would "have to be scrutinized on an individual basis" pursuant to Section VIII.E of the Settlement Agreement).   And no one considered the requirements of the Claim Form (i.e., attestation and including a number from the Biggerstaff list) sufficient unto themselves so as to abrogate BTL's audit rights or eliminate the need for additional information.  See Hr'g Tr. (Dkt. 410) at 164:19-

---

[19] Nor were the enumerated processes and procedures in Section VIII the <u>only</u> mechanisms specified for the processing of claims.  See Settlement Agt. (Dkt. 324-1) § VII.C.(iv) (noting the potential need for "additional processes" for the evaluation of claims).

165:3 (approving Mailed Notice in light of BTL's audit rights).  Indeed, if the Claim Form was intended to be what Class Counsel now claim it is, there would have been no need for any of the other provisions in Section VIII.  See Settlement Agt. (Dkt. 324-1) § VIII.E.  But that is not how contracts are interpreted, and it is in no sense a logical or coherent reading of the Settlement Agreement, let alone a reading consistent with the due process rights of BTL or the duty of courts to safeguard the administration of justice and the integrity of the class process.  See McArthur v. A.A. Green, 637 So.2d 311, 312 (Fla. 3d DCA 1994) (courts must "construe a contract as a whole so as to give effect, as here, to all provisions of the agreement if it can be reasonably done"); see also Gulf Oil v. Bernard, 452 U.S. 89, 100 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."); Order (Dkt. 918) at 2, Opperman v. Kong Tech., No. 3:13-cv-00453 (N.D. Cal. 2017) (ordering defect notices be sent to potentially fraudulent claimants to provide proof of claim).

### 2.   Plaintiffs And Class Counsel Again Try To Take The Court's Comments Out Of Context

In their motion, Class Counsel make reference to the Court's comments at the August 31, 2022 hearing to bolster their argument that the submission of a Claim Form that satisfies the attestation requirement and provides a number on the Biggerstaff list supposedly extinguishes BTL's right to request more information as well as the rest of the audit process.  See Mot. (Dkt. 451) at 11-12.  That, however, is not at all what the Court said.  See Hr'g Tr. (Dkt. 410) at 138:9-24.  Instead, the Court clearly contemplated a phased approach, deliberately allowing over-inclusive notice to potential members of the class in order to ensure as many Settlement Class

Members as possible received actual notice but then relying as a backstop on <u>both</u> the requirements of the Claim Form <u>as well as</u> BTL's audit rights under Section VIII:

> THE COURT:  But isn't that why -- despite the intervenors' objection, I can only assume on this [Settlement Agreement] why the parties contemplated it would be appropriate to require the identifying information to include the number to be included under the penalty of perjury by any potential claimant. So when a claimant makes that, that in and of itself is putting forth evidence of a claim under the penalty of perjury.
>
> And then in addition to that, as I highlighted under <u>Section VIII(E)</u>, <u>you have the opportunity at that point, once a claimant comes forward with that type of proof, to challenge that.  And it could be to the point that the administrator requires further proof,</u> or even if you're dissatisfied, then, now, I recognize, as you just highlighted a moment ago, that could be manageability issues down the road, but we won't know that.

<u>Id.</u> at 138:9-24; <u>see also</u> <u>id.</u> at 164:19-165:3.  As such, the Court plainly recognized BTL was entitled to challenge Claims Forms and the proof provided by claimants in Claim Forms.  <u>See</u> <u>id.</u>  Moreover, that was obviously <u>before</u> the Court was fully apprised by TransUnion and LexisNexis of the significant limitations in their databases or the fact <u>neither</u> of them are capable of pinpointing whether anyone held a specific number during the class period, a "match" in a reverse lookup instead only meaning the person or entity held that number at "some" time or at "any" time, which is why <u>independent</u> verification and validation are now required.[20]  <u>See</u> Roach Decl. (Dkt. 442); Parks Decl. (Dkt. 398-2).

---

[20] It is also important to note the timing of the disclosures by LexisNexis and TransUnion. LexisNexis did not provide a declaration to BTL until late in the day before the August 31, 2022 hearing (which BTL provided the Court at the hearing), and TransUnion did not provide a declaration to BTL until March 29, 2023.  <u>See</u> Roach Decl. (Dkt. 442); Parks Decl. (Dkt. 398-2). As such, the Court (and BTL) did not have a full opportunity to review the information supplied by LexisNexis before the August 31, 2022 hearing, and no information had been provided by TransUnion by then.  <u>See</u> Roach Decl. (Dkt. 442).

