# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CIN-Q AUTOMOBILES, INC. and )
MEDICAL & CHIROPRACTIC CLINIC, )
INC., individually and on behalf of a class, )
                   )
        Plaintiffs, )    No.: 8:13-CV-01592-AEP
                   )
        v. )
                   )
BUCCANEERS TEAM LLC, )
                   )
        Defendant. )
_____ )
                   )
TECHNOLOGY TRAINING ASSOCS., INC. )
*et al.*, )
                   )
        Intervenors. )

## PLAINTIFFS' OPPOSED MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs, Cin-Q Automobiles, Inc. and Medical & Chiropractic Clinic, Inc., ("Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully request, pursuant to Fed. R. Civ. P. 23(e), that the Court enter an order (1) granting final approval to the class-action Settlement Agreement, attached as Exhibit 1; (2) granting Plaintiffs' Motion for Attorney Fees and Incentive Awards (Doc. 347); (3) rejecting the lone objection to the Settlement, raised by Intervenors, Technology Training Assocs., Inc., Larry F. Schwanke, D.C., Barewood Outlet, Inc., and Thomas Savino d/b/a WebRx Pharmacy Palace (collectively, "Intervenors") (Doc. 434); and (4) entering the Final Order & Judgment, attached hereto as Exhibit 2.

As discussed in the attached Memorandum, the Agreement is the result of hard-fought negotiations over many months with the assistance of Magistrate Judge Amanda Sansone, and it will provide substantial relief to members of the Settlement Class if finally approved. The Agreement provides, *inter alia*, for a Settlement Fund of up to $19.75 million; payments of $350 to $615 to Settlement Class members on a per-claim-form basis, with no *pro rata* reduction; Defendant's agreement to entry of an injunction ordering it not to send any further unsolicited fax advertisements; and awards of attorneys' fees, expenses, and incentive awards to the named Plaintiffs.

Following preliminary approval, the Court ordered that notice of the Settlement be sent by U.S. mail to those class members for whom mailing addresses could be determined, by a settlement website, and by publication, which the Settlement Administrator, Epiq, has confirmed was completed. (*See* Ex. 3, Affidavit of Stephanie Amin-Giwner Regarding Notice & Settlement Administration ("Amin-Giwner Aff.") ¶¶ 8–12). This notice plan fully complies with due process.

On November 3, 2023, Epiq reported to the parties that, as of November 1, 2023, Epiq has approved and is ready to pay 1,566 timely and complete claims relating to "a total of 7,425 facsimiles received," which translates into "$799,725.00 in total payments" to claiming class members. (Amin-Giwner Aff. ¶ 22). That equates to a 2.11% claims rate compared to the 131,011 fax numbers that were successfully sent BTL's faxes in 2009–2010, and a 2.16% claims rate compared to the 343,011 successful fax transmissions at issue, which is a typical claims rate in a TCPA class-action settlement. *See, e.g.*, *Bayat v. Bank of the W.*, 2015 WL 1744342, at *5 (N.D. Cal.

Apr. 15, 2015) (final approval of TCPA class settlement with 1.9% claims rate); *Arthur v. SLM Corp.*, No. C10-0198 JLR (W.D. Wash. Aug. 8, 2012), Docket No. 249 at 2-3 (noting roughly 2% TCPA claims rate)). No class member whose claim was approved will be paid less than $350, which is an excellent recovery in a TCPA class action. *See Williams v. Bluestem Brands, Inc.*, 2019 WL 1450090, at *2 (M.D. Fla. Apr. 2, 2019) (collecting TCPA settlement cases, finding awards of $25-$75 typical); *Bayat*, 2015 WL 1744342, at *5 ($151 payment per claimant); *Wilkins v. HSBC Bank Nev., N.A.,* 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ($93.22 per claimant); *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) ($34.60 per claimant); *Arthur*, No. C10–0198 JLR (W.D. Wash. Aug. 8, 2012), Docket No. 249 at 3 (maximum $120 per claimant).

The Settlement Agreement provides an adequate recovery for the Settlement Class, which would otherwise be at risk of recovering nothing at trial in this action, and it should be finally approved. A proposed Final Order & Judgment is attached as Exhibit 2 and will be submitted to the Court electronically as directed.

<u>**MEMORANDUM OF LAW**</u>

## I.    Background

### A.    Procedural Background and Settlement Negotiations.

This case arises out of faxed advertisements for Tampa Bay Buccaneers tickets allegedly sent by or on behalf of defendant Buccaneers Team LLC, formerly Buccaneers Limited Partnership ("BTL" or "Defendant"), in 2009 and 2010. The case has an extraordinarily long procedural history, beginning in 2009 with Cin-Q

3

Automobiles' first state-court action against Defendant, and the filing in 2013 of this federal action, *Cin-Q Auto. Inc. v. Buccaneers Ltd. P'Ship*, No. 13-cv-1592 (M.D. Fla.) (the "*Cin-Q* Action").

The essential facts surrounding the fax advertising in 2009–2010 that gave rise to this case are recited in Plaintiffs' Motion for Summary Judgment (*Cin-Q* Doc. 138), Plaintiffs' Motion for Class Certification (*Cin-Q* Doc. 207), and the Court's ruling denying both parties summary judgment in *Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13-CV-01592-AEP, 2014 WL 7224943 (M.D. Fla. Dec. 17, 2014). In short, from July 2009 through June 2010, a "fax broadcaster" hired by Defendant called FaxQom, arranged for the sending of 343,011 faxes advertising tickets to Tampa Bay Buccaneers games. (*Cin-Q* Doc. 207 at 3–10).

