# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CIN-Q AUTOMOBILES, INC., <u>et</u> <u>al</u>., | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 8:13-cv-01592-AEP |
| BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, | ) ) ) | Magistrate Judge Anthony E. Porcelli |
| Defendants, | ) ) | |
| ─────────────────────── | ) | |
| TECHNOLOGY TRAINING ASSOCIATES, INC., <u>et</u> <u>al</u>., | ) ) ) | |
| Intervenors. | ) | |

## BTL'S RESPONSE TO
## <u>PLAINTIFFS' MOTION FOR FINAL APPROVAL</u>

Date:  December 15, 2023

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
          robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................1

II.     FACTUAL BACKGROUND.................................................................2

    A.    Earlier Settlement Negotiations With Class Counsel ...........................3

    B.    The TTA Settlement................................................................5

    C.    The Current Settlement ...........................................................7

    D.    The Settlement Approval Process ......................................................7

III.    APPLICABLE LEGAL STANDARDS.................................................8

    A.    The Approval Process ...............................................................8

        1.    Amchem ...........................................................................9

        2.    The Court's Provisional Certification Of The Settlement Class ...................................................................................10

    B.    Burden .......................................................................................11

IV.     DISCUSSION.......................................................................................13

    A.    Article III Standing..................................................................13

    B.    Ascertainability .......................................................................14

        1.    Cherry v. Dometic.................................................................14

        2.    The Membership Of The Settlement Class Cannot Be Ascertained, As Efforts To Provide Notice To Settlement Class Members Made Clear ......................................................17

        3.    Class Counsel Have No One To Blame But Themselves For The Settlement Class Not Being Ascertainable Today ......19

        4.    The Complete Inability Of The Settlement Administrator To Verify Membership In The Settlement Class During

**Page**

The Claims Process Further Confirms The Lack Of Ascertainability ...........................................................................20

C.  The Settlement Is Fair, Reasonable And Adequate, As Was The TTA Settlement ..........................................................................22

D.  Adequacy ..............................................................................24

E.  The Unavailability Of Incentive Awards Has Now Been Conclusively Resolved By The Eleventh Circuit ...........................27

F.  Plaintiffs' Rule 3.01(g) Certification Omits Relevant Context And Otherwise Glosses Over The Refusal Of Plaintiffs' Counsel To Meet And Confer On Article III Or Ascertainability ......29

V.  CONCLUSION.................................................................................30

LOCAL RULE 3.01(h) STATEMENT ..................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Adams v. Sentinel Offender Servs.,
   2018 WL 2148372 (N.D. Ga. 2018) ......................................................................10

Amchem v. Windsor,
   521 U.S. 591 (1997) ....................................................................... 8, 9, 10, 20

Arkin v. Pressman,
   38 F.4th 1001 (11th Cir. 2022) ............................................... 23, 25, 27

Baltzer v. Midland Credit,
   2014 WL 3845449 (S.D. Fla. 2014) ....................................................12

Cherry v. Dometic,
   986 F.3d 1296 (11th Cir. 2021)........................................... 14, 15, 16, 17

Creative Montessori v. Ashford Gear,
   662 F.3d 913 (7th Cir. 2011)....................................................................25

Doe v. Tangipahoa Parish Sch. Bd.,
   494 F.3d 494 (5th Cir. 2007)....................................................................10

Dorado v. Bank of Am.,
   2017 WL 5241042 (S.D. Fla. 2017) ....................................................26

Drazen v. Pinto,
   41 F.4th 1354 (11th Cir. 2022), vacated on other grounds,
   61 F.4th 1297 (11th Cir. 2023) ............................................... 8, 12, 26

Drazen v. Pinto,
   74 F.4th 1336 (11th Cir. 2023) ..............................................................8

Edwards v. Horizon Staffing,
   2015 WL 13283397 (N.D. Ga. 2015) ....................................................8

First Mercury Ins. v. Nationwide Sec. Servs.,
   54 N.E.3d 323 (Ill. App. Ct. 2016) ....................................................26

Griffin v. Dugger,
   823 F.2d 1476 (11th Cir. 1987)........................................................ 11, 12

Haight v. Bluestem Brands,
   2015 WL 12830482 (M.D. Fla. 2015), report and recommendation
   adopted, 2015 WL 12835994 (M.D. Fla. 2015) ............................................. 9, 12

**Page(s)**

Haines v. Fidelity Nat'l Title,
2022 WL 1095961 (M.D. Fla. 2022) ....................................................19

Hinman v. M&M Rental,
No. 1:06-cv-01156, Final Approval Mem. (Dkt. 269) (N.D. Ill. 2015) ..............22

In re AT&T,
270 F.R.D. 330 (N.D. Ill. 2010) ...................................................9

In re Marine Hose,
2009 WL 10685187 (S.D. Fla. 2009) ..................................................8

In re Wellbutrin,
308 F.R.D. 134 (E.D. Pa. 2015) ..................................................17

Jerue v. Drummond Co.,
2023 WL 6610603 (M.D. Fla. 2023) ........................................... 12, 13

Johnson v. NPAS,
975 F.3d 1244 (11th Cir. 2020) ............................................... 27, 28

Johnson / Dickenson v. NPAS,
No. 18-12344, Pet. for Reh'g en Banc (Dkt. 63) (11th Cir., Oct. 22, 2020) ........27

Johnson v. NPAS,
43 F.4th 1138 (11th Cir. 2022) ...............................................28

Lee v. Ocwen Loan Serv.,
2015 WL 5449813 (S.D. Fla. 2015) ......................................................3

Lewis v. First Am. Ins.,
2017 WL 3269381 (D. Idaho 2017) ........................................... 12, 17

Lipuma v. AMEX,
406 F. Supp. 2d 1298 (S.D. Fla. 2005) ..................................................14

M&C v. Oppenheim,
981 F.3d 983 (11th Cir. 2020) ............................................... 6, 25

Machesney v. Lar-Bev,
317 F.R.D. 47 (E.D. Mich. 2016) ........................................... 25, 26

Michel v. WM Healthcare,
2014 WL 497031 (S.D. Ohio 2014) ..................................................22

**Page(s)**

Monmouth v. Fla. Cancer Specialists,
  2019 WL 1487340 (M.D. Fla. 2019), subseq. det.,
  2019 WL 3242491 (M.D. Fla. 2019) ....................................................................3

Paldo Sign v. Topsail,
  2011 WL 13268072 (N.D. Ill. 2011) ..................................................................22

Reliable Money v. McKnight,
  704 F.3d 489 (7th Cir. 2013)..............................................................................25

Rensel v. Centra Tech,
  2 F.4th 1359 (11th Cir. 2021) ............................................................................16

Rodriguez v. Nat'l City Bank,
  277 F.R.D. 148 (E.D. Pa. 2011)............................................................... 9, 10, 11

Rutstein v. Avis,
  211 F.3d 1228 (11th Cir. 2000)...........................................................................11

Sandusky Wellness Ctr. v. Heel,
  No. 3:12-cv-01470, Final Approval Order (Dkt. 95) (N.D. Ohio 2014) ..............22

Scoma Chiro. v. Nat'l Spine,
  2022 WL 16695130 (M.D. Fla. 2022) .................................................... 14, 21, 26

Sharfman v. Infucare,
  2022 WL 18926792 (M.D. Fla. 2022), report and recommendation
  adopted, 2023 WL 2624754 (M.D. Fla. 2023) ...................................................16

Sharfman v. Infucare,
  No. 6:21-cv-00525, Mot. for Entry of Auth. Order (Dkt. 19)
  (M.D. Fla. Aug. 18, 2021)...................................................................................20

TransUnion v. Ramirez,
  141 S.Ct. 2190 (2021) ............................................................................ 8, 13, 26

Williams v. Reckitt Benckiser,
  65 F.4th 1243 (11th Cir. 2023) ................................................................. 12, 13

Wilson v. Badcock Home Furn.,
  329 F.R.D. 454 (M.D. Fla. 2018).........................................................................18

### OTHER AUTHORITIES

CPI Inflation Calculator, U.S. Bureau of Labor Statistics
  available at https://www.bls.gov/data/inflation_calculator.htm ...........................26

**Page(s)**

W. Henderson, <u>Clear Sailing Agreements</u>,
  77 Tulane L. Rev. 813 (2003) ..................................................................3

## RULES

Fed. R. Civ. P. 23 ............................................................. 1, 6, 8

## TREATISES

1 McLaughlin on Class Actions § 4:2 (20th ed.)....................................20

Defendant Buccaneers Team LLC ("BTL") responds as follows to the motion of Plaintiffs Cin-Q Automobiles, Inc. ("Cin-Q") and Medical & Chiropractic Clinic, Inc. ("M&C" and together with Cin-Q, "Plaintiffs") for final approval of the Settlement Agreement:[1]

## I.    INTRODUCTION

If the requirements of Article III could be satisfied and if the identities of Settlement Class Members were actually ascertainable and if the other requirements of Fed. R. Civ. P. 23(a) and 23(b) could otherwise be met, then BTL would not oppose final approval of the Settlement or permanent certification of the Settlement Class, as the benefit to be conferred on Settlement Class Members through the Settlement would plainly be fair, reasonable and adequate within the meaning of Fed. R. Civ. P. 23(e)(2).  But as the approval process has only further confirmed, the requirements of Article III cannot be met, the Settlement Class is not ascertainable and adequacy of representation remains an issue.

