# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **CIN-Q AUTOMOBILES, INC., et al.,** | ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 8:13-cv-01592-AEP** |
| **BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10,** | ) ) ) | **Magistrate Judge** |
| **Defendants,** | ) ) | **Anthony E. Porcelli** |
| **TECHNOLOGY TRAINING ASSOCIATES, INC., et al.,** | ) ) ) | |
| **Intervenors.** | ) | |

**DECLARATION OF KEN SPONSLER**

I, Ken Sponsler, declare and state as follows:

**I.    INTRODUCTION**

1.     My name is Ken Sponsler. I am the Senior Vice President at PossibleNOW Services, Inc. d/b/a CompliancePoint Litigation Support Services ("CPLSS"), located in Duluth, Georgia.

2.     This declaration lists my current findings and conclusions in this matter. I reserve the right to provide additional information on this matter. I also

reserve the right to supplement this declaration as new information becomes available.

## II.   ASSIGNMENT

3.      CPLSS and I were asked by counsel for Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL") in the above-captioned matter to assess whether and to what extent telephone carriers could have been subpoenaed by Plaintiffs' counsel before or shortly after this case was filed to determine who the subscribers to the numbers identified on the Biggerstaff list were from July 2009 to June 2010.

## III.   QUALIFICATIONS

4.      I have extensive experience regarding fax transmission technology and its application with respect to the rules and requirements under the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), 47 USC § 227 (hereafter "TCPA").  I have previously served as a party-appointed expert witness in dozens of TCPA matters.  I have also been appointed by federal courts to serve as a TCPA compliance monitor.

5.      My experience includes dozens of consulting and testifying witness engagements in matters relating to the inability to reliably identify historical recipients of faxes, particularly in a case such as this where the faxes at issue were allegedly sent in 2009 and/or 2010 (over 13 years ago).

6.      My qualifications were previously described in Paragraphs 15-25 of the February 18, 2022, Declaration of Ken Sponsler in Support of BTL's Submission Regarding the Reliability of the Biggerstaff Report Data ("February 18, 2022, Sponsler Declaration"), and I incorporate them into this Declaration.

2

7.     This declaration assumes the Court is familiar with the faxes at issue in this case and incorporates the background information regarding the alleged fax marketing campaign described in Paragraphs 26-31 of the February 18, 2022, Sponsler Declaration.

8.     This declaration also assumes the Court is familiar with the various expert reports prepared on this matter by Plaintiffs' expert, Robert Biggerstaff.  See Biggerstaff Report (Dkt. 207-5); Biggerstaff Suppl. Rpt. (Dkt. 207-9); Biggerstaff Second Rpt. (Dkt. 210-2).

## IV.    ANALYSIS AND OPINIONS

**A.    <u>Opinion One</u>: If Plaintiffs' counsel had subpoenaed telephone carriers before or shortly after they filed suit in 2013, they likely could have obtained information regarding the subscribers to the telephone numbers identified on the Biggerstaff list from July 2009 to June 2010 and used that information to generate a class list.**

9.     As outlined in his October 30, 2015, Supplemental Expert Report, Mr. Biggerstaff has consistently been of the opinion in this matter that "the task of obtaining the name and address data of the holders of those 131,011 numbers at the time of the fax transmissions in question is both quantitatively and qualitatively manageable."  See Biggerstaff Suppl. Rpt. (Dkt. 207-9) at 4.

10.    Mr. Biggerstaff also indicated in his October 30, 2015, Supplemental Expert Report that there were only a handful of carriers serving the Tampa area during the period of July 2009 through June 2010:  A&T, Verizon, CenturyLink, Level 3, Frontier, Paetec and Fairpoint, with AT&T itself accounting for upwards of 39.5% of the telephone lines in Tampa.  See id. at 6.

11.     All telephone carriers have records retention policies, and Mr. Biggerstaff agreed in his reports that telephone carriers have such policies.  See Biggerstaff Second Rpt. (Dkt. 210-2) at ¶ 43.

