## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CIN-Q AUTOMOBILES, INC. and MEDICAL CHIROPRACTIC CLINIC, INC., individually and on behalf of a class, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 8:13-cv-01592-AEP |
| v. | ) ) | Hon. Anthony E. Porcelli |
| BUCCANEERS TEAM LLC, | ) ) | |
| Defendant | ) ) | |
| _____ | ) ) | |
| TECHNOLOGY TRAINING ASSOCIATES, INC., *et al.*, | ) ) ) | |
| Intervenors. | ) ) | |

## INTERVENORS/OBJECTORS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR FINAL APPROVAL

Intervenors Technology Training Associates, Inc., Larry F. Schwanke, D.C.,

d/b/a Back to Basics Family Chiropractic, Barewood Outlet, Inc., and Thomas

Savino d/b/a WebRX Pharmacy Palace, d/b/a RxPalace.com (collectively

"Intervenors"), submit the following in opposition to the motion filed by Plaintiffs

Cin-Q Automobiles, Inc. and Medical and Chiropractic Clinic, Inc. ("Plaintiffs") and

seeking final approval of their proposed class action settlement. *Cin-Q* Doc. 434.[1]

---

[1]     Documents filed in the docket for this action, No. 8:13-cv-01592-AEP (M.D. Fla.), are
referred to by their ECF number as follows "*Cin-Q* Doc. ___," and page references are to the pages
in the docket entry not those in the original document.

To avoid repetition, Intervenors incorporate by reference the points they made in opposition to Plaintiffs' motion preliminary approval and in their formal objection [*E.g.*, *Cin-Q* Docs. 325, 332, 338-1 (transcript of hearing January 20, 2022), and 482] and focus here on developments that took place since those filings and require denial of the proposed settlement.

## I. The notice was inadequate and misleading.

### A. The class notice was misleading because it did not explain that claims of fax service providers and their customers would not be paid or that fax service providers are not part of the class (if that is the case).

Nothing in the class notice clarified the status of fax service providers or their customers. *Cin-Q* Doc. 482-3 at 20 (class notice). It did not say whether they are in or out of the class. It did not say whether they could have claims paid.

After notice was concluded and the opt out and claims deadlines had passed, the settling parties reached an agreement that the claims administrator would investigate which claimants were fax service providers. *See Cin-Q* Doc. 438 at 3 n. 5 (raising fax service provider issue); *Cin-Q* Doc. 475 at 10 (ordering Epiq to confer with the settling parties to determine a way to identify suspected fax service providers). Apparently, many suspected fax service providers did not respond to those inquiries and their claims are being denied. *Cin-Q* Doc. 482-3 at 9-10.

Defendant has challenged payment of $615 to one claimant, Astro Companies, LLC ("Astro"), on the ground that it is a fax service provider. In its

challenge to Astro's claim, filed December 8, 2023, Defendant contends that the class definition explicitly excludes fax service providers because they were not intended ultimate recipients of the faxes: "Under the terms of the Settlement Agreement, any entity that was not the intended recipient of a fax purportedly sent on behalf of BTL but, instead, was only an online fax service that processed faxes and delivered them to recipients as emails is not a Settlement Class Member." *Cin-Q* Doc. 485 at 17 (under seal).

That argument does not make any sense either as a matter of construction or a matter of fact or a matter of law. The class definition is "All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games." *Cin-Q* Doc. 343 at 78. The word "intended" and the phrase "intended recipient" are not in it. To the extent any faxes were received by fax service providers they were recipients of the faxes, whether intended or not, and faxes were successfully sent to them. The class definition expressly excludes BTL, Class Counsel and judges, but says nothing about any exclusion of fax service providers. *Id.* By its plain unambiguous words, fax service providers are within the class definition.[2]

---

[2]    Defendant does not address another possibility—that among the 131,011 fax numbers to which the fax numbers were sent were business fax numbers of fax service providers. Presumably, the fax service provider would be the "intended recipient" of a fax sent to its business fax number. A fax service provider would be a potential prospect for season tickets just like any other business.

