## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CIN-Q AUTOMOBILES, INC. and          )
MEDICAL & CHIROPRACTIC CLINIC,       )
INC., individually and on behalf of a class,  )
                                     )
    Plaintiffs,              )    No.: 8:13-CV-01592-AEP
                                     )
        v.                 )
                                     )
BUCCANEERS LIMITED PARTNERSHIP,      )
                                     )
    Defendant.               )
_____      )
                                     )
TECHNOLOGY TRAINING ASSOCS., INC.    )
*et al.*,                            )
                                     )
    Intervenors.             )

## PLAINTIFFS' OPPOSITION TO BTL'S MOTION TO
## DISMISS AND DECERTIFY THE SETTLEMENT CLASS

Plaintiffs, Cin-Q Automobiles, Inc. and Medical & Chiropractic Clinic, Inc.,

on behalf of themselves and the Settlement Class, state as follows in opposition to the

Motion to Dismiss Class Claims for Lack of Article III Standing and to Decertify the

Class filed by Defendant, Buccaneers Team LLC ("BTL") (Doc. 492 ("Mot.")).

As argued below, BTL's Motion should be denied, where (1) it is untimely

and violates the Settlement Agreement; (2) it argues users of "online fax services" are

not covered by the TCPA, contrary to the "plain language" of the TCPA, *Lyngaas v.

Curaden AG*, 992 F.3d 412, 425–27 (6th Cir. 2021), and binding "final orders" of the

FCC, *see In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18

FCC Rcd. 14014, 14133 ¶¶ 199–201 (July 3, 2003) ("2003 Commission Order"); (3) it assumes users of "online fax services" lack Article III standing, contrary to controlling precedent, *see Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023) (en banc) (holding TCPA plaintiff had standing because a single "unwanted text message shares a close relationship with the harm underlying the tort of intrusion upon seclusion"); *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2020) (holding "there is no *qualitative* difference in harm between reading then answering an unwanted text and reviewing then deleting a junk fax sent by e-mail"); and (4) in any event, the Settlement Class is limited to recipients of "facsimiles," not emails, and every approved claimant attested to receiving "faxes," not emails.

## I.  The Motion is untimely and in violation of the Settlement Agreement.

### A.  The Motion to Decertify is untimely.

BTL has been aware of the ruling by the Consumer & Governmental Affairs Bureau of the FCC in *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, 2019 WL 6712128 (CGAB Dec. 9, 2019) ("Amerifactors Ruling"), which forms the entire basis of its motion, since that ruling was issued in December 2019, more than a year before entering into the Settlement Agreement. As explained in Plaintiffs' Motion for Preliminary Approval (Doc. 324 at 5–7) and Plaintiffs' Motion for Final Approval (Doc. 482 at 5–8), the Amerifactors Ruling, along with another Bureau ruling regarding the "sender" element for TCPA liability, were the main drivers in Class Counsels' decision to settle the case for just over what Intervenors were able to negotiate in 2016, before those rulings were issued.

On October 16, 2023, Plaintiffs filed an Unopposed (In Part) Motion to Modify Settlement Deadlines. (Doc. 478). In the Local Rule 3.01(g) certification, BTL stated that it did not object to the proposed modifications to the schedule, "but BTL does object to the refusal of Class Counsel to include in the proposed schedule the Motion Regarding Article III Standing that BTL intends to file." (*Id.* at 7).

On October 20, 2023, the Court granted the motion to modify deadlines, including the proposed deadline of December 8, 2023, for the parties to "present to the Court disputed claims that cannot be resolved through good faith negotiations between the Parties and objections to determinations made by the Settlement Administrator." (Doc. 479, Order ¶ 1.c). The Court also added a footnote, which was not contained in the schedule proposed in the motion to modify, stating that the December 8, 2023, deadline was to include "any objections to a claimant's standing." (*Id.* at 2, n.2).

BTL did not file its "objections to a claimant's standing" on December 8, 2023, as the Court ordered. BTL did file three objections to disputed claims on that date, spanning a combined 65 pages, objecting to (1) the claims of Plaintiff Cin-Q "and additional claims accepted by the Settlement Administrator" (Doc. 489 (filed under seal)); (2) the claims of two other claimants (Doc. 486 (filed under seal)); and (3) the claims of every other claimant (Doc. 490 (filed under seal)). None of these objections raises the argument that users of "online fax services" are not covered by the TCPA or lack Article III standing. In fact, BTL's objection to Astro's claim argues that "it is the consumer to whom the content of a fax or efax is directed that is

3

the 'recipient' under the TCPA," while online fax service providers "are neither the intended recipient nor the ultimate recipient of the document sent as a fax any more than would be the telephone company providing a telephone line to a consumer's traditional fax machine." (Doc. 486 at 17).

