## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC. and )<br>MEDICAL & CHIROPRACTIC CLINIC, )<br>INC., individually and on behalf of a class, )<br>                                                          )<br>         Plaintiffs,                                      )<br>                                                          )<br>              v.                                          )<br>                                                          )<br>BUCCANEERS TEAM LLC,                       )<br>                                                          )<br>         Defendant.                                    )<br>_____ )<br>                                                          )<br>TECHNOLOGY TRAINING ASSOCS., INC. )<br>*et al.*,                                                  )<br>                                                          )<br>         Intervenors.                                  ) | No.: 8:13-CV-01592-AEP |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs, Cin-Q Automobiles, Inc. and Medical & Chiropractic Clinic, Inc.,

("Plaintiffs"), on behalf of themselves and the Settlement Class, state as follows for

their Reply in Support of their Motion for Final Approval of Class Action

Settlement (Doc. 482). Two oppositions were filed to the Motion for Final

Approval: (1) the Opposition of Defendant, Buccaneers Team LLC ("BTL") (Doc.

496); and (2) the Opposition of Intervenors, Technology Training Assocs., Inc.,

Larry F. Schwanke, D.C., Barewood Outlet, Inc., and Thomas Savino d/b/a

WebRx Pharmacy Palace (collectively, "Intervenors")  (Doc. 497).

As argued in Section I, below, the Court should reject BTL's Opposition and grant final approval of the Settlement. The Settlement is "fair, reasonable, and adequate" under Rule 23(e), as BTL concedes. (BTL Opp. at 22). BTL's other arguments (1) violate the terms of the Settlement Agreement, which oblige BTL to use its best efforts to obtain final approval; (2) incorrectly assume that users of "online fax services" in the Settlement Class (if any) are not covered by the TCPA and lack Article III standing; (3) are based on BTL's stubborn refusal to accept the controlling "ascertainability" standard under *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021); and (4) improperly attack the adequacy of class counsel, even though BTL stipulated to adequacy of representation in the Settlement Agreement and at preliminary approval.

In addition, on December 8, 2023, BTL filed three objections to disputed claims, spanning a combined 65 pages, that collectively seek to invalidate every one of the over 1,500 claims approved by Epiq, including Plaintiff Cin-Q's claim. (Docs. 486, 489, 490). Since the Settlement cannot be finally approved if the Court invalidates every approved claim, Plaintiffs respond in Section II, below.

As argued in Section III, the Court should reject Intervenors' Opposition, where (1) the notice was the best practicable under the circumstances, and the Court was reasonable in declining to send notice by fax; (2) the claim form does not require claimants to swear that they "remember" receiving BTL's faxes in 2009–2010; (3) there was no need to create sub-classes based on the distinction between faxes transmitted by 127 High Street or Rocket Messaging; (4) Intervenors are

2

conflating online fax service *providers*, who are not "recipients" of faxes, and *users* of online fax services, who are "recipients"; (5) calculating attorney fees based on the amount actually claimed by the class, as opposed to the $19.75 million fund established for the benefit of the class, would violate controlling Eleventh Circuit authority; and (6) there is no reason to stay the case pending *Scoma Chiropractic, P.A. v. Nat'l Spine Ctrs.* because that case has been settled.

## I.     The Court should reject BTL's Opposition.

### A.     BTL agrees that the Settlement is "fair, reasonable, and adequate," and BTL has breached the Settlement Agreement by opposing final approval.

BTL concedes that "the Settlement is fair, reasonable, and adequate within the meaning of Rule 23(e)(2)." (BTL Opp. at 22). That should be the end of the matter for purposes of resolving BTL's opposition. BTL insists, however, that the Court must also consider (1) "how the Settlement compares with the prior settlement in TTA" and (2) "whether Class Counsel's opposition to that earlier settlement was justified and whether the lengthy wait endured by the members of the Settlement Class and the risks to the Settlement Class that flowed from that delay were worth it . . . ." (*Id.*). These issues are irrelevant.

BTL cites no authority for the proposition that a Court must evaluate whether a settlement that reaches the final approval stage is fair, reasonable, and adequate when compared to some other settlement that did not reach final approval. Rule 23(e) certainly says nothing of the sort. The question before the Court is whether *this*

3

*Settlement* merits final approval, not whether it would prefer some other settlement that is not on the table.

As to whether Class Counsel were "justified" in opposing the *TTA* Settlement, the Eleventh Circuit and this Court have already held that they were. *See Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697 (11th Cir. 2017) (reversing denial of Plaintiffs' motion to intervene in the *TTA* Action); *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, No. 8:16-CV-1622-T-AEP, 2019 WL 4751799, at *18 (M.D. Fla. Sept. 30, 2019) (granting Plaintiffs' motion to vacate preliminary approval and decertify the *TTA* settlement class).

BTL seeks to relitigate the result in *TTA*, asking "[i]f Bock & Hatch was completely 'disarmed' in negotiation of the TTA settlement as the Wanca firm repeatedly claimed and convinced the Eleventh Circuit of, then other than a focus on fees, what explains the fact that Class Counsel agreed to almost identical terms in the Settlement?" (BTL Opp. at 24). The answer—as BTL is well aware—is that in the meantime, the Consumer & Governmental Affairs Bureau of the FCC issued two TCPA-related declaratory rulings, *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos. 02-278, 05-338, Declaratory Ruling, 2019 WL 6712128 (CGAB Dec. 9, 2019), and *In re Akin Gump Strauss Hauer & Feld LLP Pet. for Expedited Clarification or Declaratory Ruling*, 2020 WL 5747205 (CGAB Sept. 21, 2020). As Plaintiffs discussed in their Motion for Preliminary Approval (Doc. 324 at

5–7) and Motion for Final Approval (Doc. 342 at 5–8), these rulings drove the settlement in this case.

