**EXHIBIT B**

Case 8:13-cv-01592-AEP   Document 508-2   Filed 12/29/23   Page 2 of 19 PageID 14928

BEFORE THE
FEDERAL COMMUNICATIONS COMMISSION
Washington, DC

| In the Matter of: | ) |  |
|---|---|---|
|  | ) |  |
| Akin Gump Strauss Hauer & Feld LLP | ) | CG Docket No. 02-278 |
| Petition for Expedited Clarification or | ) | CG Docket No. 05-338 |
| Declaratory Ruling | ) |  |
|  | ) |  |

**REPLY COMMENTS OF BUCCANEERS HOLDING LLC**

Mitchell S. Nusbaum
WOODS OVIATT GILMAN LLP
700 Crossroads Building
2 State Street
Rochester, New York 14614
Telephone: (585) 987-2800
Facsimile: (585) 454-3968
E-mail: mnusbaum@woodsoviatt.com

# EXECUTIVE SUMMARY

Buccaneers Holding LLC, formerly Buccaneers Limited Partnership ("BLP"), files these comments in response to the February 26, 2019 Petition of Akin Gump Strauss Hauer & Feld LLP for Expedited Clarification or Declaratory Ruling (the "Petition"). In particular, BLP replies to the comments submitted by Cin-Q Automobiles, Inc. ("Cin-Q") to the Petition.

It is unnecessary for purposes of the Petition for the Commission to address the underlying facts of the lawsuit Cin-Q and its counsel filed against BLP. Cin-Q nevertheless mischaracterizes the facts of record in that case as well as the positions Cin-Q and its counsel have taken in that lawsuit and elsewhere, all of which are addressed in these reply comments.

The record in the Cin-Q case fully reflects the fact that BLP made every effort to ensure compliance with the TCPA. After considerable due diligence and familiarizing itself with the requirements of the TCPA, BLP selected a fax broadcaster, FaxQom, which assured BLP all fax transmissions would be sent in full compliance with the TCPA as well as industry practices. FaxQom repeatedly represented orally and in writing that it had an extensive database of persons and entities who had "opted in" and affirmatively indicated a willingness to receive fax advertising, and assured BLP that faxes would only be sent to such persons and entities. As such, the record in the Cin-Q case presents precisely the sort of situation addressed in Akin Gump's Petition, namely an advertiser that went to considerable lengths to ensure compliance with the TCPA, and an unscrupulous fax broadcaster that surreptitiously thwarted the efforts of the advertiser to comply. Cin-Q ignores the evidence that led the Court in the Cin-Q case to conclude BLP had been deceived by the fax broadcaster. As the Court's decision fully reflects, BLP was the victim of fraud through a "tortured path of lies and deceit."

i

After it was sued, BLP was shocked to learn through discovery that FaxQom had repeatedly lied to BLP about the identity of the FaxQom "executive" handling the fax campaign, FaxQom's experience and FaxQom's catalog of "opt-in" numbers. BLP was also shocked to learn that FaxQom farmed out its work to at least three other companies that undertook the transmission of the faxes. FaxQom never handled the transmission of faxes, as it had represented verbally and in its contract that only it would do. FaxQom's deception left BLP completely unaware and stripped it of any control over the fax campaign. Because of the deception and lack of control, BLP was unable to prevent TCPA violations by FaxQom.

Given the relief requested in the Petition, there is no need for the Commission to address Cin-Q's comments regarding its case against BLP. The Petition asks the Commission to explain and clarify language from the 2006 Junk Fax Order that courts, including the Court in the Cin-Q case, have grappled to understand. The Commission said "the sender is the person or entity on whose behalf the advertisement is sent. In most instances, this will be the entity whose product or service is advertised or promoted in the message." Clearly, the Commission anticipated that there would be "instances" in which the liable sender is not the advertiser but, instead, the fax broadcaster.

