**EXHIBIT D**

1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

2

**TAMPA DIVISION**

3    CINQ AUTOMOBILES,

4                         Plaintiff,

5         vs.                    CASE NO. 8:13-cv-1592 AEP
                                 April 7, 2014
6                                Tampa, Florida
                                 2:02 – 2:59 p.m.
7

     BUCCANEERS LIMITED PARTNERSHIP,

8
                         Defendant.
9    _____/

10

11

12

13                   **TRANSCRIPT OF MOTION HEARING**
                BEFORE THE HONORABLE ANTHONY E. PORCELLI
14                 UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24   Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
25   transcription.

```
 1   APPEARANCES:

 2
     For the Plaintiff:        MICHAEL C. ADDISON, ESQ
 3                             Addison & Howard, P.A.
                               1304 Alicia Avenue
 4                             Tampa, Florida 33604
                               813/223-2000
 5
                               ROSS GOOD, ESQ
 6                             Anderson & Wanca
                               3701 Algonquin Road, Suite 500
 7                             Rolling Meadows, Illinois
                               855/827-2329
 8
 9   For the Defendant:        BARRY A. POSTMAN, ESQ.
                               Cole, Scott & Kissane, PA
10                             Esperante Building
                               222 Lakeview Avenue, Suite 120
11                             West Palm Beach, Florida 33401
                               561/383-9200
12
                               DAVID C. BORUCKE, ESQ.
13                             Cole, Scott & Kissane, PA - Tampa
                               4301 West Boy Scout Blvd.
14                              Suite 400
                               Tampa, Florida 33607
15                             813/864-9351

16
     Also Present:             DAVID COHEN, ESQ.
17                             CASSIE SADOWITZ, ESQ.

18
     Court Reporter:           Howard W. Jones, RDR, RMR, FCRR
19                             801 N. Florida Avenue, Suite 15A
                               Tampa, Florida 33602
20                             813/301-5024

21

22                  * * * * * * * * * *

23

24

25
```

# I N D E X

|  | **PAGE** |
|---|---|
| RULING OF THE COURT: | 5 |
| RULING OF THE COURT: | 6 |
| ARGUMENT BY MR. POSTMAN: | 7 |
| ARGUMENT BY MR. GOOD: | 17 |
| RULING OF THE COURT: | 26 |
| ARGUMENT BY MR. GOOD: | 27 |
| ARGUMENT BY MR. POSTMAN: | 28 |
| ARGUMENT BY MR. GOOD: | 30 |
| RULING OF THE COURT: | 32 |
| ARGUMENT BY MR. GOOD: | 35 |
| ARGUMENT BY MR. POSTMAN: | 35 |
| ARGUMENT BY MR. GOOD: | 37 |
| RULING OF THE COURT: | 38 |
| ARGUMENT BY MR. POSTMAN: | 38 |
| RULING OF THE COURT: | 42 |
| ARGUMENT BY MR. ADDISON: | 43 |
| ARGUMENT BY MR. POSTMAN: | 43 |
| RULING OF THE COURT: | 44 |
| ARGUMENT BY MR. POSTMAN: | 46 |
| ARGUMENT BY MR. GOOD: | 47 |
| RULING OF THE COURT: | 48 |
| CERTIFICATE OF COURT REPORTER: | 50 |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

4

```
 1                     P R O C E E D I N G S

 2              (Court called to order.)

 3              THE COURT:  Let's call the case, please.

 4              THE DEPUTY CLERK:  Cin-Q Automobiles vs.

 5     Buccaneers Limited PIP, Case 813-cv-1592-AEP.

 6              THE COURT:  All right.  Counsel state your

 7     appearance for the record.

 8              MR. ADDISON:  Michael Addison on behalf of

 9     plaintiffs with the firm of Addison & Howard in Tampa.

10              THE COURT:  Thank you, Mr. Addison.

11              MR. GOOD:  Ross Good also on behalf of the

12     plaintiffs from law firm of Anderson & Wanca out of Chicago,

13     Illinois.

14              THE COURT:  All right.  Thank you, Mr. Good.

15              MR. POSTMAN:  Good afternoon, Your Honor.  Barry

16     Postman, and this is my associate, David Borucke, from

17     Cole, Scott & Kissane on behalf of the defendants.  Present

18     with us today is David Cohen, General Counsel for the

19     Buccaneers, and his colleague, Cassie Sadowitz, also from

20     the Buccaneers.

21              THE COURT:  All right.  Good afternoon all of you.

22              All right.  There are a number of pending motions.

23     It's also my intent, although they were not noticed today,

24     to at least take up a couple additional motions that have

25     been filed, namely Documents No. 115 and 117, and we'll
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1    discuss them.

2         All right.  Let me just start off with Documents

3    No. 91 and 92.  Number 91 is defense motion to amend the

4    answer.  There's been no response filed to that.  It's my

5    intent to grant that.

6         But Mr. Good or Mr. Addison, if you have any

7    comment upon that, but there's been no response filed to

8    that motion.

9         MR. ADDISON:  No, Your Honor.

10        THE COURT:  All right.  For the record, I'm gonna

11   grant No. 91 and direct that the Clerk file the -- well, let

12   me just direct --

13        Mr. Postman, I'm gonna direct that you file -- go

14   ahead and file it, rather than have the Clerk file the

15   amended answer, just go ahead and file it and I'll give you

16   three days to file it.

17        MR. POSTMAN:  Yes, Your Honor.

18        THE COURT:  All right.  Number 92.  Mr. Addison,

19   are you handling this or Mr. Good?  This is the third-party

20   complaint?

21        MR. ADDISON:  Mr. Good will handle that, Your

22   Honor.

23        THE COURT:  All right.  Mr. Good, let me just

24   address a couple quick questions to you.  The first is you

25   do cite some cases in your response, but namely none of

1    those cases deal with the allegations as represented here;

2    that is, where there is a contract for indemnification and

3    the allegations of fraudulent representations.

4           As I understand your pleading, it's in essence

5    what the Southern District of Florida has commented upon

6    where the statute itself does not create an indemnification

7    or it cannot do so in common law.  But there is nothing

8    prohibiting the types of causes of action, at least as

9    alleged in Count One and Count Three and Count Four.

10          Is that accurate?

11          MR. GOOD:  Yes, Your Honor.

12          THE COURT:  All right.  So I'm going to go ahead

13    and grant No. 92, the motion to file a third-party

14    complaint.

15          Mr. Postman, I'm gonna give you three days to file

16    the complaint.  You can decide whether as far as -- and I'm

17    not gonna limit it to number Count Two as far as the common

18    law indemnification, because as an additional matter I'll

19    note I don't think plaintiff has standing to assert that.  I

20    think it's something that the third party themselves.  If

21    you feel there is a legitimate basis to assert that claim,

22    although Mr. Good's case law is sound, but I'm not gonna

23    resolve that at this point.  But you can take it upon if you

24    feel there is a good faith basis for that count or not.  But

25    as to Counts One, Three, and Four, they certainly seem

 1   appropriate.

 2          MR. POSTMAN:  So, Your Honor, just for

 3   clarification, if I so choose, I don't have to file the

 4   amended complaint attached to the motion, I can amend it if

 5   I wanted to to take out the count Your Honor addresses, it

 6   doesn't have to be exactly what I attached to the motion?

 7          THE COURT:  Outside of that, that's correct, no

 8   other additional counts.  But if you're going to remove the

 9   one count, that -- you know, that is at issue, that is Count

10   No. 2, the common law indemnification, that's fine.  You can

11   file it as that.  But if you think there's a good faith

12   basis to pursue it, then go ahead and file it as amended.

13          MR. POSTMAN:  Thank you, Your Honor.

14          THE COURT:  All right.  So let's skip over the

15   third-party subpoenas for a moment.  Or, excuse me, let's

16   skip to the third-party subpoenas, which is No. 100.  And

17   the response has been filed at No. 108.

18          A couple of things to address.  Mr. -- there seems

19   to be a factual issue, at least as identified in the

20   pleadings there are three third-party subpoenas where there

21   is an assertion, Mr. Postman, that you did not receive the

22   proper notice and that is the Clear Choice, the Paypal, and

23   the Comerica subpoenas; is that correct?

24          MR. POSTMAN:  Yes, Your Honor.  And I can probably

25   explain it a little bit better if Your Honor wants --

8

```
 1              THE COURT:  All right.

