## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., )
et al., )
            Plaintiffs, )
   v. )
BUCCANEERS LIMITED )
PARTNERSHIP and JOHN DOES )
1-10, )
         Defendants, )
 )
─────────────────── )
TECHNOLOGY TRAINING )
ASSOCIATES, INC., et al., )
         Intervenors. )

Case No. 8:13-cv-01592-AEP

**Magistrate Judge
Anthony E. Porcelli**

## NOTICE SUBMITTED BY BTL OF DEMONSTRATIVES
## FOR USE DURING JANUARY 4, 2024 ZOOM HEARING

Date:  January 3, 2024

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
      robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## **TABLE OF CONTENTS**

I.   ARTICLE III, STANDING & SUBJECT-MATTER
     JURISDICTION .................................................................................5

     A.   Waiver Of Subject-Matter Jurisdiction / Consent To
          Subject-Matter Jurisdiction .......................................................5

          1.   Gonzalez v. Thaler, 565 U.S. 134 (2012) ...................5

          2.   Doe v. Tangipahoa Parish School Bd.,
               494 F.3d 494 (5th Cir. 2007) ......................................5

          3.   Swipe for Life, LLC v. XM Labs, LCC,
               2012 WL 1289726 (S.D. Fla.) (Scola, J.) ...................6

          4.   White v. National Fire & Marine Ins.,
               2019 WL 2206443 (N.D. Ala. 2019) ...........................7

          5.   Taylor v. Phillips, 442 Fed. Appx. 441 (11th Cir. 2011)............7

          6.   Target Media Partners v. Specialty Marketing Corp.,
               2015 WL 1061140 (N.D. Ala. 2015) ...........................8

          7.   October 20, 2023 Order (Dkt. 479)..............................8

          8.   BTL's July 14, 2023 Reply (Dkt. 467) to Intervenors'
               June 30, 2023 Response to Motions Regarding Claims
               Administration Process (Dkt. 460) ..............................8

     B.   In re Amerifactors, 2019 WL 6712128 (Dec. 9, 2019).........................9

     C.   In re Joseph T. Ryerson & Son, Inc.,
          2020 WL 5362216 (Sept. 3, 2020)......................................12

     D.   Other FCC Orders ....................................................................13

          1.   2003 FCC Order, 2003 WL 21517853 (July 3, 2003)..............13

          2.   In re Westfax, 2015 WL 5120880 (Aug. 28, 2015).................14

E.   *Amerifactors* And *Ryerson* Are Final Orders .....................................15

    1.   47 U.S.C. § 155, 47 C.F.R. § 1.102 and
       47 C.F.R. § 1.115 ..........................................................15

       a.   47 U.S.C. § 155(c) - Delegation .....................................15

       b.   47 C.F.R. § 1.102 - Effective Dates Of Actions
          Taken Pursuant To Delegated Authority.......................16

       c.   47 C.F.R. § 1.115 - Application For Review Of
          Action Taken Pursuant To Delegated Authority...........16

    2.   *Committee To Save WEAM v. F.C.C.*,
       808 F.2d 113 (D.C. Cir. 1986)....................................17

    3.   *Career Counseling, Inc. v. Amerifactors Financial Group,*
       *LLC*, 2021 WL 3022677 (D.S.C. 2021) .................................18

    4.   Mr. Hara's Applications For Review.......................................20

       a.   *Amerifactors* ..................................................20

       b.   *Ryerson* ......................................................21

F.   Representative Decisions Supporting BTL's Position On
    Article III Standing.................................................................22

    1.   *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021) .............22

    2.   *Drazen v. Pinto*, 41 F.4th 1354 (11th Cir. 2022), *vacated*
       *on other grounds*, 61 F.4th 1297 (11th Cir. 2023)...................23

    3.   *Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023) .....................25

    4.   *Scoma Chiropractic, P.A. v. Dental Equities, LLC*,
       2021 WL 6105590 (M.D. Fla. 2021) (*Badalamenti, J.*)...........28

    5.   *Scoma Chiropractic, P.A. v. National Spine and Pain*
       *Centers, LLC*, 2022 WL 16695130 (M.D. Fla. Nov. 3,
       2022) (*Badalamenti, J.*) ............................................31

    6.   *Licari Family Chiropractic Inc. v. Eclinical Works, LLC*,
       2021 WL 4506405 (M.D. Fla. Jan. 11, 2021) (*Scriven, J.*)......35

7.   *Sharfman v. Infucare*, 2022 WL 18926792 (M.D. Fla. 2022) (*Irick, M.J.*), report and recommendation adopted, 2023 WL 2624754 (M.D. Fla. 2023) (*Berger, J.*) ...................39

8.   *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287 (M.D. Fla. 2020) (*Chappell, J.*) ...................................40

9.   *True Health Chiro. v. McKesson*, 2021 WL 4818945 (N.D. Cal. 2021), aff'd, 2023 WL 7015279 (9th Cir. 2023) ..........................................................................43

  a.   Order To Show Cause (Dkt. 476), *True Health v. McKesson*, No. 4:13-cv-02219 (N.D. Cal., Sept. 29, 2021) .........................................................43

  b.   Order Decertifying The Class - *True Health v. McKesson*, 2021 WL 4818945 (N.D. Cal. 2021)...........44

10.  *Advanced Rehab and Medical, P.C. v. Amedisys Holding, LLC*, 2020 WL 4937790 (W.D. Tenn. 2020)............46

11.  *Jeffrey Katz Chiropratic, Inc. v. Diamond Respiratory Care, Inc.*, 340 F.R.D. 383 (N.D. Cal. 2021)...........................49

G.   Other Decisions ....................................................................50

1.   *Lyngaas v. Curaden AG*, 992 F.3d 412 (6th Cir. 2021) ...........50

  a.   Majority Opinion ............................................................50

  b.   Dissent Of Judge Thapar ................................................50

2.   *In re: Advanced Rehab and Medical, P.C.*, 2021 WL 3533492 (6th Cir. 2021) ...........................................52

3.   *Ambassador Animal Hospital, Ltd. v. Hill's Pet Nutrition, Inc.*, 2021 WL 3043422 (N.D. Ill. 2021) .................53

4.   *Mussat v. IQVIA Inc.*, 2020 WL 5994468 (N.D. Ill. 2020)..........................................................................53

II.   BTL'S OBJECTION TO THE SETTLEMENT ADMINISTRATOR'S
      FINAL CLAIMS REPORT (DKT. 490) / ASCERTAINABILITY ............55

      A.    Mullins v. Direct Digital, LLC, 795 F.3d 654
            (7th Cir. 2015) ........................................................................55

      B.    Other Cases Addressing The Limitations Of Self-
            Attestation ..............................................................................56

            1.    Wilson v. Badcock, 329 F.R.D. 454 (M.D. Fla. 2018).............56

            2.    Xavier v. Philip Morris, 787 F. Supp. 2d 1075
                  (N.D. Cal. 2021).........................................................................57

            3.    Hunter v. Time Warner, 2019 WL 3812063
                  (S.D.N.Y. 2019) .........................................................................57

            4.    Karhu v. Vital Pharmaceuticals, Inc., 621 Fed. Appx. 945
                  (11th Cir. 2015), superseded on other grounds by
                  Cherry v. Dometic Corp., 986 F.3d 1296 (11th Cir. 2021) ......58

      C.    Plaintiffs' Position On The Intended Purpose Of The
            Reverse Lookups / Ascertainability ....................................................59

      D.    Settlement Agreement (Dkt. 324-1)...................................................60

            1.    Notice ........................................................................................60

            2.    Settlement Administration .........................................................61

                  a.    BTL's Audit Rights ........................................................61

                  b.    Other Provisions ............................................................62

# I.  ARTICLE III, STANDING & SUBJECT-MATTER JURISDICTION

## A.  Waiver Of Subject-Matter Jurisdiction / Consent To Subject-Matter Jurisdiction (addressed in Plaintiffs' December 28, 2023 Opposition to BTL's Article III Motion to Dismiss (Dkt. 505) at 1-5)

### 1.  <u>Gonzalez v. Thaler</u>, 565 U.S. 134 (2012)

> <u>When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.</u> [1]

<u>Gonzalez</u>, 565 U.S. at 141.

> <u>Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety.</u> "[M]any months of work on the part of the attorneys and the court may be wasted." *Henderson, 562 U.S., at 435, 131 S.Ct., at 1202.*

<u>Id.</u>

### 2.  <u>Doe v. Tangipahoa Parish School Bd.</u>, 494 F.3d 494 (5th Cir. 2007)

> <u>Standing is a jurisdictional requirement and not subject to waiver.</u> *Lewis v. Casey, 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 2178 n. 1, 135 L.Ed.2d 606 (1996).* <u>A federal court must consider its jurisdiction sua sponte.</u> *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93, 118 S.Ct. 1003, 1011, 140 L.Ed.2d 210 (1998).*

<u>Doe</u>, 494 F.3d 496 n.1.

---

[1] All emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

3.   <u>**Swipe for Life, LLC v. XM Labs, LCC**</u>, **2012 WL 1289726**
     **(S.D. Fla.) (*Scola, J.*)**

> <u>Subject matter jurisdiction defenses</u>, even if not raised in a
> prior motion to dismiss, are <u>not subject to waiver</u>. *See Fed. R.*
> *Civ. P. 12(h) (3); see also Gonzalez v. Thaler, -- U.S. --, --,*
> *132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012)* . . . <u>Indeed, a</u>
> <u>district court has a continuing obligation to satisfy itself of its</u>
> <u>jurisdiction and authority to hear and determine every matter</u>.
> *See Williams v. Chatman, 510 F.3d 1290, 1293 (11th Cir.*
> *2004)* ("Federal courts are 'obligated to inquire into subject-
> matter jurisdiction *sua sponte* whenever it may be lacking.'").

> <u>Swipe for Life</u>, 2012 WL 1289726, at *2.

> A defendant may attack standing, and hence subject-matter
> jurisdiction, under *Rule 12(b)(1)* in two ways—facially or
> factually. *Principal Life Ins. Co. v. Alvarez, 2011 WL*
> *4102327, at *2 (S.D. Fla. Sept. 14, 2011)*. "A facial attack
> asserts that a plaintiff has failed to allege a basis for subject
> matter jurisdiction in the complaint," and "the plaintiff's
> allegations are taken as true for the purposes of the motion[.]"
> *Id.* A factual attack, by contrast, "challenges the existence of
> subject matter jurisdiction in fact, irrespective of the
> pleadings, and matters outside the pleadings such as
> testimony and affidavits, are considered." *Id.* (quoting
> *Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th*
> *Cir. 1980)*). "No presumption of truth attaches to the
> plaintiff's allegations, and the existence of disputed material
> facts does not prevent the trial court from evaluating for itself
> the merits of the jurisdictional claim." *Principal Life Ins. Co.*
> *v. Alvarez, 2011 WL 4102327, at *2*. <u>Unlike facial challenges,</u>
> <u>factual challenges to subject matter jurisdiction place the</u>
> <u>burden</u> "<u>on the plaintiff to prove that jurisdiction exists</u>." *OSI,*
> *Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002)*
> (citations omitted).

> <u>Id.</u>

4. <u>**White v. National Fire & Marine Ins.,**</u> **2019 WL 2206443 (N.D. Ala. 2019)**

"'Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute.'" *Dudley v. Eli Lilly & Co., 778 F.3d 909, 911 (11th Cir. 2014)* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)*). <u>As a result, federal courts possess "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party</u>." *Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).*

<u>White</u>, 2019 WL 2206443, at *2.

With regard to the existence of the jurisdictional minimum, <u>the parties may neither consent to nor waive federal subject matter jurisdiction</u>. *Simon v. Wal-Mart Stores, Inc., 193 F.3d 848 (5th Cir. 1999).*

<u>Id.</u> at *5.

5. <u>**Taylor v. Phillips,**</u> **442 Fed. Appx. 441 (11th Cir. 2011)**

Here, the district court's sua sponte remand was plainly for lack of subject matter jurisdiction, pursuant to *§ 1447(c)*, and therefore "<u>the concepts of equity, waiver, and estoppel are inapplicable</u>," because "<u>[t]he subject matter jurisdiction of federal courts is limited by the Constitution and the Congress, and cannot be expanded by judicial interpretation or by the acts or consent of the parties to a case</u>." *In re Carter, 618 F.2d 1093, 1100 (5th Cir. 1980); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981).

<u>Taylor</u>, 442 Fed. Appx. at 443 n.3.

