# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BUCCANEERS LIMITED )<br>PARTNERSHIP and JOHN DOES )<br>1-10, )<br>)<br>Defendants, )<br>_____ )<br>)<br>TECHNOLOGY TRAINING )<br>ASSOCIATES, INC., et al., )<br>)<br>Intervenors. ) | Case No. 8:13-cv-01592-AEP<br><br>**Magistrate Judge<br>Anthony E. Porcelli** |

## MOTION TO DENY AS MOOT
## THE MOTION OF ASTRO COMPANIES, LLC
## TO OPT OUT OF THE SETTLEMENT CLASS

Date:  January 18, 2024

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
         robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

Defendant Buccaneers Team LLC ("BTL") hereby moves the Court to deny as moot, in light of the submission by Astro Companies, LLC ("Astro") on January 16, 2024 of the affidavit of Mike Ray (Dkt. 522), the December 22, 2023 motion in which Astro sought leave to opt-out of the Settlement Class:[1]

## I. DISCUSSION

1. Given the affidavit from Mr. Ray that was submitted by Astro on January 16, 2024, Astro's motion for leave to opt out of the Settlement Class should be denied as moot, because Astro is not and by all accounts has never been a Settlement Class Member and because Astro would lack Article III standing in any event. See disc. infra at 2-6.

### A. Factual Background

2. At the January 4, 2024 hearing, the Court directed Astro to file a notice and declaration addressing (1) whether the numbers listed on Astro's Claim Form were ever utilized or intended to be utilized for subscribers of Astro's fax service and (2) if the numbers listed on Astro's Claim Form were utilized for Astro's business purposes, what purposes were they utilized for. See Jan. 4, 2024 Hr'g Tr. Excerpts, Ex. 1 hereto, at 67:16-68:2.[2]

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval. See Settlement Agt. (Dkt. 324-1). In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

[2] The specific questions asked of Astro by the Court were as follows:

> Mr. VanEtten, I'm going to require -- before I finalize my order on allowing the opt-out, I want another affidavit and submission that provides the detail and response to my questions so I have a better understanding exactly what these numbers were utilized for, and let me reiterate those questions.
>
> The first is, the numbers that have been claimed, were these numbers ever intended or ever utilized to be subscribed to customers for a customer's use as facsimile or any other use? And, two, during the relevant time period, if these numbers were utilized for Astro's business purposes, what purposes were they being utilized for?

Jan. 4, 2024 Hr'g Tr. Excerpts, Ex. 1, at 67:16-68:2.

3. On January 16, 2024, Astro filed its notice and the Affidavit of Mike Ray (the "Ray Affidavit"). See Notice (Dkt. 522); Ray Affidavit (Dkt. 522-1). Mr. Ray responded to the Court's first question by stating that "our records indicate that these numbers were not issued to our subscribers on or around the time that the disputed facsimiles were received" and that Astro had not "knowingly submitted any numbers which were active for any subscriber during the subject time as best reflected by [its] records." Ray Aff. (Dkt. 522-1) ¶ 5. But see Final Claims Report (Dkt. 490-20) (Claim No. 103474 making a claim for same number as Astro).

4. Mr. Ray responded to the Court's second question by stating that "Astro maintained and continues to maintain spare telephone numbers in each distinct geographic area in which it provides service, so that its customers (new or existing) can instantly activate or augment service in its systems when desired without waiting for Astro to acquire and activate telephone numbers for the service." Ray Aff. (Dkt. 522-1) ¶ 6.³

5. Respectfully, the Ray Affidavit fails to fully answer the specific questions that the Court asked, and in some sense, it raises more questions than it answers. The Ray Affidavit, however, appears to confirm that Astro is not and never has been a member of the Settlement Class and that even if it were, Astro would nonetheless lack standing under Article III. See Ray Aff. (Dkt. 522-1) at passim.⁴

---

³ This case, of course, is limited to the Tampa area, and we do not know what other areas Astro provides numbers for nor do we know what percentage of the "spare" numbers Astro claims to have maintained were maintained for the Tampa area.

