# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CIN-Q AUTOMOBILES, INC., <u>et al.</u>, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | Case No. 8:13-cv-01592-AEP |
| BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, | ) ) ) | **Magistrate Judge** |
| Defendants, | ) ) | **Anthony E. Porcelli** |
| TECHNOLOGY TRAINING ASSOCIATES, INC., <u>et al.</u>, | ) ) ) | |
| Intervenors. | ) | |

## BTL'S SUBMISSION REGARDING THE ISSUES
## <u>ADDRESSED AT THE JANUARY 19, 2024 HEARING</u>

Date:  February 20, 2024

Mark S. Mester
   (admitted *pro hac vice*)
Robert C. Collins III
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
        robert.collins@lw.com

Joseph H. Varner, III
   (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

**<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

I.   INTRODUCTION ........................................................................................1

A.   As The Latest Pronouncements By The FCC, The
Interpretations Of The TCPA In <u>Amerifactors</u> And <u>Ryerson</u>
Should Control In The Event Of A Conflict With Earlier
Interpretations..................................................................................1

B.   The 2003 Order, <u>Westfax</u>, <u>Amerifactors</u> And <u>Ryerson</u> ........................3

1.   The 2003 Order ....................................................................5

2.   <u>Westfax</u> ................................................................................6

3.   <u>Amerifactors</u> And <u>Ryerson</u> ....................................................6

4.   Harmonizing <u>Westfax</u> And <u>Amerifactors</u> / <u>Ryerson</u> .................8

a.   <u>Different</u> Equipment Used By <u>Different</u> Fax
Service Providers..................................................9

b.   The Rulings In <u>Amerifactors</u> And <u>Ryerson</u>
Themselves Make Clear That The Decisions
Revolved Around And Depended Upon The
Nature Of The Equipment At Issue ...............................10

c.   Impact On The Inquiry Required By Article III.............11

d.   A Recent Decision By The Fourth Circuit In
Another TCPA Case Filed By The Wanca Firm
Only Further Confirms Much Of The Foregoing...........13

C.   The Claims By Class Counsel Regarding The Status Of
<u>Amerifactors</u> And <u>Ryerson</u> Are Simply False ...................................15

D.   <u>Amerifactors</u> And <u>Ryerson</u> Clearly Can And Should Be
Applied Retroactively .......................................................................17

E.   Plaintiffs Cannot Possibly Satisfy Their Burden Of  <u>Pleading</u>
And <u>Proving</u> That Each Settlement Class Member Has Article
III Standing......................................................................................19

i

**Page**

F.    Loss Of Time Would Not Establish Article III Standing For All Settlement Class Members Even If It Were A Harm Identified By Congress For Fax Recipients (Which It Clearly Is <u>Not</u>) ..............21

G.    <u>Chevron</u> And <u>Skidmore</u> Deference ......................................24

H.    Application Of The TCPA In The Event <u>Chevron</u> Deference Is Not Accorded .................................................................25

I.    The Requirements Of <u>TransUnion</u> And <u>Drazen I</u> As Well As Article III Itself Apply To <u>All</u> Settlement Class Members, Not Just Claimants...............................................................27

J.    BTL Would Plainly Have A Due Process Right To Contest Any Evidence That Class Counsel Bring Forward On Article III Standing..................................................................29

K.    The Court Would Still Need To Address The Issue Of Emails And Logging Into Cloud-Based Servers Under Article III Even If It Accorded No Deference To Rulings Of The FCC......................30

II.    CONCLUSION...............................................................32

LOCAL RULE 3.01(g) CERTIFICATION.............................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

2003 Order,
 2003 WL 21517853 (F.C.C. July 3, 2003) ................................................ 1, 3, 4, 5

Advanced Rehab v. Amedisys Holding,
 2020 WL 4937790 (W.D. Tenn. 2020)............................................................ 9, 26

Bischoff v. Osceola Cnty.,
 222 F.3d 874 (11th Cir. 2000)..................................................................................30

Bolger v. Youngs Drug,
 463 U.S. 60 (1983) ...................................................................................................24

Career Counseling v. Amerifactors,
 2021 WL 3022677 (D.S.C. 2021) ........................................................... 14, 17, 20

Career Counseling v. Amerifactors,
 91 F.4th 202 (4th Cir. Jan. 22, 2024) ............................... 4, 6, 9, 14, 15, 21, 25, 26

Carter v. Morehouse Par. Sch. Bd.,
 441 F.2d 380 (5th Cir. 1971)....................................................................................29

Cherry v. Dometic,
 986 F.3d 1296 (11th Cir. 2021)......................................................................... 12, 30

Chevron v. NRDC,
 467 U.S. 837 (1984) ...................................................................................................2

Coniglio v. Bank of Am.,
 638 Fed. App'x 972 (11th Cir. 2016) ......................................................................28

Daisy v. Mobile Mini,
 489 F. Supp. 3d 1287 (M.D. Fla. 2020)..................................................... 23, 31, 32

Drazen v. Pinto,
 41 F.4th 1354 (11th Cir. 2022) ..................................................... 13, 19, 27, 28, 31

Facebook v. Duguid,
 592 U.S. 395 (2021).....................................................................................................4

FCC v. Fox,
 556 U.S. 502 (2009) ...................................................................................................1

**Page(s)**

Friends of Everglades v. S. Fla. Water Mgmt.,
   570 F.3d 1210 (11th Cir. 2009)..................................................................2

Gorss Motels v. Safemark,
   931 F.3d 1094 (11th Cir. 2019)................................................................16

Harner v. SSA,
   38 F.4th 892 (11th Cir. 2022) ..................................................................2

Heimmermann v. First Union Mortg.,
   305 F.3d 1257 (11th Cir. 2002)........................................................ 18, 19

In re Advanced Rehab,
   2021 WL 3533492 (6th Cir. 2021) .........................................................18

In re Amerifactors,
   2019 WL 6712128 (F.C.C. Dec. 9, 2019).................................... passim

In re Ryerson,
   2020 WL 5362216 (F.C.C. Sept. 4, 2020) ............................ 1, 5, 9, 11, 16, 19, 24

In re Westfax,
   2015 WL 5120880 (F.C.C. Aug. 28, 2015) .................................. 1, 5, 6, 9, 10, 11

Juris v. Inamed,
   685 F.3d 1294 (11th Cir. 2012)................................................................28

Karhu v. Vital Pharma.,
   621 Fed. App'x 945 (11th Cir. 2015) ...................................... 28, 29, 30

Katz Chiro. v. Diamond,
   340 F.R.D. 383 (N.D. Cal. 2021).............................................................17

Levine Hat v. Innate Intel.,
   538 F. Supp. 3d 915 (E.D. Mo. 2021)....................................................18

Licari v. Eclinical Works,
   2021 WL 4506405 (M.D. Fla. 2021) ........................................ 8, 11, 18

Loper Bright v. Raimondo,
   No. 22-451 (S.Ct.)....................................................................................24

Lyngaas v. Curaden Ag,
   992 F.3d 412 (6th Cir. 2021)..................................................... 14, 18

Marcus v. BMW,
   687 F.3d 583 (3d Cir. 2012)....................................................................30

**Page(s)**

Miami-Dade Cnty. v. USEPA,
  529 F.3d 1049 (11th Cir. 2008)...............................................................2

National Cable v. Brand X,
  545 U.S. 967 (2005) ..................................................................................2

Ortiz v. Fibreboard,
  527 U.S. 815 (1999)................................................................................27

Palm Beach Golf Center v. Sarris,
  781 F.3d 1245 (11th Cir. 2015)........................................................ 16, 22

PDR v. Carlton & Harris,
  139 S.Ct. 2051 (2019) ............................................................................25

Scoma v. Dental Equities,
  2021 WL 6105590 (M.D. Fla. 2021) .............................. 18, 20, 22, 23, 24, 25, 27

Scoma v. Mastercard,
  2021 WL 720347 (M.D. Fla. 2021) .......................................................18

Scoma v. Nat'l Spine,
  2022 WL 16695130 (M.D. Fla. 2022) ........................... 12, 20, 21, 22, 29

Sharfman v. Infucare,
  2022 WL 18926792 (M.D. Fla. 2022) ............................................. 20, 25

Skidmore v. Swift,
  323 U.S. 134 (1944)................................................................................25

Spokeo v. Robins,
  578 U.S. 330 (2016)................................................................................31

Taylor v. Sturgell,
  553 U.S. 880 (2008)................................................................................28

Thompson v. Regions Sec. Servs.,
  67 F.4th 1301 (11th Cir. 2023) ........................................................ 16, 25

TransUnion v. Ramirez,
  594 U.S. 413 (2021)............................................... 6, 19, 24, 27, 28, 31

True Health v. McKesson,
  2021 WL 4461585 (N.D. Cal. 2021) ............................................ 12, 21, 23

True Health v. McKesson,
  2021 WL 4818945 (N.D. Cal. 2021) .......................................................20

**Page(s)**

True Health v. McKesson,
    2023 WL 7015279 (9th Cir. 2023) ............................................... 15, 17, 18, 21, 25

U.S. v. 1998 BMW "I" Convertible,
    235 F.3d 397 (8th Cir. 2000) .................................................................................30

U.S. v. Sanchez-Gomez,
    584 U.S. 381 (2018) .............................................................................................28

Wilson v. Badcock Home Furniture,
    329 F.R.D. 454 (M.D. Fla. 2018) .........................................................................30

**STATUTES**

15 U.S.C. § 7701 et seq. ............................................................................................4

47 U.S.C. § 155 .............................................................................................. 15, 17

47 U.S.C. § 227 ....................................................................................... 4, 10, 13

**OTHER AUTHORITIES**

H.R. Rep. No. 102-317 (1991) ............................................................................ 8, 22

Pub. L. No. 102-243 (1991) ......................................................................................4

S. Rep. No. 102-178 (1991) ................................................................................ 8, 22

**REGULATIONS**

47 C.F.R. § 0.361 ..................................................................................................17

47 C.F.R. § 1.102 .......................................................................................... 16, 17, 18

47 C.F.R. § 1.115 ..................................................................................................18

Defendant Buccaneers Team LLC ("BTL") makes the following submission pursuant to the Court's directive at the January 19, 2024 hearing:[1]

## I.   INTRODUCTION

We discuss below the questions the Court asked the Parties to address at the January 19, 2024 hearing.  See Clerk's Minutes (Dkt. 525); Hr'g Tr. (Dkt. 530) at 59:2-18.  We also respectfully address a few additional issues that directly bear upon the matters raised by the Court at that hearing.  See disc. infra at 1-3.

### A.   As The Latest Pronouncements By The FCC, The Interpretations Of The TCPA In Amerifactors And Ryerson Should Control In The Event Of A Conflict With Earlier Interpretations

We explain in Section B infra how the 2003 Order, Westfax, Amerifactors and Ryerson can be harmonized, but a prior question is whether harmonization is wholly necessary.[2]  We understand this was not one of the questions raised by the Court at the January 19, 2024 hearing, but we believe the answer to this question would be useful for the Court's deliberations.  See disc. infra at 24-25.

