# EXHIBIT 7

Cin-Q Automobiles, Inc., et al. v. BTL
Case No. 8:13-cv-01592-AEP (M.D. Fla.)

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al., <br>                   Plaintiffs, <br> v. <br> BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, <br>                   Defendants, <br><br> TECHNOLOGY TRAINING ASSOCIATES, INC., et al., <br>                   Intervenors. | Case No. 8:13-cv-01592-AEP <br><br> **Magistrate Judge <br> Anthony E. Porcelli** |

## DECLARATION OF KEN SPONSLER

I, Ken Sponsler, declare and state as follows:

### I. INTRODUCTION

1. My name is Ken Sponsler. I am the Senior Vice President at PossibleNOW Services, Inc. d/b/a CompliancePoint Litigation Support Services ("CPLSS"), located in Duluth, Georgia.

2. This declaration lists my additional findings and conclusions in this matter. I reserve the right to provide additional information in this matter. I also reserve the right to supplement this declaration as new information becomes available.

### II. ASSIGNMENT

3. CPLSS and I were asked by counsel for Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership ("BTL") in the above-captioned matter

1

to assess whether and to what extent fax service providers during the period of 2009 and 2010 would have utilized technology that was substantially similar to the technology identified by the FCC as being used by "online fax services" in its declaratory rulings in In re Amerifactors Fin. Grp., LLC, 2019 WL 6712128 (FCC Dec. 9, 2019) and In re Joseph T. Ryerson & Son, Inc., 2020 WL 5362216 (FCC Sept. 4, 2020).

### III.   QUALIFICATIONS

4.   I have extensive experience regarding fax transmission technology and its application with respect to the rules and requirements under the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), 47 USC § 227 (hereafter "TCPA"). I have previously served as a party-appointed expert witness in dozens of TCPA matters. I have also been appointed by federal courts to serve as a TCPA compliance monitor.

5.   My experience includes dozens of consulting and testifying witness engagements in matters relating to the types of technologies employed by fax service providers and online fax services.

6.   My qualifications were previously described in Paragraphs 15-25 of the February 18, 2022 Declaration of Ken Sponsler in Support of BTL's Submission Regarding the Reliability of the Biggerstaff Report Data ("February 18, 2022 Sponsler Declaration"), and I incorporate them into this declaration.

7.   This declaration assumes the Court is familiar with the faxes at issue in this case and incorporates the background information regarding the alleged fax marketing campaign described in Paragraphs 26-31 of the February 18, 2022 Sponsler Declaration.

8. This declaration also assumes that the Court is familiar with the various expert reports prepared in this matter by Plaintiffs' expert, Robert Biggerstaff.  See Biggerstaff Report (Dkt. 207-5); Biggerstaff Suppl. Rpt. (Dkt. 207-9); Biggerstaff Second Rpt. (Dkt. 210-2).

IV. **OPINION ONE: ALL OR VIRTUALLY ALL OF THE ONLINE FAX SERVICES IN OPERATION IN 2009 AND 2010 WOULD HAVE BEEN "ONLINE FAX SERVICES" AS THAT TERM IS DESCRIBED BY THE FCC IN ITS DECLARATORY RULINGS IN AMERIFACTORS AND RYERSON, AND WOULD HAVE UTILIZED TECHNOLOGY CONSISTING ESSENTIALLY OF A CLOUD-BASED FAX SERVER USED TO SEND OR RECEIVE FAXES IN DIGITAL FORMAT OVER TELECOMMUNICATIONS FACILITIES.**

9. The TCPA provides, among other things, that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain conditions apply.  47 U.S.C. § 227(b)(1)(C).

10. A "telephone facsimile machine" is defined in the statute as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."  47 U.S.C. § 227(a)(3).

11. In In re Amerifactors, the Consumer and Governmental Affairs Bureau of the FCC analyzed the question of whether "faxes sent to 'online fax services' are [] faxes sent to 'telephone facsimile machines.'"  Amerifactors, 2019 WL 6712128, *1 (FCC 2019).

