# EXHIBIT 9

| 102D CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>102–317 |
|---|---|---|

# TELEPHONE ADVERTISING CONSUMER RIGHTS ACT

NOVEMBER 15, 1991.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. DINGELL, from the Committee on Energy and Commerce, submitted the following

# REPORT

[To accompany H.R. 1304]

[Including cost estimate of the Congressional Budget Office]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 1304) to amend the Communications Act of 1934 to regulate the use of telephones in making commercial solicitations, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| The Amendment | 2 |
| Purpose and Summary | 5 |
| Background and Need for Legislation | 6 |
| Telephone Solicitation Issues | 7 |
| The Modern Telemarketing Industry | 7 |
| Telephone Company Studies | 8 |
| Increase in Unlisted Numbers | 9 |
| State Laws—Legislation | 9 |
| Automatic Dialing Systems | 10 |
| Facsimile Advertising | 10 |
| Hearings | 11 |
| Committee Consideration | 11 |
| Committee Oversight Findings | 11 |
| Committee on Government Operations | 11 |
| Committee Cost Estimate | 11 |
| Congressional Budget Office Estimate | 11 |
| Inflationary Impact Statement | 12 |
| Section-by-Section Analysis and Discussion | 12 |
| Section 1. Short Title | 12 |
| Section 2. Findings | 12 |
| Section 3. Amendments to the Communications Act of 1934 | 12 |
| Definition of Telephone Solicitation | 13 |
| Exemption of Established Business Relationships | 13 |

59–006

2

Exclusion of Calls from Tax Exempt Organizations ........................... 16
Protection of Subscriber Privacy Rights ......................................... 18
    Consumer Complaints ..................................................................... 18
    Possible Remedies—Limitations ................................................... 19
    Development of the Electronic Database Alternative ...................... 20
    Database Cost Assumptions ............................................................ 21
    Database Cost Estimates ................................................................. 22
    Additional Clarifications ................................................................. 23
Changes in Existing Law Made by the Bill, as Reported ...................... 26

## The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Telephone Advertising Consumer Rights Act".

**SEC. 2. FINDINGS.**

The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective tele-marketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of pri-vacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the tele-phone for marketing, but telemarketers can evade their prohibitons through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarket-ing solicitations.

(9) Individuals privacy rights, public safety interests, and commercial free-doms of speech and trade must be balanced in a way that protects theprivacy of individuals and permits legitimate telemarketing practices.

**SEC. 3. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.**

Title II of the Communications Act of 1934 is amended by inserting immediately after section 226 (47 U.S.C. 226) the following new section:

**"SEC. 227. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.**

"(a) DEFINITIONS.—As used in this section:

"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator;

"(B) to dial such numbers; and

"(C) to deliver, without initial live operator assistance, a prerecorded voice message to the number dialed, with or without manual assistance.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity to do either or both of the following: (A) to transcribe text or images (or both) from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an elec-tronic signal received over a regular telephone line onto paper.

"(3) The term 'telephone solicitation' means the initiation of a telephone call or mesage for the purpose of encouraging the purchase or rental of, or invest-ment in, property, goods, or services, which is transmitted to any person (A) without that person's prior express invitation or permission, or (B) with whom the caller does not have an established business relationship. Such term does not include a call or message by a tax exempt nonprofit organization.

"(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is

3

transmitted to any person (A) without that person's prior express invitation or permission, or (B) with whom the caller does not have an established business relationship.

"(b) RESTRICTIONS.—It shall be unlawful for any person within the United States by means of telephone—

"(1) to make any telephone solicitation in violation of the regulations prescribed by the Commission pursuant to subsection (c);

"(2) to use, to make any telephone solicitation, any telephone facsimile machine or any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under subsection (d), or to use, to make any telephone solicitation, any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards;

"(3) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement in violation of any regulations prescribed by the Commission pursuant to subsection (e);

"(4) to use any automatic telephone dialing system to make unsolicited calls—

"(A) to any emergency telephone line or pager of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or

"(B) to any telephone number assigned to paging, specialized mobile radio, or cellular telephone service; or

"(5) to use a computer or other electronic device to send an unsolicited advertisement via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the advertisement or on the first page of each transmission, the date and time it is sent, an identification of the business sending the advertisement, and the telephone number of the sending machine or of such business.

"(c) PROTECTION OF SUBSCRIBER PRIVACY RIGHTS.—

"(1) RULEMAKING PROCEEDING REQUIRED.—Within 120 days after the date of enactmentof this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—

"(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

"(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

"(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

"(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

"(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

"(2) REGULATIONS.—Not later than 240 days after the date of enactment of this section, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

"(3) USE OF DATABASE PERMITTED.—The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, or to receiving certain classes or categories of telephone solicitations, and to make that compiled list available for purchase. If the Commission determines to require such a database, such regulations shall—

"(A) specify a method by which the Commission will select an entity to administer such database;

4

"(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

"(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber,

"(D) specify the methods by which such objections shall be collected and added to the database;

"(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

"(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

"(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

"(H) specify the methods for recovering, from persons accessing such database, the costs involved in notifying, collecting, updating, disseminating, and selling, and other activites relating to, the operations of the database that are incurred by the entities carrying out those activities;

"(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with subsection (b);

"(J) be designed to enable and require States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

"(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

"(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

"(4) Considerations required for use of database method.—If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

"(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

"(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—

"(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

"(ii) reflect the relative costs of providing such lists on paper or electronic media; and

"(iii) not place an unreasonable financial burden on small businesses; and

"(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

"(d) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after 6 months after the date of enactment of this section clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business or other entity sending the advertisement, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 12 months

5

after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(2) AUTOMATIC TELEPHONE DIALING SYSTEMS.—The Commission shall prescribe technical and procedural standards for automatic telephone dialing systems that are used to transmit any prerecorded telephone solicitation. Such standards shall require that—

"(A) all prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business or other entity; and

"(B) such systems will, as soon as is technically practicable (given the limitations of the telephone exchange service facilities) after the called party hangs up, automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.

"(e) CONSIDERATION OF FACSIMILE MACHINE RESTRICTIONS.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding to prescribe rules to restrict the use of any telephone facsimile machine or computer or other electronic device to send any unsolicited advertisement to the telephone facsimile machine of any person. In establishing such restrictions, the Commission shall consider—

"(1) the extent to which unsolicited advertisements are transmitted through telephone facsimile machines;

"(2) the extent to which recipients of such advertisements incur costs for such receipt; and

"(3) the most cost effective methods of preventing advertising abuses with telephone facsimile machines.

"(f) EFFECT ON STATE LAW.—

"(1) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits, either or both of the following:

"(A) The use of telephone facsimile machines or other electronic devices to send unsolicited advertisements.

"(B) The use of automatic telephone dialing systems to transmit prerecorded telephone solicitations.

"(2) STATE REGULATION OF TELEPHONE SOLICITATIONS.—If, pursuant to subsection (c), the Commission requires the establishment of a database of telephone numbers of subscribers who object to receiving telephone solicitations or a functionally equivalent methods or procedures for Federal regulation, a State or local authority may not develop any different database or system for use in the regulation of telephone solicitations and may not enforce restrictions on telephone solicitations in any manner that is not based upon the requirements imposed by the Commission.

