# EXHIBIT 10

# Calendar No. 262

| 102D CONGRESS 1st Session | SENATE | REPORT 102–178 |
|---|---|---|

## AUTOMATED TELEPHONE CONSUMER PROTECTION ACT

Mr. HOLLINGS, from the Committee on Commerce, Science, and Transportation, submitted the following

## R E P O R T

OF THE

## SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

## S. 1462



OCTOBER 8 (legislative day, SEPTEMBER 19), 1991.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

59–010         WASHINGTON : 1991

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

ERNEST F. HOLLINGS, South Carolina, *Chairman*

DANIEL K. INOUYE, Hawaii
WENDELL H. FORD, Kentucky
J. JAMES EXON, Nebraska
AL GORE, Tennessee
JOHN D. ROCKEFELLER IV, West Virginia
LLOYD BENTSEN, Texas
JOHN F. KERRY, Massachusetts
JOHN B. BREAUX, Louisiana
RICHARD H. BRYAN, Nevada
CHARLES S. ROBB, Virginia

JOHN C. DANFORTH, Missouri
BOB PACKWOOD, Oregon
LARRY PRESSLER, South Dakota
TED STEVENS, Alaska
ROBERT W. KASTEN, Jr., Wisconsin
JOHN McCAIN, Arizona
CONRAD BURNS, Montana
SLADE GORTON, Washington
TRENT LOTT, Mississippi

KEVIN G. CURTIN, *Chief Counsel and Staff Director*
WALTER B. McCORMICK, Jr., *Minority Chief Counsel and Staff Director*

(II)

## Calendar No. 262

| 102D CONGRESS<br>*1st Session* | SENATE | REPORT<br>102–178 |
|---|---|---|

# AUTOMATED TELEPHONE CONSUMER PROTECTION ACT

OCTOBER 8 (legislative day, SEPTEMBER 19), 1991.—Ordered to be printed

Mr. HOLLINGS, from the Committee on Commerce, Science, and Transportation, submitted the following

# R E P O R T

[To accompany S. 1462]

The Committee on Commerce, Science, and Transportation, to which was referred the bill (S. 1462) to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill as amended do pass.

## PURPOSE OF THE BILL

The purposes of the bill are to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers.

## BACKGROUND AND NEEDS

### A. CONSUMER COMPLAINTS

The use of automated equipment to engage in telemarketing is generating an increasing number of consumer complaints. The Federal Communications Commission (FCC) received over 2,300 complaints about telemarketing calls over the past year. The Federal Trade Commission, State regulatory agencies, local telephone companies, and congressional offices also have received substantial numbers of complaints.

Consumers are especially frustrated because there appears to be no way to prevent these calls. The telephone companies usually do

(1)

not know when their lines are being used for telemarketing purposes, and, even if they did, it is questionable whether the telephone companies should be given the responsibility of preventing such calls by monitoring conversations. Having an unlisted number does not prevent those telemarketers that call numbers randomly or sequentially.

In general, those who complain about these calls believe that they are a nuisance and an invasion of privacy. Residential and business subscribers believe that these calls are an impediment to interstate commerce. In particular, they cite the following problems:

- automated calls are placed to lines reserved for emergency purposes, such as hospitals and fire and police stations;
- the entity placing the automated call does not identify itself;
- the automated calls fill the entire tape of an answering machine, preventing other callers from leaving messages;
- the automated calls will not disconnect the line for a long time after the called party hangs up the phone, thereby preventing the called party from placing his or her own calls;
- automated calls do not respond to human voice commands to disconnect the phone, especially in times of emergency;
- some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls; and
- unsolicited calls placed to fax machines, and cellular or paging telephone numbers often impose a cost on the called party (fax messages require the called party to pay for the paper used, cellular users must pay for each incoming call, and paging customers must pay to return the call to the person who originated the call).

### B. REASONS FOR THE CONSUMER COMPLAINTS

The growth of consumer complaints about these calls has two sources: the increasing number of telemarketing firms in the business of placing telephone calls, and the advance of technology which makes automated phone calls more cost-effective.

The telemarketing industry is growing by immense proportions and is now a multibillion dollar industry. Some estimates are that the telemarketing industry gathered $435 billion in sales in 1990, a more than fourfold increase since 1984.

