**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
CIN-Q AUTOMOBILES INC.,          \*
et al.
                                 \*   Case No. 8:13-cv-1592-AEP
vs.                              \*
                                 \*   January 19, 2024
                                 \*
BUCCANEERS LIMITED               \*
PARTNERSHIP, and JOHN DOES       \*
1-10                             \*
_____ \*
                                 \*
TECHNOLOGY TRAINING              \*
ASSOCIATES INC., et al.          \*
              Intervenors.       \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MOTION HEARING

Heard in Courtroom 10A
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
January 19, 2024


### BEFORE THE HONORABLE ANTHONY E. PORCELLI

### UNITED STATES MAGISTRATE JUDGE


Official Court Reporter:      Tana J. Hess, CRR, FCRR, RMR
                              U.S. District Court Reporter
                              Middle District of Florida
                              Tampa Division
                              801 N. Florida Avenue
                              Tampa, FL  33602
                              813.301.5207
                              tana_hess@flmd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:

FOR THE PLAINTIFFS:

        Glenn L. Hara
        Anderson & Wanca
        3701 Algonquin Road
        Suite 500
        Rolling Meadows, IL   60008
        847.368.1500
        ghara@andersonwanca.com

        Michael C. Addison
        Addison Law Office PA
        1304 Alicia Avenue
        Tampa, FL   33604
        813.223.2000
        m@mcalaw.net

        Ross Michael Good
        Loftus & Eisenberg Ltd.
        161 N. Clark
        Suite 1600
        Chicago, IL   60601
        786.539.3952
        ross@loftusandeisenberg.com

FOR THE DEFENDANTS:

        Mark S. Mester
        Latham & Watkins LLP
        330 N. Wabash Avenue
        Suite 2800
        Chicago, IL   60611
        312.876.7700
        mark.mester@lw.com

        Robert C. Collins III
        Latham & Watkins LLP
        330 N. Wabash Avenue
        Suite 2800
        Chicago, IL   60611
        312.876.7700
        robert.collins@lw.com

APPEARANCES:

FOR THE DEFENDANTS:

        Joseph H. Varner III
        Holland & Knight LLP - Tampa
        100 N. Tampa Street, Suite 4100
        PO Box 1288
        Tampa, FL  33602
        813.227.8500
        joe.varner@hklaw.com

FOR ASTRO COMPANIES:

        Daniel P.VanEtten
        Blalock Walters PA
        802 11th St W.
        Bradenton, FL  34205
        941.748.0100
        dvanetten@blalockwalters.com

FOR THE INTERVENORS:

        Jonathan B. Piper
        Bock Hatch & Oppenheim LLC
        203 N. LaSalle Street
        Suite 2100
        Chicago, IL  60601
        312.658.5500
        jonathan@classlawyers.com

|  | |
|---|---|
| 1 | **THE COURT:** All right. Let's call the case, please. |
| 12:58PM 2 | **COURTROOM DEPUTY:** Certainly. It's Cin-Q Automobiles |
| 12:58PM 3 | versus Buccaneers Limited Partnership. Case number is |
| 12:58PM 4 | 8:13-CV-1592-AEP. |
| 12:58PM 5 | **THE COURT:** All right. Let me have counsel state |
| 12:58PM 6 | your appearance, please. |
| 12:58PM 7 | **MR. ADDISON:** Michael Addison, and to my left is |
| 12:58PM 8 | Mr. Glenn Hara. To my right is Mr. Ross Good. |
| 12:58PM 9 | **THE COURT:** All right. Go ahead. And we'll just -- |
| 12:58PM 10 | **MR. VANETTEN:** David VanEtten on behalf of Astro |
| 12:58PM 11 | Companies, LLC. |
| 12:58PM 12 | **THE COURT:** Thank you. All right. |
| 12:58PM 13 | **MR. MESTER:** Good afternoon, Your Honor. Mark Mester |
| 12:58PM 14 | and Robert Collins for BTL. |
| 12:58PM 15 | **THE COURT:** Thank you. |
| 12:58PM 16 | **MR. VARNER:** And, Your Honor, Joe Varner, also for |
| 12:58PM 17 | BTL. |
| 12:58PM 18 | **MR. PIPER:** Jonathan Piper for the intervenors. |
| 12:58PM 19 | **THE COURT:** All right. Thank you all for being here, |
| 12:58PM 20 | and thank you for your time. What I'm going to do is take up |
| 12:58PM 21 | first the Astro issue, and then I want to come back to follow |
| 12:59PM 22 | up with you all as to what discussions you've had and then |
| 12:59PM 23 | address the standing issue and the motion to supplement that |
| 12:59PM 24 | issue. |
| 12:59PM 25 | All right. Who's going to be arguing the motion |

| | |
|---|---|
| 12:59PM | 1 |
| 12:59PM | 2 |
| 12:59PM | 3 |
| 12:59PM | 4 |
| 12:59PM | 5 |
| 12:59PM | 6 |
| 12:59PM | 7 |
| 12:59PM | 8 |
| 12:59PM | 9 |
| 12:59PM | 10 |
| 12:59PM | 11 |
| 12:59PM | 12 |
| 12:59PM | 13 |
| 1:00PM | 14 |
| 1:00PM | 15 |
| 1:00PM | 16 |
| 1:00PM | 17 |
| 1:00PM | 18 |
| 1:00PM | 19 |
| 1:00PM | 20 |
| 1:00PM | 21 |
| 1:00PM | 22 |
| 1:00PM | 23 |
| 1:00PM | 24 |
| 1:00PM | 25 |

1  that has been filed by the Buccaneers as to mooting out the
2  Astro issue?
3          MR. COLLINS:  Good morning, Your Honor.  I will.
4  Robert Collins.
5          THE COURT:  All right.  Mr. Collins, before we even
6  get into argument, I have a question for you.  One of the
7  arguments as to fax service providers lacking standing, are you
8  aware of any opinion that has been issued that just by being
9  merely a fax service provider, the fax service provider lacks
10  standing?  Isn't it a matter of who is the recipient of the
11  fax?
12          MR. COLLINS:  So, Your Honor, I think there's two
13  parts of that.  The Amerifactors decisions and WestFax held
14  that online fax service providers don't have standing.
15          THE COURT:  As recipients.
16          MR. COLLINS:  They're not recipients.  They're not
17  the consumers to whom the faxes are sent, and the basic model
18  with the fax service providers, they are not the recipient of
19  the fax to a telephone facsimile machine, which is equipment
20  that has the capacity --
21          THE COURT:  Well, that's what I want to discuss.  So
22  the first thing is in the context of this case, we have no clue
23  who the recipient is, right?  You can't tell me who the
24  intended recipient is if we're using a list of numbers that we
25  don't know who's at the other end of the number.  So arguably

| | | |
|---|---|---|
| 1:00PM | 1 | the recipient is -- the design of it is whoever is at the end |
| 1:00PM | 2 | of the number. |
| 1:00PM | 3 | MR. COLLINS:  Well, I think, Your Honor, that goes |
| 1:00PM | 4 | back to the bigger issue, which is you're right.  We don't have |
| 1:00PM | 5 | a class list because there's never any effort on the part of |
| 1:00PM | 6 | the Plaintiffs or class counsel to subpoena the records when |
| 1:00PM | 7 | they were available.  So now we're in this situation where |
| 1:00PM | 8 | that's right, we don't know the recipients, but we do know that |
| 1:01PM | 9 | under the -- |
| 1:01PM | 10 | THE COURT:  Well, we know Astro, so that's what I'm |
| 1:01PM | 11 | asking you because the motion is about Astro.  And so if we |
| 1:01PM | 12 | don't know who the recipient is, but Astro is at the end of the |
| 1:01PM | 13 | number, then Astro is the intended recipient; is it not? |
| 1:01PM | 14 | MR. COLLINS:  I don't believe so, Your Honor, because |
| 1:01PM | 15 | now we have the affidavit of Mr. Ray that was submitted on the |
| 1:01PM | 16 | 16th, and Your Honor at the last hearing asked the appropriate |
| 1:01PM | 17 | question, which is were any of these numbers used for your |
| 1:01PM | 18 | business purposes, right?  Were they internal to Astro -- |
| 1:01PM | 19 | THE COURT:  That's a separate matter.  We'll get to |
| 1:01PM | 20 | that.  What I'm asking simply is if the design of the fax is to |
| 1:01PM | 21 | be communicated to whoever is at the end of the number and the |
| 1:01PM | 22 | number ends with Astro, then Astro is the recipient of the fax; |
| 1:01PM | 23 | are they not? |
| 1:01PM | 24 | MR. COLLINS:  I'm not sure we know that, Your Honor, |
| 1:01PM | 25 | because based on the evidence we now have, what it sounds like |

1:01PM 1  from the declaration of Mr. Ray is that these were dormant

1:01PM 2  numbers that were waiting to be subscribed to by subscribers,

1:01PM 3  but not in use.

1:01PM 4       THE COURT:  That may be a separate issue.  So let me

1:01PM 5  then ask this:  As I understand WestFax -- and the record is

1:02PM 6  not fully developed, so I need some clarity on this.  The

1:02PM 7  distinction that's trying to be made from Amerifactors and

1:02PM 8  WestFax is that in WestFax, it's essentially a software that is

1:02PM 9  utilized by an end user, the consumer themselves, that has a

1:02PM 10  fax modem that essentially through the software -- and I think

1:02PM 11  it was FaxForward, that can convert the fax to an electronic

1:02PM 12  signal that is sent by email and -- as a PDF.  And the reason

1:02PM 13  in the opinion of WestFax is because it was received for the

1:02PM 14  fax modem -- that is, the equipment that has essentially been

1:02PM 15  identified as a stand-alone fax machine that is capable of

1:02PM 16  receiving a fax through a telephone line -- that's why

1:02PM 17  regardless of whether it was converted to an email or not, it

1:02PM 18  was still considered to be received by a facsimile machine.  Am

1:02PM 19  I stating that correctly?  In other words, Amerifactors, the

1:03PM 20  way I'll view that is it is the third party who receives the

1:03PM 21  fax and maintains the electronic communication essentially in

1:03PM 22  the cloud.  So the intended recipient doesn't need a fax modem

1:03PM 23  to receive the fax.  Rather, they can go get it through the

1:03PM 24  cloud or have it sent to them by email.

1:03PM 25       MR. COLLINS:  But I think, Your Honor, it's always

1:03PM 1    about the end recipient, right?  So --

1:03PM 2              MR. MESTER:  I'm sorry.

1:03PM 3              THE COURT:  Yes.

1:03PM 4              MR. MESTER:  I think -- I apologize.

1:03PM 5              THE COURT:  No, I need this clarified for me, because

1:03PM 6    I --

1:03PM 7              MR. MESTER:  I understand.  The record -- the WestFax

1:03PM 8    record isn't that clear.  As I understand it, WestFax is a

1:03PM 9    third party.  It's a middleman, so to speak.  It --

1:03PM 10             THE COURT:  But where do you get that?  Cite that to

1:03PM 11   me, because I've read that opinion many times, and it is not

1:03PM 12   clear to me exactly what they're trying to articulate there.

1:03PM 13             MR. MESTER:  Well, I think it's WestFax sends an

1:03PM 14   eFax.  WestFax sends an eFax to the ultimate recipient.  I

1:03PM 15   believe WestFax is a third party.  It's in the middle.

1:03PM 16             THE COURT:  All right.  So clear that up for me,

1:04PM 17   because this is very important to me.

1:04PM 18             MR. HARA:  Your Honor, this is Glenn Hara.  WestFax,

1:04PM 19   just to be clear, does a couple of different things.  It is a

1:04PM 20   fax broadcaster, so it will send faxes on your behalf if you

1:04PM 21   hire it to do that.  It also, at least at the time of the

1:04PM 22   WestFax Bureau ruling in 2015, had a service called FaxForward,

1:04PM 23   which is described in the WestFax ruling as a service that uses

1:04PM 24   a fax server to receive faxes on behalf of its clients.  So

1:04PM 25   that's like send -- point A would be the sending machine.

| | |
|---|---|
| 1:04PM | 1 |
| 1:04PM | 2 |
| 1:04PM | 3 |
| 1:04PM | 4 |
| 1:04PM | 5 |
| 1:04PM | 6 |
| 1:04PM | 7 |

1  Point B would be the fax server maintained by <u>WestFax</u>, and then

2  point C would be the user's device that gets the PDF or the

3  email or a computer that they use to log into the portal, to

4  the FaxForward portal.  It's an eFax system.  You know, they're

5  -- <u>WestFax</u> isn't the only provider of those systems, but the

6  rationale of the 2003 Commission order and the <u>WestFax</u> ruling

7  is not so much about what --

8          THE COURT:  Okay.  Well, if that's the case, explain

9  to me the difference then in <u>Amerifactors</u>, because if it is

10 this point A that goes to B that is <u>WestFax</u> who then converts

11 it to an email as a PDF and sends it to the end user, the

12 consumer, how is that any different than what <u>Amerifactors</u> is

13 doing by receiving it and then sending it by an email to the

14 consumer?

15          MR. HARA:  Your Honor, there is no difference.

16          THE COURT:  This is for --

17          MR. MESTER:  Your Honor, I don't know that there is a

18 difference.  My view is that <u>Amerifactors</u> pretty clearly

19 without saying it superseded <u>WestFax</u>.  Your Honor, we have the

20 same problem.  I have a difficult -- I have difficulty

21 harmonizing those two orders and declaratory rulings from the

22 FCC.

23          The only thing -- and I don't know this to be

24 the case.  This is speculation.  There may have been some

25 difference in the equipment used by <u>WestFax</u> versus the

1:05PM    1    equipment used by <u>Amerifactors</u>, but I don't think the rationale

1:05PM    2    of <u>Amerifactors</u> can be perfectly harmonized with <u>WestFax</u>.

1:05PM    3    <u>Amerifactors</u> is obviously the later opinion, and it's followed

1:06PM    4    up by <u>Ryerson</u>.

1:06PM    5            THE COURT:  All right.  Mr.Hara, you wanted to say

1:06PM    6    something?

1:06PM    7            MR. HARA:  Yes.  Under the 2003 Commission order and

1:06PM    8    <u>WestFax</u> ruling, it's not so much about received, what kind of

1:06PM    9    equipment receives the fax, because what the statute talks

1:06PM   10    about, what it prohibits is to send to a telephone facsimile

1:06PM   11    machine.  So people get hung up on receipt, but the Eleventh

1:06PM   12    Circuit held in <u>Sarris v. Palm Beach</u> that receipt isn't even an

1:06PM   13    element of a TCPA claim.  What the statute prohibits is to send

1:06PM   14    to a telephone facsimile machine an unsolicited advertisement.

1:06PM   15    I just wanted to clarify that.

1:06PM   16            THE COURT:  But that still doesn't -- all the

1:06PM   17    analysis goes on to the definition of a facsimile machine.

