**EXHIBIT B**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | CC Docket No. 92-90 |
| | ) | |
| | ) | |
| | ) | |

**COMMENTS OF NEXTEL COMMUNICATIONS, INC.**

Robert McNamara
  Senior Counsel – Regulatory
Frank Triveri
  Counsel – Regulatory

**NEXTEL COMMUNICATIONS, INC.**
2001 Edmund Halley Drive
Reston, VA  20191

(703) 433-4000

To-Quyen T. Truong
Scott D. Dailard
Briana E. Thibeau

**DOW, LOHNES & ALBERTSON, PLLC**
1200 New Hampshire Avenue, NW
Suite 800
Washington, DC  20036

(202) 776-2000

  Its Attorneys

December 9, 2002

## TABLE OF CONTENTS

**Page**

SUMMARY ...................................................................................................................i

I.      A National "Do-Not-Call" Database Should Only Be Adopted With Certain
        Conditions. ........................................................................................................3

        A.      The Commission Must Preempt State Do-Not-Call Laws.....................................4

        B.      The Commission Should Require Annual Renewal of Do-Not-Call
                Registrations.........................................................................................6

        C.      The Commission Should Not Impose Burdensome Company-Specific
                "Do-Not-Call" Rules............................................................................7

        D.      The Commission Should Provide a "Safe Harbor" for Sellers and
                Telemarketers that Make a Good Faith Effort to Comply With TCPA
                Rules..................................................................................................10

II.     The "Established Business Relationship" Rule, As Currently Applied by the
        Commission, Is an Integral Part of the TCPA ...................................................11

        A.      The Commission's Current Formulation of the Established Business
                Relationship Exception Best Implements the Letter and Spirit of the
                TCPA .................................................................................................11

        B.      The Commission Should Interpret the Established Business
                Relationship Exception in a Manner Consistent with the Consent
                Requirements of the CPNI Rules.........................................................16

III.    The Commission Should Prohibit Deliberate Falsification or Blocking of
        Caller ID Information, but Should Not Require Telemarketers to Use
        Telecommunications Equipment that Supports Caller ID ...................................17

IV.     The Commission Should Consider the Unique Characteristics of Mobile
        Telephone Service in its Reevaluation of the TCPA Rules ...............................19

        A.      The Commission Should Not Treat Wireless Telephone Numbers as
                Residential Numbers for Purposes of Administering the TCPA ............19

        B.      Wireless Customers Should Not be Subjected to Autodialed and
                Prerecorded Calls in a Number Portability Regime...............................23

V.      The Commission Must Clarify The TCPA Rules To Address Developments
        In Facsimile Advertising...................................................................................24

**TABLE OF CONTENTS**
(continued)

A. The Commission Should Preserve the Established Business Relationship Rule .....................................................................27

    1. The Established Business Relationship Rule ..................................27

    2. Proof that the Fax Advertisement Was Unsolicited, Including the Absence of an Established Business Relationship, is an Element of Proof of a Violation ......................................................29

B. The Commission Should Clarify That the TCPA Does Not Prohibit the Transmission of Unsolicited Advertisement to Fax Servers and Personal Computers ...............................................................30

    1. Fax Servers and Personal Computers Fall Outside the TCPA Definition of "Telephone Facsimile Machines" ...............................31

    2. The Technological Differences Between Traditional Telephone Facsimile Machines and New Paperless Fax Devices Have Important Ramifications Under the First Amendment ....................34

C. The Commission Should Clarify the Boundaries of Liability under the TCPA, Including Specifically that Section 217 Does Not Create Unique Obligations for Common Carriers under the TCPA................38

    1. Liability Should Rest With the Party Who Determines the Destination of Fax Advertisements..................................................38

    2. Section 217 Applies to Nondelegable Carrier Obligaitons, Not the TCPA .......................................................................................40

VI. CONCLUSION...............................................................................44

## SUMMARY

Nextel Communications, Inc. ("Nextel") applauds the Commission's initiation of this rulemaking proceeding to reevaluate and clarify the implementing rules for the Telephone Consumer Protection Act of 1991 ("TCPA").  Nextel supports clear rules under the TCPA because, if we have learned anything in the last decade since the law's enactment, it is that in the absence of clear rules, lawyers rush in.  Indeed, the TCPA, and the ambiguity surrounding its reach and scope, have spawned an entire class action litigation industry focused on reaching "deep pockets" rather than restraining bad actors or protecting consumers.  The Commission's work in this docket takes place in the midst of this litigation explosion, and the Commission should be mindful of this context as it pens the rules.

In particular, the uncertainty surrounding certain aspects of the rules governing unsolicited facsimile advertisements has provided fertile ground for litigation, and the Commission should take immediate steps to clarify the applicable legal framework that will apply in pending and future lawsuits under the TCPA.  Nextel asks the Commission to preserve the established business relationship rule, which makes clear that a fax advertisement to an existing customer is not unsolicited unless the customer advises the company that he or she does not wish to receive such communications in the future.  Moreover, the Commission should make clear that, in any enforcement proceeding or private action, the burden is on the plaintiff to show that a fax was unsolicited.  Further, the Commission should clarify that the TCPA only applies to unsolicited advertisements sent to fax machines, and not to personal computers, fax servers or other devices that are excluded from the statutory definition of a receiving fax machine.  These devices fall outside Congress' definition of a "telephone facsimile machine" because they are incapable of either transcribing text and images from paper into an electronic signal, or

transcribing information contained in an electronic signal onto paper.  Because the recipient has the choice to open, read, save, or delete such a fax transmission from his or her computer without ever printing or reducing it to paper, these devices also do not impose on consumers the costs that justified the TCPA's prohibition against unsolicited fax advertising under the First Amendment in the first place.  Finally, notwithstanding the attempts of class action lawyers to extend Section 217 of the Telecommunications Act of 1996 to the TCPA, the Commission should confirm that carriers are not strictly liable for the acts of independent contractors under the TCPA and that common law agency principles dictate whether a person is liable under the TCPA.

Nextel, like many other businesses, uses a variety of marketing tools to attract new customers and to communicate with existing customers.  Nextel's ability to communicate information about its products and services is essential for long term company growth in the highly competitive telecommunications industry; and these communications are protected by the First Amendment.  The Commission's rules must preserve the ability of businesses to communicate freely with customers within an established business relationship.  Thus, for example, general registration on a national or state-level do-not-call list should not vitiate the customer's more specific established business relationship with a company.

In regard to other marketing tools, Nextel urges the Commission to avoid unnecessary and costly burdens on legitimate marketing activities in today's precarious economy.  For example, the Commission should prohibit companies from deliberately falsifying or blocking transmissions of accurate caller ID information, but also should recognize that certain cost-effective telemarketing technologies lack the capability to transmit caller ID information that

would be meaningful to consumers.  Consequently, the Commission should not require the use of telecommunications equipment that supports the transmission of caller ID information.

If the Commission establishes a national do-not-call system under the TCPA, it should ensure that this system does not simply add another cumbersome and confusing layer to the patchwork of existing and future do-not-call systems established by the states and the Federal Trade Commission ("FTC").  In addition to reconciling the FTC and state frameworks with the Commission's do-not call system — including preempting state requirements where necessary, as required by Congress — the Commission should ensure the accuracy and efficiency of the system through such actions, for example, as a requirement for annual renewal of subscribers' do-not-call registrations in order to take account of subscriber phone number changes.

Commission adoption of a national do-not-call system may render unnecessary any detailed requirements for the maintenance of company-specific do-not-call systems.  Regardless of whether the Commission adopts a national do-not-call system, however, it should not add burdensome new requirements to its company-specific do-not-call rules – such as the establishment of web sites or toll-free numbers for registering do-not-call requests or the provision of notification to consumers confirming such registration – which would do little or nothing to prevent continued abuses by unscrupulous telemarketers, but would inflict undue burdens and costs on responsible telemarketers.  Furthermore, the Commission should adopt a safe-harbor provision for telemarketers who make good-faith efforts to comply with the do-not-call system and other TCPA rules.

*Next*, the Commission should consider the unique characteristics of mobile telephone service in its reevaluation of the TCPA framework.  The Commission should confirm that wireless telephone numbers are not "residential numbers" for purposes of enforcing its rules

governing live telephone solicitation calls.  The TCPA reflects unique Congressional concerns with protecting the privacy of telephone subscribers in their homes – concerns that are not implicated by the overwhelming majority of calls to wireless subscribers.  In addition, the Commission should adopt rules to ensure that wireless customers are not subjected to and forced to pay for autodialed and prerecorded calls in a number portability regime.  Specifically, the Commission should adopt a program that would enable telemarketers to access the information necessary to purge numbers used by wireless customers from their calling databases, regardless of whether those numbers are in NXX codes assigned to wireless providers.  The costs of such a program should be borne by telemarketers who are the cost-causers and beneficiaries of such marketing activities, as opposed to wireless carriers or their customers.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Rules and Regulations Implementing the ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 ) | CC Docket No. 92-90 |
| ) | |
| ) | |
| ) | |

To:     The Commission

## COMMENTS OF NEXTEL COMMUNICATIONS, INC.

Nextel Communications, Inc. ("Nextel"), by its attorneys, hereby submits these comments in response to the Federal Communications Commission's ("FCC's") Notice of Proposed Rulemaking seeking comment on whether the FCC should revise its rules that implement the Telephone Consumer Protection Act of 1991 ("TCPA").[1]  Nextel applauds the Commission's efforts to reevaluate the TCPA implementing rules to provide clarity and consistency in light of the intervening changes in technology and business arrangements and the recent regulatory activities of other federal and state authorities.  Nextel urges the Commission to ensure that legitimate telemarketing activities are protected from unnecessary and costly new requirements, which would impose economic hardships, even on financially healthy companies like Nextel.  The Commission should craft these rules with the goal to prevent undue burdens on legitimate marketing efforts and commercial freedoms of speech.

