**EXHIBIT G**

**EXHIBIT F**

Page 1

1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2
     SCOMA CHIROPRACTIC, P.A.,        )
3    a Florida corporation,          )
     FLORENCE MUSSAT, M.D.,           )
4    S.C., an Illinois service       )
     corporation, and                )
5    DR. WILLIAM P. GRESS, an        )
     Illinois resident,              )
6    individually and as the         )
     representatives of a class      )    Civil Action No:
7    of similarly-situated           )    2:16-cv-00041-UA-
     persons,                        )    MRM
8                                    )
             Plaintiffs,             )
9                                    )
     vs.                             )
10                                   )
     MASTERCARD INTERNATIONAL        )
11   INCORPORATED, a Delaware        )
     corporation,                    )
12                                   )
             Defendant.              )
13                                   )
     _____/
14
15
     DEPOSITION OF:    KENNETH SPONSLER
16
17
     DATE:             FRIDAY, JANUARY 20, 2023
18
19
     TIME:             10:00 A.M. - 1:30 P.M.
20
21
     PLACE:            ALL PARTIES APPEARING VIA
22                     VIDEOCONFERENCE
23
24   STENOGRAPHICALLY
     REPORTED BY:      BRITTANY O'NEILL VALLADAREZ
25

Page 2

1   A P P E A R A N C E S:
2   WALLACE SOLBERG, ESQUIRE
    OF: ANDERSON & WANCA
3        3701 ALGONQUIN ROAD
         SUITE 500
4        ROLLING MEADOWS, ILLINOIS 60008
         (847) 368-1500, FAX (847) 368-1501
5        wsolberg@andersonwanca.com
         APPEARING ON BEHALF OF THE PLAINTIFFS
6
    JONATHAN MONTCALM, ESQUIRE
7   OF: DORSEY & WHITNEY, LLP
         51 WEST 52ND STREET
8        NEW YORK, NEW YORK 10019
         (212) 415-9347, FAX (646) 417-7238
9        montcalm.jonathan@dorsey.com
         APPEARING ON BEHALF OF THE DEFENDANT
10
    HEATHER KOLBUS, ESQUIRE
11  OF: EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
         20 SOUTH CLARK STREET
12       SUITE 1500
         CHICAGO, ILLINOIS 60603
13       (312) 739-4200, FAX (312) 419-0379
         hkolbus@edcombs.com
14       APPEARING ON BEHALF OF THE PLAINTIFFS
15  CURTIS C. WARNER, ESQUIRE
    OF:  CURTIS C. WARNER
16       5 EAST MARKET STREET
         SUITE 250
17       CORNING, NEW YORK 14830
         (888) 551-8685
18       cwarner@warner.legal
         APPEARING ON BEHALF OF PLAINTIFFS
19
    RYAN KELLY, ESQUIRE
20  OF:  ANDERSON & WANCA
         3701 ALGONQUIN ROAD
21       SUITE 500
         ROLLING MEADOWS, ILLINOIS 60008
22       (847) 368-1500, FAX (847) 368-1501
         rkelly@andersonwanca.com
23       APPEARING ON BEHALF OF THE PLAINTIFFS
24
25

Page 3

1                    I N D E X

2  TESTIMONY OF KENNETH SPONSLER

3        DIRECT EXAMINATION BY MR. KELLY..................5

4  CERTIFICATE OF OATH................................106

5  CERTIFICATE OF DEPOSITION TRANSCRIPT...............107

6  ERRATA SHEET.......................................108

7  NOTIFICATION LETTER................................109

8

9                  INDEX OF EXHIBITS

10  PLAINTIFFS' EXHIBITS

11  EXHIBIT 1     SUPPLEMENTAL REPORT

12  EXHIBIT 2     EXHIBIT B TO THE SUPPLEMENTAL REPORT

13  EXHIBIT 3     MASTERCARD SUBPOENA

14  EXHIBIT 5     AMERIFACTORS RULING

15  EXHIBIT 6     RYERSON RULING

16  EXHIBIT 14    ANALYSIS

17  EXHIBIT 22    DECLARATION OF DOROTHY SUE MERRYMAN

18  EXHIBIT 25    See Fax Without a Fax Machine

19  EXHIBIT 26    Faxing Isn't Dead; Three Reasons the
                  Predictions Were Wrong

20

    EXHIBIT 27    The Definitive Guide to Online Fax

21

22  EXHIBIT 28    See How to Fax Over the Internet in
                  Five Easy Steps

23

    EXHIBIT 31    HIPAA Compliant E-Fax Provider
24                Recommendations

25  EXHIBIT 33    The Percentage of Businesses That Fail

Page 4

REPORTER'S NOTE:  Exhibits mentioned above were retained
by WALLACE SOLBERG, Esquire.


                          ------
                  S T I P U L A T I O N S
          It is hereby stipulated and agreed by and
between the counsel for the respective parties and the
deponent that the reading and signing of the deposition
transcript be reserved.
                          ------

Page 5

```
 1                    P R O C E E D I N G S

 2                       *********

 3         THE REPORTER:  Would you raise your right hand,

 4    please?

 5         Do you solemnly swear or affirm that the

 6    testimony you're about to give in this cause is the

 7    truth, the whole truth, and nothing but the truth?

 8         THE WITNESS:  I do.

 9    THEREUPON,

10                       KENNETH SPONSLER

11    was called as a witness and, after having been duly

12    sworn, testified as follows:

13                     DIRECT EXAMINATION

14    BY MR. SOLBERG:

15      Q.  All right.  Let the record reflect that this is

16    the deposition of Kenneth Sponsler, taken pursuant to

17    notice, the Federal Rules of Civil Procedure, and the

18    local rules for the Middle District of Florida.

19         Good morning, Mr. Sponsler.  I've already

20    introduced myself.  My name is Wallace Solberg, and I'm

21    one of the attorneys representing the plaintiffs.

22    You've been deposed in numerous cases, so I'm sure you

23    know the drill so I'll make it quick.

24         I ask the questions; you answer them

25    truthfully.  If you don't understand a question please
```

1    tell me and I'll attempt to clarify the question so that

2    you do understand it.  If you need a break please tell

3    me and we'll do that, but if there's a question pending

4    please answer the question before we take the break.  As

5    you know, this deposition is being conducted remotely.

6    Can you tell me where you're at?

7         A.  I'm at my home office in Beverly Hills,

8    Florida.

9         Q.  And you're by yourself, I assume?

10        A.  I am, sir.

11        Q.  And the attorney presenting to you today --

12   well, strike that.

13             During the course of this deposition -- we've

14   done this before.  If you want to look at a hardcopy of

15   your supplement report in this case, feel free, as long

16   as we can agree as to what you're looking at.  I think

17   you'll find it's easier to look at a hardcopy than the

18   screen, but in any event we'll deal with that when we

19   get to it.

20             So to start, let me direct your attention to

21   what's been previously marked as Exhibit No. 1.  And

22   while that's coming up I can tell you it's your

23   supplemental report.

24             MR. SOLBERG:  You know what?  I see something

25   on the screen.  Let's take about a two-minute break.

1   Okay?  I'll be back.

2          THE WITNESS:  Yes, sir.

3          (Break was taken.)

4   BY MR. SOLBERG:

5      Q.  Do you recognize Exhibit 1, Mr. Sponsler?

6      A.  I recognize the name of it.  Yes, sir.

7      Q.  Yeah.  I don't know.  That's what I was talking

8   about.  What you're looking at is a list of exhibits,

9   Sponsler deposition exhibits.  Right?

10      A.  Yes, sir.

11      Q.  And the exhibit's not open?

12          MR. KELLY:  Yeah.  I'll open it.

13          MR. SOLBERG:  Okay.

14   BY MR. SOLBERG:

15      Q.  And, Mr. Sponsler, this may be a perfect

16   opportunity to get a hardcopy.  All right.  Here we go.

17      A.  I've got it right here, sir.

18      Q.  Do you?  What?  A hardcopy or the view on the

19   screen?

20      A.  I have a hardcopy of this supplemental.

21      Q.  For the record, this supplement report consists

22   of pages 1 through 27, and then Exhibits A to -- I'm

23   sorry?  I thought someone said something.  Let me start

24   again.

25          Your supplement report consists of pages 1 to

Page 8

1    27, and then Exhibits A to N, and N was provided to us

2    yesterday by Counsel.  Do you see that?

3         A.  Yes, sir.  Well, right now on the screen I see

4    the open Exhibit 1.

5         Q.  Okay.  I mean, I guess we can --

6         A.  I'm not arg- -- I'm not disputing the rest of

7    it.

8    BY MR. SOLBERG:

9         Q.  Yeah.  And I hear you, and I think -- let's see

10   if we can agree on that.  Your supplemental report, like

11   I said, pages 1 to 27, Exhibits A to N.  It's dated

12   December 2nd, 2022.  Do you agree with all of that?

13        A.  Yes, sir.

14        Q.  Your signature's on page 27?

15        A.  Yes.  Can I grab my printed copy real quick?

16        Q.  Absolutely.

17             MR. SOLBERG:  We're not waiting on me, are we?

18             THE WITNESS:  Sorry.  It just ran out of paper

19   in the middle of it.

20             MR. SOLBERG:  That's fine.

21             THE WITNESS:  All right.

22   BY MR. SOLBERG:

23        Q.  So the last question was:  Your signature is on

24   page 27.  Correct?

25        A.  Yes, sir.

1    Q.  All right.  Now, I've designated as Exhibit 2

2    your Exhibit B to the supplemental report.  Now, if we

3    could pull that up?  And that might be a bit of a task.

4    And, again, if you have an electronic version of that in

5    your office --

6    A.  I do.  I do have it, sir.

7    Q.  Please do or this dep will take three days.

8    A.  Yeah.  I can open up Exhibit B.

9    Q.  And I'm going to ask you some quick identifying

10   questions about that.

11   A.  Yes.

12   Q.  So again, Exhibit B has been designated

13   Exhibit 2.  Do you agree that Exhibit 2 consists of

14   three tabs, the first called summary, the second called

15   details, and the third called multiple carriers.  Do you

16   see that?

17   A.  I do, sir.

18   Q.  Mr. Sponsler, when were you retained to render

19   this supplemental report?

20   A.  Was the question when was I retained?

21   Q.  Yes.  I know you issued an earlier report in

22   this case, but then you were tasked to do a supplemental

23   report.  When did that happen?

24   A.  I'm not for certain when it was, sir.  At some

25   point we were asked to summarize and kind of collect and

Page 10

1    categorize as the subpoena responses were coming in.

2    And as you know, we've done very similar work many times

3    in the past, but I don't remember exactly when the date

4    was.

5         Q.  Do you remember the first time -- well, strike

6    that.

7             Do you have assistance on putting together the

8    supplemental report?

9         A.  The analysis part of it.  Yes, sir.

10        Q.  Who helped you?

11        A.  My team, led by Jennifer Smith.  And then we

12   have a team of reviewers that we routinely engage, and

13   they were also assistive.

14        Q.  You know, in your answer you began with

15   analysis.  Is there a distinction between compiling

16   those numbers and what you do?  I don't know if I missed

17   a part of your answer.

18            MR. MONTCALM:  Objection to form.

19   BY MR. SOLBERG:

20        Q.  What do you do -- strike that.

21            MR. SOLBERG:  I'm sorry?

22            MR. MONTCALM:  I just said, Objection to form.

23            MR. SOLBERG:  Okay.

24   BY MR. SOLBERG:

25        Q.  What did you do in this supplemental report

Page 11

1    specifically, Mr. Sponsler?

2         A.   I, of course, interacted with the team to help

3    guide this effort from all of my experience of doing

4    this, I participated in the training of the team, I

5    participated in the QA of the process.  And as this was

6    progressing and we decided to add additional

7    information, such as the summary sheet, the detail

8    sheet, the multiple carriers issue came to light, so we

9    also documented that.

10        Q.   What issue came to light?  You just said an

11   issue came to light, or were you speaking generally?

12        A.   I didn't catch your question, sir.

13        Q.   I thought you just said you and your team

14   addressed an issue that came to light, or did I

15   misunderstand you?

16        A.   Well, just the multiple carriers responding.

17   In other words, Iconectiv and Somos identified more than

18   one carrier for the same number.

19        Q.   And that's Tab 3.  Correct?  In your

20   supplemental Exhibit E, which is our Exhibit 2.

21        A.   Right.  That issue is documented in the

22   multiple carriers tab.

23        Q.   You know, if you could pull up -- as long as

24   we're on this topic, Mr. Sponsler, can you pull up the

25   summary sheet?

Page 12

1      A.  I'm looking at it, sir.

2      Q.  Now, as you look in -- and we're going to get

3  into this a little later, but Column C is "Indicated

4  no."  Do you see that?  Up at the top of the page.

5      A.  Yes.

6      Q.  How did you handle that column in relation to

7  multiple carriers?  What did you do with multiple

8  carriers relative to the Indicated-no column?

9      A.  Now, this -- it's my recollection that the

10  summary sheet is -- reflects each and every carrier that

11  received a subpoena.  I think there were 120-some odd,

12  so we would have responded for each carrier's response

13  that we have listed here in the carrier named from

14  subpoena.

15      Q.  So if we're looking at Indicated-no -- and I

16  just went over to the multiple carriers column, and my

17  count there's 345 listed there.  Why don't you check

18  that for yourself and make sure we're on the same page?

19      A.  On the summary sheet?

20      Q.  No.  I'm sorry.  Page was a poor choice of

21  words.  Make sure we're in agreement that the multiple

22  carriers -- it ends in 346, but I always assume the

23  first line was not that.  How many multiple carriers

24  were there?

25      A.  Well, on the multiple carriers tab we have 346

Page 13

1    telephone numbers listed, which would be -- yes, 345.

2         Q.   Okay.  So are those numbers -- were those

3    numbers subtracted from Indicated-no, Column C on the

4    summary sheet or are they still in there?

5         A.   These numbers are in there.  You can go back to

6    the summary tab and you can look at the -- so in other

7    words, here's -- the reason that we understand there

8    were multiple carriers identified was because during

9    that time span in December of 2015 there was a time span

10   of the effective time that these faxes were sent, and

11   during that time the carrier had changed for that fax

12   number.  So there were faxes received by two separate

13   carriers during that small date window, which came out

14   to be 345 instances of that.  So, obviously, you would

15   have two carriers that accounted and responded to the

16   subpoenas because they were identified by Iconectiv and

17   Somos.

18        Q.   So if we were to try to get the -- I don't know

19   if this is the right way to say it, but an absolute --

20   strike that.

21             To get a true count of Indicated-no in Column C

22   we would have to subtract those 345 numbers.  Is that

23   your understanding?

24        A.   No.

25        Q.   Where am I wrong?

Page 14

1        A.   Because we're talking about a fax that was

2    allegedly going to be a part of this action if someone

3    received it, except we have two carriers who are

4    involved in servicing that number, the same number on

5    two different faxing events.  So what you end up with is

6    accounting for the response of each of those carriers

7    since they were servicing the number at different times,

8    different faxes.

9        Q.   So the same -- two carriers that would be

10   listed on the summary report, would they be -- would the

11   Indicated-no column be accounting for two different

12   faxes or just one fax?

