# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CIN-Q AUTOMOBILES, INC. *et al.*,              )
individually and on behalf of a class,         )
                                               )
          Plaintiffs,            )
                                               )  No. 8:13-cv-01592-AEP
     v.                               )
                                               )  Hon. Anthony E. Porcelli
BUCCANEERS TEAM LLC,                           )
                                               )
          Defendant,             )
_____                )
                                               )
TECHNOLOGY TRAINING                            )
ASSOCIATES, INC., *et al.*,                    )
                                               )
          Intervenors.           )


## INTERVENORS/OBJECTORS' SUBMISSION
## REGARDING QUESTIONS POSED BY THE COURT
## AT THE HEARING ON JANUARY 19, 2024

Phillip A. Bock
Robert M. Hatch
Jonathan B. Piper
Bock Hatch & Oppenheim, LLC
203 N. La Salle Street, Suite 2100
Chicago, IL 60601
(312) 658-5501 (phone)
service@classlawyers.com

# TABLE OF CONTENTS

Page

I.    QUESTIONS AND SUMMARY ANSWERS. ..............................................1

    A.    "Give me whatever you want for your explanation on how I reconcile to the best I can this issue with each of those three opinions – or I should say four now." ECF No. 530, Trans. at p. 59. ....................................................................................................1

    B.    "Can *Amerifactors* be applied retroactively?" ECF No. 530, Trans. at p. 67. ................................................................................................3

    C.    "If I do not apply the *Chevron* deference, then I want you to make your argument as to what I should do and how the statute should be applied; that is, just as we were arguing there at the end, is there really a harm that is resulted upon the intended recipient if a third-party fax service provider is utilized? And I want you to articulate for me that harm that was designed and intended for by Congress's prohibition." ECF No. 530, Trans. at p. 59. ..........................................3

    D.    "If I do find that there is a standing issue, does that end the inquiry? In other words, can we remedy it? And if the only suggestion of remedy is attestation, then I want you to address *Karhu v. Vital Pharmaceuticals*, 621 F. App'x 945. It's a 2015, a pre-*Cherry* case, that casts doubt on self-attestation." ECF No. 530, Trans. at p. 59. ..............................................................................3

II.   ARGUMENT..................................................................................................4

    A.    All faxes at issue and being resolved in this case were transmitted as faxes to 10-digit numbers over the public switched telephone network, with costs accruing to the end recipients. ............................4

    B.    *Amerifactors* and *Ryerson* are at odds with *Westfax* and other earlier FCC rulings, and their characterizations of the technologies at issue cannot be squared with the record before this Court. .............8

        1.    The technologies at issue in the various FCC orders, and the technological confusion in *Amerifactors* and *Ryerson*. .............8

            a.    The FCC's 1995 Order: Fax Modem Boards are Telephone Facsimile Machines. .......................................8

            b.    The FCC's 2003 Order. ....................................................9

i

c.     The *Westfax* ruling..........................................................11

d.     The *Amerifactors* ruling...................................................14

e.     The *Ryerson* ruling. .......................................................17

f.     The *Career Counseling* opinion. ....................................18

2.     *Amerifactors, Ryerson*, and *Career Counseling* ignore the costs online fax service customers must pay for junk faxes.....19

3.     Faxes to online fax services are not like emails. ......................19

4.     Because *Amerifactors* and *Ryerson* are patently inconsistent with prior FCC rulings, they are not mere "clarifications" and not retroactive...................................................................20

C.     All class members, including those who received BTL's faxes through an online fax service, have standing under *Sarris* and *Drazen II*, regardless of whether the faxes were printed or interfered with sending or receiving some other fax transmission. ....22

3.     At most, *Amerifactors* raises a potential merits defense, not a standing issue. ........................................................................24

D.     Identifying or excluding putative class members who used an online fax service can be addressed through a claims administration process or a special master.........................................26

III.     CONCLUSION...............................................................................28

## I.     Questions and Summary Answers.

Intervenors Technology Training Associates, Inc., *et al.* (collectively "Intervenors"), submit this memorandum to respond to the four questions the Court posed at the hearing on January 19, 2024. ECF No. 530, Trans. at p. 59. Intervenors continue to assert that the Court should deny final approval to the proposed settlement because it is not fair, reasonable, and adequate. The Court's questions, and Intervenors' summary answers, are as follows:

**A.     "Give me whatever you want for your explanation on how I reconcile to the best I can this issue with each of those three opinions – or I should say four now." ECF No. 530, Trans. at p. 59.**

**Answer:** First, the Court need not reconcile the various FCC opinions at this stage of the proceedings. Every Settlement Class Member has Article III standing because, according to the definition, they "received or were successfully sent" one or more of BTL's unsolicited advertisements through a facsimile transmission to their unique, assigned, 10-digit telephone number. Second, on their merits, *Amerifactors* and *Ryerson* cannot be reconciled with earlier FCC opinions. *Amerifactors* and *Ryerson* misstate the technologies they purport to address, leading to a muddle in which they equate faxes sent to online fax services as emails. Equating faxes and emails is a clear technological and legal error. As explained below, all faxes are sent over the telephone system to 10-digit telephone numbers, not to email addresses over the internet, and thus are not like emails.

