# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al.,<br>Plaintiffs,<br>v.<br>BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10,<br>Defendants,<br><br>TECHNOLOGY TRAINING ASSOCIATES, INC., et al.,<br>Intervenors. | Case No. 8:13-cv-01592-AEP<br><br>Magistrate Judge<br>Anthony E. Porcelli |

## DECLARATION OF KEN SPONSLER

I, Ken Sponsler, declare and state as follows:

### I.  INTRODUCTION

1. My name is Ken Sponsler. I am the Senior Vice President at PossibleNOW Services, Inc. d/b/a CompliancePoint Litigation Support Services ("CPLSS"), located in Duluth, Georgia.

2. This declaration lists my additional findings and conclusions in this matter. I reserve the right to provide additional information in this matter. I also reserve the right to supplement this declaration as new information becomes available.

### II.  ASSIGNMENT

3. In my February 20, 2024 declaration, CPLSS and I were asked by counsel for Defendant Buccaneers Team LLC f/k/a Buccaneers Limited Partnership

1

("BTL") in the above-captioned matter to assess whether and to what extent fax service providers during the period of 2009 and 2010 would have utilized technology that was substantially similar to the technology identified by the FCC as being used by "online fax services" in its declaratory rulings in In re Amerifactors Fin. Grp., LLC, 2019 WL 6712128 (FCC Dec. 9, 2019), and In re Joseph T. Ryerson & Son, Inc., 2020 WL 5362216 (FCC Sept. 4, 2020).

4. CPLSS and I were asked by counsel for BTL in the above-captioned case to assess in this declaration whether and, if so, to what extent fax servers utilized by online fax services have the capacity to print.

5. CPLSS and I were also asked by counsel for BTL to respond to claims made by Plaintiffs in their March 21, 2024 submission regarding certain testimony I have given in earlier cases involving the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), 47 USC § 227 (hereafter "TCPA").

6. Finally, CPLSS and I were asked by counsel for BTL to clarify the claims made by Intervenors in their March 21, 2024 submission regarding how online fax services operate.

### III. QUALIFICATIONS

7. I have extensive experience regarding fax transmission technology and its application with respect to the rules and requirements under the TCPA. I have previously served as a party-appointed expert witness in dozens of TCPA matters. I have also been appointed by federal courts to serve as a TCPA compliance monitor.

8. My experience includes dozens of consulting and testifying witness engagements in matters relating to the types of technologies employed by fax service providers and online fax services.

9. My qualifications were previously described in Paragraphs 15-25 of the February 18, 2022 Declaration of Ken Sponsler in Support of BTL's Submission Regarding the Reliability of the Biggerstaff Report Data ("February 18, 2022 Sponsler Declaration"), and I incorporate them into this declaration.

10. This declaration assumes the Court is familiar with the faxes at issue in this case and incorporates the background information regarding the alleged fax marketing campaign described in Paragraphs 26-31 of the February 18, 2022 Sponsler Declaration.

11. This declaration also assumes that the Court is familiar with the various expert reports prepared in this matter by Plaintiffs' expert, Robert Biggerstaff. See Biggerstaff Report (Dkt. 207-5); Biggerstaff Suppl. Rpt. (Dkt. 207-9); Biggerstaff Second Rpt. (Dkt. 210-2).

12. Finally, this declaration assumes that the Court is familiar with the online fax service provider technology described in Paragraphs 11-19 of the February 20, 2024 Sponsler Declaration (Dkt. 532-12).

**IV. OPINION ONE: FEW, IF ANY, FAX SERVERS USED BY ONLINE FAX SERVICE PROVIDERS WERE OR ARE BUILT, CONFIGURED OR PROGRAMMED TO PRINT, AND IT IS UNLIKELY THAT ANY ONLINE FAX SERVICE PROVIDER WOULD UNDERTAKE THE SIGNIFICANT EFFORT AND EXPENSE NEEDED TO PROGRAM AND CONFIGURE THEIR FAX SERVERS TO PRINT, GIVEN THE LACK OF ANY PRACTICAL NEED FOR DOING SO**

13. As noted previously, the TCPA provides, among other things, that "[i]t shall be unlawful for any person within the United States, or any person outside the

United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain conditions apply. 47 U.S.C. § 227(b)(1)(C).

