# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, <br><br> Defendants, <br><br> TECHNOLOGY TRAINING ASSOCIATES, INC., et al., <br><br> Intervenors. | Case No. 8:13-cv-01592-AEP <br><br> **Magistrate Judge Anthony E. Porcelli** |

## BTL'S RESPONSE TO INTERVENORS' MARCH 21, 2024 SUBMISSION CONCERNING THE ISSUES RAISED AT JANUARY 19, 2024 HEARING

Date:  April 26, 2024

Mark S. Mester
  (admitted *pro hac vice*)
Robert C. Collins III
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com
         robert.collins@lw.com

Joseph H. Varner, III
  (Bar No. 394904)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602-3644
Telephone:  (813) 227-8500
Facsimile:  (813) 229-0134
Email:  joe.varner@hklaw.com

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

    A. Intervenors' Reliance On Ten-Digit Telephone Numbers Fundamentally Misperceives The Role Of Online Fax Services ..........1

    B. Receiving An Email Or Logging In To A Cloud-Based Server Simply Does Not Satisfy Article III, The Efforts Of Intervenors Notwithstanding ...................................................................................4

        1. Intrusion On Seclusion And Invasion Of Privacy Do Not Create Article III Standing Here ..................................................4

        2. The Fact Some Online Fax Services Charged Some Consumers Per Fax Only Reinforces Why Class Treatment Is Not Feasible Here ..................................................5

    C. Intervenors Refuse To Acknowledge Or Address How The Four FCC Orders Can Be Reconciled .....................................................6

    D. Intervenors Ignore Governing Law And What Each FCC Order Says In Arguing Against Retroactive Application ..............................7

    E. Intervenors Again Fail To Address How The Court Could Possibly Determine Which Settlement Class Members Would Need To Be Excluded From The Class Due To Lack Of Article III Standing ...........................................................................................8

    F. Amerifactors And Ryerson Raise More Than Just A Merits Defense ...........................................................................................9

II. CONCLUSION ......................................................................................................9

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

2003 Order,
   2003 WL 21517853 (F.C.C. July 3, 2003) ...........................................................1, 7

Auer v. Robbins,
   519 U.S. 452 (1997)...............................................................................................6

Chevron v. NRDC,
   467 U.S. 837 (1984)...............................................................................................7

Daisy v. Mobile Mini,
   489 F. Supp. 3d 1287 (M.D. Fla. 2020)..............................................................4, 5

Drazen v. Pinto,
   41 F.4th 1354 (11th Cir. 2022) ..............................................................................8

Hulce v. Lustre-Cal,
   2021 WL 2018771 (E.D. Wis. 2021)....................................................................2

In re Amerifactors,
   2019 WL 6712128 (F.C.C. Dec. 9, 2019).............................................. 1, 2, 3, 4, 6

In re Ryerson,
   2020 WL 5362216 (F.C.C. Sept. 4, 2020) ................................................. 1, 2, 3, 6

In re Westfax,
   2015 WL 5120880 (F.C.C. Aug. 28, 2015) ........................................... 1, 2, 3, 6, 7

Licari v. Eclinical Works,
   2021 WL 4506405 (M.D. Fla. 2021) .................................................................5, 6

National Cable v. Brand X,
   545 U.S. 967 (2005)...............................................................................................6

Nussbaum v. Mortg. Servs.,
   913 F. Supp. 1548 (S.D. Fla. 1995) .......................................................................7

Scoma v. Dental Equities,
   2021 WL 6105590 (M.D. Fla. 2021) .....................................................................7

Skidmore v. Swift,
   323 U.S. 134 (1944)...............................................................................................7

**Page(s)**

Spokeo v. Robins,
   578 U.S. 330 (2016) ...................................................................................................4

TransUnion v. Ramirez,
   594 U.S. 413 (2021) ...................................................................................................8

True Health v. McKesson,
   2023 WL 7015279 (9th Cir. 2023) .............................................................................6

Wilson v. Rater8,
   2021 WL 4865930 (S.D. Cal. 2021) ..........................................................................5

## OTHER AUTHORITIES

H.R. Rep. No. 102-317 ......................................................................................................4

## REGULATIONS

47 C.F.R. § 0.141 ...............................................................................................................6

47 C.F.R. § 0.361 ...............................................................................................................6

47 C.F.R. § 64.1200 ...........................................................................................................2

