UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CIN-Q AUTOMOBILES, INC., et al., <br>                 Plaintiffs, <br>    v. <br> BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, <br>                 Defendants, <br><br> TECHNOLOGY TRAINING ASSOCIATES, INC., et al., <br>                 Intervenors. | Case No. 8:13-cv-01592-AEP <br><br> Magistrate Judge <br> Anthony E. Porcelli |

**BTL'S RENEWED REQUEST
FOR AN EVIDENTIARY HEARING**

Pursuant to Local Rule 3.01(h), BTL respectfully renews its earlier request for an evidentiary hearing in light of claims raised by Plaintiffs and Intervenors Technology Training Associates, Inc., et al. ("Intervenors") in their March 21, 2024 submissions (Dkts. 536, 537).[1] In support of this request, BTL states as follows:

## I.   INTRODUCTION

1. Along with its initial submission concerning the issues raised during the January 19, 2024 hearing (Dkt. 532), BTL asked the Court to hold an evidentiary hearing to address evidence (if any) presented by Plaintiffs (or Intervenors) in opposition to BTL's pending motion to dismiss the class claim for lack of Article III standing and to decertify the Settlement Class. See BTL's Request for Evidentiary Hearing (Dkt. 533). In that request, BTL noted that Plaintiffs continue to have the

---

[1] Capitalized terms have the meaning ascribed to them in the Settlement Agreement filed with Plaintiffs' motion for preliminary approval. See Settlement Agt. (Dkt. 324-1).

burden of demonstrating that all members of the Settlement Class have Article III standing and that as of BTL's February 20, 2024 submission, Plaintiffs and Class Counsel had offered no evidence that would demonstrate that the bulk of the Settlement Class in fact have standing.  See id. ¶ 2.  Instead, Plaintiffs relied on Cherry for the notion that the definition of the Settlement Class was sufficient (simply because the Settlement Class is defined in objective terms) and that the Claim Form (completed by only 1% to 2% of Settlement Class Members) somehow demonstrates Article III standing for the entire Settlement Class.  See id. ¶¶ 2-3.

## II.   THE MARCH 21, 2024 SUBMISSIONS BY PLAINTIFFS AND INTERVENORS

2.   Not all that much has changed since Plaintiffs and Intervenors made their respective submissions on March 21, 2024, with little (if any) actual evidence being provided in either submission and with no evidence presented that directly addresses the issues at hand.  See Plaintiffs' Submission (Dkt. 536); Intervenors' Submission (Dkt. 537).  Of note, however, both Plaintiffs and Intervenors now finally seem to acknowledge that it is necessary for all Settlement Class Members to have Article III standing.  See Plaintiffs' Submission (Dkt. 536) at 2 ("Every member of the settlement class in this case has Article III standing[.]"); Intervenors' Submission (Dkt. 537) at 22 ("All class members, including those who received BTL's faxes through an online fax service, have standing[.]").

3.   But by and large, Plaintiffs and Intervenors both try to minimize to the point of incredulity what would be necessary to demonstrate that all Settlement Class Members actually have standing.  See, e.g., Scoma v. Nat'l Spine, 2022 WL 16695130, *9 (M.D. Fla. 2022); True Health v. McKesson, 2021 WL 4818945, *2 (N.D. Cal. 2021).  And neither Plaintiffs nor Intervenors seem willing to even

2

entertain the obvious possibility that it simply may <u>not</u> be feasible at this late date to ascertain the identities of most Settlement Class Members or determine whether they have standing, even though that is something that likely could have been accomplished by Class Counsel much earlier in the litigation.  <u>See</u>, <u>e.g.</u>, BTL's Submission (Dkt. 532) at 12.