### 3.   Class Counsel Likewise Want To Simply Ignore The Directives Of TransUnion And LexisNexis In Terms Of The <u>Proper</u> Use Of Their Databases

As addressed in earlier submissions, Class Counsel and Mr. Biggerstaff <u>vastly</u> oversold the capacities and capabilities of reverse lookups under the circumstances presented here as well as the accuracy of the Biggerstaff list itself.   <u>See</u> BTL's Ascert. Subm. (Dkt. 365) at 6. While Mr. Biggerstaff confidently predicted that a reverse lookup could be used to accurately and reliably identify class members, it turns out that it is not possible to isolate who held any number on the Biggerstaff list between July 14, 2009 and June 9, 2010 <u>without</u> additional information and independent verification and validation.   <u>See</u> BTL's Mot. (Dkt. 458) at 12-15.   In spite of this, however, Plaintiffs now suggest in their motion that BTL lacks "evidence" of fraudulent and invalid claims.   <u>See</u> Mot. (Dkt. 451) at 13.   But the evidence is actually abundant and includes the following:   (a) the rampant fraud already present in the claims process and the fact that upwards of 91% of claimants (at a minimum) were willing to make at least one <u>false</u> statement under penalty of perjury; (b) the fact that 890 duplicate claims were submitted (representing 30% of all claims submitted), and as the Court previously noted, duplicate claims are a strong indication of fraud; (c) the estimate of Intervenors' counsel that one-third of claims are fraudulent or invalid; and (d) the sworn declarations of Leslie Roach (TransUnion) and Shawn Parks (LexisNexis), <u>both</u> of which confirm that their databases should not be used without independent validation to determine who is actually in the Settlement Class.   <u>See</u> BTL's Mot. (Dkt. 458) at 8-11; Intervenors' Objs. (Dkt. 434) at 14-21; Hr'g Tr. (Dkt. 410) at 165:4-12.   As such, the evidence of <u>significant</u> fraud is now of record, and it is overwhelming.   <u>See</u> disc. <u>supra</u> at 16-17;

BTL's Mot. (Dkt. 458) at passim.  But see Mot. (Dkt. 451) at 13 (claiming "If BTL has evidence any particular claim is in fact fraudulent, it should bring that evidence to the Administrator's attention.").

Against this backdrop, the need for additional information from claimants should be obvious.  We now know Mailed Notice was sent to 114,301 recipients based only on the fact they may have held a number on the Biggerstaff list at "some" time or at "any" time.  See Apr. 4, 2023 Email fr. J. Diego (Dkt. 454-3).  We also know that TransUnion and LexisNexis are unable to determine whether any "match" actually held a number between July 14, 2009 and June 9, 2010 and that that determination can only be made with additional information not possessed by TransUnion, LexisNexis or Epiq.  See BTL's Mot. (Dkt. 458) at 12-15.  With all of this now of record, however, it should not be surprising that a recipient of Mailed Notice who held a number on the Biggerstaff list at "some" time or "any" time would be able to supply that number on a Claim Form and that that same person might believe or suspect some 14 years later that they may have held that number between July 14, 2009 and June 9, 2010 (or simply not remember when they held it).[21]  It is for these reasons that TransUnion and LexisNexis have made it clear that

---

[21] Whether one considers the 2,738 Claim Forms that are known to date to contain at least one piece of false information evidence of widespread perjury or simply evidence (at least in some cases) of mistaken belief, it is abundantly clear that the attestation requirement on the Claim Form served little or no deterrent effect and that the fact Claim Forms were submitted under penalty of perjury unfortunately means little or nothing.  See BTL's Mot. (Dkt. 458) at 20-22.  It is equally clear, however, that a recipient of Mailed Notice might well assume upon receiving such notice that he or she was selected to receive notice for a reason and that the receipt of notice itself indicates membership in the Settlement Class, an issue BTL raised at the August 31, 2022 hearing.  See Hr'g Tr. (Dkt. 410) at 115:5-16; see also BTL's Mot. re Notice (Dkt. 381) at 6-12.  Indeed, this is precisely the concern articulated by the courts in Skelton, Domestic Air, Carlough, In re Nissan, DeHoyos and Schneider cited in BTL's August 10, 2022 submission (Dkt. 381).  See, e.g., Skelton v. GM, 1987 WL 6281, *3 (N.D. Ill. 1987) (sending notice to non-class members "could mislead many thousands of ineligible consumers into thinking that they qualify to recover in this action").

independent verification and validation of membership in the Settlement Class is necessary, but Class Counsel simply refuse to address this issue, pretending instead that the submission of a Claim Form is sufficient in itself.  See Mot. (Dkt. 451) at 12.

### 4. Class Counsel Continue To Refuse To Take Any Responsibility For Problems That Are Largely Of Their Own Making

The problems encountered thus far in the claims process are largely the result of the following:

1. Not obtaining documentation from telephone providers as to who held the numbers on the Biggerstaff list from July 14, 2009 and June 9, 2010 when that documentation was still available;

2. Relying on Mr. Biggerstaff's opinion that the names and addresses of Class Members could be obtained through "simple" and "objective" measures and failing to test whether a reverse lookup would be feasible under the fairly unique circumstances of this case;

3. Making the Biggerstaff list publicly available for six years, a decision Mr. Addison now admits was "a mistake";

4. Relying on the Biggerstaff list in spite of ever-growing evidence that it is riddled with errors;

5. Insisting on two reverse lookups and sending Mailed Notice to multiple matches, including approximately 55,698 non-class members;[22]