On August 28, 2009, Cin-Q filed a class-action TCPA action against BTL in Florida state court. (*Id.*) BTL ceased the fax advertising at issue after June 9, 2010. On or about June 15, 2013, Cin-Q filed this action in this District, and Plaintiffs filed a Second Amended Complaint ("SAC"), adding Medical & Chiropractic, Inc. as a Plaintiff on January 3, 2014.

On December 17, 2014, this Court denied both parties summary judgment. (Order, Doc. 167). The Court found there were genuine issues of material fact regarding the issue of whether BTL was liable as the "sender" of the faxes, as that term is defined in the governing regulations, 47 C.F.R. § 64.1200(f)(11), ruling that a jury must decide the question. (*Id.*)

On March 25, 2016, Plaintiffs filed their initial Motion for Class Certification. (Doc. 207). Thereafter, this case was stayed during the pendency of a proposed settlement in *Technology Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, No. 8:16-cv-01622-MSS-AEP (M.D. Fla. 2016) (the "*TTA* Action"). *See Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697 (11th Cir. 2017) (reversing denial of Plaintiffs' motion to intervene in the *TTA* Action); *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, No. 8:16-CV-1622-T-AEP, 2019 WL 4751799, at *18 (M.D. Fla. Sept. 30, 2019) (granting Plaintiffs' motion to vacate preliminary approval and decertify the *TTA* settlement class).

On January 17, 2020, this Court ordered the parties to hold a settlement conference with Magistrate Judge Sansone and appointed Michael C. Addison as Interim Lead Counsel. (Doc. 284). The COVID-19 pandemic delayed the conference until September 22, 2020, when it was held via teleconference, and subsequent negotiations continued through Judge Sansone for months. (Doc. 312).

On or about June 9, 2021, the parties reached an agreement in principle that would resolve the claims in this litigation on a class-wide basis. BTL continues to deny all material allegations of the SAC and denies liability.

During the pendency of this action, the Consumer & Governmental Affairs Bureau ("Bureau") of the Federal Communications Commission ("FCC"), issued two TCPA-related declaratory rulings. First, on December 9, 2019, the Bureau issued *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos.

5

02-278, 05-338, Declaratory Ruling, 2019 WL 6712128 (CGAB Dec. 9, 2019) ("Amerifactors Bureau Ruling"), stating that a fax is not sent "to a telephone facsimile machine," as required for TCPA liability under 47 U.S.C. § 227(b)(1)(C), when it is received by the end-user using an "online fax service." The Amerifactors Bureau Ruling is currently on appeal to the full Commission pursuant to 47 C.F.R. § 1.115, which is a "condition precedent to judicial review." 47 U.S.C. § 155(c)(7).

Following the Amerifactors Bureau Ruling, the question of whether users of "online fax services" are covered by the TCPA "has divided federal district courts." *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 n.5 (E.D. Mo. 2023) (certifying all fax recipients class, holding Amerifactors Bureau Ruling is not a "final order" of the FCC and rejecting its reasoning); *see also Lyngaas v. Curaden AG*, 992 F.3d 412, 425–27 (6th Cir. 2021) (finding no distinction between users of "online fax services" and users of "stand-alone" fax machines under the plain language of 47 U.S.C. § 227(a)(3), and affirming certification of a litigation class of all fax recipients, notwithstanding the Amerifactors Bureau Ruling); *Ambassador Animal Hosp., Ltd. v. Hill's Pet Nutrition, Inc.*, No. 20 C 3326, 2021 WL 3043422, at *1 (N.D. Ill. Feb. 17, 2021) (denying motion to dismiss, holding Amerifactors Bureau Ruling "flies in the face of years of precedent, established by the FCC . . . that the TCPA covers faxes sent to computers in addition to traditional fax machines"); *but see Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1296 (M.D. Fla. 2020)

(holding plaintiff who used an "online fax service" lacked Article III standing);[1] *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 22-15710, 2023 WL 7015279, at *2 (9th Cir. Oct. 25, 2023) (unpublished) (affirming decertification of class based on Amerifactors Bureau Ruling).

Second, on September 21, 2020, the Bureau issued *In re Akin Gump Strauss Hauer & Feld LLP Pet. for Expedited Clarification or Declaratory Ruling*, 2020 WL 5747205 (CGAB Sept. 21, 2020) ("Akin Gump Bureau Ruling"). Both Cin-Q Automobiles and BTL filed comments with the FCC on the petition that led to the Akin Gump Bureau Ruling. The Akin Gump Bureau Ruling stated that "a fax broadcaster is solely liable for TCPA violations when it engages in deception or fraud against the advertiser (including when a fax broadcaster violates its contract with the advertiser in a manner that is deceptive or fraudulent)," although it also ruled that "to the extent the advertiser is on notice of TCPA violations by its fax broadcaster and fails to take action to stop such behavior, it cannot claim that it remains deceived by the fax broadcaster's action and may be liable for such violations." (Akin Gump Bureau Ruling ¶¶ 3, 9). To Class Counsels' knowledge, only two courts have considered the applicability of the Akin Gump Bureau Ruling. *See Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 2022 WL 286189, at *9 (D.S.C. Jan. 31, 2022) (rejecting