BTL has raised the issues of Article III, ascertainability and adequacy early and often prior to as well as during the approval process, and as discussed below, Plaintiffs and their counsel must demonstrate all three.  Rather than saying a word, however, about any of these issues, Class Counsel instead spent 30 pages in their final approval motion largely addressing the one issue not in dispute, namely whether the Settlement is fair, reasonable and adequate.  Plaintiffs and their counsel nonetheless bear the burden of establishing Article III standing, ascertainability and

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval.  See Settlement Agt. (Dkt. 324-1).  In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

adequacy, and they have manifestly failed to do so, as their final approval motion makes abundantly clear.  Nor can that burden be met.

Instead, Class Counsel extol in their final approval motion the benefits of the Settlement, while blithely noting that the Settlement Class as a whole will receive at <u>most</u> $799,725 (and likely less after objections to claims are resolved by the Court) as compared to the more than $5 million in fees and expenses Class Counsel are now seeking, meaning Class Counsel would receive well over <u>six</u> times what the Settlement Class would receive as a whole, which appears to be of little or no moment at all to Plaintiffs or Class Counsel.  But perhaps that should not be surprising.  This case has long since ceased being about the members of the Settlement Class or their interests, if it ever was.  Instead, it represents many of the features of class litigation that have drawn the ire of courts and commentators alike:  a relentless pursuit of fees by class counsel, culminating in a request whereby class counsel would receive in fees many multiples of what the class would receive, while seeking approval of a settlement that is <u>not</u> materially different from an earlier settlement that class counsel went to <u>extraordinary</u> lengths to scuttle with little or no regard for the interests of the class, all only further confirming inadequate representation.

We elaborate below.

## II.   FACTUAL BACKGROUND

The relevant factual background for purposes of this memorandum is set forth below.  <u>See</u> disc. <u>infra</u> at 2-8.  Much of the relevant background, however, has been provided by BTL in earlier submissions, which BTL incorporates by reference.  <u>See</u>, <u>e.g.</u>, BTL's Subm. re Biggerstaff List (Dkt. 341); BTL's Subm. re Ascertainability

(Dkt. 365); BTL's Mot. re Notice and Reverse Lookups (Dkt. 381); BTL's Mot. to Compel (Dkt. 458).

### A.   Earlier Settlement Negotiations With Class Counsel

Settlement negotiations between Class Counsel and BTL's current counsel commenced in August of 2015.  Those negotiations were overseen by the Honorable Wayne R. Andersen (Ret.), a highly experienced mediator who has deservedly earned the praise of judges throughout the country.[2]  See, e.g., BTL's Opp. to Mot. to Decertify (TTA Dkt. 148) at 2-3.

During an initial mediation session on August 31, 2015, Class Counsel quickly got to their bottom line:  a "virtual fund" of $92 million and no minimum compensation to the class, with Class Counsel to seek 25% of the amount in fees (i.e., approximately $23 million) and with a firm commitment BTL could not contest fees.[3]  See BTL's Opp. to Mot. to Decertify (TTA Dkt. 148) at 3-4.  Class Counsel reassured BTL, however, that under this proposal, BTL would pay no more than

---

[2] Before the mediation privilege had been waived by Class Counsel but after Judge Andersen had declared an impasse, BTL suggested that the Court be allowed to contact Judge Andersen for a balanced assessment of what had transpired.  See BTL's Mot. for Settlement Conf. (Dkt. 215) at 3.  Class Counsel, however, vehemently opposed the suggestion, and nothing came of it.  See Pls.' Opp. to Mot. for Settlement Conf. (Dkt. 219).  But if the Court wishes to obtain any further detail on what transpired before Judge Andersen, it should now be free to contact him directly, inasmuch as the mediation privilege has since been fully waived.  See Order (TTA Dkt. 153) (unsealing materials describing mediation negotiations); BTL's Mot. to Compel (Dkt. 264) at 3 n.1 (outlining history of waiver of mediation privilege).

[3] These so-called clear sailing agreements have properly been the subject of considerable criticism:

These agreements are troubling because they demonstrate that class counsel negotiated some aspect of their fee agreement with the defendant when counsel's ethical obligation is to the class, not to its own fees.

Monmouth v. Fla. Cancer Specialists, 2019 WL 1487340, *5 (M.D. Fla. 2019), subseq. det., 2019 WL 3242491 (M.D. Fla. 2019); see generally W. Henderson, Clear Sailing Agreements, 77 Tulane L. Rev. 813 (2003).  Class Counsel likewise insisted on a clear-sailing provision in the Settlement Agreement and would not settle without one.  See Settlement Agt. (Dkt. 324-1) at § VI.A.  The presence of a clear-sailing provision, however, requires even greater scrutiny by the Court.  See, e.g., Lee v. Ocwen Loan Serv., 2015 WL 5449813, *12 (S.D. Fla. 2015).

$8.75 million to the class, since in Class Counsel's view, the anticipated claim-in rate would certainly be no more than 5% and likely much less.[4]

Of course, the fact no more than $8.75 million would be paid to the class begged the question of why the settlement fund needed to be $92 million. The answer to that question, however, was nonetheless fairly obvious and later became crystal clear when it was revealed Mr. Wanca had decided he wanted to set a "record" in this case by eclipsing the then-recent TCPA settlement in Capital One of $75,455,099 (for a settlement class numbering more than 17.5 million) and thereby securing for himself in this case a record fee of more than $23 million or roughly ten times what a reasonable fee would be for a common fund of $8.75 million (i.e., the absolute most that Class Counsel believed would ever be paid to the class). See Lally Decl. (TTA Dkt. 148-2) ¶¶ 39-40.

Negotiations between Class Counsel and BTL dragged on before Judge Andersen for a few more months, but Class Counsel never really budged from their demand of a $92 million common fund, fees of over $20 million and a clear-sailing provision, in spite of periodic indications to the contrary. See Lally Decl. (TTA Dkt. 148-2) ¶¶ 41-44. As a result, an impasse was eventually declared by Judge Andersen on May 2, 2016. See Notice of Impasse (Dkt. 218).

---

[4] A more realistic estimate would have been 2%, and at that number, the Settlement Fund would only have had to be $4.9 million and the fee paid to Class Counsel would have been $1.2 million. See Lally Decl. (TTA Dkt. 148-2) ¶ 9. But as it ultimately turned out, the actual claim-in rate was initially 2.5%, and once all false and fraudulent claims are weeded out, it will likely be below 1.2%, meaning a common fund of $3 million and a fee of $750,000 would have more than sufficed. See, e.g., Amin-Giwner Aff. (Dkt. 482-3) ¶ 22; BTL's Obj. to Final Claims Report (Dkt. 490) at 7-8.

### B.   The <u>TTA</u> Settlement

After Class Counsel publicly filed the notice of impasse on the Court's docket, a competing case was filed, and BTL's counsel were then contacted by the firm that filed that case (<u>i.e.</u>, Bock & Hatch).   <u>See</u> <u>TTA v. BLP</u>, No. 16-CA-004333 (Hillsborough Cty., Fla., filed May 6, 2016).   Settlement discussions later ensued, overseen by Peter Grilli, an experienced mediator in Tampa, after Judge Andersen was forced to withdraw due to threats from the Wanca firm and baseless allegations that Judge Andersen and JAMS were somehow perpetuating a fraud on the Court. <u>See</u>, <u>e.g.</u>, Lally Decl. (<u>TTA</u> Dkt. 148-2) ¶¶ 51-62.