12.     Carriers publish their record retention policies. Record retention policies include subscriber information, call history, SMS content and so on. As this information indicates, inactive subscriber record policies are much shorter in many cases.  While this information was published regarding cell phone data retention, similar retention polices likely in force since the underlying issue is data storage and related maintenance costs such as data backup processes, multiple storage facilities, increased costs due to adding necessary storage mediums and so on. Finally, of primary importance to this case is the retention period for "subscriber information". As specifically noted below by one carrier, former subscriber information is purged right after the account is closed. While all carriers did not address this specific issue, it is likely that most carriers would maintain similar retention policies.

**Verizon Wireless**

Subscriber Information: 7-10 years

Call History: 7 years

SMS Content: 3-5 days (although I've been told unofficially it may be as much as 7-10 days)

**AT&T**

Subscriber Information: 7 Years

Call History: 7 years

SMS Content: Not Available

**Sprint**

Subscriber Information: 10 years

Call History: 18 months. Bill reprint form 7-10 years, pre-pay accounts only 18 months regardless.

SMS Content: Not Available

**T-Mobile**

Subscriber Information: 3-5 years. Canceled accounts are purged after the account closes.

Call History: 23 months

SMS Content: Not Available

**U.S. Cellular**

Subscriber Information: up to 7 years

Call History: 1 rolling calendar year. Bill reprint: 7 years.

SMS Content: 3-5 days

As illustrated here, the retention periods and even the types of available records are not uniform, making this type of information crucial in both criminal and civil investigations alike. For records such as bill re-print, the detail in this data will be far less than we normally see in traditional investigative cellular call detail records, so I wouldn't rely on this information for anything other than basic communication

documentation. As a rule, I recommend checking with the provider first to see if the data you're looking for is still available.

13.     Because of these records retention policies, and the possibility that the holder of a fax line changes hands over time, it is important to subpoena telephone carriers as early as feasible in order to obtain records that would allow for the identification of the subscribers to the lines at the time the faxes are allegedly sent.

14.     It is my understanding that neither Mr. Biggerstaff nor Plaintiffs' counsel ever subpoenaed such records from any telephone carriers that operated in the Tampa area in 2009 and/or 2010.

15.     Had they chosen to do so before or soon after this case was filed in 2013, Plaintiffs' counsel likely could have obtained the names and last known addresses of the subscribers of the numbers on the Biggerstaff list as of the dates the faxes at issue were allegedly sent, and the identities of those persons and entities would now be known.

16.     If the subscriber of the line was the direct holder or user of the line, that would identify the member of the class.

17.     If the subscriber of the line was <u>not</u> the direct holder or user of the line, additional steps would then be needed to identify the end user of the line.

18.     Because the telephone carriers were never subpoenaed, we do not today have information definitively indicating who held the numbers at issue on the Biggerstaff list from July 2009 to June 2010, and the attempt to identify class members has become subject to subjective, individualized, and unmanageable methods, such as self-attestations and associations on reverse lookups, which are not intended to identify who held a telephone number at a specific point in the past.

## V.    CONCLUSIONS

19.    It is always a best practice to subpoena telephone carriers as early as possible in order to obtain the most accurate information on who held telephone numbers at a particular point in time, before those records no longer exist consistent with the telephone carriers' retention policies.

20.    Had Plaintiffs' counsel subpoenaed those records before or shortly after filing this lawsuit, the subscribers of the telephone numbers identified on the Biggerstaff list at the time the faxes at issue were allegedly sent likely could have been identified.

21.    Even if the subscriber identified through such a subpoena process was not the ultimate end user of the line, this information could have been used to conduct additional investigation in an attempt to determine who the end user of a line was.

22.    Because no attempt was ever made by Mr. Biggerstaff or Plaintiffs' counsel to subpoena any telephone carriers regarding the lines at issue in this case, the identities of the holders of the numbers on the Biggerstaff list cannot now reliably be determined because the reverse lookup databases being used were not designed for that purpose.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 11, 2023, in Beverly Hills, Florida.

_____
**Ken Sponsler**