Moreover, the notice to the class states that the settlement settles "**all claims** about 343,122 advertising faxes allegedly sent by or on behalf of BTL." *Cin-Q* Doc. 482-3 at 20 (emphasis added). The notice does not say that claims of fax service providers are not part of the settlement.

As a factual matter, it is not clear what "intended recipient" even means in the context of this case. Defendant claims it intended the faxes to be sent to people who had "opted in" to receive faxes, but that would yield a class of zero members because there is no evidence that anyone did "opt in" to receive Defendant's faxes. *Cin-Q Auto, Inc. v. Buccaneers Ltd. P'ship,* No. 2014 WL 7224943 at *2 (M.D. Fla. Dec. 17, 2014) (denying summary judgment). The provenance of the fax lists to which the broadcasters ultimately sent the faxes is a bit of a mystery, and the evidence does not support the idea that there was much intentionality behind the selection of the fax numbers.

Finally, as a legal matter, standing to assert claims under the TCPA is not limited to the "intended recipients" of the faxes. *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.,* 757 F.3d 540, 544 (6th Cir. 2014). The owner of the fax machine, the subscriber of the fax number, the intended recipient, and the actual recipient all can assert claims for fax advertisements sent without permission. *Id.*

Defendant also takes the position that persons who received the faxes through an online fax service provider—*i.e.,* customers of that provider—are members of the

4

class but lack Article III standing to assert claims and should not have their claims compensated under the settlement. *Cin-Q* Doc. 492 at 17 (the settlement class "indisputably includes persons and entities that received faxes as emails through online services and thus lack Article III standing"). Defendant also asserts that Plaintiffs agree with this. *Id.* at 9.

To the extent that the settlement excludes any users of online fax service providers from the Class or disqualifies them from being paid for their claims, it should have been set forth in the settlement agreement. To the extent that the customers of online fax service providers are members of the Class but will not be compensated under the Settlement, that also should have been disclosed in the notice, so they could opt out and pursue their claims outside of this litigation. Astro has a claim relating to x faxes, potentially worth $x dollars. If it is not going to recover anything on its claim, as Defendant contends it should not, it should have been advised of that up front.

Incidentally, contrary to BTL's arguments, whether a claimant is an online fax service provider or a person who received faxes through such a service could be ascertained, were it necessary to do so, by requiring claimants to attest that they were not a fax service provider and received faxes in 2009-10 on a standalone fax machine. At this point, a business owner is more likely to remember whether they had a physical fax machine connected to their fax number in 2009-10 than to

remember receiving a Buccaneers fax on that machine, as the claim form here requires. Remembering the fax isn't an element of a TCPA claim.

It is patently unfair to release claims of persons who received faxes through online fax service providers without making any benefit available to them and without giving them notice that their claims will not be paid. They should have been excluded or provided an opportunity to opt out on that basis and pursue their claims outside this case. That is particularly true when the TCPA status of faxes sent to and through online fax service providers is unresolved even at the Federal Communications Commission, where the *Amerifactors* ruling is still under review. *In re Amerifactors Fin. Grp. LLC Petition for Expedited Declaratory Ruling,* 34 FCC Rcd. 11950 (F.C.C. Dec. 9, 2019); *Applicant Career Counseling Svcs., Inc.'s Application for Review,* CG Docket Nos. 02-278, 05-338 (Jan. 8, 2020). In *Lyngaas v. Curaden AG,* 992 F.3d 412, 427 (6th Cir. 2021), the Sixth Circuit addressed *Amerifactors,* concluded that the FCC bureau was wrong about the issue, and ruled that in any event the bureau's order would not apply retroactively to claims about fax transmissions before the order was issued in December 2019.