Instead, BTL waited until December 14, 2023, to file its objection based on the argument that claimants who used an "online fax service" to receive faxes in 2009–2010 are not proper claimants. (Doc. 492). Absent a showing of "good cause" for the delay, which BTL's motion does not attempt to set forth, "motions filed after a deadline imposed by a court should be denied as untimely." *Tampa Bay Storm, Inc. v. Arena Football League, Inc.*, 1998 WL 182418, at *1 (M.D. Fla. Mar. 19, 1998) (quoting *Payne v. Ryder Sys., Inc.,* 173 F.R.D. 537, 540 (M.D. Fla. 1997)). The Court should strike the Motion to Decertify as untimely.

### B.    The Motion violates the Settlement Agreement.

In the Settlement Agreement, BTL and Plaintiffs expressly agreed "to use their best efforts to perform all acts necessary and proper to promptly effectuate the terms of this Agreement and to take all necessary or appropriate actions to obtain judicial approval of this Agreement in order to give this Agreement full force and effect." (Doc. 482-1, § XV.P). By filing a Motion to Decertify the Class (and opposing final approval), BTL is plainly not using its best efforts "to obtain judicial approval of this Agreement." At best, BTL is using its best efforts *to unnecessarily delay* judicial approval of the Agreement. At worst, BTL is using its best efforts *to prevent* judicial

approval of the Settlement Agreement. Regardless, this is a blatant breach of the Settlement Agreement, and the Court should not allow it.

To the extent BTL suggests that circumstances have materially changed in some way since it executed the settlement agreement in June 2021 that would allow it to rescind the deal now, that is mistaken and irrelevant. The Settlement Agreement expressly states that there is "**No Rescission on Grounds of Mistake**":

> The Parties acknowledge that they have made their own investigations of the matters covered by this Settlement Agreement to the extent they have deemed it necessary to do so. Therefore, the Parties agree that they will not seek to set aside any part of the Settlement Agreement on the grounds of mistake. Moreover, the Parties understand, agree and expressly assume the risk that any fact not recited, contained, or embodied in the Settlement Agreement may turn out hereinafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true, and further agree that the Settlement Agreement shall be effective in all respects notwithstanding and shall not be subject to termination, modification, or rescission by reason of any such difference in facts.

(Doc. 482-1 § XV.D). In sum, the Court should enforce the deal that BTL and Plaintiffs agreed to and deny the Motion to Decertify.

## II.    Users of "online fax services" are covered by the TCPA under the plain language of the statute and the binding "final orders" of the FCC.

BTL's Motion to Decertify is built on the proposition that the Amerifactors Ruling "is entitled to *Chevron* deference or is at a minimum persuasive . . . ." (Mot. at 16, n.16). BTL is mistaken because controlling FCC authority states that faxes sent "to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes." (2003 Commission Order ¶ 200).

The 2003 Commission Order is a "final order" under the Hobbs Act, 28 U.S.C. § 2342(1). *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d

1334, 1341 (S.D. Fla. 2022); *Correll v. Iconic Mortg. Corp.*, 2021 WL 5014122, at *5 (S.D. Fla. Feb. 8, 2021). Eleventh Circuit precedent holds that district courts "may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation, because '[d]eeming agency action invalid or ineffective is precisely the sort of review the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders.'" *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015) (quoting *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120–21 (11th Cir. 2014)); *but see Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1109 (11th Cir. 2019) (Pryor, J., concurring) (arguing these Hobbs-Act precedents were wrongly decided, but acknowledging they are controlling precedent in the Eleventh Circuit).

The 2003 Commission Order was issued following a rulemaking proceeding initiated by the FCC in 2002, seeking public comment on whether the development of "computerized fax servers" might "warrant revisiting the rules on unsolicited faxes." *In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd. 17459, 17482 (Pub. Notice Sept. 18, 2002). Several "industry representatives" urged the FCC to rule that faxes sent to computerized "fax servers" and then forwarded to the end-user's email "inbox" are not sent to a "telephone facsimile machine" because they "do not implicate the harms Congress sought to redress in the TCPA, as they are not reduced to paper and can be deleted from one's inbox without being opened or examined." (2003 Commission Order ¶ 199).

After notice and comment, the full FCC issued a final order explaining that "developing technologies permit one to send and receive facsimile messages in a myriad of ways," and ruling that "faxes sent to personal computers equipped with, or attached to, modems *and to computerized fax servers* are subject to the TCPA's prohibition on unsolicited faxes." (2003 Commission Order ¶ 200 (emphasis added)).

The 2003 Commission Order ruled that "the "TCPA's definition of 'telephone facsimile machine' broadly applies to any equipment that has the capacity to send or receive text or images." (*Id.* ¶ 201 (citing 47 U.S.C. § 227(a)(3)). The FCC reasoned:

> The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented. Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers *and fax servers*, rather than to traditional stand-alone facsimile machines.