The Amerifactors Ruling represented a threat to obtaining certification of a litigation class. *See Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 2021 WL 3022677, at *12 (D.S.C. July 16, 2021) (denying certification of contested litigation class based on Amerifactors Ruling); *but see Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 n.5 (E.D. Mo. 2023) (certifying all fax recipients class, notwithstanding Amerifactors Ruling); *Lyngaas v. Curaden AG*, 992 F.3d 412, 425–27 (6th Cir. 2021) (affirming certification of a litigation class of all fax recipients, notwithstanding the Amerifactors Ruling). Class Counsel believe they have strong arguments for why the Amerifactors Ruling is not a "final order" under the Hobbs Act and is foreclosed by the "plain language" of the definition of "telephone facsimile machine" in 47 U.S.C. § 227(a)(3), as well as long-standing FCC precedent, including *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14133 ¶¶ 199–201 (July 3, 2003) ("2003 Commission Order"). *See Lyngaas*, 992 F.3d at 425–27; *Brust*, 343 F.R.D. at 589. Nevertheless, the ruling created a risk that was not present in 2016 and forced Class Counsel's hand.

The Akin Gump Ruling presented a risk on the merits regarding "sender" liability, the issue the Court held required a jury trial in this case. (Order, Doc. 167). Although Plaintiffs would have argued that the Akin Gump Ruling is non-binding guidance, the Court may have found it persuasive or binding. And, although

Plaintiffs would have argued to a jury that BTL is liable under the terms of the ruling itself because BTL was "on notice of TCPA violations by its fax broadcaster and fail[ed] to take action to stop such behavior"—at least as to the faxes BTL sent in 2010, *after* Cin-Q filed a class action against BTL in Florida state court—a jury might have agreed with BTL that FaxQom "engage[d] in deception or fraud against the advertiser," leaving BTL off the hook entirely. (Akin Gump Ruling ¶¶ 3, 9). *See Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 2022 WL 286189, at *9 (D.S.C. Jan. 31, 2022) (applying Akin Gump Bureau Ruling, but nevertheless finding defendant the "sender" of the faxes).

BTL was well aware of these rulings while negotiating the Settlement before the Court. BTL actively participated in the FCC proceedings that led to the Akin Gump Ruling, filing comments with the FCC in support of the petition that led to the ruling. (*See* Ex. A, Cin-Q Comments in Opposition to Petition; Ex. B, BTL Reply Comments in Support of Petition). For BTL to now feign ignorance of why Class Counsel would agree to settle for slightly more than the TTA settlement strains credulity.

In addition, in opposing final approval, BTL is in violation of the Settlement Agreement, which imposes on all parties a contractual obligation "to use their best efforts to perform all acts necessary and proper to promptly effectuate the terms of this Agreement and to take all necessary or appropriate actions to obtain judicial approval of this Agreement in order to give this Agreement full force and effect." seek final approval of the Settlement. (Doc. 482-1, § XV.P). By opposing final

6

approval (and moving to decertify the Class), BTL is plainly not using its best efforts "to obtain judicial approval of this Agreement." At best, BTL is using its best efforts *to unnecessarily delay* judicial approval of the Agreement. At worst, BTL is using its best efforts *to prevent* judicial approval of the Settlement Agreement. Regardless, this is a blatant breach of the Settlement Agreement, and the Court should not allow it.

To the extent BTL suggests that circumstances have materially changed in some way since it executed the settlement agreement in June 2021 that would allow it to oppose final approval now, that is mistaken and irrelevant. The Settlement Agreement expressly states that there is "**No Rescission on Grounds of Mistake**," that the parties "have made their own investigations of the matters covered by this Settlement Agreement to the extent they have deemed it necessary to do so," and that "any fact not recited, contained, or embodied in the Settlement Agreement may turn out hereinafter to be other than, different from, or contrary to the facts now known to them or believed by them to be true, and . . . the Settlement Agreement shall be effective in all respects notwithstanding and shall not be subject to termination, modification, or rescission by reason of any such difference in facts." (Doc. 482-1 § XV.D).

In short, BTL voluntarily agreed to the Settlement, and it cannot back out now.

**B.     Users of "online fax services," to the extent any are in the Class, are covered by the TCPA and have Article III standing.**

BTL argues any persons who received BTL's faxes via an "online fax service" in 2009–2010 are not covered by the TCPA and lack Article III standing, referring to its Motion to Decertify and a lone district court decision in *Scoma Chiropractic, P.A. v. Nat'l Spine*, 2022 WL 16695130 (M.D. Fla. 2022). (BTL Opp. at 13–14). Plaintiffs responded extensively to this argument in their Opposition to BTL's Motion to Decertify, filed December 28, 2023. (Doc. 505).

In short, BTL's argument that the TCPA is limited to users of "stand-alone" fax machines is contrary to the "plain language" of the TCPA, *Lyngaas v. Curaden AG*, 992 F.3d 412, 425–27 (6th Cir. 2021), and binding "final orders" of the FCC, *see* 2003 Commission Order, 18 FCC Rcd. at 14133 ¶¶ 199–201. The ruling of the inferior FCC bureau on which BTL relies, *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, 2019 WL 6712128 (CGAB Dec. 9, 2019), is not a "final order" under the Hobbs Act, and it is neither controlling nor persuasive.

BTL's Article III argument is foreclosed by *Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023) (en banc), which held a TCPA plaintiff had Article III standing to sue over a single text message because the annoyance and intrusion "shares a close relationship with the harm underlying the tort of intrusion upon seclusion"). As the court held in *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2020), there "is no *qualitative* difference in harm between

8

reading then answering an unwanted text and reviewing then deleting a junk fax sent by e-mail."

In sum, the Court should reject BTL's opposition to final approval based on the erroneous argument that the TCPA is limited to users of "stand-alone" fax machines and grant final approval.

### C. BTL continues to misstate the standards for class "ascertainability" in the Eleventh Circuit, and there is no "manageability" issue that would preclude final approval.