Akin Gump is asking the Commission to explain those "instances" to enable more courts to decide at the summary judgment stage cases like Cin-Q that involve unscrupulous fax broadcasters, so that victims of such broadcasters are not further victimized by prolonged and costly litigation as well as exorbitant and otherwise unwarranted settlement demands. BLP agrees that this clarification is necessary and should be provided.

**TABLE OF CONTENTS**

A. The Cin-Q Case ..................................................................................................................1

B. The Facts Of Record In Cin-Q's Suit Against BLP ............................................................2

    1. Cin-Q Ignores BLP's Lack Of Control Over The Dissemination Of Any Faxes .................................................................................................................................4

    2. Cin-Q Vastly Overstates The Complaints Regarding The Faxes That BLP Received And Likewise Mischaracterizes BLP's Response To Those Complaints ...........................................................................................................................8

C. Cin-Q's Position Regarding The Standard For "Sender" Liability In Cin-Q Only Confirms That There Exists A "Controversy" Or "Uncertainty" For The Commission To Resolve, As Does The Position Taken By Cin-Q's Counsel In Other Cases ......................................................................................................................10

D. Conclusion ........................................................................................................................13

BEFORE THE
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C.

| | |
|---|---|
| In the Matter of: ) | |
| ) | CG Docket No. 02-278 |
| Petition of Akin Gump Strauss Hauer & Feld ) | GC Docket No. 05-338 |
| LLP for Clarification ) | |

**REPLY COMMENTS OF BUCCANEERS HOLDING LLC**

Buccaneers Holding LLC, formerly Buccaneers Limited Partnership ("BLP"), files these comments in response to the February 26, 2019 Petition of Akin Gump Strauss Hauer & Feld LLP for Expedited Clarification or Declaratory Ruling (the "Petition"). In particular, BLP replies to the comments submitted by Cin-Q Automobiles, Inc. ("Cin-Q") to the Petition.

BLP believes it is unnecessary for purposes of the Petition for the Commission to address the underlying facts of the lawsuit Cin-Q and its counsel filed against BLP. Cin-Q nevertheless mischaracterizes the facts of record in that case as well as the positions Cin-Q and its counsel have taken in that lawsuit and elsewhere, all of which are addressed below.

**A. The Cin-Q Case**

The record in *Cin-Q Automobiles, Inc., et al. v. Buccaneers Limited Partnership*, Case No. 8:13-cv-01592-AEP (M.D. Fla. filed June 19, 2013) ("Cin-Q"), fully reflects the fact that BLP made every effort to ensure compliance with the Telephone Consumer Protection Act ("TCPA"). After considerable due diligence and familiarizing itself with the requirements of the TCPA, BLP selected a fax broadcaster that ensured BLP all fax transmissions would be sent in full compliance with the TCPA as well as industry practices. *See Cin-Q v. BLP*, 2014 WL 7224943, at *8 (M.D. Fla. 2014); BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 4. Moreover, BLP selected a fax broadcaster which repeatedly represented orally and in writing that it had an

1

extensive database of persons and entities who had "opted in" and affirmatively indicated a willingness to receive fax advertising, and the fax broadcaster assured BLP that faxes would only be sent to such persons and entities. See Cin-Q, 2014 WL 7224943, at *1, 8. As such, the record in Cin-Q presents precisely the sort of situation addressed in Akin Gump's Petition, namely an advertiser that went to considerable lengths to ensure compliance with the TCPA and an unscrupulous fax broadcaster that surreptitiously thwarted the efforts of the advertiser to comply. See id.

Moreover, Cin-Q ignores the evidence that led the Court in Cin-Q to conclude BLP had been deceived by the fax broadcaster retained. As the Court's decision fully reflects, BLP was the victim of fraud through a "tortured path of lies and deceit." See Cin-Q, 2014 WL 7224943, at *8. Cin-Q, however, blithely tries to gloss over how that path of lies and deceit of which BLP was a clear victim should inform the proper standard of liability under the TCPA as well as the issues raised in the Petition. See id.