 2              MR. POSTMAN:  -- but I want to make sure I respond

 3    to your questions, but the answer is yes.

 4              THE COURT:  And sit down.  You don't have to

 5    stand, or however you're comfortable.

 6              MR. POSTMAN:  I'm actually more comfortable

 7    standing.

 8              THE COURT:  All right.  Proceed any way you want

 9    then.

10              MR. POSTMAN:  Yes, Your Honor.  And maybe I can

11    clarify.  Your Honor may have seen within their -- there was

12    a debate about what we did and did not receive.

13              THE COURT:  Right.

14              MR. POSTMAN:  In fact, in the notices that were

15    sent to us, they actually included the statement these

16    things have been sent out, which led us to believe,

17    predicated upon their representation, that in fact we did

18    not get them.  (Inaudible) to us, as Your Honor may have

19    seen in their response, and we tried to have a good faith

20    conference, let me know, let me see everything, I want to be

21    able to confirm, they've represented that they did give it

22    to us either contemporaneously, perhaps minutes before or

23    the day before or otherwise.

24              Generally speaking, Judge, I don't want to fight

25    over whether there word is better than my word, because I
```

1  don't think that's the global issue for Your Honor's

2  determination.  I think the global issue is this discovery

3  practice that is happening in this case with regard to these

4  subpoenas.  I don't want the motion to be granted because

5  Your Honor believes that I'm correct and they gave it to us

6  the day after as opposed to the day before, because that

7  wouldn't be appropriate use of this Court's time.  It's the

8  concept of what they're sending out and whether they can

9  send it out and whether the judicial resources in this case

10  justify it.

11          I'm happy to argue that now, Judge, but I don't

12  want to spend a lot of time arguing over whether they're

13  right or I'm right about the receipt of the actual notice.

14          THE COURT:  All right.  Well, let's then get to

15  the heart of it, because I'll note just based upon what's

16  represented, and I'll take that and I certainly understand

17  the position, as to the timeliness issue, there just doesn't

18  seem to be a basis to quash his subpoenas.  As I understand

19  your other argument, though, which is problematic, because

20  it relates to a relevancy argument, and the question is what

21  standing does the defendant have to assert that argument

22  regarding these subpoenas?

23          MR. POSTMAN:  Judge, let me take a step back.

24  That's what I want to argue if I can, Judge.

25          THE COURT:  All right.

1          MR. POSTMAN:  I want to take a step back, Judge,

2     and remind the Court where we are in this case.

3          Approximately three or four months ago we sat in

4     this courtroom and Your Honor suggested a bifurcation of

5     liability and damages and suggested, I think invited me, to

6     file a motion, which I did.

7          Counsel Mr. Good was not present, but his

8     colleague, Mr. Wanca, was present and suggested to the Court

9     that they needed the opportunity, even though we were going

10    to address vicarious liability first, to conduct this

11    discovery because, I think as he suggested, had he not had

12    the right to do so documents may be lost or information

13    not -- that we might need later on wouldn't do that.  And

14    Your Honor, based -- I think, you didn't tell us, but I

15    think based upon that representation, allowed discovery on

16    both with us only to address the vicarious liability

17    argument at some point after June.

18         And this is globally where we're going to go, Your

19    Honor, so that it's clear, with regard to the depositions,

20    as well as the discovery.  Because what's happened has been,

21    at least in my experience, unexpected with regard to what

22    has occurred.

23         As Your Honor may have seen with regard to the

24    responses, there has been a plethora of third-party

25    discovery that is served with regard to a whole bunch of

1   companies, for lack of a legal term, that have little to no

2   relevance to this case.  The requests, so that it's clear,

3   in terms of the documents are not narrowed or specific to

4   the Buccaneers.

5           And I think Your Honor may or may not know this in

6   the documents, this isn't the first lawsuit, as we've since

7   learned, that has been filed with regard to these faxes.

8   The plaintiffs have filed multiple, I think three, prior

9   lawsuits, wasn't represented previously, about these faxes

10  and have conducted extensive discovery.

11          Additionally, as Your Honor may have seen, the

12  same firm has been criticized by a sister court in a

13  different state for using discovery in one state to help

14  find cases to be filed in other jurisdictions in other

15  matters.  All of this centers into why I'm here today making

16  the argument that they shouldn't be allowed to do this,

17  Judge.

18          On top of which, one more thing.  As I recently

19  learned, as you may have seen the papers, there's actually

20  cases going on in other states about the legitimacy of these

21  subpoenas that counsel doesn't think I should have to be

22  noticed on because I wasn't a part of the pleadings or

23  noticed, even though it involves my client.

24          Judge, I think when Your Honor hears the facts of

25  this case, of which I would like to talk about, this case

1   gets resolved on the vicarious liability issue without us

2   having to spend all of this time and all of this money with

3   regard to all of these subpoenas that are being sent all

4   across the country, as my client pointed out, all across

5   North America, because we're now going to Canada too.  I

6   don't believe they are narrowly focused with regard to this

7   case.  None of them have anything to do with the issues on

8   vicarious liability and we're spending a lot of time, money,

9   and energy fighting over whether or not they can get

10  something from Seattle, Washington, when there's no

11  relevance to the issues that Your Honor need to decide.

12          I actually am going to ask, and it's not in my

13  papers, that we revisit the issue that Your Honor talked

14  about four months ago.  Let's litigate the issue, discover

15  the issue with regard to vicarious liability.  If Your Honor

16  agrees with me, I don't need to worry about third-party

17  complaints, I don't need to worry about subpoenas, I don't

18  need to worry about more than ten depositions.  If Your

19  Honor disagrees with me, then they have the opportunity and

20  they'll -- we may fight over it if I lose this part of the

21  case, what they can done and how they can do it, but now

22  we're spending a significant amount of money, well over six

23  figures, fighting over subpoenas that may or may not be

24  relevant.  I don't think are remotely relevant, but my

25  client is having to spend money to address these issues

 1    since they're named in these subpoenas and we don't know

 2    what documents are there or not there.  They want to take

 3    depositions everywhere.  Right now is the time to go back

 4    and revisit that issue.

 5            And if Your Honor will give me two minutes, I can

 6    tell you why I think it's more important to do it now than I

 7    could before, because now we know more information.  But I

 8    don't want to speak if Your Honor doesn't want me to

 9    continue speaking.

10            THE COURT:  No, you may proceed.

11            MR. POSTMAN:  Let me tell you what we've learned,

12    Judge, because this is now uncontroverted and the facts are

13    a little bit clearer than they were four months ago, Judge.

14    The Buccaneers, there's no dispute was -- retained a company

15    by the name of FaxQom, sometime in 2009 to send out faxes.

16    It's unclear as to who contacted who first, but there is no

17    dispute the Buccaneers hired FaxQom.  FaxQom made certain

18    representations to the Buccaneers, Your Honor, all of which

19    are not disputed and we know that because my client's

20    testified and a representative from FaxQom has testified and

21    we have the emails.

22            The representations were that they had been in

23    business for 18 years, that they had compiled an opt-in

24    list, that's the word used in the emails, of people who had

25    agreed to receive faxes.  They had represented that only

1   faxes would be sent to those people.  They had represented