6. **Target Media Partners v. Specialty Marketing Corp., 2015 WL 1061140 (N.D. Ala. 2015)**

> The court disagrees with the magistrate judge *only* to the extent that he found that, pursuant to *Fed. R. Civ. P. 12(g) (2)* and *12(h)(1)*, Specialty Marketing waived its motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)* by filing the previous motion to quash pursuant to *Rule 12(b)(5)*. *Rule 12(g)(2)* specifically makes an exception for motions to dismiss for lack of subject matter jurisdiction, and the waiver provision of *Rule 12(h)(1)* only applies to defenses listed under *Rule 12(b)(2)-(5)*. Lack of subject matter jurisdiction is a defense listed under *Rule 12(b)(1)*. In fact, *Rule 12(h)(3)* states that the court *must* dismiss the action if it determines, *at any time*, that it lacks subject matter jurisdiction; the parties cannot waive subject matter jurisdiction. As such, this court finds that Specialty Marketing did not waive its defense of lack of subject matter jurisdiction.

Target Media, 2015 WL 1061140, at *2.

7. **October 20, 2023 Order (Dkt. 479)**

> No later than December 8, 2023, the Parties may present to the Court disputed claims that cannot be resolved through good faith *negotiations* between the Parties and objections to determinations made by the Settlement Administrator. [2]
>
> > [2] Including any objections to a claimant's standing.

Order (Dkt. 479) at 2, ¶ 1.c, n.2.

8. **BTL's July 14, 2023 Reply (Dkt. 467) to Intervenors' June 30, 2023 Response to Motions Regarding Claims Administration Process (Dkt. 460)**

> BTL anticipates filing a motion on the standing issue under Article III in due course after the meet and confer process is completed, unless agreement can be reached between the parties. Article III, however, presents an *independent* basis for requiring claimants to provide additional information to the Settlement Administrator, given the burden on *each*

Settlement <u>Class</u> <u>Member</u> to <u>demonstrate</u> <u>Article</u> <u>III</u> <u>standing</u>.
*See TransUnion v. Ramirez*, 141 S.Ct. 2190, 2208 (2021)
("Every class member must have Article III standing in order
to recover individual damages."); *Drazen*, 41 F.4th at 1360
(quoting *TransUnion* and making clear *TransUnion* applies to
each member of a settlement class).

BTL's Reply (Dkt. 467) at 7 n.13.

**B.**   <u>**In re Amerifactors, 2019 WL 6712128 (Dec. 9, 2019)**</u>
(cited in Plaintiffs' December 29, 2023 Reply in Support
of Motion for Final Approval (Dkt. 508) at 4, 5, 8)

The Telephone Consumer Protection Act (TCPA), as amended by
the Junk Fax Protection Act (JFPA), prohibits any person from
sending an unsolicited advertisement to a "telephone facsimile
machine."  In relevant part, a ""telephone facsimile machine" is
defined as "equipment which has the capacity ... to transcribe text or
images (or both) from an electronic signal received over a regular
telephone line onto paper."  <u>Construing</u> <u>these</u> <u>terms</u> <u>in</u> <u>2003,</u> <u>the</u>
<u>Commission</u> <u>has</u> <u>made</u> <u>clear</u> <u>that</u> <u>the</u> <u>prohibition</u> <u>does</u> <u>not</u> <u>extend</u> <u>to</u>
<u>facsimile</u> <u>messages</u> "<u>sent</u> <u>as</u> <u>email</u> <u>over</u> <u>the</u> <u>Internet.</u>"

<u>Amerifactors</u>, 2019 WL 6712128, at ¶ 1.

An online fax service is "a cloud-based service consisting of a fax
server or similar device that is used to send or receive documents,
images   and/or   electronic   files   in   digital   format   over
telecommunications facilities" <u>that</u> <u>allows</u> <u>users</u> <u>to</u> "<u>access</u> '<u>faxes</u>'
<u>the</u> <u>same</u> <u>way</u> <u>that</u> <u>they</u> <u>do</u> <u>email</u>: <u>by logging into a server over the</u>
<u>Internet or by receiving a pdf attachment</u> [<u>as</u>] <u>an</u> <u>email.</u>"

<u>Id.</u> at ¶ 2.

<u>In</u> <u>2003,</u> <u>the</u> <u>Commission</u> <u>made</u> <u>clear</u> <u>that</u> <u>the</u> <u>TCPA's</u> <u>prohibition</u>
<u>does</u> <u>not</u> <u>extend</u> <u>to</u> <u>facsimile</u> <u>messages</u> "<u>sent</u> <u>as</u> <u>email</u> <u>over</u> <u>the</u>
<u>Internet.</u>"  <u>In</u> <u>doing</u> <u>so,</u> <u>the</u> <u>Commission</u> <u>made</u> <u>clear</u> <u>that</u> <u>where</u> <u>the</u>
<u>equipment</u> <u>itself</u> <u>could</u> <u>transcribe</u> <u>a</u> <u>fax</u> <u>onto</u> <u>paper</u>—<u>such</u> <u>as</u> <u>a</u>
<u>personal</u> <u>computer</u> <u>attached</u> <u>to</u> <u>printer</u> <u>and</u> <u>modem</u>—<u>it</u> <u>would</u> <u>remain</u>
<u>within</u> <u>the</u> <u>scope</u> <u>of</u> <u>the</u> <u>statute.</u>  The Consumer and Governmental
Affairs Bureau reiterated this finding in the *Westfax Declaratory
Ruling*, finding that the "efaxes" at issue in that case were received

9

by equipment that had "the capacity to 'transcribe text or images (or both) from an electronic signal received over a telephone line onto paper."D'

<u>Id.</u> at ¶ 5.

> <u>Congress did not intend the statute's prohibition to apply to faxes sent to equipment other than a telephone facsimile machine. Specifically, the language of the statute proscribes sending a fax only to a "telephone facsimile machine." In contrast, Congress made clear that the proscription applies when such a fax is sent from other devices as well</u>—<u>specifically, an unsolicited facsimile advertisement can originate on any of three types of equipment: a "telephone facsimile machine," a "computer," or any "other device."</u>

<u>Id.</u> at ¶ 10. <u>But see</u> <u>Lyngaas v. Curaden AG</u>, 992 F.3d 412, 438-46 (6th Cir. 2021) (addressing text of the TCPA).

> <u>We also understand that an online fax service cannot itself print a fax</u>—<u>the user of an online fax service must connect his or her own equipment in order to do so</u>. As such, an online fax service is plainly not "equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." <u>Accordingly, under the plain terms of the Act, an online fax service is not a "telephone facsimile machine" and a fax sent to one is not "an unsolicited facsimile advertisement" prohibited by the TCPA.</u>

<u>Id.</u> at ¶ 11.

> <u>What is more, we agree with commenters that faxes sent to online fax services do not cause the specific harms to consumers Congress sought to address in the TCPA</u>. The House Report on the TCPA makes clear that <u>the facsimile provisions of the statute were intended to curb two specific harms</u>: "<u>First, [a fax advertisement] shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.</u>"

<u>Id.</u> at ¶ 12.

10

> Specifically, we find that the advertiser cost-shifting that Congress sought to prevent, such as the use of a recipient's paper and ink, is not a factor with online fax services. The House Report on the TCPA explained in 1991 that fax machines were "designed to accept, process, and print all messages which arrive over their dedicated lines."

Id. at ¶ 12.

> By contrast, the record here confirms that online fax services hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired. Faxes sent to online fax services use paper and ink only when the recipient *chooses* to print it using their own separately provided equipment. Neither is Congress' concern about junk faxes occupying the recipient's fax machine so it is unavailable for other transmissions an issue with online fax services. These services can handle multiple simultaneous incoming transmissions and thus receipt of any one fax does not render the service unavailable for others. In short, online fax services differ in critical ways from the traditional faxes sent to telephone facsimile machines Congress addressed in the TCPA. These faxes are more accurately characterized as faxes sent to a "computer" or "other device," and not a "telephone facsimile machine."

Id. at ¶ 13.

> We agree with Amerifactors that interpreting the TCPA to mean that every "computer" or "other device" is a telephone facsimile machine, merely because it could be connected to a printer, directly or indirectly, would be overly broad and result in the kind of impermissibly expansive application of the TCPA that the D.C. Circuit recently rejected. *See* Letter from Steven A. Augustino, Counsel for Amerifactors to Marlene H. Dortch, FCC, CG Docket No. 02-278 (dated Feb. 22, 2019).

Id. at ¶ 13 n.33.

We disagree with those commenters who suggest that other consumer inconveniences necessitate that all computers and devices capable of being sent faxes be deemed telephone facsimile machines. *For one*, we see no discretion contained in the statute to expand the meaning of a telephone facsimile machine beyond its defined scope. *For another*, the more general harms that such commenters point to—such as time spent monitoring unwanted faxes stored by online fax services—are more generalized harms that go beyond the specific harms Congress identified in enacting the TCPA.

Id. at ¶ 14.[2]

We also disagree with those that suggest this case is governed by the *Westfax Declaratory Ruling*. That decision focused on whether the mere conversion of a conventional fax to email at some point in the transmission chain removed the fax from the TCPA's reach—and found that it did not. And based on a limited record, it assumed that the "efax" in question was sent to a computer with an attached fax modem that had the capacity to print the fax, as required by statute. That decision did not consider the online fax services that have no such capacity at issue here.

Id. at ¶ 15.

**C.** **In re Joseph T. Ryerson & Son, Inc., 2020 WL 5362216 (Sept. 3, 2020)**

Construing these terms in 2003, the Commission made clear that the prohibition does not extend to facsimile messages "sent as email over the Internet."

Ryerson, 2020 WL 5362216, at ¶ 1.

---

[2] The commenter referred in this excerpt from Amerifactors is Career Counseling, represented by Glenn Hara of Anderson + Wanca. See Amerifactors, 2019 WL 6712128, at ¶ 14 n.34 ("Career Counseling Comments at 6-8 (noting time spent opening, reviewing and deleting messages)").

The Bureau reiterated this finding in the Westfax Declaratory Ruling, finding that "a fax sent as an email over the Internet—e.g., a fax attached to an email message or a fax whose content has been pasted into an email message—is not subject to the TCPA."

Id. at ¶ 6.

Further, we reiterate that transmissions that are effectively email do not implicate the consumer harms Congress sought to address in the TCPA, such as tying up phone/fax lines and the unnecessary use of paper and toner/ink from automatic printing.

Id. at ¶ 15.

Similarly, we disagree with those commenters who argue that the transmissions are TCPA-covered faxes because they were eventually sent to a computer that could print the message. Virtually all email could be accessed by computers with printing capabilities; yet emails do not implicate the consumer harms that are the TCPA's target, such as automatic printing.

Id. at ¶ 16.

### D.  Other FCC Orders

1.  **2003 FCC Order**, **2003 WL 21517853 (July 3, 2003)**
    (cited in Plaintiffs' December 29, 2023 Reply in Support of Motion for Final Approval (Dkt. 508) at 5, 8, 26)

    We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes. However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet.

    2003 Report & Order at ¶ 200.

    Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes. "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines.

    Id.

13

> Commenters also note that some commercial facsimile services transmit faxes to the recipients as email attachments. <u>We emphasize that any rules the Commission adopts with respect to unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email over the Internet</u>. *See* definition of telephone facsimile machine at *47 U.S.C. § 227(a)(2)*.

<u>Id.</u> at ¶ 199 n.736.

> As the House Report accompanying the TCPA explained, "<u>facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines</u>. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine."

<u>Id.</u> at ¶ 201.

> Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed. They may also tie up lines and printers so that the recipients' requested faxes are not timely received.

<u>Id.</u> at ¶ 202.

**2.**   **<u>In re Westfax</u>, 2015 WL 5120880 (Aug. 28, 2015)**
(cited in Plaintiffs' Dec. 28, 2023 Opposition (Dkt. 505) to BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 8-13, 16)

> <u>We next clarify that it is the consumer to whom the content of a fax or efax is directed that is the "recipient" under the TCPA</u>. Westfax asks whether the recipient is the company with the fax server that converts the fax into an email. The Commission's rules and orders make clear that the ""recipient" of a fax is the consumer for whom the fax's content is intended and to whom the fax's content is sent by dialing that consumer's fax number. The TCPA and the Commission's rules are designed to protect consumers for whom unwanted faxes represent annoyance and wasted resources. Entities that convert faxes to email are not

"recipients" of such faxes under the TCPA because they are not the intended audience for the fax. Instead, based upon the description of Westfax's own FaxForward service, such entities provide a service to the recipient that requires them to become part of the communications pathway between the sender and the recipient. Thus, while they expect to be part of the fax communication, they are neither the intended recipient nor the ultimate recipient of the document sent as a fax any more than would be the telephone company providing a telephone line to a consumer's traditional fax machine.

<u>Westfax</u>, 2015 WL 5120880, at ¶ 12.