⁴ As part of the meet and confer process, we tried to obtain additional information from Astro's counsel throughout this process. See, e.g., Dec. 26, 2023 Email to D. VanEtten, Ex. 2 hereto; Dec. 28, 2023 Email to D. VanEtten, Ex. 3 hereto; Jan. 3, 2024 Email to D. VanEtten, Ex. 4 hereto; Jan. 6, 2024 Email to D. VanEtten, Ex. 5 hereto. Without exception, however, those emails and our calls went unanswered. Likewise, we asked Class Counsel to advise when they first communicated with Astro's counsel and the dates of all subsequent communications. See Jan. 12, 2024 Email to

6.  More specifically, the Ray Affidavit suggests that none of the 780 numbers on the Biggerstaff list that were claimed by Astro were held by Astro for its internal business purposes. See Ray Aff. (Dkt. 522-1) ¶ 6. And there is no indication that Astro itself used these lines to send or receive faxes.[5] See id.

### B. Guidance From The FCC

7.  The FCC, however, has determined that fax service providers like Astro are not the "intended recipients" of faxes under the TCPA and do not have standing. See In re Westfax, 2015 WL 5120880, ¶ 12 (F.C.C. Aug. 28, 2015); In re Amerifactors, 2019 WL 6712128, ¶ 8 (F.C.C. Dec. 9, 2019).

8.  In 2015, the FCC issued Westfax to address the role of fax service providers. See Westfax, 2015 WL 5120880, ¶ 4. An "efax" was described in the 2015 declaratory ruling in Westfax as "a facsimile transmission" that is "received

---

R. Good, et al., Ex. 6 hereto. Mr. Addison promptly responded on his own behalf, but we have never received a response from either Mr. Hara or Mr. Good regarding their communications with Astro's counsel. See Jan. 14, 2024 Email fr. M. Addison, Ex. 7 hereto.

[5] Astro's contention at the January 4, 2024 hearing in support of its belated opt-out request that Rule 23 purportedly provides a secondary opt-out period is also incorrect. The provision on which Astro relies, Rule 23(e)(4) (originally codified as Rule 23(e)(3)), only applies to situations in which a Rule 23(b)(3) litigation class had already been certified and a settlement was reached after the opt-out period for the previously-certified class had passed. See Fed. R. Civ. P. 23(e)(3) advisory committee's notes to 2003 amendment ("Rule 23(e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice."); see also 2 McLaughlin on Class Actions § 6.21 (20th ed. 2023) ("Of course, a second opt-out has no applicability when a settlement agreement is submitted to the court simultaneously with a request that a class be certified."). Furthermore, courts have refused to grant second opt-out periods as a matter of course, even in situations in which settlement terms change after the expiration of the opt-out period. See, e.g., Denney v. Deutsche Bank, 443 F.3d 253, 271 (2d Cir. 2006) ("Neither due process nor Rule 23(e)(3) [now (e)(4)] requires . . . a second opt-out period whenever the final terms change after the initial opt-out period. Requiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached."); see also In re Prudential Ins., 177 F.R.D. 216, 241 (D.N.J. 1997) (holding late opt-out was not due to "excusable neglect" where class member had mistaken understanding of whether settlement covered their claims).

on a fax server" and then is "converted to email" by that fax server and sent to the intended "recipient" as an "attachment to an email message." See id. The Westfax ruling further clarified that "it is the consumer to whom the content of a fax or efax is directed that is the 'recipient' under the TCPA" and that the "company with the fax server that converts the fax into an email" is not the "recipient." See id. ¶ 12.

9. The declaratory ruling in Amerifactors, issued in December of 2019, then provided further clarification of the role of fax service providers like Astro. See Amerifactors, 2019 WL 6712128, ¶¶ 8-13. The question presented in Amerifactors was whether faxes sent to a fax service were faxes sent to "telephone facsimile machines" within the meaning of the TCPA, with the FCC concluding they are not, because a fax received by a fax service is "effectively an email." See id. ¶ 11. In making its ruling, however, the FCC made clear that "Congress did not intend the statute's prohibition to apply to faxes sent to equipment other than a telephone facsimile machine." See id. ¶ 10.