Under settled law, an agency's interpretation of its governing statute that clarifies an earlier interpretation should control.   Not unlike courts, agencies oftentimes refine and reevaluate their interpretations of their governing statutes, especially in circumstances (like this one) where technology is evolving or factual circumstances change.  See, e.g., FCC v. Fox, 556 U.S. 502, 517-18 (2009) (noting refinement of the FCC's interpretation of 18 U.S.C. § 1464 given "technological

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval.  See Settlement Agt. (Dkt. 324-1).  In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

[2] See In re Rules & Regs. (TCPA), 2003 WL 21517853 (F.C.C. July 3, 2003) (the "2003 Order"), Ex. 1 hereto; In re Westfax, 2015 WL 5120880 (F.C.C. Aug. 28, 2015) ("Westfax"), Ex. 2 hereto; In re Amerifactors, 2019 WL 6712128 (F.C.C. Dec. 9, 2019) ("Amerifactors"), Ex. 3 hereto; In re Ryerson, 2020 WL 5362216 (F.C.C. Sept. 4, 2020) ("Ryerson"), Ex. 4 hereto.

advances"). And when they do so, it is the <u>later</u> interpretation that controls and is entitled to deference. <u>See</u>, <u>e.g.</u>, <u>Harner v. SSA</u>, 38 F.4th 892, 896-98 (11th Cir. 2022) (applying <u>Chevron</u> deference to later interpretation of the Social Security Act).

This principle was fully articulated by the Supreme Court in <u>National Cable v. Brand X</u>, 545 U.S. 967 (2005). There, the FCC had issued earlier interpretations of "telecommunications service" under the Communications Act, with the question being whether the later interpretation took precedence and was entitled to <u>Chevron</u> deference. <u>See id.</u> at 980-82. And in <u>National Cable</u>, the Supreme Court expressly answered <u>both</u> questions in the <u>affirmative</u>:

> <u>Some of the respondents dispute this conclusion, on the ground that the Commission's interpretation is inconsistent with its past practice. We reject this argument. Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the <i>Chevron</i> framework</u>. . . . [I]f the agency adequately explains the reasons for a reversal of policy, "change is not invalidating, since <u>the whole point of <i>Chevron</i> is to leave the discretion provided by the ambiguities of a statute with the implementing agency.</u>" "<u>An initial agency interpretation is not instantly carved in stone. On the contrary, the agency</u> . . . <u>must consider varying interpretations and the wisdom of its policy on a continuing basis</u>," for example, in response to changed factual circumstances, or a change in administrations. That is no doubt why <i>Chevron</i> itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy. <u>We therefore have no difficulty concluding that <i>Chevron</i> applie</u>s.

<u>Id.</u> at 981-82; <u>see also</u>, <u>e.g.</u>, <u>Miami-Dade Cnty. v. USEPA</u>, 529 F.3d 1049, 1062-65 (11th Cir. 2008); <u>Everglades v. S. Fla. Water Mgmt.</u>, 570 F.3d 1210, 1219, 1223-28 (11th Cir. 2009).[3] It is, therefore, clear that to the extent there were irreconcilable differences in the interpretations of the TCPA between <u>Westfax</u> on the one hand and <u>Amerifactors</u> and <u>Ryerson</u> on the other, the more recent interpretations in

---

[3] As noted in <u>National Cable</u>, <u>Chevron</u> itself involved a situation where deference was given to an agency interpretation that amounted to a change in a <u>prior</u> interpretation by the FCC. <u>See</u> <u>Nat'l Cable</u>, 545 U.S. at 981-82 (citing <u>Chevron v. NRDC</u>, 467 U.S. 837, 857-58 (1984)).

Amerifactors and Ryerson should control and be accorded deference by the Court as the FCC's current interpretation.[4]  See Nat'l Cable, 545 U.S. at 980-82, 1000-02.

The four decisions of the FCC at issue here, however, are readily harmonized, at least for present purposes.  See disc. infra at 8-15.  All four affirm that the TCPA does not apply to faxes sent as emails over the Internet.  See disc. infra at 9-10. Moreover, Westfax, Amerifactors and Ryerson focus on fax service providers using different types of equipment, with Westfax addressing equipment assumed to have the capacity to print and Amerifactors and Ryerson addressing online fax services that lacked the capacity to print.  See disc. infra at 6-8.  As such, Westfax, Amerifactors and Ryerson are harmonized by reference to the differing types of equipment utilized by the fax service provider and online fax services in each of the three rulings.  See disc. infra at 10-11.

### B.   The 2003 Order, Westfax, Amerifactors And Ryerson

The one overarching and consistent theme as between and among the 2003 Order, Westfax, Amerifactors and Ryerson is that faxes sent as emails are not covered by the TCPA and by implication are not sufficient to confer Article III standing.  See 2003 Order ¶ 200.  The 2003 Order says exactly that, and the other

---

[4] It is also worth noting what would be inconsistent with what.  If the 2003 Order were accorded the primacy Class Counsel suggest it should be (at least when it suits their purposes), then Westfax would appear inconsistent with the clear pronouncement in the 2003 Order that the TCPA "does not extend to facsimile messages sent as email over the Internet," insofar as the only thing a subscriber to a fax service provider would receive is an email sent over the Internet, which the 2003 Order said was not sufficient under the TCPA.  See Pls.' Opp. (Dkt. 505) at 5-17 (suggesting the 2003 Order should supposedly be accorded more weight, because it was decided by the full Commission as opposed to on delegated authority).  But even on the interpretation of the TCPA advanced by Westfax, that same subscriber would not have standing under the TCPA if his or her fax service provider received the email on equipment that did not have the capacity to print, the very situation that later was the focus of Amerifactors and Ryerson.  See disc. infra at 11-13.

three rulings <u>all</u> reaffirm that interpretation of the TCPA.  <u>See</u> Ex. 5 hereto.[5]

The FCC made this clear as early as the 2003 Order and has <u>never</u> wavered from this interpretation of the TCPA:

> [W]e clarify that the prohibition does <u>not</u> extend to facsimile messages sent as <u>email</u> over the Internet.
>
> . . .
>
> We emphasize that <u>any</u> <u>rules</u> <u>the</u> <u>Commission</u> <u>adopts</u> with respect to unsolicited facsimile advertisements <u>would not extend to facsimile messages</u> <u>transmitted as email over the Internet</u>. See definition of telephone facsimile machine at *47 U.S.C. § 227(a)(2)*.

2003 Order ¶¶ 200, 199 n.736.  Moreover, this interpretation of the TCPA is <u>fully</u> consistent with the statute itself as well as its legislative history.  <u>See</u>, <u>e.g.</u>, <u>Career</u> <u>Counseling v. Amerifactors</u>, 91 F.4th 202, 209-11 (4th Cir. Jan. 22, 2024) (petition for rehearing or rehearing <u>en</u> <u>banc</u> denied February 20, 2024).

Indeed, there is no indication whatsoever in <u>either</u> the TCPA or its legislative history of <u>any</u> intention on the part of Congress to regulate emails, and there is, of course, a <u>separate</u> federal statute that does <u>exactly</u> that (<u>i.e.</u>, CAN-SPAM).  <u>See</u> 15 U.S.C. § 7701 <u>et</u> <u>seq</u>.  Likewise, there is <u>no</u> indication of an intent by Congress to regulate the Internet in enacting the TCPA.  <u>See</u> TCPA, Pub. L. No. 102-243, § 2 (1991).  Quite to the contrary, the whole purpose of the TCPA or "<u>Telephone</u> <u>Consumer Protection Act</u>" is to regulate "regular telephone line[s]."  <u>See</u> 47 U.S.C. § 227(a)(3).  Any effort to expand the TCPA beyond its intended scope into other communication mediums or modalities, however, should be rejected.  <u>See</u>, <u>e.g.</u>, <u>Facebook v. Duguid</u>, 592 U.S. 395, 408 (2021) (declining to expand the TCPA beyond what Congress wrote into the statute and intended).  Therefore, the TCPA

---

[5] Due to space limitations, the relevant excerpts on this issue from <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> are provided in Exhibit 5 hereto.

very clearly does <u>not</u> extend to faxes sent as emails over the Internet.  <u>See</u> 2003 Order ¶ 200; <u>Amerifactors</u> ¶ 8; <u>Ryerson</u> ¶ 11; disc. <u>infra</u> at 5-8.

### 1.    The 2003 Order

The 2003 Order devoted a section to "fax servers," which at that time were only a "developing technology" the FCC felt "<u>might</u> warrant revisiting" existing rules.  <u>See</u> 2003 Order ¶ 198.  In so doing, the FCC differentiated between personal computers "equipped with, or attached to" a fax modem and "computerized fax servers."  <u>Id.</u> ¶ 200.  There was, however, <u>no</u> consideration in the 2003 Order of how the TCPA should be applied if the person or entity receiving a fax on a telephone facsimile machine, computer or other device is <u>not</u> the intended recipient and the intended recipient instead <u>only</u> receives a fax "sent as email over the Internet."[6]  <u>Id.</u>

Based on the technology available in 2003, the FCC nonetheless concluded in the 2003 Order that fax servers or other devices possessed <u>by</u> the intended recipients of faxes and that <u>have</u> "the *capacity* to transcribe text or messages onto paper" are "telephone facsimile machines" within the meaning of the TCPA.  <u>See</u> 2003 Order ¶¶ 199-200 (emphasis in original and supplied).  But again, the FCC also cautioned this "prohibition does <u>not</u> extend to facsimile messages sent as <u>email</u> over the Internet."  <u>Id.</u>  The statement in the 2003 Order, however, that the prohibition on "unsolicited advertisements" in the TCPA does <u>not</u> extend to faxes sent as an email remains the <u>one</u> overarching constant in later rulings by the FCC.  <u>See</u> <u>Westfax</u> ¶ 10; <u>Amerifactors</u> ¶ 8; <u>Ryerson</u> ¶ 11.

---

[6] The issues of fax service providers and online fax services were instead addressed in <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson.</u>  <u>See</u> <u>Westfax</u> ¶ 12; <u>Amerifactors</u> ¶¶ 8-16; <u>Ryerson</u> ¶¶ 11-17.

5

## 2.    **Westfax**

In <u>Westfax</u>, the FCC addressed fax service providers and concluded they do <u>not</u> have standing under the TCPA and that, instead, standing is reserved for the <u>intended</u> recipients of the fax (<u>i.e.</u>, subscribers of fax service providers).[7]  <u>See</u> <u>Westfax</u> ¶¶ 1 n.3, 12.   <u>Westfax</u> was, however, necessarily limited to the facts presented in the petition filed by Westfax, and on those facts, the FCC concluded the equipment used there by the fax service provider constituted a "telephone facsimile machine" under the TCPA.   <u>See</u> <u>id.</u> ¶ 9.   That conclusion was based on the fact the particular equipment in <u>Westfax</u> was deemed to <u>have</u> the capacity to print.  <u>See</u> <u>id.</u>  And based on that conclusion, an "e-fax" was considered within the scope of the TCPA, with the intended recipient of the fax received as an email (<u>i.e.</u>, the subscriber) having statutory standing, <u>provided</u> the equipment used by the fax service provider to receive the fax in the first instance had the <u>capacity</u> to <u>print</u>.[8]  <u>See</u> <u>id.</u> ¶ 12.