12. <u>Amerifactors</u> described an "online fax service" as "'a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities' that allows users to 'access "faxes" the same way that they do email: by logging into a server over the Internet or by receiving a pdf attachment [as] an email.'" <u>Id.</u>

13. The FCC concluded in <u>Amerifactors</u> that "an online fax service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine' and thus falls outside the scope of the statutory prohibition." <u>Id.</u> at *1, *2.

14. In its analysis, the FCC noted that "Congress did not intend the statute's prohibition to apply to faxes sent to equipment other than a telephone facsimile machine." <u>Id.</u> at *3. Online fax services are not "telephone facsimile machines" as defined by the TCPA because, <u>inter alia</u>, "an online fax service cannot itself print a fax—the user of an online fax service must connect his or her own equipment in order to do so." <u>Id.</u> Online fax services instead "hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal or via an email attachment and has the option to view, delete, or print them as desired." <u>Id.</u> at *4.

15. The FCC distinguished the equipment at issue in <u>Amerifactors</u> from the equipment at issue in its 2015 declaratory ruling in <u>In re Westfax</u>, 2015 WL 5120880 (FCC Aug. 28, 2015). The <u>Westfax</u> decision, "based on a limited record, . . .

4

assumed" that the faxes at issue were sent to technology that had the capacity to print the fax, which was not the case with the technology in Amerifactors. Amerifactors, 2019 WL 6712128, at *4.

16. Similarly, the FCC in Ryerson found that the fax transmission at issue was not subject to the TCPA under the rationale of Amerifactors because the "cloud-based service received the document, and it is not equipment that can transcribe a fax onto paper." Ryerson, 2020 WL 5362216, *4.

17. As discussed in previous declarations in this matter, cloud-based online fax services were in widespread use in the period of 2009 to 2010, and it is my opinion that roughly 40% of faxes would have been received through an online fax service. See Dec. 11, 2023 Sponsler Decl. (Dkt. 492-2) ¶ 15; Feb. 18, 2022 Sponsler Decl. (341-2) ¶¶ 54-76. All or virtually all faxes received through a fax service provider in 2009 or 2010 would have been received using cloud-based technology that did not have the capacity to print the faxes at issue, like the technology described in Amerifactors and Ryerson.

18. It is thus my opinion that a substantial portion of the alleged fax transmissions at issue in this litigation would have been received by cloud-based online fax services that did not have capacity to print. In my view, however, it is not possible at this date to determine in any systematic way which faxes would have been received in such a manner.

19. Online fax services in existence in 2009-2010 were not and currently are not structured to be able to print incoming faxes, not least of all because they are not the intended recipients of those faxes and have no reason or need to print anything. Rather, they hold the incoming faxes digitally on servers and then either

5

send those faxes on to their customers as emails or make the faxes available for viewing by their customers on an online portal.  Additional hardware and software would have to be developed and implemented for online fax services to be able to print.  For example, HylaFax, a major enterprise fax hardware and software provider that has existed since 1991, lacks the capacity to print faxes itself for either its "open source" or enterprise products.  Lacking the business need to do so, it is apparent why no online fax service I am aware of structures its operations to be able to print incoming faxes.

## V.     CONCLUSIONS

20.     During the period of 2009 and 2010, roughly 40% of faxes would have been received through an online fax service, and all or virtually all of these services were using technology that is substantially similar to the technology utilized by "online fax services" found to <u>not</u> constitute "facsimile telephone machines" under the TCPA by the FCC in <u>Amerifactors</u> and <u>Ryerson</u> (<u>i.e.</u>, cloud-based services that essentially transmit the faxes to recipients as attachments to email or allow users to log into an online portal, and which do not themselves have the capability of printing the faxes).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 19th, 2024, in Beverly Hills, Florida.

*[signature]*

**Ken Sponsler**