"(3) STATE ENFORCEMENT PERMITTED.—Nothing in this section or in the regulations prescribed under this section shall prohibit the segmentation of the database or functionally equivalent method or procedure for use by State or local authorities, nor preempt any State or local authority from creating mechanisms to enforce compliance with the database or functionally equivalent system, or a segment thereof.

"(g) EFFECTIVE DATE OF REQUIREMENTS.—The requirements of this section shall take effect 30 days after the date that regulations are prescribed under subsection (c).".

SEC. 4. CONFORMING AMENDMENT.

Section 2(b) of the Communications Act of 1934 is amended by striking "Except as provided" and all that follows through "and subject to the provisions" and inserting "Except as provided in sections 223 through 227, inclusive, and subject to the provisions".

## PURPOSE AND SUMMARY

The purpose of the bill (H.R. 1304) is to protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment. Specifically, the bill makes it unlawful

6

within the United States to use the telephone, or automatic dialing recorded message player (ADRMP) systems, to solicit individuals who object to receiving commercial telephone solicitations. In addition, it restricts use of facsimile machines, computers or other electronic devices to send unsolicited advertisements.

Although certain specific telephone uses are prohibited, the Committee does not attempt to make all unsolicited telemarketing or facsimile advertising illegal. Instead, H.R. 1304 is designed to return a measure of control to both individual residential telephone customers and owners of facsimile machines. When conducted properly, unsolicited commercial calls and faxes are an established lawful marketing practice.

With regard to intrusive telephone solicitation, the legislation requires that the Federal Communications Commission (FCC) conduct a rulemaking to compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, etc.) for protecting residential telephone subscriber privacy rights and to prescribe regulations implementing the most effective method or procedure.

H.R. 1304 also prohibits unsolicited ADRMP calls to any emergency telephone line or pager of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or to any telephone number assigned to paging, specialized mobile radio, or cellular telephone service. In addition, the bill requires the Commission to establish specific technical and procedural standards governing ADRMP solicitations and facsimile advertisements. The Commission is also required to conduct a separate rulemaking to prescribe rules to restrict the use of any telephone facsimile machine, computer, or other electronic device to send unsolicited advertisements. This rulemaking must consider the extent of unsolicited facsimile advertising, costs incurred by recipients, and the most cost effective methods for preventing abuses.

### BACKGROUND AND NEED FOR THE LEGISLATION

In the United States, use of the telephone and related telecommunications technologies to conduct business has become commonplace. Since the 1920's, telephone marketing (telemarketing) has given businesses a cost-effective opportunity to broaden their markets as well as provide fast, efficient customer service information. However, rapidly decreasing telecommunications costs coupled with nationwide business use of sophisticated, computer driven telemarketing tools have caused the frequency and number of unsolicited telemarketing calls increase markedly.

In addition, businesses often use two other telephone-based technologies that offer a low cost means of communicating with prospective customers. Automatic dialing systems (automatic telephone dialers coupled with recorded message players) ensure that a company's message gets to potential customers in the exact same way, every time, without incurring the normal cost of human intervention. Advertisers have also seized on facsimile machines, often coupled to personal computers; as another potent tool for direct marketing of a number of products and services. An advertiser's facsimile machine can easily deliver tens of thousands of unsolic-

7

ited messages per week to other facsimile machines across the country.

### TELEPHONE SOLICITATION ISSUES

Use of the telephone to market property, goods and services directly to business customers, as well as individual consumers, is not only a common practice, but also a high growth industry. According to Telemarketing Magazine, U.S. expenditures on telemarketing have grown from $1 billion to $60 billion over the past 10 years. Meanwhile, the dollar value of telemarketing sales has grown from just over $80 billion in 1984 to $430 billion in 1990.

Every day over 300,000 solicitors call more than 18 million Americans, for an average of 60 calls per solicitor. In addition, the Wall Street Journal reported that some 75,000 stockbrokers make some 1.5 billion calls a year—roughly 80 calls per stockbroker per business day.

*The modern telemarketing industry*

While some telemarketing businesses still rely on telephone directories, printed lists of prospective customers, and manual operations, the number of such businesses is dwindling. Today, computers assist an estimated 82 percent of America's businesses conducting telemarketng campaigns. And computer assistance goes far beyond dialing the telephone number of the prospective customer and transferring the call to the next available telemarketing service representative. The entire sales to service marketing function has been automated. Modern telemarketing software organizes information on current and prospective clients into databases designed to support businesses in every aspect of telephone sales—all with the objective of bringing the company's product or service to the customer most likely to purchase it.

In addition, a separate market exists to develop and enhance telemarketing databases. Hundreds of companies sell customized and off-the-self software for data base applications within mainframe, mini and personal computer environments. Their telemarketing software products are designed to meet the needs of any size business. A leading vendor of PC-based telemarketing software, for example, has sold roughly 80,000 copies of its product—over half the copies were sold to one-person businesses.

Another market exists for companies that specialize in maintaining demographic and psychographic databases designed to provide businesses with a wealth of personal and life-style data on as many as 50 or 60 million people. Businesses routinely purchase data from multiple sources in an effort to create unique product- or service-specific databases. And, the databases can be developed from multiple starting points: a name, address, or telephone number; a drivers license number or license plate; or a personal check or credit card number.

In addition, because people change addresses and telephone numbers often enough, a separate "confirmation" market has emerged within the database market. A typical fee for updating a company's file with new telephone numbers would include a charge of about $2.00 per thousand numbers of input, plus $5.00 per thousand num-

8

bers confirmed, plus $20.00 per thousand numbers changed. Another update service will remove the names or numbers of those deceased within the last 18 months for a charge of 50 cents per thousand input names, plus $25.00 per thousand removed.

In addition, industry periodicals include information and advice designed to help businesses develop telemarketing capabilities and tools, including sophisticated databases. As an adjunct to professional journals and other literature, the Direct Marketing Association also offers instructional video and audio tapes, and conference proceedings, at nominal fees. Topics identified in the Association's catalogue include: Database Management and the Privacy Issues; Merge/Purge Methodologies—Database Marketing Correlations; A Marketing Managers Primer to Database Marketing; How to Use Outside Databases Effectively; and numerous industry-specific database marketing tapes.

Although the introduction of the computer has greatly increased the effectiveness and efficiency of telephone marketing, modern telemarketing techniques and equipment do not guarantee the emergence of ethical, unintrusive telephone solicitation practices. The telemarketing industry labors under an extremely negative image. Highly publicized fraudulent telephone sales schemes appear to account for some of the problem, but there is also a public perception that some telemarketers are unethical and unscrupulous.

The responsible telemarketers want to change the industry's image. They favor placing reasonable restrictions on the industry to curb those practices the industry itself has been unable to control through voluntary programs. The Telemarketing Legislative Coalition, for example, shares the concern over the growing misuse of the telephone in direct marketing. This group, which consists of Chief Executive Officers from the nation's top 50 telemarketing agencies, openly acknowledges the need to solve the problems of unrestricted telemarketing and applauds the Committee's determination in pursuing enactment of H.R. 1304.

*Telephone company studies*

Studies conducted by two regional Bell operating companies (Bell Atlantic and Ameritech) have produced data showing the pervasive nature of telemarketing practices within their respective regions. These studies document residential telephone customer experience with—and attitudes towards—various types of problem calls, including sales/solicitation and computer/advertising. Both studies, which include data analogous to complaints, were conducted in conjunction with planned offerings of Caller ID services and are proprietary in nature. In several cases, they are a part of the record of ongoing litigation and are subject to certain disclosure—discussion restrictions imposed by the court. The Committee has obtained relevant excerpts and summaries of the companies' findings and conclusions.