Recent changes in the telemarketing industry have made making unsolicited phone calls a more cost-effective method of reaching potential customers. Over the past few years, long distance telephone rates have fallen over 40 percent, thereby reducing the costs of engaging in long distance telemarketing. The costs of telemarketing have fallen even more with the advent of automatic dialer recorded message players (ADRMPs) or automatic dialing and announcing devices (ADADs). These machines automatically dial a telephone number and deliver to the called party an artificial or prerecorded voice message. Certain data indicate that the machines are used by more than 180,000 solicitors to call more than 7 million Americans every day. Each ADRMP has the capacity to dial as many of 1,000 telephone numbers each day.

3

### C. THE NEED FOR LEGISLATION

Many consumers and consumer representatives believe that legislation is necessary to protect them from these calls. One survey found that about 75 percent of persons contacted favored some form of regulation of these calls, and one-half of these favored prohibiting all unsolicited calls.

As a result, over 40 States have enacted legislation limiting the use of ADRMPs or otherwise restricting unsolicited telemarketing. These measures have had limited effect, however, because States do not have jurisdiction over interstate calls. Many States have expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls.

The FCC, however, has decided not to take any action to regulate unsolicited calls. After examining this issue in 1980 and 1986, the FCC concluded that it did not need to take any action.[1] In its statement submitted to the Communications Subcommittee for the record of the hearing on this bill, FCC Chairman Alfred C. Sikes stated: "It is not clear, however, that sweeping Federal legislation is required. * * * [T]his may be a situation where continued regulatory scrutiny and monitoring, subject to congressional review and oversight, is preferable to passage of legislation."[2]

### D. THE LEGISLATION

In response to these increasing consumer complaints and calls for Federal legislation, Senator Hollings introduced S. 1462, the "Automated Telephone Consumer Protection Act," on July 11, 1991. The bill as introduced proposed to ban artificial or prerecorded messages to residential consumers and to emergency lines, and to place restrictions on unsolicited advertisements delivered via fax machine. The bill received the strong support of consumer groups and many telephone customers.

### E. RESPONSE TO THE TELEMARKETERS

Telemarketers generally believe that Federal legislation is unnecessary; they believe that the tremendous growth in the telemarketing industry is evidence that many consumers benefit from these calls. The Direct Marketing Association and other groups representing companies that engage in telemarketing, however, do not oppose the restrictions contained in S. 1462 as reported. These companies do not use automatic dialers or other equipment to make automated telephone calls and thus do not object to the reported bill. They also do not object to banning telemarketing calls to emergency and mobile services numbers.

Some telemarketers asked that S. 1462 be amended to exempt the following automated calls: automated calls made by companies to tell people who have ordered products that the item is ready for pickup; automated calls made for debt collection purposes; and

---

[1] See, e.g., *Unsolicited Telephone Calls*, 77 FCC 2d 1023 (1980); *Automatic Dialing Devices*, FCC Release No. 86–352 (1986).
[2] Statement of Alfred C. Sikes, Chairman, FCC, before the Subcommittee on Communications, Committee on Commerce, Science, and Transportation, on S. 1410, S. 1462, and S. 857, July 24, 1991, pp. 1–2.

4

automated calls that ask a customer to "Please hold. An operator will be with you shortly."

These exemptions are not included in the bill, as reported. The Committee believes that such automated calls only should be permitted if the called party gives his or her consent to the use of these machines. In response to these concerns, however, the reported bill does not include the requirement included in the bill as introduced the requirement that any consent to receiving an automated call be in writing. The bill as reported thus will allow automated calls to be sent as long as the called party gives his or her prior express consent either orally or in writing.

### F. CONSTITUTIONAL CONCERNS

Some people have raised questions about whether S. 1462 is consistent with the First Amendment protections of freedom of speech. The Committee believes that S. 1462 is an example of a reasonable time, place, and manner restriction on speech, which is constitutional. The reported bill, does not discriminate based on the content of the message. It applies equally whether the automated message is made for commercial, political, charitable or other purposes. The reported bill regulates the manner (that is, the use of an artificial or prerecorded voice) of speech and the place (the home) where the speech is received.