1:06PM   18            MR. HARA:  Telephone facsimile machine.

1:06PM   19            THE COURT:  That's right.  And so the distinction

1:06PM   20    that is being drawn, I think at least there's one uniformity.

1:06PM   21    It all recognized there is a distinction between the machine --

1:06PM   22    or the devices that could be used to send it because it doesn't

1:06PM   23    have to be sent by a facsimile machine, but is the receipt by a

1:07PM   24    facsimile machine.  And then the definition of what a facsimile

1:07PM   25    machine is what is being decided by these decisions.

1:07PM   1          And the way I try to harmonize it is the 2003

1:07PM   2   opinion, without much analysis, just simply states, and leaves

1:07PM   3   us a little caveat, that an email sent over the internet is not

1:07PM   4   covered.  With no analysis, it says that.

1:07PM   5         MR. HARA:  Correct.

1:07PM   6         THE COURT:  Then you get the <u>WestFax</u> decision, which

1:07PM   7   the record is simply not clear to me to understand exactly what

1:07PM   8   is the equipment that's being used and the technology that is

1:07PM   9   being used to explain the distinction.  And I'm having a hard

1:07PM  10   time deciphering whether I'm correct in my analysis of -- the

1:07PM  11   only way I could reconcile it is by looking at it is the end

1:07PM  12   user who has a modem, a facsimile modem hooked up to a computer

1:07PM  13   that is receiving the fax, which then is capable of later

1:08PM  14   printing it out.  Because if it is the analysis that it is the

1:08PM  15   third party that has the facsimile modem, then -- and if that

1:08PM  16   is the Buc's position, you're asking me to consider -- because

1:08PM  17   it doesn't say in <u>Amerifactors</u>.  Rather, it says it's

1:08PM  18   harmonious with <u>WestFax</u>.  It's not overruling <u>WestFax</u>, and that

1:08PM  19   is to me problematic.  I don't know how you could say that

1:08PM  20   <u>Amerifactors</u> is simply overruling <u>WestFax</u>.  I don't know why

1:08PM  21   that would be.

1:08PM  22         MR. MESTER:  I didn't mean -- I don't know -- I don't

1:08PM  23   know that it is.  I agree with you.  I think the <u>WestFax</u>

1:08PM  24   decision is difficult to decipher.  I don't know the specifics

1:08PM  25   of the equipment.  But I think one thing I do know, and the one

| | |
|---|---|
| 1:08PM | 1 |
| 1:08PM | 2 |
| 1:08PM | 3 |
| 1:08PM | 4 |
| 1:08PM | 5 |
| 1:08PM | 6 |
| 1:09PM | 7 |

issue, Your Honor, I would disagree with, is I think it's clear that they're not talking about the final recipient, the consumer, having a computer with a fax modem because if they had that, they wouldn't need to retain the fax provider, the middleman, who receives the fax from any of the many machines that are covered by the TCP as the sending machine.

THE COURT:  Unless it's the software that you utilize to do that itself.  If you have the fax modem locally -- and we're talking about 2003, so the technology -- I don't know what it was then, but that's certainly one application could be they're pitching software that you manage internally with your own fax modems.

MR. MESTER:  But I think, Your Honor, that's my point.  I should have been clear.  If you have that software or you had a fax modem as the ultimate intended recipient, the consumer at the back end, you wouldn't need a fax service provider, because they're provided -- I used one of those.  I remember them.  It was hard to have a fax modem on a laptop, and when I was traveling, it was a good way to be able to see my email and my faxes.  I could see them as emails.  So you would use the number, you would check it and get the email. Then you'd look at the email on your computer, and that's what it was used for.  But there was always -- it was a three-step process.  We're focused now on Astro as the middle part of that.  If a consumer had a fax modem in a computer, that's a

1:09PM  1    different issue, and I think that -- in that instance, I think
1:10PM  2    the TCP is clear that that consumer would have standing,
1:10PM  3    Article III and statutory standing, with the TCP, but that's
1:10PM  4    not -- that's not this situation.  This situation is a provider
1:10PM  5    who's offering a service that's -- roughly does what a fax
1:10PM  6    modem would do in the ultimate end user's computer.
1:10PM  7             THE COURT:  So explain to me the WestFax then.  If it
1:10PM  8    is focusing on the recipient, and the recipient doesn't have
1:10PM  9    the fax modem, how do you reconcile then the opinion in
1:10PM  10   WestFax?
1:10PM  11            MR. MESTER:  Well, as I said, Your Honor, I have some
1:10PM  12   difficulty doing that.  The only thing I can think of -- and,
1:10PM  13   again, this is speculation -- is that there's a difference in
1:10PM  14   the equipment used by WestFax as the fax service provider on
1:10PM  15   the one hand and by whoever the fax service provider in
1:10PM  16   Amerifactors was.  I believe it was Amerifactors, but I'm not
1:10PM  17   sure.
1:10PM  18            MR. HARA:  That's not correct.
1:10PM  19            MR. MESTER:  I don't know this material.  Whoever the
1:10PM  20   third-party provider was in Amerifactors, it's possible that
1:10PM  21   they had a different type of equipment that could have resulted
1:10PM  22   in the decision being different, but that isn't made very clear
1:11PM  23   in either of those opinions.
1:11PM  24            THE COURT:  All right.  Mr. Hara, you wanted to say
1:11PM  25   something else?

1:11PM 1          **MR. HARA:**  I appreciate Mr. Mester's concession that

1:11PM 2     the <u>Amerifactors</u>' ruling is completely contrary to the <u>WestFax</u>

1:11PM 3     ruling.  It is.  But more importantly, it is completely

1:11PM 4     contradictory to the 2003 Commission order, which says that the

1:11PM 5     computerized fax server that is used by commercial facsimile

1:11PM 6     services, which is just another term for online fax services,

1:11PM 7     that that equipment meets the statutory definition of telephone

1:11PM 8     facsimile machine.  So it's sent to a telephone facsimile

1:11PM 9     machine, regardless of how the end user looks at it, either as

1:11PM 10    an email on a computer screen or if the middleman puts it in

1:11PM 11    a -- prints it out, puts it in an envelope and mails it to

1:11PM 12    them.  It doesn't make any difference.  That device at point B

1:11PM 13    is a telephone facsimile machine under the 2003 Commission

1:11PM 14    order, and that's a binding, final order of the FCC under the

1:11PM 15    Hobbs Act.

1:11PM 16          **THE COURT:**  But if that's the case -- and that's why

1:11PM 17    I asked the question regarding <u>WestFax</u> -- isn't then the

1:12PM 18    analysis of who is the recipient -- because if I'm looking at

1:12PM 19    what the congressional concern was as far as the harm being

1:12PM 20    caused -- and it's clear to me the congressional concern was

1:12PM 21    the time consumed in taking up of the telephone line and

1:12PM 22    preventing other faxes from coming in and then shifting of the

1:12PM 23    costs that is related to the printing of the fax.  If that is

1:12PM 24    the congressional concern, isn't that concern then extinguished

1:12PM 25    by using the middleman who then later transmits it by an email

| | |
|---|---|
| 1:12PM | 1 |
| 1:12PM | 2 |
| 1:12PM | 3 |
| 1:12PM | 4 |

1   to the end user, a consumer?

2          MR. HARA:  Those concerns still are implicated

3   because the consumer might print it out, but they have to view

4   it either way.  And the -- Congress's concerns were not limited

5   to those two things, by the way.  I want to make sure I say

6   that.  It's important.  In document 505, our opposition to the

7   motion to be certified, we laid out in the 2003 order, the FCC

8   held that Congress was also concerned with the quote,

9   "Interference, interruptions, and expense to businesses and

10  interstate commerce caused by junk faxes."  So that's the FCC's

11  interpretation of that statute.  It's a binding order.  It says

12  that was one of the concerns that Congress had in passing the

13  statute:  Interruptions, interference and expense of junk

14  faxes.  Not just the cost of paper.  Not just the cost of

15  toner.  Not justed wasted employee time monitoring faxes.  It's

16  a broader concern that motivated Congress to put these

17  prohibitions on junk faxes.

18          THE COURT:  Go ahead.

19          MR. MESTER:  Your Honor, just a couple of points.

20  First of all, I think it's oversimplifying to the point of

21  obscuring the statute.  You had it right to begin with.  The

22  scope of machines from which you can send would bring the fax

23  within the statute, and the scope of machines that you send to

24  are different.  And it's quite clear that it has to be sent to

25  a telephone facsimile machine, and the vast majority, if not

|   |   |
|---|---|
| 1:14 PM | 1 |
| 1:14 PM | 2 |
| 1:14 PM | 3 |
| 1:14 PM | 4 |
| 1:14 PM | 5 |
| 1:14 PM | 6 |

1  all, of the machines used by these third parties are not -- by

2  the nature of the business are not telephone facsimile machines

3  because they're not capable of printing on paper.  Instead,

4  what they're designed to do is to convert the fax into an

5  email, into a PDF like we're familiar with, and to send it on

6  to the consumer.

7          And to be sure, that does not implicate -- we

8  keep going back to this argument that we should just ignore

9  Amerifactors because Mr. Hara filed an appeal four years ago.

10  Amerifactors has the exact same force and effect as the 2003

11  order which was entered 15 or 16 years before it.  So we can't

12  ignore that, and the Amerifactors' decision could not be

13  clearer on what the goals of Congress were in enacting the fax

14  portion of the TCPA, to be sure to be contrasted with the text

15  and call portions of the TCPA which are designed to address

16  different concerns.  But, Your Honor, that's paper, toner, and

17  the occupation of the5 machine.  That's what matters in faxes.

18          And that's why this whole -- not to jump ahead

19  with the Article III issue, but that is the Article III issue.

20  It applies differently with respect to Astro, but it also

21  applies to Astro, because Astro doesn't have Article III

22  standing.  And it's now clear based upon the declaration that

23  was submitted to the Court on Tuesday that Astro never was a

24  settlement class member.  We were prepared give them the

25  benefit --

| | |
|---|---|
| 1:15 PM | 1 |
| 1:15 PM | 2 |
| 1:15 PM | 3 |
| 1:15 PM | 4 |
| 1:15 PM | 5 |
| 1:15 PM | 6 |
| 1:15 PM | 7 |

        THE COURT:  Well, the one problem with the argument
as to Astro, I believe it's <u>Sarris</u>, but it's not a matter of
whether it was printed out.  It's -- right?  So if Astro can
demonstrate that it had a fax modem that received those faxes,
then you're left arguing whether they are the intended
recipient or not.

        MR. MESTER:  We asked all those questions of counsel
several times.  We never got a response to any of them.  So
we're assuming it was like every other fax service provider
that did not have one.  But you're correct, Your Honor.  If
they used -- if they used devices that were capable of
printing, then at least for that portion of the argument they
would -- they would fall within the scope.  I think there would
be other problems, including whether they were the intended
recipient or not, but that -- in that respect, yes.

        MR. HARA:  Your Honor, can I make one other point --

        THE COURT:  Please.

        MR. HARA:  -- as to Astro?

        THE COURT:  And just so you all know, you could stay
seated.  I want you to be relaxed.  You don't have to stand up
every time you want to talk.

        MR. HARA:  Okay.

        THE COURT:  This obviously is a very fundamental
issue that we need to figure out before we go forward, and I
need to get as much argument as you want to provide me to help

1:16PM 1   me understand it.  So go ahead.

1:16PM 2                  MR. HARA:  Sure.  As to Astro -- and Astro has its

1:16PM 3   own counsel who can speak on its behalf, but I want to make a

1:16PM 4   distinction because the <u>WestFax</u> ruling, the two District Court

1:16PM 5   cases that I know of that addressed the issue, the <u>J2 Global</u>

1:16PM 6   case and the <u>Whiteamire Clinic</u> case, they all address a

1:16PM 7   situation where the fax service provider is leasing out the

1:16PM 8   numbers to some end user, right?  And the Courts said, "Well,

1:16PM 9   fax service provider, you're not -- you don't have standing to

1:17PM 10  sue under the TCPA.  The consumer who's leasing the fax number

1:17PM 11  has standing to sue."  This is a little different situation

1:17PM 12  because as I understand it, the numbers that Astro is claiming

1:17PM 13  on it were not being leased to an end user consumer at the

1:17PM 14  time.

1:17PM 15                  THE COURT:  That's right.  That's how I was

1:17PM 16  understanding it as well.

1:17PM 17                  MR. HARA:  So that's, I think, a meaningful

1:17PM 18  distinction.

1:17PM 19                  THE COURT:  Well, that's why I started with my

1:17PM 20  question as to if we don't know who the design -- in theory, as

1:17PM 21  I would at least understand it, what was originally represented

1:17PM 22  to the Bucs was, "We have a list of opt-in phone numbers that

1:17PM 23  have been identified with certain consumers."  And so in

1:17PM 24  theory, if that was legitimate and true and accurate, then it

1:17PM 25  would have been known who was the intended recipient.  But when

| | | |
|---|---|---|
| 1:17 PM | 1 | you send out -- just randomly knowing that a fax number exists |
| 1:17 PM | 2 | and you are just sending it out, the design of the |
| 1:17 PM | 3 | advertisement is to be sent to whoever is at the other end of |
| 1:18 PM | 4 | that number.  And if at the other end of the number is Astro or |
| 1:18 PM | 5 | anyone else, they then are arguably the intended recipient, |
| 1:18 PM | 6 | which is an argument to be made.  I'm not making that decision, |
| 1:18 PM | 7 | but I'm saying that is yet an issue that has to be decided. |
| 1:18 PM | 8 | MR. HARA:  Your Honor, I'm not sure you do have to |
| 1:18 PM | 9 | decide that, because what Astro is asking to do is opt out. |
| 1:18 PM | 10 | THE COURT:  I know, but they're asking -- but the |
| 1:18 PM | 11 | Bucs are asking me not to let them opt out and then to find |
| 1:18 PM | 12 | that they don't have standing at all.  And so that's why I pose |
| 1:18 PM | 13 | that question, is it seems to me that's a whole larger issue |
| 1:18 PM | 14 | than simply making that decision on a very limited record |
| 1:18 PM | 15 | that's before me. |
| 1:18 PM | 16 | MR. HARA:  I question whether allowing Astro to file |
| 1:18 PM | 17 | an opt-out is a determination on the merits that Astro is a |
| 1:18 PM | 18 | member of the class, you know. |
| 1:18 PM | 19 | THE COURT:  No, the motion by the Bucs is not to let |
| 1:18 PM | 20 | them opt out and then to determine the merits.  That's the |
| 1:18 PM | 21 | distinction.  I could just simply let them opt out, and then |
| 1:19 PM | 22 | the Bucs are left that peril to face another litigation, to |
| 1:19 PM | 23 | have to undergo all that expense and make that decision, which |
| 1:19 PM | 24 | may be the result.  Certainly if I find there's no standing and |
| 1:19 PM | 25 | decertify this entire class, they subject themselves to all of |

| | |
|---|---|
| 1:19 PM | 1 |

that.  And that's the curiosity I've had from the beginning
about all of this, but nonetheless, that's the potential
consequence of all of this.