---

[1] In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Notice of Proposed Rulemaking*, FCC 02-250, CG Dkt. No. 02-278, CC Dkt. No. 92-90 (rel. Sept. 18, 2002) ("*Notice*" or "*NPRM*"); Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.

## BACKGROUND

Nextel operates a nationwide digital mobile network that provides more than 10 million customers with an array of fully-integrated, all-digital wireless communications services, including digital mobile telephone service, two-way radio service, and mobile messaging. Nextel also offers its customers a bundle of wireless Internet access and related Web services including advanced Java-enabled business applications.  Using Nextel's Internet-enabled handsets, its customers can search the Internet, access wireless websites, send and receive email, and access office email accounts, events and calendar lists.

Nextel's responsible use of telemarketing has played an important role in the growth of the company and in Nextel's efforts to maintain its relationships with customers.  Nextel representatives call customers to notify them when their subscriber agreements are about to expire, alert them to the availability of new services and upgrade options, and inquire about and resolve any technical or other problems they may be experiencing with their service. Unnecessary restrictions on these activities could severely impair the quality, pricing and variety of services available to Nextel's current and prospective customers.

Nextel has complied diligently with the Commission's company-specific do-not-call requirements.  Although only a small fraction of the outbound telemarketing calls made by or on behalf of Nextel result in do-not-call requests, Nextel's do-not-call database currently contains approximately 440,000 records, and Nextel has incurred considerable expense to ensure that these requests are honored.

Telemarketing promises to play an important role in Nextel's future, as it has the potential to become one of the company's most cost-effective means of expanding its service to new subscribers.  Indeed, telemarketing offers prospective wireless customers certain advantages

that cannot be duplicated efficiently through other marketing channels or media. Most importantly, telemarketing allows sales representatives to tailor Nextel's diverse service and equipment offerings to the needs of individual customers, answer customers' questions before they commit to a purchase, and resolve all the details of a transaction with a single call.

## DISCUSSION

### I.    A National "Do-Not-Call" Database Should Only Be Adopted With Certain Conditions.

The Commission seeks comment on whether it should establish a national "do-not-call" database that would contain the telephone numbers of residential subscribers who object to receiving "telephone solicitations," as defined by the TCPA.[2]  In considering any such database, the Commission must ensure that it does not simply add another cumbersome, confusing and costly layer to the multiple existing and future do-not-call systems from the states and the Federal Trade Commission ("FTC").  Any national do-not-call system the Commission adopts must avoid imposing undue burdens on legitimate marketing efforts and commercial freedoms of speech by (1) eliminating the burdens on consumers and telemarketers that result from disparate federal and state do-not-call systems, particularly state do-not-call laws which are preempted with respect to interstate calling; (2) keeping the national database current by requiring annual renewal of subscribers' do-not-call registrations; (3) abolishing costly requirements for the maintenance of company-specific do-not call lists; and (4) providing a "safe harbor" for telemarketers that make diligent efforts to comply with the law.

---

[2] *See* 47 U.S.C. § 227(a)(3); *NPRM* at ¶ 39-42.

## A.    The Commission Must Preempt State Do-Not-Call Laws.

Congress required that any federal do-not-call registry should supersede state do-not-call lists and related procedural requirements.  Specifically, the House Report accompanying the TCPA states that "the House Committee [] believes that because state laws will be preempted, the Federal statute must be sufficiently comprehensive and detailed [to] ensure States' interests are advanced and protected."[3]  The TCPA's Senate sponsor, Senator Hollings, likewise stated that "[p]ursuant to the general preemptive effect of the Communications Act of 1934, [s]tate regulation of interstate communications, including interstate communications initiated for telemarketing purposes, is preempted."[4]  Congress' determination that any federal do-not-call regime must govern interstate telephone solicitations exclusively is consistent with the general preemptive effect of the Communications Act of 1934 over state regulation of interstate wire communications.[5]

In addition, both the language of the statute and the legislative history indicate that Congress also intended the national do-not-call database to be incorporated into any state do-not-call laws applicable to intrastate telephone solicitations.  Specifically, Section 227(e)(2) states that "if . . . the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a [s]tate or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing

---

[3] *House Report*, H.R. REP. NO. 102-317, at 20 ("*House Report*").

[4] 137 CONG. REC. S18781 (Nov. 27, 1991).

[5] 47 U.S.C. § 152(a).

system that does not include the part of such single national database that relates to such

[s]tate."[6]  The House Report explained the intent of this section as follows:

> [I]f the FCC requires establishment of the [national do-not-call] database permitted in subsection c(3), State or local authorities' regulation of telephone solicitations *must be based upon the requirements imposed by the FCC*.  State and local authorities may enforce compliance with the database, or functionally equivalent system, or a segment thereof.[7]

Accordingly, Congress intended to preserve the state's authority to regulate intrastate telephone

solicitations but only on the condition that the states incorporate into any do-not-call laws they

might choose to adopt the segments of the national database applicable to intrastate calls within

their respective territories.

Further, as a policy matter, the proliferation of different state and federal do-not-call

requirements increases costs and confusion for consumers and companies alike.  Consumers

have to learn about and comply with the registration requirements and costs for different do-not-

call systems, and undoubtedly many consumers will be confused about the coverage of these

various systems.  For companies struggling to develop marketing solutions in today's

challenging economy, the potential of fifty different sets of do-not-call requirements would

negate any efficiencies gained from centralized operations.  Consequently, for both legal and

policy reasons, any Commission effort to establish a national do-not-call system should have as

its primary objective the elimination of concurrent obligations for consumers and companies to

deal with a patchwork of different state and federal do-not-call rules.  Both public policy and the

---

[6] 47 U.S.C. § 227(e)(2).

[7] *House Report*, H.R. REP. NO. 102-317, at 25 (emphasis added).

statute's express terms mandate preemption of state do-not-call systems if the Commission adopts a national do-not-call system.

**B.      The Commission Should Require Annual Renewal of Do-Not-Call Registrations.**

Section 227(c)(3)(I) of the TCPA states that national do-not-call regulations shall "specify the frequency with which such database will be updated . . . ."[8] Given that telephone numbers change for at least sixteen to twenty percent of the population every year,[9] almost all of the names and numbers listed in the proposed national do-not-call registry would roll over to new subscribers in a five-year period. The Commission therefore should adopt a system that would purge names and numbers from any national do-not-call list if they have been on the list longer than twelve months from the date of a consumer's initial registration, or from any subsequent renewal. Annual renewal of national do-not-call requests should not prove unduly burdensome for consumers in light of the automated registry systems that apparently are available.[10]

---

[8] *See* 47 U.S.C. § 227(c)(3)(I); *NPRM* at ¶ 43.

[9] *See* Comments of The Direct Marketing Association and The U.S. Chamber of Commerce in FTC's Telemarketing Sales Rule Rulemaking Proceeding (FTC File No. R411001), at 12 (April 2002), *available at* http://www.ftc.gov/os/comments/dncpapercomments/04/dma.pdf (last visited Nov. 12, 2002); Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Report and Order*, 7 FCC Rcd 8752 ¶¶ 11-17 (1992) ("*TCPA Report and Order*") (*citing* Comments of AT&T in the FCC's Telemarketing Rulemaking Proceeding, CC Dkt. No. 92-90 (1992)).

[10] *See* Caroline E. Mayer, *FTC Anti-Telemarketer List Would Face Heavy Demand*, Washington Post, March 19, 2002, *available at* http://www.washingtonpost.com/wp-dyn/articles/A47200-2002Mar18.html (last visited at Dec. 9, 2002) ("To collect names, the agency is not planning to rely, as most states have, on operators or the Internet. Consumers who want to sign up would have to call in from the phone number they want listed on the do-not-call registry. The number would be automatically 'captured' in the database, and the consumer would have to verify it by entering the number again. 'That's all we need,' [J. Howard Beales III, director of the FTC's Bureau of Consumer Protection] said.").

The Commission also should bear in mind the potential for abuse of the national registry system, and adopt reasonable authentication procedures to ensure that only line subscribers of record will be able to place their numbers on the proposed national do-not-call list.  Finally, the Commission should allow telemarketers who obtain actual knowledge that a number included in the national registry has been reassigned to remove that number from their suppression lists. These safeguards are essential for the Commission to ensure that the national registry accurately reflects consumers' preferences and does not unnecessarily burden legitimate commercial speech.

### C.    The Commission Should Not Impose Burdensome Company-Specific "Do-Not-Call" Rules.

The Commission's adoption of a national do-not-call system may render unnecessary any detailed company-specific do-not-call requirements.  Regardless of whether the Commission adopts a national system, however, it should not add unnecessary new requirements to its company-specific do-not-call rules, and thereby impose burdensome costs on companies coping with difficult economic conditions.[11]  The Commission raises the possibility of requiring telemarketers to provide a toll-free telephone number and/or to establish a web site that consumers could use to place their name and number on a company-specific do-not-call list.[12] The Commission also asks whether companies should be required to "respond affirmatively to such requests or otherwise provide some means of confirmation so that consumers may verify that their requests have been processed."[13]  Nextel urges the Commission to refrain from adopting these additional requirements, because they would do little or nothing to prevent abuses

---

[11] *NPRM* at ¶ 4.