13       A.   Well, that column has really nothing to do with

14   faxes.  It has to do with the numbers of -- that were

15   subpoenaed by carrier.  That's what that has to do with.

16   And if you look at B through G, all of those columns

17   relate to the single question if the carrier provided

18   online fax services to the numbers.

19       Q.   So going to page 4 of your summary if -- and

20   forgetting or not taking into account what's going to

21   happen at this depth, the number is total 275,828.  Do

22   you see that?

23       A.   Yes.  I do, sir.

24       Q.   Now, would I be correct in saying that as far

25   as Indicated-no, which means did not provide online fax

Page 15

1    service, that number is accurate?

2        A.   Sir, it is my belief that that number is

3    accurate.

4        Q.   All right.  And we'll get back to that later.

5    Do you know how -- strike that.

6            Mr. Sponsler, CompliancePoint Litigation

7    Services is who is providing this supplemental expert

8    report.  Is that correct?

9        A.   Yes, sir.

10       Q.   To date how many hours have been spent on this

11   supplemental report?  Do you know?

12       A.   I don't.  As you can imagine, there's a lot of

13   work that would go into analyzing all of the subpoena

14   responses and tracking and checking and QAing and all of

15   those things.

16       Q.   Let me ask you this:  How do you bill for your

17   report?  Is it an hourly rate?  Is it a firm fixed

18   price?  What is it?

19       A.   We bill an hourly rate.  Of course, you know,

20   that's not something personally that any of us receive.

21   That goes to the company.  I just run a P&L.  So I'm

22   salaried.  I'm not based on hourly things for this --

23   like this.  But, yeah.  And we have the team that works

24   on this kind of manual review to compile this sort of

25   data, or lower cost resources that help us do that.

1      Q.  Do you know the amount that's been billed to

2   date on this effort?

3      A.  I do not, sir.

4      Q.  When you were preparing this supplemental

5   report, Mr. Sponsler, did you review prior reports

6   regarding this subpoena process?

7      A.  Not to my recollection.  I mean, I'm extremely

8   familiar with the process.  We've done it many, many

9   times, this same work.

10      Q.  Let me direct your attention to your report at

11   page 7, note 2.  And I will tell you as you look through

12   that that provides a listing of cases where you've

13   addressed the subpoena process.  Of those cases do you

14   recall being deposed in the following:  Scoma versus

15   National Spine, Brust versus Opensided, Sharfman versus

16   InfuCare, and Career Counseling versus Amerifactors?

17      A.  Is that in footnote 2, sir?

18      Q.  Yeah.  Yes.

19      A.  Okay.

20      Q.  You recall being deposed in those?

21      A.  I don't know if I recall...

22      Q.  Let me ask it this way:  You wouldn't be

23   surprised if you were deposed in those.  Is that an

24   easier way to answer that question for you?

25      A.  Yes, sir.

1      Q.  Let's go to Exhibit B of your report that

2    contains the materials you have reviewed and relied upon

3    in this report.

4      A.  I don't have any Exhibits printed off, so I can

5    print it off -- find it and print it off.

6      Q.  We have them here, but I think it might be -- I

7    think you're going to need to view a couple.  Let's see

8    how we can do without doing that.  All right?  You have

9    Exhibit B in front of you.  Correct?

10     A.  I do not have -- oh, you mean the --

11     Q.  The report?

12     A.  I have the report.  Yes.

13     Q.  Now, your report goes Exhibit A to Exhibit N.

14   Do you have those exhibits handy to your report?

15     A.  They're not printed.  I could go back into my

16   files and find those.

17     Q.  Well, here's what I'm going to do:  I'm going

18   to walk through your list and ask you what we have

19   designated as particular exhibits, Is this what you're

20   actually referring to?  And Ryan can pull those up on

21   the screen, I guess.  There's going to be about four or

22   five of them, so let's give this a shot and see how we

23   do.  Okay?

24          MR. KELLY:  Do you see it on the screen?

25          MR. SOLBERG:  I see "Materials reviewed and

1    relied upon by Mr. Sponsler."  Yeah.

2            MR. KELLY:  All right.

3    BY MR. SOLBERG:

4        Q.  So the first one, Mr. Sponsler, is revised

5    expert report of Robert Biggerstaff dated December 1st,

6    2017, including Exhibit 1.

7        A.  Yes, sir.

8            MR. SOLBERG:  And, you know, I don't know if

9    this is going to be the way to do this but, Ryan, can

10   you pull up Plaintiff's Exhibit 7?

11   BY MR. SOLBERG:

12       Q.  What you're looking at is what's been

13   designated as Plaintiff's Exhibit 7, minus the

14   Exhibit 1, which I assume would be the transmission

15   logs.  Is this -- if you're able to go through this or

16   if you can tell from the cover page, is this what you

17   reviewed?

18       A.  Yes, sir.  This looks like what I reviewed.

19       Q.  And in your career, Mr. Sponsler, I would

20   except you've seen a ton of those expert reports by

21   Mr. Biggerstaff.  Is that correct?

22       A.  Yes, sir.

23       Q.  A ton not being too accurate, but quite a few?

24       A.  Yes, sir.

25       Q.  And that's all I want to do with these right

Page 19

1   now.  I just want to identify exactly what you've

2   reviewed.  The next one you state in paragraphs 24 and

3   25 of Exhibit B to your supplemental report you reviewed

4   Amerifactors and Ryerson, those rulings from the Bureau.

5   Is that your understanding that that's what those are?

6        A.  Yes, sir.

7        Q.  You know, let me show them to you just so we

8   have it in the record.

9        MR. SOLBERG:  Can you pull up Exhibit 5, Ryan?

10  BY MR. SOLBERG:

11       Q.  And the question for you, Mr. Sponsler, is

12  going to be:  Is this what you reviewed or relied upon?

13       A.  Yes, sir.

14       Q.  And then same question if we could pull up

15  Exhibit 6?  It's going to be Ryerson, and the question

16  is the same:  Is that what you reviewed?  And it's

17  referenced in Paragraph 25 of Exhibit B to your

18  supplemental report.

19       A.  It appears to be so, sir.  Yes.

20       Q.  And we'll move on then.  Let me direct your

21  attention, Mr. Sponsler, to Exhibit C of your

22  supplemental report.

23       MR. SOLBERG:  And, Ryan, I think we're going to

24  have to pull up Exhibit C.

25  BY MR. SOLBERG:

1      Q.  Now, this is one -- to make this process

2  easier, you don't have these in front of you.  Is that

3  what you told us, Mr. Sponsler?  Your exhibits to your

4  report?

5      A.  I do not, sir.

6      Q.  Here we go.  Do you recognize Exhibit C to your

7  report, Mr. Sponsler?  When I say "report" in this dep,

8  you have two reports, a supplemental report and a

9  report.  Unless I say otherwise, all these questions are

10  referring to your [unintelligible] report.

11      A.  Unless you specify otherwise --

12      Q.  Unless I specify that it's your original

13  report.  Okay?  Take a look at Exhibit C to your report

14  and tell me if you recognize it.

15      A.  Yeah.  I mean, yes.  I mean, it's been a while,

16  but yes.

17      Q.  And that's a question, too, Mr. Sponsler.

18  When's the first time you can recall reviewing a --

19  well, strike that.

20          Identify for me, if you would, what Exhibit C

21  is.

22      A.  Is that Exhibit C right there?  That looks like

23  a subpoena.

24      Q.  It is.  And I'll tell you what, on these kind

25  of questions I'll try to expedite this a bit.  This is a

Page 21

1    subpoena for deposition to CSC Holdings that I believe

2    was served September 16th, 2022.  The place for the

3    deposition is listed as Minneapolis, Minnesota.  CSC

4    Holding's address is listed as 1201 Hays Street in

5    Tallahassee, Florida.  Can you see all that on the page

6    that's on the screen?

7         A.  I see Minneapolis and Tallahassee.  Yes.

8         Q.  And the dep was set for September 30th, 2022?

9         A.  Yes, sir.

10        MR. SOLBERG:  Ryan, if you could go to the

11   rider to the subpoena?  There we go.

12   BY MR. SOLBERG:

13        Q.  Take a look to -- can you see that,

14   Mr. Sponsler, the rider to the subpoena?

15        A.  Yes, sir.

16        Q.  Take a look at Instructions in paragraph 2.

17   "Please note that in most instances providing a

18   declaration or affidavit will obviate the need for a

19   deposition."  Do you see that?

20        A.  Under Instructions No. 2?

21        Q.  Yeah.

22        A.  It says, "Questions for additional time to

23   respond to the subpoena inquiries regarding depositions

24   scheduled shall be directed to caitlinhull@dorsey.com."

25        Q.  Next sentence.

1      A.   Say again?

2      Q.   The next sentence is what I was looking for.

3    I'm sorry.

4      A.   Oh, I'm sorry.  "Please note that in most

5    instances providing a declaration or affidavit will

6    obviate the need for a deposition."

7      Q.   Mr. Sponsler, did you participate in the

8    drafting of the topics for this deposition?

9           MR. MONTCALM:  Objection to form.

10     A.   In the contents of this subpoena?

11   BY MR. SOLBERG:

12     Q.   Yes.

13     A.   No, sir.

14     Q.   Not the instructions; what's actually asked.

15     A.   What's actually in it?

16     Q.   Let's roll on.  I got ahead of myself.

17   Deposition topic, affidavit topic, and/or document

18   request No. 1, and I'll read that to you.  "Whether you

19   have any information or mechanism available to determine

20   whether any subscribing fax number identified in

21   plaintiff's subpoena used an online fax service or

22   standalone fax machine to receive faxes on the dates

23   identified in plaintiff's subpoena, or confirmation that

24   no such information or mechanism exists."  Do you see

25   that?

Page 23

1      A.  Yes, sir.

2      Q.  Did you participate in the drafting of that

3  topic?

4      A.  No, sir.

5      Q.  When were you first made aware that MasterCard

6  was going to serve subpoenas on phone carriers?

7      A.  Sir, it's been a common -- I mean, if you -- if

8  I'm a defendant attorney and I'm looking at similar

9  cases, this has become fairly commonplace to see

10  defendants ask for affidavits about specific things.

11  There's a lot of record -- public record out there on

12  that.

13      Q.  Yeah.  But my question is:  When did you first

14  become aware that MasterCard was going to serve

15  subpoenas for depositions in this case?

16      A.  Sir, I can't answer that.  I just don't know

17  for sure when I became aware.  It's a long process.  I

18  know it's been going on for a while.

19      Q.  One of the documents you relied on -- and this

20  is Exhibit B, Mr. Sponsler -- was the order allowing

21  MasterCard's motion for discovery.  And it was entered

22  May 25th, 2022, and it's paragraph 11 of your materials

23  reviewed and relied upon, and trust me it's there.  Do

24  you recall the date the first subpoena was served by

25  MasterCard in this case?

Page 24

1          A.   I do not, sir.

2               MR. SOLBERG:   Ryan, let's go back to Exhibit C

3     of the supplemental report.   And if we could go to the

4     definition section, definition 3.   Is everybody getting

5     blocked by pictures on the right?   As I look at these

6     exhibits I'm getting cut off.   Can you guys see those

7     documents in full?

8               THE WITNESS:   I can.

9               MR. MONTCALM:   Yeah.   Me, too.

10              MR. SOLBERG:   You can?   Okay.

11              THE WITNESS:   But I've got two different

12    monitors.

13    BY MR. SOLBERG:

14         Q.   Here's my question, Mr. Sponsler, and I'm going

15    to read to you:   "Definition 3 provides online fax

16    service refers to a cloud-based service consisting of a

17    fax server or similar device that is used to send or

18    receive documents, images, and/or electronic files in

19    digital format over telecommunications facilities that

20    allows users to access the faxes the same way that they

21    do e-mail:   By logging into a server over the Internet

22    or by receiving a PDF attachment as an e-mail."   Do you

23    see that?

24         A.   I see it, sir.

25         Q.   And I read it correctly.   Right?   You're

Page 25

1    supposed to say yes to that, Mr. Sponsler.  I asked you

2    if I read it correctly.

3         A.  Oh, I'm sorry.  Yes.  You read it correct.

4         Q.  Is it your understanding that that definition

5    was taken from the Amerifactors' ruling?

6         A.  I have no idea, sir.  I didn't have anything to

7    do with this process, so I don't know.

8         Q.  Mr. Sponsler, you're not aware of an online fax

9    service that does not require the use of a fax server,

10   are you?

11        A.  That an online fax server does not require the

12   use of a fax --

13        Q.  No.  Just the opposite.  That an online fax

14   server does require the use of a fax server.

15        A.  Oh, yes, sir.

16        Q.  And to subscribe to an online fax service the

17   subscriber needs to access the Internet.  Correct?

18        A.  Yes, sir.

19        Q.  All right.  You're familiar with Groove3

20   standards for faxing?

21        A.  Yes.

22        Q.  Groove3 employs the T30 protocol.  Correct?

23        A.  Yes, sir.

24        Q.  Is it your understanding that the faxes at

25   issue in this case were sent from a telephone, facsimile

1    machine, computer, or other device to 10-digit telephone

2    numbers over telephone lines to equipment that could

3    perform the T30 protocol?

4          A.  Yes, sir.

5               MR. MONTCALM:  Objection to form.

6               MR. SOLBERG:  Did you catch that answer?

7    BY MR. SOLBERG:

8          Q.  Your answer was, Yes, sir to that question?

9          A.  Yes, sir.

10         Q.  And whether that process was successful, that's

11   demonstrated by fax logs in this case.  Correct?

12         A.  Whether the faxes were successful?

13         Q.  Successfully transmitted from -- and we're

14   going to get to it -- but from Point A to Point B?

15         A.  Yes, sir.

16         Q.  And again, I got ahead of myself.  What I was

17   going to ask you and will ask you is:  You and

18   Mr. Biggerstaff in the course of your work regarding

19   TCPA fax cases, you talk about Points A, B, and C.

20   Correct?

21         A.  Correct, sir.

22         Q.  And what you're describing is what happens

23   during a fax transmission and thereafter is the Point C?

24               MR. MONTCALM:  Objection to form.

25   BY MR. SOLBERG:

Page 27

1        Q.  Did you catch that last question?

2        A.  Yes.  I think so, sir.  You're saying that

3    Point C is thereafter the fax is received.

4        Q.  Successfully transmitted.  All right.  Let's

5    talk about what happens with an online fax server using

6    Point A and Point B.  When a fax is transmitted from

7    Point A, which is a telephone facsimile machine,

8    computer, or other device, and it arrives at the online

9    fax service, Point B, it arrives at the online fax

10   service's fax server, which is the equipment that

11   performs the T30 protocol and converts the signal

12   received over the telephone line into a PTD or a TIFF.

13   Is that right?

14       A.  Yes, sir.

15           MR. MONTCALM:  Objection to form.

16   BY MR. SOLBERG:

17       Q.  Can you tell me what a PDF is, Mr. Sponsler?

18       A.  Yeah.  A PDF is a -- something document form.

19   It's an abbreviation for a specific type of conversion

20   into a readable, some of them editable, format.  The

21   name -- I use them every day, but the name escapes me.