1

Furthermore, *Amerifactors* and *Ryerson* ignore the indirect and direct costs incurred to receive faxes through an online fax service, such as subscription costs and per-page charges. These are discussed below. Crucially, both opinions ignore the intangible harm caused by unwanted fax messages. Noting that "intangible harms can satisfy Article III's concreteness requirement," the Eleventh Circuit held in *Drazen II* "that the harm associated with an unwanted text message shares a close relationship with the harm underlying the tort of intrusion upon seclusion … [and] the receipt of an unwanted text message causes a concrete injury…." *Drazen v. Pinto,* 74 F.4th 1335, 1345-46 (11th Cir. 2023) ("*Drazen II*"). Here, too, Plaintiffs alleged that BTL's unwanted, successful fax communications invaded seclusion and privacy interests. Doc. 70, para. 43 (PageID 1287) ("The Defendants' fax cost the Plaintiffs time, as the Plaintiffs and their employees wasted their time receiving, reviewing, and routing the Defendants' unauthorized fax. That time otherwise would have been spent on the Plaintiffs' business activities. The Defendants' fax unlawfully interrupted the Plaintiffs' and other class members' privacy interests.); Doc. 70 (PageID 1270), para. 3 ("An unsolicited fax wastes the recipient's valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy. Unsolicited faxes … require additional labor to attempt to discern the source and purpose of the unsolicited message."). The harms suffered by different fax recipients differ, when they differ, in degree and not in kind. Fax

messages are received only through dedicated, special means, at the recipients' cost, and unwanted fax messages interrupt and interfere with the recipients' right to be left alone. The TCPA prohibits faxing any unsolicited advertisement.

**B.    "Can *Amerifactors* be applied retroactively?" ECF No. 530, Trans. at p. 67.**

**Answer:** No. *Amerifactors* and *Ryerson* would not apply retroactively because they are patently inconsistent with prior FCC rulings.

**C.    "If I do not apply the *Chevron* deference, then I want you to make your argument as to what I should do and how the statute should be applied; that is, just as we were arguing there at the end, is there really a harm that is resulted upon the intended recipient if a third-party fax service provider is utilized? And I want you to articulate for me that harm that was designed and intended for by Congress's prohibition." ECF No. 530, Trans. at p. 59.**

**Answer:** Yes, when BTL sent the unsolicited fax advertisements, the recipient class members incurred costs (including paying the online fax service for the incoming faxes) and suffered invasions of privacy and seclusion sufficient to provide Article III standing to sue, even if they received the faxes through an online fax service and even if the faxes were not printed to paper.

**D.    "If I do find that there is a standing issue, does that end the inquiry? In other words, can we remedy it? And if the only suggestion of remedy is attestation, then I want you to address *Karhu v. Vital Pharmaceuticals*, 621 F. App'x 945. It's a 2015, a pre-*Cherry* case, that casts doubt on self-attestation." ECF No. 530, Trans. at p. 59.**

**Answer:** Yes, if the Court finds a standing issue, then there is a remedy. If

3

BTL is concerned the class definition includes members without standing to sue, the Court can modify the class definition to exclude such persons. For example, the Court could add the following highlighted language to the definition of the Settlement Class. Doc. 343, PageID 10856 ("All persons who received or were successfully sent in 2009 or 2010 one or more facsimile advertisements relating to tickets for Tampa Bay Buccaneers games, **except any person who used an online fax service to receive facsimile transmissions in 2009 or 2010**.")

Claimants who received BTL's faxes through an online service can be excluded from the judgment, and BTL can challenge their claims through the claims administration process it agreed to. At preliminary approval, BTL said the claim form was negotiated to resolve the issue. If necessary, the claim form could be further modified to identify which class members received faxes through online fax services. Self-attestation is permissible because the claimants' fax numbers can be checked against the Biggerstaff report and BTL can challenge the claims after resubmission.

## II.    Argument.

### A.    All faxes at issue and being resolved in this case were transmitted as faxes to 10-digit numbers over the public switched telephone network, with costs accruing to the end recipients.

Faxes are communications over a service "interconnected with the public switched telephone network … to an end user using resources from the North

4

American Numbering Plan or any successor." *See* 47 C.F.R. 1600(r). To understand fax technology, it is useful to understand the concepts of the "public switched telephone network" ("PSTN") and the North American Numbering Plan ("NANP"), which is administered by the NANP Administrator ("NANPA").

**NANP** is the system of 10-digit telephone numbers regulated in the U.S. exclusively by the FCC. 47 U.S.C. 52.5(d) (defining "North American Numbering Plan" as the "basic numbering scheme for telecommunications networks" in the U.S. and certain other North American countries); 47 U.S.C. 251(e) ("The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States."). *See also* nationalnanpa.com/about_us/index.html ("NANP numbers are ten-digit numbers consisting of a three-digit Numbering Plan Area (NPA) code, commonly called an area code, followed by a seven-digit local number.") (Exhibit 1). All the faxes in this case were sent to NANP 10-digit telephone numbers. *See* Biggerstaff Report, ECF 207-5 Ex. 7, pp. 81 of 167 *et seq.*, sealed ECF 401.

**PSTN** refers to the common carrier switched networks, which provide switched telephone services using NANP numbers. *See*, e.g., 47 CFR 9.3. ITU T.30, the international standard for sending faxes, is a standard providing procedures "for document facsimile transmission in the general switched telephone network." All the faxes transmitted in this case were transmitted using T.30 over the public

5

switched telephone network. *See* ECF No. 207-5 at p. 9 of 17 (T.30 "defines the procedures necessary for an analog document transmission between two facsimile devices on the public switched telephone network or PSTN").