14. A "telephone facsimile machine" is defined in the statute as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." 47 U.S.C. § 227(a)(3).

15. In multiple instances, the FCC has analyzed online fax services and determined that the fax servers they use do not have the capacity to print. See Feb. 20, 2024 Sponsler Decl. (Dkt. 532-12) ¶¶ 11-16 (citing In re Amerifactors, 2019 WL 6712128 (FCC 2019) and In re Ryerson, 2020 WL 5362216 (FCC 2020)).

16. Fax servers are physical or virtual systems used by online fax services or other fax service providers that, among other things, aggregate faxes received via fax modems that are connected to telephone lines or that are received in digital form via the Internet and process (by converting an analog file to digital, as necessary) and then store those digital files so that they can be sent to end-recipients (i.e., subscribers) via email or otherwise be accessed by subscribers via an online portal. This conversion process is not a component of the T.30 protocol.

17. Most, if not all, of the fax servers that were in widespread use in the 2009 to 2010 period (and to this day) were not built, programmed or configured to be able to print. To be able to print from a fax server, the fax server would need, among other things, (1) physical access to a printer (which could be via a USB cable,

a network, etc.), and (2) drivers installed on the fax or network server that enable it to communicate with a printer.

18. As discussed in my prior declaration, HylaFax is a major enterprise fax hardware and software provider that has existed since 1991. See Feb. 20, 2024 Sponsler Decl. (Dkt. 532-12) ¶ 19. HylaFax in its standard form does not include print drivers or have the functionality to print. Instead, HylaFax would require additional software to be installed that would send documents of a certain format to a printer, because fax servers cannot themselves send documents to printers. See, e.g., How To Auto Print, HYLAFAX.ORG, https://www.hylafax.org/how-to/auto-print/ (last accessed April 15, 2024).

19. Additionally, a fax server would require a connection (via physical or network access and a driver that facilitates communication) to a printer, which is highly atypical, because fax servers do not have access to off-network printers and online fax services typically do not have network printers as part of their operations. Indeed, it was (and is) common to segregate any production network from an internal office network to prevent corruption of the production network and to maintain confidentiality of information stored on the production network. Thus, fax servers on a production network for an online fax service would be segregated from an internal office network for that service that might have attached to it a network-capable printer.

20. HylaFax is not unique in this regard but was and is widely used in the fax industry. As such, it is representative of the lack of capacity for printing by fax servers and the equipment used by online fax services.

5

21. As conduits through which faxes are received, transformed from analog into digital format and either sent on to customers as emails or made available to customers for viewing on an online portal, there is no business purpose or need for online fax service providers to take any (and certainly not all) of the steps necessary to modify their fax servers to be able to print, much less to connect them to a printer or use them for printing. See also Feb. 20, 2024 Sponsler Decl. (Dkt. 532-12) ¶ 19.

22. The T.30 protocol is a necessary component of a stand-alone fax machine's automatic print process for faxes received over a regular telephone line. However, an online fax service provider interrupts the process and instead converts the fax transmission to a digital image. This is accomplished distinctly from and after the T.30 process has completed.

23. Moreover, HylaFax itself, for instance, cannot natively produce printer-compatible images. An additional application or applications are required to produce print-compatible image formats. Importantly, however, the process of converting fax transmission images into print-capable formats is completely outside of the T.30 facsimile process. In other words, these print-compatible images are not faxes. Therefore, even if an online fax service provider programmed all of the additional software and installed printer drivers and other applications for the conversion of fax images to print-capable images (which—as noted—it would typically have no reason to do), no fax transmissions would be printed; only the converted images identical to the ones sent to customers as email attachments would be printed. Similarly, customers who receive email attachments from online fax service providers must also have applications that can open, view, and print the images, such as Foxit or Adobe or image viewers such as Paint and photo viewers.