BTL replies as follows to Intervenors' March 21, 2024 submission (Dkt. 537):[1]

## I.   INTRODUCTION

Intervenors' response avoids much of the dissembling and rank mischaracterization that pervade Plaintiffs' submission (Dkt. 536), but like Plaintiffs, Intervenors make no effort to harmonize the 2003 Order, Westfax, Amerifactors or Ryerson, instead dismissively rejecting Amerifactors and Ryerson as "a muddle" but offering the Court no guidance how the four orders should be interpreted together or why it is acceptable to choose the two Intervenors like best and ignore the other two.  (It's not.)  Moreover, Intervenors finally acknowledge all Settlement Class Members must have Article III standing and suggest ways subscribers to online fax services might be ferreted out but offer no explanation for how that would work for a Settlement Class where we do not even know who over 60% or more of the members actually are.  (It wouldn't.)

### A.   Intervenors' Reliance On Ten-Digit Telephone Numbers Fundamentally Misperceives The Role Of Online Fax Services

Intervenors emphasize that faxes in this case were sent to ten-digit telephone numbers and transmitted in part over the PSTN (public switched telephone network), arguing this fact alone supposedly means all Settlement Class Members have Article III standing.[2]  See Int. Sub. at 4-8.  Intervenors, however, ignore how online fax

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement.  See Settlement Agt. (Dkt. 324-1).  In addition, all emphasis is supplied, and all internal citations, quotations and footnotes are omitted.  To conserve space, cases and authorities cited in BTL's February 20, 2024 submission (Dkt. 532) ("BTL Sub.") and/or Intervenors' March 21, 2024 submission (Dkt. 537) ("Int. Sub.") are cited herein using short-form citations.

[2] BTL disagrees with this characterization to a degree, but the Court need not resolve this issue, given that capacity to print is dispositive.  In truth, however, many faxes sent on behalf of BTL to online fax services would have started digitally and remained in digital form throughout the entire transmission to the online fax service, since the switches in use on the PSTN in 2009 were themselves digital, meaning those transmissions would have never traveled over what would be

services operate.³ Online fax services assign a ten-digit telephone number possessed by the service to each subscriber, and faxes to the subscriber are sent to that number and received by the online fax service, which then digitally stores an image of the fax on cloud-based servers.⁴  See Ex. 4; *ProFax*, ProCirrus, Ex. 5.  Subscribers "receive" those faxes either by logging in to cloud-based servers maintained by the online fax service or by having them sent as emails over the Internet.  See Ex. 4.  But in no sense are faxes received by the subscriber on a ten-digit number; they are instead "received" by the subscriber either by logging in to cloud-based servers or as emails sent by the online fax service over the Internet.

This is the exact fact pattern in Amerifactors and Ryerson, with a related fact pattern addressed in Westfax.  And the point of demarcation in the three orders in terms of TCPA liability is whether the equipment used by a third-party fax service

---

called a "regular telephone line" (i.e., "POTS" or plain old telephone service) or have needed to be converted to analog form.  See 47 C.F.R. § 64.1200(f)(14) (to come within the scope of the TCPA, faxes must be sent and received over a "regular telephone line"); Hulce v. Lustre-Cal, 2021 WL 2018771, *3-4 (E.D. Wis.  2021) (noting faxes sent using VoIP are potentially not in the TCPA's ambit); Cameron Johnson, *What Is PSTN and How Does It Work?*, Nextiva (Aug. 12, 2023), Ex. 1 (describing PSTN and VoIP); *Telephone Switch Timeline*, Telephone World (Sept. 14, 2022), Ex. 2 at 4 (noting all PSTN switches had transitioned to digital by 2002); *Plain Old Telephone Service*, Wikipedia, Ex. 3-A (addressing POTS); see also *T.38,* Wikipedia, Ex. 3-B (addressing T.38 protocol).  But again, this issue need not be resolved by the Court.  See disc. infra at 3-5.

³ Intervenors also ignore the role of VoIP.  See generally Int. Sub.  While making much of ten-digit numbers, Intervenors and their expert neglect to mention that many of the ten-digit numbers on the Biggerstaff list were assigned to VoIP numbers, which would have facilitated a fully digital transmission from sender to recipient.  *Voice over IP*, Wikipedia, Ex. 3-C, at 3 (explaining VoIP and fact over 80% of PBX's installed in 2008 were VoIP).