4. Nonetheless, BTL renews its request for an evidentiary hearing to the extent the Court concludes any of the claims made by Plaintiffs or Intervenors in their March 21, 2024 submissions raise genuine issues of material fact with regard to <u>either</u> the Article III standing of any or all Settlement Class Members <u>or</u> the ability of Plaintiffs and Class Counsel to discharge their burden of demonstrating that all Settlement Class Members have Article III standing.  <u>See</u>, <u>e.g.</u>, <u>Bischoff v. Osceola Cnty.</u>, 222 F.3d 874, 878-82, 885 (11th Cir. 2000) (noting need for an evidentiary hearing if there is a genuine issue of material fact regarding issues relevant to subject-matter jurisdiction).

### A.  Plaintiffs' Submission

5. While Plaintiffs' March 21, 2024 submission was accompanied by relatively voluminous exhibits, those exhibits say <u>nothing</u> about which Settlement Class Members subscribed to online fax services (as referenced in <u>Amerifactors</u> and <u>Ryerson</u>) or which Settlement Class Members subscribed to online fax services or other fax service providers with equipment that did <u>not</u> have the capacity to print. <u>See</u> Plaintiffs' Submission (Dkt. 536).  To the contrary, the bulk of the materials attached to Plaintiffs' March 21, 2024 submission consist of lengthy and discursive comments submitted by Nextel and numerous other commenters regarding various topics addressed in the Notice the FCC issued for the 2003 Order, with Plaintiffs'

3

current position being that the FCC addressed in the 2003 Order (once and for all) online fax services of the type actually addressed years later in Amerifactors and Ryerson and with the clear implication being that the 2003 Order carved into stone an interpretation of the TCPA that could never be altered, revisited or refined, no matter how much technology changed in the ensuing years.[2] See id. at 5-18.

6. Instead of providing evidence of how Settlement Class Members received faxes sent on behalf of BTL in 2009 and 2010, Plaintiffs try to argue (incorrectly) that based on the 2003 Order, any device or equipment capable of receiving a fax transmission is itself as a matter of law a "telephone facsimile machine" within the meaning of the TCPA, thereby hoping to avoid any factual issues whatsoever. See Plaintiffs' Submission (Dkt. 536) at 5-18. That argument, however, directly contradicts Amerifactors and Ryerson and the case-by-case analysis of the equipment at issue that was performed for both orders (as well as for the equipment in Westfax). See In re Amerifactors, 2019 WL 6712128, ¶ 8 (F.C.C.

---

[2] On September 18, 2002, the FCC issued in the Federal Register a notice of proposal rulemaking, indicating it sought to update its TCPA-related regulations, rules and interpretations given advancements in technology. See FCC Order 02-250, 2002 WL 31084939 (F.C.C. Sept. 18, 2002); 2003 Order ¶ 14. The topics to be addressed spanned a broad range, from Do-Not-Call lists to autodialers to artificial and pre-recorded voice messages. See FCC Order 02-250, 2002 WL 31084939, ¶¶ 6-14, 17-18. Unsolicited fax advertisements were only a very small part of what was to be covered in the 2003 Order, and as it turned out, less than one page of the 2003 Order out of 129 pages in total were devoted to fax servers, with the rest addressing other topics. See 2003 Order ¶¶ 198-202. In contrast to the interpretation of "telephone facsimile machine" provided in Paragraphs 198 to 202 of the 2003 Order, much of the rest of the 2003 Order consists of what are properly viewed as legislative rules, consisting of new directives promulgated to have prospective legal effect (including amendments to the Code of Federal Regulations). See, e.g., Correll v. Iconic Mortg., 2021 WL 5014122, *4 (S.D. Fla. 2021) (indicating the portion of the 2003 Order dealing with the Do-Not-Call provisions was a legislative rule). The portions of the 2003 Order, however, devoted to the interpretation of the term "telephone facsimile machine" in the TCPA clearly consist of an interpretative rule and should be treated accordingly. See generally O'Reilly, Administrative Rulemaking § 3:38 (2023 ed.); Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 92 (2015) (interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers").