6. Taking extreme and unsupportable positions in terms of the Settlement Agreement (e.g., insisting the Parties did not agree to a five-fax cap and $615 limit on claims by each Settlement Class Member);

7. Refusing to agree with BTL on common sense measures to address problems in the claims process as they arise (e.g., sending requests for

---

[22] With the information recently received from TransUnion, we now know that the distribution of Mailed Notice was almost certainly far more over-inclusive than previously thought.  See Roach Decl. (Dkt. 442); Parks Decl. (Dkt. 398-2).  Not only was Mailed Notice sent to multiple matches on the two reverse lookups, but we now know that a "match" only means that some person or entity held a number on the Biggerstaff list at "some" time or "any" time, with no indication whatsoever whether that time included July 14, 2009 through June 9, 2010.  See id.  Because of multiple matches alone, approximately 55,698 notices were sent out to non-class members, accounting for 49% of all notices sent.  See Sponsler Decl. (Dkt. 349-2) ¶ 21; Sponsler Decl. (Dkt. 381-4) ¶ 19.  On top of the inherent problems associated with reverse lookups in the first instance, however, it is likely that a significant majority of the notices sent in this case went to non-class members, which is precisely what BTL's expert, Ken Sponsler, repeatedly warned would occur. See, e.g., Sponsler Decl. (Dkt. 349-2) ¶ 7 ("A Reverse Lookup is not an accurate or reliable method to identify the holder of a phone line as of 2009 and/or 2010.").

information to claimants not identified in <u>either</u> reverse lookup <u>or</u> claimants for which the reverse lookups found <u>multiple</u> matches); and

8. Failing or refusing to investigate obvious cases of fraud (<u>e.g.</u>, the 215 Claim Forms submitted using a number claimed by Cin-Q or M&C <u>or</u> all five Intervenors including numbers on their Claims Forms <u>not</u> on the Biggerstaff list).

Having played a role (deliberately or not) in most of the problems that caused rampant fraud in the claims process and that made the process itself unmanageable, one would hope Class Counsel would work with BTL to address these problems to the degree they can be resolved.  But instead of meaningful cooperation, we get from Class Counsel stonewalling and arguments (like those in Plaintiffs' motion) that the five-fax cap and $615 limit on recovery in the Settlement Agreement should just be ignored.  <u>See</u> Mot. (Dkt. 451) at 3-10.

### 5.   If Requests For Information Are Not Going To Be Sent To Claimants, Then BTL Should Be Allowed To Take Discovery

As discussed in BTL's June 16, 2023 motion, the simplest and most efficient way to obtain the information necessary to confirm that claimants are members of the Settlement Class is to have the Settlement Administrator send requests for information to the categories of claimants identified in BTL's motion.[23]  <u>See</u> BTL's Mot. (Dkt. 458) at 17-34.  At this point, there is no legitimate reason why requests for information should not be sent to those claimants, and <u>none</u> has been identified by Class Counsel.  <u>See id.</u>  If requests for such information are <u>not</u> sent, however, then BTL should be entitled to take discovery in order to obtain "the evidence of fraud"

---

[23] In their motion, Class Counsel mischaracterize BTL's position, claiming BTL is suggesting that any Claim Form submitted by a person or entity that matched on the reverse lookups is <u>ipso facto</u> "defective" and that "defect notices" should be sent to all such claimants.  <u>See</u> Mot. (Dkt. 451) at 2.  None of this is true.  BTL simply suggested the fact of multiple matches is evidence that whoever submitted a Claim Form may not be a Settlement Class Member (if the reverse lookups are to be accorded any evidentiary weight, which Class Counsel suggested they should be when it suited their purposes), and BTL is only suggesting that requests for information (as contemplated by Section VIII.E of the Settlement Agreement) be sent to the categories of claimants identified in its June 16, 2023 motion, <u>not</u> defect notices.  <u>See</u> BTL's Mot. (Dkt. 458) at 17-28.

that Class Counsel are insisting on before a <u>single</u> request for information is sent to the categories of claimants outlined in BTL's June 16, 2023 motion.  <u>See</u> <u>id.</u> at 32-34.

## IV.  CONCLUSION

We now know that the reverse lookups the Settlement Administrator had performed are <u>not</u> capable of pinpointing the crucial information necessary to know whether any person or entity is <u>actually</u> a member of the Settlement Class, namely whether that person or entity held a number on the Biggerstaff list in the 11-month period between July 14, 2009 and June 9, 2010.  Instead, the reverse lookups only tell us whether someone held a number at "some" time or "any" time, meaning membership in the Settlement Class requires <u>independent</u> verification and validation.  Class Counsel have taken the position that the submission of a Valid Claim and Claim Form is sufficient to eliminate the need for additional information as well as BTL's rights under the Settlement Agreement.  But that position is neither consistent with the Settlement Agreement itself or nor the due process rights of BTL. It is also directly belied by what has transpired thus far in the claims process.

Date:  June 30, 2023

Respectfully submitted,

<u>/s/ Mark S. Mester</u>
Mark S. Mester, One of the Attorneys
for Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
      robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  June 30, 2023

/s/ Mark S. Mester
Mark S. Mester
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com