---

[1] *Daisy* relied on the holding in *Salcedo v. Hanna*, 936 F.3d 1162, 1173 (11th Cir. 2019), that TCPA class members who received a single text message lacked Article III concrete injury. *Salcedo* was subsequently overruled by the Eleventh Circuit en banc in *Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023), which held the plaintiff had Article III standing because a single "unwanted text message shares a close relationship with the harm underlying the tort of intrusion upon seclusion."

plaintiff's argument that the ruling did not apply, but nevertheless finding defendant the "sender" of the faxes); *Crescent City Surgical Ctr. Operating Co., LLC v. Next Bio-Research Servs., LLC*, 2021 WL 1985166 (E.D. La. May 17, 2021) (denying motion to dismiss on "sender" element at the pleading stage).

In light of all the facts and the potentially applicable authorities, including the Amerifactors Bureau Ruling and the Akin Gump Bureau Ruling, Plaintiffs and Class Counsel concluded that the Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class. The Settlement provides substantial benefits to the Settlement Class and resolves all issues that were or could have been raised in this action without prolonged litigation and the risks and uncertainties inherent in litigation. Despite maintaining its denial of liability, and without admitting or conceding any wrongdoing, BTL consented to the Settlement solely to avoid the expense, inconvenience, and inherent risks of litigation as well as continued disruption of its business operations. Based upon their review and analysis, Plaintiffs and BTL agreed to and executed the Agreement.

**B.    Material Terms of the Settlement.**

The Agreement will resolve this action regarding Defendant's fax advertisements sent at any time in 2009 or 2010 (the "Class Period"). The key terms of the Agreement are as follows:

a.    <u>Certification of a Settlement Class</u>. For the purpose of implementing the Settlement, the parties stipulated to certification of a Rule 23(b)(3) "Settlement Class" defined as, "All persons who received or were successfully sent in 2009 or 2010 one or

more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games." Specifically excluded from the Settlement Class are BTL and its respective parents, subsidiaries, divisions, affiliates, associated entities, business units, predecessors in interest, successors, successors in interest and representatives and each of their respective immediate family members; Class Counsel; and the judges who have presided over this litigation and any related cases.

b.    <u>Class Representatives and Class Counsel</u>. The parties agreed that Plaintiffs are the Class Representatives and that Plaintiffs' attorneys (Michael C. Addison and the law firm of Addison Law Office, P.A., Ross M. Good, Glenn L. Hara, and Brian J. Wanca and the law firm of Anderson + Wanca) are Class Counsel for the Settlement Class.

c.    <u>Settlement Fund</u>. Defendant agreed to make available up to $19,750,000.00 (the "Settlement Fund") to pay valid class member claims ("Awards"), to pay incentive awards to Plaintiffs, and to pay Class Counsel attorneys' fees and reasonable out-of-pocket litigation expenses, as approved by the Court, and to pay Notice and Administration Costs.

d.    <u>Monetary Relief to the Members of the Settlement Class</u>. Settlement Class Members who received one or more unsolicited fax advertisements sent by or on behalf of Defendant and who submit a valid claim are eligible to receive Awards up to:

(i)        $350 for the first such facsimile;

(ii)       $125 for the second such facsimile;

(iii)     $90 for the third such facsimile;

(iv)     $25 for the fourth such facsimile; and

(v)     $25 for the fifth such facsimile.

The Agreement provided that, if the aggregate claimed Awards were to exceed the amount available to pay the Awards, after accounting for the payment of incentive awards, the payment of attorneys' fees and expenses, and the payment of Notice and Administration costs, the Awards to the Settlement Class Members who submitted valid claims would be reduced on a *pro rata* basis. As discussed below, there will be no *pro rata* reduction here.

e.     <u>Class Notice</u>. The parties agreed to notify the Settlement Class about the settlement by sending the Mailed Notice by U.S. mail to all Settlement Class Members for whom mailing addresses can be determined. The notice includes instructions about opting out, objecting, or submitting a claim form to the Settlement administrator by mail. In addition, the parties agreed to cause to be created a settlement website that will provide information and relevant documents related to the Settlement, including the Settlement Agreement, the Class Notice, the Claim Form, and Plaintiffs' Motion for Attorneys' Fee Award and Incentive Awards. The parties agreed that the Court would decide following preliminary approval whether to send notice by facsimile.

f.     <u>Claims</u>.

(i)     <u>Claim Form</u>. The parties agreed to a simple Claim Form for submitting claims for cash Awards, attached to the Settlement Agreement as Exhibit

A. The Claim Form submitted by each class member was required to be signed under penalty of perjury. Claiming class members were required to identify the fax number or numbers on which they may have received faxes from Defendant, as well their contact information.