Almost immediately, however, the Wanca firm took various steps to derail any competing cases and prevent <u>anyone</u> else from trying to settle the claims of the class, all with no regard whatsoever for the actual interests of class members.   <u>See</u> Lally Decl. (<u>TTA</u> Dkt. 148-2) ¶¶ 57-60.   These efforts by the Wanca firm included unsuccessful attempts on at least four different occasions in at least four different cases before at least two different courts to enjoin Bock & Hatch from even <u>attempting</u> to settle the class claim, along with a request in a case filed by M&C and funded by the Wanca firm to enjoin Bock & Hatch from even seeking to serve as counsel for the class in either <u>TTA</u> or this case.   <u>See</u> <u>id.</u>

During this lengthy process, the Wanca firm freely cast aspersions on anyone and everyone, including Judge Andersen, JAMS, Mr. Grilli, Bock & Hatch, Mr. Oppenheim and BTL and its counsel, making baseless claims of breaches of fiduciary duty, perpetuating a fraud, ethical violations and a reverse auction.   <u>See</u> Lally Decl. (<u>TTA</u> Dkt. 148-2) ¶¶ 57-60.   The claims made by the Wanca firm were,

however, consistently <u>rejected</u> by the many courts that heard them. <u>See</u>, <u>e.g.</u>, <u>M&C v. Oppenheim</u>, 981 F.3d 983, 992-94 (11th Cir. 2020).

More importantly, however, and as discussed below, the Settlement that Class Counsel are now extolling the virtues of is <u>not</u> materially different from the settlement in <u>TTA</u> the Wanca firm so relentlessly attacked. <u>See</u> Pls.' Mot. for Final Approval (Dkt. 482) at 20 (noting the Settlement "exceeds any applicable standard"). Indeed, a side-by-side comparison of the terms of the two settlements makes clear they are strikingly similar and that <u>all</u> of the efforts of the Wanca firm to impugn Bock & Hatch and denigrate the <u>TTA</u> settlement were largely disingenuous and misplaced and that the endless claims and assertions made by the Wanca firm against Bock & Hatch and the <u>TTA</u> settlement were really about <u>nothing</u> other than attorneys' fees and who would receive what. <u>See</u> Comparison of Settlement Agts., Ex. 1 hereto.

When virtually the same settlement terms are now being proposed by Class Counsel as were contained in the <u>TTA</u> settlement, they suddenly "provide substantial relief," are "in the best interest of the Settlement Class" and are "the product of significant give and take," but when similar terms were proposed in <u>TTA</u>, they were "inadequate settlement terms," "a low-ball settlement," "not within 'the range of possible recovery'" and evidence of a "reverse auction." <u>Compare</u> Final Approval Mot. (Dkt. 482) at 2, 8, 17, <u>with</u> Pls.' Mot. to Decertify (<u>TTA</u> Dkt. 128) at 6, 17, 21.[5]

---

[5] To be sure, the Court decertified the settlement class in <u>TTA</u> and vacated its preliminary approval order in <u>TTA</u>, guided (as it understandably was) by the Eleventh Circuit's ruling and by the determination of the Eleventh Circuit (based on a very limited record) that the Bock & Hatch firm was "disarmed," a determination that subsequent events have pretty clearly called into question. <u>See</u> Order (<u>TTA</u> Dkt. 169); disc. <u>infra</u> at 22-24. There was no indication in the Court's September 30, 2019 Order, however, that the terms of the <u>TTA</u> settlement themselves were not fair, reasonable or adequate (as required by Fed. R. Civ. P. 23(e)(2)). <u>See</u> Order (<u>TTA</u> Dkt. 169) at <u>passim</u>. Instead, the Court's ruling appeared to be based entirely on the ability of Bock & Hatch to adequately

Whatever the basis was for the Eleventh Circuit concluding Bock & Hatch was "disarmed," however, the Settlement now being presented to the Court for approval at a minimum tends to cast prior events in a different light, though that would be hard to tell if Plaintiffs' final approval motion were the only document one reviewed. See Final Approval Mot. (Dkt. 482) at 5 (dedicating a mere paragraph to the events surrounding decertification of the TTA settlement class).

### C.   The Current Settlement

The current Settlement Agreement was the result of a lengthy mediation before Magistrate Judge Sansone.  See Final Approval Mot. (Dkt. 482) at 5.  As noted, however, the Settlement bears a striking resemblance to the TTA settlement, but like that settlement, it would undoubtedly be fair, reasonable and adequate, provided the other requirements of a class settlement could be satisfied.  See disc. infra at 22-24.

### D.   The Settlement Approval Process

In negotiating the Settlement, the Parties anticipated potential problems in identifying Settlement Class Members, based not only on the considerable passage of time since the faxes in question were purportedly sent on behalf of BTL but also because of the many infirmities in the list compiled by Mr. Biggerstaff.  See generally BTL's Subm. re Biggerstaff List (Dkt. 341).  Based on the opinion and reports of Mr. Biggerstaff, however, the Parties agreed in the Settlement Agreement to have one reverse lookup undertaken for purposes of (hopefully) identifying Settlement Class Members and then providing notice to the Settlement Class.  See Settlement Agt. (Dkt. 324-1) § VII.G.  But the Parties also agreed to publication

---

represent Plaintiffs in Cin-Q or the members of the class, again based on the earlier ruling by the Eleventh Circuit.  See id. at 34-38.

notice in the event a reverse lookup was not feasible under the circumstances of this case.[6]  See id.

### III.  APPLICABLE LEGAL STANDARDS

All class settlements are subject to the approval process required by Fed. R. Civ. P. 23.  See, e.g., Amchem v. Windsor, 521 U.S. 591, 613-16, 620 (1997).  In order for a class settlement to be approved, a settlement class must meet the requirements of Rule 23(a) and 23(b), must be ascertainable and the terms of the settlement itself must be fair, reasonable and adequate (the standard embodied in Fed. R. Civ. P. 23(e)(2) for all class settlements).  See, e.g., Fed. R. Civ. P. 23(e)(2); Amchem, 521 U.S. at 620-22; In re Marine Hose, 2009 WL 10685187, *10 (S.D. Fla. 2009); Edwards v. Horizon Staffing, 2015 WL 13283397, *2 (N.D. Ga. 2015).

As the Supreme Court recently held in TransUnion, however, all members of any class seeking monetary relief must also satisfy the standing requirements of Article III.  See TransUnion v. Ramirez, 141 S.Ct. 2190, 2204-05, 2208 (2021).  Moreover, as the Eleventh Circuit has recently noted, the requirements of Article III articulated in TransUnion apply fully to a settlement class and how the settlement class is defined.  See Drazen v. Pinto, 41 F.4th 1354, 1360 (11th Cir. 2022), vacated on other grounds, 61 F.4th 1297 (11th Cir. 2023); Drazen v. Pinto, 74 F.4th 1336, 1343-46 (11th Cir. 2023).

### A.  The Approval Process

A settlement class that does not satisfy Article III or that is not ascertainable cannot remain certified, and a settlement proposed on behalf of such a settlement

---

[6] Mailed notice ended up being sent to persons and entities for which there was any "match" on the reverse lookup performed by TransUnion and persons and entities for which there was a single "match" on the reverse lookup performed by LexisNexis; publication notice was also provided by way of placement in three different publications.  See Order (Dkt. 409) at 11.

class should not be approved.  See, e.g., Haight v. Bluestem Brands, 2015 WL 12830482, *3 (M.D. Fla. 2015), report and recommendation adopted, 2015 WL 12835994 (M.D. Fla. 2015) (denying approval of settlement where "proposed settlement class is not clearly ascertainable or adequately defined").  This is true even if (as is the case here) the terms of the settlement and the benefit to be conferred upon class members are fair, reasonable and adequate.[7]  See, e.g., id. *10 (noting that because insufficient evidence was adduced to certify class, "there is insufficient evidence for the Court to even reach the question of whether the proposed settlement is fair, reasonable and adequate"); In re AT&T, 270 F.R.D. 330, 340 (N.D. Ill. 2010) (noting that courts "may not . . . abandon the Federal Rules merely because a settlement seems fair, or even if the settlement is a 'good deal'"); Rodriguez v. Nat'l City Bank, 277 F.R.D. 148, 152 (E.D. Pa. 2011) (noting that "[b]efore turning to the fairness of the proposed settlement, the Court must determine that certification of the proposed settlement class is appropriate").  Indeed, that is the gist of the Supreme Court's seminal opinion in Amchem.  See Amchem, 521 U.S. at 622 ("Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper.").

## 1.  **Amchem**

As Amchem makes clear, a settlement class is still subject to all of the requirements for certification of a contested class, and certification of a settlement class is not warranted if certification of a class for trial would not be warranted.[8]  See

---

[7] In other words and contrary to the impression left by Plaintiffs' final approval motion, Rule 23(e)(2) is not the only requirement for final approval of a class settlement; the other requirements of Rule 23 must be satisfied as well.  See, e.g., Amchem, 521 U.S. at 620-21.