Finally, the online fax service issue is on appeal to the Eleventh Circuit in *Scoma Chiropractic, P.A. v. National Spine Ctrs.,* Appeal No. 23-13087. Doc 8 at 2

(raising issue whether TCPA "protects consumers who use an 'online fax service' to receive faxes").[3]

Here, whichever way the online fax service provider issues might be resolved—whether the recipients of those fax transmissions are excluded from the Class and the release, or they are included in the Class but ineligible for a settlement payment—the settlement needs to be clarified and the notice needs to be revised and resent so that they can know how they will be treated and, if they are included in the Class and have claims released but will not receive compensation, so they can opt out or object. For that reason, the proposed settlement should be rejected.

### B.   The notice was misleading because it did not explain the five-fax cap to which Plaintiffs unwittingly agreed.

The notice did not explicitly state that compensation was limited to five faxes per claimant, regardless of how many of the corporate claimant's fax machines received the faxes. *Cin-Q* Docs. 482-3 at 20; 475 at 8. Class members who received more than five faxes (because they had more than one fax number connected to a fax machine) needed to know this information. In fact, one such class member, Astro, having learned of the five-fax limit after appearing through counsel, is now seeking leave to opt out of the settlement if it is approved. *Cin-Q* Doc. 483. (On the other hand, if Defendant is right and Astro is not a class member, then it would not need

---

[3]     The court recently issued a Jurisdictional Question, requiring simultaneous briefs from the parties by December 28, 2023.

to opt out, its claims would not be released by the settlement, and it can file suit and litigate on its own.)

A reasonable person reading the notice would not have understood that the settlement payout was limited to five faxes per person, because the notice did not say that. *Cin-Q* Docs. 482-3 at 20. Anyone who looked at the court record as of the opt-out date would have reasonably assumed the opposite—that claims would be paid on a "per unique fax number" basis. Intervenors raised the issue in opposing preliminary approval. *Cin-Q* Doc. 325 at 6. Plaintiffs responded that claims would be paid on a per fax number basis "up to $615 ***per fax number***." *Cin-Q* Doc. 329 at 4 (emphasis added). Defendant did not contradict this. Anyone reading the court record would have reasonably believed the issue was settled and payments would be on a per fax number basis as Plaintiffs asserted without contradiction.

It was only later, after the claims submission, opt out, and objection deadlines had passed that the parties raised with the Court that this was a disputed issue. *Cin-Q* Doc, 451 at 5.[4] The Court decided that the settlement agreement was unambiguous and provides payments only on a per claimant, not per fax number, basis. However, that was too late. The deadlines had passed. Claims by class members with multiple

---

[4]      Plaintiffs asserted that "BTL was silent on this issue until February 2023, when it came up during email correspondence with the Settlement Administrator." *Cin-Q* Doc. 451 at 5. That was after the notice had already been mailed on November 7, 2022. *Cin-Q* Doc. 482-3 at 6. The claims/opt out deadline was February 6, 2023. *Cin-Q* Doc. 482-3 at 21.

fax numbers and more than five faxes had already been submitted. Most of these class members still do not know about the five fax per claimant limit because the Court's ruling on that issue has not been sent to them.

Astro has submitted validated claims for 2,122 successful fax transmissions received on its fax machines, potentially worth $1,061,000 at $500 per TCPA violation. Exhibit 1 (Declaration of David Bachmannhuff), ¶ 13. Astro reasonably was not aware that its payout would be limited to $615 under the settlement when it submitted its list of fax numbers as part of a consolidated claim rather than submitting a claim for each of its dozens of fax numbers that were successfully sent and received these faxes; or capped at 5 shares of the Settlement Fund regardless. Astro couldn't reasonably have known these facts based on the existing court record as of the opt-out deadline.

Because the notice did not clearly explain the relief available, it was misleading and inadequate. The settlement should either be rejected, or those claimants must be notified and given a renewed opportunity to opt out or object based on that information.

## C. The notice was misleading because it did not explain that claimants could get around the five-fax cap by submitting multiple claim forms.