(*Id.* ¶ 201 (emphasis added)).

Apart from the lost paper and toner and tying up of lines, the 2003 Commission Order noted that Congress was also concerned with the "interference, interruptions, and expense" to businesses and interstate commerce caused by junk faxes, and ruled that faxes sent to a fax server and forwarded to the user by email "may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business." (*Id.* ¶¶ 199–202 (emphasis added)). The FCC ruled that "because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal

computer *or fax server*, it would make little sense to apply different rules based on the device that ultimately received it." (*Id.* ¶ 202 (emphasis added)).

The 2003 Commission Order specifically addressed commenters' concerns regarding "commercial facsimile services," which "transmit faxes to the recipients as email attachments," ruling these services do not violate the TCPA by forwarding faxes to the recipients by email because the TCPA does "not extend to facsimile messages transmitted as email over the Internet." (*Id.* ¶ 199 & n.736 (emphasis added)). Stated differently, while commercial fax services—*i.e.*, "online fax services" in the parlance of the Amerifactors Ruling—do not violate the TCPA by forwarding faxes attached to emails over the Internet, *fax advertisers* whose unsolicited fax advertisements are transmitted to and received on fax servers, converted to a PDF, attached to an email, and forwarded to personal computers "are subject to the TCPA's prohibition on unsolicited faxes." (*Id.* ¶ 200). *See also Am. Copper & Brass, Inc. v. Lake City Indus. Prods, Inc.*, 2013 WL 3654550, at *5 (W.D. Mich. July 12, 2013) (holding that, although the 2003 Commission Order "exempted from the TCPA the act of forwarding a fax by email," "the first step—the transmission of the original fax—still falls within the confines of the TCPA").

The "email over the Internet" caveat in the 2003 Commission Order prompted WestFax, Inc., a fax broadcaster, to seek "clarification" as to whether an "efax" received on a "fax server" and then converted to email is a "fax, an email or both." *Lyngaas v. Curaden AG*, 992 F.3d 412, 426 (6th Cir. 2021); *see also* Ex. A, *WestFax, Inc. Petition for Reconsideration & Clarification*, CG Docket Nos. 02-278, 05-338 (Sept. 25,

2009), at 3. WestFax argued that "fax servers are not designed to print and do not print the messages," and that Congress's findings regarding lost paper, toner, as well as its findings regarding time wasted "monitoring" unwanted faxes by employees, and "inability to process actual business communications or lines or printers tied up," were "not accurate with respect to faxes sent to fax servers." Ex. A at 4.

On August 28, 2015, the Bureau denied the WestFax Petition, relying largely on the 2003 Commission Order, stating: "Based on our clarification, consumers will enjoy the same protections from unwanted efaxes as they do from conventional faxes." *See In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620, 2015 WL 5120880, at *1 ¶ 1 (CGAB Aug. 28, 2015) (WestFax Bureau Ruling). The Bureau stated WestFax described an efax as a facsimile transmission "received on a fax server," and "in general" "a fax that is converted to email." *Id.* at *1 ¶ 4. WestFax's service, called "FaxForward," was described as "a service that 'automatically converts received faxes into electronic images that are delivered directly to your email inbox.'" *Id.* at *1 ¶ 4 n. 15.

The WestFax Bureau Ruling explained that "a document sent as a fax over a telephone line to the recipient's fax number becomes an efax when a fax server on the receiving end converts the fax transmission into a digital image or PDF that is in turn sent to the recipient as an attachment to an email message." *Id*. The WestFax Bureau Ruling further noted that "[E]faxes differ from other faxes in that the intended recipient, instead of using a fax machine to receive incoming faxes, *uses equipment or a service* that converts the incoming fax into a format that can be and is

9

emailed to the recipient." *Id*. at *1 ¶ 1 n.1 (emphasis added). The Bureau ruled efaxes are covered by the TCPA, stating:

> WestFax's description makes clear that efaxes are sent over telephone lines, which satisfies the statutory requirement that the communication be a fax on the originating end. Efaxes also satisfy the statutory requirements to be a fax on the receiving end. *The definition of "telephone facsimile machine" sweeps in the fax server and modem, along with the computer that receives the efax because together they by necessity have the capacity to "transcribe text or images (or both) from an electronic signal received over a telephone line onto paper."* The interpretation is consistent with the Commission's conclusion in the *2003 TCPA Order* addressing whether the TCPA covers faxes sent to computers attached to fax servers or modems. *WestFax's description of efaxes makes clear that the recipient computers are attached to fax servers or services that convert the fax into a format that is attached to an email received by the computer.*

*Id*. at *2 ¶ 9 (emphasis added). The WestFax Bureau Ruling then addressed the "email over the Internet" "caveat" reference noted in *Lyngaas*:

> WestFax correctly notes in this regard that the Commission's finding in the *2003 TCPA Order* that faxes sent to computers with attached fax servers or modems is accompanied by the statement that faxes "sent as an email over the Internet" are not subject to [the] TCPA and the rules. *WestFax's concern appears to be that the conversion of the fax to email after it is sent removes it from the TCPA's reach. That is not the case.* The TCPA applies to a fax that is sent as a fax over a telephone line to a device that meets the statutory definition of "telephone fax machine," which as discussed above is the case here. There is an end-to-end communication that starts when the faxed document is sent over a telephone line and ends when the converted document is received on a computer. *Just so, citing the statute in the 2003 TCPA Order, the Commission stated that, "the TCPA makes it unlawful for any person to use any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine," including sending an unsolicited advertisement to a computer attached to a fax server or modem. E-faxes are sent as a fax over a telephone line to a telephone facsimile machine and are thus subject to TCPA and the Commission's rules.* By contrast, *a fax sent as an email* over the Internet–e.g., a fax attached to an email message or a fax whose content has been pasted into an email message—is not the subject of the TCPA.

*Id*. at *3 ¶ 10 (emphasis added). The WestFax Bureau Ruling also "disagree[d] with the contention that efaxes do not implicate consumer protection concerns":

> Faxes "*sent to a computer or fax server* may shift the advertising costs of paper and toner to the recipient if they are printed" and can cause "interference, interruptions, and expense" that can result from junk faxes, whether physical or electronic. *Efaxes, just like paper faxes, can increase labor costs for businesses, whose employees must monitor faxes to separate unwanted from desired faxes.* Moreover, as the Commission stated in 2003, it would make little sense to apply a different set of rules (or, in this case, no rule at all) to faxes sent to one type of device (a standalone fax machine) versus another (a computer and its attachments) when the sender generally does not know what device will receive the fax. We share commenters' concerns that efaxes could be used to avoid the TCPA's protections resulting in increased unwanted fax ads on their computers.

*Id.* *3 ¶ 11. Finally, the WestFax Bureau Ruling stated that the "recipient" of the fax is the consumer to whom the fax's content is intended and to whom the fax's content is sent by dialing that consumer's fax number because the "TCPA and the Commission's rules are designed to protect consumers for whom unwanted faxes represent annoyance and wasted resources." *Id.* *4 ¶ 12.

Taken together, the text of the TCPA, the 2003 Commission Order, and the WestFax Bureau Ruling, make clear that when an unsolicited fax advertisement is sent from a telephone facsimile machine, computer, or other device over a telephone line to a ten-digit telephone number, arrives at the *fax server* of the online fax service that performs the T.30 protocol and converts the signal to a PDF that is then pasted into an email message and sent to the recipient's computer, that fax advertisement *as to the advertiser* is subject to the TCPA. The Amerifactors Ruling, in contrast, flagrantly "flies in the face" of the 2003 Commission Order and Westfax Bureau Ruling. *Ambassador Animal Hosp., Ltd. v. Hill's Pet Nutrition, Inc.*, 2021 WL 3043422, at *1 (N.D. Ill. Feb. 17, 2021).

Unlike the Amerifactors Ruling, the 2003 Commission Order is final order for Hobbs Act purposes,[1] and so is the WestFax Bureau Ruling, since it was not appealed. *See Georgia Power Co. v. Telport Comm'n Atlanta,* 346 F.3d 1047, 1050 (11th Cir. 2003) (order from a subordinate unit of the FCC (such as the Bureau) becomes final if no application for review before the full Commission is filed). Accordingly, the Court is bound to follow both the 2003 Commission Order and the WestFax Bureau Ruling. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014); *Murphy v. DCI Biologicals, LLC,* 797 F.3d 1302, 1307 (11th Cir. 2015). That rule of law is dispositive here.

In other words, this Court is bound to follow the 2003 Commission Order rulings that (i) "faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes," 2003 Commission Order ¶ 200; (ii) the "TCPA's definition of 'telephone facsimile machine' ***broadly applies*** to any equipment that has the capacity to send or receive text or images," *id*. ¶ 201; (iii) Congress was concerned with the "interference, interruptions, and expense" to businesses and interstate commerce caused by junk faxes, and that faxes sent to a fax server and forwarded to the user's email "inbox" "may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business," *id.* ¶¶ 199–202; (iv) "because a sender of a facsimile message

---

[1] *See Turizo*, 603 F. Supp. 3d at 1341; *Correll*, 2021 WL 5014122, at *5.

has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it," *id.* ¶ 202; and (v) while commercial fax services, *i.e.*, online fax services, do not violate the TCPA by forwarding faxes attached to emails over the Internet, fax advertisers whose unsolicited fax advertisements are transmitted to and received on fax servers, converted to a PDF, attached to an email, and forwarded to personal computers "are subject to the TCPA's prohibition on unsolicited faxes," *id.* ¶ 200.