BTL's Opposition repeats its consistent refusal to accept the reality of the standard for class "ascertainability" in the Eleventh Circuit under *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021). In *Cherry*, the Eleventh Circuit clarified that in this Circuit, the requirement that a Rule 23(b)(3) class be "ascertainable" simply means that the class must be defined by objective criteria. The Eleventh Circuit held the "[a]dministrative feasibility" of identifying class members is not an "aspect of ascertainability," and that "administrative feasibility *is not a requirement for certification under Rule 23*" at all. *Id.* at 1304 (emphasis added). The Eleventh Circuit rejected the Third Circuit's "heightened" ascertainability standard, which concerns "both the definition of the class and its administrative feasibility." *Id.* at 1303–04.[1] The Eleventh Circuit recognized that it applied the heightened standard

---

[1] To its credit, in its Opposition, BTL has finally stopped its practice of citing out-of-circuit decisions and pre-*Cherry* district court decisions to argue "ascertainability." (*Compare e.g.*, Doc. 381 at 21–22 (citing *Carrera v. Bayer*, 727 F.3d 300, 310–11 (3d Cir. 2013) (applying the heightened "administrative feasibility" requirement that the Eleventh Circuit rejected in *Cherry*), and *Perez v. Metabolife*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) (pre-*Cherry* decision denying certification of a litigation class based on the heightened ascertainability requirement) *with* BTL Opp. at 14–21 (omitting any reference to

in two earlier unpublished decisions, but held "those decisions do not bind us as precedent." *Id.* at 1302.

In this case, the Settlement Class is defined as persons "who received or were successfully sent" particular faxes in a particular time frame, which are "objective" criteria. *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-CV-41-JLB-MRM, 2021 WL 719655, at *1 (M.D. Fla. Feb. 24, 2021) (finding in TCPA fax case that "Plaintiffs' proposed class definitions meet the traditional ascertainability rule" under *Cherry*); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014). The class definition is not "vague," and it "identifies a particular group" that was "harmed in a particular way" in "a specific period." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660–61 (7th Cir. 2015). The definition is not based on subjective "state of mind," and it is not "fail-safe," since it entails no merits conclusions. *Id.* The class is therefore "ascertainable" under the traditional standard adopted by *Cherry* (and most other circuits). *See also A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, 2013 WL 3463489, at *5 (S.D. Fla. July 3, 2013); *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 689 (S.D. Fla. 2014).

BTL argues that if the "ascertainability" requirement concerns only the class definition—which is precisely what *Cherry* says, *see* 986 F.3d at 1304 (holding the phrase "adequately defined and clearly ascertainable" is redundant)—then "absurd results" will follow. (BTL Opp. at 15). BTL argues that if a class turns out to not be

---

these cases)).

"manageable," then that class "is not ascertainable" (BTL Opp. at 17), conflating ascertainability with Rule 23(b)(3) manageability, exactly what *Cherry* warns against. But in the event that a litigation class is not "manageable," then the court would deny class certification for failure to satisfy the "superiority" prong of Rule 23(b)(3), not on the basis of a defect in the class definition, which is what happened in the authority BTL cites. *See Lewis v. First Am. Ins. Co.*, 2017 WL 3269381, at *7 (D. Idaho Aug. 1, 2017) (decertifying litigation class where it became clear after certification that identifying class members was "unmanageable").

In this case, there is no issue regarding Rule 23(b)(3) "manageability" for three reasons. First, although *Cherry* held that "administrative feasibility" of identifying class members has some "limited relevance to Rule 23(b)(3)(D)," when considering whether to certify a *litigation* class, 986 F.3d at 1304, this case does not involve a litigation class. It involves a Settlement Class, which Plaintiffs and BTL jointly asked the Court to certify.

In deciding whether a *settlement* class is properly certified, a district court does not "inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Court "must consider the same factors that it would consider in connection with a proposed litigation class—*i.e.*, all Rule 23(a) factors and at least one subsection of Rule 23(b) must be satisfied—*except that the Court need not consider the manageability of a potential trial, since the settlement, if approved, would obviate the need for a trial.*" *Fruitstone v.*

*Spartan Race Inc.*, 2021 WL 354189, at *1 (S.D. Fla. Feb. 2, 2021) (emphasis added) (quoting *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 654, 659 (S.D. Fla. 2011)). In other words, "manageability concerns do not stand in the way of certifying a settlement class." *Fruitstone*, 2021 WL 354189, at *4 (quoting *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 242 (2d Cir. 2012)); *id.* at *4 ("because Plaintiff seeks class certification for settlement purposes, the Court need not inquire into whether this Action, if tried, would present intractable management problems") (citing *Anchem*, 521 U.S. at 620; *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016); *In re Am. Int'l Grp.*, 689 F.3d at 242).

Second, BTL cannot challenge Rule 23(b)(3) superiority, including the manageability prong in subsection (D), because it (1) stipulated that this element was met in the Settlement Agreement § III.A, (2) joined in a proposed Preliminary Approval Order finding that superiority was satisfied (Doc. 324-2, PageID 9454), and (3) did not oppose Plaintiffs' Motion for Preliminary Approval, which argued superiority is satisfied (Doc. 324 at 15).

Third, even if the Court concludes that there are concerns regarding "manageability," *Cherry* holds that "[a]dministrative feasibility alone will rarely, if ever, be dispositive," in this Circuit. *Cherry*, 986 F.3d at 1305. The Settlement at issue here does not present one of those "rare" cases.

The Settlement Agreement that BTL agreed to uses "self-identifying affidavits, subject as needed to audits and verification procedures and challenges, to identify class members." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015).

12

There is nothing wrong with that method, certainly not in the context where the defendant who is funding the settlement agrees to the process, as BTL has. While BTL has a contractual and due-process right to challenge claims, "[i]t does not follow that a defendant has a due process right to a *cost-effective* procedure for challenging every individual claim to class membership." *Id.* "As long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected." *Id.* at 671.

In sum, the Court should reject BTL's Opposition to the Settlement it agreed to and grant final approval.