### B. The Facts Of Record In Cin-Q's Suit Against BLP

An employee of BLP (i.e., Matt Kaiser) was tasked with new business development, and after undertaking substantial due diligence regarding the TCPA and best practices for compliance, Mr. Kaiser contacted Michael Clement, who represented himself to be Steven Simms, Executive Vice President of Marketing with FaxQom, a fictitious entity claiming to be in the business of fax marketing. See Cin-Q, 2014 WL 7224943, at *1-2; see also BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 4. Mr. Clement, who clearly knew he was perpetrating a fraud on the public, was using the alias of Steven Simms to "keep his name out of it." See Cin-Q, 2014 WL 7224943, at *2. After discussing legal concerns, FaxQom's compliance with the TCPA and FaxQom's vast library of "opt-in" numbers with Mr. Simms, Mr. Kaiser executed a written

contract on behalf of BLP and engaged FaxQom to send a series of faxes advertising Tampa Bay Buccaneers tickets. See id. at *1, 8.

Faxes were sent in three waves, beginning in July of 2009, and BLP became aware of an extremely limited number of complaints after each wave.[1] See Cin-Q, 2014 WL 7224943, at *1-2. BLP consulted with FaxQom after each of the few complaints it received, and FaxQom assured BLP the situation was under control. See id.; see also id. at *8 n.11. After the third wave, however, BLP received a letter from the Florida Attorney General and immediately asked FaxQom to cease any further transmissions. See id. at *2. But as the Court in Cin-Q noted, BLP "took repudiative and curative measures when noncompliance was brought to its attention by members of the putative class." See id. at *8. Indeed, there were no obvious red flags until the letter from the Florida Attorney General was received, but this was after the third and final wave of faxes had already been sent.

After it was sued, BLP was shocked to learn through discovery in Cin-Q that FaxQom had repeatedly lied to BLP about Mr. Simm's identity, FaxQom's experience and FaxQom's catalog of "opt-in" numbers. See Cin-Q, 2014 WL 7224943, at *2, 8, 8 n.10. BLP was also shocked to learn that FaxQom farmed out its work to at least three other companies that undertook the transmission of the faxes. See id. at *2, 8. In other words, FaxQom never handled the transmission of faxes, as it represented verbally and in its contract only it would do. See id. FaxQom's deception left BLP completely unaware and stripped it of any control over the fax campaign. See id. Because of the deception and lack of control, BLP was unable to prevent TCPA violations by FaxQom. See id.

---

[1] All told and as addressed more fully below, BLP received complaints from materially less than one tenth of one percent of all recipients, and each complaint was promptly addressed by BLP. See disc. infra at 8-9.

3

Given the relief requested in the Petition, there is no need for the Commission to address Cin-Q's comments regarding its case against BLP, as Akin Gump is not asking the Commission to serve as a finder of fact in Cin-Q or any of the other cases referenced in the Petition. See Petition at passim.  Rather, the Petition asks the Commission to explain and clarify language from the 2006 Junk Fax Order that courts, including the Court in Cin-Q, have grappled to understand.  See id. at 1-2.  The Commission said "the sender is the person or entity on whose behalf the advertisement is sent.  In most instances, this will be the entity whose product or service is advertised or promoted in the message."  See id. at 2.  Clearly, the Commission anticipated that there would be "instances" in which the liable sender is not the advertiser but, instead, the fax broadcaster.  See id.

Akin Gump is asking the Commission to explain those "instances" to enable more courts to decide at the summary judgment stage cases like Cin-Q that involve unscrupulous fax broadcasters, so that victims of such broadcasters are not further victimized by prolonged and costly litigation as well as exorbitant and otherwise unwarranted settlement demands.  See Petition at 2-5, 9.  BLP agrees that this clarification is necessary and should be provided.  Nevertheless, Cin-Q's one-sided recitation of the facts requires a correction of the record.  See disc. infra at 4-10.