2   the fax list was compiled legally.  They had represented

3   that this one person and this company were going to send out

4   all the faxes and that they would follow best practices.

5   All of this is confirmed in writing and one -- and two

6   different indemnity agreements and in the emails.

7           What we've since learned, Judge, in all fairness

8   to everybody, is those representations were not accurate.

9   But my clients testified and Mr. Simms or Mr. Clement,

10  whatever name he's going by these days, has confirmed that

11  he received what's called limited authority, the limited

12  authority to only send out faxes to people that were in this

13  opt-in list and had only had limited authority to send them

14  out himself.

15          We've since learned, Judge, that FaxQom didn't

16  send out one fax.  Not one fax.  They hired a second company

17  or a person and a third company and maybe a fourth company,

18  I don't even know how many companies they've hired.  In all

19  fairness to counsel, I don't know if they know either.  And

20  that was probably what they're going to argue as to why I

21  should go to Seattle and Philadelphia and Ottawa and

22  everywhere.  And Texas.  They clearly, meaning FaxQom, not

23  only made misrepresentations, but exceeded whatever limited

24  authority they had in sending out these faxes.  My client

25  only agreed to do something that was legal and appropriate

1    in accordance with the law.

2        I think I win vicarious liability, Judge.  The

3    papers they have filed, the arguments they've raised, rely

4    upon the FCC's old interpretation of the TCPA.  As Your

5    Honor recalls, because I think you educated me, the FCC

6    changed its regulation -- its interpretation of regulation

7    in 2013 in the Palm Beach Golf case, which was decided -- I

8    have it here -- I think in October of 2013, Eleventh Circuit

9    case says the analysis is vicarious liability.

10       Judge, if this is it, this case gets decided I

11   think really easy without us having to fight about whether I

12   have to spend money going to Ottawa or not and my client has

13   got to get a new passport.  None of this has anything to do

14   with vicariously built.  None of it.

15       I am asking, because I don't think they can send

16   out faxes to Concord and faxes to 127 High Street and

17   Michigan and Philadelphia and everywhere, because the

18   expense is enormous.  The cost of the travel is significant.

19   The potential relevance, maybe.  They're going to say they

20   needed to prove who sent out faxes.  You know what?

21   There's -- there may be something there.  I actually, in all

22   fairness, will agree with them, because we don't know how

23   many faxes, who got the faxes, who sent the faxes, all of

24   that are really open questions that in all fairness they may

25   need to investigate.

1       But if I win the issue of vicarious liability, and

2   I think the facts there, we don't need to go to any of that.

3   If I'm wrong and after Your Honor sees the briefing or hears

4   the argument, then we can decide whether or not they need to

5   take a deposition in X or Y or send all of these subpoenas

6   to A or B, and whether or not I have the right, considering

7   my client is the one that's going to have to pay for some of

8   the work, to object to the broadness of the subpoena to

9   Paypal.  To Paypal.  I don't know how Paypal has anything to

10  do with this case.

11      And you're going to say, well, why you, why here?

12  Listen, they're nice people.  We have some disagreements

13  your Honor has probably seen in some of the papers, but we

14  know what's happened in prior cases.  In prior cases they

15  have sent out subpoenas to get information to find out about

16  faxes to send other lawsuits out.  My client shouldn't have

17  to pay to deal with that, particularly in a case that when

18  Your Honor sees what I think are the clear undisputed facts,

19  I get out of the case.

20      So globally, so that it's clear, Judge, I'm going

21  to ask you to revisit that issue.  They're not prejudiced at

22  all if Your Honor puts off the discovery with regard to

23  class certification, because they've had four years and have

24  investigated it four years.  My client is prejudiced.  Now

25  we can see what happened based upon Your Honor's prior

 1    ruling.  We're going everywhere.  We're looking at every

 2    document.  We're going through every single three when

 3    really all we need is the evidence with regard to the issue

 4    that, as I understand the case law and the interpretation,

 5    should have this case decided upon.

 6          So I spoke a lot with regard to a limited issue,

 7    but I wanted Your Honor to understand my position with

 8    regard to all of this, because I'm getting ready for this,

 9    the subpoenas keep coming out, and they may be able to say

10    this company was related to this company and maybe they have

11    a document.  You know what?  I can't dispute that, Judge.

12    All I can tell you is that it may not and they may be

13    getting documents for other cases and my client shouldn't

14    have to worry about it.  That's our position generally.

15          THE COURT:  All right.  Thank you, Mr. Postman.

16          Mr. Good, I don't want to put you in a spot, you

17    probably were not even anticipating that, but if you want to

18    comment upon the request for bifurcation again, you may do

19    so.

20          MR. GOOD:  I definitely was not anticipating that,

21    Your Honor.  What I was hoping to do instead was to explain

22    to you the relevance of all of those subpoenas and go

23    through point by point what Mr. Postman said in our response

24    to that.

25          THE COURT:  Well, Mr. Good, let me first tell you

1   there's no need to explain the relevance.  I understand the

2   relevance.  The problem is those subpoenas are overbroad.

3   And I will tell you, if they were before me, I would limit

4   the extent of those subpoenas.  Essentially, every one of

5   those subpoenas is asking for every document.  I have a hard

6   time understanding why that would be.

7           MR. GOOD:  I would like to explain that to you.

8           THE COURT:  Why don't you, because as I see it,

9   the only issue here is -- whatever the gentleman's name

10  is --

11          Again, remind me, Mr. Postman.

12          MR. POSTMAN:  Mr. Clement.

13          MR. GOOD:  Mr. Clement, depending on which day it

14  is of the week.

15          THE COURT:  Right.  Mr. Clement or Mr. Simms, and

16  his relation, for example, of with Wabos Technology or

17  127 High Street, it would be just anything with his dealings

18  and maybe even particularly limited to the defendant.  But

19  as to all documents, explain that.

20          MR. GOOD:  Thank you, Your Honor.  The owner of

21  127 High Street or Wabos Technology, as it was known before,

22  is deceased.  Its attorney, Mr. Tom Yardley (ph), has

23  refused to tell us any other employer, any other individual,

24  he refused to tell us how to even serve the company, because

25  as I said, Mr. Crocker, the owner of it, is deceased.

1           The reason we sent the subpoena to the bank, we

2    actually did reach out to the bank prior to sending the

3    subpoena, they would not limit it by information such as

4    things that say Mr. Clement or Mr. Simms' name on it.  The

5    only way to issue the subpoena to the bank was to do it this

6    way.

7           We offered to Mr. Yardley to produce the records

8    to him and have him sift through the records and produce to

9    us only those records that were relevant to the case.

10   Mr. Yardley has refused.

11          And I would like to point Your Honor to Doc 100,

12   which is defendant's motion to quash, in which defendant

13   states that the only way they found out about this

14   proceeding in court was through the fortuitous circumstance

15   of Mr. Yardley making them aware of it.  To date Mr. Postman

16   nor anybody from defense counsel has made us aware of when

17   he became aware of this case.  I've asked Mr. Yardley and

18   I've asked Mr. Postman, neither have answered.

19          I would like to just point out to the Court when I

20   first asked Mr. Postman, he actually informed me that I was

21   the one that told him and not Mr. Yardley, and when I

22   reminded him about Doc 100, he told me that he was informed

23   by Mr. Yardley immediately prior to being notified by us,

24   but refused to give us a date as to when he became aware of

25   the case.