### E.   <u>Amerifactors</u> And <u>Ryerson</u> Are Final Orders

#### 1.   47 U.S.C. § 155, 47 C.F.R. § 1.102 and 47 C.F.R. § 1.115

##### a.   47 U.S.C. § 155(c) - Delegation

When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, <u>delegate</u> <u>any</u> of its functions . . .

47 U.S.C. § 155(c)(1).

Any order, decision, report, or action made or taken <u>pursuant</u> <u>to</u> <u>any</u> <u>such</u> <u>delegation</u>, unless reviewed as provided in paragraph (4) of this subsection, <u>shall</u> <u>have</u> <u>the</u> <u>same</u> <u>force</u> <u>and</u> <u>effect</u>, and shall be made, evidenced, and enforced in the same manner, <u>as</u> <u>orders</u>, <u>decisions</u>, <u>reports</u>, <u>or</u> <u>other</u> <u>actions</u> <u>of</u> <u>the</u> <u>Commission</u>.

47 U.S.C. § 155(c)(3).

<u>Any</u> <u>person</u> <u>aggrieved</u> <u>by</u> <u>any</u> <u>such</u> <u>order</u>, <u>decision</u>, <u>report</u> <u>or</u> <u>action</u> <u>may</u> <u>file</u> <u>an</u> <u>application</u> <u>for</u> <u>review</u> by the Commission within such time and in such manner as the Commission shall prescribe, and <u>every</u> <u>such</u> <u>application</u> <u>shall</u> <u>be</u> <u>passed</u> <u>upon</u> <u>by</u> <u>the</u> <u>Commission</u>.

47 U.S.C. § 155(c)(4).

15

The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection.

47 U.S.C. § 155(c)(7).

**b.    47 C.F.R. § 1.102 - Effective Dates Of Actions Taken Pursuant To Delegated Authority**

Non-hearing or interlocutory actions <u>taken</u> <u>pursuant</u> <u>to</u> <u>delegated</u> <u>authority</u> shall, unless otherwise ordered by the designated authority, <u>be</u> <u>effective</u> <u>upon</u> <u>release</u> of the document containing the full text of such action, or in the event such a document is not released, upon release of a public notice announcing the action in question.

47 C.F.R. § 1.102(b)(1).

If a petition for reconsideration of a non-hearing action is filed, <u>the</u>  <u>designated</u> <u>authority</u> <u>may</u> in its discretion <u>stay</u> <u>the</u> <u>effect</u> <u>of</u> <u>its</u> <u>action</u> <u>pending</u> <u>disposition</u> <u>of</u> <u>the</u> <u>petition</u> <u>for</u> <u>reconsideration</u>.

47 C.F.R. § 1.102(b)(2).

**c.    47 C.F.R. § 1.115 - Application For Review Of Action Taken Pursuant To Delegated Authority**

Any person aggrieved by any action taken pursuant to delegated authority may file an <u>application</u> <u>requesting</u> <u>review</u> of that action by the Commission.

47 C.F.R. § 1.115(a).

<u>In</u>  <u>the</u>  <u>event</u>  <u>the</u>  <u>Commission</u>  <u>orders</u>  <u>further</u> <u>proceedings</u>, <u>it</u> <u>may</u> <u>stay</u> <u>the</u> <u>effect</u> <u>of</u> <u>the</u> <u>order</u> <u>from</u> <u>which</u> <u>review</u> <u>is</u> <u>sought</u>.

47 C.F.R. § 1.115(h)(2).

2.   **Committee To Save WEAM v. F.C.C.**, 808 F.2d 113
(D.C. Cir. 1986)

This assignment was initially approved by the FCC's Mass Media Bureau ("Bureau"), acting by authority delegated from the Commission pursuant to section 5 of the Communications Act of 1934, *47 U.S.C. § 155(c) (1982)*. Appellant filed a timely application for Commission review of the Bureau's approval; <u>nevertheless, under Commission rules, the Bureau's decision was effective upon issuance</u>. The assignment was consummated soon thereafter.

<u>WEAM</u>, 808 F.2d at 114.

<u>Under *47 U.S.C. § 155(c)(3)*, Bureau orders "shall have the same force and effect" as those of the Commission "unless reviewed as provided in paragraph (4) of this subsection." Appellant argues that if Commission review of a Bureau decision has been sought, the decision cannot be effective until the review has been completed</u>.  The Commission rule applicable to the "nonhearing" Bureau decision here at issue provides, however, that <u>a Bureau order becomes "effective upon release" unless the Commission, in its discretion, "stay[s] the effect of . . . such action until its review of the matters at issue has been completed."</u> *47 C.F.R. § 1.102(b) (1985)*.

<u>Id.</u> at 115.

A Commission rule, which has been in effect since 1962, provides (at *47 C.F.R. § 1.102(b)*) that <u>unless the Bureau specifies otherwise, its orders are to be effective upon release. Subsection 1.102(b)(3) provides that an application for Commission review will not preclude their taking effect unless the Commission, "in its discretion," decides to stay the effectiveness of a Bureau's order pending completion of its review</u>.

<u>Id.</u> at 119.

17

3.    **Career Counseling, Inc. v. Amerifactors Financial Group, LLC, 2021 WL 3022677 (D.S.C. 2021)[3]**

> As to the first element, <u>the</u> <u>court</u> <u>finds</u> <u>that</u> <u>the</u> <u>CGAB's</u> [i.e., Consumer and Governmental Affairs Bureau] <u>ruling</u> <u>is</u> <u>of</u> <u>the</u> <u>FCC.</u> <u>The</u> <u>CGAB</u> <u>is</u> <u>a</u> <u>bureau</u> <u>that</u> "<u>acts</u> <u>for</u> <u>the</u> [Federal Communications] <u>Commission</u> <u>under</u> <u>delegated</u> <u>authority</u>" <u>in matters of</u> "<u>adjudication</u> <u>and</u> <u>rulemaking</u>." *47 C.F.R. § 0.141.* The Fourth Circuit has clarified that "[w]hen a federal agency delegates its decision-making authority to a subdivision and Congress has expressly permitted such delegation by statute, <u>the</u> <u>decision</u> <u>of</u> <u>the</u> <u>subdivision</u> <u>is</u> <u>entitled</u> <u>to</u> <u>the</u> <u>same</u> <u>degree</u> <u>of</u> <u>deference</u> <u>as</u> <u>if</u> <u>it</u> <u>were</u> <u>made</u> <u>by</u> <u>the</u> <u>agency</u> <u>itself</u>." *MCImetro Access Transmission Servs. Inc. v. BellSouth Telecomms., Inc., 352 F.3d 872, 880 (4th Cir. 2003).* <u>The appropriate</u> <u>authority</u> <u>has</u> <u>been</u> <u>delegated</u> <u>to</u> <u>the</u> <u>CGAB</u> <u>both by</u> <u>the</u> <u>FCC</u> <u>and</u> <u>by</u> <u>Congress</u> <u>in</u> <u>statute</u>. *See 47 C.F.R. § 0.141.* <u>Therefore,</u> <u>the</u> <u>CGAB</u> <u>acts</u> <u>as</u> <u>a</u> <u>delegated</u> <u>authority</u> <u>under</u> <u>the</u> <u>FCC,</u> <u>and</u> <u>any</u> <u>order</u> <u>from</u> <u>the</u> <u>CGAB</u> <u>should</u> <u>be</u> <u>treated</u> <u>as</u> <u>if</u> <u>it</u> <u>were</u> <u>from</u> <u>the</u> <u>FCC.</u>

Career Counseling, 2021 WL 3022677, at *8.

---

[3] Counsel of record for plaintiff in <u>Career Counseling</u> was Brian J. Wanca, Glenn L. Hara, Ryan M. Kelly and Wallace C. Solberg of Anderson + Wanca and Ross M. Good now of Loftus & Eisenberg, Ltd.

Lastly, the court finds that the CGAB's declaratory ruling is final. Under *47 C.F.R. § 1.102(1)*, non-hearing or interlocutory actions "taken pursuant to delegated authority" will be "effective upon release of the document containing the full text of such action" unless the designating authority orders otherwise. *Id.* Career Counseling has filed a petition for reconsideration of the CGAB's declaratory ruling (see ECF No. 139-2), and the FCC has the discretion to "stay the effect of its action pending disposition of the petition for reconsideration." *47 C.F.R. § 1.102(2)*. Even though the FCC has the authority to stay the CGAB's ruling, it has not yet done so and neither has Career Counseling specifically requested a stay on the ruling while the appeal is being processed. Therefore, it stands to reason that under *47 C.F.R. § 1.102(1)*, the CGAB's ruling is in effect until the FCC says otherwise in response to an appeal.

Id. at *10.

19

### 4.    Mr. Hara's Applications For Review

### a.    <u>Amerifactors</u>

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Amerifactors Financial Group, LLC Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | )   CG Docket No. 02-278 |
| | ) |
| Junk Fax Prevention Act of 2005 | )   CG Docket No. 05-338 |

<u>APPLICATION FOR REVIEW</u>

Glenn L. Hara
Brian J. Wanca
Anderson + Wanca
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
ghara@andersonwanca.com

Attorneys for Applicant Career Counseling Services, Inc.

January 8, 2020

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Amerifactors Financial Group, LLC Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | )   CG Docket No. 02-278 |
| | ) |
| Junk Fax Prevention Act of 2005 | )   CG Docket No. 05-338 |

<u>APPLICATION FOR REVIEW</u>

Pursuant to Section 1.115 of the Commission's rules,[1] Applicant Career Counseling

Services, Inc. ("Career Counseling") seeks review by the full Commission of the Order issued by

the Consumer & Governmental Affairs Bureau on December 9, 2019, in the above-captioned

proceeding.[2]

20

## b.   Ryerson

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| In the Matter of | ) | |
| | ) | |
| Petition of Joseph T. Ryerson & Son, Inc. for | ) | |
| Declaratory Ruling | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Junk Fax Prevention Act of 2005 | ) | CG Docket No. 05-338 |

**APPLICATION FOR REVIEW**

Glenn L. Hara
Brian J. Wanca
Anderson + Wanca
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501
ghara@andersonwanca.com

Attorneys for Applicant Anderson + Wanca

October 5, 2020

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| In the Matter of | ) | |
| | ) | |
| Petition of Joseph T. Ryerson & Son, Inc. for | ) | |
| Declaratory Ruling | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Junk Fax Prevention Act of 2005 | ) | CG Docket No. 05-338 |

**APPLICATION FOR REVIEW**

Pursuant to Section 1.115 of the Commission's rules,[1] Applicant Anderson + Wanca

seeks review by the full Commission of the Order issued by the Consumer & Governmental

Affairs Bureau on September 4, 2020, in the above-captioned proceeding.[2]

21

**F.** **Representative Decisions Supporting BTL's Position On Article III Standing**

**1.** **TransUnion LLC v. Ramirez, 141 S.Ct. 2190 (2021)** (cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 2, 4, 11-15, 21)

> As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing. *See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).*

Id. at 2207-08.

> Every class member must have Article III standing in order to recover individual damages. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 466,136 S.Ct. 1036, 194 L.Ed.2d 124 (2016)* (ROBERTS, C. J., concurring).

Id. at 2208.

> We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class. *See, e.g., Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1277 (CA11 2019).*

Id. at 2208 n.4.

> A plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan, 504 U.S., at 561, 112 S.Ct. 2130.* Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial." *Ibid.* (internal quotation marks omitted).

Id. at 2208.

> And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages). *Davis, 554 U.S., at 734, 128 S.Ct. 2759; Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).*

Id.

2. **Drazen v. Pinto,**
   **41 F.4th 1354 (11th Cir. 2022), vacated on other grounds, 61 F.4th 1297 (11th Cir. 2023)** (cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 1-2, 12-14, 21)[4]

> We have in this case an argument over the meaning of coupon settlements. But, because there is an Article III standing problem with the class, we must vacate the District Court's approval of class certification and settlement in this case and remand for the opportunity to revise the class definition.

Drazen, 41 F.4th at 1355.

> After considering the briefing of the parties, the District Court, citing our decision in *Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1273 (11th Cir. 2019)*, determined that only the named plaintiffs must have standing.

Id. at 1357.

> After that complicated procedural history, we start with the basic question of whether we have subject-matter jurisdiction in this case. The parties did not brief the issue before us, apparently assuming the class definition passed Article III standing muster. Not to hide the ball, we hold that the class definition does not meet Article III standing requirements, so we vacate the District Court's decision to grant final approval

---

[4] Counsel of record for plaintiff in Drazen was Robert M. Hatch and David M. Oppenheim of Bock Hatch & Oppenheim, LLC.

of the settlement and remand to give the parties an opportunity to revise the class definition.

Id. at 1359.