10. On the issue of telephone facsimile machines, Amerifactors states as follows:

> By contrast, the record here confirms that online fax services hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired. <u>Faxes sent to online fax services use paper and ink only when the recipient *chooses* to print it using their own separately provided equipment. Neither is Congress' concern about junk faxes occupying the recipient's fax machine so it is unavailable for other transmissions an issue with online fax services</u>. These services can handle multiple simultaneous incoming transmissions and thus receipt of any one fax does not render the service unavailable for others. <u>In short, online fax services differ in critical ways from the traditional faxes sent to telephone facsimile machines Congress addressed in the TCPA. These faxes are more accurately characterized as faxes sent to a "computer" or "other device," and not a "telephone facsimile machine."</u>

4

Amerifactors, 2019 WL 6712128, ¶ 13; see also In re Ryerson, 2020 WL 5362216, ¶¶ 11-12 (F.C.C. Sept. 4, 2020) ("[T]o the extent an unsolicited facsimile advertisement is sent to an online service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper,' the service is not a 'telephone facsimile machine' and is thus outside the scope of the statutory prohibition.").[6]

11. Further elaborating on the role of fax services like Astro and whether they implicate the harms Congress sought to address such that either the services themselves or the subscribers who receive faxes as emails would have standing under Article III, Amerifactors states as follows:

> What is more, we agree with commenters that faxes sent to online fax services do not cause the specific harms to consumers Congress sought to address in the TCPA. The House Report on the TCPA makes clear that the facsimile provisions of the statute were intended to curb two specific harms: "First, [a fax advertisement] shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." The record is clear that faxes sent to online fax services do not pose these harms and, in fact give consumers tools such as blocking capabilities to control these costs. Specifically, we find that the advertiser cost-shifting that Congress sought to prevent, such as the use of a

---

[6] This last point addresses the dichotomy in the TCPA and noted by the FCC and numerous courts between devices that send and receive faxes, with the former being specified in the TCPA as telephone facsimile machines and "computer[s], or other device[s]," whereas devices that receive faxes are limited to "telephone facsimile machines" only. See 47 U.S.C. § 227(b)(1)(C); see also Scoma Chiro. v. Nat'l Spine, 2022 WL 16695130, *8 (M.D. Fla. 2022) ("[W]hile Congress 'made clear that the proscription applies when such a fax is sent from' devices other than a telephone facsimile machine, Congress expressly narrowed the equipment to which it is prohibited to send an unsolicited fax.") (emphasis in original); Licari v. Eclinical Works, 2021 WL 4506405, *7 (M.D. Fla. 2021) (noting the elements of a TCPA claim include that "the defendant sent the fax to a telephone facsimile machine using a telephone facsimile machine, computer, or other device"); Sharfman v. Infucare, 2022 WL 18926792, *6 (M.D. Fla. 2022) (noting the FCC "concluded that faxes received via an online fax service 'are more accurately characterized as faxes sent to a 'computer' or 'other device' and not a 'telephone facsimile machine'"), R&R adopted, 2023 WL 2624754 (M.D. Fla. 2023).

recipient's paper and ink, is not a factor with online fax services. The House Report on the TCPA explained in 1991 that fax machines were "designed to accept, process, and print all messages which arrive over their dedicated lines."

Amerifactors, 2019 WL 6712128, ¶ 12.

### C. Earlier Rulings By The Court

12. It was in recognition of the role of fax service providers and of the fact that they do not have standing that the Settlement Administrator was directed to identify as best it could fax service providers on the Biggerstaff list and the list of persons and entities that submitted claims to the Settlement Administrator. See Order (Dkt. 475) at 11.

13. The Settlement Administrator, in turn, identified Astro as a fax service provider, and the question then became whether any of the telephone lines claimed by Astro were lines that were used by Astro for its own internal business purposes as opposed to being used by or intended for use by subscribers. See Astro's Resp. to Req. for Add'l Info. (Dkt. 486-5) ¶ 5; Jan. 4, 2024 Hr'g Tr. Excerpts, Ex. 1, at 52:2-53:11. Our understanding was and is that if any of the lines claimed by Astro were used by it to send and receive faxes where Astro was the intended recipient and where the fax was received on a "telephone facsimile machine" as opposed to a fax server or other device, then Astro would be a Settlement Class Member vis-à-vis those lines and would have standing under the TCPA, the Settlement and Article III for those lines. See BTL's Resp. to Astro's Mot. to Opt Out (Dkt. 511) at 13 n.8.[7]