## 3.    **Amerifactors** And **Ryerson**

In contrast to <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> addressed an "online fax service," which is "a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital

---

[7] Notably, the petitioner in <u>Westfax</u> (<u>i.e.</u>, Westfax, Inc.) was <u>both</u> a fax broadcaster <u>and</u> a fax service provider, and the principle thrust of Westfax's petition was whether the "recipient" of what it termed an "efax" was the fax service provider <u>or</u> the consumer and whether the "company with the fax server" was simply a "'passive conduit.'"  <u>See</u> Westfax Petition, Ex. 6 hereto, at 3, 5.  As noted in <u>Westfax</u>, however, Westfax (the petitioner) "raises <u>no</u> questions regarding a document sent as an email over the Internet."  <u>See</u> <u>Westfax</u> ¶ 10.

[8] Although there was no indication the FCC was intending to address Article III standing in <u>Westfax</u>, the rationale in <u>Westfax</u> would plainly <u>not</u> suffice for purposes of Article III.  <u>See</u> <u>Westfax</u> ¶ 11.  The law is <u>very</u> clear that in order to have Article III standing, the person making a claim must be the <u>same</u> person who suffered the harm elevated by Congress.  <u>See</u>, <u>e.g.</u>, <u>TransUnion v. Ramirez</u>, 594 U.S. 413, 426-27 (2021).  But a recipient of a fax sent as an email by a fax service provider over the Internet would plainly <u>not</u> suffer the harms Congress intended to address in the TCPA for recipients of faxes on conventional fax machines.  <u>See</u>, <u>e.g.</u>, <u>Amerifactors</u> ¶ 12; <u>Career Counseling</u>, 91 F.4th at 210-11; <u>see</u> <u>also</u> disc. <u>infra</u> at 22.

format over telecommunications facilities." <u>Amerifactors</u> ¶ 2.  These services allow "users to 'access 'faxes' the same way that they do email: by logging into a server over the Internet <u>or</u> by receiving a pdf attachment [as] an email.'"[9] <u>Id.</u>

Crucial to the FCC's interpretation in <u>Amerifactors</u> was the dichotomy in 47 U.S.C. § 227(b)(1)(C) <u>between</u> the covered devices for <u>sending</u> faxes (<u>i.e.</u>, "<u>any</u> telephone facsimile machine, <u>computer</u> or <u>other</u> <u>device</u>") and <u>receiving</u> faxes (<u>i.e.</u>, <u>only</u> a "telephone facsimile machine"), as well as the capacity to print.[10]  Focusing on the statutory definition, the FCC concluded in <u>Amerifactors</u> that online fax services are "more accurately characterized as faxes sent to a 'computer' or 'other device'" versus a "telephone facsimile machine":

> [W]e <u>turn</u> <u>to</u> <u>whether</u> <u>an</u> <u>online</u> <u>fax</u> <u>service</u> <u>is</u> <u>a</u> "<u>telephone</u> <u>facsimile</u> <u>machine</u>." As described in the record, a fax received by an online fax service as an electronic message is effectively an email. <u>Under</u> <u>our</u> <u>precedent,</u> <u>faxes</u> "<u>sent</u> <u>as</u> <u>email</u> <u>over</u> <u>the</u> <u>Internet</u>" <u>are</u> <u>not</u> <u>subject</u> <u>to</u> <u>the</u> <u>TCPA.</u> <u>Faxes</u> <u>sent</u> <u>to</u> <u>online</u> <u>fax</u> <u>services</u> <u>via</u> <u>an</u> <u>attachment</u> <u>that</u> <u>the</u> <u>consumer</u> <u>can</u> <u>delete</u> <u>without</u> <u>printing</u> <u>are</u> <u>effectively</u> <u>the</u> <u>same</u> <u>as</u> "<u>email</u> <u>sent</u> <u>over</u> <u>the</u> <u>Internet.</u>'" Consumers can manage those messages the same way they email by blocking senders or deleting incoming messages without printing them.

<u>Amerifactors</u> ¶ 11.  And as <u>Amerifactors</u> makes clear, the lack of a capacity to print was also dispositive:

> <u>We</u> <u>also</u> <u>understand</u> <u>that</u> <u>an</u> <u>online</u> <u>fax</u> <u>service</u> <u>cannot</u> <u>itself</u> <u>print</u> <u>a</u> <u>fax</u>—<u>the</u> <u>user</u> <u>of</u> <u>an</u> <u>online</u> <u>fax</u> <u>service</u> <u>must</u> <u>connect</u> <u>his</u> <u>or</u> <u>her</u> <u>own</u> <u>equipment</u> <u>in</u> <u>order</u> <u>to</u> <u>do</u> <u>so.</u> <u>As</u> <u>such,</u> <u>an</u> <u>online</u> <u>fax</u> <u>service</u> <u>is</u> <u>plainly</u> <u>not</u> "<u>equipment</u> <u>which</u> <u>has</u> <u>the</u> <u>capacity</u> . . . <u>to</u> <u>transcribe</u> <u>text</u> <u>or</u> <u>images</u> <u>(or</u> <u>both)</u> <u>from</u> <u>an</u> <u>electronic</u> <u>signal</u> <u>received</u> <u>over</u> <u>a</u> <u>regular</u> <u>telephone</u> <u>line</u> <u>onto</u> <u>paper.</u>" Accordingly, under the plain terms of the Act, <u>an</u> <u>online</u> <u>fax</u> <u>service</u> <u>is</u> <u>not</u> <u>a</u> "<u>telephone</u> <u>facsimile</u> <u>machine</u>" <u>and</u> <u>a</u> <u>fax</u> <u>sent</u> <u>to</u> <u>one</u> <u>is</u> <u>not</u> "<u>an</u> <u>unsolicited</u> <u>facsimile</u> <u>advertisement</u>" <u>prohibited</u> <u>by</u> <u>the</u> <u>TCPA.</u>

---

[9] As addressed in the attached declaration of Mr. Sponsler, virtually all fax service providers in operation in 2009 and 2010 were what <u>Amerifactors</u> described as "online fax services," using cloud-based systems akin to what was addressed in the <u>Amerifactors</u> ruling.  <u>See</u> Sponsler Decl., Ex. 7 hereto, at ¶ 17.

[10] The full definition of a "telephone facsimile machine" in the TCPA is provided in Exhibit 8, with the capacity to print being an <u>essential</u> part of the definition.  <u>See</u> Ex. 8 hereto.

Id.[11]

The FCC further based its conclusion in Amerifactors on the fact faxes sent to online fax services "do not cause the specific harms to consumers Congress sought to address in the TCPA" (i.e., toner/paper and occupation of the facsimile machine). See Amerifactors ¶ 12.  Moreover, the FCC expressly rejected in Amerifactors the argument being made there by Mr. Hara on behalf of Career Counseling, Inc. and also being made here by Class Counsel that loss of time in reviewing faxes sent as emails is supposedly a harm Congress intended to address in the TCPA.  See id. ¶ 14 & n.34 (citing to comments submitted by Mr. Hara on the petition in Amerifactors regarding loss of time and noting that the "more generalized harms" like loss of time were not identified by Congress vis-à-vis faxes); see also disc. infra at 21-24.[12]

### 4.  Harmonizing Westfax And Amerifactors / Ryerson

Westfax and Amerifactors/Ryerson are most easily harmonized for present purposes by the different equipment addressed in the three rulings.  See, e.g., Licari v. Eclinical Works, 2021 WL 4506405, *6 (M.D. Fla. 2021).  By its terms, Westfax involved a different type of technology utilized by the fax service provider than Amerifactors and Ryerson, and those differences were pivotal in determining whether the TCPA applied.  See disc. supra at 6-8.

---

[11] In addition to concluding that the equipment at issue in Amerifactors was different than what was at issue in Westfax, the FCC also cautioned in Amerifactors against efforts to impermissibly extend the TCPA beyond the limits set by Congress by interpreting the TCPA to mean that "every 'computer' or 'other device' is a telephone facsimile machine, merely because it could conceivably be connected to a printer, directly or indirectly."  Amerifactors ¶ 13 n.33.

[12] The issue of loss of time was mentioned in passing in the 2003 Order, but no citation was provided there to either the House Report or the Senate Report.  See Amerifactors ¶ 14.  And both reports themselves make clear that loss of time was not a harm Congress was addressing vis-à-vis faxes.  See H.R. Rep. No. 102-317 (1991), Ex. 9 hereto, at 10; S. Rep. No. 102-178 (1991), Ex. 10 hereto, at 2; see also disc. supra at 3-5.

Westfax made explicit that the equipment at issue there had "the capacity to 'transcribe text or images (or both) from an electronic signal received over a telephone line onto paper.'"  Westfax ¶ 9.  Conversely, the equipment at issue in Amerifactors was a cloud-based, online fax service that did not have the capacity to print and thus was not a "telephone facsimile machine."  Amerifactors ¶ 11 ("[A]n online fax service cannot itself print a fax—the user of an online fax service must connect his or her own equipment in order to do so."); Ryerson ¶ 11 (same).

This distinction was further emphasized in Amerifactors, with the FCC noting the term "telephone facsimile machine" should not be expanded beyond its defined scope and clarifying that the equipment in Westfax was assumed to have the capacity to print, whereas the equipment used by online fax services did not:

> We also disagree with those that suggest this case is governed by the *Westfax Declaratory Ruling*. That decision focused on whether the mere conversion of a conventional fax to email at some point in the transmission chain removed the fax from the TCPA's reach—and found that it did not. And based on a limited record, it [i.e., the decision in Westfax] assumed that the "efax" in question was sent to a computer with an attached fax modem that had the capacity to print the fax, as required by statute. That decision did not consider the online fax services that have no such capacity at issue here.

Amerifactors ¶ 15.