Between July 1988 and October 1989, Bell Atlantic surveyed residential telephone customers in Maryland, Virginia, Delaware, Pennsylvania, New Jersey, and the District of Columbia. Sales/solicitation and Computer/advertising calls, respectively, were the most often mentioned type of problem or annoyance call. The per-

9

centage of the people interviewed mentioning problem sales/solicitation calls ranged from 35 (New Jersey) to 49 (Virginia). The percentage mentioning computer/advertising calls ranged from 13 (Virginia) to 21 (Maryland).

Ameritech's annoyance call studies sampled customer experience and projected the percentage of customers that would receive the different types of calls studied. A November 1990 Ameritech study found an estimated 3.1 million Illinois residential customers (90 percent) would receive an average of 36 sales/telemarketing calls per year. Some Illinois Bell customers would receive only one sales/telemarketing call, but others could receive as many as 730 such calls in a given year. An earlier March 1990 study estimated 1.6 million Ohio customers (68 percent) would receive between one and 760 sales/telemarketing calls in a given year. This study found that an estimated 256,000 Ohio Bell customers would receive over 50 such calls per year.

The Bell Atlantic and Ameritech study results parallel the findings of a September 1990 survey conducted by The Roper Organization, Inc. To find out what things most annoy Americans, Roper interviewed a nationwide cross-section of 2,000 adults over the age of 18, face-to-face, in their homes. Each respondent was given a list of 19 annoying things and asked to rate each as (1) very annoying, (2) somewhat annoying, (3) doesn't bother, or (4) don't know.

Phone calls from people selling things were identified as very annoying by 67 percent of the respondents. Only phone calls from a computer trying to sell something were found to annoy more people (70 percent). Surveys that are really just selling things were found to be very annoying by 63 percent of those interviewed. In contrast, people coming to your house trying to sell things (door-to-door salesmen) were very annoying to 54 percent of those surveyed.

*Increase in unlisted numbers*

According to the Consumer Federation of America, the change in the percentage of unlisted residential telephone numbers is another indicator of consumer's desire to free themselves from intrusive telemarketing practices. A recent survey of U.S. households revealed that the percentage of unlisted numbers has increased by 30 percent nationwide since 1984.

The Consumer Federation asserts that the increase in the number of residential telephone subscribers purchasing unlisted numbers provides evidence of peoples' frustration with unwanted calls and indicates a need to restore a measure of privacy to their lives. However, even with an unlisted number, consumers may not get the protection they desire. According to USA Today, some companies have already developed software that numerically sorts listed numbers and identifies the missing numbers, which are likely to be unlisted.

*State laws—legislation*

Many States have passed laws that seek to regulate telemarketing through various time, place and manner restrictions. Florida is attempting to regulate telemarketers through a "do not call" database. However, telemarketers can easily avoid the restrictions of State law, simply by locating their phone centers out of state.

10

States are nonetheless actively exploring ways of bringing intrusive telemarketing practices under control.

According to the Direct Marketing Association, there are 43,000 bills touching on the practice of direct marketing pending before state legislatures. Of these, 475 bills are related to privacy. There are 18 bills that would establish do-not-call lists. Under the circumstances, a substantive argument can be made that federal legislation is needed to both relieve states of a portion of their regulatory burden and protect legitimate telemarketers from having to meet multiple legal standards.

The preponderance of the evidence documents the existence of a national problem and argues persuasively in favor of federal intervention balancing the privacy rights of the individual and the commercial speech rights of the telemarketer.

### AUTOMATIC DIALING SYSTEMS

In recent years a growing number of telemarketers have begun using automatic dialing systems to increase their number of customer contacts. The Committee record indicates that these systems are used to make millions of calls every day. Each system has the capacity to automatically dial as many as 1,000 phones per day. Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted telephone numbers.

Once a phone connection is made, automatic dialing systems can "seize" a recipient's telephone line and not release it until the prerecorded message is played, even when the called party hangs up. This capability makes these systems not only intrusive but, in an emergency, potentially dangerous as well. Despite these limitations—and the negative public image associated with these systems and the companies that use them—ADRMP use has not declined substantially. The Committee record also includes examples of this technology being employed in conjunction with 900 number schemes.

### FACSIMILE ADVERTISING

An office oddity during the mid-1980s, the facsimile machine has become a primary tool for business to relay instantaneously written communications and transactions. In an effort to speed communications and cut overnight delivery costs, millions of offices in the Untied States currently send more than 30 billion pages of information via facsimile machine each year. However, the proliferation of facsimile machines has been accompanied by explosive growth in unsolicited facsimile advertising, or "junk fax."

Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

11

### Hearings

On April 24, 1991, the Committee's Subcommittee on Telecommunications and Finance held a legislative hearing on H.R. 1304 (and related legislation H.R. 1589, the Telephone Privacy Act, and H.R. 1305, the Telephone Consumer Privacy Act). Testimony was received from 10 witnesses representing 9 organizations, with additional materials received from 6 organizations.

### Committee Consideration

On May 9 1991, the Subcommittee on Telecommunications and Finance met in open session and ordered reported the bill H.R. 1304, as amended, by a voice vote, a quorum being present. On July 30, 1991, the Committee met in open session and ordered reported the bill, H.R. 1304, with an amendment, by voice vote, a quorum being present.

### Committee Oversight Findings

Pursuant to clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Subcommittee held hearings and made findings that are reflected in the legislative report.

### Committee on Government Operations

Pursuant to clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Operations.

### Committee Cost Estimate

In compliance with clause 7(a) of rule XIII of the Rules of the House of Representatives, the Committee believes that the cost incurred in carrying out H.R. 1304 would be approximately $350,000 in FY 1992 and $250,000 each year thereafter.

### Congressional Budget Office Estimate

· U.S. Congress,
Congressional Budget Office,
*Washington, DC, September 20, 1991.*

Hon. John D. Dingell,
*Chairman, Committee on Energy and Commerce,*
*U.S. House of Representatives, Washington, DC.*

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 1304, the Telephone Advertising Consumer Rights Act, as ordered reported by the Committee on Energy and Commerce on July 30, 1991. CBO estimate that implementation of H.R. 1304 would cost between $4 million and $6 million over the next five years, assuming appropriation of the necessary amounts. Enactment of H.R. 1304 would not affect direct spending or receipts. Therefore, pay-as-you-go procedures would not apply to the bill.

H.R. 1304 would ban unsolicited telemarketing calls to emergency services, paging and cellular telephones. The bill would also ban unsolicited facsimile advertisements. H.R. 1304 would direct the

12

Federal Communications Commission (FCC) to revise standards for telephone facsimile machines and artificial and prerecorded voice systems. Finally, the bill would direct the FCC to conduct a rule-making proceeding examining the need to protect the privacy rights of residential telephone subscribers and to prescribe regulations protecting such privacy rights.

Based on information from the FCC, CBO estimates that promulgating and enforcing the various rules would cost about $700,000 over the next five years. The FCC may determine that a database containing a list of residential subscribers who object to receiving telephone solicitations is required to protect the privacy rights of residential telephone subscribers. If such a database is required, creation, maintenance, and use of such a database could cost between $3 million and $5 million over the next five years, depending on the size and capabilities of the system. We believe that such a database would probably be required.