The Supreme Court has recognized the legitimacy of reasonable time, place, and manner restrictions on speech when the restrictions are not based on the content of the message being conveyed. In 1948, the Court upheld an ordinance banning sound trucks. *Kovacs* v. *Cooper*, 336 U.S. 77 (1948). The Supreme Court also has recognized that "in the privacy of the home * * * the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *FCC* v. *Pacifica Found.*, 438 U.S. 726, 748 (1978). The case upheld an FCC ruling that prohibited the daytime broadcast of indecent language.

In addition, it is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by "live" persons. These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party,[3] fill an answering machine tape or a voice recording service,[4] and do not disconnect the line even after

---

[3] For instance, Mr. Steve Hamm, Administrator of the South Carolina Department of Consumer Affairs, testified that "[O]ne of the constant refrains that I hear * * * from consumers and business leaders who have gotten these kinds of computerized calls is they wish they had the ability to slam the telephone down on a live human being so that that organization would actually understand how angry and frustrated these kinds of calls make citizens, and slamming a phone down on a computer just does not have the same sense of release." Communications Subcommittee Hearing on S. 1410, S. 1462, S. 857, July 24, 1991. Hearing Transcript, p. 22.

[4] When machines call a person using an answering machine, the automated call can fill the entire tape of the answering machine, thereby preventing the called party from receiving other messages from other callers. When a person uses a voice recording system from the telephone company, the person often is required to pay for every message that is recorded. The amount of the payment often varies depending on the length of the call. When "live" persons place these telemarketing calls, they usually hang up soon after realizing that the called party is not personally available, thus minimizing payment.

the customer hangs up the telephone.[5] For all these reasons, it is legitimate and consistent with the constitution to impose greater restrictions on automated calls than on calls placed by "live" persons.

### G. CHANGES TO THE BILL AS INTRODUCED

In response to the comments received by the Committee, the version of S. 1462 reported by the Committee includes three changes to the bill as introduced. These changes are as follows:

    a. The reported bill deletes the ban on sending faxes to emergency phones or cellular phones. Some persons have fax machines in their cars and may want to receive fax messages. Further, there may be times when an emergency situation requires the use of a fax message.

    b. The reported bill deletes the requirement that all consent must be in writing. Many persons order goods over the phone and may give their oral consent to being called back by a computer telling them that their product is ready for pickup. The reported bill allows the consent to be given either orally or in writing.

    c. The bill as introduced banned automated telephone calls unless the call was placed by a "public school or other governmental entity." The reported bill replaces this language with an exception for "any emergency purposes." This will allow the use of automated calls when private individuals as well as schools and other government entities call for emergency purposes.

### H. CONCLUSION

The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services. Federal action is necessary because States do not have the jurisdiction to protect their citizens against those who use these machines to place interstate telephone calls. The Federal Government has a legitimate interest in protecting the public, and the regulations required by the reported bill are the minimum necessary to protect the public against the harm caused by the use of these machines. These regu-

---

[5] The disconnection problem is especially important and is one of the principal reasons why automated calls are more of a nuisance than calls placed by "live" persons. Automated calls often do not disconnect the line after the called party hangs up, thereby preventing the called party from being able to use his or her line to make outgoing calls. Testimony before the Committee and press accounts have given numerous examples of persons who tried to place a call for emergency purposes and who could not use their phones because the phones were tied up by an automated machine that failed to recognize that the called party had hung up the phone.

This problem is not solved completely by the requirement in S. 1462 that these machines disconnect the line within five seconds of the time that the telephone network notifies the machines that the called party has hung up. When a called party hangs up on a "live" person, the "live" person can hear the called party hang up and can disconnect the line immediately. A machine, however, does not hear the called party hang up the phone. The machine must await a disconnect signal transmitted by the telephone network. The testimony of the FCC indicates that it can take up to 32 seconds for the telephone network to generate this signal so that the machine knows to disconnect its end of the line. Thus, even if the machines are required to disconnect within five seconds of being notified that the called party has hung up, the called party's line can remain tied up for up to 37 seconds after he or she hangs up the phone.

lations are consistent with the constitutional guarantee of free speech.

## LEGISLATIVE HISTORY

Senator Hollings introduced S. 1462 on July 11, 1991, which is co-sponsored by Senators Inouye, Stevens, Bentsen, and Simon. The Communications Subcommittee held a hearing on S. 1462 and S. 1410, the Telephone Advertising Consumer Rights Act, on July 24, 1991. Witnesses included representatives of consumer organizations, the Direct Marketing Association, and the mobile telephone services industry. On July 30, 1991, in open executive session, the Committee ordered S. 1462 reported, with an amendment in the nature of a substitute, without objection.