Mr. Mester, you wanted to say something else,
and I'm going to move on to the standing.

MR. MESTER:  The only point is what we do have, Your
Honor, is Mr. Ray's affidavit is -- perhaps purposely so,
but --

THE COURT:  It's vague.  It doesn't answer my
questions.  But nonetheless, the issue still remains as to --
and the question you're asking me to make is to keep them in
despite the substantive change, and I don't think we can --
well, let me rephrase it.

To me, it's a significant change based upon that
I had to make the interpretation as to what was the meaning of
the ultimate amount to be resolved.  I accept that it is
plausible that Astro did not understand that, and if they
didn't understand it, then there was a change in circumstances.
Could they have moved quicker to get an objection to it?
Probably.  But nonetheless, they did so and sought counsel and
advice of counsel to do so.

So then my -- what really is before me is is
there excusable neglect for their delay in asking to opt out?

MR. MESTER:  Understood, Your Honor.  I just want to
bring Your Honor's attention -- and, again, not criticizing the

| | | |
|---|---|---|
| 1:20 PM | 1 | vagueness, but just pointing out that we do have in the record |
| 1:20 PM | 2 | a competing claim made by an Astro subscriber.  So they've told |
| 1:20 PM | 3 | us in the declaration that all these numbers were dormant.  We |
| 1:20 PM | 4 | have a number on the Biggerstaff list on which a claim was made |
| 1:20 PM | 5 | by Astro that someone else made a claim on too now.  We could |
| 1:20 PM | 6 | bring up how the settlement administrator handled that.  We |
| 1:21 PM | 7 | don't think it handled it correctly. |
| 1:21 PM | 8 | But my point is we have a piece of evidence. |
| 1:21 PM | 9 | There's a conflict.  There's certainly reason to believe that |
| 1:21 PM | 10 | some of these -- we don't know how many, but some -- were also |
| 1:21 PM | 11 | held by subscribers.  That's a separate problem. |
| 1:21 PM | 12 | But back to our motion, Mr. Hara put it really |
| 1:21 PM | 13 | not the way we did.  That's not quite what we're looking for. |
| 1:21 PM | 14 | We think their motion to opt out is moot because we don't think |
| 1:21 PM | 15 | they're a member of the settlement class.  I don't think you |
| 1:21 PM | 16 | can opt out of a class you're not a member of.  So that's the |
| 1:21 PM | 17 | point we wanted to make in the motion. |
| 1:21 PM | 18 | THE COURT:  All right.  Give me one moment. |
| 1:22 PM | 19 | (Pause.) |
| 1:22 PM | 20 | THE COURT:  I apologize for this.  I'm going to have |
| 1:22 PM | 21 | to step out and grab my key card because I have to log in to my |
| 1:22 PM | 22 | computer, but this is not pulling up on my iPad.  So just bear |
| 1:22 PM | 23 | with me one moment.  We'll be in recess for one moment. |
| 1:22 PM | 24 | (Pause.) |
| 1:24 PM | 25 | THE COURT:  Remain seated, please.  Sorry about that. |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

1:24PM   1          All right.  So the point I wanted to make is the

1:25PM   2  issue that I see that's before me on standing is certainly

1:25PM   3  clouded and complicated by the prior rulings because I am

1:25PM   4  having a difficult time reconciling exactly what is indicated

1:25PM   5  by those rulings.

1:25PM   6          What seems to be fundamental starting with the

1:25PM   7  2003 ruling, which clearly indicates that an email sent over

1:25PM   8  the internet is not covered under the TCPA.

1:25PM   9          That gets clouded by WestFax because WestFax

1:25PM  10  specifically states here -- I'll quote it.  "WestFax's

1:25PM  11  description of eFaxes makes clear that the recipient computers

1:25PM  12  are attached to fax servers or services that convert the fax

1:26PM  13  into a format that is attached to an email received by the

1:26PM  14  computer."

1:26PM  15          Why that's clouded for me is because how do you

1:26PM  16  reconcile 2003 that says an email sent over the internet is not

1:26PM  17  covered?  Because when I read that last part under the WestFax

1:26PM  18  opinion that says that the fax is converted into a format

1:26PM  19  that's attached to an email sent and received by a computer,

1:26PM  20  that last part to me then would say that email is not covered.

1:26PM  21          However, what precedes that is what reads,

1:26PM  22  "WestFax's description of eFaxes makes clear that quote, 'The

1:26PM  23  recipient computers are attached to fax servers or services

1:26PM  24  that convert the fax.'"

1:26PM  25          And the only way I can reconcile that is the

recipient is the consumer; that is, the party at issue, not the third party.  Because if the recipient is the third party, I don't -- how do you reconcile any of this then?

**MR. MESTER:**  I don't think you do.  I read it the other way.  I think the recipient -- the initial recipient is the service, because the fax is sent.  The sender sends to somebody or something, and that somebody or something is the initial recipient.  The intended ultimate recipient is the consumer.  It's the middleman, it's the fax service provider in the middle that I think that they're referring to, but I'll certainly concede that it's not as well drafted as it could be.

**MR. HARA:**  Judge Porcelli?

**THE COURT:**  Yes.

**MR. HARA:**  That statement in the 2003 order that says, "The TCPA does not extend to emails sent over the internet," if you read the order closely, what prompted that -- and I think it's footnote 157, going off the top of my head, but -- was that commenters who filed comments in response to the notice of proposed rulemaking that the FCC issued in 2002 said, "Well, what about commercial facsimile services?  Are they going to be liable under the TCPA for forwarding the faxes as emails to their clients?"  And the FCC put that sentence in there to make sure that it was clear that an online fax service wasn't liable for violating the TCPA.

But that initial -- but two things.  That

| | | |
|---|---|---|
| 1:28PM | 1 | initial transmission from point A to point B, the device at |
| 1:28PM | 2 | point B is a telephone facsimile machine.  It has to be, |
| 1:28PM | 3 | because it has the capacity to receive that signal over a |
| 1:28PM | 4 | regular telephone line and the capacity to print.  Anything |
| 1:28PM | 5 | that can send a document by email can print.  That's the same |
| 1:28PM | 6 | thing to a computer.  You're telling it to send the output to |
| 1:28PM | 7 | an email address, or you're telling it to send the PDF to a |
| 1:28PM | 8 | printer.  The computer doesn't care.  If it has the capacity to |
| 1:28PM | 9 | send an email, it has the capacity to print from a printer. |
| 1:28PM | 10 | But so -- but -- so that caveat in there about |
| 1:28PM | 11 | email over the internet was specifically in there to protect |
| 1:28PM | 12 | commercial facsimile services in the language of the 2003 order |
| 1:29PM | 13 | or eFax service providers in the language of the WestFax ruling |
| 1:29PM | 14 | or online fax service providers in the language of the |
| 1:29PM | 15 | Amerifactors Bureau ruling.  They're all the exact same thing. |
| 1:29PM | 16 | THE COURT:  So what -- then what is the difference in |
| 1:29PM | 17 | the Amerifactors' technology from the -- |
| 1:29PM | 18 | MR. HARA:  There isn't one.  It's all the exact same. |
| 1:29PM | 19 | Amerifactors flies in the face of those prior precedents, which |
| 1:29PM | 20 | why I have an appeal of that pending with the full FCC.  And if |
| 1:29PM | 21 | I lose there, I will take a judicial Hobbs Act appeal to a |
| 1:29PM | 22 | Circuit Court of Appeals, because it's blatantly wrong.  And |
| 1:29PM | 23 | it's not a final order of the FCC.  This Court is not bound by |
| 1:29PM | 24 | it under Eleventh Circuit precedent like Mais and the other |
| 1:29PM | 25 | Eleventh Circuit precedence, Self, but it is bound by the 2003 |

| | | |
|---|---|---|
| 1:29PM | 1 | Commission order. |
| 1:29PM | 2 | MR. MESTER:  Your Honor, could I just get a |
| 1:29PM | 3 | clarification?  Did you say footnote 157 of the 2003 order? |
| 1:30PM | 4 | MR. HARA:  That's what I said.  I'm not sure that |
| 1:30PM | 5 | it's correct.  Does that address commercial facsimile services? |
| 1:30PM | 6 | MR. MESTER:  Not at all.  It addresses prior |
| 1:30PM | 7 | expressed permission. |
| 1:30PM | 8 | MR. HARA:  Okay.  I was wrong about the footnote. |
| 1:30PM | 9 | MR. MESTER:  Well, could you give us the correct |
| 1:30PM | 10 | cite?  Because I have the order right here.  That's not at all |
| 1:30PM | 11 | my understanding of the order. |
| 1:30PM | 12 | MR. HARA:  Note 736.  Much later.  Sorry about that. |
| 1:30PM | 13 | MR. MESTER:  Your Honor, I think we're talking |
| 1:30PM | 14 | about -- we're talking about commercial facsimile service |
| 1:30PM | 15 | providers.  That's what 736 talks about. |
| 1:30PM | 16 | MR. HARA:  Right, and it's -- |
| 1:30PM | 17 | THE COURT:  Hold on one second.  Let me read this. |
| 1:30PM | 18 | (Pause.) |
| 1:31PM | 19 | THE COURT:  All right.  Mr. Mester? |
| 1:31PM | 20 | MR. MESTER:  Two points.  I think what they're |
| 1:31PM | 21 | referring to there is fax service providers, but to the extent |
| 1:31PM | 22 | they aren't, Your Honor made the point earlier, this was issued |
| 1:31PM | 23 | in 2003.  I don't remember when fax service providers first |
| 1:32PM | 24 | came into existence, the middlemen by that, I'm referring to, |
| 1:32PM | 25 | but it's entirely possible that they weren't there or around at |

1:32PM  1    that time.  But it's quite clear at the end of the process is

1:32PM  2    the same.  If what you're getting is an email, whether you're

1:32PM  3    the middleman or you're the -- ultimately the intended

1:32PM  4    recipient, an email is not an injury.  It's not a concrete

1:32PM  5    injury within the scope of the TCPA, and it doesn't give you

1:32PM  6    Article III standing, and that -- that I don't think really

1:32PM  7    answers the Astro question necessarily, but I do think it

1:32PM  8    answers the settlement class question.

1:32PM  9          THE COURT:  Mr. Hara, I'm looking at footnote 736.

1:32PM 10    It reads, "Commentators also note that some commercial

1:32PM 11    facsimile services transmit faxes to the recipients as email

1:32PM 12    attachments.  We emphasize that any roles the Commission adopts

1:32PM 13    with respect to unsolicited facsimile advertisements would not

1:32PM 14    extend to facsimile messages transmitted as email over the

1:33PM 15    internet."

1:33PM 16          Doesn't limit it to fax service providers

1:33PM 17    sending that.  It just blanketly says, "Facsimile messages

1:33PM 18    transmitted by -- as email over the internet."  And that's what

1:33PM 19    the Commission has struggled with, and that's obviously what I

1:33PM 20    am struggling with.  Fundamentally, what just simply should be

1:33PM 21    answered is when you use a provider to what you could otherwise

1:33PM 22    do in house, and they receive the faxes, then transmit it to

1:33PM 23    you one way or the other, is there liability for it?  They have

1:33PM 24    not answered that question clearly because certainly as

1:33PM 25    technology has evolved, the concept of sending a fax by email

1:33PM  1    is not a fax anymore.  It's simply an email period.  And it's
1:33PM  2    not -- as I see it, not covered on the statute.
1:33PM  3              And so the question to be asked is when it
1:33PM  4    originates as a fax and is received as a fax and somehow
1:34PM  5    converted by a third party at the direction of the end -- the
1:34PM  6    intended recipient or the consumer, is there liability to that
1:34PM  7    recipient or end user consumer?
1:34PM  8              And as I see it, there is -- I mean, you all are
1:34PM  9    arguing all these opinions to me, and I don't see a clear
1:34PM  10   answer in any of it, and it seems to me you don't either
1:34PM  11   because you both are arguing each of these in a variety of
1:34PM  12   ways, and maybe the Commission has not given a clear answer.
1:34PM  13             And here is the other problem because it relates
1:34PM  14   to standing.  Ultimately I have to make the decision -- if
1:34PM  15   Amerifactors controls, standing is absolutely an issue that we
1:34PM  16   must confront.  I don't say it's the end issue because as I see
1:34PM  17   it, there are further issues.  If Amerifactors controls, then
1:34PM  18   the question is what is the impact upon our settlement class?
1:35PM  19   And that's how I classify it, as a settlement class, because
1:35PM  20   ultimately I believe I can get past all the other hurdles for
1:35PM  21   this class to get to a final group of a settlement class; that
1:35PM  22   is, to reconcile, to hear whatever objections you have, along
1:35PM  23   with Astro and anyone else to get to a final class, settlement
1:35PM  24   class, excluding this issue of standing.  And so if we are
1:35PM  25   dealing with that, we're going to deal with that on the front

| | | |
|---|---|---|
| 1:35PM | 1 | end.  And if <u>Amerifactors</u> controls, then the question is what |
| 1:35PM | 2 | is the impact upon that class? |
| 1:35PM | 3 | I think the answer to that then is -- we're left |
| 1:35PM | 4 | with is two things.  One, was already the self-attestation |
| 1:35PM | 5 | sufficient enough to address that issue?  And I have skepticism |
| 1:35PM | 6 | about that as to whether -- I noted and pushed back on it at |
| 1:35PM | 7 | the last hearing -- whether then by stating that they received |
| 1:35PM | 8 | a facsimile, is that sufficient enough?  I have concern whether |
| 1:36PM | 9 | that will survive an appellate attack. |
| 1:36PM | 10 | So then two, if that's not sufficient, then what |
| 1:36PM | 11 | is left to be able to remedy that?  And all I keep coming up |
| 1:36PM | 12 | with that is then an additional attestation by the settlement |
| 1:36PM | 13 | class.  But then when I look at that, I think the case law -- |
| 1:36PM | 14 | and the case law I've seen is pre-<u>Cherry</u>, but nonetheless, I |
| 1:36PM | 15 | still think is dispositive as to this issue.  The case law |
| 1:36PM | 16 | frowns upon that given the Defendant's due process rights. |
| 1:36PM | 17 | **MR. HARA:**  Your Honor, could I offer a suggestion? |
| 1:36PM | 18 | **THE COURT:**  Yes, please. |
| 1:36PM | 19 | **MR. HARA:**  To the extent the legal question is if |
| 1:36PM | 20 | <u>Amerifactors</u> controls, are users of online fax services covered |
| 1:36PM | 21 | by the TCPA; right? |
| 1:37PM | 22 | **THE COURT:**  Before you give me your response, I got |
| 1:37PM | 23 | one more issue for you. |
| 1:37PM | 24 | **MR. HARA:**  Okay. |
| 1:37PM | 25 | **THE COURT:**  Which is -- because -- and I'm sure this |