[12] *Id.*

[13] *Id.* at ¶ 4

by unscrupulous telemarketers, but would unduly burden legitimate businesses that faithfully honor consumer do-not-call requests.

Requiring telemarketers to establish a toll-free number or web site to register do-not-call requests is unnecessary in light of the relative ease with which consumers can assert their rights under the existing company-specific do-not-call rules.  Under the current rules, a consumer who does not wish to be called by a particular telemarketer need only say so during the course of the telemarketing call.  Nextel and the vast majority of other legitimate companies engaged in outbound telemarketing document all such requests at the time they are made and take appropriate steps to ensure that they are honored.  The Commission notes that some telemarketers may "hang up before consumers can assert their do-not-call rights" and fail to honor consumers' do-not-call requests.[14]  While this may be true in isolated cases, requiring a web site or toll free number to register do-not-call requests would do little, if anything, to prevent continued abuses by such telemarketers.  Telemarketers who fail to accept or honor consumers' do-not-call requests during a telemarketing call are no more likely to accept or honor such requests if they are made via the Internet or a toll-free telephone number.

Rather than serving to prevent abuses by unscrupulous telemarketers, the addition of new requirements to the Commission's company-specific do-not-call rules would serve only to increase the burdens and costs for legitimate telemarketers.  For example, Nextel estimates that, apart from other implementation and administrative costs, it would incur annual recurring costs of approximately $100,000 to $200,000 to staff and administer a toll-free do-not-call request line.  The speculative and negligible benefits from such a requirement cannot justify the

---

[14] *Id.* at 62669.

additional costs on Nextel and on the vast majority of other responsible telemarketers that are following scrupulously the existing rules at the same time that they are striving to increase operational efficiency and reduce their marketing costs.

A requirement for telemarketers to affirmatively contact consumers to confirm the removal of their names and numbers in response to do-not-call requests similarly would impose unnecessary costs on companies and, ultimately, consumers to whom they must pass these costs. Unscrupulous telemarketers who currently ignore do-not-call requests under threat of civil forfeiture penalties and statutory damages actions are equally likely to ignore any confirmation requirements that the Commission may adopt.  Moreover, it is difficult to imagine how such a requirement would be administered without both inflicting unreasonable costs on legitimate telemarketers and intruding on the very privacy interests that the TCPA was designed to protect. For example, it would be cost-prohibitive for telemarketers to follow up every do-not-call request with a direct mail confirmation notice.  It is also unrealistic to think that consumers who object to being called by a particular company would be willing to divulge their mailing address to that same company for purposes of receiving confirmation of a do-not-call request.  Nor is it likely that such consumers would want to reveal their email addresses to telemarketers, and it goes without saying that they probably would not welcome a follow-up telephone call from the telemarketer for any reason, including confirmation of their do-not-call requests.

Enforcement of the Commission's existing rules, rather than the addition of new company-specific do-not-call requirements, is the best way to prevent abusive telemarketing tactics.  The existing panoply of enforcement and remedial provisions, including the private right

of action available to consumers,[15] the threat of forfeiture actions by the Commission,[16] and the law enforcement authority of state attorneys general,[17] provide far better tools to promote compliance with the TCPA.

>    **D.    The Commission Should Provide a "Safe Harbor" for Sellers and Telemarketers That Make a Good Faith Effort to Comply With TCPA Rules.**

Finally, to provide certainty in the marketplace and encourage compliance, the Commission should adopt a "safe harbor" provision for companies that affirmatively strive to comply with the TCPA rules. Among other rules, this safe harbor should shield telemarketers from liability if they have made a diligent, good faith effort to comply but inadvertently call a number that appears on the Commission's do-not-call list. Specifically, the Commission should adopt "safe harbor" criteria that would shield marketers from liability for inadvertently calling a suppressed number if, within thirty days of making the call in question, they had obtained and reconciled their lists against the names and/or numbers in the Commission's national registry. The FTC, in proposing its own national do-not-call database, agreed with commenters that "strict liability is inappropriate where a company has made a good faith effort to comply with the [Telemarketing Sales] Rule's requirements and has implemented reasonable procedures to do

---

[15] *See* 47 U.S.C. § 227(c)(5).

[16] *See* 47 U.S.C. § 503(b)(1) (giving the Commission the authority to assess a forfeiture against any person who has "willfully or repeatedly failed to comply with any of the provisions of [the Communications Act] or of any rules, regulation or order issued by the Commission under [the Act] . . . .").

[17] *See* 47 U.S.C. § 227(f)(1).

so."[18]  The Commission should apply the same safe harbor rationale in implementing the TCPA rules, including any do-not-call scheme it may develop.

## II.     The "Established Business Relationship" Rule, As Currently Applied by the Commission, Is an Integral Part of the TCPA.

The Commission requested comment regarding the "established business relationship" rule under the TCPA and its relationship to the Commission's rules for the protection of customer proprietary network information ("CPNI") and any national do-not-call system the Commission may adopt.

### A.     The Commission's Current Formulation of the Established Business Relationship Rule Best Implements the Letter and Spirit of the TCPA.

The term "telephone solicitation," as defined by the TCPA, "does not include a call or message . . . to any person with whom the caller has an established business relationship."[19] Congress' goal was to strike a balance between "barring all calls to those subscribers who object[] to unsolicited calls" with the legislature's "desire to not unduly interfere with ongoing business relationships."[20]  To provide as much protection as possible to the former interest, while respecting the latter, Congress "adopted an exception to the general rule – that objecting subscribers should not be called – which enables businesses to continue established business relationships with customers . . . ."[21]  This Congressional determination is consistent with the reality that a consumer's decision to contact or do business with a company reflects his/her

---

[18] Telemarketing Sales Rule, Notice of Proposed Rulemaking, Federal Trade Commission, *available at*: http://www.ftc.gov/os/2002/01/16cfr310.pdf (January 30, 2002) (to be codified at 16 C.F.R. pt. 310).

[19] *See id.* at §227(a)(3).

[20] *See* House Report, H.R. REP. NO. 102-317, at 13-16 (1991).

[21] *Id.* at 13 (1991).

decision to open a line of communication with that company, in contrast to other companies with which the consumer has not chosen to do business.  Consequently, the individual relationship between a company and its customer must prevail over the customer's registration on do-not-call lists that are not company-specific, but merely reflect the registrants' general preference not to receive such solicitations from companies with which they have no existing relationship.

The House Report emphasized the importance of the established business relationship rule as a means of allowing businesses to place calls that "build upon, follow up, or renew, within a reasonable period of time," customer relationships.[22]   Congress recognized that "consumers who previously have expressed interest in products or services offered by a telemarketer are unlikely to be surprised by calls from such companies or to consider them intrusive."[23]   The House Committee elaborated on this principle by stating that, pursuant to the established business relationship rule,

> magazines, cable television franchises, and newspapers all could call their current subscribers to continue their subscriptions . . . Similarly, credit card companies could call current cardholders, including holders of affiliated cards.  Stockbrokers or lawyers could call current clients at home to discuss existing portfolios or ongoing legal cases.  In the case of mutual funds, calls by the fund's manager to existing shareholders would not be covered [by the TCPA].  In addition, if an investor had written to a mutual fund or responded to an ad requesting additional information, the fund's manager could make follow-up calls, [without being] subject to [the TCPA's] restrictions . . . [Moreover, a] magazine publisher would be able to call someone who has let their subscription lapse.[24]

---

[22] *Id.*

[23] *House Report*, H.R. REP. NO. 102-317, at 13.

[24] *Id.* at 14.

After conducting a lengthy rulemaking, the Commission in 1992 likewise "conclude[d], based upon the comments received and the legislative history, that a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests."[25]  Accordingly, the Commission appropriately adopted the following definition of an "established business relationship":

> The term established business relationship means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.[26]

This definition is sufficiently flexible to encompass the various types of customer communications that Congress intended to protect, and allows Nextel and other companies to renew customer relationships and build upon or expand existing relationships as they deliver new and enhanced products and services to the marketplace.

The current formulation of the "established business relationship" rule fulfills Congress' intent admirably.  Nonetheless, the Commission has suggested that it may consider narrowing the definition of "established business relationship" so that a company that has an established relationship with a customer based on one type of product or service may not be allowed to call that customer to offer a different product or service if that customer's name appears on the national do-not-call list.[27]  Such a modification would be contrary to the express language of the statute, which broadly exempts *all* calls to persons "with whom the caller has an established

---

[25] *TCPA Report and* Order at ¶ 34.

[26] 47 C.F.R. § 64.1200(f)(4).

[27] *NPRM* at ¶ 10.

business relationship," not merely those calls that relate to the same products or services that formed the original basis of the relationship.