22   I think it's portable document format.

23       Q.  Yeah.  I was just going to say.  It is portable

24   document format.

25       A.  Yeah.

1    Q.  Now, as to an online fax service, when a fax is

2    transmitted from Point A to Point -- from Point A and

3    arrives at Point B, the fax service doesn't receive

4    something that's essentially an e-mail; it receives a

5    fax.  Is that right?

6          MR. MONTCALM:  Objection to form.

7    A.  It does.  Yes, sir.

8    BY MR. SOLBERG:

9    Q.  Now, in going back to the definition up top,

10   the reference to -- and when I say that -- strike that.

11         Going back to the definition of online fax

12   service in the subpoena by MasterCard, the reference to

13   logging into a fax server over the Internet means

14   logging into the portal of an online fax service.  Is

15   that correct?

16   A.  I believe so, sir.

17   Q.  And when a subscriber is logged into the online

18   fax service's portal is the subscriber viewing an image

19   of the fax on a server maintained by the online fax

20   service?

21   A.  Potentially.  They can do other things when

22   they're logged into the portal, but potentially they

23   could.

24   Q.  The subscriber -- and again, referencing the

25   definition of online fax service up top -- the

Page 29

1    subscriber to an online fax service can also view the

2    fax as an attachment to an e-mail that is sent to the

3    subscriber's e-mail address.  Is that right?

4         A.  That's correct.

5         Q.  And it's this combination of equipment, the

6    online fax service, server's fax server, and telephone

7    lines, together with the computer through which the

8    subscriber goes onto the Internet to log into the online

9    fax provider's server or to access -- to access the

10   port- -- you know what?  I'm going to try that again.

11   Strike that.

12        The online fax service, fax server, and

13   telephone lines and the computer of the subscriber, that

14   allows the subscriber to either go onto the portal to

15   look at a fax or receive it by e-mail, and it also

16   allows the subscriber to view, delete, or print the fax.

17   Is that right?

18        MR. MONTCALM:  Objection to form.

19        A.  Among other things, yes, sir, those things.

20   BY MR. SOLBERG:

21        Q.  Now, in order for an online fax service to

22   provide its services it has to be able to access the

23   Internet.  Is that correct?

24        A.  Yes.

25        Q.  And one of the things an online fax service

```
 1   does is it sends e-mails over the Internet.  Is that
 2   right?
 3        A.  Yes.
 4        Q.  And if an online fax service can send an e-mail
 5   over the Internet the online fax service has the
 6   capacity to print because it can access a printer over
 7   the Internet.  Isn't that correct?
 8            MR. MONTCALM:  Objection to form.
 9        A.  I'm not assuming they can access a printer over
10   the Internet.  They would have to have some printer that
11   they wanted to access or that they have access to.  So,
12   yes, they could.
13   BY MR. SOLBERG:
14        Q.  And what I'm talking about is capacity to
15   print.
16            MR. MONTCALM:  Objection to form.
17   BY MR. SOLBERG:
18        Q.  So if you can send an e-mail over the Internet
19   you have the capacity to print?
20            MR. MONTCALM:  Objection to form.
21        A.  Well, it's a stretch, but you have a capacity
22   with no use to print.  No useful capacity, but...
23   BY MR. SOLBERG:
24        Q.  But capacity nonetheless.  Isn't that correct?
25            MR. MONTCALM:  Objection to form.
```

1      A.  Well, sir, the Internet affords unlimited

2  capacity of things that you might do that are not useful

3  to your business.  So I mean, printing is just one

4  thing, but you can do a myriad of things, so...

5  BY MR. SOLBERG:

6      Q.  So, yes, you have capacity to print.  That's

7  one of the myriad of things you can do.  Correct?

8          MR. MONTCALM:  Objection to form.

9      A.  Yes, sir.

10  BY MR. SOLBERG:

11      Q.  Let's go to Exhibit 1 of your supplemental

12  report.  Well, strike that.

13          Let's go to Exhibit G of your supplemental

14  report, Mr. Sponsler.

15      A.  I don't have any of those, sir, here in front

16  of me.

17      Q.  Mr. Sponsler, were you the one who decided what

18  exhibits to include in your supplemental report?

19      A.  Yes, sir.  I mean, I think I limited the

20  exhibits to larger carriers.  I didn't try to include

21  all of them.  Or carriers that indicated something that

22  I thought was relevant.

23      Q.  But you were the one who selected the exhibits?

24  Ken Sponsler, and no one else?

25      A.  I'm not -- you know, definitively answer that?

Page 32

1    I don't remember.  I know that I have done many other

2    reports with exhibits like this from the same carriers,

3    so I probably have a list of these that I would use in

4    any case.  But I specifically don't remember.  It would

5    have been reasonable for me to select these.

6         Q.  Let's go to Topic 1 if we could.  And once

7    again, I will read to you, Mr. Sponsler.  "Topic No. 1,

8    for each telephone number on the list below identify

9    whether or not you provided online fax service to the

10   subscriber of that telephone line from December 18th,

11   2015, to December 23rd, 2015."  Do you see that?

12        A.  Yes, sir.

13        Q.  And there's an asterisk.  And below that it

14   says, "If any of the phone numbers listed below were

15   assigned to wholesale customers please identify the

16   wholesale customer for each number."  Do you see that?

17        A.  I see that, sir.

18        Q.  Now, you testified that you've been involved in

19   the subpoena process in several cases.  I think we've

20   talked about them earlier.  You know then, as you were

21   going into your report in this case, that plaintiff --

22   when they define the alternative class plaintiff

23   excludes wholesalers or resellers of fax numbers.  Were

24   you aware of that?

25        A.  No, sir.  I had never seen this.  And I wasn't

Page 33

1    even sure what it was, to be honest, because it wasn't a

2    numbered topic.  It appeared to be associated with the

3    first question because that's where the asterisk was,

4    and so I didn't understand how that -- it really wasn't

5    clear to me what that was, sir.

6         Q.  And you've addressed the subpoena process in

7    Sharfman versus InfuCare and in Brust versus Opensided.

8    Can you remember those cases?

9         A.  I remember being in those cases.  Yes, sir.

10        Q.  And as plaintiff conducted its subpoena process

11   in those cases plaintiff -- for the alternative class B

12   where plaintiff excludes online fax service providers,

13   isn't it your understanding that plaintiff excludes

14   wholesalers or resellers of fax numbers as part of that

15   process?

16            MR. MONTCALM:  Objection to form.

17        A.  Yeah.  I don't recall that, sir.

18   BY MR. SOLBERG:

19        Q.  Well, your report here anticipates that.  Does

20   it not?  If you go to paragraph -- paragraph 37 of your

21   report seems to me anticipates exclu- -- or anticipates

22   wholesalers or resellers.

23            MR. MONTCALM:  Objection to form.

24        A.  37 does, sir?

25   BY MR. SOLBERG:

Page 34

1        Q.   Yes.   If you could read that?

2        A.   I'm not sure it's anticipating wholesalers,

3   sir.  Are you showing me the --

4        Q.   I'm showing you a paragraph number.

5        A.   37.  Is that right?

6        Q.   37.  It says, "Online fax services subscriber."

7        A.   Yes, sir.

8        Q.   Now, that's a situation where an online fax

9   service provider has obtained numbers from a provider

10   that would sell -- resell -- would sell numbers to them.

11        A.   Sir, I meant this in a different way.

12        Q.   How did you mean it?

13        A.   Well, I'm describing that someone could use an

14   online fax service as a subscriber to the service other

15   than obtaining those services directly from their

16   carrier.

17        Q.   And how would they obtain -- how would the

18   online fax service provider obtain a number to provide

19   to a subscriber?

20        A.   It could be a ported number from the

21   subscriber, it could be a number that is transferred

22   from the subscriber to the online fax service, or they

23   could ask the online fax service for a new fax number.

24        Q.   Do you understand -- you don't understand as

25   you're testifying here today what's meant by the term

Page 35

```
 1   wholesaler of phone numbers?
 2            MR. MONTCALM:  Objection to form.
 3        A.  Do I -- could you repeat that question, sir?
 4            MR. SOLBERG:  Could the court reporter repeat
 5   that question?
 6            (Question was read back by the reporter.)
 7   BY MR. SOLBERG:
 8        Q.  You don't understand what's meant by the term a
 9   wholesaler or reseller of fax numbers?
10            MR. MONTCALM:  Same objection.
11        A.  I mean, I am familiar with wholesaling, I'm
12   familiar with some services could be wholesaled fax
13   numbers, but I do not understand that every online fax
14   service must be a wholesale customer.  I do not
15   understand that.
16   BY MR. SOLBERG:
17        Q.  Well, that wasn't --
18        A.  I thought you were asking me if I understood
19   you were asking me about wholesale fax numbers.
20        Q.  I think I can get a little more specific for
21   you, Mr. Sponsler.  Can you go to paragraph 51 of your
22   report?  And I will read to you paragraph 51.
23   "Additionally, some carriers, including Bandwidth,
24   indicated in their response that they are wholesalers,
25   and therefore they are selling their services to another
```

1   carrier."  Do you understand that?  What that means?  Or

2   what you meant?

3           A.  Yes, sir.

4           Q.  And what did you mean?

5           A.  Exactly what it says, sir.

6           Q.  That was my question that started out this line

7   is the question regarding -- in plaintiff's subpoena,

8   "If any of the phone carriers listed below were assigned

9   to wholesale customers, please identify the wholesale

10  customer for each number."  Having reviewed paragraph

11  51, do you have an understanding now of what was

12  requested in plaintiff's subpoena?

13          A.  Well, 51 -- I don't think 51 supports what

14  you're asking me.  It's my recollection that Bandwidth

15  was a wholesaler to other wholesale customers who then

16  may have been online fax providers that Bandwidth didn't

17  have any direct customer relationships.  They didn't

18  have -- they had no idea who was associated with a

19  particular number.  I believe that was what --

20          Q.  Exactly.  Exactly.  So they were a wholesaler.

21  Correct?

22          A.  It says they were a wholesaler.

23          Q.  Now, when the order came down on May 25th,

24  2022, to allow MasterCard to do additional discovery did

25  you have any input as to what form or what information

Page 37

1    that discovery would take?

2        A.  I'm not sure what you mean by additional

3    discovery.  If it was some legal process or something,

4    I'm not sure I was involved in any of that.

5        Q.  All right.  As we go back to Exhibit C of your

6    supplemental report, and in particular to Roman Numeral

7    III, deposition topic, affidavit topic, and/or document

8    request, do you see those two requests or topics?

9    Affidavit topics or document requests, do you see those?

10       A.  Yes, sir.

11       Q.  Are you aware of anything that would have

12   prevented MasterCard from inquiring, via a deposition

13   topic or the rest of it up top there, inquiring

14   regarding wholesalers of fax numbers?

15       A.  I don't know how to answer that, sir.  I'm not

16   sure what you're asking me.

17       Q.  And so we can wrap this part of it up I'll ask

18   you again just so we clarify:  You didn't have any input

19   whatsoever in the subpoenas served by MasterCard in this

20   case?

21       A.  No, sir.

22       Q.  Did you review any documents generated

23   regarding the subpoenas for depositions served by

24   MasterCard?  And I'm not trying to trick you here.  Let

25   me tell you what you describe.  In paragraph 7 of your

1   materials reviewed and relied upon you say, "Documents

2   produced by MasterCard in connection with the subpoena

3   process, including the telecarrier's responses to

4   MasterCard's subpoena and nonsubpoena outreach."  And

5   you identify -- there's a Bates stamp there, and it's 1

6   to 277.  Do you see that?

7        A.  Yes, sir.  But that's referring to something

8   different.  When we did our analysis of the responses

9   from the carriers we included in that response to

10  plaintiffs' subpoenas as well as MasterCard subpoenas

11  and nonsubpoena outreach, which I think was described as

12  e-mails and maybe calls, things like that.  I don't know

13  if that's what you're referring to.

14       Q.  So in going back to what you just said,

15  nonsubpoena outreach, MasterCard produced documents

16  regarding phone calls they had with subpoena

17  respondents, among other things, examples of

18  declarations, and so forth, they produced quite a few

19  documents.  I believe it was over 5,000.  Now, did you

20  have occasion to review any of those documents?

21       A.  We reviewed all of the documents that were

22  relevant to the analysis that we provided, which was

23  from plaintiffs as well as defendants.

24       Q.  Do you recall being provided those -- and I'll

25  just say 5,000-or-so pages of documents by MasterCard?

Page 39

1      A.  If the pages had any information in them that
2   related to the determination of the responses, then yes,
3   we would have reviewed those.  Now, there could have
4   been some that we didn't that maybe weren't responsive
5   or didn't have any information useful to what we were
6   trying to do, so I can't say if I saw them all.
7      Q.  Going back to Topic 1 of MasterCard subpoena,
8   and this is --
9          MR. SOLBERG:  This is Exhibit 3, Ryan, page --
10  and again, we're right back at the Roman Numeral III,
11  and I'm just going to abbreviate, deposition topic.
12  BY MR. SOLBERG:
13     Q.  Just to refresh our recollection here I'm going
14  to tell you again what this says.  "Whether you have any
15  information or mechanism to determine whether any
16  subscribing fax number identified in plaintiffs'
17  subpoena used an online fax service or standalone fax
18  machine to receive faxes on the dates identified in
19  plaintiffs' subpoena or confirmation that no such
20  information or mechanism exists."  We're getting there,
21  Mr. Sponsler, but -- there you go.  So what I had just
22  read, Mr. Sponsler, was Topic No. 1.  Is it fair to say
23  you're quite familiar with the TCPA fax provisions?
24     A.  I'm sorry.  I'm just reading this again here.
25  Okay.

Page 40

1      Q.  Go ahead.  I'm sorry?

2      A.  I was going to ask the reporter to read back

3   your question.  I'm sorry.

4          (Question was read back by reporter.)

5      A.  I am familiar with the TCPA fax provisions.

6   BY MR. SOLBERG:

7      Q.  And the TCPA prohibits the use of, and now I'm

8   quoting, "any telephone, facsimile machine, computer, or

9   other device to send to a telephone facsimile machine an

10  unsolicited advertisement."  And I'm citing 47 U.S.C.

11  227b1c.  Now, what I just read, does that sound familiar

12  to you?

13     A.  Yes, sir.

14     Q.  And it's your understanding that the

15  prohibition I just read prohibits sending unsolicited

16  advertisements, and it doesn't say anything about

17  receiving them.  Is that correct?

18         MR. MONTCALM:  Objection to form.

19     A.  What you just read, yes.

20  BY MR. SOLBERG:

21     Q.  Mr. Sponsler, are you aware of whether the TCPA

22  requires that an unsolicited fax advertisement be

23  printed to be a violation of the TCPA?

24         MR. MONTCALM:  Objection to form.

25     A.  If it were printed it would be a violation?

Page 41

1   BY MR. SOLBERG:

2        Q.   No.   I'm asking:   Is printing a requirement for

3   there to be a violation of the TCPA?