**Emails,** in contrast to faxes transmitted over the PSTN to NANP ten-digit numbers, are transmitted over the internet to email addresses referring to an Internet domain. *See* 15 U.S.C. §7702 (6) (CAN-SPAM ACT) ("The term 'electronic mail message' means a message sent to a unique electronic mail address"). *See* Gralla, *How the Internet Works* (8th ed. 2006), p. 30, <u>Exhibit 2</u>. Email addresses are strings of characters that, unlike NANP 10-digit phone numbers, take the form username@domainname. *See* 15 U.S.C. §7702 (5) (defining "electronic mail address"); <u>Ex. 2</u>, pp. 30-31. Domain names are regulated not by NANP but by the Internet Assigned Numbers Authority (IANA). Domain names include a domain (e.g., "amazon" or "gmail") and a root (e.g., .com, .gov, .net, .ru). *Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 503 (D.C. Cir. 1999).[1] The routing of an email over

---

[1]    IANA also allocates blocks of unique Internet Protocol addresses (long strings of numbers) to regional internet registries, which then delegate blocks of addresses to internet service providers and other organizations. *Coal. for Icann Transparency Inc. v. Verisign, Inc.,* 464 F. Supp. 2d 948, 951–53 (N.D. Cal. 2006). If an email is directed to a domain name rather than an IP address, then an internet protocol such as Simple Mail Transport Protocol looks up the appropriate IP address for that domain and routes the email. *Rmail Ltd. v. Amazon.com, Inc.,* No. 2:10-CV-00258 (Lead Case), 2019 WL 10375652 at *3 (E.D. Tex. June 12, 2019).

the Internet is a transmission through a network of computers and does not necessarily use the PSTN at all. Ex. 2, pp. 90-91.

**Online fax services** receive faxes over the PSTN directed to 10-digit fax numbers. They are faxes, not emails. *See* Exhibit 3, Declaration of Andrew Barnett (March 19, 2024). From 1999-2021, Mr. Barnett was VP of sales and development for Profax Inc., an online fax service. Ex. 3, ¶ 1. Mr. Barnett explains that online fax services receive incoming faxes via the PSTN over telephone lines through fax modems. Ex. 3, ¶¶ 4-6.[2] They receive faxes on fax servers, which are computing equipment with portals needed to connect a printer, or which can print via a network or wifi. Ex. 3, ¶¶ 5, 9. Many online fax services have an option for customers to automatically print the faxes they receive. Ex. 3, ¶ 9.

Online fax service customers incur costs when they receive faxes through online fax services. The online fax server pays its telephone carrier(s) for the incoming faxes to the customer's dedicated 10-digit NANP number. Those costs are passed on to the recipient customer, whether through a flat base charge, a per-page charge, or a per-minute charge. Ex. 3, ¶ 8. In the 2009-10 period, a customer's cost to receive a fax through an online fax service—a few cents—was comparable to the

---

[2]     BTL's telecom expert, Ken Sponsler, agrees that a fax transmission to an online fax service "engages the telephone lines that belong to the Online Fax Services." ECF 341-2, p. 39 of 70, ¶ 64 (Exhibit 4).

cost of receiving a fax on a standalone fax machine. *Id.*[3] *Cf. Craftwood II, Inc. v. Generac Power Systems, Inc.,* No. 17 C 4105, 2020 WL 13602759 (N.D. Ill. June 18, 2020) ("Even on a traditional fax machine, the cost to receive a fax in terms of ink and paper is about 2 cents"); *Texas v. American Blastfax, Inc.,* 164 F. Supp. 2d 892, 900 (W.D. Tex. 2001) ("average cost of receiving an unwanted fax is seven cents per page").

    **B.**     ***Amerifactors* and *Ryerson* are at odds with *Westfax* and other earlier FCC rulings, and their characterizations of the technologies at issue cannot be squared with the record before this Court.**

        **1.**     **The technologies at issue in the various FCC orders, and the technological confusion in *Amerifactors* and *Ryerson*.**

            **a.**     **The FCC's 1995 Order: Fax Modem Boards are Telephone Facsimile Machines.**

In addition to the four opinions the Court asked about at the hearing on January 19, 2024, it is instructive to consider the portion of the FCC's clarifying ruling in 1995 that "fax modem boards"—computer boards that receive and confirm receipt of faxes under the T.30 protocol—are "telephone facsimile machines" within the TCPA's definition, even though they have only "electronic input and output" and cannot by themselves print a fax onto paper. *In re Rules and Reguls. Implementing*

---

[3]      Today, Westfax charges $8.99 per month for its basic plan for 500 pages (1.79¢ per page), and 3¢ for faxes over the first 500 pages. <u>Exhibit 5</u>. Efax charges a "best value" introductory rate of $15 for the first month for 500 pages (3¢ per page) with a 16¢ per page overage, going up to $49.99 after the first month. <u>Exhibit 6.</u>

*the Tel. Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12403-12404 (FCC) ("1995 FCC Order"). Manufacturers sought clarification from the FCC that fax modem boards were not "telephone facsimile machines," because they did not want to be held accountable to comply with certain technical standards applicable to "telephone facsimile machines" under the TCPA. 10 FCC Rcd. at 12403-12404. The FCC rejected the attempt, reasoning that exempting fax modem boards from the requirements would defeat the purpose of the TCPA, because fax modem boards are used in every form of fax machine, from a simple stand-alone unit to a remote fax server linked to a computer network by the internet. *Id*.