24. Even if a fax server were programmed to send faxes converted to PDF and attached to an email and sent to a printer, one of the most prevalent printer manufacturers, Hewlett-Packard ("HP") did not have email-to-printer functionality until at least the summer of 2010. See Andrew Ostrow, HP Looks To Change The Way We Print, MASHABLE (June 7, 2010, 3:06 P.M.), attached hereto as Exhibit A (noting that HP announced a "major new initiative" to enable users to "ePrint" to web-connected printers). However, it is important to note that ePrint, even if used, is printing by the customer at their choice rather than the online fax service itself. The ePrint-capable printer is the property of the customer.

25. Fax servers used by online fax services are materially different from personal computers in many ways. While it is possible to connect a printer to many personal computers and to print from the personal computer to the printer with minimal configuration using software and print drivers that are pre-loaded on many personal computers as well as ports and Wi-Fi capabilities that are standard on many personal computers, that is in no sense true of fax servers, as fax servers lack the software and drivers that are needed to print, almost always lack Wi-Fi capability and often may lack ports suitable for connecting printers. Fax servers are purpose-built and typically have only the operating system and fax server software (e.g., HylaFax) installed that are needed for the specific purpose for which the fax server is intended, namely to receive and store faxes in digital form and to make them accessible to subscribers to the online fax service. Conversely, many personal computers (e.g., Apple Macs) come pre-loaded with print drivers and with software suites that contain numerous programs fully capable of printing (e.g., word processing, spreadsheet and presentation software).

26.   It is thus my opinion that a substantial portion of the alleged fax transmissions at issue in this litigation would have been received by cloud-based online fax services that did <u>not</u> have inherent capacity to print. In my view, however, it is not possible at this date to determine in any systematic way how the faxes at issue in this matter were ultimately received.

V.   **OPINION TWO: PLAINTIFFS' CITATION TO TESTIMONY FROM THE <u>SCOMA V. MASTERCARD</u> CASE LACKS CONTEXT AND MISCONSTRUES THE NATURE OF ONLINE FAX SERVICES**

27.   Plaintiffs cite to my prior deposition testimony in <u>Scoma v. Mastercard</u>, Case No. 2:16-cv-00041 (M.D. Fla.), for the proposition that "the equipment used by online fax services has the 'capacity' to print." <u>See</u> Pls.' Resp. to BTL's Submission Regarding the Issues Raised at the January 19, 2024 Hearing (Dkt. 536) at 23 (citing Sponsler Dep. (Dkt. 536-7) at 30:11-12, 30:21, 31:3, 31:9, 58:11, 59:10). The proposition Plaintiffs put forward is overly simplistic, misleading, ignores necessary context to the testimony, and omits the fact that the word "capacity" was nowhere defined in the deposition.

28.   When asked "if an online fax service can send an e-mail over the Internet the online fax service has the capacity to print because it can access a printer over the Internet," my response was "I'm not assuming they can access a printer over the Internet. They would have to have some printer that they wanted to access or that they have access to." Sponsler Dep. (Dkt. 536-7) at 30:4-7, 9-11. As previously noted, virtually no online fax service would have a printer connected to their fax server network or would have the capacity to send documents over the Internet to a remote, off-network printer without knowing that printer's IP address and configuring their equipment to access such a printer. Again, this is known as ePrint,

8

which was not available until 2010 and is a customer printer solution. The printing would be entirely dependent on additional equipment, configuration and programming that the fax server is virtually guaranteed not to have had or have had access to in 2009-2010. For all practical purposes and as these terms are commonly understood, there is no "capacity to print" in this situation, even setting aside the previously discussed issues of fax servers generating documents in formats that printers cannot read and lacking the ability to transform the fax into those formats without additional coding.

29. Later, when asked again whether "if you have access to the Internet and you can send e-mails you have the capacity to print," I testified that it would be a "nonsensical capability" and that "the only way that you could print over the Internet is to have an Internet-capable, e-mail capable printer that would print if you designated it to go to that printer." Sponsler Dep. (Dkt. 536-7) at 58:7-17. This further reinforces my opinion that no matter whether a fax server could send a fax over the Internet, the <u>fax server</u> itself has no capacity to print in the absence of installed printer drivers and connectivity through the intranet or Internet connection. Accessing such a printer is impractical and otherwise not feasible for online fax service providers because they typically do not have a business need for access to remote printers or the programming to be able to do so. As discussed earlier, this technology might have been a viable option for printing images of faxes sometime after 2010. But again, it would have been the customer's printer rather than the online fax service.