⁴ Online fax servers do not print faxes and do not have the capacity to print.  See Amerifactors ¶ 15.  Indeed, the whole point of online fax services is to avoid the need to print faxes.  See *Online Faxing 101*, Apollo Tech. (May 9, 2023), Ex. 4.  Instead, online fax services store faxes digitally on a cloud-based server and make them accessible to the subscriber over the Internet on that server or by email sent by the online fax service over the Internet.  See Amerifactors ¶ 13; Sponsler Decl. (Dkt. 532-12) at ¶ 19 (noting most online fax services used servers running HylaFAX software, which lacks print drivers and the capacity to print).

2

provider was deemed to have the capacity to print.[5]  See BTL Sub. at 8-11.  But that too is an issue the Court need not resolve, because as Amerifactors makes clear, the equipment used by online fax services does not have the capacity to print and the vast majority of Settlement Class Members who "received" faxes through a fax service provider were subscribers to an online fax service (as defined in Amerifactors).  See id. at 19-21.  Moreover, there is no way to now determine what type of equipment was used in 2009 / 2010 for Settlement Class Members who subscribed to third-party services.  See id.  As such, the fact faxes on the Biggerstaff list were sent to ten-digit numbers is of no moment, and it certainly does not resolve the lack of Article III standing of upwards of 40% of the Settlement Class or the inability to determine who those Settlement Class Members are.[6]  See id. at 12 n.15.

---

[5] If it does, based on an assessment of the actual equipment used, then TCPA liability attaches, though there remains the question whether receipt of an email or logging in to a cloud-based server over the Internet nevertheless creates Article III standing on the part of the intended recipient / subscriber (we respectfully submit it does not).  See BTL Sub. at 30-31.

[6] Intervenors' suggestion that Amerifactors and Ryerson "equate" faxes and emails ignores what the two orders actually say.  Emails, however, are the only thing subscribers to online fax services receive, if they receive anything, as many subscribers access faxes by logging in to cloud-based servers of the online fax service.  See BTL Sub. at 9-10.  Moreover, a fax sent by a fax broadcaster using Internet Protocols ("IP") to a VoIP number would never have been "transcribed" from or to paper, as it would have remained in digital form its entire journey from sender to initial recipient (i.e., the online fax service).  See Sponsler Decl., Ex. 7 to BTL's Reply to Pls. Sub, at ¶ 32.  Indeed, Plaintiffs' Second Amended Complaint (the operative pleading in this case) alleges that FaxQom was able to use the Internet to send faxes on behalf of BTL:

> Faxqom can [disseminate] tens of thousands of faxes in just a few minutes using the largest integrated IP fax broadcast system.

Dkt. 70 at Ex. C (indicating FaxQom used an "integrated IP fax broadcast system," which sent faxes over the Internet using IP a/k/a TCP/IP); id. ¶ 19 (referencing IP broadcast services); Westfax ¶ 10 ("The Commission's statements address separate factual situations—one involving a communication originating as a fax over a telephone line and another communication originating as an email over the Internet.").  Finally, Amerifactors states "a fax received by an online fax service as an electronic message is effectively an email." Amerifactors ¶ 11.  Whether it is actually an email or not would depend on the equipment in question, but the fact it is received and stored digitally on equipment lacking the capacity to print is sufficient to take it outside the scope of the TCPA, as Amerifactors so holds.  See id.

3

### B.  Receiving An Email Or Logging In To A Cloud-Based Server Simply Does <u>Not</u> Satisfy Article III, The Efforts Of Intervenors Notwithstanding

Intervenors try to sidestep the fact receipt of an email or logging in to a server would <u>not</u> amount to concrete injury under Article III by suggesting (a) Settlement Class Members otherwise suffered harm akin to intrusion on seclusion or invasion of privacy and (b) some Settlement Class Members may have paid an incremental fee to receive through an online fax service a fax sent on behalf of BTL.  <u>See</u> Int. Sub. at 19, 22-23.  Neither argument, however, holds up under scrutiny.