Dec. 9, 2019); In re Ryerson, 2020 WL 5362216, ¶ 11 n.26 (F.C.C. Sept. 4, 2020). It also finds no support in the 2003 Order, Westfax or the TCPA itself  See 2003 Order, 2003 WL 21517853, ¶ 200 (F.C.C. July 3, 2003); In re Westfax, 2015 WL 5120880, ¶ 7 (F.C.C. Aug. 28, 2015) (noting the decision in Westfax was "[b]ased on the record" submitted by the petitioner).  Moreover, Plaintiffs' argument depends on a misreading of the 2003 Order and the false assumption that like Amerifactors, the 2003 Order was somehow addressing online fax services using off-site, cloud-based servers that allow subscribers to access faxes in digital format the "same way they do email" as opposed to an on-site server that can be accessed only by persons on an internal network in a business, law firm or other organization.  See Plaintiffs' Submission (Dkt. 536) at 5-12.  But see 2003 Order ¶ 200 (addressing "fax servers" enabling "multiple desktops" to "send and receive faxes from the same or shared telephony lines"); Intervenors' Submission (Dkt. 537) at 11 ("When a business sets up an internal network with a fax server that routes incoming faxes to employee desktop computers as emails, the entire network constitutes a telephone facsimile machine.").

7. Indeed, Plaintiffs make the very argument Amerifactors warned against, and their argument itself violates almost every rule of statutory construction recognized in Anglo-American law, since if Westfax, Amerifactors and Ryerson stand for anything, it is that determining whether particular equipment does or does not have the capacity to print within the meaning of the TCPA is a factual inquiry that can only be made on a case-by-case basis.  See Amerifactors ¶ 13 n.33.[3]  As

---

[3] Indeed, Amerifactors rejected Plaintiffs' argument in no uncertain terms:
   [I]nterpreting the TCPA to mean that every "computer" or "other device" is a telephone facsimile machine, merely because it could be connected to a printer, directly or indirectly,

5

such, the question of whether faxes received by Settlement Class Members through third-party online fax services and other fax service providers were received by those third-parties on equipment that had the capacity to print <u>remains</u> a factual issue that would need to be resolved in order for Plaintiffs to meet their burden.[4]  <u>See</u> BTL's Submission (Dkt. 532) at 10-11.  And the ability of Class Counsel to address that factual issue for a Settlement Class for which upwards of 60% of Settlement Class Members cannot even be identified is itself a factual question that would also need to be addressed.  <u>See id.</u> at 19-21.

### B.   Intervenors' Submission

8.   For their part, Intervenors take a somewhat different tack, arguing that the fact all faxes sent on BTL's behalf (as identified in the Biggerstaff list) were sent in the first instance to ten-digit telephone numbers somehow means that "[e]very Settlement Class Member has Article III standing."  <u>See</u> Intervenors' Submission (Dkt. 537) at 1.  That argument, however, fails for the reasons noted in BTL's reply (Dkt. 543), because subscribers to online fax services received their faxes as emails

---

would be <u>overly</u> broad and result in the kind of <u>impermissibly</u> expansive application of the TCPA that the D.C. Circuit recently rejected.

<u>Amerifactors</u> ¶ 13 n.33.  And numerous courts have recognized why Plaintiffs' proffered reading violates multiple rules of statutory construction.  <u>See</u>, <u>e.g.</u>, <u>Career Counseling v. Amerifactors</u>, 91 F.4th 202, 210 (4th Cir. 2024); <u>see</u> <u>also</u> <u>Lyngaas v. Curaden Ag</u>, 992 F.3d 412, 445-46 (6th Cir. 2021) (Thapar, J., concurring in part and dissenting in part).