        (ii)   <u>Settlement Administrator</u>. Defendant agreed to retain and pay from the Settlement Fund a third-party settlement administrator, later approved by the Court to be Epiq, to issue the class notice, maintain the settlement website, receive the claim forms, assist class members in completing and submitting forms, and issue settlement checks. The parties agreed that any claim that is not substantially in compliance with the instructions on the Claim Form or the terms of the Settlement Agreement or is postmarked later than the Claim Deadline would be rejected. The decision of the settlement administrator regarding whether a claim is valid is final and binding on the parties, subject to the right of the parties and/or any absent class member to appeal any such determination by the administrator and subject to the provisions of Section VIII(E) of the Agreement. In such event, the parties agreed to negotiate in good faith a resolution of any dispute regarding a decision by the claims administrator, and only if the dispute cannot be resolved informally by the parties, shall the dispute be presented to and resolved by the Court.

    g.   <u>Release</u>. In consideration of the relief provided by the Settlement, the Settlement Class will release all claims that were brought or could have been brought, as defined in the Agreement, in this action against Defendant and the other released parties about the subject advertisements sent by fax during the Class Period.

h.      Attorneys' Fees and Costs and Class Representative Award. The
Agreement states that Class Counsel will file a Motion for Attorneys' Fee Award and
Incentive Award with the Court seeking an award of attorneys' fees in an amount not
to exceed in total 25% of the Settlement Fund ($4,937,500.00), plus reasonable out-of-
pocket expenses incurred not to exceed $250,000 to be paid from the Settlement Fund.
The Agreement states Class Counsel will ask the Court to approve an award of $10,000
for each Plaintiff for serving as the class representatives. In accordance with *Johnson v.
NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. Sept. 17, 2020), the Motion for Attorneys'
Fees and Incentive Award was made available on the settlement website for class
members to review.

i.      Best Efforts. The parties agree "to use their best efforts to perform all acts
necessary and proper to promptly effectuate the terms of this Agreement and to take
all necessary or appropriate actions to obtain judicial approval of this Agreement in
order to give this Agreement full force and effect." (Section XV.P).

### C.      Preliminary Approval and Notice.

On August 27, 2021, Plaintiffs and BTL presented the Agreement to the Court
requesting preliminary approval. (Doc. 324). Following extensive briefing and a
hearing on January 20, 2022, the Court granted preliminary approval on March 29,
2022. (Doc. 343).

The Court first confirmed that "at least one named class representative has
Article III standing to raise each class subclaim." (*Id.* at 48 (quoting *Prado-Steiman ex
rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). The Court then analyzed each

of the Rule 23(a) requirements—numerosity, commonality, typicality, and adequacy—and found them satisfied. (*Id.* at 49–60). The Court then concluded that certification was appropriate under Rule 23(b)(3), where common issues "predominate" over any individual issues and where class treatment was "superior" to individual actions, as BTL and Plaintiffs stipulated in the Unopposed Motion for Preliminary Approval. (*Id.* at 60–62).

The Court noted that the Motion for Preliminary Approval discussed "several developments regarding TCPA claims involving faxes have occurred in the past few years both at the administrative and district-court levels while this action remained pending," referring to the Amerifactors Bureau Ruling and the Akin Gump Bureau Ruling. (*Id.* at 48, n.8). The Court held that it "does not read the administrative rulings or case law to divest this Court of jurisdiction over the immediate claims," holding instead that "the changing legal landscape provides another rationale in support of approving the settlement and avoiding litigating issues pertaining to the use of an 'online fax service' or 'fax broadcaster' and the degree of liability or culpability on behalf of BTL." (*Id.*)

On April 28, 2022, Class Counsel timely filed their Motion for Award of Attorney Fees & Expenses and Incentive Awards. (Doc. 347).

Following preliminary approval, the Court "held multiple hearings and the parties have briefed multiple issues relating to the notice program." (Order, Doc. 475 (discussing Docs. 349, 350, 359, 377, 381, 384, 409, 413, 414, 418–20)). On September 2, 2022, the Court resolved disputes over (1) whether to send notice by facsimile, as

Plaintiffs proposed (*see* Doc. 350), and (2) whether Epiq would conduct a second reverse-lookup, which BTL opposed (*see* Doc. 349). (Order, Doc. 409).

The Court ruled that it would not order notice by fax. (*Id.*) The Court "highlighted that multiple safeguards exist in the claims process, including that the claimant must provide the fax number associated with the claim (which was not included in the notice) and certify under penalty of perjury that the information they have provided in the Claim Form is true and correct." (Doc 409, at 9–10; Doc. 324-1 at 47)). The Court did, however, order Epiq to conduct a second reverse-lookup and send mail notice to those persons associated with the target fax numbers in this case, finding this would constitute the "best notice that is practicable under the circumstances." (Doc. 409 at 8).

Epiq has confirmed that it carried out the notice program as ordered. (Amin-Giwner Aff. ¶¶ 8–12). Epiq reports that it mailed 114,301 notices by mail, along with 22 notices that were requested by claimants. (*Id.* ¶ 10). Epiq reported that, after mailing to forwarding addresses and skip tracing efforts, only "10,003 Notices to unique potential Class Members are currently known to be undeliverable, which is a 91.25% deliverable rate of the Class List." (*Id.* ¶ 12).

### D.    Claims Administration.

Following the dissemination of notice and expiration of the claims period, the Court was required to resolve disputes among the parties regarding the "deficiency process" by which Epiq would follow up on claims that were incomplete or deficient for some reason, which the Court ruled upon at a hearing on July 17, 2023. The Court

14

followed with a written order on July 26, 2023, directing Epiq to send requests for additional information/defect notices to five categories of claimants. (Doc. 475).