[8] The only exception is a settlement class need not be demonstrated to be manageable for trial, since there would obviously be no trial if the settlement were approved.  See Amchem, 521 U.S. at 620 ("[A] district court need not inquire whether the case, if tried, would present intractable

_Amchem_, 521 U.S. at 621.  If anything, the requirements for class certification "demand undiluted, even heightened, attention in the settlement context." _Id._ at 620; _id._ at 620 n.16 (noting "proposed settlement classes sometimes warrant more, not less, caution on the question of certification").  As such, the requirement of Rule 23(e)(2) that a class settlement be fair, reasonable and adequate is simply an _additional_ requirement that a settlement class must meet, not a replacement or proxy for the rigorous analysis required under Rule 23:

> This prescription was designed to function as an _additional_ requirement, _not_ a superseding direction, for the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b).

_Id._ at 621; _see_ also, _e.g._, _Adams v. Sentinel Offender Servs._, 2018 WL 2148372, *3-4 (N.D. Ga. 2018) (approving settlement class before addressing settlement terms).[9]

### 2.    The Court's Provisional Certification Of The Settlement Class

In its March 29, 2022 Order granting preliminary approval, the Court _provisionally_ certified the Settlement Class, subject to the contemplated approval process and the obligation of Plaintiffs and their counsel to meet _all_ of the requirements for permanent certification of the Settlement Class, including Article III, ascertainability and the other requirements of Rule 23.  _See_ Order (Dkt. 343) at 77-78.[10]  The proposed Final Approval Order submitted with Plaintiffs' motion

---

management problems, _see_ Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

[9] Just as is the case with Article III, the requirements of Rule 23 cannot be agreed to by the parties or in effect established by way of stipulation.  _See_ _Doe v. Tangipahoa Parish Sch. Bd._, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (noting the indisputable principle that parties to litigation cannot simply stipulate to waive Article III standing in order to create subject-matter jurisdiction).  As the Supreme Court made very clear in _Amchem_, parties cannot stipulate away the requirements of Rule 23.  _See_ _Amchem_, 521 U.S. at 621 (noting that class counsel and courts would be disarmed without analyzing the requirements of Rule 23(a) and (b)).

[10] _See_ also _Rodriguez_, 277 F.R.D. at 153-55 (denying final approval of settlement due to lack of typicality and commonality after preliminarily approving it).

contemplates, in turn, that as part of any final approval order, the Court would lift the provisional certification of the Settlement Class and make that certification final, but again, only <u>if</u> Plaintiffs could meet their burdens on <u>each</u> of the required elements.  <u>See</u> Proposed Final Approval Order (Dkt. 482-2).  The corollary is also true, however:  if any of the requirements for final approval cannot be met, then final approval should not be granted and the Settlement Class should be decertified.  <u>See,</u> <u>e.g.</u>, <u>Rodriguez</u>, 277 F.R.D. at 155 (finding "that Plaintiffs['] proposed class fails to meet the requirement of Rule 23(a) and thus fails to show that the class could be certified").

### B.   Burden

As noted, Plaintiffs bear the burden of establishing that <u>each</u> of the requirements of Rule 23 are met and that the Settlement Class satisfies the requirements of <u>both</u> Article III and ascertainability.  <u>See</u> <u>Rutstein v. Avis</u>, 211 F.3d 1228, 1233 (11th Cir. 2000).  Remarkably, however, Plaintiffs make <u>no</u> mention of <u>any</u> of this in their 30-page motion for final approval, even though BTL has made clear for months that it disputes the ability of Plaintiffs and their counsel to satisfy Article III as well as the ascertainability of the Settlement Class, most recently during the meet and confer process required by Local Rule 3.01(g) for this <u>very</u> motion.  <u>See</u> disc. <u>infra</u> at 29-30.

As BTL made clear to Class Counsel during that meet and confer process, BTL does not dispute the Settlement is fair, reasonable and adequate, but that is not the end of the inquiry.  <u>See</u> disc. <u>infra</u> at 29-30.  In fact, it is not even the beginning.  <u>See</u> <u>Griffin v. Dugger</u>, 823 F.2d 1476, 1482 (11th Cir. 1987).  As the Eleventh Circuit held in <u>Griffin</u>, "any analysis of class certification must <u>begin</u> with the issue

of standing." <u>Id</u>.[11]  The Court must, therefore, satisfy itself that Article III standing exists for Plaintiffs and <u>all</u> Settlement Class Members <u>before</u> addressing the requirements of Rule 23(a) and Rule 23(b) (<u>e.g.</u>, commonality, adequacy, etc.) as well as the separate question of whether the Settlement is fair, reasonable and adequate (which BTL does not dispute).  <u>See</u> <u>Drazen</u>, 41 F.4th at 1360 ("[E]ven at the settlement stage of a class action, we must assure ourselves that we have Article III standing at every stage of the litigation.").

The Court must also determine that the Settlement Class is in fact ascertainable before converting the provisional certification of the Settlement Class into a permanent certification.  <u>See</u>, <u>e.g.</u>, <u>Lewis v. First Am. Ins.</u>, 2017 WL 3269381, *6-7 (D. Idaho 2017) (decertifying class proven to not be ascertainable).  But as this Court aptly put it in its recent Report and Recommendation in <u>Jerue</u>, the party seeking certification bears the burden on these issues, and doubts about whether that burden has been met compel denial of the request for certification:

> The advocate of the class thus carries the burden of proof to establish the propriety of class certification . . . .  If the court harbors <u>doubt</u> about whether the party seeking class certification carries that burden, the party <u>loses</u>.

<u>Jerue v. Drummond Co.</u>, 2023 WL 6610603, *11 (M.D. Fla. 2023).  Since Class Counsel did not even address any of these issues in their final approval motion (let alone try to satisfy Plaintiffs' burden), however, it is a little hard to not have doubts for that reason alone.[12]  <u>See</u> <u>Haight</u>, 2015 WL 12830482, *6, 12 (denying class

---

[11] <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Williams v. Reckitt Benckiser</u>, 65 F.4th 1243, 1253 (11th Cir. 2023) (noting that "technically speaking before undertaking any formal typicality or commonality review," standing must be satisfied).

[12] Nor should Class Counsel be allowed to try and rectify this situation on reply.  Reply memoranda are decidedly not the time to raise new matters, and reply memoranda that raise new matters are properly stricken.  <u>See</u>, <u>e.g.</u>, <u>Baltzer v. Midland Credit</u>, 2014 WL 3845449, *1 (S.D. Fla. 2014) ("A reply memorandum may not raise new arguments or evidence, particularly where the evidence

certification as speculative, because plaintiff did "not present[] evidence sufficient to show that the proposed class" satisfies Rule 23).

## IV.  **DISCUSSION**

Article III standing, ascertainability and adequacy are each <u>independent</u> requirements, and as noted, Plaintiffs have the burden of demonstrating <u>all</u> three. <u>See</u>, <u>e.g.</u>, <u>Jerue</u>, 2023 WL 6610603, *11.  Failing to establish any <u>one</u> of the three, however, defeats Plaintiffs' bid for final approval, and as discussed below, Plaintiffs and Class Counsel cannot satisfy even <u>one</u> of the three.  <u>See</u> disc. <u>infra</u> at 13-22, 24-27.

### A.   **Article III Standing**

Plaintiffs have plainly failed to meet their burden of establishing Article III standing for all Settlement Class Members, having made virtually no effort to even mention Article III in <u>either</u> their preliminary approval motion <u>or</u> final approval motion.  <u>See</u> Mot. for Prelim. Approval (Dkt. 324); Final Approval Mot. (Dkt. 482). That alone is reason to deny their request for final approval.  <u>See</u>, <u>e.g.</u>, <u>TransUnion</u>, 141 S.Ct. at 2207 (noting "the plaintiffs bear the burden of demonstrating that they have standing"); <u>Williams</u>, 65 F.4th at 1253-54 (<u>sua</u> <u>sponte</u> reversing grant of final approval of class settlement for failure to establish Article III standing).

As made clear in BTL's pending motion on Article III (<u>see</u> BTL's Mot. to Dismiss (Dkt. 492) at 21-22) and as we previewed in detail with Class Counsel during the meet and confer process that commenced in July, Plaintiffs and their counsel could not meet their burden under Article III even if they tried.  <u>See id.</u> at 8-11.  Indeed, Plaintiffs admit (as they must) that the definition of the Settlement Class

---

was available when the underlying motion was filed and the movant was aware (or should have been aware) of the necessity of the evidence.").

includes many persons and entities that received faxes through online services, and they also admit that over 13 years after the faxes were allegedly sent, there is no feasible way to determine which were sent to traditional fax machines and which were sent to online services and received as emails.  See id. at 9-10.  Therefore, the definition of the Settlement Class is fatally defective, and the Settlement Class cannot remain certified, because there is no way to determine which Settlement Class Members have standing under Article III and which do not.  See, e.g., Scoma Chiro. v. Nat'l Spine, 2022 WL 16695130, *9-12 (M.D. Fla. 2022).  If the Settlement Class cannot remain certified, however, then the Settlement obviously cannot be approved.  See, e.g., Lipuma v. AMEX, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) ("Regardless of whether a class is certified for settlement or for trial, the Court must find [the Rule 23(a) and (b)] prerequisites are met[.]").