The settlement has been administered in such a way that the five-fax limit is evaluated on a "per-claim-form basis, with no *pro rata* reduction," rather than on a

"per claimant" or "per fax number" basis. Epiq has approved payments to claimants who appear to have submitted multiple claim forms for multiple fax numbers and will be paid up to five faxes *per claim form*. <u>Exhibit 1</u> ¶¶ 4-10. On the other hand, had these claimants included all their fax numbers on just one claim form, they would have been capped at five faxes total. Put differently, take the example of claimant 177503, a large retailer with stores all over the area. This company submitted a claim relating to 780 valid fax numbers and 330 faxes. <u>Exhibit 1</u> ¶¶ 12. On a "per claim form" basis, this claimant is only entitled to $615 in settlement payment. However, had the claimant submitted a separate claim form for each of its fax numbers, as other claimants apparently did, Epiq would have paid it money for each of the illegal faxes it received.

Because the notice did not explain the arbitrary, differential treatment of a person submitting a single claim form versus a person submitting multiple claim forms, it was misleading and inadequate, and either the settlement should be rejected, or new notice should go out explaining the "per claim form" basis for applying the five-fax limit.

### D.    There has been no showing as to notice reach.

Despite continual wrangling between the settling parties as to the form of notice, and despite their burden to support the settlement, neither has presented the Court with an expert opinion as to the reach of any component of the notice plan.

This even though Epiq said it was ready, willing, and able to provide such an opinion. Aug. 31, 2022 Tr. 63-70. The Court declined Intervenors' suggestion to appoint its own expert, but made it clear to the parties at the October 16, 2022, status conference that "there will have to be something on the record for the Court's satisfaction that reach was successfully accomplished." Tr. 18-19. Plaintiff's motion attempts no such showing. The Epiq declaration states the number of notices that were mailed because of the reverse lookups, and states that newspaper ads were run as ordered, but it contains no reach analysis, no analysis of duplication or error rate in the reverse lookups, and no estimation of newspaper reach. *Cin-Q* Doc. 482-3. Intervenors were not mailed notice and did not see a publication notice. Cin-Q Doc. 434-6 ¶7, 434-7 ¶8, 434-8 ¶9, and 434-9 ¶9. The settlement should be rejected because the parties have not established the reach of the notice program.

### E.   There should have been fax notice.

Intervenors renew their objection to the notice plan on the ground that faxes were not sent to the fax numbers to which the faxes were sent. The abysmal claims rate, discussed at III, *infra,* is testament to the inadequacy of the reverse lookup/mail notice program and the unduly burdensome claim form. In *Yates v. Checkers Drive-In Restaurants, Inc.,* No. 1:17-cv-09219, 2020 WL 6447196 (N.D. Ill. Nov. 3, 2020), the court denied final approval without prejudice in a TCPA text-message case due to the low claims rate and ordered supplemental notice by text message. As a result

of the second text message round, ***the claims rate rose over 400%,*** from an initial 7,017 to 40,040 eligible claim forms. *Id.,* Doc. 164-3 (claims administrator declaration explaining that Court's requirement of text-message notice added "an additional 33,023 Claim Forms" over the original 7,017). Fax notice here would almost certainly do the same (with a reasonable claim form). Persons using those fax numbers today would be happy to receive a **fax** notice of a one-time, take-it-or-leave-it opportunity to claim money in a settlement about junk faxes they received years ago but need not remember because the only necessary confirmation, if they choose to submit a claim form, is that they are a rightful claimant for legal claims about faxes sent to that fax number in 2009-10.

## II.    The settlement does not treat class members equitably.

Rule 23(e)(2)(D) requires that a proposed class settlement "treats class members equitably relative to each other." *See also Ponzio v. Pinon*, No. 21-14503, 2023 WL 8183241, at *3 (11th Cir. Nov. 27, 2023), discussed *infra*. Added in 2018, the advisory committee notes explain, "Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."