This Court is also bound to follow the WestFax Bureau rulings that: (i) the definition of "telephone facsimile machine" sweeps in the fax server and modem, along with the computer that receives the efax because together they by necessity have the capacity to "transcribe text or images (or both) from an electronic signal received over a telephone line onto paper," WestFax Bureau Ruling, 2015 WL 5120880, at *2 ¶ 9; (ii) that the 2003 Commission Order ruling that commercial fax services, *i.e.*, online fax services, do not violate the TCPA by forwarding faxes to the recipients by email because the TCPA does "not extend to facsimile messages transmitted as email over the Internet," does not remove the fax "from the TCPA's reach," *id.* at *3 ¶ 10; (iii) that "the TCPA makes it unlawful for any person to use any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine," including sending an unsolicited advertisement to a computer attached to a fax server or modem, *id.*; (iv) e-faxes are sent as a fax over a telephone line to a telephone facsimile machine and are thus

subject to TCPA and the Commission's rules, *id*.; (v) faxes "sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient if they are printed" and can cause "interference, interruptions, and expense" that can result from junk faxes, whether physical or electronic," *id*. at *3 ¶ 11; (vi) "efaxes, just like paper faxes, can increase labor costs for businesses, whose employees must monitor faxes to separate unwanted from desired faxes," *id*.; and (vii) it would make little sense to apply a different set of rules (or no rule at all) to faxes sent to one type of device (a standalone fax machine) versus another (a computer and its attachments) when the sender generally does not know what device will receive the fax, *id*.

The only circuit court of appeals to decide whether users of "online fax services" are covered by the TCPA answered the question in the affirmative. In *Lyngaas v. Curaden AG*, 992 F.3d 412, 425 (6th Cir. 2021), the Sixth Circuit in a TCPA fax class action rejected the defendants' arguments that a TCPA claim "is not actionable if the unsolicited advertisement is received by any device (such as a computer through an 'efax') other than a traditional fax machine." The *Lyngaas* court held that defendants' argument was an attempt to limit the definition of telephone facsimile machine to only "traditional fax machines," and that "such a narrow definition does not comport with the plain language of the TCPA." *Id*. at 425–26.

*Lyngaas* further held that the definition "makes clear that a 'telephone facsimile machine' encompasses more than traditional fax machines that automatically print a fax received over a telephone line," that the definition also includes "equipment that has the capacity . . . to transcribe text or images from or onto paper as long as the

electronic signal is transmitted or received over a telephone line," and that the "statutory text alone" rebuts the defendants' argument. *Id*.; *see also Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 (E.D. Mo. 2023) (TCPA fax case certifying litigation class, finding *Lyngaas* persuasive and concluding that "the plain language of the statute rebuts Defendants' argument that the TCPA applies only to traditional fax machines" and that "the most recent final rule issued by the FCC [the 2003 Commission Order] determined that online fax services were covered by the TCPA"). BTL's argument that a viable TCPA fax claim requires receipt of a fax only on a stand-alone fax machine fails as a matter of law. *Lyngaas*, 992 F.3d at 425–26; *Brust*, 343 F.R.D. at 589.

The *Lyngaas* dissent raised the *expressio unius est exclusio alterius* canon to support the mistaken position that the TCPA does not regulate faxes received on a fax server. The Bureau in the Amerifactors Ruling asserted that the statutory prohibition against sending unsolicited fax ads, 47 U.S.C. 227(b)(1)(C), "demonstrates" that "Congress did not intend the statute's prohibition to apply to faxes sent to equipment other than a telephone facsimile machine," and that online faxes are "more accurately characterized as faxes sent to a 'computer or 'other device, and not a 'telephone facsimile machine.'" (Amerifactors Ruling, 2019 WL 6712128, at *3–4, ¶¶ 10, 13). The *Lyngaas* majority rejected the *expressio unius* analysis, holding that "(1) a computer is not excluded from the statutory definition of a 'telephone facsimile machine,' *id*. § 227(a)(3), and (2) Congress presumably understood that a computer, as a stand-alone device, can be distinct from a telephone facsimile machine and yet part of one as an

15

integrated piece of 'equipment.'" *Id.* at 426–27.

The TCPA's definition of "telephone facsimile machine" references "any equipment." 47 U.S.C. § 227(a)(3). The *expressio unius* canon does not apply if there are "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013), and it applies only when "circumstances support a sensible inference that the term left out must have been meant to be excluded." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017). The "contrary indications" here are that the TCPA expressly defines "telephone facsimile machine" to include "any equipment," and thus there is no "sensible inference" that Congress meant to exclude "any equipment." Even if there was no binding final order of the FCC on point, the TCPA is a "remedial statute," and any ambiguity in the term "telephone facsimile machine" should be interpreted in favor of consumers. *See Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013).