### D.   BTL's attack on adequacy of representation fails.

BTL is contractually barred from attacking the adequacy of Class Counsel. In the Settlement Agreement, BTL stipulated to the appointment of Michael Addison and three attorneys from the Anderson + Wanca firm as Class Counsel. (Settlement Agreement § III.B & C). BTL agreed to use its "best efforts" to obtain final approval of that agreement (*id.* § XV.P), and agreed that once final approval is granted, BTL would jointly seek a Final Order and Judgment which, among other things, will find that "Class Counsel and Plaintiffs adequately represented the Settlement Class for purposes of entering into and implementing the Settlement and Settlement Agreement" (*id.* § XI.A(vii)).

BTL's attack on Anderson + Wanca's adequacy is also totally misguided. Anderson + Wanca ably represented the Class in this case, devoting thousands of

13

hours of attorney time and well in excess of the $250,000 in out-of-pocket expenses it stands to recover from the settlement. (*See* Doc.  Pls.' Mot. Attorney Fees at 2–7 (summarizing the massive amount of effort this case has required)).[2]

Anderson + Wanca has regularly been appointed class counsel in this circuit, *e.g.*, *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *6 (S.D. Fla. Dec. 24, 2014) (A+W "is knowledgeable of the applicable law and experienced in litigating TCPA classes"); *A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, 2013 WL 3463489, at *4 (S.D. Fla. July 3, 2013), and outside this Circuit, *e.g.*, *Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 312 (N.D. Cal. 2017) (noting A+W's "experienced TCPA litigators"); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 724 (N.D. Ill. Sept. 27, 2016) (finding "no reason to doubt" A+W's adequacy); *Siding & Insulation Co. v. Combined Ins. Grp., Ltd., Inc.*, 2012 WL 1425093, at *4 (N.D. Ohio Apr. 24, 2012) (A+W "sufficiently experienced and qualified to handle class actions").

Anderson + Wanca also prevailed in this case before the Eleventh Circuit and this Court in defeating the *TTA* Settlement. Class Counsel respectfully submit that if Anderson + Wanca were inadequate counsel, they could not have prevailed against the skilled and experienced attorneys representing BTL and Intervenors. *See Sandusky*

---

[2] BTL also asks the Court to "rescind[]" its appointment of Anderson + Wanca and order a "reallocation of any fee paid to the respective applicants." (BTL Opp. at 26, n.26). Not only is BTL wrong on the merits, BTL is barred from seeking such an order because it agreed that "BTL will not oppose Class Counsel's application for said award of fees and expenses." (Settlement Agreement § VI.A).

*Wellness Ctr., LLC v. MedTox Sci., Inc.*, 250 F. Supp. 3d 354, 360–61 (D. Minn. 2017) (finding A+W "competent and experienced," that A+W "vigorously litigated this case from the very beginning," and that A+W were adequate where they "defeated two motions to dismiss and prevailed on one appeal to the Eighth Circuit").

In conclusion, the Court should reject BTL's attempt to challenge Anderson + Wanca's ability to represent the Settlement Class.

## II.   The Court should overrule BTL's objections to all approved claims, as well as BTL's objection to Cin-Q's claim.

### A.   The Court should reject BTL's global objection to all claims deemed "eligible" by Epiq.

On December 8, 2023, BTL filed objections to (1) the claims of Plaintiff Cin-Q "and additional claims accepted by the Settlement Administrator" (Doc. 489 (filed under seal)); (2) the claims of Astro and MCAG (Doc. 486 (filed under seal)); and (3) the claims of every other claimant approved by Epiq (Doc. 490 (filed under seal)). According to BTL, not a single one of the over 1,500 claims ruled "eligible" by Epiq should be paid. (Doc. 490 at 22).

However, BTL raises no specific objection as to 1,298 of those claims, with BTL's sole argument apparently being that BTL suspects these claimants are lying. (*Id.* (arguing that, since the "attestation under penalty of perjury" did not completely eliminate invalid claims, the Court should assume that they are all fraudulent). BTL argues it has a "due process right" to challenge "self-attestation affidavits," citing *Hunter v. Time Warner Cable Inc.*, 2019 WL 3812063, at *12 (S.D.N.Y. Aug. 14, 2019). (*Id.* at 22). But *Hunter* denied a motion to certify a

*litigation* class, not a case where the defendant signed a Settlement Agreement and agreed to voluntarily send claim forms.

The Court should reject BTL's non-specific challenge to the 1,298 eligible claims first, which will establish that the vast majority of eligible claims will be paid. Plaintiffs reserve the right to respond to BTL's objection to the remaining claims at the Fairness Hearing.

### B.   The Court should reject BTL's objection to Plaintiff Cin-Q's claim.

BTL has objected to payment of Plaintiff Cin-Q's claim.[3] BTL's objection should be denied because (1) it had fourteen years to investigate the faxes Cin-Q attached to the Second Amended Complaint (Doc. 70); (2) it has deposed both the owner of Cin-Q and his wife (Craig Cinque and Kim Cinque); (3) it has reviewed the phone bills from the months in question which were produced in the ordinary course of discovery; and (4) it paid for and performed a detailed expert analysis of the faxes at issue, the fax machine at issue, and the phone line connecting the fax machine at issue. The attached Declaration of Michael C. Addison explains how he came to represent Cin-Q and details the evidence showing that Cin-Q's claim is valid, all of which BTL has had for years. (Ex. C, Addison Decl. ¶¶ 3–19).

---

[3] Plaintiffs take no position regarding BTL's challenges to Tracking # 177443 or 177451.

## 1.  The weight the Parties agreed to put on the Attestation Requirement.

BTL's Objection fails to acknowledge that the Parties jointly agreed to the

attestation requirement for the claim form which they have subsequently put at

issue. The attestation says:

**Step 2.  VERIFY OWNERSHIP OF THE FAX NUMBER(S) LISTED ABOVE AND RECEIPT OF A FAX OR FAXES.**

Between July 14, 2009 and June 9, 2010, I or my company subscribed to the fax number(s) identified above or attached to this Proof of Claim and faxes were received at such number or numbers, including faxes from the Tampa Bay Buccaneers.