### 1. Cin-Q Ignores BLP's Lack Of Control Over The Dissemination Of Any Faxes

Cin-Q's creative retelling of the history of Cin-Q ignores the fact that FaxQom wholly misrepresented not only its expertise and capabilities to BLP, but also its true identity, surreptitiously engaging a variety of third parties to compile fax lists and send faxes and then actively concealing from BLP the existence and roles of those third parties after FaxQom represented verbally and in its contract with BLP that only FaxQom itself would be sending the faxes to its catalog of opt-in numbers.  See disc. infra at 4-8.  All of this is amply reflected in the

4

record in Cin-Q, but unfortunately ignored by Cin-Q in its recent submission to the Commission. See Cin-Q's Comments on Petition at 2-5, CG Docket Nos. 02-278, 05-338 (filed April 8, 2019) ("Cin-Q's Comments"). FaxQom's fraud, however, deprived BLP of control over the fax campaign.

BLP did its diligence about the requirements of the TCPA and FaxQom's compliance with the requirements. On its website, in telephone conversations and in writing, FaxQom explicitly represented to BLP that it was familiar with the TCPA and industry standards, that it fully complied with such standards, that it used legal techniques in gathering its fax data and that it had compiled a database of "opt-in" fax numbers, whose owners had agreed to receive faxes. See Cin-Q, 2014 WL 7224943, at *8; BLP Opp. to Motion Summary Judgment (Cin-Q Dkt. #143) at 2. Indeed, the written agreement between BLP and FaxQom expressly memorialized the following representations to BLP by FaxQom:

- FaxQom was a "legal compiler of fax databases and has been using the same compiling techniques since 1991 . . . the same year the TCPA . . . was in force."

- FaxQom uses "legal techniques in compiling fax data [which] has enabled FaxQom to be 18 years strong with a solid reputation in broadcast marketing."

- BLP's "account [would] be handled directly by Steven Simms, Exec VP of Marketing. All broadcast orders, changes or questions [would] be under his management."

- "FaxQom confirms that all faxes have been collected according to the best industry practices as outlined by the Direct Marketing Association."

- "FaxQom will agree to abide by all laws associated with facsimile marketing."

BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 5-6.

As the Court observed in its December 17, 2014 decision in Cin-Q, however, there was in actuality a "complicated web" of facts underlying the relationship between BLP and FaxQom. See Cin-Q, 2014 WL 7224943, at *2. As noted, testimony indicated that Michael Clement, who

5

operated under the alias of Steven Simms, held himself out to BLP as the Executive Vice President of Marketing with FaxQom.  See id.  But FaxQom was not a legal entity, and unbeknownst to BLP, (a) FaxQom did not have a database of "opt-in" fax numbers whose owners had agreed to receive faxes, (b) FaxQom did not compile fax numbers in compliance with legal requirements, (c) FaxQom did not send any fax advertisements itself or have the capability of doing so and (d) FaxQom did not ensure that any fax advertisements that were sent complied with the law and/or industry standards.[2]  See id. at *2, 8, 8 nn.8-11; see also BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 10-13.  Instead, FaxQom (again unbeknownst to BLP) delegated these tasks to third parties such as USA Datalink, 127 Highstreet and Rocket Messaging.  See Cin-Q, 2014 WL 7224943, at *8.

As reflected in the Court's opinion, BLP "generally appear[ed] to have been two to three degrees of connection removed from the [fax] transmissions."  See Cin-Q, 2014 WL 7224943, at *2.  In other words, BLP hired a fax broadcaster that was only authorized by BLP to send faxes to numbers that were legally compiled and whose owners had already agreed to receive fax marketing messages.  See disc. supra at 2-6.  FaxQom, however, wholly ignored the scope of its authority and contract with BLP as well as the repeated directives of BLP and instead deceived BLP, surreptitiously engaging with undisclosed third parties to flout the clear instructions of BLP.  See id.