```
 1              But to Your Honor's point about being beyond the
 2    scope and overly broad, we are trying to take that up with
 3    Mr. Yardley, but Comerica Bank cannot limit the scope to a
 4    person or to a name.  They could do it to a time period, but
 5    we don't believe that that would be -- that would cover
 6    everything relevant to this case, because according to our
 7    research, 127 High Street had its own equipment, had its own
 8    staff, and things of that nature.  The equipment especially
 9    is very relevant to this case for our expert report and for
10    our own knowledge as to how the faxing took place.
11              THE COURT:  Let me just stop you.  It seems to me
12    Comerica Bank is a redundancy.  If you're looking to get
13    specific relevant information, it should be from 127 High
14    Street.  And if you're having a problem there, it's simply a
15    motion to compel.  And then Mr. Yardley could be brought in
16    to explain why he will not comply with an appropriate
17    subpoena.  Why is there a need, then, to go beyond that?
18              MR. GOOD:  Mr. Yardley has represented to us that
19    the records, and I'm quoting him verbatim, have been
20    obliterated and there are no records.  127 High Street sold,
21    disassembled all of its equipment, it is all gone, and they
22    have nothing.  And Mr. Yardley has told us that is why he
23    will not tell us who to serve, who is still there.  He has
24    obviously confirmed and I should mention Mr. David Crocker,
25    the deceased, used to be an attorney in Michigan.  He is
```

1  definitely deceased.  There is no name and Mr. Yardley has

2  refused to provide one, which leaves us with Comerica Bank.

3  And the deposition testimony thus far in this case, and

4  Mr. Postman was a part of the deposition, said that the

5  money that was transferred on behalf of the defendant to pay

6  for the faxing at issue in this case went to that Comerica

7  Bank account.

8        THE COURT:  What is the status of that litigation?

9        MR. GOOD:  Well, it's interesting you point that

10  out.  It is stayed penning this hearing today.  As soon as

11  this hearing is over, we are going to inform that Court as

12  to what Your Honor's decision is.  We would hope -- just so

13  you know, everything has been fully briefed, so in the event

14  that Your Honor cites and denies Mr. Posted motion to quash,

15  that will be heard almost immediately thereafter.

16        THE COURT:  All right.  How many total subpoenas

17  are out there?

18        MR. GOOD:  I believe the number --

19        THE COURT:  Is it nonparty subpoenas -- and let me

20  be more focused on this.  What I want to know is the

21  connection to other entities that were utilized to send out

22  the faxes, which is how I would classify 127 High Street.

23        MR. GOOD:  Yes.  127 High Street, according to my

24  records and my research -- and when I say my records,

25  Mr. Postman has been provided them, it was on a hard drive

1   that came to us after our trip to Canada which Mr. Postman

2   has already mentioned to you -- indicate that 127 High

3   Street and a company called Clear Choice Sales, LLC, are

4   both affiliated with a company that does still exist and

5   does still send faxes called Concord Technologies.  It's

6   actually incorporated under the name of Concord III -- and

7   that's the Roman numeral III -- LLC, which is out of

8   Seattle.

9          The other interesting thing, plaintiffs have asked

10  Your Honor, Your Honor had granted the letters of rogatory

11  to Canada for the two individuals in the company, the two

12  individuals are James Flemming and Stephanie Pelowich (ph).

13  James Flemming works for, according to him, Concord III in

14  Seattle, in addition to maintaining and owning the domain,

15  127 High Street.com.  The domain 127 High Street.com was

16  used by Mr. Clement to send faxes on behalf of the

17  Buccaneers.

18         THE COURT:  So again, then, how many subpoenas are

19  out there, the nonparty subpoenas?

20         MR. GOOD:  Are you saying how many have ever gone

21  out or how many are unanswered?

22         THE COURT:  Unanswered.

23         MR. GOOD:  I believe that would be three, Your

24  Honor.

25         THE COURT:  And which ones are those?

```
 1              MR. GOOD:  That would be Clear Choice Sales bank

 2   account with Bank of America, that would be the Comerica,

 3   and there's one to Clear Choice Sales itself, which is still

 4   incorporated.  Those would be the three, Your Honor.

 5              THE COURT:  That also includes the --

 6              MR. GOOD:  Yeah, the bank account of 127.

 7              THE COURT:  The Comerica Bank?

 8              MR. GOOD:  Yes.

 9              THE COURT:  All right.  Of all the subpoenas -- go

10   ahead, I'm sorry.

11              MR. GOOD:  Your Honor, I'm sorry, I forgot one.

12   There is the Concord, the motion to quash for Concord, and

13   its employee, James Earl Scott.  And I should mention James

14   Earl Scott set up the website for Clear Choice Sales, works

15   for Concord, and knows Mr. Flemming very well.  I just

16   wanted to make the record clear on that.  And their motion

17   to quash is pending in Seattle.

18              THE COURT:  So it's Clear Choice, Bank of America,

19   Clear Choice Sales, Comerica Bank for Wabos Technology, and

20   then Concord in Seattle, this is Mr. Scott's opposing it; is

21   that correct?