From *Gaos*, we take the following: <u>even at the settlement stage of a class action, we must assure ourselves that we have Article III standing at every stage of the litigation</u>. *U.S. Const. art. III, § 2; United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019)* ("To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation."); *see TransUnion LLC v. Ramirez, — U.S. —, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021)* (evaluating Article III standing of plaintiffs on appeal after a full trial below). <u>That requirement is derived from Article III as well as the unique nature of class action settlements as laid out in Rule 23(e), which require court approval</u>.

Id. at 1360.

Our problem in this case is that the District Court's granting of this class definition runs headlong into *Cordoba* and *TransUnion*. Starting with the District Court's use of *Cordoba*, <u>we acknowledge that *Cordoba* says that "[f]or a class to be certified, [only] the named plaintiff must have standing</u>." *Cordoba*, 942 F.3d at 1267. <u>But *Cordoba* also counsels that "whether absent class members can establish standing may be exceedingly relevant to the class certification analysis required by Federal Rule of Civil Procedure 23,"</u> and "<u>at some time in the course of the litigation the district court will have to determine whether each of the absent class members has standing before they could be granted any relief</u>." *Id. at 1273, 1274*.

Id. at 1361.

So, the *Cordoba* inquiry into standing for certification purposes through Rule 23 merges with the *TransUnion* analysis of damages recovery to lead us to the following conclusion: <u>when a class seeks certification for the sole purpose of a damages settlement under Rule 23(e), the class definition must be limited to those individuals who have Article III standing. If every plaintiff within the class definition in the class action in *TransUnion* had to have Article III standing to recover damages after trial, logically so too must be the case with a court-approved class action settlement</u>.

<u>Id.</u>

And Article III standing goes to the heart of our jurisdiction to hear cases in the first place. We cannot, therefore, check our Article III requirements at the door of the class action. <u>Any class definition that includes members who would never have standing under our precedent is a class definition that cannot stand</u>.

<u>Id.</u> at 1362.

At the very least, *Cordoba* and *Glasser* were decided pre-*TransUnion*, and under *TransUnion* plaintiffs have the burden of establishing Article III standing for statutory violations by alleging facts that would allow us to find a common-law analogue to the injury in question. *See TransUnion, 141 S. Ct. at 2204*.

<u>Id.</u> at 1363.

**3.**   **<u>Drazen v. Pinto</u>, 74 F.4th 1336 (11th Cir. 2023)**
(cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 2, 15, 18, 19, 20, 22)

Because Congress is well-suited to identify such harms, we find Congress's judgment instructive when it creates a cause of action for an intangible harm.

<u>Drazen</u>, 74 F.4th at 1339.

25

> Once Congress identifies a harm by enacting a statute with a cause of action to redress that harm, we consider whether the statutory harm shares a "close relationship" with a harm that has traditionally provided a basis for a lawsuit in English or American courts.

Id.

> Pinto then appealed, focusing solely on CAFA issues and the district court's approval of the class settlement. But the panel of this Court that was assigned the appeal did not address those arguments.

> <u>Rather, the panel dismissed the case for lack of jurisdiction. In the process, it noted the Supreme Court's admonition: "'Every class member must have Article III standing in order to recover individual damages.'"</u> *Drazen v. Pinto, 41 F.4th 1354, 1360 (11th Cir. 2022) (*quoting *TransUnion LLC v. Ramirez,* —— U.S. ——, *141 S. Ct. 2190, 2204–05, 2208, 210 L.Ed.2d 568 (2021))*.

Id. at 1341.

> "<u>So," the panel concluded, "the class definition cannot stand to the extent that it allows standing for individuals who received a single text message from GoDaddy</u>." *Id.* As a result, the panel "vacate[d] the District Court's decision to grant final approval of the settlement and remand[ed] to give the parties an opportunity to revise the class definition." *Id. at 1359.*

Id. at 1342.

> So once Congress has identified an intangible harm, the question becomes whether that "'harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.'" *Hunstein, 48 F.4th at 1243 (*quoting *Spokeo, 578 U.S. at 341, 136 S.Ct. 1540)*.

Id. at 1343.

> And Drazen and Pinto contend that the class members who received only one unwanted text message from GoDaddy suffered a privacy invasion that shares a close relationship with the harm associated with intrusion upon seclusion. In particular, the complaint alleges that the class members "suffered an invasion of a legally protected interest in privacy, which is specifically addressed and protected by the TCPA."

Id.

> GoDaddy contends that Congress has been silent on *47 U.S.C. § 227(b)(1)(a)(iii)*'s applicability to text messages. For the purposes of assessing our jurisdiction and without deciding the merits of the TCPA claim, we disagree and conclude that Congress appears to have targeted unwanted text messages (as well as unwanted phone messages) with the TCPA. *See Cranor v. 5 Star Nutrition, L.L.C., 998 F.3d 686, 690–91 (5th Cir. 2021); see also, e.g., Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016)* ("A text message to a cellular phone, it is undisputed, qualifies as a 'call' within the compass of *§ 227(b)(1)(A)(iii)*.").

Id. at 1343 n.5.

> And as with "the unwanted ringing of a phone from a phone call," the "undesired buzzing of a cell phone from a text message . . . is an intrusion into peace and quiet in a realm that is private and personal." *Gadelhak, 950 F.3d at 462 n.1*.

Id. at 1345.

> But the Constitution empowers Congress to decide what degree of harm is enough so long as that harm is similar in kind to a traditional harm. And that's exactly what Congress did in the TCPA when it provided a cause of action to redress the harm that unwanted telemarketing texts and phone calls cause. *See 47 U.S.C. § 227(b)(1)(A)(iii)*.

Id.

4.   **Scoma Chiropractic, P.A. v. Dental Equities, LLC,**
**2021 WL 6105590 (M.D. Fla. 2021) (*Badalamenti, J.*)** [5]

> In a 2019 Declaratory Ruling, the Consumer and
> Governmental Affairs Bureau (the "Bureau"), acting on
> delegated authority from the FCC, determined that the TCPA
> does not apply to online fax services.

Dental Equities, 2021 WL 6105590, at *1.

> First, it is likely that many of the putative members who
> received the fax via an online fax service lack Article III
> standing. Second, the question of whether the TCPA covers
> receipt of a fax via an online fax service bears on the
> predominance inquiry under Rule 23(b) (3) and must be
> answered. The Court finds that receipt of such faxes through
> online fax services is not covered by the TCPA.

Id. at *3.

> But there is no testimony indicating that the time spent
> printing and reviewing the one-page fax—whether it was
> accessed via email or the portal—was sufficient to confer
> Article III standing. And Plaintiffs cite no authority in support
> of the proposition that voluntarily printing an emailed fax
> pursuant to an office policy results in an injury in fact.

Id. at *5.

> Indeed, although there may be circumstances where an
> individual who received a fax via an online fax service
> suffered an injury in fact, the Court would be required to
> determine on an *individual basis* whether each member read
> the fax, the time spent reviewing the fax, whether the fax was
> printed, or whether the member followed up on the fax.
> Accordingly, the question of standing would predominate
> over the common issues of the class, and the classes cannot
> be certified. *See Cordoba, 942 F.3d at 1277.*

Id.

---

[5] Counsel of record for plaintiffs in Scoma v. Dental Equities is Brian J. Wanca and Ryan
M. Kelly of Anderson + Wanca and Ross M. Good now of Loftus & Eisenberg, Ltd.

> The Court agrees with the well-reasoned analysis of the Magistrate Judge and several other courts in finding that receipt of a fax via an online fax service does not support a TCPA claim. *See, e.g.,* (Doc. 172 at 18–28); *Licari Family Chiropractic Inc. v. Eclinical Works, LLC, No. 8:16-cv-3461-MSS-JSS, 2021 WL 4506405, at *4–7 (M.D. Fla. Jan. 11, 2021); Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC, No. 3:16-cv-03013-JMC, 2021 WL 3022677, at *8–10 (D.S.C. July 16, 2021); Advanced Rehab & Med., P.C. v. Amedisys Holding, LLC, No. 1:17-cv-01149-JDB-JAY, 2020 WL 4937790 (W.D. Tenn. Aug. 24, 2020); True Health Chiropractic Inc., 2020 WL 7664484.*

Id. at *7

> First, the Bureau's decision in *AmeriFactors* is entitled to deference under the Chevron doctrine. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1257 n.12 (11th Cir. 2015)* (collecting cases that have deferred to the FCC's construction of the TCPA in reports and orders "issued without the formalities of regulations").

Id.

> The Eleventh Circuit has found that Congress "delegated to the FCC authority to promulgate binding legal rules to carry out the provisions of the TCPA." [*Palm Beach Golf, 781 F.3d at 1256*] (quotation omitted). Additionally, the Eleventh Circuit has held that an order issued under "delegated rulemaking authority" by the Bureau has the "same force and effect of the Commission." *Gorss Motels, Inc., 931 F.3d at 1104* (citing *47 C.F.R. § 0.203(b)*).

Id.

> Moreover, even if *Chevron* deference did not apply, *AmeriFactors* would still be persuasive, as the decision is well-reasoned, based on a voluminous record, consistent with earlier and later pronouncements, and decided by the agency with the requisite expertise. *See Martin v. Soc. Sec. Admin., Comm'r, 903 F.3d 1154, 1159 (11th Cir. 2018)* (citation omitted). Indeed, the FCC has since reaffirmed that interpretation. *See In the Matter of Joseph T. Ryerson & Son, Inc. Pet. for Expedited Declaratory Ruling, 2020 WL 5362216, at \*4, No. 02-278 (OHMSV 2020)* ("[W]e reiterate that transmissions that are effectively email do not implicate the consumer harms Congress sought to address in the TCPA, such as tying up phone/fax lines and the unnecessary use of paper and toner/ink from automatic printing.").

Id. at \*8.

> Upon review and in consideration of *AmeriFactors*, the Court finds that the TCPA does not cover receipt of a fax via an online fax service.

Id. at \*9.

> The Article III standing inquiry would require further analysis of, among other things, whether the member read the fax, how long it took that member to read the fax, and whether there were any other potential bases to support an injury in fact.

Id. at \*10.

> In all events, the Court retains the "discretion to decertify a certified class that turns out to be unmanageable."

Id. at \*11.

30

5. **Scoma Chiropractic, P.A. v. National Spine and Pain Centers, LLC**, 2022 WL 16695130 (M.D. Fla. Nov. 3, 2022) (***Badalamenti, J.***) (cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 5 n.5, 6 n.7, 9 n.9, 16 n.17, 17-18, 22)[6]

> A standing analysis is also intertwined with the requirements of *Rule 23*. As the Eleventh Circuit has explained, courts must "consider under *Rule 23(b)(3)* before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing . . . and making that determination for these members of the class will require individualized inquiries." *Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1277 (11th Cir. 2019); see also Drazen v. Pinto, 41 F.4th 1354, 1361 (11th Cir. 2022).*

Scoma, 2022 WL 16695130, at *6.

> For the sake of brevity, the Court finds persuasive the reasoning of other courts in this Circuit which have found that the mere receipt of a fax through an online fax service, even if in violation of the TCPA, does not cause an injury in fact. *See, e.g., Daisy, Inc. v. Mobile Mini, Inc., 489 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2020).*

Id.

> Although there may be circumstances where an individual who received a fax via an online fax service suffered an injury in fact, *see Salcedo v. Hanna, 936 F.3d 1162, 1173 (11th Cir. 2019)* (noting that "allegations of wasted time can state a concrete harm for standing purposes"), the Court would be required to determine on an individual basis whether each member read the fax, the time spent reviewing the fax, whether the fax was printed, or whether the member followed up on the fax. Accordingly, as will be further explained, the question of standing would predominate over the common

---

[6] Counsel of record for plaintiff in Scoma v. National Spine is Ross M. Good now of Loftus & Eisenberg, Ltd. and Wallace C. Solberg and Ryan M. Kelly of Anderson + Wanca.

issues of the class, and Class A cannot be certified. *See Cordoba, 942 F.3d at 1277.*

Id. at *7.

> The Court agrees with several other courts in finding that receipt of a fax via an online fax service, as opposed to a standalone fax machine, does not support a TCPA claim. *See, e.g., Licari Family Chiropractic Inc. v. Eclinical Works, LLC, No. 8:16-cv-3461-MSS-JSS, 2021 WL 4506405, at *4–7 (M.D. Fla. Jan. 11, 2021); Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC, No. 3:16-cv-03013-JMC, 2021 WL 3022677, at *8–10 (D.S.C. July 16, 2021); True Health Chiropractic Inc., 2020 WL 7664484.*

Id. at *8.