---

[7] More specifically, what we said in an earlier submission is as follows, and we understand this to be the focus of what the Court intended to have clarified in the Ray Affidavit:

> We understand Astro to be a fax service provider like Westfax, but as noted and as Intervenors pointed out in their December 15, 2023 submission (Dkt. 497), it is also possible that Astro had a few fax lines that were used for its own internal business use and that were not assigned to subscribers. See Intervenors' Opp. to Final Approval Mot. (Dkt. 497) at 3 n.2. The need to address that issue is why BTL asked in its December 8, 2023 submission (Dkt. 486) for the Settlement Administrator to be directed to obtain more

The Ray Affidavit, however, submitted in response to the Court's directive would suggest that <u>none</u> of the lines Astro held were used for its own internal business purposes, and therefore, Astro is <u>not</u> a Settlement Class Member, is <u>not</u> eligible to make a claim under the Settlement and does <u>not</u> have standing under either the TCPA or Article III, as addressed above and below.  <u>See</u> Ray Aff. (Dkt. 522-1) ¶¶ 5-6; disc. <u>supra</u> at 3-6.

### D.  Article III Standing And Opting Out

14.     It is, of course, axiomatic that a person or entity that is <u>not</u> a member of a class cannot opt out of that class, and it is now equally clear that any person or entity that lacks standing under Article III cannot be a member of a settlement class. <u>See</u> <u>In re Glenn W. Turner Enters.</u>, 521 F.2d 775, 779-781 (3d Cir. 1975) (reversing injunction as applied to the Kentucky Attorney General, because he was not a class member and could not have chosen to opt out of federal class action case), <u>cited</u> <u>with approval</u> <u>in</u> <u>Carlough v. Amchem</u>, 1993 WL 144901, *6-7 (E.D. Pa. 1993); <u>Drazen v. Pinto</u>, 41 F.4th 1354, 1360 (11th Cir. 2022) (specifying that <u>all</u> members of a settlement class must have Article III standing).

15.     Astro has certainly done little or nothing to discharge its burden of demonstrating standing under Article III, the TCPA or the Settlement, and all indications are that Astro never was and is not a member of the Settlement Class. <u>See</u> <u>TransUnion v. Ramirez</u>, 141 S. Ct. 2190, 2205 (2021) (noting that the party invoking federal jurisdiction has burden to prove standing); disc. <u>supra</u> at 6-7. Therefore, Astro's motion for leave to opt out can properly be denied as moot.  <u>See</u>

---

information from Astro or, in the alternative, for BTL to be allowed to take confirmatory discovery. <u>See</u> BTL's Obj. (Dkt. 486) at 17-18.

BTL's Resp. to Astro's Mot. to Opt Out (Dkt. 511) at 13 n.8.

disc. supra at 1-6; Hunt v. Aimco Props., 814 F.3d 1213, 1220 (11th Cir. 2016) (noting an issue is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief").[8]

## II. CONCLUSION

For the foregoing reasons, BTL respectfully requests that the Court deny as moot Astro's motion for leave to opt out (Dkt. 503), because Astro is not a Settlement Class Member and lacks Article III standing.

Date:  January 18, 2024

Respectfully submitted,

*/s/ Robert C. Collins III*
Robert C. Collins III, One of the Attorneys for Defendant Buccaneers Team LLC

Mark S. Mester
   (admitted *pro hac vice*)
Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
        robert.collins@lw.com

Joseph H. Varner, III
   (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

---

[8] To the extent Astro contests standing, BTL would respectfully request leave to take limited discovery of Astro on that issue, but inasmuch as Astro has now had several opportunities to demonstrate that it does have standing, we believe the most appropriate course would be to simply deny its motion as moot.

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), the undersigned hereby certifies that counsel for BTL conferred by email with Class Counsel, counsel for Intervenors and counsel for Astro with respect to the instant motion and have been informed that the relief requested herein is opposed.

Date:  January 18, 2024

<u>/s/ Robert C. Collins III</u>
Robert C. Collins III, One of the Attorneys for Defendant Buccaneers Team LLC

Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  robert.collins@lw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  January 18, 2024

*/s/ Robert C. Collins III*
Robert C. Collins III, One of the Attorneys for Defendant Buccaneers Team LLC

Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  robert.collins@lw.com