### a. **Different** Equipment Used By **Different** Fax Service Providers

Westfax, Amerifactors and Ryerson plainly indicate that any consideration of whether a recipient of a fax as an email has standing under the TCPA (and by extension Article III standing) would turn on the type of equipment used by that recipient's fax service provider and, more specifically, on the factual issue of whether that equipment (a) was a "telephone facsimile machine" and (b) therefore, inter alia, had "the capacity to print."  See, e.g., Advanced Rehab v. Amedisys Holding, 2020 WL 4937790, *8 (W.D. Tenn. 2020).  Amerifactors and Ryerson

9

expressly state that the equipment in those rulings consisted of an online service comprised of a "computer" or "other device" that receives and holds "inbound faxes in digital form on a <u>cloud-based</u> <u>server</u>," allowing consumers to access "faxes" the "same way that they do email" by "<u>logging</u> into a server over the Internet <u>or</u> by <u>receiving</u> a pdf attachment [as] an email," with the <u>consumer</u> choosing whether to delete the fax or print it on his or her computer.   <u>See</u> <u>Amerifactors</u> ¶¶ 13, 2. Conversely, the equipment used by the fax service provider in <u>Westfax</u> was deemed to be a "telephone facsimile machine."  <u>See</u> <u>Westfax</u> ¶ 9.  Moreover, it was assumed in <u>Westfax</u> that the equipment there had "the capacity to print" (an essential element of the definition of a "telephone facsimile machine"), whereas it was expressly determined in <u>Amerifactors</u> and <u>Ryerson</u> that the equipment used by an online fax service "is plainly <u>not</u> '<u>equipment</u> <u>which</u> <u>has</u> <u>the</u> <u>capacity</u> . . . <u>to</u> <u>transcribe</u> <u>text</u> <u>or</u> <u>images</u> (or both) from an electronic signal received over a regular telephone line <u>onto</u> <u>paper</u>.'"  <u>Compare</u> <u>Westfax</u> ¶ 9, <u>with</u> <u>Amerifactors</u> ¶ 11.[13]

### b. The Rulings In <u>Amerifactors</u> And <u>Ryerson</u> Themselves Make Clear That The Decisions Revolved Around And Depended Upon The Nature Of The Equipment At Issue

<u>Amerifactors</u> and <u>Ryerson</u> themselves also <u>both</u> make clear that those rulings were explicitly based on the <u>specific</u> equipment at issue in those two petitions and that that equipment was <u>different</u> than what was at issue in <u>Westfax</u>, hence the differing interpretations offered:

---

[13] Other relevant passages from <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> on the equipment at issue in each and whether it was a "telephone facsimile machine" are collected in Exhibit 11 hereto.  As the FCC stated in <u>Amerifactors,</u> however, faxes sent as emails "are more accurately characterized as faxes sent to a 'computer' or 'other device,' and not a 'telephone facsimile machine.'" <u>Amerifactors</u> ¶ 13; <u>see</u> <u>also</u> 47 U.S.C. § 227(b)(1)(C) (limiting to "telephone facsimile machines" the devices that unsolicited faxes cannot be <u>sent</u> <u>to</u> as opposed to <u>sent</u> <u>from</u>).

### Amerifactors

Our clarification is limited to an analysis of online fax services, as informed by the current record, and does not prejudge whether we would arrive at the same conclusion for other types of equipment and services.

Amerifactors ¶ 8.

### Ryerson

In this declaratory ruling, we find that Ryerson's technology is similar to the technology the Bureau addressed in *Amerifactors*. We therefore grant the Petition because the petitioner did not send an unsolicited advertisement to a telephone facsimile machine under the TCPA.

We find that the technology described by Ryerson in its Petition is sufficiently similar to that described in *Amerifactors*, and is thus governed by our analysis there. The transmission in this case is, therefore, not subject to the TCPA. As explained in *Amerifactors*, to the extent an unsolicited facsimile advertisement is sent to an online service that effectively receives faxes "sent as email over the Internet" and is not itself "equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper," the service is not a "telephone facsimile machine" and is thus outside the scope of the statutory prohibition.

Ryerson ¶¶ 4, 11.  *Amerifactors* and *Ryerson*, therefore, make plain that this is a factual issue and an equipment-specific inquiry (as does Westfax).  See Westfax ¶ 9; Amerifactors ¶ 15 (Westfax "did not consider the online fax services that have no such capacity [to print the fax] at issue here").[14]

### c.  Impact On The Inquiry Required By Article III

For purposes of the required Article III inquiry, however, the factual differences in equipment used by fax service providers would create insuperable

---

[14] Judge Scriven also addressed this exact issue in Licari:

Licari's reliance on these earlier FCC rulings is unavailing. The Bureau expressly ruled that the question presented in *Amerifactors* was not "governed" by its earlier decision in *Westfax*. *Amerifactors, 2019 WL 6712128, at *4*. The Bureau explained that *Westfax* "assumed that the 'efax' in question was sent to a computer with an attached fax modem that had the capacity to print the fax, as required by statute." *Id. Westfax* did not, however, consider "online fax services" such as SmartFax, which "hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired." *Id.* The FCC's 2003 order is likewise consistent with *Amerifactors* and *Ryerson*.

Licari, 2021 WL 4506405, *6.

problems in this case.  See, e.g., Scoma v. Nat'l Spine, 2022 WL 16695130, *6-7, 9-10 (M.D. Fla. 2022) ("[I]ndividualized inquiries would be required to determine whether each member received a fax via a stand-alone machine or online fax service."); see also, e.g., True Health v. McKesson, 2021 WL 4461585, *3-4 (N.D. Cal. 2021) (noting difficulty of determining "on a class-wide basis, which individuals received the faxes at issue on a stand-alone fax machine" as opposed to "via an online fax service").  Indeed, if Article III standing turns on what specific equipment was employed by any fax service provider utilized by a Settlement Class Member in 2009 or 2010 (as Westfax, Amerifactors and Ryerson make clear it does), then the ascertainability issues BTL has been raising for some time again come front and center.  See, e.g., BTL's Submission re Ascertainability (Dkt. 365) at 8-23.  It simply is not possible at this late date and without a class list to even begin to determine which Settlement Class Members received as emails faxes sent on BTL's behalf, let alone which ones used online fax services as contemplated by Amerifactors and Ryerson.  See, e.g., True Health, 2021 WL 4461585, *3-4.[15]

Because Plaintiffs have the burden of demonstrating Article III standing for all Settlement Class Members, it would, of course, be up to Class Counsel to come up with a "manageable" and "successful" plan for obtaining this information and differentiating between Settlement Class Members who have Article III standing and those that do not.  See Cherry v. Dometic, 986 F.3d 1296, 1302 (11th Cir. 2021); see

---

[15] Indeed, after extensive efforts, we still do not have any idea who a substantial percentage of the Settlement Class Members actually are, and for those for whom we have some identifying information, much of that information is conflicting and we only know they "may" have possessed a number on the Biggerstaff list at "some time" or "any time," but certainly not that such number was possessed during the 11-month class period (i.e., July 14, 2009 to June 9, 2010).  See Sponsler Decl. (Dkt. 381-4) ¶ 16; Roach Decl. (Dkt. 442) ¶ 3; Parks Decl. (Dkt. 398-2) ¶ 6.

also disc. infra at 19-21.  Stated otherwise, Class Counsel would have to prove each Settlement Class Member received one or more faxes sent on behalf of BTL on "equipment which has the capacity" to print, a capacity online fax services obviously lack.  47 U.S.C. § 227(a)(3); see also disc. infra at 19-21.

To date, Class Counsel have made no such showing (in spite of many opportunities), instead suggesting it is enough if they simply define the Settlement Class in objective terms.  See, e.g., Aug. 31, 2022 Hr'g Tr. (Dkt. 410) at 143:12-15, 24-25.  But as Drazen I makes clear, the concerns expressed in Cherry with respect to class definitions are simply not the only operative concerns:

> Any class definition that includes members who would never have standing under our precedent is a class definition that cannot stand.

Drazen v. Pinto, 41 F.4th 1354, 1362 (11th Cir. 2022) ("Drazen I").  It is, in turn, obvious the definition of the Settlement Class is defective under Drazen I and cannot stand, and it is equally obvious Plaintiffs cannot begin to meet their burden of proving each Settlement Class Member has Article III standing.  See disc. infra at 19-21.

### d. A Recent Decision By The Fourth Circuit In Another TCPA Case Filed By The Wanca Firm Only Further Confirms Much Of The Foregoing

Amerifactors arose from litigation commenced by the Wanca firm, the underlying case being captioned Career Counseling v. Amerifactors, No. 3:16-cv-03013 (D.S.C., filed Sept. 2, 2016).  See Compl. (Career Counseling Dkt. 1).  In Career Counseling, the Wanca firm brought on behalf of a proposed class claims under the TCPA relating to the transmission of what were alleged to be junk faxes.  See id. at 1-2.  Early in that litigation, however, it became obvious a sizeable (but indeterminate) number of faxes had been sent as emails through an online fax service.  Amerifactors then petitioned the FCC for a declaratory ruling that faxes

13

received as emails were <u>not</u> covered by the TCPA.  <u>See</u> Amerifactors Petition, Ex. 12 hereto, at i-iii.  That petition was, of course, granted by the FCC, and the ruling in <u>Amerifactors</u> took full force and effect upon issuance (and <u>remains</u> in full force and effect).  <u>See</u> disc. <u>supra</u> at 14 n.16; <u>see also</u> Career Counseling v. Amerifactors, 2021 WL 3022677, *10 (D.S.C. 2021) (giving full force and effect to <u>Amerifactors</u> and rejecting arguments by the Wanca firm to the contrary).

Based on <u>Amerifactors</u> and the inability of the Wanca firm to differentiate recipients of faxes on a "telephone facsimile machine" from recipients of faxes as emails, the district court denied class certification, concluding class treatment was <u>not</u> warranted.  <u>See</u> Career Counseling, 2021 WL 3022677, *13.  An appeal was then taken by the Wanca firm on the class decision, and on January 22, 2024 (<u>i.e.</u>, three days <u>after</u> the last hearing before the Court in <u>this</u> case), the Fourth Circuit affirmed that denial.  <u>See</u> Career Counseling, 91 F.4th at 214.  In so doing, the Fourth Circuit (like the district court) differentiated between online fax services and telephone facsimile machines with the capacity to print and concluded recipients of faxes as emails from the former did <u>not</u> have standing under the TCPA, whereas recipients of faxes on conventional fax machines did.[16]  <u>See</u> <u>id.</u> at 208-11.  Because there was

---

[16] Rather than addressing the Hobbs Act or <u>Chevron</u> or <u>Skidmore</u>, the Fourth Circuit concluded it could base its holding <u>solely</u> on a <u>de novo</u> review of what it termed "the plain statutory language" of the TCPA and the fact the statute addresses telephone facsimile machines but not online fax services.  <u>See</u> Career Counseling, 91 F.4th at 210.  Its conclusion was based on the <u>express</u> language in Section 227(b)(1)(C):

> To be sure, an online fax service may qualify as a "computer" or some "other device" within the meaning of the TCPA. With respect to a "computer" or "other device," however, the 47 U.S.C. § 227(b)(1)(C) prohibition applies only to faxes sent <u>from</u> a "computer" or "other device" — and not to faxes sent <u>to</u> a "computer" or "other device" — as a result of the <u>meaningful</u> variances in § 227(b)(1)(C)'s language.

Career Counseling, 91 F.4th at 210; <u>see also</u>, <u>e.g.</u>, <u>Lyngaas v. Curaden Ag</u>, 992 F.3d 412, 445-46 (6th Cir. 2021) (Thapar, J., concurring in part and dissenting in part).  Relying on the plain

no way to differentiate between the two, however, the Fourth Circuit ruled the claims in <u>Career Counseling</u> were not appropriate for class treatment and affirmed the district court's decision.[17]  <u>See</u> <u>id.</u> at 214.