CBO estimates that enactment of this bill would result in no cost to state or local governments.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is John Webb, who can be reached at 226–2860.

Sincerely,

ROBERT D. REISCHAUER,
*Director.*

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee makes the following statement with regard to the inflationary impact of the reported bill:

H.R. 1304 will have no inflationary impact.

SECTION-BY-SECTION ANALYSIS AND DISCUSSION

SECTION 1. SHORT TITLE

This Act may be cited as the "Telephone Advertising Consumer Rights Act."

SECTION 2. FINDINGS

The bill makes several findings regarding modern telemarketing technology and practices; intrusions upon individual privacy rights and public safety concerns; and the need for a federal solution that both protects the privacy rights of individual residential telephone subscribers and permits legitimate telemarketing practices.

SECTION 3. AMENDS THE COMMUNICATIONS ACT BY ADDING A NEW SECTION 227—RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING

Subsection a. Defines the terms automatic telephone dialing system, telephone facsimile machine, telephone solicitation, and unsolicited advertisement.

### Definition of telephone solicitation

Under H.R. 1304, the term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services which is transmitted to any person (A) without that person's prior express invitation or permission, or (B) with whom the caller does not have an established business relationship. Such term does not include a call or message by a tax exempt nonprofit organization.

The term does not apply to calls or messages where the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications. In addition, if a subscriber has given "prior express permission or invitation" to a telephone solicitation, this consent renders the call solicited and relieves the caller of liability for relying on such permission. The Committee did not attempt to define precisely the form in which express permission or invitation must be given, but did not see a compelling need for such consent to be in written form. Requiring written consent would, in the Committee's view, unreasonably restrict the subscriber's rights to accept solicitations of interest and unfairly expose businesses to unwarranted risk from accepting permissions or invitations from subscribers. However, enterprises relying on the exception should establish specific procedures for obtaining prior permission and maintaining appropriate documentation with respect to such permission.

To come within the definition, a caller must encourage a commercial transaction. Thus, the Committee does not intend the term "telephone solicitation" to include public opinion polling, consumer or market surveys, or other survey research conducted by telephone. A call encouraging a purchase, rental or investment would fall within the definition, however, even though the caller purports to taking a poll or conducting a survey.

Survey research conducted by telephone is not covered by the legislation for a number of reasons. First, such research has generated relatively few complaints from subscribers. Equally important, the results of telephone surveys could be rendered unreliable if the pool of subscribers available to be called was to be artificially limited by "Don't Call" lists or by other means. Alternative means of conducting surveys are significantly more expensive, and less practical, than telephone surveys.

The Committee's rationale for exempting calls where the caller has an established business relationship and excluding calls from charitable—political organizations is discussed below.

### Exemption of established business relationships

the bill reflects a balance the Committee reached between barring all calls to those subscribers who objected to unsolicited calls, and a desire to not unduly interfere with ongoing business relationships. To provide as much protection as possible to the former interest while respecting the latter, the Committee adopted an exception to the general rule—that objecting subscribers should not be called—which enables businesses to continue established business relationships with customers.

14

The Committee considered whether and under what circumstances a telephone subscriber could be solicited by telemarketers notwithstanding the fact that the subscriber is listed in a national database, or otherwise protected from unsolicited calls through an alternative mechanism. The Committee found that subscribers' objections to telemarketing initiatives were twofold. The first element pertains to the volume of unwanted calls. The second involves the unexpected nature of the calls. That is, the absence of any current or prior dealings with the caller was the source of many objections.

The Committee concluded that an enterprise having an "established business relationship" with a subscriber should be permitted to solicit the subscriber even if the subscriber otherwise objected to unsolicited calls. The existence of the relationship at the time of the solicitation, or within a reasonable time prior to it, would form the basis for the new solicitation, provided that it substantially relates to the products or services forming the basis of the relationship.

Under the exception adopted by the Committee, an established business relationship would include a business entity's existing customers, for which an established business relationship is clearly present. Therefore, magazines, cable television franchises, and newspapers all could call their current subscribers to continue their subscriptions even if such subscribers objected to "unsolicited" commercial calls. Similarly, credit card companies could call current cardholders, including holders of affiliated cards. Stockbrokers or lawyers could call current clients at home to discuss existing portfolios or ongoing legal cases. In the case of mutual funds, calls by the fund's manager to existing shareholders would not be covered. In addition, if an investor had written to a mutual fund or responded to an ad requesting additional information, the fund's manager could make follow-up calls, which would not be subject to H.R. 1304's restrictions.

In the Committee's view, an "established business relationship" also could be based upon any prior transaction, negotiation, or inquiry between the called party and the business entity that has occurred during a reasonable period of time. However, the Committee strongly believes that a subsequent telemarketing solicitation by an entity with an "established business relationship" to an objecting consumer must be substantially related to the product or service which formed the basis of the prior relationship. By requiring this type of relationship, the Committee expects that otherwise objecting consumers would be less annoyed and surprised by this type of unsolicited call since the consumer would have a recently established interest in the specific products or services.

The Committee recognized this relationship so as not to foreclose the capacity of businesses to place calls that build upon, follow up, or renew, within a reasonable period of time, what had once been "existing customer relationship." For example, magazine publisher would be able to call someone who has let their subscription lapse. A person who recently bought a piece of merchandise may receive a call from the retailer regarding special offers or information on related lines of merchandise. A loan officer or financial consultant may call a telephone subscriber who had requested a loan or

15

bought auto insurance a couple of months ago to pitch new loan
offerings or other types of insurance.

On the other hand, the Committee does not believe that an "es-
tablished business relationship," formed through a prior transac-
tion, negotiation, or inquiry between the called party and the busi-
ness entity regarding one element of the business, means that a
business relationship necessarily also has been established for unaf-
filiated divisions, subsidiaries, or other disparate parts of the same
business entity. In other words, a relationship established through
the purchase of a piece of merchandise from a company's retail or
catalogue division does not necessarily mean that a business rela-
tionship has been established between the customer and the com-
pany's other unaffiliated divisions or subsidiaries, or divisions that
a customer would not associate with the initial contract or pur-
chase.

However, the Committee recognizes that contact by an affiliate
of the company having the business relationship would be permissi-
ble if the solicitation by the affiliate related to a transaction in
progress with the subscriber or was substantially related to the
product or service forming the basis of the business relationship.
Consequently, the Committee believes that under these specific cir-
cumstances, it would be generally consistent with subscribers' ex-
pectations for affiliated companies to solicit subscribers. However,
the Committee anticipates that affiliate solicitations will be few in
number—the exception rather than the rule—and stresses its view
that it would be inappropriate for an affiliate company to rely on
the established business relationship exception to solicit a subscrib-
er with respect to products or services not substantially related to
those upon which its affiliate's business relationship was based.

In sum, the Committee believes the test to be applied must be
grounded in the consumer's expectation of receiving the call. Con-
sequently, the test shall consist of a determination of whether the
new solicitation occurs within a reasonable period of time and the
new product or service being promoted is related substantially to
the prior relationship. The Committee intends this test to be one of
substance and not one of form. Nothing in the test necessarily
would bar solicitations by affiliates of an entity, so long as the con-
tact occurs within a reasonable period of time and the product or
service being promoted is substantially related. In short, the Com-
mittee finds this test, which focuses on the substance of the con-
tact, that is, the presence of an established business relationship,
and not the form of the corporate organizational structure, to be
necessary and relevant.