The House of Representatives also has been considering telemarketing legislation. The House Telecommunications and Finance Subcommittee favorably reported H.R. 1304, the Telephone Advertising Consumer Rights Act, on May 9, 1991, and the House Energy and Commerce Committee favorably reported a modified version of H.R. 1304 on July 30, 1991. This House bill contains restrictions on calls to emergency lines and unsolicited advertising by fax machine that are similar to the restrictions contained in S. 1462, as reported. Congresswoman Unsoeld (D–WA) has introduced legislation in the House (H.R. 1589) to ban the use of autodialers. No action on this bill has yet been taken.

In the 101st Congress, the House passed a bill (H.R. 2921), similar to the bill it is currently considering but that bill was not passed by the Senate before adjourned.

## SUMMARY OF MAJOR PROVISIONS

The bill would accomplish the following:

1. *Emergency and Cellular lines:* ban all autodialed calls, and artificial or prerecorded calls, to emergency lines and paging and cellular phones.

2. *Computerized calls to homes:* ban all computerized calls to the home, unless the called party consents to receiving them, or unless the calls are made for emergency purposes (the ban applies whether the automated call is made for commercial, political, religious, charitable or other purposes).

3. *Junk Fax:* ban all unsolicited advertisements sent by fax machine, unless the receiver invites or gives permission to receive such advertisements.

4. *Technical and Procedural Requirements:*
   a. *Autodialers:* Autodialers must identify the initiator of the call, must give the telephone number of the business placing the call, and must disconnect the line within 5 seconds of receiving notice that the called party has hung up the telephone; and
   b. *Fax machines:* Fax machines must identify the sender on each page or the first page of each transmission, and give the telephone number of the sending machine.

7

ESTIMATED COSTS

In accordance with paragraph 11(a) of rule XXVI of the Standing Rules of the Senate and section 403 of the Congressional Budget Act of 1974, the Committee provides the following cost estimate, prepared by the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 9, 1991.*

Hon. ERNEST F. HOLLINGS,
*Chairman, Committee on Commerce, Science, and Transportation,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 1462, the Automated Telephone Consumer Protection Act, as ordered reported by the Senate Committee on Commerce, Science, and transportation on July 30, 1991. CBO estimates that enactment of this bill would result in increased costs to the federal government of $750,000 over the next five years. Enactment of S. 1462 would not affect direct spending or receipts. Therefore, pay-as-you-go procedures would not apply to the bill.

S. 1462 would ban all prerecorded or automatically-dialed telephone calls to emergency, paging, or cellular telephone numbers and to residential subscribers without the express prior constant of the called party. The bill also would ban unsolicited facsimile advertisements. Finally, S. 1462 would require the Federal Communications Commission (FCC) to revise standards for facsimile and autodialing machines to require that they provide certain information about the sender.

Based on information from the FCC, CBO estimates that development, implementation, and enforcement of the various bans and standards required by the bill would result in increased costs to the federal government of $750,000 over the next five years.

No costs would be incurred by state or local governments as a result of enactment of this bill.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is John Webb, who can be reached at 226–2860.

Sincerely,

ROBERT D. REISCHAUER, *Director.*

REGULATORY IMPACT STATEMENT

In accordance with paragraph 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee provides the following evaluation of the regulatory impact of the legislation, as reported.

NUMBER OF PERSONS COVERED

This bill, as reported imposes a limited regulatory burden on some equipment manufacturers and some telemarketers. As a result of this legislation, telemarketers must obtain the express consent of any residential telephone subscriber before placing an automated telephone call to that subscriber (unless the call is made for emergency purposes.) Most telemarketers that have contacted

the Committee do not use these machines to place automated telephone calls to consumers' homes. If they do use these machines, such consent can be obtained at the beginning of a telephone call by a "live" person. For instance, when a consumer answers the phone, a "live" person can ask the consumer if he or she consents to listening to a recorded or computerized message. If the consumer indicates express consent, the "live" caller may switch to a recorded or computerized message. The Committee does not believe that this consent requirement will be an inordinate regulatory burden on the telemarketer.