| | | |
|---|---|---|
| 1:37PM | 1 | is a joy for everybody involved with this case because we've |
| 1:37PM | 2 | confronted numerous issues, but there's another one coming.  As |
| 1:37PM | 3 | you all know, the Supreme Court is about to take up the Chevron |
| 1:37PM | 4 | deference which is looming, large, and it seems to me that is |
| 1:37PM | 5 | another problem.  I think we could all speculate as to what the |
| 1:37PM | 6 | result will be, but certainly it could have significant |
| 1:37PM | 7 | ramifications because if there is no Chevron deference, then |
| 1:37PM | 8 | that would have a change upon -- potentially on the ruling in |
| 1:37PM | 9 | this case. |
| 1:37PM | 10 | MR. HARA:  It depends.  If it's a final order of the |
| 1:37PM | 11 | FCC under the Hobbs Act, then Chevron doesn't even coming into |
| 1:37PM | 12 | play in the Eleventh Circuit.  The statute means what the FCC |
| 1:37PM | 13 | says it means.  It's a very hard and fast rule that -- |
| 1:37PM | 14 | THE COURT:  But you're arguing the 2003 is also a |
| 1:37PM | 15 | final order, and that's what I'm telling you is I don't see |
| 1:37PM | 16 | what you're saying to me that it is just simply limited to |
| 1:38PM | 17 | exclude liability to fax service providers.  It doesn't mention |
| 1:38PM | 18 | it.  It just simply says an email sent over the internet. |
| 1:38PM | 19 | MR. HARA:  Yes. |
| 1:38PM | 20 | THE COURT:  That's it.  And that's my problem is -- I |
| 1:38PM | 21 | will tell you, I find that to be very persuasive, because an |
| 1:38PM | 22 | email over the internet is clearly not covered by this.  It's |
| 1:38PM | 23 | an email.  Whether you want to call it a fax or not, once you |
| 1:38PM | 24 | attach a PDF to an email, it's no longer a fax.  It is an |
| 1:38PM | 25 | email, and that is not covered under the TCPA. |

| | | |
|---|---|---|
| 1:38PM | 1 | So the question that remains then is when an |
| 1:38PM | 2 | entity or an individual hires a third party to manage their |
| 1:38PM | 3 | faxes on their behalf and then send them to them any way they |
| 1:38PM | 4 | want -- by email or by cloud access or a portal or whatever |
| 1:38PM | 5 | other available technology is available, an app on the phone, |
| 1:38PM | 6 | who knows -- as long as then the statutory definitions are met |
| 1:39PM | 7 | at the provider's end, is there liability?  And they never say |
| 1:39PM | 8 | that clearly.  They just never address that in any of these |
| 1:39PM | 9 | opinions. |
| 1:39PM | 10 | MR. HARA:  Your Honor, that's the merits question |
| 1:39PM | 11 | that we settled this case to avoid, okay?  So -- |
| 1:39PM | 12 | THE COURT:  I agree with you, but it's also tied into |
| 1:39PM | 13 | standing because these opinions draw that out, and that's what |
| 1:39PM | 14 | the Bucs are arguing over and over again, that there's still |
| 1:39PM | 15 | nonetheless a standing issue. |
| 1:39PM | 16 | MR. HARA:  We still have to do Article III standing, |
| 1:39PM | 17 | but Drazen II lowered the bar so significantly from where it |
| 1:39PM | 18 | was in Salcedo v. Hanna which held that a single text message |
| 1:39PM | 19 | wasn't enough for Article III standing.  Now Drazen II held |
| 1:39PM | 20 | that it is.  It doesn't need to be exactly the same as -- |
| 1:39PM | 21 | THE COURT:  I disagree with that, too.  That's why I |
| 1:39PM | 22 | find it to be alive, this issue, because all Drazen II says -- |
| 1:39PM | 23 | and you highlighted it at the last hearing.  It says everyone |
| 1:39PM | 24 | seeking damages in the settlement class must establish |
| 1:39PM | 25 | standing.  The standing analysis, where it gets clouded is we |

1:40PM  1   keep focusing on the concreteness of the injury.  That is not

1:40PM  2   the analysis here.  The analysis to be done is, first of all,

1:40PM  3   does the statute prohibit this conduct?  Has congress

1:40PM  4   identified this intangible harm to be prohibited by the

1:40PM  5   statute?  And that is what is unclear here is in the -- under

1:40PM  6   these circumstances, is that a prohibited harm by the statute

1:40PM  7   itself?

1:40PM  8               MR. MESTER:  Your Honor, could I just make two

1:40PM  9   points?

1:40PM 10               THE COURT:  Yes.

1:40PM 11               MR. MESTER:  I'm not trying to make it more

1:40PM 12   complicated, but on the Chevron question, even if Chevron goes

1:40PM 13   away, it would still be entitled to Skidmore deference.  These

1:40PM 14   opinions, as at least six judges in this district have found,

1:40PM 15   are persuasive, even if the deference is different.  All the

1:40PM 16   orders -- I guess we're still fighting about Amerifactors and

1:40PM 17   whether it's binding or not.  It has the same force and effect

1:40PM 18   as the 2003 order, and I think it does answer the question.

1:41PM 19               But the final point I want to make is -- and in

1:41PM 20   some sense it's the most important one -- is all the --

1:41PM 21   starting with TransUnion going through the two Drazens, it's

1:41PM 22   not just the claimants that have to satisfy Article III.  It's

1:41PM 23   the entire settlement class.  All members of the settlement

1:41PM 24   class have to have Article III standing.  So even if we change

1:41PM 25   the attestation requirement or did something like that, I think

| | |
|---|---|
| 1:41PM | 1 |
| 1:41PM | 2 |
| 1:41PM | 3 |
| 1:41PM | 4 |
| 1:41PM | 5 |
| 1:41PM | 6 |
| 1:41PM | 7 |
| 1:41PM | 8 |
| 1:41PM | 9 |
| 1:41PM | 10 |
| 1:41PM | 11 |
| 1:41PM | 12 |
| 1:41PM | 13 |
| 1:42PM | 14 |
| 1:42PM | 15 |
| 1:42PM | 16 |
| 1:42PM | 17 |
| 1:42PM | 18 |
| 1:42PM | 19 |
| 1:42PM | 20 |
| 1:42PM | 21 |
| 1:42PM | 22 |
| 1:42PM | 23 |
| 1:42PM | 24 |
| 1:42PM | 25 |

1  it clearly would raise a number of due process questions, but

2  it wouldn't begin to address the broader problem, which is we

3  don't even know who 60 percent of this class is to ask them the

4  question, "Did you get it as an email, or did you get it as

5  something else?"  And even if we did ask that question, Your

6  Honor, 40 or 50 percent --

7          THE COURT:  Why do you say that when Drazen said "who

8  are seeking damages"?  So if there's members of the settlement

9  class who have not sought damages, why would that apply here?

10          MR. MESTER:  Because they're in a class that's

11  defined as people seeking damages, and they're going to be

12  giving us release.  So if you take the logic to its extreme,

13  that would mean that the class as defined as Drazen says, the

14  definition is defective.  It's fatally defective.  It includes

15  40 percent of the people who don't have Article III standing,

16  so they're not really properly before Your Honor.  Yet you'll

17  be effectively giving release to us that would affect them,

18  even though they're not properly before you.  So it's the class

19  as a whole.  It's not just the claims.  It's the class --

20          THE COURT:  You don't see that circular argument

21  though?  If they're not properly before me, how can I exclude

22  them from any relief?

23          MR. MESTER:  Well, you're not excluding them.

24          THE COURT:  How could I be giving them a release?

25          MR. MESTER:  That's the problem.  That's what we

| | | |
|---|---|---|
| 1:42PM | 1 | bargained for.  We bargained for a release on behalf of the |
| 1:42PM | 2 | entire settlement class, and 40 percent of the settlement |
| 1:42PM | 3 | class, it appears, are not properly before you.  You really can |
| 1:42PM | 4 | do it, but they shouldn't be there to begin with, which is to |
| 1:42PM | 5 | say the settlement definition -- the definition of the |
| 1:42PM | 6 | settlement class is defective, and I don't think it can be |
| 1:42PM | 7 | fixed. |
| 1:42PM | 8 | THE COURT:  All right.  Well, that's a separate |
| 1:42PM | 9 | issue.  You wanted to come back to the point that I'm getting |
| 1:42PM | 10 | at, which is it seems to me I have to resolve this issue as to |
| 1:43PM | 11 | ultimately do -- can we reconcile these opinions to say that |
| 1:43PM | 12 | fax service providers are simply excluded -- let me rephrase |
| 1:43PM | 13 | that. |
| 1:43PM | 14 | Consumers using fax service providers are |
| 1:43PM | 15 | excluded if they receive it by email; or alternatively, is |
| 1:43PM | 16 | there something else in these opinions that demonstrate that |
| 1:43PM | 17 | the intent is, as you're arguing, not to exclude them, but |
| 1:43PM | 18 | rather, the analysis should be simply on that the fax service |
| 1:43PM | 19 | provider received it through a fax modem and then later |
| 1:43PM | 20 | distributed the email some other way. |
| 1:43PM | 21 | MR. HARA:  I didn't understand the second -- |
| 1:43PM | 22 | THE COURT:  In other words, should I just focus on if |
| 1:44PM | 23 | the fax service providers, they're receiving the faxes and |
| 1:44PM | 24 | their computers are connected to modems, is that sufficient |
| 1:44PM | 25 | enough? |

| | |
|---|---|
| 1:44PM | 1 |
| 1:44PM | 2 |
| 1:44PM | 3 |
| 1:44PM | 4 |

1          **MR. HARA:**  That is sufficient under the 2003 order,

2  yeah.  The TCPA has been violated.

3          **THE COURT:**  For any intended recipient?

4          **MR. HARA:**  Correct.  There's been a TCPA violation.

5  You might have a subsequent question about who has statutory

6  standing to bring that claim.  That's what was at issue in the

7  <u>J2 Global</u> case.  Two online fax service providers sued each

8  other over who had the right to collect on faxes, and the Court

9  said, "Neither of you.  It's the person that's leasing the

10  phone line that has standing to sue because that's the

11  recipient under the statute."

12          **MR. MESTER:**  Your Honor, I think <u>WestFax</u> answers

13  that.

14          **THE COURT:**  All right.

15          **MR. MESTER:**  It says, "Thus, while the" -- this is

16  referring to fax service providers --

17          **THE COURT:**  Where are you at in that opinion?

18          **MR. MESTER:**  I'm sorry, Your Honor.  I've got the CCR

19  cite, 8624.  I don't have a paragraph number, of course.  I can

20  get it for you.

21          **THE COURT:**  All right.

22          **MR. MESTER:**  It's -- I believe it's in our -- what we

23  filed.  But it says, "Thus while they -- the fax service

24  provider -- expect to be part of the fax communication, they

25  are neither the intended recipient nor the ultimate recipient

1:45PM  1    of the document sent as a fax, any more than would be the

1:45PM  2    telephone company providing the telephone line to a consumer's

1:45PM  3    traditional fax machine."

1:45PM  4              Again, I don't think this answers the Astro

1:45PM  5    question, but for the class -- some of the class as a whole, if

1:45PM  6    what you're getting is an email, if that's what you're getting,

1:45PM  7    you don't have standing under either the TCPA or Article III,

1:45PM  8    and for 40 percent of the class, that's what they got, an

1:45PM  9    email.

1:45PM  10             THE COURT:  Yeah, the preceding part though reads,

1:45PM  11   "Entities that convert faxes to email are not recipients of

1:46PM  12   such faxes under the TCPA because they are not the intended

1:46PM  13   audience for the fax.  Instead, based upon the description of

1:46PM  14   WestFax's own FaxForward service, such entities provide a

1:46PM  15   service to the recipient that requires them to become part of

1:46PM  16   the communications pathway between the sender and the

1:46PM  17   recipient.  Thus, while they expect to be part of the

1:46PM  18   communication, they are neither the intended recipient or the

1:46PM  19   ultimate recipient of the document."  And then it goes on to go

1:46PM  20   on about telephones.

1:46PM  21             That then clouds it again for me more, because

1:46PM  22   it goes back to how is that any different than Amerifactors

1:46PM  23   then?  Because if I read that part of it, it's telling me what

1:46PM  24   they think is happening here is that the fax is originally

1:46PM  25   received by WestFax who then converts it in the pathway of the

| | | |
|---|---|---|
| 1:46PM | 1 | communication to an email that is then sent to the intended |
| 1:47PM | 2 | recipient. |
| 1:47PM | 3 | MR. MESTER:  I think, Your Honor, it depends on the |
| 1:47PM | 4 | equipment used by the fax service provider.  If that equipment |
| 1:47PM | 5 | happens to have the capacity to print -- which the vast |
| 1:47PM | 6 | majority of equipment used by fax service providers doesn't and |
| 1:47PM | 7 | wouldn't because that's not the purpose of it.  The purpose of |
| 1:47PM | 8 | it is to convert.  It's a simple server to convert -- |
| 1:47PM | 9 | THE COURT:  But that's not what WestFax -- WestFax is |
| 1:47PM | 10 | talking about that is then received by the computer that has |
| 1:47PM | 11 | the capacity to print. |
| 1:47PM | 12 | MR. MESTER:  I understand.  I think Amerifactors may |
| 1:47PM | 13 | be talking about different -- that's the only way I can |
| 1:47PM | 14 | harmonize it.  It's talking about different equipment.  But the |
| 1:47PM | 15 | answer -- for the broader class, Your Honor, the answer is |
| 1:47PM | 16 | exactly the same.  That's the issue I think we're talking |
| 1:47PM | 17 | about, and that was the Astro issue.  The broader class issue |
| 1:47PM | 18 | is if what you're getting at the end of the process as the |
| 1:47PM | 19 | intended recipient -- which is the case for the vast majority |
| 1:47PM | 20 | of class members.  If what you're getting is an email, then you |
| 1:47PM | 21 | don't have standing, and for 40 percent of the settlement |
| 1:47PM | 22 | class, that's what they got.  They don't have standing. |
| 1:47PM | 23 | So this is the discussion of Article III |
| 1:47PM | 24 | broadly.  Again, I think the Astro discussion is a little |
| 1:47PM | 25 | different because it depends on the equipment that they used. |

1:47PM  1       **MR. HARA:**  Your Honor, could I suggest a slightly

1:48PM  2  different way to look at this?

1:48PM  3       **THE COURT:**  Yes.