Limiting the ability of Nextel and other wireless telecommunications providers to communicate with existing customers about new products and services would be inconsistent with the purposes underlying the TCPA and would frustrate other important Congressional and Commission policies and goals. Indeed, restrictions on telecommunications carriers' communications with their existing customers could retard the growth of wireless Internet and advanced telecommunications services at a time when both Congress and the administration have placed a high priority on speeding their deployment.[28] Nextel and other wireless providers are developing and deploying advanced wireless services that will offer customers unprecedented mobile data capabilities. Internet access and related functions form the key components of these suites of services. As the Commission has recognized, these advanced services form the frontier of the wireless industry and are expected to increase the growth of the industry significantly over

---

[28] *See* S. REP. NO. 104-230, at 50 (1995) ("deployment of advanced telecommunications services" is one of the "primary objectives" of the Telecommunications Act of 1996); Telecommunications Act of 1996, § 706, PUB. L. 104-104, Title VII, Feb. 8, 1996, 110 STAT. 153, reproduced in the notes to 47 U.S.C. § 157 (directing the FCC to conduct yearly review of deployment and make any regulatory changes necessary to ensure that high-speed Internet access, among other capabilities, is being deployed expeditiously); *see also* Remarks by Secretary of Commerce Donald L. Evans to the Precursor Group, February 6, 2002, *available at* http://www.commerce.gov/opa/speeches/Evans-Precursor-Group.html (last visited Nov. 12, 2002) ("We're working on ways to help accelerate broadband deployment and usage . . . NTIA will work closely with the FCC to craft the right regulatory policies to facilitate broadband deployment and the creation of a competitive broadband marketplace . . . ." ); Remarks of Commerce Assistant Secretary Nancy Victory, January 23, 2002, *available at* http://www.ntia.doc.gov/ntiahome/speeches/2002/ outlook_012302.htm (last visited Nov. 12, 2002) ("broadband issues are a top priority for President Bush and his administration").

the next several years.[29]  Extensive customer outreach efforts will be necessary to develop customer knowledge and acceptance of these new services, and telemarketing activities will play a vital role in the deployment efforts of Nextel and other wireless providers.

When Congress adopted the established business relationship rule in the TCPA, it recognized that a business's right to place calls that "build upon, follow up, or renew" an existing customer relationship must extend, in appropriate circumstances, to calls that offer new and different products and services to existing customers.  The House Committee explained, for example, that pursuant to the established business relationship rule, "[a] person who recently bought a piece of merchandise may receive a call from the retailer regarding special offers or information on related lines of merchandise, [and a] loan officer or financial consultant may call a telephone subscriber who had requested a loan or bought auto insurance a couple of months ago to pitch new loan offerings or other types of insurance."[30]

Nextel therefore urges the Commission to retain its broad and flexible definition of the term "established business relationship" so that the development of a national do-not-call database will not  prevent consumers from receiving timely and valuable information about the availability of new products and services from companies that they know and trust.  To effectuate Congress' purpose and allow the efficient deployment of new services and products, the Commission must adhere to its well-reasoned position that the established business relationship rule is company-specific, and not product or service-specific.  The Commission must not modify the definition of the term "established business relationship" in a manner that would

---

[29] *See, e.g.*, Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, *Sixth Report*, 16 FCC Rcd 13350 (2001).

[30] *House Report*, H.R. REP. NO. 102-317, at 14-15.

prevent companies like Nextel from communicating with their customers about product upgrades, enhanced service offerings, and/or new technologies that would form a natural extension of an existing customer relationship.

     **B.    The Commission Should Interpret the Established Business Relationship Rule in a Manner Consistent With the Consent Requirements of the CPNI Rules.**

The Commission has conducted extensive analysis under the CPNI regulatory framework regarding the level of customer consent that may properly be presumed from an existing business relationship. The Commission's CPNI analysis confirms the importance of allowing carriers to build on their relationships with existing customers to further Congressional and Commission telecommunications policies, and the CPNI rules provide useful support for the implementation of the TCPA established business relationship rule.

The Commission's "Total Service Approach" under the CPNI rules – including its definition of the total service package within which a carrier is permitted to market to its existing customers under these customers' implied consent – should be preserved notwithstanding any steps the Commission might otherwise take to limit the scope of the established business relationship rule under the TCPA. The "Total Service Approach" allows a carrier to use and disclose its customer's CPNI to market products and services within the package of services to which the customer already subscribes, without requiring separate notice and explicit consent from the customer. The Commission explained as follows:

> This approach recognizes that the customer may fairly be considered to have given implied consent to the carrier's use of CPNI within the total service package to which the customer subscribes.

> Such sharing was intended to allow carriers with a pre-existing relationship with the customer to develop "packages" of services best tailored to their customers' needs. The Commission noted that customers would reasonably expect carriers with whom they

dealt to review their CPNI to fashion service packages tailored to
their needs . . .[31]

Given that the policy considerations behind the CPNI rules and the TCPA are similar, the
Commission should use its court-tested CPNI rules to inform its definitions under the TCPA.

Using the CPNI consent framework to implement the TCPA established business
relationship exception also would avoid confusion for both telecommunications carriers and their
customers.  Furthermore, it would avoid the imposition of unnecessary costs and potentially
conflicting obligations for telecommunications carriers, which must comply with both CPNI and
TCPA restrictions on their marketing activities.  Consequently, the Commission should hold that
carrier marketing activities that satisfy the CPNI standard for consent from their existing
customers also would satisfy the TCPA established business relationship rule, notwithstanding
any changes the Commission might otherwise adopt that narrow the scope of the rule.

**III.        The Commission Should Prohibit Deliberate Falsification or Blocking of
Caller ID Information, but Should Not Require Telemarketers to Use
Telecommunications Equipment that Supports Caller ID.**

The Commission asks whether it should "require telemarketers to transmit the name and
telephone number of the calling party, when possible, or prohibit them from blocking or altering
the transmission of such information."[32]  Nextel supports the addition of TCPA rules prohibiting
the deliberate falsification or blocking of caller ID information by a telemarketer using

---

[31] In the Matter of Implementation of the Telecommunications Act of 1996:
Telecommunications Carriers' Use of Customer Proprietary Network Information and Other
Customer Information; Implementation of the Non-Accounting Safeguards of Section 271 and
272 of the Communications Act of 1934, As Amended; 2000 Biennial Regulatory Review –
Review of Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance
Carriers, *Third Report and Order and Third Further Notice of Proposed Rulemaking*, FCC 02-
214, CC Dkt. Nos. 96-115, 96-149, 00-257, at ¶¶ 12-13 (rel. Jul. 25, 2002).

[32] *NPRM* at ¶ 12.

equipment capable of transmitting such information.  The Commission should refrain, however, from affirmatively requiring the transmission of caller ID information, because it is technically impossible for some telemarketers to transmit such information due to the type of telephone system or equipment that they use.  Several of Nextel's telemarketing contractors, for example, use proprietary dialers that do not support the ability to transmit such information.  Nextel's contractors also use large "trunk side" connections (also known as trunk or T-1 lines), which are cost-effective for making calls, but often cannot transmit caller ID information, or can transmit only a non-callable trunk exchange number that is useless to consumers and has the potential to cause confusion.

In light of these technological limitations, the Commission should refrain from imposing an affirmative obligation on telemarketers to transmit caller ID information.  While there may be no reason that a legitimate seller or telemarketer would choose to subvert the transmission of caller ID information, there certainly are reasons why a legitimate seller or telemarketer would be unable to transmit that information.  An affirmative obligation to transmit caller ID information would require many legitimate telemarketers to change their network and operational infrastructure, raising costs to prohibitive levels in today's precarious economy. Accordingly, the Commission should acknowledge as lawful the practices of using telecommunications systems and equipment that lack caller ID capabilities, and of contracting for telemarketing services from contractors that use such technologies.  In this way, the Commission can prohibit the deliberate falsification or blocking of caller ID by unscrupulous actors, while avoiding the imposition of economically prohibitive requirements on legitimate telemarketers.

IV.     **The Commission Should Consider The Unique Characteristics of Mobile Telephone Service In Its Reevaluation of The TCPA Rules.**

Marketing to mobile telephone numbers raises unique TCPA issues on which the Commission also seeks comment in the Notice.  As a preliminary matter, the Commission should hold that wireless telephone numbers are not "residential telephone numbers" for purposes of implementing the TCPA, because they are not used primarily for communications to subscribers' residences.  In addition, the Commission should adopt a program that would enable telemarketers to access the information necessary to purge mobile telephone numbers from their calling databases in a number portability regime, in order to ensure that wireless customers are not subject to autodialed and prerecorded calls.

A.     **The Commission Should Not Treat Wireless Telephone Numbers as Residential Numbers for Purposes of Administering the TCPA.**

Wireless telephone numbers cannot qualify as "residential telephone numbers" for purposes of enforcing restrictions on live telephone solicitations under 47 C.F.R. § 64.1200(e).[33] The TCPA only authorizes the Commission to regulate solicitations to "residential telephone subscribers."[34]  While the statute does not define this term, its plain and ordinary meaning is telephone service used primarily for communications in the subscriber's residence.  This plain and ordinary meaning of "residential telephone subscriber" also is consistent with the TCPA's goal of protecting residential privacy, as opposed to the privacy of customers communicating outside of their homes.  Congress' principal concern with residential privacy is manifest in its statutory findings, which made plain that the TCPA was intended to curb the "pervasive" use of

---

[33] *NPRM* at ¶ 34.

[34] 47 U.S.C. § 227.

telemarketing "to market goods and services *to the home*"[35] and to address the concerns of "consumers [who] are outraged over the proliferation of intrusive, nuisance calls *to their homes* from telemarketers."[36]

Congress' particular concern for residential privacy also is evidenced by the legislative history.  The Senate Report accompanying the TCPA justified the need to regulate telemarketing as follows:

> The evidence gathered by the Committee indicates that a substantial proportion of the public believes that these calls are a nuisance and an invasion of one's privacy rights *in the home.*  The Supreme Court has recognized explicitly that the right to privacy is founded in the Constitution, and telemarketers who place telephone calls *to the home* can be considered "intruders" upon that privacy.[37]

In contrast to Congress' plain intent to protect residential privacy interests by restricting telephone solicitations "to the home," nothing in the text or legislative history of the TCPA suggests that Congress considered telemarketing restrictions necessary to protect the privacy of wireless subscribers communicating in a mobile setting outside of their homes.  Indeed, the only provision of the TCPA expressly applicable to wireless telephone service was designed to protect wireless subscribers from cost-shifting (as they are forced to pay for the telemarketing calls), as opposed to intrusions on their privacy.[38]

The TCPA's focus on residential privacy also is consistent with the Supreme Court's recognition that the state interest in protecting privacy in the home can support restrictions on the

---

[35] PUB. L. 102-243, § 2(1) (emphasis added).