4             MR. MONTCALM:   Objection to form.

5        A.   Well, I don't want to get into a legal question

6   here -- answer, but I know that the TCPA exemptions for

7   online fax services discusses that online fax services

8   do not have the ability to print and that the harms that

9   the regulations attempted to govern were not in play,

10  such as tying up a phone line, using paper, using ink,

11  all that stuff.   That was all in the commentary of

12  Amerifactors and Ryerson.

13  BY MR. SOLBERG:

14       Q.   And getting back to my question, is it a

15  requirement that a fax be printed in order for there to

16  be a violation of the TCPA unsolicited fax provisions?

17  If you don't know, just say you don't know.

18            MR. MONTCALM:   Objection to form.

19       A.   Yeah.   I don't know.   I mean, it's a part of

20  the harms that were described and the reasoning for the

21  Junk Fax Prevention Act.   I mean, people can print a fax

22  regardless of how -- if they receive it by e-mail or any

23  other way, they can print it.

24            MR. SOLBERG:   Okay.   You know what?   This is a

25  good time to -- if it's okay with everyone here, let's

Page 42

1   take about five minutes.  Is that all right?

2           THE WITNESS:  Yes, sir.

3           MR. MONTCALM:  Wallace, can we make it 10,

4   please?

5           MR. SOLBERG:  You got it.

6           (Break was taken.)

7   BY MR. SOLBERG:

8       Q.  Mr. Sponsler, directing your attention to

9   paragraph 33 of your supplemental report, which I

10  believe is on the screen in front of you, and I will

11  read this to you:  "The fact that the carrier does not

12  itself provide the online fax service," when you say

13  OFS, online fax service, "does not mean that the carrier

14  subscribers must have received the fax on the standalone

15  fax machine.  There are multiple ways that a fax

16  recipient may receive a fax other than on a standalone

17  fax machine."  Do you see that?

18      A.  I do, sir.

19      Q.  All right.  Let's move to the first one, which

20  you have in paragraph 34 is call forwarding, and you

21  state, "Carriers do not know whether their subscribers

22  utilize call forwarding to have their faxes forwarded to

23  an online fax service provider.  In that case the

24  telephone carrier would reflect that the customer is a

25  regular subscriber of telephone services and would have

1    no need" -- "no record that the telephone number is used

2    for OFS."  Strike the "no need."  That was a mistake.

3    Just no record is what it should have been.

4    Mr. Sponsler, when you call forward a fax line to an

5    online fax service the subscribe-to number remains

6    working with your current provider but is programmed to

7    forward all incoming calls to the new online fax

8    service.  Is that right?

9         A.  Yes, sir.

10        Q.  And when you call forward your fax number to an

11   online fax service you're not only paying the current

12   provider for the fax line, your call forwarding, you're

13   also paying the online fax service for its service as

14   well.  Correct?

15        A.  Yes, sir.  But it's worth it to a lot of

16   people.

17        Q.  Regardless -- all right.  I'm going to move on.

18   Busy signals.  When you call forward your fax number to

19   an online fax service you may receive busy signals

20   because call forwarding can only forward one call at a

21   time.  Is that correct?

22        A.  Yes.  Call forwarding forwards one number at a

23   time.  Yes, sir.

24        Q.  And, again, because of that you can get busy

25   signals.  Correct?

1      A.  Are you meaning busy signals from..

2      Q.  From the call forwarded number to the online

3  fax service.

4      A.  While the transmission is going on to the

5  online fax service.

6      Q.  Now, let me ask it again.  If you have call

7  forwarding to an online fax service from a fax number

8  the call to the call-forwarded number could get a busy

9  signal?

10      A.  Yes, sir.

11      Q.  Now, when you call forwarding -- when you call

12  forward a number doesn't the forwarded call go through

13  an extra switch?

14      A.  I'm sure it does, sir.  Yes.

15      Q.  And so when you call forward to an online fax

16  service does that process potentially degrade fax

17  quality and result in more failed faxes as a result of

18  the expanded travel of the fax?

19      A.  I've never seen any evidence of that, sir.  No.

20      Q.  Is it a possibility?

21      A.  I would never say that anything is not

22  possible.  But, you know, it's nothing that I have read

23  or heard anything about it being a problem associated

24  with call forwarding.

25          MR. SOLBERG:  Bear with me for a second here.

Page 45

1          THE WITNESS:  Yes, sir.

2     BY MR. SOLBERG:

3          Q.  You've been deposed in several -- strike that.

4               You've been involved in the subpoena process in

5     several cases.  Correct, Mr. Sponsler?

6          A.  Well, it depends on your definition of

7     involved.  I've been in cases where the subpoena process

8     was certainly involved.  Yes.

9          Q.  And you've been deposed regarding the subpoena

10    process in several cases.  Is that correct?

11         A.  That's correct, sir.  Some of them by you.

12         Q.  Have you ever identified a single instance of

13    call forwarding a fax number to an online fax service in

14    all of those cases?

15         A.  Sir, as I've said here, call forwarding is

16    something that I know exists; I know it's used.  The fax

17    companies themselves, the online fax services, talk

18    about call forwarding, how it can be done.  And carriers

19    are largely not aware, so it's not one of the questions;

20    it's not something that they would be aware of.

21         Q.  My question is:  Are you aware of a single

22    instance in all of these cases that you've testified in,

23    a single instance of call forwarding from a fax number

24    to an online fax service?

25         A.  It's a void in which I can't answer.  I mean,

1    it's not directly addressed by the carrier because they

2    don't know, and so I don't know how to answer that

3    question.  It's not something -- it's not a point of

4    information that is sought after in the discovery here.

5          Q.  But again, Mister -- I guess what I'm saying is

6    I think it's a yes-no question.  You either can point to

7    a particular fax number that was call forwarded to an

8    online fax service in all these cases or you cannot.

9    And that's my question:  Can you?

10          MR. MONTCALM:  Objection to form.

11          A.  Well, it's just an unknown quantity here, so I

12    don't think it's yes or no.  It's just unknown.  It's

13    another area of nonresponse, is all I can say.  I don't

14    want to say that I haven't come across an instance

15    because the responses don't address it.

16    BY MR. SOLBERG:

17          Q.  What responses?

18          A.  The subpoena responses or the -- you know, the

19    work that the defendants did in this case.  It's not an

20    area that has been addressed, so I don't know if the

21    answer is no or yes.

22          Q.  With that in mind, Mr. Sponsler, if we go to

23    paragraph 36 of your report you say, "It is very likely

24    that the fax-forwarding feature was used by a number of

25    the recipients of the subject faxes."  What's the basis

Page 47

1    of that assertion?

2        A.   It is a -- number one, is the fact that I have

3    confirmed with numerous online fax service providers

4    that they do process telephone numbers that have been

5    transferred, they have that capability.  The only thing

6    I can think of as to why they have that capability and

7    offer it is because it is something that their customers

8    want.  So otherwise, they wouldn't even talk about it.

9    They wouldn't make it available.

10       Q.   What do you mean by transferred?

11   [Unintelligible].

12       A.   Yes.  Transferred.  I'm sorry.  Yes, sir.

13       Q.   Are you using the word transfer synonymous with

14   call forwarding?  Or could transfer mean ported?

15           THE REPORTER:  I'm sorry.  I didn't hear the

16   beginning of that question.

17           MR. SOLBERG:  Strike it and I'll do it again.

18   BY MR. SOLBERG:

19       Q.   You used the word transfer, Mr. Sponsler.  Are

20   you using the word transfer to mean call forwarding or

21   does it mean something else?

22       A.   No.  I misspoke.  Call forwarding is the

23   correct term, sir.

24       Q.   When you say very -- strike that.

25           When you say by a number of the recipients,

Page 48

1    what do you mean?  What would that number be?

2           MR. MONTCALM:  Objection to form.

3       A.  It is unknown what the number would be, sir.

4    BY MR. SOLBERG:

5       Q.  And what's the basis of the use of the phrase

6    very likely?  What we've just been talking about?

7       A.  Yes, sir.  Exactly what we've been talking

8    about.  It is very likely.  There are benefits of

9    forwarding over porting.  Many benefits.

10      Q.  Such as?  Please can you give me some

11   specifics?

12      A.  Well, sir, when you port your number that

13   number -- you have to fill out a form from the online

14   fax service provided form that you authorized porting

15   your number to them, and you give up subscribership of

16   that number.  We also know that once you give up

17   subscribership there are some online fax services that

18   will not forward that number onto a -- or port it --

19   allow you to port it onto another online fax service or

20   even gain control of it again yourself.  So that's a

21   risk you take when you port.

22      Q.  Are you testifying that you have to give up

23   your particular phone number in order to port it?

24      A.  Yes.  When you port a number you are no longer

25   the subscriber of that number.

1          Q.  And is it your testimony here that if I have a

2     fax number and I want to port that fax number to an

3     online fax service, I have to give up that number to my

4     phone provider?  I'm not allowed to port that number to

5     an online fax service?

6               MR. MONTCALM:  Objection to form.

7          A.  You confused me with your question, sir.  Maybe

8     I was confused.

9     BY MR. SOLBERG:

10         Q.  You're not alone, Mr. Sponsler.  That was

11    inartfully worded.  I just want to have the testimony

12    clear.

13              It's your testimony that if I port a number to

14    on an online fax service I may be required to give up

15    that number and get a new one from the online fax

16    service.  Is that your testimony?

17         A.  No, sir.  My testimony is when you port your

18    existing fax number -- let's say you have it plugged

19    into a standalone fax machine -- when you port it to an

20    online fax service you have to fill out an authorization

21    from your current carrier that says that you authorized

22    porting that number away from your control and account

23    to the carrier associated with the online fax service.

24    Then the online fax service will use that number, your

25    number that you had, they will use that number in order

Page 50

1   to process faxes that come in received at that number.

2   Instead of it processing on your standalone machine you

3   will now receive an e-mail with the PDF or TIFF attached

4   to it, but you lose control of your number.  Even though

5   it's used by the online fax service they are the

6   subscriber to the number.  Now, you are no longer the

7   subscriber.  You are no longer billed for that number.

8       Q.  And when if I wanted to move to another online

9   fax service?  Could I port that number to a new online

10  fax service?

11      A.  The answer to that depends on the online fax

12  service.  Several have specifically denied that they

13  will do that, that that is now their number, but I don't

14  think it's universal that every online fax service

15  provider would not support it.

16      Q.  Who will not let you port your number?  Which

17  online fax services are you referring to?

18      A.  Primarily the J2 family of online fax services

19  that are owned by J2.  They have a -- seems to have a

20  universal policy of not reporting.

21      Q.  Anyone else?

22      A.  That's the one -- there's five or six in that

23  group that are major fax providers.

24      Q.  Let's move to paragraph 37 of your supplemental

25  report.  You state, "Another way in which users may

1   receive faxes using an online fax service other than

2   retaining those services from on online fax service

3   provider or other intermediary, which is itself the

4   subscriber to the fax number."  Did that make sense?

5   That felt funny at the end when I was reading it.

6        A.   Yeah.

7        Q.   Let me give it another shot.  "If a

8   supplemental" -- what?

9        A.   It felt funny to me, too.

10       Q.   All right.  In your supplemental report in

11  paragraph 37 you state, "Another way in which users may

12  receive faxes using an online fax service other than

13  obtaining those services directly from their carrier is

14  to receive those services from on online fax service

15  provider or other intermediary, which itself is a

16  subscriber to the fax number."  Do you see that?

17       A.   Yes, sir.

18       Q.   Is that the wholesaler --

19       A.   No.  This has nothing -- well, what I'm saying

20  is -- what I'm doing is describing even if a carrier

21  says, We do not provide online fax service or we do

22  provide it but this particular customer was not using

23  the service, I'm just introducing the fact that they can

24  use directly an online fax service who is not their

25  carrier, it's another online fax service or other

Page 52

1    intermediary, which itself is a subscriber to the fax

2    number.  So we're describing now a situation where you

3    may have ported your number and now they are the

4    subscriber to the fax number but you receive your faxes

5    at the number, or you're assigned a new fax number from

6    this other online fax service provider who is not the

7    carrier -- not your carrier.

8        Q.  Now, we talked about Bandwidth earlier today in

9    this deposition.  Would Bandwidth fit within paragraph

10   37 as you're describing it or characterizing it?

11       A.  Sir, if I'm recalling correctly, Bandwidth is a

12   reseller of wholesale numbers.  They do not provide fax

13   service themselves directly, but they wholesale to

14   providers of online fax services who then in turn have

15   customers.  I think their response was they have no

16   relationship with any online fax service customer

17   directly.

18       Q.  Yeah.  But my question is:  Does Bandwidth fit

19   within what you're describing in paragraph 37?

20       A.  Well, not -- I don't think so.  Or other

21   intermediary, which itself is the subscriber to the fax

22   number.  Yeah.  I mean, it could be.  It could be the

23   subscriber to the fax number, but then their an

24   intermediary, so they're selling that number to perhaps

25   an online fax service.

Page 53

1      Q.  Now, plaintiff has identified in addition to

2   Bandwidth two other entities, ATL and Peerless, as

3   wholesalers or resellers.  Are you aware of that?

4      A.  Yes, sir.

5      Q.  Are you aware of anyone else who would fit that

6   definition, wholesaler or reseller of fax numbers, in

7   this case besides Bandwidth, ATL, and Peerless?

8           MR. MONTCALM:  Objection to form.

9      A.  I can't remember them all.  I think perhaps

10  Lumens.  Lumens may have been one.

11  BY MR. SOLBERG:

12     Q.  We'll get to Lumens later on.  Other than

13  Lumens, anyone else?

14     A.  Not off the top of my head, sir.

15     Q.  Are there any notes you could refer to to

16  refresh your recollection as to that particular

17  question?

18     A.  I mean, there could be notes that aren't in the

19  record or something.  I mean, we may have -- I don't

20  know.  I'd have to --

21     Q.  Well, if you had discovered something like that

22  you would have certainly put it in your report, would

23  you not?

24          MR. MONTCALM:  Objection to form.

25     A.  Well, that issue that we're talking about right

Page 54

1  now was not something that I addressed.  The idea of

2  wholesaling and all of that, I didn't address it.

3  BY MR. SOLBERG:

4      Q.  I thought you did in paragraph 51.

5  Nonetheless, let's move on to the next question.  You

6  identify in paragraph 40 an application called Fax

7  Burner.  And what you say in paragraph 40, "Applications

8  such as Fax Burner as subscriber, as well as FaxBetter,

9  FaxZero, MyFax, and others facilitate sending and

10  receiving faxes without the need for a phone line or

11  standalone fax machine."  Do you see that?

12      A.  Yes, sir.

13      Q.  Are those applications online fax services?

14      A.  Well, they are -- in a way they are online fax

15  services, but it's more of a direct.  I mean, these are

16  all services that can -- you know, MyFax definitely is

17  an online fax service, but they have gone into the more

18  modern use of businesses where they can actually

19  interact with mobile phones, they'll set up file-sharing

20  situations for when faxes come in, so you would get

21  things over the Internet from them.  They use virtual

22  fax numbers.

23      Q.  These applications that you're describing in

24  paragraph 40, does the provider use a fax server and a

25  telephone line to provide its service?