The 1995 ruling is instructive in two respects. First, it illustrates the principle that the TCPA should be read broadly to effectuate its consumer protection purposes, rather than narrowly. Second, in treating the modem boards, which are simply components of a fax transmission system, as "telephone facsimile machines," the FCC showed that a "telephone facsimile machine" can be an assemblage of equipment working in conjunction with other components.

### b.    The FCC's 2003 Order.

In 2003, the FCC clarified that a fax server linked to a computer network, receiving faxes and forwarding them as email attachments, was a "telephone facsimile machine" as defined by the TCPA. *In re Rules and Reguls. Implementing*

*the Tel. Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14133 (FCC) ("2003

FCC Order"). In pertinent part, the FCC explained:

200. We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes. However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet. The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways. Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes. "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines.

201. The TCPA's definition of "telephone facsimile machine" broadly applies to any equipment that has the capacity to send or receive text or images. The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented. **Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines.** As the House Report accompanying the TCPA explained, "facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine." However, Congress also took account of the "interference, interruptions, and expense" resulting from junk faxes, emphasizing in the same Report that "[i]n addition to the costs associated with the fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications."

202. Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed. They may also tie up lines and printers so that the recipients' requested

10

faxes are not timely received. Such faxes may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business. **Finally, because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.**

*Id*. at pp. 14133-34 (emphasis added).

The FCC read the TCPA broadly to protect consumers from evolving technologies, concluding that an assemblage of equipment is a "telephone facsimile machine." When a business sets up an internal network with a fax server that routes incoming faxes to employee desktop computers as emails, the entire network constitutes a telephone facsimile machine. Again, the FCC's focus was on consumer protection and preventing "easy circumvention" of the TCPA's prohibitions.

### c.    The *Westfax* ruling.

In 2015, the FCC's Consumer and Governmental Affairs Bureau (the "Bureau") issued a ruling, "mak[ing] clear that a type of fax advertisement—an efax, a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment—is covered by the consumer protections in the [TCPA]." *In the Matter of Westfax, Inc. Petition for Consideration & Clarification*, 30 F.C.C. Rcd. 8620 ¶ 1 (Aug. 8, 2015) ("*Westfax*").

As the Sixth Circuit described it, "The caveat in Paragraph 200 of the 2003 Order—that 'the TCPA's prohibition on unsolicited faxes … does not extend to

11

facsimile messages sent as email over the Internet'—prompted WestFax … to seek clarification from the FCC as to whether an 'efax' that is received on a fax server and then converted to an email is a 'fax, an email or both.'" *Lyngaas v. Curaden Ag*, 992 F.3d 412 (6th Cir. 2021), citing Westfax, 30 FCC Rcd. 8622 ¶ 5.

The FCC reasoned that, because they are sent over telephone lines, efaxes satisfy "the statutory requirement that the communication be a fax on the originating end." *Id.* at 8623 ¶ 9. Furthermore, the FCC noted, the "statutory requirements to be a fax on the receiving end" were satisfied because "[t]he definition of 'telephone facsimile machine' sweeps in the fax server and modem, along with the computer that receives the efax because together they by necessity have the capacity to 'transcribe text or images (or both) from an electronic signal received over a telephone line onto paper.'" *Id.* (quoting 47 C.F.R. § 64.1200(f)(13)).

The difference between the equipment addressed in the FCC's 2003 Order and *Westfax* is that the 2003 Order described a fax server housed inside the fax recipient's business that received and routed incoming faxes to computers as attachments to emails, whereas the fax server discussed in *Westfax* was housed at Westfax, which received the faxes sent to a recipient's dedicated 10-digit number and routed them as attachments to emails forwarded to the recipient's email address. Westfax described the technology at issue as precisely same as the technology at issue in *Amerifactors*:

12

An "efax", in general, is a facsimile message converted to an email. A facsimile transmission is received on a fax server. Once a telephone call is placed, the sending and receiving machines communicate with one another with a "handshake". If a connection is established, the document is transmitted between the two machines. <u>After the transmission, the fax server converts the message into a digital image file that is then sent as an email attachment via the Internet to the recipient.</u>

"efaxes" change the traditional sender (fax broadcaster) – sending telephone facsimile machine – telephone line – recipient telephone facsimile machine – recipient model to a sender (fax broadcaster) – telephone facsimile machine – telephone line – efax carrier fax server (fax converted to pdf file) – Internet – email to efax carriers' customer (recipient) model.

Westfax, Inc. Petition for Consideration and Clarification, CG Docket Nos. 02-278, 05-338 (Sept. 25, 2009), at 2 (attached as <u>Exhibit 7</u>) (emphasis added).

The petition summarized the technology as faxes received by "[c]ompanies with fax servers that convert facsimiles to email **and send them over the Internet to their customers**." *Id.* at 4 (emphasis added). The petition sought clarification as to whether an "efax" that is received on a fax server and then converted to an email is a "fax, an email or both." *Id*. at 8622 ¶ 5. The Bureau held this technology was a "telephone facsimile machine" subject to the TCPA. 30 FCC Rcd. at 8623.