VI. **OPINION THREE: SUBSCRIBERS TO ONLINE FAX SERVICE PROVIDERS DO NOT RECEIVE FAXES OVER THE PUBLIC SWITCHED TELEPHONE NETWORK ("PSTN"), BUT RATHER AS**

## EMAIL THROUGH AN ONLINE PORTAL ACCESSED OVER THE INTERNET

30. Intervenors cite to my prior declaration from this case for the unremarkable proposition that some (but not all) faxes that are sent from a telephone facsimile machine to an online fax service utilize the PSTN, at least in part. See Intervenors' March 21, 2024 Submission (Dkt. 537) at 7 n.2 (citing February 18, 2022 Sponsler Decl. (Dkt. 341-2) ¶ 64). While true, this proposition fails to acknowledge that the end-user (i.e., the subscriber to the online fax server) does not utilize the PSTN at all to receive or access the image of the fax that was created by the online fax service provider and that, instead, the end-user or subscriber typically accesses or receives the fax through the Internet. The fax T.30 protocol, however, is not involved in this process at all.

31. Online fax services assign a ten-digit telephone number possessed by the online fax service to each of their subscribers. Faxes that are sent by a conventional fax machine (e.g., one that does not use Voice over Internet Protocol ("VoIP") or the Internet to send faxes to an online fax service) travel over the PSTN to the online fax service's fax server. The PSTN has been almost entirely converted from analog to digital for many years. The online fax service's fax server transforms the fax into an image, likely stores that image on a cloud-based server which, for many online fax services, is and was at the time of the faxes at issue here hosted on Amazon Web Services ("AWS") or similar services. Cloud or Internet storage services enable online fax service provider subscribers to access the image of the fax either by logging into the Internet cloud-based servers maintained by the online fax service (or AWS) or by having the faxes sent to the subscriber as emails over the

Internet (usually at the subscriber's election). At no part of that process, however, does the subscriber or end-user ever receive a fax from the online fax service provider over the PSTN nor does the subscriber or end-user typically (if ever) receive or access the fax over a "regular telephone line," as that term is used in the TCPA. Instead, receipt and access to the image of the fax by the subscriber or end-user is almost always over the Internet.

32. Furthermore, if both the fax broadcaster and the online fax service utilized VoIP technology in their operations, it was possible for a transmission to avoid the PSTN for the entirety of the transmission, and merely traverse the PSTN and IP gateways. In that regard, I understand that Plaintiffs in this case allege that the surreptitious web of fax broadcasters employed by FaxQom to allegedly send the faxes at issue in the case utilized an Internet-based technology. See Second Am. Compl. (Dkt. 70) ¶ 19 (describing FaxQom's advertising of "the furnishing of Worldwide IP Fax Broadcast Services"); id. Exhibit C ("Faxqom can disseminate tens of thousands of faxes in just a few minutes using the largest integrated IP fax broadcast system."). Taking Plaintiffs' allegations as true, it was certainly possible for a subset of the faxes to have been transmitted entirely over IP networks (Internet) to an online fax service. And by 2009, many faxes sent by fax broadcasters would have been sent over the Internet, and remained so until received by an online fax service or VoIP recipient. (VoIP fax reception would have required the installation of an Analog Telephone Adapter ("ATA") assuming the receiving equipment was a conventional fax machine).

## VII. **OPINION FOUR: THE DECLARATION OF ANDREW BARNETT SUBMITTED BY INTERVENORS CONTAINS NUMEROUS STATEMENTS LACKING CONTEXT OR THAT IGNORE THE PRACTICAL REALITIES OF ONLINE FAX SERVICES**

33.     I understand that Intervenors filed with their March 21, 2024 submission a declaration of Andrew Barnett, who identifies himself as the vice president of sales and development from 1999 until 2021 for a company called Profax Inc. See Barnett Decl. (Dkt. 537-3) ¶ 1. Mr. Barnett makes a variety of statements regarding online fax services that are either incomplete, lacking context, or that ignore the practical realities of online fax services. I respond to a number of these statements below.