#### 1.  Intrusion On Seclusion And Invasion Of Privacy Do <u>Not</u> Create Article III Standing Here

Intervenors suggest intrusion on seclusion and invasion of privacy create Article III injury that would otherwise be lacking for Settlement Class Members who "received" faxes from online fax services.  <u>See</u> Int. Sub. at 19, 22-23.[7]  But intrusion on seclusion and invasion of privacy were <u>not</u> harms Congress intended to address with respect to "unsolicited advertisements" sent by fax.[8]  <u>See</u> <u>Amerifactors</u> ¶¶ 12, 14.  Accordingly, they would <u>not</u> provide a basis for Article III standing even if this type of injury were cognizable for corporations and other Settlement Class Members that are not individuals.  <u>See</u> Dkt. 523.  As Judge Chappell noted in <u>Daisy</u>, however, corporations have <u>never</u> had a cause of action under English or American law for invasion of privacy <u>or</u> intrusion on seclusion, meaning under <u>Spokeo</u>, at least half of

---

[7] We earlier addressed this issue at length (Dkt. 523), but Intervenors made no effort to respond to <u>any</u> of those arguments.  There is, however, no support for the notion corporations or business organizations would have a claim for intrusion upon seclusion or invasion of privacy, making the showing required by <u>Spokeo</u> an act of futility.  <u>See</u> <u>Daisy</u>, 489 F. Supp. 3d at 1294.  Class Counsel apparently agree, as they have not even <u>attempted</u> that analysis, in spite of <u>repeated</u> opportunities.

[8] While invasion of privacy and intrusion on seclusion were identified by Congress <u>vis-à-vis</u> texts and calls, there is no mention of faxes or emails <u>anywhere</u> in the legislative history for these types of harms.  <u>See</u> H.R. Rep. No. 102-317 at 10.  They are, therefore, obviously <u>not</u> harms Congress sought to elevate in the portions of the TCPA that are relevant to this case, namely those concerning unsolicited fax advertisements.  <u>See</u> <u>Amerifactors</u> ¶ 14 & n.34.

the Settlement Class who received faxes through online fax services would lack Article III standing for that reason alone.  See Daisy, 489 F. Supp. 3d at 1294; BTL Sub., Ex. 22, at 2.  And at this juncture, there is no way to tell which Settlement Class Members did or did not do so.  See BTL Sub. at 19-21.

### 2. The Fact Some Online Fax Services Charged Some Consumers Per Fax Only Reinforces Why Class Treatment Is Not Feasible Here

Intervenors also try to capitalize on the fact that some online fax services charged a per-fax fee if applicable limits were exceeded, suggesting Settlement Class Members who may have incurred an incremental charge would have Article III standing.  See Int. Sub. at 7-8, 19.  But even assuming payment for an online fax service creates Article III standing (and that is not clear), Intervenors neglect to mention that many online fax services offered free trial periods or flat fees, and these permutations would only complicate matters and further compel decertification of the Settlement Class.[9]  Someone who paid nothing or only a flat fee would not have Article III standing, and as with the issue of capacity to print, there is simply no way at this juncture to determine who in the Settlement Class did and did not pay an incremental charge for any fax sent on behalf of BTL.[10]  See BTL Sub. at 19-21.

---

[9] Indeed, Judge Scriven faced this issue in Licari, where a class representative paid $0.08 to its online fax service as an overage fee for the fax in question.  See Licari, 2021 WL 4506405, *1, 4.  In the 2009 time period, however, there were a multitude of different online fax services, and the pricing varied considerably, with some services charging nothing for a specific number of faxes per month and others charging a flat fee and still others charging a per-fax fee if a monthly limit were exceeded, with many services offering free trial periods.  See *Internet Fax Reviews*, FAXCOMPARE, Ex. 6 (identifying the many different pricing structures used by online fax services in 2009 /2010); see also Collins Decl., Ex. 7 (describing how *Internet Fax Reviews* was accessed).  Ironically, Intervenors' own expert confirms this in his declaration.  See Barnett Decl. (Dkt. 537-3) ¶ 8 (noting "actual charges by online fax services vary" and that "[t]he pricing [of online fax services] involves one or more of a flat rate, a per page charge, or a per minute charge").