[4] In point of fact, <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> were <u>each</u> the result of an adjudication undertaken by the Consumer and Governmental Affairs Bureau ("CGAB") pursuant to 5 U.S.C. § 554(e) and 47 C.F.R. § 1.2.  <u>See</u> <u>Westfax</u> ¶ 15; <u>Amerifactors</u> ¶ 17; <u>Ryerson</u> ¶ 18.  The <u>express</u> purpose of an adjudication under 47 C.F.R. § 1.2 is to aid in "removing uncertainty," and as <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> each make clear, an adjudication is a case-by-case determination based on a <u>factual</u> record presented to the agency.  <u>See</u> <u>Westfax</u> ¶ 7 ("Based on the record . . ."); <u>Amerifactors</u> ¶ 8 ("Based on the record, including a <u>great</u> deal of information on the nature and operations of current <u>online</u> <u>fax</u> <u>services</u> . . ."); <u>Ryerson</u> ¶ 11 n.26 ("We are basing our determination here solely on the <u>facts</u> in the <u>record</u>[.]"); <u>see</u> <u>also</u>, <u>e.g.</u>, 2 Admin. L. & Prac. §§ 5:1, 5:17 (3d ed.) (discussing how adjudications depend on a factual record).

over the Internet or by logging in to a cloud-based service and the argument itself raises its own set of factual issues.[5] See id. at 1-3 & n.2.

9. To be sure, Intervenors do not suggest (like Plaintiffs) that the 2003 Order was addressing online fax services. See Plaintiffs' Submission (Dkt. 536) at 5-12. Instead, Intervenors freely and correctly acknowledge that the 2003 Order was addressing an internal network with a fax server connected to various desktop computers. See Intervenors' Submission (Dkt. 537) at 12 ("[T]he 2003 Order described a fax server housed inside the fax recipient's business that received and routed incoming faxes to computers as attachments to emails[.]"); id. at 11 ("When a business sets up an internal network with a fax server that routes incoming faxes to employee desktop computers as emails, the entire network constitutes a telephone facsimile machine."). But in the end, Intervenors (like Plaintiffs) made no effort to harmonize the 2003 Order, Westfax, Amerifactors and Ryerson, focusing instead on the fact that every Settlement Class Member received a fax sent on behalf of BTL that was (at least initially) sent to a unique ten-digit telephone number, even if what subscribers to online fax services actually received were emails sent over the Internet or images of faxes accessed via a cloud-based server. See Intervenors' Submission (Dkt. 537) at 4-8.

---

[5] Ten-digit numbers only pertain to how faxes were directed in the first instance to third-party fax service providers. See Sponsler Decl., Ex. 7 to BTL's Reply to Plaintiffs' Submission (Dkt. 542-8), at ¶ 31. They have no bearing on how those fax service providers in general and online fax services in particular sent emails to their subscribers over the Internet or how they provided access to cloud-based servers. See id. For purposes of Article III, however, it is what the subscribers received and how they received it that matters, since the person making a claim must be the same person who suffered the alleged harm in order to satisfy Article III. See TransUnion v. Ramirez, 594 U.S. 413, 426-27 (2021).

7

10. Intervenors did provide a declaration with their March 21, 2024 submission, but that declaration only provides general information regarding online fax services and other fax service providers, offering <u>no</u> particulars whatsoever with regard to what <u>specific</u> online fax services and other third-party fax service providers Settlement Class Members subscribed to, what <u>specific</u> equipment was used by those services and providers <u>or</u> what <u>specific</u> fee structures those services and providers employed in 2009 and 2010. See Barnett Decl. (Dkt. 537-3).

11. Instead, Mr. Barnett's declaration is notably vague, addressing "[g]enerally" how subscribers accessed online fax services, what equipment was "often" used by unspecified services and other third-party providers, where that equipment was "typically" located and how online fax services "usually" charged subscribers. See Barnett Decl. (Dkt. 537-3) ¶¶ 3, 5, 8. Even Mr. Barnett acknowledges, however, that actual charges "by online fax services <u>vary</u>," and no specifics are provided in his declaration regarding the online fax services <u>actually</u> used by Settlement Class Members or the equipment those services utilized.[6] See id. ¶ 8. Moreover, Mr. Barnett glossed over the issue of capacity to print (trying to conflate printing on an online fax service's internal network with elective printing by a subscriber at a remote location), not to mention the issue of whether each of the online fax services subscribed to by Settlement Class Members utilized equipment