On November 3, 2023, Epiq provided its Final Status Report and Affidavit of Ms. Amin-Giwner (attached as Exhibit 3). Epiq reported that, as of November 1, 2023, Epiq received 3,213 Claim Forms. (Amin-Giwner Aff. ¶ 22). Of those 3,213 claims received, Epiq reported that "1,566 have been deemed timely and complete, 196 are duplicative of another claim, 1,449 are deemed deficient or late and 2 were withdrawn."[2] (*Id.*) Of the 1,566 timely and complete claims, Epiq reported that "Class Members have claimed a total of 7,425 facsimiles received," which translates into "$799,725.00 in total payments." (*Id.*)

## II.    The Court should grant final approval.

### A.    Standards governing final approval.

A court may approve a class action settlement if the settlement "is fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2). *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. Appx. 429, 434 (11th Cir. 2012). "[A] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Manual for Complex Litigation*, Third, § 30.42 (1995); *see also Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972) ("The law actively encourages compromise and settlement of disputes.").

---

[2] Epiq reported that the 1,449 denied claims related to 1,808 facsimiles. (*Id.*)

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice . . . ." *Turner v. Gen. Elec. Co.*, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006). For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005).

Courts in this circuit consider the following factors in deciding whether to grant final approval of a class-action settlement: (1) the existence of fraud or collusion behind the settlement; (2) complexity, expense, and duration of litigation; (3) the stage of proceedings at which the settlement was achieved; (4) the likelihood of the plaintiff's success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the opposition received. *See Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 691–94 (S.D. Fla. 2014). "In assessing these factors, the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991)). Analysis of these factors compels the conclusion that this Court should grant final approval of the Settlement.

**B.      The absence of fraud or collusion supports final approval.**

The first factor for final approval requires the Court to consider whether the Settlement was obtained by fraud or collusion among the parties or counsel. Courts begin with a presumption of good faith in the negotiating process. *See Saccoccio*, 297 F.R.D. at 692 ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion."); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement"). The Settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arm's length. The parties participated in an intensive mediation with Magistrate Judge Sansone, who has significant experience resolving complex cases. Judge Sansone conducted multiple mediation sessions from September 2020 to June 2021.

The parties, through regular phone calls and emails with Judge Sansone, negotiated first the terms of an initial memorandum of understanding and then a final Settlement Agreement. Judge Sansone was involved in every step of the process. The very fact of Judge Sansone's involvement weighs in favor of a finding of no fraud or collusion. *See, e.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619–20 (E.D. La. 2006) (use of special master to oversee mediation evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions

from which this settlement emerged" belied any suggestion of collusion). The parties' negotiations were also informed by the considerable discovery obtained by Class Counsel in litigating these claims.

### C.   The complexity, expense, and duration of litigation support final approval, as does the stage of the litigation.

Class actions have a well-deserved reputation for complexity. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D. Ga. 1993) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). This case is no exception.

Further litigation of this case would have required a significant commitment of time and financial resources by the parties and the Court. Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to prevail in this litigation (which BTL contests), that success would likely have borne fruit for the Class only after years of trial and appellate proceedings. *See, e.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012), *aff'd*, 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

In contrast, the Settlement here avoids the uncertainty, delay, and high costs associated with continuing this hard-fought litigation, with many class members receiving all they could have hoped to recover at trial. *See, e.g., Beber et al. v. Branch*

*Banking & Trust Co. et al.*, No. 15-cv-23294 (S.D. Fla.) (ECF No. 109) (approving settlement with payment percentages of 10%, 8%, and 5%); *Saccoccio*, 297 F.R.D. at 693 (return of 12.5% of premiums charged with prospective relief "very likely exceeds what Plaintiffs could have won at trial"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (range of 9% to 45% of damages was an "exemplary" result).

These benefits come without the expense, uncertainty, and delay of further litigation. In light of the cost, uncertainty, and delay of contested class-certification, a trial, and at least one appeal, "the benefits to the class of the present settlement become all the more apparent." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992). The Court should find this factor for final approval satisfied.

### D.   The likelihood of success on the merits supports final approval.

"[T]he likelihood and extent of any recovery from the defendants absent . . . settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp.*, 148 F.R.D. at 314; *see also Ressler*, 822 F. Supp. at 1555 ("a court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise").

Here, Class Counsel and Plaintiffs believe they have a compelling case, but also recognize that BTL would have raised significant defenses both as to class certification and on the merits. Although Plaintiffs and Class Counsel maintain that these defenses lack merit, had litigation continued, Plaintiffs and Settlement Class

Members would have risked everything. Had the parties continued to litigate, Plaintiffs could have stood to recover nothing on behalf of the Class. Final approval of the Settlement is clearly in the best interests of the Class.

### E.   The range of possible recovery supports final approval.

The Settlement made $19.75 million available for cash payments to the Settlement Class, less fees and expenses, which is 11.5% of the total damages had Plaintiffs prevailed in every way and (1) obtained class certification, and defeated BTL's Rule 23(f) petition; (2) prevailed at trial on all claims at $500 per fax; and (3) prevailed on BTL's appeal from a final judgment. That exceeds any applicable standard. *See, e.g.*, *Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate . . . . A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery . . . ."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of settlement is . . . a yielding of absolutes and an abandoning of highest hopes").