### B.   Ascertainability

As noted, Plaintiffs and their counsel also ignored the issue of ascertainability in both their preliminary approval motion and final approval motion.  See disc. supra at 11.  Ascertainability is, however, an implied requirement of Rule 23 on which Plaintiffs bear the burden of proof, and their silence on the issue in their approval papers is telling.  See, e.g., Cherry v. Dometic, 986 F.3d 1296, 1302 (11th Cir. 2021).

### 1.   **Cherry v. Dometic**

While Plaintiffs said nothing in their final approval motion about ascertainability, Class Counsel have previously made clear they believe the ascertainability requirement is satisfied under Eleventh Circuit law simply if the definition of the Settlement Class relies on objective criteria.  See, e.g., Pls.' Resp. to Mot. to Address Limitations of Reverse Lookups (Dkt. 388) at 3-5.  Indeed, that is exactly what Mr. Hara said at the August 31, 2022 evidentiary hearing:

> [A] class is ascertainable in the Eleventh Circuit if it is defined by objective criteria. That word "ascertainability" concerns the class definition . . . .  So the class is ascertainable.

Hr'g Tr. (Dkt. 410) at 143:12-15, 24-25.  Moreover, Class Counsel have stipulated they are <u>not</u> relying on any extrinsic evidence for purposes of establishing ascertainability and, in particular, are <u>not</u> relying on the results of <u>either</u> of the two reverse lookups undertaken in this matter.[13]  <u>See</u>, <u>e.g.</u>, BTL's Mot. to Compel (Dkt. 458) at 30 n.31.  As such, the ascertainability analysis begins and ends in the view of Class Counsel with the question of whether the Settlement Class is defined by reference to objective criteria, meaning there would be no need to consider whether the membership of the Settlement Class is <u>actually</u> ascertainable (<u>i.e.</u>, capable of being ascertained) and if not, who may be responsible for that state of affairs.  <u>See</u> Pls.' Resp. to Mot. to Compel (Dkt. 459) at 5 (explaining Plaintiffs' view that class is ascertainable merely because it is not vague and is defined as a particular group harmed in a particular way in a specific time period).

Such a narrow reading of <u>Cherry</u>, however, can easily lead to absurd results, as it would here if ultimately adopted.  The Eleventh Circuit's decision in <u>Cherry</u> was directly addressing whether the feasibility of ascertaining the members of a proposed class is a "prerequisite for certification."  <u>See Cherry</u>, 986 F.3d at 1301.  The Eleventh Circuit plainly concluded it is not.  <u>See id.</u> at 1302 ("Proof of

---

[13] Instead, Class Counsel have said that the only purpose of the reverse lookup was to facilitate notice, not to ascertain the identities of Settlement Class Members.  <u>See</u>, <u>e.g.</u>, BTL's Mot. to Compel (Dkt. 458) at 30 n.31.  It is somewhat difficult to understand how or why the notice process could or should be divorced from the identification of the members of the Settlement Class (and perhaps that would be a partial explanation for the many problems encountered during the notice program and claims process), but it is in any event clear Class Counsel are <u>not</u> relying on the reverse lookups to satisfy their burden on ascertainability and they have so stipulated. <u>See id.</u>  As a result of that stipulation, BTL made no further effort to seek discovery on the reverse lookup process utilized by Epiq as well as the accuracy of the information relied upon.  <u>See</u> BTL's Am. Proposed Timeline (Dkt. 419) at 4-6 (BTL initially proposing discovery to address issue of ascertainability).

administrative feasibility cannot be a <u>precondition</u> for certification."). As long as the proposed class is defined in objective terms, that is sufficient for certification, provided the other requirements of Rule 23 are satisfied. <u>See</u> <u>id.</u> at 1304.

<u>Cherry</u> clearly contemplates, however, that <u>after</u> certification, the class representatives and their counsel continue to bear the burden of actually proving the membership of the class can be ascertained by proposing a plan for doing so that will be <u>both</u> manageable <u>and</u> successful:

> A plaintiff proves administrative feasibility by explaining how the district court can <u>locate</u> the remainder of the class after certification . . . . The plaintiff satisfies this requirement if the district court concludes that the proposed process will be <u>manageable</u> and <u>successful</u>.

<u>Cherry</u>, 986 F.3d at 1303.[14]

Class Counsel try to read out of <u>Cherry</u> the foregoing passage and the plain requirement that the plan for identifying class members proposed by the proponents of class certification must be "manageable" <u>and</u> "successful," suggesting instead that it does not matter whether class members can actually be identified or not. <u>See</u> BTL's Mot. to Compel (Dkt. 458) at 22. In fact, Class Counsel have <u>never</u> proposed <u>any</u> plan for ascertaining the identity of the members of the Settlement Class, let alone a plan that would be <u>manageable</u> or <u>successful</u>. <u>See</u> BTL's Obj. to Final Claims Report (Dkt. 490) at <u>passim</u>.[15] Instead, Class Counsel have rested <u>entirely</u>

---

[14] <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Rensel v. Centra Tech</u>, 2 F.4th 1359, 1370 (11th Cir. 2021) (noting "the district court should have asked whether membership was '<u>capable</u> of determination'").

[15] Indeed, Class Counsel have proposed <u>no</u> plan at all for ascertaining membership in the Settlement Class just as they do not address ascertainability in their final approval motion. <u>See</u> BTL's Subm. re Biggerstaff List (Dkt. 341) at 3-7 (noting lack of class list); Final Approval Mot. (Dkt. 482) at <u>passim</u> (no discussion of how to actually identify those in the class). Without a plan being proposed, however, there is obviously no way to determine if the plan is "successful," as required by <u>Cherry</u>. <u>See</u> <u>Sharfman v. Infucare</u>, 2022 WL 18926792 (M.D. Fla. 2022) (class of stand-alone fax recipients could not be identified even after phone carrier subpoenas), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u>, 2023 WL 2624754 (M.D. Fla. 2023).

on the fact the Settlement Class is defined in objective terms and have simply ignored (as they did in their preliminary approval motion and final approval motion) the question of whether the Settlement Class actually is ascertainable. See Pls.' Opp. to Mot. to Compel (Dkt. 459) at 4-8.

But as Cherry itself makes clear, when a class is certified (as here) and the plan proposed by class counsel for ascertaining class membership proves to be either not "manageable" or not "successful" such that it is not possible to determine who is and is not in a class, then the class itself is not ascertainable and the district court can and should "decertify a certified class." See, e.g., Cherry, 986 F.3d at 1304 (noting district courts always have the "discretion to decertify a certified class that turns out to be unmanageable" due to the infeasibility of ascertaining the identities of class members). Indeed, if the members of a certified class ultimately cannot be successfully ascertained, then decertification is required. See, e.g., Lewis, 2017 WL 3269381, *6-7 (decertifying class proven to not be ascertainable); In re Wellbutrin, 308 F.R.D. 134, 149-51 (E.D. Pa. 2015) (same).

**2.   The Membership Of The Settlement Class Cannot Be Ascertained, As Efforts To Provide Notice To Settlement Class Members Made Clear**

Apart from the lack of any attempt by Class Counsel to actually demonstrate ascertainability, the approval process and the two reverse lookups performed only reinforce the fact the Settlement Class is not ascertainable. See disc. infra at 17-19. Over 38% of the numbers on the Biggerstaff list could not be associated with anyone. See Sponsler Decl. (Dkt. 381-4) ¶ 16.  Moreover, conflicting information was obtained for 31% of the numbers on the Biggerstaff list, meaning upwards of 70% of the Settlement Class either could not be identified at all or there existed conflicting and unresolved information on who the Settlement Class Member was. See id. ¶ 20.

17

And most importantly, it was later disclosed by LexisNexis and TransUnion (the sources relied upon by Epiq for the reverse lookups) that it was <u>not</u> possible to accurately identify the names of <u>any</u> Settlement Class Members "without independent verification and validation" and that a "match" on one or both of the reverse lookups simply meant that a person or entity held a number on the Biggerstaff list "at any point in time," <u>not</u> that the person or entity held the number during the short, 11-month period in 2009 and 2010 that would actually make them members of the Settlement Class (<u>i.e.</u>, July 2009 to June 2010).[16]  <u>See</u> Parks Decl. (Dkt. 398-2) ¶¶ 5-6; Roach Decl. (Dkt. 442) ¶ 3.