**A.    The five-fax cap is inequitable to class members who received more than five faxes.**

The settlement does not treat class members equitably, because claimants are capped at five faxes per claim form, regardless of how many faxes the class member received or was successfully sent. For example, Astro confirms it received some 2,122 faxes, yet would be entitled to only $615 in this settlement, the same as a claimant who received just five faxes. There are many other claiming class members who received over five faxes. Another claimant received 330 faxes in total but is only receiving $615 under the settlement. Exhibit 1, ¶¶ 12-14. The settling parties agreed to base the payments on the successful transmissions to each fax number reflected in Mr. Biggerstaff's report, but capped at 5 faxes per claim form or 5 faxes per claimant, rather than per successful fax transmission to the class member's verified fax numbers as Plaintiffs should have required.

Whether or not the Court ruled correctly in construing the settlement to cap payouts at five faxes per claim form or claimant—Plaintiffs argued otherwise—the fact of the cap shows the parties intended an unreasonable and inequitable apportionment of the Settlement Fund between claimants with four or fewer verified fax numbers versus claimants with five or many more than five verified fax numbers that the parties have agreed Epiq can consider "received" one to five successful facsimile transmissions of the Buccaneers group ticket solicitations. The settlement

13

fund is large enough to pay all the claimants for all their faxes on a per fax basis. If that is not done, the settlement should be rejected.

**B.** **The application of the five-fax cap on a "per claim form" basis is inequitable to class members who filed only one claim form.**

The settlement has been administered in such a way that the five-fax limit is evaluated on a "per claim form" basis, rather than "per claimant" or "per fax number."

There are claimants who submitted multiple claim forms for multiple fax numbers and are being paid up to five faxes per claim form. On the other hand, had these claimants submitted all their fax numbers on just one claim form, they would have been capped at five faxes total.

Conversely, one large company submitted one claim form relating to 780 fax numbers and 2,122 faxes. Exhibit 1 ¶¶ 12. On a "per claim form" basis, that claimant is only entitled to $615 in payment. However, had that claimant submitted a separate claim for each of its fax numbers, Epiq apparently would have validated payments for each of the faxes it received.

The differential treatment of class members based on whether they split their claims and submitted multiple claim forms or not is entirely arbitrary and inequitable. The cap should be "per fax number" or the settlement should be rejected.

14

**C.    The common treatment of the 127 High Street fax transmissions and the Rocket fax transmissions is inequitable because the quality of evidence as to the two broadcasters is completely different.**

As Intervenors have previously argued, there is a vast difference in the quality of evidence concerning authentication and foundation for the records of faxes transmitted by 127 High Street and those transmitted by Rocket. *Cin-Q* Doc. 434 at 24. As a result, it is unfair that the Rocket transmissions are being heavily discounted based on problems with the 127 High Street records. A contested litigation class of Rocket recipients could be certified and gain a recovery, regardless of the 127 High Street evidentiary issues. Accordingly, compromising both sets of transmissions on the same basis is inequitable and warrants rejections of the settlement.

**III.   If online fax service providers or their customers are included in the Class and releasing their claims, but ineligible to claim any payment, they lack adequate representation.**

As noted above, it is not clear whether online fax service providers and customers are included in the settlement class. Defendant contends they are not because they were not "intended recipients." It is also not clear whether persons who received faxes through a fax service provider are included in the class or not. There is presently no evidence that any claimants received their faxes through a fax service provider, but Defendant appears to want to challenge that and, if there are such claimants, deny their claims.

To the extent that the settlement includes sub-classes—fax service providers or persons who received their faxes through a fax service provider—whose claims will not be paid but will be released, those subclasses are entitled to independent representation. There is no evidence that either of the settling Plaintiffs falls into either sub-class. Accordingly, the settlement should be rejected.