In short, the 2003 Commission Order and the WestFax Bureau Ruling are binding, and they show that the plain language of the TCPA is not limited to "stand-alone" fax machines and covers users of online fax services. Thus, any inquiry based on the illusory distinction between "stand-alone" fax machines and "online fax

services" is unnecessary. Since this false distinction forms the foundation of BTL's Motion to Decertify, the motion should be denied.

### III.   Users of "online fax services" have Article III standing under *Drazen*.

BTL argues that, even if users of "online fax services" were covered by the TCPA, such users would lack Article III standing. (Mot. at 20). BTL is mistaken.

In *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), the Supreme Court held Article III standing requires concrete injury in the context of a statutory violation. The Supreme Court held that while a concrete injury must be "*de facto*," *i.e.*, it must actually exist, "concrete" was not synonymous with tangible, and intangible injuries can also be concrete. *Id.* at 340. In determining whether intangible statutory injuries are concrete, *Spokeo* teaches that "both history and the judgment of Congress play important roles." *Id.*

As to the judgment of Congress, *Spokeo* stated that because Congress "is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important," and further, Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law." *Id.* at 341. In enacting the TCPA, Congress elevated the invasion of privacy, invasion of interest in seclusion, and nuisance that results from being sent an unsolicited fax advertisement "to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law." *Id.*[2] In fact,

---

[2] Congress found "automated or prerecorded calls are a nuisance and an invasion of privacy," Pub. L. 102-243, § ¶ 13; and that "Businesses also have complained to the Congress and the Federal

the Supreme Court has recognized that Congress found in its passage of the TCPA that unregulated telemarketing was "intrusive," a "nuisance," and "rightly regarded as an invasion of privacy." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

Once Congress has identified an intangible harm, *i.e.*, the judgment of Congress, as it did in enacting the TCPA, the question becomes whether that "harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Drazen v. GoDaddy.com*, 74 F.4th 1336, 1343 (11th Cir. 2023) (en banc) (citing *Hunstein v. Preferred Collection & Management*, 48 F.3d 1236, 1242 (11th Cir. 2022) (en banc) (quoting *Spokeo*, 578 U.S. at 341). The Supreme Court has acknowledged the harm associated with the common-law tort of intrusion upon seclusion as an example of a harm "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

In *Drazen*, the plaintiffs argued class members who received one unwanted text message suffered a privacy invasion that shared a "close relationship" with the harm associated with intrusion upon seclusion. *Id*. The defendant argued that the harm from receiving one unwanted text message lacks a close relationship to the harm underlying intrusion upon seclusion because an element of that common-law tort requires that the privacy invasion "be highly offensive to a reasonable person," and that a single unwanted illegal text was not. *Id*. (citing Restatement (Second) of Torts

---

Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce," *id*. ¶ 14.

§ 652(B) (Am. L. Inst. 1965); W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* 855 (5th ed. 1984)) (emphasis added). The defendant argued that calling someone two or three times, for example, is insufficiently offensive to state a claim under the common-law tort, and that "only when the telephone calls are repeated with such persistency and frequency as to amount to a course of hounding the plaintiff" does the intrusion rise to the degree of offensiveness that the common law requires. *Id.* (citing Restatement (Second) of Torts § 652B cmt. d.) The defendant argued that because receiving one text message falls short of that degree of harm, class members who received only one text message did not suffer an injury that has a close relationship to the injury associated with intrusion upon seclusion. *Id.*

The Eleventh Circuit rejected the defendant's "highly offensive to a reasonable person" argument, stating that because the concreteness inquiry centers on whether the harms share "a close relationship," the courts "do not require carbon copies; the new harm need only be 'similar to' the old harm." *Id.* (citing *TransUnion*, 141 S. Ct. at 2209) ("In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for lawsuit in American courts, we do not require an exact duplicate").

The *Drazen* Court noted that now-Justice Barrett held that in applying the "close relationship" test, the question should be whether the harms share "a 'close relationship' in kind, not degree." *Id.* (citing *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 341) (*cited with approval in TransUnion*, 141 U.S. at 2204) (citation omitted); *see also Hunstein*, 48 F.4th at 1267

19

(Newsom, J., dissenting) (finding it "hard to imagine a circumstance in which a plaintiff's harm is similar in both *kind* and *degree* to a common-law tort and yet is not precisely the same) (emphasis in original). *Drazen* noted that "[j]ust as the Seventh Circuit focuses on kind but not degree, the Fourth, Fifth, Sixth, Ninth, and Tenth Circuits look to the 'types of harms protected at common law, not the precise point at which those harms become actionable.'" *Id.* at 1344 (citing *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 654 (4th Cir. 2019); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822 (5th Cir. 2022); *Ward v. NPAS, Inc.*, 63 F.4th 576, 580-81 (6th Cir. 2023); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th 2017); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021)). *Drazen* noted the Second and Third Circuits "similarly focus on the 'character' of the new and old harms when determining whether the relationship is sufficiently close." *Id.* (citing *Melito v. Experian Marketing Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019); *Thorne v. Pep Boys Manny Moe & Jack, Inc.*, 980 F.3d 879, 890 (3d Cir. 2020)).