I certify under penalty of perjury that the foregoing is true and correct.

_____

(Sign your name here)

(Doc. 482-1, Settlement Agreement at 47). In addition to this attestation, the Parties

agreed to Section VIII of the Settlement Agreement, which states in part:

C.   The Settlement Administrator shall be responsible for reviewing all claims to determine their validity.

(i)   Any claim that is not substantially in compliance with the instructions on the Claim Form or the terms of this Settlement Agreement or is postmarked later than the Claim Deadline shall be rejected.

(Settlement Agreement § VII(c)). This review process includes making sure that the

claimed fax numbers are on the Class List. Additionally, the review process includes

evaluating evidence of competing claims. Of course, "BTL shall have the right to

audit Claim Forms for validity and fraud."

17

For example, Plaintiff Cin-Q (Tracking # 88205) and another entity (Tracking # 177241)[4] filed competing claims regarding Cin-Q's fax number. The Settlement Administrator, Epiq, reviewed evidence submitted by Cin-Q and the other entity (Tracking # 177241) and determined that Cin-Q had the valid claim and invalidated the other entity's competing claim.[5] This process worked exactly as the Parties intended. The fact that BTL now wants to walk back the Settlement Agreement, in part by challenging the claim of Cin-Q, is done in bad faith. Furthermore, claims that the attestation requirement is solely responsible for Cin-Q's claim being accepted by Epiq is, at best, misleading.

> **2.    There is no amount of discovery that can be obtained to satisfy BTL.**

BTL's Objection related to Cin-Q leaves out much of the relevant discovery in this case. The Court was previously satisfied with less than the amount of discovery contemplated regarding Cin-Q. (*See* Ex. D, Hr'g Tr., Apr. 7, 2014). At that hearing, this Court said in part "Mr. Addison, you may just simply not have that and all you need to do is certify that it's not in his possession.  But whatever is and you provide it, **that will be sufficient**." (*Id.* at 43 (emphasis added)).

---

[4] This entity also filed a second claim form for another fax number not on the class list. (Tracking # 177171).

[5] BTL fails to note that the other entity (Tracking # 177241) obtained Cin-Q's fax number from the faxes Cin-Q attached to the Second Amended Complaint. This unique situation cannot be duplicated for other fax numbers.

In part, BTL was provided:

1. The phone bill of Cin-Q during the time period at issue. (CINQ007014-CINQ007018, attached to Addison Decl. as Exhibit 4).

2. The payment ledger for Cin-Q's business checking account showing payment for the phone bill. (CINQ007020, attached to Addison Decl. as Exhibit 5).

3. The fronts and backs for business cards identifying Cin-Q's fax number (CINQ007022–CINQ007023, attached to Addison Decl. as Exhibit 3).

4. The manual for Cin-Q's fax machine. (CINQ007030–CINQ007050, attached to Addison Decl. as Exhibit 2).

5. The physical faxes and physical fax machine for on-site microscopic[6] inspection by BTL's expert, Thomas W. Vastrick[7], on or about May 5, 2014 under the supervision of BTL's former counsel David Borucke (Doc. 101) and a legal assistant for Cin-Q's Counsel. (Memo to File attached to Addison Decl. as Exhibit 1).

6. The deposition testimony of Craig Cinque taken on February 14, 2014 from 10:01AM to 4:35PM.

7. The deposition testimony of Kim Cinque taken on October 14, 2015 from 11:00AM to 3:15PM.

8. The attestation of Cin-Q and backup documentation submitted to Epiq. (Attestation and backup documentation of Cin-Q, attached to Addison Decl. as Exhibit 6).

None of this is enough to satiate BTL, as it seeks additional, and as of this filing, unidentified further verification from Cin-Q and other claimants who filed claims accepted pursuant to the agreed upon process identified in the Settlement Agreement. (Doc. 490 at 24). BTL had 14 years to develop further evidence to dispute the eligibility of Cin-Q to file a claim in this matter. BTL has found nothing

---

[6] Plaintiff's Counsel is not embellishing, BTL's expert did in fact use a microscope to perform this inspection. The absurdity of BTL's investigation into Cin-Q is obvious.

[7] Vastrick is a Forensic Document Examiner with 45 years of experience and was chosen at BTL's sole discretion. *See* https://thomaswvastrick.com (last accessed Dec. 26, 2023).

despite its efforts. BTL's feigned concern that Cin-Q does not have a valid claim in service to its absurd claim that the agreed upon claims process is insufficient falls flat.

Any claim that BTL makes regarding the Settlement Agreement allegedly requiring claimants to submit (1) phone bills for the time period at issue are produced, (2) payment ledgers from bank accounts for the time period at issue are produced, (3) business cards identifying claimed fax numbers for the time period at issue are produced, (4) manuals for physical fax machine for the time period at issue are produced, (5) on-site microscopic examination of the received fax and the receiving fax machine is conducted by an expert of BTL's choosing under the watchful eye of BTL's counsel, **and** (6) deposition testimony of the claimant stands against the plain language of the Settlement Agreement which requires (a) the attestation discussed above, and (b) the claimant provide at least one fax number on the Class List. The Settlement Agreement is not a mere dress rehearsal, and BTL's challenge to Cin-Q clearly demonstrates that BTL could never possibly be satisfied with either the requirements on the claimants under the terms of the Settlement Agreement nor any additional terms BTL dreams up now. Though BTL has been provided abundant evidence supporting Cin-Q's claim in this matter, it still feigns concern regarding credibility of Cin-Q's claim in service of its goal to delay the Final Approval Hearing in this matter.

In conclusion, the Court should overrule BTL's objection to Cin-Q's claim and allow Epiq to pay that claim in accordance with its determination that Cin-Q's claim is valid.