Moreover, Cin-Q ignores the fact that the record fully reflects BLP's lack of control over the dissemination of the faxes, due to FaxQom's efforts to deceive BLP.  See Cin-Q's Comments

---

[2] As the Court in Cin-Q found, there is no evidence of record that any but a handful of faxes were actually sent by anyone, since FaxQom sent no faxes and the undisclosed third parties secretly engaged by FaxQom kept few (if any) records.  See Cin-Q, 2014 WL 7224943, at *2, 5 n.3.  As such, the claims made in Cin-Q's comments regarding the breadth and scope of the fax campaigns at issue in Cin-Q are at best unsubstantiated allegations and more likely just hyperbole.  See id.

at passim. When it contracted with FaxQom, BLP understood and was repeatedly assured by FaxQom that FaxQom would be "the only entity with the limited authority to press the 'send' button." See Cin-Q, 2014 WL 7224943, at *8. BLP, however, never received "confirmation [] that anything went out."[3] See id. The record instead indicates BLP had no access to the fax lists at issue and was kept wholly unaware of FaxQom's outsourcing to third parties.[4] See id. Based on the foregoing, the Court in Cin-Q found that BLP's control over the entities that transmitted the fax advertisements "amounted to none" and that the relationship between BLP and the parties involved in the fax transmissions was "a tortured path of lies and deceit," the claims of Cin-Q notwithstanding. See id. The Court in Cin-Q would thus clearly benefit from the clarification requested by Akin Gump.

Cin-Q's current focus on BLP's control over the content of the faxes is, however, equally misguided. See Cin-Q's Comments at 2-3. The Court in Cin-Q has already rejected the argument that BLP has liability under the TCPA solely because it designed the fax advertisement and provided FaxQom with desired dates, times and area codes for the faxes. See Cin-Q, 2014 WL 7224943, at *7 (noting that the "degree of input and control over the content of the fax(es)" is only one consideration in determining "on whose behalf the offending behavior is conducted").[5] Other

---

[3] The fact BLP never received confirmation of actual transmissions, in spite of repeated requests, is only further reason why the numbers bandied about in Cin-Q's comments regarding the scope of any fax transmissions by FaxQom must be viewed with suspicion. See Cin-Q, 2014 WL 7224943, at *8.

[4] As the Court in Cin-Q noted, BLP had no way of controlling the actions of FaxQom, because FaxQom actively concealed from BLP the fact that FaxQom was delegating to third parties:

> Likewise, Clement testified that because BLP did not know he was delegating tasks to third parties, BLP had no way of controlling FaxQom's actions.

Cin-Q, 2014 WL 7224943, at *8 n.7.

[5] And it is again worth noting that there is evidence that BLP's wishes regarding the timing of the faxes were also completely ignored by FaxQom. See Cin-Q's Comments at 3 (noting that BLP had to follow up on late faxes). More importantly, however, the critical instruction by BLP that

7

courts have similarly rejected Cin-Q's argument that a person or entity can be a per se "sender" under the TCPA merely because an offending fax promotes their goods or services. See, e.g., Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 938 (7th Cir. 2016) (holding that "agency rules are properly applied" to determine if a party is the directly-liable sender of a fax advertisement); Bais Yaakov v. Varitronics, 2015 WL 1529279, at *4-5 (D. Minn. 2015) (rejecting strict advertiser liability). But as discussed more fully below, the very types of arguments that Cin-Q and its counsel advanced in Cin-Q are precisely why clarification is necessary from the Commission as to the circumstances under which a fax broadcaster and not an advertiser is the liable sender. See disc. infra at 10-13.