22              MR. GOOD:  Correct.

23              THE COURT:  All right.

24              MR. GOOD:  And if I may add one more?  Just to be

25   completely clear, you had said only subpoenas.  There's also
```

1  the letters of rogatory that are pending in Canada.

2         THE COURT:  All right.  Thank you.

3         Has Paypal responded?

4         MR. GOOD:  To be honest, I don't know.  I know

5  there's no motion to quash pending.  I've never seen the

6  response if it came in our office.

7         MR. ADDISON:  I think it did.  I think --

8         MR. GOOD:  Did it?  Were there any records?

9         MR. ADDISON:  I don't know.

10        THE COURT:  All right.  And I'm not trying to

11  catch you here, I'm just trying to get an understanding of

12  what's left out there.

13        There is the broader issue here.  And let me just

14  say this:  As I just stated, under the rule I see no issue

15  regarding the notice, and so there is no basis for me to

16  quash subpoenas for that reason.  I do have a concern,

17  though, as to Mr. Postman's position as to what's the extent

18  and nature of the discovery.  And I take your representation

19  that you've tried to narrow it but have come across some

20  difficulties in limiting the scope of the discovery.

21        MR. GOOD:  Correct, Your Honor.  And the people

22  that we've had the trouble with are all represented by

23  counsel and we can provide the Court with documentation

24  showing our good faith efforts to work with them and either

25  their inability to work with us or the impossibility of

1  working with us because they don't have records.

2        THE COURT:  Well, more importantly, two of the

3  four outstanding, as we've just discussed, putting aside the

4  letters of rogatory, so focusing on subpoenas -- Comerica

5  Bank is in Michigan; is that correct?

6        MR. GOOD:  Correct.

7        THE COURT:  So you have a dispute in Michigan and

8  dispute in Seattle where the parties are represented and

9  they are asserting whatever objections, which I'm assuming

10 one of those may be relevancy and whether there's -- the

11 scope is limited in nature for the purpose of this matter.

12        As I stated on the record already and it's not a

13 matter that's before me, I cannot, based upon an objection

14 by the defendant, quash the subpoenas based on relevancy,

15 that's a matter for the court where the subpoena was served

16 from.

17        Having said that, I do think that Rule 26 does

18 give me some authority to control discovery overall in the

19 case, which before even coming out here, it was not until I

20 read No. 117, where there is representations and that is the

21 issue regarding contact with counsel -- I think it was 117.

22 In one of the most two resent pleadings, there was the

23 representation about Mr. Clement and the alleged fraudulent

24 nature of his conduct, which then also brought to my

25 attention is this a matter that needs to be addressed early

1    on or not in an abundance of judicial economy, as well as

2    efficiency and economy for the parties.

3           I'm not going to resolve that question today, but

4    what I am going to do is direct if you want to respond to

5    the argument in writing as to why I should not just stay all

6    discovery only back to just focusing on the bifurcation as

7    to liability in this matter.  Because very simply I see

8    this, which is what I saw a while ago, as an issue that

9    drives this case and one that needs to be resolved.

10          But secondly, the parties have expended an

11   inordinate amount of time and money in this litigation to

12   something as to the nature of the allegation is rather

13   simple.  Was a fax sent and was it an authorized fax?  To go

14   through the burden and expense of pursuing something like

15   this to the extent we have is very -- very cumbersome and

16   troubling to me.

17          So, Mr. Good, I'm going to direct you within ten

18   days to tell me why I should not bifurcate the matter, and

19   until we resolve it, I am going to stay all the discovery.

20   So that means we are going to be put on hold until I decide

21   whether we're going to bifurcate it and give you an

22   opportunity to respond as to why I should not just bifurcate

23   it.

24          It seems to me, we can get that, rather than

25   spending the time on doing it, we could probably get right

1   to the issue.  What discovery needs to be left and to go to

2   the issue of liability at this point.

3           MR. GOOD:  Thank you, Your Honor.  There have been

4   a couple issues that have come up regarding that issue.  The

5   day before the deposition of defendant's 30(b)6 witness

6   Mr. Postman provided us several new documents that had not

7   previously been produced in the many years that this case

8   has been going on.  Included in those documents was the fax

9   number for a person who complained to defendant's general

10  counsel, Mani Alvera (ph).  Her name is Phyllis Towzey and

11  she's an attorney in this area.  She had discussed the issue

12  of the illegality of the faxing at issue in this case with

13  Mr. Alvera.  She followed up her discussions with a letter

14  to Mr. Alvera outlining the illegality, giving examples of

15  other sports teams in fact that had been sued for such

16  violations.  One of her examples was the Dallas Mavericks, I

17  believe.  And it is very relevant, we believe, to the issue

18  you just described.

19          Additionally, defendant's privilege log includes

20  no entries prior to 2013.  It does not include these newly

21  discovered documents.  And defendants discovered at the

22  deposition of the 30(b)6 that defendants have yet to name a

23  single individual with knowledge of this lawsuit in 2009 and

24  2010 while they were litigating the issue in 2009 and 2010.

25  We believe that this issue does warrant more discovery that

1    is directly relevant to what you're talking about today.

2              MR. POSTMAN:  May I respond, Judge?

3              THE COURT:  You may.

4              MR. POSTMAN:  Yeah.  Judge, let me just tell you

5    factually what occurred.  There was a prior lawsuit that

6    happened in 2009, I think in state court, as Your Honor may

7    recall, against the Buccaneers.  I did not represent the

8    Buccaneers at that time.  My understanding is discovery was

9    propounded and responded.

10             The deposition of Mr. Kaiser, the corporate

11   representative deposition, of the Buccaneers took place in

12   California.  Approximately three weeks ago, maybe two weeks

13   ago, in a meeting with him prior to the deposition, I

14   learned as an officer of the Court that there were documents

15   that I believed had not been produced by prior counsel.  I

16   immediately, the day before the deposition, as I'm required

17   to do, sent an email, had them scanned in, sent an email and

18   told them I'm going to agree to these, but I want you to

19   have them as soon as I possibly could have them.  In all

20   fairness, I think he needed to get them before, but at that

21   point all I could do was give it to him as soon as I was

22   aware of them.

23             Counsel then inquired, so that it's clear, of

24   Mr. Kaiser for I think six hours, could have been seven

25   hours, and went over all of the documents.  If he suggested

1  that perhaps he was prejudiced because he didn't have the

2  opportunity to go over documents that he ultimately did, I

3  would understand that argument.  I gave him everything that

4  we had.  He has suggested that we have not given him other

5  documents.  I don't -- you know, at some point I don't know

6  what else to do.  I've told him I've double-checked, we're

7  going to triple check, we've done everything we possibly

8  can, and you may have seen us.

9          He then, I believe inappropriately, Judge, I

10  believe significantly inappropriately, contacted my client's

11  former lawyer to ask him questions about the document

12  retention policy and how they kept documents, et cetera,

13  et cetera.  And that's the subject of another motion that

14  Your Honor may or may not hear today, because I have some

15  problems with that.  Ms. Towzey was someone who allegedly

16  received a fax that complained.  We didn't have the

17  document.  We don't have the documents.  I don't know where

18  they are.  The testimony from Mr. Kaiser was it was dealt

19  with by somebody else.  I don't know how that has any

20  relevance or bearing.  But okay, if they want to take

21  Ms. Towzey's deposition to say she complained, that's fine.

22  I guess they can take Ms. Towzey's deposition based upon

23  what they've filed, they've already spoken with her, so I'm

24  not so sure how that makes much a difference, but I

25  understand that deposition.  I don't know what else I can

1   do.

2            They're right.  Those documents should have been

3   produced earlier.  As soon as I got them, Judge, we were

4   sitting -- we had them scanned in and sent to him.  He then

5   said he had to pay to have them printed out.  I offered

6   since there was a charge at his hotel to pay for the charge

7   of printing out the documents, because I don't think he

8   should have to do that, despite the fact I told him I had an

9   extra copy.  I don't know what else to do.

10           If he can tell you how he was he prejudiced in

11  taking Mr. Kaiser's deposition and needs to take it again,

12  we can argue that.  I'll show you the transcript.  Other

13  than that, Judge, there's no issue with regard to any of

14  these subject matters.  And the fact that Ms. Towzey

15  complained doesn't have anything to do with the issue of

16  vicarious liability.

17           THE COURT:  All right.  Mr. Good, do you want to

18  respond?

19           MR. GOOD:  Yes.  First of all, Your Honor, it

20  absolutely has bearing on the issue of vicarious liability,

21  because contrary to Mr. Postman's assertion, no other case

22  has -- has stood for the proposition that after getting

23  notice of the illegality you can continue relying on the

24  individual misrepresenting the issues you're relying on to

25  you.

1          THE COURT:  What's the allegation of when the

2     notice came in?

3          MR. GOOD:  I believe the end of August, like

4     August 28th.  Ms. Towzey is working on recovering the FedEx

5     receipts to prove that.  She does remember sending them, she

6     has the letter.  The letters recount the conversation with

7     Mr. Alvera and Mr. Alvera confirmed that he had the

8     conversation with me.

9          I would like to point out one other inaccuracy

10    that I think is quite glaring.  Mr. Alvera contacted me,

11    Mr. Alvera sought me out, and Mr. Alvera told me that he

12    sought me out after talking to Mr. Postman and David.  I

13    don't know which of the two Davids here today was the David

14    he referred to, but he said it was one of the two of them.

15    I did not ask him anything about privileged conversations at

16    all.  But he is the one that sought me out.

17         THE COURT:  All right.  Outside of that, what

18    other discovery is left to be taken as to liability?

19         MR. GOOD:  The other discovery has to to with one

20    of their documents, the defendants have.  For example, at

21    the deposition of Jason Layton (ph), which was held two days

22    after Mr. Kaiser's, we found out that contrary to the

23    assertions in the interrogatories and requests to produce,

24    the Buccaneers were not the ones that processed the payments

25    and the database they used to manage all the calls that came

1  in, which would include the complaints, was not their own,

2  it was actually Ticketmaster's.  It's in a program called

3  Artics (ph).  Forgive me, I don't know the spelling offhand,

4  that's just how I'm going to pronounce it.  But we believe

5  the number of complaints they received and the specificity

6  of those complaints is directly relevant to the issue of

7  vicarious liability, because we believe that getting notice

8  of a lawsuit, getting complaints about the specific

9  illegality and examples of the lawsuit are all directly

10  relevant to that point.  And Mr. Kaiser actually testified

11  as their 30(b)6 witness that if he had been told about the

12  lawsuit, he would have stopped sending the faxes.

13          THE COURT:  All right.  No need to respond.

14  Here's what we're going to do:  I am -- I don't even need a

15  response, so I've decided I'm going to bifurcate the issue.

16  We're going to go forward and decide the liability issue and

17  I'm going to enter a stay on everything excluding liability

18  discovery.  And the reason for that, and Mr. Postman is

19  correct, I took the position previously and I was worried

20  about any potential destruction of evidence that may be

21  relevant to this litigation.  Subpoenas have been served,

22  discovery has been responded to, the only outstanding

23  discovery where there's been ongoing litigation disputing

24  it, not looking to impact the courts in those jurisdictions,

25  if it's unnecessary and, more importantly, to impact the

1    parties to have to expend the cost and the nonparty to

2    expend the cost of litigating those matters.

3            If the records do exist, they are now protected by

4    the subpoena and nothing will happen to them.  We can get to

5    the initial issue first, and there seems to me, based upon

6    what's been represented by the parties, legitimate issues as

7    to the Court's consideration as to whether, one, vicarious

8    liability should be applied and, two, is there an issue of

9    fact as to that matter.

10           Now, as represented by both sides, I see that

11   there are issues that need to be fleshed out.

12           MR. GOOD:  Can I ask for just a quick

13   clarification, Your Honor?  The letters of rogatory in

14   Canada --

15           THE COURT:  I won't interfere with those.

16           MR. GOOD:  Okay.  Those can proceed?

17           THE COURT:  Otherwise, if you receive a favorable

18   ruling, we're going to be delaying the process.

19           MR. GOOD:  Thank you, Your Honor.

20           THE COURT:  Do you have any concern with that,

21   Mr. Postman?

22           MR. POSTMAN:  No, I agreed to that, Your Honor.

23   Listen, I agreed to that.

24           THE COURT:  So that's excluding letters of

25   rogatory.