> First, the Bureau's decision in *AmeriFactors* is entitled to deference under the *Chevron* doctrine. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984); Palm Beach Golf, 781 F.3d at 1257 n.12* (collecting cases that have deferred to the FCC's construction of the TCPA in reports and orders "issued without the formalities of regulations"). Deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that agency interpretation claiming deference was promulgated in the exercise of that authority." *Palm Beach Golf, 781 F.3d at 1256* (quotation omitted). The Eleventh Circuit has found that Congress "delegated to the FCC authority to promulgate binding legal rules to carry out the provisions of the TCPA." *Id.* (quotation omitted). Additionally, the Eleventh Circuit has held that an order issued under "delegated rulemaking authority" by the Bureau has the "same force and effect of the Commission." *Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094, 1104 (11th Cir. 2019)* (citing *47 C.F.R. § 0.203(b)*).

Id.

Even if *Chevron* deference did not apply, *AmeriFactors* would still be persuasive because the decision is well-reasoned, based on a voluminous record, consistent with earlier and later pronouncements, and decided by the agency with the requisite expertise. *See Martin v. Soc. Sec. Admin., Comm'r, 903 F.3d 1154, 1159 (11th Cir. 2018)* (citation omitted). In fact, the FCC has since reaffirmed AmeriFactors. *See In the Matter of Joseph T. Ryerson & Son, Inc. Pet. For Expedited Declaratory Ruling, No. 02-278, 05-338, 2020 WL 5362216, at \*4 (OHMSV 2020)*. In summary, the Court finds that the TCPA does not cover receipt of a fax via an online fax service.

Id. at \*9.

Here, the putative members of Class B (and for that matter, Class A) are ascertainable in the sense that the class is defined by objective criteria. However, as it relates to *Rule 23(b)(3)(D)*'s manageability factor, administrative feasibility—or the lack thereof—gives the Court pause. Indeed, a "difficulty in identifying class members is a difficulty in managing a class action." *Cherry, 986 F.3d at 1303–04*. Here, Scoma has failed to show that its subpoena process resolves this difficulty.

Id. at \*11.

Significantly, as to more than 6,000 of the remaining numbers, the telephone carriers responded that, in essence, they do "not have information available to allow [the telephone carrier] to determine whether the customer . . . used a standalone fax machine or online fax service."

Id.

In short, Scoma has failed to establish that, through its own proposed subpoena process, it is administratively feasible to identify users of stand-alone fax machines. *Cf. True Health Chiropractic Inc., 2021 WL 4818945, at \*3* (granting motion to decertify class and noting that "[s]imply asking whether various phone carriers themselves provided online fax

services does not provide uniform class-wide proof that each class member received the faxes at issue in the manner necessary to give rise to TCPA liability"); *Career Counseling, 2021 WL 3022677, at \*12* ("The court finds that it would need to make an individualized inquiry of each class member to determine if the fax number identified in the fax log actually was linked to a stand-alone fax machine. . . .").

Id. at \*12.

> The Court is mindful that other courts have addressed this issue in terms of predominance or ascertainability as a threshold requirement. Here, the issue rears its head in the context of *Rule 23(b)(3)(D)*'s manageability factor, but the outcome is the same: Certification is inappropriate.

Id. at \*12 n.14.

> Moreover, because this motion follows Scoma's failed attempts to distinguish between users of stand-alone fax machines and online fax services, it is unnecessary to wait "to decertify a certified class that turns out to be unmanageable." *Cherry, 986 F.3d at 1304* (citation omitted); *see e.g., Scoma, No. 2:16-cv-41, ECF No. 205, at \*5 (Mar. 16, 2022)* (denying immediate review of order granting motion to certify where "plaintiffs haven't yet had the chance to attempt to show that such a determination [of who is in a stand-alone fax machine class] is, in fact, possible"); *Jeffrey Katz Chiropractic, Inc., 340 F.R.D. at 390* (concluding at the outset that, due to identification difficulties, class action was not superior vehicle for dispute).

Id. at \*12.

In summary, upon applying *Rule 23(b)(3)* and mindful of the applicable burden of proof, the Court determines that certification of either Class A or Class B is inappropriate. To be sure, the Court acknowledges that, against the backdrop of *Cherry*, this may be a closer call, but "the entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, the party with the burden of proof loses."

> *Brown, 817 F.3d at 1233* (quotation omitted). After all, "the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.* (citations omitted).

Id.

**6.   Licari Family Chiropractic Inc. v. Eclinical Works, LLC, 2021 WL 4506405 (M.D. Fla. Jan. 11, 2021) (*Scriven, J.*)** (cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 16 n.17, 17 n.18) [7]

> Licari was assigned a fax number upon signing up for SmartFax. (*Id. at ¶ 23*) <u>When SmartFax received a fax at the designated number, it would convert the fax to a PDF and forward it as an attachment to Licari's email address.</u>

Licari, 2021 WL 45606405, at *1.

> SmartFax charged an overage fee of $0.08 per page if fax usage exceeded 250 pages in a given month. (*Id. at ¶ 31*)

Id.

> It is undisputed that Licari received the eClinicalWorks fax as an email from an online fax service. <u>Because the FCC has twice ruled that faxes received in this manner are not covered by the TCPA, and that interpretation warrants Chevron deference, eClinicalWorks is entitled to summary judgment against Licari.</u>

Id. at *3.

> Licari suffered a concrete monetary injury because it paid $0.08 in overage fees as a result of receiving the eClinicalWorks fax. (*Dkt. 146 at ¶¶ 30-32*) In the month the fax was sent, Licari received and sent a total of 286 pages of faxes. (*Id. at ¶ 32*) SmartFax charged an additional $0.08 per page if fax usage exceeded 250 pages in a month. (*Id. at ¶ 31*)

---

[7] Counsel of record for plaintiffs in <u>Licari</u> was Ross M. Good now of Loftus & Eisenberg, Ltd. and Ryan M. Kelly of Anderson + Wanca.

> Thus, the one-page eClinicalWorks fax caused Licari to incur $0.08 in overage fees. (*Id. at ¶ 30*) Put differently, had eClinicalWorks not sent the fax to Licari, it would have saved $0.08. Although the economic loss Licari experienced was small, it is sufficient for standing purposes.

Id. at *4.

> "Congress has authorized the FCC to issue regulations to implement the [TCPA]." *Scoma Chiropractic, P.A. v. Dental Equities, LLC, No. 2:16-CV-41-FTM-99MRM, 2018 WL 2455301, at *2 (M.D. Fla. June 1, 2018); see also 47 U.S.C. § 227(b)(2)* ("The Commission shall prescribe regulations to implement the requirements of this subsection."). The FCC, in turn, has delegated "adjudication and rulemaking" functions to the Consumer and Governmental Affairs Bureau "in matters pertaining to consumers and governmental affairs." *47 C.F.R. § 0.141(a)*.

Id.

> Pursuant to that authority, in December 2019, the Bureau issued a declaratory ruling on the question of whether "an online fax service is a 'telephone facsimile machine' " under the TCPA.  *In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling, No. 05-338, 2019 WL 6712128, at *3 (C.G.A.B. Dec. 9, 2019)*. The Bureau concluded that "an online fax service is not a 'telephone facsimile machine' and a fax sent to one is not 'an unsolicited facsimile advertisement' prohibited by the TCPA." *Id.*

Id.

> When the Consumer and Governmental Affairs Bureau "issue[s] [an] order pursuant to [its] delegated rulemaking authority," that "action has the same force and effect as actions of the Commission." *Gorss Motels, Inc., 931 F.3d at 1104* (citing *47 C.F.R. § 0.203(b)*).

Id. at *4 n.1.

The Bureau subsequently reaffirmed this interpretation of the TCPA in a September 2020 declaratory ruling. *In the Matter of Joseph T. Ryerson & Son, Inc. Petition for Declaratory Ruling, No. CG02-278, 2020 WL 5362216 (C.G.A.B. Sept. 4, 2020)*. Citing *Amerifactors*, the Bureau reiterated that "the TCPA's language demonstrates that Congress did not intend the statute's prohibition to apply to an online service that receives faxes 'sent as email over the Internet.'" *Id. at *3*. The Bureau specifically rejected the argument that such transmissions "are TCPA-covered faxes because they [are] eventually sent to a computer that could print the message." *Id. at *4*. As the Bureau explained, "[v]irtually all email could be accessed by computers with printing capabilities; yet emails do not implicate the consumer harms that are the TCPA's target, such as automatic printing." *Id.*

Id. at *5.

Under *Amerifactors* and *Ryerson*, a fax received in this manner cannot give rise to TCPA liability because it was not sent to a "telephone facsimile machine." Accordingly, the question is whether the Court is bound to defer to these agency rulings. The Court concludes that *Amerifactors* and *Ryerson* are entitled to *Chevron* deference, and that, therefore, Licari's TCPA claim fails as a matter of law.

Id.

Licari offers two principal arguments against applying *Amerifactors* and *Ryerson*. Neither is persuasive. First, Licari contends that the controlling FCC rulings are two agency decisions that predate *Amerifactors* and *Ryerson*. (*Dkt. 165 at 9*) In 2003, the FCC issued an order concluding that "faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14133 (2003)*. At the same time, the FCC "clarif[ied]" that "the prohibition does not extend to facsimile messages sent as email over the Internet." Id. Twelve years later, the Bureau issued a declaratory ruling

finding that "efaxes"—faxes sent "over telephone lines" to "a computer attached to a fax server or modem" that "convert[s] the fax into" an email—are subject to the TCPA. *In the Matter of Westfax, Inc. Petition for Consideration & Clarification, 30 F.C.C. Rcd. 8620, 8623-24 (2015)*.

Id. *6.

Licari's reliance on these earlier FCC rulings is unavailing. The Bureau expressly ruled that the question presented in *Amerifactors* was not "governed" by its earlier decision in *Westfax*. *Amerifactors, 2019 WL 6712128, at *4*. The Bureau explained that *Westfax* "assumed that the 'efax' in question was sent to a computer with an attached fax modem that had the capacity to print the fax, as required by statute." *Id*. *Westfax* did not, however, consider "online fax services" such as SmartFax, which "hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired." *Id*. The FCC's 2003 order is likewise consistent with *Amerifactors* and *Ryerson*.

Id.

Second, Licari contends that even if *Amerifactors* and *Ryerson* warranted deference, they would not apply here because they do not operate retroactively. (*Dkt. 165 at 13*) Licari received the fax on February 4, 2014, years before the *Amerifactors* and *Ryerson* decisions were issued. (*Dkt. 146 at ¶ 10*) "[N]o problem with the retroactive application of [these rulings] exists," however, because they are "clarifications of existing law and not new rules or regulations." *Heimmermann v. First Union Mortg. Corp., 305 F.3d 1257, 1260 (11th Cir. 2002); see also Clay v. Johnson, 264 F.3d 744, 749 (7th Cir. 2001)* ("[A] rule simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been."). "While not dispositive, an agency's determination that a new statement is a clarification of existing law, rather than an

entirely new rule, is generally given much weight." *Heimmermann, 305 F.3d at 1260.*

Id. at *7.

"Entities that convert faxes to email are not 'recipients' of such faxes under the TCPA because they are not the intended audience for the fax." [*Westfax, 30 F.C.C. Rcd. at 8624.*] Here, the consumer (Licari) received the eClinicalWorks fax as an email attachment, and the Bureau has made clear that faxes received in this manner are not covered by the TCPA.

Id. at *7 n.2.

**7.   Sharfman v. Infucare, 2022 WL 18926792 (M.D. Fla. 2022) (*Irick, M.J.*), report and recommendation adopted, 2023 WL 2624754 (M.D. Fla. 2023) (*Berger, J.*)[8]**

The undersigned recommends that the Court find *Dental Equities*, *Daisy*, and the Bureau's statement in *Amerifactors* persuasive. The court in *Daisy* provided that "[w]hile Congress could have extended the prohibition to faxes no matter how they are received, it did not. So there is no indication from the statutory text that Congress sought to protect against the harm of wasted time spent reviewing faxes received by e-mail."

Sharfman, 2022 WL 18926792, at *5.

While not binding on this case, the courts in *Licari* and *Dental Equities* answered the *Chevron* deference question in the affirmative.

Id. at *6.

---

[8] Counsel of record for plaintiff in Sharfman was Ross M. Good of Loftus & Eisenberg, Ltd. and Ryan M. Kelly and Wallace C. Solberg of Anderson + Wanca.

The <u>undersigned</u> <u>finds</u> *Licari* and *Dental Equities*' <u>analyses</u> <u>are</u> <u>persuasive</u> <u>and</u> <u>recommends</u> <u>that</u> <u>the</u> <u>Court</u> <u>give</u> *Chevron* <u>deference</u> <u>to</u> <u>the</u> <u>Bureau's</u> <u>decision</u> <u>that</u> <u>online</u> <u>fax</u> <u>services</u> <u>are</u> <u>not</u> <u>covered</u> <u>by</u> <u>the</u> <u>TCPA</u>.