### C.   The Claims By Class Counsel Regarding The Status Of <u>Amerifactors</u> And <u>Ryerson</u> Are Simply False

Class Counsel have variously suggested that in spite of being the most recent interpretations by the FCC in terms of fax service providers and faxes received as emails, <u>Amerifactors</u> and <u>Ryerson</u> are somehow not operative or of lesser force or effect than other FCC rulings because of applications for review Mr. Hara filed three or more years ago <u>and</u> the fact <u>Amerifactors</u> and <u>Ryerson</u> were made on delegated authority by the Consumer and Governmental Affairs Bureau ("CGAB") (as was <u>Westfax</u>).  <u>See</u>, <u>e.g.</u>, Pls.' Opp. (Dkt. 505) at 12.  Both propositions, however, are refuted by governing statutes and regulations but also by the decisions of other courts where the Wanca firm has had the exact <u>same</u> argument rejected.  <u>See</u>, <u>e.g.</u>, <u>True Health v. McKesson</u>, 2023 WL 7015279, *2 & n.1 (9th Cir. 2023).

<u>First</u>, the Communications Act of 1934 expressly states that rulings and orders like <u>Amerifactors</u> and <u>Ryerson</u> made pursuant to delegated authority have <u>exactly</u> the same force and effect as <u>any</u> order, decision or ruling of the Commission itself:

> Any order, decision, report, or action made or taken <u>pursuant</u> <u>to</u> <u>any</u> <u>such</u> <u>delegation</u>, unless reviewed as provided in paragraph (4) of this subsection, shall have <u>the</u> <u>same</u> <u>force</u> <u>and</u> <u>effect</u>, and shall be <u>made</u>, <u>evidenced</u>, <u>and</u> <u>enforced</u> <u>in</u> <u>the</u> <u>same</u> <u>manner</u>, as <u>orders</u>, <u>decisions</u>, <u>reports</u>, <u>or</u> <u>other</u> actions of <u>the</u> <u>Commission</u>.

47 U.S.C. § 155(c)(3); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Gorss Motels v. Safemark</u>, 931 F.3d 1094, 1104

---

language of the statute obviously remains an option for this Court.  <u>See</u> <u>Career Counseling</u>, 91 F.4th at 211; <u>see</u> <u>also</u> disc. <u>infra</u> at 26-27.

[17] Again due to space limitations, relevant passages from the Fourth Circuit decision in <u>Career Counseling</u> are included in Exhibit 13 hereto.

(11th Cir. 2019) (CGAB rulings have "same force and effect as actions of the Commission").  As such, any hierarchy Class Counsel try to suggest between orders of the Commission and orders and rulings by the CGAB simply does <u>not</u> exist.

<u>Moreover</u>, the Eleventh Circuit has been equally clear that <u>Chevron</u> and <u>Skidmore</u> deference should be accorded to various forms of orders, rulings, decisions, reports and other actions by administrative agencies and their delegees:

> [T]he <u>construction of the statute need not be found in a formal regulation adopted after notice and comment to receive deference</u>.  Thus, the United States Supreme Court, in <u>Mead</u>, found <u>Chevron</u> deference applies in instances of "administrative implementation of a particular statutory provision ... when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  Here, Congress has delegated to the FCC "authority to promulgate binding legal rules" to carry out the provisions of the TCPA.  Pursuant to this authority, the FCC adopted rules regulating the use of fax machines[.]

<u>Palm Beach Golf Center v. Sarris</u>, 781 F.3d 1245, 1256 (11th Cir. 2015); <u>see also</u>, <u>e.g.</u>, <u>Thompson v. Regions Sec. Servs.</u>, 67 F.4th 1301, 1308 n.3 (11th Cir. 2023).

<u>Finally</u>, the FCC's regulations make it perfectly clear that decisions made on delegated authority like <u>Amerifactors</u> and <u>Ryerson</u> are <u>effective</u> upon release:

> Non-hearing or interlocutory actions <u>taken pursuant to delegated authority shall</u>, unless otherwise ordered by the designated authority, <u>be effective upon release</u> of the document containing the full text of such action, or in the event such a document is not released, upon release of a public notice announcing the action in question.

47 C.F.R. § 1.102(b)(1); <u>Amerifactors</u> ¶ 18; <u>Ryerson</u> ¶ 19.  Parties may file a motion for reconsideration with the CGAB <u>or</u> an application for review by the Commission, but the ruling remains in full force and effect <u>unless</u> the party seeking review <u>also seeks</u> and obtains a stay <u>or</u> the ruling is otherwise stayed by the Commission:

> If an application for review of a non-hearing or interlocutory action is filed, or if the Commission reviews the action on its own motion, the Commission <u>may in its discretion</u> stay the effect of any such action until its review of the matters at issue has been completed.

47 C.F.R. § 1.102(b)(3); <u>see also</u> <u>id.</u> § 1.102(b)(2) (noting the designated authority <u>may</u> stay the effect of any order or ruling).  And other courts before which the Wanca firm have made these same arguments have likewise rejected them.  <u>See</u>, <u>e.g.</u>, <u>Career Counseling</u>, 2021 WL 3022677, *8-10.  Indeed, the Ninth Circuit recently rejected the exact same argument Class Counsel made in their recent submission on Article III (Dkt. 505), holding that the application for review Mr. Hara filed on January 8, 2020 has <u>no</u> impact whatsoever on <u>Amerifactors</u> having <u>full</u> force and effect:

> That there is a pending application for review of *Amerifactors* by the full Commission does <u>not</u> change this analysis. Orders issued on delegated authority are "<u>effective</u> <u>upon</u> release." *47 C.F.R. § 1.102(b)(1)*. <u>Unless the full</u> Commission issues a stay pending review, *Amerifactors* remains in effect. *See id. §§ 1.102(b)(2), 1.115(h)(2).*

<u>True Health</u>, 2023 WL 7015279, *2 n.1; <u>Katz Chiro. v. Diamond</u>, 340 F.R.D. 383, 389 (N.D. Cal. 2021) ("And the *Amerifactors* decision is clearly <u>final</u>[.]").[18]

### D. <u>Amerifactors</u> And <u>Ryerson</u> Clearly Can And Should Be Applied Retroactively

<u>Amerifactors</u> and <u>Ryerson</u> are both declaratory rulings by the CGAB issued on delegated authority.  <u>See</u> 47 U.S.C. § 155(c)(1); 47 C.F.R. § 0.361.  As such, they have <u>exactly</u> the same force and effect as any order, decision, report or other action of the Commission.  <u>See</u> 47 U.S.C. § 155(c)(3).  Moreover, they were effective upon <u>issuance</u> and remain so <u>unless</u> and <u>until</u> someone <u>seeks</u> and <u>obtains</u> a stay from the Commission, which has <u>not</u> occurred and almost certainly will <u>not</u> occur at this point.[19]  <u>See</u> 47 U.S.C. § 155(c)(4); 47 C.F.R. §§ 1.102(b)(1), (3).  And as

---

[18] Pertinent excerpts from <u>Katz</u> (N.D. Cal.), <u>True Health</u> (N.D. Cal.), <u>True Health</u> (9th Cir.) and <u>Career Counseling</u> (D.S.C.) are included in Exhibit 14 hereto.

[19] If the Commission felt there were any merit to Mr. Hara's arguments with respect to <u>Amerifactors</u> or <u>Ryerson</u>, the Commission would no doubt have already acted on the Applications for Review he filed over three years ago or more.  <u>See</u> Jan. 8, 2020 Application for Review, Ex. 15 hereto; Feb. 3, 2020 Reply in Support of Application for Review, Ex. 16 hereto; Oct. 5, 2020 Application for Review, Ex. 17 hereto.  And if Mr. Hara wanted a stay of <u>Amerifactors</u> or <u>Ryerson</u>, he certainly should have asked for one, as contemplated by the FCC's regulations.  <u>See</u> 47 C.F.R.

declaratory rulings interpreting the terms of the TCPA, <u>Amerifactors</u> and <u>Ryerson</u> can and should be applied retroactively under controlling precedent in the Eleventh Circuit and innumerable decisions in this district and elsewhere. <u>See</u>, <u>e.g.</u>, <u>Heimmermann v. First Union Mortg.</u>, 305 F.3d 1257, 1260-61 (11th Cir. 2002).

Indeed, Judge Scriven addressed this very question in <u>Licari</u> and concluded Eleventh Circuit precedent <u>fully</u> supports retroactive application of <u>Amerifactors</u>, because <u>Amerifactors</u> is a clarification and itself made clear it was a clarification.[20] <u>See Licari</u>, 2021 WL 4506405, *7. Numerous other courts have reached the same conclusion, and the <u>exact</u> same arguments advanced here by Class Counsel have been rejected by many other courts. <u>See</u>, <u>e.g.</u>, Ex. 18 hereto (providing relevant excerpts from, <u>inter alia</u>, decisions in cases involving the Wanca firm).

The Eleventh Circuit's decision in <u>Heimmermann</u> is most instructive. <u>See</u> <u>Heimmermann</u>, 305 F.3d at 1260-61. In <u>Heimmermann</u>, the Eleventh Circuit left no doubt that clarifications of existing law like <u>Amerifactors</u> and <u>Ryerson</u> are <u>not</u> new rules or regulations, and thus, there is no problem applying them retroactively:

> The 2001 SOP [<u>i.e.</u>, statement of policy] was promulgated after the transactions that gave rise to this litigation and after the district court's ruling on the issue of class certification. But because we accept that both the 2001

---

§§ 1.102(b)(3), 1.115(h)(2). Otherwise, <u>Amerifactors</u> and <u>Ryerson</u> have full force and effect. <u>See</u> <u>id.</u> § 1.102(b)(1); <u>see also</u>, <u>e.g.</u>, <u>True Health</u>, 2023 WL 7015279, *2 n.1.

[20] Given space limitations, the relevant passages from <u>Licari</u> are set forth in Exhibit 18 hereto, along with relevant passages from other decisions in which these same arguments by the Wanca firm on retroactivity were rejected by other courts. The only courts to reach a contrary conclusion to our knowledge, however, were the divided panel of the Sixth Circuit in <u>Lyngaas</u>, which inexplicably addressed retroactivity <u>sua sponte</u> in <u>dicta</u> without the benefit of <u>any</u> briefing by the parties, and <u>Levine Hat v. Innate Intel.</u>, 538 F. Supp. 3d 915, 926 (E.D. Mo. 2021), in which Judge Limbaugh followed (without much – if any – analysis) the ruling in <u>Lyngaas</u>. <u>See Lyngaas</u>, 992 F.3d at 427. <u>But see In re Advanced Rehab</u>, 2021 WL 3533492, *2 (6th Cir. 2021) (Sixth Circuit stating it is "not so sure" that <u>Lyngaas</u> represents a holding that <u>Amerifactors</u> should not be applied retroactively). But Eleventh Circuit authority is plainly to the contrary of Class Counsel's position on retroactivity. <u>See Scoma v. Dental Equities</u>, 2021 WL 6105590, *8 (M.D. Fla. 2021); <u>Licari</u>, 2021 WL 4506405, *7; <u>Scoma v. Mastercard</u>, 2021 WL 720347, *11 (M.D. Fla. 2021).

SOP and the statement it <u>interprets</u>, the 1999 SOP, are <u>clarifications</u> of existing law and not new rules or regulations, <u>no problem</u> with <u>the</u> <u>retroactive</u> <u>application of</u> the <u>statements exists</u>.