The Committee emphasizes that businesses should not view the
presence of an established relationship as absolute relief from sub-
scribers' privacy requests. If a subscriber asks a company with
whom it has an established relationship not to call again, the com-
pany has an obligation to honor the request and avoid further con-
tacts. Despite the fact that objecting subscribers can be called
based on an "established business relationship," it is the strongly
held view of the Committee that once a subscriber objects to a busi-
ness that calls based on an established relationship, such a busi-
ness must honor this second objection and implement procedures
not to call that twice-objecting subscriber again. Businesses calling

16

established customers who object to unsolicited calls must remember that these are subscribers who have made a predetermination that they will not be receptive to unsolicited telemarketing. The telephone subscriber's second objection, which is a company-specific objection, must be respected by that company. The Committee expects the FCC to address this matter within the required rulemaking.

The definition of a "telephone solicitation" is in no way intended to include calls to collect debts or to follow up on billing a subscriber for some service, purchase or other transaction.

*Exclusion of calls from tax exempt organizations*

The Committee made the public policy determination to exclude calls made by charitable or political organizations on the basis of the record, which does not contain sufficient evidence to demonstrate that calls from these tax exempt nonprofit organizations should be subject to the restrictions provided for under the bill. To the contrary, the record suggests that most unwanted telephone solicitations are commercial in nature.

Complaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations. In response to a request from the Subcommittee on Telecommunications and Finance, the National Association of Consumer Agency Administrators polled its state level members for statistical data describing the extent to which consumer complaints about unsolicited telemarketing calls involved commercial, charitable, or political calls. States with statistical data readily available provided the following information:

| State | Percentage of consumer commercial calls | Complaints involving charitable calls |
|---|---|---|
| Kansas | 99.0 | 1.0 |
| Colorado | 99.0 | 1.0 |
| Florida | 94.5 | 5.5 |
| Texas | 92.8 | 7.2 |
| Rhode Island | 90.0 | 10.0 |
| South Carolina | 87.7 | 12.3 |
| Virginia | 86.3 | 13.7 |
| Vermont | 80.0 | 20.0 |
| California | 80.0 | 20.0 |

Other states (including New York, Tennessee, Nevada, and Washington) responded that consumer complaints about unsolicited telemarketing involved calls that were "mostly commercial" in nature.

In addition to the relative low volume of non-commercial calls, the Committee also reached the conclusion, based on the evidence, that such calls are less intrusive to consumers because they are more expected. Consequently, the two main sources of consumer problems—high volume of solicitations and unexpected solicitations—are not present in solicitations by nonprofit organizations.

However, to allow for the possibility that charitable or political calls might—in pockets of the country—represent as serious a problem as commercial solicitations, a special requirement (Subsection

17

c(1)(D)) was added to H.R. 1304. It directs the Commission to consider whether there was a need for additional authority to further restrict telephone solicitations, and if such a finding is made and supported by the record, to propose specific restrictions to the Congress. The Committee expects the Commission's proposal to consider fully constitutional limitations on any proposed restrictions.

In crafting H.R. 1304, the Committee was sensitive to restraints on its authority to regulate the speech of charitable and political organizations, speech which the Supreme Court has identified as "core" First Amendment Speech. See *Village of Schaumberg* v. *Citizens for a Better Environment*, 444 U.S. 620 (1980); *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940). As demonstrated above, the Committee found that solicitations by such organizations were less of a problem than commercial calls. It is on this basis that the Committee believes that the scope of the regulation is a workable "commercial speech" distinction consistent with Supreme Court precedent. See *Central Hudson Gas & Elec. Corp.* v. *Public Service Commission of New York*, 447 U.S. 557 (1980); *Metromedia, Inc.* v. *City of San Diego*, 453 U.S. 490 (1981). Finally, the Committee relied on the research of the American Law Division of the Congressional Research Service and the American Civil Liberties Union to conclude that these restrictions justified by the magnitude of the problem and that such restrictions remain faithful to Supreme Court precedent on protections to be accorded "commercial speech."

Subsection b. Restrictions: The bill makes it unlawful:

To solicit telephone subscribers in violation of FCC regulations to protect privacy rights required under subsection (c);

To use for purposes of solicitation any facsimile machine or automatic dialing system that does not comply with technical and procedural standards specified in the bill;

To use any fax machine, computer or other device to send an unsolicited advertisement in violation of future FCC regulations;

To use an automatic dialing system to make unsolicited calls to any emergency telephone line or pager of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; and

To use a computer or other electronic device to send an unsolicited advertisement via a fax machine that does not meet certain specific marking requirements.

The restriction on calls to emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications. The Committee does not intend for this restriction to be a barrier to the normal, expected or desired communications between businesses and their customers. For example, a retailer, insurer, banker or other creditor would not be prohibited from using an automatic dialer recorded message player to advise a customer (at the telephone number provided by the customer) that an ordered product had arrived, a service was scheduled or performed, or a bill had not been paid.

18

*Consumer complaints*

Subsection c. Protection of Subscriber Privacy Rights: The Committee found that unsolicited telemarketing most often is targeted toward consumers who are not familiar with the company's product or service. But all too frequently it represents more of a nuisance than an aid to commerce. Whether an individual or a machine is on the other end of the line, consumers find unsolicited telemarketing calls an intrusive, often frustrating, invasion of their privacy. The nightly recurrence of calls from solicitors and automated machines trying to sell something is now a predictable part of many lives, yet consumers can do nothing to change things. The expert testimony, data, and legal analyses comprising the Committee's record, and broad support of consumers, state regulators, and privacy advocates clearly evidence that unsolicited commercial telemarketing calls are a widespread problem and a federal regulatory solution is needed to protect residential telephone subscriber privacy rights.

The Committee's records include expert testimony and data provided by the National Association of State Utility Consumer Advocates, which represents the 43 state utility consumer advocates in 38 states and the District of Columbia. The Association's witness, Mr. Jack Shreve, Public Counsel for the State of Florida, testified that Florida's Division of Consumer Services typically received an average of 250 written complaints per month and double that amount of telephone complaints per month, regarding problems about unsolicited calls.

In response to a post-hearing question, the Association noted that the Florida experience is fairly typical of other states, but noted that complaints about unsolicited calls are also received by states' Commerce Departments, Public Utility Commissions, Attorneys General, Consumer Protection Agencies and others. The Federal Trade Commission (FTC), the FCC, Better Business Bureaus and local telephone companies also receive complaints about unsolicited telephone calls.

Although there is no single repository of consumer complaints about unwanted commercial telephone calls, and the various organizations tracking these complaints do not use comparable methodologies, the Committee record contains consumer complaint data documenting the widespread nature of intrusive telephone solicitation problems.

Subsection c(1). Rulemaking Proceeding Required: Within 120 days, the FCC must initiate a rulemaking on the need to protect consumers from telephone solicitations to which they object. The proceeding shall compare and evaluate alternative methods and procedures, evaluate categories of entities with the capacity to establish and administer such methods and procedures, consider whether different methods should apply for local telephone solicitations, and consider whether additional FCC authority is needed to restrict solicitations from organizations exempted under subsection (a)(3) of the bill.