Telemarketers also will be required to ensure that they do not place automated calls to residential customers, to emergency lines, or to cellular or paging numbers. These restrictions are necessary to accomplish the objectives of the bill. The bill, as reported, does not bar telemarketers from placing automated calls to business users.

Also, the reported bill prohibits telemarketers from sending unsolicited advertisements via a fax machine. Under the definition of "unsolicited advertisement" contained in the bill, the recipient either must invite or must give his or her permission to receive an advertisement via a fax machine. In other words, as long as the recipient of a fax either invites or gants permission, telemarketers may continue to send such fax messages. While telemarketers will be responsible for determining whether a potential recipient of an advertisement, in fact, has invited or given permission to receive such fax messages, such a responsibility, is the minimum necessary to protect unwilling recipients from receiving fax messages that are detrimental to the owner's uses of his or her fax machine. Such restrictions do not apply to fax messages that are not "advertisements."

Finally, the bill imposes some minimal technical requirements on all fax machines to include the name, address, and telephone number of the person sending any fax message. In addition, automated telephone equipment manufacturers must ensure that their equipment disconnects the called party's line within 5 seconds of the time the equipment is notified that the called party has hung up the telephone. These requirements may impose a minimal burden on the manufacturers of such machines, although most machines already comply with these requirements. The Committee has received no objections to these requirements.

These minimal burdens must be compared to the great number of people who will benefit from the protection of these regulations. As noted previously, it is estimated that these machines are used to call as many as 7 million Americans every day.

### ECONOMIC IMPACT

The reported bill may have a minimal economic impact on the telemarketing industry. The bill prohibits telemarketers from using artificial or prerecorded voice messages to residential consumers without the prior express consent of the recipient of the call. As noted previously, however, most telemarketers do not place unsolicited telephone calls to residential customers using artificial or prerecorded messages. Further, this legislation continues to

permit telemarketers to contact potential customers using "live" persons to place telephone calls, to call business customers through artificial or prerecorded voice messages, or to engage in any other method of advertising. The fact that the major telemarketers do not oppose this legislation further reflect the view that the potential economic impact on telemarketers, if any, will be small.

### PRIVACY

The reported bill will result in a significant benefit in protecting the personal privacy of residential telephone subscribers. The evidence gathered by the Committee indicates that a substantial proportion of the public believes that these calls are a nuisance and an invasion of one's privacy rights in the home. The Supreme Court has recognized explicitly that the right to privacy is founded in the Constitution, and telemarketers who place telephone calls to the home can be considered "intruders" upon that privacy.

### PAPERWORK

The reported bill adds a new section to the Communications Act of 1934, and it requires the FCC to revise its technical and procedural standards for fax machines and automated telephone equipment. These technical and procedural standards already exist in the industry; the FCC need only accept these standards, which already have been developed by the industry. The FCC also may initiate a rulemaking proceeding to develop regulations to enforce the provisions of this bill. Such rulemaking proceedings are unlikely to require a great deal of paperwork because of the relatively straight-forward nature of the restrictions contained in this bill. The reported bill imposes no additional reporting requirements on any of the parties affected by the legislation. The paperwork burden on the FCC and on any parties affected by this bill thus will be minimal.

## SECTION-BY-SECTION ANALYSIS

### SECTION 1—SHORT TITLE

This section states that the bill's short title is the "Automated Telephone Consumer Protection Act."

### SECTION 2—RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT

Subsection (a) adds a new section 228 to the Communications Act of 1934 establishing regulations concerning automatic dialing devices, fax machines, artificial or prerecorded voice messages, or other similar devices. The regulations concerning the use of these machines apply to the persons initiating the telephone call or sending the message and do not apply to the common carrier or other entity that transmits the call or message and that is not the originator or controller of the content of the call or message.

Subsection (a) of new section 228 sets forth definitions of an "automatic telephone dialing system," a "telephone facsimile machine" and an "unsolicited advertisement."

New section 228(b)(1) prohibits any call using any automated telephone dialing system, or an artificial or prerecorded voice, to emergency, paging, or cellular telephone lines.