1:48PM  4       **MR. HARA:**  What the <u>WestFax</u> ruling says is that in

1:48PM  5  the scenario where the end user is on a computer, and they're

1:48PM  6  receiving an email, and the fax service provider is forwarding

1:48PM  7  the -- you know, receiving the fax on a fax server and then

1:48PM  8  forwarding it by email to the end user, the end user's computer

1:48PM  9  or phone is part of the equipment.  That's the statutory term

1:48PM  10  that's used in 227(a)(3).  Telephone facsimile machine is

1:48PM  11  defined as equipment with the relevant capacity, the capacity

1:48PM  12  to receive the transmission, and the capacity to print it.

1:48PM  13       And the Sixth Circuit in <u>Lyngaas v. Curaden AG</u>,

1:48PM  14  which we discuss extensively in our briefs, goes through that

1:48PM  15  definition, and it says Congress used that word "equipment" on

1:48PM  16  purpose instead of the word "device."  "Equipment" is broader

1:48PM  17  than "device."  And what the <u>WestFax</u> ruling says is that that

1:48PM  18  term "equipment," that broad term sweeps in the fax server at

1:48PM  19  the fax service provider.  It also sweeps in the computer at

1:49PM  20  the end, right?  All of that together is equipment with the

1:49PM  21  capacity to print.  Equipment doesn't have to be just one

1:49PM  22  device.  Equipment can be a system of devices that connected to

1:49PM  23  each other, and that's exactly what happens in this online fax

1:49PM  24  service scenario.

1:49PM  25       **MR. MESTER:**  Your Honor, I think I can provide -- if

| | |
|---|---|
| 1:49PM | 1 |
| 1:49PM | 2 |
| 1:49PM | 3 |
| 1:49PM | 4 |
| 1:49PM | 5 |
| 1:49PM | 6 |
| 1:49PM | 7 |
| 1:49PM | 8 |
| 1:49PM | 9 |
| 1:49PM | 10 |
| 1:49PM | 11 |
| 1:49PM | 12 |
| 1:50PM | 13 |
| 1:50PM | 14 |
| 1:50PM | 15 |
| 1:50PM | 16 |
| 1:50PM | 17 |
| 1:50PM | 18 |
| 1:50PM | 19 |
| 1:50PM | 20 |
| 1:50PM | 21 |
| 1:50PM | 22 |
| 1:50PM | 23 |
| 1:50PM | 24 |
| 1:50PM | 25 |

1  you want to harmonize for purposes of the broader Article III
2  question, here's how I think it can be done and quite easily.
3  The one thing that is very clear from -- starting with the 2003
4  order, through WestFax, through Amerifactors, and through
5  Ryerson is if what you as the end consumer get is an email, you
6  don't have a claim under the TCPA.  You don't have standing.
7  And that's -- that answers the question for a vast majority of
8  the class members, whether they did or they didn't get the
9  email.  We don't know who did and who didn't, but we know a
10  sizable portion did.  That's the unifying theme.  If what you
11  got was an email, you don't have Article III standing.
12       MR. HARA:  That's not what the WestFax ruling says at
13  all.  It says the opposite.  It says it is covered by the TCPA
14  because you're -- the device that the end user is looking at
15  that email on is swept into the statutory definition of
16  equipment because it's connected to an online fax service.  If
17  it wasn't connected to an online fax service, then it wouldn't
18  have the capacity to print the fax.  But since it is connected,
19  it does have the relevant capacity.
20       THE COURT:  Well, here's what we're going to do.
21  This standing issue -- and I know you filed your motion to
22  supplement, but what I need is you all to make your arguments
23  to me on these orders as to how you see it because to be very
24  blunt, whether I apply the Chevron deference or not, it seems
25  to me I alternatively need to make a decision whether these are

| | |
|---|---|
| 1:50PM | 1 | even persuasive upon me, and I don't have the clarity before me |
| 1:50PM | 2 | to make that decision.  And I need to hear and allow you the |
| 1:50PM | 3 | opportunity to make your arguments and submit pleadings for me |
| 1:51PM | 4 | for my consideration, because just as happened right there, |
| 1:51PM | 5 | Mr. Mester, I agree with you.  To me, it seems I could make the |
| 1:51PM | 6 | simple analysis to say once you receive as an email, that's it. |
| 1:51PM | 7 | It's done because it's no longer a fax.  But WestFax then |
| 1:51PM | 8 | complicates that. |
| 1:51PM | 9 | MR. MESTER:  May I add one more point? |
| 1:51PM | 10 | THE COURT:  Sure. |
| 1:51PM | 11 | MR. MESTER:  I don't agree with what Mr. Hara said at |
| 1:51PM | 12 | all with respect to the TCPA, what these orders say, but you |
| 1:51PM | 13 | don't need to get that point because even if that's the -- if |
| 1:51PM | 14 | the level of generality we're at is an email, we got six |
| 1:51PM | 15 | decisions from this District alone that focus on that issue, |
| 1:51PM | 16 | whether an email -- putting aside whatever the TCPA says, |
| 1:51PM | 17 | whether an email is itself sufficiently concrete to generate |
| 1:51PM | 18 | Article III standing, and the answer to that is clearly no.  We |
| 1:51PM | 19 | don't -- we can certainly provide you, and we're happy to do |
| 1:51PM | 20 | that analysis, all of these opinions by the FCC, the |
| 1:51PM | 21 | declaratory rulings and decisional case law, but what's very |
| 1:52PM | 22 | obvious is you still would also have to make the fundamental |
| 1:52PM | 23 | Article III conclusion, which is is an email sufficient to |
| 1:52PM | 24 | create concrete injury, and I think the answer to that is |
| 1:52PM | 25 | plainly no. |

1:52PM   1        **MR. HARA:**  Your Honor, those cases all --

1:52PM   2        **THE COURT:**  Hold on.  In any of these cases where

1:52PM   3   they've actually -- no one has done the analysis as to the

1:52PM   4   concreteness of it.  So explain to me -- under these

1:52PM   5   circumstances, so explain to me why you think that's applicable

1:52PM   6   here.

1:52PM   7        **MR. MESTER:**  I believe several of them have, Your

1:52PM   8   Honor.

1:52PM   9        **THE COURT:**  Well, the ones that you're talking about

1:52PM  10   are citing to -- a lot of them cite to one another.  I mean, so

1:52PM  11   give me the full-blown analysis that goes through, for example,

1:52PM  12   what <u>Drazen</u> did to do -- and explain to me how the distinction

1:52PM  13   is between one text message as compared to one email.

1:52PM  14        **MR. MESTER:**  Well, I mean, I think that they looked

1:52PM  15   to -- because that was the state of the law at the time, they

1:52PM  16   looked to <u>Salcedo</u> because that was operative limits at the

1:52PM  17   time.  But I believe Judge -- I cannot get his name correctly.

1:53PM  18   John Badalamenti --

1:53PM  19        **THE COURT:**  Badalamenti.

1:53PM  20        **MR. MESTER:**  And I believe that the judge in <u>Daisy</u>

1:53PM  21   both looked also at the general question of whether or not

1:53PM  22   receiving an email is a concrete injury under Article III

1:53PM  23   without regard to what the TCPA says, and I think it's clear it

1:53PM  24   isn't.

1:53PM  25        **MR. HARA:**  I just want to say, Your Honor, those

1:53 PM 1  cases are all pre-Drazen II.  They rely on Salcedo v. Hanna,

1:53 PM 2  which clearly held one text message is not enough for

1:53 PM 3  Article III standing, and that's not the law in this circuit

1:53 PM 4  anymore.  They're not good law anymore, at least on that point.

1:54 PM 5           THE COURT:  We're focused on -- and let me ask

1:54 PM 6  Mr. Hara, what is your position as to Ryerson where simply it

1:54 PM 7  reaffirms Americfactors?  So how am I to look at that?

1:54 PM 8           MR. HARA:  It's wrong for all the same reasons that

1:54 PM 9  Americfactors is wrong, and it's also not a binding final order

1:54 PM 10  of the FCC.  It's just like the Americfactors ruling.  We've got

1:54 PM 11  cases saying the WestFax Bureau ruling is a final order for

1:54 PM 12  Hobbs Act purposes because it was never appealed, so it has a

1:54 PM 13  special status as if it were a final order of the full

1:54 PM 14  Commission.  But those are binding.  They're not like -- it's

1:54 PM 15  not a matter of Chevron deference.  Those are -- you know, it's

1:54 PM 16  Hobbs Acts deference.  It's -- the Court's required to defer to

1:54 PM 17  them.

1:54 PM 18           MR. MESTER:  Your Honor, you know our position on

1:54 PM 19  that one.  We couldn't disagree more.

1:55 PM 20           MR. HARA:  Your Honor, could I address the standing

1:55 PM 21  issue, one other --

1:55 PM 22           THE COURT:  Yeah, one moment.  I just want to confirm

1:55 PM 23  something here.

1:55 PM 24                     (Pause.)

1:55 PM 25           THE COURT:  Mr. Mester, to come back, you know, just

1:55PM 1    reviewing again Judge Badalamenti's order, I think this is

1:55PM 2    pre-Drazen, and it's not identified in the analysis under

1:55PM 3    Drazen.  It just simply says, "The time spent reviewing a fax

1:55PM 4    had no analogue in common law causes of action.  It's clear

1:55PM 5    Congress did not view one wasted minute spent reviewing a junk

1:55PM 6    fax received through an email as a concrete injury."

1:55PM 7            MR. MESTER:  In Daisy, Your Honor -- I forget the

1:55PM 8    judge in Daisy.  I apologize.  In Daisy, the judge went through

1:55PM 9    intrusion, on seclusion and all the other analogues and found

1:56PM 10   none.  And I think at the end of the day that -- maybe we need

1:56PM 11   to do that again, but the -- I don't think that the -- that an

1:56PM 12   email is concrete harm without regard to what the TCPA says.

1:56PM 13   And I do believe that that -- that was -- that's how I

1:56PM 14   understand these two decisions -- these three decisions.

1:56PM 15   There's two Scomas and Daisy, at least.  I think other judges

1:56PM 16   in this District have said the same thing.  And I understand,

1:56PM 17   Your Honor, you're not bound by them, but I just -- there's a

1:56PM 18   lot of judges who addressed this issue and found it to be

1:56PM 19   insufficient.  And I think common sense suggests that receiving

1:56PM 20   an email is not the same as a text for which many people used

1:56PM 21   to pay a per text charge, and a text is much more intrusive,

1:56PM 22   and a text is explicitly addressed -- in fact, it is addressed

1:56PM 23   by the TCPA, whereas the FCC keeps telling us that emails

1:56PM 24   aren't.

1:56PM 25            So we're kind of left with -- if we were here

| | | |
|---|---|---|
| 1:56 PM | 1 | today, and we didn't have a TCPA and all Mr. Hara was doing was |
| 1:56 PM | 2 | bringing a common law claim because he received bunch of |
| 1:57 PM | 3 | emails, would he have a claim?  I think the answer is clearly |
| 1:57 PM | 4 | not.  That's the -- I think that's the essence of the more |
| 1:57 PM | 5 | fundamental Article III question. |
| 1:57 PM | 6 | THE COURT:  What would you argue to me as to what is |
| 1:57 PM | 7 | the harm Congress intended this provision of the TCPA to cover? |
| 1:57 PM | 8 | MR. MESTER:  The fax provision? |
| 1:57 PM | 9 | THE COURT:  Yes. |
| 1:57 PM | 10 | MR. MESTER:  Wasted paper, wasted toner, and |
| 1:57 PM | 11 | occupation of the fax machine when attached to a phone line. |
| 1:57 PM | 12 | The old fax machines obviously could only receive one fax at a |
| 1:57 PM | 13 | time.  It would take a minute or two.  That was the Eleventh |
| 1:57 PM | 14 | Circuit's decision of the standing in Sarris, which was even if |
| 1:57 PM | 15 | you didn't print the fax, even if you didn't look at it, it |
| 1:57 PM | 16 | still occupied the machine for a minute or more, which meant |
| 1:57 PM | 17 | that that was time that machine couldn't receive a different |
| 1:57 PM | 18 | fax that you wanted to receive. |
| 1:57 PM | 19 | THE COURT:  What about the 2003 additional argument |
| 1:57 PM | 20 | as to general interference with business operations? |
| 1:57 PM | 21 | MR. MESTER:  I don't believe that that applied to |
| 1:57 PM | 22 | faxes, and certainly it's not reflected in any subsequent FCC |
| 1:58 PM | 23 | decision or case, in any of the decisions or the case law. |
| 1:58 PM | 24 | MR. HARA:  It's in the WestFax ruling.  It's a |
| 1:58 PM | 25 | critical part of it. |

| | |
|---|---|
| 1:58PM | 1 |
| 1:58PM | 2 |
| 1:58PM | 3 |
| 1:58PM | 4 |
| 1:58PM | 5 |
| 1:58PM | 6 |
| 1:58PM | 7 |
| 1:58PM | 8 |
| 1:58PM | 9 |
| 1:58PM | 10 |
| 1:59PM | 11 |
| 1:59PM | 12 |
| 1:59PM | 13 |
| 1:59PM | 14 |
| 1:59PM | 15 |
| 1:59PM | 16 |
| 1:59PM | 17 |
| 1:59PM | 18 |
| 1:59PM | 19 |
| 1:59PM | 20 |
| 1:59PM | 21 |
| 1:59PM | 22 |
| 1:59PM | 23 |
| 1:59PM | 24 |
| 1:59PM | 25 |

1       THE COURT:  So under your argument then, if that is

2   all that Congress's intent was to focus on, when a third party

3   is utilized, and there is a break in the communication, the

4   third party may undergo the potential harms; that is,

5   disruption in the fax if it's occupied, the line is occupied,

6   but that is no longer harm that is the -- the consequences upon

7   the intended recipient.

8       MR. MESTER:  I think that's right, Your Honor.  I

9   think maybe we can agree on that.  WestFax focused on the fact

10  that the -- that the third party is not the intended recipient,

11  and the purpose of the TCPA was to protect the consumer.  So I

12  think clearly WestFax suggests that the third party doesn't

13  have standing because they're not the intended recipient, and

14  they're certainly not the consumer.  Again, Astro may be a

15  different question.  I'm not addressing that.  But generally

16  that's right.  The third party doesn't have a claim under the

17  TCPA.  The only entity that would have a claim under the TCPA

18  is -- I think WestFax makes clear, is the ultimate consumer,

19  but if what they get is an email, then they don't.

20      THE COURT:  All right.  Mr. Hara, what's your

21  response to that?

22      MR. HARA:  The 2003 order and the WestFax Bureau

23  ruling expressly say that Congress was not just concerned with

24  the cost of paper or the cost of toner and the occupation of

25  the machine.  Congress was also concerned with the

1:59PM  1   interference, interruptions, and expense to businesses, and

1:59PM  2   they ruled that eFaxes, you know, faxes in this online fax

2:00PM  3   service context quote "may increase labor costs for businesses

2:00PM  4   whose employees must monitor faxes to determine which ones are

2:00PM  5   junk faxes and which are related to their company's business."