[36] *Id.* at § 2(6) (emphasis added).

[37] S. REP. NO. 102-178, at 9 (1991) (emphasis added).

[38] 47 U.S.C. § 227(b)(1)(A)(iii).

time, place and manner of protected speech that would be unconstitutional outside of a

residential setting.  As the Supreme Court explained in *Frisby v. Schultz*:

> One important aspect of residential privacy is the protection of the
> unwilling listener.  Although in many locations, we expect
> individuals simply to avoid speech they do not want to hear, the
> home is different.  "That we are 'captives' outside the sanctuary of
> the home and subject to objectionable speech . . . does not mean
> we must be captives everywhere."  Instead, a special benefit of the
> privacy all citizens enjoy within their own walls, which the State
> may legislate to protect, is an ability to avoid intrusions.  Thus, we
> have repeatedly held that individuals are not required to welcome
> unwanted speech into their own homes and that the government
> may protect this freedom.[39]

Accordingly, it is doubtful whether the Commission possesses either the statutory or

constitutional power to categorically extend its authority to regulate telephone solicitations to

"residential telephone subscribers" to cover calls to wireless subscribers.  At most, the

Commission might have authority to regulate solicitations to wireless subscribers in those

circumstances where wireless service actually has displaced a residential land line, and functions

as a consumer's primary residential telephone service.  The available data suggests, however,

that such instances still are quite rare.  For example, although the Commission notes the dramatic

growth of the wireless phone industry in the last decade,[40] this growth does not suggest that

mobile telephones have widely displaced traditional residential landline service.  To the contrary,

the Yankee Group's "2002 U.S. Mobile User Survey" (which was repeatedly cited in the

Commission's *2002 CMRS Competition Report*) indicates that only three percent (3%) of

wireless service subscribers have used their mobile phones to displace traditional residential

_____

[39] *Frisby v. Schultz*, 487 U.S. 474, 484-85 (1988) (citations omitted).

[40] *NPRM* at ¶ 27 n.160 (citing Implementation of Section 6002(b) of the Omnibus Budget
Reconciliation Act of 1993, *Seventh Report*, FCC 02-179, rel. July 3, 2002, at C-2, C-12 ("*2002
CMRS Competition Report*").

landline service.  This survey data suggests that the overwhelming majority of all mobile telephone customers continue to subscribe to residential landlines.[41]

The Commission notes that a USA Today/CNN/Gallup poll suggested that approximately 20% of wireless subscribers use mobile handsets as their "primary phones."[42]  This statistic does not, however, address the extent to which mobile telephones are used within the home or have displaced residential landlines.  Although the survey data might suggest that a substantial percentage of the population uses their mobile phones for residential calling, an equally plausible interpretation is that many consumers – presumably younger, active adults – make and receive most of their phone calls outside of the home.  Moreover, the polling data show that 80% of mobile telephone users still consider their "primary phones" to be traditional wire line telephones.  If anything, this statistic weighs decidedly against a categorical presumption that wireless telephone numbers generally function in the same way as "residential" numbers.  Indeed, Nextel's own customer base, which is composed predominantly of commercial and government users, shows that any such presumption would be misplaced.

Unless and until the Commission receives evidence that wireless service has widely displaced residential land line service, it should refrain from regulating telephone solicitations to wireless numbers, or at least limit its regulation of calls to wireless customers to those narrow circumstances in which a wireless number clearly is being used primarily for calling within a

---

[41] The Yankee Group, *Landline Displacement Fuels Mobile Growth But Market Still Cries Out For Wireless Carrier Consolidation*, p. 9 (Oct. 30, 2002) (citing the Yankee Group *2002 U.S. Mobile User Survey*) ("*Mobile User Survey*").

[42] *NPRM* at ¶ 27 n.161 (citing, *2002 CMRS Competition Report*, Section II.A.1.e.) (citation omitted).

residence.  Otherwise, however, wireless numbers should remain outside the scope of the Commission's rules governing live solicitations to residential telephone subscribers.

      **B.**      **Wireless Customers Should Not be Subjected to Autodialed and Prerecorded Calls in a Number Portability Regime.**

The Commission seeks comment on various issues related to the statutory prohibition on autodialed and prerecorded calls to customers who are charged for receiving calls.[43]  These concerns are particularly salient as the wireless industry moves to number pooling and, eventually, number portability.  It is important that the Commission act promptly in this proceeding to adopt safeguards that will ensure that the limits on autodialed and prerecorded calls are honored in a number portability regime and, equally important, that the costs of those safeguards are borne by the cost-causing entities.

First, the Commission must maintain its commitment to enforcing the statutory prohibition against autodialed and prerecorded calls to customers who must pay for the calls they receive.[44]  Indeed, the TCPA does not permit any exemptions from or waivers of this provision.[45]  In that context, the Commission must adopt a program to give telemarketers access to the information necessary to purge numbers used by wireless customers from call databases, regardless of whether those numbers are in NXX codes assigned to wireless providers.  This program must be in place before number portability is implemented.  While the measures to prevent unlawful calls to wireless customers could take a variety of forms, they should, at a minimum, allow any number assigned to a wireless customer to be purged from telemarketers'

---

[43] *Id.* at ¶ 35.

[44] 47 U.S.C. § 227(b)(1)(A)(iii).

[45] The TCPA does permit the Commission to exempt calls to wireless customers who are not charged for receiving calls, but that provision is drawn narrowly to cover only services in which the receiving customer does not pay.  47 U.S.C. § 227(b)(3)(C).

databases and require frequent updates of any list of wireless numbers, so as to capture all customers who port to wireless service numbers previously assigned to landline carriers.

Second, whatever program the Commission adopts, the costs of implementing that program should fall on telemarketers, not on wireless providers or their customers. Telemarketers not only are the cost-causers for any measures necessary to prevent violations of the prohibition on calls to wireless numbers, but also are the principal beneficiaries of the calls they make and of any program to prevent unlawful calls. In the absence of such a program, telemarketers would be at risk of liability for violation of the law and, thus, it is to their benefit to have a program in place.

By contrast, it would be utterly inappropriate to place the costs associated with this statutory requirement on wireless providers or their customers. The TCPA's prohibition is not aimed at either carriers or customers, and neither wireless providers nor wireless subscribers are responsible for compliance. Consequently, all compliance costs should be placed on telemarketers that use autodialers and prerecorded messages.

## V.    The Commission Must Clarify The TCPA Rules To Address Developments In Facsimile Advertising.

Perhaps nowhere is affirmative Commission action more needed under the TCPA than in clarifying the rules to address changes that have occurred since 1991 in the technology and business arrangements used for facsimile advertisements. Clarification by the Commission is necessary and appropriate to address the unintended consequences of its rules for companies that do not engage in fax advertising but nonetheless find themselves targeted as defendants in the class action industry's efforts to extend the TCPA to reach perceived "deep pockets." [46] This

---

[46] *See Coontz v. Nextel,* District Court of Johnson County, Texas, 249th Judicial District (Cause No. C200100349).

highly destructive trend in TCPA class actions is plaguing numerous legitimate businesses, particularly those in the telecommunications industry.  To illustrate this phenomenon for the Commission:  Nextel has been named as the defendant in a TCPA class action lawsuit, not because Nextel or even an advertising firm contracted by Nextel has transmitted fax advertisements, but because an independent contractor of an independent business that happens to sell Nextel services[47] allegedly engaged a fax broadcaster for its advertisements.[48]  Such is the plaintiffs bar's zeal in exploiting any ambiguity in the TCPA that even this most attenuated of circumstances is enough to ensnare an unwitting defendant.

Courts no doubt will look to the outcome of this Commission docket to guide their decisions in that litigation and the multitude of other similar cases pending cases across the country.  Accordingly, the Commission should act expeditiously to clarify the TCPA rules in order to ensure that they are applied consistently nationwide in a manner that comports with Congressional intent.

In this regard, the Commission first should reaffirm the established business relationship rule for fax advertisements so as to preserve the sanctity of the customer relationship and avoid unduly burdening the right of companies to communicate with their customers.  Under the TCPA and the Commission's rules, it is unlawful to use a "telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3).  The phrase "unsolicited advertisement" is defined in the TCPA and the Commission's rules as "any material advertising the commercial availability

---

[47] Typically, such businesses are independent dealers that operate under a non-exclusive arrangement and sell the services of a variety of wireless carriers.

[48] *See Coontz v. Nextel,* District Court of Johnson County, Texas, 249th Judicial District (Cause No. C200100349).

or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).  The Commission has rightly concluded that a company's established business relationship with a customer provides the necessary "invitation or permission" for the transmission of fax advertisements to that customer, and Nextel supports that long-standing and understood rule.