Page 55

1      A.  No.  They are what you call nomadic VoIP

2   services, which are not tied to -- you know, they're

3   movable, they're not static VoIP, and so they take care

4   of -- they take advantage of that technology.  One of

5   the biggest ones is like Gmail, Yahoo.  They're all

6   users of that same -- it's an integration of these

7   e-mail service providers and with fax.

8      Q.  Do those applications use a fax server?

9          MR. MONTCALM:  Objection to form.

10  BY MR. SOLBERG:

11     Q.  And by applications I'm referring to the ones

12  listed in paragraph 40, FaxBetter, FaxZero, MyFax.

13     A.  Right.  So obviously, they would have to have

14  the capability of transcribing a fax, so there would be

15  a fax modem, which could be called a fax server.  Yes.

16     Q.  And faxes sent to and from these applications,

17  are they sent over a 10-digit telephone number?

18     A.  They are sent over a 10-digit telephone number.

19     Q.  So I'll ask you again:  What's the difference

20  as far as an online fax service that's described in the

21  subpoena and described in Amerifactors with what these

22  applications provide?

23     A.  These applications go beyond the traditional

24  understanding of an online fax service because of their

25  integration with IOS, with Android, with setting up

Page 56

1   file-share capabilities.  So they're not a standard

2   online fax service in the traditional way.

3        Q.  Would it be your understanding that these

4   applications are covered by the Amerifactors Bureau

5   order as far as the definition of online fax service?

6             MR. MONTCALM:  Objection to form.

7        A.  Well, I don't want to answer a legal question

8   here or give a legal opinion on this.  But what they

9   have in similarity to both of those rulings is that the

10  faxes are not automatically printed, they're not tying

11  up a phone line, they're not -- you know, all the harms.

12  And they can be received as an e-mail or through a file

13  share, so that the option of printing or storing or

14  deleting and all that is there just like online fax

15  service.

16  BY MR. SOLBERG:

17       Q.  And you also say in here that -- and I'm

18  reading the last sentence of paragraph 40.  "All of

19  these various methods allow users to simply view, store,

20  delete e-mail, or if desired print the fax images all

21  without the need of a phone line or standalone fax

22  machine."  Do you see that?

23       A.  I don't see where you're reading from, sir.

24       Q.  The last sentence of paragraph 40 on your

25  supplemental report.  Yeah.  Sorry about that.  I got

1    ahead of you.  There it is.

2         A.  I see that.  Yes, sir.

3         Q.  So these applications have the capacity to

4    print?

5         A.  Well, you have --

6              MR. MONTCALM:  Object to form.

7         A.  -- the capacity.  Not the application.

8              THE WITNESS:  I'm sorry I interrupted you.

9              MR. SOLBERG:  No.  You didn't.  You were

10   answering the question.

11        A.  Yes.  The application itself doesn't have the

12   capacity to print.  The user of the service can view,

13   store, delete, or print, whatever they want to do.  Same

14   as any e-mail within an attachment that you would get.

15   BY MR. SOLBERG:

16        Q.  Well, these applications, you just said they

17   send e-mails.  Correct?

18        A.  They send e-mails, they can notify you through

19   text that you have a fax in your file server that you've

20   set up on their servers.  Yes.  But these services don't

21   print.  It's you have the option of printing if you wish

22   to.

23        Q.  So again, if these applications or services

24   have the ability to send an e-mail, your prior testimony

25   is they have the capacity to print.  Correct?

Page 58

```
 1          MR. MONTCALM:  Objection to form.
 2      A.  Sir, if you have the access to the Internet you
 3  have the capacity for unlimited what you could do.  I
 4  mean --
 5  BY MR. SOLBERG:
 6      Q.  Well, I'm not worried about the unlimited; I'm
 7  worried about capacity to print.  So if you have access
 8  to the Internet and you can send e-mails you have the
 9  capacity to print.  Is that not true?
10          MR. MONTCALM:  Objection to form.
11      A.  I guess.  I mean, I guess you could print.  I'm
12  not sure what -- it doesn't -- it's a nonsensical
13  capability.  I'll just put it that way.  And I don't
14  even know if they would actually -- I mean, the only way
15  that you could print over the Internet is to have an
16  Internet-capable, e-mail capable printer that would
17  print if you designated it to go to that printer.
18  BY MR. SOLBERG:
19      Q.  You know, we've talked about this before, you
20  and me, Mr. Sponsler, and --
21      A.  Oh, yes, we have.  Yes, sir.
22      Q.  -- the testimony is -- and I'm getting to it
23  here, so if we could maybe short circuit this.  You
24  previously testified that if you can send an e-mail --
25  you have access to the Internet and you can send an
```

Page 59

1    e-mail you have the capacity to print.  Now, you've

2    referred to it as a useless capacity or whatever, but

3    nonetheless you've testified that if you can access the

4    Internet to send an e-mail you have capacity to print

5    because you can access a printer.  And I'll ask you

6    again:  Is that correct?

7              MR. MONTCALM:  Objection to form.

8         A.  That's correct.  I don't think I've said

9    anything different today other than describe it as being

10   something that -- yeah.  Not very useful, but sure.

11   BY MR. SOLBERG:

12        Q.  Let's go to paragraph 41, and I will read this

13   to you as well.  You say, "Even if a subscriber is not

14   using an OFS," and again, OFS is online fax service,

15   "they may utilize a local fax server or Intranet" -- not

16   Internet, Intranet -- "based fax server that delivers

17   faxes electronically to designated recipients rather

18   than to a standalone fax machine.  These local fax

19   servers can be configured to send e-mails to designated

20   employees rather than automatically printing incoming

21   faxes.  Multichannel fax server systems are capable of

22   receiving multiple faxes simultaneously without busy

23   signals."  So let me ask you this,

24   Mr. Sponsler:  Are the terms local fax server and

25   in-house fax server, are those the same?  Is it the same

Page 60

1    piece of equipment we're talking about?

2         A.  I mean, you could term it as in-house fax

3    server, I guess, or a premise-based fax server.

4         Q.  Yeah.  And I just wanted to make sure I wasn't

5    mixing something up.  So you've got local fax servers

6    and in-house fax servers.  They're referring to the same

7    thing?

8         A.  Yes, sir.

9         Q.  And you agree that a local fax server is not an

10   OFS, an online fax service.  Is that correct?

11            MR. MONTCALM:  Objection to form.

12        A.  Well, the reason that it's not is because it's

13   Intranet based, it's not Internet based.  So online

14   would not probably fit accurately to an Intranet-based

15   server.

16   BY MR. SOLBERG:

17        Q.  Is it your understanding that if an unsolicited

18   tax advertisement is fed to an in-house fax server

19   without permission, unsolicited, that fax violates the

20   TCPA?

21            MR. MONTCALM:  Objection to form.

22   BY MR. SOLBERG:

23        Q.  And I'm asking for your understanding.

24        A.  I'm sorry, sir.  You kind of backed up away

25   from the mic there, and I'm not sure I heard you

Page 61

1    clearly.

2         Q.  I'll try again.

3         A.  Okay.  Thank you.

4         Q.  Is it your understanding that an unsolicited

5    fax advertisement sent to an in-house fax server

6    recipient violates the TCPA?

7              MR. MONTCALM:  Same objection.

8         A.  That's a legal conclusion I don't want to make.

9    I put this here because it is, in fact, another

10   technology of which many that I've named here, and it is

11   very similar to what the TCPA has decided in

12   Amerifactors and Ryerson because, once again, these are

13   received, the IFE attachment, instead of automatically

14   printing.

15   BY MR. SOLBERG:

16        Q.  [Unintelligible] fax service e-mails?

17             THE REPORTER:  I'm sorry.  I didn't hear that

18   question.

19   BY MR. SOLBERG:

20        Q.  I lost your train of thought there,

21   Mr. Sponsler.  Let me backtrack.  I think you testified

22   that a local fax server is not an online fax service.

23   Is that correct?

24        A.  Yes, sir.

25        Q.  All right.  Now, going back to the no-mechanism

Page 62

1    declarations obtained with MasterCard subpoenas, and you

2    reference those in paragraphs 44, 45, 46, 47, 48, and

3    49.  And what they say is:  The phone carriers have said

4    they can't tell whether the telephone number received a

5    fax -- well, strike that.  Let me try this again.

6          All right.  Here we go.  The no-mechanism

7    declarations obtained with MasterCard subpoenas for

8    deposition state, "The carriers cannot tell whether the

9    customers associated with the telephone numbers used an

10   online fax service from a third party or was using a

11   standalone fax machine or any other technology to

12   receive the faxes."  Do you agree with that?  Is that a

13   fair assessment of what's stated?

14        A.  Yes, sir.  But that paragraph moved away from

15   me there.  Okay.  Right there.  Okay.  Yes, sir.

16        Q.  Now, let us assume -- without asking you to

17   make a legal assessment let's assume that sending a fax

18   to a recipient who has an in-house fax server is

19   contrary to -- it violates the TCPA.  Okay?  Do we have

20   that assumption?

21        A.  Okay.

22        Q.  Now, what's the difference?  If a fax violates

23   the TCPA when it's sent to an online -- I'm sorry --

24   sent to a local fax server and a fax violates the TCPA

25   when it's sent to a standalone fax machine, what's the

Page 63

1    difference between those two things as far as violating

2    the TCPA?

3            MR. MONTCALM:  Objection to form.

4       A.  Well, sir, that's your hypothetical.  That's

5    not what I believe.  You want me to assume that it does

6    violate it.  I can't explain that because I don't

7    believe the same way.  I believe it's still a fax that's

8    received as an e-mail attachment.

9    BY MR. SOLBERG:

10      Q.  On an in-house fax server?

11      A.  Yes, sir.  That's what I'm describing here.

12      Q.  It's Intranet.  Correct?  Is that what you

13   said?

14      A.  Yes, sir.

15      Q.  And are you aware of the 2003 order regarding

16   faxes received on fax servers or on computers?  Do you

17   recall that?

18      A.  I recall it somewhat.  Yes, sir.

19      Q.  And I'll read this to you, Mr. Sponsler.  And

20   I'll pull it up as an exhibit if I have to, but let me

21   read this.  This is paragraph 200 from the 2003 order of

22   the full FCC.  "We conclude that faxes sent to personal

23   computers equipped with or attached to modems and to

24   computerized fax servers are subject to the TCPA's

25   prohibition on unsolicited faxes."  And then the last

Page 64

1    sentence -- well, that's it.  Are you familiar with that

2    particular ruling by the FCC?

3         A.  I believe so, sir.  Yes.

4         Q.  And a fax that's sent to an in-house fax server

5    is just that, it's sent to an in-house fax server per

6    that order.  Isn't that correct?

7              MR. MONTCALM:  Objection to form.

8         A.  I thought you read it was sent to a computer

9    modem or -- I'm not sure if you mentioned in-house.

10   BY MR. SOLBERG:

11        Q.  I'll read it again.  Paragraph 200, and it's

12   the first line.  "We conclude that faxes sent to

13   personal computers equipped with or attached to modems

14   and to computerized fax servers are subject to the

15   TCPA's prohibition on unsolicited faxes."

16        A.  Well, they're not describing an Intranet-based

17   fax server there.

18        Q.  The last sentence says, "Fax servers enable

19   multiple desktops to send and receive faxes from the

20   same or shared telephone lines."  You know what?  Let's

21   make this an exhibit.

22             MR. SOLBERG:  Ryan, could you pull up

23   Exhibit 3?

24   BY MR. SOLBERG:

25        Q.  Can you see that, Mr. Sponsler?

Page 65

1      A.  Yes, sir.

2           MR. SOLBERG:  And, Ryan, you're going to scroll

3  down to the first, second, third, fourth page -- fifth

4  page, which is page 47 of the order, paragraph 200.

5  BY MR. SOLBERG:

6      Q.  And if you could, Mr. Sponsler, just review

7  paragraph 200 for yourself.

8      A.  Can you show me that footnote to the last line?

9           MR. SOLBERG:  You know what?  The chances of

10 this happening are one in a million, but I have -- the

11 last page of this exhibit has footnote 38, but I have to

12 give you another page, 124, and I will do that.  Why

13 don't we take a five-minute break here and I will locate

14 that page and I will show it to you.  Okay?

15          THE WITNESS:  Thank you, sir.

16          (Break was taken.)

17 BY MR. SOLBERG:

18     Q.  All right.  Mr. Sponsler, you wanted the

19 footnote 738, and I will read it to you in its entirety.

20 It says, "See Kaufman comments at 3.  Although fax

21 boards alone do not have the ability to transcribe text

22 onto or from paper, the Commission nevertheless

23 determined that fax modem boards, which enable personal

24 computers to transmit messages to or receive messages

25 from conventional facsimile machines or other computer

Page 66

1  fax boards are the functional equivalent of telephone

2  facsimile, next page machines," and it says, "see 1995

3  reconsideration order 10 FCC record," which is

4  abbreviated RCD, "at 12404-06, paragraphs 28 to 30."

5  That's what that says.

6      A.  Okay.  Thank you.

7      Q.  Here was my question or what should have been

8  my question -- and this is, again, operating on the

9  assumption that a fax sent to an in-house fax server

10 recipient violates the TCPA -- that's our assumption in

11 this question.  Here's the question:  If receiving an

12 unsolicited fax advertisement violates the TCPA, whether

13 it is received on a standalone fax machine or an

14 in-house, i.e. local fax server, what difference does it

15 make if the phone carriers cannot tell whether the

16 recipient received the unsolicited fax advertisement on

17 a standalone fax machine or local fax server?

18      MR. MONTCALM:  Objection to form.

19      A.  Well, sir, I don't believe that's what any of

20 them said.  They said they could not determine how any

21 of the faxes -- what technology any of them were

22 received.  I don't recall reading anything about a

23 premise-based fax server they didn't know if it was that

24 technology or not.

25 BY MR. SOLBERG:

1     Q.  No.  What I'm asking you, as the expert for

2  MasterCard, which is what difference does -- if both

3  scenarios violate the TCPA, a standalone fax machine

4  recipient and a local fax server recipient, if both

5  violate the TCPA what difference does it make as to

6  whether a telephone carrier can't tell the difference

7  between one or the other by looking at the records?

8          MR. MONTCALM:  Same objection.

9     A.  Well, sir, for one thing what we're reading

10  from is the 2003 order, and faxing technology has

11  changed and improved and broadened greatly between then

12  and 2015.  And I am not sure in 2003 how many or the use

13  of Intranet fax servers that did not print -- did not.

14  They sent an e-mail saying as what Amerifactors and

15  Ryerson was subscribing.  That's the reason I included

16  it in there as another means of receiving a fax that

17  would be relevant at the 2015 time period at issue here.

18  BY MR. SOLBERG:

19     Q.  No.  My question -- my question is this:

20  Assume that receiving -- being sent an unsolicited fax

21  on a local or in-house fax server violates the TCPA.

22  Just assume that.  Don't worry about the 2003 order,

23  just assume it.  If that's the case what's the

24  difference between an unsolicited fax advertisement --

25  strike that.  Let me try again.