Each of these examples requires that a successful fax at some point in its transmission traverses the PSTN to a NANP-assigned number at the receiving end, whether a fax server on site or off site, even if some parts of the communication path take place through the internet or a computer network. "Westfax's concern appears

13

to be that the conversion of the fax to email *after* it is sent removes it from the TCPA's reach. That is not the case." *Id.*[4]

### d.    The *Amerifactors* ruling.

In 2019, the Bureau revisited the issue of online fax services in *In re Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prot. Act of 2005*, 34 FCC Rcd. 11950 (Bureau, Dec. 9, 2019) ("*Amerifactors*"). *Amerifactors* says the Bureau was considering a different technology than that considered in *Westfax,* but the record belies that. According to the decision, an online fax service is a "cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities" that allows users to "access 'faxes' the same way that they do email: by logging into a server over the Internet or by receiving a pdf

---

[4]    *Westfax* is entirely consistent with the FCC's 2003 Order and therefore is retroactive. *Westfax* remains in force and effect. Indeed, *Westfax* is the legal basis for the conclusion by the settling parties and the Court that the consumer to whom the content of the fax was directed is the "recipient" under the TCPA, not the online fax service through which the fax was received. *Westfax*, 30 FCC Rcd at 8624. Online fax services "provide a service to the recipient that requires them to become part of the communications pathway between the sender and the recipient. Thus, while they expect to be part of the fax communication, they are neither the intended recipient nor the ultimate recipient of the document sent as a fax any more than would be the telephone company providing a telephone line to a consumer's traditional fax machine." *Id*.

14

attachment [as] an email.'" 34 FCC Rcd. at 11950. *Amerifactors* expressly limited the scope of its ruling to the record before the Bureau. "Our clarification is limited to an analysis of online fax services, as informed by the current record, and does not prejudge whether we would arrive at the same conclusion for other types of equipment and services." *Id.* at 11952.

*Amerifactors* said it concerned different technology than the 2003 FCC Order and *Westfax. Id.* at 11954. It did not. As explained above, the technology in *Westfax* was the same technology described in *Amerifactors*. Faxes were sent as faxes over telephone lines to a third-party service that received the faxes and converted them into pdfs sent to customers as email attachments. BTL argues the equipment in *Westfax* had the capacity to print, but the equipment in *Amerifactors* did not, but the equipment was identical. The online fax service had a fax server that received the fax and converted it to an email attachment sent to the customer. *Amerifactors* involved identical equipment. The use of the words "cloud based" does not change anything. Faxes are received on fax servers, not clouds. The fax server at the online fax service had the capacity to print in each case, either by attaching a printer or printing by a wifi or network connection. The computer that the end user received the faxes on also had the capacity to print. Printing is not necessary to establish Article III standing or a TCPA violation. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,* 781 F.3d 1245, 1252-53 (11th Cir. 2015).

15

*Amerifactors* asserts that the online fax service "effectively receives faxes 'sent as email over the internet.'" 34 FCC Rcd. at 11950, ¶ 3. As outlined above and in the Barnett declaration, and in the Sponsler declaration, that is not true technologically. Online fax services receive faxes as faxes sent to NANP 10-digit numbers over the PSTN just like any other fax receiving equipment. Emails, in contrast, are sent to email addresses over the internet.

In short, *Amerifactors* involved the exact same equipment as *Westfax,* reached an irreconcilable and incompatible conclusion, and should not be followed. *See, e.g., Ambassador Animal Hosp., Ltd. v. Hill's Pet Nutrition, Inc.*, No. 20 C 3326, 2021 WL 3043422, at *1 (N.D. Ill. Feb. 17, 2021) ("The problem with this invitation is that the Bureau's decision [*Amerifactors*] flies in the face of years of precedent, established by the FCC"); *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 (E.D. Mo. 2023) ("The Court finds the Sixth Circuit's analysis persuasive, and likewise concludes that the plain language of the statute rebuts Defendants' argument that the TCPA applies only to traditional fax machines."). *See also Thompson v. Regions Security Svcs, Inc.,* 67 F.4th 1301, 1308 (11th Cir. 2023) (factors weighing on deference to agency interpretation of statute include "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements").

e.      **The *Ryerson* ruling.**

BTL also relies on the Bureau's 2020 ruling in *In re Joseph T. Ryerson & Son, Inc. Petition for Expedited Declaratory Ruling Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 35 FCC Rcd. 9474 (Bureau, Sept. 3, 2020) ("*Ryerson*"). *Ryerson* is careful to assert twice that it is based "solely on the facts in the record; there is no evidence to suggest that the facts are incorrect." 35 FCC Rcd. at 9477 n.26 and 9475 n.12. *Ryerson* even notes that "the record lacks sufficient detail for us to know whether the Ryerson transmittal was identical to that in *Amerifactors." Id.* at 9477 n.26.

*Ryerson* does not describe the technology involved as including faxes transmitted over the PSTN to 10-digit NANP phone numbers. Instead, the Bureau followed the description of the technology provided in the Petition, which significantly did not say that faxing, the PSTN, or 10-digit NANP phone numbers were involved. Rather, a digital image was "uploaded … to a Web portal" and then received "via email." Ryerson describes the technology as follows:

> A Ryerson employee uploaded a digital version of the file to a Web portal managed and owned by a third party provider of communication tools that is unaffiliated with Ryerson. The communication to Connector [i.e., Connector Castings, a Ryerson customer] therefore originated in digital form (not as a traditional facsimile).
>
> Ryerson also has learned that Connector received the alleged "fax" via email. Connector used AT&T's RingCentral Office@Hand tool to facilitate email receipt.