34.     Mr. Barnett states in Paragraph 5 that "[f]ax servers are computer equipment, often personal computers like a desktop, configured with a fax modem board installed." This statement lacks context and is certainly not the most common form of fax server that would have been utilized by an online fax service in 2009 and 2010. Online fax services would have had virtually no need for "personal computers like a desktop" to provide their services to customers. Fax servers were most likely connected to cloud-based storage systems from which customers could retrieve their faxes by logging in or opting to have them emailed. And as previously stated, supra ¶¶ 30-32, if an online fax service utilized VoIP-type technology to receive faxes, then there would have been no need for a "fax modem board" to receive the faxes at issue because the transmission would have been entirely over the Internet.

35.     Mr. Barnett likewise states in Paragraph 6 that "[t]he incoming fax communication is received over the public switched telephone network [i.e., PSTN]

over a telephone line connected to a fax card (i.e., a fax server modem board)." This statement ignores transmissions that are sent and received via the Internet. Such transmissions would not require a "fax server modem board," and the cloud-based servers used to store received faxes for viewing or email to subscribers certainly would not have "fax server modem boards" or fax modems at all.

36.  Paragraph 6 continues that "[i]t is generally not possible to send a fax to a 10 digit NANPA fax number without the transmission being sent, at least in part, over the public switched telephone network. The exceptions would be faxes sent over dedicated local networks, for example within a single business with multiple offices." These exceptions also fail to include Internet transmissions from fax broadcasters using IP-based technology (as FaxQom allegedly did) to online fax services receiving faxes sent to VoIP or Fax Over Internet Protocol ("FoIP") capable recipients such as many online fax service providers.

37.  Mr. Barnett states in Paragraph 9 that "[i]t is possible to connect printers to online fax servers. It is also possible to print from an online fax server to a printer via Wi-Fi or through a local network. It is an option for customers to set their account to automatically print all incoming faxes or to select which incoming faxes to print." See Barnett Decl. (Dkt. 537-3) ¶ 9. As described more fully above, supra ¶¶ 16-26, fax servers require additional programming and software in order to be able to print over either a Wi-Fi or other Internet-connected printer, and the vast majority (if not all) online fax services would not have invested in equipping their fax servers with such programming and software. Online fax services have no business need themselves to print incoming faxes—the entire reason for online fax services is so that incoming faxes are <u>not</u> automatically printed and the customers of

13

the online fax service can choose whether they want to print any individual fax <u>after</u> the PDF or image of the fax has been forwarded to them. The "option for customers to set their account to automatically print" refers to printing on the <u>customers'</u> computers and printers, <u>not</u> the online fax service's fax service. It would be nonsensical for an online fax service customer to print a fax over the Wi-Fi or local network of the fax service provider rather than the customer's own network and printers. If Mr. Barnett is referring to the online fax provider automatically printing faxes, he does not explain further how these printed faxes would be delivered to the customer (FedEx/Mail/UPS?), and at what additional cost?

38. Finally, Mr. Barnett states in Paragraph 10 that "[i]f fax advertisements sent to customers using online fax services were not regulated, and that increased the number of fax advertisements sent to such customers, the result would be increased telecommunications phone bills for the service, which would be passed on to customers either through increased flat rates, per page charges, or per minute charges." Mr. Barnett offers no support for this contention, and in the absence of any need to build out additional capacity to receive additional fax advertisements, there is no reason why a flat rate charged by an online fax service would need to be increased.

## VIII. CONCLUSIONS

39. The fax servers that were predominantly in use in the 2009-2010 time period and today do not have the "capacity to print" in any practical, meaningful, logical or business sense. Even in the unlikely event this capacity existed, they would be printing images outside of the T.30 protocol and therefore would not be associated at all with the fax transmission. The printing would also NOT be

involuntary or automatic without customer approval, with the customer being billed for this extra service. Fax servers are not able to communicate with printers or send printer-compatible files unless they are built, configured and programmed to do so, and online fax services do not as a matter of course program and configure their fax servers in such a manner due to the nature of the customer benefits of the service they offer, such as no automatic printing, and the costs associated with receiving them.