[10] Paying a flat fee for an online fax service is functionally the same as paying a monthly fee for a regular telephone line attached to a conventional fax machine or a monthly lease on computer equipment necessary for an internal network capable of sending and receiving faxes of the type described in the 2003 Order.  See Wilson v. Rater8, 2021 WL 4865930, *4 (S.D. Cal. 2021).  No one (not even Plaintiffs or Intervenors), however, has suggested that monthly telephone fees or

5

### C. Intervenors Refuse To Acknowledge Or Address How The Four FCC Orders Can Be Reconciled

Like Plaintiffs, Intervenors refuse to address how Westfax, Amerifactors and Ryerson differentiated third-party fax service providers.[11] See Int. Sub. at 1. Intervenors likewise make no mention of Auer or how serial orders of an agency like the FCC should properly be construed. See Nat'l Cable, 545 U.S. at 581-82; BTL Reply to Pls. Sub. at 2-5 & n.4 (addressing Auer). Calling Amerifactors and Ryerson a "muddle" or asserting they "should not be followed" is scarcely sufficient, especially since Amerifactors and Ryerson went to great lengths to explain how they could be harmonized with earlier orders by reference to the capacity to print and by a case-by-case analysis of the types of equipment used by online fax services. See Amerifactors ¶ 15; Ryerson ¶ 15. Moreover, the factual findings in Amerifactors and Ryerson regarding whether the equipment used by online fax services had the capacity to print is entitled to the same deference Plaintiffs and Intervenors so adamantly insist be given to the 2003 Order and Westfax.[12] See True Health, 2023

---

lease fees for fax machines or computer equipment necessary to provide the capacity to receive faxes confer Article III standing. See generally Pls. Sub.; Int. Sub. Moreover, subscribers to online fax services with flat monthly fees would have paid the same whether every fax received by a service on their behalf was fully compliant with the TCPA or every one was non-compliant or some combination of the above. See Licari, 2021 WL 4506405, *4. So as Judge Scriven concluded in Licari, standing would only exist (if at all) if a Settlement Class Member paid an incremental fee for a fax sent on behalf of BTL, something that could not possibly be proven at this point for the vast majority of Settlement Class Members. See id.

[11] To their credit, Intervenors admit the 2003 Order addressed "a fax server housed inside the fax recipient's business," avoiding the dissembling over the 2003 Order that characterized Plaintiffs' submission (Dkt. 536). Compare Int. Sub. at 12, 11 ("When a business sets up an internal network with a fax server that routes incoming faxes to employee desktop computers as emails, the entire network constitutes a telephone facsimile machine."), with Pls. Sub. at 5-12 ("[T]he 2003 Commission Order clearly determined that online fax services were covered by the TCPA").

[12] Indeed, Westfax, Amerifactors and Ryerson are literally on all fours, as all of them were issued by the CGAB pursuant to 47 C.F.R. §§ 0.141 and 0.361. See Westfax ¶ 15; Amerifactors ¶ 17; Ryerson ¶ 18; see also, e.g., True Health, 2023 WL 7015279, *2 & n.1. Accordingly, the findings of fact and interpretation of the TCPA offered in Westfax are entitled to no more deference than Amerifactors and Ryerson, the only difference being that Amerifactors and Ryerson were issued later and thus should take priority under National Cable and its progeny in the event of conflicts that are irreconcilable. See Nat'l Cable, 545 U.S. at 981. But again, it is perfectly feasible to

WL 7015279, *2 & n.1 (Hobbs Act); see also, e.g., Dental Equities, 2021 WL 6105590, *7-8 (Chevron and Skidmore).

### D. Intervenors Ignore Governing Law And What Each FCC Order Says In Arguing Against Retroactive Application

Our initial submission cited no less than four separate decisions (including three in this district) in which Amerifactors / Ryerson were applied retroactively, and Intervenors address none of them.  See BTL Sub. at 18 n.20.  Instead, they oppose retroactive application based upon purported inconsistencies between Westfax and Amerifactors, which Intervenors again characterize as an "irreconcilable muddle."  See Int. Sub. at 21.  If there is a muddle, however, it is easily resolved by focusing on what the FCC said in the four orders.  In the 2003 Order, the FCC made clear (some six years before the faxes here were sent) that faxes sent as emails over the Internet were not covered by the TCPA.  See 2003 Order ¶ 200.  Moreover, Westfax, Amerifactors and Ryerson each expressly stated they were clarifications of prior interpretations and explained how they are all consistent (i.e., focusing on whether the equipment in each had the capacity to print). See Westfax ¶ 9.  And as adjudications under Section 5(d) of the APA and interpretations of the TCPA and 2003 Order as opposed to legislative rules, they are plainly appropriate for retroactive application just like an interpretation of the TCPA or any other statute by this or any other Court.[13]  See Nussbaum v. Mortg. Servs., 913 F. Supp. 1548, 1557 (S.D. Fla. 1995).  Finally, there is no sense in which

---

harmonize the four orders simply by following what they each say and taking heed of the case-by-case analysis performed in each regarding the equipment used by each fax service provider and whether that equipment had the capacity to print.  See BTL Sub. at 5-9.