---

[6] Among other things, Mr. Barnett does not take issue with Mr. Sponsler's observations that HylaFAX was the dominant software used by online fax services circa 2009-2010 <u>or</u> that HylaFAX lacks printer drivers or printer functionality. See Sponsler Decl. (Dkt. 532-12) ¶ 19. Mr. Barnett likewise does not indicate whether the fax servers in use at the fax service provider where he used to work (i.e., Profax Inc.) used HylaFAX software, whether printers were actually connected to them, whether those servers had print drivers or the capability to send faxes to a printer <u>or</u> whether Profax offered its subscribers the ability to print faxes on printers attached to Profax's internal network, a capability that would be most unusual, since the point of online fax services was to <u>avoid</u> the need to print. See generally Barnett Decl. (Dkt. 573-3).

8

that had the capacity to print within the meaning of the 2003 Order, Westfax, Amerifactors and Ryerson. See generally id.

### C. Unresolved (And Likely Unresolvable) Factual Issues

12. Neither Class Counsel nor Intervenors provided evidence with their March 21, 2024 submissions that would begin to satisfy Plaintiffs' burden of establishing that all Settlement Class Members have Article III standing, and the Court could certainly grant BTL's pending motion under Article III (Dkt. 492) on that ground alone without holding an evidentiary hearing. See BTL's Submission (Dkt. 532) at 19-23. Moreover, neither Plaintiffs nor Intervenors provided any credible explanation of how exactly the necessary showing could possibly be made at this late date, which is likewise an independent grounds for granting BTL's motion, since Plaintiffs clearly have the burden on these issues. See id. at 12.

13. As of the recent submissions by Plaintiffs and Intervenors, however, the following issues remain unresolved (and likely unresolvable) :

    a. Is it possible to identify at this juncture which Settlement Class Members received faxes through "online fax services" (as that term is defined in Amerifactors and Ryerson) sent on behalf of BTL, and if so, which ones did?[7]

    b. Is it possible to identify which Settlement Class Members "received" faxes sent on behalf of BTL as emails transmitted over the Internet by the online fax service, and if so, which ones did?

    c. Is it possible to determine for each Settlement Class Member that received a fax sent on behalf of BTL as an email over the Internet whether that Settlement Class Member opened the email and the attachment, and if so, which ones did?

---

[7] During the meet and confer the Parties held on August 15, 2023, Class Counsel acknowledged it was not possible at this juncture to identify which Settlement Class Members received faxes as emails through online fax services. See Collins Decl. (Dkt. 492-6) ¶ 8. We know of nothing that should have changed their view in that regard.

9

      d.   Is it possible to identify which Settlement Class Members "received" faxes from online services that offered software to block unwanted / junk faxes, and if so, which ones did?[8]

      e.   Is it possible to identify which Settlement Class Members "received" faxes sent on behalf of BTL by logging in to a cloud-based or other server maintained by an online fax service or other fax service provider, and if so, which ones did?

      f.   Is it possible to identify which Settlement Class Members subscribed to fax service providers that used devices or equipment that had the capacity to print, and if so, which ones did and what equipment was used by those fax service providers in 2009 / 2010?

      g.   Which Settlement Class Members "received" faxes from online fax services that charged an incremental fee for incoming faxes and which Settlement Class Members actually paid a fee for any faxes sent on behalf of BTL as opposed to "receiving" such faxes as part of a free trial or monthly allotment?

      h.   Was HylaFAX software frequently used by online fax services circa 2009-2010?

      i.   Does HylaFAX software contain print drivers and provide functionality to print?

      j.   Is it possible to identify which Settlement Class Members (if any) "received" or accessed over regular telephone lines faxes on cloud-based servers maintained by online fax services, and if so, which ones did?

      k.   Is it possible to identify which Settlement Class Members had faxes sent to them on behalf of BTL that originated as digital files and were sent over the Internet as opposed to over regular telephone lines, and if so, which ones did?

      l.   Did any online fax services utilized by Settlement Class Members offer subscribers the ability to print faxes on printers connected to the internal networks maintained by the online fax services and if so, which ones did?[9]

---

[8] As reflected in Exhibit 19 to BTL's Submission (Dkt. 532-24), several online fax services offered subscribers the ability to block unwanted faxes. See Sept. 6, 2019 Corresp. fr. S. Augustino to FCC (Dkt. 532-24) at 6.