The fact that the parties agreed to a "claims-made" settlement does not render its terms unreasonable and, in some cases, it is a better result. *See, e.g.*, *Saccoccio*, 297 F.R.D. at 696 (overruling objections to claims-made process because "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment"); *Atkinson v. Wal-Mart Stores, Inc.*, 2011 WL 6846747, at *5 (M.D. Fla. Dec. 29, 2011) (approving claims-made settlement with full reversion to

defendant). The Settlement will also provide valuable injunctive relief to the Settlement Class to prevent any future unsolicited fax advertising by BTL. (*See* Agreement § IV.D). These results are clearly reasonable.

### F. The opinions of class counsel, class representatives, and the lack of opposition support final approval.

The courts give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988). This Court has already found that Class Counsel and Plaintiffs will adequately represent the Class, and its conclusion was warranted. (*See* Doc. 343, Preliminary Approval Order at 54–55).

Plaintiffs and Class Counsel concluded that the terms of the Agreement are fair, reasonable, adequate, and in the best interests of the Class as a means of resolving this litigation. Counsel have litigated TCPA class actions since 2003. They have been appointed class counsel in dozens of such cases. *See, e.g.*, *Med. & Chiropractic Clinic, Inc. v. KMH Cardiology Centres Inc.*, No. 8:16-cv-00644-SDM-JSS (M.D. Fla. Nov. 17, 2017); *A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695, 2013 WL 3463489 (S.D. Fla. July 3, 2013); *Am. Copper & Brass v. Lake City Indus. Prods., Inc.*, 757 F.3d 540 (6th Cir. 2014); *Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*, 12 CV 2257, 2014 WL 6750690 (N.D. Ohio Dec. 1, 2014); *Spine & Sports Chiropractic, Inc. v. Zirmed, Inc.*, 3:13-CV-489, 2014 WL 2946421 (W.D. Ky. June 30, 2014); *Imhoff Inv., Inc. v. Sammichaels, Inc.*, No. 10-10996, 2012 WL 4815090 (E.D. Mich. Oct. 1, 2012); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442 (N.D. Ohio

2012). Under these circumstances, Class Counsels' opinion should be given great weight because of their experience dealing with the myriad and complex issues involving the TCPA at issue in this case.

In addition, a low rate of opposition reflects favorably on a settlement. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020–21 (N.D. Ill. 2000), *aff'd* 267 F.3d 743 (7th Cir. 2001) (acceptance rate of 99.9% of class "is strong circumstantial evidence in favor of the settlements"). Here, the class members overwhelmingly support the Settlement, given that only one objection was filed, and only three class members opted out. (*See* Doc. 433, Castillejos Decl. ¶ 4); *see also Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. Feb. 2, 2001) (low opt-out and objection statistic showed that approximately 99.99% of the class approved of the settlement); *Schlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978); *In re SmithKline Beecham Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 163, 175 (S.D.N.Y. 2000) (a small number of objectors is "indicative of the adequacy of the settlement"); *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 141 (W.D. Ky. 1992) ("small number of objectors is a good indication of the fairness of the settlement"). The only objection to this Settlement was filed by a law firm that the Eleventh Circuit called out for "deliberately underbid[ding Class Counsel] in an effort to collect attorney's fees while doing a fraction of the work that [Class Counsel] did." *Technology Training Assocs. v. Buccaneers Ltd. P'Ship*, 874 F.3d 692, 697 (11th Cir. 2017).

In sum, the applicable factors weigh strongly in favor of final approval, and the Court should finally approve the Settlement Agreement.

## III.   The Court should approve the requested "benchmark" attorney fees and expenses and incentive awards.

### A.   The Court should grant the Motion for Attorney Fees and Expenses.

The Settlement Agreement provides that Class Counsel may seek 25% of the Settlement Fund in attorney fees, along with expenses not to exceed $250,000. (Agreement § VI.A). Class Counsel filed their Motion for Attorney fees explaining the massive amount of time and expenses they have poured into this litigation over the past 14 years on April 28, 2022. (Doc. 347).

As the Court noted at preliminary approval, attorney fees from a class-action settlement are to "'be based upon a reasonable percentage of the fund established for the benefit of the class.'" (Doc. 343, Order at 67 (citing *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011)). In other words, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class," not the amount actually claimed by the class. *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *see also Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1262 n.14 (11th Cir. 2020) ("*Camden I* therefore remains good law, and the district court should apply it in the first instance on remand."). In the Eleventh Circuit, fees between 20% and 25% are generally considered the "benchmark." *Id.*

The agreed-upon 25% fee award Class Counsel seek here is well within the range awarded in common-fund settlements in this Circuit, including numerous TCPA settlements. *See Camden I*, 946 F.2d at 774–75 (noting that awards in common-fund settlements range from 20% to as much as 50% of the benefit, with most falling between 20% and 30%); *Faught*, 668 F.3d at 1243 ("25% is generally recognized as a reasonable fee award in common fund cases"); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999) ("The majority of common fund fee awards fall between 20% to 30% of the fund."); *In re Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019) ("In this Circuit, courts typically award between 20–30%, known as the benchmark range."); *Wilson v. EverBank*, 2016 WL 457011, at *18 (S.D. Fla. Feb. 3, 2016) (courts "routinely awarded class counsel fees in excess of the 25 percent 'benchmark'"); *Swaney v. Regions Bank*, 2020 WL 3064945 (N.D. Ala. June 9, 2020) ("'[T]he majority of common fund fee awards fall between 20% to 30% of the fund,' with 25% of the fund being viewed as a 'benchmark percentage fee award.'"); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1201 (S.D. Fla. 2006) ("the 'bench mark' percentage is 25%, 'which may be adjusted up or down based on the circumstances of each case.'").