Accordingly, the results of the two reverse lookups performed in this litigation would scarcely be proof of ascertainability even if Class Counsel were suggesting they are (which they are not).  <u>See</u>, <u>e.g.</u>, <u>Wilson v. Badcock Home Furn.</u>, 329 F.R.D. 454, 457-59 (M.D. Fla. 2018) (criticizing the "black box" quality of reverse lookups and noting ascertainability issues with self-attestation).   To the contrary, the approval process and the reverse lookups only reinforce the fact that more than 13 years after faxes were purportedly sent, the Settlement Class is <u>not</u> ascertainable

---

[16] In discussions with BTL's counsel <u>prior</u> to being appointed as Settlement Administrator, Epiq grossly understated to BTL the limitations of reverse lookups under the circumstances here.  <u>See</u> July 16, 2021 Email fr. A. Palmer, Ex. 2 hereto. At the same time, Epiq alerted Class Counsel to the fact that a reverse lookup might not be effective in this case, though Class Counsel never bothered to share that information with BTL or its counsel.  <u>See</u> Aug. 2021 Emails btwn. Epiq and Class Counsel (Dkt. 365-3).  Epiq, however, continued its efforts to suppress the problem even after being appointed Settlement Administrator, flatly <u>refusing</u> to provide copies of its contracts with TransUnion and LexisNexis and forcing BTL to subpoena those contracts, which contracts fully confirm that the two databases Epiq used for the reverse lookups are simply <u>not</u> capable of identifying Settlement Class Members without independent verification and validation.  <u>See</u> BTL's Mot. re Notice and Reverse Lookups (Dkt. 381) at 13-14.  Class Counsel nonetheless insist in spite of all of this that we should pretend as if the attestation requirement and supplying a number on the Biggerstaff list are enough, such that no further auditing or sampling is necessary, even though we now know that thousands upon thousands of notices were sent to persons and entities only because they held a number on the Biggerstaff list at "any" time or "some" time.  <u>See</u> Pls.' Opp. to Mot. to Compel (Dkt. 459) at 2-3.

under any coherent standard.  See Haines v. Fidelity Nat'l Title, 2022 WL 1095961,

*7-8 (M.D. Fla. 2022) (explaining a class is only ascertainable if its membership can

be determined from objective evidence).

### 3. Class Counsel Have No One To Blame But Themselves For The Settlement Class Not Being Ascertainable Today

Without a doubt, the members of the Settlement Class could have been

identified in the earlier stages of this litigation, and Class Counsel have no one to

blame but themselves for failing to do so.  See Sponsler Decl., Ex. 3 hereto, ¶¶ 15-

20.  As has been clear from the outset, Class Counsel have at all times had the burden

of demonstrating the class is ascertainable.  See, e.g., Haines, 2022 WL 1095961, *7

("The advocate of the class thus carries the burden of proof to establish the propriety

of class certification.").  If Class Counsel had served subpoenas on the telephone

carriers serving the Tampa area shortly after filing suit (as is typically done in TCPA

class litigation), however, then those carriers could have supplied to Class Counsel

the names and last known addresses of the holders of the numbers on the Biggerstaff

list, and the identities of those persons and entities would now be known.[17]  See

Sponsler Decl., Ex. 3, ¶¶ 15-20.

No explanation has ever been provided by Class Counsel as to why they failed

to undertake this crucial but simple step at the outset of the litigation.[18]  See

---

[17] As Mr. Biggerstaff indicated in his October 30, 2015 report, there were only a handful of carriers serving Tampa in 2009 and 2010: AT&T, Verizon, CenturyLink, Level 3, Frontier, Paetec and Fairpoint, with AT&T itself accounting for upwards of 39.5% of the telephone lines in Tampa at the time.  See Biggerstaff Suppl. Rpt. (Dkt. 207-9) at 6.  As Mr. Biggerstaff further indicated in his reports, however, those telephone carriers (like most companies) have document retention policies, such that it was necessary for Class Counsel to seek this information early in the litigation (and not more than 13 years after the faxes were purportedly sent, if ever).  See Biggerstaff Second Rpt. (Dkt. 210-2) ¶ 43.

[18] To be sure, there are numerous instances in other cases handled by the Wanca firm where subscriber information was secured from telephone carriers early in the litigation.  See, e.g., Mot.

Biggerstaff Suppl. Report (Dkt. 207-9) at 6 (Plaintiffs' expert not even opining on feasibility of subpoenaing carriers until several years <u>after</u> lawsuit was filed).  One distinct possibility is they were concerned that if the identities of class members became known, it would have been much easier to expose and fully uncover all of the infirmities in the Biggerstaff list.  <u>See</u>, <u>e.g.</u>, BTL's Subm. re Biggerstaff List (Dkt. 341) at 9-17 (cataloguing known problems with the Biggerstaff list).  Whatever the reason, however, there is no question Class Counsel made no effort to obtain subscriber information from the carriers in the Tampa area or any other effort to identify class members before the approval process, instead treating the telephone numbers on the Biggerstaff list as if they were themselves class members until after the Settlement Agreement was executed.  <u>See id.</u> at 3-5 (describing lack of class list).  Moreover, it is equally clear Class Counsel accepted at face value the untested speculation of Mr. Biggerstaff that "the task of obtaining the name and address data of the holders of those 131,011 numbers at the time of the fax transmissions in question is both quantitatively and qualitatively manageable."  <u>See</u> Biggerstaff Suppl. Rpt. (Dkt. 207-9) at 4.[19]

### 4.    The <u>Complete</u> Inability Of The Settlement Administrator To Verify Membership In The Settlement Class During The Claims Process Further Confirms The Lack Of Ascertainability

At base, the ultimate test of ascertainability is whether it is actually possible to verify whether someone is or is not a class member.  <u>See generally</u> 1 McLaughlin on Class Actions § 4:2 (20th ed.) ("A district court cannot determine whether a

---

for Entry of Auth. Order (Dkt. 19), <u>Sharfman v. Infucare</u>, No. 6:21-cv-00525 (M.D. Fla. Aug. 18, 2021).

[19] During the approval process, there have been vague (and otherwise unsubstantiated) suggestions that BTL somehow waived ascertainability in agreeing to the Settlement.  Like Article III and the other requirements of Rule 23, however, ascertainability cannot be waived or stipulated to as part of a settlement.  <u>See</u>, <u>e.g.</u>, <u>Amchem</u>, 521 U.S. at 621.

proposed class satisfies the Rule 23 requirements without a way to identify absent class members.").  And the recent efforts of the Settlement Administrator to make that determination with respect to Cin-Q underscore why the Settlement Class is <u>not</u> ascertainable.  <u>See</u> BTL's Obj. to Cin-Q Claim (Dkt. 489) at 5-12.

In vainly attempting to demonstrate that Cin-Q is a Settlement Class Member, the Settlement Administrator was forced to rely on a database that only shows <u>current</u> associations between a telephone number and the holder of that number but like the databases maintained by TransUnion and LexisNexis, is <u>incapable</u> of demonstrating who or what held that number between July 14, 2009 and June 9, 2010.[20]  <u>See</u> BTL's Obj. to Cin-Q Claim (Dkt. 489) at 5-8.  The fact that the Settlement Administrator does not have available to it a <u>single</u> source that is capable of reliably identifying persons and entities who held the numbers on the Biggerstaff list from July 14, 2009 and June 9, 2010 is conclusive proof that the Settlement Class simply is <u>not</u> ascertainable as of today, again due to the misfeasance of Class Counsel.  <u>See</u> <u>Scoma</u>, 2022 WL 16695130, *11-12 (class whose members could not be determined cannot be certified).

---

[20] Lacking any database of historical holders of telephone numbers dating back over a decade, the Settlement Administrator was forced to use a database of <u>current</u> associations maintained by Thompson Reuters called CLEAR in trying to confirm Cin-Q was a Settlement Class Member.  <u>See</u> BTL's Obj. to Cin-Q Claim (Dkt. 489) at 5-6.  But CLEAR indicated in the initial search performed by the Settlement Administrator that the <u>actual</u> holder of (352) 377-9774 was Sunshine State Insurance, <u>not</u> Cin-Q.  <u>See</u> <u>id.</u> at 7.  Only after stacking the deck and adding Cin-Q's address to the search (thereby pre-determining the result) did the search show Cin-Q.  <u>See</u> <u>id.</u> at 7-8.  But the more important point for purposes of ascertainability is that even that search result <u>only</u> shows a <u>current</u> association, not an <u>historic</u> association, which is the only way the Settlement Class would actually be ascertainable.  <u>See</u> <u>id.</u> at 7.