## IV.   The miniscule claims rate warrants rejection of the settlement.

The Court must consider the claims rate in determining whether to give final approval to a settlement. Plaintiff's counsel declare victory, citing a handful of cases—none of the dozens of cases they have settled during 20+ years of working on TCPA junk fax cases—to argue "a 2.11% claims rate ... is a typical claims rate in a TCPA class action settlement." ECF 482, p. 2. They ask the Court to approve the settlement and award them millions of dollars in attorney fees, even though 99% of the class members will get nothing.

In *Ponzio v. Pinon*, No. 21-14503, 2023 WL 8183241, at *3 (11th Cir. Nov. 27, 2023), the Eleventh Circuit recently explained the issue as follows:

> Under Rule 23(e)(2), a district court may approve a class action settlement that binds class members "only after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Since 2018, Rule 23(e)(2)—in subsections (A)-(D)—has set out four core concerns the district court must consider in making this determination. These are whether "[t]he class representatives and class counsel adequately represented the class"; whether "the proposal was negotiated at arm's length"; whether "the relief provided for the class is adequate" ("taking into account" the "costs, risks and delay of trial and appeal," "the effectiveness of any proposed method of distributing relief to the class,

16

including the method of processing class-member claims," the "terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)"); and whether "the proposal treats class members equitably relative to each other." *See* Rubenstein, 4 Newberg on Class Actions § 13:58 (explaining that "Rule 23 gave no further meaning" to the "fair, reasonable, and adequate" standard until Rule 23(e)(2) codified a list of "four 'core concerns' that the Advisory Committee labeled 'the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal' "). *See also* Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment.

Before the 2018 amendment to Rule 23(e)(2), we "also instructed district courts to consider several additional factors called the *Bennett* factors." *In re Equifax Inc.*, 999 F.3d at 1273 (citing *Bennett*, 737 F.2d at 986). These factors are

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. At the end of the day, the district court acts "as a fiduciary for the class." *In re Equifax Inc.*, 999 F.3d at 1265. *See also* 7B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1797 (3d ed. & April 2023 update) ("The purpose of subdivision (e) is to protect the nonparty class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise, abandoning the claims of the absent class members.")

***

The "[p]roponents of class action settlements bear the burden of developing a record demonstrating that the settlement distribution is fair, reasonable and adequate." *Holmes*, 706 F.2d at 1147. *Accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011); *Ault v. Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012).

*Id*. at \*3-\*4.

To determine the TCPA claims rate in a TCPA case, it is necessary to divide the number of successful transmissions being paid by the number of transmissions sent. In this case, the total number of transmissions was 343,122. The number of transmissions for which compensation is being paid is 4276. This yields a claims rate of 1.2%. Plaintiffs seek to goose the numbers to assert the claims rate was 2% by including transmissions that are not eligible for payment, such as 2,122 transmissions to Astro. And that is before rejection of the many claims opposed by Defendant. That is not a fair, reasonable, and adequate distribution.

## V.   The method of distribution is unfair, unreasonable, and inadequate.

As argued in prior filings, the settlement is unfair, unreasonable, and inadequate because class members were required to verify under penalty of perjury that they received the faxes at issue. *Cin-Q* Docs. 325 at 5, 434 at 21. As a result, class members who could not recall junk faxes they received over ten years ago were ineligible for relief. The memory test claim form is particularly unfair given that the TCPA does not require that faxes be "printed or seen." *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015) ("Notably, a prevailing plaintiff need not have suffered any monetary loss in order to recover statutory damages.")

The low claims rate substantiates Intervenors' contention that the memory test requirement unfairly reduced claims. On the other hand, it did little to nothing to prevent false claims! Slightly over half the claims submitted were invalidated by Epiq, and Defendant is seeking to invalidate many more. *Cin-Q* Docs. 482-3, 486, 489, 490.