Drazen* stated that "following this approach, seven of our sister Circuits have declined to consider the *degree* of offensiveness required to state a claim for intrusion upon seclusion at common law" and instead have held that "receiving either one or two unwanted texts or phone calls resembles the *kind* of harm associated with intrusion upon seclusion." *Id.* (citing *Gadelhak*, 950 F.3d at 463 & n.2 (one unwanted text message); *Melito*, 923 F.3d at 93 (same); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 346, 1042-43 (9th Cir. 2017 (two unwanted text messages); *Sussino v. Work

*Out World, Inc.* 862 F.3d 346, 351 (3d Cir. 2017) (one unwanted phone call); *Ward*, 63 F. 4th at 581 (same); *Lupia*, 8 F.4th at 1192 (same).

The Eleventh Circuit stated that "asking whether the harms are similar in kind but not degree makes sense," in that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law,'" and that "the level of harm required at common law 'does not stake out the limits of [its] power to identify harms deserving a remedy.'" *Id.* (citations omitted). The *Drazen* Court stated that while a single unwanted text message may not "be highly offensive to the ordinary reasonable man," an unwanted text message is nonetheless offensive to some degree to a reasonable person, and even the defendant conceded at oral argument that receiving one unwanted text message each day for thirty days would be "enough to satisfy the offensiveness element." *Id.* at 1345.

The Court then held as follows:

> And that concession is the whole ballgame. After all, the argument that thirty unwanted text messages in thirty days are enough but one is not is an argument of degree, not kind. If thirty are enough, then are twenty-nine? Are twenty-eight? How about two? Drawing the line necessarily requires us to make a choice of degree.

> But the Constitution empowers Congress to decide what degree of harm is enough so long as that harm is similar in kind to a traditional harm. And that's exactly what Congress did in the TCPA when it provided a cause of action to redress the harm that unwanted telemarketing texts and phone calls cause. See 47 U.S.C. 227(b)(1)(A)(iii). As our colleagues in the Third Circuit have recognized, "Congress was not inventing a new theory of injury when it enacted the TCPA." *Sussino*, 862 F.3d at 352. Rather, "Congress identified a modern relative of a harm with long common law roots." *Gadelhak*, 950 F.3d at 462.

> In sum, then, we hold that the harm associated with an unwanted text message shares a close relationship with the harm underlying the tort of

21

> intrusion upon seclusion. Both harms represent "an intrusion into peace and quiet in a realm that is private and personal." *Id.* at 462 n.1. For that reason, the harms are similar in kind, and the receipt of an unwanted text message causes a concrete injury. While an unwanted text message is insufficiently offensive to satisfy the common law's elements, Congress has used its lawmaking powers to recognize a lower quantum of injury necessary to bring a claim under the TCPA. As a result, the plaintiffs' harm "is smaller in degree rather than entirely absent." *Hunstein*, 48 F.4th at 1249.

*Id.* Thus, as BTL concedes (Mot. at 15), *Drazen* overruled *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), which held receipt of a single unwanted text message was not a concrete Article III injury. *See Rowan v. Pierce*, 2023 WL 5672575, at *6, n.6 (D.P.R. Sept. 1, 2023) (recognizing that *Drazen* overruled *Salcedo*).

Every member of the Settlement Class in this case has Article III standing under *Drazen* because, as BTL's own authority held, "there is no *qualitative* difference in harm between reading then answering an unwanted text and reviewing then deleting a junk fax sent by e-mail." *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2020). The Settlement Class members have not suffered "a bare procedural violation, divorced from any concrete harm," but instead a "direct" harm, the very harm the TCPA was meant to prevent—being sent an unsolicited advertisement. There is a dispositive difference between statutory violations that cause direct injury, like TCPA fax cases, and those that cause a procedural injury, like violations of the Fair & Accurate Credit Transactions Act of 2003 ("FACTA").

In *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020), the Eleventh Circuit explained this difference in considering a "procedural violation" of FACTA where a merchant failed to truncate credit card numbers on a receipt.