III.   **The Court should reject Intervenors' Opposition.**

   A.   **The Court should not consider Intervenors' objections that were not contained in their Objection filed on the deadline.**

Under the Court's Preliminary Approval Order, any objection filed by a class member must contain, among other things, "[a] statement of *all* objections to the settlement." (Doc. 343, Prelim. Approval Order ¶ 13.iii (emphasis added)). Only one objection was filed, in which Intervenors made three arguments: (1) that the class notice was not "the best practicable under the circumstances" because it did not provide fax notice; (2) that the Settlement does not provide an effective "method for distributing relief" because it required claimants to swear to receiving faxes at the number they provided in 2009–2010; and (3) that the Settlement does not "treat class members equitably relative to each other" because it supposedly treats claimants differently depending on whether they "remember" receiving BTL's faxes. (Doc. 434 at 14–22).

Intervenors raise a host of other arguments in their Opposition to Final Approval. (Doc. 497). To the extent Intervenors could have raised these issues in their initial objections but failed to do so, the Court should reject them.

   B.   **The notice was the best practicable under the circumstances.**

Intervenors argue that fax notice was necessary in order to be the best notice practicable. (TTA Opp. at 15). The Court previously rejected this argument, holding that, although fax notice might be appropriate in some cases, under the circumstances in this case, one of the "multiple safeguards" against fraudulent claims

21

was that "the claimant must provide the fax number associated with the claim (which was not included in the notice) and certify under penalty of perjury that the information they have provided in the Claim Form is true and correct." (Order, Doc 409 at 9–10).

This additional "safeguard" that the Court found necessary could not have been obtained if notice had been sent by fax because recipients would have been able to simply list on the claim form the fax number at which the fax notice was received. Although Plaintiffs previously advocated for fax notice, the Court's decision on this point was reasonable and within the Court's discretion in managing this class action settlement. *See* Fed. R. Civ. P. 23(d).

## C. The claim form does not require claimants to swear that they "remember" receiving BTL's faxes.

Intervenors argue the claim form was inappropriate because it required claimants to list their fax number(s) and state that "faxes were received at such number or numbers, including faxes from the Tampa Bay Buccaneers." (TTA Opp. at 18). According to Intervenors, this language required claimants to state that they "recalled" or "remembered" receiving BTL's faxes in 2009–2010. (*Id.*). Intervenors previously predicted in their objections that this language would result in a "less than 1%" claims rate. (Doc. 434, TTA Obj. at 21).

The Court addressed this issue in great detail in granting preliminary approval. (Doc. 343, Order at 74–77). The Court found that "the addition of the disputed language represented a fair compromise to resolve the outstanding issues. Namely,

given the unique factual and procedural history, the disputed substantive issues, the extensive negotiations facilitated by a United States Magistrate Judge, and the contested expert findings present in this action, including the issues regarding the reliability of the Biggerstaff Report, the inclusion of such language serves both Class Members, by potentially preventing fraudulent claims from depleting the Settlement Fund, and the ends of due process." (*Id.* at 76–77).

Contrary to Intervenors' assertion, the statement on the claim form does not require anyone to "remember" receiving BTL's faxes in 2009–2010. It is merely a statement that the fax number the claimant has listed on the claim form was in use and receiving faxes during that timeframe and that any faxes successfully sent by BTL during that time frame would have been received. And, of course, the actual results of the claims process are more than double Intervenors' predicted "less than 1%" claims rate, where the rate is actually 2.11% (compared to the 131,011 target fax numbers) or 2.16% (compared to the 343,011 successful faxes). Even using Intervenors' calculation, which Plaintiffs disagree with, the claims rate is 1.2%. (TTA Opp. at 18). Although Class Counsel had hoped to achieve a higher claims rate, the fact that the faxes were sent 13–14 years ago certainly worked against them, and Intervenors provide no authority for the proposition that a 1.2% claims rate is insufficient for final approval. (*Id.*)

**D.** **There was no need to treat class members differently based on whether they received faxes transmitted by 127 High Street or Rocket Messaging.**

Intervenors argue that there is a "vast difference" in the quality of evidence between faxes transmitted by 127 High Street in July 2009 and by Rocket Messaging in August 2009 and May–June 2010, and so they should be separately represented or treated differently. (TTA Opp. at 15). This argument fails.

As the Court observed in granting preliminary approval, BTL marshalled expert testimony that although Rocket Messaging "provided some very basic log information, the logs did not provide definitive 'MCF' notations required to confirm receipt by the receiving fax machine" (Order, Doc. 343 at 76 (citing Canfield Report ¶¶ 20–21)), and BTL's expert noted "several other deficiencies that call into question the methodology used, the results obtained, and the opinions rendered by Biggerstaff (*id.* (citing Canfield Report ¶¶ 8–61)). Of course, Plaintiffs' expert, Robert Biggerstaff, disputed the conclusions of BTL's expert, but that is why the Agreement represents a "fair compromise" of this matter, even if Intervenors do not believe it is perfect. The difference in the quality of evidence is not "vast," as Intervenors claim, and the Court should reject Intervenors' argument.

**E.** **Intervenors improperly conflate the distinction between *providers* of online fax services and *users* of online fax services.**

Intervenors argue the Settlement is unfair because it is unclear "whether online fax service providers and customers are including in the settlement class," and so the Court should create "sub-classes" and order "independent

representation" for such persons. (TTA Opp. at 15–16). Here, Intervenors are conflating two different groups: (1) online fax service providers, who are not "recipients" of faxes included in the class; and (2) end-users of online fax service, who are recipients included in the class (to the extent any exist).

The law is clear that an online fax service or "e-fax" service provider that receives faxes on a fax server and then forwards them to its customers by email (or via a log-in portal) is not the "recipient" with standing to sue under the TCPA. *See In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620, 2015 WL 5120880, at *1 ¶ 1 (CGAB Aug. 28, 2015) (WestFax Bureau Ruling). The Westfax Bureau Ruling is crystal clear on this issue:

> [I]t is the consumer to whom the content of a fax or efax is directed that is the "recipient" under the TCPA. Westfax asks whether the recipient is the company with the fax server that converts the fax into an email. The Commission's rules and orders make clear that the "recipient" of a fax is the consumer for whom the fax's content is intended and to whom the fax's content is sent by dialing that consumer's fax number. The TCPA and the Commission's rules are designed to protect consumers for whom unwanted faxes represent annoyance and wasted resources. Entities that convert faxes to email are not "recipients" of such faxes under the TCPA because they are not the intended audience for the fax.