**2. Cin-Q Vastly Overstates The Complaints Regarding The Faxes That BLP Received And Likewise Mischaracterizes BLP's Response To Those Complaints**

In another distortion of the record, Cin-Q grossly exaggerates the number of complaints that BLP received regarding the faxes at issue in Cin-Q and likewise misrepresents BLP's response to those complaints. See Cin-Q's Comments at 4-5. For example, after faxes were transmitted in July of 2009, BLP received only three opt-out requests and two complaints. See BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 7. BLP, however, immediately forwarded these complaints to FaxQom. See id. FaxQom, in turn, reassured BLP and instructed BLP that "[i]f you get these in the future, just forward to me . . . I handle all of these throughout our company because I have been here 17 years and know the data and procedures very well." See id. at 7-8.

Similarly, BLP received only two complaints after the faxes were sent in August 2009. See BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 7-8. The first complaint was from Phyllis Towzey. See Cin-Q's Comments at 4. In response to Ms. Towzey's letter, BLP

---

all faxes be sent in full compliance with the law was apparently ignored by FaxQom and clearly outside the control of BLP. See disc. supra at 2-8.

immediately took steps to ensure that Ms. Towzey did not receive another fax advertising Buccaneers' tickets and wrote to Mr. Simms: "FYI – You might want to remove this # from your future broadcasts. Definitely remove it for anything we might do in the future." See BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 8-9. The second complaint was a lawsuit filed on August 28, 2009 in Florida state court by Cin-Q. See id. at 9. After the lawsuit was filed, BLP sent a letter to FaxQom demanding indemnification and legal defense for the suit, and also demanding that FaxQom reconfirm that all of the fax numbers they were using were "opt-in." See Pls.' Motion for Summary Judgment (Cin-Q Dkt. #138) at 8. FaxQom, in turn, again confirmed that "all numbers have been collected lawfully and with cause." See id. at 8-10. Cin-Q and its counsel, however, did not prosecute the case, and little activity took place in the case until the lawsuit was later voluntarily dismissed. See BLP Motion for Final Summary Judgment (Cin-Q Dkt. #129) at 9. And because Cin-Q did not pursue the case and because there had been few other complaints, BLP believed it was an isolated event and not evidence of a larger problem.[6] See id. at 7-9.

As the record demonstrates, far from being a "prolific junk-faxer" that "persisted in its unlawful activity" after being put on notice of specific customer concerns, BLP worked expeditiously to respond to complaints and requests to opt-out, with complaints representing fewer than <u>one</u> <u>tenth</u> <u>of</u> <u>one</u> <u>percent</u> of the faxes Cin-Q alleges were sent out for BLP. See Cin-Q's Comments at 2; disc. supra at 8-9. And given the low number of complaints and opt-out requests that appeared to indicate FaxQom was adhering to requirements under the TCPA and industry

---

[6] Notably, Cin-Q and its counsel separately filed suit against FaxQom, reflecting obvious uncertainty on their part as to who should actually be responsible for the alleged fax transmissions at issue. See Compl., Cin-Q v. Clement, Case No. 8:11-cv-01502 (M.D. Fla. filed July 7, 2011).

9

standards, BLP reasonably placed its confidence in FaxQom to proceed appropriately and address any problems.[7] See disc. supra at 8-9.

### C. Cin-Q's Position Regarding The Standard For "Sender" Liability In Cin-Q Only Confirms That There Exists A "Controversy" Or "Uncertainty" For The Commission To Resolve, As Does The Position Taken By Cin-Q's Counsel In Other Cases

Cin-Q's claim that there is no "controversy" or "uncertainty" for the Commission to resolve regarding "sender" liability under the Junk Fax Rule is belied by the position that Cin-Q and its counsel have taken in Cin-Q and other cases. See disc. infra at 10-13. In its case against BLP, Cin-Q has repeatedly argued for a strict liability standard, which would hold BLP liable as the "sender" of the junk faxes "merely because their 'goods or services' appear as advertised in the faxes at issue." Cin-Q, 2014 WL 7224943, at *6. Although the Court rejected this standard and focused instead on a "totality test based loosely on agency principles" and the "origin of the offending behavior" before determining whether an entity or person is properly considered a "sender" (id. at *4, 7-8), Cin-Q has continued to maintain that strict liability is the proper standard and that summary judgment should be granted in its favor:

> And if we win, we win, and if we lose, you know, on the issue that -- where the Court denied summary judgment on the -- you know, whether the sender regulation should be read strictly to impose, you know, direct liability if your goods or services are advertised. If we lose on that, we'll take that, you know, pure legal issue up to the Eleventh Circuit. We've done very well with it in the Middle District of Florida recently.