```
 1              MR. GOOD:  Thank you, Your Honor.
 2              THE COURT:  But as to everything else, there's
 3   going to be a stay pending a resolution of the liability
 4   issue.  Not going to get -- I don't think it's necessary, I
 5   think the parties can confer as to how much discovery is
 6   left for that issue and then provide me with a modified
 7   schedule as far as a pleading schedule and we'll go from
 8   there.
 9              Go ahead, Mr. Good, you seemed like you wanted to
10   say something.
11              MR. GOOD:  Yeah, one other question.  The
12   defendants are seeking to redepose one of the --
13              MR. ADDISON:  Mike Addison, Your Honor.  The
14   defendants have a plan to take the deposition of
15   Mrs. Cin-Q --
16              MR. POSTMAN:  Not relevant -- just given Your
17   Honor's ruling, I'll make it simple, I don't need that.
18              MR. ADDISON:  Okay.
19              MR. POSTMAN:  That's also as to class
20   representation.
21              MR. ADDISON:  Yeah, I just wanted to make sure
22   that and if the stay is, it's not just a stay --
23              THE COURT:  Both ways.
24              MR. POSTMAN:  I don't -- Your Honor, I don't think
25   they need Ticketmaster's subpoena, just so that it's clear.
```

1    I don't know if that's -- if you want to address it today

2    or, you know, I don't know why my client's relationship with

3    a company that processes tickets is going to help this case

4    on a vicarious liability.  But if you want to see if we can

5    agree on that, I'm happy to.

6              THE COURT:  Well, Mr. Good, go ahead, you were

7    about to say something.

8              MR. GOOD:  Yeah.  Your Honor, we believe the issue

9    of the complaints that came in to the Buccaneers is directly

10   relevant to what Your Honor has just bifurcated the case for

11   and we believe that this database that tracks complaints, as

12   well as ticket purchases, is directly relevant to that

13   issue.  And as I said, Your Honor, we just became aware of

14   this at the deposition of Jason Layton after the 30(b)6

15   deposition and in spite of the discovery responses we had

16   that clearly indicated that it was Buccaneers' own

17   proprietary system that would track all such matters.

18             THE COURT:  All right.  Go ahead, Mr. Postman.

19             MR. POSTMAN:  Yeah, let me tell you what's

20   happened, Judge, because I've been at every deposition in

21   this case.  There has been testimony that there were -- and

22   I'm going to guestimate -- estimate five or six complaints.

23   The documents that have been produced and the evidence has

24   suggested that when those complaints came in, they went to

25   this Steve Simms character, Michael Clement I think is his

1   real name, and he dealt with them.  He suggested the

2   Buccaneers -- this has all been testified by

3   Mr. Simms/Mr. Clement that -- and by the way, confirmed in

4   emails, including this Towzey lady.  He was contacted and

5   there's an email saying I'll take her off the list or I

6   dealt with this person.  These five or six people, I don't

7   know how this goes into vicarious liability.  We're not

8   disputing that there were five or six people that

9   complained, how that proves that they acted outside the

10   scope and authority of the limited representation.

11          And I'm not trying to stop everything, I just

12   think sending a subpoena to Ticketmaster just proves the

13   point that we're trying to make here.  If they can give you

14   an -- we're not disputing there were five or six complaints

15   by the way.  And Jason Layton didn't say that there were

16   complaint that went to Ticketmaster, he just said

17   Ticketmaster handled the tickets.

18          This is kind of what we're fighting over here.  I

19   haven't heard, in all fairness, now that Your Honor has seen

20   the picture, an argument as to why Ticketmaster, or candidly

21   a complaint that went into the Buccaneers, has anything to

22   do with whether or not Mr. Simms' or Mr. Clement's fraud or

23   they're acting outside the scope of their authority or them

24   actually having parties that had no relationship with the

25   Buccaneers have anything to do with vicarious liability.

1          THE COURT:  Well, I'm assuming Mr. Good is going

2    to say that the more complaints that were out there that may

3    be unknown about and --

4          MR. POSTMAN:  Okay.

5          THE COURT:  -- the more Buccaneers knew about it,

6    at some point there may have been an argument to present

7    that the Buccaneers should have went to Mr. Clement to ask

8    if you're only representing you have opt-in, what is going

9    on here.

10         MR. POSTMAN:  Judge, I'm happy to -- I just --

11         THE COURT:  I understand your argument, but there

12   is some relevancy there.

13         MR. POSTMAN:  Okay.

14         MR. GOOD:  You know, I was going to say what Your

15   Honor said.  There's one other thing I did not point out to

16   Your Honor, and that is some of the faxes at issue did not

17   actually contain the Buccaneers' phone number advertised on

18   it, it actually displayed Ticketmaster's.  So the calls did

19   not even go to the Buccaneers, they went to Ticketmaster on

20   behalf of the Buccaneers.

21         Five or six complaints, I'm not sure where

22   Mr. Postman is coming up with that number, but we believe

23   that without, you know, doing discovery we have no way to

24   know exactly how many complaints and, like Your Honor said,

25   we believe that is directly relevant.

1      THE COURT:  I'm not looking to limit it as to that

2  issue.  So that's why I say the parties can meet and confer.

3      Mr. Postman, I understand your argument, but I do

4  think that is at last relevant discovery as Rule 26 is

5  considered for purposes of the liability issue.  But I'm

6  going to direct the parties meet and confer within five days

7  as to setting up scheduling for purposes of any additional

8  discovery for the liability issue and the briefing schedule.

9      All other discovery is stayed.  The Court is going

10  to terminate the deadlines as previously ordered in the case

11  management order.  The only discovery that may be obtained

12  outside the liability are the letters of rogatory, which the

13  Court has previously entered an order on.

14      All right.  There's still a couple other things I

15  do want to take up since we're here, I have to avoid it,

16  although, there may be --

17      MR. POSTMAN:  There's a couple of --

18      THE COURT:  Go ahead, Mr. Postman.

19      MR. POSTMAN:  Your Honor, if we're not going to

20  address the class representation issues, then I don't need

21  to go through a lot of the motion to compel, we can argue it

22  later, except for two things, Judge.  Mr. Cin-Q and the

23  Cin-Q motion to compel, I would like to address two issues.

24      The testimony has been, and this is somewhat kind

25  of shocking to me, that it wasn't even their fax line, it

1   was the fax line of Mr. Cin-Q's father.  Now, that would be

2   going to liability, because I think I get a summary judgment

3   if it's not even his fax.  So that comes out in discovery.

4           I then follow up, well, let me have the fax bill.

5   And I may -- let me have the proof that it's -- in essence,

6   prove to me that Mr. Cin-Q, given what he's testified in

7   deposition -- because I'm going to slap that onto a summary

8   judgment, Your Honor, and send it to you, and it may be part

9   of vicarious liability, because if it's not his fax, he

10  doesn't have the right to even bring the claim, leaving

11  aside whether he's appropriate class representative.

12  Because all of the faxes, that goes to other issues as it

13  relates to damages.  And my client also has a right to know

14  that, particularly given what we've heard, that they have

15  the original fax.

16          So those are the two things, because everything

17  else can wait and if Your Honor says wait on the original

18  fax, I actually hear that as long as they tell me they have

19  it.

20          THE COURT:  Mr. Postman, I want to make sure I

21  heard you right.  There is deposition testimony that the fax

22  belonged to Mr. Cin-Q?

23          MR. POSTMAN:  No, Mr. Cin-Q's father.

24          THE COURT:  Whose testimony?

25          MR. POSTMAN:  Mr. Cin-Q testified, I took his

1   deposition, the plaintiff, the owner of Cin-Q Automobiles, I

2   don't have the corporate name in front of me, Judge.  I was

3   present at the deposition.  I think he testified very

4   clearly that --

5             THE COURT:  Hold old, Mr. Addison.

6             MR. POSTMAN:  -- very clearly that it was not his

7   fax line.  Now, let's call an issue a fact before he even

8   says it.  I think I heard it one way.  I've asked for the

9   bill.  So it makes it very simple, it's just a way to prove

10  it so that if in fact I'm right, we don't have this fight.

11            THE COURT:  All right.  And this is what I was

12  going to get to.  Specifically what you're referring to is

13  Document No. 115, which is your motion to compel.

14            MR. POSTMAN:  Yes.

15            THE COURT:  As to the objections, your requests

16  are overbroad.  I agree that you are entitled to get limited

17  information to show what you're looking to obtain, but

18  you're asking to go back, I think -- let me pull it up --

19  like to at least 2008, is that correct, in some sense it's

20  2015.

21            MR. POSTMAN:  I actually don't need it past

22  June -- well, August of -- well, I need it from 2008 to

23  2010.

24            THE COURT:  Why do we even have to go back -- if

25  I -- and I even --

1              MR. POSTMAN:  I just --

2              THE COURT:  -- hear the argument to say the whole

3    year of 2009 may be overbroad, but why can't we just focus

4    on 2009?

5              MR. POSTMAN:  You know what?  You're right Judge.

6              THE COURT:  All right.  Mr. Addison, you wanted to

7    say something.

8              MR. ADDISON:  Yes, Your Honor.  The testimony of

9    Mr. Cin-Q was that he took over the telephone line that had

10   been operated by his father, his father had been dead I

11   think when he testified about 20 years, and he merely left

12   the name on the phone bill that was his father's phone line

13   and bill.  He's paid the bill ever since.  And I did produce

14   this morning a full copy of the August 2009 bill from AT&T

15   from Mr. Cin-Q's line, as well as a page of his computer

16   printout on his bank statement with lines redacted except

17   for the payment to AT&T for the month of August 2009, which

18   I think is all that's relevant.

19              And he owned the machine, so what line fed into

20   the machine isn't nearly as important as whose machine was

21   it.  And I produced a photocopy of the operating manual for

22   the fax machine or the front and back and table of contents,

23   but they're somewhat lengthy and full of technical jargon

24   that I'm not sure any of us would understand anyway.  But

25   the fact of the matter is Mr. Cin-Q paid for and received --

1  paid for the supplies and received the fax that's the fax in

2  question that's attached to the complaint.

3          THE COURT:  All right.

4          MR. POSTMAN:  I haven't seen that, Judge.  I'm not

5  saying it wasn't produced, I haven't seen it.

6          THE COURT:  All right.  And if that is what has

7  been provided, do you have any issues, then, as to the other

8  requested matters?

9          MR. POSTMAN:  If it's not his phone line, I don't

10 think it's his fax, but if he's given -- maybe -- does the

11 phone line -- here's what he testified to, he didn't want to

12 have a new deposit, so he didn't want the line in his name.

13 It is his father's fax line.  And I'm going to argue,

14 therefore, the fax line is the owner of the fax where it was

15 sent to and he can't confirm otherwise.  But I need the fax

16 bill for the time they claim the fax came in so I can at

17 least make the argument at the relevant time period.  He's

18 saying it's his fax machine, I just am asking for proof to

19 show that it's his fax machine.

20         MR. ADDISON:  You don't register a fax machine.

21         THE COURT:  If he has it in his possession, so

22 let's just look at them real quick, because some of these

23 may overlap to liability, so I'm going to go ahead and cover

24 115 while we're here.

25         Again, going all the way back to 2008, there's no