<u>Additionally,</u> <u>the</u> <u>undersigned</u> <u>agrees</u> <u>with</u> *Dental Equities*' <u>determination</u> <u>that</u> <u>even</u> <u>if</u> *Chevron* <u>deference</u> <u>does</u> <u>not</u> <u>apply,</u> *Amerifactors* <u>is</u> <u>still</u> <u>persuasive</u> "<u>based</u> <u>on</u> <u>a</u> <u>voluminous</u> <u>record,</u> <u>consistent</u> <u>with</u> <u>earlier</u> <u>and</u> <u>later</u> <u>pronouncements,</u> <u>and</u> <u>decided</u> <u>by</u> <u>the</u> <u>agency</u> <u>with</u> <u>the</u> <u>requisite</u> <u>expertise.</u>" *2021 WL 6105590, at\*8* (citing *Martin v. Soc. Sec. Admin., Comm'r, 903 F.3d 1154, 1159 (11th Cir. 2018)*).

<u>Id.</u> at \*7.

8.  **Daisy, Inc. v. Mobile Mini, Inc., 489 F. Supp. 3d 1287 (M.D. Fla. 2020) (*Chappell, J.*)** (cited in BTL's Dec. 14, 2023 Article III Motion to Dismiss (Dkt. 492) at 16, 19)[9]

> <u>Daisy,</u> <u>however,</u> <u>receives</u> <u>faxes</u> <u>through</u> <u>an</u> <u>online</u> <u>service</u> ("<u>Vonage</u>"). <u>Vonage</u> <u>acts</u> <u>as</u> <u>a</u> <u>sort</u> <u>of</u> <u>middleman,</u> <u>collecting</u> <u>then</u> <u>sending</u> <u>Daisy</u> <u>its</u> <u>faxes</u> <u>attached</u> <u>to</u> <u>e-mails</u>. The e-mail at issue read, "You have received a document. Sender's Caller ID: Restricted Date/Time: 12/18/2019 04:49:00 PM Number of Pages: 1." (Doc. 38-2 at 2).

<u>Daisy</u>, 489 F. Supp. 3d at 1289.

> Even so, the parties here agree on all the relevant jurisdictional facts, which are separate from the merits, and <u>simply</u> <u>dispute</u> <u>whether</u> <u>Daisy</u> <u>has</u> <u>Article</u> <u>III</u> <u>standing</u>. So the result here is the same under either standard: dismissal without prejudice because Daisy lacks standing.

<u>Id.</u> at 1291.

---

[9] Counsel of record for plaintiff in <u>Daisy</u> was Ross M. Good now of Loftus & Eisenberg, Ltd. and Ryan M. Kelly of Anderson + Wanca.

> Importantly, it is undisputed Daisy received the fax by e-mail, not a fax machine. That distinguishes this case from others where the Eleventh Circuit found concrete injuries based on plaintiffs' occupied fax machines and their lines or imposed printing costs. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1252-53 (11th Cir. 2015); Florence Endocrine Clinic, PLLC v. Arriva Med., LLC, 858 F.3d 1362, 1366 (11th Cir. 2017)*. Likewise, almost every junk fax case Daisy cites differs because such injuries were present. If this were a regular fax case (like those situations) Daisy would have standing.

Id. at 1292.

> Because Daisy cannot claim those injuries, it alleges only an intangible harm of wasted time. Specifically, a Daisy employee wasted one minute reviewing the fax, deciding it was junk, and dragging the e-mail to his spam folder. (Doc. 60).

Id.

> Given the absence of controlling precedent on standing, the Court turns to *Spokeo's* inquiry for intangible injuries. *Salcedo, 936 F.3d at 1168*. "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo, 136 S. Ct. at 1549*. Here, neither leans toward a concrete injury.

> Up first is history. Courts should "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. . . .

> Neither party attempts to draw analogies to common law causes of action, which *Spokeo* demands. Maybe it's because history knew no parallel for the harm of wasted time spent reviewing a junk fax received by e-mail. To explain why, the Court takes possible historical harms in three parts.

Id. at 1293-94.

> In short, Daisy's alleged harm for one minute of wasted time resembles no historical cause of action.

Id. at 1295.

> Again, the statute prohibits unwanted ads sent from a fax machine, computer, or other device to a fax machine. *47 U.S.C. § 227(b)(1)(C)*. While Congress could have extended that prohibition to faxes no matter how they are received, it did not. So there is no indication from the statutory text that Congress sought to protect against the harm of wasted time spent reviewing faxes received by e-mail.

Id.

> The legislative history similarly cuts against a concrete harm. As the Eleventh Circuit noted, "the TCPA's prohibition against sending unsolicited fax advertisements was intended to protect citizens from the loss of the use of their fax machines during the transmission of fax data." *Palm Beach, 781 F.3d at 1252*.

Id. at 1296.

> Having considered both history and congressional judgment, the Court concludes Daisy's alleged harm does not satisfy Article III's injury-in-fact requirement. Because Daisy has no standing, the Court lacks jurisdiction and must dismiss without prejudice. *Gardner, 962 F.3d at 1343 & n.11*.

Id. at 1296.

9.   **True Health Chiro. v. McKesson**, 2021 WL 4818945 (N.D. Cal. 2021), aff'd, **2023 WL 7015279 (9th Cir. 2023)**[10]

   a.   **Order To Show Cause (Dkt. 476), True Health v. McKesson**, No. 4:13-cv-02219 (N.D. Cal., Sept. 29, 2021)

In short, there is no TCPA liability for sending a fax to an online fax service. *See id.* The FCC's decision in *Amerifactors* is binding on this Court, as previously explained. *See Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 400 (9th Cir. 1996); Dkt. No. 393 at 9-11.

Id. at 3

Following *Amerifactors*, Defendants moved to decertify the class, arguing that it would require a fact-intensive inquiry on an individual basis to determine which members of the class received a fax on a telephone facsimile machine as opposed to via an online fax service. Dkt. No. 362. In response, Plaintiffs proposed a subpoena process that they represented would differentiate, on a class-wide basis, which class members received a fax on a stand-alone fax machine as opposed to via an online fax service.

Id.

In their continued representation of the Stand-Alone Fax Machine Class, Plaintiffs served 246 subpoenas on the class members' telecommunications services providers ("telephone carriers") to determine whether class members had received the faxes on a stand-alone fax machine. Dkt. No. 455 at 1 ("Offer of Proof").

Id. at 4.

---

[10] Counsel of record for plaintiffs True Health was Brian J. Wanca, Ryan M. Kelly and Glenn Hara of Anderson + Wanca and Ross M. Good now of Loftus & Eisenberg, Ltd.

> When the Court certified the Stand-Alone Fax Machine Class, the Court did so based on Plaintiffs' representation that their subpoena process would generate class-wide proof capable of showing which individuals received the faxes at issue on a stand-alone fax machine, as opposed to via an online fax service. After reviewing Plaintiffs' Offer of Proof, the Telephone Carrier Declarations, Defendants' Response, and the two declarations submitted by Defendants, Dkt. Nos. 470 and 471, the Court has substantial concerns regarding whether it is possible to determine, on a class-wide basis, which individuals received the faxes at issue on a stand-alone fax machine.

Id. at 5-6.

> *Amerifactors* has made the manner in which the faxes were received a critical element of TCPA liability, and, in the absence of class-wide proof, every class member would need to present evidence as to how they received the faxes. At this stage, this is the predominant issue.

Id. at 8.

### b.   Order Decertifying The Class - True Health v. McKesson, 2021 WL 4818945 (N.D. Cal. 2021)

> While Defendants sought decertification of the class after the *Amerifactors* ruling issued, *see* Dkt. No. 362, the Court gave Plaintiffs the opportunity to obtain class-wide proof sufficient to show how class members received the faxes at issue, *see* Dkt. No. 393. Plaintiffs returned with over 100 telephone carrier declarations, which Defendants supplemented with two additional telephone carrier declarations. *See* Dkt. Nos. 460, 465, 468, 469, 470, 471.  Telephone carriers who provided service to over 60% of the class members affirmatively say they have no way of knowing if the class member received faxes via a stand-alone fax machine or via an online fax service.  Defendants' Response at 4; *see* Dkt.

Nos. 460, 465, 468, 469, 470, 471; *see*, *e.g.*, Dkt. No. 460, Exhibit A Part 5 at 63 ("Comcast has no mechanism to determine whether its subscribers received faxes on a standalone fax machine or via online fax service."). Plaintiffs attempt to fill this evidentiary gap with a proffered expert who opines on general trends in online fax service usage, from which Plaintiffs then make assertions about the likelihood of particular individual consumer choices.

True Health, 2021 WL 4818945, *1.

Second, the individualized question of whether each class member received the faxes at issue on a stand-alone fax machine predominates over common questions. Plaintiffs argue that the predominance inquiry does not require that every possible issue in the case be capable of resolution via class-wide proof. *See* Plaintiffs' Response at 1-5. Plaintiffs miss the point. There can be no TCPA liability at all if the fax was received via an online fax service. *Amerifactors* at ¶ 8. Plaintiffs themselves proposed splitting the class into two subgroups: those that received the subject faxes "via a 'stand-alone' fax machine" and those that received the subject faxes "via an 'online fax service'." *See* Dkt. No. 372 at 10. As reflected by the class definitions, how the fax was received is a threshold requirement for TCPA liability. It is the central issue in this case.

Id. at *3.

The Court understands the desire of Plaintiffs (and their counsel) to resolve these claims via a class action lawsuit. However, *Amerifactors* changed the landscape for TCPA litigation, and under Ninth Circuit precedent, this Court must follow the FCC's interpretation. *See Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 400 (9th Cir. 1996); Dkt. No. 393 at 9-11. In the Court's view, whether *Amerifactors* in fact controls

> here is determinative of the viability of this case as a class action.

Id. at *3.

## 10. **Advanced Rehab and Medical, P.C. v. Amedisys Holding, LLC, 2020 WL 4937790 (W.D. Tenn. 2020)**[11]

> For these reasons, the FCC opined that "[t]he TCPA's definition of 'telephone facsimile machine' broadly applies to any equipment that has the capacity to send or receive text or images." *Id. at ¶ 201*. However, the *2003 Order* also "clarif[ied]" that the statute's prohibition "does not extend to facsimile messages sent as email over the Internet." *Id. at ¶ 200*.

Advanced Rehab, 2020 WL 4937790, at *1.

> In short, the CGAB interpreted "telephone facsimile machine" as not including the type of "online fax services" described in Amerifactors' petition.

Id. at *2.

> Based on the *Amerifactors* Ruling, Defendant seeks to modify the class definition in this case to exclude "any fax recipients who received any fax(es) via an online fax service."

Id. at *3.

> Plaintiff counters that the CGAB's ruling is not a "final order" subject to the Hobbs Act, since an application for review of the ruling is currently pending before the full Commission. (D.E. 91 at PageID 6569.)

Id.

---

[11] Counsel of record for plaintiff in Advanced Rehab was Brian J. Wanca and Ryan M. Kelly of Anderson + Wanca.

> Amedisys correctly points out that the TCPA is silent on the issue of "online fax services," as this term is not mentioned in the statute. "Silence, however, does not necessarily connote ambiguity, nor does it automatically mean that a court can proceed to *Chevron* step two." *Arangure v. Whitaker, 911 F.3d 333, 338 (6th Cir. 2015)*. At the same time, however, just because Congress defined one term in the statute does not mean that it has directly spoken to the precise question at issue.

Id. at *4.

> Further, given that online fax services were not developed until after the enactment of the TCPA, the Court concludes that Congress has not directly spoken to the precise question at issue.

Id. at *5.

> Thus, Plaintiff's assertion that the FCC and the CGAB lack authority to interpret the TCPA because Congress did not expressly delegate such authority is unconvincing.

Id. at *6.

> Moreover, consideration of the interpretive method used, the nature of the question at issue, and the *Barnhart* factors support the conclusion that Congress delegated the necessary authority in this case. The CGAB's interpretation is the result of notice-and-comment rulemaking. *See Amerifactors Ruling, 34 FCC Rcd. at 11951 ¶ 7 n.14* (citing *Consumer and Governmental Affairs Bureau Seeks Comment on Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling Under the Telephone Consumer Protection Act of 1991, CG Docket Nos. 02-278, 05-338, Public Notice, 32 FCC Rcd. 5667 (2017)*).

Id. at *7.