<u>Id.</u> at 1260.  The Eleventh Circuit further noted in <u>Heimmermann</u> that where the agency indicates a ruling or order is simply a clarification of existing law (as the FCC did in <u>Amerifactors</u> and <u>Ryerson</u>), that statement is given considerable weight:

> While not dispositive, <u>an</u> <u>agency's</u> <u>determination</u> that <u>a</u> <u>new</u> <u>statement</u> <u>is</u> <u>a</u> <u>clarification</u> of <u>existing law</u>, <u>rather than</u> <u>an entirely</u> <u>new</u> <u>rule</u>, <u>is generally</u> <u>given</u> <u>much</u> <u>weight</u>. <u>See Pope, 998 F.2d at 483.</u> We will defer to an agency's statement that a new rule is a clarification of the law, instead of a new rule altogether, unless "the prior interpretation . . . is patently inconsistent with the later one." <u>Id.</u> Another significant indicator that a statement only clarifies existing law is when the law supposedly being clarified is ambiguous. <u>See Piamba Cortes, 177 F.3d at 1283-84.</u>

<u>Id.</u>; <u>see also</u>, <u>e.g.</u>, <u>Amerifactors</u> ¶ 8 ("Our <u>clarification</u> is limited to an analysis of online fax services[.]"); <u>Ryerson</u> ¶ 11.

### E.   Plaintiffs Cannot Possibly Satisfy Their Burden Of <u>Pleading</u> And <u>Proving</u> That Each Settlement Class Member Has Article III Standing

Plaintiffs have the burden at <u>each</u> stage of the litigation of <u>proving</u> <u>each</u> Settlement Class Member has Article III standing, with that burden <u>escalating</u> at each successive stage of the litigation.  <u>See</u> <u>TransUnion</u>, 594 U.S. at 430-31; <u>Drazen I</u>, 41 F.4th at 1360.  For purposes of Settlement Class Members who received faxes sent as emails, this should mean at a <u>minimum</u> that Class Counsel must demonstrate by a preponderance of the evidence <u>each</u> of the following after harmonizing <u>Westfax</u> and <u>Amerifactors</u> and even assuming loss of time were a harm identified by Congress (which it plainly is <u>not</u> – <u>see</u> disc. <u>infra</u> at 21-24):

Issue No. 1:  The identities of <u>each</u> Settlement Class Member who received a fax as an email through a fax service provider, with the current (and only) estimate being that 40% or more of the Settlement Class Members received faxes as emails instead of as paper faxes on a conventional fax machine.

Issue No. 2:  For <u>each</u> Settlement Class Member so identified, who the fax service provider was for that Settlement Class Member for <u>each</u> fax

19

the member claimed to have received between July 14, 2009 and June 9, 2010 and <u>what</u> specific equipment that fax service provider was using at the time faxes were being sent on behalf of BTL (<u>e.g.</u>, was it an online fax service and/or did the equipment used otherwise lack a capacity to print).[21]

Issue No. 3:   To the extent Class Counsel are still maintaining that loss of time is a harm Congress intended to address for fax recipients under the TCPA, whether <u>each</u> Settlement Class Member identified as having received a fax as an email <u>actually</u> received, opened and reviewed the email and attachment, and if so, how much time that took.

<u>See</u> <u>Nat'l Spine</u>, 2022 WL 16695130, *6-7; <u>Dental Equities</u>, 2021 WL 6105590, *10.  And for Settlement Class Members who did <u>not</u> receive a fax as an email but, instead, simply logged into a cloud-based server for any faxes received by that person or entity's online fax service and then stored on its server, the necessary inquiry would be similar, if <u>not</u> more detailed.[22]   <u>See</u>, <u>e.g.</u>, <u>Amerifactors</u> ¶ 2 (describing how cloud-based servers also allow subscribers to log into a cloud-based server to check on faxes received by the fax service provider).

Inquiries of this nature would have been exceedingly difficult even if Class Counsel had bothered to prepare a class list when it was still feasible to do so, as individualized inquiries would be required for at least 40% of the Settlement Class.[23]

---

[21] Identifying the fax service provider for each class member was, of course, <u>exactly</u> what the Wanca firm <u>tried</u> to do in <u>Sharfman</u>, <u>National Spine</u>, <u>Career Counseling</u> and <u>True Health</u>, issuing subpoenas to the Local Number Portability Administrator of the Number Portability Administrative Center and to phone carriers in each case.  <u>See</u> <u>Sharfman v. Infucare</u>, 2022 WL 18926792, *20 (M.D. Fla. 2022); <u>Nat'l Spine</u>, 2022 WL 16695130, *11-12; <u>Career Counseling</u>, 2021 WL 3022677, *11; <u>True Health v. McKesson</u>, 2021 WL 4818945, *2 (N.D. Cal. 2021).  In each such instance, however, the Wanca firm <u>failed</u> in its efforts, and that was in cases involving faxes sent only a few years ago, <u>not</u> faxes sent (as here) well <u>over</u> a decade ago.  <u>See</u> <u>id.</u>

[22] To date, the focus has been on faxes received as emails, but <u>Amerifactors</u> also noted that many online fax services also allow subscribers to check on faxes received by simply logging into a cloud-based server.  <u>See</u> <u>Amerifactors</u> ¶ 2.  For Settlement Class Members who "received" faxes in that fashion, however, the argument for Article III standing is even more attenuated, and the necessary showing would be every bit as intricate and individualized, if not more so.  <u>See</u> <u>Nat'l Spine</u>, 2022 WL 16695130, *6-7.

[23] Individualized inquiries would be necessary for the 40% of the Settlement Class who received faxes as emails if it were possible to know <u>a priori</u> who those persons and entities were, but since that is <u>not</u> possible, individualized inquiries would be necessary for <u>all</u> Settlement Class Members

See, e.g., True Health, 2021 WL 4461585, *3-4 (addressing difficulties in differentiating recipients of faxes received by different means).  Similar problems have, in turn, lead numerous courts in this district and elsewhere to decertify a certified class or not certify a class in the first place, and the same result should obtain here.   See, e.g., id.; Nat'l Spine, 2022 WL 16695130, *9-13 (noting individualized inquiries necessary to determine whether each class member who received a fax by email had Article III standing).  But in this case, inquiries of this breadth and nature are simply not possible at this juncture, and the claims being asserted by Plaintiffs and Class Counsel are no longer remotely amenable to class treatment (if they ever were), hence the need for the Settlement Class to be decertified.  See, e.g., True Health, 2023 WL 7015279, *2 (affirming decertification); Career Counseling, 91 F.4th at 206-12 (affirming denial of certification).

### F.   Loss Of Time Would Not Establish Article III Standing For All Settlement Class Members Even If It Were A Harm Identified By Congress For Fax Recipients (Which It Clearly Is Not)

Class Counsel suggested at the January 19, 2024 hearing that loss of time was supposedly another harm Congress considered for fax recipients in enacting the TCPA, citing a sentence from the 2003 Order that itself contains no citation to the House or Senate reports.  See Hr'g Tr. (Dkt. 530) at 48:12-22.  Amerifactors clarified, however, that loss of time was not one of the harms Congress sought to address with respect to faxes:

> What is more, we agree with commenters that faxes sent to online fax services do not cause the specific harms to consumers Congress sought to address in the TCPA.  The House Report on the TCPA makes clear that the facsimile provisions of the statute were intended to curb two specific harms: "First, [a

---

(i.e., all Settlement Class Members would have to be asked in the first instance whether they received faxes on behalf of BTL as emails or by logging into cloud-based servers as opposed to receiving a fax on a conventional fax machine).  See Nat'l Spine, 2022 WL 16695130, *9-13.

> fax advertisement] shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." The record is clear that faxes sent to online fax services do not pose these harms and, in fact give consumers tools such as blocking capabilities to control these costs.  Specifically, we find that the advertiser cost-shifting that Congress sought to prevent, such as the use of a recipient's paper and ink, is not a factor with online fax services. The House Report on the TCPA explained in 1991 that fax machines were "designed to accept, process, and print all messages which arrive over their dedicated lines."
>
> . . .
>
> [T]he more general harms that such commenters point to—such as time spent monitoring unwanted faxes stored by online fax services—are more generalized harms that go beyond the specific harms Congress identified in enacting the TCPA.

Amerifactors ¶¶ 12, 14.  And this conclusion is fully supported by the legislative history itself.  See H.R. Rep. No. 102-317, Ex. 9 hereto, at 10; S. Rep. No. 102-178, Ex. 10 hereto, at 2.

Even if loss of time were a harm Congress intended to address, however, loss of time would not be a harm suitable for class adjudication under Rule 23 (or sufficient for Article III).  See disc. supra at 19-21; Nat'l Spine, 2022 WL 16695130, *6-7.  For the harms Congress identified in the TCPA for fax recipients, the harm is incurred when the fax is received on a conventional fax machine.  See H.R. Rep. No. 102-317, Ex. 9 hereto, at 10.  Toner and paper are consumed upon receipt, and even if the fax is not printed or viewed, the occupation of the fax machine and telephone line for a minute or more means another fax cannot be received, as the Eleventh Circuit noted in Sarris.  See, e.g., Sarris, 781 F.3d at 1252-53 ("This occupation of Plaintiff's fax machine is among the injuries intended to be prevented by the statute[.]").  And this is why the need to prove standing for each class member does not arise if faxes are sent to conventional fax machines.  See Dental Equities, 2021

WL 6105590, at *3-5.  Injury and thus standing are established simply by virtue of proof of receipt of the fax itself.  <u>See</u>, <u>e.g.</u>, <u>True Health</u>, 2021 WL 4461585, *3-4.

But that is not the case if the only harm is loss of time and especially not for a fax received as an email or by logging into an online server.  <u>See</u>, <u>e.g.</u>, <u>Daisy v. Mobile Mini</u>, 489 F. Supp. 3d 1287, 1291 (M.D. Fla. 2020).  If a Settlement Class Member was sent a fax as an email or "received" the fax by logging into a cloud-based server, they would have only suffered any "injury" at all if they actually opened <u>and</u> reviewed the email <u>and</u> its attachment.  <u>See</u>, <u>e.g.</u>, <u>Dental Equities</u>, 2021 WL 6105590, *5.  But there are many ways that emails can be screened or blocked (as recognized in <u>Amerifactors</u>), such that the recipient does not need to spend <u>any</u> time reviewing the actual email, let alone its contents or attachments, and anyone who did not spend any time reviewing such an email would obviously <u>not</u> have Article III standing, even on Class Counsel's telling of what Congress intended.  <u>See</u>, <u>e.g.</u>, <u>Amerifactors</u> ¶ 12 (referencing "blocking capabilities" available to block unwanted emails).[24]  In other words, junk faxes received as email could be treated just like any other junk email.  <u>See id.</u> ¶ 11.  Moreover, Plaintiffs would have the burden in any event of <u>proving</u> that <u>all</u> Settlement Class Members sent a fax as an email actually received the email, opened it and spent time reviewing the email and attachment (as opposed to blocking the email or never opening it), and for a Settlement Class for which we cannot identify many or most members, there is

---

[24] These blocking capabilities allow subscribers to block various types of transmissions (<u>e.g.</u>, all numbers without a Caller ID) or create a separate inbox for junk faxes, but all Settlement Class Members who used blocking tools to block faxes sent as emails on behalf of BTL could <u>not</u> possibly claim loss of time even in the first instance as a basis for Article III standing and even if that were a harm identified by Congress.  <u>See</u> Sept. 6, 2019 Ltr. fr. S. Augustino to M. Dortch, Ex. 19 hereto, at 6; Amerifactors Reply Comments, Ex. 20 hereto, at 13-14.

clearly no way that Class Counsel could <u>ever</u> meet that burden of proof if the only alleged harm were loss of time and even if loss of time were something Congress intended to address <u>vis-à-vis</u> faxes (which it is not).[25]  <u>See</u> <u>TransUnion</u>, 594 U.S. at 430-31; <u>see</u> <u>also</u> disc. <u>supra</u> at 19-21.