With regard to H.R. 1304's requirement that the FCC conduct a rulemaking to compare and evaluate alternative methods and procedures, the Committee received the following suggestions from af-

19

fected parties: electronic databases, telephone network technologies, special directory markings, and industry-based or company-specific "do-not-call" systems. The FCC should consider these or any other alternatives, either individually or in combination with others. Although the legislation gives the FCC latitude within its rulemaking to select among different methods and procedures to protect consumers from unsolicited telephone calls, the Committee expects the Commission to choose the alternative that is most effective in protecting telephone subscriber privacy.

*Possible remedies—limitations*

The goal of this rulemaking is to identify and implement the most effective and efficient means of protecting telephone subscriber privacy. The Committee believes that the electronic database alternative is the option with the potential to provide the most effective, efficient and economic control at the national, regional, state and local levels. The Committee feels that the electronic database alternative is the most viable, cost effective means of balancing individual privacy and commercial speech rights. However, the Commission's Rulemaking may disclose additional information unavailable to the Committee that would dictate a different outcome. In reviewing other alternatives, the Committee notes the major factors limiting the effectiveness of these alternatives.

For instance, telephone network technologies could be effective and highly efficient, but may not be available until after the year 2000. These remedies are dependent on the existence of advanced switching (Signalling System 7) and intelligent network capabilities throughout the national telephone network. The Committee record indicates that at today's cost, the expense of developing identification and blocking software, assigning special identifying numbers to the tens of thousands of companies that telemarket, and determining how to bill individual telemarketers for calls blocked, is expected to be far more expensive than the cost of developing a do-not-call database application with off-the-shelf software.

The special directory markings alternative also appears less effective than the database option—due to difficulties publishing and shipping updates to national, regional, state or local directories on a quarterly or semi-annual basis. The printing and mailing costs of special directories is another major disadvantage. Moreover, they are less efficient because they do not fit within the modern, computer-based telemarketing environment, and as such could discourage computer-based telemarketers (82 percent of the industry) from using them. Consequently, such directories only may be useful to a fraction of the 18 percent of the industry that is not telemarketing in an automated environment (i.e., those businesses which use the telephone directory as a primary source of prospective telemarketing customers.)

An industry "do-not-call" database known as the telephone Preference Service has been maintained and operated by the Direct Marketing Association for several years. The Committee recognizes that some responsible telemarketers already use this tool as a method for avoiding potentially unproductive calls, as well as protecting individual privacy. The Committee commends these efforts, but notes that this database is not comprehensive in nature and

20

that the Association has not enjoyed great success in persuading individual companies to utilize it. The Committee record shows that the database contains fewer than 500,000 names and telephone numbers and that only 82 of the Association's 3,800 members use it. The record established by the Committee strongly indicates that consumer complaint statistics, telephone company studies, and other independent polls attest to the need for a more effective and comprehensive means of protecting consumer telephone privacy rights.

Company specific databases, which also have been used for several years, provide some protection of telephone subscriber privacy rights, but are not seen as a comprehensive, industry-wide solution to intrusive telephone solicitation. Moreover, the Committee is concerned that the selection of this alternative could place unreasonable burdens on consumers and regulators. From the consumer's standpoint, it would be burdensome to require the residential telephone subscriber whose privacy is being invaded to personally request each of the tens of thousands of companies that telemarket not to call. For regulators, the major disadvantage associated with this alternative is the regulatory enforcement nightmare it would create for the FCC and state and local regulators tasked with overseeing so many (potentially tens of thousands) different "do-not-call" systems. With respect to both company-specific and industry-wide databases, the Commission should consider whether making such practices mandatory, and imposing substantial sanctions for violations, would increase their effectiveness to the point that they could satisfy the statutory requirements of this Act.

Subsection c(2). Regulations: Within 240 days, the FCC shall prescribe regulations to protect privacy rights in an efficient, effective and economic manner without any additional charge to telephone subscribers.

Subsection c(3). Use of Database Permitted: This section gives the FCC authority to require establishment and operation of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations and establishes specific requirements to be addressed in regulations. In developing the electronic database alternative, the Committee sought a minimally restrictive regulatory tool which would be comprehensive in scope, effective in operation, and easy to implement and enforce.

*Development of the electronic database alternative*

The database concept was developed to specifically address direct marketer and retailer concerns that the "clearinghouse" provided for in H.R. 2921 (101st Congress) would lead to a costly, bureaucratic regulatory structure. The specific alternative included in H.R. 1304 was developed as a result of investigations into telemarketing industry business operations. The committee sought to develop a regulatory tool that would fit easily into the machinery of the modern, computer-based telemarketing operation. Many of the specific requirements associated with the database alternative were developed out of additional concerns expressed by the Direct Marketing Association and National Retail Federation. The committee's intent was to direct the Commission to investigate regulatory alternatives that would address the operations of all telemarketers

21

and to recognize that the Commission may choose different approaches for various categories of telemarketers.

As a result of these efforts to develop and improve the database alternative, the Committee finds that establishment of a national database to be a well defined option available to the FCC for addressing the problem of intrusive telephone solicitation. The several additional public policy factors unique to the database solution that the FCC is required to consider also recommend this alternative. Finally, the Committee undertakes a detailed discussion of the alternatives because of the untried nature of this option and the Committee's clear intent that this option be given serious consideration. The Committee further believes that because state laws will be preempted, the Federal statute must be sufficiently comprehensive and detailed ensure States' interests are advanced and protected. The committee anticipates that the Commission's review will show that the database alternative will fully serve the manifold interests discussed above.

*Database cost assumptions*

Cost was one of the largest concerns voiced in conjunction with the database option. Telemarketers were concerned that the proposed database would be expensive to develop and maintain. To address this concern, the Committee requested cost estimates from the FCC and private companies. The following guidance was provided:

(1) The cost of developing and operating the database would be paid for in charges to telemarketers.

(2) Estimates should consider only those costs that are directly related to the development of the database.

(3) Administrative, rulemaking, or indirect costs (other than those normally allocable to personnel and equipment resources directly related to the database) were not allowable.

(4) Enforcement costs are not an appropriate systems development and operation cost element.

(5) The database will consist of 10 million, 10 digit records and would be developed by a least-cost contractor.

(6) Local telephone companies will absorb the cost of bill or directory inserts.

(7) Residential subscribers will pay the cost of postage, but not the cost of long distance phone charges should an 800 number be used.

(8) Database updates will be made quarterly.

(9) Local telephone companies will assist in maintenance through the new service hook-up and service disconnect interviews.

The potential "size" of the database (the number and length of records it will contain) was a critical cost estimate assumption. Database size translates into the number of residential telephone subscribers that will place their phone numbers in the database. The Committee's size estimate of 10 million subscribers is supported by the operating experience of businesses and states that currently utilize "do not call" databases or similar mechanisms.

According to Telemarketing Magazine, for example, the internal "do not call" lists maintained by nationwide telemarketing service agencies generally contain around 1.5 million numbers (less than 2

percent of the 88.4 million total U.S. residential phone lines). Even the largest firms, which call every household in America at least once a year, have fewer than 5 million numbers (less than 6 percent of the population) on their lists.

Over the past 4 years, Massachusetts has averaged about 250,000 telephone numbers (about 10 percent of the state residential line population) in its "no recorded solicitations" database. Florida now has about 26,100 telephone numbers (less than 1 percent of the residential phone lines) in its "do not call" database. The Direct Marketing Association's national database contains fewer than 500,000 names.