New section 228(b)(2) prohibits any call to a residence using an artificial or prerecorded voice message without the prior, express, oral or written consent of the called party, unless the call is initiated for emergency purposes. The FCC shall define what constitutes an "emergency." In general, any threat to the health or safety of the persons in a residence should be considered an emergency. In adopting a definition of this term, the FCC should consider whether disconnecting telephone service would constitute an emergency. If so, telephone companies would be permitted to use an artificial or prerecorded voice message to alert their customers that their telephone service was about to be disconnected unless payment of the outstanding balance was received.

New section 228(b)(3) prohibits sending unsolicited advertisements by a fax machine.

New section 228(c)(1)(A) prohibits the sending of a communication by a fax machine or automatic telephone dialing system that does not comply with technical standards prescribed under new section 228(c).

New section 228(c)(1)(B) requires that any message sent by a computer or other electronic device via fax machine must identify the date, time, company's name, and phone number in the margin of every page, or on the first page.

New section 228(c)(2) requires the FCC to set technical standards so that all fax machines which are manufactured after 6 months after the date of enactment of this section and which can be used for unsolicited advertising have the capability of making such identification of the sender of the message. The FCC shall exempt from such standards, for 18 months, those fax machines that cannot engage in automatic dialing and transmission and that cannot operate with a computer.

New section 228(c)(3) requires the FCC to set technical standards for systems sending artificial or prerecorded voice messages via telephone. New section 228(c)(3)(A) requires all artificial or prerecorded telephone messages to identify the business initiating the call and to state the telephone number or address of such business.

New section 228(c)(3)(B) requires any artificial or prerecorded voice system to release the called party's line within 5 seconds of receiving notification that the called party has hung up. This provision does not require such equipment to disconnect within 5 seconds of the time called party actually hangs up; it requires disconnection with 5 seconds of the time *it is notified* by the telephone network that the called party has hung up. This clarification is included in recognition that some telephone companies are not able to notify the calling party that the called party has hung up for several seconds. It is thus unrealistic to except such equipment to disconnect the line before it recognizes that the called party actually has hung up the telephone.

New section 228(d) states that nothing in this legislation preempts more restrictive State action regarding the use of fax machines, automatic telephone dialing systems, and artificial or prerecorded voice messages.

11

Subsection (b) of the reported bill is a conforming amendment.

### CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new material is printed in italic, existing law in which no change is proposed is shown in roman):

### COMMUNICATIONS ACT OF 1934

### Section 2 of that Act

#### APPLICATION OF ACT

SEC. 2. (a) * * *

(b) Except as provided in section 223 or sections 224 [and 225], *225, and 228* and subject to the provisions of section 301 and Title VI, nothing in this Act shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 through 205 of this Act, both inclusive, shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4).

### Title II of that Act

### TITLE II—COMMON CARRIERS

SECS. 201 through 227 * * *

*SEC. 228. RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.—(a) DEFINITIONS.—As used in this section—*

*(1) The term "automatic telephone dialing system" means equipment which has the capacity—*

*(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and*

*(B) to dial such numbers.*

*(2) The term "telephone facsimile machine" means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line.*

12

*(3) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.*

*(b) RESTRICTIONS.—It shall be unlawful for any person within the United States—*

*(1) to make any call using any automatic telephone dialing system or an artificial or prerecorded voice—*

*(A) to any emergency telephone line of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or*

*(B) to any telephone number assigned to paging or cellular telephone service;*

*(2) to initiate any telephone call to any residence using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes; or*

*(3) to send an unsolicited advertisement by a facsimile machine.*

*(c) TECHNICAL AND PROCEDURAL STANDARDS.—*

*(1) PROHIBITION.—It shall be unlawful for any person within the United States—*

*(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system (to make any telephone solicitation) in a manner that does not comply with such standards; or*

*(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business sending the message and the telephone number of the sending machine or of such business.*

*(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—*

*(A) is manufactured after 6 months after the date of enactment of this section, and*

*(B) can be used for the distribution of unsolicited advertising,*

*clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business sending the message, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.*

13

      *(3) ARTIFICIAL OR PRERECORDED VOICE SYSTEMS.—The Commissioner shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—*

         *(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business; and*

         *(B) any such system will automatically release the called party's line within 5 seconds of the time the system receives notification that the called party has hung up, to allow the called party's line to be used to make or receive other calls.*

  *(d) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—*

      *(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;*

      *(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations; or*

      *(3) the use of artificial or prerecorded voice messages.*