2:00PM  6   That's the 2003 order, paragraphs 199 -- I think that's

2:00PM  7   paragraph 202.  It's either 199, 200, 201, or 202.  I'm quoting

2:00PM  8   from several paragraphs.

2:00PM  9        THE COURT:  Slow down just a little bit for the court

2:00PM  10  reporter, if you could.

2:00PM  11       MR. HARA:  Sure.  The FCC also ruled that quote,

2:00PM  12  "Because a sender of a facsimile message has no way to

2:00PM  13  determine whether it is being sent to a number associated with

2:00PM  14  a stand-alone fax machine or to one associated with a personal

2:00PM  15  computer or a fax server, it would make little sense to apply

2:00PM  16  different rules based on the device that ultimately received

2:00PM  17  it."  And that's paragraph 202 of the 2003 Commission order.

2:00PM  18       That order was very specific about what it was

2:00PM  19  talking about.  There was a notice of proposed rulemaking

2:01PM  20  issued in 2002, which we discussed in document 505, our brief

2:01PM  21  in opposition to the Motion to Decertify, where the FCC asked

2:01PM  22  for public comment on whether the development of computerized

2:01PM  23  fax servers warranted changing the FCC's rules on how to

2:01PM  24  interpret the statute.  And it was -- you know, a lot of people

2:01PM  25  submitted comments.  The FCC carefully considered this issue of

| | |
|---|---|
| 2:01PM | 1 |
| 2:01PM | 2 |

the computerized fax server issue and commercial facsimile
services, and it came out saying that those faxes are covered.
It's a binding determination.  It's really not a -- there's no
ambiguity about it.

            MR. MESTER:  Your Honor, I think it says just the
opposite, and I'm looking at it now.  It's talking about the
occupation of the machine.  It's talking about a traditional
facsimile -- telephone facsimile machine.

            MR. HARA:  It also talks about --

            THE COURT:  One moment.  So it reads, "Facsimile
messages sent to a computer or fax server may shift the
advertising cost of paper and toner to the recipient if they
are printed.  They may also tie up lines and printers so that
the recipient's requested faxes are not timely received.  Such
faxes may increase labor costs for businesses whose employees
must monitor faxes to determine which ones are junk faxes and
which one are related to the fax company's business."

            MR. MESTER:  Your Honor, I think that gets back to
what I said earlier.  I think what they're talking about there
is if the ultimate recipient, intended recipient has a computer
with the fax modem, that's a different question.  That's not
obviously the focus of our motion under Article III.  We're
talking about people who used services like Astro to bypass
much of that, to not have machines tied up, and instead get
their faxes by email.  That's very -- excuse me.  That's a very

| | |
|---|---|
| 2:02PM | 1 |
| 2:02PM | 2 |
| 2:02PM | 3 |
| 2:03PM | 4 |
| 2:03PM | 5 |
| 2:03PM | 6 |
| 2:03PM | 7 |
| 2:03PM | 8 |
| 2:03PM | 9 |
| 2:03PM | 10 |
| 2:03PM | 11 |
| 2:03PM | 12 |
| 2:03PM | 13 |
| 2:03PM | 14 |
| 2:03PM | 15 |
| 2:03PM | 16 |
| 2:03PM | 17 |
| 2:03PM | 18 |
| 2:03PM | 19 |
| 2:03PM | 20 |
| 2:04PM | 21 |
| 2:04PM | 22 |
| 2:04PM | 23 |
| 2:04PM | 24 |
| 2:04PM | 25 |

1 different scenario.

2    MR. HARA:  That passage has nothing to do with a fax
3 modem connected to a computer.  It's talking about an email
4 inbox.  The word that the Commission uses is inbox.  When you
5 get a fax delivered to your inbox by a commercial facsimile
6 service, is it covered?  And the Commission held that it is.

7    THE COURT:  I don't see that.  I read it to say,
8 "Because a sender of a facsimile message has no way to
9 determine whether it's being sent to a number associated with
10 quote 'a stand-alone fax machine' or to one associated with a
11 personal computer or fax server, it would make little sense to
12 apply different rules based upon the device that ultimately
13 received it."

14    MR. HARA:  Right.  It's associated with a fax server.
15 In other words, it's connected to an online fax service.  It's
16 associated with a fax server.  That's what they're talking
17 about, a commercial facsimile service; i.e., an online fax
18 service.

19    MR. MESTER:  That's before WestFax.  We don't know at
20 that point whether that server -- whether the fax service
21 provider has standing under the TCPA or not.  What we're
22 worried about, the ultimate recipient, the intended recipient,
23 and the person that gets nothing other than an email.  Nothing
24 is getting tied up for that person because that email is sent
25 over the internet.  There's no phone line that's tied up.

| | | |
|---|---|---|
| 2:04 PM | 1 | **THE COURT:**  Mr. Hara, let me give you a hypothetical. |
| 2:04 PM | 2 | Company hires a fax service provider to manage their faxes |
| 2:04 PM | 3 | coming in, and integrated in that is artificial intelligence |
| 2:04 PM | 4 | that essentially identifies for it all the relevant faxes so |
| 2:05 PM | 5 | that they need not prune the faxes for themselves or have an |
| 2:05 PM | 6 | employee look at them.  Have they suffered harm that is |
| 2:05 PM | 7 | intended by Congress? |
| 2:05 PM | 8 | **MR. HARA:**  Hold on.  So it's in the course of the |
| 2:05 PM | 9 | company's business, they would never look at the faxes unless |
| 2:05 PM | 10 | it got past the AI? |
| 2:05 PM | 11 | **THE COURT:**  Yes. |
| 2:05 PM | 12 | **MR. HARA:**  I think they would have Article III |
| 2:05 PM | 13 | standing for the ones that they look at for sure because you |
| 2:05 PM | 14 | have to open it and take the time to review it.  For ones that |
| 2:05 PM | 15 | are never reviewed, that might be a closer question.  I'm not |
| 2:05 PM | 16 | sure.  No human ever looked at it.  Well, you still have to set |
| 2:05 PM | 17 | up the AI to deal with the problem, so it's imposing some cost |
| 2:05 PM | 18 | on the business.  I think I would argue that you do.  There is |
| 2:05 PM | 19 | a harm there.  Now, is it covered by the statute?  Yeah, well, |
| 2:05 PM | 20 | definitely it's covered by the statute under the 2003 order and |
| 2:06 PM | 21 | the WestFax ruling.  So yeah, I would argue that's a valid TCPA |
| 2:06 PM | 22 | claim. |
| 2:06 PM | 23 | **MR. MESTER:**  We would disagree, Your Honor. |
| 2:06 PM | 24 | **MR. GOOD:**  Your Honor, could I ask, what type of |
| 2:06 PM | 25 | artificial intelligence are you hypothesizing?  The reason I |

| | |
|---|---|
| 2:06 PM | 1 |

ask is I'm familiar with the ability to block phone numbers.

I'm hoping you're aware of that, which if artificial

intelligence was broad enough could say every, you know, fax

sent by a certain phone number is a junk fax, and we should

just block that fax number, and then the faxes never go

through.  And then there's another type of artificial

intelligence which is sort of emerging where it actually reads

the content of the fax.  It -- what are you referring to?

        THE COURT:  It could be either.  I mean, what I'm

inferring is is there a possibility that the technology could

rise to the level that there -- the harm that was intended and

designed by Congress not even be covered?

        MR. GOOD:  And I don't want to disagree with Mr. Hara

at all, but if you're talking about blocking fax numbers and

never receiving the faxes, then they would never be -- I mean,

would never go through.

        THE COURT:  Right.

        MR. GOOD:  So -- and I am familiar that -- there are

even clients that I've worked with that block certain numbers

based on, you know, having received faxes from said numbers.

It's artificial intelligence --

        THE COURT:  You can manually block numbers.  I

mean -- right.

        MR. GOOD:  I know.

        THE COURT:  You could manually block numbers.

| | | |
|---|---|---|
| 2:07PM | 1 | **MR. GOOD:**  No, I know, but I'm saying you could also |
| 2:07PM | 2 | use artificial intelligence to do it daily and to add to that |
| 2:07PM | 3 | block list constantly if that's how you're hypothesizing the |
| 2:07PM | 4 | AI. |
| 2:07PM | 5 | **THE COURT:**  Mr. Mester, is there any disagreement |
| 2:07PM | 6 | that fax service providers do receive the fax -- there's no |
| 2:07PM | 7 | disagreement.  I've heard nobody -- I hesitate to even ask the |
| 2:08PM | 8 | question to open up the door for disagreement on this, but |
| 2:08PM | 9 | there is no disagreement that the faxes are being transmitted |
| 2:08PM | 10 | by fax or other equipment over telephone lines? |
| 2:08PM | 11 | **MR. MESTER:**  I believe there is some disagreement. |
| 2:08PM | 12 | **THE COURT:**  Okay. |
| 2:08PM | 13 | **MR. MESTER:**  Sorry. |
| 2:08PM | 14 | **THE COURT:**  That's all right. |
| 2:08PM | 15 | **MR. MESTER:**  We don't know, but I believe there's |
| 2:08PM | 16 | several ways it can be done, and one of the ways it can be |
| 2:08PM | 17 | done, there are some fax broadcasters I believe that use an |
| 2:08PM | 18 | internet-based system to send, but that's why the broader |
| 2:08PM | 19 | definition of the sending device and the receiving device |
| 2:08PM | 20 | matters, because I believe that that -- if it's that type of |
| 2:08PM | 21 | device, it still may be -- I think if it goes over the |
| 2:08PM | 22 | internet, it's a different question, but if a broader type |
| 2:08PM | 23 | device is used -- in other words, you don't take a piece of |
| 2:08PM | 24 | paper and put it in the machine, but instead you send it |
| 2:08PM | 25 | through a computer over the phone line to the fax service |

2:08PM   1   providers, then yes, that's the first step.  Then the

2:09PM   2   connection breaks depending on the equipment used by the fax

2:09PM   3   server.  At least that's the harmonizing of the interpretation

2:09PM   4   between <u>WestFax</u> on the one end and <u>Amerifactors</u> and <u>Ryerson</u> on

2:09PM   5   the other.

2:09PM   6          THE COURT:  All right.  Let me refine my question.

2:09PM   7   What I'm asking then is the fax service provider -- let's just

2:09PM   8   say <u>Amerifactors</u>.  They are receiving it, and if it ended with

2:09PM   9   them, despite all the other arguments about intended recipient,

2:09PM  10   but it would be covered under the TCPA, that it was received by

2:09PM  11   a server or computer that was connected to a fax modem?

2:09PM  12          MR. MESTER:  I don't think so, Your Honor.  It would

2:09PM  13   depend on the equipment they used.  If they used the narrow

2:09PM  14   type of fax server I'm talking about, which is what most of

2:09PM  15   these entities do -- there would be no reason if you were a fax

2:09PM  16   service provider to have a bunch of --

2:09PM  17          THE COURT:  Phone lines?

2:09PM  18          MR. MESTER:  -- computers set up.  Well, phone lines,

2:09PM  19   but to have a bunch of computers set up that have the capacity

2:09PM  20   to print, because you're not printing anything.

2:09PM  21          THE COURT:  I'm not talking about capacity to print.

2:09PM  22   I'm just talking about the receipt of it digitally.  Does it

2:10PM  23   not come through a phone line to a fax modem that eventually

2:10PM  24   converts it to a server so it can be emailed?

2:10PM  25          MR. MESTER:  I don't know that I'd call it a fax

| | | |
|---|---|---|
| 2:10PM | 1 | modem, Your Honor.  It's a -- |
| 2:10PM | 2 | THE COURT:  It's coming from a telephone line; is it |
| 2:10PM | 3 | not?  It's the transmission through a telephone line. |
| 2:10PM | 4 | MR. MESTER:  Yes. |
| 2:10PM | 5 | THE COURT:  So it's got to be routed some way |
| 2:10PM | 6 | digitally from the telephone line to a server so that it can |
| 2:10PM | 7 | then be transmitted digitally over the internet. |
| 2:10PM | 8 | MR. MESTER:  But if that device doesn't have the |
| 2:10PM | 9 | capacity to print, then it's not a telephone facsimile machine. |
| 2:10PM | 10 | THE COURT:  I understand the argument, but that |
| 2:10PM | 11 | ultimately is what is -- as I see it, all these opinions are |
| 2:10PM | 12 | trying to address and ultimately what I have to address is -- |
| 2:10PM | 13 | going back to what I stated before, is can the liability -- |
| 2:10PM | 14 | despite what Amerifactors is stating and trying to articulate, |
| 2:10PM | 15 | do you look at it that it is essentially, as WestFax reads, |
| 2:10PM | 16 | they are just a link in the communication?  And all they are is |
| 2:11PM | 17 | a conduit to the ultimate recipient, the intended recipient? |
| 2:11PM | 18 | MR. MESTER:  Yes, I think so. |
| 2:11PM | 19 | THE COURT:  And as part of that conduit, it went |
| 2:11PM | 20 | through and was received by fax equipment and ultimately then |
| 2:11PM | 21 | converted.  Because -- let me put it to you this way.  Go back |
| 2:11PM | 22 | to my example that I started with.  If WestFax was simply just |
| 2:11PM | 23 | software that was sold to companies to use on their own |
| 2:11PM | 24 | equipment so that they could receive faxes through a telephone |
| 2:11PM | 25 | connection that converts it and then recognizes, based on the |

| | | |
|---|---|---|
| 2:11PM | 1 | number, to email it.  Let's say a law firm, and a law firm uses |
| 2:11PM | 2 | software just to manage it that -- rather than having fax |
| 2:11PM | 3 | machines on every floor, it can be sent directly to the lawyers |
| 2:11PM | 4 | or whoever staff, to their email boxes.  Would the TCPA cover |
| 2:11PM | 5 | that? |
| 2:11PM | 6 |         MR. MESTER:  If that device doesn't have the capacity |
| 2:11PM | 7 | to print, no, because it's not sent to a telephone facsimile |
| 2:12PM | 8 | machine. |
| 2:12PM | 9 |         THE COURT:  A computer doesn't have the -- |
| 2:12PM | 10 |         MR. MESTER:  I don't think these are computers.  I |
| 2:12PM | 11 | don't think the fax service providers use computers. |
| 2:12PM | 12 |         THE COURT:  No, no, stay focused on my hypothetical. |
| 2:12PM | 13 |         MR. MESTER:  Oh, I'm sorry. |
| 2:12PM | 14 |         THE COURT:  The law firm uses software that converts |
| 2:12PM | 15 | it from the fax server to a PDF that's sent to the email to a |
| 2:12PM | 16 | personal, you know, desktop.  Is that covered under the TCPA? |
| 2:12PM | 17 | That's all right.  Believe me -- |
| 2:12PM | 18 |         MR. MESTER:  I'm going to give you the answer again. |
| 2:12PM | 19 | You're not going to like it. |
| 2:12PM | 20 |         THE COURT:  Let me give you it again.  I'm sending a |
| 2:12PM | 21 | fax to your law firm.  Your law firm has the equipment that |
| 2:12PM | 22 | converts it with software so my fax is going through a |
| 2:12PM | 23 | telephone line.  It's received by a fax modem or a server on |
| 2:12PM | 24 | your law firm's end.  But rather than having a stand-alone fax |
| 2:12PM | 25 | machine that prints it out, there is software then that will |