Second, the Commission should clarify that the definition of "telephone facsimile machine" does *not* extend to computers or fax servers, and the prohibition on unsolicited advertisements does not apply to electronic transmissions to such devices. Both the TCPA and the Commission's rules define "telephone facsimile machine" as "equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."  47 U.S.C. § 227(a)(2); 47 C.F.R. § 64.1200(f)(2).  Addressing the TCPA's definition of "telephone facsimile machine," the Commission has stated that "[f]ax modem boards are the functional equivalent of stand-alone facsimile machines."[49] But that determination relates to the type of equipment used to *send* a fax, not to receive one, and Congress drew a sharp and deliberate distinction between the technologies involved in sending and receiving facsimile advertisements.

Finally, the Commission should reject the efforts of the class action bar to hold common carriers vicariously liable for the acts of even independent contractors by applying Section 217 of

---

[49] Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Memorandum and Opinion and Order*, 10 FCC Rcd 12391 ¶ 29 (1995) ("*1995 TCPA Reconsideration Order*").

the Act to TCPA violations.  Carriers are no more nor less liable for a TCPA violation by virtue

of their common carrier status than any other business entity.

    **A.    The Commission Should Preserve the Established Business Relationship Rule.**

        1.    <u>The Established Business Relationship Rule</u>

The TCPA prohibits sending "unsolicited advertisements" by facsimile to any person

without that person's prior express invitation or permission.  The Commission should reaffirm

that an established business relationship gives rise to an invitation to communicate by facsimile

advertising within the customer relationship, absent any customer objection to the contrary. The

Commission correctly determined in its original TCPA Report and Order that "a facsimile

transmission from persons or entities who have an established business relationship with the

recipient can be deemed to be invited or permitted by the recipient."[50]  Subsequently, the

Commission has confirmed on numerous occasions that "[i]f the sender and the recipient have an

established business relationship, an invitation or permission to receive an unsolicited facsimile

advertisement is presumed to exist."[51]  Businesses plainly have come to rely on this

understanding, and there is no record before the Commission of any complaints arising out of

such communications.

---

[50] *TCPA Report and Order* at ¶ 54 n.87.

[51] *Telephone Consumer Protection Act Telephone Solicitations, Autodialed and Artificial or Prerecorded Voice Message Telephone Calls, and the Use of Facsimile Machines, Industry Bulletin*, 8 FCC Rcd 506 (1993); *see also 1995 TCPA Reconsideration Order* at ¶ 37 ("the existence of an established business relationship establishes consent to receive telephone facsimile advertisement transmissions"); *TCPA Report and Order* at ¶ 54, n.87 ("facsimile transmission[s] from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient"); FCC Reminds Consumers about "Junk Fax" Prohibition, *Public Notice*, 16 FCC Rcd 4524 (2001) ("[a]n established relationship . . . demonstrates consent to receive fax advertisement transmissions").

The Commission acted well within its discretion and delegated authority in adopting this construction because Congress has not "directly spoken to the precise question" of what constitutes "prior express invitation or permission" to receive a facsimile advertisement.[52] Moreover, the Commission's construction of the TCPA is fully consistent with legislative history indicating that Congress did not intend for the statute to unduly interfere with "ongoing business relationships."[53]

The Commission's existing policy does not undermine a consumer's authority to stop faxes to his or her telephone facsimile machine even if he or she has formed an established relationship with the sender.  As the Commission has recognized, issues of permission or consent ultimately must be analyzed and adjudicated on a case-by-case basis,[54] and there may be particular facts and circumstances in a given case that would rebut the presumption of prior invitation or consent created by an established business relationship.  Such circumstances generally would exist, for example, when the recipient of a fax transmission communicates her wish to the sender that such transmissions stop.  Although formal modification to the Commission's rules probably are unnecessary, the Commission may wish to clarify that such "do-not-fax" requests must be honored and effectively terminate the consent otherwise created by an established business relationship.

The Commission's continued application of the current established business relationship rule to telemarketing and facsimile advertising activities — supplemented by the consent

---

[52] *Mobile Communications Corp. v. FCC*, 77 F.3d 1399, 1405 (D.C. Cir. 1996).

[53] *House Report*, H.R. REP. NO. 102-317, at 13; *TCPA Report and Order* at ¶ 34.

[54] *See 1995 TCPA Reconsideration Order* at ¶ 37 ("we believe it is appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements on a case-by-case basis").

framework of the CPNI rules — thus will protect customers' privacy rights while ensuring that they enjoy the benefits of responsible telemarketing by companies such as Nextel.

  2. <u>Proof that the Fax Advertisement Was Unsolicited, Including the Absence of an Established Business Relationship, is an Element of Proof of a Violation</u>.

As noted above, the Commission has said that "it is appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements on a case-by-case basis."[55]  Nextel agrees, but the Commission should say more, to offer the courts clear guidance regarding the scope and applicability of its rules.  For instance, in Nextel's own defense of the pending class action lawsuit in Texas, the court held—in contravention of the Commission's express ruling and federal court precedent in Texas[56]— that an established business relationship does not confer consent to receive a facsimile advertisement.  This ruling effectively relieved the plaintiffs of their statutory burden of proving that the faxes in question were "unsolicited."

In order to avoid similar rulings that are contrary to the Commission's rules implementing the TCPA, the Commission should clarify that the plaintiff bears the burden of pleading and proving that the fax advertisements at issue were unsolicited – i.e., the absence of consent, including the lack of an established business relationship, is an essential element of the plaintiff's case.[57]  This is no more than the Commission itself practices when exercising its own

---

[55] *1995 TCPA Reconsideration Order*, 10 F.C.C.R. 12,391 ¶37.

[56] In these and its other comments, Nextel is not seeking to try its class action defense or prosecute its appeal before the Commission.  Rather, it is seeking a definitive statement of the rules from the Commission as the expert agency designated by Congress to implement the TCPA.  The absence of such clarity has been the source of much mischief in class action cases around the nation.

[57] Even if the Commission were to decide that the defendant had the burden of providing consent as an affirmative defense, the plaintiff still must bear the ultimate burden because the established business relationship creates a *presumption* of consent that plaintiffs must rebut to prevail.  *See Texas v. American Blast Fax, Inc. et al.*, 159 F. Supp. 2d 936, 937-38 (W.D. Tex. 2001).

enforcement powers under the TCPA.  Indeed, the enforcement orders listed on the
Commission's TCPA enforcement web page each aver that the offending faxes were unsolicited,
usually based on the Commission's investigation of an underlying complaint.[58]

     **B.**     **The Commission Should Clarify That the TCPA Does not Prohibit the
Transmission of Unsolicited Advertisements to Fax Servers and Personal
Computers.**

The Commission seeks comment on the continued effectiveness of its rules prohibiting
the transmission of unsolicited advertisements to facsimile machines and asks whether
developing technologies, such as computerized fax servers, might warrant revisiting its rules on
unsolicited faxes.  Changes in technology, and especially the common use of fax servers and
personal computers to *receive* faxes, have fundamentally altered the premises for the
Commission's original regulations  and do indeed merit certain clarifications regarding the scope
of the Commission's rules.

When the TCPA was passed in 1991, the vast majority of faxes were sent and received by
stand-alone thermal paper telephone fax machines.  These analog devices had no scanning or
receiving memory, operated at slow data transfer speeds, tied up telephone lines for significant
periods of time, and consumed expensive thermal paper with every transmission.  These
considerations lay at the heart of both Congress' decision to regulate fax advertising and its
constitutional justification for doing so.

Since the passage of the TCPA, however, data transfer speeds have increased and
transmission times have decreased dramatically.  Plain-paper fax technology has obviated the
need for costly thermal paper.  Most important, fax modem technology now enables the delivery
of faxes to email inboxes where consumers can electronically retrieve, view *or discard* a fax

---

[58] *See* http://www.fcc.gov/eb/tcd/ufax.html.

image without ever reducing it to paper.  In light of these changes, the Commission should make it clear that the TCPA does not prohibit the transmission of unsolicited facsimile ads to fax servers, personal computers, and other devices that will not print a fax without a user command and attachment to a peripheral printer.  As explained below, the plain language of the TCPA, fundamental principles of statutory construction, and constitutional considerations all support such a clarification.

> 1.  <u>Fax Servers and Personal Computers Fall Outside the TCPA Definition of "Telephone Facsimile Machines."</u>

The TCPA and the Commission's implementing rules only prohibit the use of a "telephone facsimile machine, computer, or other device to send *an unsolicited advertisement to a telephone facsimile machine*."[59]  They do not, and could not as a matter of law, prohibit the transmission of unsolicited advertisements to devices other than "telephone facsimile machines." Congress expressly defined a "telephone facsimile machine" to mean:

> equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.[60]

Today, fax servers and many personal computers are enabled by fax modem cards or simply connection to the Internet to receive fax transmissions.  However, these devices do not have the capacity either to transcribe text or images from paper into an electronic signal, or to transcribe text or images received from an electronic signal onto paper.  External devices – *i.e.*, optical scanners and printers – must be attached and used by the recipient to perform these transcription

---

[59] 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3).