Page 68

1           If that's the case what difference does it make

2      if a phone carrier can't tell whether a recipient of an

3      unsolicited fax advertisement received it on a

4      standalone fax machine or a local or in-house fax

5      server?

6           MR. MONTCALM:   Same objection.

7      A.   Well, I mean, that question is sort of

8      cornering those two methods.  I mean, it wouldn't make

9      any difference, but I mean, that's not what any of them

10     said.  They all said they can't determine how, not what.

11     So given your limited, you know, definition that it

12     would be a violation to have an Intranet-based fax

13     server, then if I were to assume that's true then it

14     would be a violation under your hypothetical.

15     BY MR. SOLBERG:

16     Q.   But my question is:  The fact that the phone

17     carrier can't distinguish between faxes received on a

18     standalone fax machine and faxes received on a local fax

19     server, what difference does that make if both

20     occurrences result in liability under the TCPA?

21          MR. MONTCALM:   Objection to form.

22     A.   The difference it makes is they cannot

23     determine either way -- any way online fax service --

24     any way they cannot determine.

25     BY MR. SOLBERG:

1      Q.  No.  We're not -- we're excluding online fax

2   service.  Again, I don't know -- let me do it this way.

3           MR. SOLBERG:  Could the court reporter read

4   back the last question I asked?

5           (Question read back by reporter.)

6      A.  Well, again, I'm introducing this type of

7   technology in this report that exists that perhaps

8   didn't in 2003.  But given your limited hypothetical

9   that it is without question a violation, then it

10  wouldn't make a difference that they -- because it's

11  just one of many, many other things that I've described

12  here that they can't determine how the fax was received.

13  BY MR. SOLBERG:

14     Q.  But if I heard you correctly, it doesn't make a

15  -- if both are a violation, the standalone fax machine

16  and the local fax server scenario I've described to you,

17  if both of them are assumed to be a violation it just

18  doesn't matter as to those two occurrences whether the

19  phone carrier can distinguish which way the fax was

20  received, on a standalone fax machine or a local fax

21  server.  Correct?

22          MR. MONTCALM:  Objection to form.

23     A.  Given your limited scope of the question, it

24  doesn't.

25  BY MR. SOLBERG:

1          Q.  Now, if we exclude that, if we exclude local

2     fax services, all that seems to be left -- well, strike

3     that.  Let me do this.

4               Your supplemental report at page 13, Opinion 1,

5     "It is not possible to determine which recipients

6     received the faxes through a standalone fax machine

7     simply by asking telephone carriers whether they,

8     themselves, provided online fax service to recipients of

9     the subject fax in December 2015."  Do you see that?

10         A.  No, sir.

11         Q.  Sorry about that.

12              MR. SOLBERG:  Page 13, Ryan, of 51.

13    BY MR. SOLBERG:

14         Q.  All right.  Did you have a chance to read that,

15    Mr. Sponsler?  It's A, Opinion 1.

16         A.  Yes, sir.

17         Q.  All right.  Now, if we exclude faxes received

18    from -- faxes received on a standalone fax machine and

19    we exclude faxes received on a local fax server am I

20    correct in stating what's different are the scenarios of

21    call forwarding, resellers, which you call online fax

22    services subscriber, and Fax Burner applications?  Am I

23    right about that?

24              MR. MONTCALM:  Objection to form.

25         A.  Given your hypothetical, yes.

Page 71

1    BY MR. SOLBERG:

2         Q.  I'm going to turn, Mr. Sponsler, to your

3    supplemental report in Exhibit E, and I want to walk

4    through the summary chart and ask you some questions

5    about that.

6         A.  Yes, sir.

7         Q.  Yeah.  I would suggest, Mr. Sponsler, if you

8    could pull up electronically your Exhibit E?  You might

9    want to do that.  I think that will make life a lot

10   easier.

11        A.  Yes, sir.

12        Q.  And I understand Counsel provided us with

13   Exhibit N, but let me walk through this anyway here.

14   I'm looking at Attachment No. 1 to Exhibit E, your

15   summary.

16        A.  The summary sheet?

17        Q.  Yes.

18        A.  Yes, sir.

19        Q.  And the first Column B, it's indicated number

20   with different carrier or customer, and there were 207

21   of those.  How does that number, that 207 number, affect

22   indicated-no on Column C?

23        A.  It's a different -- so again, sir, B through G

24   all relate to the question responses to if carrier

25   provides online fax service to the numbers that they

Page 72

1    received in the subpoena.  One of the possible responses

2    that we received was in Column B, which said that the

3    number was with a different carrier or customer that was

4    not their customer.

5        Q.  And as I'm looking at this, Mr. Sponsler, I

6    think I had my own question answered.  Because if you go

7    to Buckeye Communications, which is entry 31, do you see

8    that?

9        A.  Yes, sir.

10       Q.  All right.  Now, if you go to count the fax

11   numbers with response, which is Column I, the number's

12   475.  If you go to Column B, different indicated number

13   with different carrier customer, it's 127, and you go to

14   Column C indicated no, that's 313.  So having looked at

15   that my assumption is that you've already done the math

16   and what's left for Column C is 313.  Correct?

17           MR. MONTCALM:  Objection to form.

18       A.  Are you saying that the number 313 came from us

19   doing math?

20   BY MR. SOLBERG:

21       Q.  Well, you're excluding.  The total -- the count

22   of fax numbers for that particular subpoena responded

23   Buckeye Communications is 475.

24       A.  Correct.

25       Q.  You have 12 nonresponsive, 23 indicated fax

Page 73

1    line but unclear on the type of fax, 313 indicated no,

2    and 127 indicated number with different carrier or

3    customer.  As I look at this I -- so 313 is the answer

4    for indicated no?

5         A.  Right.  I'm trying to...

6         Q.  As you're looking at that, what I'm getting at

7    is I don't got to worry about the other columns as I

8    look at your chart here.  313 indicated no?

9         A.  Correct.

10        Q.  All right.

11        A.  No to the question that if they provided online

12   fax services.

13        Q.  Okay.

14        A.  The carrier.  Okay.

15        Q.  What is the column next to that?  Indicated no

16   analog fax.  What does that mean?

17        A.  Which column are you looking at, sir?

18        Q.  D.  Column D.  D as in "dog."

19        A.  Right.  Indicated no analog fax.  Yes.

20        Q.  So what does that mean?

21        A.  We did have some that indicated -- very few,

22   but it looks like a total of 47 or so, 42, indicated no.

23   Because I'm assuming they meant it's analog fax --

24   indicated no analog fax.  So no to the question if they

25   provided online fax services.

Page 74

1      Q.  So if I wanted to add up all the indicated noes

2  in this case would Column C and D be the sum of that?

3  Or would I just go with Column C if I want all the

4  indicated noes?

5      A.  Indicated noes to what, sir?

6      Q.  Provided online fax services to carrier.

7      A.  Okay.  No.  These are -- C is they indicated no

8  to that question, and D is they indicated no analog fax.

9  So I am assuming no to the question of online fax

10  service, and they're indicating analog fax.  47 of these

11  is what I can determine.

12      Q.  So if I'm looking at your summary chart here

13  and I want to compile the number of those carriers that

14  said they do not provide online fax service I would be

15  adding C and D together.  Right?  So it would be -- if

16  you go to the bottom of this thing it would be 275,828

17  plus 42?

18      A.  And what are you adding those together?  To

19  determine what, sir?

20      Q.  I want to come up with a number for the number

21  of carriers that indicated, No, they did not provide

22  online fax service on the dates in question.  And Column

23  C is obviously 275,828.  What I'm asking is:  Should I

24  add to that number the 42 indicated in Column D?

25      A.  No.  That's a different question.  That's a

1  different response.

2      Q.  So I should exclude that then if I want to come

3  up with the number that indicated no as to whether they

4  provided online fax services?

5      A.  It's my understanding of what they're saying is

6  if you look at Access 1 there were 66 of the numbers

7  that they indicated no, they did not provide an online

8  fax service.  Nine of the total number, which was 75 in

9  this case, they indicated no, they didn't provide an

10  online fax service, but it says "analog fax."

11      Q.  All I'm looking for is you to tell me what that

12  means.

13      A.  I have another sheet that I can -- that's sort

14  of a table that I could look at if you...

15      Q.  By all means.  Absolutely.  Go ahead.

16      A.  And we're looking at...

17      Q.  You were looking at Access 1, which is entry 4.

18      A.  Yes.  And what column was that again?

19      Q.  I'm trying to figure out what Column D means --

20      A.  E?

21      Q.  -- indicated no analog fax.  D as in "dog."

22      A.  Okay.  Yeah.  So all I'm getting here is that

23  these were the responses in the subpoenas, and so those

24  carriers in this case indicated that they believed that

25  nine of those numbers in the case of Access 1 were

1    analog fax.  That's my -- what I believe.

2         Q.  Now, let's concentrate on Column C, the

3    summary.

4         A.  C?

5         Q.  C.

6         A.  Okay.

7         Q.  And the total for that column is 275,828, as

8    I've said a few times here.  And that number -- and

9    correct me if I'm wrong -- that number represents the

10   phone carrier respondents indicating no for particular

11   phone numbers as to whether they provided online fax

12   service.  Am I right about that?

13        A.  I believe that's correct.  Yes, sir.

14        Q.  And I've told you during this dep that

15   plaintiff excludes resellers, and I will identify who

16   plaintiff has intended the resellers are.  ATL

17   Communications, which had 322 fax numbers, Bandwidth

18   which had 3,068 fax numbers.  Those numbers were put in

19   Column C.  Those numbers exist.  For instance, if you go

20   to Bandwidth you'll see -- and it's the 19th entry --

21   you'll see 3,068.  If you go to ATL Communications --

22        A.  Right.

23        Q.  -- which I'm trying to find, you'll see 322.

24        A.  Right.

25        Q.  Now, there's -- for Peerless there was -- if

```
1    you look at Peerless, there's no entry for them on the
2    indicated-no C Column.  Okay?  That's entry 118.
3         A.   Peerless is -- okay.
4         Q.   So if you subtract those two carriers,
5    Bandwidth and ATL Communications, that leaves you with
6    272,438.  You can do your own math, but just trust me on
7    that one.  And then if you go to Column F at the end it
8    says 287 indicated yes, but as I recall your expert
9    report trims that by one to 286.  And that -- if you
10   need to find that that's in paragraph 29.  You say,
11   "Carrier response has indicated 286 were provided with
12   OFS by the carriers."
13        A.   Yes, sir.  That's explained in my footnote 10
14   in my report.
15        Q.   That's fine.  So if we compare the noes to the
16   yeses in leaving out the 42 total from Column D the
17   percentage would be 286 divided by 272,438.  272,438.
18   And by my math that's approximately a 10th of a percent.
19   And what I'm doing is I'm comparing the yeses to the
20   noes.
21        A.   Okay, sir.  Yeses to noes in what -- what
22   columns are you talking about you're comparing?
23        Q.   I'm comparing Column C --
24        A.   Okay.
25        Q.   -- of the total, and I've subtracted the
```

```
 1    wholesalers and resellers -- but I'm comparing Column C

 2    to Column F.  So we have this universe of responses that

 3    are yes or no, and the yeses are less than one tenth of

 4    one percent -- about one tenth of one percent of the

 5    noes.  Do you see how I would do that mathematically?

 6         A.  You're saying the yeses are in Column E?

 7         Q.  No.  Column F.  If I said E that was my

 8    mistake.  It's Column F, indicated yes.

 9         A.  That they did provide an online fax service?

10         Q.  Yes.

11         A.  Okay.  Yes.

12         Q.  So you have those two numbers, the 275,828

13    minus the resellers, which as I've said were ATL

14    Communications and Bandwidth.  So once you subtract them

15    you have a number 272,438.  So by my math the 286 yeses

16    are about a tenth of a percent of the noes.

17         A.  Okay.

18         Q.  Can you see how that would operate

19    mathematically?  Is it understandable?  Whether you

20    agree with it or not, is it understandable

21    mathematically?

22         A.  I think so.  Yes.

23         Q.  All right.  So if those are the results --

24    well, period.  I'll stop right there.  Now, do you

25    consider yourself an expert in statistical analysis,
```

Page 79

```
 1    Mr. Sponsler?
 2         A.   No.
 3         Q.   And you're not credentialed in that regard?
 4         A.   No, sir.
 5         Q.   Let's go to Lumen, which -- let's look for
 6    Lumen in Column C.  And that's at entry 96.
 7         A.   96?
 8         Q.   Yes.
 9         A.   All right.
10         Q.   Now, the entry for Lumen indicated yes is 80.
11    In Column I, count of fax numbers with responses,
12    46,192.  And obviously, you know -- and nonresponsive is
13    46,112.  Can you locate all those numbers?
14         A.   I see that, sir.
15         Q.   So why were the 46,112 designated nonresponsive
16    rather than indicated no?
17         A.   They were not responsive to the question
18    whether they provided online fax services.
19         Q.   Lumen told or responded to the subpoena by
20    saying they provided online fax service for 80 numbers
21    and they identified those numbers.  Is that your
22    recollection?
23         A.   Well, yes.  But that's not the same as saying
24    that 46,112 were not.  There was no indication out of
25    the entire amount of what they were subpoenaed for.  The
```

1    only thing we had to go on was -- to that question, Did

2    they provide an online fax service, was their response.

3    They did not indicate any response to the rest.  That's

4    why it's 80 yes and not responsive to the question in G.

5           MR. SOLBERG:  All right.  Hey, Ryan, pull up

6    Exhibit 14.

7    BY MR. SOLBERG:

8        Q.  Let's take a look at this, Mr. Sponsler.

9        A.  Exhibit 14?

10       Q.  Not for you.  We'll pull it up.

11       A.  And by the way, sir, can I clarify my last

12   answer to you about statistical analysis?

13       Q.  Sure.

14       A.  In my view we're not presenting a statistical

15   analysis.  This is simply logging of the responses by

16   carrier and formulating all of those responses in these

17   three ways that you see here, summary, detail, and

18   multiple carriers.  We're not doing any statistical

19   analysis on that.

20       Q.  And please don't take this question the wrong

21   way because the work here is substantial, but this isn't

22   the work of an expert, is it?  You don't have to be an

23   expert to compile these numbers.  Am I right about that?

24           MR. MONTCALM:  Objection to form.

25       A.  It helps me to formulate and support my

Page 81

1    opinions is the reason that this is important to my

2    opinions and my report.

3    BY MR. SOLBERG:

4        Q.  But the statistics that you're compiling in the

5    summary and in the detail portion of this supplemental

6    report, you don't have to be an expert to do that.

7    Correct?  You just have to look at the responses and

8    enter the data.  Although we're going to disagree about

9    Lumen, but for the most part you don't have to be an

10   expert to do that, do you?

11       MR. MONTCALM:  Objection to form.

12       A.  You have to have experience with the subpoena

13   process and you have to also be very diligent in your

14   analysis and reviewing of those, what they're saying and

15   not saying and how they're saying it and what's omitted

16   and what is stated, maybe unclearly at times.  We have

17   multiple carriers with all the same numbers.  I mean,

18   there is a complexity to this that we have to understand

19   in order to do this.  So I don't -- I don't agree that

20   it's a simple, you know, just recording some simplistic

21   information.