17

*Id.* at 9475-76, ¶ 7.

Significantly the *Ryerson* ruling is silent as to how the fax was transmitted between the Web portal and ATT Office@Hand email. Was there a fax transmitted to a 10-digit NANP number via the PSTN, or did the entire transmission take place over the Internet to an email address? *Ryerson* asserts in a footnote that "there is no evidence to suggest … that the document in question began as a fax transmittal." 35 FCC Rcd at 9475 n. 12.

### f.   The *Career Counseling* opinion.

More recently, the Fourth Circuit held that faxes received via an online fax service do not fall within the scope of the TCPA. *Career Counseling, Inc. v. Amerifactors Financial Group, LLC,* 91 F.4th 202 (4th Cir. 2024). *Career Counseling* declined to defer to *Amerifactors,* and instead purported to rely on the TCPA's clear language.[5] The court inexplicably relied on *Amerifactors* as its sole source of technological understanding, however, and got the technology wrong. *Amerifactors* erroneously asserted that online fax services "***effectively*** receive[] faxes … sent as emails over the Internet," but *Career Counseling* dispensed with the

---

[5]   *Curaden* reached the opposite conclusion, relying on "the statutory text alone." *Id*. at 426 (the TCPA's definition "makes clear that a 'telephone facsimile machine' encompasses more than traditional fax machines that automatically print a fax received over a telephone line. In particular, it includes 'equipment' that has the '*capacity* ... to transcribe text or images,' *id.* (emphasis added), from or onto paper— as long as the electronic signal is transmitted or received over a telephone line. The statutory text alone, therefore, rebuts the defendants' argument.")

hedge word "effectively" and simply concluded—wrongly—that online fax services "receive faxes over the Internet" and *not* "over a regular telephone line." *Id*., 91 F.4th at 210. In a footnote, *Career Counseling* specified that it was construing a fax sent to an online fax service "as an email over the Internet," as opposed to a message "sent over a telephone line." *Id.* at 210 n. 5. Thus, *Career Counseling* is at odds with the record in this case, which establishes that all the faxes were sent to NANP 10-digit numbers, sent over the PSTN and received over the PSTN even if they were received via an online fax service.

> ### 2. *Amerifactors, Ryerson*, and *Career Counseling* ignore the costs online fax service customers must pay for junk faxes.

Receiving faxes through an online fax service costs the ultimate end recipient money. As set forth in the Barnett declaration and explained above, a junk fax sent via an online fax service will cost an end user roughly the same amount of money as the cost of receiving a junk fax on a traditional, standalone fax machine. Ex. 3, ¶ 9. They impose the same intangible harms by invading the recipients' seclusion. The TCPA was enacted to curtail all these harms and, therefore, the end users have standing to assert claims based on such faxes. *See Sarris,* 781 F.3d at 1252-53.

> ### 3. Faxes to online fax services are not like emails.

All the faxes at issue in this case were transmitted to 10-digit telephone numbers over the PSTN, not as emails to email addresses. As a result, even if some class members received faxes through an online fax service, the transmission was

like the one described in *Westfax,* not like the ones in *Amerifactors, Ryerson* or *Career Counseling* purport to describe. Both *Amerifactors* and *Ryerson* are expressly limited by the technological explanations in the record before the Bureau, and because the technological explanations provided by the Bureau are either mistaken or different than the technology at issue in this case as shown by the record before this Court, neither opinion is persuasive. An email sent entirely over the internet to an email address that never crosses the PSTN would not be covered by the TCPA, but that is irrelevant here because all the transmissions here were sent to 10-digit numbers. That a fax is received and then forwarded as an email attachment does not make it an email or "remove[] it from the TCPA's reach." *Westfax,* 30 FCC Rcd at 8623.

> **4.   Because *Amerifactors* and *Ryerson* are patently inconsistent with prior FCC rulings, they are not mere "clarifications" and not retroactive.**

"Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hosp.,* 488 U.S. 204, 208 (1988). Accordingly, in *Swift v. Bank of America Corp.,* No. 3:14-CV-1539-J-20PDB, 2015 WL 13333136 (M.D. Fla. June 18, 2015), a defendant sought to stay a TCPA case "until the FCC rules on pending petitions which address the same issue in front of this Court." *Id.* at *1. Relying on *Bowen,* the court declined to issue the

20

stay because "if the FCC does make a ruling, it is likely to be prospective in nature and will not affect Defendants' past conduct which is at issue here." *Id.* at *3.

BTL argues *Amerifactors* is retroactive because it says it is merely "clarifying" the interpretation of the statute, citing *Heimmermann v. First Union Mortg.,* 305 F.3d 1257, 1260-61 (11th Cir. 2002). However, *Heimmermann* states that when an agency's "clarification" is "patently inconsistent" with prior interpretations, it is a "new rule altogether" rather than simply a clarification of the law. 305 F.3d at 1260.

As set forth above, *Amerifactors* is patently inconsistent with *Westfax* and earlier FCC and court pronouncements. Neither the FCC nor any court had suggested that online fax services are not covered by the TCPA. *Amerifactors* does not expressly overrule *Westfax or* identify any ambiguity in the earlier ruling that it is clarifying. *Amerifactors* does not specify what parts of *Westfax* it is reiterating and what ambiguities it is clarifying, as the order at issue in *Heimmermann* did.[6] Instead, as this Court is acutely aware, *Amerifactors* created an irreconcilable muddle, and as such should not apply retroactively.