40. Plaintiffs' citation to previous deposition testimony I gave in a different case ignores key context and distorts the ultimate conclusion, which is that fax servers utilized by online fax services do not have the capacity to print without several additional complex and unnecessary steps that in practical terms seldom (if ever) occur, because online fax services do not offer printing services or capabilities because there is no business model that supports this.

41. Subscribers of online fax service providers do not receive faxes from the online fax service provider over the PSTN.

42. The Barnett Declaration contains a number of statements that are either incomplete, lacking context, or that ignore the practical realities of online fax services.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 26, 2024 in Beverly Hills, Florida.

_____
**Ken Sponsler**

# EXHIBIT A

www.cnn.com /2010/TECH/gaming.gadgets/06/07/hp.print.mashable/index.html

# HP looks to change the way we print

By **Adam Ostrow**, Mashable

June 7, 2010 2:06 p.m. EDT | Filed under: Gaming & Gadgets



HP announced a slew of new devices that enable users to print from any device to a web-enabled printer.

**STORY HIGHLIGHTS**

- It works by giving each printer its own unique e-mail address
- The new printers, along with ePrint, can connect directly to Google Cloud

(Mashable) -- HP has announced a major new initiative and a slew of new devices that enable users to print from any device to a web-enabled printer by simply using e-mail.

The idea -- which builds off the announcement we saw back in April -- starts with giving each printer its own unique e-mail address.

That printer's owner (and their designated family, friends, and colleagues) can then print documents by sending it an email from a smartphone, from a tablet, or any other device that allows it. Called HP ePrint, the technology eliminates the need for installing drivers and enables a variety of new apps and services.

**Putting Documents in the Cloud**

The new printers that HP is unveiling today along with ePrint can connect directly to Google Cloud using their touchscreen interface. That means users can print Google Docs directly from the cloud without using their desktop computer, as well as scan documents directly to their Google Docs account. Other Google services like Calendar

and Picasa for photos are also supported. Similarly, Box.net and Docstoc users can also retrieve and push documents to and from the cloud through new print apps.

**A New Opportunity for Publishers**

Another area HP is exploring with the ePrint concept is scheduled delivery. This allows users to get content printed at specific times -- for example, getting a customized daily newspaper printed out every morning that they can take with them on the train. MSNBC has signed on as a partner to pilot this concept, and HP has teamed with Yahoo to sell the ads, which, you can imagine could include a mix of contextual advertising and locally relevant promotions and coupons.

**Another Platform for Developers**

Beyond productivity and news, initial apps include Facebook for printing photos and events and MapQuest for printing maps and directions. HP also sees a big opportunity for providing different types of activities for parents and kids, and to that end has signed on Crayola for coloring pages and PBS for a variety of education-driven printing. As for the market size for developers here, HP says it expects to ship, "tens of millions of web-connected printers" by the end of next year. Currently, developers interested in building apps need to apply for access to HP's SDK.

**Why's HP Doing This?**

Beyond selling printers, HP needs to sell ink. With more and more types of documents getting digitized and smartphones replacing former functions of printers (think coupons and tickets), HP needs new ways to drive printer usage.

Web-connected printers fill this need in a few ways. First, they connect to the ever growing cloud for business users and make their lives easier. Second, the email-to-print concept clearly has the potential to drive new kinds of usage, both from business users and consumers who do things like print photos and news. Finally, there's also opportunities for developers to create sticky apps -- perhaps not on the scale we've seen in mobile, but with HP betting the future of its printers on web connectivity, you can bet we'll see some big winners emerge from the developer community.

HP will dive into these topics at a press conference this morning to kick off Internet Week New York, where I'll be moderating a panel with a number of the players involved in the new ePrint initiative. We'll try and bring you video of the discussion later on.

Disclosure: HP is a sponsor of Mashable's Internet Week New York channel.

© 2013 MASHABLE.com. All rights reserved.

FOLLOW THIS TOPIC

**We recommend**

**From around the web**