[13] The number of decisions making this broader point in terms of agency interpretation of statutes and why retroactive application is proper is considerable, to say the least.  See, e.g., BTL Sub. at 17-19.

7

Westfax (issued in 2015—some six years after the faxes here were sent), could create legitimate expectations on the part of Settlement Class Members in terms of their right to recovery for faxes received in 2009 and 2010. As such, there is no credible basis for suggesting (as Intervenors do) that the interpretations of the TCPA provided by Amerifactors and Ryerson should not be applied here.

### E. Intervenors Again Fail To Address How The Court Could Possibly Determine Which Settlement Class Members Would Need To Be Excluded From The Class Due To Lack Of Article III Standing

Having finally acknowledged (at least implicitly) that all Settlement Class Members must have Article III standing (see Int. Sub. at 22-23), Intervenors nevertheless argue the "claims administration process or a special master" could decide who should be excluded from the Settlement Class for lack of standing. Id. at 26. What Intervenors do not address, however, is how the Settlement Administrator or a special master could possibly identify everyone who should be excluded nor do Intervenors (or Plaintiffs) address (let alone contest) the discussion in BTL's initial submission (Dkt. 532) as to why only persons and entities with standing are properly before the Court and thereby subject to the Release in the Settlement, which is the fundamental premise for the requirement of Drazen I that any definition of a settlement class must contain only persons with standing. See BTL Sub. at 27-29. But for a Settlement Class where less than 32% of members have been even tentatively identified and fewer than 5% submitted a Claim Form, the task of identifying and then excluding all Settlement Class Members without standing (as required by TransUnion and Drazen I) would simply not be feasible nor has anyone even tried to explain how it could be accomplished.[14]  See id. at 19-21.

---

[14] The suggestion by Intervenors that "[c]laimants who received BTL's faxes through an online service can be excluded from the judgment," gratuitously assumes that it would be feasible to

## F. <u>Amerifactors</u> And <u>Ryerson</u> Raise More Than Just A Merits Defense

Virtually conceding Settlement Class Members who "received" faxes as emails or by logging in to a cloud-based server would not have a claim under the TCPA, Intervenors argue the FCC orders "do not mention standing" and therefore "at most" raise a merits defense. <u>See</u> Int. Sub. at 24. As BTL demonstrated earlier, however, the question of whether <u>all</u> Settlement Class Members have a TCPA claim is <u>directly</u> related to whether they have Article III standing, all the more so because the issue here goes to the question of whether any <u>harms</u> suffered by subscribers to online fax services qualify under Article III. <u>See</u> BTL Sub. at 30-31. If upwards of 40% of the Settlement Class do not have a claim under the TCPA because receiving an email or accessing a cloud-based server is <u>not</u> sufficient under Article III or the TCPA (as is plainly the case), then BTL is obviously entitled to the relief it is requesting in its motion to dismiss and decertify (Dkt. 492).

## II. <u>CONCLUSION</u>

For the foregoing reasons, BTL respectfully requests that the Court dismiss the class claim and decertify the Settlement Class.

Date: April 26, 2024

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for Defendant Buccaneers Team LLC

---

identify who those Settlement Class Members are or consistent with the Settlement Agreement. <u>See</u> Int. Sub. at 4. But again, since it is <u>not</u>, Intervenors' suggestion is of little relevance or probative value.

| | |
|---|---|
| Mark S. Mester<br>   (admitted *pro hac vice*)<br>Robert C. Collins III<br>   (admitted *pro hac vice*)<br>LATHAM & WATKINS LLP<br>330 North Wabash Avenue<br>Suite 2800<br>Chicago, Illinois 60611<br>Telephone:  (312) 876-7700<br>Facsimile:  (312) 993-9767<br>E-mail:  mark.mester@lw.com<br>         robert.collins@lw.com | Joseph H. Varner, III<br>   (Bar No. 394904)<br>HOLLAND & KNIGHT LLP<br>100 North Tampa Street, Suite 4100<br>Tampa, Florida 33602-3644<br>Telephone:  (813) 227-8500<br>Facsimile:  (813) 229-0134<br>Email:  joe.varner@hklaw.com |

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  April 26, 2024

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for Defendant Buccaneers Team LLC

Mark S. Mester
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com