[9] Since the whole point of an online fax service is to avoid the need to print incoming faxes, it would be odd indeed for an online fax service to configure its fax servers to print or to provide a service to subscribers whereby faxes received by the online fax service could be printed remotely by a subscriber on printers on the online fax service's internal network. See *Online Faxing 101*, Ex. 4 to BTL's Reply to Intervenors' Submission (Dkt. 543-7); *About eFax & Our Story*, EFAX (Last accessed Apr. 25, 2024), Ex. 1 hereto (noting that eFax® a/k/a Consensus Cloud Solutions

  m. Did any online fax services utilized by Settlement Class Members offer subscribers a service whereby faxes would be printed by the online fax service and then mailed or otherwise delivered to the subscriber, and if so, which ones did?

  n. Did the fax service provider Mr. Barnett worked for (i) utilize a cloud-based server, (ii) offer subscribers the option of checking faxes remotely on a server provided by Mr. Barnett's employer or (iii) offer subscribers the ability to print faxes on the internal network and printers maintained by Mr. Barnett's employer?

### D. In This Case, Article III Turns On Factual Issues

14. The issues the Court needs to address in this case for purposes of addressing the Article III standing of Settlement Class Members are <u>factual</u> questions: (1) which Settlement Class Members subscribed to online fax services; (2) what online fax services did those Settlement Class Members subscribe to at the time they received faxes sent on behalf of BTL and (among other things) what pricing structures were used by those services in 2009 and 2010; and (3) what <u>specific</u> equipment did those online fax services use and did that equipment have the capacity to print. See BTL's Request for Evidentiary Hearing (Dkt. 533) at 4-7. Like any factual issues, these questions cannot be entirely resolved through arguments by counsel or by parsing statutory language or agency orders. While statutory language and agency orders both determine to a degree what the factual questions are, they certainly do not dictate what the answers to these factual issues are in any particular instance. See 3 Admin. L. & Prac. § 8:52 (3d ed.). Instead, to answer factual questions, <u>evidence</u> is required, and Plaintiffs have the burden of coming forward with such evidence, a burden that to date, they have ignored. See BTL's Request for Evidentiary Hearing (Dkt. 533) at 2-4.

---

Inc. has been for over two decades a "digital cloud faxing organization" that does away with the need for "machines, ink, paper and needless landline connections").

15.     Nor is it a coincidence that the FCC itself has relied upon adjudications under Section 554(e) of the APA in determining whether <u>specific</u> equipment used by fax service providers and online fax services did or did not have the capacity to print.  <u>See</u> 2 Admin. L. & Prac. § 5:17 (3d ed.) ("[D]eclaratory orders should be issued only where critical <u>facts</u> are clear and cannot be altered by subsequent events.").  As noted, <u>Westfax</u>, <u>Amerifactors</u> and <u>Ryerson</u> were <u>each</u> adjudications undertaken by the CGAB based on evidence and a factual record presented in each instance.  <u>See</u> disc. <u>supra</u> at ¶ 7 n.4.  While this Court is by and large lacking a record at this point, the lack of a record or the infeasibility at this time of presenting a record obviously does not eliminate the need for one.  <u>See</u> BTL's Request for Evidentiary Hearing (Dkt. 533) at 4-7.