Here, because Plaintiffs do not seek an attorney fee in excess of the 25% benchmark, the so-called *Johnson* factors do not apply. *See Faught*, 668 F.3d at 1242 ("Where the requested fee exceeds 25%, the court is instructed to apply the twelve *Johnson* factors.") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)); *Muransky*

*v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1195 (11th Cir. 2019), *reversed on other grounds*, 979 F.3d 917 (11th Cir. 2020) ("To evaluate whether the [25%] benchmark should be enhanced, district courts can apply the twelve factors from [*Johnson*]."). To the extent the Court considers the *Johnson* factors, they are satisfied for the reasons laid out in Plaintiffs' Motion for Attorney Fees. (Doc. 347 at 10–14).

In sum, the Court should grant Plaintiffs' requested fees and expenses.

**B.      The Court should award each Plaintiff a $10,000 incentive award.**

The Settlement Agreement calls for each Plaintiff to be paid a $10,000 incentive award. (Agreement § VI.B). At preliminary approval, the Court noted its concern that these awards might be barred by the Eleventh Circuit's decision in *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020). (Doc. 343, Order at 68–69). Nevertheless, the Court ordered that "the parties may present their arguments as to why they believe the Court should still provide incentive awards to *Cin-Q* Plaintiffs" at final approval. (*Id.* at 69).

The distinguishing factor between *Johnson* and this case is that the settlement at issue in *Johnson* created "a *non-reversionary* $1,432,000 settlement fund," from which attorney fees and incentive awards would be deducted before the remainder of the non-reversionary fund was distributed to the class. *Johnson*, 975 F.3d at 1250 (emphasis added). Thus, the incentive awards were to come "out of the fund or property recovered," reducing the amount to be paid to the class, and the Eleventh Circuit held they were "unsupported by reason or authority." *Id.* at 1257 (quoting *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 122 (1885)).

The Settlement in this case is different. Here, the incentive awards are to come from a reversionary fund, in a situation where there will in fact be a reversion to the defendant because less than the entire Settlement Fund was claimed. Thus, rather than being paid "out of the fund" that would otherwise be distributed to the class, the awards will in reality be paid by BTL. In other words, unlike in *Johnson*, the awards are "separate and apart from the Settlement Fund so as not to reduce distributions to class members." *Tweedie v. Waste Pro of Fla., Inc.*, No. 8:19-cv-1827-AEP, 2021 WL 5843111 at *11 (M.D. Fla. Dec. 9, 2021).

In addition, but for the tireless work of the class representatives, the representations about certain documents made before this Court at the Conflict of Interest Hearing on October 20, 2016, would not have been corrected. (Doc. 248).[3] For a class representative to be found to be adequate, a low standard is applied. *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 697–98 (S.D. Fla. 2015) (quoting *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 281 F.R.D. 327, 333 (E.D. Wis. 2012) ("'low standard' applied in the adequacy analysis"). On the contrary, in this case, the conduct of the class representatives has been extraordinary. The class

---

[3] This Court candidly stated at the following hearing: "I'm troubled, and I was troubled initially, upon reading that Eleventh Circuit opinion, given the representations to the Court [by Intervenors]. Because that was the explicit purpose of that proceeding." *Technology Training Assocs. Inc. v. Buccaneers Ltd. P'Ship*, No. 8:16-CV-1622-T-AEP (M.D. Fla.) (ECF No. 87) (emphasis added). Plaintiffs attempted to address this on October 20, 2016, but this Court did not grant Plaintiffs the ability to participate. (Doc. 248). The October 20, 2016 evidentiary hearing was held in both this case and the one filed by Intervenors. *Id.* The transcript does not acknowledge in-person attendance by (1) Michele Zakrzewski on behalf of Plaintiff Medical & Chiropractic Clinic, Inc., (2) Michael Addison, (3) Ryan Kelly and (4) Ross Good. The transcript does not acknowledge they were informed they would not be able to participate in said hearing immediately prior to the commencement of said hearing. *Id.*

representatives were subjected to multiple in-person depositions lasting dozens of hours, produced numerous documents demanded for no other purpose than harassment, provided their fax machines for expert inspections, were threatened with IRS investigations, traveled over a thousand miles to attend a mediation that was orchestrated in bad faith, and offered money to abdicate their responsibilities to the Class they have now been certified to represent. Plaintiffs' conduct as class representatives in this matter on behalf of the Settlement Class has been exemplary, and they should be paid an incentive award.

## IV.   The Court should reject Intervenors' objections.

Only one objection to the Settlement was filed, by Intervenors on April 28, 2023. (Doc. 434). Intervenors make three arguments: (1) that the class notice was not the "best notice that is practicable under the circumstances"; (2) that the Settlement did not provide an effective "method for distributing relief to the class"; and (3) that the Settlement does not "treat class members equitably relative to each other." (Obj. at 14–22). The Court should reject each objection.