### C.   The Settlement Is Fair, Reasonable And Adequate, As Was The <u>TTA</u> Settlement

As noted, BTL does not dispute that the Settlement is fair, reasonable and adequate within the meaning of Rule 23(e)(2). <u>See</u> disc. <u>supra</u> at 1, 7.  The terms of the Settlement and the benefit that would be conferred to the Settlement Class are plainly so and compare favorably to comparable TCPA settlements, including TCPA settlements sponsored by the Wanca firm as well as by Bock & Hatch.  <u>See</u> <u>Michel v. WM Healthcare</u>, 2014 WL 497031, *5 (S.D. Ohio 2014) (payout of $190/claimant); Final Approval Order (Dkt. 95) at 4, <u>Sandusky Wellness Ctr. v. Heel</u>, No. 3:12-cv-01470 (N.D. Ohio 2014) (payout of $62/claimant); Final Approval Mem. in Supp. (Dkt. 269) at 5-6, <u>Hinman v. M&M Rental</u>, No. 1:06-cv-01156 (N.D. Ill. 2015) (payout of up to $265/claimant).  Settlement Class Members are eligible to receive up to $615, and like the <u>TTA</u> settlement, the amounts made available under the Settlement are as generous (if not more generous) than other TCPA class settlements, including numerous other settlements sponsored by the Wanca firm.  <u>See</u>, <u>e.g.</u>, <u>Paldo Sign v. Topsail</u>, 2011 WL 13268072, *2 (N.D. Ill. 2011) (payout of $42/fax).

What Class Counsel conveniently ignore in their final approval motion, however, is how the Settlement compares with the prior settlement in <u>TTA</u> as well as the corollary question of whether Class Counsel's opposition to that earlier settlement was justified and whether the lengthy wait endured by the members of the Settlement Class and the risks to the Settlement Class that flowed from that delay were worth it, as these questions go <u>directly</u> to the adequacy of Class Counsel and

of the Wanca firm in particular.[21]  See, e.g., Arkin v. Pressman, 38 F.4th 1001, 1011-12 (11th Cir. 2022) (Wanca firm putting "class's claims at serious risk" for "the sake of inflated attorneys' fees and convenience").  The reason why Class Counsel would like to avoid that issue is obvious:  the side-by-side comparison of the two settlements is not flattering to Class Counsel, nor does it remotely justify a delay of no less than five years in any payment to Settlement Class Members.  See disc. infra at 23-24.

In spite of the expenditure of thousands of hours of attorney time and countless hours spent by the Court, very little (if anything) was gained by Class Counsel for the Settlement Class in the intervening years.  The total amount of the Settlement Fund changed only 1.3% as compared to the TTA settlement (i.e., from $19,500,000 to $19,750,000), and the maximum amount any Settlement Class Member could recover increased only 8.8% (i.e., from $565 to $615).[22]  And for the majority of Settlement Class Members, the difference in dollars was much less, since very few persons or entities received five faxes.[23]  Other features of the TTA settlement, however, were actually more favorable from the perspective of class members.  Compare, e.g., Settlement Agt. (TTA Dkt. 18-1) at §§ VI.A (attorneys' fees and costs were aggregated at 25% of TTA settlement fund), VII.B (BTL to bear

---

[21] As noted above and below, they also go to the related question of whether Bock & Hatch really was "disarmed" in negotiating the TTA settlement.  See disc. supra at 5-7; disc. infra at 23-24.

[22] In reality, the change in size of the Settlement Fund and the amount available to the Settlement Class was even less, because the settlement in TTA called for BTL to fund notice and administration outside the settlement fund, whereas the Settlement Fund here calls for notice and administration to be paid for from the Settlement Fund.  See Comparison of Settlement Agts., Ex. 1.

[23] The mean number of faxes allegedly received by numbers on the Biggerstaff list was 2.6.  See Biggerstaff Rpt. (Dkt. 207-5) ¶ 1.  For a person or entity that only received three faxes, however, the difference in payouts as between the TTA settlement and the Settlement here was a mere $40.  See Comparison of Settlement Agts., Ex. 1.

all notice and administration costs apart from <u>TTA</u> settlement fund), VII.G (agreed publication notice), <u>with</u> Settlement Agt. (Dkt. 324-1) at §§ VI.A (costs of $250,000 awardable in addition to 25% of Settlement Fund in fees), VII.B (notice and administration costs to come from Settlement Fund), VII.G (publication notice only if ordered by the Court).  If Bock & Hatch was completely "disarmed" in negotiation of the <u>TTA</u> settlement as the Wanca firm <u>repeatedly</u> claimed and convinced the Eleventh Circuit of, then other than a focus on fees, what explains the fact that Class Counsel agreed to almost <u>identical</u> terms in the Settlement?

## D.  Adequacy

We have previously addressed the adequacy of Class Counsel and in particular the Wanca firm, and we incorporate those comments herein.[24]  <u>See</u>, <u>e.g.</u>, BTL's Resp. to Mot. for Settlement Conf. (Dkt. 260) at 3-5; BTL's Resp. to Mot. to Intervene (Dkt. 267) at 2-7; BTL's Resp. to Mot. to Enter and Continue Briefing (Dkt. 272) at 5-12.  Seemingly from the outset and certainly since the undersigned became involved in this litigation, the Wanca firm has <u>consistently</u> put its own interests first, and it was this very sort of approach that was recently criticized by the Eleventh Circuit in another TCPA class case in which the Wanca firm was involved:

> But this is not an ordinary case.  Here, the record clearly shows that Wanca subordinated the interests of the class to its own interests throughout the <u>Arkin</u> litigation.  There is no other rational explanation for the terms of the <u>Arkin</u> Settlement, which provided for a huge payout for Wanca with <u>little</u> to the class[.] . . .
>
> . . .

---

[24] Our comments on adequacy are directed at the Wanca firm and <u>not</u> at Mr. Addison.  Since the Court appointed Mr. Addison as Interim Lead Counsel "[f]or purposes of conducting the settlement conference" (<u>see</u> Order (Dkt. 284) at 2), our dealings with him have been consistently professional and productive, and while the Wanca firm appeared to continue to exert undue influence during the mediation with Magistrate Judge Sansone, we have little doubt that agreement on settlement terms would <u>not</u> have been reached without the involvement of Mr. Addison.

> Subordinating the interests of the class for the convenience of the attorneys is as much an ethical violation as selling the class out for attorneys' fees. So, we agree with the District Court that "[r]egardless of the reason, the dismissal and re-filing does not appear to have been a decision made in the interest or for the benefit of the class members."
>
> . . .
>
> The record clearly shows that Wanca put the class at serious risk of harm with the Arkin Settlement for the sake of inflated attorneys' fees and convenience. Wanca has thus closed the doors of equity on its claim for attorneys' fees under the Pressman Settlement. Accordingly, we hold that the District Court did not abuse its discretion by denying Wanca attorneys' fees.

Arkin, 38 F.4th at 1011-13; see also, e.g., Creative Montessori v. Ashford Gear, 662 F.3d 913, 917 (7th Cir. 2011) (noting the Wanca firm "demonstrated a lack of integrity that casts serious doubt on [its] trustworthiness as representatives of the class"); Reliable Money v. McKnight, 704 F.3d 489, 490-91 (7th Cir. 2013) (chronicling ethical lapses of the Wanca firm); Machesney v. Lar-Bev, 317 F.R.D. 47, 61 (E.D. Mich. 2016) (declining to appoint the Wanca firm as class counsel and noting it "engaged in conduct that is at least questionable from an ethical standpoint"). And in this case, the Eleventh Circuit itself was critical of what the Wanca firm did and how it did it. See M&C, 981 F.3d at 992-93 (noting the court was "troubled" by the Wanca firm's "thinly-veiled attempt to derail the TTA settlement").

As in Arkin, the Wanca firm put its own interests above those of the class in this case by trying to block the TTA settlement because it was supposedly "a low-ball settlement" but then ultimately agreeing to a settlement that did not significantly differ from the terms agreed upon in TTA. See disc. supra at 5-7. From the perspective of a Settlement Class Member, however, the marginal increases in the size of the common fund and the maximum award to any claimant were scarcely worth the wait of five years or more, simply taking into account the time value of

money but even more so if the risk of intervening changes in law are taken into account.[25]  <u>See</u> Final Approval Mot. (Dkt. 482) at 5-8.  Indeed, the changes in governing law that now compel decertifying the Settlement Class on Article III grounds (<u>i.e.</u>, <u>TransUnion</u>, <u>Drazen</u> and <u>Scoma</u>) were all decided in the last three years and well <u>after</u> the settlement in <u>TTA</u> would have long since been approved.  <u>See</u> disc. <u>supra</u> at 26 n.25 (noting fairness hearing scheduled in <u>TTA</u> for October 2017).