## VI.   The treatment of fax service providers renders the claim payouts inadequate and unreasonable.

Plaintiffs have argued that they reached this settlement reluctantly because of problems created by the *Amerifactors* ruling. *E.g., Cin-Q* Doc. 324 at 7. Worried that *Amerifactors* would jeopardize class certification, Plaintiffs say they accepted a smaller settlement fund and smaller claims payouts for all class members, whether they received their faxes through an online fax service provider or not. *Id.* Then, after the opt out deadline had passed, the fax service providers were excluded from the settlement class (or included in the class but without the ability to get claims paid) and processes were put in place for the settlement administrator to identify fax service providers and deny their claims. It is a contradiction that fax service providers are not having claims paid, yet the rest of the class is receiving a reduced benefit because the online fax services were included in the class.

As it stands, it is unclear whether the fax service providers are class members whose claims are being rejected, or whether they are excluded from the class altogether. As explained above, the class definition does not exclude them. If their

claims were not eligible for payment, they should be excluded from the class, and the relief to the remaining class members should be renegotiated because *Amerifactors* is no longer relevant and does not warrant a reduction or compromise of the fund or the payouts.

The settlement is therefore unfair, unreasonable, and inadequate for the class members who are not fax service providers or their customers.

## VII. Attorney fees should be calculated based on the amount made available to class members who remembered receiving the Buccaneers faxes and should not include any consideration of the illusory benefit claimed for those who did not remember.

In the Eleventh Circuit, attorney fees to the plaintiff's lawyers in a class action settlement are calculated by reference to the dollar value of the common fund made available to the class members through the attorneys' efforts. The fact that an eligible class member chooses not to submit a claim for relief does not thereby reduce the benefit conferred on the class. *See Ponzio v. Pinon,* No. 21-14503, 2023 WL 8183241 at *9 (11th Cir. 27 Nov. 2023) (distinguishing class members "ineligible … to receive benefits" from class members who are "uninterested in seeking reimbursement for one reason or another"). But there was no "benefit" conferred upon the class members who Plaintiffs agreed would be ineligible to claim anything.

"Historically, the rationale entitling counsel to a percentage of the common fund derives from the equitable power of the courts under the doctrines of quantum meruit … unjust enrichment … and later, what has become known as the

20

'substantial' or 'common benefit' doctrine." *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (internal citations omitted).

In *Arkin v. Pressman, Inc.*, 38 F.4th 1001 (11th Cir. 2022), the Eleventh Circuit explained the law as follows:

> "[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Home Depot Inc., Customer Data Sec. Breach Litig.*, 931 F.3d 1065, 1079 (11th Cir. 2019) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, (1980)). Common funds belong to the plaintiffs, not to the defendant(s), and so plaintiffs' lawyers may receive payment from the common fund without violating the American Rule. *Id.* The key here is that only those lawyers who "recover[ ] a common fund" for the plaintiffs are entitled to a portion of the common fund as a reasonable attorneys' fee. *Id.* This makes sense. Attorneys, like all other professionals, are paid for the services they provide their clients, and it would be foolish to force plaintiffs to pay lawyers whose work did not benefit them, especially in the absence of a contractual relationship.

*Id.* at 1008 (note omitted).

Here, the class is defined to include "All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games." Thus, both those "who received" and those who "were successfully sent" the faxes are in the class. Yet, Plaintiffs agreed that settlement relief would be available only to those class members who could declare under penalty of perjury that they received a Buccaneers fax in 2009 or 2010.

As a result, a substantial number of class members were ineligible to submit claims. If they could not remember receiving a Buccaneers fax, they could not claim

a settlement check but their legal claims will be released. Plaintiffs even agreed that such people could not object to the settlement. If the people who received faxes in 2009 or 2010 but do not remember them were represented in releasing their TCPA claims for nothing, not even an opportunity to claim a share, then their representation was inadequate.

The best evidence of the benefit conferred on class members eligible to receive money, under the circumstances, is the amount that will be paid to class members who submitted valid claims, and that should be the benefit amount against which attorney fees are calibrated. At present, based on the Epiq report, that amount is $799,725. *Cin-Q* Doc. No. 482-3 at 9.