*Muransky* stated a plaintiff can show a concrete injury by showing "the statutory violation itself" caused a "direct harm," and that such a harm can be tangible or intangible. *Id.* at 926–27. *Muransky* held that, even without direct harm, a plaintiff can show injury in fact if a statutory violation created a "risk of harm," and that "while nearly any level of direct injury is sufficient to show a concrete harm," *id.* at 927, the risk of harm standard requires that the court evaluate whether the claimed "procedural violations . . . entail a degree of risk sufficient to meet the concreteness requirement," *id.* (citing *Spokeo*, 136 S. Ct. at 1550). The Court explained:

> We consider two things when we evaluate whether concrete harm flows from an alleged statutory violation—and thus whether the plaintiff has standing. *First, we ask if the violation itself caused harm, whether tangible or intangible, to the plaintiff. If so, that's enough.* If not, we ask whether the violation posed a material risk of harm to the plaintiff. If the answer to both questions is no, the plaintiff has failed to meet his burden of establishing standing.

*Id.* at 928 (emphasis added).

*Muransky* then compared the FACTA "procedural violation" before it to the "direct injury" in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982), where the Supreme Court held that the denial of the "legal right to truthful information about available housing" constituted concrete harm:

> That, the Supreme Court has already made clear, is not a "bare" procedural violation, or one that is "divorced from any concrete harm"; if a statute protects against a lack of information, the denial of access to information is a concrete harm. For FACTA, on the other hand, a violation of the statute does not directly result in the harm Congress was trying to prevent. That is, no one's identity is stolen at the moment a receipt is printed with too many digits.

*Muransky*, 979 F.3d at 930. Similarly, in *Spokeo*, the Supreme Court held a defendant's alleged violations of procedural requirements of the Fair Credit

Reporting Act ("FCRA") (the purpose of which were to prevent dissemination of false information in reports) may or may not result in concrete harm:

> [N]ot all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Spokeo*, 136 S. Ct. at 1550.

In contrast, Settlement Class members here were, by definition, sent unsolicited fax advertisements. The TCPA "does not require the adoption of procedures to decrease congressionally identified risks," and "there is no gap—there are not some kinds of violations of section 227 that do not result in the harm Congress intended to curb, namely, the receipt of unsolicited telemarketing calls that by their nature invade the privacy and disturb the solitude of their recipients." *Aranda v. Caribbean Cruise Line, Inc.*, 202 F. Supp. 3d 850, 857 (N.D. Ill. 2016). Claimants have attested that they were successfully sent one or more unsolicited fax advertisements—that is not a "bare procedural violation," but is instead a "direct injury" and the very harm the TCPA was designed to prevent. As stated in *Muransky*, "if the violation itself caused harm, whether tangible or intangible, to the plaintiff. If so, that's enough." *Muransky*, 979 F.3d at 928. That is the case here.

**IV.    Even if the Amerifactors Ruling applied here, the Settlement Class is limited to recipients of "faxes," not emails, and every approved claimant attested under penalty of perjury that they received "faxes," not emails.**

Alternatively, the Court could find the "online fax services" question is academic in the context of the Settlement at issue here because the lynchpin of the

Amerifactors Ruling is the notion that "a fax received by an online fax service as an electronic message is effectively an email." 2019 WL 6712128, at *3, ¶ 11. The Settlement Class in this case is defined as persons "who received or were successfully sent in 2009 or 2010 one or more *facsimile* advertisements relating to tickets for Tampa Bay Buccaneers games." (Doc. 482-1, Settlement Agreement § III.A (emphasis added)). The Agreement says nothing about receiving "emails."

Additionally, the Claim Form required every approved claimant to attest that "I or my company subscribed to the fax number(s) identified above . . . and faxes were received at such number or numbers, including faxes from the Tampa Bay Buccaneers." (Doc. 324-1, PageID 9432). Again, the claim form says nothing about receiving emails, which BTL now feigns concern about. Thus, even if the Amerifactors Ruling required exclusion of those persons who received BTL's advertisements by email, the approved claimants have shown that they do not fall into that category. If BTL has evidence that any such eligible claimant did, in fact, receive unsolicited advertisements from BTL by email, the time for it to raise that evidence with the Court was December 8, 2023 (*see* Order, Doc. 479).

<u>Conclusion</u>

For the foregoing reasons, the Court should deny BTL's Motion to Decertify, grant final approval of the Settlement Agreement, and grant any other relief the Court deems appropriate.

Respectfully submitted,

25

/s/ Glenn L. Hara
Glenn L. Hara (admitted *pro hac vice*)
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
ghara@andersonwanca.com

Michael C. Addison (Fla. Bar. No. 0145579)
ADDISON LAW OFFICE, P.A.
1304 Alicia Avenue
Tampa, Florida 33604
Telephone: (813) 223-2000
Facsimile: (813) 228-6000
m@mcalaw.net

Ross M. Good (Fla. Bar. No. 116405)
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (786) 539-3952
ross@loftusandeisenberg.com

*Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

s/Glenn L. Hara