(Westfax Bureau Ruling ¶ 12).

The WestFax Bureau Ruling is a Hobbs Act "final order" of the FCC, since it was not appealed. *See Georgia Power Co. v. Telport Comm'n Atlanta,* 346 F.3d 1047, 1050 (11th Cir. 2003) (order from a subordinate unit of the FCC becomes final if no application for review before the full Commission is filed). Accordingly, the Court is bound to follow the WestFax Bureau Ruling. *Mais v. Gulf Coast Collection Bureau, Inc.*,

768 F.3d 1110, 1120 (11th Cir. 2014); *Murphy v. DCI Biologicals, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015).

The courts have consistently applied this rule. For example, in *J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, 2010 WL 9446806, at *8 (C.D. Cal. Oct. 1, 2010), two online fax service providers argued that, by intercepting and converting faxes to emails for their clients, they were the "recipients" and had standing to assert TCPA claims. The district court rejected this argument, holding that "[g]iven the plain language, purpose, and statutory scheme of the TCPA, the Court concludes that 'the recipient' of an unsolicited fax is the person to whom the fax is directed and not an unknown intermediary, like j2 [or Protus], who intercepts the transmission." *Id.*

The district court further held that under the FCC rules, end-users who receive faxes on a computer as opposed to a stand-alone fax machine have no less right to sue for TCPA violations:

> [T]he FCC has concluded that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes.  However, a facsimile machine does not have standing under the TCPA; rather, "the recipient" has standing, "the recipient" being the person to whom the . . . unsolicited fax advertisement is directed.

*Id.* at *7 (citing *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14133 (July 3, 2003) ("2003 Commission Order")).

Similarly, in *Whiteamire Clinic, P.A., Inc. v. Cartridge World N. Am., LLC*, 2017 WL 561832, at *3 (N.D. Ohio Feb. 13, 2017), the plaintiff received the subject fax via an online fax service, which then converted it to email. The defendant argued

26

that the plaintiff lacked standing to sue, and the district court rejected the argument,

holding that, despite the lack of wasted paper or ink toner, the fax nevertheless

"wasted [plaintiff's] time reviewing the junk emails that could have been spent on

other business activities," and "impede[d] Plaintiff's ability to engage in the free flow

of commerce," and that "Plaintiff suffered damages to his business in lost time and in

diversion of resources and can be made whole by injunctive and monetary relief

through this Court." *Id.* (citing *Holtzman v. Turza*, 728 F.3d 682, 684 (7th

Cir.2013) ("Even a recipient who gets the fax on a computer and deletes it without

printing suffers some loss: the value of the time necessary to realize that the inbox

has been cluttered by junk.")).

In sum, Intervenors are improperly conflating *providers* of online fax services or

"e-faxes," which are not covered by the TCPA and are not included in the

Settlement Class, and the end-user "recipients" of the faxes, which are covered by the

statute and included in the class definition. There is no need to expressly "exclude"

fax service providers from the class, as Intervenors argue (TTA Opp. at 20), because

they are excluded by operation of law.[8]

---

[8] Of course, it is entirely possible, in fact likely, that a fax service provider would have fax lines that it uses for its own business, in which case the fax service provider, like any other entity, would be the recipient of faxes sent to those lines.

**F.    The Court should not calculate attorney fees based on the amount claimed by the Class, which would violate *Camden I*.**

Intervenors suggest the Court calculate attorney fees based on "the amount that will be paid to the class members who submitted valid claims . . . ." (TTA Opp. at 22). But that would violate controlling authority stating that "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class," not the amount actually claimed by the class. *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *see also Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1262 n.14 (11th Cir. 2020) ("*Camden I* therefore remains good law, and the district court should apply it in the first instance on remand."). The "fund established for the benefit of the class" here was $19.75 million, not $799,725, and the agreed-upon 25% fee award Class Counsel seek is well within the range awarded in common-fund settlements in this Circuit. *See Camden I*, 946 F.2d at 774–75 (noting that awards in common-fund settlements range from 20% to as much as 50% of the benefit, with most falling between 20% and 30%); *Faught*, 668 F.3d at 1243 ("25% is generally recognized as a reasonable fee award in common fund cases").

Intervenors argue that the "fund established for the benefit of the class" was not really $19.75 million because only those class members who "remember" receiving a fax from BTL in 2009–2010 were eligible to claim. (TTA Opp. at 22). As argued above, there is no "memory" requirement. The claim form simply requires claimants to affirm that the fax number they listed on the form was in use and

28

receiving faxes in that timeframe, including any faxes sent by BTL. The Court should follow controlling Eleventh Circuit authority and calculate attorney fees as a percentage of the $19.75 million fund established for the benefit of the class.

### G.   The five-fax cap does not treat class members inequitably, and the Court should not deny final approval based merely on the fact that the parties disagreed as to the interpretation of the contract.

Intervenors argue that capping claims at five-faxes treats class members who received more than five faxes (on more than one fax line) fails to "treat[] class members equitably relative to each other" under Rule 23(e)(2). (TTA Opp. at 13). Not so. An overall cap on payments to claiming class members is common, and does not treat class members with a claim that could potentially exceed the cap if they were to succeed at trial inequitably. *See, e.g.*, *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, 2023 WL 4420348, at *7 (S.D. Fla. July 8, 2023) (granting final approval of data-breach class action containing "$2,500 cap per individual on Out-of-Pocket losses," no matter how large the out-of-pocket losses, and "a per individual $5,000 cap on actual identity fraud losses," regardless of the actual loss).