May 1, 2018 Hr'g Tr. (Dkt. #106) at 12:19-13:1, Technology Training Associates, Inc., et al. v. BLP, Case No. 8:16-cv-01622-AEP (M.D. Fla.) ("TTA"); see also Pls.' Motion for Class

---

[7] Although Cin-Q refers to complaints regarding BLP's fax broadcasts received by the Commission and FTC, for the vast majority of those complaints, there is no indication that BLP was aware of the complaints or provided the opportunity to address them. See Cin-Q's Comments at Exhibits G-H of Declaration of Glenn L. Hara.

10

Certification (Cin-Q Dkt. #207) at 26 ("Plaintiffs maintain that BLP is the sender under the plain language of 47 C.F.R. § 64.1200(f)(10) because its 'goods or services are advertised or promoted[.]'"); Intervenors' Renewed Motion to Decertify Settlement Class (TTA Dkt. #131) at 22-23 (noting that since the summary judgment decision, four other courts in the Middle District of Florida have found "sender" liability solely because a defendant's "goods or services" are advertised in the faxes).

The gulf between the strict liability standard and the standard applied in Cin-Q, along with Cin-Q's continued assertion that strict liability should apply against BLP, obviously undercuts any claim that the FCC need not address now the "instances" in which the fax broadcaster (and not the advertiser) is the liable sender.[8]  See disc. supra at 10.  Moreover, even a cursory reading of the Court's opinion in Cin-Q would further illustrate the need for clarification by the Commission. See Cin-Q, 2014 WL 7224943, at *3-9.  In its opinion, the Court in Cin-Q carefully chronicled the evolution of the "sender" issue but was "left only to conclude" that the applicable standard for assessing the issue of "on whose behalf" is "a standard lying somewhere in the middle" between per se liability and vicarious liability through common law agency.  See id. at *7.

Importantly, the Court in Cin-Q was also guided by the earlier decision of the Eleventh Circuit in Sarris.  See Cin-Q, 2014 WL 7224943, at *4-7; Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 771 F.3d 1274, 1284-87 (11th Cir. 2014), opinion vacated and

---

[8] Cin-Q also completely ignores the conflict among federal circuits regarding the scope of sender liability in junk fax cases and the application of the exception articulated in the 2006 Junk Fax Order, as noted by Akin Gump in the Petition.  See Petition at 9 ("[T]here is conflict among the Sixth, Seventh, and Eleventh Circuits regarding how to determine the liable 'sender' when a fax is transmitted by a party other than the entity whose goods and services are advertised.  District courts in the First, Eighth, and Ninth Circuits also have adopted divergent standards for 'sender' liability that fall somewhere between the Seventh Circuit's agency approach and the Sixth Circuit's strict liability approach.").

superseded on reconsideration by 781 F.3d 1245 (11th Cir. 2015).  Most pertinently, the lack of a clearer standard led the Eleventh Circuit in Sarris to conclude in that case that summary judgment on the issue of "sender" liability was not appropriate and that the issue would instead have to be presented to a jury.  See Sarris, 771 F.3d at 1287-88.  Following suit, the Court in Cin-Q later noted the Eleventh Circuit's "unflinching" characterization of the issue as a question of fact for a jury and denied BLP summary judgment.  See Cin-Q, 2014 WL 7224943, at *9.  Guidance from the Commission about what it meant in the 2006 Junk Fax Order, when the advertiser is not the liable sender and when faxes are not sent "on behalf of" advertisers would, however, make summary judgment more accessible and would enable victims like BLP of rogue broadcasters to avoid the costs and risks of prolonged litigation.  See Petition at 4.