```
 1   need to do it.  In fact, I think it's sufficient, we can
 2   even limit it just to the month before and the month after
 3   August, so those three months to show for Request No. 1, the
 4   bills related to the fax number.
 5           Request No. 2, the same thing, just those three
 6   months.
 7           Request No. 3, which is the documents or invoices
 8   or checks as to how the fax machine was purchased.
 9           Mr. Addison, you may just simply not have that and
10   all you need to do is certify that it's not in his
11   possession.  But whatever is and you provide it, that will
12   be sufficient.
13           All right.  The remaining requests go to somewhat
14   to the advertisements.
15           MR. POSTMAN:  That goes to the other part of the
16   case, not vicarious liability.
17           THE COURT:  Yeah, I don't think we need to address
18   that right now.
19           MR. POSTMAN:  My client has sent a request to
20   examine the original fax to prove that they actually have
21   received the original fax.
22           THE COURT:  Oh, I thought --
23           Mr. Addison, did you just say you provided it?
24           MR. ADDISON:  I provided a copy of it.
25           MR. POSTMAN:  We want the original.
```

1          MR. ADDISON:  I'm not going to give them the

2    original fax.

3          THE COURT:  You want to inspect it?

4          MR. ADDISON:  Yes, Judge.

5          THE COURT:  All right.  Do you have any objection

6    to the inspection of the original fax?

7          MR. ADDISON:  No, I have no objection to the

8    inspection of the fax or the fax machine.  They wanted me to

9    ship the fax machine to an expert in Apopka.  We're not

10   going to do that either, but -- or at least unless Your

11   Honor orders us to.  But we're happy to let their expert

12   come and look at it and see that it is in fact a personal

13   fax machine.

14         MR. POSTMAN:  So at this point I just need the

15   fax.  I'm happy to do it at his office, Judge.

16         THE COURT:  All right.  Well, what I will do is

17   direct that that inspection of the fax occur within -- well,

18   I'm not going to set a time limit on it, but by stipulation

19   Mr. Addison has already agreed to do it, so I'll just direct

20   that that occurs.

21         All right.  So bring us back then on point,

22   we're -- I am going to grant No. 91 and 92, that is the

23   motion to amend the answer, the motion to file the

24   third-party complaint.

25             As I've already stated, we're going to address the

1    issue of bifurcation and grant that.  We'll address the

2    liability issue.  The parties are to meet and confer within

3    five days to give scheduling for the Court for purposes of

4    any additional discovery and pleadings.  The letters of

5    rogatory may be pursued, but all the discovery is stayed and

6    any issues in the District Courts in Seattle and Michigan

7    must be informed of the Court's order staying the discovery.

8             I'm going to enter an order as to Document

9    No. 115, which is the motion to compel, memorializing what I

10   just stated on the record as to what needs to be provided

11   for those specific requests related to the fax line and fax

12   machine.

13            I'm going to deny the remaining of Document

14   No. 115 as moot in light of the Court's order.

15            If we get to that point, Mr. Postman, you're just

16   going to have to reraise those issues.

17            MR. POSTMAN:  Yes, Judge.

18            THE COURT:  Same thing with Document No. 105,

19   which is the motion to take the more than ten depositions.

20   I'm going to deny it as moot in light of the bifurcation,

21   and then we can reraise that issue if necessary at a later

22   date.

23            MR. GOOD:  I believe Mr. Postman has already said

24   that he would not object to taking Mr. -- Ms. Towzey's dep.

25            THE COURT:  This is the discovery as to the

1  liability.  And, yes, you know, there was no objection, you

2  can certainly take it.

3            MR. GOOD:  Okay.

4            MR. POSTMAN:  He's already taken eight

5  depositions.  I don't know if Your Honor is going to --

6            THE COURT:  Well --

7            MR. POSTMAN:  I mean, I have no problem with

8  Ms. Towzey, he's got two more depositions I would argue

9  though --

10            THE COURT:  I understand your position and that's

11  something he will have to consider.

12            MR. POSTMAN:  Yeah.

13            THE COURT:  All right.  That leaves only the one

14  thing we had not really discussed much, is Document No. 117.

15  The parties may want to meet and confer about what there may

16  be an understanding as to whether there's going to be any

17  more contact.

18            MR. POSTMAN:  We've done that, Judge, and we

19  couldn't agree.

20            THE COURT:  All right.  So then I'll just await

21  the response and I'll take that up.  I'm not going to have

22  you provide an oral respond, you can provide a written

23  response.

24            MR. POSTMAN:  All I ask is until this is briefed

25  and argued and decided there be no additional contact with