Accordingly, the Court concludes that Congress, at a minimum, implicitly delegated authority to the agency to interpret the provisions of the TCPA. And pursuant to its authority, the Commission delegated to the Bureau authority to engage in rulemaking and adjudication "in matters pertaining to consumers and governmental affairs." *47 C.F.R. § 0.141; see also 47 U.S.C. § 155(c)(1)* (empowering the FCC to "delegate any of its functions," with certain exceptions not relevant here). The CGAB, in turn, issued its interpretation in the exercise of its rulemaking authority. *See Amerifactors Ruling, 34 FCC Rcd. at 11954 ¶ 17* ("Ordering Clauses"). The Court therefore concludes that *Chevron* deference applies to the Bureau's interpretation.

Id.

Plaintiff also argues that *Chevron* deference should not apply to the Bureau's interpretation since it "completely ignored" and is "blatantly inconsistent with" the *2003 Order* and the *Westfax Ruling*. (D.E. 99 at PageID 6741–42.) The Court disagrees. "Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Brand X, 545 U.S. at 981, 125 S.Ct. 2688* (citation omitted). In *Amerifactors*, the CGAB specifically noted that the *Westfax Ruling* was not controlling since that decision had "assumed that the 'efax' in question was sent to a computer with an attached modem that had the capacity to print the fax." *Amerifactors Ruling, 34 FCC Rcd. at 11954 ¶ 15*. Moreover, the Bureau's interpretation is not inconsistent with the *2003 Order*. In the *2003 Order*, the FCC concluded that "computerized fax servers" and "personal computers equipped with, or attached to, modems" are equipment that fall within the statute's definition of a telephone facsimile machine; whereas in the *Amerifactors Ruling*, the Bureau determined that an "online fax service" itself is not such equipment.

Id. at *8.

48

> Since the agency's construction of the statute is reasonable,
> the Court is required to accept it. Accordingly, any fax(es)
> sent to an online fax service is not "an unsolicited facsimile
> advertisement" prohibited by the TCPA.

Id.

> For the reasons provided above, the Court GRANTS
> Defendant's motion to modify the class definition to exclude
> any fax recipients who received any fax(es) via an "online fax
> service," as described in the *Amerifactors Ruling*.

Id.

**11.    Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory
        Care, Inc., 340 F.R.D. 383 (N.D. Cal. 2021)**

> An independent ground that defeats predominance is the
> question of whether each fax recipient used a standalone fax
> machine or an online fax service. Only those who receive
> faxes on standalone fax machine have a cognizable TCPA
> claim. Another court in this district recently decertified a class
> because, after hearing from 100 major telephone companies
> on this issue, it concluded that it is impossible to determine
> on a class-wide basis whether recipients received the fax on a
> standalone fax machine. *True Health Chiropractic Inc. v.
> McKesson Corp., No. 13-cv-02219, 2021 WL 4818945, at *1-
> 3 (N.D. Cal. Oct. 15, 2021)*. So it is here.

Jeffrey Katz Chiro., 340 F.R.D. at 389.

> A "final order" is one that is not "merely tentative or
> interlocutory" and is "one by which rights or obligations have
> been determined, or from which legal consequences will
> flow." *US W. Commc'ns, Inc. v. Hamilton, 224 F.3d 1049,
> 1054–55 (9th Cir. 2000), as amended on reh'g (Sept. 13,
> 2000)* (citation and quotation omitted). The complaint in this
> case seeks the remedy for a viable TCPA claim—precisely
> the relief foreclosed by *Amerifactors*. And the *Amerifactors*
> decision is clearly final: it is not tentative and it determines
> rights and obligations under the TCPA. *See True Health
> Chiropractic, 2021 WL 4818945, at *1*.

Id.

> But *True Health* teaches that any common answer to this question is indeterminate at any stage, even after a year of subpoenas, declarations, and expert testimony. Nor is this the sort of issue that can be determined easily at the claims phase.

Id. at 390.

## G.    Other Decisions

### 1.    Lyngaas v. Curaden AG, 992 F.3d 412 (6th Cir. 2021)[12]

#### a.    Majority Opinion

> For the sake of completeness on this issue, we note our awareness that the Bureau issued a declaratory ruling in December 2019 that efaxes sent through an "online fax service" are not covered by the TCPA. *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling, CG Docket Nos. 02-278, 05-338, 2019 WL 6712128, *1, *3 ¶¶ 2, 11 (Dec. 19, 2019)*. But an application for review of the Bureau's ruling is currently pending before the FCC, *see Applicant Career Counseling Services, Inc.'s Application for Review, CG Docket Nos. 02-278, 05-338 (Jan. 8, 2020)*, the *Amerifactors* ruling is not mentioned by either party, and the ruling in any event would have no bearing on the case before us because the operative facts here took place more than three years earlier[.]

Lyngaas, 992 F.3d at 427.

#### b.    Dissent Of Judge Thapar

> The Telephone Consumer Protection Act makes it illegal (with certain exceptions) "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." *47 U.S.C. § 227(b) (1)(C)*. The district court and majority conclude that this prohibition

---

[12] Counsel of record for plaintiff in Lyngaas was David M. Oppenheim of Bock, Hatch & Oppenheim, LLC.

applies to e-faxes sent to computers because, in their view, the term "telephone facsimile machine" encompasses computers. I disagree.

The statute defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id. § 227(a)(3)*. A computer, on its own, does not have the capacity to do either. You need to hook it up to extra equipment first—a printer or a scanner.

So does a computer fall under the statutory definition? At first glance, it doesn't look like it—a fax sent to a computer is not a fax sent to equipment with the capacity to scan or print.

And there's another clue in the statute. Recall that the TCPA makes it illegal to use a "telephone facsimile machine" or a "computer" to send an unsolicited advertisement "to a telephone facsimile machine." *Id. § 227(b)(1)(C)*. Congress expressly included computers alongside "telephone facsimile machine[s]" in the (broad and open-ended) list of sender devices. But it omitted computers from the list of receiver devices.

Id. at 445.

Given this distinction, we cannot read "telephone facsimile machine" to encompass computers without creating two interpretive problems. First, "[w]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)*. Here, the difference

occurred not across sections, but in different parts of the same sentence. So if we can assume that Congress remembered what it said in the first half of the sentence by the time it got to the second, we can take it that the omission of "computer" in the second half was no accident. Second, our job is to "give effect to each word" in the statute. *Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp., 654 F.3d 654, 657 (6th Cir. 2011)* (cleaned up). If "telephone facsimile machine" included "computers," Congress would not have listed them separately.

In my view, understanding a "computer" to be a "telephone facsimile machine" conflicts with the statutory definition, the syntax of the relevant provision, and the common understanding of both terms.

Id. at 445-56.

### 2.   In re: Advanced Rehab and Medical, P.C., 2021 WL 3533492 (6th Cir. 2021) (addressing Lyngaas)[13]

Advanced Rehab asserts that our decision in *Lyngaas* holds that the *Amerifactors Ruling* is not retroactive. We are not so sure. *See Lyngaas, 2021 WL 1115870, at \*10* (noting "[f]or the sake of completeness" that the *Amerifactors Ruling* was "not mentioned by either party," and that "the ruling in any event would have no bearing on the case" because the facts "took place more than three years earlier")[.]

In re: Advanced Rehab, 2021 WL 3533492, at \*2.

---

[13] Counsel of record for petitioner in In re: Advanced Rehab was Glenn L. Hara of Anderson + Wanca.

3.   **<u>Ambassador Animal Hospital, Ltd. v. Hill's Pet Nutrition,</u>**
     **<u>Inc.</u>, 2021 WL 3043422 (N.D. Ill. 2021)**[14]In its opening brief,
     Hill's argues that the Bureau's decision is binding on this
     Court. But as Ambassador points out in its brief, a court in this
     district recently held that it is not binding because it was issued
     by "a subordinate unit of the FCC," and an application for
     review by the full FCC is pending. *See Mussat v. IQVIA Inc.,*
     *2020 WL 5994468, at *3 (N.D. Ill. Oct. 9, 2020).*

     <u>Ambassador Animal Hosp.</u>, 2021 WL 3043422, at *1.

4.   **<u>Mussat v. IQVIA Inc.</u>, 2020 WL 5994468 (N.D. Ill. 2020)**

     <u>However, Mussat argues that the court is only "bound to</u>
     <u>follow the FCC's interpretation of a term" where "there is no</u>
     appeal of the FCC's interpretation." *Physicians*
     *Healthsource, Inc. v. A-S Medication Sols., LLC, 950 F.3d*
     *959, 965 (7th Cir. 2020); see also Blow v. Bijora, Inc., 855*
     *F.3d 793, 802 (7th Cir. 2017)* ("[A]bsent a direct appeal to
     review the 2015 FCC Order's interpretation . . . we are bound
     to follow it."). IQVIA disagrees, arguing that until and unless
     the order is reversed, it has the force of law. It cites *Scoma*
     *Chiropractic, P.A. v. Dental Equities, LLC, No. 2:16-cv-*
     *00041, 2018 WL 2455301 (M.D. Fla. June 1, 2018)*, another
     case Mussat is involved in. There, the court stayed the action
     pending a ruling from the FCC on the *Amerifactors* petition
     (the petition that resulted in the Dec. 9, 2019 declaratory
     ruling). *Id.* at *4. The court rejected an argument that the stay
     would have to extend through subsequent judicial review, and
     stated that until the D.C. Circuit ruled, "the FCC's Final
     Order" would have "the force of law" and the "case could
     proceed."

     <u>Mussat</u>, 2020 WL 5994468, *3.

---

[14] Counsel of record for plaintiff in <u>Ambassador Animal Hospital</u> was David M.
Oppenheim, Molly E. Stemper, Jonathan B. Piper and Phillip A. Bock of Bock Law Firm.

But the court does not need to decide whether a final FCC order would have the force of law pending judicial review. The declaratory ruling was issued by the Consumer and Governmental Affairs Bureau, not the full Commission, and an application for review by the full FCC was filed.

Id.

Nor does the court address Mussat's argument that under Seventh Circuit precedent and the FCC's previous decisions an online fax service may constitute a "telephone facsimile machine" within the meaning of the TPCA. The court need not address this issue now to conclude that IQVIA has not carried its burden of showing that the proposed amendment is futile. The parties are free to raise this issue again later as well.

Id.

## II.    BTL'S OBJECTION TO THE SETTLEMENT ADMINISTRATOR'S FINAL CLAIMS REPORT (DKT. 490) / ASCERTAINABILITY

### A.    **Mullins v. Direct Digital, LLC**, 795 F.3d 654 (7th Cir. 2015) (cited with approval in Plaintiffs' December 29, 2023 Reply in Support of Motion for Final Approval (Dkt. 508) at 10, 12-13)

> Again, this concern about the danger of fraudulent or mistaken claims is <u>legitimate</u> and <u>understandable</u>, <u>especially</u> <u>when</u> <u>contemplating</u> <u>the</u> <u>prospect</u> <u>that</u> <u>money</u> <u>might</u> <u>seem</u> <u>available</u> <u>just</u> <u>for</u> <u>the</u> <u>asking</u>. In the words of then-future President John Adams, "<u>it</u> <u>is</u> <u>prudent</u> <u>not</u> <u>to</u> <u>put</u> <u>virtue</u> <u>to</u> <u>too</u> <u>serious</u> <u>a</u> <u>test</u>." 2 John Adams, *The Works of John Adams, Second President of the United States: Diary, with A Life of the Author, Notes & Illustrations* 457 (Charles Francis Adams ed. 1850) (during 1775 debate on whether to open ports for trade and the need for customs officials to regulate the ports).

<u>Mullins</u>, 795 F.3d at 666.

> We recognize that the risk of mistaken or fraudulent claims is not zero. But courts are not without tools to combat this problem during the claims administration process. They can rely, as they have for decades, on <u>claim</u> <u>administrators</u>, <u>various</u> <u>auditing</u> <u>processes</u>, <u>sampling</u> <u>for</u> <u>fraud</u> <u>detection</u>, <u>follow-up</u> <u>notices</u> <u>to</u> <u>explain</u> <u>the</u> <u>claims</u> <u>process</u>, and <u>other</u> <u>techniques</u> <u>tailored</u> <u>by</u> <u>the</u> <u>parties</u> <u>and</u> <u>the</u> <u>court</u> <u>to</u> <u>take</u> <u>into</u> <u>account</u> <u>the</u> <u>size</u> <u>of</u> <u>the</u> <u>claims</u>, <u>the</u> <u>cost</u> <u>of</u> <u>the</u> <u>techniques</u>, <u>and</u> <u>an</u> <u>empirical</u> <u>assessment</u> <u>of</u> <u>the</u> <u>likelihood</u> <u>of</u> <u>fraud</u> <u>or</u> <u>inaccuracy</u>.

<u>Id.</u> at 667.