### G.   <u>Chevron</u> And <u>Skidmore</u> Deference

While the issue of <u>Chevron</u> deference is presently before the Supreme Court, no one can obviously predict with any degree of certainty what the outcome will be, let alone how exactly (if at all) the Supreme Court might revise or alter the <u>Chevron</u> doctrine going forward.[26]  <u>See</u>, <u>e.g.</u>, <u>Loper Bright v. Raimondo</u>, No. 22-451 (S.Ct.). Unless and until the <u>Chevron</u> doctrine is revised, however, the <u>Chevron</u> doctrine should be applied in its current form, and <u>Amerifactors</u> and <u>Ryerson</u> should be accorded <u>Chevron</u> deference, as <u>numerous</u> courts have concluded.  <u>See</u>, <u>e.g.</u>, <u>Dental Equities</u>, 2021 WL 6105590, *7-8.  Indeed, <u>Amerifactors</u> and <u>Ryerson</u> readily satisfy each of the requirements of <u>Chevron</u> and are entitled to deference from this Court as the most recent pronouncements by the FCC in terms of the issues raised in BTL's pending motion.[27]  <u>See</u> BTL's Mot. to Dismiss (Dkt. 492) at 21-22.

---

[25] Moreover (and as noted), faxes that were only "received" by the subscriber logging into a server would pose even more issues under Article III.  <u>See</u> disc. <u>supra</u> at 21-24.  According Article III standing to this subset of the Settlement Class would be akin, however, to giving Article III standing to persons who simply open their mailbox and discover junk mail in the mailbox but never read it.  <u>See</u> <u>Bolger v. Youngs Drug</u>, 463 U.S. 60, 72 (1983) (noting that the "'short, though regular, journey from mail box to trash can'" is <u>not</u> sufficient under the Constitution to warrant restrictions on commercial speech).

[26] As noted above, <u>Chevron</u> deference is accorded the most <u>recent</u> interpretation from an administrative agency <u>if</u> there is a conflict with earlier interpretations, and the sort of hierarchy suggested by Class Counsel in terms of various agency actions simply does <u>not</u> apply in terms of <u>Chevron</u> deference, with recency instead being the relevant consideration in the event of varying interpretations over time.  <u>See</u> <u>Nat'l Cable</u>, 545 U.S. at 981-82.  A full list of all decisions in which <u>Amerifactors</u> has been accorded <u>Chevron</u> deference is attached as Exhibit 21 hereto.

[27] Both <u>Amerifactors</u> and <u>Ryerson</u> were issued after the FCC had provided notice and requested comments.  <u>See</u>, <u>e.g.</u>, <u>Amerifactors</u> ¶ 7 ("The Bureau sought comment on Amerifactors' <u>Petition</u>."); <u>Ryerson</u> ¶ 9.  Under existing Eleventh Circuit precedent, this means that <u>Amerifactors</u>

Even if <u>Chevron</u> deference were to be completely eliminated, however, that would by no means mandate that there would be no place for deference to <u>Amerifactors</u> and <u>Ryerson</u>.  To the contrary, <u>Skidmore</u> deference would remain a fully viable doctrine and requires that the Court give deference to an agency's interpretation to the extent the agency's ruling has the power to persuade.  <u>See</u> <u>Skidmore v. Swift</u>, 323 U.S. 134, 140 (1944).  And as many courts have already decided, <u>Amerifactors</u> would be subject to <u>Skidmore</u> deference even if <u>Chevron</u> deference were not required.  <u>See</u>, <u>e.g.</u>, <u>Sharfman</u>, 2022 WL 18926792, *7; <u>Dental Equities</u>, 2021 WL 6105590, *8.  Thus, <u>Amerifactors</u> and <u>Ryerson</u> would remain subject to <u>Skidmore</u> deference in any case, and there is little doubt that both rulings are persuasive.  <u>See</u>, <u>e.g.</u>, <u>Sharfman</u>, 2022 WL 18926792, *5.[28]

### H.   Application Of The TCPA In The Event <u>Chevron</u> Deference Is Not Accorded

The Court also asked at the January 19, 2024 hearing how the TCPA should be applied if <u>Chevron</u> deference is not applicable.  <u>See</u> Clerk's Minutes (Dkt. 525). In terms of the statute itself, the best template would be the Fourth Circuit's recent

---

is entitled to <u>Chevron</u> deference as opposed to <u>Skidmore</u> deference (as is <u>Ryerson</u>).  <u>See</u>, <u>e.g.</u>, <u>Thompson</u>, 67 F.4th at 1308 n.3 (<u>Chevron</u> deference called for if "notice-and-comment procedures" followed).

[28] We believe the questions posed by the Court at the January 19, 2024 hearing can readily be answered through application of <u>Chevron</u> or <u>Skidmore</u> deference.  <u>See</u> Pet. for Reh'g or Reh'g En Banc (Dkt. 52-1) at 12-15, <u>True Health v. McKesson</u>, Appeal Nos. 22-15710, 22-15732 (9th Cir., filed Nov. 22, 2023) (submission by Mr. Hara suggesting the Hobbs Act should <u>not</u> be read to require district courts to defer to agency interpretations); <u>Career Counseling</u>, 91 F.4th at 208-09. In a recent decision, however, in a case involving the Wanca firm, the Ninth Circuit concluded the Hobbs Act fully applies to <u>Amerifactors</u> and that the district court in <u>True Health</u> was obligated to follow <u>Amerifactors</u>, as it did.  <u>See</u> <u>True Health</u>, 2023 WL 7015279, *2.  The law in the Eleventh Circuit and the Ninth Circuit <u>vis-à-vis</u> the Hobbs Act are largely in accord, but neither circuit appears to have yet addressed the Supreme Court's recent decision in <u>PDR</u> questioning the application of the Hobbs Act to district courts in private enforcement actions.  <u>See</u> <u>PDR v. Carlton & Harris</u>, 139 S.Ct. 2051, 2053-55 (2019); <u>id.</u> at 2056-67 (concurring opinions of Justice Thomas (joined by Justice Gorsuch) and Justice Kavanaugh (joined by Justices Thomas, Alito and Gorsuch)).

decision in <u>Career Counseling</u>.  <u>See</u> <u>Career Counseling</u>, 91 F.4th at 208-11.  As the

Fourth Circuit made clear, treating an online fax service as a telephone facsimile

machine is <u>not</u> at all consistent with a proper or coherent reading of the TCPA.  <u>See</u>

<u>id.</u>  More specifically, such a reading fails to take into account the fact the TCPA

defines <u>differently</u> devices used to <u>send</u> faxes <u>versus</u> devices used to <u>receive</u> faxes:

> Thus, to fall within the *§ 227(b)(1)(C)* prohibition, a fax can be <u>sent</u> from a "telephone facsimile machine" (as defined in *§ 227(a)(3)*), or from a "computer," or from some "other device." But that fax can be <u>received</u> in <u>only one</u> <u>way</u>: <u>on a</u> "<u>telephone</u> <u>facsimile</u> <u>machine</u>" (also as defined in *§ 227(a)(3)*).

<u>Id.</u> at 209; <u>see also</u>, <u>e.g.</u>, <u>Advanced Rehab</u>, 2020 WL 4937790, *8.  And as the Fourth

Circuit further recognized, an online fax service or conventional fax server may

qualify as a "computer" or "other device," but that is <u>not</u> sufficient to trigger liability

if the fax in question is <u>received</u> on that device (as opposed to being <u>sent</u>):

> To be sure, an online fax service may qualify as a "computer" or some "other device" within the meaning of the TCPA. With respect to a "computer" or "other device," however, the *47 U.S.C. § 227(b)(1)(C)* prohibition applies only to faxes sent *from* a "computer" or "other device" — and not to faxes sent *to* a "computer" or "other device" — as a result of the meaningful variances in *§ 227(b)(1)(C)*'s language. *See Rush v. Kijakazi, 65 F.4th 114, 120 (4th Cir. 2023)* (quoting *Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)*, for the proposition that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

<u>Career Counseling</u>, 91 F.4th at 210 (emphasis in original).  Alternatively, the Court

could also grant BTL's request for decertification of the Settlement Class without

giving deference to <u>Amerifactors</u> simply because Class Counsel cannot <u>possibly</u>

prove that all Settlement Class Members received faxes sent to "telephone facsimile

machines" with the capacity to print.  <u>See</u> disc. <u>supra</u> at 19-21.  Either way, however,

the result would be the same.

**I.   The Requirements Of <u>TransUnion</u> And <u>Drazen I</u> As Well As Article III Itself Apply To <u>All</u> Settlement Class Members, Not Just Claimants**

The Court also asked at the January 19, 2024 hearing whether if it concludes there is a standing issue, the lack of standing could nonetheless be remedied.  <u>See</u> Hr'g Tr. (Dkt. 530) at 59:13-18.  Respectfully, we believe the answer to that question is no, because Article III applies to <u>all</u> Settlement Class Members and, among other things, we have no idea who many or most Settlement Class Members even are.

More specifically, <u>TransUnion</u> and <u>Drazen I</u> both state that <u>all</u> members of any class seeking money damages must demonstrate Article III standing.  <u>See</u> <u>TransUnion</u>, 594 U.S. at 431; <u>Drazen I</u>, 41 F.4th at 1360.  There is, however, no suggestion anywhere that <u>only</u> claimants or persons from such a class eventually awarded money damages must satisfy Article III.  <u>See</u> <u>Drazen I</u>, 41 F.4th at 1361 ("If <u>every</u> plaintiff <u>within</u> the <u>class</u> <u>definition</u> in the class action in *TransUnion* had to have Article III standing to recover damages after trial, logically so too must be the case with a court-approved class action settlement.").  To the contrary, <u>Drazen I</u> explicitly provides that any definition of a settlement class that <u>includes</u> members lacking standing under Article III is defective and "cannot stand."  <u>Id.</u> at 1362; <u>see also</u>, <u>e.g.</u>, <u>Dental Equities</u>, 2021 WL 6105590, *3.  Moreover, the case law makes it equally clear the requirements of Article III apply to <u>all</u> members of a class seeking monetary damages, and since <u>all</u> members of the Settlement Class were eligible to submit a claim, there is no question they all must have Article III standing.  <u>See</u>, <u>e.g.</u>, Settlement Agt. (Dkt. 324-1) §§ III(A), IV(B).