*Database cost estimates*

Several organizations submitted estimates of the cost of developing and operating the database permitted in H.R. 1304. In a memorandum dated April 23, 1991, the FCC provided two estimates. For what it called a "minimal" system, FCC estimated a total hardware and software (development) cost of $1 million and total annual (operating) costs of $294,481. For an "upper end" system, FCC estimated total development costs at $6 million and annual operating expenses at $597,000. This was the highest estimate received by the Committee. In an August 23, 1991, response to a request for another estimate, FCC estimated the development cost at between $500,000 and $2.5 million and annual operating costs at $500,000.

The National Exchange Carriers Association provided the second highest estimate received by the Committee. The Association's estimate of the database development costs was approximately $3 million, two-thirds of which was attributable to the cost of 800 number telephone lines. Annual operating costs were estimated at $500,000.

The Committee's record also includes database cost estimates from other organizations that are expert in database applications in the telecommunications environment at the national level. These organizations, which include AT&T and Sprint-United Telcomm, routinely customize such applications to meet the needs of hundreds of government and business customers. For the database envisioned in H.R. 1304, their development cost estimates range from approximately $1 to $3 million, with annual operating costs of $500,000.

In developing its estimate, AT&T assumed a phased development of the database over a three year period during which combined development and operating costs would average $850,000 per year. The annual cost of operating the system in year four and beyond was estimated at $500,000.

Sprint utilized a unit cost (per record charge) estimating technique in extrapolating systems development costs under two alternative scenarios. Under one development scenario, Sprint assumed use of audio response technology connected to an 800 number with automatic number identification. The estimated per record cost range under this development methodology was between 22 and 33 cents. A 10-million record 10-digit database would cost between $2.2 and $3.3 million to develop under the 800 number scenario.

Under the second scenario, Sprint assumed the use of machine-readable postcards (which could be included within new white

23

pages directories, inserted in bills, or provided in service disconnect new service hook-up interviews). Assuming that residential telephone subscribers would provide the stamp, the estimated per record cost range under this methodology was between 8 and 14 cents. A 10-million record 10-digit database would cost between $800,000 and $1.4 million to develop under the machine readable card scenario.

According to the Massachusetts Department of Public Utilities, it cost the State approximately $400,000 to develop their "no recorded messages" database. Florida estimates the cost of developing its "do not call" database at approximately $125,000.

*Additional clarifications*

To help ensure that the specific requirements in subsection c(3) are interpreted correctly, the Committee offers the following clarifications:

(1) In the language authorizing the FCC to establish and operate a single national database (Subsection c(3)), reference is made to telephone subscribers who object to receiving certain classes or categories of telephone solicitations. The Committee intends that this reference be interpreted as including the following broad categories of solicitation: commercial, charitable, and political. This reference is intended to work hand-in-glove with the requirement for the FCC to consider whether additional authority is needed to further restrict telephone solicitations (Subsection c(1)(D)). The Committee does not intend for the FCC to offer consumers an opportunity to receive telephone solicitations from one type of business, but avoid those of another. Such an interpretation is not supported by the record and would be burdensome to both the regulator and the regulated. It would also add substantially to the complexity and cost of the database alternative.

(2) In requiring the FCC to specify the method by which the Commission will select an entity to administer the database (Subsection c(3)(A)), the Committee intends that the Commission contract out, or enter into other arrangements, for the development and administration of the national database, rather than administer it in-house.

(3) In prohibiting any residential subscriber from being charged for having their telephone number added to, or deleted from, the national database (Subsection c(3)(E)), the Committee does not intend to prevent telephone subscribers from incurring nominal expenses for postage or long distance charges.

(4) In prohibiting any person from making or transmitting a telephone solicitation to any telephone number in the national database (Subsection c(3)(F)), the Committee intends to prevent businesses, and/or their telemarketing service agents from making unsolicited calls to residential subscribers who object to receiving telephone solicitations and have registered this objection by subscribing to the national database. It does not intend to prohibit a telephone company from placing calls involving telephone solicitations over its facilities. Such a burden would be unreasonable, if not infeasible.

(5) In requiring the FCC to specify the methods for recovering from persons accessing the database the developmental and oper-

24

ational costs involved (Subsection c(3)(H)), the Committee intends to place the primary financial burden on the businesses and service agencies that engage in telemarketing. In addition, the Committee intends the purchase and use of the database to be an integral part of a business' defense in resolving enforcement claims.

(6) In requiring FCC to specify the frequency with which the database will be updated and the method by which such updating will be implemented (Subsection c(3)(I)), the Committee directs the FCC to recognize in regulations mandated by the bill, that an estimated 16 to 20 percent of the nation's residential telephone numbers change each year. The Committee believes that the Commission should determine the optimum time frame for necessary updates, but that such updates should occur at least semi-annually.

The Committee recognizes the implementation of this legislation will in some situations involve certain reasonable delays. The Committee expects there will likely be a time-lag between the date on which the consumer first seeks protection of his privacy rights and the date on which he can expect to be free from unwanted telephone solicitations. Similarly, whenever a telephone subscriber changes address and telephone number, another implementation delay of up to six to twelve months should reasonably be expected. The actual period of delay will correspond to the update period chosen by the FCC.

Subsection c(4). Considerations Required for Use of Database Method: This provision requires the FCC to consider several additional public policy factors pertaining to the needs of national, regional, State and local telemarketers and certain cost considerations.

Subsection d. Technical and Procedural Standards.

Subsection d(1). Telephone Facsimile Machines: Fax machines manufactured 6 months after enactment, and used for unsolicited advertising, must clearly mark each transmitted page, or the first page of each transmission, with the date and time sent, the identity of the business or other entity sending the advertisement, and the telephone number of the sending machine or of such business. Machines without automatic dialing—transmission capabilities and unable to interfere with a computer are exempt for 12 months after the date of enactment.

Subsection d(2). Automatic Telephone Dialing Systems: All prerecorded messages shall, at the beginning of the message, clearly state the identity of the business or other entity initiating the call and, during or after the message, state clearly the telephone number or address of such business or entity. The Bill also requires that as soon as technically practicable after the called party hangs up, such machines automatically create a disconnect signal or on-hook condition that allows the called party's line to be released.

The Committee record includes examples of systems calling and seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services. In addition, customers who pay additional fees for cellular phones, pagers, or unlisted numbers are inconvenienced and even charged for receiving unsolicited calls from automatic dialer systems.

25

The Committee does not intend to extend the prohibition on use of automatic dialers to unsolicited telephone calls made for the purposes of providing a public safety message or warning. The Committee finds that governmental and non-governmental entities should be permitted to use automated telephone dialing systems to provide publish health and safety warnings.

The technical flaws of automatic dialing systems have engendered numerous consumer complaints about their use and have prompted more than half the state legislatures to enact or introduce legislation that restricts or totally bans their use. However, because regulatory jurisdiction is shared between federal and state agencies, telemarketers have been able to circumvent more restrictive regulation. By altering the routing of their calls among intrastate and interstate telephone lines, telemarketers have sought the least restrictive regulatory requirements.

Eighteen states prohibit and 23 states restrict the use of automatic dialing and announcing devices for commercial solicitation and legislation to impose a federal ban on the use of this technology has been introduced in the House and Senate.