| 2:13PM | 1 | convert it electronically so that it could be then attached as |
| 2:13PM | 2 | a PDF and sent directly to you as an email to your desktop.  Is |
| 2:13PM | 3 | that covered under the TCPA? |
| 2:13PM | 4 | MR. MESTER:  With due respect, Your Honor, I think |
| 2:13PM | 5 | the answer -- I think the answer is no, provided that that |
| 2:13PM | 6 | server -- which is also equipment.  It's not just software -- |
| 2:13PM | 7 | that server doesn't have the capacity to print.  But in some |
| 2:13PM | 8 | sense, that becomes an academic issue because -- and in that |
| 2:13PM | 9 | sense, I guess, Your Honor, the law firm is not a perfect |
| 2:13PM | 10 | example, but the better example is the fax service provider -- |
| 2:13PM | 11 | what really matters is what does the end user get?  And if what |
| 2:13PM | 12 | the end user gets is an email and that's all they get, I think |
| 2:13PM | 13 | it's very clear that there's not statutory standing and there's |
| 2:13PM | 14 | not Article III standing. |
| 2:13PM | 15 | And Your Honor's -- your hypothetical is |
| 2:13PM | 16 | addressing a different link in the chain, and the chain can be |
| 2:14PM | 17 | broken several times.  But where it clearly is broken is at the |
| 2:14PM | 18 | end.  And, again, we think this is for a sizable portion of the |
| 2:14PM | 19 | settlement class because all they got was an email, and they |
| 2:14PM | 20 | were the intended recipients, and that's all they got; ergo, |
| 2:14PM | 21 | there's no statutory standing, and there's no Article III |
| 2:14PM | 22 | standing. |
| 2:14PM | 23 | MR. VARNER:  Your Honor -- |
| 2:14PM | 24 | THE COURT:  Yes, please. |
| 2:14PM | 25 | MR. VARNER:  If I could add this point just by way of |

2:14PM 1    comparison.  There could hypothetically be a third-party

2:14PM 2    provider at one time that you sent your fax to, and then they

2:14PM 3    would send faxes out to multiple people.  In that event, if

2:14PM 4    those recipients got a fax, they are, of course, covered.  But

2:14PM 5    to Mr. Mester's point, I think all roads lead to the conclusion

2:14PM 6    that no matter what happens at the third-party provider level,

2:14PM 7    if the ultimate recipient gets an email, there is no standing

2:14PM 8    because there is no harm.

2:14PM 9         MR. COLLINS:  And, Your Honor, I think <u>Amerifactors</u>

2:14PM 10   addresses your direct question in paragraph 11.  It says, "An

2:14PM 11   online fax service cannot itself print a fax.  The user of an

2:15PM 12   online fax service must connect his or her own equipment in

2:15PM 13   order to do so."  At the law firm, for example, someone then

2:15PM 14   connects a printer to their computer when they get an email,

2:15PM 15   and they decide to print it out.

2:15PM 16        THE COURT:  But isn't that contrary to what

2:15PM 17   Mr. Mester just told me, that there is no liability?  My

2:15PM 18   scenario was the law firm has the fax server, and it's sent to

2:15PM 19   your desktop which then can print it out.  It's all within the

2:15PM 20   same control.  Why wouldn't liability be there?

2:15PM 21        MR. COLLINS:  <u>Amerifactors</u> says that's not a

2:15PM 22   telephone facsimile machine.  It says, "An online fax service

2:15PM 23   cannot itself print a fax.  The user of an online fax service

2:15PM 24   must connect his or her own equipment in order to do so.  As

2:15PM 25   such, a online fax service is plainly not equipment which has

2:15 PM 1  the capacity to transcribe," and so on.

2:15 PM 2          THE COURT:  That's the online fax service.  My

2:15 PM 3  scenario was the law firm has the fax service -- what I thought

2:15 PM 4  WestFax was; that the law firm -- you're sending the fax

2:15 PM 5  directly to the law firm who then converts it through software

2:16 PM 6  and emails it.

2:16 PM 7          MR. MESTER:  I think I understand your question.  So

2:16 PM 8  it's all -- it's like combining the online fax service --

2:16 PM 9          THE COURT:  Not using an online fax service.  It's

2:16 PM 10 just your equipment.

2:16 PM 11         MR. MESTER:  I understand, but that's the point I'm

2:16 PM 12 trying to make.  You're combining those two functions into one

2:16 PM 13 entity.  The law firm is both.

2:16 PM 14         THE COURT:  Yes.

2:16 PM 15         MR. MESTER:  It's effectively acting as the online

2:16 PM 16 fax service and the end user.  I'd have to think about that.  I

2:16 PM 17 think that's a different question than what we're looking at,

2:16 PM 18 but I think this is important, we should remember, we don't

2:16 PM 19 have the burden.  They have the burden.  They have to

2:16 PM 20 demonstrate that every member of the settlement class has

2:16 PM 21 Article III standing, and we're all sitting here now

2:16 PM 22 speculating about all the different types of equipment and the

2:16 PM 23 permutations, but they need to meet that burden, and I think

2:16 PM 24 it's I think painfully obviously based upon this argument that

2:16 PM 25 they can't do that.

| | |
|---|---|
| 2:16PM | 1 |
| 2:16PM | 2 |
| 2:16PM | 3 |
| 2:16PM | 4 |
| 2:17PM | 5 |
| 2:17PM | 6 |
| 2:17PM | 7 |
| 2:17PM | 8 |
| 2:17PM | 9 |
| 2:17PM | 10 |
| 2:17PM | 11 |
| 2:17PM | 12 |
| 2:17PM | 13 |
| 2:17PM | 14 |
| 2:17PM | 15 |
| 2:17PM | 16 |
| 2:17PM | 17 |
| 2:17PM | 18 |
| 2:17PM | 19 |
| 2:17PM | 20 |
| 2:17PM | 21 |
| 2:17PM | 22 |
| 2:17PM | 23 |
| 2:18PM | 24 |
| 2:18PM | 25 |

1    MR. VARNER:  Your Honor, if I could respond to your
2  law firm analogy, I don't know the answer to the question about
3  what happens at the law firm stage.  Let's say hypothetically
4  there would be liability there.  The law firm might have
5  standing, but when I get it, if Holland & Knight gets the fax
6  and through whatever system we have they send me an email, I
7  clearly don't have standing.  And I think that's closer to the
8  situation we have here.
9    MR. HARA:  So, Your Honor --
10    THE COURT:  Yes.
11    MR. HARA:  That question is illuminating, and I've
12  talked about it with my colleagues before, because really the
13  only difference in -- they have to admit that that's covered by
14  the TCPA.  So it would be absurd for it not to be, right?  So
15  the only reason they're saying yes is based on where the fax
16  server is located.  Is it located with the online fax service
17  provider, or is it located in your building in your law firm?
18    THE COURT:  That's why I asked the question, because
19  I could give you a different analogy.
20    MR. HARA:  It should make no difference.
21    THE COURT:  If you maintain documents on Microsoft's
22  cloud, are they nonetheless still your documents?
23    MR. HARA:  Of course.
24    THE COURT:  And that's why I asked the question, is
25  because what we're talking about -- but I think that's what the

2:18PM  1    struggle of these opinions are is just that fundamental issue

2:18PM  2    right there, which is does the receipt of the incoming fax

2:18PM  3    through a telephone line by a third party break the harm, stop

2:18PM  4    the connection, the continuing harm to the intended recipient?

2:18PM  5    And obviously I understand over and over again your position is

2:18PM  6    it does.  I'm struggling though with what WestFax is stating

2:18PM  7    because it seems to say it does not.  And then I cannot

2:18PM  8    reconcile then how do I look at WestFax in combination with

2:18PM  9    Amerifactors?

2:18PM  10           MR. HARA:  They cannot be reconciled.  I have tried

2:18PM  11   to do that.  They are completely contradictory, which is why

2:19PM  12   Amerifactors is wrong, and it's not persuasive, and it's

2:19PM  13   inconsistent with prior Commission precedent.

2:19PM  14           THE COURT:  All right.  Here's what we're going to do

2:19PM  15   going forward, and I am not looking -- believe me, I hate doing

2:19PM  16   this truly, because it's going to delay matters more and cause

2:19PM  17   you more resources, more than is necessary that you've already

2:19PM  18   expended to get through this case, but this is clearly a

2:19PM  19   fundamental issue that must be resolved before I can go

2:19PM  20   forward.  Because if I resolve it and find that there is no

2:19PM  21   standing issue, then there's still matters yet to be attended

2:19PM  22   to, and we'll get through those.  But if I find there is a

2:19PM  23   standing issue, then that is going to obviously change the

2:19PM  24   trajectory of where we're going, so I need to resolve this.

2:19PM  25           So this is why I would like for you all to

2:19PM 1   address the questions for me.

2:19PM 2              1.  Give me whatever you want for your

2:20PM 3   explanation on how I reconcile to the best I can this issue

2:20PM 4   with each of those three opinions -- or I should say four now.

2:20PM 5              2.  If I do not apply the Chevron deference,

2:20PM 6   then I want you to make your argument as to what I should do

2:20PM 7   and how the statute should be applied; that is, just as we were

2:20PM 8   arguing there at the end, is there really a harm that is

2:20PM 9   resulted upon the intended recipient if a third-party fax

2:20PM 10  service provider is utilized?  And I want you to articulate for

2:20PM 11  me that harm that was designed and intended for by Congress's

2:20PM 12  prohibition.

2:21PM 13             3.  If I do find that there is a standing issue,

2:21PM 14  does that end the inquiry?  In other words, can we remedy it?

2:21PM 15  And if the only suggestion of remedy is attestation, then I

2:21PM 16  want you to address Karhu -- I think that's how you say it --

2:21PM 17  K-a-r-h-u, v. Vital Pharmaceuticals, 621 F.App'x 945.  It's a

2:21PM 18  2015, a pre-Cherry case, that casts doubt on self-attestation.

2:22PM 19             I pause because we'll take this up, because if

2:22PM 20  the Court does get to the point that standing is a problem and

2:22PM 21  finds there is merit to the Buccaneers' position, then I need

2:22PM 22  vacate the preliminary approval.  That is going to open up a

2:22PM 23  Pandora's box as to what that means and what procedural

2:22PM 24  safeguards need to be put in place to preserve the opportunity

2:22PM 25  for individuals to file claims if we get to that point, but I

| | | |
|---|---|---|
| 2:22PM | 1 | don't need briefing on that, but that is something that is in |
| 2:22PM | 2 | the back of my mind as a concern. |
| 2:22PM | 3 | MR. PIPER:  Your Honor, just to clarify -- |
| 2:22PM | 4 | THE COURT:  Yes. |
| 2:22PM | 5 | MR. PIPER:  -- as to question 1, you said now it's |
| 2:22PM | 6 | four cases.  I guess you meant _Ryerson_? |
| 2:22PM | 7 | THE COURT:  Yes, yes. |
| 2:22PM | 8 | MR. PIPER:  Okay.  Your Honor, could I just address |
| 2:23PM | 9 | one point? |
| 2:23PM | 10 | THE COURT:  Yes. |
| 2:23PM | 11 | MR. PIPER:  I'll borrow a microphone. |
| 2:23PM | 12 | THE COURT:  Thank you, Mr. Piper. |
| 2:23PM | 13 | MR. PIPER:  Well, I would just observe that -- and I |
| 2:23PM | 14 | think these questions still implicitly assume that the FCC |
| 2:23PM | 15 | purports to make rulings about what the jurisdiction of |
| 2:23PM | 16 | Article III Courts is.  Now, particularly -- and obviously |
| 2:23PM | 17 | we'll submit something on this, but particularly if we're |
| 2:23PM | 18 | talking about things like Chevron deference, you might decide |
| 2:23PM | 19 | on the merits that there's a persuasive argument in some FCC |
| 2:23PM | 20 | opinion that's going to lead you to deny somebody's claim on |
| 2:24PM | 21 | the merits.  That's, as you're well aware, very different than |
| 2:24PM | 22 | the standing issue, and I'll just leave that at that.  I do |
| 2:24PM | 23 | think it's important not to lose sight of that point. |
| 2:24PM | 24 | MR. MESTER:  Judge, we tried to address that in the |
| 2:24PM | 25 | submission we made.  You -- I think you do need to look at the |

2:24PM 1    statute for the Article III analysis, but not to decide the

2:24PM 2    merits.  It's whether to decide Congress intended to elevate

2:24PM 3    the particular harm that's at issue.  Again, I think with

2:24PM 4    respect to emails, the answer is quite clear.

2:24PM 5              MR. HARA:  We agree with that conceptually.  Under

2:24PM 6    Spokeo, there are two prongs.  There's the judgment of

2:24PM 7    Congress, and there's history.  Like, Drazen II looked at

2:24PM 8    history, but it was a common law analogue, but -- you know,

2:24PM 9    they're both relevant inquiries, but it's not just the judgment

2:24PM 10   of Congress, but it is relevant to the standing analysis.

2:24PM 11             THE COURT:  I agree with that, but then it still goes

2:24PM 12   to am I obligated under Chevron?  And then okay, if I'm

2:25PM 13   obligated under Chevron, how do I reconcile them as we've just

2:25PM 14   gone round and round here trying to figure that out?  How do I

2:25PM 15   reconcile each of these?  Because as I've stated -- and that's

2:25PM 16   what I'm looking for from clarity in your pleadings, if there

2:25PM 17   is any, although I've not heard it because you have different

2:25PM 18   opposing views, but how do I reconcile these opinions to get to

2:25PM 19   some deference?

2:25PM 20             And then if I can't get to deference, then how

2:25PM 21   are they even persuasive to me?  And which one is persuasive to

2:25PM 22   me?