[60] 47 U.S.C. § 227(a)(2).

functions.  Accordingly, because fax servers and computer desktops and laptops can neither transcribe text and images from paper into an electronic signal nor transcribe electronic signals representing text and images onto paper without the human intervention of the recipient, these devices fall outside the statutory definition of a "telephone facsimile machine."[61]  And because fax servers and personal computers are not "telephone facsimile machines," the transmission of unsolicited advertisements to such devices are not prohibited by the TCPA or by the Commission's rules, regardless of whether the device originating the transmission is a "telephone facsimile machine."  The Commission is bound by the plain meaning of the statutory definition of a "telephone facsimile machine," which excludes devices incapable of either transcribing advertising copy from paper to electronic signals or of transcribing electronic signals onto paper.[62]

Fundamental principles of statutory construction and the purposes underlying the TCPA also mandate the conclusion that the TCPA does not prohibit the transmission of fax advertisements to fax servers and computers.  The TCPA expressly differentiates between the devices used to <u>send</u> a regulated advertising transmission – *i.e.*, a "telephone facsimile machine, computer, or other device" – and the technology used to *receive* a regulated fax communication – *i.e.*, a "telephone facsimile machine."[63]  Of course, Congress must be presumed to use each word in a statute for a reason, and the Commission must avoid any construction that would render

---

[61] Nextel notes that note only does the human intervention necessary to cause transcription take the personal computer or other device out of the definition of fax machine, it likewise is a manifestation of consent to accept the fax.

[62] "If the statute is clear and unambiguous 'that is the end of the matter, for . . . the agency must give effect to the unambiguously expressed intent of Congress."  *Bd. of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 368 (1986).

[63] 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3).

some words in the statute mere surplusage.[64]   Accordingly, the Commission must presume that Congress intended to exclude "computers" from the definition of a "telephone facsimile machine," and that it ascribed separate and distinct meanings to these terms.

Furthermore, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."[65]   Consequently, given Congress' exclusion of the computer from the technology used to receive regulated fax communications, the Commission must presume that the prohibition against unsolicited fax advertising does not apply to communications sent to computers, in contrast to those sent to telephone facsimile machines.

The careful distinction drawn by Congress between the sending and receiving technology involved in a regulated fax transmission reflects a sensible judgment that the sending technology must be defined broadly to capture any device capable of transmitting a facsimile to consumer or business.  However, the receiving technology was defined more narrowly to capture only those devices that by their nature would produce the specific harm to consumers and businesses that the statute was designed to prevent.

As the Commission has recognized, "Congress prohibited the transmission of 'junk faxes' to facsimile machines so that costs of advertising could not be shifted to the recipients of facsimile advertisements."[66]   Congress was concerned primarily with the printing costs associated with the receipt of an unsolicited fax advertisement by a conventional stand-alone

---

[64] *Bailey v. United States*, 516 U.S. 137, 145 (1995).

[65] *Rodriguez v. United States*, 480 U.S. 522, 525 (1987).

[66] *See* Rules and Regulations Implementing the Telephone and Consumer Protection Act of 1991, *Memorandum Opinion and Order*, 10 FCC Rcd 12391 ¶ 29 (1995).

facsimile machine.  As the House Report explained, "facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines.  The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine."[67]

Unlike faxes sent to a "telephone facsimile machine," faxes sent to a fax server or personal computer can be deleted by the recipient without ever being printed to paper.  Indeed, such electronic faxes can be deleted without ever being viewed by the intended recipient.  Accordingly, the transmission of facsimiles to these devices simply does not implicate the policy concerns with cost shifting underlying Section 227(b)(1)(C) and in no event meet the definition of a telephone facsimile machine.[68]

> 2. The Technological Differences Between Traditional Telephone Facsimile Machines and New Paperless Fax Devices Have Important Ramifications Under the First Amendment.

The technological differences between transmissions to traditional fax machines and fax servers and personal computers have important constitutional ramifications.  The TCPA's prohibitions against unsolicited facsimile advertisements directly regulate truthful commercial speech about lawful activities and therefore must be justified under the familiar *Central Hudson* test.[69]  Under this test, the asserted governmental interest in restricting unsolicited facsimile advertising must be substantial, the government must show that its speech restriction directly and materially advances the asserted governmental interest, and the government must narrowly tailor

---

[67] *House Report*, H.R. REP. NO. 102-317, at 25; *see also* S. REP. NO. 102-178 ("unsolicited calls placed to fax machines . . . often impose a cost on the called party (fax messages require the called party to pay for the paper used . . .").

[68] 47 U.S.C. § 227(b)(1)(C).

[69] *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557 (1980).

its restriction to the asserted interest.[70]  The core of the *Central Hudson* analysis, reflected in the latter two prongs, is that the First Amendment demands a "reasonable fit" between a speech-restrictive regulation and the government's asserted goal, such that the challenged regulation advances the government's interest "in a direct and material way."[71]  To withstand this test, the record must indicate "a reasonable fit between the [regulatory] ends and the means chosen to accomplish those ends . . . a means narrowly tailored to achieve the desired objective."[72]  On the whole, the record also must indicate that the legislature has "carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition."[73]

At least one federal court has expressed considerable skepticism about the strength of the government's asserted interest in preventing fax advertisers from shifting advertising costs to recipients, noting the paucity of material in the legislative history indicating a real problem in this area.[74]  But even assuming the substantiality of the government's interests, a blanket prohibition against the transmission of unsolicited fax advertisements to fax servers and computers could not survive scrutiny under *Central Hudson*, because such a ban would not directly and materially further the government's interest in preventing advertisers from unfairly shifting costs to consumers.

Moreover, such a prohibition could not possibly be considered to represent a "reasonable fit" between the legislatures' ends and means, because there is nothing to suggest that Congress

---

[70] *Id.* at 566.

[71] *Edenfeld v. Fane*, 507 U.S. 761, 767 (1993).

[72] *Id.* (citations omitted).

[73] *City of Cincinnati v. Discovery Network,* 507 U.S. 410, 417 (1993) (internal quotation omitted).

[74] *Missouri v. American Blast Fax*, 196 F. Supp.2d 920 (E.D. Mo. 2002).

ever weighed the costs and benefits of restricting the transmission of advertisements to fax servers and computers, as opposed to traditional telephone facsimile machines.  Indeed, because the recipient can delete a fax transmission from his or her computer without ever reducing it to paper, a fax sent to a computer is closely analogous to direct mail advertising – a medium that Congress *expressly distinguished* from the unsolicited facsimile advertising that it sought to suppress through the TCPA.  For example, the House Committee found that "when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter."[75]  By contrast, the Committee noted that "[i]n the case of fax advertisements . . .  the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages.  It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised."[76]

Significantly, the courts consistently have held that the First Amendment protections for commercial speech override asserted interests in restricting the flow of intrusive or offensive direct mail advertising, and the same considerations would prohibit a blanket ban on fax advertising sent to personal computers and fax servers.  As the Supreme Court has observed, "we have never held that the government itself can shut off the flow of mailings to protect those recipients who might potentially be offended.  The First Amendment does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech."[77]  Because "[r]ecipients of objectionable mailings . . . may effectively

---

[75] *House Report*, H.R. Rep. No. 102-317, at 25.

[76] *Id.; see also Telemarketing Practices*, Hearing before the Subcommittee on Telecommunications and Finance on H.R. 628, H.R. 2131, and H.R. 2184, at 3 (May 24, 1989).

[77] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) (internal quotation omitted).

avoid further bombardment of their sensibilities simply by averting their eyes," the *Bolger* Court concluded that "the short, though regular, journey from the mailbox to trash can . . . is an acceptable burden, at least so far as the Constitution is charged."[78]  Of course, the virtual pathway between a computer user's email inbox and the trash can on his or her desktop involves an even briefer journey.  Because the recipient of an advertisement sent to a fax server or personal computer is no more bound to review and pay the cost of printing the message than a direct mail recipient if he or she has no interest in the advertised product or service, a prohibition on such advertisements cannot "directly and materially advance" Congress' interest in adopting Section 227(b)(1)(C) to prevent advertisers from unfairly shifting costs to consumers.

"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," the law must be construed "to avoid such problems unless such construction is plainly contrary to the intent of Congress."[79]  Here, the Commission can and should avoid constitutional problems by construing Section 227(b)(1)(C) – consistent with the statutory language – not to apply to advertisements sent to fax servers, personal computers and other devices that cannot independently transcribe advertising copy into an electronic signal or transcribe electronic fax signals onto paper.  There is no statutory basis, policy reason nor constitutional justification for the prohibition of advertisements sent to these devices.

---

[78] *Id.* (internal quotations and citations omitted); *see also Lamont  v. Commissioner of Motor Vehicles*, 269 F. Supp. 880, 883 (S.D.N.Y.), *aff'd*, (2d Cir. 1967).

[79] *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trade Council*, 485 U.S. 568, 575 (1988).

**C.**     **The Commission Should Clarify the Boundaries of Liability under the TCPA, Including Specifically that Section 217 Does Not Create Unique Obligations for Common Carriers under the TCPA.**

1.   Liability Should Rest With the Party Who Determines the Destination of Fax Advertisements.

Technological advances also have resulted in the growth, since 1991, of fax broadcasters who transmit advertisements to a large number of telephone facsimile machines for a fee and "maintain lists of telephone facsimile numbers that they use to direct their clients' advertisements."[80]  As the Commission has recognized, "the apparent prevalence of fax broadcasters that determine the destination of their clients' advertisements" raise unique liability issues that necessitate Commission clarification regarding the appropriate allocation of liability under the TCPA.[81]

Fax broadcasters rarely act as mere passive conduits for their advertiser customer's messages.  Instead, as demonstrated by the Commission's findings in its Notice Apparent Liability directed to Fax.com, fax broadcasters frequently determine the destination of the messages that they send on behalf of their customers and they actively compile and market databases of fax numbers used in fax advertising campaigns.  Indeed, the major perpetrators of TCPA fax violations today are the fax broadcasters who convince legitimate businesses interested in reaching new customers that it is lawful to fax intrastate or in bulk, or worse, that the intended recipients have provided consent to receive facsimile advertisements.  For example, when the Texas Attorney General sued American Blast Fax for its deceptive practices and TCPA

---

[80] *NPRM* at ¶40.