22   BY MR. SOLBERG:

23       Q.  No.  I wasn't suggesting that it's simple.

24   What I was suggesting was in order to do the compilation

25   you certainly have to be diligent, you have to know what

Page 82

1   you're doing, but you don't have to be an expert?

2          MR. MONTCALM:  Object to form.

3       A.  Okay.  I disagree with that, sir.

4   BY MR. SOLBERG:

5       Q.  I've handed you what's been marked Plaintiffs'

6   Exhibit 14.  Could you take a look at that,

7   Mr. Sponsler?

8       A.  Let me pull this down and that down.  Let me

9   see if I can get to it this way.  Okay.  I see

10  Exhibit 14.

11         MR. SOLBERG:  So, Ryan, can you scroll through

12  the whole thing for him and then we'll double back?  I

13  think that's going to be it.

14  BY MR. SOLBERG:

15      Q.  All right.  Mr. Sponsler, have you ever seen

16  this document before?

17      A.  Yes, sir.

18      Q.  And by the way, I should have asked you this

19  sooner.  You have reviewed plaintiffs' production of

20  subpoenaed responses as well, and I believe you list

21  that on documents reviewed, but that's your

22  recollection.  Right?  It was 1 to 8- -- let me get the

23  exhibits.  It was TCSR 1 to TCSR 863.  Does that ring a

24  bell?

25      A.  Yes, sir.

Page 83

1      Q.  Now, if you look at what's been Bates stamped

2  862, this is a letter from Lumen to Ross Good from

3  Sean Maloney, their associate general counsel, and what

4  he says in paragraph 2, "Based on a reasonable search of

5  its records Lumen has determined that the subscribers

6  identified in the accompanying production utilized

7  online fax services provided by Lumen during December

8  2015.  Lumen is not able to determine if the subscribers

9  who utilized online fax services provided by Lumen

10 between December" -- "is unable to determine who

11 utilized online fax services provided by Lumen between

12 December 18th and December 23rd, 2015."

13      And again, they list the numbers. You can see

14 them after 863.  Now, if they're telling you who they

15 provided online fax service to and they're identifying

16 them, doesn't that mean that what they don't identify

17 they did not provide online fax service to?

18      A.  Sir, Lumen, I believe, is a wholesaler.  They

19 could have provided those other numbers to other

20 purchasers of wholesalers, cell services, who were

21 online fax providers who they have no insight into who

22 their customers were.  That could be an explanation.

23      Q.  You know Lumen's a wholesaler or you think

24 they're a wholesaler?

25      A.  No.  I believe -- yeah.  I think they're a

Page 84

1    wholesaler.  Yes.  Lumens.

2        Q.  So if they're not a wholesaler -- let's assume

3    that for a second.  If they're not a wholesaler would

4    those 46,112 nonresponsive would you believe they should

5    be moved into the indicated-no column?

6        A.  Sir, we didn't guess or assume anything when we

7    put these sheets together.  It was based upon this

8    response is how that got put together.  We didn't make

9    any assumptions as what it doesn't say or doesn't say.

10   We just had to go by what they said.

11       Q.  And again, to me what they said was there's

12   46,192, 80 of them we provided online fax service to,

13   which leaves the rest.  But I guess we disagree on that

14   one, and I'll leave it at that, but that's what I'm

15   talking about:  If you're not one of the 80 you're not

16   getting provided online fax service.  But you disagree

17   with that, and we'll leave the transcript to say what it

18   says.

19       A.  Yes, sir.

20       Q.  Let's go to your Opinion 2, Mr. Sponsler.

21   That's on your supplemental report at page 21.  What

22   your Opinion 2 is, "It is highly unlikely that a large

23   majority of recipients of the subject faxes used

24   standalone fax machines."  And you have paragraphs 54 to

25   62 underneath.  And what these paragraphs say -- I had

Page 85

1    intended on reading these to you, Mr. Sponsler, but I'll

2    save us that.  I would suggest that and ask that you

3    look through paragraphs 57 to 60.  And if we want -- you

4    want to take a couple of minutes to do that we could

5    take a very, very short break if that's all right?

6        A.  Okay, sir.

7        Q.  When we come back I'm going to ask you some

8    quick questions about those paragraphs.

9        A.  Okay, sir.

10           MR. SOLBERG:  All right.  Back in five.

11           THE WITNESS:  Okay, sir.

12           (Break was taken.)

13   BY MR. SOLBERG:

14       Q.  Have you had a chance to read those paragraphs?

15       A.  I did, sir.

16       Q.  It looks to me as you go through paragraphs 57,

17   58, 59, 60, you're extolling the virtues of online fax

18   services.  Is that a fair assessment of those

19   paragraphs?

20           MR. MONTCALM:  Objection to form.

21       A.  That's probably a mischaracterization, sir.

22   BY MR. SOLBERG:

23       Q.  How would you characterize it then or describe

24   it?

25       A.  I'm just saying that in this case, particularly

Page 86

1    in the medical industry, that it is highly likely that a

2    great number, if not the majority of these fax numbers,

3    went to online fax services for those reasons.

4         Q.  And is that your opinion in this case?

5         A.  Yes.  I think I've said that -- I think I wrote

6    in here something close to that.

7         Q.  Well, your Opinion 2 says, "It's highly

8    unlikely that a large majority of the recipients of the

9    subject faxes used standalone fax machines."  And you

10   did say in paragraph 62 at the end, "I conclude that a

11   significant percentage of the proposed class in this

12   case likely used an OFS," online fax service.  You see

13   that?

14        A.  Yes, sir.

15        Q.  So are those both your opinions in this case or

16   [unintelligible] just picking the opinion in -- that's

17   designated Opinion 2?

18        A.  Well, I would say that statement is in support

19   of Opinion 2.

20        Q.  Now, we've just covered the numbers regarding

21   no and yes as to online fax service, and we're -- the

22   equation for those is the yeses -- what percentage are

23   the yeses to the noes?  They're a 10th of a percent.

24   Now, does that affect your opinion that a significant

25   percentage of the proposed class likely used an online

Page 87

1    fax service?

2            MR. MONTCALM:  Objection to form.

3        A.  No, sir.  It doesn't change it at all.  All it

4    is telling me, which I have known for a long time after

5    many cases like this, is that very few carriers provide

6    online fax services themselves.  That's -- we've seen

7    that over and over again.

8    BY MR. SOLBERG:

9        Q.  And so to make up -- well, strike that.

10           Let me ask this:  Can you put a number on

11   significant percentage for me?

12       A.  If I could have I would have, sir.  But I'm

13   like you, I can't get any definitive information from

14   the carriers.  I do study the industry trends, I study

15   the online fax industry trends, and there is a heavy

16   focus on products and services aimed at the medical

17   space to serve the medical industry by the online fax

18   service.

19       Q.  And is that the basis of your opinion regarding

20   significant percentage?  What you perceive to be

21   movement in the industry towards OFS?

22       A.  Well, my basis is, you know, I've been

23   obviously involved in this for a long time and I follow

24   it; I study it.  So I know that these online fax

25   services have developed specific capability, HIPAA

Page 88

1    compliance, medical -- electronic medical record

2    technology, electronic health record technology that is

3    all aimed at the medical industry.  And they wouldn't do

4    that if they didn't have a lot of competition among them

5    and a lot of customers in the medical industry.

6        Q.  Now, these faxes, you're aware they were sent

7    in December of 2015.  Correct?

8        A.  I am, sir.

9        Q.  All right.  And at that point in time don't

10   these numbers -- strike that.

11           Don't you think if what you're saying is

12   correct there would be more than 286 out of 275,828 or

13   thereabouts?  Don't you think there would be more online

14   fax service yeses in Column F if it was as prevalent as

15   you say?

16           MR. MONTCALM:  Objection to form.

17   BY MR. SOLBERG:

18       Q.  And again, I'm talking in 2015.

19       A.  Sir, that response is to a question of whether

20   the carrier themselves provide online fax services.

21   That is such a miniscule amount of carriers that are

22   involved in that directly they can't compete with these

23   professional online fax service providers, nor do they

24   want to in my opinion.

25       Q.  So what you're left with outside of those

Page 89

1    answers is what we talked about earlier.  You either

2    have -- and you correct me if I'm wrong here -- you

3    either have call forwarding, wholesalers, or

4    applications like Fax Burner and what have you.  That's

5    what has to make up the difference from the 237 to

6    whatever level you consider a significant percentage.

7    Am I correct in that?

8              MR. MONTCALM:  Objection to form.

9         A.  No, sir.  You're not correct.

10   BY MR. SOLBERG:

11        Q.  How am I incorrect?

12        A.  This idea of wholesaling, I have seen nothing.

13   And Mr. Biggerstaff has provided no authority, no

14   citation, no anything to indicate his idea that every

15   single online fax service has to be also a wholesale

16   customer.  I don't know where he gets that from.  He

17   doesn't support it with anything.  I have never come

18   across such an idea and I don't believe it's true.

19        Q.  I think he was looking at the subpoena

20   responses where Bandwidth was identified as a wholesaler

21   and so was Peerless and so was ATL.  I think what

22   Mr. Biggerstaff was doing was taking these carriers at

23   their word as far as that response.

24             MR. MONTCALM:  Objection to form.  Is there a

25   question there?

Page 90

1          MR. SOLBERG:  I was answering his, but I get

2     it, Counsel.

3     BY MR. SOLBERG:

4          Q.  And again, I'll ask you again, are you aware of

5     any -- first of all, let me do this:  Can you define

6     wholesaler for me?

7          A.  A wholesaler is complex.  There are many tiers

8     of wholesalers.  But carriers are the genesis of

9     providing and servicing numbers that could be purchased

10    by other entities who are themselves wholesalers and

11    they can sell to other wholesalers who eventually may

12    sell to SMS providers, fax providers, and so on.  But it

13    doesn't mean that because no one answered the question

14    about wholesaling it doesn't mean that they're not

15    wholesaling or it also doesn't mean that in order to --

16    for a number to be associated with an online fax service

17    that it must be a wholesale situation.

18         Q.  So back to your Opinion 2, if I have -- if I'm

19    understanding you correctly, you still have those

20    categories of or scenarios outside of -- strike that.

21              What you've said is the fact that an online fax

22    service may not -- strike that.  We've been at this a

23    while.

24              The fact that a phone carrier says it did not

25    indicate or indicated no to selling online fax services

Page 91

1    to a particular number, you've presented certain

2    instances that you claim they just can't tell, we have

3    addressed call forwarding, and we've addressed -- for

4    lack of a better term, wholesaling -- and we've

5    addressed Fax Burner, the applications you talk about

6    with Fax Burner.  Is there anything else that I'm

7    missing regarding your opinion in this regard?  Those

8    categories of numbers.

9         MR. MONTCALM:  Objection to form.

10        A.  Sir, I don't think I've attempted to address

11   every possible faxing-capable technology that's emerging

12   every day and that was present in 2015.  That's not what

13   I'm trying to do here.  I am discussing in the report a

14   few of the major -- what I feel major ways that people

15   and companies can receive and send faxes today.

16   BY MR. SOLBERG:

17        Q.  Yeah.  And paragraph 34 is call forwarding,

18   paragraph 37 is online fax service subscriber, paragraph

19   40 is applications such as Fax Burner and subscriber,

20   and then the next is paragraph 41, local fax servers.

21   Now, all I'm asking is that -- did I miss anything else

22   in your report where you attempt to address the idea

23   that just because a phone carrier indicates it does not

24   provide online fax service there may be other ways that

25   a fax recipient can receive a fax other than on a

Page 92

1    standalone fax machine?

2         A.   Absolutely, sir.   The carriers -- the majority

3    of the carriers said the same thing, that they cannot

4    determine how someone may have received a fax.   They've

5    said the same thing, and that's what I have to go on,

6    what they have said.

7         Q.   And we've already covered the idea of

8    standalone fax and local fax server.   If those two --

9    well, strike that.   We've covered what we've covered

10   there.

11             Here's a question for you:   What do the fax

12   logs show?

13        A.   Fax logs show nothing about the type of

14   technology that receive the fax.

15             MR. MONTCALM:   Objection to form.

16   BY MR. SOLBERG:

17        Q.   I didn't ask you what they don't show; I asked

18   you, What do fax logs show?

19             MR. MONTCALM:   Hold on.   Ken, you can answer

20   this question, but we're getting pretty far away from

21   the subject of the supplemental report.   So I'm just

22   going to give you a sort of caution that if we go too

23   far afield I'll start instructing him not to answer.

24   BY MR. SOLBERG:

25        Q.   Go ahead, Mr. Sponsler.

Page 93

1          A.   I didn't spend a lot of time on the fax logs.
2     I mean, I wasn't asked to have an opinion about whether
3     or not the fax logs indicated successful or not.  That's
4     normally what I do with fax logs.  Typically they would
5     have shown a fax number, a date, maybe an ID number for
6     the campaign, it would have showed potentially the
7     number of pages, the length of seconds it took to fax.
8     There may have been some indicator of a successful fax
9     or a busy or a failure and so on.
10         Q.   I think I asked the question the wrong way.
11    And I'll ask this and then I will move on.  A fax log --
12    what a fax log demonstrates -- and you tell me if you
13    disagree -- it demonstrates that a fax was sent from a
14    telephone facsimile machine, computer, or other device
15    to a piece of equipment that could perform the T30
16    protocol and create an image of the fax.  The fax logs
17    will show if that transmission was successful.  Am I
18    right?
19         A.   I have seen fax logs that do not show whether
20    they were successful or not.
21         Q.   How about the fax logs in this case?
22         A.   Sir, I did not spend a lot of -- again, I
23    wasn't asked to analyze the fax logs or determine
24    whether from the logs whether or not there was a
25    question about the number of successful faxes, whether

Page 94

1    that was in dispute or not.  So I did not pay close

2    attention to fax logs because I wasn't asked to opine on

3    anything about it.

4         Q.  Let's move on to your Opinion 3, and this is at

5    page 23 of your report.  And you state, "It's not

6    possible to rely" -- "it is not possible to reliably

7    determine today the identities of the persons who or

8    business that allegedly received the faxes in 2015."  Do

9    you see that?

10        A.  Yes, sir.

11        Q.  One of the things you reviewed is --

12             MR. MONTCALM:  We can't hear you, Wallace.

13   BY MR. SOLBERG:

14        Q.  One of the things, Mr. Sponsler, you reviewed

15   was the declaration of Dorothy Sue Merryman.  Do you

16   remember that?

17        A.  Yes, sir.

18             MR. SOLBERG:  Ryan, could you pull that one up?

19   Exhibit 22.

20   BY MR. SOLBERG:

21        Q.  Did you take a look at that, Mr. Sponsler?

22        A.  Yes, sir.

23        Q.  Now, if you go to paragraph 14 of

24   Ms. Merryman's declaration you see, "Notice was

25   successfully sent by fax and U.S. mail to 97.7 percent

Page 95

1    of class members."  Do you see that?

2         A.  I see it, sir.

3         Q.  Based on that, what's the basis of -- and other

4    than what you say in -- tell me, what's the basis of

5    your opinion to -- strike that.