---

[6]     *See Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1,* 66 FR 53052-01, 2001 WL 1240492 (F.R.) (Oct. 18, 2001) ("Today's Statement of Policy reiterates the Department's position that yield spread premiums are not per se legal or illegal, and clarifies the test for the legality of such payments set forth in HUD's 1999 Statement of Policy.")

21

**C.    All class members, including those who received BTL's faxes through an online fax service, have standing under *Sarris* and *Drazen II*, regardless of whether the faxes were printed or interfered with sending or receiving some other fax transmission.**

The Settlement Class includes only the recipients of BTL's successful fax transmissions, as demonstrated by the Biggerstaff report, and all recipients have Article III standing. *See Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015) (entry on a fax log was sufficient to establish standing for a TCPA claim without proof the recipient ever saw, printed, or remembered the fax); *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019) (wasted time spent reading an unsolicited fax advertisement is a "concrete rather than abstract" loss satisfying Article III).

Under *Drazen II,* even class members who received BTL's fax advertisements through an online fax service have Article III standing because they suffered concrete, particularized, actual harm. *Id.*, 74 F.4th at 1342. To begin with, online fax services charge for their services and the costs associated with BTL's faxes are equivalent whether they came through an online fax service provider bill or through lost toner and paper. Ex. 3, ¶ 9. That financial harm is enough to give rise to standing.

Intangible harm can also give rise to standing. The issue is whether there is an analogue between the harm addressed by the TCPA and a common law tort. *Drazen II* held that the TCPA addresses harms analogous to the common law interest in privacy. 74 F.4th at 1343. Unwanted junk faxes create a harm "similar to" the

22

common law harm of invasion of privacy, and this is true whether the incoming fax prints on a standalone fax machine or shows up in an email inbox. An unwanted fax advertisement in an email inbox is "offensive to some degree to a reasonable person." *Id.* at 1345. An unwanted email attachment is, if anything, more offensive than the single text message that gave rise to standing in *Drazen II.* The email attachment must be opened and read to ascertain whether it is an important business communication or a junk fax. *Cf. Daisy v. Mobile Mini,* 489 F. Supp. 3d 1287 (M.D. Fla. 2020) (noting that it takes a minute to review a fax received as an email attachment, compared to just one second to review an unwanted text message).[7] The Eleventh Circuit has held that it is not necessary that a fax print, or even be looked at, in order to give rise to standing. *Sarris,* 781 F.3d at 1252-53. Like a single text message, a fax received as an email is sufficiently "offensive to some degree to a reasonable person" to give rise to standing. *Drazen II,* at 1345. *See also Gadelhak v. AT&T Svcs., Inc.,* 950 F.3d 458, 463 n.2 (7th Cir. 2020) (Barrett, J.) (*contra Salcedo,* the number of texts "is irrelevant to the injury-in-fact analysis").

---

[7]    BTL relies heavily on *Daisy,* but *Daisy* was premised on *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), which was effectively overruled by *Drazen II.*

### 3. At most, *Amerifactors* raises a potential merits defense, not a standing issue.

BTL argues "Westfax, Amerifactors and Ryerson make clear" that "Article III standing turns on what specific equipment was employed by any fax service provider utilized by a Settlement Class Member in 2009 or 2010. Doc 532; PageID 15839. Those FCC opinions do not mention standing. "Federal agencies do not administer and have no relevant expertise in enforcing the boundaries of the courts' jurisdiction." *Allegheny Defense Project v. FERC*, 964 F.3d 1, 11 (D.C. Cir. 2020). *See also Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–509 (1990) (congressional delegation to administer statute did not "empower" agency "to regulate the scope of the judicial power vested by the statute").

Likewise, *Career Counseling* did not address standing of online fax service class members but rather held the district court did not abuse its discretion in concluding that individualized inquiries would be required to determine which class members used a "stand-alone fax machine" when the faxes were sent.

Standing exists regardless of whether a plaintiff's claim is meritorious. A district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998). In litigation, a claimant who used an online fax service "wins under one construction of [the TCPA] and

loses under another." *Id.* Under those circumstances, the class members all have standing, regardless of how the online fax service issue may someday be resolved.

BTL's "fax machine" defense is nothing more than a merits defense it waived by agreeing to settle with the Settlement Class. The Supreme Court resolved an "equipment" defense in *Facebook, Inc. v. Duguid*, 592 U.S. 395, 401 (2021), on the merits. According to BTL, however, the Supreme Court lacked jurisdiction to decide the matter because a plaintiff like *Duguid* who received the offending message from the "wrong" equipment has no Article III standing to attempt to allege a claim.[8] There is no standing issue.[9]

---

[8]    The Ninth Circuit's holding that Duguid alleged "a concrete injury in fact" was not challenged or discussed in the Supreme Court. *Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1150 (9th Cir. 2019), *rev'd and remanded*, 592 U.S. 395 (2021) ("Faithful to our unflagging duty to assess constitutional standing, we hold that Duguid adequately alleges a concrete injury in fact. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042–43 (9th Cir. 2017) (citing *Spokeo, Inc. v. Robins*, ⸺ U.S. ⸺, 136 S. Ct. 1540 (2016)).