### E.   BTL's Right To Challenge Any Evidence Offered By Plaintiffs (Or Intervenors)

16.     At the January 19, 2024 hearing, the Court also asked the Parties to address whether BTL would have a right to challenge self-attestations or other evidence offered by Plaintiffs and/or Intervenors on the Article III issue.  <u>See</u> Jan. 19, 2024 Hr'g Tr. (Dkt. 530) at 59:13-18.  Plaintiffs, however, provided <u>no</u> response to this issue in their March 21, 2024 submission and presumably agree that BTL has such a right.  <u>See</u> <u>generally</u> Plaintiffs' Submission (Dkt. 536).  And for their part, Intervenors appear to acknowledge that BTL has such a right, based on Intervenors' most recent submission.  <u>See</u> Intervenors' Submission (Dkt. 537) at 27.

17.     The right of a party to confront evidence, however, is otherwise well-established.  <u>See</u>, <u>e.g.</u>, <u>Carter v. Morehouse Parish Sch. Bd.</u>, 441 F.2d 380, 382 (5th

Cir. 1971). That right should not properly be in doubt. See BTL's Request for Evidentiary Hearing (Dkt. 533) at 4-7.[10]

## CONCLUSION

18. In spite of several opportunities, neither Plaintiffs nor Intervenors have raised a genuine issue of material fact in terms of (a) whether <u>all</u> Settlement Class Members have Article III standing or (b) whether it is feasible at this juncture to determine whether they do. As such, we believe the Court can and properly should grant BTL's pending motion to dismiss and decertify (Dkt. 492) without an evidentiary hearing. To the extent, however, the Court concludes that a genuine issue of material fact has now been raised by Plaintiffs and/or Intervenors with respect to the issues identified above (or any other issue bearing on Article III standing), then BTL respectfully renews its request for an evidentiary hearing.[11]

WHEREFORE, BTL respectfully renews its request for an evidentiary hearing on relevant factual issues in light of claims and factual matters raised by Plaintiffs and Intervenors in their March 21, 2024 submissions (Dkts. 536 and 537). BTL further requests such other relief as the Court deems appropriate.

Date: April 26, 2024

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for Defendant Buccaneers Team LLC

---

[10] As noted, Intervenors offered with their March 21, 2024 submission the declaration of Andrew Barnett. See Barnett Decl. (Dkt. 537-3). BTL, however, has the right to challenge statements made by Mr. Barnett, and BTL respectfully requests leave to depose Mr. Barnett in the event the Court determines an evidentiary hearing is necessary in order to resolve BTL's motion to dismiss and/or decertify (Dkt. 492).

[11] BTL incorporates herein the time estimates set forth in its earlier request. See BTL's Request for Evidentiary Hearing (Dkt. 533) at 7-8.

| | |
|---|---|
| Mark S. Mester | Joseph H. Varner, III |
|   (admitted *pro hac vice*) |   (Bar No. 394904) |
| Robert C. Collins III | HOLLAND & KNIGHT LLP |
|   (admitted *pro hac vice*) | 100 North Tampa Street, Suite 4100 |
| LATHAM & WATKINS LLP | Tampa, Florida 33602-3644 |
| 330 North Wabash Avenue, Suite 2800 | Telephone:  (813) 227-8500 |
| Chicago, Illinois 60611 | Facsimile:  (813) 229-0134 |
| Telephone:  (312) 876-7700 | Email:  joe.varner@hklaw.com |
| Facsimile:  (312) 993-9767 | |
| E-mail:  mark.mester@lw.com | |
|         robert.collins@lw.com | |

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), the undersigned hereby certifies that we conferred with Class Counsel and counsel for Intervenors by email with respect to the instant request and have been informed that Class Counsel and counsel for Intervenors oppose the relief requested herein.

Date:  April 26, 2024

*/s/ Mark S. Mester*
Mark S. Mester, One of the Attorneys for Defendant Buccaneers Team LLC

Mark S. Mester
   (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served all relevant parties.

Date:  April 26, 2024

*/s/ Mark S. Mester*
Mark S. Mester
  (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail:  mark.mester@lw.com