First, Intervenors argue that "notice by fax," combined with mail notice, was necessary in order to be the "best notice practicable under the circumstances." (Obj. at 15). The Court rejected this argument in its prior order, holding that, although fax notice might be appropriate in some other case, under the facts of this case, one of the "multiple safeguards" against fraudulent claims was that "the claimant must provide the fax number associated with the claim (which was not included in the notice) and certify under penalty of perjury that the information they have provided

in the Claim Form is true and correct." (Order, Doc 409 at 9–10). That additional "safeguard" could not have been obtained if notice had been sent by fax.

Second, Intervenors argue the claim form was inappropriate because it required claimants to list their fax number(s) and state that "faxes were received at such number or numbers, including faxes from the Tampa Bay Buccaneers." (Obj. at 19). Intervenors predicted that this language would result in a "less than 1%" claims rate. (Obj. at 21).

The Court addressed this issue in great detail in granting preliminary approval. (Doc. 343 at 74–77). The Court found that "the addition of the disputed language represented a fair compromise to resolve the outstanding issues. Namely, given the unique factual and procedural history, the disputed substantive issues, the extensive negotiations facilitated by a United States Magistrate Judge, and the contested expert findings present in this action, including the issues regarding the reliability of the Biggerstaff Report, the inclusion of such language serves both Class Members, by potentially preventing fraudulent claims from depleting the Settlement Fund, and the ends of due process." (*Id.* at 76–77). And, of course, the actual results of the claims process are more than double Intervenors' predicted "less than 1%" claims rate, where the rate is actually 2.11% (compared to the 131,011 target fax numbers) or 2.16% (compared to the 343,011 successful faxes).

Third, Intervenors argue that "the class should have been divided into two separate subclasses," depending on whether they were sent faxes transmitted by 127 High Street or Rocket Messaging. (Obj. at 22). This argument is based on

28

Intervenors' assumption that the "alleged uncertainties" in the electronic transmission data was limited to "the 127 High Street data," with no alleged uncertainties in the Rocket Messaging data. (*Id.*) That is incorrect.

As the Court observed in granting preliminary approval, BTL marshalled expert testimony that, although Rocket Messaging "provided some very basic log information, the logs did not provide definitive 'MCF' notations required to confirm receipt by the receiving fax machine" (Order, Doc. 343 at 76 (citing Canfield Report ¶¶ 20–21)), and BTL's expert noted "several other deficiencies that call into question the methodology used, the results obtained, and the opinions rendered by Biggerstaff (*id.* (citing Canfield Report ¶¶ 8–61)). Of course, Plaintiffs' expert, Mr. Biggerstaff, disputed the conclusions of BTL's expert, but that is why the Agreement represents a "fair compromise" of this matter, even if Intervenors do not believe it is perfect.

In sum, the Court should reject Intervenors' objections and grant final approval of the Settlement.

## Local Rule 3.01(g) Certification

The undersigned certifies that, pursuant to L.R. 3.01(g), he conferred by email with counsel for Intervenors, Technology Training Assocs., Inc., Larry F. Schwanke, D.C., Barewood Outlet, Inc., and Thomas Savino d/b/a WebRx Pharmacy Palace, regarding the relief sought. Intervenors advised that they oppose final approval of the Settlement Agreement.

The undersigned certifies that he conferred by email with counsel for Defendant, Buccaneers Team LLC, formerly Buccaneers Limited Partnership,

29

regarding the relief sought. BTL's counsel, Mark Mester, advised that the following accurately reflects BTL's position:

> Jon - Our position is pretty straightforward, even for someone like yourself burdened as you are by an education from Princeton.
>
> We believe that in terms of the benefit to be conferred to the Settlement Class, the Settlement is fair, reasonable and adequate within the meaning of Rule 23, just as the <u>TTA</u> settlement was.   And if the Settlement Class were ascertainable and not otherwise incapable of meeting the requirements of Article III, BTL would not oppose final approval of the Settlement or permanent certification of the Settlement Class.
>
> But as the approval process has made abundantly clear, the Settlement Class is not ascertainable, and the Article III problems are insuperable.   For those reasons, BTL is compelled to oppose Final Approval of the Settlement as well permanent certification of the Settlement Class.
>
> I am reasonably confident conditional logic was taught even at Princeton. Robbie certainly seems to have grasped the concept.  Not at all sure, however, why it still seems to elude you.
>
> Best regards.
>
> P.S. - Glenn - We would appreciate it if your Rule 3.01(g) certification accurately reflects BTL's position as described above.
>
> Sent with BlackBerry Work
>
> ([www.blackberry.com](http://www.blackberry.com))

## <u>Conclusion</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement and enter the Final Order & Judgment attached as Exhibit 2.

Respectfully submitted,

 /s/ Glenn L. Hara

Glenn L. Hara (admitted *pro hac vice*)
Ryan M. Kelly (Fla. Bar No: 90110)
Brian J. Wanca (admitted *pro hac vice*)
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL  60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
ghara@andersonwanca.com
rkelly@andersonwanca.com
bwanca@andersonwanca.com

and

Michael C. Addison (Fla. Bar. No. 0145579)
ADDISON LAW OFFICE, P.A.
1304 Alicia Avenue
Tampa, Florida 33604
Telephone: (813) 223-2000
Facsimile: (813) 228-6000
m@mcalaw.net

and

Ross M. Good (Fla. Bar. No. 116405)
Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
Telephone:  (786) 539-3952
Email:  ross@loftusandeisenberg.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.


<u>s/Glenn L. Hara</u>