Class counsel who do not put the interests of the class ahead of their own interests are not fit to serve in the role of fiduciaries to the class, and that is all the more true where the actions of class counsel actually prejudice the class, as they have here.[26]  <u>See</u>, <u>e.g.</u>, <u>First Mercury Ins. v. Nationwide Sec. Servs.</u>, 54 N.E.3d 323, 336 (Ill. App. Ct. 2016) (criticizing Wanca firm and noting "[c]lass attorneys, however, all too often aim to solidify a fund via the settlement negotiations in order to satisfy their hefty fee petition rather than their fiduciary obligations towards safeguarding class members' interests").  Numerous courts have questioned the fitness of the Wanca firm to serve in that role, and this record makes clear the

---

[25] The <u>TTA</u> settlement was signed on or about June 22, 2016, and a Fairness Hearing was scheduled for October 25, 2017.  <u>See</u> Order (<u>TTA</u> Dkt. 57).  The Settlement here was not signed until five years later, and the Fairness Hearing is currently scheduled for January 19, 2024. Inflation over that five-year period, however, has been more than 25% in the aggregate.  <u>See</u> CPI Inflation Calculator, U.S. Bureau of Labor Statistics, available <u>here</u> (comparing October 2017 and October 2023); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Dorado v. Bank of Am.</u>, 2017 WL 5241042, *4 (S.D. Fla. 2017) (noting that "where unnecessary additional costs and delay are likely to be incurred absent a settlement, 'it [is] proper to take the bird in the hand instead of a prospective flock in the bush'").

[26] If the other requirements for final approval could be met (and we respectfully submit they cannot be), the Court could address the adequacy issue noted above by rescinding appointment of the Wanca firm and retaining Mr. Addison as Class Counsel, with presumably an appropriate reallocation of any fee paid to the respective applicants.  <u>See</u>, <u>e.g.</u>, <u>Machesney</u>, 317 F.R.D. at 60-61 (declining to appoint the Wanca firm as class counsel when other options existed and noting Rule 23(g)(2)'s directive for "the court to appoint the applicant <u>best</u> able to represent the interests of the class").

members of that firm should <u>not</u> continue to serve as Class Counsel.  <u>See</u> disc. <u>supra</u> at 24-25.

Indeed, it is inconceivable that counsel can adequately represent a class if they go to extraordinary lengths to derail a class settlement proposed by other counsel but then seek approval of a settlement that provides little or no additional benefits to the <u>same</u> class, while seeking fees and costs that are more than six times <u>more</u> than what the class as a whole will receive.  That is the very definition of "[s]ubordinating the interests of the class" for the interests of the Wanca firm, and it is one of several reasons why the Wanca firm is not an adequate representative of the Settlement Class.  <u>Arkin</u>, 38 F.4th at 1012.

### E.   The Unavailability Of Incentive Awards Has Now Been Conclusively Resolved By The Eleventh Circuit

Finally, Plaintiffs request that the Court approve incentive awards of $10,000 each to Plaintiffs.  <u>See</u> Final Approval Mot. (Dkt. 482) at 25-27.  This request, however, is contrary to now-controlling Eleventh Circuit precedent.  <u>See</u> <u>Johnson v. NPAS</u>, 975 F.3d 1244, 1263-64 (11th Cir. 2020) (holding incentive awards are contrary to Supreme Court precedent).

When the Parties executed the Settlement Agreement, the panel opinion in <u>Johnson</u> was under review by the entire Eleventh Circuit in light of a pending petition for rehearing <u>en banc</u> filed on October 22, 2020.  <u>See</u> Pet. for Reh'g <u>en Banc</u> (Dkt. 63), <u>Johnson / Dickenson v. NPAS</u>, No. 18-12344 (11th Cir.).  Indeed, that petition was pending for nearly two years, and our understanding was that Class Counsel were reserving the right to seek incentive payments in the Settlement Agreement in the event the petition for rehearing <u>en banc</u> was granted and the panel opinion in <u>Johnson</u> was reversed.  On August 3, 2022, however, the petition in

27

Johnson was denied, meaning the panel opinion is now the law of the Eleventh Circuit.  See Johnson v. NPAS, 43 F.4th 1138 (11th Cir. 2022) (denying petition for rehearing en banc).

While Class Counsel reserve the right in the Settlement Agreement to seek Incentive Awards in spite of Johnson, the rationale articulated in their final approval motion is not compelling.  Plaintiffs claim in their motion for final approval that Johnson can supposedly be disregarded by this Court, because the settlement in Johnson did not call for reversion, whereas the Settlement Agreement does.  See Final Approval Mot. (Dkt. 482) at 25-27.  But that is a distinction without a difference, as the rationale of the panel opinion in Johnson makes abundantly clear. See Johnson, 975 F.3d at 1255-61 (no mention of reversion).  The panel opinion in Johnson rested on the fact that under Supreme Court authority, incentive payments like the one being sought by Plaintiffs were deemed to constitute "part salary" and "part bounty" and are thus impermissible.  See id. at 1258.  There is no indication in Johnson, however, that the fact the settlement there was non-reversionary had any bearing at all on the ruling itself, and under the logic of Johnson, an incentive payment would be akin to a salary or a bounty whether a settlement was reversionary or not.  See id. (noting the incentive award is akin to being "compensated for the time he spent litigating the case, or his 'personal services'").   Accordingly, Plaintiffs' request for incentive payments for themselves are contrary to controlling law in the Eleventh Circuit.

**F.   Plaintiffs' Rule 3.01(g) Certification Omits Relevant Context And Otherwise Glosses Over The Refusal Of Plaintiffs' Counsel To Meet And Confer On Article III Or Ascertainability**

Lastly, Plaintiffs' Local Rule 3.01(g) certification omits <u>entirely</u> the context of the exchange between counsel for Plaintiffs, Intervenors and BTL, choosing instead to reproduce in Plaintiffs' motion the <u>entirety</u> of an email from BTL's counsel <u>without</u> giving the Court <u>any</u> indication as to what preceded that email and <u>without</u> any effort to address substantive issues that BTL has been raising for months.   <u>See</u> Final Approval Mot. (Dkt. 482) at 29-30.   The email we were responding to in the email reproduced in Plaintiffs' motion is as follows:

> Easy for Intervenor/objectors. We oppose.  Can't wait to hear how Mr. "Both Sides of His Mouth" Mester responds[.]

Nov. 14, 2023 Email from J. Piper, Ex. 4 hereto.  In this email, Mr. Piper once again seemed to be feigning ignorance with respect to BTL's position on Article III, ascertainability and final approval, all of which we had addressed numerous times. <u>See</u> BTL's Mot. to Dismiss (Dkt. 492) at 8-11; disc. <u>infra</u> at 29-30.  His email, however, was only one of many acerbic emails received from him over the last several months (usually late in the evening), including baseless threats of sanctions, unwarranted personal attacks and hyperbolic mischaracterizations.  <u>See</u>, <u>e.g.</u>, Slater Decl. (Dkt. 467-1) ¶¶ 27-29, 37-42; May 26, 2023 Email fr. J. Piper (Dkt. 467-5); July 5, 2023 Email fr. J. Piper (Dkt. 467-16); July 11, 2023 Email fr. J. Piper (Dkt. 467-28).

More substantially, however, we received no response to our email from <u>either</u> Class Counsel or Mr. Piper.  <u>See</u> BTL's Mot. to Dismiss (Dkt. 492) at 11.  In particular, no effort was made by Class Counsel to complete the earlier meet and confer process on Article III or to address the remaining questions on that issue by

BTL.  See id.  Nor did Class Counsel bother to address in their final approval motion the issues BTL indicated it was contesting, making their silence on these issues all the more inexplicable but telling nonetheless.  See Final Approval Mot. (Dkt. 482) at passim (addressing standing solely in the context of fairness, reasonableness and adequacy of Settlement Agreement).

## V.   CONCLUSION

WHEREFORE, BTL respectfully requests that Plaintiffs' motion for final approval of the Settlement be denied for the reasons set forth herein.  BTL further requests any other such relief as the Court deems appropriate.

Date:  December 15, 2023

Respectfully submitted,

/s/ Mark S. Mester
Mark S. Mester, One of the Attorneys
for Defendant Buccaneers Team LLC

Mark S. Mester
   (admitted *pro hac vice*)
Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
        robert.collins@lw.com

Joseph H. Varner, III
   (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## <u>LOCAL RULE 3.01(h) STATEMENT</u>

Pursuant to Local Rule 3.01(h), BTL respectfully requests an evidentiary hearing on any factual issues raised by Plaintiffs' motion for final approval and/or BTL's response thereto.

Date:  December 15, 2023                    */s/ Mark S. Mester*

Mark S. Mester
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  December 15, 2023                    */s/ Mark S. Mester*                         
                                            Mark S. Mester
                                               (admitted *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            330 North Wabash Avenue, Suite 2800
                                            Chicago, Illinois 60611
                                            Telephone:  (312) 876-7700
                                            Facsimile:  (312) 993-9767
                                            E-mail:  mark.mester@lw.com