## VIII. Given the disagreements between the settling parties about what deal they made, and unresolved issues about who is in the Class and what categories of class members were eligible to claim payments, the settlement should be rejected.

The Court should deny final approval and reject the proposed settlement. To begin with, the settlement as construed by the Court is not the one Plaintiffs thought they negotiated. Plaintiffs understood that claims would be paid on a per fax and per fax number basis. The Court ruled that claims would be paid on a per claimant basis. Even accepting that the Court is right about that, as Plaintiffs have done in moving for final approval, the fact that Plaintiffs' counsel agreed to a deal which is substantially less lucrative than they thought is a significant problem warranting

rejection of the proposal. It renders the settlement unfair. Moreover, it raises issues as to Plaintiffs' counsel's adequacy.

The settling parties also seem to be disputing whether the claims of fax service providers and persons who received faxes through fax service providers are class members, or whether their claims should be paid and released. The fact that even at the settlement stage the parties appear to disagree about what the settlement is, or who is in the settlement class, shows the need for a do-over.

From the record it appears obvious that many of these issues—the "per fax number" payout issue and the fax service provider issue—simply were not even considered by the settling parties during the mediation and were not negotiated. They have been raised on an ad hoc basis after the settlement agreement was finalized and filed with the Court and are still in dispute. It is patently unfair to class member to have to make decisions on whether to participate in the settlement and file claims when the parties themselves are still jousting over what the settlement contemplates.

The settlement should be rejected. If the settling parties want to try a do-over and re-notice the class, they certainly can do so.

## IX.  In the alternative, the case should be stayed while the Eleventh Circuit addresses the issues of online fax service users and providers.

There is a case pending in the Eleventh Circuit that raises the question of whether faxes sent to fax service providers are covered by the TCPA. *Scoma Chiropractic, P.A. v. National Spine Ctrs.,* Appeal No. 23-13087. Doc 8 at 2 (raising

23

issue whether TCPA "protects consumers who use an 'online fax service' to receive faxes"). The outcome of that appeal may be decisive in evaluating the settlement here because the treatment of faxes sent via fax service providers implicates so many issues: Should the settlement have discounted the payments to other class members because of the issues surrounding *Amerifactors?* Should fax service providers and persons who received faxes through them be included in the settlement and their claims be paid? Was the notice adequate when it did not spell out the exclusion? Recently a sister court stayed a TCPA case to wait for the ruling in *National Spine Ctrs. Scoma Chiropractic, P.A. v. Dental Equities, LLC,* No.2:16-cv-41-JLB-NPM, Doc. No. 301 (M.D. Fla. Nov. 9, 2023). It would be prudent to stay the present case so that the issues regarding online fax services can be determined with the Eleventh Circuit's guidance.

WHEREFORE, Intervenors-Objectors respectfully request that the Court deny the motion for final approval, without prejudice, and require the parties to meet-and-confer about whether they can agree to an amended settlement proposal that satisfies these valid objections or submit a case management plan to finish the work necessary to decide some of the issues apparently keeping the parties from reaching a fair, reasonable, and adequate settlement.

Respectfully submitted,

TECHNOLOGY TRAINING ASSOCIATES, INC., LARRY E. SCHWANKE, D.C. d/b/a BACK TO BASICS FAMILY CHIROPRACTIC, BAREWOOD OUTLET, INC., AND THOMAS SAVINO D/B/A WEBRX PHARMACY PALACE, D/B/A RXPALACE.COM

By: /s/ Phillip A. Bock

Phillip A. Bock
Robert M. Hatch
Jonathan B. Piper
Bock Hatch & Oppenheim, LLC
203 N. La Salle Street, Suite 2100
Chicago, IL 60601
(312) 658-5501
phil@classlawyers.com

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically serves a copy upon each counsel of record.

By: <u>/s/ Phillip A. Bock</u>