For example, in *Ponzio v. Pinon*, 87 F.4th 487, 496 (11th Cir. 2023), a class action settlement arising out of allegedly defective automobile paint, there was a "per claim cap on claims performed by Independent Services Providers," which stated "the reasonable repair cost to be reimbursed shall not exceed 10% of what the same repair would have cost if it were performed at an Authorized Service Center." But class members who had repairs performed by an Authorized Service Center were eligible to receive "100% reimbursement," or "50% reimbursement," or "25%

reimbursement," depending on the age and mileage of the vehicle and date of the repair. *Id.* at 495–96. Thus, class members were eligible for very different reimbursement rates, and yet the Eleventh Circuit nevertheless affirmed final approval, including the "per claim cap" without suggesting the arrangement treated class members equitably to each other." (*Id.* at 494 (quoting Rule 23(e)(2)).

Intervenors argue that the mere fact that Plaintiffs and BTL disagreed about how to interpret the Settlement Agreement means it does not warrant final approval. (TTA Opp. at 22–23). But dispute over the meaning of a settlement agreement, like any contract, are inherent to any litigation, which is why the Settlement Agreement expressly states that the Court reserves jurisdiction over "enforcement and interpretation of the terms of the Settlement [Agreement]," which would be unnecessary if the parties did not anticipate any disputes arising. (Settlement Agreement § XI.A(xi)).

The Court may recall that a serious dispute arose between Intervenors and BTL regarding the meaning of the TTA Settlement, where the claim form required claimants to swear "**UNDER PENALTY OF PERJURY**" as to the number of BTL fax advertisements they received in 2009–2010, with the claim form stating "[i]f you believe you received more than one fax to the number(s) listed above," you must "indicate how many you believe you received at each number in parenthesis next to each number." (*TTA* Doc. 18-1). BTL interpreted this language to mean what it says: that in order to recover for more than one fax, "a claimant must attest only to the number of faxes they received, hardly a burdensome task." (*TTA* Doc. 139, BTL

Opp. Mot. Decertify at 33, n.38). Intervenors argued that claimants under the *TTA* Settlement merely had "the option to include that information, but are not required to do so." (*TTA* Doc. 141, TTA Opp. Mot. Decertify at 28).

This difference in interpretation would have had massive consequences for claimants if the *TTA* Settlement had proceeded. If the Court had resolved the dispute in BTL's favor, it is likely no claimant would have recovered more than $350 for one fax under the *TTA* Settlement because it is highly unlikely any claimant could attest to the correct number of BTL's faxes it received in 2009–2010. That would have reduced payments to class members by much more than the five-fax limit imposed in this case.

In addition, the language the Court cited in capping claims at five faxes in this case is *verbatim* the same language from the *TTA* Settlement. (*Compare* Doc. 432-1, *Cin-Q* Settlement § IV.B ("shall be eligible to receive up to") *with TTA* Doc. 18-1, *TTA* Settlement Agreement § IV.B ("shall be eligible to receive up to"). Thus, Intervenors would have had to address the same issue had the *TTA* Settlement survived, and this Court would have held, as it did here, that the unambiguous language of the *TTA* Agreement limited claimants to five faxes. Surely, once that happened, Intervenors' Counsel would not have agreed that they were inadequate representatives, or that it was improper to seek approval of the *TTA* Settlement.

In sum, the five-fax limit does not treat class members inequitably, and the fact that a disagreement over the meaning of the Agreement does not undercut the case for final approval.

31

**H.**   **Intervenors have identified anomalies with respect to a very small number of claims ruled eligible by Epiq, which Class Counsel have asked Epiq to look into.**

Intervenors have identified a handful of anomalies in Epiq's Final Report that Class Counsel have brought to Epiq's attention. (It appears that Intervenors' counsel did not do so).

For example, Intervenors identify ten instances where they say more than one claim for the same fax number has been ruled "eligible" by Epiq. (Doc. 497-1, Bachmannhuff Decl. ¶ 10). Intervenors identify an additional 32 claims where they suggest that a claimant is avoiding the five-fax limit by submitting more than one claim form. (*Id.* ¶¶ 4–9). Class Counsel have asked Epiq to investigate these issues, but Class Counsel agree that Epiq should not pay more than one claimant for the same fax number, and Class Counsel concede that under the Court's interpretation of the Agreement, each "Settlement Class Member" is limited to $615 for five faxes, and cannot avoid that limit by submitting separate claim forms for more than one fax number. (*See* Doc. 475, Order at 6–8).

**I.**   **The Court should not stay the case pending *Scoma Chiropractic v. Nat'l Spine*, which has been settled individually.**

Intervenors suggest the Court should stay this case pending a decision from the Eleventh Circuit on the question of whether users of "online fax services" are covered by the TCPA in *Scoma Chiropractic, P.A. v. Nat'l Spine Ctrs.*, No. 23-13087. As Class Counsel represented to the Court at the hearing on December 18, 2023,

the *National Spine* appeal has been settled individually on confidential terms. The

parties filed an agreed Motion to Dismiss the appeal on December 28, 2023. (*See*

Ex. E). The Eleventh Circuit granted the motion and dismissed the appeal on

December 29, 2023. (*See* Ex. F).

<u>Conclusion</u>

For the foregoing reasons, the Court should reject the oppositions filed by

BTL and Intervenors and grant final approval of the Settlement.

Respectfully submitted,

 /s/ Glenn L. Hara
Glenn L. Hara (admitted *pro hac vice*)
Ryan M. Kelly (Fla. Bar No: 90110)
Brian J. Wanca (admitted *pro hac vice*)
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL  60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
ghara@andersonwanca.com
rkelly@andersonwanca.com
bwanca@andersonwanca.com

and

Michael C. Addison (Fla. Bar. No. 0145579)
ADDISON LAW OFFICE, P.A.
1304 Alicia Avenue
Tampa, Florida 33604
Telephone: (813) 223-2000
Facsimile: (813) 228-6000
m@mcalaw.net

and

Ross M. Good (Fla. Bar. No. 116405)
Loftus & Eisenberg, Ltd.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
Telephone:  (786) 539-3952
Email:  ross@loftusandeisenberg.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

s/Glenn L. Hara