      Finally, counsel for Cin-Q have advocated standards for "sender" liability in other junk fax cases that differ markedly from the standard they argued for in Cin-Q, only providing further evidence of the need for clarification by the Commission.  See Cin-Q, 2014 WL 7224943, at *4.  In one case, Cin-Q's counsel observed that because the faxes at issue "indisputably" advertised the defendants' goods and services, defendants could avoid liability "only by showing that the faxes were not sent 'on [their] behalf.'"  See Pl.'s Opp. to Defs.' Motion for Summary Judgment (Dkt. #221) at 8, Savanna Grp., Inc. v. Trynex, Inc., et al., Case No. 1:10-cv-07995 (N.D. Ill. 2013) ("Savanna").  Under this formulation and contrary to the standard they argued for in Cin-Q, a "sender" must be the person or entity "on whose behalf" the faxes were sent and whose "goods or services" were advertised in the faxes.  See id.

In another case, Cin-Q's counsel claimed that a defendant was a "sender," simply because the faxes were sent "on behalf of" the defendant.[9] See Pl.'s Mem. in Supp. of Motion for Partial Summary Judgment (Dkt. #263-1) at 9-11, Creative Montessori Learning Center v. Ashford Gear LLC, Case No. 1:09-cv-03963 (N.D. Ill. 2013). In contrast to the strict liability standard they advocated in Cin-Q, Cin-Q's counsel in Creative Montessori acknowledged that the fact the faxes advertised defendant's products was not dispositive of "sender" liability, and Cin-Q's counsel then cited and relied upon additional facts to support a finding that the faxes were sent on the defendant's behalf. See id. (noting that the faxes "promoted" defendant's product, defendant was responsible for the content of the faxes, and defendant worked with the broadcaster and authorized the broadcaster to send out the faxes); see also id. at 10-11 ("There might be outlier cases in which the entity whose product or service is advertised had absolutely nothing to do with the junk fax, but that is not the situation here."). That Cin-Q's counsel has argued three different standards for "sender" liability, however, should demonstrate without more the need for the Commission's clarification on this issue. See disc. supra at 10-13.

### D. Conclusion

BLP respectfully requests that the Commission consider its correction of the record offered by Cin-Q and reiterates its support for Akin Gump's request that the Commission clarify language from the 2006 Junk Fax Order that courts, including the Court in Cin-Q, have grappled to understand. BLP agrees with Akin Gump that one of the "instances" in which the liable sender is

---

[9] Even the approach taken by Cin-Q's counsel in analyzing whether a fax was sent "on behalf of" a person or entity differs from case to case. Compare Pls.' Mem. in Supp. of Motion for Summary Judgment (Cin-Q Dkt. #138) at 12-13 (arguing that faxes were sent "on [BLP's] behalf" because the faxes advertised BLP's products and services), with Pl.'s Opp. to Defs.' Motion for Summary Judgment (Savanna Dkt. #221) at 8 ("Defendants can avoid liability only by showing that the faxes were not sent 'on [their] behalf' -- i.e., that the fax broadcaster lacked actual or apparent authority to send the faxes.").

13

not the advertiser is when the fax broadcaster "both commits TCPA violations and engages in deception or fraud against the advertiser (or blatantly violates its contract with the advertiser) such that the advertiser cannot control the fax campaign or prevent TCPA violations." See Petition at 3.

Date:  April 23, 2019                                        Respectfully submitted,

*/s/ Mitchell S. Nusbaum*
Attorney for Buccaneers Holding LLC

Mitchell S. Nusbaum
WOODS OVIATT GILMAN LLP
700 Crossroads Building
2 State Street
Rochester, New York 14614
Telephone: (585) 987-2800
Facsimile: (585) 454-3968
E-mail: mnusbaum@woodsoviatt.com

14