```
 1   Mr. Alvera.  I don't think that that in any way prejudices
 2   the plaintiff.  It might prejudice the defendant, because if
 3   there's communication and, hopefully there hasn't been since
 4   we filed the motion, about the information that was
 5   discussed, it might affect the different version of events
 6   about what took place during this call.  I don't think there
 7   would be any reason why Mr. Good and/or anybody from either
 8   of the two plaintiffs' firms should talk to Mr. Alvera at
 9   this point until Your Honor gives them the go-ahead.  That's
10   what I would ask.
11             THE COURT:  All right.  Mr. Good.
12             MR. GOOD:  First of all, Your Honor, I don't
13   believe there's been any communication by the defendant
14   about working out how to work with Mr. Alvera.  The first
15   conversation we had with the defendant was them moving -- or
16   saying they were going to move to disqualify us.  Mr. Alvera
17   called our office.  I would be happy to tell Your Honor that
18   we have no intention to reach out to him, either Anderson
19   Wanca or Addison and Howard.  I would go so far as to tell
20   our secretarial staff that if he is to call to tell him to
21   not call again.  I'm not sure what else we can do here.  If
22   a subpoena is issued --
23             THE COURT:  All right.  Mr. Good.
24             Mr. Postman, what you're asking me is to remind
25   Mr. Good of his ethical obligations and he's going to take
```

```
 1    those -- you say you're prejudiced and the curious point I
 2    have is what is the prejudice?  The prejudice is not that
 3    anything is going to be -- won't be able to be remedied if
 4    the Court makes a finding at a later date that somehow there
 5    was inappropriate conduct.  But I don't understand what your
 6    concern is by asking me to enjoin conduct right now that --
 7    without having a full briefing of it.
 8           MR. POSTMAN:  Yeah, and that's good question,
 9    Judge.  We don't know exactly what was discussed between
10    Mr. Good and Mr. Alvera.  Only two people I would argue on
11    this good God Earth probably understand that.  If those two
12    people have an opportunity to discuss what was discussed
13    prior to when we have the opportunity to find out, one
14    might -- one cynical person might argue that we may not get
15    the entire full version.
16           And I am not in any way impugning Mr. Good, I
17    don't believe what he did was correct, but I'm not impugning
18    his integrity as it relates to anything aside from -- it's
19    like invoking the rule in a trial, Judge.  There's a whole
20    reason for doing so, because the fact finder should listen
21    without the other side being influenced by the other.
22    That's -- that would be the answer to the question about the
23    potential prejudice about speaking beforehand so that when
24    Your Honor does address the issue you hear it without it
25    being conferred.
```

```
 1              THE COURT:  Well, I'm not inclined to do that.
 2    I'll just take it up on the pleading itself so I can make a
 3    determination as to whether any conduct should be enjoined.
 4    So I'm not going to prohibit it, although as I understood
 5    Mr. Good, it's not his intention to do so anyway and he's
 6    willing to have a conversation with you about that matter.
 7              MR. GOOD:  Correct, and it never was.
 8              MR. POSTMAN:  I did send an email in good faith,
 9    Judge.
10              THE COURT:  All right.  There's no need to get
11    there.
12              All right.  Anything else we need to take up at
13    this point, Mr. Good?
14              MR. GOOD:  No, Your Honor.
15              THE COURT:  Mr. Addison, anything else?
16              MR. ADDISON:  I don't believe so.  I think the
17    only concern that I had was Mrs. Cin-Q's depo and I think
18    that's --
19              THE COURT:  That's been clear.
20              MR. POSTMAN:  Our understanding is at this point
21    there's no depositions on and we will meet and confer about
22    what depositions need to be taken.
23              THE COURT:  That's correct.  Or the --
24              MR. GOOD:  The letters in rogatory.
25              THE COURT:  Well, the letters of rogatory is a
```

1    separate issue.

2              MR. GOOD:  Okay.

3              THE COURT:  But whatever other discovery the

4    parties intend, if there's a dispute, for example, if you

5    walk out of here when you meet and confer and either party

6    says I would like to get this additional information as to

7    the liability issue and there's a dispute about that, do not

8    file a pleading.  Just contact my chambers and we'll set it

9    up for a telephonic hearing only so we can resolve that

10   dispute.  Again, my intent is to try to limit your time and

11   efforts in this matter and, more importantly, the costs to

12   the parties.  So if there's a dispute, we'll take it up

13   telephonically.

14             MR. POSTMAN:  Thank you.

15             THE COURT:  All right.  Once you meet and confer,

16   though, just file the scheduling order and it's my intent to

17   adopt that and I'll just await the pleadings.

18             All right.  Mr. Postman, anything else?

19             MR. POSTMAN:  Nothing else, Your Honor.

20             THE COURT:  All right.  Appreciate your time.

21   We'll be in recess.

22                   (Proceedings adjourned.)

23

24

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
 1   UNITED STATES DISTRICT COURT )
                                  )
 2   MIDDLE DISTRICT OF FLORIDA   )

 3
                   REPORTER TRANSCRIPT CERTIFICATE
 4
          I, Howard W. Jones, Official Court Reporter for the
 5   United States District Court, Middle District of Florida,
     certify, pursuant to Section 753, Title 28, United States
 6   Code, that the foregoing is a true and correct transcription
     of the stenographic notes taken by the undersigned in the
 7   above-entitled matter (Pages 1 through 50 inclusive) and
     that the transcript page format is in conformance with the
 8   regulations of the Judicial Conference of the United States
     of America.

 9

10                                /s
                                  _____
11                                Bill Jones, RDR, RMR, FCRR
                                  Official Court Reporter
12                                United States District Court
                                  Middle District of Florida
13                                Tampa Division
                                  Date:  12/26/2023
14

15

16

17

18

19

20

21

22

23

24

25
```