> In the face of such empirical uncertainty, a district judge has discretion to say <u>let's</u> <u>wait</u> <u>until</u> <u>we</u> <u>know</u> <u>more</u> <u>and</u> <u>see</u> <u>how</u> <u>big</u> <u>a</u> <u>problem</u> <u>this</u> <u>turns</u> <u>out</u> <u>to</u> <u>be</u>.

<u>Id.</u> at 668.

> As long as the defendant is given the <u>opportunity</u> <u>to</u> <u>challenge</u> <u>each</u> <u>class</u> <u>member's</u> <u>claim</u> to recovery during the damages phase, the defendant's due process rights are protected.

<u>Id.</u> at 671.

> A defendant has a <u>due process right</u> to challenge the plaintiffs' evidence at <u>any</u> stage of the case, including the claims or damages stage.

<u>Id.</u> at 669.

> <u>In addition, a district judge has discretion to (and we think normally should) wait and see how serious the problem may turn out to be after settlement or judgment,</u> when much more may be known about available records, response rates, and other relevant factors. <u>And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.</u>

<u>Id.</u> at 664.

## B.   Other Cases Addressing The Limitations Of Self-Attestation

### 1.   <u>Wilson v. Badcock</u>, 329 F.R.D. 454 (M.D. Fla. 2018)

> Plaintiff also assures the Court that any discrepancies will be worked out by a subsequent self-attestation process of mailing notices and claim forms to the matched names and addresses, but the Court is skeptical. First, such a step ignores the very purpose of ascertainment and will, in any event, require an individualized inquiry. <u>Secondly, while an affidavit certifying inclusion in a class might be appropriate in some cases where damages for an individual claimant are negligible,</u> *see e.g., Mullins v. Direct Digital, LLC, 795 F.3d 654, 667 (7th Cir. 2015),* <u>here Defendant could face up to $1500 per call. This amount is relevant both as an incentive for individuals to improperly enter the class and, as discussed more fully below, a danger that impacts due process protections for Defendant.</u>

<u>Wilson</u>, 329 F.R.D. at 458.

### 2. <u>Xavier v. Philip Morris</u>, 787 F. Supp. 2d 1075 (N.D. Cal. 2021)

> *Third,* plaintiffs suggest inviting potential class members to submit affidavits attesting to their belief that they have smoked 146,000 Marlboro cigarettes. Such affidavits would be unreliable for several reasons, one of which is the subjective memory problem described above. Swearing "I smoked 146,000 Marlboro cigarettes" is categorically different from swearing "I have been to Paris, France," or "I am Jewish," or even "I was within ten miles of the toxic explosion on the day it happened." <u>The memory problem is compounded by incentives individuals would have to associate with a successful class or dissociate from an unsuccessful one</u>. Plaintiffs argue that individuals "have little reason to lie given the lack of pecuniary gain" (Reply Br. 2), but this order finds to the contrary. For example, long-term smokers of other cigarette brands and long-term smokers who have smoked fewer than 146,000 cigarettes may desire medical monitoring and be tempted to free-ride on relief granted in this action. At trial, Philip Morris will be able to cross-examine Xavier and Franklin regarding their smoking histories. If absent class members are permitted to testify to *their* smoking histories by way of affidavit, on the other hand, Philip Morris would be forced to accept their estimates without the benefit of cross-examination. Such a procedure would not be proper or just.

<u>Xavier</u>, 787 F. Supp. 2d at 1090.

### 3. <u>Hunter v. Time Warner</u>, 2019 WL 3812063 (S.D.N.Y. 2019)

> Furthermore, <u>Time Warner would have a due process right to challenge the veracity of those affidavits at trial</u>. *See In re Asacol Antitrust Litig., 907 F.3d 42, 53 (1st Cir. 2018); Gordon v. Caribbean Cruise Line, Inc., No. 14 Civ. 5848, 2019 WL 498937, at \*11 (N.D. Ill. Feb. 8, 2019).* <u>And in light of the concerns about the accuracy of such affidavits, the Court would reasonably expect those challenges to be abundant</u>. Consequently, the use of self-identification affidavits would not forestall individualized inquiry regarding

when reassignment may have occurred and whether putative members indeed received wrong-number calls.

<u>Hunter</u>, 2019 WL 3812063, at *14.

4.  **<u>Karhu v. Vital Pharmaceuticals, Inc.,</u> 621 Fed. Appx. 945 (11th Cir. 2015), <u>superseded</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Cherry v. Dometic Corp.,</u> 986 F.3d 1296 (11th Cir. 2021)**

The potential problems with self-identification-based ascertainment are intertwined. On the one hand, allowing class members to self-identify without affording defendants the opportunity to challenge class membership "provide[s] inadequate procedural protection to . . . [d]efendant[s]" and "implicate[s their] due process rights."

<u>Karhu</u>, 621 Fed. Appx. at 948.

On the other hand, protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a "series of mini-trials just to evaluate the threshold issue of which [persons] are class members." *Fisher, 238 F.R.D. at 302; see also Perez, 218 F.R.D. at 269* ("[I]ndividualized mini-trials would be required even on the limited issue of class membership."). A plaintiff proposing ascertainment via self-identification, then, must establish how the self-identification method proposed will avoid the potential problems just described.

<u>Id.</u> at 948-49.

In *Allapattah [333 F.3d 1248]*, we held that defendants do have a due-process right to contest individual class members' claims *during postverdict claim distribution*, at least when total liability has not already been established and the defendants' defenses might affect such liability.

<u>Id.</u> at 949 n.3.

### C.   Plaintiffs' Position On The Intended Purpose Of The Reverse Lookups / Ascertainability

> Class Counsel have said that the only purpose of the reverse lookup was to facilitate notice, not to ascertain the identities of Settlement Class Members.  See, e.g., BTL's Mot. to Compel (Dkt. 458) at 30 n.31.  It is somewhat difficult to understand how or why the notice process could or should be divorced from the identification of the members of the Settlement Class (and perhaps that would be a partial explanation for the many problems encountered during the notice program and claims process), but it is in any event clear Class Counsel are not relying on the reverse lookups to satisfy their burden on ascertainability and they have so stipulated.  See id.  As a result of that stipulation, BTL made no further effort to seek discovery on the reverse lookup process utilized by Epiq as well as the accuracy of the information relied upon.  See BTL's Am. Proposed Timeline (Dkt. 419) at 4-6 (BTL initially proposing discovery to address issue of ascertainability).

BTL's Dec. 15, 2023 Response to Plaintiffs' Motion for Final Approval (Dkt. 496) at 15 n.13.

> Notably, Class Counsel also confirmed during the meet and confer process that they were no longer taking the position that the reverse lookup process or the results obtained therefrom were intended to identify or capable of identifying members of the Settlement Class.  See Slater Decl. ¶ 19.  Instead, the reverse lookup process in the view of Class Counsel was only intended to identify who should receive Mailed Notice.  See id.  We note this issue now, because Class Counsel previously indicated that confirmatory discovery by BTL would not be necessary on the reverse lookup process and the ascertainability issue, since Class Counsel only intended to rely upon what is already in the record, as no other evidence suggesting that the Settlement Class is ascertainable has ever been provided or identified by Class Counsel.  See Sept. 29, 2022 Email fr. R. Good, Ex. 20 hereto.  At that time, BTL raised the need to take further discovery from TransUnion and/or LexisNexis, but now that Class Counsel have confirmed they will not rely on the reverse lookups performed by those two entities to address ascertainability or determine who is and is not in the class, that will no longer be necessary, and BTL is accordingly noting in this submission and to

the Court that it is relying on the representation of Class Counsel in electing to not further pursue confirmatory discovery on the reverse lookups for purposes of the ascertainability issue itself.  See BTL's Amended Proposed Timeline (Dkt. 419) (providing for confirmatory discovery in its proposed schedule).

BTL's June 16, 2023 Motion to Compel Compliance with Section VIII of the Settlement Agreement (Dkt. 454 / 458) (*filed under seal*) at 30 n.31.

**D.  Settlement Agreement (Dkt. 324-1)**

**1.  Notice**

Within ten (10) Days of the Preliminary Approval Date, the Parties shall provide to the Settlement Administrator records identifying the fax numbers to which the facsimile advertisements offering tickets for Tampa Bay Buccaneer games were allegedly sent.  The Settlement Administrator will then use these records to determine the mailing addresses for as many members of the Settlement Class as possible. The Parties will work cooperatively with the Settlement Administrator to mutually agree upon the most practicable and reasonable methods under the circumstances by which the addresses of the members of the Settlement Class can be derived in an efficient and reasonable manner. The mailing addresses will be updated with the National Change of Address Database maintained by the United States Postal Service before mailing.

Settlement Agt. (Dkt. 324-1) at § VII.D.

The Parties agree that the Court will decide whether either (or both) of the following two additional notice methods shall be undertaken, to the extent the identity and mailing address of absent Class Members cannot be reasonably determined in a manner consistent with existing requirements for notice in the class context from the reverse-lookup process to be undertaken by the Settlement Administrator using records identifying the fax numbers:  (1) send notice to those absent class members for whom names and addresses were not

60

> obtained at the fax numbers contained in the Biggerstaff fax number database; and/or (2) cause to be published a "Publication Notice" referring to the Settlement Website in one-quarter page advertisements on two consecutive Sundays in the Tampa Bay Times, the Sarasota Herald Tribune, and the Gainesville Sun.

Settlement Agt. (Dkt. 324-1) at § VII.G.

2.    **Settlement Administration**

a.    **BTL's Audit Rights**

> The Settlement Administrator shall be responsible for reviewing <u>all</u> <u>claims</u> to determine their <u>validity</u>.

Settlement Agt. (Dkt. 324-1) at § VIII.C.

> <u>BTL</u> <u>shall</u> <u>have</u> <u>the</u> <u>right</u> <u>to</u> <u>audit</u> <u>Claim</u> <u>Forms</u> <u>for</u> <u>validity</u> <u>and</u> <u>fraud</u>.  In the event BTL determines that a Claim Form is invalid or fraudulent and should be rejected, it shall bring that to the attention of Class Counsel, and the Parties shall meet and confer and attempt, in good faith, to resolve any dispute regarding the rejected claim.

Settlement Agt. (Dkt. 324-1) at § VIII.E.

> <u>At</u> <u>any</u> <u>time</u> <u>during</u> <u>the</u> <u>claims</u> <u>process,</u> <u>if</u> <u>the</u> <u>Settlement</u> <u>Administrator</u> <u>has</u> <u>a</u> <u>reasonable</u> <u>suspicion</u> <u>of</u> <u>fraud,</u> <u>the</u> <u>Settlement</u> <u>Administrator</u> <u>shall</u> <u>immediately</u> <u>notify</u> <u>both</u> <u>Class</u> <u>Counsel</u> <u>and</u> <u>BTL</u> <u>Counsel</u> of that fact and the basis for its suspicion.  Class Counsel and BTL Counsel shall endeavor to reach an agreed-upon solution to any suspected fraud and, if necessary, the Settlement Administrator may suspend the claims process, and the Parties will then promptly seek assistance from the Court.

Settlement Agt. (Dkt. 324-1) at § VIII.F.

b.    **Other Provisions**

**No Admission**.  Neither this Settlement Agreement nor any of its provisions, its exhibits or related documents (including but not limited to drafts of the Settlement Agreement, the Preliminary Approval Order or the Final Order and Judgment), its negotiation or any proceedings relating in any way to the Settlement shall be construed as or deemed to be evidence of an admission or concession by any person, including BTL, and shall not be offered or received in evidence, or subject to discovery, in this or any other action or proceeding except in an action brought to enforce its terms or except as may be required by law or Court order.  The provisions of this Paragraph shall become effective when this Settlement Agreement has been signed by the Parties and shall be binding on the Parties and their counsel regardless of whether the Settlement Agreement is approved by this Court or any other court and regardless of whether the Settlement Agreement is otherwise rendered null and void.

Settlement Agt. (Dkt. 324-1) at § XV.H.

Date:  January 3, 2024

Respectfully submitted,

/s/ Mark S. Mester
Mark S. Mester, One of the Attorneys for Defendant Buccaneers Team LLC

Mark S. Mester
 (admitted *pro hac vice*)
Robert C. Collins III
 (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
         robert.collins@lw.com

Joseph H. Varner, III
 (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  January 3, 2024            */s/ Mark S. Mester*
                                         Mark S. Mester
                                           (admitted *pro hac vice*)
                                         LATHAM & WATKINS LLP
                                         330 North Wabash Avenue, Suite 2800
                                         Chicago, Illinois 60611
                                         Telephone:  (312) 876-7700
                                         Facsimile:  (312) 993-9767
                                         E-mail:  mark.mester@lw.com