The reasons why this is the case are tied to Rule 23 and the impact of any class settlement on a defendant as well as absent class members.  <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Fibreboard</u>, 527 U.S. 815, 846-47 (1999).  If the Settlement were approved by the

27

Court and upheld on appeal, then <u>all</u> Settlement Class Members would be bound by the judgment and the Release, not just the relative handful (less than 2%) of Settlement Class Members whose claims were tentatively approved by the Settlement Administrator.  <u>See</u>, <u>e.g.</u>, <u>Juris v. Inamed</u>, 685 F.3d 1294, 1312 (11th Cir. 2012).  Because <u>all</u> Settlement Class Members would be bound, however, it is essential to determine whether they <u>all</u> have Article III standing and are properly before the Court.  <u>See</u>, <u>e.g.</u>, <u>U.S. v. Sanchez-Gomez</u>, 584 U.S. 381, 387 (2018).  And it is that finality which is the essence of what any defendant entering into a class settlement seeks and to which it is entitled.  <u>See</u>, <u>e.g.</u>, <u>Karhu v. Vital Pharma.</u>, 621 Fed. App'x 945, 948 n.3 (11th Cir. 2015).  It is certainly what BTL sought in this case in entering into the Settlement.  <u>See</u> Settlement Agt. (Dkt. 324-1) at 1 ("This Settlement Agreement and Release is entered into . . . in order to effect a <u>full</u> <u>and</u> <u>final</u> settlement and dismissal of <u>all</u> <u>claims</u> against BTL[.]").

If the Settlement Class contains members lacking Article III standing, however, then they are <u>not</u> properly before the Court, the Court lacks jurisdiction over them and they would inevitably argue any judgment issued by the Court would <u>not</u> be binding on them.  <u>See</u>, <u>e.g.</u>, <u>TransUnion</u>, 594 U.S. at 431.  Accordingly, any of those persons and entities could conceivably try to file suit against BTL in state court (where Article III <u>per se</u> is not a requirement) and claim they are not bound by the Settlement, the Release or the Court's judgment.[29]  <u>See</u> <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892-93 (2008).  BTL would thus be deprived of the finality it rightfully

---

[29] To be sure, there would be many other impediments to doing so, including the statute of limitations.  <u>See</u>, <u>e.g.</u>, <u>Coniglio v. Bank of Am.</u>, 638 Fed. App'x 972, 974 n.1 (11th Cir. 2016).  But the risk of approval of a settlement for class members who lack Article III standing is <u>not</u> a risk that any settling defendant should have to bear.  <u>See</u>, <u>e.g.</u>, <u>Drazen I</u>, 41 F.4th at 1361.

sought in the Settlement, and Class Counsel would have already walked away with $5,187,500 in fees and costs (or whatever the Court ultimately awarded) for a monetary recovery by the <u>entire</u> Settlement Class of $800,000 or less, without Class Counsel having delivered finality and, to the contrary, having <u>actively</u> impeded the ability of BTL to secure finality.  <u>See</u> BTL's Mot. to Suppl. (Dkt. 523) at 20-22.

In sum, Article III necessarily applies to <u>all</u> Settlement Class Members, and there is no way of identifying or contacting the vast majority of them.  <u>See</u> Nat'l Spine, 2022 WL 16695130, *6-7.  So in this instance, the inability of Plaintiffs to satisfy their burden under Article III cannot be remedied.  <u>See id.</u> *12-13.

## J.   BTL Would Plainly Have A Due Process Right To Contest Any Evidence That Class Counsel Bring Forward On Article III Standing

To date, Class Counsel have offered <u>no</u> evidence whatsoever that <u>all</u> Settlement Class Members have Article III standing, and it is clear they will be unable to do so.  <u>See</u> Collins Decl. (Dkt. 492-6) ¶ 8 (describing meet and confer in which Class Counsel openly acknowledged the Settlement Class includes members who received faxes through online services).  If Class Counsel were able to come forward with evidence, however, whether that evidence took the form of self-attestations or something else, BTL would certainly have a due process right to contest such evidence.  <u>See, e.g.,</u> Carter v. Morehouse Parish Sch. Bd., 441 F.2d 380, 382 (5th Cir. 1971) ("A ruling based on evidence which a party has not been allowed to confront or rebut is one which denies due process.").  That basic principle is made clear by <u>Karhu</u> and numerous other decisions.  <u>See, e.g.,</u> <u>Karhu</u>, 621 Fed. App'x at 948.

Indeed, numerous courts (including the Eleventh Circuit in <u>Karhu</u>) have held that if self-attestations were to be used to determine class membership, then the defendant would have a due process right to challenge such attestations, which

routinely results in a conclusion class treatment is <u>not</u> appropriate.[30]  <u>See</u> <u>Karhu</u>, 621 Fed. App'x at 948-49 (not affording the opportunity to challenge self-attestations would provide "inadequate procedural protection" and "implicate[ the] due process rights" of defendants); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Marcus v. BMW</u>, 687 F.3d 583, 594 (3d Cir. 2012) (forcing a defendant to accept as true self-attestations "would have serious due process implications"); <u>Wilson v. Badcock Home Furn.</u>, 329 F.R.D. 454, 457-58, 460 (M.D. Fla. 2018) ("due process allows Defendant to inquire" as to the veracity of any self-attestation).  While these decisions largely address the issue of proving ascertainability through self-attestations by absent class members, the due process rights addressed in each of these decisions (and many others) would be no different if self-attestations were used to prove Article III standing or to address subject-matter jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>Bischoff v. Osceola Cnty.</u>, 222 F.3d 874, 878-82, 885 (11th Cir. 2000); <u>U.S. v. 1998 BMW "I" Convertible</u>, 235 F.3d 397, 399-400 (8th Cir. 2000).  And the risk of allowing persons and entities to "prove" an entitlement to the benefit of class membership would also be the same.  <u>See</u>, <u>e.g.</u>, <u>Wilson</u>, 329 F.R.D. at 461.

### K.  The Court Would Still Need To Address The Issue Of Emails And Logging Into Cloud-Based Servers Under Article III Even If It Accorded No Deference To Rulings Of The FCC

At the end of the day, the issue of Article III standing in this case boils down to whether a recipient of a fax as an email or someone who only logged into a cloud-

---

[30] <u>Karhu</u> was, of course, overruled by <u>Cherry</u> on the issue of ascertainability and, more specifically, what a proponent of class certification must demonstrate in <u>advance</u> of the certification decision in order to <u>obtain</u> certification in the first place.  <u>See</u> <u>Cherry</u>, 986 F.3d at 1301-05 (rejecting the holding in <u>Karhu</u> that a proponent of class certification must prove ascertainability in order to initially <u>secure</u> class certification).  <u>Cherry</u>, however, by no means abrogated the ruling in <u>Karhu</u> that a defendant would have a due process right to contest self-attestations, and <u>Cherry</u> certainly did not suspend the due process clause of the Constitution.  <u>See</u> <u>id.</u>

based server would <u>ever</u> have standing under Article III, no matter <u>what</u> Congress intended to do in the TCPA or <u>how</u> the FCC interpreted Congressional intent or the TCPA itself.  See <u>Daisy</u>, 489 F. Supp. 3d at 1291-97.  Indeed, that is precisely the question <u>Spokeo</u> and <u>TransUnion</u> direct this Court to ultimately address.  See <u>Spokeo v. Robins</u>, 578 U.S. 330, 339 (2016); <u>TransUnion</u>, 594 U.S. at 423-29.  While statutory standing can inform the issue of Article III standing (and likely does here), statutory standing on its own (even if it exists) does <u>not</u> create Article III standing.  See <u>Drazen I</u>, 41 F.4th at 1359 n.10; <u>see also</u> BTL's Mot. to Suppl. (Dkt. 523) at 3-7.  Likewise, <u>Chevron</u> and <u>Skidmore</u> deference are useful in determining whether statutory standing exists, but the Article III inquiry is necessarily <u>broader</u> and requires the Court to consider whether the recipient of an email standing alone (or someone who logs into a server) would have Article III standing, irrespective of what Congress intended to do.  See, <u>e.g.</u>, <u>Daisy</u>, 489 F. Supp. 3d at 1297.

We believe the foregoing discussion makes it clear that Congress did <u>not</u> intend to address faxes received as emails in the TCPA, and the FCC has consistently reaffirmed that.  See disc. <u>supra</u> at 3-5.  But even if the intent of Congress or the pronouncements of the FCC were less clear, the result would be the same.  See disc. <u>supra</u> at 21-24.  In <u>Daisy</u>, Judge Chappell undertook the detailed analysis required by <u>Spokeo</u> as to whether the intangible harm of "wasted time" in reviewing a junk fax sent by email "constitutes injury in fact" sufficient to satisfy Article III.[31]  See <u>Daisy</u>, 489 F. Supp. 3d at 1291-97.  In so doing, Judge Chappell considered "both

---

[31] To date, Class Counsel have <u>not</u> even attempted to address the analysis required by <u>Spokeo</u> and <u>TransUnion</u> or provided <u>any</u> analysis at all of what appropriate historical analogues there would be (if <u>any</u>) to a statutory cause of action for mere receipt of an email or logging into a server.  See BTL's Mot. to Suppl. (Dkt. 523) at 14-15.  They apparently provided no such analysis in <u>Daisy</u> either.  See <u>Daisy</u>, 489 F. Supp. 3d at 1292-97.

history and congressional judgment" as contemplated by <u>Spokeo</u> in concluding an alleged loss of time spent reviewing a fax received as an email "does not satisfy Article III's injury-in-fact requirement."[32]  <u>See id.</u> at 1297.  The exact same result should obtain in this case, however, because statutory standing under the TCPA is plainly lacking but also because the receipt of a mere email (or logging into a server) would <u>not</u> satisfy Article III in any event.  <u>See id.</u>

## II.  **CONCLUSION**

For the foregoing reasons, BTL respectfully requests that, pursuant to Fed. R. Civ. P. 12(b) and Fed. R. Civ. P. 23(c)(1)(C), the Court dismiss the class claim and decertify the Settlement Class.  BTL further requests such other relief as the Court deems appropriate.

Date:  February 20, 2024

Respectfully submitted,

/s/ Mark S. Mester
Mark S. Mester, One of the Attorneys for
Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
         robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

---

[32] Due to space limitations, the relevant passages from <u>Daisy</u> on the issue of loss of time are included in Exhibit 22 hereto.

## **LOCAL RULE 3.01(g) CERTIFICATION**

We understand that Plaintiffs and Class Counsel oppose BTL's motion to dismiss for lack of subject-matter jurisdiction and to decertify the Settlement Class. See BTL's Mot. to Dismiss (Dkt. 492) at 24 (L.R. 3.01(g) Certification).

Date:  February 20, 2024

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for
Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  February 20, 2024

<u>/s/ Mark S. Mester</u>
Mark S. Mester, One of the Attorneys for
Defendant Buccaneers Team LLC

Mark S. Mester
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com