Subsection e. Consideration of Facsimile Machine Restrictions: Within 120 days, the FCC must initiate a rulemaking to restrict the use of FAX machines, computers or other electronic devices to send unsolicited advertisements. The rulemaking must consider the cost borne by recipients, and the most cost effective methods of preventing facsimile advertising abuses.

The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.

In addition to the costs associated with fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications. Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time. Since businesses have begun to express concern about the interference, interruptions and expense that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices. Connecticut and Maryland have enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills are currently pending in the legislatures of about half the states.

Subsection f. Effect on State Law: States may impose more restrictive intrastate requirements on the use of telephone facsimile machines and automatic telephone dialing systems. However, if the FCC requires establishment of the database permitted in subsection c(3), State or local authorities' regulation of telephone solicitations must be based upon the requirements imposed by the FCC. State

26

and local authorities may enforce compliance with the database, or functionally equivalent system, or a segment thereof.

Subsection g. Effective Date of Requirements: Thirty days after FCC prescribes regulations under subsection (c).

### Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### Communications Act of 1934

\*　　\*　　\*　　\*　　\*　　\*　　\*

### TITLE I—GENERAL PROVISIONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### APPLICATION OF ACT

SEC. 2. (a) \* \* \*

(b) [Except as provided in sections 223 or 224 and subject to the provisions] *Except as provided in sections 223 through 227, inclusive, and subject to the provisions* of section 301 and title VI, nothing in this Act shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classification, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 through 205 of this Act, both inclusive, shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4).

\*　　\*　　\*　　\*　　\*　　\*　　\*

### TITLE II—COMMON CARRIERS

\*　　\*　　\*　　\*　　\*　　\*　　\*

*SEC. 227. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.*

(a) *Definitions.—As used in this section:*

.

    *(1) The term "automatic telephone dialing system" means equipment which has the capacity—*

        *(A) to store or produce telephone numbers to be called, using a random or sequential number generator;*

        *(B) to dial such numbers; and*

        *(C) to deliver, without initial live operator assistance, a prerecorded voice message to the number dialed, with or without manual assistance.*

    *(2) The term "telephone facsimile machine" means equipment which has the capacity to do either or both of the following: (A) to transcribe text or images (or both) from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.*

    *(3) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person (A) without that person's prior express invitation or permission, or (B) with whom the caller does not have an established business relationship. Such term does not include a call or message by a tax exempt nonprofit organization.*

    *(4) The term "Unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person (A) without that person's prior express invitation or permission, or (B) with whom the caller does not have an established business relationship.*

*(b)* RESTRICTIONS.—*It shall be unlawful for any person within the United States by means of telephone—*

    *(1) to make any telephone solicitation in violation of the regulations prescribed by the Commission pursuant to subsection (c);*

    *(2) to use, to make any telephone solicitation, any telephone facsimile machine or any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under subsection (d), or to use, to make any telephone solicitation, any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards;*

    *(3) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement in violation of any regulations prescribed by the Commission pursuant to subsection (e);*

    *(4) to use any automatic telephone dialing system to make unsolicited calls—*

        *(A) to any emergency telephone line or pager of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or*

        *(B) to any telephone number assigned to paging, specialized mobile radio, or cellular telephone service; or*

    *(5) to use a computer or other electronic device to send an unsolicited advertisement via a telephone facsimile machine unless such person clearly marks, in a margin at the top or*

28

*bottom of each transmitted page of the advertisement or on the first page of each transmission, the date and time it is sent, an identification of the business sending the advertisement, and the telephone number of the sending machine or of such business.*

(c) PROTECTION OF SUBSCRIBER PRIVACY RIGHTS.—

*(1) RULEMAKING PROCEEDING REQUIRED.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—*

*(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory marketings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;*

*(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;*

*(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;*

*(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and if such a finding is made and supported by the record, propose specific restrictions to the Congress; and*

*(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.*

*(2) REGULATIONS.—Not later than 240 days after the date of enactment of this section, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.*

*(3) USE OF DATABASE PERMITTED.—The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, or to receive certain classes or categories of telephone solicitations, and to make that compiled list available for purchase. If the Commission determines to require such a database, such regulations shall—*

*(A) specify a method by which the Commission will select an entity to administer such database;*

29

(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, or (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

(D) specify the methods by which such objections shall be collected and added to the database;

(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

(H) specify the methods for recovering, from persons accessing such database, the costs involved in notifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with subsection (b);

(J) be designed to enable and require States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

(4) CONSIDERATIONS REQUIRED FOR USE OF DATABASE METHOD.—If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers con-

30

*ducting business on a national, regional, State, or local level;*

*(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—*

*(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;*

*(ii) reflect the relative costs of providing such lists on paper or electronic media; and*

*(iii) not place an unreasonable financial burden on small businesses; and*

*(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.*

*(d) TECHNICAL AND PROCEDURAL STANDARDS.—*

*(1) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after 6 months after the date of enactment of this section clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business or other entity sending the advertisement, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 12 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.*

*(2) AUTOMATIC TELEPHONE DIALING SYSTEMS.—The Commission shall prescribe technical and procedural standards for automatic telephone dialing systems that are used to transmit any prerecorded telephone solicitation. Such standards shall require that—*

*(A) all prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business or other entity; and*

*(B) such systems will, as soon as is technically practicable (given the limitations of the telephone exchange service facilities) after the called party hangs up, automatically create a disconnect signal or on-hook condition which allows the called party's line to be released.*

*(e) CONSIDERATION OF FACSIMILE MACHINE RESTRICTIONS.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding to prescribe rules to restrict the use of any telephone facsimile machine or computer or other electronic device to send an unsolicited advertisement to the telephone facsimile machine of any person. In establishing such restrictions, the Commission shall consider—*

31

(1) *the extent to which unsolicited advertisements are transmitted through telephone facsimile machines;*

(2) *the extent to which recipients of such advertisements incur costs for such receipt; and*

(3) *the most cost effective methods of preventing advertising abuses with telephone facsimile machines.*

(f) EFFECT ON STATE LAW—

(1) STATE LAW NOT PREEMPTED.—*Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits, either or both of the following:*

(A) *The use of telephone facsimile machines or other electronic devices to send unsolicited advertisements.*

(B) *The use of automatic telephone dialing systems to transmit prerecorded telephone solicitations.*

(2) STATE REGULATION OF TELEPHONE SOLICITATIONS.—*If, pursuant to subsection (c), the Commission requires the establishment of a database of telephone numbers of subscribers who object to receiving telephone solicitations or a functionally equivalent methods or procedures of Federal regulation, a State or local authority may not develop any different database or system for use in the regulation of telephone solicitations and may not enforce restrictions on telephone solicitations in any manner that is not based upon the requirements imposed by the Commission.*

(3) STATE ENFORCEMENT PERMITTED.—*Nothing in this section or in the regulations prescribed under this section shall prohibit the segmentation of the database or functionally equivalent method or procedure for use by State or local authorities, nor preempt any State or local authority from creating mechanisms to enforce compliance with the database or functionally equivalent system, or a segment thereof.*

(g) EFFECTIVE DATE OF REQUIREMENTS.—*The requirements of this section shall take effect 30 days after the date that regulations are prescribed under subsection (c).*

\*        \*        \*        \*        \*        \*        \*

O