2:25PM 23             Which is ultimately why I recognize what other

2:25PM 24   Courts have done, and I've studied those opinions, but no one

2:25PM 25   has taken a true deep dive on these issues, certainly not under

| | | |
|---|---|---|
| 2:25PM | 1 | the landscape we're under right now after <u>Drazen</u>, and that's |
| 2:25PM | 2 | what -- I think why this is still somewhat fresh and new that |
| 2:25PM | 3 | has to be resolved. |
| 2:25PM | 4 | So that -- I appreciate and I understand your |
| 2:25PM | 5 | positions on that, but that's what I'm trying to articulate |
| 2:26PM | 6 | with you is that I think there is a fundamental problem here |
| 2:26PM | 7 | that we have to resolve, and I am looking for your argument and |
| 2:26PM | 8 | insights on how I can come to that conclusion. |
| 2:26PM | 9 | Ultimately in the end, I'm recognizing also that |
| 2:26PM | 10 | if it is Chevron, then which one is it that is the most -- that |
| 2:26PM | 11 | I'm supposed to follow?  And can they all three be reconciled |
| 2:26PM | 12 | so that I can follow them and give a cohesive decision in that |
| 2:26PM | 13 | regard?  If I do that and then a year later I find out Chevron |
| 2:26PM | 14 | is not applicable anymore, and so then -- believe me, whatever |
| 2:26PM | 15 | I do, I'm going to make sure I can do it also in the |
| 2:26PM | 16 | alternative, if I can. |
| 2:26PM | 17 | But that's what I'm looking for is some clarity |
| 2:26PM | 18 | on how we look at what was done by the FCC and what they're |
| 2:26PM | 19 | trying to articulate here.  And then more importantly, what is |
| 2:26PM | 20 | the intent of the statute and Congress that I can articulate is |
| 2:27PM | 21 | there Article III standing or not? |
| 2:27PM | 22 | Because I agree with the Bucs, and I'll make |
| 2:27PM | 23 | that clear.  If what is surmised by <u>Amerifactors</u> is what I |
| 2:27PM | 24 | should follow, we have a problem.  And then that goes to the |
| 2:27PM | 25 | second aspect of what needs to be addressed.  Can you remedy |

| | | |
|---|---|---|
| 2:27PM | 1 | that problem? |
| 2:27PM | 2 | But if <u>Amerifactors</u> is not binding upon this |
| 2:27PM | 3 | Court, or I find that it not be persuasive, then we don't have |
| 2:27PM | 4 | a problem, and I'll articulate that. |
| 2:27PM | 5 | But that's what I see the issue before me, and |
| 2:27PM | 6 | it really is that question that is the harm over or -- let me |
| 2:27PM | 7 | rephrase that.  Is there any harm that continues on when an |
| 2:27PM | 8 | intended recipient uses a fax service provider who converts it |
| 2:27PM | 9 | by email and sends it by email? |
| 2:28PM | 10 | And I think every time I read <u>WestFax</u>, that |
| 2:28PM | 11 | answer is clear.  Every time I read <u>Amerifactors</u>, it gets |
| 2:28PM | 12 | clouded.  So I'll leave it at that for you so you have an idea |
| 2:28PM | 13 | of what would be helpful for me. |
| 2:28PM | 14 | I'm happy to even answer any further questions |
| 2:28PM | 15 | if you want if I've been ambiguous as to what I'm looking you |
| 2:28PM | 16 | to help me resolve that, and I'm happy to hear any further |
| 2:28PM | 17 | argument. |
| 2:28PM | 18 | But this is an issue -- so to be clear, I'm |
| 2:28PM | 19 | denying your motion as to Astro as -- without prejudice.  I'm |
| 2:28PM | 20 | not going to decide on Astro until I decide this issue. |
| 2:28PM | 21 | There's no sense to do anything with Astro until I get past the |
| 2:28PM | 22 | overall standing issue. |
| 2:28PM | 23 | If we get past the standing issue, then I'm |
| 2:28PM | 24 | going to -- and find there is no standing issue, then we will |
| 2:28PM | 25 | take up Astro as well as the other objections to any claims, |

| | | |
|---|---|---|
| 2:28PM | 1 | and we will go through that process. |
| 2:28PM | 2 | And I'll be very clear about that.  I am |
| 2:28PM | 3 | comfortable in looking at those matters and find that we're |
| 2:28PM | 4 | going to be able to get past those matters if we get to that |
| 2:29PM | 5 | point. |
| 2:29PM | 6 | I know the Bucs have other arguments.  I'll let |
| 2:29PM | 7 | you make all those arguments, put them on the record, but I |
| 2:29PM | 8 | think the process that was designed has played out, and we can |
| 2:29PM | 9 | get there, but this is the larger issue that's looming. |
| 2:29PM | 10 | All right.  Mr. Hara, do you have anything else |
| 2:29PM | 11 | you want to say or any other arguments you want to put on the |
| 2:29PM | 12 | record right now? |
| 2:29PM | 13 | MR. HARA:  Not at this time, Your Honor. |
| 2:29PM | 14 | THE COURT:  All right.  Mr. Mester? |
| 2:29PM | 15 | MR. MESTER:  No, Your Honor. |
| 2:29PM | 16 | THE COURT:  All right.  And how about anyone else? |
| 2:29PM | 17 | Mr. Piper? |
| 2:29PM | 18 | MR. PIPER:  No, Your Honor. |
| 2:29PM | 19 | THE COURT:  All right.  Anyone else? |
| 2:29PM | 20 | MR. VANETTEN:  Your Honor, my only question is when |
| 2:29PM | 21 | do you want that memorandum by? |
| 2:29PM | 22 | THE COURT:  So I'm not -- you're welcome to file |
| 2:29PM | 23 | something if you would like to, but I'm not seeking it, |
| 2:29PM | 24 | certainly imposing it upon Astro to submit anything, but you're |
| 2:29PM | 25 | welcome to do so, but this is what I'd like to do, and do it in |

| | | |
|---|---|---|
| 2:29 PM | 1 | this fashion. |
| 2:29 PM | 2 | It is the Buccaneers who are seeking this, so |
| 2:29 PM | 3 | I'm going to have you just file it first and then allow the |
| 2:30 PM | 4 | response to be filed by the -- yes? |
| 2:30 PM | 5 | MR. MESTER:  Your Honor, may I -- |
| 2:30 PM | 6 | THE COURT:  You filed the Motion to Dismiss. |
| 2:30 PM | 7 | MR. MESTER:  I understand, Your Honor. |
| 2:30 PM | 8 | THE COURT:  And so I'm going to have you supplement |
| 2:30 PM | 9 | your motion. |
| 2:30 PM | 10 | MR. MESTER:  I only did that, Your Honor, because |
| 2:30 PM | 11 | they didn't mention -- they have the burden.  I have yet to |
| 2:30 PM | 12 | hear coherently in one piece of paper that I can look at and |
| 2:30 PM | 13 | respond to precisely what each their arguments and positions -- |
| 2:30 PM | 14 | THE COURT:  But I'm going to give you an opportunity |
| 2:30 PM | 15 | to do so.  I want you to file first.  They will file, and then |
| 2:30 PM | 16 | I will give you a chance to reply. |
| 2:30 PM | 17 | All right.  I'm going to leave the normal page |
| 2:30 PM | 18 | limit, so let's talk about timing and sequence of that so that |
| 2:30 PM | 19 | everybody has an opportunity to do it without being under a |
| 2:30 PM | 20 | time crunch. |
| 2:30 PM | 21 | So how much time, Mr. Mester, to file the |
| 2:30 PM | 22 | initial supplement? |
| 2:30 PM | 23 | MR. MESTER:  Your Honor, the other complication is |
| 2:30 PM | 24 | that this is -- I know there's many other cases going on in |
| 2:30 PM | 25 | this courthouse, but it often takes us a fair amount to time to |

| | | |
|---|---|---|
| 2:30 PM | 1 | get the transcript, and the transcript is fairly important. |
| 2:30 PM | 2 | We got the one that was -- that was submitted |
| 2:31 PM | 3 | with the submission we had this week a couple of weeks ago.  We |
| 2:31 PM | 4 | need to get the transcript and have a chance to look at it. |
| 2:31 PM | 5 | I -- I think 30 days would accomplish that if we -- if we cut |
| 2:31 PM | 6 | much less than that -- |
| 2:31 PM | 7 | THE COURT:  So 30 days to file? |
| 2:31 PM | 8 | MR. MESTER:  Yes, Your Honor. |
| 2:31 PM | 9 | THE COURT:  That's fine.  All right.  How much time |
| 2:31 PM | 10 | then to file the response? |
| 2:31 PM | 11 | MR. HARA:  Let's see.  That's putting BTL's brief in |
| 2:31 PM | 12 | late February, February 19th. |
| 2:31 PM | 13 | THE COURT:  Mr. Addison? |
| 2:31 PM | 14 | MR. ADDISON:  May I be excused Your Honor? |
| 2:31 PM | 15 | THE COURT:  Yes, please, yes.  I'm sorry. |
| 2:31 PM | 16 | MR. HARA:  The same time, 30 days, if that's okay. |
| 2:31 PM | 17 | THE COURT:  If that's what you want.  I'm not going |
| 2:31 PM | 18 | anywhere.  I mean, I'd like the case to go somewhere, but if |
| 2:31 PM | 19 | you think you need that much time, I'm going to give it to you. |
| 2:31 PM | 20 | MR. HARA:  I'd like 30 days. |
| 2:31 PM | 21 | THE COURT:  All right. |
| 2:31 PM | 22 | MR. HARA:  If we can get it on file sooner -- |
| 2:31 PM | 23 | THE COURT:  That's fine.  30 days.  And then how much |
| 2:32 PM | 24 | time from the filing of the -- |
| 2:32 PM | 25 | MR. MESTER:  21 days, Your Honor. |

2:32PM   1           **THE COURT:**  All right.  Mr. Piper, you're fine with

2:32PM   2   the 30 days?

2:32PM   3           **MR. PIPER:**  Right.  We'll file at the same time as

2:32PM   4   Plaintiffs.

2:32PM   5           **THE COURT:**  All right.  So 30 days to file something

2:32PM   6   from today's date.  I'm going to give you 30 days from the

2:32PM   7   filing of the supplement and then 21 days from the filing of

2:32PM   8   the response to file the reply.

2:32PM   9               Give me one moment.

2:32PM   10              I neglected to look.  Has it been put up on the

2:32PM   11  website that the matter has been -- the fairness hearing was

2:32PM   12  canceled and will be rescheduled?

2:32PM   13          **MR. GOOD:**  It was sent to them, Your Honor.  It was

2:32PM   14  definitely sent to them.  I did it.

2:33PM   15          **THE COURT:**  Thank you, Mr. Good.

2:33PM   16          **MR. GOOD:**  It says, "To be determined."  It has been

2:33PM   17  updated, it looks like.

2:33PM   18          **THE COURT:**  All right.  Oh, I'm sorry.  I did neglect

2:33PM   19  one other issue that you could address for me.  Can

2:33PM   20  Amerifactors be applied retroactively?  Eleventh Circuit case

2:33PM   21  law I was looking at was Piamba Cortes v. American Airlines.

2:33PM   22  The cite is 177 F.3d 1272.  It's a 1999 Eleventh Circuit case.

2:33PM   23          **MR. GOOD:**  Just for clarification, was that for all

2:33PM   24  of the rulings or just Amerifactors?  These faxes were sent in

2:34PM   25  2009 and 2010.

2:34PM 1          THE COURT:  Those rulings were prior to faxes being

2:34PM 2    sent, though; were they not?  The 2003?  I'm sorry?

2:34PM 3          MR. GOOD:  The 2015 order, the <u>WestFax</u> order --

2:34PM 4          THE COURT:  The <u>WestFax</u> 2015.  That's right.  That

2:34PM 5    would apply to that as well.

2:34PM 6          MR. GOOD:  That's what I wanted to know for

2:34PM 7    clarification.

2:34PM 8          THE COURT:  Yes.

2:34PM 9          MR. HARA:  So the three then, Your Honor?

2:34PM 10         THE COURT:  Yes.  I mean, really what it comes down

2:34PM 11   to is the question is is it just a clarification, or is it a

2:34PM 12   fundamental -- as I see the Eleventh Circuit.  The reason why I

2:34PM 13   raise that is because obviously that's what -- it just escaped

2:34PM 14   my mind.

2:34PM 15         MR. MESTER:  <u>Lyngaas</u>, the Sixth Circuit.

2:34PM 16         THE COURT:  The Sixth Circuit, thank you.  The Sixth

2:34PM 17   Circuit found that it did not apply retroactively.

2:34PM 18         MR. MESTER:  Your Honor --

2:34PM 19         THE COURT:  Yes.

2:34PM 20         MR. MESTER:  -- my secretary is out today.  I don't

2:34PM 21   want to lose a day.  Can we -- is there somewhere we can go

2:34PM 22   order the transcript here while we're here?

2:35PM 23         THE COURT:  Well, I don't know the answer to that.

2:35PM 24   How would we do that?

2:35PM 25         THE COURT REPORTER:  You can just tell me you want

| | | |
|---|---|---|
| 2:35PM | 1 | it. |
| 2:35PM | 2 | MR. MESTER:  We do. |
| 2:35PM | 3 | THE COURT:  All right.  One more moment. |
| 2:35PM | 4 | MR. GOOD:  While you're doing that, Your Honor, as |
| 2:35PM | 5 | long as the court reporter is here, how long does that take? |
| 2:35PM | 6 | THE COURT REPORTER:  Can we discuss it after the |
| 2:35PM | 7 | hearing? |
| 2:35PM | 8 | MR. GOOD:  Sure. |
| 2:35PM | 9 | THE COURT:  Okay.  That's all I have.  All right. |
| 2:35PM | 10 | We've often done this in this case, but I |
| 2:35PM | 11 | obviously do not want to delay the matter any more, but I think |
| 2:35PM | 12 | this just has to be done.  As much as I've tried to wrap my |
| 2:35PM | 13 | head around it, I've been unable to do so, so I think this is |
| 2:35PM | 14 | the necessary step to go forward. |
| 2:35PM | 15 | With that said, I pause to say this, but it |
| 2:36PM | 16 | seems to me every time we take a step forward, we take two |
| 2:36PM | 17 | steps back.  I just think in the end if we get resolved one way |
| 2:36PM | 18 | or the other, I recognize that going forward there will be |
| 2:36PM | 19 | ultimately clarity on this decision, and that's the way I look |
| 2:36PM | 20 | at it is for me, this is the last step in this case that I can |
| 2:36PM | 21 | see going forward to get some clarity for everyone, one way or |
| 2:36PM | 22 | the other.  So I recognize, again, there are other arguments, |
| 2:36PM | 23 | but I at least am confident that we can move forward either |
| 2:36PM | 24 | way.  So that's what we're going to do. |
| 2:36PM | 25 | All right.  We'll be adjourned.  Thank you. |

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

(End of proceedings.)

* * * * * * * * * * * * * * * * * * * * * *

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA


REPORTER TRANSCRIPT CERTIFICATE

        I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 70 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.


_____

Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date:  January 24, 2024