[81] *Id.*

violations, the court specifically addressed ABF's culpability, stating that "the State presents evidence that Blast Fax -- by express representations and by failing to disclose information about the TCPA and/or information about the  Court's October 5, 2000 order – told potential customers and fax recipients in Texas that Blast Fax's unsolicited intrastate fax advertisements are not unlawful in any manner."[82]

In light of the fact that fax broadcasters, rather than their advertiser customers, often are the moving force behind large scale violations of the TCPA, the Commission should reconsider its statement in its 1995 Reconsideration Order[83] that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule."  Class action attorneys have used this language to urge courts to adopt a standard of strict liability – a standard that turns the statute on its head by absolving the actual fax sender of responsibility, while imposing liability on the advertisers regardless of whether they were involved in the transmissions or the selection of the destination of the advertisements This standard of strict advertiser liability creates unintended consequences, results in an inequitable apportionment of responsibility and sweeps innocent bystanders into the fray.

Nextel's own experience is illustrative.  In its pending class action lawsuit in Texas, Nextel was not a sender of fax advertisements and was not even an *advertiser—i.e.*, Nextel did not contract with a  fax broadcaster to disseminate advertising material on its behalf.  Rather, Nextel merely was the source of products and services *advertised* by an independent third-party dealer via faxes transmitted by that dealer's independent contractor, American Blast Fax. [84]

---

[82] *Texas v. American Blast Fax,* 159 F. Supp. 2d 936, 940-41 (W.D. TX. 2001).

[83] 10 FCC Rcd 12391, ¶ 35 (1995).

[84] Nextel's only role in the matter was largely administrative, as it approved the allocation of advertising dollars and content through its independently contracted vendor.

Despite having only the most attenuated connection to the alleged violations  Nextel has become embroiled in costly class action litigation.

To eliminate such unintended consequences, the Commission should clarify that, when it is the fax broadcaster that determines the destination of fax advertisements and promotes the legitimacy of the method, the fax broadcaster, and not the advertised business, should be responsible under the TCPA.  Accordingly, the Commission should specify by rule that it is the party (or parties) determining the destination of the facsimile advertisement that is liable for any violation of the TCPA.  At the same time, the Commission should clarify that parties who do not control and have no knowledge of the destination of these advertisements are not liable for such activities.  This rule is particularly appropriate because, as a consequence of the established business relationship exception to the prohibition on unsolicited facsimile advertising, only the entity or entities who know the destination of the advertisements would know whether these advertisements violate the TCPA prohibition.

2.    Section 217 Applies to Nondelegable Carrier Obligations, Not the TCPA

The Commission should clarify that Section 217 of the Communications Act does not impose a higher level of liability on common carriers than other entities for violations of the TCPA.[85]  Section 217 merely codifies common law agency principles and ensures that carriers cannot avoid responsibility for complying with unique common carrier duties by purporting to

---

[85] The plaintiffs bar's use of Section 217 to impose a higher level of liability on carriers is not surprising.  When independent contractors violate the law, they are liable for the consequences, not the party hiring them to perform the service.  This is especially true where such independent contractors represent and warrant that they will follow the law in executing their obligations, much as did Nextel's independent dealers.  TCPA cases properly have been dismissed on this basis. Reading Section 217 to apply to TCPA cases conveniently avoids this outcome.  Nextel urges the Commission to make it clear that whether a person is an independent contractor and responsible for his own acts under the TCPA is a matter of state agency law.

delegate them to third parties.[86]  The Commission should confirm that Section 217 does not make common carriers automatically liable whenever an independent contractor violates a law of general applicability.[87]

The plaintiffs bar's argument that, under Section 217, carriers are always vicariously liable for the acts of their independent contractors contravenes established common law agency principles, whereby " . . . the term 'independent contractor' is used to indicate all persons for whose conduct, aside from their use of words, the employer is not responsible *except in the performance of nondelegable duties*."[88]  Section 217 ensures that common carriers are responsible for the actions of their agents when those agents violate the Communications Act. Section 217 does not, however, make carriers liable for the acts of independent contractors except in those limited circumstances when the independent contractor is carrying out a nondelegable common carrier obligation under the Act.

---

[86] 47 U.S.C. § 217.  Section 217 provides that "in construing and enforcing the provisions of this Act, the act, omission, or failure of any office, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person."

[87] 47 U.S.C. § 217.  Section 217 provides that "in construing and enforcing the provisions of this Act, the act, omission, or failure of any office, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person."

[88] Restatement Second of Agency § 2 (emphasis added).  *See also Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354 (Tex. 1998) (Employer did not retain sufficient control over manner and means by which employees of independent contractors performed their maintenance services to incur duty to use reasonable care to ensure that independent contractors performed their work in a reasonable manner, despite employer's insistence that independent contractor observe and promote compliance with federal laws . . .").

The language of Section 217 establishing common carrier liability is derived from a similar provision in the Elkins Act.[89]  The Elkins Act eliminated rebates, concessions or discrimination from the handling of commerce and contained a provision regarding common carrier liability for acts of agents.[90]  Application of the Elkins Act followed traditional common law agency principles, and the courts have assigned liability to corporations under this statutory provision consistent with traditional agency law.[91]

Likewise, the Commission has interpreted Section 217 to be consistent with common law agency principles, by imposing liability on carriers in cases where an independent contractor was hired to carry out nondelegable common carrier obligations.[92]  The Commission has emphasized the need to ensure that telecommunications service providers do not avoid their statutory

---

[89] A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934 50, 363, 441 (Max D. Paglin, ed., 1989) ("Section 217, affirming the liability of carriers for acts and omissions of their agents, follows the provision originally introduced in the Elkins Act of 1903.").  *Id*. at 330 ("Section 217: This states for general application which is provided in some individual sections of the I.C. Act and in general terms of section 1 of the Elkins Act.").  *Id.* at 363 ("Section 217 is in the Elkins Act.").

[90] 49 U.S.C. § 41 ("…That anything done or omitted to be done by a corporation common carrier, subject to the Act to regulate commerce and the Acts amendatory thereof which, if done or omitted to be done by any director or officer thereof, or any receiver trustee, lessee, agent, or person acting for or employed by such corporation, would constitute a misdemeanor under said Acts or under this Act shall also be held to be a misdemeanor committed by such corporation…").

[91] *See, e.g., United States of America v. General Motors Corporation*, 226 F.2d 745, 749 n.5 (1955) ("In determining whether or not the Corporation has violated the Elkins Act, the Corporation is held responsible for all the acts of its officers and agents in the course of their employment."); *New York Central and Hudson R.R. v. United States*, 212 U.S. 481, 492-296 (1908) (The Supreme Court imposed criminal responsibility on a corporation for an act done while an authorized agent of the company was exercising the authority conferred upon him.").

[92] *See, e.g.,* ConQuest Operator Services Corp, *Order of Forfeiture*, 14 FCC Rcd 12518, ¶ 10 n.29-30 (1999) (citing Restatement Second of Agency § 268 in conjunction with Section 217.).

common carrier obligations under the Communications Act by assigning those obligations to third parties outside of their control.[93]

However, where there is no nondelegable common carrier obligation at issue, there can be no basis for holding a carrier liable for the acts of entities that are not its agents.  For example, a common carrier should not be held liable for the marketing activities of its independent contractors, e.g., its authorized dealers, to any greater extent than an automobile manufacturer should be held liable for the marketing activities of its authorized dealers.  Common law agency principles should apply to both scenarios, and the common carrier should not be held to higher standard and greater liability than the automobile manufacturer or other entities under the TCPA.  Consequently, the Commission should clarify that Section 217 does not impose any unique, discriminatory obligation or liability on common carriers for compliance with the TCPA.

---

[93] *See* Long Distance Direct, Inc., *Memorandum Opinion and Order*, 15 FCC Rcd 3297, ¶ 9 (2000) ("Congress's clear intent in enacting section 217 was to ensure that common carriers not flout their statutory duties by delegating them to third parties."); Vista Services Corporation, *Order of Forfeiture*, 15 FCC Rcd 20646, ¶ 9 (2000).

## V.     CONCLUSION

Nextel fully supports the Commission's clarification of the TCPA rules to prohibit the deceptive practices of unscrupulous telemarketers, but also cautions the Commission against the imposition of costly requirements that will unduly burden legitimate telemarketers in today's precarious economy.  The Commission should take the regulatory actions discussed above to provide clarity and consistency to the market and provide guidance and protection for companies that legitimately seek to follow the rules, while developing efficient marketing solutions to minimize cost and maximize service to consumers.

Respectfully submitted,

**NEXTEL COMMUNICATIONS, INC.**


/s/ To-Quyen T. Truong

Robert McNamara                     To-Quyen T. Truong
  Senior Counsel - Regulatory       Scott D. Dailard
 Frank Triveri                      Briana E. Thibeau
   Counsel - Regulatory             **DOW, LOHNES & ALBERTSON, PLLC**
**NEXTEL COMMUNICATIONS, INC.**     1200 New Hampshire Avenue, NW
2001 Edmund Halley Drive            Suite 800
Reston, VA  20191                   Washington, DC  20036

(703) 433-4000                      (202) 776-2000

                                     Its Attorneys

December 9, 2002