6              Do you have any reason to disbelieve

7    paragraph 14 of this declaration?

8         A.  Yes, sir.  The context of it.

9         Q.  What does that mean?

10        A.  That means that there is a U.S. address.

11   Unless they came in with bulldozers and mowed down the

12   houses or apartments it's still there, and U.S. mail

13   could have been successfully delivered to that address.

14   You can't argue with that.  The addresses are probably

15   pretty static.

16        Q.  Is that it?

17        A.  Yeah.  Well, I think the idea that of the class

18   members, 97.7 percent of the class members, is a

19   stretch.

20        Q.  How so?

21        A.  Well, because this statement doesn't clarify

22   who -- you know, that the addressees, who's our alleged

23   class members, received the mail.  Or whether that

24   business, that doctor's office, that medical practice

25   that was there in 2015 is still the same medical

1    practice.

2         Q.  Well, in paragraph 12 Ms. Merryman says, "Out

3    of 90,171 notices sent by mail 8,295 were returned as

4    undeliverable, and a total of 2,211 notices contained

5    call forwarding address information."  Do you see that?

6         A.  I see that, sir.

7         Q.  And Ms. Merryman also states that, "The class

8    settlement," which is who she's working with, "was

9    otherwise able to obtain additional address information

10   via skiptracing, and those items were subsequently

11   remailed."  Do you see that?

12        A.  I see that, sir.

13        Q.  Is the basis for your opinion in Exhibit C,

14   Opinion 3, it is paragraphs 63 to 76.  Is there anything

15   else besides that that you're relying on for that

16   opinion?

17             MR. MONTCALM:  Objection to form.

18        A.  Well, I think I've put everything in here

19   that's part of that opinion.

20   BY MR. SOLBERG:

21        Q.  Now, in paragraph 66 you say, "Dr. Shaw [ph]

22   attempted to send 500,000 faxes, and only 381,010 were

23   successfully sent.  That means 24 percent of the fax

24   numbers provided by CarePrecise were not reachable and

25   the subject faxes were being sent in December 2015."  Do

Page 97

1   you see that?

2        A.   I do, sir.

3        Q.   So you would agree that 381,010 faxes were

4   received.  Right?

5        A.   By who?  If 24 percent of the list had the fax

6   numbers wrong it is certain that a larger percentage may

7   have had a working fax number but the CarePrecise list

8   of who they were or what business they were was not the

9   same.  Because we're only looking at one category, the

10  fax number itself, where 24 percent were wrong.

11       Q.   But the 381,000 were right.  Correct?

12       A.   The fax number --

13       Q.   Yeah.

14       A.   -- but not the recipient.  Not the identity of

15  the business, the practice, the recipient.

16       Q.   And what's your basis for saying that?  Do you

17  have any specific evidence that the recipient was wrong?

18       A.   Yes.  I have evidence here that says 24 percent

19  of that list was out of date in terms of a very

20  fundamental fax number.  [Unintelligible] --

21       Q.   But the 24 percent --

22            MR. MONTCALM:  Please let him finish his

23  answer.

24       A.   It tells me that there are other elements of

25  that CarePrecise list that also would be very likely to

Page 98

1   be inaccurate as well.

2   BY MR. SOLBERG:

3       Q.  Those 24 percent, they're not part of the

4   class.  Correct?

5       A.  Sir, my opinions here in 66 and 7 relate to how

6   poorly that list was compiled and how outdated it was,

7   even in December of 2015.  That's the whole point of

8   that.  I'm not arguing that there were so many

9   successful.  I am arguing that you can rely upon that

10  list to identify who those individuals or businesses

11  were -- practices.

12          MR. SOLBERG:  Let's take five here.  And I

13  think I'm getting close to the end or at the end, so

14  let's take five and come back.

15          THE WITNESS:  Yes, sir.

16          (Break was taken.)

17  BY MR. SOLBERG:

18      Q.  I have a couple questions for you,

19  Mr. Sponsler, and then I just want you to -- I'm going

20  to walk through some exhibits, and all I want you to do

21  is identify them.  They were referenced in your report.

22          Getting back to your paragraphs 66 and 67 of

23  your report, I want to make sure I understand you

24  correctly.  You're extrapolating the fact that the list

25  failed for 24 percent of the witnesses -- I'm sorry --

Page 99

1   24 percent of the fax numbers, and you're applying that

2   fact to the 381,000 transmissions that were successful

3   regarding the quality of the list?

4        A.  No, sir.  I'm applying the issue that

5   24 percent of the list had incorrect fax numbers, and

6   I'm extrapolating that poor quality of the list to the

7   ones that were successful except I am -- my opinion is

8   that more than the fax numbers -- even though the fax

9   went through the identity of the recipients is in

10  question in terms of what the list says.

11       Q.  And moving up to paragraph 76, you talk about

12  churn in business, failures in business.  Take a second

13  and take a look at that.

14       A.  Yes, sir.

15       Q.  And are you also extrapolating churn in

16  business to the quality of the list and to whether

17  Ms. Merryman's declaration is correct?

18       A.  I am not, sir.

19            MR. MONTCALM:  Objection to form.

20       A.  I'm not extrapolating that to the quality of

21  the list.  This is more as of the difficulty in reaching

22  the true alleged class members from 2015 today in 2023

23  and 2022.

24  BY MR. SOLBERG:

25       Q.  And it's not based on actual evidence; it's

1   based on churn rates in business.  Am I right about

2   that?

3           MR. MONTCALM:  Objection to form.

4       A.  Well, yes, sir.  Well, it is evidence.  I mean,

5   a lot of these studies in the healthcare industry

6   especially are that many of these industries are being

7   bought up and assimilated and go out of business.  The

8   medical industry is very well subject to those same

9   things.

10  BY MR. SOLBERG:

11      Q.  But again, I'm talking about this case.  Not

12  the general case, this case.  And you're applying the

13  churn rate to a case in which 97 percent of the class

14  members have received notice.  And that's what I'm

15  asking:  Is that what you're doing?

16          MR. MONTCALM:  Objection to form.

17      A.  Yeah.  So I disagree that 97 percent of the

18  class members received notice.  I don't think that's

19  accurate.  And this, though, 76, is pertaining to today

20  versus five years ago.  And it goes into my opinion

21  about 97 percent of the correct class members received

22  notice in some way.

23  BY MR. SOLBERG:

24      Q.  All right.  Here's where I wanted the

25  identifying exhibits exercise I had told you about.

Page 101

1              MR. SOLBERG:  Ryan, let's start with

2    Exhibit 25.

3    BY MR. SOLBERG:

4         Q.  Mr. Sponsler, your footnote 13 on your report

5    at page 16 references, "See Fax Without a Fax Machine."

6    My question for you is:  Looking at Exhibit 25, is this

7    the article that you're referencing?

8         A.  Sir, if that's the article that came up when

9    you clicked on that link, then yes.  I don't

10   specifically remember today.

11             MR. SOLBERG:  Ryan, can you -- you know what?

12   Let's just do this in order.  Could you pull up

13   Exhibit 26?

14   BY MR. SOLBERG:

15        Q.  Mr. Sponsler, Exhibit 26 is "Seeing Faxing

16   Isn't Dead; Three Reasons the Predictions Were Wrong."

17   Now, I realize this is blacked out -- not by us, that's

18   just how it came off -- but my question is this:  Is

19   Exhibit 26 what's referenced in footnote 16 of your

20   report, "Faxing Isn't Dead; Three Reasons the

21   Predictions Were Wrong"?

22        A.  I'm assuming so, sir.

23        Q.  You don't know one way or the other?

24        A.  I mean, it's hard for me to tell.  I mean, I --

25   that is the title of the article.  Yes.

1        MR. SOLBERG:  All right.  Let's move onto

2   Exhibit 27, Ryan.

3   BY MR. SOLBERG:

4        Q.  This, Mr. Sponsler, is referenced in footnote

5   17 of your report.  It says, "The Definitive Guide to

6   Online Fax," and is dated 2017.  You have Exhibit 27 in

7   front of you, which I believe is that article, and I'm

8   just asking if that's your recollection?

9        A.  Yes, sir.  That's my recollection.

10       MR. SOLBERG:  Ryan, can you pull up Exhibit 31?

11   BY MR. SOLBERG:

12       Q.  Plaintiff's Exhibit No. 31, Mr. Sponsler, is --

13   what it's titled in your report is, "HIPAA Compliant

14   E-Fax Provider Recommendations."

15       A.  Yes, sir.

16       Q.  And that comes on the third page here.  What I

17   pulled up was starting where it starts.  Do you

18   understand that this is the article that was referenced

19   in footnote 19 of your report?

20       A.  I'm assuming so.  Yes, sir.  I remember reading

21   this.

22       MR. SOLBERG:  All right.  Let's go back, Ryan,

23   to Exhibit 28.

24   BY MR. SOLBERG:

25       Q.  Exhibit 28, Mr. Sponsler, was referenced in

Page 103

1    footnote 18 of your report, "See How to Fax Over the
2    Internet in Five Easy Steps."
3        A.  Yes, sir.
4        Q.  And again, my question for you once this comes
5    up:  Is it your understanding that this is the article
6    that's referenced in your report at footnote 18?
7        A.  To the best of my recollection, yes, sir.
8            MR. SOLBERG:  Ryan, can you pull up Exhibit 33?
9    BY MR. SOLBERG:
10       Q.  And this is an article referenced on page 26 of
11   your report, Mr. Sponsler, at footnote 26, "The
12   Percentage of Businesses That Fail."  Now, is it your
13   understanding that this is the article that's referenced
14   in footnote 26 of your report?
15       A.  To the best of my recollection, sir.
16           MR. SOLBERG:  I think that's it.  Let me talk
17   to Mr. Kelly for a second in case there's something I
18   ought to note.  So we'll get back in a couple, and I
19   think this is it.  Are you going to have any redirect or
20   no?
21           MR. MONTCALM:  Not as of this moment.
22           MR. SOLBERG:  All right.  Give me five to wrap
23   it up.
24           MR. MONTCALM:  All right.
25           (Break was taken.)

Page 104

1   BY MR. SOLBERG:

2        Q.  Last question.  Mr. Sponsler, do you know if

3   phone carriers keep records of calls that are call

4   forwarded?

5            MR. MONTCALM:  Objection.

6   BY MR. SOLBERG:

7        Q.  Go ahead.

8        A.  I didn't -- are you asking if the carriers keep

9   records?

10       Q.  Yes.  Do you know that one way or the other?

11       A.  It is my understanding that in past subpoena

12  responses -- I don't think so in this case -- that that

13  question was answered no, that they didn't keep call

14  forwarding information.

15           MR. SOLBERG:  Okay.  That's it.  Thank you,

16  Mr. Sponsler.

17           MR. MONTCALM:  Thanks, everyone.

18           MR. SOLBERG:  We're going to order a copy of

19  the transcript.

20           MR. MONTCALM:  Me, too.

21           MR. SOLBERG:  What's the turnaround of the dep?

22           THE REPORTER:  It is 10 business days, so it

23  would be two weeks from today, I believe.

24           MR. SOLBERG:  And if we want to get it sooner

25  can we do that?

Page 105

1          THE REPORTER:  Absolutely.

2          MR. MONTCALM:  I can just tell you that we have

3    a pretty tight turnaround, the parties do, for some

4    briefing coming up, and so I think we probably all want

5    it sooner than that.

6          MR. SOLBERG:  So could you get it by next

7    Friday?

8          THE REPORTER:  Absolutely.

9          MR. SOLBERG:  All right.  Thank you.

10         (Deposition concluded at 1:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA:

3    COUNTY OF HILLSBOROUGH:

4

5         I, BRITTANY O'NEILL VALLADAREZ, Notary Public,

6    State of Florida, do hereby certify that

7    KENNETH SPONSLER personally appeared before me on

8    JANUARY 20, 2023, and was duly sworn and produced a

9    United States ID Card as identification.

10        Signed this 22ND day of JANUARY, 2023.

11

12

13

14

15

                     BRITTANY O'NEILL VALLADAREZ

16                   Notary Public, State of Florida

                     My Commission No.: GG986657

17                   Expires: 07/06/2024

18

19

20

21

22

23

24

25

Page 107

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF HILLSBOROUGH:

4

5         I, BRITTANY O'NEILL VALLADAREZ, Notary Public,

6    State of Florida, certify that I was authorized to and

7    did stenographically report the deposition of

8    KENNETH SPONSLER; that a review of the transcript was

9    requested; and that the foregoing transcript, pages 5

10   through 105, is a true and accurate record of my

11   stenographic notes.

12        I further certify that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18        DATED this 22ND day of JANUARY, 2023.

19

20

21

                    BRITTANY O'NEILL VALLADAREZ

22

23

24

25

```
                                                     Page 108
 1                        Veritext Legal Solutions
                              1100 Superior Ave
 2                               Suite 1820
                            Cleveland, Ohio 44114
 3                          Phone: 216-523-1313
 4
      January 27, 2023
 5
      To: Jonathan Montcalm, Esq.
 6
      Case Name: Scoma Chiropractic, P.A., et al. v.
 7              Mastercard International Incorporated, etc.
 8    Veritext Reference Number: 5659002
 9    Witness:  Kenneth Sponsler        Deposition Date:  1/20/2023
10
      Dear Sir/Madam:
11
12    Enclosed please find a deposition transcript.  Please have the witness
13    review the transcript and note any changes or corrections on the
14    included errata sheet, indicating the page, line number, change, and
15    the reason for the change.  Have the witness' signature notarized and
16    forward the completed page(s) back to us at the Production address
      shown
17
      above, or email to production-midwest@veritext.com.
18
19    If the errata is not returned within thirty days of your receipt of
20    this letter, the reading and signing will be deemed waived.
21
      Sincerely,
22
      Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

Page 109

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5659002
 3      CASE NAME: Scoma Chiropractic, P.A., et al. v.
                   Mastercard International Incorporated, etc.
        DATE OF DEPOSITION: 1/20/2023
 4      WITNESS' NAME: Kenneth Sponsler
 5         In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7         I have made no changes to the testimony
        as transcribed by the court reporter.
 8
        _____        _____
 9      Date                    Kenneth Sponsler
10         Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11      the referenced witness did personally appear
        and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
                Statement; and
14          Their execution of this Statement is of
                their free act and deed.
15
            I have affixed my name and official seal
16
        this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

```
                                                    Page 110

 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 5659002
 3        CASE NAME: Scoma Chiropractic, P.A., et al. v.
                    Mastercard International Incorporated, etc.
          DATE OF DEPOSITION: 1/20/2023
 4        WITNESS' NAME: Kenneth Sponsler
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____      _____
     Date                      Kenneth Sponsler
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18             in the appended Errata Sheet;
          They signed the foregoing Sworn
19             Statement; and
          Their execution of this Statement is of
20             their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23             _____
               Notary Public
24
               _____
25             Commission Expiration Date
```

Page 111

```
1                    ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 5659002
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
       _____        _____
20     Date                     Kenneth Sponsler
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                      _____
                        Notary Public
24
                        _____
25                      Commission Expiration Date
```