[9]    Suppose BTL contended some class members gave BTL express permission to send them group ticket ads in 2009 by fax. That would not mean those class members lacked standing to assert a TCPA claim, even if it were the basis for a potential merits defense. Similarly, the fact that BTL contends some class members did not receive their faxes on a traditional standalone fax machine may create a merits defense (or not), but it is not a standing issue.

**D.    Identifying or excluding putative class members who used an online fax service can be addressed through a claims administration process or a special master.**

The named plaintiff's standing should ideally be addressed early in a case, before the merits, but there is no burden to establish standing of absent class members prior to class certification. 1 Newberg and Rubenstein on Class Actions § 2:3 (6th ed.). *Accord Cordoba v. DirectTV, LLC,* 942 F.3d 1259, 1272-73 (11th Cir. 2019). In a litigated damages case, the standing of class members other than the named representative needs to be established at the time of final judgment when damages are to be awarded to the class members. *TransUnion v. Ramirez,* 594 U.S. 413, 431 (at the time of judgment "[e]very class member must have Article III standing in order **to recover individual damages**.") *TransUnion* does not require proof of standing of all class members at the certification stage. *Id.* n.4.

The Eleventh Circuit adopted this approach in *Cordoba,* a TCPA case involving a defendant's alleged failure to properly maintain a do-not-call registry. The court held that class members who had not requested to be included in the registry could not establish the causality prong of standing. *Id.* at 1272. This posed the issue of whether a class could be certified that included such class members who lacked standing. The court reaffirmed, both at the pleadings stage and at the certification stage, that a plaintiff need not establish the standing of every class member. *Id.* at 1273. However, the court held that "at some time in the course of the

litigation the district court will have to determine whether each of the absent class members has standing **before they could be granted any relief**." *Id.* at 1274 (emphasis added). The court vacated class certification and remanded so that the trial court could determine whether individualized standing inquiries would defeat predominance. *Id.* at 1276-77. The court emphasized, "We do not hold today that a court is required to ensure that the class definition does not include any individuals who do not have standing before certifying a class." *Id.* Rather, the court needs to undertake the predominance analysis with that question in mind and plan for how it will be resolved before relief is granted. *Id.*

Assuming that standing must be shown before final judgment in a class settlement that has not gone to trial, as here, standing can be established through evidence developed in the agreed-upon claims administration process. In this case, fully aware of *Amerifactors,* BTL negotiated a claims form to address its standing and merits concerns. All claiming class members, over Intervenors' objection, were required to certify that they received the BTL faxes at a specific 10-digit phone number. Self-attestation is a permissible method of identifying class members, provided there is some objective basis for evaluating the attestation.

Membership in a proposed class "can be capable of determination without being capable of *convenient* determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021) (emphasis in original). "A plaintiff might establish that

27

self-identification-based ascertainment is administratively feasible and otherwise unproblematic by proposing a case-specific and demonstrably reliable method for screening each self-identification." *Karhu v. Vital Pharmaceuticals, Inc.,* 621 Fed. Appx. 945, 949 n.5 (11th Cir. 2015). *See also City Select Auto Sales Inc. v. BMW Bank of N. America,* 867 F.3d 434 (3d Cir. 2017) (self-identification of class members permissible if database of numbers to which faxes were sent provides corroboration). Here, the Biggerstaff report provides an objective basis to test claims. To the extent that BTL challenges claims on the ground that a claimant received faxes through an online fax service, the settlement lays out a process for resolving those challenges. If necessary, the Court could appoint a special master to do that. Moreover, should the Court deem it necessary, the class could be re-noticed and the claim form modified to require claimants to certify that they did not receive their faxes through an online fax service. BTL's due process rights will be protected so long as it can challenge those attestations in the claims administration process. Again, if necessary, the Court could appoint a special master as permitted by Fed. R. Civ. P. 53(a)(1)(C).

### III.    Conclusion

For all these reasons, the Court should deny BTL's motion to dismiss and decertify. ECF No. 492.

Respectfully submitted,

TECHNOLOGY TRAINING ASSOCIATES, INC., LARRY E. SCHWANKE, D.C. d/b/a BACK TO BASICS FAMILY CHIROPRACTIC, BAREWOOD OUTLET, INC., and THOMAS SAVINO D/B/A WEBRX PHARMACY PALACE, D/B/A RXPALACE.COM

By: /s/ Phillip A. Bock

Phillip A. Bock
Robert M. Hatch
Jonathan B. Piper
Bock Hatch & Oppenheim, LLC
203 N. La Salle Street, Suite 2100
Chicago, IL 60601
(312) 658-5501 (phone)
service@classlawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and thereby caused it to be served on all counsel of record through the ECF notice system.

<u>By: /s/ Phillip A. Bock</u>

## TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | nationalnanpa.com/about_us/index.html |
| 2 | Excerpts of P. Gralla, *How the Internet Works* (8th ed. 2006), ch. 5 ("How Internet Addresses and Domains Work") and 11 ("How Email Works") |
| 3 | Declaration of Andrew Barnett, March 19, 2024 |
| 4 | Excerpt from Declaration of Ken Sponsler, Feb. 18, 2022 |
| 5 | Westfax.com pricing |
| 6 | Efax.com pricing |
| 7 | Westfax, Inc. Petition for Consideration and Clarification |